## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| INPHONIC, INC., et al.,[1] | : | Case No. 07-_____ |
|  | : |  |
| Debtors. | : | (Jointly Administered) |

## MOTION OF THE DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b) FOR ORDER AUTHORIZING PAYMENT OF PREPETITION (I) WAGES, SALARIES AND OTHER COMPENSATION OF EMPLOYEES AND SUBCONTRACTORS, (II) EMPLOYEE MEDICAL AND SIMILAR BENEFITS, (III) REIMBURSABLE EMPLOYEE EXPENSES, AND (IV) OTHER MISCELLANEOUS EMPLOYEE EXPENSES AND BENEFITS

The above-captioned debtors and debtors in possession (the "Debtors"), by their undersigned counsel, move for entry of an order authorizing the payment of prepetition wages, compensation and employee benefits (the "Motion"). In support of this Motion, the Debtors respectfully represent as follows:

### Jurisdiction and Venue

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory basis for the relief requested herein are Sections 105(a) and 363(b) of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code").

---

[1] The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows: (a) InPhonic, Inc., a Delaware corporation, Fed. Tax Id. No. 9384; (b) CAIS Acquisition, LLC, a Delaware limited liability company, Fed. Tax Id. No. 6257; (c) CAIS Acquisition II, LLC, a Delaware limited liability company, Fed. Tax Id. No. 3695; (d) SimIPC Acquisition Corp., a Delaware corporation, Fed. Tax Id. No. 4924; (e) Star Number, Inc., a Delaware corporation, Fed. Tax Id. No. 5549; (f) Mobile Technology Services, LLC, a Delaware limited liability company, Fed. Tax Id. No. 1426; (g) FON Acquisition, LLC, a Delaware limited liability company, Fed. Tax Id. No. 2807; and (h) 1010 Interactive, LLC, a Delaware limited liability company, Fed. Tax Id. No. 5391.

<u>Background</u>

3.      On the date hereof (the "<u>Petition Date</u>"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The factual background regarding each of the Debtors, including their current and historical business operations and the events precipitating these chapter 11 filings, is set forth in detail in the *Affidavit of Kenneth D. Schwarz, Chief Financial Officer of the Debtors, in Support of First Day Motions* (the "<u>Schwarz Affidavit</u>"), and is incorporated herein by reference.[2]

4.      The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5.      No trustee, examiner or committee has been appointed in any of the Debtors' chapter 11 cases.

<u>The Debtors' Business Operations</u>

6.      InPhonic was incorporated in 1997 and began operations in 1999.  InPhonic's business principally involves the marketing of wireless telephone and satellite television services and related equipment and support services.  InPhonic focuses in four (4) areas:  (i) wireless device activation services, (ii) television satellite activation services, (iii) mobile virtual network enabler ("<u>MVNE</u>") services, and (iv) unified communication services.

7.      InPhonic is a leading internet (online) seller of wireless services and devices to consumers.  InPhonic sells these services and devices through company owned and branded websites, including without limitation www.wirefly.com, as well as through a variety of private

---

[2] Capitalized terms shall have the meanings ascribed to them in the Schwarz Declaration unless otherwise defined herein.

labeled websites that it develops and manages for marketing partners such as internet businesses, affinity organizations and national retailers.

8.      InPhonic markets its services through a variety of online advertising programs including display advertising, search marketing, email marketing and affiliate programs. InPhonic's website www.wirefly.com, a leading one-stop shopping site for mobile phones and wireless plans, has been awarded "Best of the Web" by Forbes magazine and "Best in Overall Customer Experience" by Keynote Performance Systems.

9.      InPhonic also markets its services through its partners' private labeled websites which InPhonic creates to leverage its partners' brands and their existing customer relationships. InPhonic private-labels customer touch points to the partners' brands, including the web storefront, customer communications (such as call centers and in-box collateral) and device packaging.

