**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| INPHONIC, INC., et al.,[1] | Case No. 07-____________ |
| Debtor. | (Jointly Administered) |

**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 345, 363, 364, 1107, 1108 AND LOCAL RULE 2015-2 FOR ORDER AUTHORIZING (I) CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, (II) MAINTENANCE OF EXISTING BANK ACCOUNTS, (III) CONTINUED USE OF EXISTING CHECKS AND BUSINESS FORMS, AND (IV) CONTINUED USE OF EXISTING INVESTMENT GUIDELINES**

The above-captioned debtors and debtors in possession (the "Debtors"), by and through their undersigned counsel, hereby move for entry of an order authorizing the Debtors to (I) continue to use their existing cash management system, (II) maintain their existing bank accounts, (III) continue to use their existing checks and business forms, and (IV) continue to use their existing investment guidelines (the "Motion"). In support of this Motion, the Debtors respectfully represent as follows:

Jurisdiction and Venue

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

[1] The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows: (a) InPhonic, Inc., a Delaware corporation, Fed. Tax Id. No. 9384; (b) CAIS Acquisition, LLC, a Delaware limited liability company, Fed. Tax Id. No. 6257; (c) CAIS Acquisition II, LLC, a Delaware limited liability company, Fed. Tax Id. No. 3695; (d) SimIPC Acquisition Corp., a Delaware corporation, Fed. Tax Id. No. 4924; (e) Star Number, Inc., a Delaware corporation, Fed. Tax Id. No. 5549; (f) Mobile Technology Services, LLC, a Delaware limited liability company, Fed. Tax Id. No. 1426; (g) FON Acquisition, LLC, a Delaware limited liability company, Fed. Tax Id. No. 2807; and (h) 1010 Interactive, LLC, a Delaware limited liability company, Fed. Tax Id. No. 5391.

2. The statutory basis for the relief requested herein are Sections 105(a), 345, 364, 1107 and 1108 of title 11 of the United States Code (the "Bankruptcy Code").

Background

3. On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The factual background regarding each of the Debtors, including their current and historical business operations and the events precipitating these chapter 11 filings, is set forth in detail in the *Affidavit of Kenneth D. Schwarz, Chief Financial Officer of the Debtors, in Support of First Day Motions* (the "Schwarz Affidavit"), and is incorporated herein by reference.[2]

4. The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5. No trustee, examiner or committee has been appointed in any of the Debtors' chapter 11 cases.

The Debtors' Business Operations

6. InPhonic was incorporated in 1997 and began operations in 1999. InPhonic's business principally involves the marketing of wireless telephone and satellite television services and related equipment and support services. InPhonic focuses in four (4) areas: (i) wireless device activation services, (ii) television satellite activation services, (iii) mobile virtual network enabler ("MVNE") services, and (iv) unified communication services.

7. InPhonic is a leading internet (online) seller of wireless services and devices to consumers. InPhonic sells these services and devices through company owned and branded

---

[2] Capitalized terms shall have the meanings ascribed to them in the Schwarz Affidavit unless otherwise defined herein.

websites, including without limitation www.wirefly.com, as well as through a variety of private labeled websites that it develops and manages for marketing partners such as internet businesses, affinity organizations and national retailers.

8. InPhonic markets its services through a variety of online advertising programs including display advertising, search marketing, email marketing and affiliate programs. InPhonic's website www.wirefly.com, a leading one-stop shopping site for mobile phones and wireless plans, has been awarded "Best of the Web" by Forbes magazine and "Best in Overall Customer Experience" by Keynote Performance Systems.

9. InPhonic also markets its services through its partners' private labeled websites which InPhonic creates to leverage its partners' brands and their existing customer relationships. InPhonic private-labels customer touch points to the partners' brands, including the web storefront, customer communications (such as call centers and in-box collateral) and device packaging.

