IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| INPHONIC, INC., et al.,[1] | : | Case No. 07-__________ |
| Debtors. | : | (Jointly Administered) |

**MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING AND APPROVING POSTPETITION FINANCING; (II) GRANTING LIENS AND SECURITY INTERESTS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) AUTHORIZING USE OF CASH COLLATERAL AND AFFORDING ADEQUATE PROTECTION; (IV) MODIFYING AUTOMATIC STAY; AND (V) SCHEDULING FINAL HEARING, PURSUANT TO SECTIONS 105, 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002 AND 4001(C) AND (D)**

The above-captioned debtors and debtors in possession (the "Debtors"), by and through their undersigned counsel, hereby move (the "Motion") this Court for the entry and approval of interim and final orders: (a) authorizing and approving postpetition financing; (b) granting liens and security interests and providing superpriority administrative expense status; (c) authorizing use of cash collateral and affording adequate protection; (d) modifying automatic stay; and (e) scheduling final hearing, pursuant to sections 105, 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code") and Federal Rules of Bankruptcy Procedure 2002 and 4001(c) and (d) of the Federal Rules of Bankruptcy (the "Bankruptcy Rules") (the "Interim Order"), in the form attached hereto as Exhibit A and incorporated herein by reference, and a

[1] The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows: (a) InPhonic, Inc., a Delaware corporation, Fed. Tax Id. No. 9384; (b) CAIS Acquisition, LLC, a Delaware limited liability company, Fed. Tax Id. No. 6257; (c) CAIS Acquisition II, LLC, a Delaware limited liability company, Fed. Tax Id. No. 3695; (d) SimIPC Acquisition Corp., a Delaware corporation, Fed. Tax Id. No. 4924; (e) Star Number, Inc., a Delaware corporation, Fed. Tax Id. No. 5549; (f) Mobile Technology Services, LLC, a Delaware limited liability company, Fed. Tax Id. No. 1426; (g) FON Acquisition, LLC, a Delaware limited liability company, Fed. Tax Id. No. 2807; and (h) 1010 Interactive, LLC, a Delaware limited liability company, Fed. Tax Id. No. 5391.

final order, substantially in the form of the Interim Order with requisite conforming changes (the "Final Order"), providing, among other things, authorization for the Debtors to: (i) obtain credit (the "DIP Facility") and incur postpetition debt up to the aggregate principal amount of Twenty-Five Million Dollars ($25,000,000.00), secured by liens on property of the Debtors' estates pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code and with priority, as provided in section 364(c)(1) of the Bankruptcy Code; (ii) enter into and comply with in all respects with the financing arrangement, as provided in that certain Senior Secured, Super-Priority Debtor in Possession Credit and Guaranty Agreement, substantially in the form attached to the Interim Order as Exhibit 1 (the "DIP Credit Agreement"), by and among Adeptio INPC Funding, LLC (together with its successors, assigns and transferees, the "DIP Lender") and InPhonic, Inc., as Borrower, and the remaining Debtors as Guarantors; and that certain Security Agreement, dated as of November 9, 2007, among the Debtors as Guarantors and Adeptio INPC Funding, LLC (the "DIP Security Agreement", and together with the DIP Credit Agreement and the other loan documents referenced in the DIP Credit Agreement, the "DIP Facility Documents"); (iii) providing the DIP Lender with valid, binding, continuing, enforceable, fully perfected and unavoidable first priority senior security interests in, and liens (all such liens and security interests granted to the DIP Lender, pursuant to the Interim Order and the DIP Facility Documents, the "DIP Facility Liens") upon Collateral (as defined below); (iv) granting the DIP Lender a superpriority claim over any and all administrative expenses, other than those set forth in the Interim Order and the DIP Credit Agreement; (v) authorizing the use of the Prior Lender's (as defined below) cash collateral and affording the Prior Lender adequate protection on account of the Prepetition Loan Agreement (as defined below) pursuant to sections 105, 361, 362 and 363 of the Bankruptcy Code; (vi) modifying the automatic stay to the extent necessary and

required by the DIP Facility Documents; and (vii) scheduling a final hearing (the "Final Hearing") to consider the entry of an order authorizing and approving the DIP Facility, the DIP Credit Agreement, the use of cash collateral and the Interim Order on a final basis.[2] In support of this Motion, the Debtors respectfully represent as follows:

## Jurisdiction and Venue

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory basis for the relief requested herein are Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Bankruptcy Rules 2002 and 4001.

## Background

3. On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The factual background regarding each of the Debtors, including their current and historical business operations and the events precipitating these chapter 11 filings, is set forth in detail in the *Affidavit of Kenneth D. Schwarz, Chief Financial Officer of the Debtors, in Support of First Day Motions* (the "Schwarz Affidavit"), and is incorporated herein by reference.

4. The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Interim Order. To the extent the descriptions provided in this Motion differ in any way from the terms of the Interim Order, the terms of the Interim Order shall govern. Further, the description of the Interim Order contained herein shall not limit, in any way, the Interim Order.

5. No trustee, examiner or committee has been appointed in any of the Debtors' chapter 11 cases.

The Debtors' Business Operations

6. InPhonic was incorporated in 1997 and began operations in 1999. InPhonic's business principally involves the marketing of wireless telephone and satellite television services and related equipment and support services. InPhonic focuses in four (4) areas: (i) wireless device activation services, (ii) television satellite activation services, (iii) mobile virtual network enabler ("MVNE") services, and (iv) unified communication services.

