IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| INPHONIC, INC., et al.,[1] | : Case No. 07-_____ |
| | : |
| Debtors. | : (Jointly Administered) |
| | : |
| | : |
| | : |
| | : |

**MOTION FOR ORDER (I) APPROVING BID PROCEDURES RELATING TO SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (II) SCHEDULING A HEARING TO CONSIDER THE SALE AND APPROVING THE FORM AND MATTER OF NOTICES; (III) ESTABLISHING PROCEDURES RELATING TO ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS, (IV) APPROVING EXPENSE REIMBURSEMENT PROVISION, AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors"), by and through

their undersigned counsel, hereby move (the "Motion") this Court, pursuant to sections 105(a),

363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), for an order

(a) approving bid procedures (the "Bid Procedures") relating to a sale of substantially all of the

Debtors' assets (the "Asset Sale") as set forth below and in that certain Asset Purchase

Agreement (the "Agreement") by and between the Debtors and Adeptio INPC Funding, LLC, a

Delaware limited liability company ("Adeptio"); (b) scheduling a hearing (the "Sale Hearing") to

consider the sale and approving the form and matter of notices including notices relating to an

---

[1] InPhonic, Inc. together with its wholly-owned subsidiaries identified below, have each filed voluntary Chapter 11 petitions and a motion is pending pursuant to Federal Rule of Bankruptcy Procedure 1015 for Joint Administration. The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows: (a) InPhonic, Inc., a Delaware corporation, Fed. Tax Id. No. 9384; (b) CAIS Acquisition, LLC, a Delaware limited liability company, Fed. Tax Id. No. 6257; (c) CAIS Acquisition II, LLC, a Delaware limited liability company, Fed. Tax Id. No. 3695; (d) SimIPC Acquisition Corp., a Delaware corporation, Fed. Tax Id. No. 4924; (e) Star Number, Inc., a Delaware corporation, Fed. Tax Id. No. 5549; (f) Mobile Technology Services, LLC, a Delaware limited liability company, Fed. Tax Id. No. 1426; (g) FON Acquisition, LLC, a Delaware limited liability company, Fed. Tax Id. No. 2807; and (h) 1010 Interactive, LLC, a Delaware limited liability company, Fed. Tax Id. No. 5391.

(i) auction (the "Auction") and (ii) objection deadline with respect to the Asset Sale; (c) establishing procedures relating to assumption and assignment of certain Designated Contracts, including notice of proposed cure amounts (the "Cure Costs"), (d) approving the Expense Reimbursement provision as defined herein, and (e) granting related relief.  In support of this Motion, the Debtors respectfully represent as follows:

Jurisdiction and Venue

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157(a) and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory basis for the relief requested herein is sections 105(a), 363, and 365 of the Bankruptcy Code and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

Background

3.      On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The factual background regarding each of the Debtors, including their current and historical business operations and the events precipitating these chapter 11 filings, is set forth in detail in the *Declaration of Kenneth D. Schwarz, Chief Financial Officer of the Debtors, in Support of First Day Motions* (the "Schwarz Affidavit"), and is incorporated herein by reference.[2]

4.      The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[2] Capitalized terms shall have the meanings ascribed to them in the Schwarz Affidavit unless otherwise defined herein.

5.     No trustee, examiner or committee has been appointed in any of the Debtors' chapter 11 cases.

The Debtors' Business Operations

6.     InPhonic was incorporated in 1997 and began operations in 1999.  InPhonic's business principally involves the marketing of wireless telephone and satellite television services and related equipment and support services.  InPhonic focuses in four (4) areas:  (i) wireless device activation services, (ii) television satellite activation services, (iii) mobile virtual network enabler ("MVNE") services, and (iv) unified communication services.

7.     InPhonic is a leading internet (online) seller of wireless services and devices to consumers.  InPhonic sells these services and devices through company owned and branded websites, including without limitation www.wirefly.com, as well as through a variety of private labeled websites that it develops and manages for marketing partners such as internet businesses, affinity organizations and national retailers.

8.     InPhonic markets its services through a variety of online advertising programs including display advertising, search marketing, email marketing and affiliate programs.  InPhonic's website, www.wirefly.com, a leading one-stop shopping site for mobile phones and wireless plans, has been awarded "Best of the Web" by Forbes magazine and "Best in Overall Customer Experience" by Keynote Performance Systems.

9.     InPhonic also markets its services through its partners' private labeled websites which InPhonic creates to leverage its partners' brands and their existing customer relationships.  InPhonic private-labels customer touch points to the partners' brands, including the web storefront, customer communications (such as call centers and in-box collateral) and device packaging.

10.     CAIS Acquisitions II, LLC, a wholly-owned subsidiary of InPhonic, does business under the name VMC Satellite.  Through VMC Satellite, InPhonic markets consumer digital broadcast satellite television, broadband and VOIP services.  VMC Satellite markets its services through a portfolio of its own websites, affiliate websites, print advertisement and private labeled websites, as well as through an in-bound call center.

11.     InPhonic's Mobile Virtual Network Enabler (MVNE) business leverages the company's e-commerce platform and operational infrastructure to enable communications service providers and consumer brands to offer a branded wireless service to their customers without having to own or operate the underlying wireless network or operational infrastructure. InPhonic's MVNE platform provides a turn-key solution that combines system integration to every major U.S. wireless carrier with enterprise strength billing and customer care solutions.

12.     InPhonic develops and sells a unified communications service that provides users with a private toll-free number and a professional set of small business messaging services for one monthly fee.  Users have one central location for all of their voicemail, email, faxes, calendar appointments and address books and can manage all of their messages from anywhere by accessing a single message box using any phone or computer.  The platform offers users many voice messaging, fax delivery, conference calling and call routing services integrated into a single application accessible by telephone or computer for a single monthly fee.

13.     InPhonic's relationships with its carrier, service, affiliate and marketing partners are the keys to its business operations.  InPhonic has agreements with the largest wireless carriers in the U.S., as well as large satellite, broadband and VOIP providers, to market their products and services.  The company also has agreements with thousands of affiliate and marketing

partners that market the Debtors' products and services under their brands through private-labeled websites that InPhonic creates and manages and/or their websites.

