## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| INPHONIC, INC., et al.,[1] | : | Case No. 07-_____ |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |

### MOTION OF DEBTORS FOR AN ORDER PURSUANT TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE AND RULES 2002, 6004, 6006 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THEIR ASSETS; (II) APPROVING AN ASSET PURCHASE AGREEMENT, SUBJECT TO HIGHER AND BETTER OFFERS;(III) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (the "Debtors"), by and through

their undersigned counsel, hereby move (the "Motion") this Court pursuant to sections 105(a),

363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002,

6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for

entry of an order (a) authorizing the sale of substantially all their assets (collectively, the

"Assets"), free and clear of liens, claims, encumbrances, and interests (collectively referred to as

"Encumbrances") subject to higher or better offers for all or portions of the Assets (the "Asset

---

[1] InPhonic, Inc. together with its wholly-owned subsidiaries identified below, have each filed voluntary Chapter 11 petitions and a motion is pending pursuant to Federal Rule of Bankruptcy Procedure 1015 for joint administration. The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows: (a) InPhonic, Inc., a Delaware corporation, Fed. Tax Id. No. 9384; (b) CAIS Acquisition, LLC, a Delaware limited liability company, Fed. Tax Id. No. 6257; (c) CAIS Acquisition II, LLC, a Delaware limited liability company, Fed. Tax Id. No. 3695; (d) SimIPC Acquisition Corp., a Delaware corporation, Fed. Tax Id. No. 4924; (e) Star Number, Inc., a Delaware corporation, Fed. Tax Id. No. 5549; (f) Mobile Technology Services, LLC, a Delaware limited liability company, Fed. Tax Id. No. 1426; (g) FON Acquisition, LLC, a Delaware limited liability company, Fed. Tax Id. No. 2807; and (h) 1010 Interactive, LLC, a Delaware limited liability company, Fed. Tax Id. No. 5391.

Sale"); (b) approving that certain Asset Purchase Agreement (the "Agreement")[2] by and between the Debtors and Adeptio INPC Funding LLC ("Adeptio" or "Buyer"), subject to higher and better offers; (c) approving the assumption and assignment of certain executory contracts and unexpired leases (the "Designated Contracts") pursuant to the Agreement; and (d) granting related relief. In support of this Motion, the Debtors respectfully represents as follows:

Jurisdiction and Venue

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    The statutory predicates for the relief requested herein are sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

Background

3.    On the date hereof (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The factual background regarding each of the Debtors, including their current and historical business operations and the events precipitating these chapter 11 filings, is set forth in detail in the *Affidavit of Kenneth D. Schwarz, Chief Financial Officer of the Debtors, in Support of First Day Motions* (the "Schwarz Affidavit"), and is incorporated herein by reference.[3]

4.    The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[2]    A copy of the Agreement is annexed hereto as Exhibit A.

[3]    Capitalized terms shall have the meanings ascribed to them in the Schwarz Affidavit or in the Agreement unless otherwise defined herein.

5.    No trustee, examiner or committee has been appointed in any of the Debtors' chapter 11 cases.

The Debtors' Business Operations

6.    InPhonic was incorporated in 1997 and began operations in 1999.  InPhonic's business principally involves the marketing of wireless telephone and satellite television services and related equipment and support services.  InPhonic focuses in four (4) areas:  (i) wireless device activation services, (ii) television satellite activation services, (iii) mobile virtual network enabler ("MVNE") services, and (iv) unified communication services.

7.    InPhonic is a leading internet (online) seller of wireless services and devices to consumers.  InPhonic sells these services and devices through company owned and branded websites, including without limitation www.wirefly.com, as well as through a variety of private labeled websites that it develops and manages for marketing partners such as internet businesses, affinity organizations and national retailers.

8.    InPhonic markets its services through a variety of online advertising programs including display advertising, search marketing, email marketing and affiliate programs.  InPhonic's website www.wirefly.com, a leading one-stop shopping site for mobile phones and wireless plans, has been awarded "Best of the Web" by Forbes magazine and "Best in Overall Customer Experience" by Keynote Performance Systems.

9.    InPhonic also markets its services through its partners' private labeled websites which InPhonic creates to leverage its partners' brands and their existing customer relationships.  InPhonic private-labels customer touch points to the partners' brands, including the web storefront, customer communications (such as call centers and in-box collateral) and device packaging.

10.    CAIS Acquisitions II, LLC, a wholly-owned subsidiary of InPhonic, does business under the name VMC Satellite.  Through VMC Satellite, InPhonic markets consumers digital broadcast satellite television, broadband and VOIP services.  VMC Satellite markets its services through a portfolio of its own websites, affiliate websites, print advertisement and private-labeled websites, as well as through an in-bound call center.

11.    InPhonic's Mobile Virtual Network Enabler (MVNE) business leverages the company's e-commerce platform and operational infrastructure to enable communications service providers and consumer brands to offer a branded wireless service to their customers without having to own or operate the underlying wireless network or operational infrastructure. InPhonic's MVNE platform provides a turn-key solution that combines system integration to every major U.S. wireless carrier with enterprise strength billing and customer care solutions.

12.    InPhonic develops and sells a unified communications service that provides users with a private toll-free number and a professional set of small business messaging services for one monthly fee.  Users have one central location for all of their voicemail, email, faxes, calendar appointments and address books and can manage all of their messages from anywhere by accessing a single message box using any phone or computer.  The platform offers users many voice messaging, fax delivery, conference calling and call routing services integrated into a single application accessible by telephone or computer for a single monthly fee.

