## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| INPHONIC, INC., et al.,[1] | : | Case No. 07-_____ |
| | : | |
| Debtors. | : | (Jointly Administered) |

## AFFIDAVIT OF KENNETH D. SCHWARZ, CHIEF FINANCIAL OFFICER
## OF THE DEBTORS, IN SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS

I, KENNETH D. SCHWARZ, being duly sworn, depose and state as follows:

1.    On November 8, 2007 (the "Petition Date"), InPhonic, Inc., a Delaware corporation ("InPhonic"), and its wholly-owned corporate and limited liability company subsidiaries: (a) CAIS Acquisition, LLC, a Delaware limited liability company ("CAIS"); (b) CAIS Acquisition II, LLC, a Delaware limited liability company ("CAIS II"); (c) SimIPC Acquisition Corp., a Delaware corporation ("SimIPC"); (d) Star Number, Inc., a Delaware corporation ("Star Number"); (e) Mobile Technology Services, LLC, a Delaware limited liability company ("MTS"); (f) FON Acquisition, LLC, a Delaware limited liability company ("FON"); and (g) 1010 Interactive, LLC, a Delaware limited liability company ("1010 Interactive") (InPhonic, CAIS, CAIS II, SimIPC, Star Number, MTS, FON and 1010 Interactive are referred to collectively as the "Debtors"), as debtors and debtors in possession, each commenced a case

---

[1]    The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows: (a) InPhonic, Inc., a Delaware corporation, Fed. Tax Id. No. 9384; (b) CAIS Acquisition, LLC, a Delaware limited liability company, Fed. Tax Id. No. 6257; (c) CAIS Acquisition II, LLC, a Delaware limited liability company, Fed. Tax Id. No. 3695; (d) SimIPC Acquisition Corp., a Delaware corporation, Fed. Tax Id. No. 4924; (e) Star Number, Inc., a Delaware corporation, Fed. Tax Id. No. 5549; (f) Mobile Technology Services, LLC, a Delaware limited liability company, Fed. Tax Id. No. 1426; (g) FON Acquisition, LLC, a Delaware limited liability company, Fed. Tax Id. No. 2807; and (h) 1010 Interactive, LLC, a Delaware limited liability company, Fed. Tax Id. No. 5391.

under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in this Court.

2.    The Debtors have continued in the possession of their property and have continued to operate and manage their business as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3.    I am the Chief Financial Officer of each of the Debtors.  My duties for the Debtors include the general supervision of and responsibility for many aspects of the Debtors' day-to-day operations, business affairs and books and records.  Among other things, I am significantly involved with the development and implementation of the Debtors' business plans and strategies and advise the Debtors with respect to their business and financial activities.

4.    As the Chief Financial Officer of the Debtors, I have general knowledge of the Debtors' books and records and am familiar with the Debtors' financial and operational affairs.

5.    To enable the Debtors to minimize any adverse effects of the commencement of these chapter 11 cases on their business operations, the Debtors file simultaneously herewith certain "first day" applications and motions (collectively, the "First Day Motions").  The First Day Motions seek, among other things, to ensure the continuation of the Debtors' business operations without interruption and to ensure a smooth transition into chapter 11.

6.    I submit this Affidavit to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the First Day Motions.  Except as otherwise indicated, all statements in this Affidavit are based on my personal knowledge, my review of relevant documents, my opinion based on my experience and knowledge of the Debtors' operations and financial condition or

information provided to me by other representatives of the Debtors.  If I were called upon to

testify, I could and would testify competently to each of the facts set forth in this Affidavit.

      7.      I am authorized to submit this Affidavit on behalf of the Debtors.

      8.      Any capitalized terms not expressly defined herein shall have the meanings set

forth in the applicable motion or application.

I.

BACKGROUND AND EVENTS LEADING TO
THE COMMENCEMENT OF THE CHAPTER 11 CASES

A.      The Debtors' Business Operations

      1.      InPhonic was incorporated in 1997 and began operations in 1999.  InPhonic's

business principally involves the marketing of wireless telephone and satellite television services

and related equipment and support services.  InPhonic focuses its business in four (4) areas: (a)

wireless device activation services, (b) television satellite activation services, (c) mobile virtual

network enabler ("MVNE") services, and (d) unified communication services.

      2.      InPhonic is a leading internet (online) seller of wireless services and devices to

consumers.  InPhonic sells these services and devices through company owned and branded

websites, including without limitation www.wirefly.com, as well as through a variety of private

labeled websites that it develops and manages for marketing partners such as internet businesses,

affinity organizations and national retailers.

      3.      InPhonic markets its services through a variety of online advertising programs

including display advertising, search marketing, email marketing and affiliate programs.

InPhonic's website www.wirefly.com, a leading one-stop shopping site for mobile phones and

wireless plans, has been awarded "Best of the Web" by Forbes magazine and "Best in Overall

Customer Experience" by Keynote Performance Systems.

4.      InPhonic also markets its services through its partners' private label websites which InPhonic creates to leverage its partners' brands and their existing customer relationships. InPhonic private-labels customer touch points to the partners' brands, including the web storefront, customer communications (such as call centers and in-box collateral) and device packaging.

5.      CAIS Acquisitions II, a wholly-owned subsidiary of InPhonic, does business under the name VMC Satellite. Through VMC Satellite, InPhonic markets consumer digital broadcast satellite television, broadband and VOIP services. VMC Satellite markets its services through a portfolio of its own websites, affiliate websites, print advertisement and private labeled websites, as well as through an in-bound call center.

6.      InPhonic's Mobile Virtual Network Enabler (MVNE) business leverages the company's e-commerce platform and operational infrastructure to enable communications service providers and consumer brands to offer a branded wireless service to their customers without having to own or operate the underlying wireless network or operational infrastructure. InPhonic's MVNE platform provides a turn-key solution that combines system integration to every major U.S. wireless carrier with enterprise strength billing and customer care solutions.

7.      InPhonic developed and sells a unified communications service that provides users with a private toll-free number and a professional set of small business messaging services for one monthly fee. Users have one central location for all of their voicemail, email, faxes, calendar appointments and address books and can manage all of their messages from anywhere by accessing a single message box using any phone or computer. The platform offers users many voice messaging, fax delivery, conference calling and call routing services integrated into a single application accessible by telephone or computer for a single monthly fee.

8.     InPhonic's relationships with its carrier, service, affiliate and marketing partners are the keys to its business operations.  InPhonic has agreements with the largest wireless carriers in the U.S., as well as large satellite, broadband and VOIP providers, to market their products and services.  InPhonic also has agreements with thousands of affiliate and marketing partners that market Debtors' products and services under their brands through private-label websites that InPhonic creates and manages and/or their websites.

9.     All of the Debtors are headquartered in Washington, D.C.  The Debtors maintain technology and operations centers in Largo, Maryland; Reston, Virginia and Great Falls, Virginia.

B.     The Debtors' Corporate Structure

9.     InPhonic, a Delaware corporation, is publicly traded on the National Association of Securities Dealers Automated Quotations (NASDAQ: INPC).  InPhonic is the sole member of CAIS, CAIS II, MTS, FON and 1010 Interactive, all of which are Delaware limited liability companies.  InPhonic is also the sole shareholder of SimIPC and Star Number, both Delaware corporations.

10.     On November 19, 2004, InPhonic closed an initial public offering of its common stock, which resulted in net proceeds of approximately $108.9 million.

C.     The Debtors' Principal Prepetition Secured Indebtedness

11.     On November 7, 2006, InPhonic entered into a Credit Agreement (the "Prepetition Credit Agreement") with Goldman Sachs Credit Partners L.P., as Lead Arranger, Lead Bookrunner and Lead Syndication Agent, Citicorp North America, Inc., as Administrative Agent, and the lenders from time to time party thereto (collectively, the "Prepetition Lenders").  InPhonic is the borrower under the Prepetition Credit Agreement, and each of the other Debtors is a guarantor of InPhonic's obligations to the Prepetition Lenders.

12.     The Credit Agreement provides for a $100 million aggregate principal amount senior secured term loan bearing a fixed interest rate of nine percent (9%) per annum. The term loan is secured by substantially all of InPhonic's assets and matures in November 2011. InPhonic pledged the stock and membership interests of each of the other Debtors to further secure its obligations under the Credit Agreement.

13.     As additional consideration, InPhonic granted the Prepetition Lenders warrants (the "Warrants") to purchase an aggregate of 1,250,000 shares of InPhonic common stock at an exercise price of $0.01 per share. The Warrants expire on November 7, 2011. The Warrants were issued in reliance on the exemptions provided for in Section 4(2) of the Securities Act relating to sales not involving any public offering.

14.     InPhonic received $75 million of the term loan proceeds on November 8, 2006 and had the option to draw the remaining amount within 90 days. The Prepetition Credit Agreement contains affirmative and negative covenants, including financial covenants and covenants restricting indebtedness, liens, investments, asset transfers and distributions. After November 2009, InPhonic has the ability to repay principal on the term loan without penalty and, conversely, the Prepetition Lenders have the right to call the remaining outstanding principal of the term loan without penalty.

15.     In connection with the Prepetition Credit Agreement, InPhonic terminated a loan facility with Comerica Bank and used proceeds from the term loan to repay the outstanding principal obligation of $19.9 million plus accrued interest under the Comerica facility.

