# EXHIBIT 1

**EXECUTION VERSION**

SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION

CREDIT AND GUARANTY AGREEMENT

DATED AS OF NOVEMBER 9, 2007

BETWEEN

INPHONIC, INC.

AS BORROWER,

THE GUARANTORS PARTY HERETO

AND

ADEPTIO INPC FUNDING, LLC

AS

LENDER

# **TABLE OF CONTENTS**

Page

1. AMOUNT AND TERMS OF CREDIT ............................................................................ 2

    1.1.    Revolving Credit Advances. .......................................................................... 2
    1.2.    Repayment of Revolving Credit Loan; Termination of Revolving Credit Commitments. ............................................................................................... 3
    1.3.    Use of Proceeds. ........................................................................................... 3
    1.4.    Interest on Revolving Credit Loans. ............................................................. 4
    1.5.    Fees. .............................................................................................................. 5
    1.6.    Receipt of Payments. .................................................................................... 5
    1.7.    Application and Allocation of Payments. ..................................................... 5
    1.8.    Accounting. ................................................................................................... 5
    1.9.    Indemnity. ..................................................................................................... 6
    1.10.    Access. ......................................................................................................... 6
    1.11.    Taxes. ........................................................................................................... 7
    1.12.    Super-Priority Nature of Obligations and Lender's Liens. ........................... 8
    1.13.    Payment of Obligations. ............................................................................... 9
    1.14.    No Discharge; Survival of Claims. ............................................................... 9
    1.15.    Release. ......................................................................................................... 9
    1.16.    Waiver of Any Primary Rights. .................................................................. 10

2. CONDITIONS PRECEDENT ...................................................................................... 10

    2.1.    Conditions to the Initial Revolving Credit Advance. ................................. 10
    2.2.    Further Conditions to Each Revolving Credit Advance after the Closing Date. ... 12

3. REPRESENTATIONS AND WARRANTIES ............................................................. 13

    3.1.    Corporate Existence; Compliance with Law. ............................................ 13
    3.2.    Executive Offices; Corporate or Other Names; FEIN. .............................. 13
    3.3.    Corporate Power; Authorization; Enforceable Obligations. ...................... 14
    3.4.    Financial Statements. ................................................................................. 14
    3.5.    Material Adverse Effect. ............................................................................ 14
    3.6.    Ownership of Property; Liens. ................................................................... 15
    3.7.    Restrictions; No Default. ............................................................................ 15
    3.8.    Labor Matters. ............................................................................................ 15
    3.9.    Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness. ...... 16
    3.10.    Government Regulation. ............................................................................. 16
    3.11.    Margin Regulations. ................................................................................... 16
    3.12.    Taxes. ......................................................................................................... 16
    3.13.    ERISA. ....................................................................................................... 17
    3.14.    No Litigation. ............................................................................................. 18
    3.15.    Brokers. ...................................................................................................... 18
    3.16.    Intellectual Property. ................................................................................. 18

Error! Unknown document property name.

3.17.   Full Disclosure. ................................................................................................. 19
3.18.   Environmental Matters. ..................................................................................... 19
3.19.   Insurance Policies. ............................................................................................. 19
3.20.   Deposit and Disbursement Accounts. ............................................................... 19
3.21.   Government Contracts. ...................................................................................... 20
3.22.   Customer and Trade Relations. ......................................................................... 20
3.23.   Agreements and Other Documents. ................................................................... 20
3.24.   Bankruptcy Matters. .......................................................................................... 20

4.  FINANCIAL STATEMENTS AND INFORMATION ........................................................ 21

4.1.    Reports and Notices. ......................................................................................... 21
4.2.    Communication with Accountants. .................................................................... 21
4.3.    Documents Filed with the Bankruptcy Court or Delivered to the U.S.  Trustee or
        Committee. ........................................................................................................ 21

5.  AFFIRMATIVE COVENANTS ........................................................................................... 22

5.1.    Maintenance of Existence and Conduct of Business. ........................................ 22
5.2.    Payment of Charges and Claims. ....................................................................... 22
5.3.    Books and Records. ........................................................................................... 22
5.4.    Litigation. ......................................................................................................... 23
5.5.    Insurance. .......................................................................................................... 23
5.6.    Compliance with Laws. ..................................................................................... 23
5.7.    Agreements; Leases. .......................................................................................... 23
5.8.    Supplemental Disclosure. .................................................................................. 24
5.9.    Environmental Matters. ..................................................................................... 24
5.10.   Application of Proceeds. .................................................................................... 25
5.11.   Fiscal Year. ....................................................................................................... 25
5.12.   Subsidiaries. ...................................................................................................... 25
5.13.   Further Assurances. ........................................................................................... 25
5.14.   Appraisals. ........................................................................................................ 25
5.15.   Intellectual Property. ......................................................................................... 25
5.16.   Sale Process. ..................................................................................................... 25
5.17.   Schedule of Financial Affairs. .......................................................................... 25

6.  NEGATIVE COVENANTS ................................................................................................. 25

6.1.    Mergers, Subsidiaries, Etc. ............................................................................... 25
6.2.    Investments. ...................................................................................................... 26
6.3.    Indebtedness. ..................................................................................................... 26
6.4.    Affiliate and Employee Transactions. ............................................................... 26
6.5.    Capital Structure and Business. ......................................................................... 26
6.6.    Guaranteed Indebtedness. .................................................................................. 26
6.7.    Liens. ................................................................................................................. 26
6.8.    Sale of Assets. ................................................................................................... 27
6.9.    ERISA. .............................................................................................................. 27

ii

6.10.    Financial Covenants........................................................................... 27
6.11.    Restricted Payments........................................................................... 27
6.12.    Hazardous Materials. ......................................................................... 28
6.13.    Sale-Leasebacks. ............................................................................... 28
6.14.    Cancellation of Indebtedness. ........................................................... 28
6.15.    Bank Accounts. .................................................................................. 28
6.16.    No Speculative Investments............................................................... 28
6.17.    Margin Regulations............................................................................ 28
6.18.    Limitation on Negative Pledge Clauses............................................. 28
6.19.    Material Contracts.............................................................................. 28
6.20.    Leases.................................................................................................. 28
6.21.    New Premises...................................................................................... 29
6.22.    Repayment of Indebtedness. .............................................................. 29
6.23.    Reclamation Claims............................................................................ 29
6.24.    Chapter 11 Claims.............................................................................. 29
6.25.    Change of Management. ..................................................................... 29

7.  TERM        29

7.1.    Duration. ............................................................................................ 29
7.2.    Survival of Obligations. ..................................................................... 29

8.  EVENTS OF DEFAULT; RIGHTS AND REMEDIES........................................ 30

8.1.    Events of Default. ............................................................................... 30
8.2.    Remedies............................................................................................. 34
8.3.    Waivers by Borrower........................................................................... 34

9.  SUCCESSORS AND ASSIGNS .......................................................................... 35

9.1.    Successors and Assigns........................................................................ 35
9.2.    Participations; Assignments................................................................. 35

10. MISCELLANEOUS ............................................................................................. 36

10.1.    Complete Agreement; Modification of Agreement. .......................... 36
10.2.    Fees and Expenses. ............................................................................. 36
10.3.    No Waiver............................................................................................ 37
10.4.    Remedies............................................................................................. 38
10.5.    Severability. ........................................................................................ 38
10.6.    Conflict of Terms................................................................................. 38
10.7.    Right of Setoff...................................................................................... 38
10.8.    Authorized Signature. ......................................................................... 38
10.9.    Notices. ................................................................................................ 38
10.10.  Section Titles. ..................................................................................... 40
10.11.  Counterparts........................................................................................ 40
10.12.  Time of the Essence. ........................................................................... 40
10.13.  GOVERNING LAW............................................................................ 40

iii

10.14. WAIVER OF JURY TRIAL..................................................................................... 41
10.15. Publicity. ................................................................................................................ 41
10.16. Dating...................................................................................................................... 41
10.17. Parties Including Trustees; Bankruptcy Court Proceedings. ................................. 41

11. GUARANTY ...................................................................................................................... 42

11.1. Guaranty of the Obligations.................................................................................. 42
11.2. Payment by Guarantors........................................................................................... 42
11.3. Liability of Guarantors Absolute ........................................................................... 42
11.4. Waivers by Guarantors ........................................................................................... 44
11.5. Guarantors' Rights of Subrogation, Contribution, etc. ......................................... 44
11.6. Subordination of Other Obligations....................................................................... 45
11.7. Continuing Guaranty............................................................................................... 45
11.8. Authority of Guarantors or Borrower ..................................................................... 45
11.9. Financial Condition of Borrower ............................................................................ 45

Error! Unknown document property name.

