(c) After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Obligations will be secured by a valid and perfected first priority Lien in and against all of the Collateral.

(d) The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed, modified or amended (except as may be modified or amended with Lender's express written consent).

(e) Notwithstanding the provisions of Section 362 of the Bankruptcy Code, upon the maturity (whether by acceleration or otherwise) of any of the Obligations, Lender shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

## 4. FINANCIAL STATEMENTS AND INFORMATION

4.1. Reports and Notices. Borrower covenants and agrees that from and after the Closing Date and until the Termination Date, it shall deliver to Lender the Financial Statements, budgets, cash flow forecasts, reports and notices at the times and in the manner set forth in Annex B.

4.2. Communication with Accountants. Borrower authorizes Lender to communicate directly with its independent certified public accountants and tax advisors (excluding legal counsel) and authorizes those accountants and advisors to disclose to Lender any and all work papers and financial statements and other supporting financial documents and schedules, including copies of any management letter with respect to the business, financial condition and other affairs of Borrower; provided, however, that Lender shall give Borrower reasonable prior notice of any such communications and Borrower shall be invited to be present during any such communications (but such presence shall not be a prerequisite of such communications). At Lender's request, Borrower shall send a letter to such accountants and tax advisors, and deliver a copy thereof to Lender, instructing them to make available to Lender such information and records as Lender may reasonably request and to otherwise comply with the provisions of this Section 4. In addition, at or before the Closing Date and on each date the annual audited consolidated financial statements are delivered to Lender as required by Annex B, such accountants and tax advisors shall deliver a letter to Lender stating that (a) Lender is entitled to rely upon any such accountant's certification of Borrower's audited financial statements delivered after the Closing Date and (b) such accountants and tax advisors shall otherwise comply with this Section 4 (including making available such information and records as Lender may reasonably request).

4.3. Documents Filed with the Bankruptcy Court or Delivered to the U.S. Trustee or Committee. At the time any report (including, without limitation, monthly reports), projection, prospectus or other similar document is filed with the Bankruptcy Court, Borrower shall deliver to Lender copies of any such report, projection, prospectus or other similar document. Borrower shall also promptly provide Lender with copies of all documents or information provided by or on behalf of Borrower to the Committee with respect to the Chapter 11 Case.

## 5. AFFIRMATIVE COVENANTS

Borrower covenants and agrees that, unless Lender shall otherwise consent in writing, from and after the date hereof and until the Termination Date, Borrower shall, and shall cause each Guarantor to, comply with the following affirmative covenants:

5.1. Maintenance of Existence and Conduct of Business. (a) Except as occasioned by the Chapter 11 Cases, do or cause to be done all things necessary to preserve and keep in full force and effect its statutory existence and corporate franchises; (b) continue to conduct its business substantially as now conducted or as otherwise permitted hereunder; (c) at all times maintain, preserve and protect all of its material Intellectual Property, and preserve all the remainder of its material property, in use or useful in the conduct of its business and keep the same in good repair, working order and condition (taking into consideration ordinary wear and tear) and from time to time make, or cause to be made, all necessary or appropriate repairs, replacements and improvements thereto consistent with industry practices, so that the business carried on in connection therewith may be properly and advantageously conducted at all times, provided that nothing in this Section 5.1(c) shall prevent Borrower from discontinuing the use or operation of any property if such discontinuance, in the judgment of Borrower's Board of Directors, is desirable in the conduct of its business; and (d) transact business only under the names set forth in Schedule 3.2.

5.2. Payment of Charges and Claims. To the extent permitted hereunder and to the extent applicable in the Chapter 11 Cases, pay and discharge, or cause to be paid and discharged in accordance with the terms thereof, (a) all Charges imposed upon it or its income and profits, or any of its property (real, personal or mixed) prior to the date on which penalties attach thereto, and (b) all lawful claims for labor, materials, supplies and services or otherwise, which, if unpaid, might or could become a Lien on its property; provided, however, that Borrower shall not be required to pay any such Charge or claim which is being contested in good faith by proper legal actions or proceedings, so long as at the time of commencement of any such action or proceeding and during the pendency thereof (i) reserves with respect thereto are established and are maintained in accordance with GAAP, (ii) such contest operates to suspend collection of the contested Charges or claims and is maintained and prosecuted continuously with diligence, (iii) none of the Collateral would be subject to forfeiture or loss by reason of the institution or prosecution of such contest, (iv) no Liens securing an aggregate amount in excess of $25,000 shall exist for such Charges or claims during such action or proceeding (excluding Liens securing obligations fully covered by insurance or otherwise bonded to the satisfaction of Lender), and (v) if such contest is terminated or discontinued adversely to Borrower, Borrower shall promptly pay or discharge such contested Charges and all additional charges, interest penalties and expenses, if any, and shall deliver to Lender evidence reasonably acceptable to Lender of such compliance, payment or discharge, if such contest is terminated or discontinued adversely to Borrower.

5.3. Books and Records. Keep adequate records and books of account with respect to its business activities, in which proper entries, reflecting all of its consolidated and consolidating financial transactions, are made in accordance with GAAP and on a basis consistent with the Financial Statements in all material respects.

5.4. Litigation. Notify Lender in writing, promptly upon learning thereof, of any litigation, action, suit, claim, investigation, arbitration or other proceeding commenced or threatened, at law, in equity or otherwise against it, and of the institution against it of any suit or administrative proceeding which (a) could reasonably be expected to involve an amount in excess of $50,000 individually or $100,000 in the aggregate, or (b) if adversely determined, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect.

5.5. Insurance.

(a) At its sole cost and expense, maintain or cause to be maintained policies of insurance of such type and in such amounts as is reasonable and standard in Borrower's industry and geographic location and as is satisfactory to Lender and with insurers recognized as adequate by Lender. Borrower shall notify Lender promptly of any adverse occurrence causing a material loss or material decline in value of any real or personal property and the estimated (or actual, if available) amount of such loss or material decline. Borrower hereby directs all present and future insurers under its "All Risk" policies of insurance to pay all proceeds payable thereunder directly to Lender. Each of the Borrower and each Guarantor irrevocably makes, constitutes and appoints Lender (and all officers, employees or agents designated by Lender) as its true and lawful agent and attorney in-fact for the purpose of, upon the occurrence and during the continuance of a Default, making, settling and adjusting claims under the "All Risk" policies of insurance, endorsing the name of such Person on any check, draft, instrument or other item of payment for the proceeds of such "All Risk" policies of insurance, and for making all determinations and decisions with respect to such "All Risk" policies of insurance. In the event Borrower at any time or times hereafter shall fail to obtain or maintain (or fail to cause to be obtained or maintained) any of the policies of insurance required above or to pay any premium in whole or in part relating thereto, Lender, without waiving or releasing any Obligations or Default hereunder, may at any time or times thereafter (but shall not be obligated to) obtain and maintain such policies of insurance and pay such premium and take any other action with respect thereto which Lender deems advisable. All sums so disbursed, including reasonable attorneys' fees, court costs and other charges related thereto, shall be payable, on demand, by Borrower to Lender and shall be additional Obligations hereunder secured by the Collateral.

