IN WITNESS WHEREOF, this Agreement has been duly executed as of the date first written above.

Borrower:

**INPHONIC, INC.**, as Borrower

By: _____
Name: Andrew B. Zeinfeld
Title: Chief Executive Officer

Guarantors

**CAIS ACQUISITION, LLC**, as a
Guarantor

By:
Name: Andrew B. Zeinfeld
Title: President

**SIMIPC ACQUISITION CORP.**, as a
Guarantor

By:
Name: Andrew B. Zeinfeld
Title: President

**STAR NUMBER, INC.**, as a Guarantor

By:
Name: Andrew B. Zeinfeld
Title: President

**MOBILE TECHNOLOGY SERVICES,
LLC**, as a Guarantor

By:
Name: Andrew B. Zeinfeld
Title: President

**CAIS ACQUISITION II, LLC**, as a
Guarantor

By:
Name: Andrew B. Zeinfeld
Title: President

**FON ACQUISITION, LLC**, as a
Guarantor

By: _____
Name: Andrew B. Zeinfeld
Title: ~~Chief~~ President

**1010 INTERACTIVE, LLC**, as a
Guarantor

By: _____
Name: Andrew B. Zeinfeld
Title: President

Lender:

**ADEPTIO INPC FUNDING, LLC**

By: _____
Name:
Title:

Error! Unknown document property name.

ANNEX A to
CREDIT AGREEMENT

**DEFINITIONS; RULES OF CONSTRUCTION**

1.    <u>Definitions</u>.  Capitalized terms used in this Agreement shall have (unless otherwise provided elsewhere in this Agreement) the following respective meanings when used in this Agreement.

"<u>Account Debtor</u>" shall mean any Person who may become obligated to Borrower under, with respect to, or on account of, an Account, Chattel Paper or General Intangibles.

"<u>Accounts</u>" shall mean, with respect to any Person, all "accounts" as such term is defined in the Code, now owned or hereafter acquired by such Person, and shall include, in any event, (a) all accounts receivable, other receivables, book debts and other forms of obligations (other than forms of obligations evidenced by Chattel Paper, Documents or Instruments) now owned or hereafter received or acquired by or belonging or owing to such Person, whether arising out of goods sold or services rendered by it or from any other transaction (including any such obligations which may be characterized as an account or contract right under the Code), (b) all of such Person's rights in, to and under all purchase orders or receipts now owned or hereafter acquired by it for goods or services, (c) all of such Person's rights to any goods represented by any of the foregoing (including unpaid sellers' rights of rescission, replevin, reclamation and stoppage in transit and rights to returned, reclaimed or repossessed goods), (d) all monies due or to become due to such Person under all purchase orders and contracts for the sale or lease of goods or the performance of services or both by such Person or in connection with any other transaction (whether or not yet earned by performance on the part of such Person) now or hereafter in existence, including the right to receive the proceeds of said purchase orders and contracts, and (e) all collateral security and guarantees of any kind, now or hereafter in existence, given by any Person with respect to any of the foregoing.

"<u>Affiliate</u>" shall mean, with respect to any Person, (a) each Person that, directly or indirectly, owns or Controls, whether beneficially, or as a trustee, guardian or other fiduciary, ten percent (10%) or more of the Stock having ordinary voting power in the election of directors of such Person, (b) each Person that Controls, is Controlled by or is under common Control with such Person or (c) each of such Person's officers, directors, joint venturers and partners.

"<u>Agreement</u>" shall mean this Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement to which this <u>Annex A</u> is attached and of which it forms a part including all Annexes, Schedules, and Exhibits attached or otherwise identified thereto, restatements and modifications and supplements hereto and any appendices, attachments, exhibits or schedules to any of the foregoing, and shall refer to this Agreement as the same may be in effect at the time such reference becomes operative, <u>provided</u>, <u>however</u> that any reference to the Schedules to this Agreement shall be deemed a reference to the Schedules as in effect on the Closing Date or in a written amendment thereto executed by each of Borrower and Lender.

"<u>Applicable Law</u>" shall mean, in respect of any Person, all provisions of constitutions, statutes, rules, regulations, and orders of all governmental bodies or regulatory

A-1

agencies applicable to such Person, and all orders and decrees of all courts and arbitrators in proceedings or actions to which the Person in question is a party or by which it is bound.

"Asset Purchase Agreement" shall mean the Asset Purchase Agreement by and between Lender and Borrower dated as of November __, 2007, as it may be amended, restated or modified from time to time.

"Asset Sale" shall mean the sale of substantially all of the assets of the Borrower under the terms of the Asset Purchase Agreement.

"Avoidance Action" means all actions for preferences, fraudulent conveyances, and other avoidance power claims and any recoveries under Section 552(b), Section 506(c) and Sections 542, 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code.

"Bankruptcy Code" shall have the meaning assigned to it in the recitals to the Agreement.

"Bankruptcy Court" shall have the meaning assigned to it in the recitals to the Agreement.

"Bid Procedures" shall mean the bid procedures to be established by the Bankruptcy Court with respect to the auction of the assets of Borrower.

"Borrower" shall have the meaning assigned to it in the first paragraph of this Agreement.

"Borrowing Availability" shall mean, at any time, an amount equal to the lesser of (x) the excess, if any, of (a) the Revolving Credit Commitment over (b) the aggregate principal amount of all Revolving Credit Loans then outstanding and (y) the amount permitted to be outstanding at such time pursuant to the Budget.

"Budget" shall mean the aggregate, without duplication, of all items approved by the Lender in its sole discretion that are set forth in the budget of Borrower's cash receipts and expenditures for the thirteen weeks commencing on the Petition Date in the form attached hereto as Annex D, as modified or supplemented from time to time by additional budgets (covering any time period covered by a prior budget or covering additional time periods) delivered in accordance with Annex B and approved by Lender in writing in its sole discretion.

"Budgeted Net Disbursements" shall mean, as of any date of determination, as amount equal to:  (1) the aggregate of the Weekly Budgeted Disbursements for each Calendar Week Period from the Closing Date through and including the Calendar Week Period including such date of determination minus (2) the aggregate of the Weekly Budgeted Receipts for each Calendar Week Period from the Closing Date through and including the Calendar Week Period including such date of determination.  If such amount is negative, the "Budgeted Net Disbursements" shall be zero.

"Business Day" shall mean any day that is not a Saturday, a Sunday or a day on which banks are required or permitted to be closed in Philadelphia, Pennsylvania.

