## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| INPHONIC, INC., *et al.,* | Case No. 07-11666 (KG)<br>Jointly Administered |
| Debtors. | Proposed Obj. Deadline: November 28, 2007 at 10:00 a.m.<br>Proposed Hearing Date: November 30, 2007 at 3:00 p.m. |

### MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR AN ORDER (I) DISMISSING (OR CONVERTING) DEBTORS' BANKRUPTCY CASES PURSUANT TO SECTION 1112(b) OF THE BANKRUPTCY CODE OR, ALTERNATIVELY, (II) COMPELLING THE TRUSTEE TO ABANDON FULLY-ENCUMBERED ESTATE PROPERTY PURSUANT TO SECTION 554(b) OF THE BANKRUPTCY CODE

The Official Committee of Unsecured Creditors (the "Committee"), by and through its proposed counsel, moves this Court for an order (i) dismissing (or converting) the debtors' bankruptcy cases pursuant to Section 1112(b) of the Bankruptcy Code or, alternatively, (ii) compelling the debtors to abandon fully-encumbered estate property pursuant to Section 554(b) of the Bankruptcy Code (the "Motion"), and states as follows:

## I.    PRELIMINARY STATEMENT

1.    On November 8, 2007 (the "Petition Date"), InPhonic, Inc. ("InPhonic") and each of its wholly-owned subsidiaries (collectively, the "Debtors")[1] filed for chapter 11 bankruptcy relief to effect a sale of substantially all of the Debtors' assets to Adeptio INPC Funding, LLC ("Adeptio").

---

[1]  The seven wholly owned debtor-subsidiaries are: (a) CAIS Acquisition, LLC, a Delaware limited liability company, (b) CAIS Acquisition II, LLC, a Delaware limited liability company, (c) SimIPC Acquisition Corp., a Delaware corporation, (d) Star Number, Inc., a Delaware corporation, (e) Mobile Technology Services, LLC, a Delaware limited liability company, (f) FON Acquisition, LLC, a Delaware limited liability company, and (g) 1010 Interactive, LLC, a Delaware limited liability company.

2.      Adeptio is the Debtors' stalking-horse bidder, its DIP financer and also the recent purchaser (at a very steep discount, just days prior to the filing of these bankruptcy cases) of the pre-petition lenders' $90 million claim against the Debtors.[2]  The Debtors' statements in their first day motions and related filings indicate that Adeptio's prepetition claim is grossly undersecured (considering its face amount as opposed to the underlying collateral value as evidenced by the price Adeptio paid for such claim).  As the Debtors' also indicate, the proposed auction sale of their assets will not likely generate any bid other than Adeptio's $50 million credit bid, let alone any bid that will provide value to any entity other than Adeptio.

3.      In short, the entire sale process is a farce that, if permitted, would run its course at the expense of many unsecured creditors that will not receive any benefit from the sale.  The thinly-veiled purpose of the proposed sale is to benefit Adeptio by providing for the transfer of the Debtors' assets free and clear of liens, claims and interests.  Although only Adeptio would benefit from this sale process, Adeptio purports to impose upon the estates and their other creditors the costs and expenses associated with the sale process with no resulting benefit to those creditors.

4.      Worse yet, Adeptio seeks to impose upon the estates and their creditors a claim for diminution in the value of Adeptio's collateral during the sale process – even though the Debtors undertake the sale process at Adeptio's insistence and for Adeptio's benefit.  Adeptio also apparently seeks to assert avoidance actions against unsecured creditors to satisfy Adeptio's diminution claim.

---

[2]  The Committee reserves all of its rights, defenses and claims against Adeptio, including with respect to Adeptio's alleged claims against the Debtors' estates and the security therefor.

5.     Accordingly, the Debtors' bankruptcy cases should be dismissed (or converted) as Adeptio is the only party that can hope to receive a benefit from these bankruptcy cases.  Instead of further prejudicing the Debtors' unsecured creditors by allowing the estates to incur unnecessary expenses and fees (such as the expenses and fees that will be paid unnecessarily to GAH), Adeptio should be required to obtain the Debtors' assets by exercising Adeptio's foreclosure rights outside of these chapter 11 bankruptcy cases.  Adeptio will achieve the same results by exercising its foreclosure rights, but the process would be more equitable because Adeptio, not the Debtors' unsecured creditors, will bear the costs for the benefits Adeptio will receive.

6.     Alternatively, *if* this Court does not dismiss the Debtors' cases, this Court should compel the Debtors to abandon all assets encumbered by Adeptio's security interest.  Those assets are "burdensome" and "of inconsequential value and benefit" to the Debtors' estates.  See 11 U.S.C. § 554(b).

