IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| INPHONIC, INC., *et al.*, | : | Case No. 07-11666 (KG) |
| | : | Jointly Administered |
| Debtors. | : | Docket Nos. 21 and 63 |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO THE APPLICATION FOR ORDER PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a)
AND FEDERAL RULE OF BANKRUPTCY PROCEDURE 2014 AUTHORIZING
EMPLOYMENT AND RETENTION OF GOLDSMITH, AGIO, HELMS
SECURITIES, INC. AS INVESTMENT BANKER TO DEBTORS IN POSSESSION**

The Official Committee of Unsecured Creditors (the "Committee"), by and through its proposed counsel, objects to the Application for Order Pursuant to 11 U.S.C. §§ 327(a) and 328(a) and Federal Rule of Bankruptcy Procedure 2014 Authorizing Employment and Retention of Goldsmith, Agio, Helms Securities, Inc. ("GAH") as Investment Banker to Debtors in Possession (the "Application"; D.I. 21), and states as follows:

**PRELIMINARY STATEMENT**

1.     On November 8, 2007 (the "Petition Date"), InPhonic, Inc. ("InPhonic") and each of its wholly-owned subsidiaries (collectively, the "Debtors")[1] filed for chapter 11 bankruptcy relief to effect a sale of substantially all of the Debtors' assets to Adeptio INPC Funding, LLC ("Adeptio"). Adeptio is the Debtors' stalking-horse bidder, its DIP financer and also the recent purchaser (at a very steep discount) of the pre-petition lenders' $90 million claim against the

---

[1] The seven wholly owned debtor-subsidiaries are: (a) CAIS Acquisition, LLC, a Delaware limited liability company, (b) CAIS Acquisition II, LLC, a Delaware limited liability company, (c) SimIPC Acquisition Corp., a Delaware corporation, (d) Star Number, Inc., a Delaware corporation, (e) Mobile Technology Services, LLC, a Delaware limited liability company, (f) FON Acquisition, LLC, a Delaware limited liability company, and (g) 1010 Interactive, LLC, a Delaware limited liability company.

Debtors. The Debtors' statements in their first day motions and related filings indicate that Adeptio's prepetition claim is grossly undersecured (considering its face amount as opposed to the underlying collateral value as evidenced by the price Adeptio paid for such claim). As the Debtors' also indicate, the proposed auction sale of their assets will likely not generate any bid other than Adeptio's $50 million credit bid, let alone any bid that will provide value to any entity other than Adeptio.

2. In short, the entire sale process is a farce that, if permitted, would run its course at the expense of many unsecured creditors that will not receive any benefit from the sale. The sole and thinly-veiled purpose of the proposed sale is to benefit Adeptio by providing for the transfer of the Debtors' assets free and clear of liens, claims and interests. Although only Adeptio would benefit from this sale process, Adeptio purports to impose upon the estates and their other creditors the costs and expenses associated with the sale process. Worse yet, Adeptio seeks to impose upon the estates and their creditors a claim for diminution of the value of Adeptio's collateral during the sale process – even though that sale process benefits only Adeptio. Adeptio also apparently seeks to assert avoidance actions against unsecured creditors to satisfy Adeptio's diminution claim.

3. Accordingly, the Debtors' bankruptcy cases should be dismissed as Adeptio is the only party that can hope to receive a benefit from these bankruptcy cases. Instead of further prejudicing the Debtors' unsecured creditors by allowing the estates to incur unnecessary expenses and fees (such as the expenses and fees that will be paid unnecessarily to GAH), Adeptio should be required to obtain the Debtors' assets by exercising its rights of foreclosure outside of these chapter 11 bankruptcy cases. While Adeptio will achieve the same results by

exercising its foreclosure rights, that would prove to be a more equitable result as Adeptio, not the Debtors' unsecured creditors, will bear the costs for the benefit Adeptio will receive.

## FACTUAL BACKGROUND

4. On November 7, 2006, InPhonic entered into a Credit Agreement (the "Prepetition Credit Agreement") with a syndicate of lenders led by Goldman Sachs Credit Partners L.P. as Lead Arranger, Lead Bookrunner and Lead Syndicate Agent and Citicorp North America, Inc. as Administrative Agent (collectively, the "Prepetition Lenders"). See Affidavit of Kenneth D. Schwarz, Chief Financial Officer of the Debtors, in Support of First Day Motions and Applications (the "Schwarz Affidavit") at ¶ 11. Under the Prepetition Credit Agreement, InPhonic was the borrower, while each of the other Debtors were guarantors. Id.

