## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| INPHONIC, INC., *et al.,* | : | Case No. 07-11666 (KG) |
|  | : | Jointly Administered |
| Debtors. | : | Re: Docket No. 11 and 55 |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO THE DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING AND APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND SECURITY INTERESTS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) AUTHORIZING USE OF CASH COLLATERAL AND AFFORDING ADEQUATE PROTECTION; (IV) MODIFYING AUTOMATIC STAY; AND (V) SCHEDULING FINAL HEARING, PURSUANT TO SECTIONS 105, 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002 AND 4001 (C) AND (D)**

The Official Committee of Unsecured Creditors (the "Committee"), by its undersigned

counsel[1] files this Objection to the Debtors'[2] Motion for Entry of Interim and Final Orders

(I) Authorizing and Approving Post-Petition Financing; (II) Granting Liens and Security

Interests and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of

Cash Collateral and Affording Adequate Protection; (IV) Modifying Automatic Stay; and

(V) Scheduling Final Hearing Pursuant to Section 105, 361, 362, 363 and 364 of the Bankruptcy

---

1    At the Organizational Meeting (hereinafter defined), the Committee selected Reed Smith LLP ("Reed Smith") as its counsel. The Committee will be filing an application to approve the engagement of Reed Smith in the near future.

2    The Debtors and the last four digits of each of the Debtors' federal tax identification numbers are as follows: (a) InPhonic, Inc., a Delaware corporation, Fed. Tax Id. No. 9384; (b) CAIS Acquisition, LLC, a Delaware limited liability company, Fed Tax Id No. 6257 (c) CAIS Acquisition II, LLC, a Delaware limited liability company, Fed. Tax Id No. 3695; (d) SimIPC Acquisition Corp., a Delaware corporation, Fed Tax Id. 4924; (e) Star Number, Inc., a Delaware corporation, Fed Tax Id. No. 5549; (f) Mobile Technology Services, LLC, a Delaware limited liability company, Fed. Tax Id. No.1426; (g) FON Acquisition, LLC, a Delaware limited liability company, Fed Tax Id. No. 2807; and (h) 1010 Interactive, LLC, a Delaware limited liability company, Fed. Tax Id. No. 5391.

Code and Federal Rules of Bankruptcy Procedure 2002 and 4001 (C) and (D) (the "DIP Financing Motion"; D.I. 11)[3], upon the grounds set forth herein below, and represents as follows:

## JURISDICTION AND VENUE

1.    The Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

## FACTUAL BACKGROUND

2.    On November 8, 2007 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "Code").  Pursuant to an Order of this Court dated November 9, 2007, the Debtors' Chapter 11 cases were consolidated for procedural purposes only pursuant to Fed. R. Bankr. P. 1015.

3.    The Debtors are continuing in possession of their respective properties and are operating and managing their businesses as debtors in possession, pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

4.    On or about November 16, 2007, the United States Trustee held an organizational meeting of the largest unsecured creditors in these cases (the "Organizational Meeting").  At the Organizational Meeting, the United States Trustee appointed the following creditors to the Committee pursuant to § 1103 of the Bankruptcy Code:  Yahoo!, Inc., Infinite Computer Solutions, Inc., ACN,  Google, Inc., and JBR Media Ventures, LLC (collectively, the "Committee").

---

3    Every capitalized term contained herein without a definition shall have the definition contained in the DIP Financing Motion.

5.      Prior to the inception of these chapter 11 cases (the "Cases"), the Debtors were indebted to Goldman Sachs Credit Partners, L.P., as Lead Arranger, Lead Bookrunner and Lead Syndication Agent and Citicorp North America, Inc., as Administrative Agent and various other lenders (collectively, the "Prior Lenders") in the approximate amount of $90 million under a certain Credit Agreement (the "Prepetition Credit Agreement") dated November 7, 2006.  The outstanding loans and obligations of the Debtors under the Prepetition Credit Agreement (the "Prepetition Loans") were allegedly secured by liens on and security interests in virtually all of the Debtors' assets.

