IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| INPHONIC, INC., et al.,[1] | : Case No. 07-11666 (KG) |
| | : |
| Debtors. | : Jointly Administered |
| | : |
| | : **Hearing Date: Nov. 30, 2007 at 3:00 p.m.** |
| | : **Objection Deadline: Nov. 28, 2007 at 10:00 a.m.** |

**DEBTORS' OBJECTION TO MOTION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS FOR AN ORDER (I) DISMISSING (OR CONVERTING)
DEBTORS' BANKRUPTCY CASES PURSUANT TO SECTION 1112(B) OF THE
BANKRUPTCY CODE OR, ALTERNATIVELY, (II) COMPELLING THE TRUSTEE
TO ABANDON FULLY-ENCUMBERED ESTATE PROPERTY PURSUANT TO
SECTION 554(B) OF THE BANKRUPTCY CODE**

The above-captioned debtors and debtors in possession (the "Debtors"), by and through

their undersigned proposed counsel, file this objection (the "Objection") to the Motion of the

Official Committee of Unsecured Creditors for an Order (I) Dismissing (or Converting) Debtors'

Bankruptcy Cases Pursuant to Section 1112(b) of the Bankruptcy Code or, alternatively, (II)

Compelling the Trustee to Abandon Fully-Encumbered Estate Property Pursuant to Section

554(b) of the Bankruptcy Code, dated November 21, 2007 (the "Motion to Dismiss"). In support

of this Objection, the Debtors respectfully state as follows:

---

[1] The Debtors and the last four digits of each Debtors' federal tax identification numbers are: (a) InPhonic, Inc., a Delaware corporation, Fed. Tax Id. No. 9384; (b) CAIS Acquisition, LLC, a Delaware limited liability company, Fed. Tax Id. No. 6257; (c) CAIS Acquisition II, LLC, a Delaware limited liability company, Fed. Tax Id. No. 3695; (d) SimIPC Acquisition Corp., a Delaware corporation, Fed. Tax Id. No. 4924; (e) Star Number, Inc., a Delaware corporation, Fed. Tax Id. No. 5549; (f) Mobile Technology Services, LLC, a Delaware limited liability company, Fed. Tax Id. No. 1426; (g) FON Acquisition, LLC, a Delaware limited liability company, Fed. Tax Id. No. 2807; and (h) 1010 Interactive, LLC, a Delaware limited liability company, Fed. Tax Id. No. 5391.

## PRELIMINARY STATEMENT

The Motion to Dismiss filed by the Official Committee of Unsecured Creditors (the "Committee") is an attempt at derailing the only economically feasible resolution of the Debtors' current financial predicament.  The Committee does not allege that the Debtors' chosen course of action is unreasonable or that a different course is more appropriate.  Rather, because the unsecured creditors feel that appropriate provisions have not been made for them, they would rather cause economic harm to the Debtors' enterprises, employees, executory contract parties, secured creditors, then permit the Debtors to remain in Chapter 11.  This "dog in the manger" approach is particularly puzzling since the committee has yet to articulate what it is they should or wish to get.

Although it is true that the Debtors are losing money at the rate of approximately $3.2 million per week, the Debtors have put forth a financing structure and sale transaction which allows the Debtors to continue operations through a sale, resolve in excess of $50 million in secured claims, pay all administrative claims, and pay an as of yet undetermined amount of unsecured cure claims, all without prejudicing the rights of unsecured creditors.  At the same time, the Debtors have preserved significant assets for the estate and remain able to propose and confirm a liquidating plan after a sale is consummated.  The Committee's Motion is simply an attempt to extort a payment from the assets being sold by a group with no economic interest in those assets.  Thus, the Committee's Motion to Dismiss is devoid of factual or legal support.

## BACKGROUND

1.     On November 8, 2007 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

2.      The Debtors continued to possess their property and to manage their business as debtors in possession pursuant to Bankruptcy Code Sections 1107(a) and 1108.

3.      No trustee or examiner has been appointed in any of the Debtors' Chapter 11 cases. On November 16, 2007, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee").

4.      On the Petition Date, the Debtors filed the following first day motions, among others:

a.      Motion for Entry of Interim and Final Orders: (I) Authorizing and Approving Postpetition Financing; (II) Granting Liens, and Security Interests and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of Cash Collateral and Affording Adequate Protection; (IV) Modifying Automatic Stay; and (V) Scheduling Final Hearing, Pursuant to Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002 and 4001 (c) and (d) (the "DIP Motion");

b.      Motion of the Debtors for an Order Pursuant to Sections 105(a), 363, and 365 of the Bankruptcy Code and Rules 2002, 6004, and 9014 of the Federal Rules of Bankruptcy Procedures: (I) Authorizing the Sale of Substantially All of Their Assets; (II) Approving an Asset Purchase Agreement, Subject to Higher and Better Offers; (III) Approving the Assumption and Assignment of Certain Executory Contracts, and Unexpired Leases; and (IV) Granting Related Relief (the "Sale Motion").

5.      On November 9, 2007, the Bankruptcy Court entered the Interim Order:    (I) Authorizing and Approving Postpetition Financing; (II) Granting Liens, and Security Interests and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of Cash Collateral and Affording Adequate Protection; (IV) Modifying Automatic Stay; and (V) Scheduling Final Hearing, Pursuant to Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002 and 4001 (c) and (d) (the "Interim DIP Order").

6.    The DIP Motion provides the Debtors with sufficient financing to operate their business through the sale.  The DIP and proposed sale also provides for Adeptio's payment of $1.2 million in professional fees.

7.    Pursuant to the Sale Motion, secured creditors have agreed to credit bid $50 million to purchase the Debtors' operating assets.  In addition, Adeptio will pay all cure costs, all postpetition payables and the DIP balance will be satisfied by the sale.

