IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| INPHONIC, INC., et al.,[1] | : | Case No. 07-11666 (KG) |
| | : | |
| Debtors. | : | Jointly Administered |
| | : | |
| | : | Re: Docket Nos. 11, 13, 21 |
| | : | |
| | : | **Hearing Date: November 30, 2007 at 3:00 p.m.** |

## DEBTORS' OMNIBUS REPLY TO OBJECTIONS TO FIRST DAY MOTIONS

The above-captioned debtors and debtors in possession (the "Debtors"), by and through their undersigned proposed counsel, file this omnibus reply (the "Reply") to objections filed to certain of the Debtors' first day motions.  In support of this Reply, the Debtors respectfully state as follows:

### PRELIMINARY STATEMENT

The objections and motion to dismiss filed by the Committee are an attempt by an out-of-the-money party with no real economic interest in the Debtors' operating assets to extort value at the expense of a creditor with superior legal or economic rights.  By its unreasonable and irresponsible positions, the Committee is willing to risk disastrous consequences to the Debtors' enterprises, secured creditor, employees, and unsecured creditors whose contracts will be assumed.

The Debtors are losing money at the rate of approximately $3.2 million per week;

---

[1] The Debtors and the last four digits of each Debtors' federal tax identification numbers are:  (a) InPhonic, Inc., a Delaware corporation, Fed. Tax Id. No. 9384; (b) CAIS Acquisition, LLC, a Delaware limited liability company, Fed. Tax Id. No. 6257; (c) CAIS Acquisition II, LLC, a Delaware limited liability company, Fed. Tax Id. No. 3695; (d) SimIPC Acquisition Corp., a Delaware corporation, Fed. Tax Id. No. 4924; (e) Star Number, Inc., a Delaware corporation, Fed. Tax Id. No. 5549; (f) Mobile Technology Services, LLC, a Delaware limited liability company, Fed. Tax Id. No. 1426; (g) FON Acquisition, LLC, a Delaware limited liability company, Fed. Tax Id. No. 2807; and

however, the Debtors have arranged for funding of these losses, payment of administrative expenses and preservation of their going-concern value. The sale will resolve in excess of $50 million in secured claims and a significant amount of unsecured claims.

The Debtors evaluated various options for restructuring and the only reasonable and responsible alternative was the filing of a chapter 11 petition and sale of substantially all of the Debtors' assets in an effort to continue the business. Abandonment of an operating enterprise having tens of millions of dollars in value, as is requested by the Committee, would not have been responsible. The objections filed by the Committee do not reflect any attempt by the Committee to protect the legitimate interests of its constituents, but are simply a litigation tactic.

## **BACKGROUND**

1.      On November 8, 2007 (the "Petition Date"), the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

2.      The Debtors continue to possess their property and to manage their businesses as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

3.      No trustee or examiner has been appointed in any of the Debtors' chapter 11 cases. On November 16, 2007, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee").

4.      On the Petition Date, the Debtors filed the following first day motions (the "First Day Motions"), among others:

> a.      Motion for Entry of Interim and Final Orders (I) Authorizing and Approving Postpetition Financing; (II) Granting Liens, and Security Interests and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of Cash Collateral and

---

(h) 1010 Interactive, LLC, a Delaware limited liability company, Fed. Tax Id. No. 5391.

Affording Adequate Protection; (IV) Modifying Automatic Stay; and (V) Scheduling Final Hearing, Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002 and 4001 (c) and (d) (the "DIP Motion");

b.    Application to Employ and Retain Pursuant to 11 U.S.C. Sections 327(a) and 328(a) and Federal Rule of Bankruptcy Procedure 2014, Goldsmith, Agio, Helms Securities, Inc. ("GAH") as Investment Banker to Debtors in Possession (the "GAH Retention Application"); and

c.    Motion of the Debtors for an Order Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedures (I) Authorizing the Sale of Substantially All of Their Assets; (II) Approving an Asset Purchase Agreement, Subject to Higher and Better Offers; (III) Approving the Assumption and Assignment of Certain Executory Contracts, and Unexpired Leases; and (IV) Granting Related Relief (the "Sale Motion").

5.    On November 9, 2007, the Bankruptcy Court entered the Interim Order (I) Authorizing and Approving Postpetition Financing; (II) Granting Liens, and Security Interests and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of Cash Collateral and Affording Adequate Protection; (IV) Modifying Automatic Stay; and (V) Scheduling Final Hearing, Pursuant to Sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002 and 4001 (c) and (d) (the "Interim DIP Order").

6.    The Debtors received the following objections to the GAH Retention Application:

a.    Objection to the Application for Order Pursuant to 11 U.S.C. § 327(a) and 328(a) and Federal Rule of Bankruptcy Procedure 2014 Authorizing Employment and Retention of Goldsmith, Agio, Helms Securities, Inc. as Investment Banker to Debtors in Possession, dated November 21, 2007, filed by the Committee (the "Committee GAH Objection"); and

b.    Objection to the Debtors' Application to Employ Goldsmith, Agio, Helms Securities, Inc. as Investment Banker Pursuant to Sections

327(a) and 328 (a) of the United States Bankruptcy Code, dated November 21, 2007, filed by the Office of the United States Trustee (the "UST GAH Objection").

