# EXHIBIT A

1 of 1 DOCUMENT

In re DURO INDUSTRIES, INC., Debtor.

Chapter 11, Case No. 02-16131-CJK

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF MASSACHUSETTS

2004 Bankr. LEXIS 1235; 43 Bankr. Ct. Dec. 147

October 7, 2002, Argued
August 26, 2004, Filed

**COUNSEL:** [*1] Daniel C. Cohn, Cohn & Whitesell, L.L.P., Boston, MA, and David B. Madoff, Madoff & Khoury, L.L.P., Foxboro, MA, for Debtor Duro Industries, Inc.

Jonathan D. Yellin, Riemer and Braunstein, Boston, MA, for Creditor Committee Official Committee of Unsecured Creditor.

**JUDGES:** Carol J. Kenner, United States Bankruptcy Judge.

**OPINION BY:** CAROL J. KENNER

**OPINION**

MEMORANDUM OF DECISION ON

DISMISSAL OF TILE CASE

On September 13, 2002, this Court entered a final order approving the Debtor's use of cash collateral and authorizing postpetition financing ("Financing Order"). The order was a consensual one, negotiated and agreed to by the Debtor, the principal secured creditor, who is also the Debtor's postpetition lender ("the Lender"), and the Official Committee of Unsecured Creditors. The Lender, which also holds a majority and therefore controlling share of the Debtor's equity, asserts a security interest in virtually all assets of the Debtor; the Lender and the Debtor maintained that the collateral has a value of $ 20 million and that the collateral secures a debt of $ 41.7 million (plus accruals for postpetition financing). Thus, at the outset of this Chapter 11 case, it appeared that a dividend [*2]   for unsecured creditors was unlikely. The negotiated order involved a clear *quid pro quo:* in exchange for an opportunity to market and sell its collateral in bankruptcy, the Lender created a valid bankruptcy purpose for the sale process by guaranteeing to the estate, by means of a carve-out from the sale proceeds, a return for non-priority unsecured creditors of $1,000,000 plus 20% of any sale proceeds in excess of $ 32,000,000.

Ten days later, the Committee moved to reconsider and vacate the order, based on newly discovered evidence that the Debtor and secured creditor had agreed to the terms of the Financing Order without intent to market the property in any meaningful sense. The Committee maintained that the Debtor and secured creditor had been colluding from before the start of the case to sell the assets to the secured creditor as the ostensible "stalking-horse" bidder through a process designed to minimize the likelihood of a counteroffer. In essence, the basis of the motion was fraud on the court: that the Financing Order had been obtained under the false pretense of intent to conduct a fair and legitimate marketing effort and sale. After a hearing on the motion, the Court [*3] determined that the Committee had proven that the intended marketing efforts were inadequate to justify conducting this sale through the bankruptcy process, and certainly that they were not consistent with the promise by the Debtor and the Lender to the unsecured creditors of a share in proceeds over $ 32 million. On the basis of these finding, the Court determined that the appropriate remedy was to dismiss the case; the order of dismissal entered on September 26, 2002. By the present memorandum of decision, the Court hereby sets forth its findings and rulings in support of that order.

FACTS

Duro employs some 592 individuals in the business of textile finishing in Fall River, Massachusetts. In December 2000, Duro entered into a debt restructuring agreement with its then lender (a consortium): the lender agreed to reduce its secured debt from $ 85 million to $ 50 million; in exchange, the lender received (among other things) 51 percent of the outstanding common

Case 07-11666-KG    Doc 131-1    Filed 11/28/07    Page 3 of 7

Page 2

2004 Bankr. LEXIS 1235, *; 43 Bankr. Ct. Dec. 147

stock of Duro. Subsequently, the lender sold the debt and stock to the current holder, Ark Investment Partners, II, L.P and Ark CLO2000-1, Limited (together, "Ark" or "the Lender"), for whom State Street [*4] Bank and Trust Company acts as agent. Duro [1] filed a petition under Chapter 11 of the Bankruptcy Code on August 23, 2002. At the time, the Duro was indebted to the Lender in the amount of $ 41.7 million; this debt was secured by a security interest in virtually all of Duro's assets. According to Duro, it also owed another $ 23.5 million to trade and other unsecured creditors.

