IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| INPHONIC, INC., et al.[1] | : | Case No. 07-11666 (KG) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | Re: Docket Nos. 87, 102 & 104 |
| | : | |

**ADEPTIO'S OMNIBUS RESPONSE (I) TO CREDITORS'
COMMITTEE'S (A) MOTION TO DISMISS AND (B) MOTION TO
RECONSIDER BIDDING PROCEDURES ORDER AND (II) IN
SUPPORT OF FINAL ORDER FOR POST-PETITION FINANCING**

Adeptio INPC Funding, LLC ("Adeptio") hereby files this omnibus response and reply to

the pleadings referenced herein and respectfully represent as follows:

*Preliminary Statement*

The official committee of unsecured creditors (the "Creditors' Committee") has filed

several pleadings[2] in the above-captioned cases that attempt to characterize Adeptio as a "bad

---

[1]    The Debtors are InPhonic, Inc, CAIS Acquisition, LLC, SimIPC Acquisition Corp., Star Number, Inc., Mobile
Technology Services, LLC, CAIS Acquisition II, LLC, FON Acquisition, LLC, and 1010 Interactive, LLC.

[2]    The pleadings are:

(1) Motion of the Committee of Unsecured Creditors for an Order (I) Dismissing (or Converting) Debtors'
Bankruptcy Cases Pursuant to Section 1112(b) of the Bankruptcy Code or (II) Compelling the Trustee to
Abandon Fully-Encumbered Estate Property Pursuant to Section 554(b) of the Bankruptcy Code (the "Motion
to Dismiss") (Docket No. 87);

(2) Motion to Reconsider Order (a) Approving Bid Procedures Relating to Sale of Substantially All of the
Debtors' Assets; (b) Scheduling a Hearing to Consider the Sale and Approving the Form and Matter of Notices;
(c) Establishing Procedures Relating to Assumption and Assignment of Certain Contracts, Including Notice of
Proposed Cure Amounts; (d) Approving Expense Reimbursement Provisions; and (e) Granting Related Relief
(the "Motion to Reconsider") (Docket No. 102); and

(3) Objection to Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing and Approving Post-
Petition Financing; (II) Granting Liens and Security Interests and Providing Superpriority Administrative
Expense Status; (III) Authorizing Use of Cash Collateral and Affording Adequate Protection; (IV) Modifying
Automatic Stay; and (V) Scheduling Final Hearing Pursuant to Section 105, 361, 362, 363 and 364 of the
Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002 and 4001 (C) and (D) (the "DIP Objection")
(Docket No. 104).

actor." For example, in the Motion to Dismiss, the Creditors' Committee argues that Adeptio has "tried to manipulate the bankruptcy process", stating that the "entire sale process is a farce" with "[t]he thinly veiled purpose . . . to benefit [only] Adeptio by providing for the transfer of the Debtors' assets free and clear of liens, claims and interests." (Motion to Dismiss at 2, 18) In the DIP Objection, the Creditors' Committee states that Adeptio's "multiple roles in these cases . . . demonstrate a lack of good faith on its part" and that Adeptio's "only intention is to further line its own pockets." (DIP Objection at 14, 16-17) Adeptio is filing this brief response to address the Creditors' Committee's characterizations and certain other additional points.

To be clear, as discussed more fully below, there is nothing wrong with Adeptio's role in these bankruptcy cases and nothing in the Bankruptcy Code or any other applicable law precludes Adeptio from being a prepetition secured lender, a DIP lender and a stalking horse bidder. In fact, Adeptio is before the Court (and is being targeted by the Creditors' Committee) *because Adeptio is the only party that, to date, is willing to provide any funding for these chapter 11 cases and has committed to salvage the Debtors' businesses*. There can be no dispute therefore that Adeptio's financing and stalking horse bid provides a benefit to these estates, including for those unsecured creditors that stand to benefit from, among other things, continuing to transact business with the Debtors, contracts being assumed, and the Debtors continuing to pay wages.

