IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| INPHONIC, INC., *et al.*, | Case No. 07-11666 (KG) |
| Debtors. | Jointly Administered |

**REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN FURTHER SUPPORT OF ITS MOTION FOR AN ORDER (I) DISMISSING (OR CONVERTING) DEBTORS' BANKRUPTCY CASES PURSUANT TO SECTION 1112(b) OF THE BANKRUPTCY CODE OR, ALTERNATIVELY, (II) COMPELLING THE TRUSTEE TO ABANDON FULLY-ENCUMBERED ESTATE PROPERTY PURSUANT TO SECTION 554(b) OF THE BANKRUPTCY CODE**

The Official Committee of Unsecured Creditors (the "Committee"), by and through its proposed counsel, files this Reply In Further Support Of Its Motion For An Order (I) Dismissing (Or Converting) The Debtors' Bankruptcy Cases Pursuant To Section 1112(b) Of The Bankruptcy Code Or, Alternatively, (II) Compelling The Debtors To Abandon Fully-Encumbered Estate Property Pursuant To Section 554(b) Of The Bankruptcy Code (the "Motion"), and states as follows:

## SUMMARY OF RELEVANT FACTS

1.  On November 28, 2007, the Debtors[1] filed their Objection to the Motion (the "Objection"), arguing that the Motion should be denied based upon the Committee's failure to establish "cause" for the dismissal. Specifically, the Debtors argue, *inter alia*, that the Committee cannot demonstrate any "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."

---

[1] Except as otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Motion.

11 U.S.C. § 1112(b)(4)(A). In stark contrast to their arguments, the Debtors have agreed to stipulate to each of the following facts (among others):

    a. Since their respective formations, the Debtors have never earned an operating profit or a net profit during any of their fiscal years.

    b. Except for one quarter, the Debtors have never earned an operating profit or a net profit during any quarter of any fiscal year.

    c. In 2005, the Debtors earned a net loss of $38.2 million; in 2006, the Debtors earned a net loss of $63.7 million; and for 2007, the Debtors project a net loss $116.1 million.

    d. The Debtors project that they will incur operating losses post-petition and prior to the closing of the Sale. The Debtors also project that they will incur net losses post-petition and prior to the closing of the Sale in at least the amount of $25 million (the amount of the proposed DIP facility).

    e. The Debtors project that they will incur negative cash flow post-petition and prior to the closing of the Sale.

    f. The Debtors believe that a sale of substantially all of their assets is the only viable option in these bankruptcy cases.

    g. The Debtors and Adeptio believe that Adeptio's security interests and liens fully encumber the Debtors' assets.

    h. No other entity or group of entities has provided a definitive offer to purchase the assets for greater economic value to the Debtors' estates than Adeptio, which according to the Debtors, is "particularly telling" given the Debtors' prepetition marketing efforts.

    i. After the closing of the Sale, the Debtors will not operate any business.

    j. The Debtors and Adeptio have discussed yet have not reached agreement on any budget to pay administrative expenses incurred after the closing of the Sale. The Debtors and Adeptio have discussed but not yet reached agreement on any wind-down budget.

    k. The $25 million in proposed DIP financing is intended to cover the Debtors' losses through the closing of the sale pursuant to the Sale Motion.

2.  Also on November 28, 2007, Adeptio filed its Omnibus Response (I) To Creditors' Committee's (A) Motion To Dismiss And (B) Motion To Reconsider Bidding Procedures Order And (II) In Support Of Final Order For Post-Petition Financing (the "Adeptio Response").

## ARGUMENT

3.  Section 1112(b), as amended in the Bankruptcy Abuse Prevention and Consumer Protection Act, *requires* a court to dismiss or convert a case if a creditor establishes "cause," subject to certain enumerated exceptions. The mechanics of Section 1112(b)(1)-(2) are summarized as follows.

