## SERVICES AGREEMENT

This **SERVICES AGREEMENT** (the "**Agreement**") dated May 1, 2006 (the "**Effective Date**"), by and between InPhonic, Inc., a Delaware corporation ("**InPhonic**") with its principal place of business at 1010 Wisconsin Avenue, NW, Suite 600, Washington, D.C. 20007, and NEA's Member Benefits Corporation, a Delaware corporation with its principal place of business at 900 Clopper Road, Suite 300, Gaithersburg, MD 20878 ("**NEA's MBC**"). InPhonic and NEA's MBC together shall be individually referred to as a "Party" or collectively referred to as the "Parties."

**WHEREAS**, the National Education Association of the United States ("NEA") is a labor organization established to secure, among other things, the betterment and economic welfare of its Members;

**WHEREAS**, NEA's MBC is the wholly-owned for-profit subsidiary of NEA authorized to administer consumer programs that benefit NEA members and their families;

**WHEREAS**, the Parties entered into that certain services agreement dated December 6, 2001, as extended ("Prior Agreement"), which the Parties desire to replace in its entirety by this Agreement; and

**WHEREAS**, the Parties desire to continue their strategic partnership pursuant to which InPhonic shall assist NEA's MBC to offer certain wireless communications products and services for sale to NEA members and related persons via the internet or other direct response programs, on the terms and conditions set forth herein;

**NOW, THEREFORE**, in consideration of the covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

**1.    Definitions.**

For purposes of this Agreement, the following terms shall have the meanings set forth below:

"**Advertisements**" means privately branded sponsorship messages, banner advertisements, interstitials, buttons and other promotional items developed by either party promoting the Private Label Products for promotions executed by NEA's MBC.

"**NEA's MBC Site**" means the World Wide Web site www.neamb.com or any alternate World Wide Web site operated by NEA's MBC as designated by NEA's MBC from time to time.

"**Final Sale**" means an order placed for a Product that results in InPhonic receiving full and complete payment from the Customer for such a Product and does not result in a chargeback by the Supplier.

"**Order Form**" means an on-line, telephone or paper form purchase process and purchase order form for prospective customers to order the Private Label Products.

"**Private Label Product Customers**" means the individuals, companies, and other entities that purchase Private Label Products through NEA's MBC.

"**Private Label Products**" means the wireless communications products and services identified on Exhibit A as attached to this Agreement.

"**Private Label Web Site**" means a privately branded web site hosted and operated by InPhonic at InPhonic's sole cost and expense publishing offers for the Private Labeled Products, and the terms and conditions upon which such Private Labeled Products shall be offered for sale.

"**Suppliers**" means companies providing Private Label Products to InPhonic.

## 2. Term; Principal Purpose of The Agreement

2.1  NEA's MBC hereby engages InPhonic for a period commencing on the Effective Date and ending on February 29, 2008 (the "Term"), to provide for Private Label Products and the services as set forth herein. Any renewal of this Agreement shall be by mutual written agreement.

## 3. Responsibilities of InPhonic.

3.1  On the Effective Date or on such other date as is mutually agreed upon by the Parties hereto, InPhonic shall develop (i) a Private Label Web Site and (ii) Advertisements, and (iii) the Order Form. InPhonic shall make no changes to the Private Label Web Site, other than pricing, availability, service or similar information related to specific Private Label Products, without the prior written approval of NEA's MBC. InPhonic shall update the Private Label Web Site and provide to NEA's MBC supplemental information regarding the Private Label Products promoted by NEA's MBC on NEA's MBC Site, including updated and other promotional information. InPhonic shall also provide to NEA's MBC, upon reasonable request, technical literature pertaining to the Private Label Products, to the extent that such literature is available from the Suppliers.

3.2  InPhonic shall process and fulfill purchase orders for the Private Label Products within three (3) to five (5) business days, following its receipt of a purchase order, provided, however, that such period may be extended at the reasonable discretion of InPhonic in the event that InPhonic is unable to procure the Private Label Product ordered for reasons that are beyond its control. Customers shall be notified by phone, mail, or e-mail after the order is complete as to the status of their order, and informed of any delays in shipment.