10.     CAIS Acquisitions II, LLC, a wholly-owned subsidiary of InPhonic, does business under the name VMC Satellite.  Through VMC Satellite, InPhonic markets consumers digital broadcast satellite television, broadband and VOIP services.  VMC Satellite markets its services through a portfolio of its own websites, affiliate websites, print advertisement and private labeled websites, as well as through an in-bound call center.

11.     InPhonic's Mobile Virtual Network Enabler (MVNE) business leverages the company's e-commerce platform and operational infrastructure to enable communications service providers and consumer brands to offer a branded wireless service to their customers without having to own or operate the underlying wireless network or operational infrastructure. InPhonic's MVNE platform provides a turn-key solution that combines system integration to every major U.S. wireless carrier with enterprise strength billing and customer care solutions.

12.     InPhonic developed and sells a unified communications service that provides users with a private toll-free number and a professional set of small business messaging services for one monthly fee.   Users have one central location for all of their voicemail, email, faxes, calendar appointments and address books and can manage all of their messages from anywhere by accessing a single message box using any phone or computer.   The platform offers users many voice messaging, fax delivery, conference calling and call routing services integrated into a single application accessible by telephone or computer for a single monthly fee.

13.     InPhonic's relationships with its carrier, service, affiliate and marketing partners are the keys to its business operations.   InPhonic has agreements with the largest wireless carriers in the U.S., as well as large satellite, broadband and VOIP providers, to market their products and services.   The company also has agreements with thousands of affiliate and marketing partners that market Debtors' products and services under their brands through private-labeled websites that InPhonic creates and manages and/or their websites.

14.     All of the Debtors are headquartered in Washington, D.C.   The Debtors maintain technology and operations centers in Largo, Maryland; Reston, Virginia and Great Falls, Virginia.

The Debtors' Employees

15.     As of the Petition Date, the Debtors employ approximately 421 employees, of whom approximately 270 are salaried and approximately 151 are hourly employees (collectively, the "Employees").   In addition, the Debtors' current workforce includes approximately 50 temporary employees engaged through nine (9) third party staffing agencies and five (5) independent contract personnel (all temporary employees are referred to as, "Contract

Employees"). None of the Debtors' Employees or Contract Employees is subject to a collective bargaining agreement.

16.     The Debtors' Employees (and Contract Employees) perform a variety of critical functions for the Debtors, including, without limitation, developing and supporting the Debtors' products and services, marketing the Debtors' products and services, interacting with customers and vendors, collecting revenues, and generally sustaining the Debtors' business operations. The Employees' skills and their specialized knowledge and understanding of the Debtors' infrastructure and operations are essential to the Debtors' continuing operations and to the Debtors' ability to effectuate a successful reorganization. In addition, although the Debtors rely on temporary labor from time to time, a large portion of the Contract Employees have worked for the Debtors for extended periods of time and provide critical services during peak business periods. Like the Employees, the Contract Employees often have specialized knowledge and cannot be easily replaced with new, unskilled temporary workers. Prior to the Petition Date and in the ordinary course of the Debtors' business, the Debtors provided compensation, reimbursement amounts, employee benefits and other miscellaneous consideration to the Employees (and Contract Employees) in exchange for their loyal service and hard work.

Relief Requested

17.     By this Motion, and in accordance with the DIP Facility, as such term is defined in the Schwarz Affidavit, the Debtors seek authority pursuant to Sections 105(a) and 363(b) of the Bankruptcy Code to pay certain prepetition obligations, including, but not limited to, (a) amounts owed to Employees and Contract Employees for wages, salaries, commissions and

other compensation, (b) reimbursement of employee business expenses incurred in the ordinary course, such as travel, meals and lodging, (c) maintenance of employee health and welfare plans, workers' compensation, 401(k), and other similar benefits, and (d) other miscellaneous employee expenses and benefits (collectively, the "Prepetition Obligations").