10. CAIS Acquisitions II, LLC, a wholly-owned subsidiary of InPhonic, does business under the name VMC Satellite. Through VMC Satellite, InPhonic markets consumers digital broadcast satellite television, broadband and VOIP services. VMC Satellite markets its services through a portfolio of its own websites, affiliate websites, print advertisement and private labeled websites, as well as through an in-bound call center.

11. InPhonic's Mobile Virtual Network Enabler (MVNE) business leverages the company's e-commerce platform and operational infrastructure to enable communications service providers and consumer brands to offer a branded wireless service to their customers without having to own or operate the underlying wireless network or operational infrastructure.

InPhonic's MVNE platform provides a turn-key solution that combines system integration to every major U.S. wireless carrier with enterprise strength billing and customer care solutions.

12. InPhonic developed and sells a unified communications service that provides users with a private toll-free number and a professional set of small business messaging services for one monthly fee. Users have one central location for all of their voicemail, email, faxes, calendar appointments and address books and can manage all of their messages from anywhere by accessing a single message box using any phone or computer. The platform offers users many voice messaging, fax delivery, conference calling and call routing services integrated into a single application accessible by telephone or computer for a single monthly fee.

13. InPhonic's relationships with its carrier, service, affiliate and marketing partners are the keys to its business operations. InPhonic has agreements with the largest wireless carriers in the U.S., as well as large satellite, broadband and VOIP providers, to market their products and services. The company also has agreements with thousands of affiliate and marketing partners that market Debtors' products and services under their brands through private-labeled websites that InPhonic creates and manages and/or their websites.

14. All of the Debtors are headquartered in Washington, D.C. The Debtors maintain technology and operations centers in Largo, Maryland; Reston, Virginia and Great Falls, Virginia.

<u>The Debtors' Cash Management System</u>

15. Prior to the Petition Date and in the ordinary course of business, certain of the Debtors maintain various bank accounts with Comerica Bank and Silicon Valley Bank (collectively, the "<u>Bank Accounts</u>"). The Bank Accounts are described in Exhibit A.

16. In addition, the Debtors maintain certain investment accounts with Comerica Bank and UBS Financial Services, Inc. (the "Investment Accounts"; collectively with the Bank Accounts, the "Accounts"). The Investment Accounts are described in Exhibit B.

17. The Accounts consist of the following:

a. Account Number 1891668467 maintained at Comerica Bank is in the name of InPhonic, Inc. and is the operating account (the "Comerica Operating Account") into which funds are swept from an overnight Comerica Bank investment account (Account Number 1080005060) and into which all revenues (including wires and ACH transfers) are deposited. The funds are then transferred as needed to fund draws made on any zero balance accounts that are linked to the Comerica Operating Account, which at this time consist of Account Numbers 1892038819 (InPhonic, Inc.'s trade debt account) and 1892038827 (InPhonic, Inc.'s payroll account).

b. Account Number 1891929380 maintained at Comerica Bank is in the name of Star Number, Inc. and is the operating account (the "Star Operating Account") into which transfers from the Comerica Operating Account are deposited. InPhonic, Inc. funds this account for the purpose of meeting Star Number, Inc.'s payroll obligations. As such, the funds from the Star Operating Account are transferred as needed to fund draws made on any zero balance accounts that are linked to the Star Operating Account, which at this time consist of Account Number 1892038843 (Star Number, Inc.'s trade debt account) and 1892038884 (Star Number, Inc.'s payroll account).

c. Account Number 1892770221 maintained at Comerica Bank is in the name of CAIS Acquisitions II, LLC and is the operating account into which all revenues of CAIS II are deposited and from which all obligations of CAIS II are paid.

d. Account Number 100-768-1 maintained at Comerica Bank is in the name of InPhonic, Inc. and serves as its Canadian bank account.

e. Account Number 3300453675 maintained at Silicon Valley Bank is in the name of InPhonic, Inc. and is an operating account into which cash customer payments processed through Silicon Valley Bank are deposited and from which credit card payments and chargebacks are processed. Funds from this account are swept into the Comerica Operating Account.

f. Account Number 1080005060 maintained at Comerica Bank is in the name of InPhonic, Inc. and is an overnight investment account linked to the Comerica Operating Account.

g. Account Number CP-40220-V7 maintained with UBS Financial Services, Inc. is in the name of InPhonic, Inc. and is a money market account used for private investment purposes.