7. InPhonic is a leading internet (online) seller of wireless services and devices to consumers. InPhonic sells these services and devices through company owned and branded websites, including without limitation www.wirefly.com, as well as through a variety of private labeled websites that it develops and manages for marketing partners such as internet businesses, affinity organizations and national retailers.

8. InPhonic markets its services through a variety of online advertising programs including display advertising, search marketing, email marketing and affiliate programs. InPhonic's website www.wirefly.com, a leading one-stop shopping site for mobile phones and wireless plans, has been awarded "Best of the Web" by Forbes magazine and "Best in Overall Customer Experience" by Keynote Performance Systems.

9. InPhonic also markets its services through its partners' private labeled websites which InPhonic creates to leverage its partners' brands and their existing customer relationships. InPhonic private-labels customer touch points to the partners' brands, including the web storefront, customer communications (such as call centers and in-box collateral) and device packaging.

10. CAIS Acquisitions II, LLC, a wholly-owned subsidiary of InPhonic, does business under the name VMC Satellite. Through VMC Satellite, InPhonic markets consumers digital broadcast satellite television, broadband and VOIP services. VMC Satellite markets its services through a portfolio of its own websites, affiliate websites, print advertisement and private labeled websites, as well as through an in-bound call center.

11. InPhonic's Mobile Virtual Network Enabler (MVNE) business leverages the company's e-commerce platform and operational infrastructure to enable communications service providers and consumer brands to offer a branded wireless service to their customers without having to own or operate the underlying wireless network or operational infrastructure. InPhonic's MVNE platform provides a turn-key solution that combines system integration to every major U.S. wireless carrier with enterprise strength billing and customer care solutions.

12. InPhonic developed and sells a unified communications service that provides users with a private toll-free number and a professional set of small business messaging services for one monthly fee. Users have one central location for all of their voicemail, email, faxes, calendar appointments and address books and can manage all of their messages from anywhere by accessing a single message box using any phone or computer. The platform offers users many voice messaging, fax delivery, conference calling and call routing services integrated into a single application accessible by telephone or computer for a single monthly fee.

13. InPhonic's relationships with its carrier, service, affiliate and marketing partners are the keys to its business operations. InPhonic has agreements with the largest wireless carriers in the U.S., as well as large satellite, broadband and VOIP providers, to market their products and services. The company also has agreements with thousands of affiliate and marketing

partners that market Debtors' products and services under their brands through private-labeled websites that InPhonic creates and manages and/or their websites.

14. All of the Debtors are headquartered in Washington, D.C. The Debtors maintain technology and operations centers in Largo, Maryland; Reston, Virginia and Great Falls, Virginia.

Debtors' Background Related to Financing

15. On November 7, 2006, InPhonic entered into a Credit Agreement (the "Prepetition Credit Agreement") with Goldman Sachs Credit Partners L.P., as Lead Arranger, Lead Bookrunner and Lead Syndication Agent, Citicorp North America, Inc., as Administrative Agent, and the lenders from time to time party thereto (collectively, the "Prepetition Lenders"). InPhonic is the borrower under the Prepetition Credit Agreement, and each of the other Debtors is a guarantor of InPhonic's obligations to the Prepetition Lenders.

16. The Prepetition Credit Agreement provides for a $100 million aggregate principal amount senior secured term loan bearing a fixed interest rate of nine percent (9%) per annum. The term loan is secured by substantially all of InPhonic's assets (the "Prepetition Collateral") and matures in November 2011. InPhonic pledged the stock and membership interests of each of the other Debtors to further secure its obligations under the Prepetition Credit Agreement.

17. As additional consideration, InPhonic granted the Lenders warrants (the "Warrants") to purchase an aggregate of 1,250,000 shares of InPhonic common stock at an exercise price of $0.01 per share. The Warrants expire on November 7, 2011. The Warrants were issued in reliance on the exemptions provided for in Section 4(2) of the Securities Act relating to sales not involving any public offering.

18. InPhonic received $75 million of the term loan proceeds on November 8, 2006 and has the option to draw the remaining amount within 90 days. The Prepetition Credit

Agreement contains affirmative and negative covenants, including financial covenants and covenants restricting indebtedness, liens, investments, asset transfers and distributions. After November 2009, InPhonic has the ability to repay principal on the term loan without penalty and, conversely, the Prior Lenders have the right to call the remaining outstanding principal of the term loan without penalty.

19. In connection with the Prepetition Credit Agreement, InPhonic terminated a loan facility with Comerica Bank and used proceeds from the term loan to repay the outstanding principal obligation of $19.9 million plus accrued interest under the facility.

20. On August 8, 2007, InPhonic entered into an amendment to the Prepetition Credit Agreement (the "Amendment"), pursuant to which the Delayed Draw Lender (as defined in the Amendment) loaned InPhonic an aggregate amount of $15 million. The Amendment also reduced the total loan commitment from $100 million to $90 million and the Delayed Draw Lender's Delayed Draw Commitment (as defined in the Amendment) from $25 million to $15 million. The Amendment also required InPhonic to issue immediately exercisable warrants to the Lenders to purchase 800,000 shares of InPhonic's common stock at a price of $0.01 per share.