14.    All of the Debtors are headquartered in Washington, D.C. The Debtors maintain technology and operations centers in Largo, Maryland, Reston, Virginia and Great Falls, Virginia.

Background Related to the Sale

15.    Beginning in 2006, several factors caused InPhonic to experience a rapidly declining cash balance and eventual lack of cash liquidity, including increased spending on marketing that proved to be unprofitable, insufficient improvement in revenue assurance and collection efforts, inability to maintain adequate inventory of the most popular wireless devices, increasing general and administrative expenses and declining gross margin in revenue generated by customer activations. InPhonic began to address these challenges by proactively reducing overall marketing costs, focusing marketing expenses on the marketing channels that resulted in activations with the largest gross margins, reducing general and administrative expenses, and improving collection efforts. These measures, however, did not result in enough immediate liquidity to increase inventory to levels necessary to fulfill orders for the most popular wireless devices. The positive effect of the improvements were offset by the revenue lost due to the rapidly increasing number of customer orders that were placed for wireless devices that were "out-of-stock."

16.    The Debtors are close to exhausting their cash resources and do not believe they will be able to continue in business unless they receive a cash infusion of approximately $25,000,000.00 (the "DIP Facility") which Adeptio has agreed to provide pursuant to the terms of the Senior Secured Super-Priority Debtor-in-Possession Credit and Guaranty Agreement.

17.    Although the DIP Facility should allow the Debtors to continue to operate their business for the short tem, the Debtors believe the only viable solution which will preserve the value of the assets and business of the Debtors is through a sale pursuant to Bankruptcy Code Section 363.

18.    The Debtors have also faced a severe contraction in trade terms in the months prior to the Petition Date. This contraction of trade terms has ranged from severe tightening of payment periods to placing the Debtors on cash in advance payment terms. The actions of these trade vendors have severely impacted the Debtors' liquidity. Having exhausted all other reasonable options, the Debtors faced the threat of running out of available cash and were in jeopardy of failing to meet its day-to-day obligations.

19.    Pursuant to the prepetition Senior Credit Agreement, as evidenced by its related documents, the Debtors are jointly and severally liable and have granted security interests in and liens upon all of their property, including, without limitation, all of the Debtors' accounts, inventory, equipment general intangible and intellectual property. The Debtors were not able to reach any arrangement for additional funding from the prepetition Lenders under the Senior Credit Agreement. The Debtors had no basis to secure any funding from any alternative source while the prepetition Senior Credit Agreement remained in place. Consequently, the Debtors intensified their search for a buyer.

20.    Approximately one month before the Petition Date, the Debtors engaged Goldsmith-Agio-Helms Securities, Inc. ("GAH") to, among other things, identify prospective buyers for the Debtors' business. The Debtors, through the assistance of GAH, have contacted a substantial number of potential buyers (including strategic buyers and financial purchasers) regarding a potential sale. As a result of this initial contact, various groups requested further

information, which was provided in the form of a marketing book. A number of parties executed confidentiality agreements and were provided due diligence materials.

21.    Although several parties expressed an interest in the assets of the Debtors, no party offered definitive terms and conditions of purchase which approached either the specificity or feasibility of the transaction proposed by Adeptio.

22.    On Friday, November 2, 2007, the Debtors were informed that Adeptio had acquired all the rights of the Lenders' under the Senior Credit Agreement, and had purchased all of the prepetition Lenders' right, title and interest in and to the Senior Credit Agreement.

23.    Prior to and since acquisition of the prepetition Lenders' rights the Senior Credit Agreement, Adeptio and the Debtor have negotiated an agreement for Adeptio to purchase substantially all of the assets of the Debtors and, from the Petition Date through the closing, provide funding for the Debtors' operations through the DIP Facility.

24.    The Debtors believe it is in the best interests of their estates, creditors, customers and employees to commence a bidding procedure immediately, as the Debtors have limited funding and resources to try to maximize the value of their assets. Indeed, the DIP Facility is available only for a finite period of time. Although the Debtors have made significant progress in reducing expenses, it is questionable whether they will be able to continue operating beyond the period of this proposed bidding process without additional funding, which may not be forthcoming.

25.    Additionally, the Debtors considered pursuing alternative restructuring options including a stand-alone plan of reorganization, but determined that that course of action would not be the best strategy to maximize recoveries for their creditors. The Debtors determined that a sale of their assets is in the best interests of their estates and their creditors, customers,

employees and other stakeholders after a thorough analysis of all of these factors and other considerations.

26.    The Debtors are filing this Motion for approval of the Bid Procedures in connection with the Auction in an effort to maximize the likelihood of higher and better bids being made for the Debtors' assets.  The Debtors believe that the Bid Procedures will permit interested parties reasonable opportunities, consistent with the financial constraints of the Debtors, to evaluate whether to propose a bid for the Debtors' assets that is higher and better than the Agreement entered into by the Debtors and the Buyer.

The Proposed Sale of the Assets to Adeptio

27.    The material terms of the business deal between the Debtors and Adeptio are that Adeptio has agreed, if not outbid at the Auction, to purchase substantially all of the Debtors' assets (the "Assets") for approximately $50 million, free and clear of liens (if any), claims, encumbrances, and interests (collectively referred to as "Encumbrances"), with such Encumbrances to attach to the proceeds of the Asset Sale, if any.