13.    InPhonic's relationships with its carrier, service, affiliate and marketing partners are the keys to its business operations.  InPhonic has agreements with the largest wireless carriers in the U.S., as well as large satellite, broadband and VOIP providers, to market their products and services.  The company also has agreements with thousands of affiliate and marketing partners that market Debtors' products and services under their brands through private-labeled

websites that InPhonic creates and manages and/or their websites.

14.    All of the Debtors are headquartered in Washington, D.C.  The Debtors maintain technology and operations centers in Largo, Maryland; Reston, Virginia and Great Falls, Virginia.

Background Related to Sale

15.    Beginning in 2006, several factors caused InPhonic to experience a rapidly declining cash balance and eventual lack of cash liquidity, including increased spending on marketing that proved to be unprofitable, insufficient improvement in revenue assurance and collection efforts, inability to maintain adequate inventory of the most popular wireless devices, increasing general and administrative expenses and declining gross margin in revenue generated by customer activations.  InPhonic began to address these challenges by proactively reducing overall marketing costs, focusing marketing expenses on the marketing channels that resulted in activations with the largest gross margins, reducing general and administrative expenses, and improving collection efforts.  These measures, however, did not result in enough immediate cash liquidity to increase inventory to levels necessary to fulfill orders for the most popular wireless devices.  The positive effect of the improvements were offset by the revenue lost due to rapidly increasing number of customer orders that were placed for wireless devices that were "out-of-stock."

16.    The Debtors are close to exhausting their cash resources and do not believe they will be able to continue in business unless they receive a cash infusion of approximately $25,000,000 which the Buyer has agreed to provide pursuant to the terms of the Senior Secured Super-Priority Debtor-in-Possession Credit and Guaranty Agreement (the "DIP Facility").  Although the DIP Facility should allow the Debtors to continue to operate their business, the

Debtors believe the only viable solution that will preserve the value of their assets and business is a sale pursuant to Bankruptcy Code section 363.

17.    On November 8, 2007, the Debtors filed their Motion for and Order (I) Approving Bid Procedures Relating to Sale of Substantially all of the Debtors' Assets; (II) Scheduling a Hearing to Consider the Sale and Approving the Form and Matter of Notices; (III) Establishing Procedures Relating to Assumption and Assignment of Certain Contracts, Including Notice of Proposed Cure Amounts; (IV) Approving Expense Reimbursement Provision; and (V) Granting Related Relief (the "Bid Procedures Motion"), which seeks approval of bidding procedures (the "Bid Procedures") and auction process.  Background on the Debtors, along with the issues underlying their sale and marketing process, is provided in the Bid Procedures Motion, which is incorporated by reference herein.

18.    As described in the Bid Procedures Motion, after a thorough analysis of all factors and other considerations, the Debtors have determined that pursuing a sale of substantially all of their Assets is in the best interests of their estates and their creditors, customers, employees and other stakeholders.  The Debtors believe that the Bid Procedures permit interested parties reasonable opportunities, consistent with the financial constraints of the Debtors, to evaluate whether to propose a bid for the Assets of the Debtors that is higher and better than the Agreement entered into by the Debtors and the Buyer.

Relief Requested

19.    By this Motion, the Debtors respectfully request entry of an order (a) approving the Agreement and Asset Sale to Adeptio or such other buyer who submits a higher or better offer for the Assets, or portions thereof, free and clear of all Encumbrances and claims whatsoever and eliminating the ten (10) day stay period contemplated by Bankruptcy Rule

6004(h) and 6006(d), (b) authorizing the assumption and assignment of the Designated Contracts, if the Debtors accept the Agreement, or another offer contemplating a going concern purchase, as the highest and best offer, and (c) granting such other and further relief as is just and proper.

The Requested Relief Should Be Granted

Stand-Alone Reorganization is Not Feasible

20.     Given the Debtors' financial condition and lack of liquidity, the Debtors believe that the preservation and maximization of their estate requires that the Debtors pursue two goals: (a) an improved capital debt structure and (b) preserving carrier, marketing partner and customer confidence. The first goal requires elimination of debt, and the second goal requires that the Debtors quickly signal to their various vendors and contract counterparties that the Debtors are capable of filling future orders. As described below, a sale, as opposed to a stand-alone reorganization, is the best means by which the Debtors can achieve these goals.

21.     The Debtors have maintained their position as a leading supplier of various wireless telephone services and certain satellite television subscriptions. The Debtors have taken steps to diversify their revenue by extending and expanding their products and service offerings. In addition, the Debtors' management has continued to implement operational improvements, which are expected to result in improved profit margins and cash flow.

22.     Despite these actions, the Debtors have struggled with their debt obligations and are unable to maintain regular debt service on their long-term debt. The Debtors are close to exhausting their cash resources and do not believe they will be able to continue in business unless they receive a cash infusion which the buyer has agreed to provide pursuant to the terms of the DIP Facility.

7

23.    Although the DIP Facility should enable the Debtors to continue to operate their business, the Debtors believe the only viable solution which will enable the preservation of value for the assets and business of the Debtors is to market those assets and businesses to pursue a sale pursuant to the provisions of the Bankruptcy Code.

24.    The Debtors have also faced a severe contraction in trade terms in the months prior to the Petition Date. This contraction of trade terms has ranged from severe tightening of payment periods to placing the Debtors on cash in advance payment terms. The actions of these trade vendors have severely impacted the Debtors' liquidity. Having exhausted all other reasonable options, the Debtors faced the threat of running out of available cash and were in jeopardy of failing to meet their day-to-day obligations.