16.     On August 8, 2007, InPhonic entered into an amendment to the Prepetition Credit Agreement (the "Amendment"), pursuant to which the Delayed Draw Lender (as defined in the Amendment) loaned InPhonic an aggregate amount of $15 million. The Amendment also

reduced the total loan commitment from $100 million to $90 million and the Delayed Draw Lender's Delayed Draw Commitment (as defined in the Amendment) from $25 million to $15 million. The Amendment also required InPhonic to issue immediately exercisable warrants to the Lenders to purchase 800,000 shares of InPhonic's common stock at a price of $0.01 per share.

17.    On or about October 5, 2007 the Debtors received Notice of a Default under the Credit Agreement for inter alia failure to pay interest when due.

18.    On November 2, 2007, the Prepetition Lenders assigned all of their right, title and interest in, to and under the Prepetition Credit Agreement and related loan documents to Adeptio INPC Funding, LLC ("Adeptio").

D.    Events Leading to Chapter 11 Filings

19.    Beginning in 2006, several factors caused a rapidly declining cash balance and eventual lack of cash liquidity, including increased spending on marketing that proved to be unprofitable, insufficient improvement in revenue assurance and collection efforts, inability to maintain adequate inventory of the most popular wireless devices, increasing general and administrative expenses and declining gross margin in revenue generated by customer activations. InPhonic began to address these challenges by proactively reducing overall marketing costs, focusing marketing expenses on the marketing channels that resulted in activations with the highest gross margins, reducing general and administrative expenses and improving collection efforts. These measures, however, did not result in enough immediate cash liquidity to increase inventory to levels necessary to fill orders for the most popular wireless devices. The positive effects of the improvements were offset by the revenue lost due to a rapidly increasing number of customer orders that were placed for wireless devices that were "out-of-stock".

II.

FACTS IN SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS

20.    Concurrently with the filing of their chapter 11 petitions, the Debtors have filed the First Day Motions. The Debtors request that each of the First Day Motions described below be granted, as each request constitutes a critical element in achieving the successful rehabilitation and reorganization of the Debtors for the benefit of all parties in interest.

A.    Motion of Debtors Pursuant to Federal Rule of Bankruptcy Procedure
       1015(b) for Order Authorizing Joint Administration of Cases

21.    The Debtors seek the joint administration of their chapter 11 cases for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1015-1 of the Local Rules of Practice and Procedure of the Untied States Bankruptcy Court for the District of Delaware (the "Local Rules").

22.    Joint administration of the Debtors' cases will promote the economical, efficient and convenient administration of each of the Debtors' estates to the benefit of the Debtors, their estates, creditors, and the Court. The Debtors believe it is likely that numerous filings and additional matters, including notices, applications, motions, orders, hearings and other proceedings will be made, issued, or convened in these cases. Many of these will affect a number or all of the Debtors. Joint administration will obviate the need for duplicative filings by permitting counsel for all parties in interest to (a) use a single caption on the numerous documents that will be filed and served in the Debtors' reorganization cases, and (b) file many documents in only one of the Debtors' reorganization cases rather than in multiple cases. This will save substantial time and expense for this Court, each of the Debtors and their respective estates and protect parties in interest by ensuring that parties affected by each of the Debtors' respective chapter 11 cases will be apprised of the various matters before the Court in those

cases. All parties' use of the simplified caption designated in the motion will also eliminate cumbersome and confusing procedures and ensure a uniformity of pleading identification. Joint supervision of the administrative aspects of the chapter 11 cases by the Court and the Office of the United States Trustee will also be simplified.

23.    The substantive rights of the respective creditors of each of the Debtors will not be prejudiced by joint administration of the Debtors' cases. The relief requested in the motion is purely procedural. All schedules of assets and liabilities, statements of financial affairs, and proofs of claim will be captioned and filed in each of the Debtors' respective, separate cases, as appropriate. The motion does not request substantive consolidation of the cases.

24.    I believe that granting the relief requested in the motion is in the best interest of the Debtors, their estates and all parties in interest.

B.    Motion for Entry of Interim and Final Orders (I) Authorizing and Approving Postpetition Financing; (II) Granting Liens and Security Interests and Providing Superpriority Administrative Expense Status; (III) Authorizing the Use of Cash Collateral and Affording Adequate Protection; (IV) Modifying the Automatic Stay; and (V) Scheduling Final Hearing, Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002 and 4001(C) & (D)

25.    The Debtors' cash reserves have been seriously depleted – as of November 9, 2007 the Debtors will no longer be capable of funding operations. The Debtors require funding to preserve their going concern value, pay their ongoing obligations and continue in operations. To that end the Debtors negotiated for and agreed to postpetition debtor in possession financing with Adeptio in the amount of Twenty-Five Million Dollars ($25,000,000.00) (the "DIP Facility"). The DIP Facility is memorialized in a Senior Secured, Super-Priority Debtor in Possession Credit and Guaranty Agreement dated as of November 9, 2007. Pursuant to the DIP Financing, Adeptio is providing the Debtors with funding on favorable terms that it does not believe it could acquire elsewhere.

26.     The Debtors' decision to enter into the DIP Facility quite clearly represents an exercise of sound business judgment.  Without the DIP Facility, the Debtors simply cannot conduct their operations.  Without such funds, the Debtors will not be able to pay their payroll and other direct operating expenses and obtain goods and services needed to carry on their business during this critical period.  Equally important, without financing to cover the Debtors' cash needs, the Debtors will be unable to timely satisfy their administrative obligations.  The DIP Facility addresses this need by providing the Debtors with funds necessary to meet ongoing operating needs, and by instilling the Debtors' customers and employees with a sense of the Debtors' financial security.

27.     The Debtors have negotiated the best financing arrangement that they can realistically expect to obtain under the circumstances.  The fees required by the DIP Lender are customary and reasonable.  The universe of lenders who could commit to meet the Debtors' postpetition financing requirements was quite limited.  The Debtors do not believe that they would be able to obtain the funds required in the form of unsecured debt allowable under the Bankruptcy Code.  Additionally, the Debtors do not believe that they would be able to obtain an alternative borrowing facility proposed by another lender on terms and conditions as favorable as those proffered by the DIP Lender, both economically and from a timing perspective.  Thus, the Debtors' efforts to seek necessary postpetition financing from other sophisticated lending institutions satisfy the statutory requirements of section 364(c).

28.     Therefore, in light of the circumstances, in the exercise of their sound business judgment, the proposal for debtor in possession financing provided by the DIP Lender was the most favorable under the circumstances and addresses the Debtors' reasonably foreseeable working capital needs.

C.    Motion of Debtors Pursuant to 11 U.S.C. §§ 345, 363, 364, 1107, 1108 and Local Rule 2015-2 for Order Authorizing (I) Continued Use of Existing Cash Management System, (II) Maintenance of Existing Bank Accounts, (III) Continued Use of Checks and Business Forms, and (IV) Continued Use of Existing Investment Guidelines

29.    The Debtors seek authority to (a) continue to use their existing cash management system, (b maintain their existing bank accounts, (c) continue to use their existing checks and business forms, and (d) continue to use their existing investment guidelines (the "Cash Management Motion").

30.    Prior to the Petition Date and in the ordinary course of business, certain of the Debtors maintain various bank accounts with Comerica Bank and Silicon Valley Bank (collectively, the "Bank Accounts"). The Bank Accounts are described in Exhibit A to the Cash Management Motion.

31.    In addition, the Debtors maintain certain investment accounts with Comerica Bank and UBS Financial Services, Inc. (the "Investment Accounts"; collectively with the Bank Accounts, the "Accounts"). The Investment Accounts are described in Exhibit B to the motion.

32.    The Accounts consist of the following:

a.    Account Number 1891668467 maintained at Comerica Bank is in the name of InPhonic, Inc. and is the operating account (the "Comerica Operating Account") into which funds are swept from an overnight Comerica Bank investment account (Account Number 1080005060) and into which all revenues (including wires and ACH transfers) are deposited. The funds are then transferred as needed to fund draws made on any zero balance accounts that are linked to the Comerica Operating Account, which at this time consist of Account Numbers 1892038819 (InPhonic, Inc.'s trade debt account) and 1892038827 (InPhonic, Inc.'s payroll account).

b.    Account Number 1891929380 maintained at Comerica Bank is in the name of Star Number, Inc. and is the operating account (the "Star Operating Account") into which all revenues are deposited. InPhonic, Inc. funds this account for the purpose of meeting Star Number, Inc.'s payroll obligations. As such, the funds from the Star Operating Account are transferred as needed to fund draws

made on any zero balance accounts that are linked to the Star Operating Account, which at this time consist of Account Number 1892038843 (Star Number, Inc.'s trade debt account) and 1892038884 (Star Number, Inc.'s payroll account).

c.   Account Number 1892770221 maintained at Comerica Bank is in the name of CAIS Acquisitions II, LLC and is the operating account into which all revenues of CAIS II are deposited and from which all obligations of CAIS II are paid.

d.   Account Number 100-768-1 maintained at Comerica Bank is in the name of InPhonic, Inc. and serves as its Canadian bank account.

e.   Account Number 3300453675 maintained at Silicon Valley Bank is in the name of InPhonic, Inc. and is an operating account into which cash customer payments are deposited and from which credit card payments and chargebacks are processed. Funds from this account are swept into the Comerica Operating Account.

f.   Account Number 1080005060 maintained at Comerica Bank is in the name of InPhonic, Inc. and is an overnight investment account linked to the Comerica Operating Account.

g.   Account Number CP-40220-V7 maintained with UBS Financial Services, Inc. is in the name of InPhonic, Inc. and is a money market account used for private investment purposes.