## INDEX OF ANNEXES, SCHEDULES AND EXHIBITS

| | | |
|---|---|---|
| Annex A | - | Definitions; Rules of Construction |
| Annex B | - | Financial Statements and Notices |
| Annex C | - | Financial Covenants |
| Annex D | - | Form of Budget |
| Annex E | - | Revenue |
| | | |
| Schedule 1.3 | - | Use of Proceeds |
| Schedule 2.1(a) | - | Closing Agenda |
| Schedule 2.1(k) | - | First Day Orders |
| Schedule 3.2 | - | Executive Offices; Principal Places of Business; Locations of Collateral; Trade Names |
| Schedule 3.5 | - | Restricted Payments; Redemptions |
| Schedule 3.6 | - | Real Estate and Leases |
| Schedule 3.8 | - | Labor Matters |
| Schedule 3.9 | - | Ventures, Subsidiaries and Affiliates; Outstanding Stock |
| Schedule 3.12 | - | Tax Matters |
| Schedule 3.13 | - | ERISA Plans, etc. |
| Schedule 3.14 | - | Litigation |
| Schedule 3.16 | - | Patents, Trademarks, Copyrights, Internet Domain Names and Licenses |
| Schedule 3.18 | - | Environmental Matters |
| Schedule 3.20 | - | Disbursement and Deposit Accounts |
| Schedule 3.21 | - | Government Contracts |
| Schedule 3.22 | - | Customer & Trade Relations |
| Schedule 3.23 | - | Certain Contracts |
| Schedule 6.2 | - | Investments |
| Schedule 6.3 | - | Indebtedness |
| Schedule 6.4 | - | Loans to and Transactions with Employees |
| Schedule 6.7 | - | Liens |
| Schedule 6.12 | - | Hazardous Materials |
| Schedule 10.8 | - | Authorized Signatures |
| | | |
| Exhibit A | - | Form of Notice of Revolving Credit Advance |
| Exhibit B | - | Form of Revolving Credit Note |
| Exhibit C | - | Form of Interim Order |

Error! Unknown document property name.

SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION REVOLVING CREDIT AND GUARANTY AGREEMENT, dated as of November 9, 2007 (this "Agreement"), between INPHONIC, INC., a Delaware corporation ("Borrower"), as borrower, the subsidiaries of the Borrower party hereto, as guarantors (each, a "Guarantor" and collectively, the "Guarantors") and ADEPTIO INPC FUNDING, LLC, a Delaware limited liability company (together with its successors, assigns and transferees, the "Lender"), as lender. Capitalized terms used herein are defined in Annex A or in the text hereof.

## R E C I T A L S

A.    On November 8, 2007 (the "Petition Date"), Borrower commenced Chapter 11 Case No. 07-_____ (the "Borrower's Case") by filing a voluntary petition for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. 101 *et seq.* (the "Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Each Guarantor also commenced a case under Chapter 11 of the Bankruptcy Code (such cases, together with the Borrower's Case, the "Chapter 11 Cases") in the Bankruptcy Court on the Petition Date. The Borrower and the Guarantors continue to operate their businesses and manage their properties as debtors and a debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

B.    Prior to the Petition Date, the Borrower and the Guarantors entered into that certain Credit Agreement dated as of November 7, 2006 (as amended, the "Pre-Petition Loan Agreement"), by and among the Borrower, the Lenders from time to time party thereto (the "Prior Lenders") and Citicorp North America, Inc. as Administration Agent (the "Existing Agent"). The Lender holds all of the Prior Lenders' Pre-Petition Indebtedness, the Pre-Petition Loan Documents, and the Pre-Petition Liens;

C.    Borrower has requested that Lender provide a revolving credit facility that is senior secured, super-priority as to Borrower of up to Twenty-Five Million Dollars ($25,000,000.00) to fund certain of the working capital requirements of Borrower;

D.    Lender is willing to provide a revolving credit facility to Borrower of up to such amount upon the terms and conditions set forth herein;

E.    Borrower and the Guarantors have agreed to secure all of their obligations under the Loan Documents by, among other things, granting Lender a security interest in and lien upon substantially all of their existing and after-acquired personal and real property; and

F.    Unless otherwise indicated, all references in this Agreement to sections, subsections, schedules, exhibits, and attachments shall refer to the corresponding sections, subsections, schedules, exhibits, and attachments of or to this Agreement. All schedules, annexes, exhibits and attachments hereto, or expressly identified to this Agreement, are incorporated herein by reference, and taken together, shall constitute but a single agreement. Unless otherwise expressly set forth herein, or in a written amendment referring to such schedules and annexes, all schedules and annexes referred to herein shall mean the schedules and annexes as in effect as of the Closing Date. These Recitals shall be construed as part of this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, the parties hereto agree as follows:

## 1.    AMOUNT AND TERMS OF CREDIT

### 1.1.    Revolving Credit Advances.

(a)    Upon and subject to the terms and conditions hereof, the Lender agrees to make available, from time to time, commencing on the date on which each of the conditions specified herein shall have been satisfied or waived   by the Lender until the Commitment Termination Date, for the use of Borrower and upon the request of Borrower therefor, loans (each a "Revolving Credit Advance") in an aggregate principal amount at any time outstanding up to but not exceeding the lesser of (i) the Interim Availability Amount and (ii) the Revolving Credit Commitment..  Borrower may from time to time borrow, repay and reborrow Revolving Credit Advances under this Section 1.1 subject to the limitation in the foregoing sentence. Notwithstanding the foregoing, no Revolving Credit Advance shall exceed (x) the amount of borrowings permitted under the Budget to be outstanding for such period less, (y)  the amount by which Borrower's and Guarantors' actual receipts for such period exceeds the amount of anticipated receipts for such period as set forth in the Budget.

(b)    Borrower shall give Lender notice of each borrowing of a Revolving Credit Advance hereunder as provided in Section 1.1(c) and, Lender shall make available the amount of the Revolving Credit Advance or Advances to be made by it on the requested date, in immediately available funds.

(c)    Each notice of a borrowing of a Revolving Credit Advance shall be given in writing (by telecopy, hand delivery, or U.S. mail) by Borrower to Lender at its address at c/o Versa Capital Management, Inc., Cira Centre, 2929 Arch Street, Philadelphia, PA 19104-2868, Attention: David S. Lorry, Telephone No. 215-609-3416, Telecopy No. 215-609-3499, given no later than 12:00 Noon (Eastern time) (i) no more frequently than one time per week and, except for the first week following the Petition Date, only on or after the delivery of the Weekly Budget Variance Report for the immediately prior week, and (ii) at least one Business Day prior to the date of the proposed Revolving Credit Advance.  Each such notice of borrowing (a "Notice of Revolving Credit Advance") shall be substantially in the form of Exhibit A, specifying therein the requested date, the amount of such Revolving Credit Advance, and such other information as may be reasonably required by Lender.  Lender shall be entitled to rely upon and shall be fully protected under this Agreement in accepting any Notice of Revolving Credit Advance reasonably believed by Lender to be genuine and to assume that the persons executing and delivering the same were duly authorized unless the responsible individual acting thereon for Lender shall have actual knowledge to the contrary.