(b) Lender reserves the right at any time, upon review of Borrower's risk profile, to reasonably require additional forms and limits of insurance to adequately protect Lender's interests. Borrower shall, if so requested by Lender, deliver to Lender, as often as Lender may reasonably request, a report of a reputable insurance broker reasonably satisfactory to Lender with respect to its insurance policies.

5.6. Compliance with Laws. Comply in all material respects with all federal, state and local laws (including those relating to bankruptcy and insolvency laws), permits and regulations applicable to it, including those relating to licensing, environmental, ERISA and labor matters.

5.7. Agreements; Leases. (i) Perform, within all required time periods (after giving effect to any applicable grace periods), all of its material obligations (except where Borrower is contesting such obligation reasonably and in good faith or where performance is excused by the Bankruptcy Code or by an applicable order of the Bankruptcy Court and such non-compliance

would neither have nor could be reasonably expected to have a Material Adverse Effect on Borrower's business or assets or upon any of the rights, remedies or interests of the Lender) and (ii) enforce all of its material rights under each Contract or other document or instrument to which it is a party. Borrower shall perform and comply in all material respects with all obligations in respect of Chattel Paper, Instruments, Contracts, Licenses, and Documents and all other agreements constituting or giving rise to Collateral, except to the extent that (i) such compliance is excused by the Bankruptcy Code or by an applicable order of the Bankruptcy Court as to Borrower and (ii) such non-compliance would neither have nor could reasonably be expected to have a Material Adverse Effect on Borrower's business or assets or upon any of the rights, remedies or interests of the Lender.

5.8. Supplemental Disclosure. Within thirty (30) days after the end of each Fiscal Quarter (or, if a Default has occurred and is continuing, at such other times as Lender may require upon no less than ten (10) days prior notice) and, with respect to Schedules 3.6 and 3.20 only, promptly and in any event within five (5) Business Days of any change in the information set forth in such Schedules, supplement (or cause to be supplemented) each Schedule hereto, (or Schedule 3.6 and 3.20, as applicable) or representation herein or in any other Loan Document with respect to any matter hereafter arising which, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in such Schedule or as an exception to such representation or which is necessary to correct any information in such Schedule or representation which has been rendered inaccurate thereby; provided, however, that such supplement to such Schedules or representations (except for any supplement to Schedule 3.2, Schedule 3.6 (solely relating to such Schedule's identification of real property owned, leased or used in Borrower's business), Schedule 3.9 (solely relating to such Schedule's identification of Affiliates of Borrower and the ownership of Stock of Borrower and, without limiting Section 8.1(l), the voting interests of the owners thereof), Schedule 3.12 (solely relating to the audits and extensions referred to in the fourth and fifth sentences of Section 3.12) or Schedule 3.19, in each case solely to the extent such supplement reflects actions in conformity with and not otherwise prohibited by the terms of the Loan Documents) shall not be deemed an amendment thereof unless expressly consented to in writing by Lender, and no such amendments, except as the same may be consented to in a writing which expressly includes a waiver, shall be or be deemed a waiver by Lender of any Default disclosed therein. Borrower shall, if so requested by Lender, furnish to Lender as often as it reasonably requests, statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as Lender may reasonably request, all in reasonable detail, and, Borrower shall advise Lender promptly, in reasonable detail, of (a) any Lien, other than as permitted pursuant to Section 6.7, attaching to or asserted against any of the Collateral, (b) any material change in the composition of the Collateral, and (c) the occurrence of any other event or events which, individually or in the aggregate, could have or result in a Material Adverse Effect upon the Collateral or Lender's Lien thereon.

5.9. Environmental Matters. (a) Except as otherwise prohibited by the Chapter 11 Case, comply in all material respects with all Environmental Laws and permits applicable to it, (b) notify Lender promptly after Borrower becomes aware of any Release upon any Subject Property which, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect, and (c) promptly forward to Lender a copy of any order, notice, permit, application, or any communication or report by any Governmental Authority received by

Borrower in connection with any such Release or any other matter relating to the Environmental Laws that may affect any Subject Property or Borrower. The provisions of this Section 5.9 shall apply whether or not the Environmental Protection Agency, any other federal agency or any state or local environmental agency has taken or threatened any action in connection with any Release or the presence of any Hazardous Materials.

5.10. Application of Proceeds. Use the proceeds of the Revolving Credit Advances as provided in Section 1.3.

5.11. Fiscal Year. Maintain as its Fiscal Year the calendar year.

5.12. Subsidiaries. Not form or acquire any Subsidiary.

5.13. Further Assurances. At its sole cost and expense, upon request of Lender, duly execute and deliver, or cause to be duly executed and delivered, to Lender such further instruments and documents and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of Lender to carry out more effectively the provisions and purposes of this Agreement or any other Loan Document.

5.14. Appraisals. Allow Lender and its designees from time to time as Lender shall direct, to perform, and shall assist Lender and its designees in performing, appraisals of Borrower's Inventory, Equipment, accounts receivable and Subject Property. So long as no Default has occurred and is continuing, Lender agrees to provide to Borrower upon the request of Borrower any such appraisal prepared by a third party unaffiliated with Lender which has consented to Lender so providing such appraisal. In furtherance of the foregoing, Lender agrees to use reasonable efforts to obtain any such consent. Borrower agrees to pay all reasonable out-of-pocket costs and expenses incurred by Lender in connection with such appraisals conducted after a Default.

5.15. Intellectual Property. Conduct its business and affairs without infringement of or interference with any Intellectual Property of any other Person.

5.16. Sale Process. Pursue authorization and approval of the sale of substantially all of its assets under the Asset Purchase Agreement and the consummation thereof, subject to any higher or better offers that may be received in accordance with the Bid Procedures.

5.17. Schedule of Financial Affairs. On or before November 12, 2007, file with the Bankruptcy Court completed statements of financial affairs and schedules of assets and liabilities as required by the Bankruptcy Rules.

## 6. NEGATIVE COVENANTS

Borrower covenants and agrees that, unless Lender shall otherwise consent in writing, from and after the date hereof and until the Termination Date, Borrower shall not, and shall cause each Guarantor not, to do any of the following:

6.1. Mergers, Subsidiaries, Etc. Directly or indirectly, by operation of law or otherwise, merge, consolidate or otherwise combine with any Person or acquire or hold all or

substantially all of the assets or capital stock of any Person, or form, acquire or hold any Subsidiary.

6.2. Investments. Directly or indirectly, make or maintain any Investment except: (a) Investments permitted by Section 6.3, 6.4, or 6.6; (b) Investments outstanding on the date hereof and listed in Schedule 6.2; (c) Investments in Cash Equivalents at any time during which no Revolving Credit Advances are outstanding and which are subject to a first priority perfected Lien of Lender; (d) Investments representing stock or obligations issued to Borrower in settlement of claims against any other Person by reason of a composition or readjustment of debt or reorganization of any debtor of Borrower; and (e) Investments represented by deposits into bank accounts of Borrower to the extent permitted hereunder.