Error! Unknown document property name.

"Calendar Week Period" shall mean a weekly period commencing on (and including) Monday of a calendar week and ending on (and including) Sunday of the following calendar week.

"Capital Expenditures" shall mean, with respect to any Person, all payments or accruals (including Capital Lease Obligations) of such Person for any fixed assets or improvements or for replacements, substitutions or additions thereto, that are required to be capitalized under GAAP.

"Capital Lease" shall mean, with respect to any Person, any lease of any property (whether real, personal or mixed) by such Person as lessee that, in accordance with GAAP, either would be required to be classified and accounted for as a capital lease on a balance sheet of such Person or otherwise be disclosed as such in a note to such balance sheet.

"Capital Lease Obligation" shall mean, with respect to any Person, the amount of the obligation of such Person as lessee under any Capital Lease that, in accordance with GAAP, would appear on a balance sheet of such Person in respect of such Capital Lease or otherwise be disclosed in a note to such balance sheet.

"Carve-Out Amount" shall have the meaning assigned to it in the Interim Order or the Final Order, as the case may be.

"Carve-Out Expenses" shall have the meaning assigned to it in the Interim Order or the Final Order, as the case may be.

"Cash Equivalents" shall mean, (a) securities with maturities of 180 days or less from the date of acquisition issued or fully guaranteed or insured by the United States government or any agency thereof and backed by the full faith and credit of the United States, (b) certificates of deposit, eurodollar time deposits, overnight bank deposits and bankers' acceptances of any domestic commercial bank having capital and surplus in excess of $500,000,000 having maturities of one year or less from the date of acquisition, and (c) commercial paper of an issuer rated at least A-1 by Standard & Poor's Corporation or P-1 by Moody's Investors Services, Inc., or carrying an equivalent rating by a nationally recognized rating agency if both of the two named rating agencies cease publishing ratings of investments, in each case, with maturities of not greater than sixty (60) days from the date acquired.

"Change of Control" shall mean a cumulative change in the common stock ownership of the Stock of Borrower from that in effect on the Petition Date of more than fifty percent (50%) during the term of this Agreement.

"Chapter 11 Cases" shall have the meaning assigned to it in the recitals to the Agreement.

"Charges" shall mean, for Borrower and Guarantors, all federal, state, county, city, municipal, local, foreign or other governmental taxes (including taxes at the time due and payable), levies, imposts, assessments, charges, Liens, claims or encumbrances upon or relating to (a) the Collateral, (b) the Obligations, (c) the employees, payroll, income or gross receipts of

Borrower and Guarantors, (d) Borrower's and Guarantors' ownership or use of any of its assets, or (e) imposed upon Borrower's and Guarantors' business.

"Chattel Paper" shall mean all "chattel paper" as such term is defined in the Code, including electronic chattel paper, now owned or hereafter acquired by Borrower.

"Claim" shall have the meaning assigned to it in Section 1.9.

"Closing Date" shall mean the Business Day on which the conditions precedent set forth in Section 2 have been satisfied and the initial Revolving Credit Advance has been made.

"Code" shall mean the Uniform Commercial Code as the same may, from time to time, be in effect in the State of Delaware; provided, that to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, or remedies with respect to, Lender's security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Delaware, the term "Code" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such attachment, perfection, priority or remedies and for purposes of definitions related to such provisions.

"Collateral" means, collectively, all of the real, personal and mixed property (including equity interests) and all monies and other property of any kind received on account thereof (including, upon following the approval of the Bankruptcy Court, Avoidance Actions), and all proceeds therefrom, in which Liens are granted whether pursuant to the Interim Order and Final Order, as applicable, the Collateral Documents or otherwise, in each case as security for the Obligations.

"Collateral Documents" shall mean the Security Agreement and all other instruments, waivers and agreements now or hereinafter securing in whole or in part the Obligations.

"Commitment Termination Date" shall mean the earliest of (a) December 31, 2007, (b) the date of termination of the Revolving Credit Commitment pursuant to Section 8.2, (c) the date of termination of the Revolving Credit Commitment in accordance with the provisions of Section 1.2(c), (d) five (5) days following the Petition Date if the Interim Order has not been entered by the Bankruptcy Court by such date, (e) fifteen (15) days following the Petition Date if the Final Order has not been entered by the Bankruptcy Court by such date, (f) the date upon which the Interim Order expires, unless the Final Order shall have been entered and become effective by such date, (g) the close of business on the first Business Day after the entry of the Final Order, if by that time Borrower has not paid Lender the fees required under this Agreement, unless Lender agrees otherwise, (h) the date a plan of reorganization confirmed in the Chapter 11 Cases becomes effective that does not provide for the payment in full of all amounts owed to Lender under this Agreement and the other Loan Documents on such effective date, (i) the date of the closing of a sale of all or substantially all of Borrower's and/or

Error! Unknown document property name.

Guarantors' assets pursuant to Section 363 of the Bankruptcy Code, a confirmed plan of reorganization or a liquidation pursuant to Chapter 7 of the Bankruptcy Code, and (j) the effective date of a plan of reorganization or arrangement in the Chapter 11 Cases.

"Committee" shall mean the official committee of unsecured creditors and any other committee formed, appointed, or approved in the Chapter 11 Cases and each of such Committees shall be referred to herein as a Committee.

"Contracts" shall mean, with respect to any Person, all the contracts, undertakings, or agreements (other than rights evidenced by Chattel Paper, Documents or Instruments) in or under which such Person may now or hereafter have any right, title or interest, including any agreement relating to the terms of payment or the terms of performance of any Account.

"Control" shall mean, with respect to a Person, the possession, directly or indirectly, of the power to direct or cause the direction of such Person's management or policies, whether through the ownership of voting securities, by contract or otherwise, and "Controlling" and "Controlled" shall have meanings correlative thereto.

"Copyrights" shall mean all of the following now owned or hereafter adopted or acquired by Borrower: (i) all copyrights and General Intangibles of like nature (whether registered or unregistered) all registrations and recordings thereof, and all applications in connection therewith, including all registrations, recordings and applications in the United States Copyright Office or in any similar office or agency of the United States, and any state or territory thereof, or any other country or any political subdivision thereof, and (ii) all reissues, extensions or renewals thereof.

"Default" shall mean any Event of Default or any event which, with the passage of time or notice or both, would, unless cured or waived, become an Event of Default.