## II.    FACTUAL BACKGROUND

### A.    The Sale Process And The Absence Of Any Rehabilitation

7.     On the Petition Date, the Debtors filed a Motion for an Order Pursuant to Section 105(a), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (i) Authorizing the Sale of Substantially all of the Debtors' Assets, (ii) Approving an Asset Purchase Agreement, Subject to Higher and Better Offers, (iii) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Lease and (iv) Granting Related Relief (the "Sale Motion"; D.I. 13).

8.      Pursuant to the Sale Motion, the Debtors seek to sell substantially all their assets to Adeptio for a $50 million credit bid, subject (unrealistically) to higher and better offers. <u>See</u> Sale Motion at ¶ 34.

9.      The Debtors state that no other entity or group of entities has provided a definitive offer to purchase the assets for greater economic value to the Debtors' estates than Adeptio, which according to the Debtors, is "particularly telling" given the Debtors' prepetition marketing efforts. <u>See</u> Schwarz Affidavit at ¶ 136.

10.     Any perceived benefits from the proposed bid procedures and auction process are illusory. No bid will exceed the face amount of Adeptio's recently-acquired $90 million secured claims. The Sale Motion was filed, and the sale process is being conducted, as required by Adeptio, for Adeptio's sole benefit.

**B.      The Proposed DIP Financing**

11.     Prior to the inception of these chapter 11 cases, the Debtors were indebted to Goldman Sachs Credit Partners, L.P., as Lead Arranger, Lead Bookrunner and Lead Syndication Agent and Citicorp North America, Inc., as Administrative Agent and various other lenders (collectively, the "<u>Prior Lenders</u>") in the approximate amount of $90 million under a certain Credit Agreement (the "<u>Prepetition Credit Agreement</u>") dated November 7, 2006. The obligations of the Debtors under the Prepetition Credit Agreement were allegedly secured by liens on and security interests in virtually all of the Debtors' assets.

12.     On November 2, 2007, the Prior Lenders assigned all of their right, title and interest in and to the Prepetition Credit Agreement and the documents related thereto

(collectively, the "Prepetition Credit Documents") to Versa Capital Management, Inc.

("Versa"), an affiliate of Adeptio (which is Versa's assignee).

13.     On the Petition Date, the Debtors filed their Motion for Entry of Interim

and Final Orders (I) Authorizing and Approving Post-Petition Financing; (II) Granting

Liens and Security Interests and Providing Superpriority Administrative Expense Status;

(III) Authorizing Use of Cash Collateral and Affording Adequate Protection;

(IV) Modifying Automatic Stay; and (V) Scheduling Final Hearing Pursuant to Section

105, 361, 362, 363 and 364 of the Bankruptcy Code and Federal Rules of Bankruptcy

Procedure 2002 and 4001 (c) and (d) (the "DIP Financing Motion") (D.I. 11).

14.     The Debtors claim to have urgent cash needs because they will continue to

operate at a loss post-petition.  See Affidavit of Kenneth D. Schwarz, Chief Financial

Officer of the Debtors, in Support of First Day Motions and Applications (the "Schwarz

Affidavit") at ¶ 130.

15.     The Debtors assert that their cash reserves have been so seriously depleted

that, as of November 9, 2007, the Debtors admitted that they would no longer be capable

of funding operations absent post-petition financing (that will serve only to cover further

losses).  See Schwarz Affidavit at ¶ 27.

16.     Although the Debtors believe that a DIP facility should allow them to

continue to operate their business for a very brief time, the Debtors admit that they are

not rehabilitating their business.  Rather, the Debtors claim that the "only viable solution"

that will preserve the value of their assets and business is a sale pursuant to Section 363

of the Bankruptcy Code.  See Schwarz Affidavit at ¶¶ 119 and 124.

17.    In the DIP Financing Motion, the Debtors seek to borrow, on both a secured and superpriority administrative expense basis, $25 million from Adeptio.

18.    When evaluating the DIP Financing Motion and the requests made therein for various protections to be accorded to Adeptio in its capacity as DIP lender and prepetition lender, it is critical to bear in mind all of the different hats that Adeptio wears in these chapter 11 cases. Adeptio is (a) the prepetition lender, having acquired at a steep discount the rights and interests of the Prior Lenders earlier this month, (b) the proposed purchaser of the Debtors' assets, and (c) the DIP lender, offering loans to the Debtors solely for the purpose of keeping the Debtors' businesses intact so that Adeptio can acquire them at a Section 363 sale scheduled to occur in December, 2007.