5. The Prepetition Credit Agreement provided InPhonic with a term loan of up to $100 million subject to a fixed interest rate of 9%, secured by substantially all of InPhonic's assets. See Schwarz Affidavit at ¶ 12. InPhonic received a $75 million disbursement under the Prepetition Credit Agreement on November 8, 2006. See Schwarz Affidavit at ¶ 14.

6. On August 8, 2007, the Prepetition Credit Agreement was amended (the "Amendment"). See Schwarz Affidavit at ¶ 16. Pursuant to the Amendment, InPhonic received an additional $15 million loan from the Delayed Draw Lender (as that term is defined in the Amendment), bringing the total received from InPhonic to $90 million. Id. The terms of the Amendment also reduced the loan commitment cap of the Prepetition Lenders from $100 million to $90 million. Id.

7. On October 5, 2007, the Debtors were notified that they had defaulted on their obligations under the Prepetition Credit Agreement by, *inter alia*, failing to make payments as they became due. See Schwarz Affidavit at ¶ 17.

8. Around October 5, 2007, the Debtors also engaged the services of GAH, *inter alia*, to find a party to purchase the Debtors' assets. See Debtors' Sale Motion (as defined below) at ¶ 28.

9. After the Debtors had defaulted on their payment obligations under the Prepetition Credit Agreement, Adeptio voluntarily injected itself into the Debtors' financial affairs. On November 2, 2007, the Debtors received another notice informing them that all of the rights, interest and title held by the Prepetition Lenders in the Prepetition Credit Agreement had been assigned to Adeptio. See Schwarz Affidavit at ¶ 18.

10. According to the Debtors, Adeptio made clear that it would only be willing to buy the Debtors' assets through the benefits provided by Section 363 of the Bankruptcy Code (the "Code"). The Debtor succeeded to Adeptio's demand. See Schwarz Affidavit at ¶ 128.

11. On the Petition Date, the Debtors filed a Motion for an Order Pursuant to Section 105(a), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (i) Authorizing the Sale of Substantially all of the Debtors' Assets, (ii) Approving an Asset Purchase Agreement, Subject to Higher and Better Offers, (iii) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Lease and (iv) Granting Related Relief (the "Sale Motion"; D.I. 13). Pursuant to the Sale Motion, the Debtors seek to sell substantially all their assets to Adeptio for a $50 million credit bid, subject (unrealistically) to higher and better offers. See Sale Motion at ¶ 34.

12. On the Petition Date, the Debtors also filed their Motion (i) Authorizing and Approving Postpetition Financing, (ii) Granting Liens and Security Interests and Providing Superpriority Administrative Expense Status, (iii) Authorizing Use of Cash Collateral and Affording Adequate Protection, (iv) Modifying Automatic Stay and (v) Scheduling Final

Hearing (the "DIP Motion"; D.I. 11). Pursuant to the DIP Motion, the Debtors seek $25 million in postpetition financing from Adeptio. See DIP Motion at ¶ 30. The sole purpose of the loan from Adeptio is to cover continuing losses pending the sale to Adeptio.

13. The Debtors also filed the Application, pursuant to which the Debtors seek to employ GAH as an investment banker to locate other bidders to compete with Adeptio. See D.I. 21. In reality, however, there is no reason for GAH's services. GAH supposedly marketed the Debtors' assets prior to the Petition Date. See Debtors' Sale Motion at ¶ 28. No one has ever suggested that the sale of the Debtors' assets will generate proceeds in excess of the $90 million in prepetition secured debt.

## THE COMMITTEE'S OBJECTIONS

14. The Committee objects to the Application of the Debtors to employ GAH because there is no reason for GAH's retention. GAH will not, and no one expects it to, obtain a bid in excess of the face amount (approximately $90 million) of the prepetition secured debt. First of all, GAH already attempted prepetition to locate other bidders, but failed. Secondly, no bidder will pay in excess of the $90 million face amount of Adeptio's claim.

15. Accordingly, as Adeptio is the only party that can hope to receive any real benefit from these bankruptcy cases, neither the estates nor unsecured creditors should bear the expenses associated with hiring GAH.

16. Furthermore, the Committee objects to GAH's retention because the exculpation and indemnification terms provided by the Debtors are inconsistent with decisions of the Third Circuit Court of Appeals, this Court, and the practice in Delaware.

A.  **An Investment Banker is Not Necessary as No Other Companies Will Come Forward to Compete Against Adeptio**

17.  The services of GAH (or any other investment banker for that matter) are not needed as they cannot hope to provide a benefit to the estates. Prior to the Petition Date, the Debtors engaged GAH to, *inter alia*, locate companies interested in submitting an offer for some or all of the Debtors' assets. According to the Debtors, GAH made a good faith effort to locate interested parties. However, while several parties expressed an interest in the Debtors' assets, no party other than Adeptio stepped forward with a bid.