6.      On November 2, 2007, the Prior Lenders assigned all of their right, title and interest in and to the Prepetition Credit Agreement and the documents related thereto (collectively, the "Prepetition Credit Documents") and in the Prepetition Loans to Versa Capital Management, Inc., the parent of the DIP Lender ("Versa").  According to the DIP Financing Motion, the DIP Lender is also the assignee and successor in interest to the Prior Lenders (in its role as assignee of the Prior Lenders, Versa or its subsidiary, Adeptio INPC Funding, LLC ("Adeptio") is sometimes referred to as the "Prepetition Lender").

7.      On the Petition Date, the Debtors filed a series of "first day motions" including the DIP Financing Motion, pursuant to which they sought to borrow, on both a secured and superpriority administrative expense basis, $25 million from the DIP Lender and pursuant to which they sought the use of the Prepetition Lender's cash collateral (the "Cash Collateral").  On November 9, 2007, the Court entered an Order approving interim debtor-in-possession financing of up to $10 million to be provided by the DIP Lender on both a secured and superpriority administrative expense basis.  In that same Order (the "Interim DIP Order"; D.I. 55), the Court

also approved the Debtors' use of Cash Collateral pursuant to a budget which was attached as an exhibit to the proposed form of interim DIP financing order (the "Proposed Interim Order").

8.      On the Petition Date, the Debtors also filed a Motion for Order (I) Approving Bid Procedures Relating to Sale of Substantially All of the Debtors' Assets; (II) Scheduling a Hearing to Consider the Sale and Approving the Form and Manner of Notices; (III) Establishing Procedures Relating to Assumption and Assignment of Certain Contracts, Including Notice of Proposed Cure Amounts, (IV) Approving Expense Reimbursement Provision, and (V) Granting Related Relief (the "Bid Procedures Motion"; D.I. 12). Under the Bid Procedures Motion, the Debtors request, *inter alia*, that Adeptio be accorded the status of "stalking horse bidder" for the Debtors' assets, and that it receive a number of bid protections and advantages that are often provided to stalking horse bidders in connection with Section 363 sales. On November 9, 2007, before the formation of the Committee, the Court entered an Order approving the Bid Procedures Motion and establishing various bidding procedures with respect to a sale of the Debtors' businesses and assets (the "Bid Procedures Order"; D.I. 52).

9.      Heretofore the Committee filed a motion seeking a reconsideration of the Bid Procedures Order (D.I .102) and a Motion to Dismiss the Debtors' Chapter 11 Cases (the "Motion to Dismiss"; D.I. 86). When evaluating the DIP Financing Motion and the requests made therein for various protections to be accorded to Adeptio as DIP Lender and Prepetition Lender, it is critical to bear in mind all of the different hats that Adeptio wears in these chapter 11 cases and whether any of these protections are necessary under the circumstances. The Committee contends that they are not warranted. Adeptio is the Prepetition Lender, having acquired the rights and interests of the Prior Lenders under the Prepetition Credit Documents earlier this month. Adeptio is seeking to buy the assets of the Debtors and was given the status of

stalking horse bidder with respect to an upcoming Section 363 sale. And Adeptio is the DIP

Lender, offering to make additional loans to the Debtors ostensibly for the benefit of the

Debtors' estates, but in truth, solely for the purpose of keeping the Debtors' businesses intact so

that Adeptio can acquire them at the upcoming Section 363 sale scheduled to occur in early

December, 2007.

   10.  It is glaringly obvious that these Cases were filed solely for the benefit of Adeptio

so that Adeptio can quickly purchase the Debtors' assets free and clear of liens, claims and

encumbrances. While these actions, in and of itself, may not be violative of the spirit of the

Bankruptcy Code, these Cases offer absolutely no recovery or hope of recovery to the unsecured

creditors. Thus, there is no reason for these cases to be. Presumably, if Adeptio holds valid liens

it can foreclose on its liens outside of a chapter 11, and obtain ownership of the assets through a

state court foreclosure. This Court should not permit a secured lender who has purchased

secured debt for the sole purpose of ultimately acquiring a debtor's business to use the chapter 11

process in order to achieve its goals, unless such creditor also makes provision to assure that the

chapter 11 case will be brought to a conclusion and unsecured creditors will receive a

meaningful recovery.