8.    On November 21, 2007, the Committee filed the Motion to Dismiss.

## OBJECTION AND REPLY

9.    The Committee's Motion to Dismiss should be denied.

## I.    THE COURT SHOULD NOT DISMISS THE DEBTORS' BANKRUPTCY CASES FOR "CAUSE" UNDER SECTION 1112(B)(4)(A) OF THE BANKRUPTCY CODE

10.    As demonstrated herein, and as will be established by the evidence at the hearings, the Committee's position as to the appropriateness of dismissal or conversion under section 1112(b)of the Bankruptcy Code is not supported by either the law or the facts, and the Debtors' cases should be neither dismissed nor converted.  Furthermore, if the Committee has any legitimate concerns about the proposed sale, they should be addressed at the upcoming confirmation hearing.  These concerns need not be addressed at an expedited hearing for a motion to dismiss twenty one days after filing.

11.    Section 1112(b) provides, in pertinent part:

(1)    Except as provided in Paragraph (2) of this Subsection, subsection (c) of this section . . .; on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under Chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

(2)     The relief in Paragraph (1) shall not be granted absent unusual circumstances specifically identified by the court that establish that such relief is not in the best interest of creditors and the estate if the debtor or another party in interest objects and establishes:

(A)  there is a reasonable likelihood that a plan will be confirmed . . . within a reasonable period of time; and

(B)  the grounds for granting such relief include an act or omission of the debtor other than under paragraph (4)(A);

(i)  for which there exists a reasonable justification for the act or omission; and

(ii)  that will be cured within a reasonable period of time fixed by the court.

See 11 U.S.C. § 1112(b)(1)-(2).

12.     Thus, section 1112(b), pursuant to the Bankruptcy Abuse Prevention and Consumer Act amendments, now requires a court to dismiss or convert a case if a creditor establishes "cause," unless, however, there are "unusual circumstances" specifically identified by the court establishing that the requested conversion or dismissal is not in the best interest of the creditors and the estate." See 11 U.S.C. § 1112(b)(1).

A.     **THE COURT SHOULD DENY THE COMMITTEE'S MOTION TO DISMISS BECAUSE THERE IS NEITHER CONTINUING LOSS OR DIMINUTION OF THE ESTATE NOR A LACK OF REASONABLE LIKELIHOOD OF REHABILITATION**

13.     The Committee seeks dismissal or conversion of the Debtors' cases alleging that "the Committee can establish 'cause' for dismissal under Section 1112(b)(4)(A) due to the Debtors' substantial or continuing losses and the absence of any reasonable likelihood of [sic] rehabilitation." Motion to Dismiss, ¶ 37. However, the Court should deny granting such relief because, despite the Debtors' brief postpetition continuation of prepetition losses, there is neither a substantial or continuing loss to or diminution of the estate nor the lack of a reasonable

likelihood of rehabilitation.

14.     Section 1112(b)(4)(A) provides that "cause" exists for dismissal or conversion where there is: (1) "substantial or continuing loss to or diminution of the estate *and* the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A)(emphasis added).[2] By its terms, section 1112(b)(4)(A) codifies a two-prong test for dismissal or conversion of a case: (1) continuing loss to or diminution of the estate, *and* (2) absence of a reasonable likelihood of rehabilitation.[3] In re AdBrite Corp., 290 B.R. 209, 214 (Bankr. S.D.N.Y. 2003); In re Denrose Diamond, 49 B.R. 754, 756 (Bankr. S.D.N.Y. 1985).

15.     Under section 1112(b), the burden is on the movant to establish "cause." AdBrite Corp., 290 B.R. at 214; Loop Corp. v. United States Trustee, 290 B.R. 108, (D. Minn. Feb. 5, 2003); In re Lizeric Realty Corp., 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995). At the early stages of a chapter 11 case, this burden is even more difficult to meet. See First Jersey Nat'l Bank v. Brown (In re Brown), 951 F.2d 564, 572 (3d Cir. 1991) (overruling District Court's granting of motion to dismiss where "[i]t is significant that the motion to dismiss was presented just a few weeks after the petition was filed and before the posture of the case was clear.").

### (1)     CONTINUING LOSS TO OR DIMINUTION OF ESTATE

16.     The Committee claims that "there can be no reasonable dispute that the Debtors are incurring both continued and substantial losses". Motion to Dismiss, ¶ 40.

---

[2] Under section 1112(b) prior to its amendment in 2005, the first example of cause listed in the section was "continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation." Pub. L. No. 109-8, § 442(a) (2005), which was removed.

[3] It should be noted that Section 1112 of the House amendment represents a compromise between the House and Senate amendments for conversion or dismissal. Section 1112(b)(1) of the House amendment permits conversion or dismissal if there is a continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; requiring both factors represents a compromise from the House bill which eliminated both factors from the list of enumerated causes. 124 Cong. Rec. H 11,103 (Sept. 28, 1978); S 17, 419 (Oct. 6, 1978).

17.     The only facts the Committee put forward in support of this statement are the fact that the Debtors have failed to achieve profitability in the past and, not surprisingly, that "[p]ost-petition, the Debtors . . . are continuing to consume cash and incur losses." Id., ¶ 39. As stated previously, any losses will be resolved through the proposed DIP funding and sale.

18.     Moreover, the Committee misstates the holding of several of the cases it relies on in an attempt to support the proposition that negative postpetition cash flow is sufficient to establish "continued and substantial losses." For example, the Committee selectively quotes AdBrite Corp. as stating that courts have held that the existence of a negative cash flow and an inability to pay current expenses is sufficient to satisfy the elements of 1112(b). Motion to Dismiss, ¶ 40. However, the Committee fails to avail the Court of the context of this quote. Just prior to the quoted language, the AdBrite court states that:

> To determine whether there is a continuing loss to or diminution of the estate, a court must make a full evaluation of the present condition of the estate, not merely look at the debtor's financial statements . . . . The courts must evaluate losses on a case-by-case basis.