7.    The Debtors received the following objections to the DIP Motion:

a.    Limited Objection of Verizon Wireless to Debtor's Motion for Approval of Debtor-In-Possession Financing and Related Relief, dated November 21, 2007 (the "Verizon DIP Objection");

b.    Objection to Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing and Approving Post-Petition Financing; (II) Granting Liens and Security Interests and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of Cash Collateral and Affording Adequate Protection; (IV) Modifying Automatic Stay; and (V) Scheduling Final Hearing Pursuant to Section 105, 361, 362, 363 and 364 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002 and 4001 (C) and (D), dated November 21, 2007 filed by the Committee (the "Committee DIP Objection");

c.    Limited Objection to Motion for Postpetition Financing and Use of Cash Collateral, dated November 21, 2007, filed by AT&T (the "AT&T DIP Objection");

d.    Limited Objection to Debtors' Motion For Entry Of Interim And Final Orders (I) Authorizing And Approving Postpetition Financing; (II) Granting Liens And Security Interests And Providing Superpriority Administrative Expense Status; (III) Authorizing Use Of Cash Collateral And Affording Adequate Protection; (IV) Modifying Automatic Stay; And (V) Scheduling Final Hearing, Pursuant To Sections 105, 361, 362, 363 Of The Bankruptcy Code And Federal Rules Of Bankruptcy Procedure 2002 And 4001(c) And (d), dated November 21, 2007, filed by Spanco Telesystems & Solutions Limited (the "Spanco DIP Objection");

e.    Limited Objection of Sprint Nextel Corporation to the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing and Approving Post-Petition Financing; (II) Granting Liens and Security Interests and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of Cash Collateral and Affording Adequate Protection; (IV) Modifying Automatic Stay; and (V) Scheduling Final Hearing Pursuant to Section 105, 361, 362, 363 and 364 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002 and 4001 (C) and (D), dated

November 21, 2007, filed by Sprint Nextel Corporation (the "<u>Sprint DIP Objection</u>"),

f.   Limited Objection And Reservation Of Rights Of T-Mobile USA, Inc. To Debtor's Motion For Entry Of Interim And Final Orders (I) Authorizing And Approving Post-Petition Financing; (II) Granting Liens And Security Interest And Providing Superpriority Administrative Expense Status; (III) Authorizing Use Of Cash Collateral And Affording Adequate Protection; (IV) Modifying Automatic Stay; And (V) Scheduling Final Hearing, Pursuant To Sections 105, 361, 362, 363, and 364 Of The Bankruptcy Code And Federal Rules Of Bankruptcy Procedure 2002 and 4001 (C) and (D) (the "<u>T-Mobile DIP Objection</u>", and collectively with the AT&T DIP Objection, the Verizon DIP Objection, and the Sprint DIP Objection, the "<u>Carrier DIP Objections</u>").

8.     On November 21, 2007, the Committee also filed their Motion For an Order (I) Dismissing (or Converting) Debtors' Bankruptcy Cases Pursuant to Section 1112(b) of the Bankruptcy Code or, Alternatively, (II) Compelling the Trustee to Abandon Fully-Encumbered Estate Property Pursuant to Section 554(b) of the Bankruptcy Code (the "<u>Motion to Dismiss</u>").

## **REPLY**

9.     The objections to the First Day Motions should be denied in their entirety. The genesis of each objection, the purported impropriety of the contemplated relief in the Sale Motion, is addressed in the Debtors' objection to the Motion to Dismiss, which is filed contemporaneously herewith, and is incorporated herein. The contemplated sale of substantially all of the Debtors' assets is appropriate and in the best interests of the Debtors' estates.

10.    It should be noted that the objections discussed herein are the only objections received to the First Day Motions. In addition to overruling the objections as requested herein, the Debtors respectfully request that this Court approve the remaining First Day Motions based upon the record and the *Affidavit of Kenneth D. Schwarz, Chief Financial Officer of the Debtors, in Support of First Day Motions*, dated November 8, 2007.

A.    **The Objections to the DIP Motion Should be Overruled**

11.    The Debtors respectfully request that this Court enter a final order approving cash collateral usage and the DIP financing (the "Final DIP Order"), substantially similar to the terms of the Interim DIP Order, and overrule the objections filed to the DIP Motion.  The DIP Motion seeks entry of the Final DIP Order, which approves $25 million in debtor in possession financing (the "DIP Facility") from the Debtors' prepetition secured lender, Adeptio INPC Funding, LLC ("Adeptio").  The proceeds of the DIP Facility will be used to satisfy postpetition administrative expenses pursuant to a court-approved budget (the "Budget").

12.    Postpetition financing arrangements that reflect a debtor's exercise of prudent business judgment should be approved.  See, e.g., In re Ames Dept. Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[A] court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").  Moreover, business judgment "should be left to the board room, and not to [the] court."  In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Col. 1985).

13.    The Committee challenges the Debtors' business judgment in entering into the DIP Facility.  Although the Committee mistakenly suggests that the Court should only approve the DIP Facility if it is determined to be in the best interests of each and every creditor in these chapter 11 cases, the business judgment rule requires no such exacting scrutiny.  Instead, the business judgment rule leaves decisions such as this to management, since more stringent scrutiny "would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and

threaten the court's ability to control a case impartially." <u>Richmond Leasing Co v. Capital Bank,</u> <u>N.A.,</u> 762 F.2d 1303, 1311 (5th Cir. 1985). The Debtors have determined that entering into the DIP Facility is in the estates' best interests.

14.     Under the business judgment standard, the objections should be overruled, and the Final DIP Order should be entered. Put simply, no other DIP lender exists that can provide the necessary funding to preserve the Debtors' going-concern value until a final disposition can be reached. The continuation of operations benefits the Debtors' employees, secured creditors and certain unsecured creditors, these are goals worthy of the chapter 11 process, which has been routinely acknowledged by bankruptcy courts. Notwithstanding the Committee's arguments to the contrary, the chapter 11 process is designed to provide benefits to all constituents, not just unsecured creditors. <u>See</u> <u>e.g.,</u> <u>In re Ngan Gung Restaurant,</u> 254 B.R. 556, 571 (Bankr. S.D.N.Y. 2000) (recognizing that the "clear purpose of Chapter 11 is to benefit all parties, including the debtor and its creditors.").