> 1  Duro's wholly-owned subsidiary, Tapetex, Inc., also filed for Chapter 11 protection at the same time. Duro has no operations and no employees, and its sole asset is a claim in litigation.

Shortly after its bankruptcy filing, Duro moved for entry of interim and final orders authorizing the Debtor to (I) use the Lender's cash collateral, (ii) obtain secured post-petition financing from the Lender, and (iii) provide adequate protection and post-petition security to the Lender. The proposed debtor-in-possession financing package for which this motion sought approval would have provided up to $ 4 million of new financing for the Debtor [*5] for a period of up to 90 days, but it also provided for early termination of the financing agreement if, within forty-five days of the petition date, the Debtor did not file a motion to sell substantially all of the Debtor's assets. At the initial hearing on this motion, the Debtor and the Lender indicated that, during the initial 45 days of the case, the Debtor would market and generate an initial offer for the assets, [2] with a *§ 363* sale to be approved and consummated no later than the ninetieth day after the bankruptcy filing. They made clear that the entire purpose of the Chapter 11 case was to effect a *§ 363* sale of the Debtor as a going concern, and to complete that sale in very short order.

> 2  The parties made directly conflicting statements about the marketing efforts as of that hearing date. At the hearing, the Court asked Daniel Cohn, Debtor's counsel: "What discussions have you had with respect to a sale, and with whom?" He answered, "the only discussions have concerned a stalking horse bid by the secured lender." Later, the Court asked Debtor's counsel: "Have you been marketing the company?" He answered, "We have had discussions with the company about the process that we should use, but we have not marketed the company." Lender's counsel then stated: "A couple of fill-in points. My understanding, although I would not testify in court to it, although you may hear testimony to this effect at the appropriate time, is that the company actually has been conducting an effort to sell itself for quite some time." The Court was offered no explanation for the discrepancy between these two statements. However, Lender's counsel shortly thereafter added:

> > LENDER'S COUNSEL: I would just like to eliminate any concern that we're entering bankruptcy with the purpose of conducting a quick-trigger sale to an obvious buyer which is the lender. That is simply not the case. If there is a buyer that's willing to pay more than we guess the value of the collateral to be, they are certainly welcome to take this company off of our hands.

[*6] Expedition was required because, according to the Debtor and the Lender, the Debtor would not earn enough in the near term to cover even its ongoing expenses of operation: it would be losing money while in bankruptcy, and more than a little: a budget submitted with the financing motion projected a post-petition deficit of some $ 3.7 million over the 90-day budget period. However, the Debtor and Lender both explained that, despite these expected losses, this deficit was only seasonal, the result of a scheduled summer production shutdown. Counsel for the Lender explained that the business's general problem was its debt burden; counsel stated, "its likely to be a successful business with a different capital structure, with a lower debt service requirement." In other words, despite the short-term deficit, the Company was capable of operating profitably- and, by extension, might prove attractive to prospective purchasers.

Counsel to the U.S. Trustee articulated his misgivings about whether the requirement that the Debtor file a motion to sell within 45 days created an insurmountable barrier to the Debtor's marketing effort, but he agreed to defer his objection until the appointment of [*7] a Creditors' Committee.