## I.

At the outset, it is critical to understand that Adeptio is not the only creditor that stands to benefit from these chapter 11 cases. A substantial number of the Creditors' Committee's constituents stand to benefit as well. Employees stand to benefit. Parties to assumed contracts stand to benefit. And the creditors whose trade payables will be assumed under the asset purchase agreement with Adeptio stand to benefit, among others.

But more importantly, even if Adeptio did not fund the recoveries of these stakeholders, the fact that distributions may not reach unsecured creditors is not cause to dismiss or convert a bankruptcy case. *See In re Pinnacle Brands, Inc.*, Case No. 98-1716, Tr. of Hr'g at 50-51 (Bankr. D. Del. Oct. 2, 1998), the relevant portions of which are attached hereto as Exhibit A.  In a case with similar facts, Judge Walrath in *Pinnacle* stated that "I am not convinced that Congress did not intend exactly what we have here, and that is a proceeding to permit the orderly liquidation of assets, although the proceeds of those assets may ultimately only go to the secured class of creditors." *Id.* at 50-51.[3]  Further, other courts have held that "[e]ven if the only reason for the Chapter 11 . . . is to maximize the return to the secured creditor through the retention of the debtor-in-possession to collect and liquidate assets and to avoid pre-petition transfers of the debtor, the interests of the secured creditor are legitimate interests to be taken into account in deciding whether to convert or dismiss a Chapter 11 case." *In re GPA Technical Consultants, Inc.*, 106 B.R. 139, 142 (Bankr. S.D. Ohio 1989) ("In fact, there need not be any unsecured creditors in a bona fide reorganization, and thus the only creditor interests to be taken into account may sometimes be secured creditors.") (internal citations omitted).

Moreover, the Third Circuit, in the context of a dismissal motion, unequivocally stated that the sale of a debtor's assets is an appropriate use of the chapter 11 process. *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 120, n.4 (3d. Cir. 2004).[4]  The Debtors' use of chapter 11 to conduct a going-concern asset sale to maximize the value of their estates is a recognized

---

[3]  In addition, and pertinent to this case, the court also stated "I have to admit that this is the reverse of the usual case. Usually it is the bank in here arguing that the case should be dismissed while the committee says please allow the debtor to continue to operate because the only chance we have of any recovery is the debtor continuing to operate." Tr. of Hr'g at 41.

[4]  In *Integrated Telecom*, the court ultimately determined that the debtors' petition had not been filed in good faith because the record showed that the debtor was "cash rich" at the time of filing, had no prospect of actual reorganization given that it had ceased operations, and had solely filed to cap the landlord's claim for the benefit of equity holders in the case.

3

reorganizational purpose.  *See In re PPI Enters. (U.S.), Inc.*, 324 F.3d 197, 211 (3d Cir. 2003); *In re GST Telecom, Inc.*, 2002 WL 442233, at *2 (D. Del. Mar. 20, 2002) ("there are times when it is more advantageous for the debtor to begin to sell as many assets as quickly as possible in order to insure that the assets do not lose value").  As stated by the Third Circuit in *Integrated Telecom*, there are "two . . . basic purposes of Chapter 11 . . .  (1) 'preserving going concerns' and (2) 'maximizing property available to satisfy creditors.'"  384 F.3d at 119 (citing *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999)).  In the context of an asset sale, "[t]o say that liquidation under Chapter 11 maximizes the value of an entity is to say that there is some value that otherwise would be lost outside of bankruptcy."  384 F.3d at 119.

It cannot be disputed, as the Debtors will establish in opposition to the Motion to Dismiss at the hearing, that these cases will provide the opportunity to preserve the value of the Debtors' businesses as a going concern and, upon consummation, provide value to a substantial portion of the Debtors' unsecured creditors that may otherwise be lost absent these cases.

## *II.*

Furthermore, there is also nothing sinister about a prepetition lender providing post-petition financing to finance its potential purchase of the debtor's assets under Bankruptcy Code § 363.  The DIP Motion provides the financing necessary for the Debtors to maintain their businesses as going-concerns and for the Debtors to market their assets to potential purchasers.  In their pleadings, the Creditors' Committee ignores the fact that, to date, Adeptio has borne the economic burden of these chapter 11 cases.