> Pursuant to § 1112(b)(1), the initial burden lies with the Movants to establish "cause" for conversion. *See* 11 U.S.C. § 1112(b)(1). As noted above, a list of what constitutes "cause" is found in § 1112(b)(4). . . . If the Movants establish "cause", then the burden shifts to the Debtor to prove it falls within the § 1112(b)(2) "unusual circumstances" exception to § 1112(b)(1)'s mandatory conversion. Congress explained the exception, stating it only applies if: "(1) the debtor or a party in interest objects and establishes that there is a reasonable likelihood that a plan will be confirmed within the time periods set forth in section 1121(e) and 1129(e), or if these provisions are inapplicable, within a reasonable period of time; (2) the grounds for granting such relief include an act or omission of the debtor for which there exists a reasonable justification for such act or omission; and (3) such act or omission will be cured within a reasonable period of time." H.R.Rep. No. 109-31(I) at 94 (April 8, 2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 2005 WL 832198.

In re Gateway Access Solutions, Inc., 374 B.R. 556, 561 (Bankr. M.D. Pa. 2007).

4.  As set forth in the Motion and as further discussed below, the Committee can establish that "cause" exists to dismiss the Debtors' cases under, *inter alia*, Section 1129(b)(4)(A). In fact, the *Debtors'* own admissions unequivocally establish such "cause."

5.    Moreover, the "unusual circumstances" do not save the Debtors' cases from dismissal because Section 1112(b)(2)(B) provides that the "unusual circumstances" exception is inapplicable where "cause" exists for dismissal under Section 1129(b)(4)(A).

6.    Finally, even if "unusual circumstances" could somehow save the Debtors' cases from dismissal, there are clearly no "unusual circumstances" in these cases. In fact, the Debtors (and their lender) have not even alleged that any such "unusual circumstances" exist. Therefore, the Court must dismiss (or convert) these cases.

A.    **"Cause" Exists For Dismissal (Or Conversion) Under Section 1112(b)(4)(A) Due To The Debtors' *Substantial Or Continuing Losses* And The Absence Of Any Reasonable Likelihood Of *Rehabilitation*.**

7.    In these cases, dismissal (or conversion) is *mandated* under the plain language of Section 1112(b)(1)-(2)(B) because the Committee can establish "cause" for dismissal under Section 1112(b)(4)(A) due to the Debtors' "substantial or continuing losses" and the absence of any reasonable likelihood of "rehabilitation." See 11 U.S.C. § 1112(b)(4)(A).

1.    **The Debtors' Substantial Or Continuing Losses**

8.    "Substantial or continuing losses" clearly exist in these cases. In fact, although the Committee need only demonstrate either substantial *or* continuing losses, the Committee can demonstrate both substantial and continuing losses based upon the Debtors' own admissions.

9.    First, substantial losses are apparent. As recited above, the Debtors stipulate to a staggering projected net loss in 2007 of $116.1 million. The Debtors expect losses to continue at this staggering rate during the course of their bankruptcy cases until

the closing of the proposed Sale. Specifically, the Debtors stipulate to projected *losses* post-petition and prior to the proposed Sale closing in the amount of at least $25 million. Based upon the Debtors' cash flow forecasts, they will incur negative cash flows of approximately $4 million for *each* of the first 6 weeks of their cases.

10. The Debtor's projected losses of over $25 million in less than a two-month span are "substantial" not only in general terms, but also in relation to the total value of the Debtors' assets. Currently, the only bid for the Debtors' assets is Adeptio's credit bid for $50 million. The Debtors admit that no other entity or group of entities has provided a definitive offer to purchase the assets for greater economic value to the Debtors' estates than Adeptio, which, according to the Debtors, is "particularly telling" given the Debtors' prepetition marketing efforts. Under the Debtors' projections, their losses over a 12 week period would approximate the total value of their assets. Certainly, losses of this magnitude are "substantial."

11. Second, the Debtors' losses are obviously continuing. In their Objection, the Debtors expressly admit that "the Committee is correct in stating that the Debtors *continue* to 'consume cash and incur losses.'" Objection, ¶ 21 (emphasis added). Additionally, the Debtors stipulate to a projected a net loss in 2007 of $116.1 million, and post-petition pre-Sale net losses of at least $25 million. Since their formation, except for one quarter, the Debtors have never earned an operating profit or a net profit during any quarter of any fiscal year. This history (where continuing losses are the norm) and the Debtors' own admitted projections establish continuing losses.