3.3     InPhonic shall be solely responsible for the procurement of the Private Label Products from its suppliers and/or wireless carriers (the "**Suppliers**") provided, however, that NEA's MBC reserves the right, in its reasonable discretion, to exclude any existing or future Supplier from providing Private Label Products. NEA MBC must inform InPhonic in writing which Suppliers it would like to exclude from the Private Label Products and provide a minimum of seven (7) business days for InPhonic to remove the identified Private Label Products; provided, further, at no time may NEA's MBC exclude more than two (2) Suppliers during the Term of this Agreement. Private Label Products shall be packaged together with (i) any material provided by the Suppliers pertaining to the operation and maintenance of the products; (ii) the terms and conditions of the service plans offered by the Suppliers in connection with such products; and (iii) any material provided by NEA's MBC pertaining to such products.

3.4     InPhonic shall process all credit card transactions using secure servers and appropriate software, which meets or exceeds industry standards for secure financial transactions. As requested, InPhonic will share with NEA's MBC the results of its own security audits to ensure the security of the personal and financial data of Private Label Product Customers.

3.5     InPhonic shall designate an account manager to work on a day-to-day basis with the program manager designated by NEA's MBC concerning all aspects of the Parties' obligations under this Agreement, including, but not limited to, the preparation and distribution of marketing materials, customer service, the gathering of data respecting member utilization, and accounting for compensation due to NEA's MBC.

3.6     If requested by NEA's MBC, InPhonic will participate, at its own expense, at the NEA Annual Convention each year for the entire term of this Agreement, for the purpose of promoting the Private Label Products.

3.7     InPhonic agrees that all materials developed or used for purposes of promoting the Private Label Products shall contain marks, logos or other materials owned or created by NEA's MBC provided by NEA's MBC if NEA's MBC so reasonably requests.

3.8     InPhonic shall comply with the Quality Assurance performance specifications in the attached Addendum C and shall remain in compliance.

3.9     Reports. InPhonic shall provide NEA's MBC with a monthly sales report reflecting all individual sales of Private Label Products nationwide which shall include the name, address, , e-mail address, type of plan, length of plan contract, and Supplier selected. This information shall be provided in electronic format to be specified by NEA's MBC. Information shall be provided within thirty days of the end of the period in question. Also, a summary written report of this information shall be provided to NEA's MBC in a format specified by it.

3.10    Insurance. Throughout the term of this Agreement and any extension hereof, InPhonic shall maintain commercial general liability and property damage liability insurance coverage underwritten by a Best A-rated insurance carrier. Such insurance shall have policy limits of not less than $1,000,000 per occurrence for death or personal injury, $1,000,000 per

occurrence for real and personal property damage, and $2,000,000 aggregate liability per year. Such policy shall name NEA's MBC as an additional insured and shall include a provision requiring the carrier to notify NEA's MBC in writing at least thirty (30) days prior to any cancellation, termination or amendment of such insurance coverages.

    3.11    For the Term of this Agreement, InPhonic agrees that it will not offer, provide or market the Private Label Products or any similar products or services to any other educational employees union, teacher group or teacher association that competes or could reasonably compete with NEA or its state or local affiliates for acceptance as a bargaining unit or teacher membership organization for school employees or any other website whose predominant target audience consists of teachers or other educational employees.

**4.**    **Responsibilities of NEA'S MBC.**

    4.1    NEA's MBC shall actively promote the Private Label Products during the Initial Term as described in this Section 4. Any promotion must conform in all respects to any content, design and functionality specifications provided by InPhonic to NEA's MBC. Any amendments, supplements or modifications that NEA's MBC proposes to make with respect to the promotion of the Private Label Products shall be subject to the prior written approval of InPhonic, such approval not to be unreasonably withheld.

    4.2    During the Term, NEA's MBC shall utilize various advertising vehicles as it deems necessary including placement of a wireless communications section on the home page of NEA's MBC Site, e-mail campaign(s), survey program(s) and Internet promotional advertisement(s) and which may include promotional advertisement(s) through traditional marketing mediums. NEA's MBC and InPhonic will create a mutually agreeable detailed marketing plan outlining these activities.

    4.3    Advertisements may be branded with the name and mark of NEA's MBC, subject to the restrictions set forth in Section 10, but shall, in any event, serve to promote the sale of Private Label Products. All Advertisements shall be subject to the prior written approval of NEA's MBC, such approval not to be unreasonably withheld.

    4.4    NEA's MBC shall promote offers only for the Private Label Products pursuant to the terms of this Agreement. <u>Exhibit A</u> shall be deemed to be automatically amended from time to time to reflect modifications with respect to the Private Label Products approved and available for promotion by NEA's MBC as such shall be mutually agreed upon by the Parties.