18.     The Debtors seek authority to honor their Prepetition Obligations because payment of these obligations is critical and essential to Employee and Contract Employee morale and the Debtors' future business needs.[3]  If the Prepetition Obligations are not honored in the ordinary course, the impact on the Debtors' business could be disastrous.  Indeed, the Debtors would be unable to sustain operations, supply of products and services to the Debtors' customers would cease, and revenues would quickly disappear.  Failure to honor the Prepetition Obligations could also cause Employees and Contract Employees to endure extreme personal hardship and, in many cases, raises the chances that employees will be unable to pay their basic living expenses.  This result would impair employee morale and lead to unmanageable employee turnover.  Consequently, the Debtors seek to continue paying Prepetition Obligations (as set forth below) in the ordinary course and to direct the banks at which the Debtors maintain employee-related accounts to receive, process, honor and pay all payroll and employee benefit related checks, drafts, wires, or automated clearing house transfers, provided sufficient funds are available to honor all such payments, without regard to when the applicable payroll check was issued.[4]

---

[3] The Debtors do not seek to pay severance to employees terminated after the Petition Date to the extent such severance would be characterized as a prepetition obligation.  The Debtors, however, reserve the right to seek such relief if determined to be appropriate.

[4] Contemporaneously with this Motion, the Debtors are filing a motion seeking an order authorizing, among other relief, the continued maintenance of their bank accounts (the "Cash Management Motion").  To implement fully the relief sought herein, the Debtors, by the Cash Management Motion, seek to authorize the banks at which the Debtors' employee-related accounts are maintained to continue to honor checks drawn on such accounts without regard to when such checks were issued.  As explained in the Cash Management Motion, the Debtors maintain

<u>Prepetition Obligations</u>

19.     All of the paragraphs below are subject to the DIP Facility, as such term is defined in the Schwarz Affidavit.

A.      <u>Unpaid Wages, Salaries, Commissions and Other Compensation</u>

- *The Debtors' Payroll Obligations*

20.     The Debtors seek an order authorizing, but not directing, the Debtors to honor all outstanding payroll obligations. Approximately 15% of the Debtors' payroll costs represent compensation paid to "Senior Executives", with the remaining 85% representing compensation paid to middle management or rank and file employees.

21.     In the ordinary course of business, the Debtors pay their Employees semi-monthly, one pay period in arrears. The last payroll for Employees was paid on October 31, 2007, and covered Employee compensation for the salaried employees for the period of October 16, 2007 through October 31, 2007 and employee compensation for non-exempt employees for the period of October 1, 2007 through October 14, 2007. The Debtors' next scheduled payroll on November 15, 2007 will be for the period ending November 15, 2007 for salaried employees, and for the pay period ending October 31, 2007 for non-exempt employees.

22.     In sum, the Debtors estimate that approximately $481,955.41 in unpaid salary, wages and other compensation is owing to their Employees in the aggregate for services rendered before the Petition Date.[5] Given the critical role of the Employees in the Debtors'

---

segregated payroll accounts from which only payroll and employee benefit related checks and direct deposits are issued. Accordingly, the Debtors' banks may easily discern all employee related checks from non-employee related checks. To the extent any employee-related checks are dishonored, the Debtors intend to issue new checks.

[5] The Debtors utilize the payroll-processing services of ADP to issue payroll checks to their employees. The Debtors also utilize the services of various third-party plan administrators with respect to the administration of their health and welfare plans. To the extent obligations for payment for such services or any portion of the next payment due may be characterized as a prepetition obligation, the Debtors seek authority to pay such amounts to avoid disruption of services provided to its employees.

business operations, the Debtors seek authority to honor their salary and wage obligations by paying, in the ordinary course, any prepetition amounts owed to the Employees. No Employee should be owed more than the $10,000 priority limit on account of prepetition salaries or wages under Section 507(a)(4) of the Bankruptcy Code.