18. Comerica Bank, Silicon Valley Bank and UBS Financial Services, Inc. are referred to herein collectively as the "Banks".

19. The Debtors manage their cash receipts, transfers and disbursements for the Debtors' entire corporate enterprise through the Accounts. The Debtors routinely deposit, withdraw, and otherwise transfer funds to, from, and between the Accounts by various methods including check, wire transfer, automated clearing house transfer and electronic funds transfer. Approximately $1,000,000 to $20,000,000 flows through the Debtors' cash system on a daily basis (including cash used in investment activities). It is the Debtors' belief that the Banks at which the Debtors maintain the Accounts are financially stable institutions with FDIC or FSLIC insurance or other appropriate government-guaranteed deposit protection insurance.

20. Prior to the Petition Date, the Debtors, in the ordinary course of business and in accordance with certain agreements (the "Service Documentation") with the Banks, used their established cash management system to collect, transfer, and disburse funds generated by their operations and to accurately record all such transactions as they are made (the "Cash Management System"). The Debtors also utilize the Cash Management System to make intercompany transfers.

21. The Debtors' cash management procedures are ordinary, usual and essential business practices and are similar to those used by other corporate enterprises. The Cash Management System provides significant benefits to the Debtors, including the ability to (a) control corporate funds centrally, (b) ensure availability of funds when necessary, and

(c) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information.

22. Prior to the Petition Date, the Debtors, in the ordinary course of business, also used numerous business forms including, but not limited to, letterhead, purchase orders, invoices, contracts and checks (collectively, the "Business Forms"). The Debtors have a supply of these forms on hand. It would be expensive and wasteful to destroy these forms and create new ones with the "Debtor in Possession" legend. Upon depletion of the Debtors' check stock, the Debtors will obtain new checks imprinted with the legend "Debtors in Possession" reflecting their status as debtors in possession.

Guidelines of the United States Trustee's Office

23. The Office of the United States Trustee for the District of Delaware has established certain operating guidelines for debtors in possession to supervise the administration of chapter 11 cases, including changes to the debtor's prepetition cash management system. These guidelines require debtors to, among other things, establish one (1) debtor in possession account for all estate monies required for the payment of taxes (including payroll taxes), close all existing bank accounts and open new debtor in possession accounts, maintain a separate debtor in possession account for cash collateral, and obtain checks that bear the designation "debtor in possession" referencing the bankruptcy case number and the type of account on such checks.

24. The Debtors' business and financial affairs are complex. They require the collection, disbursement and transfer of funds through several bank accounts. Enforcement of the guidelines of the United States Trustee's Office in these chapter 11 cases would significantly disrupt the Debtors' ordinary financial operations. The Debtors contract with several third-party

vendors, service providers and trade creditors to fulfill customer obligations and any interruption in payments to those third-parties could jeopardize the Debtors' efforts to reorganize.

Relief Requested

25. By this Motion, the Debtors seek entry of an order pursuant to Sections 105(a), 345, 364, 1107 and 1108 of the Bankruptcy Code:

a. Authorizing the Debtors to continue to use their integrated Cash Management System subject to the Service Documentation relating thereto (except to the extent it needs to be modified in accordance with the DIP Facility, as such term is defined in the Schwartz Affidavit, and as may be otherwise modified from time to time with the prior consent of the DIP Lender, such consent not to be unreasonably withheld, as such terms are defined in the Schwartz Affidavit), including the following:

i. The continued use of the existing Bank Accounts and Investment Accounts identified above with the same names and account numbers as existed immediately prior to the chapter 11 cases (with the option of streamlining their Cash Management System by closing or consolidating accounts) or, alternatively, to create a similar Cash Management System (or a more streamlined Cash Management System with fewer accounts) at an alternative banking institution;[3]

ii. The ability of the Debtors to deposit funds into and withdraw funds from any existing and new accounts (subject to available funds in the applicable accounts or, in the case of a zero balance account, in the applicable linked funding account) by all usual means, including, but not limited to, checks, wire transfers, electronic funds transfers and other debits;

iii. The ability of the Debtors to otherwise treat the Accounts, along with any accounts opened postpetition, for all purposes as debtorin possession accounts;