21. On or about October 5, 2007, the Debtors received notice of default under the Prepetition Credit Agreement for *inter alia* failure to pay interest due thereunder.

22. On November 2, 2007, the Prepetition Lenders assigned all of their right, title and interest in, to and under the Prepetition Credit Agreement and related loan documents to Versa Capital Management, Inc. ("Versa"), the parent of the DIP Lender. Thus, the proposed DIP Lender is also the assignee and successor in interest to the Prior Lenders.

23. The Debtors have an immediate need to obtain the DIP Facility and use the Prepetition Collateral, including the cash collateral, in order to permit, among other things, (a) the orderly continuation of the operation of their businesses, (b) the management and preservation of Debtors' assets and properties, (c) the sale of substantially all of the Debtors' assets (the "Proposed Sale") at an auction, (d) the maintenance of business relationships with vendors, suppliers and customers, (e) payment of payroll obligations, (f) the satisfaction of other working capital and operational needs and (g) the maintenance of the going concern value of the Debtors' estates. The Debtors are convinced that, without immediate access to a postpetition financing facility, they lack sufficient liquidity to preserve and maintain the going concern value of the Debtors while they pursue the Proposed Sale and their estates would be irreparably harmed.

24. Additionally, all cash generated by the Debtors' business after the Petition Date constitutes "cash collateral," as such term is defined in section 363(a) of the Bankruptcy Code, and is subject to the security interest of the DIP Lender.

25. The Debtors do not have any currently available sources of funds other than the cash collateral of the DIP Lender and the proposed DIP Facility with which to effectuate the Proposed Sale and a successful chapter 11 process to maximize value for its various creditor constituencies. More specifically, the Debtors' ability to operate their business and maximize the value of their assets for the benefit of creditors, including the DIP Lender, is dependent on their ability to use the cash collateral of the DIP Lender and obtain the funds made available by the DIP Lender under the DIP Facility.

26. In view of this, the Debtors have engaged in discussions and negotiations with the DIP Lender in an effort to ensure that the Debtors continue to have access to both cash collateral

and a credit facility. The Debtors and the DIP Lender engaged in good faith and extensive arm's length negotiations that culminated an agreement which is embodied in the DIP Credit Agreement and the Interim Order.

27. By virtue of the fact that (a) the Debtors require immediate access to cash collateral, (b) the Debtors require immediate access to the funds provided by the DIP Facility, (c) the Debtors believe that any alternative lenders' proposals will not be as favorable as the terms proposed by the DIP Lender, and (d) all or substantially all of the Debtors' assets are encumbered by liens held by the DIP Lender, the Debtors have concluded that the DIP Facility from the DIP Lender presents the best option for preservation of the Debtors' business and addressing their working capital and liquidity needs.

Relief Requested

28. This Motion contemplates, and the Debtors hereby request, this Court's authorization, for a two-step procedure whereby this Court would: (a) at the conclusion of the interim hearing on the Motion, enter the Interim Order, substantially in the form attached hereto as Exhibit A, authorizing and approving on an interim basis, *inter alia*, the use of the Prepetition and DIP Lenders' cash collateral, pursuant to the DIP Facility with interim availability of Ten Million Dollars ($10,000,000.00) and the budget (the "DIP Budget"), attached to the Interim Order as Exhibit 2, and (b) at the conclusion of the final hearing, enter an order authorizing and approving on a final basis, *inter alia*, the use of the Prepetition and DIP Lenders' cash collateral, full availability under the DIP Facility. As indicated above, an immediate need exists for the Debtors to obtain funds in order to continue their operations and preserve the value of their estate, the absence of which will immediately and irreparably harm the Debtors, their estates and their creditors, as well as the possibility for a successful reorganization.

29. The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit, allowable only under Bankruptcy Code sections 364(c)(2), 364(c)(3), and 364(d), on more favorable terms and conditions other than those provided in the DIP Credit Agreement. The Debtors are unable to obtain credit for borrowed money without the Debtors granting to the DIP Lender: (a) liens on all of the assets[3] of the Debtors pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code; (b) superpriority administrative expense claim status as provided in section 364(c)(1) of the Bankruptcy Code, over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, other than as set forth in the Interim Order, and (c) adequate protection for the use of the DIP and Prior Lenders' cash collateral pursuant to sections 105, 361, 362 and 364 of the Bankruptcy Code.

30. The significant elements of the DIP Facility are specifically set forth in the DIP Credit Agreement. However, the salient terms of the DIP Facility are as follows:[4]

- **Borrower**: InPhonic, Inc.
- **Guarantors**: CAIS Acquisition, LLC, CAIS Acquisition II, LLC, SimIPC Acquisition Corp., Star Number, Inc., Mobile Technology Services, LLC, FON Acquisition, LLC, and 1010 Interactive, LLC
- **DIP Lender**: Adeptio INPC Funding, LLC
- **Total DIP Facility**: Twenty-Five Million Dollars ($25,000,000.00), with authority to borrow up to Ten Million Dollars ($10,000,0000.00) pursuant to an Interim Order, until the entry of a Final Order.

[3] The DIP Lender is not seeking a Lien upon any claims or causes of action arising under chapter 5 of the Bankruptcy Code or proceeds thereof as part of the Interim Order. The DIP Lender is requiring, as part of a Final Order, a lien on any avoidance actions and proceeds thereof pursuant to section 547 of the Bankruptcy Code.