28.    The section summarizes the significant terms of Agreement, but are qualified in their entirety by reference to the actual Agreement:

   a. Purchase Price.  (i) $50,000,000 (the "Credit Bid Amount"); and (ii) the aggregate amount of the Assumed Liabilities.

   b. Assets means, other than the Excluded Assets, all of the Sellers' right, title and interest in and to the tangible and intangible assets, properties, rights, claims and contracts owned, leased and/or licensed by any of the Sellers of every kind, character and description, whether accrued, contingent or otherwise, existing as of the Closing (which assets comprise substantially all of the Sellers' assets, properties, rights, claims and contracts), including, without limitation:

    (i) all inventory, wherever located, including supplies, goods-in-transit, works in process, raw materials and finished products;

(ii)     all accounts receivable and other receivables of the Sellers (including, without limitation, all accounts receivable and other receivables to collect from customers) and all rights of any kind or nature to retain all fees and other amounts payable, or that may become payable, to any of the Sellers with respect to services performed by or on behalf of any Seller on or prior to the Closing Date and all defenses, claims, counterclaims and cross-claims with respect to any right of setoff or recoupment asserted with respect to such account receivable or receivable;

(iii)    all tangible personal property owned or used by any Seller, including, without limitation, all equipment, furniture, fixtures, supplies, machinery, vehicles, tools and furnishings;

(iv)    all Owned Property, together with all buildings, fixtures, structures, improvements and other appurtenances thereto and thereon;

(v)     all Designated Contracts;

(vi)    all books and records, files, data, reports, computer codes and sourcing data, customer and supplier lists, cost and pricing information, business plans, quality control records and manuals, blueprints, research and development files, accounting and tax files, personnel records and other records of any Seller or related to the operations of any Seller and/or the Business;

(vii)   the Intellectual Property and all telephone numbers utilized by any Seller in connection with the Business (including, without limitation, all of the trademarks, trade names, URL's and telephone numbers listed on Schedule 1.1), in each case, to the extent assignable;

(viii)  all Software owned by Sellers or leased by Sellers pursuant to a Designated Contract;

(ix)    all Permits that relate to the Business, to the extent assignable;

(x)     all marketing, advertising and promotional materials;

(xi)    all rights, privileges, claims (including warranty claims, to the extent transferable), Avoidance Actions (other than Excluded Avoidance Actions), offsets, demands, choses in action and indemnification rights of Sellers against or with respect to (including all of Sellers' rights under any indemnification

agreements) any Person (including, without limitation, all of the foregoing against any of the Persons identified on Schedule 1.2) in connection with and/or otherwise related to the Business, any of the Assets and/or any of the Assumed Liabilities and arising prior to (or related to facts, circumstances and/or events arising prior to) the Closing, whether choate or inchoate, known or unknown, contingent or noncontingent;

(xii)   all rights of any Seller relating to deposits and prepaid charges and expenses, claims for refunds, indemnification rights and rights to offset in respect thereof relating to the Assets;

(xiii)  all goodwill associated with the Business and/or the Assets;

(xiv)   any interest in and to any refunds of Taxes of whatever nature;

(xv)    all rights under all insurance policies and all rights of every nature and description under or arising out of such policies, except as provided in clause (g) of the definition of "Excluded Assets" and except to the extent such insurance policies are non-assignable of a matter of law; and

(xvi) all of seller's ownership rights in Flipswap, Inc.; and

(xvi)   all cash (including checks received prior to the Closing, whether or not deposited or cleared prior to the Closing), cash equivalents and short-term investments (including, without limitation, all cash deposits to or for the benefit of utilities, including any such cash deposits maintained in escrow).

c.   Excluded Assets means all of the Sellers' right, title and interest in and to the following assets:

(i)     all minute books, stock records and corporate seals;

(ii)    all records that Seller is required by law to retain in its possession and all personnel records with respect to employees that are not considered Transferred Employees (provided that records necessary for Buyer to provide COBRA coverage as legally required shall not be considered Excluded Assets and shall be considered to be Assets for all purposes of this Agreement); provided, however, that Seller shall make such records available to Buyer if required by Buyer from and after the Closing;

(iii)   the Excluded Avoidance Actions;

> (iv)   any rights of the Sellers under this Agreement;
>
> (v)    the equity securities of the Sellers;
>
> (vi)   any Contracts or leases that are not Designated Contracts; and
>
> (vii)  all rights under insurance policies to the extent relating to claims for losses related exclusively to any Excluded Asset or otherwise non-assignable as a matter of law.

d.   Assumed Liabilities means, without duplication, only the

> (i)    Cure Costs associated with, and the liabilities and obligations of the Sellers arising from and after the Closing under, the Designated Contracts assigned to Buyer;
>
> (ii)   trade payables to the extent first arising after the Petition Date directly relating to the operation of the Business in the ordinary course; and
>
> (iii)  all product returns and warranty claims with respect to the Assets, but solely to the extent requiring return, replacement or repair of the product or service provided (and specifically excluding any other Liabilities relating to products or services sold or provided prior to the Closing, including, without limitation, any Liability for any claim under any Environmental Law and any claims for property damage, personal injury or death), and (iv) without duplication, the Company's obligation (if any) to pay any accrued but unpaid fees and expenses owed by the Company to GAH as of the Closing under Section 2 of the GAH Fee Letter (excluding any and all Liabilities of any Seller under or with respect to (x) Section 2(f) of the GAH Fee Letter, (y) the Indemnification Letter (as such term is defined in the GAH Fee Letter) and/or (z) any other provision of the GAH Fee Letter, all of which shall be deemed "Excluded Liabilities" under this Agreement), but only to the extent that GAH has properly submitted a claim for payment of such fees and expenses to the Bankruptcy Court under the Bankruptcy Case and the final allowance of such claim has been approved by the Bankruptcy Court. Notwithstanding any provision of this Agreement to the contrary, the Assumed Liabilities shall not include any of the Excluded Liabilities.

e.   "Excluded Liabilities" shall include all Liabilities of the Sellers not specifically assumed by the Buyer pursuant to the Agreement as assumed liabilities, including, without limitation, the liabilities described on Schedule 1.3 of the Agreement.

f.    "Expense Reimbursement" means the documented actual out-of-pocket costs and expenses (including, without limitation, actual fees and expenses of counsel) incurred by Buyer and/or its Affiliates in connection with the negotiation, documentation and implementation of this Agreement and the transactions contemplated hereby and participation in the Bankruptcy Case up to a maximum of $1,000,000.00.