25.    Pursuant to the Senior Credit Agreement, as evidenced by its related documents, the Debtors are jointly and severally liable and have granted security interests in and liens upon all of their property, including, without limitation, all of the Debtors' accounts, inventory, equipment general intangible and intellectual property. The Debtors were not able to reach any arrangement for additional funding from the Lenders under the Senior Credit Agreement. The Debtors had no basis to secure any funding from any alternative source while the Senior Credit Agreement remained in place. Consequently, the Debtors intensified their search for a buyer.

26.    On Friday, November 2, 2007, the Debtors were informed that Adeptio had acquired all the rights of the Lenders' under the Senior Credit Agreement, and had purchased all of the Lenders' right, title and interest in and to the Senior Credit Agreement.

27.    Since it acquired the Senior Credit Agreement, Adeptio and the Debtors have negotiated an agreement for Adeptio to purchase essentially all of the assets of the Debtors and, from the petition date through the closing date on the Agreement to provide funding for the

Debtors' operations through the DIP Facility.

The Marketing Process

28.    Approximately one month before the Petition Date, the Debtors engaged Goldsmith, Agio, Helms Securities, Inc. ("GAH") to, among other things, identify prospective buyers for the Debtors' business. The Debtors, through the assistance of GAH, have contacted a substantial number of potential buyers (including strategic buyers and financial purchasers) regarding a potential sale. As a result of this initial contact, various groups requested further information, which was provided in the form of a marketing book. A number of parties executed confidentiality agreements and were provided due diligence materials. Although several parties expressed an interest in the assets of the Debtors, no party offered definitive terms and conditions of purchase which approached either the specificity or feasibility of the transaction proposed by Adeptio.

29.    Ultimately, the Board of Directors of InPhonic determined that it was in the best interest of the various creditor constituencies for InPhonic and its subsidiary Debtors to file voluntary petitions under Chapter 11 of the Bankruptcy Code in order to effect a transaction to sell essentially all of the Debtors' assets to Adeptio pursuant to the Agreement.

30.    Adeptio has made clear to the Debtors that it was unwilling to either (a) advance additional funding or (b) consummate the Agreement, outside of a Chapter 11 proceeding due to numerous uncertainties, risks and complications entailed in any attempt to do so outside of a Chapter 11 proceeding.

Need for an Immediate Sale

31.    An asset sale enables the businesses of the Debtors to continue. The Debtors have urgent cash needs, they will continue to operate at a loss postpetition and they are in danger of

losing value as a going concern. The pursuit of a stand-alone restructuring appears to be a futile effort given the Debtors' current capital structure and liquidity position. Absent a viable and realistic plan to maintain the Debtors' business through an asset sale, it is likely that the Debtors will fail and, in any event, any uncertainty would cause customers, partners and others with whom the Debtors have critical relationships to lose confidence. An asset sale will reduce this uncertainty, preserve value and thus is in the interests of all stakeholders.

32.    In short, an asset sale is the proper response to the challenges the Debtors face in attempting to maximize the value of their estates. These Assets are likely to generate the highest returns if the Debtors' business is sold to an entity (like the Buyer) with access to capital and a clear motivation to continue, and improve, the Debtors' operations.

### The Proposed Sale of the Debtors' Assets

33.    The negotiations among the Buyer, the Debtors, and the Debtors' professionals included a series of negotiations regarding the terms of the Agreement. Ultimately, the Debtors determined that an immediate sale under the terms of the Agreement, in the form attached to this Motion, would maximize the value of the Assets and that the consideration being offered by Adeptio was fair and reasonable. Accordingly, the Debtors' board of directors authorized, and the Debtors entered into, the Agreement. None of the board members have any relationship with Adeptio or its affiliates.

### Terms of the Sale

34.    Pursuant to the Agreement, the Debtors propose to sell, assign and transfer to Adeptio the Assets, free and clear of all Encumbrances, with such Encumbrances to attach to the

proceeds of the Sale. The significant terms of the Agreement are as follows:[4]

    (a)    <u>Purchase Price</u>. (i) $50,000,000 (the "<u>Credit Bid Amount</u>"); and (ii) the aggregate amount of the Assumed Liabilities.

    (b)    <u>Assets</u> means, other than the Excluded Assets, all of the Sellers' right, title and interest in and to the tangible and intangible assets, properties, rights, claims and contracts owned, leased and/or licensed by any of the Sellers of every kind, character and description, whether accrued, contingent or otherwise, existing as of the Closing (which assets comprise substantially all of the Sellers' assets, properties, rights, claims and contracts), including, without limitation:

        (i)    all inventory, wherever located, including supplies, goods-in-transit, works in process, raw materials and finished products;

        (ii)    all accounts receivable and other receivables of the Sellers (including, without limitation, all accounts receivable and other receivables to collect from customers) and all rights of any kind or nature to retain all fees and other amounts payable, or that may become payable, to any of the Sellers with respect to services performed by or on behalf of any Seller on or prior to the Closing Date and all defenses, claims, counterclaims and cross-claims with respect to any right of setoff or recoupment asserted with respect to such account receivable or receivable;

        (iii)    all tangible personal property owned or used by any Seller, including, without limitation, all equipment, furniture, fixtures, supplies, machinery, vehicles, tools and furnishings;

        (iv)    all Owned Property, together with all buildings, fixtures, structures, improvements and other appurtenances thereto and thereon;

        (v)    all Designated Contracts;

        (vi)    all books and records, files, data, reports, computer codes and sourcing data, customer and supplier lists, cost and pricing information, business plans, quality control records and manuals, blueprints, research and development files, accounting and tax files, personnel records and other records of any Seller or related to

---

[4] The following description of the terms of the Agreement and all of the exhibits, schedules and attachments thereto is intended solely to give the Court and interested parties an overview of the significant terms of the Agreement. Also, capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Agreement. The Court and interested parties should refer to the Agreement, a copy of which is annexed as Exhibit A hereto, for the complete and detailed terms thereof.