33.    Comerica Bank, Silicon Valley Bank and UBS Financial Services, Inc. are referred to herein collectively as the "Banks".

34.    The Debtors manage their cash receipts, transfers and disbursements for the Debtors' entire corporate enterprise through the Accounts. The Debtors routinely deposit, withdraw, and otherwise transfer funds to, from, and between the Accounts by various methods including check, wire transfer, automated clearing house transfer and electronic funds transfer. Approximately $1,000,000 to $20,000,000 flows through the Debtors' cash system on a daily basis (including cash used in investment activities). The Banks at which the Debtors maintain the Accounts are financially stable institutions with FDIC or FSLIC insurance or other appropriate government-guaranteed deposit protection insurance. The Debtors intend to use

reasonable best efforts to obtain control agreements with the various depositories to provide a security interest in such cash to Adeptio.

35.    Prior to the Petition Date, the Debtors, in the ordinary course of business and in accordance with certain agreements (the "Service Documentation") with the Banks, used their established cash management system to collect, transfer, and disburse funds generated by their operations and to accurately record all such transactions as they are made (the "Cash Management System").    The Debtors also utilize the Cash Management System to make intercompany transfers.

36.    The Debtors' cash management procedures are ordinary, usual and essential business practices and are similar to those used by other corporate enterprises.  The Cash Management System provides significant benefits to the Debtors, including the ability to (a) control corporate funds centrally, (b) ensure availability of funds when necessary, and (c) reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information.

37.    Prior to the Petition Date, the Debtors, in the ordinary course of business, also used numerous business forms including, but not limited to, letterhead, invoices, contracts and checks (collectively, the "Business Forms").  The Debtors have a supply of these forms on hand. It would be expensive and wasteful to destroy these forms and create new ones with the "Debtor in Possession" legend.  Upon depletion of the Debtors' check stock, the Debtors will obtain new checks imprinted with the legend "Debtors in Possession" reflecting their status as debtors in possession.

38.    The Debtors' business and financial affairs are complex.   They require the collection, disbursement and transfer of funds through several bank accounts.  Enforcement of

the guidelines of the United States Trustee's Office in these chapter 11 cases would significantly disrupt the Debtors' ordinary financial operations. The Debtors contract with several third-party vendors, service providers and trade creditors to fulfill customer obligations and any interruption in payments to those third-parties could jeopardize the Debtors' efforts to reorganize.

39.    I believe that granting the relief requested in the motion will preserve the continuity of the Debtors' business and avoid the potential for operational and administrative paralysis. Consequently, the Debtors, their estates and all parties in interest will be best served through the relief sought in the motion.

D.    Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 363(b) for Order Authorizing Payment of Prepetition (I) Wages, Salaries and Other Compensation of Employees and Subcontractors, (II) Employee Medical and Similar Benefits, (III) Reimbursable Employee Expenses, and (IV) Other Miscellaneous Employee Expenses and Benefits

40.    As of the Petition Date, the Debtors employ approximately 421 employees, of whom approximately 270 are salaried and approximately 151 are hourly employees (collectively, the "Employees"). In addition, the Debtors' current workforce includes approximately 50 temporary employees engaged through nine (9) third party staffing agencies and five (5) independent contract personnel (all temporary employees are referred to as, "Contract Employees"). None of the Debtors' Employees or Contract Employees is subject to a collective bargaining agreement.

41.    The Debtors' Employees (and Contract Employees) perform a variety of critical functions for the Debtors, including, without limitation, developing and supporting the Debtors' products and services, marketing the Debtors' products and services, interacting with customers and vendors, collecting revenues, and generally sustaining the Debtors' business operations. The Employees' skills and their specialized knowledge and understanding of the Debtors'

infrastructure and operations are essential to the Debtors' continuing operations and to the Debtors' ability to effectuate a successful reorganization. In addition, although the Debtors rely on temporary labor from time to time, a large portion of the Contract Employees have worked for the Debtors for extended periods of time and provide critical services during peak business periods. Like the Employees, the Contract Employees often have specialized knowledge and cannot be easily replaced with new, unskilled temporary workers. Prior to the Petition Date and in the ordinary course of the Debtors' business, the Debtors provided compensation, reimbursement amounts, employee benefits and other miscellaneous consideration to the Employees (and Contract Employees) in exchange for their loyal service and hard work.

42.    By the motion, the Debtors seek authority to pay certain prepetition obligations, including, but not limited to, (a) amounts owed to Employees and Contract Employees for wages, salaries, commissions and other compensation, (b) reimbursement of employee business expenses incurred in the ordinary course, such as travel, meals and lodging, (c) maintenance of employee health and welfare plans, workers' compensation, 401(k), and other similar benefits, and (d) other miscellaneous employee expenses and benefits (collectively, the "Prepetition Obligations").

43.    In particular, the Debtors seek authority to continue paying the following Prepetition Obligations in the ordinary course of business:

- *Unpaid Wages, Salaries, Commissions and Other Compensation*

44.    The Debtors' Payroll Obligations. The Debtors seek an order authorizing, but not directing, the Debtors to honor all outstanding payroll obligations. Approximately 15% of the Debtors' payroll costs represent compensation paid to "Senior Executives", with the remaining 85% representing compensation paid to middle management or rank and file employees.

45.    In the ordinary course of business, the Debtors pay their Employees semi-monthly, one pay period in arrears.  The last payroll for Employees was paid on October 31, 2007, and covered Employee compensation for the salaried employees for the period of October 16, 2007 through October 31, 2007 and employee compensation for non-exempt employees for the period of October 1, 2007 through October 14, 2007.  The Debtors' next scheduled payroll on November 15, 2007 will be for the period ending November 15, 2007 for salaried employees, and for the pay period ending October 31, 2007 for hourly employees.

46.    The Debtors estimate that approximately $481,955.41 in unpaid salary, wages and other compensation is owing to their Employees in the aggregate for services rendered before the Petition Date.  The Debtors utilize the payroll-processing services of ADP to issue payroll checks to their employees.  The Debtors also utilize the services of various third-party plan administrators with respect to the administration of their health and welfare plans.  To the extent obligations for payment for such services or any portion of the next payment due may be characterized as a prepetition obligation, the Debtors seek authority to pay such amounts to avoid disruption of services provided to its employees.

47.    The Debtors seek authority to honor their salary and wage obligations by paying, in the ordinary course, any prepetition amounts owed to the Employees.  No Employee should be owed more than the $10,950 priority limit on account of prepetition salaries or wages under Section 507(a)(4) of the Bankruptcy Code.

48.    Due to the timing of the Debtors' last payrolls, payroll checks for some Employees who are not paid by direct deposit likely remain in float.  In addition, although the Debtors believe that most payroll checks relating to payroll periods prior to the last payrolls have been presented to and honored by the applicable drawee banks, the Debtors recognize that

certain employees may fail to cash or deposit their paychecks in a timely manner. Accordingly, it is possible that some checks will remain in float postpetition that banks will not honor absent explicit authority and direction to do so. Moreover, while the Debtors do not believe material amounts, if any, remain owing for past payroll periods, to the extent any such amounts remain owing, the Debtors submit that the administrative costs resulting from determining such information with precision substantially exceed any benefit to be gained from such exercise. Therefore, the Debtors also seek authority to honor payroll checks in float but not presented or otherwise honored timely for payment.

49.    Contract/Temporary Employees. The Debtors employ their Contract Employees directly and through third-party staffing agencies. At the present time, the Debtors have on-going relationships with nine (9) third party staffing agencies and five (5) independent contract employees. Although third-party staffing agencies technically employ the Contract Employees and are responsible for paying and withholding their wages, the Contract Employees function in a quasi-employee relationship with the Debtors. Specifically, the Debtors remit payments to the third-party staffing agencies to cover the wages and withholdings of the Contract Employees. The Debtors believe that these third-party staffing agencies will likely terminate services if they are not paid amounts owing and that such termination would be significantly detrimental to the Debtors' businesses. Although Contract Employees are considered independent contractors as opposed to actual employees for the purposes of applying certain federal, state or local employment, labor, tax and other laws and regulations, their livelihood is no less dependent on the Debtors, nor is their employment any less an integral component of the Debtors' businesses, than any of the Debtors' other non-contract employees. The Debtors depend on the services provided by the Contract Employees to sustain their ongoing business operations.

50.    With respect to Contract Employees employed both directly and through third-party staffing agencies, the Debtors estimate that they owe approximately $1,196,367 to all of their Contract Employees in the aggregate for services rendered before the Petition Date. Given the critical role of the Contract Employees in the Debtors' business operations, the Debtors seek authority to honor their wage and withholding obligations by paying, in the ordinary course, any prepetition amounts owed to Contract Employees employed both directly and through third-party staffing agencies.

- *Reimbursable Business Expenses*

51.    Prior to the Petition Date and in the ordinary course of business, the Debtors reimbursed Employees for certain business expenses incurred in the scope of their employment, including, without limitation, expenses for business travel, seminars and incidental expenses, such as business meals, car rentals, tolls, parking, and a variety of miscellaneous expenses (collectively, the "Reimbursable Expenses"). All of the Reimbursable Expenses were incurred on the Debtors' behalf in connection with employment by the Debtors and in reliance upon the understanding that such expenses would be reimbursed.