(d)    The Revolving Credit Advances made by Lender may be, upon request of Lender, evidenced by a promissory note issued by Borrower in favor of Lender substantially in the form of Exhibit B, dated the Closing Date, payable to Lender in a maximum principal amount equal to the amount of the Revolving Credit Commitment as originally in effect and otherwise duly completed.

2

1.2.    Repayment of Revolving Credit Loan; Termination of Revolving Credit
Commitments.

(a)    Borrower hereby promises to pay to Lender the entire outstanding
principal amount of the Revolving Credit Loan and all other outstanding Obligations, and the
Revolving Credit Loan and all other outstanding Obligations shall mature, on the Commitment
Termination Date.

(b)    In the event that the outstanding principal amount of the Revolving Credit
Loan shall, at any time, exceed the Borrowing Availability, Borrower shall immediately repay
that portion of the Revolving Credit Loan that is in excess of the Borrowing Availability.

(c)    Subject to Section 1.5(c), Borrower shall have the right at any time upon
ten (10) days' prior written notice by Borrower to Lender to voluntarily terminate the Revolving
Credit Commitment (in whole but not in part) without premium or penalty. Upon the effective
date of such termination, Borrower's right to receive Revolving Credit Advances and Borrower's
obligation to pay the Unused Fee (except to the extent for the period prior to such termination)
shall simultaneously terminate, and, notwithstanding anything to the contrary contained herein or
in any Loan Document, the entire outstanding balance of the Revolving Credit Loan and all other
Obligations shall be immediately due and payable. On the date of such termination, Borrower
shall pay to Lender in immediately available funds all of the Obligations, including any accrued
and unpaid interest thereon.

1.3.    Use of Proceeds. Borrower shall utilize the Collateral and the proceeds of the
Revolving Credit Loans which are incurred on the Closing Date (net of any amounts used on the
Closing Date to pay Fees) as follows: (i) for working capital and general corporate purposes
including certain fees and expenses of professionals retained by Borrower, subject to the Interim
Order and Final Order, but excluding in any event the making of any Restricted Payment not
specifically permitted by Section 6.11 and solely for the purposes specified in the Budget and (ii)
certain other pre-petition expenses that are approved by the Bankruptcy Court and previously
approved by Lender. Other than as may be expressly permitted in the Interim Order and Final
Order, Borrower shall not be permitted to use the proceeds of the Revolving Credit Loans or the
Collateral:    (A) to finance in any way any adversary action, suit, arbitration, proceeding,
application, motion or other litigation of any type relating to or in connection with the Pre-
Petition Loan Agreement or any of the loan documents or in instruments entered into in
connection therewith, including, without limitation, any investigation of or challenges to the
obligations under the Pre-Petition Loan Agreement, or the validity, perfection, priority, or
enforceability of any Lien securing such claims or any payment made thereunder; (B) to finance
in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any
type adverse to the interests of Lender or its rights and remedies under this Agreement, the other
Loan Documents, the Interim Order or the Final Order; (C) to make any distribution under a plan
of reorganization in any Chapter 11 Case; or (D) to make any payment in settlement of any
claim, action or proceeding before any court, arbitrator or other governmental body without the
prior written consent of Lender. Schedule 1.3 contains a description of Borrower's sources and
uses of funds as of the Closing Date, including Revolving Credit Loans to be made on that date,
and a funds flow memorandum detailing how funds from each source are to be transferred
particular uses.

3

1.4.    <u>Interest on Revolving Credit Loans.</u>

(a)    Borrower shall pay interest on all outstanding Revolving Credit Loans to Lender, (i) in arrears for the preceding calendar month, on the first Business Day of each calendar month commencing December 1, 2007, (ii) on the Commitment Termination Date, and (iii) if any interest accrues or remains payable after the Commitment Termination Date, upon demand. If any interest or other payment under this Agreement becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(b)    Borrower shall be obligated to pay interest to Lender on the outstanding balance of the Revolving Credit Loan at a floating rate equal to the Prime Rate (as in effect from time to time) <u>plus</u> three and twenty-five hundredths percent (3.25%) per annum. All computations of interest shall be made on the basis of a three hundred and sixty (360) day year, in each case for the actual number of days occurring in the period for which such interest is payable.

(c)    Upon the occurrence and during the continuance of any Event of Default, the interest rate applicable to all of the Obligations automatically shall be the Default Rate.

(d)    Notwithstanding anything to the contrary set forth in this <u>Section 1.4</u>, if, at any time prior to the Termination Date, the rate of interest payable to Lender hereunder exceeds the highest rate of interest permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto (the "<u>Maximum Lawful Rate</u>"), then in such event and so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder to Lender shall be equal to the Maximum Lawful Rate; <u>provided, however,</u> that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, Borrower shall continue to pay interest hereunder to Lender at the Maximum Lawful Rate until such time as the total interest received by Lender from the making of the Revolving Credit Loans hereunder is equal to the total interest which Lender would have received had the interest rate payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement. Thereafter, the interest rate payable to Lender hereunder shall be the rate of interest provided in <u>Sections 1.4 (b) or (c)</u>, as applicable, of this Agreement, unless and until the rate of interest again exceeds the Maximum Lawful Rate, in which event this paragraph shall again apply. In no event shall the total interest received by Lender pursuant to the terms hereof exceed the amount which Lender could lawfully have received had the interest due hereunder been calculated for the full term hereof at the Maximum Lawful Rate. In the event the Maximum Lawful Rate is calculated pursuant to this paragraph, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made. In the event that a court of competent jurisdiction, notwithstanding the provisions of this <u>Section 1.4(d)</u>, shall make a final determination that Lender has received interest hereunder or under any of the Loan Documents in excess of the Maximum Lawful Rate, Lender shall, to the extent permitted by Applicable Law, promptly apply such excess first to any lawful interest due and not yet paid hereunder, then to the outstanding principal of the Obligations, then to Fees and any other unpaid

4

Obligations and thereafter shall promptly refund any excess to Borrower or as a court of competent jurisdiction may otherwise order.

    1.5.   <u>Fees.</u>

        (a)   <u>Unused Fee.</u> Borrower agrees to pay to Lender an unused facility fee (the "<u>Unused Fee</u>") equal to one-half percent (.5%) per annum on the average unused daily balance of Lender's Revolving Credit Commitment, payable monthly in arrears (a) on the first Business Day of each calendar month commencing on December 1, 2007 and (b) on the Commitment Termination Date. All computations of the foregoing fee shall be made by Lender on the basis of a three hundred sixty (360) day year, and for the actual number of days occurring in the period for which such fee is payable.

        (b)   <u>Commitment Fee.</u> On the Closing Date, Borrower agrees to pay to Lender a one-time commitment fee equal to one percent (1%) of the Revolving Credit Commitment, which shall be added to the outstanding principal amount of the Revolving Credit Loan.

        (c)   <u>Exit Fee.</u> Borrower agrees to pay to Lender a one-time exit fee equal to one percent (1%) of the principal amount of Revolving Credit Commitment in effect on the Closing Date, which amount shall be payable by the Borrower upon the Commitment Termination Date.

    1.6.   <u>Receipt of Payments.</u> Borrower shall make each payment under this Agreement not later than 2:00 p.m. (Eastern time) on the day when due in Dollars in immediately available funds to Lender's account at Citizens Bank of Pennsylvania, ABA# 036076150, Credit to: Adeptio INPC Funding, LLC, Account 6218879317.

    1.7.   <u>Application and Allocation of Payments.</u> Borrower irrevocably waives the right to direct the application of any and all payments at any time or times hereafter received from or on behalf of Borrower. Notwithstanding the foregoing, in the absence of a specific determination by Lender with respect thereto, or if an Event of Default shall have occurred and be continuing, such payments shall be applied in the following order: (a) then due and payable Fees and expenses of Lender; (b) then due and payable interest payments on the Revolving Credit Loans; (c) Obligations to Lender other than Fees, expenses and interest and principal payments; (d) principal of the Revolving Credit Loans; and (e) to the extent there are no other Obligations then due and payable, to Borrower or its successors or assigns or as a court of competent jurisdiction may direct.