6.3. Indebtedness. Create, incur, assume or permit to exist any Indebtedness, except: (a) the Obligations; (b) Deferred Taxes; (c) Capital Lease Obligations and Indebtedness secured by purchase money Liens permitted under clause (c) of Section 6.7 (including any such Capital Lease Obligations and Indebtedness set forth in Schedule 6.3) and from and after the Closing Date, create, incur or assume vendor debt in a maximum aggregate amount at any one time outstanding not to exceed $10,000,000; (d) Guaranteed Indebtedness permitted under Section 6.6; and (e) Indebtedness existing on the Closing Date and set forth in Schedule 6.3.

6.4. Affiliate and Employee Transactions. Except as set forth in Schedule 6.4 or as otherwise expressly permitted hereunder, enter into or be party to any lending, borrowing or other commercial transaction or arrangement with any of its Affiliates, officers, directors or employees, including payment of any management, consulting, advisory, service or similar fee or any deferred compensation (excluding salaries, bonuses and other compensation to its officers, directors and employees in the ordinary course of business, consistent with past practices).

6.5. Capital Structure and Business. (a) Make any changes in its business operations which, individually or in the aggregate, could adversely affect the repayment of the Obligations or reasonably be expected to have or result in a Material Adverse Effect; (b) make any change in its capital structure or issue of any Stock or make any revision of the terms of its outstanding Stock or amend or modify any shareholders, voting or similar agreement to which it is a party or enter into any such agreement, in each case, without the prior written consent of Lender; (c) amend its articles or certificate of incorporation, charter, by-laws or other organizational documents; or (d) engage in any business other than the businesses engaged in as of the Closing Date and other business directly related thereto.

6.6. Guaranteed Indebtedness. Create, incur, assume or permit to exist any Guaranteed Indebtedness except for the Obligations under the Loan Documents and: (a) endorsements of instruments or items of payment for deposit to a bank account of Borrower; (b) performance bonds or indemnities entered into in the ordinary course of business, consistent with past practices; and (c) Guaranteed Indebtedness outstanding on the Closing Date and listed in Schedule 6.3.

6.7. Liens. Create or permit to exist any Lien on any of its properties or assets except for: (a) presently existing or hereafter created Liens in favor of Lender, to secure the Obligations; (b) Permitted Encumbrances; (c) purchase money Liens or purchase money security

interests upon or in Equipment acquired by Borrower in the ordinary course of business to secure the purchase price of such Equipment or to secure Capital Lease Obligations, in each case, permitted under clause (c) of Section 6.3 and incurred solely for the purpose of financing the acquisition of such Equipment and (d) cash deposits with utility companies as ordered by the Bankruptcy Court or as otherwise agreed to by Borrower and a utility company with the consent of the Lender. The prohibition provided for in this Section 6.7 specifically includes, without limitation, any effort by Borrower, any Committee, or any other party-in-interest in the Chapter 11 Case to prime or create *pari passu* to any claims or interest of Lender any Lien (other than for the Carve-Out Expenses up to the Carve-Out Amount) irrespective of whether such claims or interest may be "adequately protected".

6.8. Sale of Assets. Sell, transfer, convey, assign or otherwise dispose of any of its assets or properties, including any Collateral; provided, however, that the foregoing shall not prohibit (a) the sale of Inventory in the ordinary course of business; and (b) the sale or disposition for fair consideration in any Fiscal Year of any assets in the ordinary course of business which have become obsolete or surplus to the business of Borrower having a fair market value of not greater than $50,000 in the aggregate for all Borrower during such Fiscal Year.

6.9. ERISA. Acquire any new ERISA Affiliate that maintains or has an obligation to contribute to a Pension Plan that has either an "accumulated funding deficiency," as defined in Section 302 of ERISA, or any "unfunded vested benefits," as defined in Section 4006(a)(3)(E)(iii) of ERISA in the case of any Pension Plan other than a Multiemployer Plan and in Section 4211 of ERISA in the case of a Multiemployer Plan. Additionally, no Borrower nor any ERISA Affiliate shall: (a) permit or suffer any condition set forth in Section 3.13 to cease to be met and satisfied at any time, other than permitting an ERISA Affiliate acquired after the Closing Date to sponsor a Title IV Plan, a Plan subject to IRC Section 412 or ERISA Section 302, or a Retiree Welfare Plan; (b) terminate any Title IV Plan where such termination could reasonably be anticipated to result in liability to Borrower; (c) permit any accumulated funding deficiency, as defined in Section 302(a)(2) of ERISA, to be incurred with respect to any Pension Plan; (d) fail to make any contributions or fail to pay any amounts due and owing as required by the terms of any Plan before such contributions or amounts become delinquent; (e) make a complete or partial withdrawal (within the meaning of Section 4201 of ERISA) from any Multiemployer Plan prior to a closing of the transactions under the Asset Purchase Agreement; (f) fail to provide Lender with copies of any Plan documents or governmental reports or filings, if reasonably requested by Lender; (g) fail to make any contribution or pay any amount due as required by IRC Section 412 or Section 302 of ERISA; (h) allow any ERISA Event or event described in Section 4062(e) of ERISA to occur with respect to any Title IV Plan; and (i) with respect to all Retiree Welfare Plans, allow the present value of future anticipated expenses to increase by $500,000.

6.10. Financial Covenants. Breach or fail to comply with any of the financial covenants set forth on Annex C, each of which shall be calculated in accordance with GAAP consistently applied (and based upon the financial statements delivered hereunder).

6.11. Restricted Payments; Use of Proceeds. (a) Make any Restricted Payment to any Person, except that Borrower and Guarantors may make payments between each other in the

ordinary course of business, provided, that any such payments which are in the nature of loans are evidenced by intercompany notes, repayment of which is subordinated to repayment of the Obligations, and which notes shall be collaterally assigned to Lender, to secure the Obligations; or (b) utilize the Collateral and the proceeds of the Revolving Credit Loans which are incurred from time to time other than for (i) working capital and general corporate purposes including certain fees and expenses of professionals retained by Borrower, subject to the Interim Order and Final Order solely for the purposes specified in the Budget and (ii) certain other pre-petition expenses that are approved by the Bankruptcy Court and previously approved by Lender.

6.12. Hazardous Materials. Except as set forth in Schedule 6.12, (a) cause or permit a Release of Hazardous Material on, under, in or about any Subject Property in breach of any Environmental Law; (b) use, store, generate, treat or dispose of Hazardous Materials, except in compliance in all material respects with the Environmental Laws; or (c) transport any Hazardous Materials to or from any Subject Property, except in compliance in all material respects with the Environmental Laws.

6.13. Sale-Leasebacks. Engage in any sale-leaseback, synthetic lease or similar transaction involving any of its property or assets.

6.14. Cancellation of Indebtedness. Cancel any claim or Indebtedness owing to it, except for adequate consideration negotiated in an arm's length transaction and in the ordinary course of its business, consistent with past practices.