"Default Rate" shall mean a rate per annum equal to 3.00% plus the otherwise applicable interest rate on such portion of the Obligations as in effect from time to time.

"Deferred Taxes" shall mean, with respect to any Person at any date, the amount of deferred taxes of such Person as shown on the balance sheet of such Person prepared in accordance with GAAP as of such date.

"Deposit Accounts" means all "deposit accounts" as such term is defined in the Code, now or hereafter held in the name of Borrower.

"Documents" shall mean any "documents" as such term is defined in the Code and, shall include, in any event, any bills of lading, dock warrants, dock receipts, warehouse receipts, or other documents of title.

"Dollars" and "$" shall mean lawful money of the United States of America.

"Environmental Laws" shall mean all federal, state and local laws, statutes, ordinances, orders and regulations, now or hereafter in effect, and in each case as amended or

Error! Unknown document property name.

supplemented from time to time, and any applicable judicial or administrative interpretation thereof relating to the regulation and protection of human health, safety, the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation). Environmental Laws include, but are not limited to, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. §§ 9601 et seq.) ("CERCLA"); the Hazardous Material Transportation Act, as amended (49 U.S.C. §§ 1801 et seq.); the Federal Insecticide, Fungicide, and Rodenticide Act, as amended (7 U.S.C. §§ 136 et seq.); the Resource Conservation and Recovery Act, as amended (42 U.S.C. §§ 6901 et seq.) ("RCRA"); the Toxic Substance Control Act, as amended (15 U.S.C. §§ 2601 et seq.); the Clean Air Act, as amended (42 U.S.C. §§ 740 et seq.); the Federal Water Pollution Control Act, as amended (33 U.S.C. §§ 1251 et seq.); the Occupational Safety and Health Act, as amended (29 U.S.C. §§ 651 et seq.) ("OSHA"); and the Safe Drinking Water Act, as amended (42 U.S.C. §§ 300(f) et seq.), and any and all regulations promulgated thereunder, and all analogous state and local counterparts or equivalents and any transfer of ownership notification or approval statutes.

"Environmental Liabilities" shall mean, with respect to any Person, all liabilities, obligations, responsibilities, response, remedial and removal costs, investigation and feasibility study costs, operation and maintenance costs, losses, damages, punitive damages, property damages, natural resource damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest incurred as a result of any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, including any arising under or related to any Environmental Laws, Environmental Permits, or in connection with any Release or threatened Release or the presence of a Hazardous Material whether on, at, in, under, from or about or in the vicinity of any real or personal property.

"Environmental Permits" shall mean all permits, licenses, authorizations, certificates, approvals or registrations required by any Governmental Authority under any Environmental Laws.

"Equipment" shall mean any "equipment" as such term is defined in the Code and in any event shall include all machinery, equipment, furnishings, fixtures and vehicles and any and all additions, accessions, substitutions and replacements of any of the foregoing, wherever located, together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974 (or any successor legislation thereto), as amended from time to time, and any regulations promulgated thereunder.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) under common control with Borrower and which, together with a Guarantor or Borrower, is treated as a single employer within the meaning of Section 414(b), (c), (m) or (o) of the IRC.

A-6

Error! Unknown document property name.

"ERISA Event" shall mean, with respect to Borrower or any ERISA Affiliate, (a) a Reportable Event with respect to a Title IV Plan or a Multiemployer Plan; (b) the withdrawal of Borrower or any ERISA Affiliate from a Title IV Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (c) the failure to make required contributions to a Qualified Plan; or (d) any other event or condition which might reasonably be expected to constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Title IV Plan or Multiemployer Plan or the imposition of any liability under Title IV of ERISA, other than PBGC premiums due but not delinquent under Section 4007 of ERISA.

"Event of Default" shall have the meaning assigned to it in Section 8.1.

"Excess Borrowing Availability" shall mean, at any time, the amount by which Borrowing Availability exceeds the outstanding principal amount of the Revolving Credit Loan.

"Executive Officers" shall mean the President, Chief Executive Officer, Chief Financial Officer, Treasurer and Controller of Borrower.

"Fees" shall mean the fees due to Lender as set forth in Section 1.5 or otherwise pursuant to the Loan Documents.

"Final Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be in form and substance satisfactory to Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied (unless Lender waives such requirement), together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes Borrower to obtain credit, incur (or guaranty) Indebtedness, and grant superpriority, priming, first priority Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of Lender's claims.

"Financial Statements" shall have the meaning assigned to it in Section 3.4.

"First Day Orders" shall have the meaning assigned to it in Section 2.1(m).

"Fiscal Month" shall mean any calendar month.

"Fiscal Quarter" shall mean any calendar quarter.

"Fiscal Year" shall mean any calendar year.

"GAAP" shall mean generally accepted accounting principles in the United States of America as in effect from time to time, consistently applied.

"General Intangibles" shall mean, with respect to any Person, all "general intangibles" as such term is defined in the Code, now owned or hereafter acquired by such Person and, in any event, including all right, title and interest which such Person may now or

Error! Unknown document property name.

hereafter have in or under any Contract, all payment intangibles, all customer lists, Intellectual Property, interests in partnerships, joint ventures and other business associations, permits, proprietary or confidential information, inventions (whether or not patented or patentable), technical information, procedures, designs, knowledge, know-how, software, data bases, data, skill, expertise, experience, processes, models, drawings, materials and records, goodwill (including the goodwill associated with any Intellectual Property), all rights and claims in or under insurance policies, (including insurance for fire, damage, loss, and casualty, whether covering personal property, real property, tangible rights or intangible rights, all liability, life, key man, and business interruption insurance, and all unearned premiums), uncertificated securities, choses in action, and other bank accounts, rights to receive tax refunds and other payments, rights to receive dividends, distributions, cash, Instruments and other property, and rights of indemnification.

"Governmental Authority" shall mean any nation or government, any state or other political subdivision thereof, and any agency, department, court, board, commission, or other entity exercising valid legal executive, legislative, judicial, regulatory or administrative functions.

"Guaranteed Indebtedness" shall mean, as to any Person, any obligation of such Person guaranteeing any indebtedness, lease, dividend, or other obligation ("primary obligations") of any other Person (the "primary obligor") in any manner including any obligation or arrangement of such Person (a) to purchase or repurchase any such primary obligation, (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency or any balance sheet condition of the primary obligor, (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, or (d) to indemnify the owner of such primary obligation against loss in respect thereof.