19.    Even though the DIP facility is solely for Adeptio's benefit, Adeptio seeks to impose costs upon, and reduce the rights of, the unsecured creditors in exchange for the DIP facility - as if the DIP facility benefited the unsecured creditors. For example, Adeptio seeks a "superpriority claim" for the diminution in value of its collateral during the sale process, and worse yet, Adeptio seeks to pay such claims out of the proceeds of avoidance actions against unsecured creditors that will receive no benefit from the sale process. Adeptio seeks a waiver of the estates' right to surcharge Adeptio's collateral under Section 506(c) of the Bankruptcy Code even though these cases are being run for Adeptio's benefit. Adeptio also seeks unreasonable fees, in the amount of $500,000, for a loan that Adeptio would make in any event to preserve its right to acquire the Debtors' assets via a credit bid.

20.    Moreover, Adeptio seeks to use approximately $780,000 of the DIP facility to pay Adeptio's professional fees.

21.     Accordingly, as Adeptio is the only party that can hope to receive any real benefit from these bankruptcy cases, neither the estates nor unsecured creditors should bear the expenses associated with these bankruptcy cases, including the monetary costs and proposed loss of rights associated with the proposed DIP facility.

### C.     The Proposed Retention Of An Investment Banker

22.     On the Petition Date, the Debtors also filed an Application for Order Pursuant to 11 U.S.C. §§ 327(a) and 328(a) and Federal Rule of Bankruptcy Procedure 2014 Authorizing Employment and Retention of Goldsmith, Agio, Helms Securities, Inc. ("GAH").

23.     The Committee respectfully submits that there is no reason for GAH's retention in these cases.  GAH will not, and no one expects it to, obtain a bid in excess of the face amount (approximately $90 million) of the prepetition secured debt, let alone the additional $25 million from the DIP loan.

24.     First of all, GAH already attempted prepetition to locate other bidders, but failed.  Secondly, no bidder will pay in excess of the $90 million face amount of Adeptio's claim (let alone the additional $25 million from the DIP loan).

25.     Accordingly, as Adeptio is the only party that can hope to receive any real benefit from these bankruptcy cases, neither the estates nor unsecured creditors should bear the expenses associated with these bankruptcy cases, including the hiring of an investment banker.

### III.    RELIEF REQUESTED

26.     The Committee respectfully requests that this Court enter an Order (i) dismissing the Debtors' bankruptcy cases (or as a less-favored alternative, converting

the cases to cases under chapter 7 of the Bankruptcy Code) and alternatively, (ii) if the cases are not dismissed, compelling the Debtors to abandon all property encumbered by Adeptio's assets as such property is "burdensome" and "of inconsequential value and benefit" to the Debtors' estates.

## IV.    BASIS FOR RELIEF REQUESTED

27.    It is painfully obvious that these chapter 11 cases have been filed at Adeptio's insistence and solely for Adeptio's benefit. The singular purpose of these cases is to obtain for Adeptio an order transferring the Debtors' assets free and clear of liens, claims and interests. While these actions considered in isolation may not be violative of the spirit of the Bankruptcy Code, these cases offer no material recovery for the unsecured creditors. Adeptio, however, seeks to impose upon the estates and their creditors the burden of the costs and expenses associated with these cases.

28.    There is no reason for these cases to remain pending in this Court. If Adeptio has a valid security interest it can foreclose on the Debtors' assets outside of a chapter 11, and obtain ownership of the assets through a state court foreclosure. In that foreclosure proceeding (which is fast and inexpensive), the jobs of the Debtors' employees can be preserved, and Adeptio can receive assignments of the Debtors' contracts pursuant to their terms.

29.    Chapter 11 was intended to be a collective process of negotiation and shared distribution for a group of creditors. This Court should not permit a secured lender who has purchased loans to acquire the Debtors' business to use the chapter 11 process as its private collection or foreclosure proceeding. This is particularly true in

these cases where Adeptio seeks to burden the unsecured creditors with the costs of

chapter 11 cases that have been orchestrated for Adeptio's sole benefit.

30.     Assuming for some reason that these cases are not dismissed, this Court

should order the Debtors to abandon all estate property that is fully-encumbered by

Adeptio's security interests.  There is simply no reason for the estates to incur any

expense, let alone incur a large superpriority claim for diminution of Adeptio's collateral,

to administer property for Adeptio's benefit.

**A.     This Court Must Dismiss The Debtors' Bankruptcy Cases For "Cause" Under Section 1112(b)(4)(A) Of The Bankruptcy Code.**

31.     Section 1112(b) of the Bankruptcy Code used to provide that a court had

the discretion whether to dismiss or convert a case, or do neither, if a creditor established

"cause" for dismissal or conversion.  11 U.S.C. § 1112(b) (amended effective October 17,

2005) ("the court *may* convert a case under [Chapter 11] to a case under Chapter 7 . . . or

may dismiss a case under this chapter, whichever is in the best interest of creditors and

the estate, for cause.") (emphasis added).