18.  There is no reason to think the results will be different during these bankruptcy cases. The Debtors filed these bankruptcy cases only because Adeptio required it so that it could receive the benefits provided by Section 363 of the Code. There is no other reason for these bankruptcy filings. With less than three (3) weeks before the auction bid deadline and with $90 million in secured claims, GAH will not achieve post-petition what it could not achieve before the Petition Date in October 2007 - locating a competing bid in excess of the secured debt.

B.  **Adeptio is the Only Party Benefiting from these Chapter 11 Cases**

19.  The Debtors filed these Chapter 11 bankruptcy cases only because Adeptio conditioned its offer to purchase the Debtors' assets on the sale taking place through a Section 363 sale.

20.  Shortly before the Petition Date, upon information and belief, Adeptio purchased the $90 million secured claim held by the Prepetition Lenders for a fraction of face value. Adeptio is seeking to purchase the Debtors' assets by credit bidding $50 million of its claim for assets that are worth much less than the secured debt.

21.  Thus, neither the estates nor the Debtors' unsecured creditors are benefiting from these bankruptcy cases. As such, there is no reason for the costs and expenses associated with an

6

investment banker and indeed no reason for these chapter 11 bankruptcy cases as Adeptio is the only party that benefits from it.

22.  Concurrently with the filing of this Objection, the Committee is filing a motion to dismiss these bankruptcy cases because, among other things, Adeptio should be required to bear its own costs to buy the Debtors' assets by exercising its rights of foreclosure. As these costs should not be borne by the estate or the Debtors' unsecured creditors, the Debtors' Application should be denied and the Committee's motion to dismiss these cases should be granted.

C.  <u>The Indemnification and Exculpation Provisions in the Indemnification Letter Are Improper</u>

23.  Attached to the Affidavit of Andrew Torgove in Support of Application for Order Pursuant to 11 U.S.C. 327(a) and 328(a) and Federal Rule of Bankruptcy Procedure 2014 Authorizing Employment and Retention of Goldsmith, Agio, Helms Securities, Inc. as Investment Banker to Debtors in Possession (the "<u>Torgove Affidavit</u>") is a letter dated October 11, 2007 that sets forth proposed indemnification and exculpation provisions in favor of GAH (the "<u>Indemnification Letter</u>"). <u>See</u> Attachment No. 1 to D.I. 21.

24.  Certain of the proposed indemnification and exculpation provisions contained in the Indemnification Letter are improper for the following reasons.

> a.  The Debtors seek to broadly indemnify GAH from its own misconduct, except for losses caused "primarily and directly" with respect to GAH's willful misconduct or gross negligence (which is contrary to the Third Circuit's decision in the <u>United Artists</u> case);
>
> b.  The Debtors propose to indemnify GAH for GAH's breaches of its contract with the Debtors (which is contrary to the Third Circuit's decision in the <u>United Artists</u> case);
>
> c.  The proposed terms of engagement do not require a court determination regarding GAH's conduct before indemnifying GAH where indemnification is sought for a matter that settles before a decision as to GAH's willfulness or gross negligence (which is contrary to accepted practice in Delaware); and

7

d.  The Debtors seek to limit or cap GAH's liability to the return of fees earned by GAH in this case (which is contrary to this Court's letter ruling in the <u>Dailey Internat'l</u> case).

**1.  Improper Limitation of "Primarily and Directly"**

25.  The Debtors propose to indemnify GAH for claims arising from, related to, or in connection with GAH's engagement, except "to the extent Indemnification Claims are finally judicially determined (not subject to review or appeal) to have resulted *primarily and directly* from GAH's gross negligence or willful conduct." <u>See</u> Indemnification Letter at p. 1. (emphasis added).

26.  The Third Circuit has held that limiting non-indemnifiable claims to those relating "solely" to willful misconduct or gross negligence violates public policy. Specifically, the Third Circuit held that:

> . . . Houlihan Lokey attempted to supplement its retention agreement with a provision in the retention application and approving order that in effect mandates indemnification to Houlihan Lokey for even its gross negligence if that negligence is not judicially determined to be "solely" the cause of its damages. In other words, the Debtors would be bound to indemnify Houlihan Lokey when its gross negligence contributed only in part to its damages. This attempted end run goes out of bounds for acceptable public policy.

<u>United Artists Theatre Co. v. Walton (In re United Artists Theatre Co.)</u>, 315 F.3d 217, 234 (3d Cir. 2003).

27.  Accordingly, limiting non-indemnifiable claims to those "primary and directly" related to GAH's gross negligence or willful misconduct should similarly be found to be improper. To the extent that any claim arose in part from GAH's gross negligence or willful misconduct, the Debtors should not indemnify GAH.