   11.  While the Debtors argue that the protections they request on behalf of Adeptio are

fairly customary for DIP Lenders and benefit these estates as a whole, these statements are

disingenuous. These chapter 11 cases will be of no benefit to the unsecured creditors if the DIP

Financing Motion is granted and the cases are permitted to proceed in the manner proposed by

the Debtors and the DIP Lender. These cases have been carefully orchestrated to achieve one

goal: the conveyance, as expeditiously and seamlessly as possible, of those assets of the Debtors

that Adeptio desires to acquire, free and clear of liens, claims and encumbrances so that Adeptio

can continue to operate the Debtors' businesses without the threat of future litigation or claims, with minimal additional expense, and free from the burden of undesirable executory contracts and leases. Adeptio, as the prospective purchaser, desires all of the benefits and protections available to a purchaser under Sections 363 and 365 of the Bankruptcy Code, while Adeptio, in its role as DIP Lender and as Prepetition Lender, are seemingly unwilling to make funds available so that the Debtors are able to fund the costs of administration of the Cases, and allow for a meaningful creditor recovery.

12.    In these cases, there is little or no chance of another party making a competing bid for the Debtors' assets, given the magnitude of Adeptio's alleged prepetition secured claim and its request to be able to credit bid up to the limit of that claim. Even if another party were to submit a competing bid, its bid would prevail only if Adeptio, as Prepetition Lender holding an alleged lien on all of the Debtors' assets, elected to "sell" the assets to the competing bidder, rather than take ownership of the assets by increasing its bid. It is extremely unlikely that any bidder will come forth with a bid sufficient to satisfy the Prepetition Obligations and the DIP Loan. Given Adeptio's various roles in these cases, and the fact that it has offered not a crumb to unsecured creditors, it should not be accorded most of the protections and other benefits requested in the DIP Financing Motion, even if those protections are otherwise "customary" and "reasonable." The fact is, if these cases are not dismissed, Adeptio has no choice but to make the DIP Loan available to the Debtors so that the Debtors can remain viable until the Section 363 sale closes. Nothing, not even the potential proceeds from various potential claims or causes of action, has been reserved to pay unsecured creditors who, as a group, advanced over $60 million in services and supplies to the Debtors' operations prepetition.

13.     Thus, from the unsecured creditors' vantage point, there is no reason to keep these cases in chapter 11 unless the DIP Lender is willing to make the DIP Loans on terms which are fair, reasonable and have, at a minimum, the potential to afford a meaningful recovery to the holders of unsecured claims, (exclusive of the deficiency claim of the Prepetition Lender or the DIP Lender and intercompany claims).

## SUMMARY OF OBJECTIONS

14.     The Debtors are seeking approval at the final hearing on the DIP Financing Motion of up to an additional $15 million of secured financing (the $15 million together with the $10 million already advanced under the interim DIP Order (the "Interim Order"; D.I. 55) (hereinafter called the "DIP Loan") from the DIP Lender, the proceeds of which will be used to fund the Debtors' operations through the month of December, 2007, a period of time less than six (6) weeks. The Debtors maintain that this funding is required so that they can pursue the Proposed Sale and without it, their estates would be "irreparably harmed." While the Debtors may require additional financing to keep their businesses afloat, the beneficiary of the DIP Loan is Adeptio, inasmuch as Adeptio plans to purchase the Debtors' businesses at a Section 363 sale in December. The DIP financing is limited in duration because it is designed only to afford the parties sufficient time to hold and close the Proposed Sale, a sale which, as currently conceived, will benefit no creditor of these estates other than Adeptio. The Committee opposes the DIP Financing Motion and the making of the DIP Loan on a number of grounds, including, without limitation, that the DIP Loan and the DIP Budget fail to cover the costs of the chapter 11 cases as a whole, including, without limitation, the cost of funding a chapter 11 liquidating plan and fail to provide for a recovery or potential recovery for unsecured creditors.