AdBrite, 290 B.R. at 215.

19.     Thus, rather than establishing a bright line rule, the court in AdBrite merely listed negative cash flow as one of several factors in what must be a "full evaluation of the present condition of the estate" on a case-by-case basis. Id. Furthermore, the Debtors have the ability to pay all postpetition expenses because a complete examination of the Debtors' postpetition financing makes it clear that all expenses are to be paid and provisions have been made for payment of all administrative expenses without burden to the Debtors' estates.

20.     Similarly, the Committee misstates the significance of the language extracted from In re Route 202 Corp., 37 B.R. 367, 376 (Bankr. E.D.Pa. 1984). Again, the Committee selectively quotes language that might mislead the Court into believing that negative cash flow

postpetition "obviously . . . satisfies" the elements of 1112(b).    Motion to Dismiss, ¶ 40. However, as with AdBrite, the Route 202 court was merely citing postpetition negative cash flow as one of several "guidelines [that] have been suggested" as guiding a court's determination as to whether there are substantial and continuous losses under section 1112(b)(1).    In re Route 202, at 373-75.

21.    Therefore, the existence of negative postpetition or prepetition cash flow is not a bright line test to determine whether there have been substantial and continuous losses to the estate under section 1112.    Rather, "[t]o determine whether there is a continuing loss to or diminution of the estate, a court must make a full evaluation of the present condition of the estate, not merely look at the Debtors' financial statements."    AdBrite Corp., 290 B.R. at 215; see also In re Moore Construction, Inc., 206 B.R. 436, 437-38 (Bankr. N.D. Tex. 1997); Route 202, 37 B.R. at 344-46.

22.    The Committee is correct in stating that the Debtors continue to "consume cash and incur losses."    Motion to Dismiss, ¶ 39.    However, this factor alone is not controlling in determining whether the Court should dismiss or convert these cases under section 1112(b) based in part on substantial or continuous losses.    To the contrary, as stated above, the case law requires a much more thorough evaluation of the Debtors' current financial situation.

23.    Here, conveniently, there are several facts absent from the Committee's recitation of the Debtors' past and present financial circumstances that would support a finding that, despite the residual postpetition negative cash flow, the Debtors' estates are currently either maintaining or appreciating in value as a result of the bankruptcy proceedings.    In particular, the Committee's recitation of the relevant facts fails to advise the Court of the following:

- The Debtors are engaged in reviewing and rejecting various executory contracts and unexpired leases;
- The proposed sale provides for Adeptio's assumption and cure of certain executory contracts and unexpired leases; resulting in the satisfaction of significant claims;
- Adeptio has agreed to satisfy all postpetition trade payables, ensuring that the Debtors' estates will not become insolvent;
- The DIP, through its carve out provision, provides for the payment of postpetition professional fees and costs by Adeptio;
- The Debtors have preserved all prepetition causes of action against the directors or officers covered by the Debtors' directors and officers' insurance policies;
- The Debtors have implemented various policies, including a change in marketing strategies, intended to both minimize overhead and increase cash flow;
- The Debtors has made several changes within management to ensure that the future business prospects of the Debtors are maximized;
- The Debtors have arranged for postpetition financing that will enable the Debtors to operate as a going concern and bridge the period prior to and following the proposed sale; and
- The Debtors have arranged for the retention of over 400 employees.

24.     In addition, general bankruptcy principles require that the Committee, particularly at this early stage of the Debtors' cases, do more than point out the very circumstances which led the Debtors to seek relief under the Bankruptcy Code in order to meet their burden under 1112(b). See Route 202, 37 B.R. at 345. ("[t]he underlying policy of reorganization proceedings is 'to save a sick business, not to bury it and divide up its belongings.'") (quoting In re Flying W Airways, Inc., 341 F. Supp. 26, 99 (E.D. Pa. 1972); see e.g., AdBrite Corp., 290 B.R. at 214 (stating that movant has burden under 1112(b)); First Jersey Nat'l Bank v. Brown (In re Brown), at 572 (overruling District Court's granting of motion to dismiss where "[i]t is significant that the motion to dismiss was presented just a few weeks after the petition was filed and before the posture of the case was clear.").

25.     Although the Debtors may incur losses, they have also provided for funding of those losses through the proposed DIP financing. The DIP financing will be satisfied from the sale of the Debtors' operating assets. Finally, administrative expenses are provided for through the carve out provisions in the DIP financing and Adeptio's agreement to assume postpetition trade payables.

26.     For the aforementioned reasons, the Committee has failed to meet its burden and establish the Debtors have experienced substantial or continuing losses under 1112(b)(4)(A) of the Bankruptcy Code. Thus, the Court should deny their Motion to Dismiss.

### (2)     POSSIBILITY OF REHABILITATION

27.     Dismissal or conversion is not warranted despite the existence of short-term postpetition operating losses where there exists a realistic possibility of rehabilitation. AdBrite Corp., 290 B.R. at 216; see, e.g., In re Garland Corp., 6 B.R. 456, 460 (1st Cir. BAP 1980). In order to prove an absence of a reasonable likelihood of rehabilitation in the early stages of a bankruptcy case, the movant must show that there is no more than a "hopeless and unrealistic prospect" of rehabilitation. AdBrite Corp., 290 B.R. at 215 (quoting In re Economy Cab & Tool Co., 44 B.R. 721, 724 (Bankr. D. Minn. 1984).