1.     <u>Debtors Agree to Clarifications Requested in the Carrier DIP Objections</u>

15.     The Carrier DIP Objections seek clarification that the Interim DIP Order and the Final DIP Order do not seek to impair or alter any setoff or recoupment rights available under the Bankruptcy Code or applicable law. With respect to the Interim DIP Order, language was provided on the record clarifying that setoff or recoupment rights available under the Bankruptcy Code or applicable law would not be impaired or altered.

16.     The Debtors have agreed, and Adeptio has consented, to include the following language, subject to final review by all parties, in the Final DIP Order:

Cellco Partnership. Nothing contained herein, shall impact or impair setoff or recoupment rights of Cellco Partnership d/b/a Verizon Wireless, if any.

Sprint Nextel Corporation. Nothing contained herein, shall impact or impair the validity, extent or priority of Sprint Nextel Corporation's ("Spring Nextel") claims and rights, if any, including, but not limited to, Sprint Nextel's purchase money security interest and rights of setoff and/or recoupment.

T-Mobile USA, Incorporated. Nothing contained herein, shall alter or modify the validity, extent and/or priority of claims and rights of T-Mobile USA, Inc. d/b/a T-Mobile (f/k/a VoiceStream Wireless Corporation) ("T-Mobile"), if any, including, but not limited to, T-Mobile's purchase money security interest and rights of setoff and/or recoupment.

AT&T. This Order does not abridge, alter or modify in any way AT&T's pre-petition and post-petition offset rights, including recoupment and setoff, if any, nor does this Order abridge, alter or modify in any way the validity, nor extent or priority of any such asserted offset rights.

17.     The Debtors believe the addition of this language satisfies the singular concern raised by all four Carrier DIP Objections. In light of the deadline to respond to the objections to the DIP Motion, the Debtors are still in the process of conferring with the carriers with respect to the proposed change. In the event this language is not satisfactory to the carriers, the Debtors reserve the right to assert additional objections to the relief sought in the Carrier DIP Objections.

### 2.     The Spanco Objection Should be Overruled

18.     Spanco Telesystems & Solutions Limited ("Spanco") objects to the DIP Motion on the following grounds: (a) the Budget contains inadequate detail; (b) the Budget does not account for Bankruptcy Code section 503(b)(9) administrative claims; (c) the liens on avoidance actions provided to Adeptio are improper; and (d) the waiver of Bankruptcy Code section 506(c) claims is inappropriate. The Debtors submit that none of the issues raised in the Spanco DIP Objection justify denying the DIP Motion.

19.    First, the Budget contains adequate detail.  The Debtors are not required to provide a line item in the budget for every vendor that receives payment postpetition.  Although each party is not listed, the Debtors are obligated to pay all administrative claims accrued during the postpetition period and intends to do so in the ordinary course of business.  The Budget provides adequate information of the proposed expenditures to the Court and other parties in interest.

20.    In addition, Spanco is paid bi-weekly within two (2) business days of invoice.  In the event the Debtors fail to make payments to Spanco as required by the underlying executory contract, Spanco is entitled to seek relief as permitted under the Bankruptcy Code.  Based on the timing of the payments, Spanco is in a position to protect its rights and interests in the event of nonpayment.  In addition, to the extent Spanco has questions or concerns regarding the Budget, they can obtain this information from the Debtors and their professionals.

21.    Second, Spanco asserts that the Budget is inadequate because it fails to address statutory administrative claims under Bankruptcy Code section 503(b)(9), relating to goods received by the Debtors within twenty (20) days of the Petition Date.  Bankruptcy Code section 503(b)(9) provides, in pertinent part:

> (b)    After notice and a hearing, there shall be allowed administrative claims      .                    .                    .
>
> (9)    the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold in the ordinary course of such debtor's business.

Bankruptcy Code § 503(b)(9).

22.    The express terms of section 503(b)(9) restrict its application to "the value of any goods received."  11 U.S.C. § 503(b)(9).  Because the language in section 503(b)(9) is plain and

unambiguous, it should be enforced according to its exact terms.  See e.g., Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d 197, 202 (3d Cir. 1998).

23.    Furthermore, the legislative history of section 503(b)(9) reveals that Congress intended to provide additional relief for creditors who failed to give the required notice for reclamation claims under Bankruptcy Code section 546(c).  In re Brown & Cole Stores, LLC, 375 B.R. 873, 875 n. 3 (9th Cir. B.A.P. 2007).  As with section 503(b)(9), the reclamation rights under section 546(c) only apply to goods, not services.  11 U.S.C. § 546(c) ("the rights and powers of a trustee . . . are subject to the rights of a seller of goods that has sold goods to the debtor . . . ."); see also Sieler v. Hadley (Matter of GIC Gov't Sec.), 64 B.R. 161, 162 (Bankr. M.D. Fla. 1986) ("546(c) applies only to goods.").  Accordingly, the legislative history and plain language of section 503(b)(9), along with the plain language of 546(c), support the conclusion that administrative claims under this section are limited to the value of goods sold by the debtor in the ordinary course of the debtor's business.

24.    Spanco operates a call center that provides services – not goods – to the Debtors.  As such, Spanco cannot assert this objection under section 503(b)(9), which only applies to goods.  Accordingly, Spanco's objection should be overruled.

25.    Third, Spanco asserts that the liens on avoidance actions are inappropriate.  It should be noted that the liens provided to Adeptio under the DIP Agreement are limited to the diminution value of Adeptio's collateral during the postpetition period.  The Bankruptcy Code does not contain any express prohibition on providing secured lenders with liens on avoidance actions as a condition for making the debtor in possession loans.  See 11 U.S.C. § 364(c).