At the conclusion of the hearing, the Court allowed the motion on an interim basis and scheduled a final hearing on the motion for September 13, 2002. Before the final hearing, the United States Trustee appointed an Official Committee of Unsecured Creditors; one of the Committee's seven members alone held approximately $ 8 million of the unsecured debt in this case. Before the final hearing on the financing motion, the Committee filed an objection to the financing motion. Among other things, the objection stated:

Case 07-11666-KG    Doc 131-1    Filed 11/28/07    Page 4 of 7

Page 3

2004 Bankr. LEXIS 1235, *; 43 Bankr. Ct. Dec. 147

> It is apparent from the face [of the financing motion] and the posture of this case that the DIP Lenders (the Lender] have sought to structure this case merely to take advantage of the bankruptcy provisions providing for sale of assets free and clear of liens under *section 363* of the Code, and have created a mechanism within which to expedite this process at the expense of other creditors. The Court should not sanction nor permit the DIP Lenders to use this court as a clearinghouse so that it may obtain the benefits of an ongoing business without the requisite benefit [to] the estate. It is clear that as currently structured, the only [*8] parties to benefit in this Chapter 11 case are the DIP Lenders who are obviously working as the owner of the Debtor in an effort to preserve the equity and foreclose on the assets.

However, at the final hearing on the financing motion, the Committee negotiated a resolution of its objections to the motion with the Lender and the Debtor. Under their agreement, the Committee assented to the Financing Order and, in essence, to the Lender's using the bankruptcy case to effect a sale of its collateral free and clear of liens. In exchange, the Lender agreed that, despite the apparent lack of equity in the collateral for the estate, the Lender would guarantee to the estate, by means of a carve-out from the proceeds of any sale, a return for unsecured creditors of $ 1 million plus the proceeds of certain litigation, plus twenty percent of any recovery (from sale of the Debtor's business) in excess of $ 32 million. This agreement was incorporated into the Final Order approving the sale, which the Court entered at that hearing.

The agreement accomplished two purposes. First, it gave the estate an assured stake in the sale and thus created a purpose for the sale's occurring in bankruptcy. [*9] More importantly (for present purposes), by virtue of its granting to the estate a twenty percent interest in proceeds over $ 32 million, it gave the estate an interest in *the amount* of the recovery: a reason to care that efforts were taken to maximize the recovery, not simply to effectuate a sale to the Lender at the amount of its low, stalking-horse bid. According to the opinions of value put forward by the Debtor and the Lender, a recovery in excess of $ 32 million seemed very unlikely, but the assumption that underlay this provision was that the Debtor and Lender intended to market the business in such a way as fairly to test that possibility. This was not an unreasonable assumption: the Lender itself clearly has an interest in recovering at least the amount of its lien, which is in excess of $ 41 million; and the Debtor's schedules value the assets in the aggregate at $ 49 million.

On September 23, 2002, the Creditors' Committee moved to vacate the order on the basis of new evidence that, as of September 20, 2002, the Debtor had made no significant effort at marketing the business and did not intend to make any further effort. (At that point, 30 days of the 45-day window [*10] of opportunity to file a motion to sell had expired.) The Committee charged that the financing order had been obtained under the false pretense, and with false representations, that the Debtor and Lender were intent on conducting a fair and vigorous marketing effort to obtain the highest and best price for the assets. Rather, concluded the Committee, the Lender, as controlling shareholder, was intent on using the Debtor and the bankruptcy process simply to obtain full title to the business and its assets for itself free and clear of liens and of $ 23 million in trade debt. The Committee's motion, which was filed and heard on an emergency basis, asked simply that the final financing order be vacated and for such other and further relief as is just and proper," but it made no attempt to specify what further relief might be appropriate.

The Court held a hearing on the motion on September 25, 2002, at which the Debtor's president and CEO, Lawrence Hymes, testified about the marketing effort. He indicated that the Debtor, with the assistance of its financial consultant, Horizon Advisors, LLC ("Horizon"), had created a marketing book, through which information about the Debtor could [*11] be made available to prospective purchasers. However the Debtor had not yet distributed the marketing book to anyone. He also stated that he himself had assembled a list of approximately ten entities whom he believed might have a strategic interest in acquiring the Debtor; many of these were on the creditors committee. Either he or a principal of Horizon, Dennis Gerard, had called the entities on the list to notify them that the Debtor's business was for sale. As to the first three (at least), he only left messages on answering machines. The Debtor has not retained an investment banker or other broker to assist in identifying prospective purchasers; Horizon, to whom the Debtor has assigned the task of heading-up the marketing effort, is not a broker and has no experience in marketing textile companies. Horizon has no plans and no instructions from the Debtor to conduct further marketing efforts other than (1) to answer inquiries from prospective purchasers and (2) if someone (such as a member of the Creditors Committee) identifies a prospective purchaser, to contact those prospects. Mr. Hymes stated that he felt confident that, in view of the relatively small size of the domestic textile [*12] industry, he himself could iden-