## *III.*

The Creditors' Committee's objection to the fees payable under the DIP Facility should be overruled.  Adeptio submits that the fees requested in this case are customary and reasonable.

4

Indeed, courts routinely authorize debtors to pay DIP lender's reasonable fees and expenses. *See, e.g., In re Remy Worldwide Holdings, Inc.,* Case No. 07-11481 (Bankr. D. Del. Nov. 7, 2007); *In re New Century TRS Holdings, Inc.,* Case No. 07-10416 (Bankr. D. Del. May 7, 2007) (permitting payment of DIP lender fees without court approval); *In re Dura Auto. Sys., Inc.,* Case No. 06-11202 (Bankr. D. Del. Nov. 21, 2006) (permitting payment of DIP lender fees without court approval); *In re Werner Holding Co. (DE), Inc.,* Case No. 06-10578 (Bankr. D. Del. July 25, 2006) (permitting the payment of both prepetition and DIP lender fees without court approval).

*IV.*

While the Creditors' Committee insists that it needs 60 to 90 days for the investigation and challenge process to appropriately satisfy its fiduciary duties, Adeptio believes, for the reasons set forth at the "first-day" hearing, that a 25-day period to investigate the liens and claims (and commence actions with respect thereto) more than suffices under the circumstances. At the hearing on the Motion to Dismiss, the Debtors will make a showing that they are losing money at the rate of approximately $3.2 million per week. Adeptio is providing the funding for these bankruptcy cases, and a quick sale is in the interest of all creditors so that the Debtors' businesses can get on solid footing. As Adeptio bought the prepetition debt in early November 2007, the Creditors' Committee's investigation of Adeptio's claim should not involve a lengthy process. Adeptio respectfully submits that such investigation should be accomplished in the timeframe provided for in the Court's Interim DIP Order. Indeed, Adeptio completed its due diligence regarding the debt in less time than is being provided to the Creditors' Committee.

Also, notwithstanding the Creditors' Committee's assertions to the contrary, the Court does not need to extend the investigation period so that the Creditors' Committee can investigate the actions of the prior lenders. The district court's recent decision in *In re Enron Corp.* makes it

5

clear that Adeptio's claims cannot be tainted by any of these "bad acts." *See In re Enron Corp.,* 2007 WL 2446498 (S.D.N.Y. Aug. 27, 2007). The court in *Enron* held that the doctrine of equitable subordination under Bankruptcy Code § 510(c) and disallowance of claims under Bankruptcy Code § 502(d) are both disabilities that are personal to the wrongdoing claimant and do not transfer to the purchaser. *Id.* at *8, 13 ("purchasers are protected from being subject to the personal disabilities of their sellers"). As the Creditors' Committee cannot impute any "bad acts" of the prior lenders to Adeptio, there is no need to extend the investigation period on this basis.

*V.*

The Creditors' Committee and Spanco Telesystems & Solutions Limited ("Spanco")[5] argue that Adeptio should not obtain a lien on, or security interest in, avoidance actions and should not be able to use the proceeds from avoidance actions to satisfy its superpriority administrative expense claim. By its terms, Bankruptcy Code § 541(a)(3) defines property of the estate to include interests in property avoided under § 550. Moreover, Bankruptcy Code § 541(a)(4) expressly includes within the definition of property of the estate "any interest in property preserved for the benefit of or ordered transferred to the estate under section 510(c) or 551 of this title." Like all other property of the estate, avoidance actions may be pledged to secure vital postpetition financing.