12. The Debtors' losses are both "substantial" and "continuing" under any reasonable interpretation or definition of those words. In their Objection, the Debtors

attempt to soften the staggering nature of these losses by pointing to other facts which, the Debtors allege, "would support a finding that, despite the residual postpetition negative cash flow, the Debtors' estates are currently either maintaining or appreciating in value as a result of the bankruptcy proceedings." Objection, ¶ 23.

13. In making this proposition, the Debtors rely heavily upon the DIP financing being provided by Adeptio. First of all, the fact that Adeptio is providing DIP financing does not change the fact that the Debtors continue to sustain substantial and continuing losses (which is the relevant inquiry under Section 1112(b)(4)(A)). In addition, any value to the estate provided by Adeptio's provision of post-petition financing is more than offset by Adeptio's claims against the estate. Specifically, Adeptio seeks to impose upon the estates and their creditors a claim for diminution in the value of Adeptio's collateral during the sale process – even though Adeptio required the Debtors to undertake that sale process and even though that sale process benefits only Adeptio. Adeptio apparently also seeks to assert avoidance actions against unsecured creditors to make a distribution on its diminution claim.

14. It should also be noted that the Debtors have represented in their Objection that the Debtors' estates are not suffering any diminution since "[t]he Debtors have preserved all prepetition causes of action against the directors or officers covered by the Debtors' directors and officers' insurance policies." This is entirely false. Specifically, the proposed Asset Purchase Agreement provides for the sale of all causes of action that the Debtors might have against, among others, their directors and officers, and all insurance that is available that would cover such claims. See APA, Definitions, at p. 3, k (defining "Assets" at ¶¶ (k) and (o) and "Excluded Avoidance Actions") (only certain

limited "Excluded Avoidance Actions" are not being sold). Accordingly, contrary to the Debtors' assertions, once again, their actions and agreements have robbed unsecured creditors of any benefit associated with these cases.[2]

15.  In short, the Debtors' own admissions establish that "substantial or continuing" losses to the estate exist in these cases, thereby satisfying the first prong of 1112(b)(4)(A).

### 2. There Is No Likelihood Of "Rehabilitation"

16.  The Committee can also establish that there is no reasonable likelihood of "rehabilitation" under the second prong of Section 1112(b)(4)(A). Once again, the Committee can establish that requirement through the Debtors' own admissions.

17.  In their Objection, the Debtors fail to recognize (or try to blur) the difference between "rehabilitation" and "reorganization" despite the fact that the Committee's motion addressed this legal distinction in detail. Rather, the Debtor erroneously asserts that its ability to confirm a liquidating plan of reorganization amounts to a "reasonable likelihood of rehabilitation" under Section 1112(b)(4)(A).

18.  To the contrary, it is well-settled that the reference in Section 1112 to "rehabilitation" means something different than "reorganization," which includes liquidation. As set forth by the court in In re Kanterman, 88 B.R. 26, 29 (S.D.N.Y. 1988):

> Rehabilitation of the debtor's estate, as that term is used in § 1112(b)(1), is not synonymous with reorganization as that term is used in Chapter 11. *Collier on Bankruptcy* explains the distinction between the terms:

---

[2] Misrepresentations like that described above regarding the assets being sold to Adeptio, and Adeptio's recent misrepresentations regarding the releases in the Interim DIP Order are very troubling. With the speed at which these cases are proceeding, no one can know for sure what other misrepresentations have been made.

> *"Rehabilitate" has been defined to mean "to put back in good condition; re-establish on a firm, sound basis."* Rehabilitation, as used in section 1112(b)(1), does not mean the same thing as reorganization, as such term is used in chapter 11. *Since a debtor can be liquidated in chapter 11, the ability to confirm a plan of reorganization is considerably different than reaching a firm, sound financial base.*
>
> *Collier on Bankruptcy,* ¶ 1112.03[i], p. 1112-15 (footnotes omitted). The distinction is significant. Rehabilitation of a debtor's estate implies the re-establishment of a sound financial basis, a concept which necessarily involves establishing a cash flow from which current obligations can be met.