    4.5    NEA's MBC shall not make representations regarding the Private Label Products, other than those approved or distributed by InPhonic or any of its Suppliers, unless otherwise authorized in writing by InPhonic. InPhonic shall not be bound by any unauthorized representations or warranties regarding the Private Label Products that are made by NEA's MBC.

    4.6    NEA's MBC agrees that during the term of this Agreement it shall not provide links or advertising on the NEA's MBC Website to or place or offer any advertising on behalf of

4

any privately labeled wireless products or services that compete with or are substantially similar to the Private Label Products, other than those procured through InPhonic. NEA's MBC is not responsible for website links to and from websites of the NEA or other entities related to or associated with the NEA or the NEA's state or local affiliates that offer similar products and services.

5.     **Mutual Obligations**

5.1    Both Parties shall use best efforts to promptly report to the other Party any malfunctions adversely affecting NEA's MBC Site or Private Label Web Site and shall take all actions reasonably required to restore access to NEA's MBC Site or the Private Label Web Site.

5.2    Each Party shall promptly notify the other of any information pertaining to any defects in Private Label Products and any consumer complaints it receives regarding such products.

6.     **Customer Support.** InPhonic shall manage the customer support services provided to Private Label Product Customers with respect to the Private Label Products, including, without limitation, account maintenance, billing and collections with respect to wireless communications products, and technical support activities. Technical support activities may be provided, under certain circumstances, by one or more of the Suppliers, and the Suppliers shall in all events manage billing and collections with respect to wireless communications services. NEA's MBC shall direct inquiries relating to customer support services to InPhonic. InPhonic shall provide the customer support services in accordance with the performance standards set forth in Addendum C.

7.     **Payments.**

7.1    As material consideration for NEA's MBC's marketing commitment, set forth in Section 4 hereof, InPhonic shall pay to NEA's MBC upon the monthly Final Sale and distribution of the Private Label Products in accordance with the commission schedule outlined in <u>Exhibit B</u> as attached to this Agreement ("*Commissions*").

7.2    InPhonic shall deposit accrued royalties payable to NEA's MBC in accordance with this Section 7 into an account designated by NEA's MBC on or before the thirtieth (30th) day following the last day of the calendar month in which such commissions accrued. Commissions shall accrue in a given fiscal month upon the happening of the following three (3) events:

(a)    the fulfillment by InPhonic of a purchase order for Private Label Products;

(b)    the collection by InPhonic of the purchase price of the Private Label Products ordered by a Private Label Products Customer; and

(c)    the collection by InPhonic of any amounts due from Suppliers as a direct result of the Final Sale of the Private Label Products to Private Label Customers.

5

8. **Non-Disclosure of Proprietary Information.**

8.1   Both Parties acknowledge that during the Term of this Agreement, or during the term of the Prior Agreement, they may come (or have come) into possession of or become acquainted with certain Proprietary Information (as hereinafter defined) of the other party. The term "**Proprietary Information**" shall mean all information of a private, secret or confidential nature including but not limited to, information, whether written or oral, related to the disclosing party's business, business relationships or financial affairs, whether or not marked or otherwise designated as "confidential" or "proprietary" or with a similar legend indicating its proprietary nature, provided that such information is either provided with a verbal indication of its proprietary nature or is of a nature that would indicate its proprietary character. By way of illustration, but not limitation, Proprietary Information shall include (a) NEA's MBC's information on prospective participants and existing participants, its segmentation models and strategy, and (b) the back-end order fulfillment process developed and utilized by InPhonic in connection with the fulfillment of purchase orders for the Private Label Products, information concerning the terms of InPhonic's strategic partnerships with wireless communications service and product providers, and (c) all inventions, products, processes, methods, techniques, formulas, compounds, projects, developments, research data, source code, financial data, personnel data, computer programs, customers and supplier lists, and contacts at or knowledge of members, participants, customers or prospective customers of either party. The terms of this Agreement shall be treated as Proprietary Information.

8.2   The term "Proprietary Information" shall not include information that: (i) is or becomes generally known or available by publication or otherwise through no fault of the receiving party; (ii) is already rightfully in the receiving party's possession without restriction prior to its receipt from the disclosing party; (iii) is independently developed or learned by the receiving party; or (iv) is lawfully obtained by the receiving party from a third party that has the right to make such disclosure.