23.    Due to the timing of the Debtors' last payrolls, payroll checks for some Employees who are not paid by direct deposit likely remain in float. In addition, although the Debtors believe that most payroll checks relating to payroll periods prior to the last payrolls have been presented to and honored by the applicable drawee banks, the Debtors recognize that certain employees may fail to cash or deposit their paychecks in a timely manner. Accordingly, it is possible that some checks will remain in float postpetition that banks will not honor absent explicit authority and direction to do so. Moreover, while the Debtors do not believe material amounts, if any, remain owing for past payroll periods, to the extent any such amounts remain owing, the Debtors submit that the administrative costs resulting from determining such information with precision substantially exceed any benefit to be gained from such exercise. Therefore, the Debtors also seek authority to honor payroll checks in float but not presented or otherwise honored timely for payment.

- *Contract/Temporary Employees*

24.    The Debtors employ the Contract Employees directly and through third-party staffing agencies. At the present time, the Debtors have on-going relationships with nine (9) third party staffing agencies and five (5) independent contract employees. Although third-party staffing agencies technically employ the Contract Employees and are responsible for paying and withholding their wages, the Contract Employees function in a quasi-employee relationship with the Debtors. Specifically, the Debtors remit payments to the third-party staffing agencies to

cover the wages and withholdings of the Contract Employees. The Debtors believe that these third-party staffing agencies will likely terminate services if they are not paid amounts owing and that such termination would be significantly detrimental to the Debtors' businesses. Although Contract Employees are considered independent contractors as opposed to actual employees for the purposes of applying certain federal, state or local employment, labor, tax and other laws and regulations, their livelihood is no less dependent on the Debtors, nor is their employment any less an integral component of the Debtors' businesses, than any of the Debtors' other non-contract employees. The Debtors depend on the services provided by the Contract Employees to sustain the their ongoing business operations.

25.     With respect to Contract Employees employed both directly and through third-party staffing agencies, the Debtors estimate that they owe approximately $1,196,367 to all of their Contract Employees in the aggregate for services rendered before the Petition Date. Given the critical role of the Contract Employees in the Debtors' business operations, the Debtors seek authority to honor their wage and withholding obligations by paying, in the ordinary course, any prepetition amounts owed to Contract Employees employed both directly and through third-party staffing agencies.

B.      Reimburseable Business Expenses

26.     Prior to the Petition Date and in the ordinary course of business, the Debtors reimbursed Employees for certain business expenses incurred in the scope of their employment, including, without limitation, expenses for business travel, seminars and incidental expenses, such as business meals, car rentals, tolls, parking, and a variety of miscellaneous expenses (collectively, the "Reimbursable Expenses"). All of the Reimbursable Expenses were incurred

on the Debtors' behalf in connection with employment by the Debtors and in reliance upon the understanding that such expenses would be reimbursed.

27.    The Debtors estimate that, as of the Petition Date, the total amount owed for Reimbursable Expenses is approximately $125,000, with one Employee estimated to receive in excess of $10,950.[6]    Accordingly, the Debtors seek authority to honor their Reimbursable Expense obligations by paying, in the ordinary course, any prepetition Reimbursable Expenses owed to their Employees.

C.    Non-Executive Bonuses and Reward Programs

28.    The Debtors have various performance-based bonus and reward programs in place to provide incentive and foster loyalty among their non-executive Employees, including office staff, production employees, sales directors, supervisors and others.[7]    The Debtors' bonus and reward programs are implemented on a calendar year basis.    Some of the Debtors' bonus and reward programs are calculated and payable quarterly, while others provide for a bonus or reward payment based on an individual's performance during the entire calendar year.

29.    Although most of the Debtors' bonus and reward payments to non-executive Employees for calendar year 2007 have been paid, the Debtors estimate that approximately $59,000 in commission obligations remain unpaid to non-Executive Employees, with only one non-executive Employee estimated to receive in excess of the $10,950 priority limit on account of prepetition bonus or reward obligations in the amount of $1,050 over the priority limit.[8] Accordingly, the Debtors seek authority to pay all bonus and reward obligations to non-executive Employees in the ordinary course of business.

---

[6] That employee is estimated to receive $11,720.

[7] The Debtors have various bonus plans for their Senior Executives.  The Debtors are not seeking authority to approve such bonus plans at this time, but reserve the right to seek to pay the prepetition component, if any, of such bonus plans at the appropriate time.