[3] In the event that the Debtors are unable to, or decide not to, continue their relationship with their current banking institutions, with the prior written consent of the DIP Lender, the Debtors seek authority to create a similar Cash Management System (or a more streamlined management system with fewer accounts) at an alternative banking institution; provided that to the extent reasonably required by the DIP Lender, the Debtors will enter into account control agreements.

iv. The waiver of any requirements to establish separate accounts for cash collateral and/or tax payments;

v. Permitting all institutions with whom the Debtors maintain or establish deposit accounts or investment accounts to maintain, service and administer such deposit accounts or investment accounts in accordance with applicable non-bankruptcy law and in accordance with the Service Documentation between the applicable institution and the applicable Debtor or Debtors relating to such accounts, including by rescinding any administrative or debit freeze imposed with respect to the Accounts as a consequence of the filing of the petitions commencing these bankruptcy cases, subject to paragraph 17 below; and

vi. Permitting all institutions with which the Debtors maintain or establish deposit accounts or investment accounts to administer all such accounts and provide cash management services in connection therewith in the ordinary course of business even if such activities result in a postpetition extension of credit (for example, by creating an overdraft in a zero balance or other account) that under the Service Documentation is secured by any assets of the Debtors, such as the deposit or investment accounts at such institution;

b. Authorizing the Debtors to continue to use the Debtors' existing checks and business forms without alteration or change, provided that upon depletion of the Debtors' check stock, the Debtors will obtain checks containing the "Debtor in Possession" legend;

c. Authorizing the Debtors to continue to make intercompany transfers among the Accounts in the ordinary course of their business and to provide administrative priority status to any intercompany claims arising from postpetition intercompany transactions pursuant to the Cash Management System; and

d. Authorizing the waiver of Section 345(b) of the Bankruptcy Code as to the Debtors' Cash Management System (or a streamlined alternative thereto) so that the Debtors can continue to use their existing Cash Management System (or a streamlined alternative thereto), including transfers to the Investment Accounts or other investment accounts as may be established in the future (subject to the terms of any documentation as may be required by the applicable institution), and authorizing all applicable Banks to accept and hold or invest such funds in accordance therewith.

26. Prior to the effectiveness of the rescission of the debit or administrative freeze by any of the Banks as to any of the Accounts, the Debtors shall (a) provide each of the Banks with a list of all the unpaid checks or debits (the "Prepetition Items") which the Debtors believe were all the items or debits issued or signed prepetition and which are not the subject of an order allowing payment of the specific Prepetition Item,[4] and (b) take all necessary and appropriate steps in accordance with the applicable institution's requirements (including the payment of any applicable fees to the relevant institution) to place a formal "stop payment" order on each Prepetition Item except those as to which the Debtors obtain authority from the Court to pay. Any Bank or other depository institution receiving an instruction to stop payment on any Prepetition Item will be authorized to rely thereon and shall have no liability to any person or entity for relying on such information. If the Debtors fail to place a formal stop payment order on any Prepetition Item and the item or debit is honored by the applicable institution, such institution will have no liability on account of the payment of such item or debit, notwithstanding that the same might be considered to be an unauthorized postpetition transfer.