[4] This summary is qualified in its entirety by reference to the provisions of the DIP Credit Agreement and the DIP Security Agreement. The DIP Credit Agreement and DIP Security Agreement and DIP Security Agreement will control in the event of any inconsistency between this Motion and the DIP Credit Agreement.

- **Use of Proceeds**: The proceeds of the financing shall be used, subject to the DIP Budget, to satisfy the Debtors' working capital needs and such other obligations as may be agreed to by the DIP Lender and approved by the Court.

- **Interest**: Prime plus 3.25%

- **Fees**: (i) Unused facility fee payable monthly in arrears of .50% per annum on the average unused daily balance of the amount of the revolving credit commitment; (ii) commitment fee of 1% of the amount of the revolving credit commitment and (iii) an exit fee of 1% of the amount of the DIP Credit Agreement.

- **Term**: The DIP loan matures on December 31, 2007 unless certain events specified in the DIP Credit Agreement trigger an earlier Commitment Termination Date.

- **Collateral**: The DIP Lender will receive a fully perfected first priority Lien and security interest in all of the all of the Debtors' real, personal and mixed property (including equity interests) and all monies and other property of any kind received on account thereof, (including, upon and following the approval of the Bankruptcy Court, Avoidance Actions, and all proceeds therefrom in which Liens are granted whether pursuant to the Interim Order and Final Order, as applicable, and the Collateral Documents or otherwise, in each case as security for the Obligations (collectively, the "Collateral")

- **Priority**: All Obligations of Borrower and the Guarantors shall constitute administrative expenses of such party in the Chapter 11 Cases, with administrative priority and senior-secured status under Sections 364(c) and 364(d) of the Bankruptcy Code. Subject only to the Carve-Out, such administrative claim (the "DIP Facility Superpriority Claim") shall have priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, now in existence or hereafter incurred by any of the Debtors and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), and/or 364(c)(1) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre and postpetition property of the Debtors and all proceeds thereof and shall at all times be senior to the rights of Borrower and the Guarantors, Borrower's and Guarantors' estates, and any successor trustee or estate

representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code.

- **Carve-Out**: Liens, security interests, and super-priority administrative expense claims of Existing Agent, the Prior Lender and the DIP Lender shall be subject and subordinate only to: (a) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Court (collectively, the "UST/Clerk Fees"); and (b) allowed, unpaid fees and expenses of attorneys, accountants, and other professionals retained in the case by the Debtors or the Creditors' Committee (collectively, the "Professionals") pursuant to Bankruptcy Code § § 327 and 1103 (the "Priority Professional Expenses"), but the amount entitled to priority under this sub-clause (b) shall not exceed $1.2 million outstanding in the aggregate at any time (the "Professional Expense Cap," and together with the UST/Clerk Fees, the "Carve-Out"); provided, however, that any payments actually made to the Professionals, whether under Bankruptcy Code sections 330 and 331 or otherwise, shall reduce the Professional Expense Cap on a dollar-for-dollar basis, irrespective of whether such payment was made pre-Event of Default or post-Event of Default, it being expressly understood that any prepetition retainers held by Professionals shall not count against, and shall not reduce, the Professional Expense Cap. The Carve-Out shall be free and clear of all liens, claims and encumbrances granted hereunder and shall be subject only to the allowed claims of the Professionals for such fees and expenses as may be awarded by the Court under Bankruptcy Code § 327; provided, however, the Carve-Out cannot be used for the payment or reimbursement of any fees or disbursements of the Debtors or the Creditors' Committee or any other party-in-interest incurred in connection with the assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief: (1) invalidating, setting aside, avoiding, subordinating, in whole or in part, the DIP Facility Obligations or the Prepetition Indebtedness or lien and security interest securing the DIP Facility Obligations or the Prepetition Indebtedness; or (2) preventing, hindering or delaying, whether directly or indirectly, the assertion by the Prior Lender or the DIP Lender or enforcement by the Prior Lender or the DIP Lender or enforcement by the Prior Lender or the DIP Lender of its liens or realization upon any of the respective Collateral; or (3) challenging the postpetition liens or claims seeking an affirmative recovery from the Prepeition Lender or the DIP Lender; provided that the Carve-Out may be used to investigate the Prepetition Indebtedness and

the validity and perfection of the liens and security interests securing the Prepetition Indebtedness.

- **Section 506(c) Waiver**: The DIP Lender seeks, as part of the Final Order, the waiver of any and all claims that may be made under section 506(c) of the Bankruptcy Code.

- **Conditions Precedent**: As a condition precedent to effectiveness, certain documents described in the DIP Credit Agreement must be delivered to the DIP Lender and certain conditions must be satisfied as customarily contained in lending arrangements of this nature. The conditions precedent to the initial and each subsequent borrowing are set forth in Section 2.1 and 2.2 of the DIP Credit Agreement, respectively, and are incorporated herein by reference.

- **General Representations and Warranties**: The DIP Credit Agreement contains representations, warranties and covenants as described in the DIP Credit Agreement.

- **Events of Default**: The DIP Credit Agreement provides that the occurrence of certain events will constitute an event of default, including, by way of example only and without limitation, failure to make any payment when due, failure to timely submit required reports, a Material Adverse Change, a Change of Control, certain budget variances, filing a plan of reorganization to which the DIP Lender does not consent, appointment of a trustee or examiner with expanded powers, conversion of the case to Chapter 7, failure of the Final Order to be entered within 15 days of the Petition Date, the filing of a motion for reconsideration of the Interim Order or Final Order; failure to meet a Sale Milestone, termination of the Asset Purchase Agreement with DIP Lender or failure to comply with any other term of the DIP Credit Agreement.