29.    The Debtors evaluated the terms of Adeptio's offer with the assistance of their professionals and, in their reasoned business judgment, concluded that Adeptio's proposal offered the best opportunity to initiate a sale process that will maximize creditor recoveries (both in terms of purchase price and in terms of cutting-off operational losses). The Debtors have marketed and will continue marketing their assets and business in an effort to solicit further interest from both strategic acquirers and financial buyers and investors. The Agreement is subject to higher or better offers and is conditioned in part upon Adeptio receiving the bid protections described herein.

## Relief Requested

30.    The Debtors seek entry of the proposed order attached hereto (the "Proposed Order") approving the Bid Procedures and proposed Auction process for a sale of substantially all of the Debtors' Assets.

31.    More particularly, the Debtors respectfully request entry of an order (a) approving the Bid Procedures; (b) scheduling the Sale Hearing to consider the sale and approving the form and matter of notices including notices relating to (i) the Auction and (ii) objection deadline with respect to the Asset Sale; (c) establishing procedures relating to the Cure Costs; and (d) approving the Expense Reimbursement Provision.

A.    Auction

32.    Under Bankruptcy Rule 6004(f)(1), the Debtors may sell property outside the ordinary course of business by private sale or by public auction. In this case, the Debtors believe

that an auction will expose the Assets to a broad and diverse market and ensure a sale to the highest and best offer. The Debtors propose to conduct an Auction on December 12, 2007.

B.    Proposed Bid Procedures

33.    The Debtors desire to receive the greatest value for the Assets. Although the Debtors believe the Agreement with the Buyer is fair and reasonable and reflects the highest and best value for the Assets as of the date of this Motion, and although they marketed their Assets prepetition, the Debtors nevertheless desire to place the Agreement to the test of the broader public marketplace in the hope that higher and better offers are generated for all or portions of the Assets.

34.    If the proposed Bid Procedures are approved, the Debtors will solicit competing bids for the Assets. The Bid Procedures describe, among other things, the assets available for sale, the manner in which bidders and bids become "qualified," the coordination of diligence efforts among bidders and the Debtors, the receipt, negotiation and qualification of bids received, the conduct of any auction, and the selection and approval of any ultimately successful bidders.

35.    The Bid Procedures were developed consistent with the Debtors' competing needs to expedite the sale process and promote participation and active bidding. Moreover, the Bid Procedures reflect the Debtors' objective of conducting the Auction in a controlled, but fair and open, fashion.

36.    This section summarizes key provisions of the Bid Procedures, but are qualified in their entirety by reference to the Bid Procedures attached to the Proposed Order as Exhibit 1.

> Bid Deadline. The deadline for submitting bids by a Qualified Bidder shall be December 7, 2007, at 12:00 p.m. (Eastern Time) (the "Bid Deadline"). Prior to the Bid Deadline, a Qualified Bidder that desires to make an offer, solicitation or proposal (a "Bid") shall deliver written copies of its cash bid to: (i) InPhonic, Inc., 1010 Wisconsin Ave. NW, Suite 600, Washington, D.C. 20007, Attn: Gregory S. Cole; (ii) investment banker for the Debtors, Goldsmith-Agio-Helms/Lazard Middle Market, 11

West 42nd Street, 29th Floor, New York, New York 10036 Attn: Andrew
Torgrove, (iii) counsel for the Debtors, DLA Piper US LLP, 1251 Avenue
of the Americas, New York, NY 10020, Attn: Thomas R. Califano and
The Bayard Firm, 222 Delaware Avenue, Suite 900, P.O. Box 25130,
Wilmington, DE 19899, Attn: Neil B. Glassman; (iv) counsel for Adeptio,
Kirkland & Ellis, LLP, 200 E. Randolph Dr., Chicago, IL 60601, Attn:
David Agay, Anup Sathy and John Schoenfeld; and (v) counsel for any
official committee of unsecured creditors appointed in this case
(collectively, the "Notice Parties"), not later than 12:00 p.m. (prevailing
eastern time) on December 7, 2007. A bid proposal received after the Bid
Deadline shall not constitute a Qualified Bid.

Qualified Bid. A "Qualified Bidder" is a Potential Bidder (or combination
of Potential Bidders whose bids for the assets of the Debtors do not
overlap and who agree to have their bids combined for purposes of the
determination of whether such Potential Bidders together constitute a
Qualified Bidder, and who shall also be referred to herein as a single
Qualified Bidder) that delivers the documents described in subparagraphs
(a)-(e) above, and that the Debtors in their discretion and with assistance
from their advisors determine is reasonably likely to submit a *bona fide*
offer that would result in greater cash value being received for the benefit
of the Debtors' creditors than under the Agreement and to be able to
consummate a sale if selected as a Successful Bidder (defined below).
Upon the receipt from a Potential Bidder of the information required under
subparagraphs (a)-(e) above, the Debtors, as soon as is practicable, shall
determine and notify the Potential Bidder with respect to whether such
Potential Bidder is a Qualified Bidder.

Bid Requirements. To be eligible to participate in the Auction, each Bid
and each Qualified Bidder submitting such a Bid must be determined by
the Debtors to satisfy each of the following conditions:

> (a)  Good Faith Deposit. Each Bid must be
> accompanied by a deposit (the "Good Faith Deposit") in
> the form of a certified check or cash payable to the order of
> the Debtors in the amount of $5.0 million.

> (b)  Minimum Overbid. The consideration proposed by
> the Bid can include only cash. The aggregate consideration
> must equal or exceed the sum of the Purchase Price plus
> $2.0 million.

> (c)  Irrevocable. A bid must be irrevocable until two (2)
> business days after the Assets have been sold pursuant to
> the Closing of the sale or sales approved by the Bankruptcy
> Court (the "Termination Date").

(d)     <u>The Same or Better Terms</u>:  The Bid must be on terms that, in the Debtors' business judgment are substantially the same or better than the terms of the Agreement.  A Bid must include executed transaction documents pursuant to which the Qualified Bidder proposes to effectuate the contemplated transaction (the "<u>Contemplated Transaction Documents</u>").  A Bid shall include a copy of the Agreement marked to show all changes requested by the Bidder (including those related to Purchase Price).   The Contemplated Transaction Documents must include a commitment to close by the Termination Date and contain a representation that the Qualified Bidder shall make all necessary HSR Act filings, if any, and pay all costs and expenses of such filings (including the Debtors' costs and expenses). A Bid should propose a contemplated transaction involving all of the Assets. But, the Debtors will consider proposals for less than substantially all the Assets, provided that the Debtors may evaluate all Bids, in their sole discretion, to determine whether such Bid maximizes the value of the Debtors' estates as a whole.