the operations of any Seller and/or the Business;

(vii)    the Intellectual Property and all telephone numbers utilized by any Seller in connection with the Business (including, without limitation, all of the trademarks, trade names, URL's and telephone numbers listed on Schedule 1.1), in each case, to the extent assignable;

(viii)    all Software owned by Sellers or leased by Sellers pursuant to a Designated Contract;

(ix)    all Permits that relate to the Business, to the extent assignable;

(x)    all marketing, advertising and promotional materials;

(xi)    all rights, privileges, claims (including warranty claims, to the extent transferable), Avoidance Actions (other than Excluded Avoidance Actions), offsets, demands, choses in action and indemnification rights of Sellers against or with respect to (including all of Sellers' rights under any indemnification agreements) any Person (including, without limitation, all of the foregoing against any of the Persons identified on Schedule 1.2) in connection with and/or otherwise related to the Business, any of the Assets and/or any of the Assumed Liabilities and arising prior to (or related to facts, circumstances and/or events arising prior to) the Closing, whether choate or inchoate, known or unknown, contingent or noncontingent;

(xii)    all rights of any Seller relating to deposits and prepaid charges and expenses, claims for refunds, indemnification rights and rights to offset in respect thereof relating to the Assets;

(xiii)    all goodwill associated with the Business and/or the Assets;

(xiv)    any interest in and to any refunds of Taxes of whatever nature;

(xv)    all rights under all insurance policies and all rights of every nature and description under or arising out of such policies, except as provided in clause (g) of the definition of "Excluded Assets" and except to the extent such insurance policies are non-assignable of a matter of law; and

(xvi)    all of seller's ownership rights in Flipswap, Inc.; and

(xvii)    all cash (including checks received prior to the Closing, whether or not deposited or cleared prior to the Closing), cash equivalents and short-term investments (including, without limitation, all cash

deposits to or for the benefit of utilities, including any such cash deposits maintained in escrow).

(c) <u>Excluded Assets</u> means all of the Sellers' right, title and interest in and to the following assets:

    (i)    all minute books, stock records and corporate seals;

    (ii)    all records that Seller is required by law to retain in its possession and all personnel records with respect to employees that are not considered Transferred Employees (provided that records necessary for Buyer to provide COBRA coverage as legally required shall not be considered Excluded Assets and shall be considered to be Assets for all purposes of this Agreement); provided, however, that Seller shall make such records available to Buyer if required by Buyer from and after the Closing;

    (iii)    the Excluded Avoidance Actions;

    (iv)    any rights of the Sellers under this Agreement;

    (v)    the equity securities of the Sellers;

    (vi)    any Contracts or leases that are not Designated Contracts; and

    (vii)    all rights under insurance policies to the extent relating to claims for losses related exclusively to any Excluded Asset or otherwise non-assignable as a matter of law.

(d) <u>Assumed Liabilities</u> means, without duplication, only the

    (i)    Cure Costs associated with, and the liabilities and obligations of the Sellers arising from and after the Closing under, the Designated Contracts assigned to Buyer;

    (ii)    trade payables to the extent first arising after the Petition Date directly relating to the operation of the Business in the ordinary course; and

    (iii)    all product returns and warranty claims with respect to the Assets, but solely to the extent requiring return, replacement or repair of the product or service provided (and specifically excluding any other Liabilities relating to products or services sold or provided prior to the Closing, including, without limitation, any Liability for any claim under any Environmental Law and any claims for property damage, personal injury or death), and (iv) without duplication, the Company's obligation (if any) to pay any accrued but unpaid fees and expenses owed by the Company to GAH as of

the Closing under Section 2 of the GAH Fee Letter (excluding any and all Liabilities of any Seller under or with respect to (x) Section 2(f) of the GAH Fee Letter, (y) the Indemnification Letter (as such term is defined in the GAH Fee Letter) and/or (z) any other provision of the GAH Fee Letter, all of which shall be deemed "Excluded Liabilities" under this Agreement), but only to the extent that GAH has properly submitted a claim for payment of such fees and expenses to the Bankruptcy Court under the Bankruptcy Case and the final allowance of such claim has been approved by the Bankruptcy Court.    Notwithstanding any provision of this Agreement to the contrary, the Assumed Liabilities shall not include any of the Excluded Liabilities.

(e)    Excluded Liabilities shall include all Liabilities of the Sellers not specifically assumed by the Buyer pursuant to the Agreement as assumed liabilities, including, without limitation, the liabilities described on Schedule 1.3 of the Agreement.

(f)    Expense Reimbursement means the documented actual out-of-pocket costs and expenses (including, without limitation, actual fees and expenses of counsel) incurred by Buyer and/or its Affiliates in connection with the negotiation, documentation and implementation of this Agreement and the transactions contemplated hereby and participation in the Bankruptcy Case up to a maximum of $1,000,000.00.

(g)    Conditions to Buyer's Obligations:

(i)    Delivery of the documents and affidavits as set forth in Section 7.1 of the Agreement, as well as possession of the Assets.

(ii)    The representations and warranties of Sellers contained in the Agreement shall have been true on the date of the Agreement, and shall be true in all material respects (except as to those representations and warranties that are qualified by materiality and/or Material Adverse Effect, which shall be true in all respects) on the Closing Date with the same effect as though such representations were made as of such date or, in the case of representations and warranties made as of a specified date earlier than the Closing Date, on and as of such earlier date.

(iii)    Sellers shall have performed and complied with all covenants and obligations required by the Agreement to be performed or complied with by them prior to or at the Closing.