52.    As of the Petition Date, the total amount owed for Reimbursable Expenses is approximately $125,000, with one Employee estimated to receive in excess of $10,950. That Employee is estimated to receive $11,720. Accordingly, the Debtors seek authority to honor their Reimbursable Expense obligations by paying, in the ordinary course, any prepetition Reimbursable Expenses owed to their Employees.

- *Non-Executive Bonuses and Reward Programs*

53.    Debtors have various performance-based bonus and reward programs in place to provide incentive and foster loyalty among their non-executive Employees, including office

staff, production employees, sales directors, supervisors and others. The Debtors' bonus and reward programs are implemented on a calendar year basis. Some of the Debtors' bonus and reward programs are calculated and payable quarterly, while others provide for a bonus or reward payment based on an individual's performance during the entire calendar year.

54.     Although most of the Debtors' bonus and reward payments to non-executive Employees for calendar year 2007 have been paid, the Debtors estimate that approximately $59,000 in commission obligations remain unpaid to non-Executive Employees, with only one non-executive Employee estimated to receive in excess of the $10,950 priority limit on account of prepetition bonus or reward obligations. That employee is estimated to receive $12,000. Accordingly, the Debtors seek authority to pay all bonus and reward obligations to non-executive Employees in the ordinary course of business.

- *Employee Benefits*

55.     In the ordinary course of the Debtors' business, and as is customary for most large companies, the Debtors have established various employee benefit plans and policies that provide employees with medical, prescription, dental, vision, life and disability insurance, employee retirement savings, flexible spending and other similar benefits (collectively, the "Employee Benefit Programs"). As of the Petition Date, the Debtors are obligated to pay certain contributions under the Employee Benefit Programs. The Debtors seek authority to pay and/or honor unpaid prepetition obligations under the Employee Benefit Programs that arose from services rendered within 180 days before the Petition Date (the "Prepetition Benefits"). The Employee Benefit Programs and corresponding unpaid Prepetition Benefits are described below:

56.    Health Insurance (Medical, Prescription, Dental, and Vision).    The Debtors provide their salary and hourly Employees with basic medical, dental, and vision insurance through third-party providers.

57.    The Debtors offer medical insurance to their salary and hourly Employees through a self-funded plan provided by CareFirst/Blue Cross Blue Shield PPO. A portion of the premiums are paid by the Employees. The total premium/medical and prescription payments for insurance payable by the Debtors under the medical plan is approximately $250,000 per month on average, but may fluctuate significantly in any given month.

58.    The Debtors provide dental insurance to their salary and hourly Employees through a plan provided by MetLife Preferred Dental Program. A portion of the premiums are paid by the Employees. The total premium for insurance payable by the Debtor under the dental plan is approximately $9,500 per month on average, but may fluctuate significantly in any given month.

59.    The Debtors provide vision insurance to their salary and hourly Employees through Vision Service Plan. A portion of the premiums are paid by the Employees. The total premium for insurance payable by the Debtor under the vision plan is approximately $3,300 per month.

60.    The Debtors seek authority to pay, in the ordinary course of business, any unpaid premiums, deductibles, and prepetition claims relating to the foregoing medical, dental, and vision insurance that arose from services rendered within 180 days prior to the Petition Date.

61.    Life, AD&D, Long Term Disability Insurance.    The Debtors provide basic life and long term disability insurance to regular full-time salary and hourly Employees through MetLife. The total premium for this insurance is approximately $2,000 per month. The Debtors

seek authority to pay, in the ordinary course of business, any outstanding unpaid premiums, deductibles, and prepetition claims relating to life and long term disability insurance that arose before the Petition Date.

62.     Employee Assistance Program.   The Debtors provide an Employee Assistance Plan to all regular full-time salaried and hourly employees.  The total premium for this program is approximately $1,200 per month.  The Debtors seek authority to pay, in the ordinary course of business, any outstanding unpaid premiums related to the Employee Assistance Program that arose before the Petition Date.

63.     401(k) Plan.  The Debtors offer all salary and hourly Employees an opportunity to participate in a 401(k) plan (the "401(k) Plan").    Approximately 75 current Employees participate in the 401(k) Plan, which is administered through Principal Financial Group.  Under the 401(k) Plan, the Debtors deduct contributions from participating Employees' salaries and wages and wire such amounts to Principal Financial Group.  As of the Petition Date, the Debtors have not yet funded the 401(k) Employee Deductions for the payroll ending October 31, 2007 for salaried employees and the payroll ending October 15, 2007 for non-exempt employees.  The Debtors believe that such 401(k) Deductions total approximately $46,000 in the aggregate.  The Debtors seek authority to pay any such accrued but unpaid prepetition 401(k) Deductions.

•       *Workers Compensation*

64.     The Debtors collectively maintain a premium-based workers' compensation insurance plan issued by Pennsylvania Manufacturers Indemnity Co, with an annual premium of $79,668 (the employer's liability per claim is $500,000).  The coverage is paid for in advance and is current to date.  There are currently no outstanding workers' compensation claims.  To the extent that the Debtors have amounts owing due to prepetition workers' compensation

obligations or to the extent that a portion of the current payments may be characterized as prepetition obligations, the Debtors seek authority to pay such amounts.

- *Payroll Taxes and Other Withheld Amounts*

65.    The Debtors deduct certain amounts from their Employees' paychecks for the payment of the Employee portion of health, dental, vision and welfare insurance premiums, flexible medical spending amounts, 401(k) deductions, and other miscellaneous amounts (collectively, the "Employee Deductions"). The Employee Deductions comprise property of the Debtors' Employees and are forwarded by the Debtors to appropriate third-party recipients at varying times.

66.    The Debtors are required by law to withhold from an Employee's wages amounts related to federal, state and local income taxes, social security and Medicare taxes, garnishments, child support payments, etc. (together with the Employee Deductions, the "Payroll Taxes") and remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities"). The Debtors' Payroll Taxes, including both the employee and the employer portion, for a typical payroll total approximately $240,915. It is likely that funds have been deducted from Employee wages but have not yet been forwarded to the appropriate third-party recipients. Accordingly, the Debtors seek authority to pay and/or remit to the applicable Taxing Authorities up to $25,000 in Payroll Taxes attributable to the period before the Petition Date. Absent such authority, the Debtors' officers and directors could be exposed to personal liability.

- *Paid Time Off Policy*

67.    The Debtors offer paid vacation or "paid time off" (PTO) to eligible Employees (defined as all regular full-time and part-time Employees who are regularly scheduled to work at least 25 hours per week). The Debtors have different policies in place for their salaried versus

hourly Employees.  In general, eligible Employees must work at the Debtors for ninety (90) days before any vacation hours may be taken, and vacation hours accrue on an annual basis ranging anywhere from one (1) week to five (5) weeks of vacation days per year  (all of the Debtors' paid time off policies are referred to collectively as the "PTO Policy").

68.    Pursuant to the PTO Policy, eligible Employees accrue a certain number of hours of vacation each pay period.  Accrual starts from the first day of regular employment and is based on the Employee's first date of employment with the Debtors.  Employees do not accrue vacation during pay periods when they are on unpaid leave or during periods of paid leave other than vacation, sick leave, and holidays.  Unused PTO time generally is paid to Employees only upon the termination of employment by the Debtors or death.  Employees who terminate during the first ninety (90) days of employment are not paid accrued, unused vacation hours.

69.    The Debtors estimate that the accrued, outstanding amount of unused time under the PTO Policy, if it were payable in cash, is approximately $870,612 as of the Petition Date. The Debtors seek authorization, in their sole discretion, to continue honoring the PTO Policy and to make cash payments for unused PTO that has accrued prepetition as well as postpetition only upon the termination of an Employee by the Debtors as they would have done under the PTO Policy before the Petition Date.

- *Administrative Service Providers*

70.    The Debtors utilize certain third-party providers to administer employee benefit plans and payroll services (the "Administrative Service Providers").  The continued support of the Administrative Service Providers is crucial to the Debtors' ability to maintain accurate and meaningful books and records, including, but not limited to, books and records reflecting the Debtors' employee benefit and payroll obligations.  The Debtors estimate that the average

monthly cost of these services is approximately $5,000 in the aggregate. To the extent that any such amounts remain unpaid or may be characterized as prepetition obligations, the Debtors seek to be authorized, but not directed, to pay such amounts.

- *Executive Medical Reimbursement Plan*

71.    The Debtors provide select executives reimbursement for medical costs not covered under CareFirst Blue Cross/Blue Shield PPO through BeniComp. The amount owed as of the Petition Date is approximately $16,000. The Debtors seek authority to pay, in the ordinary course of business, any outstanding claims related to the pursuant to this executive medical reimbursement plan that arose prior to the Petition Date.

- *Miscellaneous Employee-Related Obligations*

72.    The Debtors may determine that there are additional *de minimis* prepetition obligations, which have not been identified in the Motion. Consequently, the Debtors request authority to pay any such additional obligations up to an aggregate amount of $100,000 upon five (5) business days' prior written notice to counsel to any statutory creditors' committee appointed herein and counsel to the Office of the United States Trustee, setting forth the nature and amount of the additional obligation sought to be paid. If an objection is interposed within such five-day period, and such objection is not resolved consensually, the Debtors will be required to seek authority from this Court to make such payment. The Debtors also reserve their right to seek authority from the Court to pay any obligations in excess of the above-referenced limit.