    1.8.   <u>Accounting.</u> Lender shall maintain a loan account (the "<u>Loan Account</u>") on its books to record: all Advances, all payments made by Borrower, and all other debits and credits as provided in this Agreement with respect to the Revolving Credit Loans or any other Obligations. All entries in the Loan Account shall be made in accordance with Lender's customary accounting practices as in effect from time to time. The balance in the Loan Account, as recorded on Lender's most recent printout or other written statement, shall, absent manifest error, be presumptive evidence of the amounts due and owing to Lender by Borrower; <u>provided</u>, that any failure to so record or any error in so recording shall not limit or otherwise affect Borrower's duty to pay the Obligations.

Error! Unknown document property name.

1.9.    <u>Indemnity.</u>

(a)    Borrower shall indemnify and hold harmless Lender and its Affiliates, and its officers, directors, employees, attorneys and representatives (each, an "<u>Indemnified Person</u>"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigations or defense, including those incurred upon any appeal) (each, a "<u>Claim</u>") which may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and any other Loan Document and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder, and any actions or failures to act in connection therewith, including any and all Environmental Liabilities and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents (collectively, "<u>Indemnified Liabilities</u>"); <u>provided, however,</u> that Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction. NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY LOAN DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.

(b)    Borrower hereby acknowledges and agrees that Lender (as of the date hereof) is not now nor has ever been in control of any of the Subject Property or the affairs or operations of Borrower.

1.10.    <u>Access.</u>

(a)    Borrower shall: (i) provide access during normal business hours to Lender and any of its officers, employees and agents as frequently as Lender determines to be appropriate upon reasonable advance notice to Borrower (unless a Default shall have occurred and be continuing, in which event no such notice shall be required and such access shall be at any and all times) to the properties and facilities of Borrower; (ii) permit Lender and any of its officers, employees and agents, as frequently as Lender determines to be appropriate, to inspect, audit and make extracts from all of Borrower's records, files and books of account upon reasonable advance notice to Borrower (unless a Default shall have occurred and be continuing, in which event no such notice shall be required and such access shall be at any and all times); and (iii) permit Lender and any of its officers, employees and agents, as frequently as Lender determines to be appropriate, upon reasonable advance notice to Borrower (unless a Default shall have occurred and be continuing, in which event no such notice shall be required and such access shall be at any and all times) to conduct audits and to inspect, review and evaluate the Collateral, in each case subject to any confidentiality agreements binding Borrower, and Borrower agrees to

6

render to Lender at Borrower's cost and expense such clerical and other assistance as may be reasonably requested with regard thereto.

(b)    Borrower shall give not less than three (3) Business Day's prior written notice to Lender of any meeting of the Board of Directors of the Borrower, which notice shall state the location of such meeting, and Borrower shall give a representative designated by Lender the opportunity to attend such meeting as an observer or, if such meeting is held by telephone, to attend such meeting by telephone (other than any portion of such meeting in which the Board of Directors discusses competing bids for the Borrower's assets); it being understood that nothing herein shall restrict in any way the Borrower's ability to hold or conduct meetings of its Board of Directors whether or not Lender elects to have a representative attend any such meeting. Notwithstanding the foregoing, Borrower shall be permitted to take reasonable measures to preserve Borrower's attorney-client privilege in the context of such meetings.

(c)    Borrower shall make available to Lender and its counsel, as quickly as practicable under the circumstances, originals or copies of all books, records, board minutes, contracts, insurance policies, environmental audits, business plans, files, financial statements (actual and pro forma), filings with federal, state and local regulatory agencies, other instruments and documents in the custody or control or otherwise belonging to or property of Borrower and key personnel for interviews which Lender may reasonably request. Borrower shall deliver any document or instrument reasonably necessary for Lender, as it may from time to time request, to obtain records from any service bureau or other Person which maintains records for Borrower, and shall maintain duplicate records or supporting documentation on media, including computer tapes and discs owned by Borrower. Borrower shall make available to Lender, upon its reasonable request, information and records prepared by its certified public accountants and its banking and other financial institutions.

1.11.    Taxes.

(a)    Any and all payments by or on behalf of Borrower hereunder or under any Revolving Credit Note or other Loan Document shall be made, in accordance with this Section 1.11, free and clear of and without deduction for any and all present or future Taxes. If Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any Revolving Credit Note or other Loan Document, (i) the sum payable shall be increased as shall be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 1.11), Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions, and (iii) Borrower shall pay the full amount deducted to the relevant taxing or other authority in accordance with Applicable Law.

(b)    In addition, Borrower agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement (hereinafter referred to as "Other Taxes").

(c)    Borrower shall indemnify and, within ten (10) days of demand therefor, pay Lender for the full amount of Taxes or Other Taxes (including any Taxes or Other Taxes

Error! Unknown document property name.

imposed by any jurisdiction on amounts payable under this <u>Section 1.11</u>) paid by Lender and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted.

(d)    Within thirty (30) days after the date of any such payment of Taxes or Other Taxes described in <u>Sections 1.11(a), (b) or (c)</u>, Borrower shall furnish to Lender the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment satisfactory to Lender.

1.12.    <u>Super-Priority Nature of Obligations and Lender's Liens.</u>

(a)    The priority of Lender's Liens on the Collateral shall be as set forth in the Interim Order and the Final Order. Subject to the applicable DIP Order, no filings, recordings or other actions shall be necessary to perfect and maintain the perfection and status of such Liens.

(b)    All Obligations of Borrower and the Guarantors shall constitute administrative expenses of such party in the Chapter 11 Cases, with administrative priority and senior-secured status under Sections 364(c) and 364(d) of the Bankruptcy Code. Subject only to the Carve-Out Amount, such administrative claim shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provision of the Bankruptcy Code and shall at all times be senior to the rights of Borrower and the Guarantors, Borrower's and Guarantors' estates, and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code. The liens and security interests granted to Lender in and against the Collateral, and the priorities accorded to the Obligations, shall have the priority and senior-secured status afforded by Sections 364(c) and 364(d)(1) of the Bankruptcy Code (all as more fully set forth in the Interim Order and Final Order) senior to all claims and interests other than the Carve-Out Expenses up to the Carve-Out Amount.

(c)    Lender's Liens and its administrative claim under Sections 364(c)(1) and 364(d) of the Bankruptcy Code afforded the Obligations shall also have priority over any claims arising under Section 506(c) of the Bankruptcy Code, subject and subordinate only to the Carve-Out Expenses subject to the Carve-Out Amount, subject to the right of the Lender and any other party-in-interest to object to the award of such fees and expenses in accordance with any applicable Bankruptcy Rule or, if applicable, order of the Bankruptcy Court relating to the approval of fees and expenses and objections thereto; <u>provided, however</u>, that Carve-Out Expenses shall not include, and the Carve-Out Amount shall not be available to pay, any fees or disbursements (A) arising after the conversion of a Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code or (B) related to the commencement or prosecution of any claims or proceedings against (i) Lender or its claims or security interests in, or Liens upon, the Collateral whether under this Agreement or any other Loan Document and (ii) any Prior Lender under the Pre-Petition Loan Agreement or its claims or security interests in connection with the Pre-Petition Loan Agreement or any of the loan documents or instruments entered into in connection therewith. In the event of any inconsistency in the definition of "Carve-Out Amount" between the provisions of this Agreement and the Interim Order or Final Order, the provisions of the Interim Order or Final Order shall govern.

Error! Unknown document property name.

(d)    Except as set forth herein or in the Final Order, no other claim having a priority superior or pari passu to that granted to Lender by the Final Order shall be granted or approved while any Obligations under this Agreement remain outstanding.

1.13.    Payment of Obligations.    Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Lender shall be entitled to immediate payment of such Obligations without further application to, or order of, the Bankruptcy Court.