6.15. Bank Accounts. Maintain any deposit, operating or other bank accounts except for those accounts identified in Schedule 3.20.

6.16. No Speculative Investments. Engage in any speculative investment or any investment involving commodity options or futures contracts.

6.17. Margin Regulations. Directly or indirectly, use the proceeds of any Revolving Credit Advance or any of the Revolving Credit Loans to purchase or carry any Margin Stock or any equity security of a class which is registered pursuant to Section 12 of the Securities Exchange Act of 1934.

6.18. Limitation on Negative Pledge Clauses. Directly or indirectly enter into any agreement (other than the Loan Documents) with any Person which prohibits or limits the ability of Borrower or any Guarantor to create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired.

6.19. Material Contracts. (a) Cancel or terminate any Material Contract unless, in the discretion of the Board of Directors of Borrower, there occurs an event of default by any other party to such contract; and (b) waive any default or breach any Material Contract, or materially amend or otherwise modify any Material Contract or take (or omit to take) any other material adverse action in connection with any Material Contract.

6.20. Leases. (a) Renew (by amendment, modification or otherwise) any Lease or similar agreements other than renewals of existing Leases upon substantially the same terms (other than reasonable increases in rent based on market conditions) as are in effect on the

Closing Date, or (b) enter into any new Lease or similar agreements other than as permitted under Section 6.21.

6.21. New Premises. Enter into, or become a lessee under, any Operating Lease of real property without the prior written consent of Lender.

6.22. Repayment of Indebtedness. Except pursuant to a confirmed reorganization plan and except as specifically permitted hereunder, without the express prior written consent of Lender or pursuant to an order of the Bankruptcy Court after notice and hearing, make any payment or transfer with respect to any Lien or Indebtedness incurred or arising prior to the filing of the Chapter 11 Case that is subject to the automatic stay provisions of the Bankruptcy Code whether by way of "adequate protection" under the Bankruptcy Code or otherwise.

6.23. Reclamation Claims. Enter into any agreement to return any of its Inventory to any of its creditors for application against any Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims under Section 546(h) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its Pre-Petition Indebtedness, Pre-Petition trade payables or other Pre-Petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount of Pre-Petition Indebtedness, Pre-Petition trade payables and other Pre-Petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $75,000.

6.24. Chapter 11 Claims. Incur, create, assume, suffer to exist or permit any other super-priority administrative claim which is *pari passu* with or senior to the claims of Lender against Borrower, except as set forth in Section 1.12.

6.25. Change of Management. (a) Permit the composition of the Board of the Directors of the Borrower to be unsatisfactory to Lender or (b) permit Andy Zeinfeld to cease being Chief Executive Officer with substantially the same responsibilities as in effect on the Closing Date.

## 7. TERM

7.1. Duration. The financing arrangement contemplated hereby shall be in effect until the Commitment Termination Date. On the Commitment Termination Date, the Revolving Credit Commitment shall terminate and the Revolving Credit Loan and all other Obligations shall immediately become due and payable in full, in cash.

7.2. Survival of Obligations. Except as otherwise expressly provided for in the Loan Documents, no termination or cancellation (regardless of cause or procedure) of any financing arrangement under this Agreement shall in any way affect or impair the Obligations, duties, indemnities, and liabilities of Borrower or other obligor under any of the Loan Documents, or the rights of Lender relating to any Obligations, due or not due, liquidated, contingent or unliquidated or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is not required until after the Commitment Termination Date. Except as otherwise expressly provided herein or in any other Loan Document, all undertakings, agreements, covenants, warranties and representations of or binding upon Borrower or other obligor under any of the Loan Documents, and all rights of Lender, all as contained in the Loan

Documents, shall not terminate or expire, but rather shall survive such termination or cancellation and shall continue in full force and effect until the Termination Date on which date they shall cease.

## 8. EVENTS OF DEFAULT; RIGHTS AND REMEDIES

8.1. Events of Default. Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court or any notice to Borrower, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

(a) Borrower shall fail to make any payment in respect of any Obligations hereunder or under any of the other Loan Documents when due and payable or declared due and payable, including any payment of principal of, or interest on, the Revolving Credit Loan or reimburse Lender for any expense reimbursable hereunder, any other liabilities or other payment, fee, charge or expense provided for hereunder when due; or

(b) Borrower shall fail or neglect to perform, keep or observe any of the provisions of Section 4.1, Section 5.2 (solely insofar as such Section requires and Borrower fails to pay Claims for sales and use taxes and payroll withholding taxes in accordance with the terms of such Section), Section 5.5, or Section 5.7(b), within ten (10) days from the date such performance is due, or at any time any of Section 1.3, Section 5.16, Section 5.17 or any subsection of Section 6 (other than 6.9, 6.12, 6.19 or 6.20), including any of the provisions set forth in Annex B; or

(c) Borrower shall fail or neglect to perform, keep or observe any term or provision of this Agreement (other than any such term or provision referred to in paragraph (a) or (b) above), or Borrower or any other obligor under any of the other Loan Documents or contained in any other agreement or arrangement, now or hereafter entered into between Borrower and Lender relating to the Obligations, shall fail or neglect to perform, keep or observe any term or provision of any other Loan Document, and the same shall remain unremedied for a period ending on the tenth (10th) day after Borrower shall become aware of such Default; or

(d) Except for defaults occasioned by the filing of the Chapter 11 Case and defaults resulting from Obligations with respect to which the Bankruptcy Code prohibits Borrower from complying or permits Borrower not to comply, a default or breach occurs under any other material agreement, document or instrument entered into either (x) Pre-Petition and which is affirmed after the Petition Date or (y) Post-Petition, to which Borrower is a party or by which Borrower or its property is bound, and such default (i) involves the failure to make any payment (after expiration of any applicable grace period), whether of principal, interest or otherwise, due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) in respect of any Indebtedness of Borrower in an aggregate amount exceeding $100,000 or (ii) causes (or permits any holder of such Indebtedness or a trustee to cause) such Indebtedness, or a portion thereof in an aggregate amount exceeding $100,000, to become due prior to its stated maturity or prior to its regularly scheduled dates of payment; or



Error! Unknown document property name.