"Hazardous Material" shall mean (a) any element, material, compound, mixture, solution, chemical, substance, or pollutant within the definition of "hazardous substance" under Section 101(14) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601(14); petroleum or any fraction, byproduct or distillation product thereof; asbestos, polychlorinated biphenyls, or any radioactive substances; and any material regulated as a hazardous substance by any jurisdiction in which Borrower owns or operates or has owned or operated a facility; or (b) any element, pollutant, contaminate or discarded material (including any radioactive material) within the definition of Section 103(6) of the Resource Conservation and Recovery Act, 42 U.S.C. § 6903(6); and any material regulated as hazardous waste by any jurisdiction in which Borrower owns or operates or has owned or operated a facility, or to which Borrower sends material for treatment, storage or disposal as waste.

"Indebtedness" of any Person shall mean (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property or services (including reimbursement and all other obligations with respect to surety bonds, letters of credit and bankers' acceptances, whether or not matured, but not including obligations to trade creditors incurred in the ordinary course of business that are not unpaid for more than 90 days past the

Error! Unknown document property name.

stated due date therefor, unless being contested in good faith), (b) all obligations evidenced by notes, bonds, debentures or similar instruments (including, without limitation, any Subordinated Debt), (c) all indebtedness created or arising under any conditional sale or other title retention agreements with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in an event of default may be limited to repossession or sale of such property), (d) all Capital Lease Obligations, (e) all Guaranteed Indebtedness, (f) all obligations of such Person under any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate option contract, foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap, commodity purchase or option agreements or other similar agreement or contract designed to protect such Person against fluctuations in interest rates, currency values or commodity prices, as the case may be, or other hedging or derivative agreements, (g) all Indebtedness referred to in clause (a), (b), (c), (d), (e) or (f) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, (h) the Obligations, and (i) all liabilities under Title IV of ERISA.

"Indemnified Liabilities" shall have the meaning assigned to it in Section 1.9.

"Indemnified Person" shall have the meaning assigned to it in Section 1.9.

"Instruments" shall mean, for any Person, all "instruments" as such term is defined in the Code, now owned or hereafter acquired by such Person, wherever located, and in any event shall include all certificated securities, certificates of deposit and all notes and other evidences of indebtedness, other than instruments that constitute, or are a part of a group of writings that constitute, Chattel Paper.

"Intellectual Property" shall mean, for any Person, collectively, all Trademarks, and the goodwill associated with such Trademarks, all Patents, all Copyrights, all Internet Domain Names and all Licenses now held or hereafter acquired by such Person, together with all franchises, tax refund claims, rights of indemnification, payments under insurance, indemnities, warranties and guarantees payable with respect to the foregoing.

"Interim Availability Amount" shall mean, until entry of the Final Order, the lesser of Ten Million Dollars ($10,000,000.00) and the amount authorized by the Bankruptcy Court in the Interim Order to be borrowed by Borrower.

"Interim Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to Lender, which, among other matters, but not by way of limitation, authorizes, on an interim basis, Borrower to execute and perform under the terms of this Agreement and the other Loan Documents, substantially in the form of Exhibit C.

Error! Unknown document property name.

"Internet Domain Names" shall mean all rights in internet web sites and internet domain names presently registered or used by Borrower.

"Inventory" shall mean, for any Person, all "inventory" as such term is defined in the Code, now owned or hereafter acquired by such Person, wherever located, and in any event shall include inventory, merchandise, goods and other personal property which are held by or on behalf of such Person for sale or lease or are furnished or are to be furnished under a contract of service or which constitute raw materials, work in process, finished goods, returned goods or materials or supplies of any kind, nature or description used or consumed or to be used or consumed in such Person's business or in the processing, production, packaging, promotion, delivery or shipping of the same, including other supplies, and all accessions and additions thereto and all documents of title covering any of the foregoing.

"Investment" shall mean, for any Person (a) the acquisition (whether for cash, property, services, securities or otherwise) of capital stock, bonds, notes, debentures, partnership or other ownership interests or other securities of any other Person or any agreement to make any such acquisition; (b) the making of any deposit with, or advance, loan or other extension of credit to, any other Person (including the purchase of property from another Person subject to an understanding or agreement, contingent or otherwise, to resell such property to such Person); and (c) the entering into of any Guaranteed Indebtedness of, or other contingent obligation with respect to, Indebtedness or other liability of any other Person and (without duplication) any amount committed to be advanced, lent or extended to such Person.

"Investment Property" shall mean all investment property as such term is defined in the Code now owned or hereafter acquired by Borrower, wherever located, including (i) all securities whether certificated or uncertificated, including stocks, bonds, interests in limited liability companies, partnerships interests, treasuries, certificates of deposit, and mutual fund shares; (ii) all securities entitlements of Borrower to any securities account and the financial assets held by a securities intermediary with respect to that account; (iii) all securities accounts of Borrower; (iv) all commodity contracts of Borrower; and (v) all commodity accounts held by Borrower.

"IRC" shall mean the Internal Revenue Code of 1986, as amended, and any successor thereto.

"IRS" shall mean the Internal Revenue Service, or any successor thereto.

"Leases" shall mean all of those leasehold estates in real property now owned or hereafter acquired by a Borrower, as lessee.

"Lender" shall have the meaning provided in the first paragraph of this Agreement.

"Letter-of-Credit Rights" means letter-of-credit rights as such term is defined in the Code, now owned or hereafter acquired by Borrower, including rights to payment or performance under a letter of credit, whether or not Borrower, as beneficiary, has demanded or is entitled to demand payment or performance.

A-10

"License" shall mean, with respect to any Person, any Patent License, Trademark License or other license of rights or interests now held or hereafter acquired by such Person.

"Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever, whether or not choate, vested, or perfected (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Code or comparable law of any jurisdiction).

"Loan Documents" shall mean this Agreement, the Revolving Credit Notes (if any), the Collateral Documents, Interim Order and the Final Order and all other pledges, powers of attorney, consents, assignments, contracts, notices, letter of credit agreements and all other written matter whether heretofore, now or hereafter executed by or on behalf of Borrower, or any employee of Borrower, and delivered to Lender or any Lender in connection with the Agreement or the transactions contemplated thereby.

"Margin Stock" shall have the meaning specified in Regulation T, U or X of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"Material Adverse Effect" shall mean a material adverse effect on (a) the business, assets, operations, or financial condition of Borrower and the Guarantors, (b) Borrower's ability to pay or perform its Obligations in accordance with the terms of the Loan Documents, (c) the Collateral or Lender's Lien on the Collateral or the priority or perfection of any such Lien or (d) the rights and remedies of Lender under this Agreement and the other Loan Documents.