32.     Section 1112(b), however, was recently amended in the Bankruptcy Abuse

Prevention and Consumer Protection Act to *require* a court to dismiss or convert a case if

a creditor established "cause," absent "unusual circumstances specifically identified by

the court that establish that the requested conversion or dismissal is not in the best

interests of the creditors and the estate".  See 11 U.S.C. § 1112(b)(1).

33.     Importantly, however, the "unusual circumstances" exception to the

mandatory nature of dismissal or conversion does *not* apply where the "cause" for

dismissal or conversion is continuing or substantial loss and the absence of any

rehabilitation.  See 11 U.S.C. § 1112(b)(2)(B).

34.    Specifically, Section 1112(b) provides as follows:

(1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section . . ., on request of a party in interest, and after notice and a hearing, absent *unusual circumstances* specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court *shall convert* a case under this chapter to a case under chapter 7 *or dismiss* a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

(2) The relief provided in paragraph (1) shall not be granted absent unusual circumstances specifically identified by the court that establish that such relief is not in the best interests of creditors and the estate, if the debtor or another party in interest objects and establishes that—

(A) there is a reasonable likelihood that a plan will be confirmed . . . within a reasonable period of time; and

(B) the grounds for granting such relief include an act or omission of the debtor *other than under paragraph (4)(A)*—

(i) for which there exists a reasonable justification for the act or omission; and

(ii) that will be cured within a reasonable period of time fixed by the court.

See 11 U.S.C. § 1112(b)(1)-(2)(B)(ii).

35.    Accordingly, where a movant establishes "cause" under Section 1112(b)(4)(A), a court *must* dismiss (or convert) the case *regardless* of the presence of "unusual circumstances" that might otherwise weigh against dismissal (or conversion). See 11 U.S.C. § 1112(b)(1) and (2)(B).

36.    Section 1112(b)(4)(A) provides that "cause" exists for dismissal (or conversion) where a debtor incurs "substantial or continuing loss to or diminution of the

estate" and there is an "absence of a reasonable likelihood of rehabilitation" <u>See</u>
11 U.S.C. § 1112(b)(4)(A).

37.     In these cases, dismissal (or conversion) is *mandated* under the plain

language of Section 1112(b)(1)-(2)(B) because the Committee can establish "cause" for

dismissal under Section 1112(b)(4)(A) due to the Debtors' substantial or continuing

losses and the absence of any reasonable likelihood or rehabilitation.

a.     <u>The Debtors' Substantial Or Continuing Losses</u>

38.     To establish "cause" pursuant to Section 1112(b)(4)(A), the Committee

must demonstrate that the Debtors have incurred substantial *or* continuing losses.  <u>See</u>

1112(b)(4)(A).  In fact, the Debtors have incurred both substantial *and* continuing losses.

39.     From the time of their formation to the present, the Debtors have not

achieved profitability.  Post-petition, the Debtors admit that they are continuing to

consume cash and incur losses.  <u>See</u> Schwarz Affidavit at ¶¶ 27 and 130.  In fact, based

upon the Debtors' cash flow forecasts, they will incur negative cash flows of

approximately $4 million for *each* of the first 6 weeks of their cases.

40.     Thus, there can be no reasonable dispute that the Debtors are incurring

both continued and substantial losses.  <u>See, e.g.</u>, <u>In re AdBrite Corp.</u>, 290 B.R. 209, 215

(Bankr. S.D.N.Y. 2003) ("Courts have held that a negative cash flow postpetition and an

inability to pay current expenses satisfy the elements of § 1112(b)(1)" (now

§ 1112(b)(4)(A));  <u>In re Route 202 Corp. t/a Lionti's Villa</u>, 37 B.R. 367, 376 (Bankr.

E.D.Pa. 1984) ("Obviously, if the debtor has negative cash flow after entry of the order

for relief in the chapter 11 case, the [elements of former § 1112(b)(1) are] satisfied"); <u>In</u>

<u>re Galvin</u>, 49 B.R. 665, 669 (Bankr. D.N.D. 1985) ("Post-petition negative cash flow is

11

considered by courts to be evidence of continuing losses required by" former

§ 1112(b)(1)).

41.     By the Debtors' own admission, the Committee has established that the

Debtors are suffering continued and/or substantial losses under Section 1112(b)(4)(A).

           b.        <u>There Is No Likelihood Of "Rehabilitation"</u>

42.     The Committee can also establish that there is no reasonable likelihood of

"rehabilitation" under Section 1112(b)(4)(A).