8

### 2. Improper Indemnification for Breach of Contract

28. Secondly, GAH should not be indemnified for claims relating to any breach of its contract with the Debtors. That would render illusory GAH's promises in its contract with the Debtors.

29. The Third Circuit has held that a debtor may not indemnify a professional for breaches of its retention agreement with the Debtor. The Court declared that:

> To the extent that Houlihan Lokey seeks indemnity for a contractual dispute in which the Debtors allege the breach of Houlihan Lokey's contractual obligations, this is hardly an indemnity-eligible activity. *See Cochran v. Stifel Fin. Corp.*, No. Civ. A. 17350, 2000 WL 1847676, at *7 (Del. Ch. Dec. 13, 2000), *aff'd in relevant part, rev'd in part on other grounds*, 809 A.2d 555 (Del. 2002)[.]

United Artists, 315 F.3d at 234.

30. Accordingly, the Application should be denied on this basis.

### 3. Improper Indemnification for Settled Claims and Lack of Court Review

31. Thirdly, the Debtors seek to limit the non-indemnifiable claims to those judicially determined in a final order to have resulted from GAH's willful misconduct or gross negligence. The Indemnification Letter provides that the Debtors will indemnify GAH for claims arising from, related to, or in connection with GAH's engagement, except "to the extent Indemnification Claims are finally judicially determined" to have arisen from GAH's willful misconduct or gross negligence. See Indemnification Letter at p. 1.

32. This would require the Debtors to indemnify GAH for willful misconduct or gross negligence simply because the estates, GAH, and other parties decide to settle litigation to avoid a judgment. That is improper and against public policy.

### 4. The Exculpation Provision is also Unreasonable

33. The Debtors' purported agreement to limit GAH's liability to the amount of fees earned by GAH is also impermissible. See Indemnification Letter at p. 1. The Indemnification Letter provides "[i]f Company Claims are asserted, GAH's liability shall be limited to the amount of any fee received by GAH pursuant to its engagement." Id. The Indemnification Letter further provides that "the Company agrees to make contributions to any Indemnification Claims paid or payable such that GAH will not be liable for more than the fee received by GAH pursuant to the engagement." See Indemnification Letter at p. 2.

34. This Court has specifically rejected such exculpation provisions in In re Dailey International, Inc., Case No. 99-1233 (PJW), Letter Ruling (Bankr. D. Del. July 1, 1999) (Walsh, J.).[2] In Dailey, the agreement between the debtors in possession and the proposed financial advisor, Ernst & Young, provided that the advisor's liability "shall be limited to the fees paid" to Ernst & Young. Id. at 3. Analogizing the proposed damage limitation provisions to the all-encompassing damage limitation provisions utilized by photo film developers, this Court refused to approve the exculpation provisions as "inappropriate in the arena of professional services." Id. at 12. This Court recognized that it was "patently clear" under sections 327 and 328 that "sophisticated parties are not entitled to dictate the terms and conditions of the engagement of professionals." Id. at 13. This Court concluded that there was "no benefit to the administration of reorganization cases resulting from the adoption of such provisions." Id. at 15.

35. The same is true in these cases. It is patently clear that there is no benefit to the estates in limiting GAH's potential liability to the fees paid to GAH for providing services in

---

2  This Court's letter ruling in Dailey Internat'l is attached as Exhibit A.

10

these cases, particularly where GAH will only be liable for actions or omissions for which the Debtors may not indemnify GAH.

WHEREFORE, for all the reasons listed in this Objection, the Committee respectfully requests that this Court deny the Application and grant such further relief as is appropriate.

Dated: November 21, 2007  
Wilmington, Delaware

Respectfully submitted,

REED SMITH LLP

By: /s/ Gaston P. Loomis
    Kurt F. Gwynne (No. 3951)  
    Gaston P. Loomis (No. 4812)  
    1201 N. Market Street, Suite 1500  
    Wilmington, DE 19801  
    Telephone: (302) 778-7500  
    Facsimile: (302) 778-7575  
    E-mail: kgwynne@reedsmith.com  
           gloomis@reedsmith.com

and

Robert P. Simons, Esquire  
435 Sixth Avenue  
Pittsburgh, PA 15219  
Telephone: (412) 288-3131  
Facsimile: (412) 288-3063  
E-mail: rsimons@reedsmith.com

and

Claudia Z. Springer, Esquire  
2500 One Liberty Place  
1650 Market Street  
Philadelphia, PA 19103-7301  
Telephone: 215-851-8100  
Facsimile: 215-851-1420  
E-mail: cspringer@reedsmith.com

Proposed Counsel to the Official Committee of Unsecured Creditors