15.     The DIP Budget commences during the week of November 12th and ends on December 31, 2007. In the DIP Financing Motion, the Debtors have agreed to use the DIP Facility and the Cash Collateral only to fund expenses in accordance with the DIP Budget. The Committee and its newly hired professionals have not been afforded a meaningful opportunity to study the DIP Budget to make sure that it meets the Debtors' ongoing funding needs. It is apparent from the duration of the DIP Budget, however, that it fails to cover the costs associated with concluding these chapter 11 cases with a chapter 11 plan in that it will be virtually impossible to file and confirm a plan, even a plan of liquidation by December 31, 2007. Since there is no funding mechanism beyond December 31, 2007 and since the Proposed Sale is scheduled to close on or prior to December 24, 2007, it is highly likely that if the DIP Financing Motion is approved in it current form, these cases will convert to a chapter 7 immediately after the Proposed Sale is concluded. While the Debtors and the DIP Lender seek to move these cases along at lightning speed, as a *quid pro quo* to taking advantage of the chapter 11 process the DIP Lender should be compelled to lend sufficient funds so that the case can be concluded via the filing and confirmation of a chapter 11 plan, provided that the filing and confirmation process occur within a reasonable time frame (six months). The Committee is committed to doing its part not to unnecessarily delay the progress of these chapter 11 cases, so long as the DIP Lender commits to fund the Debtors' operations through the chapter 11 process (including the funding of the plan process) and provides an opportunity for the unsecured creditors to derive a meaningful recovery in these chapter 11 cases.

16.     The terms of the proposed DIP loans in these cases raise fundamental questions of fairness. For example, given the role of the DIP Lender as Proposed Purchaser, why should the DIP Lender receive certain protections in connection with the DIP Facility such as a waiver of

Section 506 (c) and releases prior to the confirmation of a chapter 11 plan? There is little doubt that the DIP Lender would make the DIP Facility available to the Debtors even absent these protections, given its desire to acquire the Debtors' businesses intact. These entire chapter 11 cases are being driven by the best interests of the DIP Lender/Proposed Purchaser. Therefore, some of the protections that would ordinarily be bestowed on a DIP lender are not appropriate or necessary in these cases where the entirety of the cases are benefitting no one other than the DIP Lender, and where the unsecured creditors may actually be better off by having the Cases dismissed.

      17.    In addition to the foregoing, the Committee asserts that the following terms of the DIP Financing Order are objectionable and should be revised or removed, as the case may be:

      a.    The fees being charged in connection with the DIP Facility are excessive and unnecessary given the circumstances of these cases. Because the DIP Lender desires to purchase the Debtors' assets in a Section 363 sale, and the sale is scheduled to occur in mid-December, it has no choice but to make the DIP Facility available to the Debtors given the fact that the Debtors are continuing to hemorrhage cash and will likely not survive on Cash Collateral alone. It is unlikely that trade creditors will extend credit to the Debtors during the chapter 11 cases and the DIP Budget indicates that the Debtors will be operating at a loss during the next six weeks. The only source for additional funding is the DIP Lender, given that all of the Debtors' assets are subject to liens and security interests. If those liens and security interests are valid and perfected, it is likely that the Prepetition Obligations are significantly undersecured. The DIP Lender must have known of the Debtors' dire cash needs prior to purchasing the Prior Lenders' interest in the Prepetition Obligations in early November, 2007 and likely anticipated those needs when determining the amount it was willing to pay to assume the Prior Lenders' position. There is no reason to burden the Debtors' estate with these fees, nor should the Prepetition Lender's

and DIP Lender's deficiency claims, if any, be supplemented because as the deficiency claims of the Prepetition Lender and DIP Lender increase, the possibility of any recovery by unsecured creditors becomes even more remote;

      c.     There should be no release given to the Prior Lenders. They are not benefiting the estates in the least and should not receive the benefit of any release;

      d.     The Committee requires and it is customary to provide more than twenty five (25) days to review the prepetition credit facility and the facts surrounding the acquisition by the Prepetition Lender of the Prepetition Obligations so as to determine whether there exist any claims or causes of action against the Prepetition Lender. Twenty-five days is far too short, given that a sale process is underway and the Committee's efforts should be focused on other more exigent matters. Sixty to ninety days is standard for this type of review, and that assumes full and complete cooperation of the Debtors and the Prepetition Lender. There should be no restriction or limitation regarding the investigation of claims pertaining to the actions of the Prior Lenders;