28.     The underlying policy of reorganization proceedings is to attempt to save the business, not immediately convert all underperforming debtors to chapter 7. Flying W Airways, Inc., 341 F.Supp. at 99; Susquehanna Chemical Corp. v. Producers Bank & Trust Co., 174 F.2d 783, 787 (3d Cir. 1949); In re Steak Loft of Oakdale, Inc., 10 B.R. 182, 185 (Bankr. E.D.N.Y. 1981). It is only when reorganization is no longer a realistic and viable undertaking that the

debtor should be removed from the cover of the "umbrella of the reorganization court." In the Matter of Maplewood Poultry Co., 2 B.R. 545, 549 (Bankr. D.Maine 1980); Steak Loft of Oakdale, Inc., 10 B.R at 185.

29.    The Supreme Court stated in NLRB v. Bildsco & Bildsco, "the policy of Chapter 11 is to permit successful rehabilitation of the Debtors." NLRB v. Bildsco & Bildsco, 465 U.S. 513, 527, 104 S.Ct. 1188 (1984). Accordingly, the "[d]etermination [of] what would constitute a successful rehabilitation involves balancing the interests of the affected parties-debtor, creditor and employee." Id. It is not synonymous with the term "reorganize." In re Lizeric Realty Corp., 188 B.R. 499, 503 (Bankr. S.D.N.Y. 1995).

30.    Rather, rehabilitation in this context means to put back in good condition and reestablish on a sound basis. AdBright, 290 B.R. at 217; Lizeric, 188 B.R. at 503; In re Kanterman, 88 B.R. 26, 29 (S.D.N.Y. 1988); In re Greene, 57 B.R. 272, 277 (Bankr. S.D.N.Y. 1986). The term rehabilitation "signifies that the Debtor will be reestablished on a secured financial basis, which implies establishing a cash flow from which its current obligations can be met." AdBrite Corp., 290 B.R. at 216; In re Rundlett, 136 B.R. 376, 380 (Bankr. S.D.N.Y. 1992); Kanterman, 88 B.R. at 29.

31.    "Rehabilitation" focuses on the debtor's business enterprise, not the returning to normalcy of the artificial entity that houses the enterprise. For this reason, the standard under section 1112(b)(4)(A) is "whether the Debtor's business prospects justify continuance of the reorganization effort." See 7-1112 Collier on Bankruptcy-15th Edition Rev. P 1112.04; see also Quarles v. United States Trustee, 194 B.R. 94, 97 (W.D. Va. 1996) (no likelihood of rehabilitation where debtor was losing money and only hope of reorganization depended entirely on speculative outcomes in pending litigation); In re Continental Holdings, Inc., 170 B.R. 919,

931 (Bankr. N.D.Ohio 1994) (debtor lacked a reasonable likelihood of rehabilitation where debtor lacked reasonably certain source of income); In re Schriock Const. Inc., 167 B.R. 569, 576 (Bankr. D.N.D. 1994); In re Hinchliffe, 164 B.R. 45, 52 (Bankr. E.D.Pa. 1994); In re Imperial Heights Apartments, Ltd., 18 B.R. 858 , 863-64 (Bankr. S.D.Ohio 1982) (no ''reasonable likelihood of rehabilitation'' where Debtor's only asset was a potential lawsuit).

32.    Here, there is a reasonable likelihood of rehabilitation of the Debtors' business operations.  The DIP Motion seeks approval of financing to provide the Debtors with the liquidity necessary to bridge the proposed sale and also sustained their businesses as a going concern while they, and the Committee, explore the Debtors' restructuring alternatives.

33.    The Debtors have started preparing a plan of liquidation (the "Plan") and intend to submit a plan following the proposed sale. This plan will include the creation of a litigation trust ("Liquidation Trust") for the benefit of unsecured creditors.  Through this Liquidation Trust, the unsecured creditors will receive the rights to pursue any causes of action the Debtors may possess, avoidance or otherwise, and will be entitled to any benefits therefrom.

34.    In addition, as stated above, the Debtors have implemented various policies and changes intended to establish a consistent cash flow from which to meet obligations as they become due. However, while the Debtors anticipate that such policies will lead to both increased cash flow and significant decreases in costs, it is difficult to quantify the positive impact of these policy changes at this early stage in the Debtors' reorganization.

35.    The clear and plain language of Bankruptcy Code, supported by legislative history and case law, all permit the sale of substantially of a Debtors' assets in a chapter 11 case. Despite the fact that chapter 11 of the Bankruptcy Code is titled "Reorganization," the legislative history clearly states that the Bankruptcy Code permits a plan of reorganization to:

propose the sale of all, or substantially all, of the property of the estate and the distribution of the proceeds of the sale among creditors and equity security holders. This . . . [is] a liquidating plan.

H.R. Rep. No. 595, 95th Cong., 1st Sess., at 407 (1977).

36.     Often, courts facilitate the sale of a debtor's assets under Bankruptcy Code section 363 and then allow for distribution in accordance with a liquidation plan.  In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (significant asset sale justified where supported by sound business reasons); Stevens Industries, Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986) (same); In reAbbotts Dairies of Penn., Inc., 788 F.2d 143 (3d Cir. 1986) (sale of all assets appropriate where in good faith and no fraud, collusion, or attempt to take grossly unfair advantage of other bidders); In re Trans World Airlines, Inc., 2001 WL 1820326 (Bankr. Del. Apr. 2, 2001); In re Coastal Industries, Inc., 63 B.R. 361 (Bankr. N.D. Ohio 1986); In re Apex Oil Corp., 92 B.R. 847 (Bankr. E.D. Mo. 1988) (sufficient business reasons articulated); In re Ancor Exploration Comp., 30 B.R. 802 (Bankr. N.D. Okla. 1983) (proposed sale must be examined from its own facts to determine if justified); In re WHET, Inc., 12 B.R. 743, 750-51 (Bankr. D. Mass. 1981) (sale of assets outside plan, then propose plan for distribution of proceeds to creditors).