26.    As stated in a leading treatise on bankruptcy, the "trustee (or debtor in possession) may offer more than one of the protections described in section 364(c)."  3 Collier on

Bankruptcy, 364.04[1], at pg. 364-11-12 (15th ed. rev. 2005); see also In re Sobiech, 125 B.R. 110, 115 (Bankr. S.D.N.Y. 1991) (stating that, "[a]lthough the subdivisions in Code § 364(c) appear in the alternative, creditors often seek the 'super-priority' of Code § 364(c)(1) in conjunction with the lien protection of Code § 364(c)(2)."

27.    If debtors are unable to obtain credit from any other source, bankruptcy courts may allow secured lenders to obtain security interests in avoidance actions as adequate protection. Mellon Bank N.A. v. Dick Corp. (In re Qualitech Steel), 351 F.3d 290, 292 (7th Cir. 2003) (recognizing that even where secured creditors are the only parties obtaining benefits from avoidance actions, it still benefits the bankruptcy estate).

28.    Ultimately, if Adeptio were not permitted to obtain a lien on avoidance actions, Adeptio would refuse to lend, ending these chapter 11 cases. As discussed in the Mellon Bank case, the substantial prepetition deficiency claim held by Adeptio would mean that any recoveries to general unsecured creditors would inure primarily to the benefit of secured creditors. Accordingly, liens on avoidance actions are appropriate under these circumstances.

29.    Whether liens on avoidance actions are necessary and appropriate is a decision that should be left to Adeptio and the Debtors in the context of their good faith negotiations. Accordingly, Spanco's objection to Adeptio's lien on avoidance actions should be overruled.

30.    Fourth, Spanco's objection to the Debtors' waiver of Bankruptcy Code section 506(c) claims should be overruled.    The Debtors prepared the Budget, which specifies postpetition costs and expenses the Debtors intend to incur and pay. Adeptio has agreed to fund the postpetition costs and expenses and finance the losses until substantially all of the Debtors' assets are sold pursuant to the relief sought in the Sale Motion. If the Debtors use the proceeds of the DIP Facility to pay other expenses set forth in the budget, Adeptio should be not be

surcharged for such expenses.

31.    Furthermore, the right to use Bankruptcy Code section 506(c) to recover the costs

of preserving, or disposing of the collateral in securing an allowed secured claim, is expressly

limited to a trustee or debtor in possession. See 11 U.S.C. § 506(c) & 1107; see also Hartford

Underwriters Insurance Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6, 120 S.Ct. 1942 (2000).

Accordingly, Spanco has no standing to assert an objection to the Debtors' decision to provide a

waiver of Bankruptcy Code section 506(c) claims.

32.    The Debtors are well within their discretion to agree to waive section 506(c)

claims to obtain the DIP Facility and there are numerous examples where courts have approved

such agreements. See In re Film Equip. Rental Co., No. 91 Civ. 3476, 1991 U.S. Dist. LEXIS

17956, at *7 (S.D.N.Y. Dec. 12, 1991) (noting that a "trustee or his agent may by stipulation

with a secured creditor preclude a subsequent claim for recovery of administration expenses

from collateral.") In re Molten Metal Tech., Inc., 244 B.R. 515, 525 (Bankr. D. Mass. 2000)

(recognizing enforceability of a debtor's waiver of section 506(c) claims); Inteliquest Media

Corp. v. Miller (In re Inteliquest Media Corp.), 326 B.R. 825 (B.A.P. 10th Cir. 2005 (rejecting

appellants' argument that the 506(c) wavier in the financing order violated public policy).

33.    Similarly, courts have recognized that a 506(c) waiver can be an integral part of

the financing arrangement reached between a debtor and DIP lenders. See, e.g., In re Antico

Mfg. Co., 31 B.R. 103, 106 n.1 (Bankr. E.D.N.Y. 1983).

34.    For the foregoing reasons, the Spanco DIP Objection should be overruled in its

entirety.

### 3.    The Committee DIP Objection Should be Overruled

35.    The Committee DIP Objection begins with recounting the various arguments

present in each of their objections to the First Day Motions and the Motion to Dismiss, all of which are independently addressed in other pleadings. Ultimately, the Debtors seek approval of the DIP Financing to finance the Debtors' operations, including payments to employees, secured creditors, unsecured creditors, and non-Debtor parties to assumed executory contracts and leases. Although the contemplated sale does not currently anticipate a recovery to unsecured creditors, several parties stand to gain from the proposed sale transaction, not just the Debtors' secured creditor, as alleged by the Committee.

36.    The Committee's primary objection to the DIP Motion appears to be a request that Adeptio fund a plan and provide a distribution to unsecured creditors. This request, however, does not rise to the level of an objection to the proposed terms of the DIP Facility. The Debtors want to confirm a plan in this case, as does the Committee (presumably). Requiring a DIP lender to agree to fund a plan as a condition of making a DIP Facility is not regularly done and is not conventional, even in the most extreme cases, such as the In re Winstar Communications, Inc. case, where the sale proceeds did not even satisfy the debtor in possession loan.[2]

37.    Although the Committee may wish for a funded plan in this case, Adeptio should not be required to do so either. Adeptio's contribution to these bankruptcy estates, in the form of a substantial DIP Facility in the approximate amount of $25 million, is money primarily used to fund operations and pay unsecured creditors providing the Debtors with goods and services postpetition. The funds do not go into Adeptio's pocket, but rather provide a direct benefit to creditors.

38.    The Committee also raises several minor objections to the certain terms of the

---

[2] In the Winstar case, the assets were sold for approximately $30 million, which was substantially less than the $80 million DIP facility provided in the case. In re Winstar Communications, Inc., Case No. 01-1430 (D. Del. Apr.