Case 07-11666-KG    Doc 131-1    Filed 11/28/07    Page 5 of 7

Page 4
2004 Bankr. LEXIS 1235, *; 43 Bankr. Ct. Dec. 147

tify all the entities who might have an interest in acquiring the Debtor's business, and therefore, he maintained, there was no need to retain an outside broker. But Hymes himself ruled out whole categories of prospective purchasers-financial (as opposed to strategic) investors, the Debtor's customers, and the Debtor's foreign competitors (or foreign textile/apparel manufacturers in general)-and did not intend to pursue them.

Hymes conceded that the Debtor had hired Horizon, the financial advisor whom the Debtor designated to "own" the Debtor's marketing effort, on the Lender's recommendation and without prior interview; and that, after the Lender had suggested Horizon, the Debtor had not asked for the names of other prospective financial advisors. He also conceded that, at the September 20 meeting of the Creditors Committee with Hymes and Horizon's Dennis Gerard, Gerard had stated:

> 1. that Horizon was also working on another matter for the Lender; [3]
>
> 2. that Horizon is a three- or four-person shop, specializing in work-out and turn
>
> around management, with no experience in the textile industry; and
>
> 3. that he (Gerard, through Horizon) had not [*13] been engaged as an investment banker
>
> type person to market and sell the Debtor's business.

According to the Debtor's application for authority to employ Horizon, the Debtor was employing Horizon as a "financial consultant." Neither the application nor Gerard's supporting declaration mentions marketing duties. The application listed various services that the Debtor anticipated Horizon would perform, including "assisting in the negotiating and consummation of potential dispositions of certain of the Debtor's assets." This is the closest the application comes to disclosing a possible role for Horizon in the sale process, but negotiating and consummating are not marketing.

> 3  In fact, Debtor's application to employ Horizon specifies that "a principal of Horizon is presently engaged as a financial consultant/CEO for a company for which the Ark Entities [the Lender] is a secured lender and equity holder."

Hymes was of the opinion that a financial investor would have no interest in the Debtor because, [*14] in recent years, the Debtor has not only been losing money but also had a negative EBITDA, which is to say, it has not been covering even its operating expenses. However, he later added that the Debtor anticipated that EBITDA in the next fiscal year (commencing 10/1/02) would be positive, in the range of $ 3 million; and that "underneath all of the problems that we have, there is a company that can survive.... I think we have much to accomplish, but I think it's doable." Nonetheless, despite this possibility of a turnaround, Hymes believed that only a strategic investor-someone in the textile industry who saw a strategic benefit to the acquisition-might have an interest in the Debtor; for this reason, the Debtor was not attempting to identify potential financial investors. Much of the textile industry, and therefore most of the possible strategic investors, have moved out of the United States, but Hymes and the Debtor never explained why they were not approaching foreign competitors as possible purchasers.

Debtor's counsel, Mr. Cohn, also stated at the hearing-more as evidence than argument, though not under oath-that the subject of the sale process was not a subject of discussion [*15] during the negotiations of the agreement between the Committee, the Lender, and the Debtor on the financing motion. "The premise of that deal.., was that the creditors were going to get a flat $ 1 million dollars plus the proceeds of the Tapetex litigation. That was the essence of the deal. There was also a sharing of proceeds above $ 32 million, but all the discussion on the record at any point during the case and all the discussion amongst the parties in the context of the negotiations was to the effect that it would be a rare and surprising event if a price that high we to be realized." Transcript of 9/25/02 hearing, pp. 36-37.