The Debtors' businesses are not "brick and mortar" companies with abundant hard assets that can be sold. A significant portion of the value consists of intangibles and thus the avoidance

---

[5]    Limited Objection of Spanco Telesystems & Solutions Limited to Debtors' Motion For Entry Of Interim And Final Orders (I) Authorizing And Approving Postpetition Financing; (II) Granting Liens And Security Interests And Providing Superpriority Administrative Expense Status; (III) Authorizing Use Of Cash Collateral And Affording Adequate Protection; (IV) Modifying Automatic Stay; And (V) Scheduling Final Hearing, Pursuant To Sections 105, 361, 362, 363 Of The Bankruptcy Code And Federal Rules Of Bankruptcy Procedure 2002 And 4001(c) And (d) (Docket No. 106).

actions are highly relevant to Adeptio's recovery. As part of its credit assessment, Adeptio determined that a pledge of avoidance actions was necessary and the Debtors, in their business judgment, agreed to this lien in the context of the overall DIP financing. This Court has approved similar provisions. *See, e.g., In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del. Nov. 21, 2006); *In re Silver Cinemas Int'l, Inc.*, Case No. 00-1978 (Bankr. D. Del. Aug. 11, 2000); *In re Trans World Airlines*, 163 B.R. 964, 974 (Bankr. D. Del. 1994).

## VI.

The Creditors' Committee argues that the Debtors should not waive their § 506(c) right to charge the secured creditors with the costs and expenses of preserving collateral. Bankruptcy Code § 506(c) allows the estate to surcharge the collateral of a secured creditor to pay the reasonable, necessary costs and expenses of preserving or disposing of such creditor's collateral to the extent of any benefit received. DIP lenders commonly request a waiver of a debtor's ability to surcharge the DIP lenders' collateral and the Debtors are well within their business judgment to agree to waive § 506(c) claims as a quid pro quo in bargaining for the DIP Facility. The waiver is a standard, negotiated term in financing and many courts have approved similar provisions. *See, e.g., In re Remy Worldwide Holdings, Inc.,* Case No. 07-11481 (Bankr. D. Del. Nov. 7, 2007); *In re Meridian Auto. Sys- Composites Operations, Inc.,* Case No. 05-11168 (Bankr. D. Del. June 30, 2005); *In re Antico Mfg. Co.*, 31 B.R. 103, 106 n.1 (Bankr. E.D.N.Y. 1983).

## VII.

The Creditors' Committee objects to many of the Events of Default, baldly stating that they are unreasonable. The Creditors' Committee also argues that the DIP Lender should not be permitted immediate relief from the automatic stay following an Event of Default. The terms of default and the terms and conditions of the DIP Facility are reasonable and customary. Many

courts have approved similar provisions. *See, e.g., In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del. Nov. 21, 2006); *In re Meridian Auto. Sys. -Composites Operations, Inc.*, Case No. 05-11168 (Bankr. D. Del. June 30, 2005).

*VIII.*

The Creditors' Committee argues that Adeptio should not be permitted to amend or modify the DIP Facility without the consent of the Committee, unless such amendment is of a nonmaterial nature. Adeptio submits that the amendment provisions embodied in paragraph 22 of the Final DIP Order are reasonable. Courts routinely authorize similar amendment and modification provisions. *See, e.g., In re Dura Auto. Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del. Nov. 21, 2006).

*Conclusion*

Adeptio should not be cast as the "bad guy" in these chapter 11 cases. Instead, Adeptio

should be acknowledged as the "rescue financier" that it is. Adeptio has provided postpetition

financing in order to keep the Debtors' businesses alive and provide a benefit for all creditors

(including Adeptio), secured and unsecured, who have an interest in maintaining the Debtors'

operations as a going concern. As a result, Adeptio respectfully requests that the Court

(i) overrule the DIP Objection, (ii) deny the Motion to Reconsider, (iii) deny the Motion to

Dismiss, and (iv) grant such further relief as is just and proper.

Respectfully submitted,

Date: November 28, 2007

Robert S. Brady (No. 2847)
Edward J. Kosmowski (No. 3849)
Edmon L. Morton (No. 3856)
Young Conaway Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

and

Anup Sathy, P.C. (*pro hac vice*)
David A. Agay (*pro hac vice*)
Andrea L. Johnson *(admission pending)*
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

Counsel to Adeptio

# EXHIBIT A

1  case we find some oil and we're taking a risk.

2  There's no allegation here by the committee that

3  economically we're better off just walking away from

4  this and letting this sale go away, a sale that's

5  approximately $10 million of value.