Kanterman, 88 B.R. at 29 (emphasis added)..

19.   The Debtors stipulate to the fact that "a sale of substantially all of their assets is the only viable option in these bankruptcy cases." Thus, the only prospect of reorganization is through liquidation. Where liquidation is the "only viable option," there can be no "likelihood of rehabilitation." Kanterman, 88 B.R. at 29; see also In re The Ledges Apartments, 58 B.R. 84, 87 (Bankr. D.Vt. 1986) ("Rehabilitation is not reorganization. Reorganization encompasses rehabilitation and may contemplate liquidation. Rehabilitation, on the other hand, may *not* include liquidation.") (emphasis added); In re Rundlett, 136 B.R. 376, 380 (Bankr. S.D.N.Y. 1992) ("Rehabilitation does not mean the same thing as reorganization for purposes of Chapter 11 because a reorganization may include a complete liquidation."); In re Greene, 57 B.R. 272, 277 (Bankr. S.D.N.Y. 1986) ("The term "rehabilitation" has been held to mean more than a "reorganization" under Chapter 11 because a plan of reorganization may now include a complete liquidation of a debtor's assets pursuant to 11 U.S.C. § 1123(b)(4)."); Loop Corp. v. U.S. Trustee, 379 F.3d 511, 516 (8th Cir. 2004) ("Courts have consistently understood 'rehabilitation' to refer to the debtor's ability to restore the viability of its

business."); In re Gonic Realty Trust, 909 F.2d 624, 627 (1st Cir. 1990) ("[W]ith no business left to reorganize, Chapter 11 proceedings were not serving the purpose of rehabilitating the debtor's business."); In re Family Snacks, Inc., 257 B.R. 884, 895 (8th Cir. BAP 2001) ("Congress has distinguished the narrower concept of rehabilitation from the broader concept of reorganization"); In re AdBrite Corp., 290 B.R. 209, 216 (Bankr. S.D.N.Y. 2003) ("rehabilitation does not mean the same thing as reorganization for purposes of Chapter 11 because a reorganization may include an orderly or complete liquidation. In this context, rehabilitation means to put back in good condition and reestablish on a sound basis. It signifies that the debtor will be reestablished on a secured financial basis, which implies establishing a cash flow from which its current obligations can be met."); In re Northeast Family Eyecare, P.C., 2002 WL 1836307, at *3-4 (Bankr. E.D.Pa. July 22, 2002).

20.    The Debtors' Objection emphasizes that the Bankruptcy Code clearly contemplates liquidating plans under chapter 11. The Committee does not dispute this point. Indeed, the cases cited in the preceding paragraph recognize that a chapter 11 plan may provide for a chapter 11 reorganization through liquidation of assets. See 11 U.S.C. § 1123(b)(4); Greene, 57 B.R. at 277. However, these cases also recognize that this type of "reorganization" is not "rehabilitation."

21.    The Debtors' own admissions establish "substantial or continuing losses" and "absence of a reasonable likelihood of rehabilitation" and, therefore, "cause" under Section 1112(b)(4)(A).

### 3. The Exception To Mandatory Dismissal (Or Conversion) Is Inapplicable Where "Cause" Has Been Established Under Section 1112(b)(4)(A).

22. Under the framework of Section 1112(b), "[i]f the Movants establish 'cause', then the burden shifts to the Debtor to prove it falls within the § 1112(b)(2) 'unusual circumstances' exception to § 1112(b)(1)'s mandatory conversion." Gateway Access, 374 B.R. at 561. However, "[i]f the movant establishes cause to convert or dismiss the case for substantial or continuing loss to or diminution of the estate and the absence of reasonable likelihood of rehabilitation, then section 1112(b)(2) does not apply." In re Incredible Auto Sales LLC, 2007 WL 1100276, *5 (Bankr. D.Mont. April 10, 2007); see also In re The 1031 Tax Group, LLC, 374 B.R. 78, 93 n.17 (Bankr. S.D.N.Y. 2007) ("The exception to conversion under § 1112(b)(2) is inapplicable here because the creditors seek conversion based upon the loss and diminution of estate assets and absence of a reasonable likelihood of rehabilitation."); 11 U.S.C. § 1112(b)(2)(B) (requiring that grounds for granting motion to dismiss "include an act or omission of the debtor other than under paragraph (4)(A)"). Accordingly, as the Committee has established "cause" under Section 1112(b)(4)(A), this Court must dismiss (or convert) the cases regardless of the presence of "unusual circumstances."