8.3   <u>Disclosure/Use Restrictions</u>. Each Party shall keep and maintain all Proprietary Information received or developed under this Agreement in strict confidence and shall protect the Proprietary Information using at least the same standard of care that the receiving Party uses to protect its own confidential and trade secret information, but in no event shall the receiving Party use less than a reasonable standard of care. Neither Party shall, directly or indirectly (i) disclose Proprietary Information to any person or entity other than its employees, and then only in the event that such employees agree in writing to be bound by the terms of this Section 8; or (ii) use Proprietary Information for its own benefit or for the benefit of any other person or entity, except as specifically authorized by the other Party.

8.4   <u>Required Disclosures</u>. In the event that a Party is required by applicable law, rule or regulation, or pursuant to the order of any court or governmental authority of competent jurisdiction to disclose Proprietary Information of the other Party, such Party shall use commercially reasonable efforts to (i) provide the other Party with at least ten (10) business days prior written notice of such disclosure; and (ii) limit such disclosure to the extent practicable.

8.5    Remedies. Each Party hereto acknowledges that breach of this Section 8 would cause irreparable harm to the other Party and/or its Suppliers for which monetary damages alone would be an inadequate remedy. For this reason, the Parties hereto agree that in the event of a breach or a threatened breach of this Section 8, the non-breaching Party and/or its Suppliers shall be entitled to the entry, by a court of competent jurisdiction, of a temporary restraining order, injunction or similar relief, as well as reimbursement of reasonable attorneys' fees or other costs incurred in obtaining such relief. Nothing in this Section 8 shall be construed as prohibiting either Party and/or its Suppliers from pursuing other remedies available at law or in equity against the breaching party or any other person or entity.

8.6    InPhonic agrees that any and all information that comes into its possession, directly or indirectly, as a result of this Agreement, including any information concerning Private Label Product Customers provided to InPhonic, its Suppliers or credit agencies in connection with the purchase of Private Label Products shall be held in confidence, shall be treated as, and deemed to be, Proprietary Information, and shall be used only in connection with activities undertaken by InPhonic pursuant to this Agreement.

9.    **Ownership; Non-Solicitation.**

9.1    Ownership.

(a)    All tangible information, including but not limited to any drawings, designs, information or specifications submitted by InPhonic to NEA's MBC with respect to the Private Label Web Site or the Advertisements other than NEA's MBC Marks, and other intellectual property provided by NEA's MBC for use thereon or therein, shall at all times be, and shall be deemed to be, the property of InPhonic, and InPhonic shall retain all right, title and interest in and to any intellectual property rights with respect to the content of the Private Label Web Site and the Advertisements, as amended, supplemented or modified from time to time by InPhonic or NEA's MBC. Notwithstanding anything to the contrary contained herein, NEA's MBC Marks, NEA's MBC Site and all information and intellectual property incorporated therein, and all other intellectual property provided to InPhonic by NEA's MBC shall at all times be, and shall be deemed to be, the property of NEA's MBC.

(b)    All personal information concerning NEA members and Private Label Product Customers, including without limitation the names, addresses, social security numbers and all other information provided by NEA members or Private Label Product Customers in connection with the purchase of Private Label Products, are and shall forever remain the sole and exclusive property of NEA and/or NEA's MBC. Information from NEA members and Private Label Product Customers shall be obtained and used by InPhonic in accordance with all applicable federal and state laws including the Children's Online Privacy and Protection Act. InPhonic shall segregate information concerning NEA members and Private Label Product Customers from its other customer information and shall not sell, disclose or share any such information with any third party without the prior written consent of NEA's MBC which may be given or withheld in its sole and absolute discretion; provided, however, that NEA's MBC hereby grants InPhonic a limited, non-exclusive, non-sublicensable, non-transferable right during the Term to disclose such information to Suppliers and credit agencies to facilitate the sale of the Private

7

Label Products. Within thirty (30) days of the termination of this Agreement, InPhonic shall return or destroy all written, electronic and other copies of information concerning NEA members and Private Label Product Customers and deliver a written certification of such return or destruction signed by an authorized officer of InPhonic to NEA's MBC.