D.    Employee Benefits

30.    In the ordinary course of the Debtors' business, and as is customary for most large companies, the Debtors have established various employee benefit plans and policies that provide employees with medical, prescription, dental, vision, life and disability insurance, employee retirement savings, flexible spending and other similar benefits (collectively, the "Employee Benefit Programs"). As of the Petition Date, the Debtors are obligated to pay certain contributions under the Employee Benefit Programs. The Debtors seek authority to pay and/or honor unpaid prepetition obligations under the Employee Benefit Programs that arose from services rendered within 180 days before the Petition Date (the "Prepetition Benefits"). The Employee Benefit Programs and corresponding unpaid Prepetition Benefits are described below:

- *Health Insurance (Medical, Prescription, Dental, and Vision)*

31.    The Debtors provide their salary and hourly Employees with basic medical, dental, and vision insurance through third-party providers.

32.    The Debtors offer medical insurance to their salary and hourly Employees through a self-funded plan provided by CareFirst/Blue Cross Blue Shield PPO. A portion of the premiums are paid by the Employees. The total premium/medical and prescription payments for insurance payable by the Debtors under the medical plan is approximately $200,000 per month on average, but may fluctuate significantly in any given month.

33.    The Debtors provide dental insurance to their salary and hourly Employees through a plan provided by MetLife Preferred Dental Program. A portion of the premiums are paid by the Employees. The total premium for insurance payable by the Debtor under the dental plan is approximately $9,500 per month on average, but may fluctuate significantly in any given month.

---

[8] That employee is estimated to receive $12,000.

34.    The Debtors provide vision insurance to their salary and hourly Employees through Vision Service Plan.  A portion of the premiums are paid by the Employees.  The total premium for insurance payable by the Debtor under the vision plan is approximately $3,300 per month.

35.    The Debtors seek authority to pay, in the ordinary course of business, any unpaid premiums, deductibles, and prepetition claims relating to the foregoing medical, dental, and vision insurance that arose from services rendered within 180 days prior to the Petition Date (the "Prepetition Health Benefits").

- *Life, AD&D, Long Term Disability Insurance*

36.    The Debtors provide basic life and long term disability insurance to regular full-time salary and hourly Employees through MetLife.  The total premium for this insurance is approximately $2,000 per month.

37.    The Debtors seek authority to pay, in the ordinary course of business, any outstanding unpaid premiums, deductibles, and prepetition claims relating to life and long term disability insurance that arose before the Petition Date (the "Prepetition Life & Disability Benefits").

- *Employee Assistance Program*

38.    The Debtors provide an Employee Assistance Plan to all regular full-time salaried and hourly employees.  The total premium for this program is approximately $1,200 per month. The Debtors seek authority to pay, in the ordinary course of business, any outstanding unpaid premiums related to the Employee Assistance Program that arose before the Petition Date (the "Prepetition Employee Assistance Program Benefits").

- *401(k) Plan*

39.     The Debtors offer all salary and hourly Employees[9] an opportunity to participate in a 401(k) plan (the "401(k) Plan").  Approximately 75 current Employees participate in the 401(k) Plan, which is administered through Principal Financial Group.  Under the 401(k) Plan, the Debtors deduct contributions from participating Employees' salaries and wages (the "401(k) Deductions") and wire such amounts to Principal Financial Group.

40.     As of the Petition Date, the Debtors have not yet funded the 401(k) Deductions for the payroll ending October 31, 2007 for salaried employees and the payroll ending October 15, 2007 for non-exempt employees.  The Debtors believe that such 401(k) Deductions total approximately $46,000 in the aggregate.  The Debtors seek authority to pay any such accrued but unpaid prepetition 401(k) Deductions.