27. In accordance with the DIP Facility, as such term is defined in the Schwarz Affidavit, the Debtors also request authority to reimburse the applicable Bank for any claim the Bank may have arising prior to or after the Petition Date in connection with (a) any fees or chargebacks owed under agreements or other Service Documentation entered into as of the Petition Date between any of the Debtors and the applicable Bank, including checks deposited which have been dishonored or returned for insufficient funds in the applicable account, to the extent required under the pre-existing agreements or Service Documentation entered into by the Debtors and the applicable Bank, and (b) any reimbursement, account fee or other payment

[4] Contemporaneously with this Motion, the Debtors have filed a motion requesting authority to pay, in the ordinary course of business, certain pre-petition obligations owed to or for the benefit of their employees.

obligations arising under the agreements governing the Bank Accounts or the Cash Management System, including all Service Documentation. The Debtors owe a total of approximately $100,000 in credit card charge backs per month and approximately $1,500,000 in checks currently outstanding. The total bank charges as of the Petition Date are approximately $69,000.

28. In addition, pursuant to the DIP Credit Agreement, the Debtors have agreed to use their best efforts to enter into account control agreements reasonably acceptable to the Lender prior to entry of a final order granting the DIP financing.

29. As described in greater detail below, the Debtors submit that the relief requested herein will help to ensure the Debtors' orderly entry into and administration in chapter 11 and avoid many of the possible disruptions and distractions that not could divert the Debtors' attention from more pressing matters during the initial days of these chapter 11 cases.

## Basis for Relief

### A. Continued Use of the Debtors' Cash Management System and Bank Accounts is in the Best Interest of the Estates and Will Not Prejudice Parties in Interest.

30. The United States Trustee generally requires a debtor in possession to close all prepetition bank accounts and open new debtor in possession bank accounts. In addition, the United States Trustee may require a debtor in possession to maintain separate accounts for cash collateral and taxes. In larger chapter 11 cases (such as here), however, courts in this District often waive these requirements, recognizing that such requirements are often impractical and potentially detrimental to a debtor's postpetition business operations and restructuring efforts. See, e.g., In re Proxim Corp., Case No. 05-11639 (PJW) (Bankr. D. Del. June 15, 2005); In re Maxide Acquisition Inc., Case No. 05-10429 (MFW) (Bankr. D. Del. Feb. 15, 2005); In re Cable & Wireless USA. Inc., Case No. 03-13711 (CGC) (Bankr. D. Del. Dec. 10, 2003); In re Fleming Co., Case No. 03-10945 (MFW) (Bankr. D. Del. Apr. 3, 2003); In re Exide Technologies, Case

No. 02-11125 (Bankr. D. Del. Apr. 17, 2002); In re W.R. Grace & Co., Case No. 01-01139 (Bankr. D. Del. Apr. 2, 2001); In re USG Corp., Case No. 01-02094 (Bankr. D. Del. June 27, 2001); In re Waccamaw's HomePlace, Case No. 01-00181 (Bankr. D. Del. Jan. 17, 2001); In re Trans World Airlines. Inc., Case No. 01-00056 (Bankr. D. Del. Jan. 10, 2001).

31. Indeed, the bankruptcy court in the Columbia Gas chapter 11 cases explained that the pooling of funds in a centralized cash management system "allows efficient utilization of cash resources and recognizes the impracticalities of maintaining separate cash accounts for the many different purposes that require cash." In re Columbia Gas Sys., Inc., 136 B.R. 930, 934 (Bankr. D. Del. 1992) (examining the validity of certain customer refund claims to funds maintained in the debtors' centralized cash management system), aff'd in part and rev'd in part, 1992 U.S. Dist. LEXIS 9460 (D. Del. 1992), aff'd in part and rev'd in part, 997 F.2d 1039 (3d Cir. 1993). The Third Circuit agreed, emphasizing that a requirement to maintain all accounts separately and to segregate funds into those separate accounts "would be a huge administrative burden and economically inefficient." Columbia Gas, 997 F.2d at 1061. See also In re Southmark Corp., 49 F.3d 1111, 1114 (5th Cir. 1995) (noting that cash management system allows debtor "to administer more efficiently and effectively its financial operations and assets").