  In addition to the aforementioned events constituting an event of default, the nonoccurrence of the following events (collectively the "Sale Milestones") will also constitute an event of default: (a) an order of the Bankruptcy Court in form and substance acceptable to the DIP Lender (the "Bid Procedures Order") establishing the Bid Procedures entered on or before November 9, 2007; (b) (i) the holding of a hearing by the Bankruptcy Court regarding the sale of all or substantially all of the assets of Borrower is accordance with the Bid Procedures Order and the Asset Purchase Agreement (at which hearing the Bankruptcy Court shall have indicated its approval of the foregoing) on or before December 13, 2007 and (ii) an order of the Bankruptcy Court, in form and substance acceptable to the DIP Lender, evidencing the approval described in the foregoing clause (i) entered on or prior to December 13, 2007;

or (c) the closing of the Asset Sale on or prior to December 24, 2007. A detailed listing of the various events of default is set forth in Section 8.1 of the DIP Credit Agreement, which is incorporated herein by reference.

- **Default Interest**: Upon the occurrence and during the continuance of any Event of Default (as defined in the DIP Credit Agreement), interest shall be payable at 3% above the applicable rate.

- **DIP Budget**: The use of the DIP Facility shall be limited in accordance with the DIP Budget (subject to permitted variances as outlined in Annex C to the DIP Credit Agreement.). A copy of the DIP Budget is attached to the Interim order as Exhibit 2.

31. In addition to providing additional funding to the Debtors pursuant to the DIP Facility, the DIP Lender has consented to the Debtors' use of Cash Collateral pursuant to the terms of the Interim Order. Pursuant to Bankruptcy Code sections 361, 363(c)(2), 363(e) and 364(d)(1), the DIP Lender is entitled to, and the proposed order grants to the DIP Lender, adequate protection of its interest in the Prepetition Collateral, in an amount equal to the aggregate diminution in value of the DIP Lender's Prepetition Collateral, including, without limitation, any diminution resulting from the use of Cash Collateral, the implementation of the DIP Facility, the sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral and the imposition of the automatic stay pursuant to Section 362 of the Bankruptcy Code. This adequate protection is in the form of, *inter alia*, (i) a valid, perfected replacement security interest in and lien upon all Prepetition Collateral of the Debtors and the proceeds thereof, subject and subordinate only to (a) the Prepetition Liens, (b) the DIP Facility Liens being granted to the DIP Lender, and (c) the Carve-Out, which is to be effective and perfected upon the entry of the Interim Order and without the necessity of the execution by the Debtors of security agreements, financing statements or other agreements, (ii) the Debtors' bidding procedures motion to be heard as part of the Debtors' other first-day motions and the order entered, in the form filed by the Debtors with the Motion, upon such motion no later than

November 9, 2007; and the relief requested in the bidding procedures motion shall not be modified except with the consent of the DIP Lender, and (iii) the Debtors' adherence to the DIP Budget.

32. The DIP Facility, Documents and the Debtors' use of Cash Collateral were negotiated in good faith and at arm's length between the Debtors and the DIP Lender. The ability of the Debtors to finance their operations and the availability of sufficient working capital through the use of the DIP Lender's cash collateral and the incurrence of indebtedness for money borrowed and other financial accommodations is vital to the Debtors' ability to operate and maximize the value of their estate for the benefit of its creditor constituencies. For these reasons, the Debtors contend that it is in the best interest of their estate to be authorized to use the DIP Lender's cash collateral and secure the DIP Facility contemplated herein.

33. Nothing in the DIP Facility Documents, the DIP Credit Agreement or the Interim Order shall be deemed to constitute an admission of any subsequently appointed creditors' committee (the "Committee") or to bind the Committee to the Debtors' releases, acknowledgements, admissions, or waivers, subject to the Committee's right to commence, within the time period specified in the Interim Order, a proceeding seeking to avoid any security or collateral interest in assets of the Debtors claimed by the DIP Lender.

34. In addition, the liens, security interests and adequate protection granted under the DIP Credit Agreement and the Interim Order shall be subordinate to the Carve-Out, as outlined above and as set forth in Section 1.12(c) of the DIP Credit Agreement.

35. The DIP Facility together with the use of Cash Collateral should provide the Debtors with sufficient liquidity to survive the early stages of the chapter 11 process through completion of the Proposed Sale process. In contrast, without the use of Cash Collateral and

access to the DIP Facility, the Debtors will have little available cash and will effectively be denied any hope of maximizing the value of their estate for the benefit of their creditor constituencies.

## Basis For Relief

### A. Basis for Emergency Relief

36. Pursuant to Bankruptcy Rule 4001(c)(2), a minimum of fifteen (15) days notice is required before a final hearing on this Motion may take place. However, that rule also provides that the Court "may conduct a hearing before such 15-day period expires, but . . . may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed.R.Bankr.P. 4001(c)(2).