(e)     <u>Contingencies</u>:  A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties or the satisfaction in all material respects at the closing of specified conditions, none of which shall be more burdensome than those set forth in the Agreement.

(f)     <u>Financing Sources</u>:  A Bid must contain written evidence of a commitment for financing or other evidence of the ability to consummate the sale satisfactory to the Debtors with appropriate contact information for such financing sources.

(g)     <u>No Fees payable to Qualified Bidder</u>:  A Bid may not request or entitle the Qualified Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment. Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under Bankruptcy Code § 503 related in any way to the submission of its Bid or the Bid Procedures.

Only if a Qualified Bid (other than Adeptio's) is received by the Bid Deadline, shall the Debtors conduct an auction (the "<u>Auction</u>") to

determine the highest and best bid with respect to the Assets. The Debtors shall provide Buyer and all Qualified Bidders with copies of all Qualified Bids at least twenty-four (24) hours prior to the Auction. The Auction shall commence on December 12, 2007.

No later than December 10, 2007, the Debtors will notify all Qualified Bidders of (a) the highest, best and otherwise financially superior Qualified Bid, as determined in the Debtors' discretion (the "Baseline Bid") and (b) the time and place of the Auction, and provide copies of all submitted bids to all Qualified Bidders (if Adeptio's Qualified Bid constitutes the Baseline Bid then the Expense Reimbursement shall be added to the Qualified Bid for purposes of the Auction).

If, however, no such Qualified Bid is received by the Bid Deadline, then the Auction will not be held, Adeptio will be the Successful Bidder, the Agreement will be the Successful Bid, and, at the December 13, 2007 Sale Hearing, the Debtors will seek approval of and authority to consummate the Proposed Sale contemplated by the Agreement.

Auction.  The Auction shall be conducted according to the following procedures:

(a)     Participation at the Auction

Only a Qualified Bidder that has submitted a Qualified Bid is eligible to participate at the Auction.  Only the authorized representative of each of the Qualified Bidders and the Debtors shall be permitted to attend.

During the Auction, bidding shall begin initially with the highest Baseline Bid and subsequently continue in minimum increments of at least $500,000.  Other than otherwise set forth herein, the Debtors, may conduct the Auction in the manner they determine will result in the highest, best or otherwise financially superior offer for the Assets.

(b)     The Debtors Shall Conduct the Auction

The Debtors and their professionals shall direct and preside over the Auction.  At the start of the Auction the Debtors shall describe the terms of the Baseline Bid.  The determination of which Qualified Bid constitutes the Baseline Bid shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the estate, including, inter alia, the following: (A) the amount and nature of the consideration; (B) the proposed

assumption of any liabilities, if any; (C) the ability of the Qualified Bidder to close the proposed transaction; (D) the proposed Closing Date and the likelihood, extent and impact of any potential delays in closing; (E) any purchase price adjustments; (F) the impact of the contemplated transaction on any actual or potential litigation; (G) the net economic effect of any changes from the Agreement, if any, contemplated by the Contemplated Transaction Documents, and (H) the net after-tax consideration to be received by the Debtors' estates (collectively, the "Bid Assessment Criteria"). All Bids made thereafter shall be Overbids (as defined below), and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders. The Debtors shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids and the Successful Bid.

(c)     Terms of Overbids.

An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of the Baseline Bid. To submit an Overbid for purposes of this Auction, a Qualified Bidder must comply with conditions specified in the Bid Procedures.

(d)     Additional Procedures

The Debtors, in their reasonable discretion, may adopt rules for the Auction at or prior to the Auction that, in their reasonable discretion, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bid Procedures Order. All such rules will provide that all bids shall be made and received in one room, on an open basis, and all other Qualified Bidders shall be entitled to be present for all bidding with the understanding that the true identity of each Qualified Bidder (i.e., the principals submitting the bid) shall be fully disclosed to all other Qualified Bidders and that all material terms of each Qualified Bid will be fully disclosed to all other Qualified Bidders throughout the entire Auction.

(e)     Closing the Auction

Upon conclusion of the bidding, the Auction shall be closed, and the Debtors shall be (i) immediately review each Qualified Bid on the basis of financial and contractual

terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Proposed Sale, and (ii) [immediately] identify the highest, best or otherwise financially superior offer for the Assets (the "Successful Bid") and the entity submitting such Successful Bid, the "Successful Bidder"), which highest, best or otherwise financially superior offer will provide the greatest amount of net value to the Debtors, and the next highest or otherwise best offer after the Successful Bid (the "Back-up Bid"), and advise the Qualified Bidders of such determination. If Adeptio's final bid is deemed to be highest and best at the conclusion of the Auction, Adeptio will be the Successful Bidder, and such bid, the Successful Bid.

C.    Buyer Protections/Expense Reimbursement

37.    To induce Adeptio to expend the time, energy and resources necessary to submit a stalking horse bid, the Debtors have agreed to provide, and to seek at this time this Court's approval of, certain bid protections provided to Adeptio pursuant to the Agreement. In addition to the above requirements, if the Agreement is terminated under certain circumstances under the Agreement, then Adeptio shall be entitled to payment of the documented actual out-of-pocket costs and expenses (including, without limitation, actual fees and expenses of counsel) (the "Expense Reimbursement") incurred by Adeptio or its Affiliates in connection with the negotiation, documentation and implementation of the Agreement and the transactions contemplated hereby and participation in the Bankruptcy Case, up to a maximum of $1,000,000.00.

38.    If the Debtors become obligated to pay Adeptio's Expense Reimbursement, then such obligations shall constitute a super priority administrative expense priority obligation under section 364(c)(1) of the Bankruptcy Code with priority over all expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject to any super-majority claims of the

Sellers' post petition lenders, and shall be payable without further order of this Court as provided for above.