(iv)    Sellers shall have received all necessary and appropriate governmental consents, approvals and filings required for them to consummate the transactions contemplated hereby, including,

675211-1

without limitation, any approval under Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations thereunder, if applicable.

(v)     The Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order substantially in the forms affixed to the Agreement as Exhibits B and D, respectively (subject to non-material changes only), and provided such other relief as may be necessary or appropriate to allow the consummation of the transactions contemplated by the Agreement. The Sale Order shall have become a final and nonappealable order, unless this condition has been waived in writing by Buyer in its sole discretion.

(vi)    There shall not be in effect, at the Closing Date, any injunction or other binding order of any court or other tribunal having jurisdiction over the Buyer that prohibits the purchase of the Assets by Buyer. The Sale Order shall not have been reversed or vacated, and shall not be subject to a stay pending appeal. The stay provided for in Fed.R.Bankr.P. 6004(h) shall have expired or been waived by the Bankruptcy Court.

(vii)   The Bankruptcy Court shall have entered an order, binding on all parties in interest in the Bankruptcy Case (which order may be the Sale Order) unconditionally allowing (i) a Claim by Buyer in the Bankruptcy Case in an amount equal to the DIP Amount and (ii) a Claim by Buyer in the Bankruptcy Case in an aggregate amount equal to all obligations under the Senior Credit Agreement as pre-petition senior secured obligations, and, in each case, authorizing and approving the credit bid by Buyer contemplated by the Agreement pursuant to Section 363(k) of the Bankruptcy Code.

(h)     Conditions to the Debtors' Obligations:

(i)     The representations and warranties of Buyer contained in the Agreement shall have been true on the date of the Agreement, and shall be true in all material respects (except as to those representations and warranties that are qualified by materiality, which shall be true in all respects) on the Closing Date with the same effect as though such representations were made as of such date or, in the case of representations and warranties made as of a specified date earlier than the Closing Date, on and as of such earlier date.

(ii)    The parties shall have received all necessary and appropriate governmental consents, approvals and filings required for them to consummate the transactions contemplated hereby, including,

675211-1

without limitation, any approval under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations thereunder, if applicable.

(iii)   Buyer shall have performed and complied in all material respects with all covenants and obligations required by the Agreement to be performed or complied with by it prior to or at the Closing.

(iv)   Buyer shall deliver, or cause to be delivered, as applicable, to Sellers, at the Closing the Assignment and Assumption Agreement executed by Buyer; and such other deliveries as Buyer may be required to make on the Closing pursuant to any other provision of the Agreement.

(v)   The Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order substantially in the forms affixed to the Agreement as Exhibits B and D, respectively (subject to non-material changes only) and provided such other relief as may be necessary or appropriate to allow the consummation of the transactions contemplated by the Agreement. The Sale Order shall have become a final and nonappealable order, unless this condition has been waived by Buyer in its sole discretion.

(vi)   There shall not be in effect, at the Closing Date, any injunction or other binding order of any court or other tribunal having jurisdiction over Seller that prohibits the sale of the Assets to Buyer. The Sale Order shall not have been reversed or vacated, and shall not be subject to a stay pending appeal. The stay provided for in Fed.R.Bankr.P. 6004(h) shall have expired or been waived by the Bankruptcy Court.

(i)   Release. Pursuant to Section 10.15 of the Agreement, effective upon the Closing Date, each Seller, on behalf of itself and its estate, acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever (including, for the avoidance of doubt, actions for avoidance, subordination or recharacterization of any of Buyer's pre-Petition Date Claims, Encumbrances, and Liens) against the Buyer and any of its members, employees, agents, Affiliates, attorneys or financial advisors (collectively, the "Buyer Group"), that directly or indirectly arise out of, are based upon, or in any manner are connected with (i) the Pre-Petition Date agreements to which Buyer (or its Affiliates) and any of the Sellers were parties and all transactions referred to in such agreements, or (ii) the acquisition by the Buyer of Claims and Liens in and against the Sellers (jointly, the "Released Claims"). Should any Released Claims nonetheless exist, each Seller, on behalf of itself and its estate, hereby (i) releases and discharges each member of the Buyer Group from any liability whatsoever on such Released Claims and (ii) releases, waives

675211-1

and discharges all such Released Claims against any member of the Buyer Group.

Basis for Relief

The Proposed Sale Is an Exercise of Sound
Business Judgment and Should be Approved

35.    The Debtors submit that ample authority exists for the approval of the proposed sale of the Assets to the Buyer pursuant to the Agreement. Section 363 of the Bankruptcy Code, which authorizes a debtor to sell assets of the estate other than in the ordinary course of business, provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate...." 11 U.S.C. § 363(b)(1).

36.    Although section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, courts have held that approval of a proposed sale of property pursuant to section 363(b) is appropriate if the transaction represents the reasonable business judgment of the debtor. See Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063 (2d Cir. 1983); see also In re Delaware & Hudson Rv. Co., 124 B.R. 169,176 (D. Del. 1991) (holding that a court must be satisfied that there is a "sound business reason" justifying the preconfirmation sale of assets); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a Chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith."); Stephens Indus. Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986).

37.    If a valid business justification exists for the sale, as it surely does in this case, the Debtors' decision to sell property out of the ordinary course of business enjoys a strong presumption "that in making a business decision the directors of a corporation acted on an

informed basis, in good faith and in an honest belief that the action taken was in the best interests of the company." In re Integrated Res., Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). Therefore, parties objecting to the Debtors' proposed Asset Sale must make a showing of "bad faith, self-interest or gross negligence." Id. at 656; see also Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

38.    Courts typically consider the following factors in determining whether a proposed sale satisfies this standard:  (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. See, e.g., In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (D. Del. 1987). The proposed Sale satisfies all these factors.