73.    Payment of the Prepetition Obligations is critical to Employee and Contract Employee morale and the Debtors' future business needs. If the Prepetition Obligations are not honored in the ordinary course, the impact on the Debtors' business could be disastrous. The

Debtors would be unable to sustain operations, supply of products and services to the Debtors'
customers would cease, and revenues would quickly disappear.  Failure to honor the Prepetition
Obligations could also cause Employees and Contract Employees to endure extreme personal
hardship and, in many cases, raises the chances that employees will be unable to pay their basic
living expenses.  This result would impair employee morale and lead to unmanageable employee
turnover.

74.    The Debtors' employees are an essential component of a successful
reorganization. Any deterioration in employee morale and welfare at this critical time
undoubtedly would have a devastating impact on the Debtors, the value of their assets and
businesses, and ultimately, the Debtors' ability to reorganize.  Accordingly, I believe that
granting the relief requested in the motion is in the best interest of the Debtors, their estates, and
all parties in interest.

E.    Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) and 507(a) and 541(d)
      for Order Authorizing Payment of Prepetition Trust Fund Taxes in the
      Ordinary Course of Business

75.    The Debtors seek authority to pay prepetition sales, use, employee-related and
other trust fund type taxes (however denominated) (collectively, the "Trust Fund Taxes") owed
to the appropriate federal, state and local taxing authorities the "Taxing Authorities") in the
ordinary course of business, on an unaccelerated basis, as such payments become due and
payable and to the extent adequate funds are available to make such payments. The Debtors seek
authority to pay Trust Fund Taxes to avoid disruption of their reorganization efforts that would
result from nonpayment of such taxes.

76.    In the ordinary course of business, the Debtors collect Trust Fund Taxes from
their employees, customers, subcontractors and other third parties and subsequently remit such

taxes to the appropriate Taxing Authorities.  For example, the Debtors withhold certain taxes (such as income tax and social security tax) from their employees' paychecks and then periodically remit these amounts to the appropriate Taxing Authorities.  The process by which the Debtors remit the Trust Fund Taxes varies depending on the nature of the tax at issue and the Taxing Authority to which the relevant tax is to be paid.  In addition, there is often a gap between the time when the Debtors incur an obligation to pay Trust Fund Taxes and the date when payment of such Trust Fund Taxes are due.  As of the Petition Date, various governmental units may have claims against the Debtors for Trust Fund Taxes that have accrued but are unpaid and not yet due.

77.    The Debtors estimate that, in the aggregate, no more than $325,000 accrued but unpaid Trust Fund Taxes may be due and owing as of the Petition Date.  I believe that granting the relief requested in the motion is in the best interest of the Debtors, their estates, and all parties in interest.

F.    Motion of Debtors Pursuant to 11 U.S.C. §§ 366(b) for Order (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service to Debtors, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Adequate Assurance of Future Performance

78.    The Debtors seek entry of an order (a) prohibiting utility companies from altering, refusing or discontinuing service, (b) deeming utility companies adequately assured of future performance, and (c) establishing procedures for determining requests for additional adequate assurance.

79.    In  the  ordinary  course  of  business,  the  Debtors  obtain  electricity, telecommunications and similar services (collectively, the "Utility Services") from various utility companies (collectively, the "Utility Companies").

80.    Historically, the Debtors have paid the Utility Companies' bills consistently and on a regular basis.  Furthermore, to the best of the Debtors' knowledge, except for amounts owing set forth on Exhibit A to the motion, the Debtors are current on all amounts owing to the Utility Companies, other than payment interruptions that may be caused by the commencement of the Debtors' chapter 11 cases.  The Debtors estimate that their average monthly payments to the Utility Companies aggregate approximately $273,160.

81.    The Debtors maintain operations at the following locations: (a) 1010 Wisconsin Avenue, NW, Suite 600, Washington D.C. 20007, (b) 1000 Wisconsin Ave N.W., Washington, DC 20007, (c) 9301 Peppercorn Place, Largo MD 20774, (d) 10790 Parkridge Boulevard, Reston VA 20191, (e) 11130 Sunrise Valley Drive, Reston VA 20191, and (f) 10205 Colvin Run Road, Suite 100, Great Falls, VA 22066.

82.    The Debtors cannot continue to operates without continued Utility Services.  If any of the Utility Companies alter, refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted.   Such disruption could have a devastating impact on the Debtors' going concern value and ability to reorganize.  In contrast, the Utility Companies will not be prejudiced by the continuation of their services and will be paid all postpetition utility charges.  It is therefore vital that Utility Services continue uninterrupted.

83.    The Debtors request authorization to provide adequate assurance of payment for future services to the Utilities Companies.  Specifically, the Debtors propose to deposit into an interest-bearing account (the "Utility Deposit Account") a sum equal to approximately fifty percent (50%) of the amounts the Utilities Companies billed the Debtors for Utility Services for the month prior to the Petition Date.  The Debtors propose to make such deposit within ten (10) days after the entry of a final order granting the Utilities Motion.

84.    Through anticipated use of cash collateral, the Debtors project generating sufficient cash postpetition to satisfy their obligations to Utility Companies.

85.    I believe that granting the relief requested in this motion is both necessary and appropriate because it will afford the Debtors an opportunity to successfully reorganize and will without materially prejudicing the Utility Companies.  Thus, I believe that granting the relief requested in the motion is in the best interest of the Debtors, their estates, and all parties in interest.

G.    Motion of Debtors Pursuant to 11 U.S.C. § 105(a), 363(c), 1107(a), and 1108 for Order Authorizing Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Their Customer Programs and Practices in the Ordinary Course of Business

86.    The Debtors seek authority to honor certain prepetition obligations to customers and to otherwise continue customer programs and practices in the ordinary course of business.

87.    Prior to the Petition Date and in the ordinary course of the Debtors' business, customers of the Debtors placed orders to purchase the Debtors' products, provided payment for services, and/or committed to pay the Debtors' carrier or service providers in connection with such orders (collectively, the "Customer Orders").  In certain instances, the Debtors have not yet fulfilled the Customer Orders.

88.    In addition, prior to the Petition Date, the Debtors offered and engaged in certain customer programs and practices to develop and sustain a positive reputation in the marketplace for their products and services and to engender customer loyalty (collectively, the "Customer Programs").  The Debtors have implemented the following categories of Customer Programs:

   a.    Product Returns:  Certain products may be returned within thirty (30) days of the Customer Order for a full refund or credit.  The Debtors may receive returns under its return policy for Customer Orders placed prior to the Petition Date for which it is obligated to issue a refund or credit.  The Debtors have also issued refunds and credits to customers

that have not been utilized as of the Petition Date. The approximate amount of monthly returns is $7,800.

b.  Goodwill Payments:  In the event of a customer escalation, the Debtors, in the ordinary course of business, award the affected customer a gift card or other compensation for their inconvenience. Certain of these awards have been made, but not issued by the Debtors or their vendors as of the Petition Date. The approximate amount Debtors seek to satisfy after the Petition Date does not exceed $20,000.

89.    The Customer Programs, including without limitation the programs described in the preceding paragraph, are standard practice in the Debtors' industry. The Customer Programs ensure customer satisfaction, generate goodwill, meet competitive pressures so that the Debtors can retain current customers, attract new ones and ultimately enhance net revenue. Additionally, certain of Debtors' agreements with its carrier and service providers require Debtor to provide the product returns included in the Customer Programs.

90.    The Debtors desire to (a) honor the Customer Orders by delivering, in the ordinary course of business, any goods ordered and paid for prepetition; (b) perform and honor their prepetition obligations related to the Customer Programs, and (c) continue, renew, replace, create, modify and/or terminate one or more of the Customer Programs as they may deem appropriate, in the ordinary course of business, without further application to the Court.

91.    The relief sought in the motion is necessary to preserve the Debtors' critical business relationships, including those with its marketing and affiliate partners, and goodwill for the benefit of their estates. This is particularly true for a business such as the Debtors' for whom revenues are largely dependent on customer and partner satisfaction. The Debtors' customers have numerous choices for purchasing a mobile phone, activating wireless service and/or subscribing to satellite services. The Debtors distinguish their services by providing the

Customer Programs.   The benefits associated with the Customer Programs exceed the operational and administrative costs to implement and maintain such programs.

92.     Continuing the Customer Programs will maintain the confidence of the Debtors' customers.   The loyalty and continued patronage of the Debtors' customers are critical to the success of their business and maximizing the return for creditors in these cases.   The Debtors' business is driven by customer satisfaction, and fulfilling the Customer Orders and retaining the Customer Programs is critical to maintaining customers' confidence in the Debtors.   If the Debtors cease providing these programs and incentives, their customers might switch their business to the Debtors' competitors who do provide such programs and incentives – especially when contracts expire or when new customers surface.   Moreover, if the Debtors fail to honor prepetition Customer Programs, they will be in breach of certain of their agreements with their carrier and service partners and may negatively impacts their relationships with marketing and affiliate partners.   Given the Debtors' dependence on maintaining goodwill with their customers, any restriction on the Customer Programs would be counter to the interest of the Debtors' estates.