1.14.    No Discharge; Survival of Claims.    Borrower and the Guarantors agree, to the extent applicable, that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in the Chapter 11 Cases (and Borrower and the Guarantors, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge) and (b) any super-priority administrative claim granted to Lender pursuant to any order described in Section 1.12 and the Liens granted to Lender pursuant to any order described in Section 1.12 shall not be affected in any manner by the entry of an order confirming a plan of reorganization in the Chapter 11 Cases.

1.15.    Release.    Borrower and the Guarantors hereby acknowledge that, upon entry of a Final Order, Borrower and the Guarantors shall not have any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of such parties' liability to repay Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from Lender. Borrower and each Guarantor, each in its own right and also with respect to its estate, and on behalf of its successors, assigns, and any Affiliates and any Person acting for and on behalf of, or claiming through it, (collectively, the "Releasing Parties"), hereby fully, finally and forever releases and discharge Lender and all of Lender's past and present officers, directors, servants, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, any interim or final bankruptcy order, the Interim Order, the Final Order and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

9

1.16. <u>Waiver of Any Primary Rights.</u> Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligation shall be outstanding, Borrower hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Lien securing the Obligations, or to approve a claim of equal or greater priority than the Obligations.

## 2. CONDITIONS PRECEDENT

2.1. <u>Conditions to the Initial Revolving Credit Advance.</u> Notwithstanding any other provision of this Agreement and without affecting in any manner the rights of Lender hereunder, Borrower shall have no rights under this Agreement (but shall have all applicable obligations hereunder), and Lender shall not be obligated to make any Revolving Credit Advances, or to take, fulfill, or perform any other action hereunder, until the following conditions have been fulfilled to the satisfaction of Lender:

(a) Lender shall have received duly executed counterparts of the Agreement and the other Loan Documents from the Borrower and the Guarantors, and such documents, instruments, certificates, and agreements as Lender shall reasonably request in connection with the transactions contemplated by this Agreement, including all documents, instruments, agreements and other materials listed in <u>Schedule 2.1(a)</u>, each in form and substance satisfactory to Lender;

(b) Lender shall have received evidence satisfactory to it that Borrower and the Guarantors have obtained consents and acknowledgments of all Persons whose consents and acknowledgments may be required, including, but not limited to, all requisite Governmental Authorities, to the terms and to the execution and delivery, of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby. Lender shall have received resolutions of the Board of Directors or other governing body of Borrower and each Guarantor approving and authorizing, among other things, the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or assistant secretary as being in full force and effect without modification or amendment. Lender shall have received good standing certificates from the applicable Governmental Authority of each of Borrower's and each Guarantor's jurisdiction of incorporation, organization or formation and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business (other than, in the case of jurisdictions other than Borrower's or such Guarantor's jurisdiction of incorporation, organization or formation, where the failure to be in good standing or so qualified could not be reasonably expected to have a Material Adverse Effect). Lender shall have received signature and incumbency certificates of the officers of such Person executing the Loan Documents.;

(c) Lender shall have received certificates of property and liability insurance of Borrower and the Guarantors showing loss payable or additional insured clauses or endorsements, or both, as appropriate, in favor of Lender, in form and substance satisfactory to Lender;

Error! Unknown document property name.

(d)    Borrower shall have consented to an increase of the Revolving Credit Loans by an amount equal to all Fees, costs, and expenses due at closing (including fees and expenses of consultants and counsel to Lender presented as of the Closing Date) (it being understood that the Borrower's acceptance of the initial Revolving Credit Loan shall be evidence of such consent);

(e)    No action, proceeding, investigation, regulation or legislation shall have been instituted or threatened before any Governmental Authority to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of this Agreement or any of the other Loan Documents or the consummation of the transactions contemplated hereby and thereby and which, in Lender's sole judgment, would make it inadvisable to consummate the transactions contemplated by this Agreement or any of the other Loan Documents;

(f)    No later than five (5) days after the Petition Date, the Bankruptcy Court shall have entered, upon motion in form and substance satisfactory to Lender, on such prior notice to such parties as may be satisfactory to Lender, the Interim Order. The Interim Order shall be in full force and effect, shall not be subject to a motion for reconsideration and shall not have been vacated, reversed, modified, amended stayed or subject to a pending appeal;

(g)    Other than the Chapter 11 Cases and the defaults under the Pre-Petition Loan Agreement and as may be disclosed in Schedule 2.1(g), none of the following shall have occurred and be continuing:  (i) a Material Adverse Effect; (ii) a material increase in liabilities, liquidated or contingent (net of any offsetting increase in assets), or a material decrease in assets of Borrower and Guarantors; or (iii) any litigation or other proceeding is pending or threatened which, if successful, could, individually or in the aggregate, reasonably be expected to have or result in a Material Adverse Effect;

(h)    Lender's satisfaction with the composition of the Board of Directors of the Borrower;

(i)    Lender shall have received all requested financial information and financial statements requested of Borrower certified by the Chief Financial Officer of Borrower and in form and substance satisfactory to Lender;

(j)    Lender shall be reasonably satisfied with the corporate structure, capital structure, debt instruments, material contracts, and governing documents of Borrower and the Guarantors, and the tax effects resulting from the commencement of the Chapter 11 Cases and the credit facility evidenced by this Agreement;

(k)    The "first day" orders described on Schedule 2.1(k) (the "First Day Orders") in form and substance satisfactory to Lender shall have been entered in the Chapter 11 Cases;

(l)    Lender, Borrower and Guarantors shall have entered into the Asset Purchase Agreement and Lender shall have received a copy of the docket in the Borrower's Case (or other of the Chapter 11 Cases which is the "lead case") which reflects the filing of a sale motion (which shall seek, among other things, approval of the Asset Purchase Agreement) by Borrower, which pleading(s) shall be in form and substance satisfactory to Lender; and

Error! Unknown document property name.

      (m)    Lender shall have received the Budget.

    2.2.   <u>Further Conditions to Each Revolving Credit Advance after the Closing Date.</u>  It shall be a further condition to the funding of the initial and each subsequent Revolving Credit Advance that the following statements shall be true on the date of each such funding, advance or incurrence, as the case may be:

      (a)    The Revolving Credit Advance requested would not cause the aggregate outstanding amount of the Revolving Credit Loans to exceed the amount then authorized by the Interim Order or the Final Order, as the case may be;

      (b)    Borrower's and Guarantors' representations and warranties contained herein or in any of the Loan Documents shall be true and correct in all material respects on and as of the Closing Date and the date on which such Revolving Credit Advance is made as the case may be, as though made on or incurred on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date and except for changes therein permitted or contemplated by this Agreement;

      (c)    No event shall have occurred and be continuing, or would result from the making of such Revolving Credit Advance which constitutes or would constitute a Default;

      (d)    After giving effect to such Revolving Credit Advance, the aggregate principal amount of the Revolving Credit Loan shall not exceed the Borrowing Availability;

      (e)    Lender shall have a senior priming, first priority perfected security interest in the Collateral subject only to the Carve-Out Expenses up to the Carve-Out Amount;

      (f)    As to each Revolving Credit Advance requested to occur on or after the date that is 15 days after the Petition Date, the Bankruptcy Court shall have entered the Final Order, on such prior notice to such parties as may be satisfactory to Lender and in compliance with the terms set forth in the Interim Order, which Final Order shall be in full force and effect, shall not be subject to a motion for reconsideration and shall not have been vacated, reversed, modified, amended stayed or subject to a pending appeal;

      (g)    As to each Revolving Credit Advance that would, when added to the aggregate amount of all Revolving Credit Loans then outstanding, exceed the Interim Availability Amount, the Bankruptcy Court shall have entered the Final Order authorizing the Borrower to incur loans to the extent of such aggregate advance;

      (h)    There shall be no motion pending that would, if granted, permit any administrative expense against Borrower or any Guarantor to have administrative priority equal to or superior to the priority of the Lender's in respect of the Obligations;

      (i)    Borrower shall have consented to an increase of the Revolving Credit Loans by an amount equal to all Fees, costs, and expenses (including fees and expenses of consultants and counsel to Lender presented on or before such date) then due and owing (it being understood that the Borrower's acceptance of the requested Revolving Credit Loan shall be evidence of such consent);

12

(j)    Borrower and Guarantors shall have used their reasonable efforts to obtain duly executed and enforceable account control agreements (with respect to each of their Deposit Accounts) in form and substance satisfactory to Lender, pursuant to which Lender shall be granted sole dominion and control over the deposits from time to time on deposit in such accounts; and

(k)    The funding of any Revolving Credit Advance shall not be enjoined, temporarily, preliminary or permanently or cause Borrower to breach any agreement, the enforcement of which is not stayed by the Chapter 11 Cases, to which Borrower or any Guarantor may be a party.