(e) Any information contained in any Weekly Budget Variance Report is untrue or incorrect by an amount which exceeds, in the aggregate for all such discrepancies, $100,000 or any representation or warranty herein or in any Loan Document or in any written statement, report, financial statement or certificate (other than a Weekly Budget Variance Report) made or delivered to Lender by Borrower shall be untrue or incorrect in any material respect as of the date when made or deemed made (including those made or deemed made pursuant to Section 2.2); or

(f) any judgments which are in the aggregate in excess of $10,000 as to any postpetition obligation shall be rendered against Borrower or any Guarantor and the enforcement thereof shall not be stayed (by court ordered stay or by consent of the party litigants); or there shall be rendered against Borrower or any Guarantor a non-monetary judgment with respect to a postpetition event which causes or would reasonably be expected to cause a material adverse change or a material adverse effect on the ability of Borrower or any Guarantor to perform its obligations under the Loan Documents; or

(g) this Agreement or any other Loan Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or Lender shall not have or shall cease to have a valid and perfected Lien in any Collateral purported to be covered by the Collateral Documents with the priority required by the relevant Collateral Document, in each case for any reason other than the failure of Lender to take any action within its control; or

(h) Borrower or any Guarantor shall contest the validity or enforceability of any of the Loan Documents in writing or deny in writing that it has any further liability, including with respect to future advances by Lender, under any Loan Document to which it is a party or shall contest the validity or perfection of any Lien in any Collateral purported to be covered by the Collateral Documents; or

(i) at any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the satisfaction in full of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate its obligations thereunder; or

(j) there shall occur a Change of Control; or

(k) an event or condition specified in Section 6.9 hereof shall occur or exist with respect to any Plan or Multiemployer Plan and, as a result of such event or condition, together with all other such events or conditions, Borrower or any ERISA Affiliate shall cause or in the opinion of Lender shall be reasonably likely to cause liability to a Plan, a Multiemployer Plan or PBGC (or any combination of the foregoing) to increase by $500,000; or

(l) The occurrence of any of the following in any of the Chapter 11 Cases:

(i) the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by Borrower in the Chapter 11 Case: (A) to obtain additional financing under Section 364(c) or (d) of the

Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral; (C) except as provided in the Interim Order or the Final Order, as the case may be, to use cash collateral of Lender under Section 363(c) of the Bankruptcy Code without the prior written consent of Lender; or (D) any other action or actions directly adverse to Lender or its rights and remedies hereunder or its interest in the Collateral; or

(ii) the filing of any plan of reorganization or disclosure statement attendant thereto by Borrower or any other Person to which Lender does not consent or otherwise agree to the treatment of its claims; or

(iii) the entry of an order in the Chapter 11 Case confirming a plan of reorganization that does not contain a provision for termination of the Revolving Credit Commitments and repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan; or

(iv) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the Interim Order or the Final Order without the written consent of Lender or the filing of a motion for reconsideration with respect to the Interim Order of the Final Order; or

(v) the Final Order is not entered immediately following the expiration of the Interim Order and, in any event, within 15 days following the Petition Date; or

(vi) other than payments permitted pursuant to this Agreement or the Interim Order or the Final Order, as applicable, Borrower or any Guarantor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Indebtedness incurred prior to the Petition Date; or

(vii) the payment of, or application for authority to pay, any pre-petition claim without Lender's prior written consent or pursuant to an order of the Bankruptcy Court after notice and hearing unless otherwise permitted under this Agreement; or

(viii) the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code against or with respect to any of the Collateral or Pre-Petition Collateral, other than for the Carve-Out Expenses and subject to the Carve-Out Amount; or

(ix) Borrower or any Guarantor shall file, support or fail to oppose a motion seeking, or the Bankruptcy Court shall enter, an order in any of the Chapter 11 Cases appointing (i) a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, (ii) a responsible officer or (iii) an examiner, in each case with enlarged powers relating to the operation of the business (powers beyond those set forth in subclauses (3) and (4) of Section 1106(a) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in the Cases; or

(x) absent the written consent of Lender, entry by the Bankruptcy Court of an order under Section 363 or 365 of the Bankruptcy Code authorizing or approving the sale or assignment of a material portion of any of the Borrower's and Guarantors'

assets, or procedures in respect thereof, or any of the Borrower or Guarantors shall seek, support, or fail to contest in good faith, the entry of such an order in any of the Chapter 11 Cases; or

(xi) a Chapter 11 plan of reorganization or liquidation with respect to the Borrower or any Guarantor is filed and (i) the treatment of the claims of the Lender in such plan is not approved by Lender or (ii) such plan does not provide for the payment in full in cash of the Obligations on or prior to the date of consummation thereof; or

(xii) the dismissal of the Chapter 11 Cases, or the conversion of the Chapter 11 Cases from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or Borrower shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise; or

(xiii) the Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Borrower or any Guarantor which have an aggregate value in excess of $50,000 or (ii) to permit other actions that would have a material adverse affect on the Borrower or any Guarantor or the Chapter 11 estates; or

(xiv) the commencement by Borrower or any officer of employee of Borrower or by any committee in the Chapter 11 Cases, or any other party in interest in the Chapter 11 Cases, of a suit, action or contested matter against Lender, the existing Agent or Prior Lender or affecting the Collateral which, in the case only of the Committee or other party of interest sets forth (a) a claim in excess of $100,000, (b) any claim or legal or equitable remedy which seeks reduction, setoff, subordination or any recharacterization of the claim or Lien of Lender or Prior Lender; or (c) a claim that would otherwise have a Material Adverse Effect or a material adverse effect on the rights and remedies of Lender or Prior Lender under any Loan Document or the Pre-Petition Loan Agreement and related documents or the collectability of all or any portion of the Obligations or Prior Lender Obligations; or

(xv) the entry of an order in the Chapter 11 Cases avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement; or

(xvi) (i) Any of Borrower or any Guarantor shall fail to comply with the terms of the Interim Order or Final Order, as applicable, in any material respect, (ii) such orders shall be amended, supplemented, stayed, reversed, vacated or otherwise modified without the written consent of Lender, or (iii) any of Borrower or any Guarantor shall file a motion for reconsideration with respect to the Interim Order or Final Order, or (iv) the right of Borrower to borrow under this Agreement is terminated by an order entered by the Bankruptcy Court; or

(xvii) the Borrower or any Guarantor shall file, support or fail to oppose a motion seeking, or the Bankruptcy Court shall enter, an order in any of the Chapter 11 Cases (i) approving additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement, (ii) granting any Lien (other than Permitted

Liens or Liens expressly permitted in the DIP Orders) upon or affecting any Collateral which are pari passu or senior to the Liens on the Collateral in favor of Collateral Agent, for the benefit of Agent and Lenders, (iii) granting any claim priority senior to or pari passu with the claims of the Lenders under the Credit Documents or any other claim having priority over any or all administrative expenses of the kind specified in Section 503(b) or Section 507(b) of the Bankruptcy Code, or (iv) granting any other relief that is adverse to Lender's interests under any Loan Document or its rights and remedies hereunder or their interest in the Collateral; or

(xviii) the failure to achieve a Sale Milestone; or

(m) Assets of Borrower with a fair market value of $50,000 or more are attached, seized, levied upon or subjected to a writ or distress warrant, or come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of Borrower and such condition continues for thirty (30) days or more; or

(n) Termination of the Asset Purchase Agreement; or

(o) Any casualty event occurs, whether or not insured or insurable, as a result of which revenue-producing activities cease or are substantially curtailed at facilities of Borrower generating more than 10% of Borrower's consolidated revenues for the Fiscal Year preceding such event and such cessation or curtailment continues for more than thirty (30) days.