"Material Contracts" shall mean the contracts listed on Schedule 6.19 hereto and any other Contract of Borrower which, if cancelled or terminated, could reasonably be expected to have or result in a Material Adverse Effect.

"Maximum Lawful Rate" shall have the meaning assigned to it in Section 1.4(d).

"Multiemployer Plan" shall mean a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, and to which Borrower or any ERISA Affiliate is making, is obligated to make, has made or been obligated to make, contributions on behalf of participants who are or were employed by any of them.

"Notice of Revolving Credit Advance" shall have the meaning assigned to it in Section 1.1(c).

"Obligations" shall mean all loans, advances, debts, liabilities and obligations for the performance of covenants, or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or amounts are liquidated or determinable) owing by Borrower, Guarantor or any other obligor under any of the Loan Documents to Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under any of the

A-11

Loan Documents. This term includes all principal and interest (including interest which accrues after the commencement of any case or proceeding referred to in <u>Section 8.1</u> (including the Chapter 11 Cases)), on the Revolving Credit Loan, all Fees, Charges, expenses, attorneys' and other advisors' fees and any other sum chargeable to Borrower, Guarantor or any other obligor under any of the Loan Documents.

"<u>Operating Lease</u>" shall mean any lease of real or personal property, or mixed property, which is not a Capital Lease.

"<u>Other Taxes</u>" shall have the meaning assigned to it in <u>Section 1.11(b)</u>.

"<u>Participants</u>" shall have the meaning assigned to it in <u>Section 9.2(a)</u>.

"<u>Patent License</u>" shall mean, with respect to any Person, rights under any written agreement now owned or hereafter acquired by such Person granting any right with respect to any invention on which a Patent is in existence.

"<u>Patents</u>" shall mean, with respect to any Person, all of the following in which such Person now holds or hereafter acquires any right, title or interest: (a) all letters patent of the United States of America or any other country, all registrations and recordings thereof, and all applications for letters patent of the United States of America or any other country, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States of America, any State or Territory thereof, or any other country, and (b) all reissues, divisions, continuations, continuations-in-part or extensions thereof.

"<u>PBGC</u>" shall mean the Pension Benefit Guaranty Corporation or any successor thereto.

"<u>Pension Plan</u>" shall mean an employee pension benefit plan, as defined in Section 3(2) of ERISA, which is not an individual account plan, as defined in Section 3(34) of ERISA, and which Borrower or any ERISA Affiliate maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by any of them.

"<u>Permitted Encumbrances</u>" shall mean: (a) Liens for Charges provided payment thereof shall not at the time be required under <u>Section 5.2</u> or to the extent that nonpayment thereof is permitted under the Bankruptcy Code; (b) deposits, Liens or pledges of cash collateral to secure obligations under workmen's compensation, unemployment insurance, social security or public liability laws or similar legislation or other public or statutory obligations arising in the ordinary course of business; (c) deposits, Liens or pledges of cash collateral to secure the performance of bids, tenders, contracts (other than contracts for the payment of money), obligations of a tenant under an Operating Lease, or surety, stay or appeal bonds or similar obligations arising in the ordinary course of business; (d) workers', mechanics', suppliers', carriers', warehousemen's Liens or other similar Liens arising by operation of law in the ordinary course of business and securing sums which are not past due or are being contested by Borrower reasonably and in good faith; (e) any attachment or judgment Lien which does not constitute a Default, unless the judgment it secures shall not, within 15 days after the entry thereof, have been discharged or execution thereof stayed pending appeal, or shall not have been

Error! Unknown document property name.

discharged within 15 days after the expiration of any such stay; (f) zoning restrictions, easements, licenses, or other restrictions on the use of real property or other minor irregularities in title (including leasehold title) thereto, including without limitation those shown on the title policies delivered to Lender on the Closing Date, so long as such restrictions or irregularities do not materially impair the use, value, or marketability of such real property, leases or leasehold estates as currently used by Borrower; (g) Liens created by statute or common law in favor of landlords for unpaid rent and related amounts that are not more than fifteen days past due or are being contested by Borrower reasonably and in good faith; (h) Liens of a banking institution encumbering deposits (including setoff rights) held by such banking institution incurred in the ordinary course of business and which are within the general parameters customary in the banking industry; (i) Liens listed in Schedule 6.7 existing on the Closing Date; and (j) Liens arising pursuant to the Pre-Petition Loan Agreement.

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, limited liability partnership, institution, public benefit corporation, entity or government (whether Federal, state, county, city, municipal or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" shall have the meaning assigned to it in the recitals to this Agreement.

"Plan" shall mean, with respect to Borrower or any ERISA Affiliate, at any time, an employee benefit plan, as defined in Section 3(3) of ERISA, which Borrower maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by any of them.

"Post-Petition" shall mean the time period beginning immediately after the filing of the Chapter 11 Cases.

"Pre-Petition" shall mean the time period ending immediately prior to the filing of the Chapter 11 Cases.

"Pre-Petition Indebtedness" shall mean all Indebtedness of Borrower outstanding on the Petition Date immediately prior to the filing of the Chapter 11 Cases, including, without limitation, Indebtedness under the Pre-Petition Loan Agreement.

"Pre-Petition Liens" shall mean all Liens against the assets of Borrower on the Petition Date immediately prior to the filing of the Chapter 11 Cases, including, without limitation, Liens securing the Pre-Petition Indebtedness arising under the Pre-Petition Loan Agreement.

"Pre-Petition Loan Agreement" shall have the meaning assigned to it in the recitals to this Agreement.

"Prime Rate" means the prime rate of interest as published in the Wall Street Journal, such rate to change from time to time; provided, however, that for the purposes of this Agreement, such rate shall be deemed to be no less than 7.75%.

A-13

"Prior Lender Obligations" shall mean all obligations of Borrower and Parent to the Prior Lender pursuant to the Pre-Petition Loan Agreement, and all instruments and documents executed pursuant thereto or in connection therewith.