43.     It is well-settled that the reference in Section 1112 to "rehabilitation"

means something different than "reorganization," which includes liquidation.  Courts

consistently hold that "rehabilitation," as distinguished from "reorganization," denotes a

restoration of a viable business and does *not* include liquidation.   <u>Loop Corp. v. U.S.</u>

<u>Trustee</u>, 379 F.3d 511, 516 (8th Cir. 2004) ("Courts have consistently understood

'rehabilitation' to refer to the debtor's ability to restore the viability of its business.");

<u>In re Gonic Realty Trust</u>, 909 F.2d 624, 627 (1st Cir. 1990) ("[W]ith no business left to

reorganize, Chapter 11 proceedings were not serving the purpose of rehabilitating the

debtor's business."); <u>In re Family Snacks, Inc.</u>, 257 B.R. 884, 895 (8th Cir. BAP 2001)

("Congress has distinguished the narrower concept of rehabilitation from the broader

concept of reorganization"); <u>AdBrite</u>, 290 B.R. at 216 ("rehabilitation does not mean the

same thing as reorganization for purposes of Chapter 11 because a reorganization may

include an orderly or complete liquidation.  In this context, rehabilitation means to put

back in good condition and reestablish on a sound basis.  It signifies that the debtor will

be reestablished on a secured financial basis, which implies establishing a cash flow from

which its current obligations can be met."); <u>In re Northeast Family Eyecare, P.C.</u>, 2002

WL 1836307, at *3-4 (Bankr. E.D.Pa. July 22, 2002) ("Rehabilitation signifies that the debtor will be reestablished on a . . . financial basis, which implies establishing a cash flow from which current obligations can be met.").

44.     In these cases, there also can be no dispute that the Debtors are not even attempting to rehabilitate their businesses.  Rather, the Debtors are liquidating substantially all of their assets.

45.     In summary, it is patently clear that "cause" exists for dismissal (or conversion) of the instant cases pursuant to Section 1112(b)(4)(A) of the Bankruptcy Code and, therefore, dismissal (or conversion) is *mandated* by Section 1112(b)(1)-(2)(B).

### B.     This Court Must Dismiss The Debtors' Bankruptcy Cases For Other "Cause" Under Section 1112(b) Of The Bankruptcy Code.

46.     Section 1112(b) lists other non-exhaustive factors that may amount to "cause" for dismissal (or conversion), including the failure to maintain proper insurance. See 11 U.S.C. § 1112(b)(4)(C); 11 U.S.C. § 102(3) (in construing the Bankruptcy Code, the terms "includes" and "including" are not limiting); S.Rep. No. 989, 95th Cong., 2d Sess. 117 (1978) ("list is not exhaustive" and courts should "consider other factors as they arise"), reprinted in 1978 U.S.C.C.A.N. 5787, 5903; H.R.Rep. No. 595, 95th Cong., 1st Sess. 406 (1977) (same), reprinted in 1978 U.S.C.C.A.N. 5963, 6362.

47.     With respect to the Debtors' cases, each of the following constitutes other "cause" for dismissal:

> ➢ The entire sale process has been unfairly orchestrated by Adeptio for its sole benefit at the expense of unsecured creditors;

> ➢ The Debtors' (apparent) failure to maintain appropriate insurance (§ 1112(b)(4)(C)); and

> ➢ The Debtors' inability to confirm a plan.

48.     Upon the Committee's demonstration of such "cause," this Court must dismiss (or convert) the Debtors' bankruptcy cases unless the Debtors can establish that "unusual circumstances" preclude dismissal (or conversion) and that there is a reasonable likelihood that the Debtors can confirm a plan within a reasonable period of time; and that such "cause" will be cured within a reasonable period of time fixed by the court. See 11 U.S.C. § 1112(b)(1)-(2)(B)(ii).

### 1.     The Fact That These Cases Solely Will Benefit Adeptio Constitutes "Cause" For Dismissal.

49.     Adeptio's end game for these bankruptcy cases is a Section 363 sale in which Adeptio expects to obtain a "free and clear" sale order. The fact that the sale is Adeptio's end game is evidenced by the fact that Adeptio has not agreed to any wind-down budget or made any other provision for the payment of fees and expenses associated with confirming a chapter 11 plan.

50.     In any event, there is no reason to confirm a chapter 11 plan because there will be no value to distribute to creditors after Adeptio takes the Debtors' assets via a credit bid.