      e.     The DIP Lender should not obtain a lien on or security interest in Avoidance Actions and should not be able to use the proceeds from Avoidance Actions to satisfy its superpriority administrative expense claim, if any. There will inevitably be a diminution in the value of the Cash Collateral, given the ongoing losses that are predicted to occur with respect to the Debtors' operations during the first two months of these cases. The Avoidance Actions should not be used as security for such diminution given the fact that it is the choice of the DIP Lender/Prepetition Lender to acquire the Debtors' assets through a Section 363 sale (rather than through a foreclosure sale), and the Section 363 Order will benefit no party other than Adeptio. Therefore, the DIP Lender should fund any diminution in Cash Collateral which occurs as a

result of the Debtors continuing to operate in a chapter 11 prior to such sale without looking to Avoidance Actions to cover the shortfall;

      f.      The term of the DIP Facility should be long enough so as to afford the Debtors or the creditors the ability to file and attempt to confirm a chapter 11 plan.  If the DIP Lender wants these Cases to remain in chapter 11 for purposes of selling the assets through a Section 363 sale, it should have to "pay to play", which means paying for the administrative expenses of the chapter 11 to the extent they are allowed and assuring unsecured creditors of a recovery;

      g.      The 506 (c) waiver is unreasonable and not necessary in these cases for the reasons set forth above;

      h.      Many of the Events of Default are unreasonable including the following: (i) the Material Adverse Change provision; (ii) the Change of Control provision; and (iii) the failure of the Debtors to meet the Sale Milestones which are extremely aggressive.  In addition, any other terms or conditions contained in the Senior Secured, Super-Priority Debtor-in-Possession Credit and Guaranty Agreement dated as of November 9, 2007 between InPhonic, Inc., as Borrower, the Guarantors Party Hereto and Adeptio INPC Funding, LLC as Lender (the "DIP Credit Agreement") that are inconsistent with the Chapter 11 Cases or which would cause an Event of Default as a result of the Debtors' financial condition or deteriorating business should not be enforceable;

      i.      The provision granting the DIP Lender immediate relief from the automatic stay should not be permitted. If the DIP Lender wants an expedited hearing regarding relief from the automatic stay, that should be sufficient.  There should be no ability on the part of the DIP Lender, following an Event of Default, to exercise any remedies other than to cease making loans under the DIP Facility, absent obtaining relief from the automatic stay;

j.      There should be no ability on the part of the DIP Lender to amend or

modify the DIP Credit Agreement or any other DIP Facility Document without the consent of the

Committee, unless such amendment is of a nonmaterial nature; and

k.      The terms of a Final DIP Order should supercede the Interim DIP Order.

## LEGAL ARGUMENT

18.     The facts of these cases are strikingly similar to the case of <u>In re Duro Industries,</u>

<u>Inc.,</u> 2004 Bankr. Lexis 1235 (Bankr. Mass. 2004).  In <u>Duro</u>, the court vacated a consensual DIP

financing agreement and dismissed the bankruptcy case because the lender had attempted to use

the bankruptcy process for its own purposes, to the complete exclusion of the estate's unsecured

creditors.  <u>Id.</u>  As in these cases, the <u>Duro</u> case was motivated solely by the secured creditor's

desire to have the debtor sold quickly as a going concern.

19.     In <u>Duro</u>, the prepetition secured creditor and the DIP lender were the same party,

and it appeared likely from the start of the chapter 11 case that there would be little or no value

in the case for unsecured creditors.  <u>Id.</u> at *1-*2.  The <u>Duro</u> DIP financing agreement was ninety

days in duration, and provided for an early termination if the debtor failed to file a motion to sell

virtually all of its assets within forty-five days of the petition date.  <u>Id.</u> at *2.  The Court observed

that it was "clear that the entire purpose of the Chapter 11 case was to effect a § 363 sale of the

Debtor as a going concern, and to complete that sale in very short order."  <u>Id.</u> at *5.  Like this

case, the rationale for a quick sale was that the debtor in <u>Duro</u> was continuing to lose money and

was actually projected to lose an additional $3.7 million during the initial ninety day period

following the petition date.