37.     The Third Circuit has left no doubt that a chapter 11 case that is filed in order to maximize value that would otherwise be lost outside of bankruptcy is an appropriate use of the bankruptcy process. See Integrated Telecom Express, Inc. (In re Integrated Telecom), 384 F.3d 108, 120-124 (3rd Cir. 2004); see also Solow v. PPI Enters (U.S., Inc. (In re PPI Enters. (U.S.), Inc.), 324 F.3d 197, 211 (3rd Cir. 1999) ("the Code clearly contemplates liquidation plans . . . whereby a debtor may develop a Chapter 11 plan to sell off all of its assets.").

38.     Although less frequent, courts have even approved the sale of assets and the

distribution of sale proceeds outside of any plan.  See, e.g., In re Parkstone Med. Info. Sys., 2001

Bankr. LEXIS 1356, at *11 (Bankr. S.D. Fla. Oct. 16, 2001); In re San Jacinto Glass Indus. Inc.,

93 B.R. 934, 944 (Bankr. S.D. Tex. 1998).

39.     The Committee's argument, taken to its logical conclusion, would require the

courts, upon motion of a party in interest, to dismiss essentially all chapter 11 cases where the

debtor sought a sale of its business under section 363 of the Bankruptcy Code.  The Committee

contends that where a debtor continues to lose money subsequent to filing and also seeks to avail

itself of the benefits of section 363 of the Bankruptcy Code by conducting an expedited sale of

the debtor's assets, a court must dismiss or convert the case to a chapter 7 case.  By this logic,

unless a debtor has an immediate reversal of financial fortunes upon filing under chapter 11 and

starts realizing positive cash flow, it is are not entitled to protection under the Bankruptcy Code.

40.     However, this immediate reversal in fortunes rarely occurs, and it is well settled

that a sale under 363(b) is a legitimate objective under chapter 11 of the Bankruptcy Code.

Further, it is not inappropriate for "Debtors to file for bankruptcy in order to take advantage of

the particular provisions of the [Bankruptcy] Code." In re PPI Enters. (U.S.), Inc., 228 B.R. 339,

345 (Bankr. D. Del. 1998) (quoting In re Clinton Centrifuge, Inc., 72 B.R. 900, 905 (Bankr. E.D.

Pa.), aff'd, 324 F.3d 197 (3rd Cir. 2003).

41.     Therefore, based on the aforementioned authority and facts, the Committee's

Motion to Dismiss should be denied and the Debtors' cases should proceed in order to afford the

Debtors the best chance of rehabilitation.

**B.    THE COURT SHOULD REFUSE TO DISMISS OR CONVERT THE DEBTORS' CASES BECAUSE NO OTHER "CAUSE" EXISTS UNDER SECTION 1112(B) OF THE BANKRUPTCY CODE**

**(1)    THE CLAIM THAT ADEPTIO IS ALLEGEDLY THE SOLE BENEFICIARY OF THE DEBTORS CASES IS NOT GROUNDS FOR DISMISSAL**

42.    The Committee argues that the Debtors' cases should be dismissed pursuant to section 1112(b) because the cases solely benefit Adeptio. Even assuming arguendo that the proposed sale only benefits Adeptio – which it does not – the sale is still permitted under the Bankruptcy Code, if not preferable. The Committee makes this irresponsible claim despite the fact that the cases preserve the Debtor's going concern value, allow the Debtors to retain jobs and employees and provide for payment to holders of executory contracts that are assumed by Adeptio.

43.    Courts have uniformly held that approval of a proposed sale of property pursuant to section 363(b) is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the Debtor. In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (holding that a court must be satisfied that there is a "sound business reason" justifying the pre-confirmation sale of assets); In re Phoenix Steel Corp., 82 B.R. 334, 335 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith.").

44.    When applying the "business judgment" rule, courts show great deference to a debtor's decision-making. In re Summit Land Co., 13 B.R. 310, 315 (Bankr. D. Utah 1981). The business judgment rule likewise applies to a debtor's decision to sell substantially all of its

assets. In re Tempo Technology Corp., 202 B.R. 363, 366 (D. Del. 1996) ("Section 363(b)(1) of the Bankruptcy Code permits a debtor to sell all or substantially all of its assets prior to confirmation of a reorganization plan").

45.     Here, the Debtors exercised their business judgment and provided for the only way to maximize the return on the assets for the estate. As other courts have noted, maximizing value is the sine qua non of any bankruptcy case:

> In either case, the goal of Chapter 11 is to maximize the value of money and property available for distribution to creditors. A person in charge of a business in Chapter 11, whether acting as a trustee or as a debtor-in-possession, is obligated to use best efforts to so maximize the value of the Debtor's estate.

In re Brook Valley IV, 347 B.R. 662, 673 (8th Cir. BAP 2006) (holding that principals of a debtor-partnership had fiduciary duties to maximize estate's, not their own, value).

46.     Further, even where secured creditors are the only parties to benefit from a sale of a debtor's assets, courts have held that the relevant issue remains maximizing value to the estate. In short, even if unsecured creditors would not benefit from a proposed 363 sale, nothing precludes such sales, as Judge Walsh explained:

> In other words, a sale under § 363(b) is intended to benefit the estate by minimizing the loss of value to the estate. There is nothing in the statute that requires a § 363(b) sale to provide pro rata distribution to all unsecured creditors, or even any distribution to all unsecured creditors. Had Congress intended that result it could have easily drafted the section to so provide.