DIP Facility, which requests should be denied as efforts to simply rewrite the terms of the DIP Facility. One bankruptcy court recently refused the unsecured creditors committee's request to rewrite a DIP agreement, noting that the committee was "in effect, asking [the court] to write out of the negotiated agreement a highly material term, which could place at risk the considerable sum of money that [the DIP lender] has already advanced . . . ." <u>Official Comm. of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.</u>, 322 B.R. 560, 571 (Bankr. M.D. Pa. 2005) (emphasis added). Here, Adeptio similarly entered into the DIP Facility based upon the specific negotiated terms and conditions contained therein. As was the case in <u>New World Pasta</u>, this Court should deny the Committee's request to rewrite provisions of an agreement that Adeptio insisted upon to extend the DIP financing to the Debtors. The Committee should not be permitted to upset the DIP Facility in an attempt to obtain concessions from Adeptio.

39.    The specific objections, and the Debtors' responses, are summarized as follows:

| Committee Objection | Debtors' Response |
| --- | --- |
| • Fees are excessively burdensome to Debtors' Estates. | • Fees are reasonable and customary for unrelated DIP lenders – which is not contested by Committee.<br>• No factual basis for demanding less fees simply because DIP Facility is provided by the prepetition secured lender.<br>• Costs not incurred by unsecured creditors or Debtors' estate.<br>• Adeptio is the only available source of debtor in possession financing. |
| • No release for "Prior Lenders". | • "Prior Lender" is intended to refer only to Adeptio, in its capacity as a prepetition lender, not Adeptio's predecessor secured lenders. Final order will clarify. |
| • Investigation period of 25 days is too short. | • 25 days is not too short, a lien investigation, under any circumstances, should only take a few days.<br>• Lien searches and related documents provided to Committee one business day after organizational meeting. |

2001).

| Committee Objection | Debtors' Response |
|---|---|
| • Lien on avoidance actions improper. | • Addressed _infra_.<br>• Liens on avoidance actions are for diminution in value only and are appropriate under the circumstances |
| • Adeptio should fund a plan. | • Not an objection to the terms of the DIP Facility, just the state of the case after the sale is closed.<br>• Adeptio not obligated to fund a plan under Bankruptcy Code or applicable law. |
| • 506(c) waiver is unreasonable and unnecessary. | • Addressed _infra_.<br>• Only Debtors can assert section 506(c) claim.<br>• Waiver is common and appropriate as collateral subject to the Debtors' business judgment. |
| • Events of Default such as material adverse charges, change in control and sale milestones are inappropriate. | • Events of Default are reasonable, customary and necessary for all lenders or debtor in possession lenders. Committee does not articulate why Adeptio should be deprived of customary protections.<br>• $3.2 million weekly cash burn justifies speed of proposed sale transaction. Slowing down process may result in more significant liens. |
| • Immediate relief from automatic stay improper. | • The proposed relief is typical and customary in Chapter 11 cases. |
| • Cannot amend DIP without Committee approval, except for nonmaterial amendment. | • Debtors would require Court approval for any material amendments outside the ordinary course of business. Committee has an opportunity to voice objections at that time. |
| • Final DIP Order should supercede the Interim DIP Order. | • Final DIP Order does supercede the Interim DIP Order, but only with respect to the time period after the Interim DIP Order expires. The Interim DIP Order controls the terms of the initial $10 million in lending. |

40.     The Committee fails to provide any legal basis for each of the aforementioned objections to the specific terms of the DIP Facility. Accordingly, the Debtors reserve the right to address the various objections in depth in the event the Committee supplements the Committee DIP Objection.

41.     After presenting a flurry of unfounded objections, the Committee then spends considerable time discussing the case of In re Duro Industries, Inc., 2004 Bankr. Lexis 1235 (Bankr. Mass. 2004) (hereinafter "Duro", a copy of the unpublished decision is attached hereto

as Exhibit A) on the basis that the facts of the Debtors cases are "strikingly similar" to the Duro case. See Committee DIP Objection, ¶¶ 18-25. This statement could not be further from the truth. A careful examination (or for that matter, a cursory review) reveals that the Duro case is in fact strikingly different from the facts at hand. In fact, the Duro case supports overruling the Committee DIP Objection and the Motion to Dismiss.

42.    As noted by the Committee, in Duro, the prepetition secured lender and the DIP lender were the same parties. In Duro, however, the prepetition secured lender and DIP lender also held a majority, and therefore, controlling share of the debtor's equity Upon the bankruptcy filing, it appeared that the secured lender holding secured claims in the amount of $47 million was woefully undersecured as the assets were valued at approximately $20 million. In re Duro Industries, Inc., 2004 Bankr. Lexis 1235, *1-*2 (Bankr. Mass. 2004). The debtors and the committee negotiated a consensual DIP financing agreement whereby, in exchange for the opportunity to market and sell the collateral, the lender carved-out $1 million in proceeds plus 20% of any sale proceeds in excess of $32 million for unsecured creditors. Id. at *2.

43.    Ten days after entry of the final DIP financing order, the committee "moved to reconsider and vacate the [DIP financing] order based on newly discovered evidence that the Debtor and secured creditor had agreed to the terms of the Financing Order without intent to market the property in any meaningful sense." Id. The basis of this motion was "fraud on the court" in the form of "false pretense of intent to conduct a fair and legitimate marketing effort and sale." Id. Based upon the agreement between the debtor, committee and secured lender, the Duro court ruled that the debtor and secured lender violated the agreement by failing to market the assets and thus procuring the agreement by fraud.

44.    The Duro court then reviewed the debtors' marketing efforts and made the

following findings: (a) the <u>Duro</u> court observed that the debtor had "made no significant effort at marketing the business and did not intend to make any further effort" (<u>id.</u> at *9); (b) although the debtors retained financial consultant who prepared a marketing book, the debtor did not distribute the marketing book to anyone (<u>id.</u> at *10-*11); (c) the debtor's principal did not market to strategic buyers as promised (purportedly leaving messages on answering machines of three potential buyers) (<u>id.</u>); (d) the debtor had not retained an investment banker or other broker to assist in identifying prospective purchasers (<u>id.</u>); and (e) the debtor failed to market to financial buyers (<u>Id.</u> at *12).