At the hearing on the Committee's motion to vacate, the Debtor and the Lender both argued that the Committee's "newly discovered evidence" of deficiencies in the marketing process was not new evidence at all. They maintained that the Committee was on notice from before the September 13 hearing that the Debtor had not yet conducted marketing efforts (or at least the evidence on that point was contradictory). Moreover, at previous hearings, the Debtor had outlined the sales process that the Debtor then envisioned. DISCUSSION

From the start of this case, [*16] the United States Trustee has taken the position that, where there is no equity in the assets for the estate, the sale that the Lender contemplates should not be permitted to occur in bankruptcy unless the Lender guarantees a meaningful dividend for unsecured creditors. Transcript of Hearing of August 27, 2002, at p. 11. The Committee itself reiterated this position as its principal objection to the financing motion. The Court agrees and has made its position clear from the start of this case. Where all equity in a debtor's assets belongs to the secured creditor, with no

Case 07-11666-KG   Doc 131-1   Filed 11/28/07   Page 6 of 7

Page 5
2004 Bankr. LEXIS 1235, *; 43 Bankr. Ct. Dec. 147

appreciable expectation of a remainder for unsecured creditors, the liquidation of the assets serves no bankruptcy purpose and should not be permitted to occur in bankruptcy. Here the Lender created a bankruptcy purpose by, in part, promising to creditors a share of any proceeds in excess of $ 32 million.

This promise was critical to the Committee's withdrawal of its objection to the financing motion, not only because it potentially enriched the creditors, but also because it meant that the sale process would have to be conducted in such a way as to determine the real value of the assets by a fair and aggressive marketing [*17] effort. Absent that kind of commitment from both Lender and Debtor, the promise of "a share in the upside" would be a charade, not to mention a breach of contract by the Lender and a breach of fiduciary duty by the Debtor. Without this mechanism to test the value of the assets, the unsecured creditors had little ability to independently determine their value. Having this means of testing value was especially important where (1) the Lender has a controlling interest in the Debtor, (2) the Lender planned to bid on the business, (3) the Lender and Debtor (whether compelled by the exigencies of the case or not) had established a very short time schedule for completing the sale process, (4) both Debtor and Lender maintained that the Lender is grossly undersecured and were establishing low expectations for the sale price and even for prospects of a competing bid, but *(5)* at the same time, the Lender (in the words of its own counsel) seeks to dispel "any concern that we're entering bankruptcy with the purpose of conducting a quick-trigger sale to an obvious buyer which is the lender." To dispel that concern in these circumstances, there needed to be a fair marketing effort. The agreement [*18] to provide the unsecureds with a share of proceeds over $ 32 million put both Lender and Debtor under an obligation to fairly test that possibility. [4] Indeed, the Lender cannot have hoped to dispel its concern about a "quick trigger sale to an obvious buyer" without such a mechanism. Good faith requires fair effort; and use of bankruptcy process requires adherence to bankruptcy standards for conducting sales.

> 4   This is not to say that the Debtor would not have been under a fiduciary duty to conduct a fair marketing effort even without the agreement.

On the basis of the evidence produced at the hearing, the Court concluded that the Committee had sustained its burden of proof. The Debtor and the Lender had not, at any time in the case, intended to conduct a serious marketing effort as to the Debtor's business. Rather, their intent was that the Lender would submit a low bid, ostensibly to be used as a stalking-horse, but with no real expectation that it would have to compete against other potential purchasers. [*19] The Debtor did not hire a broker, an investment banker, or a professional of any sort with knowledge of how these assets should be marketed. Its use of Horizon to lead its marketing effort was a fig leaf for an effort that didn't exist. (Horizon was not even hired to market the company-had marketing been mentioned in the application, the application would surely have raised serious concerns about disqualification.) There was no attempt to approach foreign investors. There was simply no effort here commensurate with the size of this enterprise, certainly no effort sufficient to dispel the notion that this case was not filed, and the sale process was not designed, simply to wash the assets though bankruptcy for the benefit of the Lender. [5]