6          What they're saying is yeah, let's let

7  that all go to dust; let's let --

8          THE COURT:  No.  They are saying don't use

9  the Bankruptcy Court to effectuate that because you

10  have remedies in state court that you can use.  So why

11  should we have a bankruptcy case, in essence, as a

12  substitute for a state court foreclosure?  I think

13  that is their argument.

14          MR. DONNELL:  I don't think there's

15  anything in the Bankruptcy Code that says if you got

16  secured creditor rights under state law that you're

17  required to go do that.  Certainly, I guess a secured

18  creditor would have the option of filing a motion for

19  relief from stay and saying look, there's no point in

20  continuing here.  But the banks pay their taxes too

21  and they are listed as creditors under 1112.

22          THE COURT:  I tend to agree with you.

23  There is nothing that I see in the Bankruptcy Code

24  that shows an intent of Congress to preclude a

1   bankruptcy where no payment will be made to

2   unsecureds.  I don't see there are any threshold

3   requirements in the Bankruptcy Code that there be some

4   benefit to unsecured creditors as there are in 109 or

5   other provisions of the Code.

6           I have to admit this is the reverse of the

7   usual case.  Usually it is the bank in here arguing

8   that the case should be dismissed while the committee

9   says please allow the debtor to continue to operate

10  because the only chance we have of any recovery is the

11  debtor continuing to operate.

12          MR. DONNELL:  Right.

13          THE COURT:  I guess this is so unusual

14  because it is so evident I guess to everybody that the

15  secured lenders' debt far exceeds the value of the

16  assets of this debtor.  Is there any contest?

17          MR. DONNELL:  Not on our side.

18          MR. HODARA:  No, Your Honor, there is not.

19          MR. DONNELL:  I would say --

20          THE COURT:  Sorry to interrupt you.

21          MR. DONNELL:  I would say in addition,

22  there are other cases that have involved the same

23  situation where an secured creditors committee was

24  basically saying look, if there's nothing in it for



1    call me from an airport and hear me out on what I had

2    to say and he said, "I have no authority. We have got

3    to go to the hearing tomorrow." And today is Friday.

4    That's a full week since the auction.

5            In sum, Your Honor, we believe that the

6    federal bankruptcy laws cannot be used for the benefit

7    of one creditor. We think that the basis under

8    Section 1112(b) for dismissal of this case resides in

9    the concept of for cause. Pages 5787 and 6361 to 62

10   of the House report with respect to this provision say

11   as much. They say specifically that the two bases

12   that are enumerated in Section 1112(b), which

13   Mr. Perkiel and Mr. Donnell focused on, are not by any

14   means the exclusive bases for dismissal of a case.

15   The reason for this case to be dismissed is because

16   Congress did not intend for the federal bankruptcy

17   process to be used for the benefit of one creditor,

18   particularly where that creditor has abused the

19   process and abused the committee the way that it has

20   in asking it to take certain measures, which it has

21   done, and then cut them off.

22           THE COURT: Well, let me ask you because I

23   don't see any provision of the Code or any indication

24   that Congress did preclude the use of a bankruptcy



1    proceeding to benefit one and let's say one class of

2    creditor, specifically the secured creditor.  And

3    while your argument seems to have some facial appeal

4    to it, I don't see any basis for it in the Code.  And

5    I am not convinced that Congress did not intend

6    exactly what we have here, and that is a proceeding to

7    permit the orderly liquidation of assets, although the

8    proceeds of those assets may ultimately only go to the

9    secured class of creditors.

10              MR. HODARA:  I think in the appropriate

11   case that's definitely true.  There is no doubt that

12   there are many cases where it is appropriate for the

13   Court to use its powers to liquidate assets under

14   Chapter 11 of the Bankruptcy Code and then the value

15   from those assets or the proceeds go where they go

16   pursuant to law.

17              But that doesn't mean that in every

18   circumstance it's appropriate to do that.  Where one

19   creditor has used the process the way the banks have

20   here, early in the case -- let me stop there for a

21   moment.  Many of the cases, if not most of the cases,

22   where it turns out that one secured creditor is the

23   only party that's really, quote, in the money are the

24   result of a long, played-out bankruptcy process where