23. In any event, even if "unusual circumstances" were somehow relevant, there are no "unusual circumstances" in these cases. The Debtors (and their lender) do not even argue that such "unusual circumstances" exist. There is simply nothing "unusual" about these cases.

24. As "cause" exists under Section 1112(b)(4)(A), dismissal (or conversion) is *mandated* under the plain language of Section 1112(b)(1)-(2)(B).

**B.     Other "Cause" Exists To Support Dismissal Under Section 1112(b) Of The Bankruptcy Code.**

25.     In addition to establishing "cause" under Section 1112(b)(4)(A), the Committee can also establish "cause" for dismissal through additional factors, including, but not limited to those listed in 11 U.S.C. § 1112(b)(4). See 11 U.S.C. § 102(3) (in construing the Bankruptcy Code, the terms "includes" and "including" are not limiting).

### 1.     The Fact That These Cases Solely Will Benefit Adeptio Constitutes "Cause" For Dismissal.

26.     As set forth in the Committee's Motion, these cases were commenced at the direction of, and solely for the benefit of the secured lender, Adeptio. Per stipulations reached by the parties, the Debtors and Adeptio believe that Adeptio's security interests and liens fully encumber the Debtors' assets. In addition, no other entity or group of entities has provided a definitive offer to purchase the assets for greater economic value to the Debtors' estates than Adeptio. In short, there is no residual value in the estate for distribution to creditors after Adeptio takes the Debtors' assets via credit bid. In fact, a potential bidder would have to bid over *$65 million more* than Adeptio's current $50 million bid before unsecured creditors had even a chance at a distribution in these cases.

27.     As set forth in the Committee's Motion, the authorities have recognized that the interest of a single creditor, even a secured creditor, is an insufficient justification for a chapter 11 proceeding, which is intended to be a collective process for the benefit of the creditor group. See In re Mazzocone, 183 B.R. 402, 414 (Bankr. E.D.Pa. 1995); see also In re Duro Indus., Inc., 2002 WL 34159091, at *5 (Bankr. D.Mass. Oct. 7, 2002) ("Where all equity in a debtor's assets belongs to the secured creditor, with no appreciable expectation of a remainder for unsecured creditors, the liquidation of the

assets serves no bankruptcy purpose and should not be permitted to occur in bankruptcy."); In re Integrated Agri, Inc., 313 B.R. 419, 425 (Bankr. C.D.Ill. 2004) ("It is well settled that it is improper for a bankruptcy trustee to liquidate property solely for the benefit of secured creditors."); In re Encore Healthcare Assocs., 312 B.R. 52, 57 (Bankr. E.D.Pa. 2004).

28. In their Objection, the Debtors argue that a chapter 11 liquidation solely for the benefit of a secured creditor is proper. In support of this position, the Debtors cite In re Trans World Airlines, Inc., 2001 WL 1820326, *11 (Bankr. D.Del. April 2, 2001), in which the Court found that Section 363 of the Bankruptcy Code did not require that unsecured creditors receive a distribution as a precondition to approval of a proposed asset sale. TWA is inapplicable here. First, that case arose in the context of a sale, not a motion to dismiss raised at the outset of the case. Additionally, in TWA, it appears that no creditor sought an order compelling abandonment under Section 554(b) of the Bankruptcy Code. To the extent that the assets offered for sale were fully encumbered, Section 554(b) and the Third Circuit cases interpreting that provision require abandonment of fully encumbered property, as it would be unjustifiable for the estate to bear the expense of administering those assets for the sole benefit of the secured creditor. See In re Lan Assocs. XI, L.P., 192 F.3d 109, 120 (3d Cir. 1999); see also discussion in Section C *infra*.