9.2   Non-Solicitation of Customers. During the Term of this Agreement, and for a period of ninety (90) calendar days thereafter (the "Non-Solicitation Period"), NEA's MBC shall not take any action to cause any Private Label Product Customer to transfer its then active wireless communications products or services to any other wireless communications service, system or carrier. Such prohibited actions include, but are not limited to, providing competitive wireless communications products or service providers or carriers with the name, address, telephone number, email address, or other identifying information relating to any Private Label Product Customer. Information pertaining to Private Label Product Customers shall be deemed to be Proprietary Information subject to Section 8 hereof. Notwithstanding such, the foregoing shall not prohibit NEA's MBC from performing general solicitations not specifically targeting Private Label Customers via general advertisements or offering products and services competitive with the Private Label Products and contracting with or selling to any person who may respond to such general advertisements or offers.

## 10.   Grant of License.

(a)   InPhonic hereby grants to NEA's MBC a non-exclusive, non-transferable, non-sublicenseable license to use the logo, trademarks or trade names of InPhonic (collectively, the **"InPhonic Marks"**) solely in connection with the promotion and sale of the Private Label Products through NEA's MBC Site. The NEA's MBC acknowledges that the InPhonic Marks are the sole property of InPhonic and, other than the license granted herein, nothing shall be construed to grant NEA's MBC any right, title or interest in or to the InPhonic Marks.

(b)   The NEA's MBC hereby grants to InPhonic a non-exclusive, non-transferable, non-sublicenseable license to use the logo, trademarks or trade names of NEA's MBC (collectively, the **"NEA's MBC Marks"**) solely in connection with the promotion and sale of the Private Label Products. InPhonic acknowledges that NEA's MBC Marks are the sole property of NEA's MBC and, other than the license granted herein, nothing shall be construed to grant InPhonic any right, title or interest in or to NEA's MBC Marks.

(c)   Each Party reserves the right to approve the form and placement of their respective Marks on NEA's MBC Site, the Private Label Web Site, the Advertisements, or any materials used to promote the Private Label Products, such approval not to be unreasonably withheld or delayed. Each Party may require the other Party to suspend the use of the requesting Party's Marks should the requesting Party reasonably determine that such use is misleading or inappropriate or fails to comply with its policies regarding the use of its intellectual property, provided the other Party has been provided a copy of such policies.

11.  **Representations and Warranties.**

Each Party represents and warrants to the other Party as follows:

(a)  <u>Authority; Compliance</u>. The representing Party has all right, title and power necessary to perform its obligations hereunder and is in compliance with all federal, state and local laws material to the conduct of its business and necessary for its performance of this Agreement.

(b)  <u>No Infringement</u>. The Marks of the representing Party and all content provided by the representing Party or its affiliates for inclusion in any promotional materials distributed by the representing Party and/or in connection with offer and the sale of the Private Label Products, do not and will not, to the knowledge of the representing Party, infringe upon or otherwise violate any copyright, trade secret, trademark, patent, invention, privacy, or non-disclosure rights (collectively, the "Intellectual Property Rights") of any third party. The representing Party further represents and warrants that it owns or has sufficient rights in and to all of its marks to grant to the other Party the license described in Section 10.

(c)  <u>No Objectionable Material</u>. The Web Sites operated by the representing party and any other promotional materials prepared or distributed by a party or its affiliates in connection with the offer and sale of the Private Label Products do not and will not contain any material that (i) is intentionally misleading or deceptive, or (ii) is known to be libelous, defamatory, obscene, or pornographic, intended to harass or annoy, or which violates any civil or criminal laws. Web sites utilized by the representing party, its suppliers, or its affiliates to promote the Private Label Products do not, to the knowledge of NEA's MBC, link to any site containing material of the type described in the preceding sentence.

(d)  <u>Manufacturer Warranties.</u> InPhonic shall make available to the Private Label Product Customers the product warranties, if any, provided to InPhonic from the manufacturer of the Private Label Products.

12.  **Disclaimer of Warranties.**

**EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN SECTION 11 ABOVE, EACH PARTY EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, GUARANTEES, AND CONDITIONS OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE OR INTENDED USE.**

13.  **Indemnification.**

13.1  Each Party shall indemnify and hold the other party harmless from and against any and all damages, liabilities, costs and expenses (including reasonable attorney's fees), (collectively "Damages"), arising from or relating to such Party's breach of any of its obligations pursuant to this Agreement, the Prior Agreement or the representations or warranties set forth in Section 11. In addition, InPhonic shall indemnify and hold NEA's MBC harmless from and

against any and all Damages arising from or relating to the offer, sale, use and operation of the Private Label Products. Each Party shall (i) defend at its own cost and through counsel of its own choice or (ii) settle, subject to the approval of the other Party, such approval not be unreasonably conditioned, withheld or delayed: any actions or suit against the other for which it is responsible hereunder and shall reimburse the other for reasonable attorney's fees, interest, costs of suit and all other expenses by the other in connection therewith. Each Party shall notify the other promptly of any claim for which the other is responsible hereunder, and shall cooperate with the other in every reasonable way to facilitate the defense of any such claim.