E.     Workers Compensation

41.     The Debtors collectively maintain a premium-based workers' compensation insurance plan issued by Pennsylvania Manufacturers Indemnity Co, with an annual premium of $79,668 (the employer's liability per claim is $500,000).  The coverage is paid for in advance and is current to date.  There are currently no outstanding workers' compensation claims.  To the extent that the Debtors have amounts owing due to prepetition workers' compensation obligations or to the extent that a portion of the current payments may be characterized as prepetition obligations, the Debtors seek authority to pay such amounts.

F.     Payroll Taxes and Other Withheld Amounts

42.     The Debtors deduct certain amounts from their Employees' paychecks for the payment of the Employee portion of health, dental, vision and welfare insurance premiums,

---

[9] Employees are eligible to enroll in the 401(k) Plan on a quarterly basis in conjunction with their hire date and entry requirements.  Quarterly periods are January 1, April 1, July 1, and October 1.

flexible medical spending amounts, 401(k) deductions, and other miscellaneous amounts (collectively, the "Employee Deductions"). The Employee Deductions comprise property of the Debtors' Employees and are forwarded by the Debtors to appropriate third-party recipients at varying times.

43.    The Debtors are required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, social security and Medicare taxes, garnishments, child support payments, etc. (together with the Employee Deductions, the "Payroll Taxes") and remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities"). The Debtors' Payroll Taxes, including both the employee and the employer portion, for a typical payroll total approximately $240,915. It is likely that funds have been deducted from Employee wages but have not yet been forwarded to the appropriate third-party recipients. Accordingly, the Debtors seek authority to pay and/or remit to the applicable Taxing Authorities up to $25,000 in Payroll Taxes attributable to the period before the Petition Date. Absent such authority, the Debtors expose their officers and directors to personal liability.

G.    Paid Time Off Policy

44.    The Debtors offer paid vacation or "paid time off" ("PTO") to eligible Employees (defined as all regular full-time and part-time Employees who are regularly scheduled to work at least 25 hours per week). The Debtors have different policies in place for their salaried versus hourly Employees. In general, eligible Employees must work at the Debtors for ninety (90) days before any vacation hours may be taken, and vacation hours accrue on an annual basis ranging anywhere from one (1) week to five (5) weeks of vacation days per year (all of the Debtors' paid time off policies are referred to collectively as the "PTO Policy").

45.     Pursuant to the PTO Policy, eligible Employees accrue a certain number of hours of vacation each pay period. Accrual starts from the first day of regular employment and is based on the Employee's first date of employment with the Debtors. Employees do not accrue vacation during pay periods when they are on unpaid leave or during periods of paid leave other than vacation, sick leave, and holidays. Unused PTO time generally is paid to Employees only upon the termination of employment by the Debtors or death. Employees who terminate during the first ninety (90) days of employment are not paid accrued, unused vacation hours.

46.     The Debtors estimate that the accrued, outstanding amount of unused time under the PTO Policy, if it were payable in cash, is approximately $870,612 as of the Petition Date. The Debtors seek authorization, in their sole discretion, to continue honoring the PTO Policy and to make cash payments for unused PTO that has accrued prepetition as well as postpetition only upon the termination of an Employee by the Debtors as they would have done under the PTO Policy before the Petition Date.

H.      Administrative Service Providers

47.     The Debtors utilize certain third-party providers to administer employee benefit plans and payroll services (the "Administrative Service Providers"). The continued support of the Administrative Service Providers is crucial to the Debtors' ability to maintain accurate and meaningful books and records, including, but not limited to, books and records reflecting the Debtors' employee benefit and payroll obligations. The Debtors estimate that the average monthly cost of these services is approximately $5,000 in the aggregate. To the extent that any such amounts remain unpaid or may be characterized as prepetition obligations, the Debtors seek to be authorized, but not directed, to pay such amounts.

I.    Executive Medical Reimbursement Plan

48.    The Debtors provide select executives reimbursement for medical costs not covered under CareFirst Blue Cross/Blue Shield PPO through BeniComp. The amount owed as of the Petition Date is approximately $16,000.

49.    The Debtors seek authority to pay, in the ordinary course of business, any outstanding claims related to the pursuant to this executive medical reimbursement plan that arose prior to the Petition Date.