32. Consistent with the foregoing, the Debtors seek authority to continue to use their current Cash Management System (or a streamlined alternative thereto with fewer accounts at the Banks or an alternative institution), including the continued use, in the Debtors' discretion, of their existing Accounts with the same names and account numbers as existed immediately prior to the Petition Date. The Debtors also seek authority to deposit funds in and withdraw funds from the Accounts by all usual means, including, but not limited to, checks, wire transfers, electronic funds transfers and other debits, and to otherwise treat the prepetition Accounts (and

any accounts opened postpetition) for all purposes as debtor in possession accounts. The Debtors also request that the Court waive any requirement to establish separate accounts for cash collateral and/or tax payments.

33. The requested relief is appropriate in this case given the complexity of the Debtors' business. Any disruption of the Debtors' cash management procedures could adversely impact the Debtors' operations. Therefore, it is important that the Debtors be permitted, in their discretion, to: (a) continue using their existing Cash Management System (or a streamlined alternative thereto), Bank Accounts, and Investment Accounts, (b) consolidate the management of their cash, and (c) transfer monies from entity to entity as needed and in the amounts necessary to continue the operation of the business pursuant to existing cash management procedures.

34. The Cash Management System constitutes a customary and essential business practice. The use of such a system is attributable to the numerous benefits it provides, including the ability to (a) control and monitor corporate funds, (b) ensure cash availability, and (c) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate account balance and presentment information. Moreover, because the Debtors have the capability to draw the necessary distinctions between pre and postpetition obligations and payments without closing the prepetition Accounts and opening new ones, the Debtors' creditors will not be prejudiced.

35. Preserving "business as usual" and avoiding the unnecessary distractions that inevitably would be associated with any substantial disruption of the Cash Management System and existing Accounts will facilitate the Debtors' stabilization of their postpetition business operations. Thus, under the circumstances, the maintenance of the Cash Management System (or

a streamlined version thereof) is not only essential but also in the best interests of the Debtors' estates. Accordingly, the Court should authorize the Debtors' continued use of the Cash Management System (or a streamlined alternative thereto), Bank Accounts and Investment Account as described herein.

36. The Debtors further request that the Court authorize the Banks with which the Debtors maintain the Accounts to continue to maintain, service and administer such Accounts in accordance with applicable Service Documentation relating thereto, except that the Debtors shall provide the Banks with the stop payment notices with regard to any unpaid Prepetition Items that the Debtors are not otherwise authorized to pay (as described above).

37. To facilitate the purposes of the order sought by this Motion, the Debtors will serve this Motion upon the Banks and counsel to the Banks (if known) and will also serve a copy of the order granting the relief requested herein on the Banks and their counsel (if known) as soon as practicable.

B. The Debtors Should be Authorized to Use Existing Checks and Business Forms.

38. In the ordinary course of business, the Debtors use a variety of checks and other business forms. To minimize the expense to the estates, the Debtors request authority to continue to use all correspondence and business forms (including, but not limited to, letterhead, purchase orders, invoices, checks, etc.) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession. Upon depletion of the Debtors' check stock, the Debtors will obtain new checks imprinted with the legend "Debtors in Possession" reflecting their status as debtors in possession.

39. By virtue of the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with whom the Debtors deal on a regular basis, it is

important that the Debtors be permitted to continue to use their existing business forms and checks without alteration or change (except as requested herein). Because parties doing business with the Debtors will receive notice of this case and therefore be advised of the Debtors' status as a debtor in possession, changing business forms and checks at this juncture is unnecessary and unduly burdensome.

C. Claims Arising From Postpetition Intercompany Transfers Among the Accounts Should be Afforded Administrative Expense Status.

40. As described above, under the Cash Management System, funds generated by the business operations of each participating Debtor flow into various centrally-maintained Accounts. Prior to the Petition Date, the Debtors engaged in certain intercompany financial transactions in the ordinary course of their businesses (collectively, the "Intercompany Transactions").[5] These Intercompany Transactions are recorded on the applicable Debtor's general ledger as an intercompany payable, receivable or loan. All of these Intercompany Transactions are made between and among the Debtors in the ordinary course of the Debtors' business as part of their consolidated Cash Management System. If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the detriment of the Debtors and their creditors.