37. It is essential to the continued operation of the Debtors' business that they be authorized by this Court to use cash collateral and obtain interim debtor in possession financing in the requested amount pending a final hearing on the Motion. Moreover, in the absence of immediate access to cash collateral and post petition financing, the Debtors' efforts to maximize the value of their estates will be immediately and irreparably jeopardized. The funds are urgently needed to meet the Debtors' working capital and other liquidity needs. Thus, the interim relief requested hereby is necessary, appropriate, and fully warranted, and is essential to avoid immediate and irreparable harm to the Debtors, their estates and their creditors.

### B. Debtors' Exercise of Sound Business Judgment

38. Section 364 of the Bankruptcy Code governs a debtor in possession's ability to incur debt or obtain credit postpetition as follows:

> (c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt -

(1) with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

(d) (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if -

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

39. Generally, sections 364(c) and (d) of the Bankruptcy Code require a debtor to demonstrate that alternative sources of credit are not available under sections 364(a) or (b). See In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("a debtor is not required to seek credit from every possible source . . . [but only to] show that it has made a reasonable effort to seek other sources of credit available."). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Bray v. Shenandoah Federal Savings & Loan Assn. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); see also Ames, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing when it selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Savings Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

40. Against this statutory backdrop, courts will evaluate the facts and circumstances of a debtor's case and will accord significant weight to the debtor's business judgment regarding the necessity for obtaining the financing. See, e.g., Bray v. Shenandoah Fed., Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); Ames, 115 B.R. at 40. For example, the need for a swift injection of cash to preserve a debtor's business satisfies the requirements of section 364(d) of the Bankruptcy Code, when coupled with unsuccessful attempts to locate alternative financing. See Ames, 115 B.R. at 40; Snowshoe, 789 F.2d at 1088 (primary facts supporting priming included lack of alternative financing sources and need to obtain prompt cash infusion to preserve value of debtors' business).

41. Initially, it should be noted that the universe of lenders who could commit to meet the Debtors' postpetition financing requirements was quite limited. The Debtors do not believe that they would be able to obtain the funds required in the form of unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code, an administrative expense pursuant to sections 364(a) or (b) of the Bankruptcy Code, unsecured debt having the priority afforded by section 364(c)(1) of the Bankruptcy Code or debt secured only as described in sections 364(c)(2) or (3) of the Bankruptcy Code, because the Prepetition Liens of the DIP Lender encumber all or substantially all of the Debtors' assets. Additionally, the Debtors do not believe that it would be able to obtain an alternative borrowing facility proposed by another lender on terms and conditions as favorable as those proffered by the DIP Lender, both economically and from a timing perspective.

42. In light of the circumstances, the Debtors concluded, in the exercise of their sound business judgment, that the proposal for debtor in possession financing provided by the DIP

Lender was the most favorable under the circumstances and addressed the Debtors' reasonably foreseeable working capital needs.

43. The Debtors' efforts to seek necessary postpetition financing from other sophisticated lending institutions satisfy the statutory requirements of section 364(c). See, e.g., In re Phoenix Steel Corp., 39 B.R. 218, 222 and n.9 (D. Del. 1984) (requiring demonstration that less onerous financing was unavailable); In re Reading Tube Indus., 72 B.R. 329, 332 (Bankr E.D. Pa. 1987) (same); Ames, 115 B.R. at 40 (approving section 364(c) financing facility and holding that the debtor made reasonable efforts to obtain less onerous terms where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders); In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (debtor "must make an effort to obtain credit without priming a senior lien").

44. The Debtors' decision to enter into the DIP Facility quite clearly represents an exercise of sound business judgment. Without the financing, the Debtors simply cannot conduct their operations. Without such funds, the Debtors will not be able to pay their payroll and other direct operating expenses and obtain goods and services needed to carry on their business during this critical period. Equally important, without financing to cover the Debtors' cash needs, the Debtors will be unable to timely satisfy their administrative obligations. The DIP Facility addresses this need by providing the Debtors with funds necessary to meet ongoing operating needs, and by instilling the Debtors' customers and employees with a sense of the Debtors' financial security.

45. Further, the Debtors have negotiated the best financing arrangement that it can realistically expect to obtain under the circumstances. The fees required by the DIP Lender are customary and reasonable. Indeed, courts routinely authorize similar lender incentives beyond

the explicit liens and rights specified in section 364 of the Bankruptcy Code. See In re Defender Drug Stores, Inc., 145 B.R. 312, 316 (9th Cir. BAP 1992). The costs of failing to approve the DIP Facility (e.g., loss of jobs and the inability to reorganize) would be catastrophic to creditors and parties in interest. See, e.g., In re Western Pacific Airlines, Inc., 223 B.R. 567, 570-71 (Bankr. D. Colo. 1997).

46. Based upon the foregoing, the Debtors respectfully request that the Court approve the DIP Facility in accordance with the terms set forth in the DIP Credit Agreement and the Interim Order.

C. The DIP Facility Is Vital to the Debtors' Ability to Consummate a Successful Reorganization

47. The continued operation of the Debtors' business should provide the Debtors with an opportunity to maximize the value of their estate for the benefit of their creditor constituencies through the Proposed Sale process.

48. The Debtors have focused their business strategy to preserve capital and reduce costs, and at the same time have undertaken a process to sell substantially all of their assets through a section 363 sale. The Debtors believe that through the Proposed Sale process, it is poised to effectuate a restructuring and deleveraging of its capital structure that will enable it to move forward as a viable, more profitable business enterprise. In the interim, however, an immediate need exists for the Debtors to obtain funds with which to pay current operating expenses, and to administer and preserve the value of its estate. Absent immediate access to funds, the Debtors will likely have to shut down and discharge their employees.