39.    Other protections, such as minimum Overbid amounts, were also negotiated with Adeptio.  These present themselves in the proposed Bid Procedures and the Bid Procedures Order, both of which are themselves the product of negotiations with Adeptio.

40.    The Debtors submit that implementation of the Bid Procedures will not chill the bidding (if any) for all or portions of the Assets.  Quite the contrary, approval of the Bid Procedures is in the best interests of the Debtors, their estates and their creditors in that the Bid Procedures provide a structure and format for other potentially interested parties to formulate a bid for all or portions of the Assets.

41.    Failure to approve the Bid Procedures may jeopardize the sale of the Debtors' assets to the detriment of the Debtors' creditors, employees, customers and vendors .

D.    Notice of Sale Hearing, Auction, Bid Procedures, and Objection Dates

42.    To preserve the Debtors' going-concern value, the Debtors wish to proceed to the Auction and Sale Hearing as expeditiously as the Court's calendar will allow, while providing the requisite notice of the proposed Sale as required under Bankruptcy Rule 2002.

43.    The Debtors propose to hold the Auction at the offices of DLA Piper US LLP, 1251 Avenue of the Americas, New York, New York 10020, 27th floor on December 12, 2007 at 10:00 a.m., Eastern Time.

44.    The Debtors request that the Court schedule the Sale Hearing on December 13, 2007, with an objection deadline for such Sale Hearing set for December 3, 2007 at 4:00 p.m., Eastern Time.

45.     In accordance with Bankruptcy Rule 2002, the Debtors propose to give notice of

the Bid Procedures, the Bid Procedures Order, the Auction and the proposed Sale in the

following form and manner:

> Not later than three (3) days after the entry of an Order approving this
> Motion, the Debtors will cause the Auction and Sale Notice attached to the
> Proposed Order as Exhibit 2 to be sent by first-class mail postage prepaid
> to all of its creditors and interest holders, all entities known to have
> expressed a *bona fide* interest in acquiring all or portions of the Assets, all
> taxing authorities or recording offices which have a reasonably known
> interest in relief requested, the Office of the United States Trustee, counsel
> for any committee formed in this case, all insurers, all non-debtor parties
> to contracts or leases (executory or other), and other known parties-in-
> interest in this bankruptcy case.
>
> The Debtors will coordinate with its proposed claims agent, The BMC
> Group, Inc., to serve notice of the filing on this Motion and the Sale
> Motion, on all parties referenced in this Motion.
>
> Not later than seven (7) days after the entry of an Order approving this
> Motion, the Debtors shall cause the Auction and Sale Publication Notice,
> in a form substantially similar to the form attached to the Proposed Order
> as Exhibit 3, to be published in (i) the national edition of The Wall Street
> Journal or The New York Times, and (ii) one of the following: Twice
> Magazine, RCR Wireless News or Wireless Week, as to be determined by
> the Debtors and the Buyer, pursuant to Bankruptcy Rule 2002(1).  The
> Debtors submit this shall constitute good and proper notice to such
> interested parties, including those whose identities are unknown to the
> Debtors.

46.     In addition, to facilitate a potential sale that would involve the assumption and

assignment of certain of the Debtors' unexpired leases, license agreements, and executory

contracts (collectively referred to as the "Designated Contracts"), the Debtors propose to serve

the Cure Amount Notice, in the form attached to the Proposed Order as Exhibit 4, not later than

five (5) days after the entry of an order approving this Motion and requests that the Court

approve the following procedure for fixing any cure amounts owed on all unexpired leases,

license agreements and executory contracts.

47.     The Debtors will attach to the Cure Amount Notice their calculation of the Cure Costs that the Debtors believe must be paid to cure all prepetition defaults under all unexpired leases, license agreements and executory contracts.  If no amount is listed on the Cure Amount Notice, the Debtors believe that there is no Cure Cost. The Debtors request that unless the non-debtor party to an unexpired lease, license agreement or executory contract files and serves an objection (the "Cure Amount Objection") to its scheduled Cure Cost within fifteen (15) days after the date of service of the Cure Amount Notice, upon (a) Inphonic, Inc., (Gregory S. Cole, InPhonic, Inc. 1010 Wisconsin Avenue, NW, Suite 600, Washington, D.C.  20007 ); with a copy to:  (a) Goldsmith-Agio-Helms/Lazard Middle Market, 11 West 42nd Street, 29th Floor, New York, New York 10036 Attn:  Andrew Torgrove, (b) counsel to the Debtors, DLA Piper US LLP, 1251 Avenue of the Americas, New York, NY 10020 Attn: Thomas R. Califano and The Bayard Firm, 222 Delaware Avenue, Suite 900, P.O. Box 25130, Wilmington, DE 19899; (c) Buyer, c/o Cira Centre, 2929 Arch Street, Philadelphia, PA  19104- with a copy to:  Kirkland and Ellis, LLP, 200 East Randolph Drive, Chicago, Illinois 60601 Attn: David Agay, and (d) counsel to any official committee of unsecured creditors appointed in this case (if any, the "Committee"), such non-debtor party should (i) be forever barred from objecting to the Cure Cost and from asserting any additional cure or other amounts with respect to such unexpired lease, license agreement or executory contract and the Debtors shall be entitled to rely solely upon the Cure Cost; and (ii) be forever barred and estopped from asserting or claiming against the Debtors, the Successful Bidder or any other assignee of the relevant unexpired lease, license agreement or executory contract that any additional amounts are due or defaults exist, or conditions to assumption and assignment must be satisfied under such unexpired lease, license agreement or executory contract.

48.    In the event that a Cure Amount Objection is timely filed, the Cure Amount Objection must set forth (a) the basis for the objection, and (b) the amount the party asserts as the Cure Cost.

49.    After receipt of the Cure Amount Objection, the Debtors will attempt to reconcile any differences in the Cure Cost believed by the non-debtor party to exist. In the event, however, the Debtors and the non-debtor party cannot consensually resolve the Cure Amount Objection and such dispute must be resolved, the Debtors will segregate any disputed cure amounts pending the resolution of any such disputes by this Court or mutual agreement of the parties.