39.    First, the Debtors have proposed the sale of the Assets after thorough consideration of all viable alternatives and have concluded that the sale is supported by a number of sound business reasons.  In particular, the Debtors submit that the facts described above, which require a prompt sale of the Assets to preserve value for this estate, provide a strong business justification for the sale of the Assets. The maximization of asset value for the benefit of creditors reflects a sound business purpose that warrants authorization of the proposed Sale.

40.    Second, the Debtors:  (a) gave notice of the Bid Procedures Motion as stated in the Bid Procedures Motion; (b) will give notice of the Auction and the Sale as outlined in the

order approving the Bid Procedures Motion; and (c) have given notice of the filing of this Sale Motion as indicated in the Bid Procedures Motion. The Debtors submit that such notice constitutes adequate and reasonable notice to interested parties. The Debtors believe that a more extended process may harm the recovery of the Debtors' stakeholders.

41.    Third, the value the Debtors will receive for the Assets as a going concern by entering into the Agreement, or through such other purchase agreement(s) between the Debtors and the successful bidder, exceeds any value the Debtors could get for the Assets if the Debtors were required to liquidate their assets piecemeal. As noted above, the Debtors and GAH engaged in an extensive solicitation of potential buyers and will conduct an Auction. As of the date of this Motion, no other entity or group of entities has provided a definitive offer to purchase the Assets for greater economic value to the Debtors' estates than the Buyer, which is particularly telling given the Debtors' prepetition marketing efforts.

42.    Finally, as described in more detail below, the Asset Sale and the Agreement were negotiated in the utmost good faith and at arm's length.

43.    For the foregoing reasons, the Debtors submit that approval of the Asset Sale and the Agreement and all related transactions are appropriate and warranted under section 363 of the Bankruptcy Code.

Sale Free and Clear of Liens

44.    The Debtors further submit that it is appropriate to sell the Assets free and clear of all Encumbrances, other than Permitted Encumbrances and Assumed Liabilities, pursuant to section 363(f) of the Bankruptcy Code, with any such Encumbrances attaching to the net sale proceeds of the Assets, as and to the extent applicable. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

(a)    applicable nonbankruptcy law permits sale of such property free and clear of such interests;

(b)    if such entity consents;

(c)    such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(d)    such interest is in bona fide dispute; or

(e)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

45.    Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five (5) requirements will suffice to permit the sale of the Acquired Assets "free and clear" of liens and interests. Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met); In re Dundee Equity Corp., 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same). The Court also may authorize the sale of a debtor's assets free and clear of any liens pursuant to section 105 of the Bankruptcy Code, even if section 363(f) did not apply. See In re Trans World Airlines. Inc., 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27, 2001) ("bankruptcy courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of § 363(f)"); see also Volvo White Truck Corp. v. Chambersberg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's

equitable powers when necessary to carry out the provisions of Title 11").

46.    The Debtors believe that one or more of the tests of section 363(f) are satisfied

with respect to the transfer of the Assets pursuant to the Agreement.  In particular, the Debtors

believe that at least section 363(f)(2) will be met in connection with the transactions proposed

under the Agreement because each of the parties holding liens on the Assets, if any, will consent,

or absent any objection to this Motion, will be deemed to have consented to, the sale and transfer

of the Assets.

47.    Moreover, any lienholder also will be adequately protected by having its liens, if

any, attach to the sale proceeds received by the Debtors for the sale of the Assets to the Buyer in

the same order of priority, with the same validity, force and effect that such creditor had prior to

such sale, subject to any claims and defenses the Debtors and their estates may possess with

respect thereto.  Accordingly, section 363(f) authorizes the sale and transfer of the Assets free

and clear of any such Encumbrances.[5]

> The Agreement Was Negotiated at
> Arm's Length and In Good Faith

48.    The terms of the Agreement were negotiated at arm's length, without collusion,

and in good faith.  Accordingly, the Debtors request that the Court determine the Buyer to have

---

[5]  In addition, Adeptio should not be liable under any successor liability doctrines, except with respect to the Assumed Liabilities or as otherwise provided in the Agreement.  Courts have consistently held that the purchaser of a debtor's assets under section 363 of the Bankruptcy Code takes such assets free and clear of successor liability resulting or arising from pre-existing claims. Such successor liability-type claims would frustrate the purpose of an order authorizing the sale of estate assets free and clear of all "interests."  Accordingly, the purchasing parties should not be subject to further claims related to the Debtors' pre-Sale conduct.  See e.g. Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 91 (2d Cir. 1988) (channeling of claims to proceeds of sale consistent with intent of sale free and clear under Bankruptcy Code section 363(f)); Rubinstein v. Alaska Pacific Consortium (In re New England Fish Co.), 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property pursuant to Bankruptcy Code section 363(f) was made free and clear of Title VII employment discrimination and civil rights claims of debtors' employees); In re Hoffman, 53 B.R. 874, 876 (Bankr. D. R.I. 1985) (transfer of liquor license pursuant to Bankruptcy Code section 363(f) was made free and clear of any interest permissible even though estate had unpaid tax liability); American Living Sys. v. Bonapfel (In re All American of Ashburn, Inc.), 56 B.R. 186, 189-90 (Bankr. N.D. Ga. 1986) (product liability claims precluded on successor liability doctrine where assets were sold free and clear pursuant to Bankruptcy Code section 363(f)); aff'd sub. nom., Griffen v. Bonapfel, 805 F.2d 1515 (11th Cir. 1986).

negotiated and acted at all times in good faith and, as a result, be entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code and that the Agreement does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code.