93.     The Debtors must be permitted to fulfill the Customer Orders and maintain the Customer Programs in the ordinary course of business to ensure the ongoing viability of their business operations.   Thus, I believe that granting the relief requested in the motion is in the best interest of the Debtors, their estates, and all parties in interest.

H.     Motion of Debtors for Order Authorizing and Approving the Appointment of The BMC Group, Inc. as Noticing, Claims, and Balloting Agent for the Bankruptcy Court.

94.     The Debtors seek the appointment of The BMC Group, Inc. ("BMC") as claims, noticing, and balloting agent (the "Claims Noticing Agent") for the Bankruptcy Court to, among other things: (a) serve as the Court's noticing agent to mail notices to the estates' creditors and

parties in interest, (b) provide computerized claims, objection and balloting database services, and (c) provide expertise, consultation and assistance in claim and ballot processing and other administrative information with respect to the Debtors' bankruptcy cases.

95.    I estimate that the Debtors have several hundred more than 200 potential creditors plus additional parties in interest to which certain notices, including notice of the Debtors' chapter 11 cases, will be sent.  The number of these parties makes it impractical for the Bankruptcy Court or the Debtors to send notices and perform other tasks associated with these cases.

96.    The Debtors seek the appointment of BMC to serve certain designated notices and maintain the claims register and other tasks related to claims administration in these cases.  In addition, assistance in the plan solicitation and voting process may be necessary.  I believe that BMC's assistance will expedite and streamline these processes.

97.    I believe that BMC is well-qualified to provide the above-described services. Consequently, I believe that approval of BMC's appointment as Claims Noticing Agent is in the best interest of the Debtors, their estates, and all parties in interest.

I.    Application for Order Pursuant to 11 U.S.C. § 327 and Federal Rule of Bankruptcy Procedure 2014 Authorizing Debtors in Possession to Retain DLA Piper US LLP as Counsel to the Debtors in Possession *Nunc Pro Tunc* to the Petition Date

98.    The Debtors seek authority to retain and employ DLA Piper US LLP ("DLA Piper" or the "Firm") as their bankruptcy counsel as of the Petition Date.

99.    In particular, the Debtors seek to retain and employ DLA Piper to represent them in connection with the following non-exclusive matters:

        a.    advising management concerning their fiduciary obligations to the estates, the creditors and the Court;

    b.    assisting regarding the administration of the Chapter 11 cases, including prosecution of motions and adversary proceedings, defense of actions commenced against the Debtors, commencement and prosecution of objections to claims, representation in the claims reconciliation process and counseling regarding the preparation of schedules, statements and operating reports;

    c.    assisting in the formulation, negotiation and confirmation of a Chapter 11 plan of reorganization and related disclosure statement; and

    d.    rendering such other legal services as may be requested by management and as may be required in furtherance of the Chapter 11 cases.

100.    I believe that DLA Piper is well-qualified to provide the above-described services. Consequently, I believe that the Debtors' retention and employment of DLA Piper as their bankruptcy counsel is in the best interest of the Debtors', their estates, and all parties in interest.

J.    Application for Order Pursuant to 11 U.S.C. § 327(a) and 328(a) and Federal Rule of Bankruptcy Procedure 2014 Authorizing Employment and Retention of Goldsmith, Agio, Helms Securities, Inc. as Investment Banker to Debtors in Possession

101.    The Debtors seek authority to retain and employ Goldsmith, Agio, Helms Securities, Inc. ("GAH") as their investment banker as of the Petition Date pursuant to the terms and conditions contained in the engagement letter between InPhonic (on behalf of itself and its controlled subsidiaries) and GAH dated as of October 11, 2007 (the "Engagement Letter") and the indemnification agreement between InPhonic (on behalf of itself and its controlled subsidiaries) and GAH, dated October 11, 2007 (the "Indemnification Agreement").

102.    GAH is an investment banking firm focused on providing financing and investment banking advice on behalf of its clients. GAH's broad range of corporate advisory services includes services pertaining to general financial advice, corporate restructurings, financing and mergers and acquisitions to middle market businesses. GAH is a registered broker dealer with the Securities and Exchange Commission.

103.    The Debtors have selected GAH as their investment banker based upon (a) GAH's extensive experience in providing investment banking services in chapter 11 cases; and (b) GAH's excellent reputation for the services it has rendered in chapter 11 cases on behalf of debtors and creditors throughout the United States.

104.    The professionals at GAH have been employed as investment bankers in a number of distressed company situations, including the chapter 11 cases in the District of Delaware of Decora Industries, Plainwell Paper and Tokheim Corporation.   The resources, capabilities, and experience of GAH in advising the Debtors are crucial to the Debtors' successful restructuring.   An experienced investment bank such as GAH fulfills a critical need that complements the services offered by the Debtors' other restructuring professionals.   I believe that GAH's general restructuring experience and expertise, its knowledge of the capital markets and its merger and acquisition capabilities will inure to the Debtors' benefit in pursuing any Restructuring or Sale Transaction.   I further believe that the value to the Debtors from GAH's services derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the contingent Restructuring Fee and Sale Transaction Fee is reasonable regardless of the number of hours expended by GAH's professionals in the performance of the services to be provided in the Engagement Letter.

105.    The compensation arrangement provided for in the Engagement Letter and the provisions of the Indemnification Agreement are consistent with and typical of arrangements entered into by GAH and other investment banking firms in connection with rendering similar services to clients such as the Debtors. The Debtors believe that GAH is well qualified and able to represent their interests in a cost-effective, efficient and timely manner, and GAH has

indicated a willingness to act on behalf of the Debtors and to subject itself to the jurisdiction and supervision of this Court.

106.    Subject to this Court's approval, GAH will be entitled to receive compensation for its chapter 11 related services as set forth in greater detail in the Engagement Letter.

107.    The overall compensation structure in the Engagement Letter is comparable to compensation generally charged by investment banker of similar stature for comparable engagements, both in and out-of-court. In addition, given the numerous issues which GAH may be required to address in the performance of its services hereunder, GAH's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for GAH's services for engagements of this nature in both out-of-court and chapter 11 contexts, the Debtors agree that the fee arrangements in the Engagement Letter are reasonable.

108.    GAH will also seek reimbursement for reasonable fees and expenses. GAH will follow its customary expense reimbursement guidelines and practices in seeking expense reimbursement from the Debtors.

109.    The compensation structure described above is consistent with GAH's normal and customary billing practices for cases of this size and complexity that require the level and scope of services outlined. GAH and the Debtors believe that the foregoing compensation arrangements are both reasonable and market-based.

110.    As part of the overall compensation payable to GAH under the terms of the Engagement Letter, the Debtors have agreed to indemnify, reimburse, and make certain contributions to GAH and its affiliates and its and their respective directors, officers, members, employees, agents and controlling persons in accordance with the provisions set forth in the Indemnification Agreement.

111.    The Debtors and GAH believe that the terms of the Indemnification Agreement are customary and reasonable for investment banking engagements, both out-of-court and in chapter 11 proceedings.

112.    The terms of the Engagement Letter and the Indemnification Agreement were fully negotiated between the Debtors and GAH, and the Debtors believe that the Indemnification Agreement and the Engagement Letter are reasonable and in the best interests of the Debtors, their estates and creditors.

113.    To the best of my knowledge, information, and belief, and except and to the extent disclosed herein and in the Torgove Affidavit, (a) GAH is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, as required by section 327(a) of the Bankruptcy Code, and holds no interest adverse to the Debtors or their estates in connection with the matters for which GAH is to be retained by the Debtors; and (b) GAH has no connection with the Debtors, their creditors, the U.S. Trustee, or other parties-in-interest in these chapter 11 cases.

114.    To the best of my knowledge, information, and belief, the Debtors do not owe GAH any amount for any services performed or expenses incurred prior to the Petition Date. Accordingly, GAH is not a prepetition creditor of the Debtors.

115.    Consequently, I believe that the Debtors' retention and employment of GAH as their investment banker pursuant to the Engagement Letter and Indemnification Agreement is in the best interest of the Debtors', their estates, and all parties in interest.

M.      Motion of Debtors For an order Pursuant to Sections 105(a),   363 and 365 of the Bankruptcy Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Sale of Substantially All of Their Assets; (II) Approving an Asset Purchase Agreement, Subject to Higher and Better Offers; (III) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief

116.    For the reasons set forth in the Sale Motion, the Debtors, in the exercise of their reasoned business judgment, determined that it was in the best interests of their estates and their creditors, customers, employees and other stakeholders that the Debtors enter into a transaction to sell substantially all of their assets. The Debtors, in conjunction with GAH explored various possible sale opportunities and determined that a sale to Adeptio for a credit bid of $50,000,000 was the best and most feasible possible course of action, subject to higher and better offers. It is imperative that the Debtors sell their assets on an expedited basis. The Debtors are operating at a loss and lack sufficient capital to operate for any prolonged basis. The Debtors are dependent on their relationship with carriers and marketing partners for their survival and a prolonged chapter 11 case will cause the Debtors to lose value as a going concern. Accordingly, the Debtors believe the sale to a bidder (like Adeptio) is in the best interests of the Debtors' estates.