The request and acceptance by Borrower of the proceeds of any Revolving Credit Advance shall be deemed to constitute, as of the date of such request or acceptance, (i) a representation and warranty by Borrower and the Guarantors that the conditions in this Section 2.2 (and, in the case of the initial Revolving Credit Advance made on the Closing Date, Section 2.1) have been satisfied and (ii) a confirmation by Borrower and the Guarantors of the granting and continuance of Lender's Liens, pursuant to the Interim Order, Final Order or Collateral Documents, as the case may be.

## 3.    REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into this Agreement and make the Revolving Credit Loans Borrower makes the following representations and warranties to Lender (and each such representation and warranty shall survive the execution and delivery of this Agreement) that:

3.1.    Corporate Existence; Compliance with Law. Each of the Borrower and each Guarantor: (a) is an entity duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its formation and is duly qualified to do business and is in good standing in each other jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification; (b) subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, has the requisite power and authority and the legal right to own, pledge, mortgage or otherwise encumber and operate its properties, to lease the property it operates under lease, and to conduct its business as now, heretofore and proposed to be conducted; (c) has all material licenses, permits, consents or approvals from or by, and has made all filings with, and has given all material notices to, all Governmental Authorities having jurisdiction, to the extent required for such ownership, operation and conduct; (d) is in compliance with its certificate or articles of formation and by-laws; and (e) is in compliance in all material respects with all Applicable Law except to the extent that (i) such compliance is excused by the U.S. Bankruptcy Code or by an applicable order of the Bankruptcy Court and (ii) such non-compliance would neither have nor could reasonably be expected to have a Material Adverse Effect on Borrower's business or assets or upon any of the rights, remedies or interests of the Lender.

3.2.    Executive Offices; Corporate or Other Names; FEIN. The current locations of Borrower's and Guarantors' executive offices, principal place of business, corporate offices, all warehouses and premises within which any Collateral is stored or located, and the locations of Borrower's and Guarantors' records concerning the Collateral are set forth in Schedule 3.2 and,

13

Error! Unknown document property name.

except as set forth in <u>Schedule 3.2</u>, such locations have not changed during the preceding 12 months. In addition, the federal employer identification number of Borrower is shown on <u>Schedule 3.2</u>. During the prior five (5) years, except as set forth in <u>Schedule 3.2</u>, neither Borrower nor any Guarantor has been known as or used any corporate, fictitious or trade name.

3.3. <u>Corporate Power; Authorization; Enforceable Obligations.</u>  Upon the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, the execution, delivery and performance by each of the Borrower and each Guarantor of the Loan Documents to which it is a party and all other instruments and documents to be delivered by it hereunder and thereunder to the extent it is a party thereto and the creation of all Liens provided for herein and therein: (a) are within its organizational power; (b) have been duly authorized by all necessary action; (c) are not in contravention of any provision of its certificate or articles of organization or by-laws or other organizational documents; (d) will not violate any law or regulation, or any order or decree of any court or governmental instrumentality; (e) will not conflict with or result in the breach or termination of, constitute a default under or accelerate any performance required by, any material indenture, mortgage, deed of trust, lease, agreement or other instrument to which it is a party or by which it or any of its material property is bound; (f) will not result in the creation or imposition of any Lien upon any of the property of Borrower other than those in favor of Lender, all pursuant to the Loan Documents; and (g) do not require the consent or approval of any Governmental Authority or any other Person, all of which will have been duly obtained, made or complied with prior to the Closing Date and which are in full force and effect. At or prior to the Closing Date, each of the Loan Documents to which each of the Borrower and each Guarantor is a party shall have been duly executed and delivered by it and shall then, assuming due execution and delivery by the other parties thereto, subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, constitute a legal, valid and binding obligation of it to the extent it is a party thereto, enforceable against it in accordance with its terms.

3.4. <u>Financial Statements.</u>  Borrower has delivered to Lender audited financial statements of Borrower for the fiscal year ended December 31, 2006 and unaudited financial statements for the most recent fiscal quarter (together, the "<u>Financial Statements</u>").  The Financial Statements, taken as whole, fairly present in all material respects, in accordance with GAAP, (i) the financial condition of Borrower and Guarantors as of the date thereof, and (ii) the results of operations and cash flow of Borrower for the fiscal year ended December 31, 2006 and the most recently available fiscal quarter, as applicable.

3.5. <u>Material Adverse Effect.</u>  Except as set forth in <u>Schedule 3.5</u>, Borrower and Guarantors have no material obligations, contingent liabilities, or liabilities for Charges, long-term leases or unusual forward or long-term commitments which are not reflected in the Financial Statements. Except as otherwise permitted hereunder or as set forth in <u>Schedule 3.5</u>, no Restricted Payment has been made since June 30, 2007, and no shares of Stock of Borrower have been, or are now required to be, redeemed, retired, purchased or otherwise acquired for value by Borrower. Other than as disclosed in the audited financial statements of Borrower for the fiscal year ended December 31, 2006 or the unaudited financial statements of Borrower for the fiscal quarter ended June 30, 2007, since such date no event or events have occurred or are continuing which, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect, other than the commencement of the Chapter 11 Cases.

14

3.6.   Ownership of Property; Liens.  Except as described in Schedule 3.6, the real estate listed in Schedule 3.6 constitutes all of the real property leased or used in Borrower's and Guarantors' businesses.  Each of Borrower and Guarantors has valid leasehold interests in the properties listed on such Schedule.  Borrower and Guarantors do not own any real property or have any real property interests other than as set forth on Schedule 3.6  None of the properties and assets of Borrower or a Guarantor are subject to any Liens, except (x) Permitted Encumbrances, (y) the Pre-Petition Liens and (z) from and after the Closing Date, the Lien in favor of Lender pursuant to the Collateral Documents.  Except as described in Schedule 3.6, Borrower has received all deeds, assignments, waivers, consents, non-disturbance and recognition or similar material agreements, bills of sale and other documents, and duly effected all recordings, filings and other material actions necessary to establish, protect and perfect Borrower's and Guarantors' right, title and interest in and to all such real estate and other assets or property.  Except as described in Schedule 3.6: (i) Neither Borrower nor any Guarantor owns, holds or is obligated under or a party to, any option, right of first refusal or any other contractual right to purchase, acquire, sell, assign or dispose of any real property owned by Borrower it as set forth in Schedule 3.6, and (ii) no material portion of any real property owned by it has suffered any material damage by fire or other casualty loss which has not heretofore been completely repaired and restored to its condition before the casualty.  All permits required to have been issued or appropriate to enable the real property owned by Borrower or a Guarantor to be lawfully occupied and used for all of the purposes for which they are currently occupied and used have been lawfully issued and are, as of the date hereof, in full force and effect.