8.2. Remedies. If any Event of Default shall have occurred and be continuing Lender may, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to or order from, the Bankruptcy Court, without prior notice, take any one or more of the following actions: (a) terminate all or any portion of the Revolving Credit Commitment whereupon Lender's obligation to make further Revolving Credit Advances shall terminate; (b) declare all or any portion of the Obligations to be forthwith due and payable whereupon such Obligations shall become and be due and payable; and/or (c) exercise any rights and remedies provided to Lender under the Loan Documents or at law or equity, including all remedies provided under the Bankruptcy Code; and, pursuant to the Interim Order and the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit Lender to exercise its remedies under this Agreement and the Loan Documents, without further application or motion to, or order from, the Bankruptcy Court; provided, however, notwithstanding anything to the contrary contained herein, Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of Borrower in the Collateral only upon 5 Business Days' prior written notice to Borrower, the United States Trustee for the District of Delaware, and any counsel approved by the Bankruptcy Court for the Committee. Upon the occurrence of an Event of Default and the exercise by Lender of its rights and remedies under this Agreement and the other Loan Documents, Borrower shall assist Lender to the extent practicable in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition.

8.3. Waivers by Borrower. Except as otherwise provided for in this Agreement and Applicable Law to the fullest extent permitted by Applicable Law, Borrower waives (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise,

settlement, extension or renewal of any or all Loan Documents, notes, commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by Lender on which Borrower may in any way be liable, and Borrower hereby ratifies and confirms whatever Lender may do in this regard, (b) all rights to notice and a hearing prior to Lender's taking possession or control of, or to Lender's replevy, attachment or levy upon, the Collateral or any bond or security which might be required by any court prior to allowing Lender to exercise any of its remedies, and (c) the benefit of any right of redemption and all valuation, appraisal and exemption laws. Borrower acknowledges that it has been advised by counsel of its choice with respect to this Agreement, the other Loan Documents and the transactions contemplated by this Agreement and the other Loan Documents, and makes the foregoing waivers knowingly and voluntarily.

**9. SUCCESSORS AND ASSIGNS**

9.1. Successors and Assigns. This Agreement and the other Loan Documents shall be binding on and shall inure to the benefit of Borrower, Lender, and their respective successors and permitted assigns, including, with respect to Borrower, its estate, any trustee or successor-in-interest of Borrower in its Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, except as otherwise provided herein or therein. Borrower may not assign, delegate, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the Loan Documents without the prior express written consent of Lender. Any such purported assignment, transfer, hypothecation or other conveyance by Borrower without such prior express written consent shall be void. The terms and provisions of this Agreement and the other Loan Documents are for the purpose of defining the relative rights and obligations of Borrower and Lender with respect to the transactions contemplated hereby and there shall be no third party beneficiaries of any of the terms and provisions of this Agreement or any of the other Loan Documents.

9.2. Participations; Assignments

(a) Lender may, at any time sell to one or more banks or other financial institutions ("Participants") participating interests in all or a portion of its rights and obligations under this Agreement or any other Loan Document (including all or a part of its Revolving Credit Advances, its Revolving Credit Commitment and its Revolving Credit Note, if any).

(b) Borrower agrees that if amounts outstanding under this Agreement are due or unpaid, or shall have been declared or shall have become due and payable upon the occurrence of an Event of Default, each Participant shall, to the maximum extent permitted by Applicable Law, be deemed to have the right of setoff in respect of its participating interest in amounts owing under this Agreement to the same extent as if the amount of its participating interest was owing directly to it as a Lender under this Agreement. Borrower also agrees that each Participant shall be entitled to the benefits of Section 1.9 with respect to its participation in the Revolving Credit Commitments and the Revolving Credit Loan outstanding from time to time as if it was a Lender.

(c) This Agreement and each other Loan Document shall inure to the benefit of the Lender and all future holders of any Revolving Credit Note, and each of their respective

successors and assigns. No rights are intended to be created under any Loan Document for the benefit of any third party donee, creditor or incidental beneficiary of the Borrower or Lender. Borrower acknowledges that Lender at any time and from time to time, without the consent of the Borrower, may sell, assign or transfer all or any part of its rights or obligations under this Agreement, the Revolving Credit Note and the other Loan Documents and/or the Collateral. Such shall have all of the rights and benefits with respect to this Agreement, the Revolving Credit Note, the Collateral and/or the other Loan Documents held by it as fully as if the original holder thereof and shall become a party to this Agreement by signing a counterpart of this Agreement or a joinder or similar agreement. Notwithstanding any other provision of any Loan Document, Lender may disclose to any potential assignees or participants all information, reports, financial statements, certificates and documents obtained under any provision of any Loan Document.

## 10. MISCELLANEOUS

10.1. Complete Agreement; Modification of Agreement. This Agreement and the other Loan Documents constitute the complete agreement between the parties with respect to the subject matter hereof and thereof and supersede all prior agreements, commitments, understandings or inducements (oral or written, expressed or implied). Neither this Agreement nor any other Loan Document nor any terms hereof or thereof may be changed, waived, discharged or terminated unless such change, waiver, discharge or termination is in writing and signed by Lender.

10.2. Fees and Expenses.

(a) Borrower agrees to pay on demand all reasonable out-of-pocket costs and expenses (including fees and expenses of counsel and of other advisors including Capstone Advisory Group, LLC) of Lender in connection with the preparation, negotiation, approval, execution, delivery, administration, modification, amendment, waiver and enforcement (whether through negotiations, legal proceedings or otherwise) of the Loan Documents, and commitments relating thereto, and the other documents to be delivered hereunder or thereunder and the transactions contemplated hereby and thereby and the fulfillment or attempted fulfillment of conditions precedent hereunder, including: (i) any amendment, modification or waiver of, or consent with respect to, any of the Loan Documents or advice in connection with the administration of the advances made pursuant hereto or its rights hereunder or thereunder; (ii) any litigation, arbitration, contest, dispute, suit, proceeding or action (whether instituted by Lender, Borrower or any other Person) in any way relating to the Collateral, any of the Loan Documents or any other agreements to be executed or delivered in connection therewith or herewith, whether as party, witness, or otherwise, including any litigation, arbitration, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced (A) in good faith by or against Borrower or any other Person that may be obligated to Lender by virtue of the Loan Documents, or (B) under title 7 or 11 of the United States Code, as now constituted or hereafter amended, or any other applicable Federal, state or foreign bankruptcy or similar insolvency law, provided, however, that Borrower shall not be required to pay any out-of-pocket costs and expenses of Lender in any litigation, contest, dispute, suit, proceeding or action resulting solely from Lender's gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction; (iii) any attempt to

enforce any rights of Lender against Borrower or any other Person that may be obligated to Lender by virtue of any of the Loan Documents; (iv) any Default; or (v) subject to Section 5.14, any effort to (A) monitor the Loans and the Loan Documents, (B) evaluate, observe, assess Borrower or its affairs, or (C) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of the Collateral. Borrower and Lender hereby agree that Lender's field examinations and audits conducted hereunder shall be charged against the Revolving Credit Loan; provided, however, that Lender shall charge Borrower the costs of not more than one such examination or audit per fiscal quarter, so long as a Default has not occurred and Lender's reimbursement for such field examinations shall not exceed $1,500.00 per day per individual (plus all out-of-pocket costs and expenses).