"Proceeds" shall mean all "proceeds" as such term is defined in the Code and, in any event, shall include, with respect to any Person: (a) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Person from time to time with respect to any of its property or assets; (b) any and all payments (in any form whatsoever) made or due and payable to such Person from time to time in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of such Person's property or assets by any governmental body, authority, bureau or agency (or any person acting under color of governmental authority), (c) any claim of such Person against third parties (i) for past, present or future infringement of any Patent or Patent License, or (ii) for past, present or future infringement or dilution of any Trademark or Trademark License or for injury to the goodwill associated with any Trademark, Trademark registration or Trademark licensed under any Trademark License; (d) any recoveries by such Person against third parties with respect to any litigation or dispute concerning any of such Person's property or assets, including claims arising out of the loss or nonconformity of, interference with the use of, defects in, or infringement of rights in, or damage to, such property or assets; and (e) all amounts collected on, or distributed on account of, other Collateral, including dividends, interest, distributions and Instruments with respect to Investment Property and pledged Stock, and (f) any and all other amounts, rights to payment or other property acquired upon the sale, lease, license, exchange or other disposition of Collateral and all rights arising out of the Collateral.

"Qualified Plan" shall mean, for Borrower an employee pension benefit plan, as defined in Section 3(2) of ERISA, which is intended to be tax-qualified under IRC Section 401(a), and which Borrower or any ERISA Affiliate maintains, contributes to or has an obligation to contribute to on behalf of participants who are or were employed by any of them.

"Release" shall mean, as to any Person, any release or any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or migration of a Hazardous Material into the indoor or outdoor environment by such Person (or by a person under such Person's direction or Control), including the movement of a Hazardous Material through or in the air, soil, surface water, ground water or property; but shall exclude any release, discharge, emission or disposal in material compliance with a then effective permit, order, rule regulation or law of a Governmental Authority.

"Reportable Event" shall mean any of the events described in Section 4043 of ERISA except those events for which the 30-day notice period has been waived.

"Restricted Payment" shall mean, with respect to any Person, either directly or indirectly, (a) the declaration or payment of any dividend or the incurrence of any liability to make any other payment or distribution of cash or other property or assets in respect of such Person's Stock, (b) any payment on account of the purchase, redemption, defeasance or other retirement, or to obtain the surrender of, such Person's Stock or any other payment or distribution made in respect thereof, (c) any payment, loan, contribution, or other transfer of funds or other property to any Stockholder or Affiliate of such Person, other than relating to

A-14

salaries, bonuses and other compensation to such Person's officers, directors and employees in the ordinary course of business consistent with past practice, (d) any payment, purchase, redemption, retirement, or other acquisition for value or setting apart of any money for a sinking, or other analogous reserve fund for the purchase, redemption, retirement or other acquisition of, or to obtain the surrender of, or any payment (scheduled, voluntary or other) of principal of or interest on, or any other amount owing in respect of, any Subordinated Debt, or (e) any payment of a claim for the rescission of the purchase or sale of, or for material damages arising from the purchase or sale of any Stock of such Person, or of a claim for indemnification or contribution arising out of or relating to any such claim for damages or rescission.

"Retiree Welfare Plan" shall refer to any Welfare Plan providing for continuing coverage or benefits for any participant or any beneficiary of a participant after such participant's termination of employment, other than continuation coverage provided pursuant to IRC Section 4980B and at the sole expense of the participant or the beneficiary of the participant.

"Revolving Credit Advance" shall have the meaning assigned to it in Section 1.1(a).

"Revolving Credit Commitment" shall mean the commitment of the Lender to make Revolving Credit Advances to Borrower pursuant to Section 1.1 and the other provisions hereof in the principal amount outstanding not to exceed Twenty Five Million Dollars ($25,000,000.00), as such amount may be reduced or modified pursuant to this Agreement.

"Revolving Credit Loan" shall mean the aggregate amount of Revolving Credit Advances of Lender outstanding at any time.

"Revolving Credit Note" shall mean the promissory note provided for by Section 1.1(d) and all promissory notes delivered in substitution or exchange therefor, in each case as it may be amended, restated, modified or supplemented and in effect from time to time.

"Sale Milestone" shall mean:

(a) an order of the Bankruptcy Court in form and substance acceptable to Lender (the "Bid Procedures Order") establishing the Bid Procedures entered on or before November 9, 2007;

(b) (i) the holding of a hearing by the Bankruptcy Court regarding the sale of all or substantially all of the assets of Borrower is accordance with the Bid Procedures Order and the Asset Purchase Agreement (at which hearing the Bankruptcy Court shall have indicated its approval of the foregoing) on or before December 13, 2007 and (ii) an order of the Bankruptcy Court, in form and substance acceptable to Lender, evidencing the approval described in the foregoing clause (i) entered on or prior to December 13, 2007; or

(c) the closing of the Asset Sale on or prior to December 24, 2007.

"Security Agreement" shall mean the Security Agreement dated of even date herewith by the Borrower in favor of Lender, as it may be amended, restated, modified or supplemented from time to time.

Error! Unknown document property name.

"Software" means all "software" as such term is defined in the Code, now owned or hereafter acquired by Borrower, other than software embedded in any category of goods, including all computer programs and all supporting information provided in connection with a transaction related to any program.

"Stock" shall mean all shares, options, warrants, general or limited partnership interests, membership interests, participation or other equivalents (regardless of how designated) of or in a corporation, partnership, limited liability company or equivalent entity whether voting or nonvoting, including common stock, preferred stock, or any other "equity security" (as such term is defined in Rule 3a11-1 of the General Rules and Regulations promulgated by the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended).

"Stockholder" shall mean each holder of Stock of Borrower.

"Subject Property" shall mean all real property owned, leased or operated by Borrower.

"Subordinated Debt" shall mean any Indebtedness of Parent or Borrower which is expressly and contractually subordinated in right of payment, to the satisfaction of Lender, to the Obligations.

"Subsidiary" shall mean, with respect to any Person, (a) any corporation of which an aggregate of 50% or more of the outstanding Stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether, at the time, Stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned legally or beneficially by such Person, or by one or more Subsidiaries of such Person, or by both, with respect to which any such Person has the right to vote or designate the vote of 50% or more of such Stock whether by proxy, agreement, operation of law or otherwise, and (b) any partnership or limited liability company in which such Person, or one or more Subsidiaries of such Person, or both, shall have an interest (whether in the form of voting or participation in profits or capital contribution) of 50% or more or of which any such Person is a general partner or managing member, as the case may be, or may exercise the powers of a general partner or managing member, as the case may be.