51.     The sale process is a farce that, if permitted, would run its course at the expense of many unsecured creditors that will not receive any benefit from the sale. It is undisputed that no prospective purchaser (if any) would pay more for the Debtors' assets than the amount of the secured debt. Thus, the sole and thinly-veiled purpose of the

proposed sale is to benefit Adeptio by providing for the transfer of the Debtors' assets free and clear of liens, claims and interests. Although only Adeptio would benefit from this sale process, Adeptio purports to impose upon the estates and their other creditors the costs and expenses associated with the sale process, including without limitation, Adeptio's due diligence expenses. Worse yet, Adeptio seeks to impose upon the estates and their creditors a claim for diminution in the value of Adeptio's collateral during the sale process – even though Adeptio required the Debtors to undertake that sale process and even though that sale process benefits only Adeptio. Adeptio apparently also seeks to assert avoidance actions against unsecured creditors to make a distribution on its diminution claim.

52.    As debtors in possession, the Debtors must ensure that their actions benefit the diverse interests of the various creditors and other constituencies that have a stake in the bankruptcy case. In re Integrated Resources, Inc., 147 B.R. 650, 659 (S.D.N.Y. 1992). Appeasing a vocal group of creditors or a single creditor, even a large creditor like Adeptio, is not a sufficient business purpose to permit a sale of substantially all of a debtor's assets. See In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153-54 (D.Del. 1999) (quoting Lionel factors); In re Encore Healthcare Assocs., 312 B.R. 52, 55 (Bankr. E.D.Pa. 2004); In re Global Crossing Ltd., 295 B.R. 726, 745 (Bankr. S.D.N.Y. 2003) (a "chapter 11 debtor should not take an action simply because a particular constituency, even an important one, wants it"). It follows that a court should not permit a Section 363 sale solely based on the "hue and cry of the most vocal special interest group." Lionel, 722 F.2d at 1070.

53.    Courts have recognized that the interest of a single creditor, even a
secured creditor, is an insufficient justification for a chapter 11 proceeding, which is
intended to be a collective process for the benefit of the creditor group. See In re
Mazzocone, 183 B.R. 402, 414 (Bankr. E.D.Pa. 1995) ("We have not found a single case
where the preference of a single creditor was held to be dispositive" of the creditors' best
interests).

54.    Recognizing that bankruptcy is intended to be a collective process and not
a private collection tool for the exclusive benefit of a secured creditor, a bankruptcy court
declared as follows:

> From the start of this case, the United States Trustee has taken the
> position that, where there is no equity in the assets for the estate,
> the sale that the Lender contemplates should not be permitted to
> occur in bankruptcy unless the Lender guarantees a meaningful
> dividend for unsecured creditors.  Transcript of Hearing of August
> 27, 2002, at p. 11.  The Committee itself reiterated this position as
> its principal objection to the financing motion.  The Court agrees
> and has made its position clear from the start of this case.  Where
> all equity in a debtor's assets belongs to the secured creditor, with
> no appreciable expectation of a remainder for unsecured creditors,
> the liquidation of the assets serves no bankruptcy purpose and
> should not be permitted to occur in bankruptcy.

In re Duro Indus., Inc., 2002 WL 34159091, at *5 (Bankr. D.Mass. Oct. 7, 2002).

55.    Similarly concluding that there was no justification for a Section 363 sale,
another bankruptcy court reasoned that:

> The proposed sale would not, as a whole benefit the Debtor or
> creditors.  In fact, if allowed, the sale would terminate Debtor's
> existence.  If Debtor's proposed sale were authorized, the
> likelihood of reorganization would dissipate as there would remain
> no assets from which a plan could be proposed. *Additionally, the
> proceeds from the proposed sale would, at most, benefit one
> creditor only.  The sale would not create proceeds that would inure
> to the benefit of unsecured creditors.*

In re Fremont Battery Co., 73 B.R. 277, 279 (Bankr. N.D. Ohio 1987) (emphasis added); see also Encore Healthcare, 312 B.R. at 57 (Debtor's motion to approve sale denied based in part on the fact that proposed sale benefits a secured creditor only).

56.    In In re Shoe Corp. of America, Inc., No. 99-55400 (Bankr. S.D. Ohio 2000), the creditors' committee asserted that the bank group sought to liquidate the debtors' assets for the bank group's own benefit.  Therefore, the committee contended that the bank group should liquidate the debtors' assets outside of the auspices of chapter 11.  On the other hand, the bank group wanted to keep the cases in chapter 11 to effectuate an asset sale to a third party that would have maximized the bank group's recovery, albeit still leaving the bank group substantially under water.  The court indicated that it would grant the committee's motion to convert, unless the bank group reached an agreement with the committee satisfactory to the committee.  The dispute was settled when the bank group agreed to carve-out a portion of its secured claim to be made available solely for the benefit of the committee's constituency.

57.    A secured creditor should not be the sole constituent to benefit from a Section 363 sale.  "Recognizing as much, most secured creditors understand the necessity of making some distribution available to other creditors as the price of the court-approved sale."  Encore Healthcare, 312 B.R. at 57 n.10.