20.     The creditors committee in <u>Duro</u> initially raised objections to the financing

agreement virtually identical to the Committee's objections in these cases.  <u>See id.</u> at *7-*8.  In

that case, as in this one, the DIP lender wore a number of "hats" including that of controlling

shareholder in the debtor, prepetition secured lender, DIP lender and potential purchaser.  In that case, as in this one, the goal of the chapter 11 was to move the debtor's assets quickly through a section 363 sale and to have a seamless transition of ownership of those assets to the lender.  At the final hearing on the financing motion, the committee and the DIP lender reached an agreement, whereby the committee agreed to withdraw its objections to the proposed DIP financing based upon what it thought was a deal that would potentially yield a dividend to the unsecured creditors.  Id. at *8.  The settlement involved giving the unsecured creditors a small carve-out from the sale proceeds, the proceeds from certain litigation and a percentage of the sale proceeds that exceeded a designated threshold.  Id.  According to the Court, this settlement was instrumental in giving the bankruptcy case a purpose because the unsecured creditors had a stake in the outcome of the Section 363 sale.  Id. at *8-*9.

21.     Ultimately, however, the Duro committee sought to vacate the DIP financing order when it became apparent that the debtor and DIP lender were doing nothing to market the assets so as to attempt to drive up the sale price and ultimately yield a return for unsecured creditors.  Id. at *9.  The committee accused the DIP lender and the debtor of misrepresenting their intentions and of false pretenses, which the committee had relied upon to its detriment.  Id. at *10.  The Committee contended that the DIP lender, which was also the controlling shareholder of the debtor, "was intent on using the Debtor and the bankruptcy process simply to obtain full title to the business and its assets for itself free and clear of liens and of $23 million in trade debt." Id.

22.     The court ultimately agreed with the committee and vacated the DIP financing order.  The court stated that "where there is no equity in the assets for the estate, the sale that the Lender contemplates should not be permitted to occur in bankruptcy *unless the Lender guarantees a meaningful dividend for unsecured creditors*.  Id. at *16 (emphasis added).  The

court added that "[w]here all equity in a debtor's assets belongs to the secured creditor, with no appreciable expectation of a remainder for unsecured creditors, the liquidation of the assets serves no bankruptcy purpose and should not be permitted to occur in bankruptcy." Id.

23.    As the court pointed out in Duro, there must be a purpose to a chapter 11 case which goes beyond lining the pocket of the secured lender. When the unsecured creditors appeared to have an opportunity to obtain some value in the case, the chapter 11 case had a reason for being.  When no effort was made to create value for anyone other than the secured creditor, the Court determined that the chapter 11 case should be dismissed. Id. at *17.  In these cases, there is no purpose to the Cases beyond helping the secured creditor obtain full title to the Debtors' assets at the expense of the unsecureds.

24.    Thus, the relief sought in the DIP Financing Motion should be denied unless there is a realistic potential for a meaningful recovery by the unsecured creditors in these cases.

25.    The DIP Lender's actions also call into question whether it is acting in good faith. Where a § 363 sale is concerned, "[g]ood faith requires fair effort; and use of the bankruptcy process requires adherence to bankruptcy standards for conducting sales." Id. at *18. The Duro court suggests that the good faith standard, even absent an agreement, would require a "fair marketing effort." Id. at *17-*18. The Committee posits that good faith ought to include an intention to complete a chapter 11 case with a plan, and not simply conduct business until a quick Section 363 sale has been concluded.

26.    The DIP Lender's multiple roles in these cases and its efforts to use the bankruptcy process solely and exclusively for its own advantage demonstrate a lack of good faith on its part.  There is no value being made available to the unsecured creditors, nor is there any attempt or intent to create or preserve value for the unsecured creditors.  Thus, the DIP lender should not be able to take advantage of protections afforded by the Bankruptcy Code which

should be reserved for those DIP lenders that exhibit good faith during the bankruptcy process. Section 364(e) of the Bankruptcy Code provides that an entity that extends credit to a debtor "in good faith" is protected from the reversal or modification on appeal of the Debtor's authorization to obtain credit or incur debt, or of a grant of a priority or a lien under Section 364 of the Bankruptcy Code. 11 U.S.C. § 364(e). While the Bankruptcy Code does not define "good faith", see Unsecured Creditors' Committee v. First Nat'l Bank & Trust Co. of Escanaba, 488 U.S. 817 (1988); Unsecured Creditors Committee v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.), 834 F.2d 599, 605 (6th Cir. 1987), cert. denied sub nom; Burchinal v. Central Washington Bank (In re Adams Apple, Inc.), 829 F.2d 1484, 1489 (9th Cir. 1987), some courts employ the definition of "good faith" contained in UCC § 1-201(19): "Good faith means honesty in fact in the conduct of the transaction concerned", see, e.g., In re Ellingsen MacLean Oil Co., 834 F.2d at 605. Other courts consider "the integrity of the actor's conduct during the proceedings" or the presence of "fraud, collusion . . . or an attempt to take gross unfair advantage of others." See, e.g., In re Adams Apple, Inc., 829 F.2d at 1489.