In re Trans World Airlines, Inc., 2001 Bankr. Lexis 980 (Bankr. D. Del. 2001) at *32 (denying committees' motions for stay pending appeal of order authorizing sale of substantially all of debtor airline's assets per approved 363(b) sale).

47.     In United States Trustee v. GPA Technical Consultants, Inc., where a court held that it was not in the best interest of creditors to dismiss or convert a chapter 11 case, even

though it appeared that that case exclusively benefited a secured lender the court stated:

> Even if the only reason for the Chapter 11 in the instant case is to maximize the return to the secured creditor through the retention of the debtor-in-possession to collect and liquidate assets and to avoid pre-petition transfers of the debtor, the interests of the secured creditor are legitimate interests to be taken into account in deciding whether to convert or dismiss a Chapter 11 case. In determining whether to convert or dismiss a case under 11 U.S.C. section 1112(b), the court must take into account the best interest of creditors and the estate. Pursuant to 11 U.S.C. Sections 101(9) and 101(4)(A), entities holding secured claims are "creditors". It follows that the secured creditor's interests must be taken into account. In fact, there need not be any unsecured creditors in a bona fide reorganization, and thus the only creditor interests to be taken into account may sometimes be secured creditors.

United States Trustee v. GPA Technical Consultants, Inc., 106 B.R. 139, 142-43 (Bankr S.D. Ohio 1989) (citation omitted).

48.    Other courts have followed this logic in holding that there is nothing wrong with the bankruptcy process being used solely for the benefit of unsecured creditors. In re Western Pacific Airlines, the court denied a motion to dismiss pursuant to 1112(b) where the case was being directed by the secured party and administered for its exclusive benefit, stating that even if the only reason for the case was to maximize the return to secured lenders, the secured lenders' interests must be considered:

> Committee contends that, in reality, the DIP Lenders are directing all liquidation procedures and that the liquidation is being undertaken solely for the benefit of the DIP Lenders. . . . The Committee strenuously argues that the bankruptcy process is being abused by allowing the Debtor to continue conducting its own liquidation when the only entity actually benefiting from the liquidation is the DIP Lenders.
>
> . . .
>
> Debtor-in-possession lenders and post-petition financiers depend on the Court and the integrity of the bankruptcy process to ensure that their rights are not ignored or summarily disposed of by the Court in the event a reorganization effort fails. . . . This Court will not set a precedent that could diminish or destroy a debtor-in-possession lender's confidence in bankruptcy courts and the Bankruptcy Code, and the protections afforded thereunder. As long as the debtor-in-possession lender *acts responsibly and in good faith*, then the bankruptcy court should retain a forum for the lender to try to protect its bargained-for rights and interests.

In re Western Pacific Airlines, 218 B.R. 590, 591-2 (Bank D. Colo. 1998) (emphasis added).

49.    Thus, it is well settled that, provided that the secured creditor acts in good faith and in accordance with good business judgment, it is appropriate for such creditors to use Chapter 11 in a manner that benefits them exclusively in order to maximize the value of a going concern for the benefit of the economic interest holders, whoever they may be. See id.; see also, Canadian Pacific Forest Products, Ltd. v. J.D. Irving, Ltd. (In re Gibson Group, Inc.), 66 F.3d 1436, 1442 (6th Cir. 1995) ("The purpose of [Chapter 11] is to provide a debtor with legal protection in order to give [it] the opportunity to reorganize, and thereby to provide creditors with going-concern value rather than the possibility of a more meager satisfaction through liquidation."); Fitzsimmons v. Walsh (In re Fitzsimmons), 725 F.2d 1208, 1210 (9th Cir. 1984) ("Chapter 11 seeks to preserve a foundering business as a going concern, because the assets of a business are often more valuable when so maintained than they would be when liquidated.").

50.    Here, it is clear that both Adeptio and the Debtors acted in good faith in negotiating the proposed sale. First, the Debtors made a good faith effort to market their assets to potential buyers other than Adeptio, targeting both strategic and financial buyers. Second, a marketing book was prepared by GAH and sent to over 30 prospective purchasers. Third, the Debtors hired investment bankers prepetition (and propose to hire them postpetition), before Adeptio was involved with the Debtors. Adeptio was brought in during the prepetition marketing process, they were not insiders during this process. Fourth, the sale transaction was negotiated at arms length and the Debtors' objective has always been the maximization and preservation of the estate. Simply put, the Debtors' good faith in both filing under chapter 11 and arranging the sale transaction cannot be, and have not been, questioned by the Committee.

51.    Therefore, even assuming arguendo that the Debtors' cases and the proposed sale

benefits only Adeptio and fails to confer any benefit upon unsecured creditors, this does not constitute "cause" for dismissal (or conversion) of the Debtors' cases under section 1112 of the Bankruptcy Code.

52.    Further, there are additional reasons – both practical and policy based – to authorize the proposed sale even were Adeptio only to benefit from it. First, it is efficient. That is, the proposed sale will permit the Debtors' to shop their assets, so as to determine the sufficiency of the value offered by Adeptio, but at the same time, provide for the necessary bridge funding to ensure the estate is maximized by allowing the Debtors' to continue to operate as a going concern.

53.    Second, the fact that only a secured creditor may benefit does not change the goal of maximizing value. After all, a secured creditor is a creditor, and it is the Bankruptcy Code itself which sets the unassailable priority scheme, so it is not as if a debtor can "favor" a secured creditor.

54.    Third, even when considering the alternative – a UCC code sale under applicable state law – there are drawbacks. Putting aside the fact that a UCC sale will likely result in a lower price for the assets, there would not be any benefit for unsecured creditors in a UCC sale either. At least under a section 363 sale in Chapter 11, unsecured creditors have the hope of a return under the watchful eye of the Bankruptcy Court. Plus, even with a UCC sale, nothing stops creditors from thereafter filing an involuntary petition and attacking the sale, thereby increasing costs and delaying finality.