45.     The <u>Duro</u> court reasoned that the debtors' failure to engaged in a legitimate marketing process, despite its agreement with the committee to do so, revealed that the case was not filed in good faith. <u>Id.</u> at *19.  Importantly, the <u>Duro</u> court stated:

> I do not find that a sale to the Lender is necessarily inappropriate here. Indeed, the Lender may be the only entity who (because it can bid in its secured claim) can acquire the Debtor with a debt burden sufficiently small to operate the business at a profit. The problem is that the Debtor and Lender are circumventing the usual bankruptcy process – at the very least, a fair marketing effort – that normally determine whether such an outcome, at a price that is likely to be in the range of $20 million, is fair to unsecured creditors, whose interests are paramount in bankruptcy.

<u>Id.</u> at *19.

46.     The importance of the <u>Duro</u> case does not lie with <u>dicta</u>[3] concerning the purpose of chapter 11, an issue that was not before the court, or the propriety of DIP financing from secured lenders.  Rather, the <u>Duro</u> court determined that the proper marketing of assets in bankruptcy was required to determine and maximize value for the estate and the failure (if not collusion) of the debtor and secured lender in this regard was grounds for vacating the settlement

---

[3]  It should be noted that, in subsequent review of the decision issued by the <u>Duro</u> court related to a subsequent writ of mandamus, the United States Bankruptcy Appellate Panel of the First Circuit acknowledged that the "memorandum was, in the truest sense, unnecessary" and "was surplus to the case's administration and adjudication

reached between the parties. The case was ultimately dismissed, but not because there was no value to the chapter 11 process in permitting the sale of assets to unsecured prepetition lenders. Indeed, the Duro court acknowledged the value in such a process. The case was dismissed because the debtors failed to properly market the assets and, ultimately, the debtors consented to dismissal after the committee established their failure to market the assets at an evidentiary hearing. Id. at *23.

47.     The facts at hand differ greatly from the Duro case. Initially, Adeptio does not own any equity in the Debtors. It does not control the decisions made by the Debtors, which have continued to use their business judgment to determine the disposition of the Debtors' businesses. The Duro case also involved a committee seeking to vacate a prior consensual DIP order based on the debtors failure to comply with their agreement and committing a fraud on the court. The present procedural posture and standard for approval are dramatically different from the Duro cases.

48.     With respect to the marketing efforts, the single most important factor in the Duro court's decision to vacate the consensual DIP order, the facts could not be more different than the Debtors' cases. First, there is no allegation that the Debtors are not actively marketing the assets. Second, a marketing book was prepared by GAH and, unlike Duro, GAH has been sending the marketing book to prospective purchasers – 244 potential purchasers have been solicited postpetition (182 financial buyers and 62 strategic buyers), 18 confidentiality agreements have been received and 14 were executed, and 14 books were sent to potential purchasers along with data room access. Third, the Debtors hired GAH to serve as investment bankers prepetition and have filed the GAH Retention Application, which seeks to hire them postpetition to further assist in marketing the Debtors' assets. GAH is an experienced and

---

in every respect." In re Duro Industries, Inc., 293 B.R. 271, 281 & n. 15 (1st Cir. BAP 2003).

sophisticated investment banking firm with the expertise in marketing and selling assets in the bankruptcy context. Fourth, the Debtors and GAH focused on financial as well as strategic purchasers. Simply put, the marketing efforts of the Debtors and their professionals in these cases have not been (and cannot be) questioned by the Committee.

49.    Incredibly, the Committee repeatedly cites the Duro case as support for the proposition that the Debtors and Adeptio are arguably acting in bad faith and that the potential lack of recovery to unsecured creditors justifies denying the DIP Motion.[4] These statements are distortions, to say the least, of the rulings of the Duro court. Ultimately, the Duro court was primarily concerned with the integrity of the sale process and even acknowledged that sales to secured lenders are sometimes the only option in the bankruptcy process.

50.    The Committee continues their shell game on the good faith issue, citing general authority with respect to standards of good faith, then implying that Adeptio lacks good faith because it "wears different hats" in the bankruptcy process. See Committee Objection, ¶¶ 27-29. The Committee provides no specific that either the Debtors or Adeptio have acted in bad faith, nor any authority for the proposition that prepetition lenders serving as DIP lenders and potential purchasers is prima facie bad faith.

51.    The Committee argues that "[w]hile balancing the needs of the Debtors and affording deference to the Debtors' business judgment, the court must refuse to approve financing where the purpose of the financing is to benefit one creditor rather than the estate. In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ('[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor')." See Committee DIP

---

[4]  "The DIP Lender's action also call into question whether it is acting in good faith. Where a § 363 sale is concerned, '[g]ood faith requires fair effort; and use of the bankruptcy process requires adherence to bankruptcy standards for conducting sale.' [Duro at *18]. The Duro court suggests that the good faith standard, even absent an agreement, would require a 'fair marketing effort.' Id. at *17-*18." See Committee DIP Objection, ¶ 25.

Objection, ¶ 28. Once again, the Committee misconstrues the law in an attempt to persuade the Court to apply heightened scrutiny, instead of the business judgment rule, to the DIP Facility. The <u>Aqua Associates</u> court was discussing standards involved in priming other secured creditors pursuant to Bankruptcy Code section 364(d), not providing liens to DIP lenders who are also prepetition secured lenders. <u>Aqua Assocs.</u>, 123 B.R. at 195-97.