> 5   I do not find that a sale to the Lender is necessarily inappropriate here. Indeed, the Lender may be the only entity who (because it can bid in its secured claim) can acquire the Debtor with a debt burden sufficiently small to operate the business at a profit. The problem is that the Debtor and Lender are circumventing the usual bankruptcy processes-at the very least, a fair marketing effort-that normally determine whether such an outcome, at a price that is likely to be in the range of $ 20 million, is fair to unsecured creditors, whose interests are paramount in bankruptcy.

[*20] The argument that the evidence about the scope and nature of the marketing efforts had already been fully disclosed, such that there is no new evidence here to justify vacating the order, misses the point: the Committee was not deceived as to what had happened before approval of the final financing order, but as to what efforts the Debtor and Lender intended to make from the date of that order going forward. At least as of the approval of the agreed financing order, the Debtor and Lender had placed themselves under an obligation to the creditors to market the assets fairly and (at least on the Debtor's part) with diligence befitting a fiduciary. Whatever may have been the marketing plans before the agreed financing order, that order and the underlying agreement created new obligations and new expectations. The Committee was fully entitled to expect appropriate marketing efforts would immediately be undertaken. The Committee could not have known at the hearing that this promise of a share in the upside would not be matched by prospective marketing efforts designed to fairly test the possibility of a recovery upward of $ 32 million.

The final financing order was thus obtained under, [*21] if not false pretenses by the Debtor and the Lender, at least a misunderstanding as to the scope of the of the marketing effort to which the Debtor and Lender had in effect committed themselves. They promised the Committee a share in any proceeds in excess of $ 32 million without any bona fide intent to solicit bids that

Case 07-11666-KG   Doc 131-1   Filed 11/28/07   Page 7 of 7

Page 6
2004 Bankr. LEXIS 1235, *; 43 Bankr. Ct. Dec. 147

might exceed that threshold. The promise was made by the Debtor and the Lender alike without intent to honor the implicit marketing requirement, and the Committee relied on the promise to its detriment. On this basis, I concluded that there existed cause-fraud and misrepresentations by the Debtor and the Lender-to vacate the final financing order. *FED. R. CIV. P. 60(b)(3)*, made applicable by *FED. R. BANKR. P. 9024.* [6] However, if the Court were simply to vacate the financing order, the Debtor would remain in bankruptcy, but without authority to use its cash or to borrow further from the Lender. Moreover, the estate would remain in the charge of the Debtor, which is itself subject to the control of the Lender (as shareholder) and-on the basis of the evidence presented to me in conjunction [*22] with this motion-should not remain a fiduciary of the estate. [7] Nor could the Court simply replace the Debtor as fiduciary with a Chapter 11 Trustee: the Trustee could not continue the Debtor's business in operation without use of the Lender's cash collateral and postpetition financing; and, under the financing order itself, all authority to use such financing would terminate upon appointment of a trustee. The only option remaining was dismissal of the case, which would at least permit the Debtor and Lender to continue the Debtor in operation pending a sale of the assets.

6   In relevant part, *Rule 60(b)(3)* provides: "On motion and upon such terms as are just, the court may relieve a party... from a final judgment, order, or proceeding for the following reasons: ... (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or misconduct of an adverse party."

7   As it happens, the first concern expressed by the United States Trustee at the preliminary hearing on the financing motion was whether Debtor could discharge its fiduciary duties where the Lender is its majority shareholder.

[*23] At the conclusion of the hearing, the principal unsecured creditor indicated that its preferred remedy would be for the Court to dismiss the case. And the Lender, too, indicated that, if the Court were inclined to vacate the order, the Court should simply dismiss the case instead, in order to avoid issues under *§ 364(e)* regarding the continuing validity of postpetition security interests as securing postpetition advances. The Court agreed and accordingly dismissed the case.

Carol J. Kenner

United States Bankruptcy Judge