29. In the Adeptio Response, Adeptio cites to In re Pinnacle Brands, Inc., Case No. 98-1716, Tr. of Hrg. At 50-51 (Bankr. D.Del. Oct. 2, 1998) for a similar proposition, namely that no provision of the Bankruptcy Code precluded the use of a bankruptcy proceeding to solely benefit the secured creditor. Again, it appears that no

party sought to compel abandonment of fully encumbered assets under Section 554(b) in that case. As interpreted by the Third Circuit, Section 554(b) compels abandonment where the estate stands to gain no residual benefit from the sale. In addition, the Bankruptcy Code has since been amended to *expand* the grounds for dismissal (or conversion) under Section 1112 and mandate dismissal (or conversion) where cause exists under Section 1112(b)(4)(A). See H.R.Rep. No. 109-31(I) at 94 (April 8, 2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 2005 WL 832198 (referring to "Sec. 442. Expanded Grounds for Dismissal or Conversion").

30. The Debtors' Objection and the Adeptio Response also argue that Adeptio is bearing "the brunt, if not all, of the burden associated with the proposed sale." Objection, ¶ 58; Adeptio Response, p. 2. First of, all who else should bear the burden associated with these cases that Adeptio required the Debtors to file for Adeptio's benefit? Secondly, even if Adeptio bore the entire burden of these cases, that does not alter that fact that chapter 11 should not be used solely for the benefit of a secured creditor. Thirdly, Adeptio has not agreed to bear the entire burden of these cases, and the Debtors' implication to the contrary is misleading. The Debtors have stipulated to the fact that Adeptio has *not* agreed to a wind-down budget. Fourthly, Adeptio does seek to impose upon other creditors costs and expenses associated with the these bankruptcy cases, including without limitation, (i) the financial impact of any deterioration in Adeptio's collateral during the sale process (i.e., any diminution in its collateral value), and (ii) the loss of rights such as Section 506(c) claims.

31. Adeptio can, and should, simply pursue its foreclosure rights under the Uniform Commercial Code. Those proceedings would be very fast and much, much less expensive than these cases.

32. Moreover, the Debtors' argument that employees and other creditors are benefiting from these chapter 11 cases is untrue. Every single employee could retain its job if Adeptio was required to proceed with a U.C.C. foreclosure sale. In addition, the parties to any contracts to be assumed by Adeptio could also have their contracts assigned to Adeptio outside of chapter 11. The simple truth is that only Adeptio stands to benefit from these cases by receiving a "free and clear" order. The lack of benefit to any constituency other than Adeptio in these cases constitutes "cause" for dismissal (or conversion) of these cases under Section 1112 of the Bankruptcy Code.

    **2.**    **The Debtors' Inability To Confirm A Plan Also Constitutes "Cause" For Dismissal Of These Cases.**

33. "Cause" is also established through the Debtors' inability to confirm a plan of reorganization. The fact that Section 1112(b)(4) does not list "inability to confirm a plan" as a grounds for "cause" is not determinative since that list is not exhaustive. <u>See</u> 11 U.S.C. § 102(3) (in construing the Bankruptcy Code, the terms "includes" and "including" are not limiting).

34. The Debtors stipulate they have not reached agreement on any budget to pay administrative expenses incurred after the closing of the Sale. Furthermore, the Debtors and Adeptio have not yet reached agreement on any wind-down budget. Thus, the Debtors will have no liquid assets to pay their administrative expenses or unsecured priority claims, let alone make any meaningful distribution on account of unsecured nonpriority claims. Under the current state of affairs, there exists no basis for the

confirmation of a plan. In fact, if the proposed Sale were to occur, the Debtors would have no operational assets and little ability (or motivation) to confirm a plan. The Debtors' inability to confirm a plan in these cases also constitutes "cause" for dismissal (or conversion) of these cases under Section 1112 of the Bankruptcy Code.