13.2   The indemnifying Party's obligations are conditioned upon the indemnified Party (i) providing the indemnifying Party with prompt written notice of any claim, suit or proceeding for which the indemnified Party is seeking indemnity and (ii) reasonably cooperating with the defense or settlement negotiations, as the case may be, conducted by the indemnifying Party.

13.3   **LIMITATION OF LIABILITY. EXCEPT WITH RESPECT TO THE INDEMNIFICATION OBLIGATIONS SET FORTH IN THIS SECTION 13, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER, OR TO ANY THIRD PARTY, UNDER THIS AGREEMENT OR OTHERWISE, FOR CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL, OR PUNITIVE DAMAGES (EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), INCLUDING, WITHOUT LIMITATION, LOSS OF REVENUE, ANTICIPATED PROFITS OR LOST BUSINESS. THE FOREGOING LIMITATIONS SHALL APPLY TO ALL CAUSES OF ACTION IN THE AGGREGATE, INCLUDING, WITHOUT LIMITATION, BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY, MISREPRESENTATION, AND OTHER TORTS.**

14.   **Independent Contractor**. Each Party agrees that neither Party is an employee, attorney-in-fact, agent, partner or joint venturer of the other Party for any purpose and does not have the authority, actual or implied, to bind the other Party to any contract or obligation, other than to fulfill purchase orders for the Private Label Products, to the extent that such products are pursuant to this Agreement. The NEA's MBC is, and shall be deemed to be, an independent contractor. All costs and expenses of performing a Party's duties hereunder shall be borne solely by the Party performing such duties.

15.   **Inspection and Audit.** InPhonic shall maintain records containing information sufficient to verify the completeness and accuracy of its respective accounting and promotional activities that are directly related to this Agreement. Once every fiscal quarter, with no less than ten (10) business days prior written notice, NEA's MBC shall have the right to have an independent auditor examine the books and records of InPhonic relating to InPhonic's performance under this Agreement. The examination shall be conducted during regular business hours. The examination shall be reasonably limited in scope and duration to verify the completeness and accuracy of InPhonic's accounting of gross revenue derived from the Final Sale of Private Label Products through NEA's MBC Site. In the event that NEA's MBC audit establishes that an amount is payable to NEA's MBC, such amount shall immediately be paid together with an amount equal to the direct costs incurred as a result of the audit.

16. **Termination.**

    16.1  <u>Termination</u>. This Agreement shall be terminated:

    (a) by either Party, upon ten (10) days prior written notice, in the event that the other Party (i) ceases to function as a going concern or to conduct operations in the normal course of business, or (ii) files a petition, voluntarily or involuntarily, under any state or federal bankruptcy or insolvency law, which petition has not been dismissed or set aside within sixty (60) days of its filing;

    (b) by either Party, upon one (1) day written prior written notice, in the event that the other Party (i) has committed any act of fraud or dishonesty against the other Party or other act which may reasonably harm the reputation of the other Party or any of its Suppliers, or (iii) fails to comply with the policies related to this Agreement, of which the such Party has received prior written notice;

    (c) by either Party in the event that the other Party breaches any material provision of this Agreement, including the Quality Assurance performance specifications, and fails to correct such breach within ten (10) days of its receipt of notice of such breach.

    (d) by either Party, with or without cause, with at least sixty (60) days prior written notice to the other Party.

    16.2  <u>Effect of Termination</u>. On the effective date of the termination of this Agreement (i) any royalty payments which have accrued on or before such date shall become immediately due and payable, (ii) InPhonic shall immediately remove the Private Label Web Site and immediately cease the use of NEA's MBC Marks and the Advertisements and shall immediately cease its promotional activities with respect to the Private Label Products, and (iii) NEA's MBC shall immediately cease its promotional activities with respect to the Private Label Products and shall no longer hold itself out as a strategic partner of InPhonic. InPhonic shall have no liability for payment of any royalties in excess of the royalties accrued to NEA's MBC as of the effective date of the termination of this Agreement, so long as InPhonic does not sell Private Label Products to Private Label Product Customers after the effective date of termination. In the event that InPhonic sells any Private Label Product to any Private Label Product Customer after the effective termination date of this Agreement, InPhonic shall, within five days of such sale, pay to NEA's MBC the Service Fees due in connection with such sale. In the event that InPhonic is unable to conduct operations in the normal course of business, NEA's MBC reserves the right to contract directly with the Suppliers.