J.    Miscellaneous Employee-Related Obligations

50.    The Debtors may determine that there are additional *de minimis* prepetition obligations, which have not been identified in the Motion. Consequently, the Debtors request authority to pay any such additional obligations up to an aggregate amount of $100,000 upon five (5) business days' prior written notice to counsel to any statutory creditors' committee appointed herein, counsel to the Office of the United States Trustee and counsel to Adeptio INPC Funding, LLC setting forth the nature and amount of the additional obligation sought to be paid. If an objection is interposed within such five-day period, and such objection is not resolved consensually, the Debtors will be required to seek authority from this Court to make such payment. The Debtors also reserve their right to seek authority from the Court to pay any obligations in excess of the above-referenced limit.

Basis for Relief

51.    Sections 105(a) and 363(b) of the Bankruptcy Code and the "necessity of payment" doctrine provide the basis for the relief requested in this Motion. Section 363(b)(1) of the Bankruptcy Code provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In

addition, Section 105(a) of the Bankruptcy Code grants bankruptcy courts broad authority to enter "any order, process or judgment that is necessary or appropriate" to carry out the provisions of the Bankruptcy Code. 11 U.S.C. § 105(a). Accordingly, the Debtors submit that this Court is authorized to grant the relief requested herein.

52.    Courts have recognized the applicability of the "necessity of payment" doctrine with respect to the payment of prepetition employee compensation and benefits. See, e.g., In re Just For Feet, Inc., 242 B.R. 821, 825 (D. Del. 1999) (recognizing the court's power to authorize payment of pre-petition claims when such payment is necessary for the debtor's survival during chapter 11); In re CoServ, L.L.C., 273 B.R. 487, 492 n.10 (Bankr. N.D. Tex. 2002) (same); In re Ionosphere Clubs, Inc., 98 B.R. 174, 176 (Bankr. S.D.N.Y. 1989) ("This rule recognizes the existence of the judicial power to authorize a debtor in a reorganization case to pay pre-petition claims where such payment is essential o the continued operation of the debtor."). Moreover, this Court has routinely granted payment of prepetition employee compensation and benefits as appropriate under Section 105(a) and the "necessity of payment" doctrine. See, e.g., In re Pliant Corp., Case No. 06-10001 (MFW) (Bankr. D. Del. Jan. 4, 2006); In re Nobex Corp., Case No. 05-20050 (MFW) (Bankr. D. Del. Dec. 6, 2005); In re FLYi, Inc., Case No. 05-20011 (Bankr. D. Del. Nov. 7, 2005).

53.    Furthermore, Section 507(a) of the Bankruptcy Code provides that the Prepetition Employee Obligations, subject to certain conditions, are afforded priority distribution up to $10,000. See 11 U.S.C. § 507(a)(4) and (a)(5). In addition, Sections 507(a)(4) and (a)(5) priority claims are entitled to payment in full under a chapter 11 plan. See 11 U.S.C. § 1129(a)(9)(B). Thus, because the Debtors' employees may be entitled to a priority distribution for prepetition amounts owed, the relief requested in this Motion should primarily affect the

timing of payment of employee claims rather than their treatment for distribution purposes, and should neither prejudice general unsecured creditors nor materially affect the Debtors' estates.

54.      Application of Sections 363(b)(1) and 105(a) of the Bankruptcy Code and the "necessity of payment" doctrine are wholly warranted here.  Absent prompt payment of amounts owed in connection with the Prepetition Employee Obligations, it is likely that employee morale and support will be impaired. As many of the Debtors' employees rely on the timely receipt of their paychecks and/or reimbursement for expenses, any delay in paying amounts owed in respect of the Prepetition Employee Obligations could cause such employees serious hardship. Any such deterioration in employee morale and welfare at this critical time undoubtedly will have a devastating impact on the value of the Debtors' assets and businesses.