41. At any given time, there may be balances due and owing between certain of the Debtors. These balances represent extensions of intercompany credit made in the ordinary course of business that are an essential component of the Cash Management System. The

[5] Because the Debtors engage in Intercompany Transactions on a regular basis and such transactions are common among enterprises similar to the business of the Debtors, the Debtors believe the Intercompany Transactions are ordinary course transactions within the meaning of Section 363(c)(1) of the Bankruptcy Code and, thus, do not require the Court's approval. Nonetheless, out of an abundance of caution, the Debtors are seeking express authority to engage in such transactions on a post-petition basis. Moreover, the continued performance of the ordinary course Intercompany Transactions is integral to ensure the Debtors' ability to operate their businesses as debtors-in-possession.

Debtors maintain records of these transfers of cash and can ascertain, trace and account for these Intercompany Transactions. The Debtors, moreover, will continue to maintain such records, including records of all current intercompany accounts receivable and payable.

42. To ensure each individual Debtor will not, at the expense of its creditors, fund the operations of another entity, the Debtors respectfully request that, pursuant to Sections 503(b)(1) and 364(b) of the Bankruptcy Code, all intercompany claims by one Debtor against another Debtor arising after the Petition Date as a result of ordinary course intercompany transactions through the Cash Management System (collectively, "Intercompany Claims"), be accorded administrative priority expense status. If Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

D. Waiver of Section 345(b) Requirements is Appropriate.

43. Pursuant to Section 345(b) of the Bankruptcy Code, any deposit or other investment made by a debtor, except those insured or guaranteed by the United States or a department, agency or instrumentality of the United States or backed by the full faith and credit of the United States, must be secured by a bond in favor of the United States that is secured by the undertaking of a corporate surety approved by the United States Trustee for the relevant district for the deposit of securities of the kind specified in 31 U.S.C. § 9303. Section 345(b) of the Bankruptcy Code provides, however, that a bankruptcy court may allow the use of alternatives to these approved investment guidelines "for cause". See In re Serv. Merch. Co, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

44. The Court's ability to excuse strict performance of the deposit and investment requirements of Section 345(b) "for cause" arises from the 1994 amendments to the Bankruptcy Code. Specifically, the legislative history of that amendment provides, in relevant part, that:

> Section 345 of the [Bankruptcy] Code governs investments of funds of bankruptcy estates. The purposes *[sic]* is to make sure that funds of a bankrupt that are obliged to creditors are invested prudently and safely with the eventual goal of being able to satisfy all claims against the bankruptcy estate. Under current law, all investments are required to be FDIC insured, collateralized or bonded. While this requirement is wise in the case of a smaller debtor with limited funds that cannot afford a risky investment to be lost, it can work to needlessly handcuff larger, more sophisticated debtors. This section would amend the [Bankruptcy] Code to allow the courts to approve investments other than those permitted by section 345(b) for just cause, thereby overruling In re Columbia Gas Systems, Inc., 33 F.3d 294 (3d Cir. 1994).

See id (quoting H.R. Rep. 103-834, 103rd Cong., 2d Sess. 224 (Oct. 4, 1994) and 140 Cong. Rec. H10767 (Oct. 4, 1994)).

45. In determining whether the "for cause" standard has been met, courts consider the totality of circumstances, utilizing the following factors: (i) the sophistication of the debtor's business; (ii) the size of the debtor's business operations; (iii) the amount of the investments involved; (iv) the bank ratings (Moody's and Standard and Poor) of the financial institutions where the debtor in possession funds are held; (v) the complexity of the case; (vi) the safeguards in place within the debtor's own business of insuring the safety of the funds; (vii) the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions; (viii) the benefit to the debtor; (ix) the harm, if any, to the estate; and (x) the reasonableness of the debtor's request for relief from Section 345(b) requirements in light of the overall circumstances of the case.