49. It is well established that a bankruptcy court, where possible, should resolve issues in favor of preserving the opportunity of a debtor to successfully reorganize:

> A debtor, attempting to reorganize a business under Chapter 11 clearly has a compelling need to use "cash collateral" in its effort to rebuild, without

> the availability of cash to meet daily operating expenses, such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated.

See generally Chrysler Credit Corp. v. Ruggiere, 727 F.2d. 1017, 1019 (11th Cir. 1984).

D. Good Faith

50. The terms and conditions of the DIP Facility are fair and reasonable and were negotiated in good faith and at arm's length between the Debtors and the DIP Lender. Accordingly, the DIP Lender should be accorded the benefits and protections of section 364(e) of the Bankruptcy Code with respect to the DIP Facility. The DIP Facility was approved by the Debtors' board of directors, the members of which have no relationship or affiliation with the DIP Lender or any of its affiliates. Accordingly, based on the foregoing, the Debtors respectfully request that the Court order that any loans, advances or other financial accommodations which are made or caused to be made to the Debtors by the DIP Lender pursuant to the DIP Facility are deemed to have been made and provided in good faith, as the term "good faith" is used in Bankruptcy Code section 364(e), and shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or the DIP Facility or any provisions are hereafter modified, vacated, amended, or stayed by subsequent order of this Court or any other court without the consent of the DIP Lender.

E. Authorization of Use of Cash Collateral and Adequate Protection

51. In addition to the need for debtor in possession financing, the Debtors' other pressing concern is the need for immediate use of the Cash Collateral pending a final hearing on the Motion. Section 363(c)(2) of the Bankruptcy Code provides that the Debtors may not use, sell or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale or lease in

accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). The DIP Lender has consented to the Debtors' use of Cash Collateral on the terms and conditions set forth in the DIP Credit Agreement and the Interim Order. Accordingly, based on the foregoing, the Debtors respectfully request that the Court authorize the Debtors to use the Cash Collateral in accordance with the terms set forth in the Interim Order and the DIP Credit Agreement.

52. Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor in possession may not use cash collateral without the consent of the secured party or court approval. Section 363(e) provides that upon request of an entity that has an interest in property to be used by a debtor, the court shall prohibit or condition such use as is necessary to provide adequate protection of such interest. What constitutes adequate protection must be decided on a case-by-case basis. See In re O'Connor, 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985); In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. See In re 495 Central Park Avenue Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992).

53. In exchange for the Debtors' use of the Prepetition Collateral, the Debtors have agreed to provide certain adequate protection to the DIP Lender. To that end, the Debtors and the DIP Lender have negotiated, and the Debtors request that the Court approve, as of the Petition Date, certain adequate protection as described above. The proposed adequate protection is intended to protect the DIP Lender from diminution in the value of its interest in the Prepetition Collateral during the period it is being used by the Debtors. See In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988). The Debtors and the DIP Lender believe that the proposed adequate protection is fair and reasonable. See 11 U.S.C. § 361. Accordingly, based on the

foregoing, the Debtors respectfully request that the Court authorize the Debtors to provide certain adequate protections in accordance with the terms set forth in the Interim Order and the DIP Credit Agreement.

F. Modification of the Automatic Stay

54. Section 362 of the Bankruptcy Code provides for an automatic stay upon the filing of a bankruptcy petition. The proposed DIP Facility contemplates a modification of the automatic stay, to the extent applicable and to the extent necessary, to permit the DIP Lender to perform any act authorized or permitted under or by virtue of the Interim Order or the DIP Credit Agreement.

55. Stay modification provisions of this kind are ordinary and standard features of postpetition debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances. Therefore, the Debtors respectfully request that the Court authorize modification of the automatic stay in accordance with the terms set forth in the Interim Order and the DIP Credit Agreement.

Disclosures Pursuant To Local Rule 4001-2

56. Local Rule 4001-2 requires that certain provisions contained in the DIP Facility be highlighted, and that the Debtors provide justification for the inclusion of such highlighted provisions. The Debtors believes that certain provisions of the DIP Facility implicate Local Rule 4001-2, and that such provisions are appropriate and justified in the context of this bankruptcy case. Accordingly, to the extent not otherwise previously disclosed, the Debtors note the following in respect of the terms of the Interim Order:

a. There are no provisions that grant cross-collateralization of postpetition collateral to secure prepetition indebtedness (Local Rule 4001-2(a)(i)(A)). The replacement liens being granted to the DIP Lender as adequate

protection for the use of Cash Collateral are only being granted to the extent of diminution in value of the DIP Lender's Prepetition Collateral.