50.    Concurrently herewith, the Debtors have filed the Sale Motion. Objections, if any, to the Sale Motion or the relief requested therein (the "Sale Objections") must:  (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; (c) be filed with the clerk of the Bankruptcy Court for the District of Delaware, 3rd Floor, 824 Market Street, Wilmington, Delaware 19801, on or before 4:00 p.m. (prevailing Eastern Time) on December 3, 2007 and (d) be served so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon (i) InPhonic, Inc., 1010 Wisconsin Ave. NW, Suite 600, Washington, D.C. 20007, Attn: Gregory S. Cole; (ii) counsel for the Debtors, DLA Piper US LLP, 1251 Avenue of the Americas, New York, NY, Attn: Thomas R. Califano, and The Bayard Firm, 222 Delaware Avenue, Suite 900, P.O. Box 25130, Wilmington, DE 19899, Attn: Neil B. Glassman; (iii) counsel for Adeptio, Kirkland & Ellis, LLP, 200 E. Randolph Dr., Chicago, IL 60601, Attn: Anup Sathy and John Schoenfeld; and (v) counsel for any official committee of unsecured creditors appointed in this case, provided however, to the extent that Adeptio is not the Successful Bidder and an alternative Successful Bidder is seeking to have certain unexpired leases, license agreements and executory contracts assumed and assigned as part of an alternative

transaction, the non-debtor parties to such unexpired leases, license agreements and executory contracts shall have until the Sale Hearing to raise objections under Bankruptcy Code section 365(b)(1)(C).

51.    The failure of any objecting person or entity receiving the Auction and Sale Notice to timely file its Sale Objections will be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Debtors' consummation and performance of the Agreement, if so authorized by this Court.

52.    The Debtors submit that the foregoing notice is reasonably calculated to provide timely and adequate notice to the Debtors' creditors and other parties in interest, along with parties that have expressed interest (or may express interest) in bidding on the Assets, of the Bid Procedures, the Auction, the Sale, and all proceedings to be held thereon.

53.    Based upon the foregoing, the Debtors submit that the relief requested herein is necessary and appropriate, is in the best interests of the Debtors and their estates and should be granted in all respects.

<u>The Requested Relief Should Be Granted</u>

A.    <u>Conducting The Auction Pursuant To The Bid
Procedures Is In The Best Interests of The Debtors' Estates</u>

54.    The Debtors believe that the Auction and proposed Bid Procedures will promote active bidding from seriously interested parties and will identify the best or highest offer(s) for the Assets.  The proposed Bid Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.  The Debtors believe that the Bid Procedures are: (a) sufficient to encourage bidding for the Assets; (b) consistent with other procedures previously approved by the Court; and (c) appropriate under the relevant standards governing

auction proceedings and bidding incentives in bankruptcy proceedings. Further, the Bid Procedures are designed to maximize value for the Debtors' estates, while ensuring an orderly sale process consistent with the timeline available to the Debtors under the Agreement and the terms of the Debtors' DIP Loan.

55.     Once the Debtors articulate a valid business justification, "[t]he business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" In re S.N.A. Nut Co., 186 B.R. 98 (Bankr. N.D. Il. 1995); In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N. Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions.").

56.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate. See, e.g., Integrated Res., 147 B.R. at 656-57 (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

57.     The paramount goal in any proposed auction of property of the estate is to maximize the proceeds received by the estate. See, e.g., In re Food Barn Stores, Inc., 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Res., 147 B.R. at 659 ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is

to obtain the highest price or greatest overall benefit possible for the estate.") (quoting In re Atlanta Packaging Prods., Inc., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

58.    To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions. See, e.g., Integrated Res., 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); In re Fin. News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991), ("court-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

59.    The Debtors have sound business justifications for seeking approval of the Bid Procedures at this juncture.  The Debtors believe it is in the best interests of their estates, creditors, customers and employees to commence a bidding procedure immediately, as the Debtors have limited funding and resources to try to maximize the value of their assets. Indeed, the debtor-in-possession financing that the Debtors were able to negotiate is available only for a finite period of time. While the Debtors have made significant progress in reducing expenses, it is questionable whether they will be able to continue operating beyond the period of this proposed bidding process without additional funding, which may not be forthcoming. In addition, the sale of the Assets provides a realistic means for the continuation of services for the Debtors' customers with minimal interruption and inconvenience.  Absent a sale, the Debtors may be forced to cease operations and wind down their affairs, leaving customers scrambling to find alternative suppliers.  For these reasons, the Debtors have determined, based upon their business judgment, that the best option for maximizing the value of their estates for the benefit of

their creditors, customers, employees and other parties in interest is through a sale of the Assets pursuant to the Bid Procedures.

60.    As set forth in the Schwarz Affidavit, the Debtors investigated other potential sources of financing prior to entering into the Agreement.  The Debtors concluded that, given their financing needs and the rapid decline of the value of their assets, the Agreement with Adeptio constituted the most likely manner in which to increase the overall value of the estates for the benefit of their creditors, customers and employees.

61.    The Debtors believe that the Bid Procedures will establish the parameters under which the value of the Proposed Sale with Adeptio may be tested at the Auction.  The Bid Procedures are designed to encourage competitive bidding in an orderly manner to maximize value for the Debtors' estates for their creditors, customers and employees.  The proposed procedures contain terms typical for a process through which a sale of this nature is consummated and will increase the likelihood that the Debtors will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.

62.    As additional support, section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). As described above, approval of the Bid Procedures will greatly assist the Debtors in maximizing the value that they may obtain for all or portions of the Assets. Consequently, the Debtors respectfully submit that granting the requested relief is "appropriate" under the circumstance.

63.    Similar procedures have been previously approved by this Court. See e.g., In re Radnor Holdings Corp., Case No. 06-10894 (Walsh, J.) (Bankr. D. Del. Sept. 22, 2006); In re Russell-Stanley Holdings, Inc., Case No. 05-12339 (Walrath, J.) (Bankr. D. Del. Sept. 9, 2005);

In re Ultimate Elecs., Inc., No. 05-10104 (Walsh, J.) (Bankr. D. Del. Mar. 24, 2005); In re Polaroid Corp., No. 01-10864 (Walsh, J.) (Bankr. D. Del. Nov. 19, 2001).