49.     Furthermore, the Debtors submit that the Agreement represents substantial value to the Debtors' estates inasmuch as it provides favorable terms for the disposition of the Assets for fair and reasonable consideration. See Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635 (3d Cir.1991) (reasonably equivalent value under the Bankruptcy Code), cert. denied, 503 U.S. 937 (1992); see Mellon Bank, N.A. v. Official Comm. Of Unsecured Creditors (In re R.M.L., Inc.), 92 F.3d 139 (3d Cir. 1996) (same); Salisbury v. Texas Commerce Bank-Houston, N.A. (In re WCC Holding Corp.), 171 B.R. 972, 984 (Bankr. N.D. Tex. 1994) (reasonably equivalent value under Texas law) (citing Besing v. Hawthorne (In re Besing), 981 F.2d 1488, 1495 (5th Cir.), cert. denied. 510 U.S. 821 (1993) and Southmark Corp. v. Riddle (In re Southmark Corp.), 138 B.R. 820, 829 (N.D. Tex. 1992)); In re China Resource Prod. Ltd. v. Favda Intern., Inc., 856 F. Supp. 856, 866 (D. Del. 1994) (fair consideration under Delaware law) (quoting Gever v. Ingersoll Publications Co., 621 A.2d 784, 792 (Del. Ch. 1992)).

50.     The Buyer is the Debtors' current secured lender under the Senior Credit Agreement, and has agreed to provide postpetition debtor in possession financing to the Debtors. The Debtors submit that all parties have acted in good faith throughout the negotiations.  As set forth above, the Debtors' Board of Directors has no connections to the Buyer or its affiliates and has taken steps, including the use of GAH, to oversee the sale and marketing process in order to ensure that the sale process is fair and open.  Further, while general discussions have taken place between representatives of Adeptio and members of the Debtors' management team regarding the possibility of employment positions being provided to insiders of the Debtors, there have

been no formal commitments or contracts to extend such employment. Those discussions have not affected the Debtors' negotiations, nor have they detracted from the fairness of the proposed transaction. See In re Integrated Resources. Inc., 147 B.R. 650, 659 (S.D.N.Y. 1992), appeal dismissed by 3 F.3d 49 (2d Cir. 1993) (employment discussions between debtor's management and prospective buyer did not taint sale process so as to negate the application of the business judgment rule to the propriety of the sale transaction).

51.    Based upon the foregoing, the Debtors submit that to preserve and maximize the value of their estates, the sale of the Assets pursuant to the Agreement (or a higher or better offer) is an exercise of sound business judgment, is in the best interests of the Debtors and their estates, and should be approved in all respects.

The Debtors May Enter Into the Agreement

52.    In connection with the sale of substantially all of a debtor's assets, as here, courts routinely approve entry into asset purchase agreements. See, e.g., In re Enron Corp., 2002 WL 32154269, at *4 (Bankr. S.D.N.Y. Apr. 24, 2002). Such agreements are approved if they are an exercise of the debtor's sound business judgment. See, e.g., In re Decora Indus., Inc., 2002 WL 32332377, at *5 (Bankr. D. Del. May 17, 2002); In re Arlco, Inc., 239 B.R. 261, 265 (Bankr. S.D.N.Y. 1999). In this case, the Agreement was the subject of intense arm's-length negotiations between the Debtors and Adeptio, and the Debtors submit that the terms and conditions of the Agreement are the best that could be obtained under the Debtors' circumstances, and that entry into the Agreement is a sound exercise of the Debtors' business judgment.

The Debtors Request that the Court
Eliminate or Reduce the 10-Day Stay Under
Rule 6004(h) of the Federal Rules of
Bankruptcy Procedure

53.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h).  Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease…is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6006(d).

54.    The Debtors request that any order entered pursuant to the Motion authorizing the consummation of a transaction that is deemed a sale of assets and/or an assignment of an unexpired lease be effective immediately by providing that the 10-day stay under Rules 6004 or 6006, as the case may be, is inapplicable, so that they may proceed to close on the transaction as expeditiously as possible and within the time frames contemplated by the Debtors and the successful bidder(s).  Given the Debtors' liquidity position and the danger of losing going concern value, as discussed above, the Debtors respectfully submit that it is in the best interests of their estates to close the sale as soon as possible after all closing conditions have been met or waived.  Accordingly, the Debtors hereby request that the Court eliminate the 10-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

Assumption and Assignment of Assumed
Contracts Is Authorized by Section 365 of the
Bankruptcy Code

55.    Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor in possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor. 11 U.S.C. § 365(a) and (b); In re Jamesway Corp., 201 B.R. 73, 76 (Bankr. S.D.N.Y. 1996).

Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1)  If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee
>
> > (A)    cures or provides adequate assurance that the trustee will promptly cure, such default;
> >
> > (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
> >
> > (C)    provide adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(l).

56.    The standard applied by a court in determining whether the assumption or rejection of an executory contract or unexpired lease pursuant to section 365(a) should be approved is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate.  See, e.g., In re Group of Institutional Investors, Inc. v. Chicago, Milwaukee, St. Paul and Pac. R.R. Co., 318 U.S. 523, 550 (1943) ("the question [of assumption] is one of business judgment"); Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098-99 (2d Cir. 1993) (to decide a motion to assume the court must put itself in the position of the trustee and determine whether such assumption would be a good decision or a bad one).

57.    Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract.  See In re Paolo Gucci, 193 B.R. 411, 414 (S.D.N.Y.