117.    Beginning in 2006, several factors caused InPhonic to experience a rapidly declining cash balance and eventual lack of cash liquidity, including increased spending on marketing that proved to be unprofitable, insufficient improvement in revenue assurance and collection efforts, inability to maintain adequate inventory of the most popular wireless devices, increasing general and administrative expenses and declining gross margin in revenue generated by customer activations. InPhonic began to address these challenges by proactively reducing overall marketing costs, focusing marketing expenses on the marketing channels that resulted in activations with the largest gross margins, reducing general and administrative expenses, and improving collection efforts. These measures, however, did not result in enough immediate cash liquidity to increase inventory to levels necessary to fulfill orders for the most popular wireless devices. The positive effect of the improvements were offset by the revenue lost due to rapidly

increasing number of customer orders that were placed for wireless devices that were "out-of-stock."

118.    The Debtors are close to exhausting their cash resources and do not believe they will be able to continue in business unless they receive a cash infusion which the Buyer has agreed to provide pursuant to the terms of the DIP Facility. Although the DIP Facility should allow the Debtors to continue to operate their business, the Debtors believe the only viable solution that will preserve the value of their assets and business is a sale pursuant to Bankruptcy Code section 363.

119.    Given the Debtors' financial condition and lack of liquidity, the Debtors believe that the preservation and maximization of their estate requires that the Debtors pursue two goals: (a) an improved capital debt structure and (b) preserving carrier, marketing partner and customer confidence. The first goal requires elimination of debt, and the second goal requires that the Debtors quickly signal to their various vendors and contract counterparties that the Debtors are capable of filling future orders. As described below, a sale, as opposed to a stand-alone reorganization, is the best means by which the Debtors can achieve these goals.

120.    The Debtors have maintained their position as a leading supplier of various wireless telephone services and certain satellite television subscriptions. The Debtors have taken steps to diversify their revenue by extending and expanding their products and service offerings. In addition, the Debtors' management has continued to implement operational improvements, which are expected to result in improved profit margins and cash flow.

121.    Despite these actions, the Debtors have struggled with their debt obligations and are unable to maintain regular debt service on their long-term debt.

122.   The Debtors are close to exhausting their cash resources and do not believe they will be able to continue in business unless they receive a cash infusion which the buyer has agreed to provide pursuant to the terms of the DIP Facility.

123.   Although the DIP Facility should enable the Debtors to continue to operate their business, the Debtors believe the only viable solution which will enable the preservation of value for the assets and business of the Debtors is to market those assets and businesses to pursue a sale pursuant to the provisions of the Bankruptcy Code.

124.   The Debtors have also faced a severe contraction in trade terms in the months prior to the Petition Date. This contraction of trade terms has ranged from severe tightening of payment periods to placing the Debtors on cash in advance payment terms. The actions of these trade vendors have severely impacted the Debtors' liquidity. Having exhausted all other reasonable options, the Debtors faced the threat of running out of available cash and were in jeopardy of failing to meet their day-to-day obligations.

125.   Pursuant to the Senior Credit Agreement, as evidenced by its related documents, the Debtors are jointly and severally liable and have granted security interests in and liens upon all of their property, including, without limitation, all of the Debtors' accounts, inventory, equipment general intangible and intellectual property. The Debtors were not able to reach any arrangement for additional funding from the Lenders under the Senior Credit Agreement. The Debtors had no basis to secure any funding from any alternative source while the Senior Credit Agreement remained in place. Consequently, the Debtors intensified their search for a buyer.

126.   On Friday, November 2, 2007, the Debtors were informed that Adeptio had acquired all the rights of the Lenders' under the Senior Credit Agreement, and had purchased all of the Lenders' right, title and interest in and to the Senior Credit Agreement.

127.    Since it acquired the Senior Credit Agreement, Adeptio and the Debtors have negotiated an agreement for Adeptio to purchase substantially all of the assets of the Debtors and, from the petition date through the closing date on the Agreement to provide funding for the Debtors' operations through the DIP Facility.

128.    Adeptio has made clear to the Debtors that it was unwilling to either (i) advance additional funding or (ii) consummate the Agreement, outside of a Chapter 11 proceeding due to numerous uncertainties, risks and complications entailed in any attempt to do so outside of a Chapter 11 proceeding.

129.    An asset sale enables the businesses of the Debtors to continue. The Debtors have urgent cash needs, they will continue to operate at a loss post petition and they are in danger of losing value as going concern. The pursuit of a stand-alone restructuring appears to be a futile effort given the Debtors' current capital structure and liquidity position. Absent a viable and realistic plan to maintain the Debtors' business through an asset sale, it is likely that the Debtors will fail and, in any event, any uncertainty would cause customers, partners and others with whom the Debtors have critical relationships to lose confidence. An asset sale will reduce this uncertainty, preserve value and thus is in the interests of all stakeholders.

130.    In short, an asset sale is the proper response to the challenges the Debtors face in attempting to maximize the value of their estates. These Assets are likely to generate the highest returns if the Debtors' business is sold to an entity (like the Buyer) with access to capital and a clear motivation to continue, and improve, the Debtors' operations.

131.    The negotiations among the Buyer, the Debtors, and the Debtors' professionals included a series of negotiations regarding the terms of the Agreement. Ultimately, the Debtors determined that an immediate sale under the terms of the Agreement, in the form attached to this

Motion, would maximize the value of the Assets and that the consideration being offered by Adeptio was fair and reasonable. Accordingly, the Debtors' board of directors authorized, and the Debtors entered into, the Agreement. None of the board members have any relationship with Adeptio or its affiliates.

132.    Pursuant to the Agreement, the Debtors propose to sell, assign and transfer to Adeptio the Assets, free and clear of all Encumbrances, with such Encumbrances to attach to the proceeds of the Sale. The Debtors believe that a valid business justification exists for the Asset Sale and approval thereof is appropriate.

133.    The Debtors have proposed the sale of the Assets after thorough consideration of all viable alternatives and have concluded that the sale is supported by a number of sound business reasons. In particular, the Debtors submit that the facts described above, which require a prompt sale of the Assets to preserve value for this estate, provide a strong business justification for the sale of the Assets. The maximization of asset value for the benefit of creditors reflects a sound business purpose that warrants authorization of the proposed Sale.

134.    The Debtors: (i) gave notice of the Bid Procedures Motion as stated in the Bid Procedures Motion; (ii) will give notice of the Auction and the Sale as outlined in the order approving the Bid Procedures Motion; and (iii) have given notice of the filing of this Sale Motion as indicated in the Bid Procedures motion. The Debtors submit that such notice constitutes adequate and reasonable notice to interested parties. The Debtors believe that a more extended process may harm the recovery of the Debtors' stakeholders.

135.    The value the Debtors will receive for the Assets as a going concern by entering into the Agreement, or through such other purchase agreement(s) between the Debtors and the successful bidder, exceeds any value the Debtors could get for the Assets if the Debtors were

required to liquidate their assets piecemeal. As noted above, the Debtors and GAH engaged in an extensive solicitation of potential buyers and will conduct an Auction. As of the date of this Motion, no other entity or group of entities has provided a definitive offer to purchase the Assets for greater economic value to the Debtors' estates than the Buyer, which is particularly telling given the Debtors' prepetition marketing efforts.

136.    Finally, the Asset Sale and the Agreement were negotiated in the utmost good faith and at arm's length.

137.    For the foregoing reasons, the Debtors submit that approval of the Asset Sale and the Agreement and all related transactions are appropriate and warranted under section 363 of the Bankruptcy Code.

138.    The Debtors further submit that it is appropriate to sell the Assets free and clear of all Encumbrances, other than Permitted Encumbrances and Assumed Liabilities, pursuant to section 363(f) of the Bankruptcy Code, with any such Encumbrances attaching to the net sale proceeds of the Assets, as and to the extent applicable.

139.    The Debtors believe that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Assets pursuant to the Agreement. In particular, the Debtors believe that at least section 363(f)(2) will be met in connection with the transactions proposed under the Agreement because each of the parties holding liens on the Assets, if any, will consent, or absent any objection to this Motion, will be deemed to have consented to, the sale and transfer of the Assets.

140.    Moreover, any lienholder also will be adequately protected by having its liens, if any, attach to the sale proceeds received by the Debtors for the sale of the Assets to the Buyer in the same order of priority, with the same validity, force and effect that such creditor had prior to

such sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto. Accordingly, section 363(f) authorizes the sale and transfer of the Assets free and clear of any such Encumbrances.

141.    The terms of the Agreement were negotiated at arm's length, without collusion, and in good faith. Accordingly, the Debtors request that the Court determine the Buyer to have negotiated and acted at all times in good faith and, as a result, be entitled to the protections of a good faith purchaser under section 363(m) of the Bankruptcy Code and that the Agreement does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code.

142.    Furthermore, the Debtors submit that the Agreement represents substantial value to the Debtors' estates inasmuch as it provides favorable terms for the disposition of the Assets for fair and reasonable consideration.

143.    The Buyer is the Debtors' current secured lender under the Senior Credit Agreement, and has agreed to provide post petition debtor in possession financing to the Debtors. The Debtors submit that all parties have acted in good faith throughout the negotiations. As set forth above, the Debtors' Board of Directors has no connections to the Buyer or its affiliates and has taken steps, including the use of GAH, to oversee the sale and marketing process in order to ensure that the sale process is fair and open. Further, while general discussions have taken place between representatives of Adeptio and members of the Debtors' management team regarding the possibility of employment positions being provided to insiders of the Debtors, there have been no formal commitments or contracts to extend such employment. Those discussions have not affected the Debtors' negotiations, nor have they detracted from the fairness of the proposed transaction.