3.7.   Restrictions; No Default.  No Contract, lease, agreement, instrument or other document to which Borrower is a party or by which it or any of its properties or assets is bound or affected and no provision of any charter, corporate restriction, Applicable Law or governmental regulation, individually or in the aggregate, has had a Material Adverse Effect. Borrower and Guarantors are not in default other than (i) the defaults under the Pre-Petition Loan Agreement and (ii) to the knowledge of Borrower and Guarantors, no third party is in default, under or with respect to any Contract, lease, agreement, instrument or other documents to which Borrower or a Guarantor is a party, which default or defaults, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect.  To the knowledge of Borrower and Guarantors, no Default has occurred and is continuing.

3.8.   Labor Matters.  There are no strikes or other material labor disputes against Borrower or Guarantors that are pending or, to the knowledge of Borrower or Guarantors, threatened.  Hours worked by and payment made to employees of Borrower or Guarantors have not been in violation of the Fair Labor Standards Act or any other applicable laws dealing with such matters.  All material payments due from Borrower or Guarantors on account of employee health and welfare insurance have been paid or accrued as a liability on the books of Borrower or Guarantors.  Except as set forth in Schedule 3.8, Borrower or Guarantors have no obligation under any collective bargaining agreement, management agreement, or any employment agreement, and a correct and complete copy of each agreement listed in Schedule 3.8 has been provided to Lender.  Except as set forth in Schedule 3.14, there are no representation proceedings pending or, to the knowledge of Borrower or Guarantors, threatened with the National Labor Relations Board, and no labor organization or group of employees of Borrower or Guarantors has made a pending demand for recognition, and, there are no complaints or charges against Borrower or Guarantors pending or, to the knowledge of Borrower or Guarantors, threatened to

15

be filed with any federal, state, local or foreign court, governmental agency or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment by Borrower or Guarantors of any individual.

3.9.  <u>Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness.</u>
Borrower has no Subsidiaries other than the Guarantors.  Borrower and the Guarantors are not engaged in any joint venture or partnership with another Person, except as set forth in <u>Schedule 3.9</u>.  Except as set forth in <u>Schedule 3.9</u>, there are no outstanding rights to purchase options, warrants or similar rights or agreements pursuant to which Borrower may be required to issue, sell or purchase any Stock or other equity security.  <u>Schedule 3.9</u> lists all outstanding Stock of Borrower and the Guarantors and the percentage of ownership and voting interests of the owners thereof as of the Closing Date.

3.10.  <u>Government Regulation.</u>  Borrower and the Guarantors are not (a) an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940 as amended; or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act or any other federal or state statute that restricts or limits Borrower's and Guarantors' ability to incur Indebtedness, pledge their assets, or to perform their obligations hereunder, or under any other Loan Document; and the making of the Revolving Credit Advances by Lender, the application of the proceeds and repayment thereof by Borrower and the Guarantors and the consummation of the transactions contemplated by this Agreement and the other Loan Documents, will not violate any provision of any such statute or any rule, regulation or order issued by the Securities and Exchange Commission.

3.11.  <u>Margin Regulations.</u>  Borrower and the Guarantors are not engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock and no proceeds of any Revolving Credit Advance will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock. Borrower and the Guarantors will not take any action which might cause any Loan Document or any document or instrument delivered pursuant hereto or thereto to violate any regulation of the Board of Governors of the Federal Reserve Board.

3.12.  <u>Taxes.</u>  Except as set forth in <u>Schedule 3.12</u>, all federal, state, local and foreign tax returns, reports and statements, including information returns required to be filed with respect to Borrower and the Guarantors have been timely filed, all such tax returns, reports and statements are correct and complete in all material respects, and except as otherwise prohibited by the Chapter 11 Cases, all Charges and other impositions due and payable with respect to Borrower and the Guarantors (whether or not shown on any such tax returns, reports and statements) have been paid prior to the date on which any fine, penalty, interest or late charge may be added thereto for nonpayment thereof.  Borrower and the Guarantors have adequately provided for in their books and records for all unpaid Charges and other impositions, being those not yet due and payable.  Proper and accurate amounts have been withheld by Borrower and the Guarantors from their employees and other third parties for all periods and such withholdings have been timely paid to the respective Governmental Authorities.  <u>Schedule 3.12</u> sets forth those taxable years for which any of the tax returns of Borrower and the Guarantors are currently being audited by the IRS or any other applicable Governmental Authority, and any currently,

16

pending or threatened assessments, actions, disputes or claims with respect to taxes are listed thereon. There are no liens on any of the assets of Borrower and the Guarantors with respect to Taxes except for Permitted Encumbrances. Except as described in <u>Schedule 3.12</u>, Borrower and the Guarantors have not executed or filed with the IRS or any other Governmental Authority any agreement or other document extending, or having the effect of extending, the period for assessment or collection of any Charges or the filing of any tax return. None of the property owned by Borrower and the Guarantors is property which it is required to treat as being owned by any other Person pursuant to the provisions of IRC Section 168(f)(8) of the Internal Revenue Code of 1954, as amended, and in effect immediately prior to the enactment of the Tax Reform Act of 1986 or is "tax-exempt use property" within the meaning of IRC Section 168(h). Borrower and the Guarantors have not agreed or been requested to make any adjustment under IRC Section 481(a) by reason of a change in accounting method or otherwise. Borrower and the Guarantors have no obligation under any tax-sharing agreement or arrangement, or liability for Charges or impositions for any other Person under applicable law, as transferee or successor, or by contract, except as described in <u>Schedule 3.12</u>.

    3.13.   <u>ERISA.</u>  <u>Schedule 3.13</u> lists all Plans maintained or contributed to by Borrower and the Guarantors and all Qualified Plans, Pension Plans, Retiree Welfare Plans or Welfare Plans maintained or contributed to by any ERISA Affiliate. Except as set forth on <u>Schedule 3.13</u>, none of the Borrower, any Guarantors or any current or former ERISA Affiliate sponsors (or has sponsored), contributes to (or has contributed to), or is (or was) required to contribute to or has any liability with respect to any Title IV Plan, any Plan subject to IRC Section 412 or ERISA Section 302, or any Retiree Welfare Plan. Except as set forth on <u>Schedule 3.13</u>, none of Borrower, any Guarantor or any current or former ERISA Affiliate contributes to (or has contributed to) or is (or was) required to contribute to any Multiemployer Plan. IRS determination letters regarding the qualified status under IRC Section 401 of each Qualified Plan have been received as of the dates listed in <u>Schedule 3.13</u>. Each of the Qualified Plans has been amended to comply with the Tax Reform Act of 1986 and to make other changes required under the IRC or ERISA, and if such required amendments are not subject to the determination letters described in the previous sentence, each Qualified Plan so amended will be submitted to the IRS for a determination letter as to the ongoing qualified status of the Plan under the IRC within the applicable IRC Section 401(b) remedial amendment period; and each such Plan shall be amended, including retroactive amendments, as required during such determination letter process to maintain the qualified status of such Plans. To the knowledge of Borrower and the Guarantors, the Qualified Plans as amended continue to qualify under Section 401 of the IRC, the trusts created thereunder continue to be exempt from tax under the provisions of IRC Section 501(a), and nothing has occurred which would cause the loss of such qualification or tax-exempt status. Except as set forth on <u>Schedule 3.13</u>, each Plan is in compliance in all material respects with the applicable provisions of ERISA and the IRC, including the filing of all reports required under the IRC or ERISA which are true and correct as of the date filed, and all required contributions and benefits have been paid in accordance with the provisions of each such Plan. Borrower and the Guarantors have not engaged in a prohibited transaction, as defined in IRC Section 4975 or Section 406 of ERISA, in connection with any Plan which would subject any such Person (after giving effect to any exemption) to a material tax on prohibited transactions imposed by IRC Section 4975 or any other material liability. Except as set forth in <u>Schedule 3.13</u>: (i) there are no pending, or to the knowledge of Borrower and the Guarantors, threatened claims, actions or lawsuits (other than claims for benefits in the normal course), asserted or

17

instituted against (x) any Plan or its assets, (y) any fiduciary with respect to any Plan or (z) Borrower or the Guarantors or any ERISA Affiliate with respect to any Plan; (ii) Borrower and the Guarantors and each ERISA Affiliate have complied with the notice and continuation coverage requirements of IRC Section 4980B and the proposed or final regulations thereunder; and (iii) no liability under any Plan has been funded, nor has such obligation been satisfied with, the purchase of a contract from an insurance company that is not A rated by A.M. Best and the equivalent by each other nationally recognized rating agency.