(b) In addition, Borrower agrees to pay on demand all reasonable out-of-pocket costs and expenses (including fees and expenses of counsel) of Lender in connection with any Event of Default and any enforcement or collection proceedings resulting therefrom or any amendment, modification or waiver of, or consent with respect to, any of the Loan Documents in connection with any Event of Default.

(c) In addition, Borrower agrees to pay on demand all reasonable fees, costs and expenses (including the fees and expenses of all of its counsel, advisors, consultants and auditors) incurred in connection with the preparation and review of pleadings, documents and reports related to the Chapter 11 Cases and any subsequent case under Chapter 7 of the Bankruptcy Code, attendance at meetings, court hearings or conferences related to the Chapter 11 Cases and any subsequent case under Chapter 7 of the Bankruptcy Code, and general monitoring of the Chapter 11 Cases and any subsequent case under Chapter 7 of the Bankruptcy Code; provided, however, that the foregoing shall not include fees, costs and expenses incurred directly or indirectly in connection with the negotiation, documentation or efforts to obtain approval of the Asset Purchase Agreement.

(d) Without limiting the generality of clauses (a), (b) and (c) above, Borrower's obligation to reimburse Lender for out-of-pocket costs and expenses shall include the reasonable fees and expenses of counsel (and local, foreign or special counsel, advisors, consultants and auditors retained by such counsel), as well as the reasonable fees and expenses of accountants, environmental advisors, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplicating expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; telegram charges; secretarial overtime charges; expenses for travel, lodging and food; and all other reasonable out-of-pocket costs and expenses of every type and nature paid or incurred in connection with the performance of such legal or other advisory services.

10.3. No Waiver. No failure on the part of Lender, at any time or times, to require strict performance by Borrower, of any provision of this Agreement and any of the other Loan Documents shall waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance therewith. Any suspension or waiver of a Default shall not suspend, waive or affect any other Default whether the same is prior or subsequent thereto and whether of the same or of a different type. None of the undertakings, agreements, warranties, covenants and representations of Borrower contained in this Agreement or any of the other Loan Documents and no Default by Borrower shall be deemed to have been suspended or waived by

Lender unless such waiver or suspension is by an instrument in writing signed by an officer of or other authorized employee of Lender.

10.4. Remedies. The rights and remedies of Lender under this Agreement shall be cumulative and nonexclusive of any other rights and remedies which Lender may have under any other agreement, including the Loan Documents, by operation of law or otherwise. Recourse to the Collateral shall not be required.

10.5. Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under Applicable Law, but if any provision of this Agreement shall be prohibited by or invalid under Applicable Law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

10.6. Conflict of Terms. Except as otherwise provided in this Agreement or any of the other Loan Documents by specific reference to the applicable provisions of this Agreement, if any provision contained in this Agreement is in conflict with, or inconsistent with, any provision in any of the other Loan Documents, the provisions contained in this Agreement shall govern and control.

10.7. Right of Setoff. Upon the occurrence and during the continuance of any Default, Lender is hereby authorized, at any time and from time to time, to the fullest extent permitted by law, to setoff and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of Borrower against any and all of the Obligations now or hereafter existing irrespective of whether or not Lender shall have made any demand under this Agreement or any other Loan Document and although such Obligations may be unmatured. Lender agrees to notify Borrower after any such setoff and application made by Lender; provided, however, that the failure to give such notice shall not affect the validity of such setoff and application. The rights of Lender under this Section are in addition to the other rights and remedies (including other rights of setoff) which Lender may have.

10.8. Authorized Signature. Until Lender shall be notified by Borrower to the contrary, the signature upon any document or instrument delivered pursuant hereto and reasonably believed by Lender or any of Lender's officers or employees to be that of an officer or duly authorized representative of Borrower listed in Schedule 10.8 shall bind Borrower and be deemed to be the act of Borrower affixed pursuant to and in accordance with resolutions duly adopted by Borrower's Board of Directors, and Lender shall be entitled to assume the authority of each signature and authority of the Person whose signature it is or reasonably appears to be unless the Person acting in reliance on such signature shall have actual knowledge of the fact that such signature is false or the Person whose signature or purported signature is presented is without authority.

10.9. Notices. Except as otherwise provided herein, whenever it is provided herein that any notice, demand, request, consent, approval, declaration or other communication shall or may be given to or served upon either of the parties by the other party, or whenever either of the parties desires to give or serve upon the other party any communication with respect to this

Agreement, each such notice, demand, request, consent, approval, declaration or other communication shall be in writing and shall be deemed to have been validly served, given or delivered (a) upon the earlier of actual receipt and three (3) days after deposit in the United States Mail, registered or certified mail, return receipt requested, with proper postage prepaid, (b) upon transmission, when sent by facsimile transmission or electronic mail, (c) one Business Day after deposit with a reputable overnight courier with all charges prepaid or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address or facsimile number indicated below or to such other address (or facsimile number) as may be substituted by notice given as herein provided. The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice. Failure or delay in delivering copies of any notice, demand, request, consent, approval, declaration or other communication to any Person (other than Borrower or Lender) designated below to receive copies shall in no way adversely affect the effectiveness of such notice, demand, request, consent, approval, declaration or other communication.

| | |
|---|---|
| If to Lender, at: | c/o Versa Capital Management, Inc.<br>Cira Centre<br>2929 Arch Street<br>Philadelphia, PA 19104-2868<br>Telephone: (215) 609-3400<br>Telecopier: (215) 609-3499<br>Attention: General Counsel |
| With a copy to: | Kirkland & Ellis LLP<br>200 East Randolph Drive<br>Chicago,Illinois 60601-6636<br>Telephone: (312) 861-2046<br>Telecopier: (312) 861-2200<br>Attention: Anup Sathy, Esq. |
| If to Borrower, at: | 1130 Sunrise Valley Drive<br>Reston, Virginia 20191<br>Telephone:<br>Telecopier:<br>Attention: Chief Financial Officer |
| With a copy to: | DLA Piper<br>1251 Avenue of the Americas<br>New York, New York 10020<br>Telephone: (212) 335-4500<br>Telecopier: (212) 335-4501<br>Attention: Thomas R. Califano, Esq. |

10.10. Section Titles. The Section titles and Table of Contents contained in this Agreement are and shall be without substantive meaning or content of any kind whatsoever and are not a part of this Agreement.

10.11. Counterparts. This Agreement may be executed in any number of separate counterparts, each of which shall, collectively and separately, constitute one agreement. Any signatures delivered by a party by facsimile transmission or by e-mail in portable document format (.pdf) shall be deemed an original signature hereto.