"Taxes" shall mean taxes, levies, imposts, deductions, Charges or withholdings, and all liabilities with respect thereto, excluding taxes, levies, imposts, deductions, charges or withholdings and liabilities with respect thereto that are imposed on or measured by the net income of any Lender by the United States of America, the jurisdiction under the laws of which Lender is organized or the jurisdiction in which such Lender's applicable lending office is located or, in each case, any political subdivision thereof.

"Termination Date" shall mean the date on which (a) the Revolving Credit Commitment has been terminated in full and Lender shall have no further obligation to make any Revolving Credit Advances or any other credit extensions or financial accommodations hereunder or under any other Loan Document, and (b) all Obligations have been irrevocably paid in full.

A-16

"Title IV Plan" shall mean a Pension Plan, other than a Multiemployer Plan, which is covered by Title IV of ERISA.

"Trademark License" shall mean, with respect to any Person, rights under any written agreement now owned or hereafter acquired by such Person granting any right to use any Trademark or Trademark registration.

"Trademarks" shall mean, with respect to any Person, all of the following in which such Person now holds or hereafter acquires any interest: (a) all common law and statutory trademarks, trade names, corporate names, business names, trade styles, service marks, logos, other source or business identifiers, prints and labels on which any of the foregoing have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations and recordings thereof, and all applications in connection therewith, including registrations, recordings and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States of America, any State or Territory thereof, or any other country or any political subdivision thereof; (b) all reissues, extensions or renewals thereof; and (c) all licenses thereunder and together with the goodwill associated with and symbolized by such trademark.

"Uniform Commercial Code jurisdiction" means any jurisdiction that had adopted all or substantially all of Article 9 as contained in the 2000 Official Text of the Uniform Commercial Code, as recommended by the National Conference of Commissioners on Uniform State Laws and the American Law Institute, together with any subsequent amendments or modifications to the Official Text.

"U.S. Trustee" means the United States Trustee appointed to the Chapter 11 Cases.

"Weekly Budget Variance Report" shall have the meaning assigned to it in Annex B.

"Weekly Budgeted Disbursements" shall mean, with respect to any Calendar Week Period, the aggregate amount of projected cash disbursements by Borrower set forth in the Budget with respect to such Calendar Week Period.

"Weekly Budgeted Receipts" shall mean, with respect to any Calendar Week Period, the aggregate amount of projected cash receipts by Borrower set forth in the Budget with respect to such Calendar Week Period.

"Welfare Plans" shall mean any welfare plan, as defined in Section 3(1) of ERISA, which is maintained or contributed to by Borrower or any ERISA Affiliate.

2.    Certain Matters of Construction.    Any accounting term used in the Agreement or the other Loan Documents shall have, unless otherwise specifically provided therein, the meaning customarily given such term in accordance with GAAP, and all financial computations thereunder shall be computed, unless otherwise specifically provided therein, in accordance with GAAP consistently applied. That certain items or computations are explicitly

A-17

modified by the phrase "in accordance with GAAP" shall in no way be construed to limit the foregoing.

All other undefined terms contained in the Agreement or the other Loan Documents shall, unless the context indicates otherwise, have the meanings provided for by the Code as in effect in the Commonwealth of Pennsylvania to the extent the same are used or defined therein. The words "herein," "hereof" and "hereunder" or other words of similar import refer to the Agreement as a whole, including the exhibits and schedules thereto, as the same may from time to time be amended, modified or supplemented, and not to any particular section, subsection or clause contained in this Agreement.

Whenever any provision in any Loan Document refers to the "knowledge" of any Person, such provision is intended to mean that such Person has actual knowledge or awareness of a particular fact or circumstance, or that such Person, if it had exercised reasonable diligence, should have known or been aware of such fact or circumstance.

For purposes of this Agreement and the other Loan Documents, the following additional rules of construction shall apply: (a) wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, the feminine and the neuter; (b) the term "including" shall not be limiting or exclusive, unless specifically indicated to the contrary; (c) all references to statutes and related regulations shall include any amendments thereto and any successor statutes and regulations; and (d) all references to any instruments or agreements, including references to any of the Loan Documents, shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof, in each case, made in accordance with the terms of the Loan Documents.

A-18

**ANNEX B** to
CREDIT AGREEMENT

**FINANCIAL STATEMENTS AND NOTICES**

       1.     <u>Inventory Report</u>. Together with the delivery of monthly financials under paragraph 3 below, an Inventory report in form and substance satisfactory to Lender.

       2.     <u>Accounts Receivable Report</u>. A monthly trial balance showing Accounts outstanding aged from invoice due date as follows: 1-30 days, 31-60 days, 61-90 days and 91 days or more, accompanied by such supporting detail and documentation as shall be requested by Lender, such trial balance to be delivered to Lender no later than five days after the end of the period to which such trial balance relates.

       3.     <u>Monthly Financials</u>. By no later the 30th day after the end of each fiscal month:

       (b)     internally prepared balance sheet and income statement as of the close of such fiscal month and that portion of the current Fiscal Year ending as of the close of such fiscal month, in each case, for Borrower which financial and other information shall provide comparisons to the prior year's equivalent period, on a year-to-date basis, and to Budget; and

       (c)     a certification of the Chief Executive Officer or Chief Financial Officer of Borrower that all such financial statements are complete and correct and present fairly the financial position, the results of operations of Borrower as at the end of such fiscal month and for the period then ended, that all rent and other obligations of Borrower with respect to their Leases were paid in accordance with the terms thereof (without giving effect to any grace periods) as at the end of such fiscal month and setting forth the aggregate amount so paid or specifying those instances when rent or such other obligations were not so paid together with a detailed explanation of the reasons for the failure of Borrower to make such payments and the aggregate amount of such payments not made, and that there was no Default in existence as of such time or specifying those Defaults of which he or she was aware.

       4.     <u>Management Letters</u>. Within five (5) Business Days after receipt thereof by Borrower, copies of all management letters, exception reports or similar letters or reports received by Borrower from its independent certified public accountants.

       5.     <u>Budget Analysis</u>. Not later than Wednesday by 12:00 noon (eastern time) in each calendar week, a Budget variance report (a "<u>Weekly Budget Variance Report</u>"), in form and scope reasonably acceptable to Lender, which report shall compare actual cash receipts and disbursements of Borrower with amounts provided for in the Budget on a line-by-line and aggregate basis for the preceding weekly period and the cumulative period from the Petition Date to the end of the preceding calendar week.