58.    A trustee, or debtor in possession, should not liquidate assets solely for the benefit of secured creditors.  See In re Integrated Agri, Inc., 313 B.R. 419, 425 (Bankr. C.D.Ill. 2004) ("It is well settled that it is improper for a bankruptcy trustee to liquidate property solely for the benefit of secured creditors.  Even acquiescence by the trustee does not transform the bankruptcy court into a collection forum for secured creditors.")

(citations omitted). Instead, where the Debtors' assets are fully encumbered with no

potential equity for unsecured creditors, the trustee or debtor in possession should

abandon those assets. Id.; see 11 U.S.C. § 554(a) (trustee may abandon property that is

"burdensome" or "of inconsequential value and benefit").

59.     In these cases, Adeptio has tried to manipulate the bankruptcy process as

its personal collection tool for Adeptio's sole benefit.

60.     Although Adeptio could simply have foreclosed on its security interests,

Adeptio *required* the Debtors to file a chapter 11 and seek a "free and clear" sale order

for Adeptio's sole benefit. Although Adeptio required the Debtors to commence these

cases, Adeptio seeks to impose upon other creditors the costs and expenses associated

with the these bankruptcy cases, including without limitation, (i) the financial impact of

any deterioration in Adeptio's collateral during the sale process (i.e., its superpriority

claim for any diminution in collateral value), (ii) the fees and other obligations under the

DIP facility (as well as the loss of rights such as Section 506(c) claims), (iii) and the costs

and expenses associated with Adeptio's Section 363 sale (including, among others,

investment banker fees and indemnification obligations and Adeptio's due diligence

expenses).

61.     Perhaps most egregious is Adeptio's assertion of a superpriority claim

against the estates for the diminution in Adeptio's collateral resulting from the automatic

stay during the course of the bankruptcy sale that *Adeptio required*. The estates will not

be in a position to pay Adeptio's diminution claim after the credit-bid sale to Adeptio.

Knowing that, Adeptio has already refused at the first days hearing to waive any right to

have its diminution claim paid out of the proceeds of avoidance actions. Instead, Adeptio

- having recently chosen to inject itself into the Debtor's financial dealings and having required the Debtors to file these cases - proposes that the estates pursue avoidance actions against unsecured creditors to pay Adeptio's diminution claim (and presumably its deficiency claim in excess of $40 million).

62.    Adeptio, having purchased the Debtors' secured debt at a steep discount, bears little risk associated with its claims against the Debtors.  Moreover, Adeptio voluntarily became a creditor long after the Debtors' financial troubles and just 6 days prior to the filing of these cases.  Adeptio should not be able to compound the misfortune of the Debtors' other creditors by orchestrating a chapter 11 bankruptcy petition that benefits only Adeptio.

63.    Adeptio can, and should, simply pursue its foreclosure rights under the Uniform Commercial Code.  Those proceedings would be very fast and much, much less expensive than these cases.

64.    The lack of benefit to unsecured creditors in these cases constitutes "cause" for dismissal (or conversion) of these cases under Section 1112 of the Bankruptcy Code.

### 2.    The Debtors' Inability To Confirm A Plan Also Constitutes "Cause" For Dismissal Of These Cases.

65.    Adeptio has not agreed to provide the Debtors with any cash to fund a wind-down budget.  Thus, the Debtors will have no liquid assets to pay their administrative expenses or unsecured priority claims, let alone make any meaningful distribution on account of unsecured nonpriority claims.

66.    In determining whether a sound business purpose exists to permit a Section 363 sale, a court should determine whether a debtor will be able to confirm a plan

after the sale. In other words, no business purpose exists to justify a Section 363 sale if the Debtor will ultimately be unable to confirm a plan. See Encore, 312 B.R. at 57 n.10 ("there are limits to the use of § 363, and it is clear that Chapter 11 liquidations are still subject to the proscriptions of Chapter 11 concerning, *inter alia*, the filing of a plan").

67.    One bankruptcy court has held that "[i]f Debtor's proposed sale were authorized, the likelihood of reorganization would dissipate as there would remain no assets from which a plan could be proposed." See Fremont, 73 B.R. at 279. Likewise, the facts of these cases are such that if the credit-bid sale motion is granted, without any assurances regarding the payment of administrative expense claims, the Debtors will not be able to effectuate a plan of liquidation. As a Section 363 sale is not meant as an end run around the confirmation process, this is a sufficient basis upon which to deny the Sale Motion and dismiss these cases. See Encore Healthcare, 312 B.R. at 57 n.10 (Section 363 sale does not provide an avenue to avoid the confirmation process).