    27.    Adeptio's position as the DIP Lender, sole prepetition secured lender, and stalking horse potential purchaser of assets under the Proposed Sale, and its thinly veiled attempt to use the entire bankruptcy process to its own benefit, tend to show that Adeptio is not acting in good faith. Thus, Adeptio should not be entitled to the protections of section 364(e) of the Bankruptcy Code. Although the early stages of the chapter 11 cases make it difficult to conclusively determine whether Adeptio is acting in good faith, Adeptio should be precluded from taking advantage of protections under the Bankruptcy Code that should be reserved for those who exercise good faith.

28.     While balancing the needs of the Debtors and affording deference to the Debtors'

business judgment, the court must refuse to approve financing where the purpose of the

financing is to benefit one creditor rather than the estate.  In re Aqua Assocs., 123 B.R. 192, 196

(Bankr. E.D. Pa. 1991) ("credit should not be approved when it is sought for the primary benefit

of a party other than the debtor").

29.     Here, the proposed amount of financing and the terms prescribing of the DIP

Financing are unreasonable, designed to benefit only the DIP Lender, not the estates, and the

entire process is being orchestrated at the expense of the estates' other creditors.

30.     "The purpose of § 364(d) is to promote a reorganization of the enterprise.  By

allowing an infusion of new debt, it seeks to facilitate a plan that will inure to the benefit of all

creditors and the estate.  While 364(d) only requires that the interest of the existing secured

creditor be protected, it is not unmindful of the interests of the other creditors. . . ."  In re Stoney

Creek Techs., LLC, 364 B.R. 882, 895 (Bankr. E.D. Pa. 2007).  The purpose of allowing post-

petition funding under section 364, is not to simply benefit the DIP Lender, or to carry the

Debtors through a § 363 sale so that they then convert to a chapter 7.  Similarly, section 363 is

designed to benefit the estate, and in particular, unsecured creditors of the Debtor; it is not

available as a means for the DIP Lender to obtain assets while simultaneously eliminating debts,

while conferring no benefit on the estate.  The availability of certain protections under the

Bankruptcy Code, including a 506(c) waiver, certain acknowledgements, and the ability to assert

a diminution claim against proceeds of avoidance actions, should not, under the circumstances,

be extended to Adeptio.  These protections, are designed to protect the DIP Lender who actually

incurs some risk in making a post-petition loan where no other financing is available, and should

not be available solely for the benefit of the secured creditor whose only intention is to further

line its own pockets at the expense of the other creditors by purchasing the Debtors' assets free and clear of all debt, liens, and encumbrances.

## RESERVATION OF RIGHTS

31.     The Committee reserves all of its rights to object to any and all other provisions of any such revised document.

## CONCLUSION

32.     For all of the above-stated reasons, the Committee respectfully requests that the Bankruptcy Court deny the Motion and grant the Committee such other and further relief as is just and equitable.

Dated: November 21, 2007                          Respectfully submitted,
    Wilmington, Delaware

                                                REED SMITH LLP

                        By:  /s/ Kurt F. Gwynne
                            Kurt F. Gwynne (No. 3951)
                            1201 N. Market Street, Suite 1500
                            Wilmington, DE 19801
                            Telephone: (302) 778-7500
                            Facsimile: (302) 778-7575

                                  and

                            Robert P. Simons, Esquire
                            435 Sixth Avenue
                            Pittsburgh, PA 15219
                            Telephone:  (412) 288-3131
                            Facsimile:  (412) 288-3063

                                  and

                            Claudia Z. Springer, Esquire
                            2500 One Liberty Place
                            1650 Market Street
                            Philadelphia, PA 19103-7301
                            Telephone: 215-851-8100
                            Facsimile: 215-851-1420

                            Proposed Counsel to the Official
                            Committee of Unsecured Creditors