55.    In sum, there is ample support to authorize a sale that benefits solely secured creditors where, as here, the sale maximizes value to the estate. On the other hand, there is nothing in the Bankruptcy Code requiring that a 363 sale or liquidating plan confer any benefit

on unsecured creditors.

56.    Therefore, based on the aforementioned authority, the Court should deny the Committee's Motion to Dismiss.

### (2)    THE DEBTORS, CERTAIN UNSECURED CREDITORS, AND OTHER CONSTITUENTS BENEFIT FROM THE SALE

57.    Although chapter 11 may serve as an appropriate vehicle for the liquidation of assets, even if only to the secured creditor, the asset sale will benefit many other constituents of the Debtors' estates.

58.    First, the Committee repeatedly, asserts that Adeptio attempts to burden the Debtors' other creditors with the costs, expenses, and burden of administering both the Debtors' cases and the proposed sale.  These allegations, however, are plainly false.  To the contrary, Adeptio has agreed to bear the brunt, if not all, of the burden associated with the proposed sale.

59.    First, Adeptio is paying the costs of administrative expenses through the DIP and Adeptio's DIP will be satisfied through the sale of the Debtors' operating assets.  Therefore, no costs of the proposed sale will be borne by the Debtors' estates.

60.    Second, through the bankruptcy proceedings, the Debtors have arranged for the assumption and cure of several executory contracts and leases assigned to Adeptio.  Through the Debtors' cases, the counterparty unsecured creditors to these executory contracts and leases will receive significant benefits in that they will receive cure payments and continued performance by the Debtors' assumption of such contracts and leases and assignment to Adeptio.  If the Debtors' cases are dismissed or converted, the all of these executory contracts and leases will be terminated or breached.  Dismissal will both deny these counterparties the benefit of the Debtors' immediate assumption and cure, and subject the Debtors' entities to increased liabilities as a

result of rejection claims.

61.     Third, the Debtors have arranged for the retention and continued employment of approximately 400 employees. Absent the Debtors' chapter 11 actions, these employees would most certainly lose their jobs and the Debtors would be denied the benefit of this human capital.

62.     In sum, the Debtors' cases will, or have, provided parties in interest, other than Adeptio, with significant benefits that would not otherwise be available outside of chapter 11.

63.     Therefore, based on the aforementioned authority, the Court should not dismiss or convert the Debtors' cases based on the unfounded allegations of the Committee.

**(3)    THE DEBTORS INABILITY TO CONFIRM OF A PLAN IS NOT GROUNDS FOR DISMISSAL**

64.     The Committee argues that the Debtors' cases should be dismissed based on the inability to confirm a plan.

65.     Section 1112(b) does not list "inability to confirm a plan" as an enumerated factor that might amount to "cause." 11 U.S.C. § 1112(b).[4]

66.     However, as stated more completely above in Trans World Airlines, Inc., this Court has held that "[t]here is nothing in the statute that requires a § 363(b) sale to provide pro rata distribution to all unsecured creditors or even any distribution to all unsecured creditors." In re Trans World Airlines, Inc., 2001 Bankr. Lexis 980 (Bankr. D. Del.) at * 32.

67.     Further, courts have often held that the purposes of Chapter 11 are better served by expeditiously selling assets. See, e.g., In re Hovis, 356 F.3d 820, 822 (7th Cir. 2004 ("[s]ometimes the best means to administer an estate is to sell the assets quickly in order to

---

[4] The second example of cause enumerated in section 1112(b)(2) prior to the section's revision in 2005 was "inability to effectuate a plan." This standard tested whether it is reasonable to expect that a plan could be confirmed within a reasonable amount of time in a chapter 11 case. As amended in 2005, section 1112(b) does not list "inability to effectuate a plan" as an example of

maximize their value"); In re Miami Gen. Hosp., Inc., 81 B.R. 682, 688 (S.D. Fla. 1988) ("[T]he bankruptcy judge's paramount responsibility is to protect the assets of the estate. The bankruptcy court accomplished this goal by expediting the sale of the Hospital so as to preserve its value as a going concern"); Loop Corp. v. United States Trustee, 374 F.3d 511, 517 ("recognition of most courts that liquidation is permitted under Chapter 11").

68.    Even assuming arguendo that inability to confirm a plan did constitute "cause" within this context, the Debtors anticipate, and have begun preparation for, the submission of a plan of reorganization following the Proposed Sale.

69.    The Committee, on the other hand, has failed to give any justification for their allegations of the Debtors' inability to confirm a plan other than conclusory statements regarding the Debtors' intent. Thus, if the inability to confirm a plan is still grounds for dismissal, the Committee has not made the required showing.

70.    Therefore, based on the aforementioned authority and facts, the Court should not grant the Committee's Motion to Dismiss.

> **(4)    THE COURT SHOULD NOT DISMISS THE DEBTORS' CASES FOR FAILURE TO MAINTAIN APPROPRIATE INSURANCE BECAUSE SUCH FAILURE, IN ANY, DOES NOT POSE A RISK TO THE ESTATE OR THE PUBLIC**

71.    The Committee seeks an order dismissing the Debtors' Cases because the Debtors' prepetition directors and officers' liability insurance policies (the "D&O Policies") allegedly expire on November 30, 2007. If the Committee had attempted the barest due diligence they would know (a) that new insurance was obtained postpetition and (b) the Debtors have taken steps to preserve any rights to the D&O Policies despite their expiration. In addition to being factually inaccurate, the Committee's argument is legally insufficient.

---

cause.