52.     In fact, as advised by the <u>Aqua Associates</u> court, "[i]t is important for a bankruptcy court to make a qualitative assessment of the credit transaction in light of readily-available [alternative financing] before granting any § 364 motion." <u>Id.</u> at 196. Under the circumstances, the proposed DIP Facility should be compared to the alternative forms of financing available to the Debtors, which alternatives do not exist. Accordingly, the DIP Motion should be granted.

53.     The Committee DIP Objection concludes with citations to <u>In re Stoney Creek Techs., LLC</u>, 364 B.R. 882, 895 (Bankr. E.D. Pa. 2007), yet another case discussing the heightened scrutiny applicable to section 364(d) DIP financing and arguing, with no apparent logical connection, that these standards apply to financing pursuant to section 364(c). There is no basis from this radical departure from the business judgment standard applicable to the facts at hand.

54.     For the aforementioned reasons, the Debtors respectfully request that this Court grant the DIP Motion, overrule the Committee DIP Motion and enter the Final DIP Order.

**B.     The Objections to the GAH Retention Application Should be Overruled**

55.     As a continuation of the Committee's efforts to disrupt the sale process to the detriment of the Debtors, their employees and the secured and unsecured creditors, the Committee has objected to GAH's retention as part of the objection to the sale process and DIP

financing.  GAH has provided, and continues to provide, extensive services to the Debtors in an effort to maximize value for the Debtors and their estates.  These efforts are ongoing and GAH is entitled to the reasonable compensation package it negotiated with the Debtors.

56.     It should be noted that neither of the objections to the GAH Retention Application constitute an objection to either the amount of the monthly fees or success fee charged or the qualifications and expertise of GAH in providing the requested services.  The contemplated fees are standard in the marketplace for a distressed company of the size and complexity of the Debtors' businesses and are abundantly reasonable based on the scope of the investment banking services that GAH continues provide to the Debtors, their estates and their creditors.

57.     Rather, the Committee and the UST contend that GAH should not earn a fee for the proposed sale to Adeptio, a transaction that GAH was instrumental in obtaining and continues to facilitate through its efforts to satisfy the due diligence and financing conditions required thereunder.  GAH continues to manage a robust sale process for the sale of the Debtors, working with numerous potential purchasers to obtain the highest value for the Debtors, their estates and creditors.  The fact that the current transaction with Adeptio, if consummated, does not currently provide a recovery to unsecured creditors is not a valid basis to deny the GAH Retention Application.

58.     The Committee and UST each object to the GAH Retention Application on primarily two grounds:  (a) in light of the economics of these chapter 11 cases, the retention and fees of GAH are inappropriate; and (b) the proposed retention documents contain improper indemnification and exculpation provisions.  Neither of these arguments justify denial of the GAH Retention Application.

1.   The Retention and Compensation of GAH is Appropriate in These Chapter 11 Cases

59.     The context of the underlying transaction does not constitute a basis for objecting to the GAH Retention Application. If the Committee and UST contest the proposed sale, their grievances are more appropriately heard as objections to the sale motion or in the context of the motion to dismiss – not as attempts to hold professionals hostage. If the sale process is deemed to be reasonable and appropriate, GAH's fees should similarly be found to be reasonable.

60.     The Debtors are entitled to deference in connection with their choice of professionals. The costs of GAH's retention, as well as other professional claims and operating expenses in these chapter 11 cases, are being borne exclusively by Adeptio. Adeptio has agreed to fund these chapter 11 cases, including professional fees, up to approximately $25 million through the sale process. The proposed asset purchase agreement signed by Adeptio expressly provides that GAH's fees are an assumed liability of Adeptio. The unsecured creditors will not bear any costs in these cases. By effectuating the purchase of substantially all of the Debtors' assets, the Debtors, the secured creditors, the employees, and unsecured creditors all stand to benefit from the proposed sale. In addition, notwithstanding the significant amount of secured debt, the Debtors may receive bids in excess of the stalking horse price offered by Adeptio. Depending on the size of a competing bid, if any, it is possible that Adeptio will consent to the sale, and the estates will further benefit by GAH's services.

61.     Even if no additional bids are received, it is inaccurate for the Committee to assert that GAH is not providing valuable services to the Debtors' estates. See, e.g., In re Channel Master Holdings, Inc., 309 B.R. 855, 861 (Bankr. D. Del. 2004) (recognizing that "success is not a prerequisite to allowance of fees in chapter 11.") GAH has been and continues to run a vigorous sale process. Since the Petition Date, 244 potential purchasers (182 financial buyers

and 62 strategic buyers) have been solicited, 18 confidentiality agreements were received and 14 were executed, and 14 books were sent to potential purchasers along with data room access. GAH has reviewed and explored strategic options available to the Debtors and will continue to do so. In light of the foregoing, it is clear that the Committee and UST GAH Objections are unfounded.

62.    Finally, despite the Committee's repeated statements to the contrary, Adeptio, as a secured creditor, is one of the constituents of the Debtors' estates. See Mellon Bank, 351 F.3d at 293. The credit bid proposed by Adeptio, if it becomes the successful bid at auction and is approved by this Court, will result in substantial compensation to the bankruptcy estate. Indeed, it would reduce the Debtors' obligations to its secured creditor by approximately $50 million, plus assumed liabilities. The payment of these amounts represent substantial consideration to the Debtors' estates, to the benefit of all of its constituents.

63.    The situation at hand is no different than any other case involving prepetition secured lenders that are undersecured. Instead of the Debtors receiving cash from a stalking horse bidder and immediately paying all of it to the undersecured secured creditor, the Debtors are obtaining a substantial reduction of their prepetition secured obligations as a result of Adeptio's credit bid. Despite the attempts to characterize this case differently, the facts of these cases are not demonstrably different than other typical chapter 11 section 363 sales. The identity of the parties does not change the fundamental economics of the cases.