3. **No Exception To Mandatory Dismissal (Or Conversion) Exists.**

35. As noted above, the Debtors' Objection does not allege that any "unusual circumstances" exist in these cases to justify application of the exception to mandatory dismissal (or conversion) under Section 1112(b). Indeed, there is absolutely nothing "unusual" about these cases.

36. As "cause" exists based upon these additional factors, dismissal (or conversion) is mandated under the plain language of Section 1112(b)(1) because there are no "unusual circumstances" precluding dismissal.

C. **Alternatively, This Court Should Compel The Debtors To Abandon Assets That Are Fully Encumbered By Adeptio's Prepetition Liens.**

37. To the extent that the Court somehow finds that "cause" does not exist to support dismissal (or conversion) under Section 1112(b), the Committee requests that this Court compel the Debtors to abandon all estate assets that are fully-encumbered by Adeptio's prepetition security interests.

38. As set forth in the Committee's Motion, the Third Circuit has held that property "in which the estate has little interest by virtue of the amount of a lien held by a secured creditor" may be properly abandoned under Section 554(b) as having "inconsequential value" and being "burdensome." In re Price, 370 F.3d 362, 363 (3d Cir. 2004). "Courts are in agreement that fully encumbered assets are unlikely to benefit the

15

estate, and, therefore, such assets are not likely to be justifiably administered." Lan Assocs., 192 F.3d at 119.

39. In the Objection, the Debtors attempt to avoid the effect of these Third Circuit precedents by distinguishing them on the basis that they involved the administration of assets in chapter 7. That factual distinction is legally irrelevant.[3] First of all, Section 554(b) applies with equal force in both chapter 7 and chapter 11 cases. See 11 U.S.C. § 103(a) ("chapters 1, 3, and 5 of this title apply in a case under chapter 7, 11, 12, or 13 of this title"). Section 554(b), along with the reasoning of Price and Lan Assocs., apply with equal force in a chapter 11 liquidation as in a chapter 7. In either chapter, in the words of the Third Circuit, in the case of a fully encumbered asset, there is "no justification for the *estate, which is created for the benefit of the unsecured creditors*, to bear the fee for the benefit of the secured creditor." Id. at 120 (emphasis added). The lack of a benefit to unsecured creditors and the estate's avoidance of the unnecessary costs and expenses associated with administering the credit-bid sale to Adeptio (which are enumerated above) is exactly the reason why the Court should compel the Debtors to abandon all property fully-encumbered by Adeptio's security interests.

WHEREFORE, for the reasons set forth in the Motion and above, the Committee respectfully requests that this Court enter an Order (i) dismissing the Debtors' bankruptcy cases (or, as a less-favored alternative, converting the cases to chapter 7 cases), (ii) if the cases are not dismissed, compelling the Debtors to abandon all property fully-encumbered by Adeptio's security interests as such property is "burdensome" and

---

[3] The Debtors and their lender do not even attempt to explain why the exact same language Section 554(b) would have different application in chapter 11 than in chapter 7.

16

"of inconsequential value and benefit" to the Debtors' estates, and (iii) granting such further relief to the Committee as is appropriate.

Dated: November 29, 2007  
Wilmington, Delaware

Respectfully submitted,

REED SMITH LLP

By: /s/ Kurt F. Gwynne  
Kurt F. Gwynne (No. 3951)  
1201 N. Market Street, Suite 1500  
Wilmington, DE 19801  
Telephone: (302) 778-7500  
Facsimile: (302) 778-7575  
E-mail: kgwynne@reedsmith.com

and

Robert P. Simons, Esquire  
435 Sixth Avenue  
Pittsburgh, PA 15219  
Telephone: (412) 288-3131  
Facsimile: (412) 288-3063  
E-mail: rsimons@reedsmith.com

and

Claudia Z. Springer, Esquire  
2500 One Liberty Place  
1650 Market Street  
Philadelphia, PA 19103-7301  
Telephone: 215-851-8100  
Facsimile: 215-851-1420  
E-mail: cspringer@reedsmith.com

Proposed Counsel to the Official  
Committee of Unsecured Creditors