17. **Assignment.** Neither of the Parties may, without the other Parties' prior written consent, which shall not be unreasonably withheld, assign or transfer this Agreement, or any of its rights or obligations under this Agreement to any person ("Assignee") except as part of the sale of all or substantially all of the assets of the Party or merger of the Party; provided, however, that the Assignee agrees to fully perform and be bound by the provisions of this Agreement; and written notice is provided to the other party within ten (10) business days; and provided, however, that

NEA's MBC shall have the right to transfer or assign its rights and duties under this Agreement to the NEA or any other corporate affiliate of NEA's MBC.

**18. Notices.** All notices permitted or required hereunder shall be in writing and shall be deemed to have been given (i) upon personal delivery; (ii) one (1) day following deposit with an overnight courier that keeps written records of its deliveries; or (iii) three (3) days following deposit as certified mail, return receipt requested:

If to NEA's MBC:

NEA's Member Benefits Corporation
900 Clopper Road, Suite 300
Gaithersburg, MD 20878
Attention: Edward G. Phoebus III, President

If to InPhonic:

InPhonic, Inc.
1010 Wisconsin Avenue, NW, Suite 250
Washington, DC 20007
Attention: Jeff Baskin, Vice President, Ecommerce

**19. Governing Law; Consent to Jurisdiction.** This Agreement shall be construed and governed by the laws of the State of Maryland, without regard to the conflicts of law provisions thereof.

**20. Expenses.** Except as otherwise provided herein, each party shall pay its own legal, accounting, out-of-pocket and other expenses incident to this Agreement and to any action taken by such Party in preparation for performing its obligations under this Agreement.

**21. Invalidity.** In the event that any one or more of the provisions contained herein or in any instrument referred to herein shall, for any reason, be held to be invalid, illegal or unenforceable, then to the maximum extent permitted by law, such provision or provisions shall be judicially reformed consistent with the parties' intentions so as to be valid, legal and enforceable, and such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or such other instrument.

**22. Arbitration.** Any and all disputes arising out of or in connection with this Agreement shall be finally settled by arbitration in accordance with the rules of the American Arbitration Association. The arbitration proceeding shall take place in the Washington metropolitan area and any award rendered shall be final and binding upon the parties. Judgment of any such award may be entered in any court having jurisdiction over the parties or their assets. The costs of arbitration shall be shared equally by the parties. Each party will pay its own attorney's fees and costs.

**23. Survival.** The obligations of the Parties under Sections 8, 9, 13, and 16.2 shall survive the termination of this Agreement. In addition, without limiting the foregoing, all provision of

this Agreement that can only be given proper effect if they survive the termination of this Agreement will survive the termination of this Agreement.

24. **Construction; Amendments and Waivers**. The Agreement, together with any exhibits attached hereto, constitutes the entire agreement of the Parties concerning the subject matter hereof and supercedes all prior agreements, including the Prior Agreement, understandings and discussions, whether oral or written, of the Parties. No modification or waiver of this Agreement shall be binding unless such modification or waiver is set forth in a writing that is signed by the Party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless expressly provided otherwise.

25. **Counterparts**. This Agreement may be executed by the Parties in separate counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any Party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

26. **Non-Waiver of Breach**. The failure or delay of any of the Parties to take action with respect to any failure of the other Party to observe or perform any of the terms or provisions of this Agreement required to be observed or performed by such other Party, or with respect to any breach hereunder by such other Party, shall not be construed as a waiver. No such delay or non-action shall, under any circumstances, operate as a waiver of any rights or remedies or to deprive any Party of its right to institute and maintain any actions or proceedings which it may deem necessary to protect, assert, or enforce any such rights or remedies.

27. **Equal Opportunity.** InPhonic agrees to make the Private Label Products available to all eligible NEA members regardless of sex, race, national origin, color, religion, or marital status. InPhonic further represents and warrants that it is an Equal Employment Opportunity Employer and that it ensures equal employment opportunity based on objective standards of recruitment, selection, promotion, classification, compensation, performance evaluations and management relations for all employees and subcontractors under this Agreement. InPhonic shall make its personnel policy available to NEA's MBC upon request.