55.      The Debtors' inability to pay the outstanding Prepetition Employee Obligations will cause employees to endure significant stress, hardship and suffering. The effect of this disruption in employee morale will likely cause a ripple of fear to run throughout the enterprise. Many employees simply live from paycheck to paycheck and rely exclusively on receiving their full compensation to pay their daily living expenses. Furthermore, many employees rely on their employee benefits, such as Health Benefits Insurance, without which they would be forced to pay for or go without insurance coverage for themselves and their families.  As a result, these employees will be exposed to significant financial and health related problems if the Debtors are not permitted to honor the unpaid Prepetition Employee Obligations.   If these employees unilaterally terminate their employment for failure to receive the compensation set forth herein, which is a very real possibility given the state of today's competitive employment market, the Debtors' ability to maintain and preserve the value of their estates may be forever lost.

56.     What's more, amounts withheld by the Debtors from employees' paychecks represent, in many cases, employee earnings specifically designated by employees or, in the case of garnishments, by judicial authorities, to be deducted from employee paychecks and paid accordingly. The failure to make these payments will result in hardship to certain employees. The Debtors expect to be inundated with a multitude of inquiries from garnishors and other designated recipients regarding the Debtors' failure to submit, among other things, taxes, child support and alimony payments which are not the Debtors' property, but rather have been withheld from employee paychecks. Moreover, if the Debtors are unable to remit certain of these amounts, the employees could face legal action and/or imprisonment.

57.     The Debtors' employees are an essential component of a successful reorganization. Any deterioration in employee morale and welfare at this critical time undoubtedly would have a devastating impact on the Debtors, the value of their assets and businesses, and ultimately, the Debtors' ability to reorganize.    Accordingly, the relief sought herein is in the best interests of the Debtors' estate and creditors, and will allow the Debtors to continue to operate their businesses with minimal disruption and proceed with the important task of stabilizing their operations.

Statement Pursuant to Local Rule 1001-1(b)

58.     Pursuant to District Court Local Rule 7.1.2(a), incorporated by reference into Bankruptcy Local Rule 1001-1(b), the Debtors waive their right to file a brief in support of the Motion because there are no novel issues of law presented in this Motion.

Notice

59.     Notice of this Motion has been provided to (a) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801; (b) counsel to

Adeptio INPC Funding, LLC: Young Conway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware 19801 (Attn.: Robert S. Brady) and Kirkland & Ellis LLP, 200 East Randolph Drive, Chicago, Illinois 60601 (Attn.: David A. Agay); and (c) the Debtors' twenty (20) largest unsecured creditors on a consolidated basis. In addition, because this Motion seeks "first day" relief, notice of this Motion and any order entered respecting this Motion will be served as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice is necessary or required.

<u>No Prior Request</u>

60.    The Debtors have not filed a prior motion seeking the relief requested herein in this Court or any other court.

<u>Conclusion</u>

WHEREFORE, based upon the foregoing, the Debtors respectfully request that the Court enter an order substantially in the form annexed hereto (a) granting the relief requested herein and (b) granting such other relief as may be deemed just and proper.

Respectfully submitted,

Date: November 8, 2007

Neil B. Glassman (No. 2087)
Mary E. Augustine (No. 4477)
The Bayard Firm
222 Delaware Avenue
Suite 900
P.O. Box 25130
Wilmington, DE 19899
Telephone:    (302) 655-5000
Facsimile:    (302) 658-6395

and

Thomas R. Califano
DLA Piper US LLP
1251 Avenue of the Americas
New York, New York  10020-1104
Telephone:      212-335-4500
Facsimile:      212-335-4501

Mark J. Friedman (MD Bar No. 00102)
Maria Ellena Chavez-Ruark (MD Bar No. 23941)
Jason W. Hardman (MD Bar No. 27470)
DLA Piper US LLP
The Marbury Building
6225 Smith Avenue
Baltimore, Maryland 21209-3600
Telephone:      (410) 580-3000
Facsimile:      (410) 580-3001

Proposed Counsel for Debtors
and Debtors in Possession