46. The Debtors request a waiver of the application of the requirements of Section 345. As described in this Motion and its exhibits, funds do not sit idly in the Accounts. Instead, they are transferred among numerous accounts maintained by the Debtors. Moreover, the Debtors are sophisticated companies with the capability to rapidly transfer funds to ensure the safety of those funds while providing the Debtors with a significant return on idle cash. In light of this fact and the safety of the investment vehicles that the Debtors propose to utilize to invest excess cash, the Debtors believe that cause exists under Section 345(b) to allow the Debtors to continue to invest funds and use the Investment Accounts consistent with their prepetition practice.

47. The Debtors further request that applicable institutions be authorized to accept and hold or invest the Debtors' funds transferred to the Investment Accounts (or other investment accounts consistent with the Debtors' prepetition investment practices) without the need for any additional bond or security not otherwise provided prior to the Petition Date.

48. Local Rule 2015-2(b) provides that, if a motion for a waiver under Section 345 of the Bankruptcy Code is filed on the first day of the case, and there are more than 200 creditors, the court may grant an interim waiver. The Debtors seek an order granting an interim waiver and, if there are no objections to the waiver, granting a final waiver of the requirements of Section 345.

49. Courts in this jurisdiction regularly grant the relief requested above. See, e.g., In re Radnor Holdings Corp., Case No. 06-10894 (PJW) (Bankr. D. Del. Aug. 23, 2006); In re Easy Gardener Prods., Ltd., Case No. 06-10396 (KG) (Bankr. D. Del. Apr. 22, 2006); In re Global Home Prods. LLC, Case No. 06-10340 (KG) (Bankr. D. Del. Apr. 11, 2006); In re J.L. French Auto. Castings, Inc., Case No. 06-10119 (MFW) (Bankr. D. Del. Mar. 3, 2006); In re World

Health Alternatives, Inc., Case No. 06-10166 (PJW) (Bankr. D. Del. Feb. 22, 2006); In re Pliant Corp., Case No. 06-10001 (MFW) (Bankr. D. Del. Jan. 4, 2006); In re Nobex Corp., Case No. 05-20050 (MFW) (Bankr. D. Del. Dec. 6, 2005); In re FLYi, Inc., Case No. 05-20011 (MFW) (Bankr. D. Del. Nov. 7, 2005). The Debtors request similar relief in these cases.

Statement Pursuant to Local Rule 1001-1(b)

50. Pursuant to District Local Rule 7.1.2(a), incorporated by reference into Bankruptcy Local Rule 1001-1(b), the Debtors waive their right to file a brief in support of the Motion because there are no novel issues of law presented in this Motion.

Notice

51. Notice of this Motion has been provided to (a) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801; (b) counsel to Adeptio INPC Funding, LLC: Young Conway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware 19801 (Attn.: Robert S. Brady) and Kirkland & Ellis LLP, 200 East Randolph Drive, Chicago, Illinois 60601 (Attn.: David A. Agay); (c) the Debtors' twenty (20) largest unsecured creditors on a consolidated basis; and (d) each of the Banks. In addition, because this Motion seeks "first day" relief, notice of this Motion and any order entered respecting this Motion will be served as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice is necessary or required.

No Prior Request

52. The Debtors have not filed a prior motion seeking the relief requested herein in this Court or any other court.

Conclusion

WHEREFORE, based upon the foregoing, the Debtors respectfully request that the Court enter an order substantially in the form annexed hereto (a) granting the relief requested herein and (b) granting such other relief as may be deemed just and proper.

Date: November 8, 2007

Respectfully submitted,

Neil B. Glassman (No. 2087)
Mary E. Augustine (No. 4477)
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899
Telephone: (302) 655-5000
Facsimile: (302) 658-6395

and

Thomas R. Califano
DLA Piper US LLP
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: 212-335-4500
Facsimile: 212-335-4501

Mark J. Friedman, Esquire
Maria Ellena Chavez-Ruark, Esquire
Jason W. Hardman, Esquire
DLA Piper US LLP
The Marbury Building
6225 Smith Avenue
Baltimore, Maryland 21209-3600
Telephone: (410) 580-3000
Facsimile: (410) 580-3001

Proposed Counsel for Debtors
and Debtors in Possession