b. Regarding Local Rule 4001-2(a)(i)(B), the Interim Order operates to establish the validity, amount and perfection of the DIP Lender's claims and Liens and waives all of the Debtors' claims (if any exist) against the DIP Lender, subject to the right of the Committee to commence a proceeding challenging the DIP Lender's claims and liens or asserting any other causes of action against the DIP Lenders, within twenty-five (25) days from the date of appointment of counsel for the Creditors' Committee (and if no Creditors' Committee is formed, any party-in-interest shall have twenty-five (25) days from entry of the Interim Order). The shortened investigation period has been required by the DIP Lender and is appropriate in this case because of the expedited nature of the sale process that is being undertaken by the Debtors. As set forth in the bid procedures motion filed contemporaneously herewith, the DIP Lender is the proposed stalking horse bidder and its bid includes a credit bid of a portion of the Prepetition Indebtedness. In light of the credit bid, the DIP Lender and Debtors believe it is important for them and the Court to know prior to approval of the sale of the Debtors' assets if the validity of the DIP Lender's Prepetition Liens and security interests with respect to such indebtedness are subject to challenge. Further, the DIP Lender cannot make such a credit bid if the validity of their liens and security interests with respect to such loans are subject to challenge. Accordingly, any review of the Prepetition Loan Documents and the Prepetition Liens should be completed prior to the commencement of the auction, i.e., on the timeframe

described above. While the proposed investigation period is short, the Debtors assert that under the facts of this case, such time period is sufficient to conduct such a review and is in the best interests of the Debtors' estates, creditors and other parties in interest.

c. Regarding Local Rule 4001-2(a)(i)(C), pursuant to paragraph 9 of the Interim Order, upon entry of the Final Order, neither the Collateral nor the DIP Lender shall be subject to surcharge, pursuant to section 506(c) of the Bankruptcy Code or otherwise, by the Debtors or any other party in interest, subject only to the Carve-Out. The DIP Lender has agreed to advance new funds in return for certain concessions by the Debtors. The Debtors submit that because the DIP Credit Agreement was negotiated in good faith and at arm's length between the Debtors and the DIP Lender, the section 506(c) waiver (other than as to the Carve-Out only) is appropriate in the context of the overall funding agreement. Such waiver however is not being requested in the Interim Order and will only be effective upon entry of a Final Order.

d. Regarding Local Rule 4001-2(a)(i)(D), the DIP Lender is not seeking a Lien upon any claims or causes of action arising under chapter 5 of the Bankruptcy Code or proceeds thereof as part of the Interim Order. The DIP Lender is requiring, as part of a Final Order, a lien on any avoidance actions and proceeds thereof pursuant to section 547 of the Bankruptcy Code. Such provision is appropriate because it will not bind the estate or parties in interest absent adequate notice and opportunity to object.

e. Finally, there are no provisions which seek to prime any secured lien without the consent of that lien holder (Local Rule 4001-2(a)(i)(G)). The DIP Facility is a priming facility with respect to the liens securing the Prepetition Indebtedness which is in fact held by the DIP Lender.

Statement Pursuant to Local Rule 1001-1(b)

57. Pursuant to District Local Rule 7.1.2(a), incorporated by reference into Bankruptcy Local Rule 1001-1(b), the Debtors waive their right to file a brief in support of the Motion because there are no novel issues of law presented in this Motion.

Notice

58. The Debtors further request that the Court schedule the Final Hearing and authorize it to mail copies of the signed Interim Order (assuming it is approved), which Notice of this Motion has been provided to (a) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801; (b) counsel to Adeptio INPC Funding, LLC: Young Conway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware 19801 (Attn.: Robert S. Brady) and Kirkland & Ellis LLP, 200 East Randolph Drive, Chicago, Illinois 60601 (Attn.: David A. Agay); (c) the Debtors' twenty (20) largest unsecured creditors on a consolidated basis; (d) the Internal Revenue Service; (e) the Securities and Exchange Commission; and (f) any other known lienholders. In addition, because this Motion seeks "first day" relief, notice of this Motion and any order entered respecting this Motion will be served as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice is necessary or required.

## No Prior Request

59. No prior request for the relief sought herein has been made to this or any other Court.

## Conclusion

WHEREFORE, the Debtors respectfully request that this Court enter the Interim Order and, after notice and a hearing, enter a final order (substantially in the form of the Interim Order) (i) authorizing the Debtors to obtain interim and final secured postpetition financing pursuant to the DIP Facility, the DIP Credit Agreement and the Interim Order; (ii) granting the DIP Lender Liens and security interests and providing superpriority administrative expense status, to the extent requested herein; (iii) authorizing the use of the DIP Lender's cash collateral; (iv) modifying the automatic stay, to the extent requested herein; (v) scheduling a Final Hearing on the Motion and prescribing the form and manner of notice thereof; and (vi) granting such other relief as the Court determines to be just and proper.

Date: November 8, 2007

Neil B. Glassman (No. 2087)
Mary E. Augustine (No. 4477)
The Bayard Firm
222 Delaware Avenue
Suite 900
P.O. Box 25130
Wilmington, DE 19899
Telephone: (302) 655-5000
Facsimile: (302) 658-6395

and

Thomas R. Califano
DLA Piper US LLP
1251 Avenue of the Americas
New York, New York 10020
Telephone: (212) 335-4990
Facsimile: (212) 884-8690
Proposed Counsel to Debtors and
Debtor in Possession

Mark J. Friedman (MD Bar No. 00102)
Maria Ellena Chavez-Ruark (MD Bar No. 23941)
Jason W. Hardman (MD Bar No. 27470)
DLA Piper US LLP
The Marbury Building
6225 Smith Avenue
Baltimore, Maryland 21209-3600
Telephone: (410) 580-3000
Facsimile: (410) 580-3001

Proposed Counsel for Debtors
and Debtors in Possession