B.      The Bid Protections Are in the Best Interests of the Debtors' Estates

64.     To induce Adeptio to expend the time, energy and resources necessary to submit a stalking horse bid, the Debtors have agreed to provide, and seek this Court's approval of, certain bid protections provided to Adeptio under the Agreement.

65.     Subject to the DIP Facility, as such term is defined in the Schwarz Affidavit, and Court approval, the Debtors have agreed to provide Adeptio Expense Reimbursement of up to $1,000,000.00 if conditions specified in the Agreement, occur.

66.     The Expense Reimbursement is a material inducement for, and a condition of, Adeptio's entry into the Agreement.  The Debtors believe that the Expense Reimbursement is fair and reasonable in view of (a) the intensive analysis, due diligence investigation, and negotiation undertaken by Adeptio in connection with the transaction and (b) the fact that, if the Expense Reimbursement is triggered, Adeptio's efforts will have triggered the chances that the Debtors will receive the highest or otherwise best offer for the Assets, to the benefit of the Debtors' creditors, customers and employees.

67.     The Third Circuit has held that although bidding incentives in favor of a stalking horse are measured against a business judgment standard, in order to receive administrative expense priority pursuant to Bankruptcy Code Section 503(b), the bidding incentive must provide some post petition benefit to the estate.  See In re O'Brien Envtl Energy, Inc., 181 F.3d 527, 533 (3d Cir. 1999).  The O'Brien Court identified two instances in which such a benefit to the estate may be found.  First, if the incentive promoted a more competitive bidding process, "such as by inducing a bid that otherwise would not have been made and without which bidding

would have been limited." Second, where bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as the floor bid on which other bidders can rely.

68.     The amount of the Expense Reimbursement in the Agreement is reasonable and appropriate in light of the size and nature of the transaction.   Moreover, the Expense Reimbursement is consistent with the Third Circuit's test above; the Expense Reimbursement provision was a material consideration without which Adeptio would not have entered into the Agreement.   Additionally, Adeptio required such Expense Reimbursement as inducement to conduct the costly research necessary to provide a competitive floor bid.

69.     The Debtors submit that the Expense Reimbursement is a normal, and oftentimes necessary component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code.  See e.g., In re Kupp Acquisition Corp., Case No. 96-1223 (PJW) (Bankr. D. Del. March 3, 1997); In re Kmart, Case No. 02-B-02474 (SPS) (Bankr. N.D. Ill. May 10, 2002) (authorizing a termination fee and overbid amounts for potential bidders); In re Comdisco, Inc., Case No. 01-24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, *inter alia*, an actual and necessary cost and expense of preserving the Debtor's estate, of substantial benefit to the Debtor's estate, and a necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement); In re Crowthers McCall Pattern, Inc., 114 B.R. 877 (Bankr. S.D.N.Y. 1990) (approving an overbid requirement in an amount equal to the approved break-up fee).

70.     In sum, the Debtors' ability to offer the Expense Reimbursement to Adeptio enables the Debtors to ensure the sale of substantially all of the Assets to Adeptio at a price they believe to be fair while, at the same time, providing the Debtors with the potential of even greater benefit to the estates. Thus, the Expense Reimbursement provision should be approved.

675213-1                                        28

71.    Moreover, payment of the Expense Reimbursement will not diminish the assets of the estates available for distribution to creditors, employees and customers. The Debtors do not intend to terminate the Agreement if to do so would incur an obligation to pay the Expense Reimbursement, unless to accept an alternative bid, which bid must exceed the consideration offered by Adeptio by an amount sufficient to pay the Expense Reimbursement.

72.    Subject to the DIP Facility (as such term is defined in the Schwarz Affidavit), the Debtors request that the Court authorize payment of the Expense Reimbursement, pursuant to the terms and conditions of the Agreement.

Statement Pursuant to Local Rule 1001-1(b)

73.    Pursuant to District Local Rule 7.1.2(a), incorporated by reference into Bankruptcy Local Rule 1001-1(b), the Debtors waive their right to file a brief in support of the Motion because there are no novel issues of law presented in this Motion.

Notice

74.    Notice of this Motion has been provided to (a) the Office of the United States Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, Delaware 19801; (b) counsel to Buyer: Young Conway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, Delaware 19801 (Attn.: Robert S. Brady) and Kirkland & Ellis LLP, 200 East Randolph Drive, Chicago, Illinois 60601 (Attn.: David A. Agay), and (c) the Debtors' twenty (20) largest unsecured creditors on a consolidated basis. In addition, because this Motion seeks "first day" relief, notice of this Motion and any order entered respecting this Motion will be served as required by Local Rule 9013-1(m). The Debtors submit that, in light of the nature of the relief requested, no other or further notice is necessary or required.

<u>No Prior Request</u>

75.    The Debtors have not filed a prior motion seeking the relief requested herein in this Court or any other court.

**WHEREFORE,** the Debtors respectfully request that this Court (i) enter the proposed Order substantially in the form attached and (ii) grant such other and further relief as is just and proper.

Respectfully submitted,

Date:  November 8, 2007

Neil B. Glassman (No. 2087)
Mary E. Augustine (No. 4477)
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899
Telephone:    (302) 655-5000
Facsimile:    (302) 658-6395

and

Thomas R. Califano
DLA Piper US LLP
1251 Avenue of the Americas
New York, New York  10020-1104
Telephone:    212-335-4500
Facsimile:    212-335-4501

Mark J. Friedman (MD Bar No. 00102)
Maria Ellena Chavez-Ruark (MD Bar No. 23941)
Jason W. Hardman (MD Bar No. 27470)
DLA Piper US LLP
The Marbury Building
6225 Smith Avenue
Baltimore, Maryland 21209-3600
Telephone:    (410) 580-3000
Facsimile:    (410) 580-3001

Proposed Counsel for Debtors
and Debtors in Possession

675213-1

30