1996); see also Sharon Steel Corp. v. National Gas Fuel Distrib. Corp. (In re Sharon Steel Corp.),

872 F.2d 36, 40 (3d Cir. 1989); In re III Enter., Inc., 163 B.R. 453, 469 (Bankr. E.D. Pa. 1994)

("Generally, a court will give great deference to a debtor's decision to assume or reject an

executory contract.  A debtor need only show that its decision to assume or reject the contract is

an exercise of sound business judgment—a standard which we have concluded many times is not

difficult to meet.").

58.     In the present case, the Debtors' assumption and assignment of the Designated

Contracts to the Buyer meets the business judgment standard and satisfies the requirements of

section 365 of the Bankruptcy Code.  As discussed above, the transactions contemplated by the

Agreement will provide significant benefits to the Debtors' estates.  Because the Debtors cannot

obtain the benefits of the Agreement without the assumption of the Designated Contracts, the

assumption of these Designated Contracts is undoubtedly a sound exercise of the Debtors'

business judgment.

59.     Further, a debtor in possession may assign an executory contract or an unexpired

lease of the debtor if it assumes the agreement in accordance with section 365(a), and provides

adequate assurance of future performance by the assignee, whether or not there has been a

default under the agreement.  See 11 U.S.C. § 365(f)(2).  Significantly, among other things,

adequate assurance may be provided by demonstrating the assignee's financial health and

experience in managing the type of enterprise or property assigned.  See, e.g., In re Bygaph, Inc.,

56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future

performance is present when the prospective assignee of a lease from the debtor has financial

resources and has expressed willingness to devote sufficient funding to the business in order to

give it a strong likelihood of succeeding).

60.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." EBG Midtown South Corp. v. McLaren/Hart Environmental Engineering Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993).

61.     Here, the Buyer has agreed to pay all Cure Amounts in connection with the Designated Contracts.[6] The Buyer has sufficient assets to continue performance thereunder, and at the Confirmation Hearing, the Buyer will demonstrate to the satisfaction of the Bankruptcy Court that adequate assurance of future performance is present by the promise to perform the obligations of the Designated Contracts from and after the Closing Date.    The Confirmation Hearing will therefore provide the Bankruptcy Court and other interested parties with the opportunity to evaluate and, if necessary, challenge the ability of the Buyer, or a higher bidder, to provide adequate assurance of future performance under the Designated Contracts. Accordingly, the Debtors submit that the assumption and assignment of the Designated Contracts as set forth herein should be approved.

62.     To assist in the assumption, assignment and sale of the Designated Contracts, the Debtors also request that the Bankruptcy Court enter an order providing that anti-assignment provisions in the Designated Contracts shall not restrict, limit or prohibit the assumption, assignment and sale of the Designated Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

63.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired

---

[6]  The Bid Procedures Motion, filed contemporaneously herewith seeks to establish a fair and efficient process by which the Debtors will timely satisfy the requirements for assumption and assignment of the Assumed Contracts as requested in this Motion.

leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection . . . .

11 U.S.C. § 365(f)(l).

64.     Section 365(f)(l), by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. See, e.g., Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.), 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"). Section 365(f)(3) goes beyond the scope of section 365(f)(1) by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. See, e.g., In re Jamesway Corp., 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

65.     Other courts have recognized that provisions that have the effect of restricting assignments also cannot be enforced. See In re Rickel Home Centers, Inc., 240 B.R. 826, 831 (D. Del. 1998) ("In interpreting Section 365(f), courts and commentators alike have construed the terms to not only render unenforceable lease provisions which prohibit assignment outright, but also lease provisions that are so restrictive that they constitute de facto anti-assignment provisions."). Similarly, in In re Mr. Grocer, Inc., the court noted that:

> [the] case law interpreting § 365(f)(l) of the Bankruptcy Code establishes that the court does retain some discretion in determining that lease provisions, which are not themselves ipso facto anti-assignment clauses, may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.

77 B.R. 349, 354 (Bankr. D.N.H. 1987). Thus, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit or prohibit the assumption, assignment and sale of the Designated Contracts and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

Notice

66.     The Debtors propose to give notice of this Motion by first class mail to (a) the Office of the United States Trustee for the District of Delaware, (b) all parties having filed requests for notices in the Debtor's chapter 11 case, (c) all of the Debtor's creditors, (d) counsel to the official committee of unsecured creditors (if formed in this case), (e) counsel to Adeptio, (f) all entities known to have expressed a bona fide interest in acquiring the Assets; (g) all entities (or counsel therefor) known to have asserted any lien, claim, encumbrance, right of refusal or other interest in or upon the Assets or the Debtors' operations; and (h) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion. The Debtors submit that such notice constitutes good and sufficient notice of this Motion and all proceedings to be held thereon, and that no other or further notice need be given.

No Prior Request

67.     No previous motion for the relief requested herein has been made to this or any other Court.

Conclusion

WHEREFORE, the Debtors respectfully request that this Court (a) enter an order, substantially in the form annexed hereto as Exhibit B, granting the relief requested herein and (b) grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

Date: November 8, 2007

Neil B. Glassman (No. 2087)
Mary E. Augustine (No. 4477)
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899
Telephone:    (302) 655-5000
Facsimile:    (302) 658-6395

and

Thomas R. Califano
DLA Piper US LLP
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone:    212-335-4500
Facsimile:    212-335-4501

Mark J. Friedman (MD Bar No. 00102)
Maria Ellena Chavez-Ruark (MD Bar No. 23941)
Jason W. Hardman (MD Bar No. 27470)
DLA Piper US LLP
The Marbury Building
6225 Smith Avenue
Baltimore, Maryland 21209-3600
Telephone:    (410) 580-3000
Facsimile:    (410) 580-3001

Proposed Counsel for Debtors
and Debtors in Possession