144.    Based upon the foregoing, the Debtors submit that to preserve and maximize the value of their estate, the sale of the Assets pursuant to the Agreement (or a higher or better offer) is an exercise of sound business judgment, is in the best interests of the Debtors and their estates, and should be approved in all respects.

145.    the Agreement was the subject of intense arm's-length negotiations between the Debtors and Adeptio, and the Debtors submit that the terms and conditions of the Agreement are the best that could be obtained under the Debtors' circumstances, and that entry into the Agreement is a sound exercise of the Debtors' business judgment.

146.    The Debtors request that any order entered pursuant to the Motion authorizing the consummation of a transaction that is deemed a sale of assets and/or an assignment of an unexpired lease be effective immediately by providing that the 10-day stay under Rules 6004 or 6006, as the case may be, is inapplicable, so that they may proceed to close on the transaction as expeditiously as possible and within the time frames contemplated by the Debtors and the successful bidder(s).   Given the Debtors' liquidity position and the danger of losing going concern value, as discussed above, the Debtors respectfully submit that it is in the best interests of their estates to close the sale as soon as possible after all closing conditions have been met or waived.   Accordingly, the Debtors hereby request that the Court eliminate the 10-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

147.    The Debtors additionally request authority to assume and assign the Designated Contracts to the Buyer. the Debtors' assumption and assignment of the Designated Contracts to the Buyer meets the business judgment standard and satisfies the requirements of section 365 of the Bankruptcy Code. As discussed above, the transactions contemplated by the Agreement will provide significant benefits to the Debtors' estates.   Because the Debtors cannot obtain the

benefits of the Agreement without the assumption of the Designated Contracts, the assumption of these Designated Contracts is undoubtedly a sound exercise of the Debtors' business judgment.

148.    Here, the Buyer has agreed to pay all Cure Amounts in connection with the Designated Contracts.  The Buyer has sufficient assets to continue performance thereunder, and at the Confirmation Hearing, the Buyer will demonstrate to the satisfaction of the Bankruptcy Court that adequate assurance of future performance is present by the promise to perform the obligations of the Designated Contracts from and after the Closing Date.  The Confirmation Hearing will therefore provide the Bankruptcy Court and other interested parties with the opportunity to evaluate and, if necessary, challenge the ability of the Buyer, or a higher bidder, to provide adequate assurance of future performance under the Designated Contracts. Accordingly, the Debtors submit that the assumption and assignment of the Designated Contracts as set forth herein should be approved.

149.    For all the above reasons, the Debtors request that the Court authorize the sale of substantially all of the Debtors' assets, approve the Agreement subject to higher and better offers, approve the assumption and assignment of the Designated Contracts and grant related relief.

N.    Motion For Order (I) Approving Bid Procedures Relating To Sale of Substantially All of the Debtors' Assets; (II) Scheduling a Hearing to Consider the Sale and Approving the Form and Matter of Notices; (III) Establishing Procedures Relating to Assumption and Assignment of Certain Contracts, Including Notice of Proposed Cure Amounts, (IV) Approving Expense Reimbursement Provision, and (V) Granting Related Relief

150.    In order to conduct an orderly sale process and to maximize the potential for bidding on the Debtors' assets the Debtors propose that certain procedures be adopted and approved by the Court.  These procedures will allow interested parties to conduct due diligence, and propose bids for the Debtors' assets in an orderly fashion and are designed to obtain the

maximum value for the Debtors' Assets. The Debtors intend to conduct an auction under rules set forth in the proposed Bid Procedures. In light of the Debtors' financial condition, and to expedite the sale process, the Debtors propose that the Motion to Establish Sale Procedures be heard as one of the First Day Motions and that a Bid Deadline of December 7, 2007 be set. Additionally, the Debtors propose that the Auction be held on December 12, 2007 at 1251 Avenue of the Americas, 27th Floor, New York, NY 10020 and the Sale Hearing be held on December 13, 2007.

151.    The Debtors believe that the Auction and proposed Bid Procedures will promote active bidding from seriously interested parties and will identify the best or highest offer(s) for the Assets. The proposed Bid Procedures will allow the Debtors to conduct the Auction in a controlled, fair and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction. The Debtors believe that the Bid Procedures are: (a) sufficient to encourage bidding for the Assets; (b) consistent with other procedures previously approved by the Court; and (c) appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. Further, the Bid Procedures are designed to maximize value for the Debtors' estates, while ensuring an orderly sale process consistent with the timeline available to the Debtors under the Agreement and the terms of the Debtors' DIP Facility.

152.    The Debtors have sound business justifications for seeking approval of the Bid Procedures at this juncture. The Debtors believe it is in the best interests of their estates, creditors, customers and employees to commence a bidding procedure immediately, as the Debtors have limited funding and resources to try to maximize the value of their assets. Indeed, the debtor-in-possession financing that the Debtors were able to negotiate is available only for a

finite period of time. While the Debtors have made significant progress in reducing expenses, it is questionable whether they will be able to continue operating beyond the period of this proposed bidding process without additional funding, which may not be forthcoming. In addition, the sale of the Assets provides a realistic means for the continuation of services for the Debtors' customers with minimal interruption and inconvenience. Absent a sale, the Debtors may be forced to cease operations and wind down their affairs, leaving customers scrambling to find alternative suppliers. For these reasons, the Debtors have determined, based upon their business judgment, that the best option for maximizing the value of their estates for the benefit of their creditors, customers, employees and other parties in interest is through a sale of the Assets pursuant to the Bid Procedures.

153.    The Debtors concluded that, given their financing needs and the rapid decline of the value of their assets, the Agreement with Adeptio constituted the most likely manner in which to increase the overall value of the estates for the benefit of their creditors, customers and employees.

154.    The Debtors believe that the Bid Procedures will establish the parameters under which the value of the Proposed Sale with Adeptio may be tested at the Auction. The Bid Procedures are designed to encourage competitive bidding in an orderly manner to maximize value for the Debtors' estates for their creditors, customers and employees. The proposed procedures contain terms typical for a process through which a sale of this nature is consummated and will increase the likelihood that the Debtors will receive the greatest possible consideration because they will ensure a competitive and fair bidding process.

155.    To induce Adeptio to expend the time, energy and resources necessary to submit a stalking horse bid, the Debtors have agreed to provide, and seek this Court's approval of, certain bid protections provided to Adeptio under the Agreement.

156.    Subject to the DIP Facility, as such term is defined herein, and Court approval, the Debtors have agreed to provide Adeptio Expense Reimbursement of up to $1,000,000.00 if conditions specified in the Agreement, occur.

157.    The Expense Reimbursement is a material inducement for, and a condition of, Adeptio's entry into the Agreement.  The Debtors believe that the Expense Reimbursement is fair and reasonable in view of (a) the intensive analysis, due diligence investigation, and negotiation undertaken by Adeptio in connection with the transaction and (b) the fact that, if the Expense Reimbursement is triggered, Adeptio's efforts will have triggered the chances that the Debtors will receive the highest or otherwise best offer for the Assets, to the benefit of the Debtors' creditors, customers and employees.

158.    The amount of the Expense Reimbursement in the Agreement is reasonable and appropriate in light of the size and nature of the transaction.  Additionally, Adeptio required such Expense Reimbursement as inducement to conduct the costly research necessary to provide a competitive floor bid.  In sum, the Debtors' ability to offer the Expense Reimbursement to Adeptio enables the Debtors to ensure the sale of substantially all of the Assets to Adeptio at a price they believe to be fair while, at the same time, providing the Debtors with the potential of even greater benefit to the estates.  Thus, the Expense Reimbursement provision should be approved.

159.    Moreover, payment of the Expense Reimbursement will not diminish the assets of the estates available for distribution to creditors, employees and customers.  The Debtors do not

675252-1

47

intend to terminate the Agreement if to do so would incur an obligation to pay the Expense Reimbursement, unless to accept an alternative bid, which bid must exceed the consideration offered by Adeptio by an amount sufficient to pay the Expense Reimbursement.

160.    Subject to the DIP Facility, the Debtors request that the Court authorize payment of the Expense Reimbursement, pursuant to the terms and conditions of the Agreement.

III.

CONCLUSION

161.    For all the foregoing reasons, I respectfully request that the Court grant the relief requested in each of the First Day Motions.

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

> INPHONIC, INC.
> (for itself and on behalf of each of its affiliated debtors as debtors and debtors in possession)

Date:  November 8, 2007        BY:   /s/ Kenneth D. Schwarz
                                          Kenneth D. Schwarz
                                          Chief Financial Officer for the Debtors

Sworn to before me this 8th
day of November, 2007

         /s/ Megan E. Murray
Notary Public
City/County of Montgomery
State of Maryland
Commission Expires: 3/1/2011

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

INPHONIC, INC.
(for itself and on behalf of each of its affiliated debtors as debtors and debtors in possession)

Date: November _8_, 2007        BY: _____
                                    Kenneth D. Schwarz
                                    Chief Financial Officer for the Debtors

Sworn to before me this
_8_ day of November, 2007

_____
Notary Public   Megan E. Murray

City/County of Montgomery
State of Maryland
Sworn to and subscribed before me this 8
day of November, 20 07
Witness my hand and official seal.
                          _____ Notary Public

Comm expires: 3/1/2011