3.14.  **No Litigation.** Other than the Chapter 11 Cases and except as set forth in Schedule 3.14 as of the Closing Date, no litigation, action, suit, arbitration, investigation or other proceeding is now pending or, to the knowledge of Borrower and the Guarantors, threatened against it, at law, in equity or otherwise; and no such matter (whether shown on Schedule 3.14 as of the Closing Date or subsequently arising) (a) challenges any such Person's right, power, or competence to enter into or perform any of its obligations under the Loan Documents, or the validity or enforceability of any Loan Document or any action taken thereunder or any Liens granted to Lender, or (b) if determined adversely, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect. To the knowledge of Borrower and the Guarantors other than the Chapter 11 Cases and except as set forth in Schedule 3.14 as of the Closing Date, there does not exist a state of facts which could reasonably be expected to give rise to any such litigation, action, suit, claim, arbitration, investigation or other proceeding.

3.15.  **Brokers.** No broker or finder, investment banker or other intermediary of any kind acting on behalf of Borrower and the Guarantors brought about the obtaining, making or closing of the credit extended pursuant to this Agreement or the transactions contemplated by the Loan Documents, and Borrower and the Guarantors have no obligation to any Person in respect of any finder's, brokerage investment banking, placement or other fees or amounts (including expenses) due in connection therewith.

3.16.  **Intellectual Property.** Set forth in Schedule 3.16 is a list and brief description of all domestic and foreign patents, patent rights, patent applications, trademarks, trademark applications, service marks, service mark applications, trade names, internet domain names and copyrights, and all applications for such which are in the process of being prepared, owned by or registered in the name of Borrower and the Guarantors, or of which Borrower and any of the Guarantors is a licensor or licensee or in which Borrower or any of the Guarantors has any right. Borrower and the Guarantors own all Intellectual Property which is necessary to continue to conduct their business as heretofore conducted by them now conducted by them and proposed to be conducted by them. Borrower and the Guarantors own or possess adequate fully paid or perpetual licenses or other rights to use all patents, patent applications, trademarks, trademark applications, service marks, service mark applications, trade names, internet domain names, copyrights, manufacturing processes, software, formulae, trade secrets, customer lists and know how necessary to the conduct of their business as proposed to be conducted. To its knowledge, the Intellectual Property that Borrower and any of the Guarantors owns or has a right to use does not infringe upon or misappropriate the rights of others, and no one is infringing upon or misappropriating the Intellectual Property that Borrower or any of the Guarantors owns or has a right to use. No claim is pending, or to Borrower's and Guarantors' knowledge, threatened to the effect that the operations of Borrower and the Guarantors infringe upon or conflict with the

18

asserted rights of any other person under any Intellectual Property. No claim is pending, or to Borrower's and the Guarantors' knowledge, threatened to the effect that any such Intellectual Property owned or licensed by Borrower and any of the Guarantors , or which Borrower and any of the Guarantors otherwise has the right to use, is invalid or unenforceable by Borrower and the Guarantor. All technical information developed by and belonging to Borrower and the Guarantors which has not been patented has been kept confidential. Borrower and the Guarantors are not aware that any of their employees is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would interfere with the use of his or her best efforts to promote the interests of Borrower and the Guarantors or that would conflict with Borrower's and the Guarantors' business as presently conducted or as proposed to be conducted.

3.17.   Full Disclosure.   No information contained in this Agreement, the other Loan Documents, the Financial Statements or any written statement furnished by or on behalf of Borrower and the Guarantors pursuant to the terms of this Agreement or any other Loan Document, which has previously been delivered to Lender, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

3.18.   Environmental Matters.Except as set forth on Schedule 3.18 and for routine operations in the ordinary course of business in compliance with applicable permits issued by or law of a Governmental Authority, the Subject Property is free of any Hazardous Material and Borrower and the Guarantors have not caused or suffered to occur any Release at, under, above or within any Subject Property, which violated any Environmental Law. Except as set forth on Schedule 3.18, there are no existing or potential Environmental Liabilities for Borrower and the Guarantors of which they have knowledge. Borrower and the Guarantors are not involved in operations which are reasonably likely to result in material Environmental Liabilities on it, or any owner of any premises which it occupies, or any Lien securing the same under any Environmental Law. Borrower and the Guarantors have provided to Lender copies of all existing environmental reports, reviews and audits and all written information pertaining to actual or potential Environmental Liabilities relating to or affecting the Subject Property. Borrower and the Guarantors hereby acknowledge and agree that Lender is not now, and has not ever been, in control of any of the Subject Property or Borrower's and the Guarantors' affairs, and (ii) does not have the capacity through the provisions of this Agreement or the other Loan Documents or otherwise to influence Borrower's and the Guarantors' conduct with respect to the ownership, operation or management of any of the Subject Property or compliance (or not) with Environmental Laws.

3.19.   Insurance Policies.   Borrower's and Guarantors' insurance is reasonable and standard for Borrower's and Guarantors' industry and geographic location.

3.20.   Deposit and Disbursement Accounts.   Schedule 3.20 lists all banks and other financial institutions at which Borrower and the Guarantors maintain deposits or other accounts or post office lock boxes and such Schedule correctly identifies the name, address and telephone number of each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number. Borrower and the Guarantors have delivered to

19

Lender true, correct and complete copies of all agreements, instruments and other documents relating to any credit card programs, arrangements or agreements to which they are a party.

3.21.  Government Contracts.  Except as set forth in Schedule 3.21, as of the Closing Date, Borrower and the Guarantors are not party to any contract or agreement with the federal government and no Borrower's or Guarantors' Accounts are subject to the Federal Assignment of Claims Act (31 U.S.C. Section 3727).

3.22.  Customer and Trade Relations.  As of the Closing Date, except as set forth on Schedule 3.22, there exists no actual or threatened termination or cancellation of, or any material adverse modification or change in: (a) the business relationship of Borrower and the Guarantors with any customer or group of customers whose purchases during the preceding twelve (12) months caused them to be ranked among the ten (10) largest customers of Borrower and the Guarantors; or (b) the business relationship of Borrower and the Guarantors with any supplier material to its operations.

3.23.  Agreements and Other Documents.  As of the Closing Date, Borrower and the Guarantors have provided Lender and its counsel, accurate and complete copies (or summaries) of all of the following agreements or documents (in addition to the Material Contracts) to which Borrower and the Guarantors are subject and each of which are listed on Schedule 3.23:  (a) supply agreements and purchase agreements not terminable by Borrower and the Guarantors within sixty (60) days following written notice issued by Borrower and the Guarantors and involving transactions in excess of $100,000 per annum; (b) any lease of Equipment having a remaining term of one year or longer and requiring aggregate rental and other payments in excess of $50,000 per annum; (c) licenses and permits held by Borrower and the Guarantors, the absence of which could be reasonably likely to have a Material Adverse Effect; (d) instruments or documents evidencing Indebtedness of Borrower and the Guarantors and any security interest granted by Borrower and the Guarantors with respect thereto; and (e) instruments and agreements evidencing the issuance of any Stock, warrants, rights or options to purchase Stock of Borrower and the Guarantors.

3.24.  Bankruptcy Matters.

(a)  The Chapter 11 Cases was commenced on the Petition Date in accordance with Applicable Law and proper notice thereof and proper notice of the hearing for the approval of the Interim Order has been given and proper notice of the hearing for the approval of the Final Order will be given.

(b)  After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against Borrower now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, or any other provision of the Bankruptcy Code, as provided under Section 364(c)(1) of the Bankruptcy Code, subject, as to priority only, to the Carve-Out Amount.

20