10.12. Time of the Essence. Time is of the essence of this Agreement and each of the other Loan Documents.

10.13. GOVERNING LAW. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ANY OF THE LOAN DOCUMENTS, IN ALL RESPECTS, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE, APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE, AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA. BORROWER HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, PROVIDED, HOWEVER, THAT LENDER AND BORROWER ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT AND, PROVIDED, FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO COLLECT THE OBLIGATIONS, TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF LENDER. BORROWER EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND BORROWER HEREBY WAIVES ANY OBJECTION WHICH BORROWER MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS. BORROWER HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINTS AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO BORROWER AT THE ADDRESS SET FORTH IN SECTION 10.9 OF THIS AGREEMENT AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF BORROWER'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE U.S. MAILS, PROPER POSTAGE PREPAID AND RETURN RECEIPT REQUESTED.

10.14. WAIVER OF JURY TRIAL. BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX FINANCIAL TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, THE PARTIES HERETO WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE, WHETHER IN CONTRACT, TORT, OR OTHERWISE ARISING OUT OF, CONNECTED WITH, RELATED TO, OR INCIDENTAL TO, THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

10.15. Publicity. Borrower will not, and will not permit any of its Affiliates to, disclose the name of Lender or any of its Affiliates or refer to this Agreement or the other Loan Documents in any press release or other public disclosure or in any prospectus, proxy statement or other materials filed with any Governmental Authority without Lender's prior written consent unless Borrower or any of its Affiliates is required to do so under Applicable Law, and then, in any event, Borrower or such Affiliate will consult with Lender prior to such disclosure. Borrower consents to Lender publishing a tombstone or similar advertising material relating to the financing transaction contemplated by this Agreement. Lender consent to Borrower's orally disclosing to its vendors, landlords and prospective landlords, and other third parties, who need to know in the reasonable judgment of Borrower, only the name of Lender, the amount of Revolving Credit Advances (including loan balances and any other information required to terminate or replace the Revolving Credit Advances), and the Commitment Termination Date. Any written materials of any type disclosing any information of the type referred to herein shall require the written approval of Lender prior to being disseminated to any Person.

10.16. Dating. Although this Agreement is dated as of the date first written above for convenience, the actual dates of execution hereof by the parties hereto are respectively the dates set forth under the signatures hereto, and this Agreement shall be effective on the latest of such dates.

10.17. Parties Including Trustees; Bankruptcy Court Proceedings. This Agreement, the other Loan Documents, and all Liens created hereby or pursuant hereto or to any other Loan Document shall be binding upon Borrower, the estate of Borrower, and any trustee or successor in interest of Borrower in the Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of Lender and its transferees and endorsees. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the conversion of the Chapter 11 Cases or any other bankruptcy case of Borrower to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Cases or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that Lender file financing statements or otherwise perfect its security interests or Liens under Applicable Law.

## 11. GUARANTY

11.1. Guaranty of the Obligations. Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to Lender the due and punctual payment in full of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (collectively, the "Guaranteed Obligations").

11.2. Payment by Guarantors. Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which Lender may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, Guarantors will upon demand pay, or cause to be paid, in cash, to Lender, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for Borrower's becoming the subject of a case under the Bankruptcy Code, would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Lender as aforesaid.

11.3. Liability of Guarantors Absolute. Each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than payment in full of the Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a) this Guaranty is a guaranty of payment when due and not of collectability. This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

(b) Lender may enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between Borrower and Lender with respect to the existence of such Event of Default;

(c) the obligations of each Guarantor hereunder are independent of the obligations of Borrower and the obligations of any other guarantor (including any other Guarantor) of the obligations of Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against Borrower or any of such other guarantors and whether or not Borrower is joined in any such action or actions;

(d) payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid. Without limiting the generality of the foregoing, if Lender is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such

Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

(e) Lender, upon such terms as it deems appropriate, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, from time to time may (i) renew, extend, accelerate, increase the rate of interest on, or otherwise change the time, place, manner or terms of payment of the Guaranteed Obligations; (ii) settle, compromise, release or discharge, or accept or refuse any offer of performance with respect to, or substitutions for, the Guaranteed Obligations or any agreement relating thereto and/or subordinate the payment of the same to the payment of any other obligations; (iii) request and accept other guaranties of the Guaranteed Obligations and take and hold security for the payment hereof or the Guaranteed Obligations; (iv) release, surrender, exchange, substitute, compromise, settle, rescind, waive, alter, subordinate or modify, with or without consideration, any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations; (v) enforce and apply any security now or hereafter held by or for Lender in respect hereof or the Guaranteed Obligations and direct the order or manner of sale thereof, or exercise any other right or remedy that Lender may have against any such security, in each case as Lender in its discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against Borrower or any security for the Guaranteed Obligations; and (vi) exercise any other rights available to it under the Loan Documents; and

(f) this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than payment in full of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Loan Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Loan Documents, or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Loan Document, or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Loan Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of

indebtedness other than the Guaranteed Obligations, even though Lender might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of Borrower or any of its Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set-offs or counterclaims which Borrower may allege or assert against Lender in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations.

11.4. Waivers by Guarantors. Each Guarantor hereby waives, for the benefit of Lender: (a) any right to require Lender, as a condition of payment or performance by such Guarantor, to (i) proceed against Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of Lender in favor of Borrower or any other Person, or (iv) pursue any other remedy in the power of Lender whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set-offs, recoupments and counterclaims, and (iv) promptness, diligence and any requirement that Lender protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder, or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to Borrower and notices of any of the matters referred to in Section 11.3 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

11.5. Guarantors' Rights of Subrogation, Contribution, etc. Until the Guaranteed Obligations shall have been indefeasibly paid in full and the Revolving Credit Commitment shall have terminated, each Guarantor hereby waives any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against Borrower or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such

Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that Lender now has or may hereafter have against Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by Lender. In addition, until the Guaranteed Obligations shall have been indefeasibly paid in full and the Revolving Credit Commitment shall have terminated, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations. Each Guarantor further agrees that, to the extent the waiver or agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against Borrower or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights Lender may have against Borrower, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor. If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been finally and indefeasibly paid in full, such amount shall be held in trust for Lender and shall forthwith be paid over to Lender to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

11.6. Subordination of Other Obligations. Any Indebtedness of Borrower or any Guarantor now or hereafter held by any Guarantor (the "Obligee Guarantor") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such Indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for Lender and shall forthwith be paid over to Lender to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

11.7. Continuing Guaranty. This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations shall have been paid in full and the Revolving Credit Commitments shall have terminated and the Obligations paid in full in cash. Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

11.8. Authority of Guarantors or Borrower. It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

11.9. Financial Condition of Borrower. Any Revolving Credit Advance may be made to Borrower or continued from time to time, in each case without notice to or authorization from any Guarantor regardless of the financial or other condition of Borrower at the time of any such grant or continuation, as the case may be. Lender shall have no obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial

condition of Borrower. Each Guarantor has adequate means to obtain information from Borrower on a continuing basis concerning the financial condition of Borrower and its ability to perform its obligations under the Loan Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Borrower and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations. Each Guarantor hereby waives and relinquishes any duty on the part of Lender to disclose any matter, fact or thing relating to the business, operations or conditions of Borrower now known or hereafter known by Lender.