       6.     <u>Updated Budgets</u>. Not later than the end of business on the Friday two weeks prior to the expiration of the existing budget, the Borrower shall deliver to Lender a new thirteen-week debtor-in-possession cash and borrowing forecast for the Borrower commencing in

Error! Unknown document property name.

the week following expiration of the existing Budget in form and scope consistent with <u>Annex D</u> and otherwise acceptable to Lender in its sole discretion. Upon the approval of such proposed budget by Lender in writing in its sole discretion, such proposed shall become the Budget for purposes of this Agreement.

       7.    <u>Supplemental Schedules</u>.  Supplemental schedules, if any, required by Section 5.8.

       8.    <u>Bankruptcy Matters</u>.  Copies of all monthly reports, projections or other information respecting Borrower's business or financial condition or prospects as well as all pleadings, motions, applications and judicial information filed by or on behalf of Borrower with the Bankruptcy Court or provided by or to the U.S. Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Cases) or the Committee, at the time such document is filed with the Bankruptcy Court, or provided by or, to the U. S. Trustee (or any monitor or interim receiver, if any, appointed in any Chapter 11 Cases) or the Committee.

       9.    <u>Notice of Default</u>.  As soon as practicable, but in any event within five (5) Business Days after Borrower becomes aware of the existence of any Default, or any development or other information that, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect, including without limitation any notice received from any holder of Subordinated Debt concerning a default thereunder, telephonic or facsimile notice specifying the nature of such Default or development or information, including the anticipated effect thereof, which notice shall be promptly confirmed in writing within four (4) Business Days.

       10.    <u>Tax Returns</u>.  Upon Lender's request, copies of all federal, state, local and foreign tax returns, information returns and reports in respect of income, franchise or other taxes on or measured by income (excluding sales, use or like taxes) filed by Borrower.

       11.    <u>SEC Documents</u>.  Promptly upon their becoming available, copies of any final registration statements and the regular, periodic and special reports, if any, which Borrower shall have filed with the Securities and Exchange Commission (or any governmental agency substituted therefor) or any national securities exchange.

       12.    <u>Documents to Shareholders</u>.  Promptly upon the mailing thereof to the shareholders of Borrower generally, copies of all financial statements, reports and proxy statements so mailed.

       13.    <u>Lease Documents.</u>  Promptly upon entering into, renewing, amending or modifying any Lease, a copy of such Lease, amendment or other related documentation.

       14.    <u>ERISA Documents.</u>  As soon as possible, and in any event within 10 days after Borrower knows or has reason to believe that any of the events or conditions specified below with respect to any Plan or Multiemployer Plan has occurred or exists, a statement signed by the Chief Financial Officer of Borrower setting forth details respecting such event or condition and the action, it any, that Borrower or any ERISA Affiliate proposes to take with respect thereto (and a copy of any report or notice required to be filed with or given to PBGC by Borrower or any ERISA Affiliate with respect to such event or condition):

Error! Unknown document property name.

(d)     any Reportable Event with respect to a Plan occurs (provided that a failure to meet the minimum funding standard of Section 412 of the IRC or Section 302 of ERISA shall be a reportable event regardless of the issuance of any waivers in accordance with Section 412(d) of the IRC);

(e)     the filing under Section 4041 of ERISA of a notice of intent to terminate any Plan or the termination of any Plan;

(f)     the institution by PBGC of proceedings under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan, or the receipt by Borrower or any ERISA Affiliate of a notice from a Multiemployer Plan that such action has been taken by PBGC with respect to such Multiemployer Plan;

(g)     the complete or partial withdrawal by Borrower or any ERISA Affiliate under Section 4201 or 4204 of ERISA from a Multiemployer Plan, or the receipt by Borrower or any ERISA Affiliate of notice from a Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA or that it intends to terminate or has terminated under Section 4041A of ERISA; and

(h)     the institution of a proceeding by a fiduciary of any Multiemployer Plan against Borrower or any ERISA Affiliate to enforce Section 515 of ERISA, which proceeding is not dismissed within 30 days.

15.     Other Reports.     Such other reports and information respecting the business, financial condition or prospects of Borrower, as Lender may, from time to time, reasonably request.  Simultaneously with the transmission thereof, each daily and weekly report reviewed by management relating to the performance and operations of the Borrower's business, including with respect to activations, deactivations and shipments.

16.     Subordinated Debt.     Simultaneously with the transmission of originals thereof, copies of any financial reports or other information respecting the business, financial condition or prospects of Borrower are required to provide or do provide such information to any holders of Subordinated Debt.

B-3

**ANNEX C** to
CREDIT AGREEMENT

**FINANCIAL COVENANTS**

(a) <u>Payment of Pre-Petition Claims</u>:  Borrower shall not make payments to creditors in respect of Pre-Petition trade payables and Pre-Petition obligations except for:  (i) amounts approved in the First Day Orders and (ii) amounts approved by Lender in writing and by the Bankruptcy Court.

(b) <u>Weekly Budget Compliance</u>.  Borrower shall not make any cash disbursement if, after giving effect thereto: (I) the aggregate cash disbursements by Borrower during each weekly period would exceed the product of:  (i) the aggregate of the Weekly Budgeted Disbursements for such week period including the date of such disbursement <u>times</u> (ii) one hundred ten percent (110%); or (II) the aggregate cash disbursements by Borrower in respect of any one line item contained in the Budget (for disbursements) during each weekly period would exceed the product of: (i) the aggregate of the disbursements for such line item for such week period <u>times</u> (ii) one hundred ten percent (110%).

(c) <u>Ending Revolving Loan Balance</u>:  Borrower shall not permit the outstanding principal amount of Revolving Loans at the end of any week to exceed the amount shown as the "Ending DIP Facility Balance" for such week on the Budget attached as Annex D *less* the aggregate amount, if any, by which actual "Total Cash Inflows" received exceeds the amount of "Total Cash Inflows" shown on such Budget from the closing date through such week.

(d) <u>Revenues</u>.  Borrower shall not permit its Weekly Covenant Revenue (as such term is calculated on the attached Annex E) (i) for the period beginning on the Petition Date through November 16, 2007 to be less than $3,000,000 and (ii) for each weekly period thereafter to be less than ninety percent (90%) of the amounts set forth on Annex E for such corresponding period.

Error! Unknown document property name.

**ANNEX D** to
CREDIT AGREEMENT

**FORM OF BUDGET**

Error! Unknown document property name.

**ANNEX E** to
CREDIT AGREEMENT

**REVENUE**

Error! Unknown document property name.