68.    If the sale were to occur, the Debtors would also have no operational assets and little ability (or motivation) to confirm a plan. For that reason, this Court should not approve the proposed sale. Similarly, the Debtors' inability to confirm a plan in these cases also constitutes "cause" for dismissal (or conversion) of these cases under Section 1112 of the Bankruptcy Code.

### 3.    The Debtors (Apparent) Failure To Maintain Appropriate Insurance Constitutes "Cause" For Dismissal Of These Cases.

69.    Upon information and belief, the Debtors' directors and officers' liability insurance policy (the "D&O Policy") expires on November 30, 2007. Assuming that D&O Policy expires on November 30, 2007, and that the Debtors have not secured an

appropriate replacement policy, "cause" exists for dismissal (or conversion) of the

Debtors' cases pursuant to Section 1112(b)(4)(C).

      **C.**    **Alternatively, This Court Should Compel The Debtors To Abandon Assets That Are Fully Encumbered By Adeptio's Prepetition Liens.**

     70.    As a less-favored alternative to dismissal of the Debtors' bankruptcy

cases, the Committee requests that this Court compel the Debtors to abandon all estate

assets that are encumbered by Adeptio's prepetition security interests.

     71.    Section 554(a) of the Bankruptcy Code authorizes a trustee or debtor in

possession to "abandon" any property of the estate that is "burdensome to the estate or

that is of inconsequential value and benefit to the estate." 11 U.S.C. §§ 554(a) and

1107(a) (debtor in possession has rights, duties and powers of trustee).

     72.    Section 554(b) provides that, on request of a party in interest, the court

"may order the trustee [or debtor in possession] to abandon any property of the estate that

is burdensome to the estate or that is of inconsequential value and benefit to the estate."

11 U.S.C. § 554(b).

     73.    Property that is of "inconsequential value" and that is "burdensome"

includes property "in which the estate has little interest by virtue of the amount of a lien

held by a secured creditor." In re Price, 370 F.3d 362, 363 (3d Cir. 2004).

     74.    Indeed, as the Third Circuit has held, "[c]ourts are in agreement that fully

encumbered assets are unlikely to benefit the estate, and, therefore, such assets are not

likely to be justifiably administered." In re Lan Assocs. XI, L.P., 192 F.3d 109, 119 (3d

Cir. 1999).

     75.    One reason that fully encumbered property should be abandoned and not

administered is because there is "no justification for the *estate, which is created for the*

*benefit of the unsecured creditors*, to bear the fee for the benefit of the secured creditor." Id. at 120 (emphasis added). As indicated above, Adeptio is trying to foist the costs and risks of its orchestrated asset sale upon the estates and their other creditors even though the sale of the fully-encumbered property will benefit only Adeptio.

76. Accordingly, if this Court does not dismiss the Debtors' cases, this Court should compel the Debtors to abandon all of the estate assets that are fully-encumbered by Adeptio's pre-petition security interests.

## V.    RESERVATION OF RIGHTS

77. The Committee was just formed on November 16, 2007.

78. The Committee intends to conduct expedited discovery in connection with this Motion. Accordingly, the Committee reserves its right to assert such other, different, or further bases for dismissal (or conversion) of the Debtors' bankruptcy cases at the hearing on this Motion.

WHEREFORE, for the reasons set forth above, the Committee respectfully requests that this Court enter an Order (i) dismissing the Debtors' bankruptcy cases (or, as a less-favored alternative, converting the cases to chapter 7 cases), (ii) if the cases are not dismissed, compelling the Debtors to abandon all property fully-encumbered by Adeptio's security interests as such property is "burdensome" and "of inconsequential value and benefit" to the Debtors' estates, and (iii) granting such further relief to the Committee as is appropriate.

Dated: November 21, 2007                    Respectfully submitted,
Wilmington, Delaware
                                            REED SMITH LLP

                                     By:    /s/ Kurt F. Gwynne
                                            Kurt F. Gwynne (No. 3951)
                                            1201 N. Market Street, Suite 1500
                                            Wilmington, DE 19801
                                            Telephone: (302) 778-7500
                                            Facsimile: (302) 778-7575
                                            E-mail: kgwynne@reedsmith.com

                                                    and

                                            Robert P. Simons, Esquire
                                            435 Sixth Avenue
                                            Pittsburgh, PA 15219
                                            Telephone: (412) 288-3131
                                            Facsimile: (412) 288-3063
                                            E-mail: rsimons@reedsmith.com

                                                    and

                                            Claudia Z. Springer, Esquire
                                            2500 One Liberty Place
                                            1650 Market Street
                                            Philadelphia, PA 19103-7301
                                            Telephone: 215-851-8100
                                            Facsimile: 215-851-1420
                                            E-mail: cspringer@reedsmith.com

                                            Proposed Counsel to the Official
                                            Committee of Unsecured Creditors