72.      Section 1112(b)(4)(C) enumerates "failure to maintain appropriate insurance that poses a risk to the estate or to the public" as the third example of cause under 1112(b). 11 U.S.C. § 1112(b)(4)(C).  Insurance that "poses a risk to the estate or the public" includes standard property insurance covering property of the estate from loss due to fire or other common hazards. See 7-1112 Collier on Bankruptcy-15th Ed. Rev. P 1112.04.  It may also include certain kinds of liability insurance that protect customers of the Debtor.  Id.  However, failure to carry insurance does not demonstrate cause for conversion or dismissal if the insurance was not of the kind "that protects the estate or the public."  Id.  Director and officers' insurance is not insurance of the kind referenced in 1112(b)(4)(C) of the Bankruptcy Code; it does not protect the public, it protects the directors and officers covered by the policy.

73.      Here, the Debtors' alleged failure to maintain the D&O Policy does not pose a risk to the estates or the public.  At all relevant times, the Debtors' maintain and maintained sufficient D&O coverage.  The D&O Policies will expire on November 30, 2007.  However, prior to its expiration, the Debtors intend to take measures to preserve the coverage of pre-expiration acts under the applicable policy.

## II.    THE COURT SHOULD NOT COMPEL THE DEBTORS TO ABANDON ALL ESTATE ASSETS ENCUMBERED BY ADEPTIO'S PREPETITION SECURITY INTEREST

74.      Lastly, the Committee requests the court compel the Debtors to abandon all estate assets that are encumbered by Adeptio's prepeition security interests pursuant to section 554(a) of the Bankruptcy Code.

75.      First, the only two cases cited in support of the Committee's proposition that the Court should force the Debtors to abandon all assets that are encumbered by Adeptio's prepetition security interest are not analogous the cases at hand.  Both In re Price, 370 F.3d 362

(3rd. Cir. 2004), and <u>In re Lan Assocs. XI, L.P.</u>, 192 F.3d 109 (3d Cir. 1999), involved debtors who had filed under chapter 7 of the Bankruptcy Code and anticipated an eventual piecemeal liquidation. Here, the Debtors seek to maximize the estates value by maintaining operations as a going concern and selling substantially all of its assets to one purchaser. As discussed more fully below, the Debtors' determination that retaining the assets at issue and intent to using them to facilitate the proposed sale, in and of themselves, make these assets of sufficient benefit to the estate so as to prevent the Committee from compelling abandonment.

76.     Section 554(a) of the Bankruptcy Code permits a trustee or debtor in possession to abandon property of the estate that is "burdensome to the estate or that is of inconsequential value and benefit to the estate," 11 U.S.C. §§ 554(a) and 1107(a).

77.     Section 554(b) permits the court to "order the trustee [ or debtor in possession] to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate." 11 U.S.C. § 554(b).

78.     Section 554(b) gives the bankruptcy court discretion in ordering abandonment, if it first finds neither benefit nor value inuring to the estate from administration of the property. <u>In re K.C. Machine & Tool Co.</u>, 816 F.2d 238, 244 (6th Cir. 1987). But "benefit" does not mean the same as present "value." <u>Id.</u> Further, "[a]n order compelling abandonment is the exception, not the rule . . . [and] should only be compelled in order to help the creditors by assuring some benefit in the administration of each asset." <u>Id.</u>; <u>In re Interpictures</u>, 168 B.R. 526, 535 (Bankr. S.D.N.Y. 1994) ("[b]ut an order compelling abandonment is the exception, not the rule.").

79.     Thus, "[t]he only issue before the court in an application for abandonment is whether there is a reason that the estate's interest in the property should be preserved or, instead, whether the property is so worthless or burdensome to the estate that it should be removed there

from." In re Tyler, 15 B.R. 258, 261 (Bankr. D. Pa. 1981). The burden is on the movant where a party in interest wishes to compel the trustee or debtor in possession to abandon property of the estate. Interpictures, 168 B.R. at 535 ("the courts have placed the burden of proving an abuse of discretion of the trustee's action or inaction on abandonment on the party seeking to make the trustee act").

80.    Here, despite the fact that the assets the Committee seeks to compel the Debtors' abandon are fully encumbered, they still provide benefit to the estate. It is these very assets that will provide for the DIP financing, which enables the Debtors to continue operations as a going concern and maximize the value of the estate. Without these assets, the Debtors would have no means of securing postpetition financing.

81.    What the Committee wants this court to do is ignore the definition of "estate" set forth in section 541 of the Bankruptcy Code, which provides that property of the estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. §541 (emphasis added). Section 541(a) defines estate as all property of the debtor, not just property having some unencumbered value. Section 541(b), which sets forth what is not included, does not refer to fully liened property.

82.    Thus, the Committee has failed to meet its burden and establish that the assets fully encumbered provide neither value nor benefit to the estate. Further, the facts make clear that these assets, comprising substantially all of the debtors' value, continue to provide a significant benefit to the Debtors and their estates.

83.    Therefore, based on the aforementioned authority and facts, the Court should deny the Committee's Motion to Dismiss.

## CONCLUSION

84.    The Debtors respectfully request that this Court deny the Motion to Dismiss and

grant such other and further relief as this Court deems just and proper.

Date:  November 28, 2007
        Wilmington, Delaware

Respectfully submitted,

**THE BAYARD FIRM**

By:
Neil B. Glassman (No. 2087)
Mary E. Augustine (No. 4477)
222 Delaware Avenue
Suite 900
P.O. Box 25130
Wilmington, DE 19899
Telephone:    (302) 655-5000
Facsimile:    (302) 658-6395

and

**DLA PIPER US LLP**

Thomas R. Califano
Jeremy R. Johnson
1251 Avenue of the Americas
New York, New York 10020
Telephone:    (212) 335-4500
Facsimile:    (212) 335-4501

Proposed Counsel for Debtors
and Debtors in Possession