64.    The form of consideration paid by Adeptio is irrelevant in deciding the appropriate amount of compensation to GAH. Other courts analyzing investment banker fees in the context of credit bids have ruled that credit bids and assumed liabilities provide benefits to the estate, and thus compensation for professional services is still appropriate. See In re HNRC

Dissolution Co., 340 B.R. 818, 824-25 (E.D.Ky. 2006) (holding that the Bankruptcy Code treats credit bids "the same as if the secured creditor paid cash and then immediately reclaimed that cash in payment of the secured debt."). The fact that a credit bid is involved does not change the fact that GAH has provided (and continues to provide) valuable services to the Debtors' estates.

65.    The objections to the nature of the compensation received by GAH are really veiled objections to the underlying sale. To the extent the sale is appropriate, the estates are obligated to seek competing bids. GAH was responsible for bringing the current deal to the table, to the benefit of the Debtors' estates, secured creditors, unsecured creditors and employees, and is extensively marketing the assets postpetition. Accordingly, the UST and Committee GAH Objections should be overruled with respect to the propriety of retaining investment bankers in these chapter 11 cases.

2.    GAH's Compensation Structure Should Be Approved Subject to Review Under the Federal Mogul-Global Standard

66.    Section 328(a) of the Bankruptcy Code specifically permits a trustee or debtor in possession to retain professionals "on any reasonable terms and conditions of employment." See 11 U.S.C. § 328(a). "In sharp contrast with the old Bankruptcy Act, [this section] now authorizes the court to pre-approve a wide variety of employment arrangements between [professionals] and the trustee [or debtor in possession]." In re Benassi. 72 B.R. 44, 47 (Bankr. D. Minn. 1987); see also Robert J. Landry & James R. Higdon, A Primer on 11 U.S.C. 328(a) and its Use in Alternative Billing Methods in Bankruptcy, 50 Mercer L. Rev. 537, 544-545 (1999).

67.    Section 328(a) of the Bankruptcy Code enables professionals to obtain pre-approval of the particular terms and conditions of their employment at the outset of a case. See, e.g., Benassi, 72 B.R. at 47. The pre-approval of the terms of retention at the beginning of a

chapter 11 case both minimizes problems at the time applications for compensation are filed and provides debtors with the benefit of predicting the funds which will be expended in compensating professionals. See Landry & Higdon, 50 Mercer L. Rev. at 538-539. "Prior to 1978, the most able professionals were often unwilling to work for bankruptcy estates where their compensation would be subject to the uncertainties of what a judge thought the work was worth after it had been done." In re National Gypsum Co., 123 F.3d 861, 863 (5th Cir. 1997). Similarly, "[i]f the most competent professionals are to be available for complicated capital restructuring and the development of successful corporate reorganization, they must know what they will receive for their expertise and commitment." In re Merry-Go-Round Enters., Inc., 244 B.R. 327, 337 (Bankr. D. Md. 2000) (citing National Gypsum, 123 F.3d at 863).

68.     Here, such uncertainty may be avoided by obtaining the Court's approval of the terms of the retention agreed to by the Debtors and GAH, keeping in mind that the Court reserves the power to later alter the arrangement should the terms prove improvident under Bankruptcy Code section 328(a). See In re Northwestern Corporation, 344 B.R. 40, 43 (D. Del. 2006) (noting that the court may reduce compensation if it determines under section 328(a), that "such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions") (quoting In re Federal Mogul-Global Inc., 348 F.3d 390, 397 (3d Cir. 2003)). The proposed retention order for GAH expressly reserves the right of the UST to object to GAH's fees based on the reasonableness standard set forth in Bankruptcy Code section 330.

69.     Based on the foregoing reasons, the Debtors respectfully suggest that the compensation and fees to be paid to GAH are fair and reasonable as determined by the market for such compensation and fees, and in conformity with compensation and Fees paid for similar

services in other cases.  See, e.g., In re Premium Papers Holdco. LLC, Case No. 06-10269 (Bankr. D. Del. 2006) (Sontchi, J.) (approving retention and fee structure of Guiliani Capital Advisors under 11 U.S.C. § 328(a)).

70.    The retention of GAH is necessary and appropriate because various aspects of the Debtors' ongoing chapter 11 cases and prospective restructuring require expertise unique to the investment banking community in areas in which GAH excels.  GAH's expertise, experience and contacts in the wireless business, and along with its chapter 11 and restructuring expertise, provide the Debtors with the tools required to assist the Debtors in these chapter 11 cases.

> 3.    GAH Consents to Certain Modifications Requested
> In the UST and Committee GAH Objections

71.    The UST and Committee GAH Objections raise certain technical issues with respect to the terms of GAH's retention.  GAH is willing to modify the terms of their engagement to address such technical issues and will attempt to negotiate a revised form of order with the Committee and the UST prior to the hearing on the GAH Retention Application.  If, despite these efforts, certain concerns still remain, the Debtors and GAH reserve their rights to address those concerns as appropriate.

## CONCLUSION

72.    The Debtors respectfully request that this Court overrule the objections filed to the First Day Motions and grant such other and further relief as this Court deems just and proper.

Date:    November 28, 2007
        Wilmington, Delaware

Respectfully submitted,

**THE BAYARD FIRM**

By: _____
Neil B. Glassman (No. 2087)
Mary E. Augustine (No. 4477)
222 Delaware Avenue
Suite 900
P.O. Box 25130
Wilmington, DE  19899
Telephone:     (302) 655-5000
Facsimile:     (302) 658-6395

      and

**DLA PIPER US LLP**

Thomas R. Califano
Jeremy R. Johnson
1251 Avenue of the Americas
New York, New York  10020
Telephone:     (212) 335-4500
Facsimile:     (212) 335-4501

Proposed Counsel for Debtors
and Debtors in Possession