28. **Titles and Headings**. The titles and headings are inserted only as a matter of convenience and reference and in no way define, limit, or describe the scope of this Agreement or the intent of any provision thereof.

29. **Gifts and Gratuities**. NEA's MBC employees and members of their families are not to accept gifts or gratuities other than de minimus gifts from any supplier or prospective supplier. Such offerings shall be construed as an attempt to improperly influence the relationship and may result in termination of this Agreement by NEA's MBC.

30. **Press Releases**. Except as required by law, neither party shall issue a press release or make a public announcement concerning the other party or this Agreement without first obtaining the prior written consent of such party.

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed on the date first written above.

| | |
|---|---|
| **INPHONIC, INC.** | **NEA's MEMBER BENEFITS CORPORATION** |
| _/s/_ | _/s/_ |
| Name  Jeff Boyle | Edward G. Phoebus, III |
| Title  SVP, E-commerce | President and CEO |
| Date   11/15/07 | Date _____ |

14

## EXHIBIT A

Schedule of Private Label Products Procured by InPhonic.

**Wireless Products and Services Provided by InPhonic**

1. **Cellular phone and service plans**
2. **Cellular phones without service plans**
3. **Satellite Television**
4. **Home security alarms**

- InPhonic will provide web-based and telephone capability for NEA members to select a wireless product, service carrier and monthly plan from the leading carriers and handset providers. Using a charge card, the member will select and purchase a standard web-enabled or digital cellular phone, a selection of which will be available at no cost. The member can upgrade to a more expensive phone for an additional fee.
- The Private Label Products shall include a service plan which offers the lowest published rates offered by Suppliers. Such service plan shall be offered and made available through the Private Label Web Site and InPhonic's toll-free telephone number.
- InPhonic intends to add to the existing list of wireless communications products and wireless service providers. InPhonic reserves the right to modify this list of service providers; provided, however, that InPhonic shall deliver to NEA's MBC written notice of each addition or deletion to the list of service providers and products within three business days of such modification.
- Orders are fulfilled at the InPhonic fulfillment center in Largo, MD.
- Standard shipping carries no charge. There is a charge for premium and next-day shipping costs.
- InPhonic will offer comprehensive customer service through both telephone and e-mail.

**EXHIBIT B**

**Commission Schedule**

InPhonic agrees to pay Company the following Commissions in accordance with Section 7 of the Agreement. All Commissions are paid in United States currency.

**New Post-Paid Lines of Wireless Service**

- For the Final Sale of each Standard Post-Paid Unit (excluding contract extensions, phone only, and MVNO plans):

    o  Line 1

    | Monthly Rate Plans | Commission |
    | --- | --- |
    | 0 – 100 | $40.00 |
    | 101-399 | $45.00 |
    | 400 – 999 | $50.00 |
    | 1,000 + | $55.00 |

    o  Line 2 purchased as part of a Family/Shared Plan - $40.00

    o  Each Additional Line purchased as part of a Family/Shared Plan - $20.00

**Contract Extensions**

- Twenty Dollars ($20.00) for each Final Sale of a Standard Post-Paid wireless service contract extension
- Thirty Dollars ($30.00) for each Final Sale of a Family/Shared Post-Paid Plan wireless service contract extension (Family/Shared Post-Paid Plan commission payments are calculated per Family/Shared Post-Paid Plan ordered not per number of phones shipped with a Family/Shared Post-Paid Plan order)

**Add-a-Line**

- Ten dollars ($10.00) for each Final Sale of an additional line of service added to an existing wireless service account
-

**New Pre-Paid Lines of Wireless Service**

- Ten Dollars ($10.00) for each Final Sale of a Pre-Paid wireless activation service plan

**Phone Only**

- Ten Dollars ($10.00) for each Final Sale of a handset purchased without a wireless service plan

### MVNO Plans
- Fifteen Dollars ($15.00) for each Final Sale of a wireless activation service plan from an MVNO service provider, including, but not limited to, Amp'd Mobile, Disney Mobile, etc.

### Home Alarms
- Sixty-Five Dollars ($65.00) for the Final Sale of a home alarm system

### Satellite Services
- Sixty Dollars ($60.00) for each installation of a digital broadcast satellite television system by Dish Network, Direct TV, or any subsequent Supplier of digital broadcast satellite television services offered under this Agreement