INPHONIC CONFIDENTIAL INFORMATION

## MASTER SERVICES AGREEMENT

**THIS MASTER SERVICES AGREEMENT** (the "Agreement") dated March 1, 2007 (the "**Effective Date**"), by and between InPhonic, Inc., a Delaware corporation ("InPhonic") with an address for purposes of this Agreement at 1010 Wisconsin Avenue, NW, Suite 250, Washington, D.C. 20007, and Randall Van Dyke & Associates d/b/a RNA, Inc. a corporation with principal offices at 9303 Gilcrease Ave. #1045, Las Vegas, Nevada 89149 ("**RNA**"). InPhonic and RNA together shall be individually referred to as a "**Party**" or collectively referred to herein as the "**Parties**."

**NOW, THEREFORE**, in consideration of the covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## SECTION 1. DEFINITIONS

For purposes of this Agreement, the following terms shall have the meanings set forth below:

"**Cause**" means any of the following:
(a) In the event that the other Party (i) ceases to function as a going concern or to conduct operations in the normal course of business, or (ii) files a petition, voluntarily or involuntarily, under any state or federal bankruptcy or insolvency law, which petition has not been dismissed or set aside within sixty (60) days of its filing;
(b) In the event that the other Party (i) has committed any act of fraud or dishonesty against the other Party or other act which may reasonably harm the reputation of the other Party or any of its Suppliers to the extent such Party has independently verifiable evidence of such fraud or act; or
(c) In the event that the other Party breaches any material provision of this Agreement and fails to correct such breach within ten (10) days of its receipt of notice of such breach.

"**RNA**" means RNA, Inc. and any related subsidiaries, subdivisions or affiliates.

"**InPhonic**" means InPhonic, Inc. and any related subsidiaries, subdivisions or affiliates.

"**SOW**" or "**Statement of Work**" means a statement of work that the Parties may enter into from time to time that sets forth the specific scope, duration, payment terms and such other specific terms and conditions relating to a particular service to be performed.

"**Term**" has the meaning set forth in Section 4.01 of this Agreement.

## SECTION 2. PURPOSE

This Master Services Agreement establishes the terms and conditions under which RNA shall provide services to InPhonic pursuant to a SOW which may be issued hereunder from time to time, any and each of which are made part hereof and incorporated by reference. This

Agreement does not by itself order any such services. Services shall only be provided pursuant to a mutually agreed upon and executed SOW by and between the Parties.

## SECTION 3.   COMPENSATION

**3.01.   Expenses.**   Each Party shall be responsible for their own expenses incurred pursuant to the execution of this Agreement and/or any associated SOW, unless otherwise specified and agreed upon within a mutually approved SOW.

**3.02.   Invoices.**   Payment terms shall be specified solely within a SOW.

**3.03.   Market Development Funds.**   InPhonic shall provide payment to RNA in the amount of one hundred five thousand dollars ($105,000) in market development funds ("MDF") to be used for the exclusive purpose of promoting the services and products offered pursuant to this Agreement and the SOWs and as otherwise reasonably requested from time to time by InPhonic. Payment of the MDF shall be due and payable within five (5) business days from the Effective Date of this Agreement and shall be non-refundable.

**3.04.   Minimum Advertising Spend.**   InPhonic agrees to a minimum Yellow Page Advertising spend per product without approval by InPhonic of the following:
- $130,000 per month Satellite Services pursuant to SOW No.1.
- $ 35,000 per month Wireless Services pursuant to SOW No. 5.
- The above minimum Yellow Page Advertising per month spend may be modified by InPhonic at any time with 60 days notice.

**3.05.   Prepayment.**   Within five (5) business days of the date of this Agreement, InPhonic will provide RNA a prepayment of five hundred thousand dollars ($500,000) from which RNA may offset any monthly commissions and payments due to RNA under any SOWs; provided, however, to the extent not previously used by RNA, RNA must use such prepayment to offset any amounts due and payable during the last two months of this Agreement.. RNA agrees to provide monthly invoices in support of any expenses or payments due RNA hereunder and InPhonic shall only be required to reimburse RNA for expenses and payments directly related to this Agreement or any relevant SOW. Any amount of prepayment not distributed to RNA for monthly commissions and/or other payments due RNA under any SOWs shall be returned to InPhonic upon termination of this Agreement by either party for any reason once a final accounting of all amounts due to RNA under this Agreement and/or any and all SOWs has been completed and all payments to RNA for monthly commissions and/or other payments due RNA have been made.

## SECTION 4. TERM AND TERMINATION

**4.01.   Term.**   This Agreement shall commence on the Effective Date and end, unless earlier terminated pursuant to the terms of this Agreement, on the later of (i) the last day of the thirty-sixth (36th) consecutive month thereafter (the "Term") or (ii) the date as of which all SOWs issued hereunder have been terminated. The parties acknowledge and agree that the

termination of one SOW shall not cause of termination of this Agreement as long as any other SOW issued hereunder is still in effect.

**4.02. Termination.** This Agreement and any applicable SOW shall be terminated:

(a) by either Party, upon ten (10) days prior written notice, in the event that the other Party (i) ceases to function as a going concern or to conduct operations in the normal course of business, or (ii) files a petition, voluntarily or involuntarily, under any state or federal bankruptcy or insolvency law, which petition has not been dismissed or set aside within sixty (60) days of its filing;

(b) by either Party, upon one (1) day written prior written notice, in the event that the other Party (i) has committed any act of fraud or dishonesty against the other Party which act may reasonably harm the reputation of the other Party, or (ii) fails to comply with any policies related to this Agreement to which the Parties have mutually agreed and of which the such Party has received prior written notice; or

(c) by either Party in the event that the other Party breaches any material provision of this Agreement and fails to correct such breach within Thirty (30) days of its receipt of notice of such breach.

**4.03. Effect of Termination.** On the effective date of the termination of this Agreement (i) any commissions and/or payments that have accrued on or before such date shall become immediately due and payable to RNA, (ii) both Parties shall immediately cease any promotional activities with respect to this Agreement, (iii) within ninety (90) days of termination, the Parties shall commence a final accounting of all amounts due to RNA under this Agreement and any and all SOWs, and (iv) upon completion of the final accounting and payment to RNA of all amounts due and owing to RNA under this Agreement and/or any and all SOWs, any amount of the prepayment remaining shall then immediately be repaid to InPhonic, and any amount owed to RNA in excess of the prepayment shall be immediately paid to RNA. Upon termination of this Agreement, except for Cause, as defined in definition of "Cause", section (b) only, InPhonic may at its discretion either continue to pay RNA for any sales resulting from the Services hereunder or assign the Toll-Free numbers to RNA for his own usage.

## SECTION 5. INDEPENDENT CONTRACTOR

Each Party agrees that neither Party is an employee, attorney-in-fact, agent, partner or joint venturer of the other Party for any purpose and does not have the authority, actual or implied, to bind the other Party to any contract or obligation, other than to perform the Services, to the extent that such products are pursuant to this Agreement. RNA is, and shall be deemed to be, an independent contractor. Unless expressly specified herein or under an applicable SOW, all costs and expenses of performing a Party's duties hereunder shall be borne solely by the Party performing such duties. InPhonic acknowledges and agrees that for the purposes of this Agreement and each SOW issued hereunder, RNA shall have sole discretion and control over which vendors RNA uses to perform the services described herein or in any SOW subject to the approval by the provider of any such services or products.

**SECTION 6.  RESERVED**

**SECTION 7.  CONFIDENTIALITY**

**7.01.**  Except as otherwise expressly provided in this Agreement, each Party agrees that (a) all information communicated to it by the other and identified as confidential, whether before or after the date hereof, (b) all information identified as confidential to which it has access in connection with the Services, whether before or after the date hereof, and (c) trade secrets and any information concerning products, processes, formulas, algorithms, designs, schematics, works of authorship, inventions (whether or not patentable or registrable under copyright, mask works or similar laws and whether or not reduced to practice), discoveries, concepts, ideas, improvements, techniques, methods, research, development and test results, specifications, data, know-how, software, code, programs, marketing plans and analyses, business plans, customer and supplier identities, characteristics and agreements and (e) the terms of this Agreement, will be and will be deemed to have been received in confidence and will be used only for purposes of this Agreement. Each Party agrees to use the same means as it uses to protect its own confidential information, but in no event less than reasonable means, to prevent the disclosure and to protect the confidentiality thereof. No such information will be disclosed by one Party without the prior written consent of the other Party; provided, however, that each may disclose the other Party's confidential information to those of its employees, attorneys and accountants who have a need to have access to such information in connection with their employment or engagement with the Party so long as the disclosing Party advises each employee, attorney and accountant of the confidentiality obligations set forth in this Section 7.

**7.02.**  The foregoing will not prevent any Party from disclosing information that (i) is publicly known or becomes publicly known through no unauthorized act of that Party, (ii) is rightfully received from a third party or (iii) is independently developed without use of the other Party's confidential information. If confidential information is required to be disclosed pursuant to a requirement of a governmental authority, such confidential information may be disclosed pursuant to such requirement so long as the disclosing Party, to the extent possible, provides the other Party with timely prior notice of such requirement and coordinates with the other Party in an effort to limit the nature and scope of such required disclosure.

**7.03.**  Upon written request of either Party at the expiration or termination of this Agreement for any reason, all documented confidential information and all copies thereof of that Party will be returned to that Party or will be destroyed, with written certification thereof being given to the requesting party.

**7.04.**  Each Party hereto acknowledges that breach of this Section 7 would cause irreparable harm to the other Party for which monetary damages alone would be an inadequate remedy. For this reason, the Parties hereto agree that in the event of a breach or a threatened breach of this Section 7, the non-breaching Party shall be entitled to the entry, by a court of competent jurisdiction, of a temporary restraining order, injunction or similar relief, as well as reimbursement of reasonable attorneys' fees or other costs incurred in obtaining such relief.

Nothing in this Section 7 shall be construed as prohibiting either Party from pursuing other remedies available at law or in equity against the breaching party or any other person or entity.

## SECTION 8. OWNERSHIP

Each Party will retain all rights in any software, ideas, concepts, know-how, development tools, techniques or any other proprietary material or information that it owned or developed prior to the Effective Date, or acquired or developed after the Effective Date without reference to or use of the intellectual property of the other party. All software that is licensed by a Party from a third party vendor will be and remain the property of such vendor. RNA agrees that, except to the extent any RNA intellectual property is embodied or incorporated therein, all copyrights associated with the deliverables described on the Statement of Work ("**Deliverables**") shall be the sole and exclusive property of InPhonic or its nominees, and RNA will and hereby does, subject to payment in full of all necessary fees, assign to InPhonic all such rights in and to such Deliverables upon the creation of any such Deliverables.

## SECTION 9. REPRESENTATIONS AND WARRANTIES

Each Party represents and warrants to the other Party that it has the right to enter into this Agreement. RNA represents and warrants that (i) any information, software or other technology furnished by RNA to InPhonic in connection with the Services is described in each SOW; (ii) that such description is accurate and complete in all material respects; and (iii) that RNA owns or has the rights necessary for InPhonic to use all such information, software and technology. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, REGARDING ANY MATTER, INCLUDING THE MERCHANTABILITY, SUITABILITY, ORIGINALITY, FITNESS FOR A PARTICULAR USE OR PURPOSE, OR RESULTS TO BE DERIVED FROM THE USE, OF ANY INVENTION, SERVICE, SOFTWARE, HARDWARE OR OTHER MATERIALS PROVIDED UNDER THIS AGREEMENT. The terms and conditions of this Section 9 shall survive the termination of this Agreement.

## SECTION 10. INDEMNIFICATION

**10.01.** Each Party shall indemnify and hold the other party harmless from and against any and all damages, liabilities, costs and expenses (including reasonable attorney's fees) arising from or relating to such Party's breach of any of the representations or warranties set forth in Section 9. Each Party shall (i) defend at its own cost and through counsel of its own choice or (ii) settle, subject to the approval of the other Party, such approval not be unreasonably conditioned, withheld or delayed: any actions or suit against the other for which it is responsible hereunder and shall reimburse the other for reasonable attorney's fees, interest, costs of suit and all other expenses by the other in connection therewith. Each Party shall notify the other promptly of any claim for which the other is responsible hereunder, and shall cooperate with the other in every reasonable way to facilitate the defense of any such claim.

**10.02.** The indemnifying Party's obligations are conditioned upon the indemnified Party (i) providing the indemnifying Party with prompt written notice of any claim, suit or proceeding

for which the indemnified Party is seeking indemnity and (ii) reasonably cooperating with the defense or settlement negotiations, as the case may be, conducted by the indemnifying Party.

## SECTION 11. PRECEDENCE OF DOCUMENTS

In the event of conflict between provisions of this Agreement and provisions contained in any SOW hereto, the provisions of the SOW shall govern for purposes of that SOW only.

## SECTION 12. TRADEMARKS & COMMUNICATION

**12.01 Trademarks.** All trademarks, logos and/or service marks (collectively the "Marks") remain the property of the respective Parties.

**12.02 Press Release.** Except as required by law, neither Party shall issue a press release or make any public announcement concerning the other Party or this Agreement without the prior written approval of the other Party.

## SECTION 13. MISCELLANEOUS

**13.01. Exclusivity.** Each Party shall be free to represent or perform services for other entities or persons during the Term of this Agreement, provided such performance does not interfere with InPhonic's performance or RNA's responsibilities under this Agreement.

**13.02. Compliance.** The Parties agree to comply with all of the applicable policies and procedures of the wireless carriers with respect to the solicitation and activation of customers for other wireless services and/or for complying with all other obligations pursuant to InPhonic's master agent agreements with the wireless carriers.

**13.03 Counterparts.** This Agreement may be executed in several counterparts each of which shall be deemed an original but all of which together shall be deemed to be one and the same instrument.

**13.04. Governing Law.** This Agreement shall be governed in all respects by the laws of the State of Delaware, without giving effect to the conflicts of laws provision thereof.

**13.05. Section Headings.** The section headings herein have been inserted for convenience of reference only and shall in no way modify or restrict any of the terms or provisions hereof.

**13.06. Severability.** Any provision of this Agreement, which is found to be invalid or unenforceable by a court of competent jurisdiction, shall be ineffective to the extent of such invalidity or unenforceability without invalidating or rendering unenforceable the remaining provisions hereof, and any such invalidity or unenforceability shall not invalidate or render unenforceable such provision in any other jurisdiction.

**13.07. Notices.** All notices which are required or permitted hereunder shall be sufficient if given in writing and delivered personally, by registered or certified mail, postage prepaid or via facsimile, to the address set forth in the introductory paragraph of this Agreement.

**13.08. Taxes.** Each Party shall be responsible for the withholding and/or payment, as required by law, of all federal, state and local taxes imposed on such Party or its employees because of the performance of the services hereunder.

**13.09 Assignment.** Neither of the Parties may, without the other Parties' prior written consent, which shall not be unreasonably withheld, assign or transfer this Agreement, or any of its rights or obligations under this Agreement to any person ("**Assignee**") except as part of the sale of all or substantially all of the assets of the Party or merger of the Party; provided, however, that the Assignee agrees to fully perform and be bound by the provisions of this Agreement.

**13.10. Limitation of Liability.** EXCEPT WITH RESPECT TO THE INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 10 OF THIS AGREEMENT, IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER, OR TO ANY THIRD PARTY, UNDER THIS AGREEMENT OR OTHERWISE, FOR CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL, OR PUNITIVE DAMAGES (EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), INCLUDING, WITHOUT LIMITATION, LOSS OF REVENUE, ANTICIPATED PROFITS OR LOST BUSINESS. IN ADDITION, IN NO EVENT SHALL EITHER PARTY BY LIABLE TO THE OTHER, OR TO ANY THIRD PARTY, FOR DAMAGES IN EXCESS OF THE VALUE RECEIVED BY SUCH PARTY UNDER THIS AGREEMENT DURING THE SIX (6) MONTH PERIOD IMMEDIATELY PRECEDING THE DATE ON WHICH A CLAIM FOR DAMAGES AROSE. THE FOREGOING LIMITATIONS SHALL APPLY TO ALL CAUSES OF ACTION IN THE AGGREGATE, INCLUDING, WITHOUT LIMITATION, BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY, MISREPRESENTATION, AND OTHER TORTS. The terms and conditions of this Section 13.10 shall survive the termination of this Agreement.

**13.11. Construction; Amendments and Waivers.** The Agreement, together with any exhibits attached hereto, SOWs issued hereunder and other documents referred to herein, constitutes the entire agreement of the Parties concerning the subject matter hereof and supercedes all prior agreements, understandings and discussions, whether oral or written, of the Parties. No modification or waiver of this Agreement shall be binding unless such modification or waiver is set forth in a writing that is signed by the Party to be bound thereby. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless expressly provided otherwise.

**Signature Page Follows**

**IN WITNESS WHEREOF,** the Parties, through their authorized representatives, hereby acknowledge that they have read the foregoing Agreement and each has been independently advised as to the terms hereof by their own separate counsel and by the execution hereof below, consent to be bound by the terms of this Agreement.

**INPHONIC, INC.**

Name _PRESIDENT YMC_

Title _____

**RNA, INC.**

Name _RANDALL VAN DYKE_

Title _CEO (RANDALL VAN DYKE & ASSOCIAT_

INPHONIC CONFIDENTIAL INFORMATION

# MASTER SERVICES AGREEMENT
## STATEMENT OF WORK NO. 5
### (Marketing and Distribution of Wireless Services)

**THIS STATEMENT OF WORK NO. 5** (the "*SOW No. 5*") dated March 1, 2007 (the "*Effective Date*") is issued pursuant to that certain Master Services Agreement, dated March 1, 2007 (the "*Agreement*"), by and between InPhonic, Inc. ("*InPhonic*") and RNA, Inc. ("*RNA*").

**WHEREAS,** the Parties desire that RNA shall assist InPhonic in offering certain communication wireless services for sale to the public via the Yellow Page Advertisements other direct response programs, on the terms and conditions set forth herein;

**NOW, THEREFORE,** in consideration of the covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## SECTION 1.  DEFINITIONS

For purposes of this SOW No. 5, unless otherwise expressly provided herein, the terms defined herein shall have the same meaning set forth in the Agreement.

**"Budget"** means that certain financial budget established in writing by the parties detailing the amounts to be expended during each year of the Term by InPhonic.

**"Cause"** means any of the following:
(a) In the event that the other Party (i) ceases to function as a going concern or to conduct operations in the normal course of business, or (ii) files a petition, voluntarily or involuntarily, under any state or federal bankruptcy or insolvency law, which petition has not been dismissed or set aside within sixty (60) days of its filing;
(b) In the event that the other Party (i) has committed any act of fraud or dishonesty against the other Party or other act which may reasonably harm the reputation of the other Party or any of its Suppliers to the extent such Party has independently verifiable evidence of such fraud or act; or
(c) In the event that the other Party breaches any material provision of this Agreement and fails to correct such breach within ten (10) days of its receipt of notice of such breach.

**"Customer(s)"** means the individual(s), companies, and other entities that purchase Products through InPhonic.

**"Final Sale"** means an order placed for a Product that results in an activation of wireless services to the Customer and InPhonic receiving full and complete payment for the activation and does not result in a chargeback by the Supplier.

**"Products"** means the wireless products and services offered by InPhonic from time to time pursuant to this SOW No. 5.

"**Yellow Page Advertisements**" means advertisements developed by RNA subject to the prior written approval of InPhonic promoting the Products for sale through yellow pages within the United States.

## SECTION 2.  TERM AND EXCLUSIVITY

InPhonic hereby engages RNA on an exclusive basis for a period commencing on the Effective Date and ending on the last day of the thirty-sixth (36th) consecutive month thereafter (the "**Term**"), to promote offers for Products via the YellowPage Advertisements or other direct response programs, as may be agreed upon by the Parties in writing from time to time.  During the Term, and as long as InPhonic maintains an advertising spend of at least fifty percent (50%) of the Budget and as long as InPhonic directly or indirectly through a third party provider answers sale calls a minimum of twelve (12) hours per day Monday through Friday, InPhonic shall be the exclusive provider to RNA and RNA shall be the exclusive marketer for InPhonic of such Products through the Yellow Page Advertisements. Nothing in the foregoing shall prohibit RNA from promoting products and/or brands that are not offered by InPhonic or which InPhonic ceases to offer.  In the event InPhonic experiences any interruption of call center service for any reason whatsoever (except for a force majeure) for more than a full day (9 am – 9pm EST), then InPhonic shall pay RNA one thousand dollars ($1,500) per day as liquidated damages and not as a penalty, which amount shall be due and payable to RNA immediately.

## SECTION 3.  THE RESPONSIBILITIES OF RNA

**3.01.**  On the Effective Date or on such date as is mutually agreed upon by the parties hereto, RNA shall develop and provide to InPhonic a comprehensive marketing program that shall actively promote the sale of  Products during the Term, including but not limited to the Yellow Page Advertisements. Any promotion must conform in all respects to any content, design and functionality specifications provided by InPhonic to RNA. Any amendments, supplements or modifications that RNA proposes to make with respect to the promotion of the Products shall be subject to the prior written approval of InPhonic, such approval not to be unreasonably withheld. RNA shall promote offers only for the Products pursuant to the terms of this SOW No.5.  RNA shall have sole discretion and control over which vendors RNA uses to promote the sale of Products subject to the prior approval of the provider of such products or services.

**3.02.  Unauthorized Representations.**  RNA shall not make representations regarding the Products, other than those approved or distributed by InPhonic or any of its Suppliers, unless otherwise authorized in writing by InPhonic.  InPhonic shall not be bound by any unauthorized representations or warranties regarding the Private Label Products that are made by RNA.

## SECTION 4.  THE RESPONSIBILITIES OF INPHONIC

InPhonic shall be solely responsible for the fulfillment of orders and procurement of the Products from its suppliers (the "**Suppliers**").  Products shall be packaged together with (i) any material provided by the Suppliers pertaining to the operation and maintenance of the products; (ii) the terms and conditions of the service plans offered by the Suppliers in connection with such products; and (iii) any material provided by InPhonic pertaining to such products.

2

**SECTION 5. CUSTOMER SUPPORT.** InPhonic shall manage the customer support services with respect to the Products, including, without limitation, account maintenance, billing and collections with respect to wireless communications products, and technical support activities. Technical support activities may be provided, under certain circumstances, by one or more of the Suppliers, and the Suppliers shall in all events manage billing and collections with respect to wireless communications services. RNA shall direct inquiries relating to customer support services to InPhonic.

## SECTION 6. PAYMENTS

**6.01** As material consideration for RNA's marketing commitment, InPhonic shall pay to RNA as provided in <u>Attachment A</u> to this SOW No. 5. Upon termination of this SOW No. 5, except for Cause, as defined in definition of "Cause", section (b) only, InPhonic may at its discretion either continue to pay RNA for any sales resulting from the Services hereunder or assign the Toll-Free numbers to RNA for his own usage.

## SECTION 7. TRANSFER OF CUSTOMERS

**7.01.** During the Term of SOW No. 5 and for a period of one (1) year thereafter (the "Non-Solicitation Period"), RNA shall not take any action to cause any Customer to transfer its then active Alarm Sservcies to any other satellite service, system or carrier. Such prohibited actions include, but are not limited to, providing competitive wireless communications products or service providers or carriers with the name, address, telephone number, email address, or other identifying information relating to any Customer. Information pertaining to Customers shall be deemed to be Proprietary and Confidential Information of InPhonic.

## SECTION 8. GRANT OF LICENSE

InPhonic hereby grants to RNA a non-exclusive, non-transferable, non-sublicenseable license to use the logo, trademarks or trade names of InPhonic (collectively, the **"InPhonic Marks"**) solely in connection with the promotion and sale of the Products through the Yellow Page Advertisements. RNA acknowledges that the InPhonic Marks are the sole property of InPhonic and, other than the license granted herein, nothing shall be construed to grant RNA any right, title or interest in or to the InPhonic Marks. InPhonic reserves the right to approve the form and placement of the InPhonic Marks, or any materials used to promote the Products, such approval not to be unreasonably withheld or delayed. InPhonic may immediately require RNA to suspend the use of InPhonic Marks should InPhonic reasonably determine that such use is misleading or inappropriate or fails to comply with its policies regarding the use of its intellectual property.

**IN WITNESS WHEREOF,** the Parties, through their authorized representatives, hereby acknowledge that they have read the foregoing SOW No. 5 and each has been independently advised as to the terms hereof by their own separate counsel and by the execution hereof below, consent to be bound by the terms of this SOW No. 5.

3



**INPHONIC, INC.**

**RNA, INC.**

Name

Title

Name  *RANDALL VAN DYKE*

Title  *CEO, RANDALL VAN DYKE & ASSOCIATES*

4

**EXHIBIT A**

**Wireless Services – Phase II**
**Insertion Fee**

Beginning October 2006, InPhonic will pay a Yellow Page insertion fee of 25% of the monthly spend for managed yellow page ads, payable to RNA, net 30 days of first invoice received from Yellow Page Vendor for that insertion period.

**Wireless Services – Phase II**
**Rate Plan Activation Commission**

Beginning October 2006, any future payments of $100 per rate plan activated is calculated as such:
- Monthly managed Yellow Page spend + 25% Yellow Page insertion fee equals total payment made by InPhonic. Total payment divided by $100 equals total rate plans activated required before any future commission is earned. Once the breakeven number of rate plans activated is met, InPhonic will pay $100 per rate plan activated, regardless of the type of plan (single, family or multi-line plan).

Additional commissions for exceptions to the above
- Contract Extensions - Fifty Dollars ($50.00) for each Final Sale of a Standard and Family Plan Post-Paid wireless service contract extension
- Stand alone Add-a-Line - Twenty dollars ($20.00) for each Final Sale of an additional line of service added to a customers previous existing wireless service account
- New Pre-Paid Lines of Wireless Service - Twenty Dollars ($20.00) for each Final Sale of a Pre-Paid wireless activation service plan
- Phone Only with no service - Twenty Dollars ($20.00) for each Final Sale of a handset purchased without a wireless service plan
- MVNO Plans - Twenty Dollars ($20.00) for each Final Sale of a wireless activation service plan from an MVNO service provider, including, but not limited to, Amp'd Mobile, Disney Mobile, etc.
- Accessory Sales - Three Dollars ($3.00) for each Final Sale of a wireless accessory

Commission is payable twice monthly (15th and EOM) by wire transfer.

**Affiliate Wireless Services – Phase II**
**Rate Plan Activation Commission**

- Using separate InPhonic tracking URLs and/or TFNs, separate from those activations from managed Yellow Page advertising, InPhonic will pay $100 per rate plan activated with rolling chargebacks; provided, however, in the event that InPhonic experiences a business downturn related to this SOW No.5, the parties shall negotiate in good faith and amend the SOW to provide for a lesser activation fee.

Additional commissions for exceptions to the above

- Contract Extensions - Fifty Dollars ($50.00) for each Final Sale of a Standard and Family Plan Post-Paid wireless service contract extension
- Stand alone Add-a-Line - Twenty dollars ($20.00) for each Final Sale of an additional line of service added to a customers previous existing wireless service account
- New Pre-Paid Lines of Wireless Service - Twenty Dollars ($20.00) for each Final Sale of a Pre-Paid wireless activation service plan
- Phone Only with no service - Twenty Dollars ($20.00) for each Final Sale of a handset purchased without a wireless service plan
- MVNO Plans - Fifteen Dollars ($20.00) for each Final Sale of a wireless activation service plan from an MVNO service provider, including, but not limited to, Amp'd Mobile, Disney Mobile, etc.
- Accessory Sales - Three Dollars ($3.00) for each Final Sale of a wireless accessory

Commission is payable twice monthly (15th and EOM) by wire transfer.

INPHONIC CONFIDENTIAL INFORMATION

## MASTER SERVICES AGREEMENT
## STATEMENT OF WORK NO. 1
### (Marketing and Distribution of Television Satellite Services)

**THIS STATEMENT OF WORK NO. 1** (the "*SOW No. 1*") dated March 1, 2007 (the "*Effective Date*") is issued pursuant to that certain Master Services Agreement, dated March 1, 2007 (the "*Agreement*"), by and between InPhonic, Inc. ("*InPhonic*") and RNA, Inc. ("*RNA*").

**WHEREAS**, the Parties desire that RNA shall assist InPhonic in offering certain television satellite for sale to the public via the Yellow Page Advertisements other direct response programs, on the terms and conditions set forth herein;

**NOW, THEREFORE**, in consideration of the covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## SECTION 1.  DEFINITIONS

For purposes of this SOW No. 1, unless otherwise expressly provided herein, the terms defined herein shall have the same meaning set forth in the Agreement.

**"Budget"** means that certain financial budget established in writing by the parties detailing the amounts to be expended during each year of the Term by InPhonic.

"Cause" means any of the following:
(a) In the event that the other Party (i) ceases to function as a going concern or to conduct operations in the normal course of business, or (ii) files a petition, voluntarily or involuntarily, under any state or federal bankruptcy or insolvency law, which petition has not been dismissed or set aside within sixty (60) days of its filing;
(b) In the event that the other Party (i) has committed any act of fraud or dishonesty against the other Party or other act which may reasonably harm the reputation of the other Party or any of its Suppliers to the extent such Party has independently verifiable evidence of such fraud or act; or
(c) In the event that the other Party breaches any material provision of this Agreement and fails to correct such breach within ten (10) days of its receipt of notice of such breach.

**"Customer(s)"** means the individual(s), companies, and other entities that purchase Products through InPhonic.

**"Final Sale"** means an order placed for a Product that results in an installation of satellite services to the Customer and InPhonic receiving full and complete payment for the installation and does not result in a chargeback by the Supplier.

**"Products"** means the television satellite products and services offered by InPhonic from time to time pursuant to this SOW No. 1.

"**Yellow Page Advertisements**" means advertisements developed by RNA subject to the prior written approval of InPhonic promoting the Products for sale through yellow pages within the United States.

## SECTION 2.  TERM AND EXCLUSIVITY

InPhonic hereby engages RNA on an exclusive basis for a period commencing on the Effective Date and ending on the last day of the thirty-sixth (36th) consecutive month thereafter (the "**Term**"), to promote offers for Products via the YellowPage Advertisements or other direct response programs, as may be agreed upon by the Parties in writing from time to time.  During the Term, and as long as InPhonic maintains an advertising spend of at least fifty percent (50%) of the Budget and as long as InPhonic directly or indirectly through a third party provider answers sales calls a minimum of twelve (12) hours per day Monday through Friday, InPhonic shall be the exclusive provider to RNA and RNA shall be the exclusive marketer for InPhonic of such Products through the Yellow Page Advertisements. Nothing in the foregoing shall prohibit RNA from promoting products and/or brands that are not offered by InPhonic or which InPhonic ceases to offer.  InPhonic acknowledges that RNA has an existing relationship with another Directv vendor and is being paid from such vendor for advertisements already placed.   In the event InPhonic experiences any interruption of call center service for any reason whatsoever (except for a force majeure) for more than a full day (9 am – 9pm EST), then InPhonic shall pay RNA  five thousand dollars ($5,000) per day as liquidated damages and not as a penalty, which amount shall be due and payable to RNA immediately.

## SECTION 3.  THE RESPONSIBILITIES OF RNA

**3.01.**  On the Effective Date or on such date as is mutually agreed upon by the parties hereto, RNA shall develop and provide to InPhonic a comprehensive marketing program that shall actively promote the sale of  Products during the Term, including but not limited to the Yellow Page Advertisements. Any promotion must conform in all respects to any content, design and functionality specifications provided by InPhonic to RNA.  Any amendments, supplements or modifications that RNA proposes to make with respect to the promotion of the Products shall be subject to the prior written approval of InPhonic, such approval not to be unreasonably withheld. RNA shall promote offers only for the Products pursuant to the terms of this SOW No.1.  RNA shall have sole discretion and control over which vendors RNA uses to promote the sale of Products, subject to the prior approval of the provider of the services or products.

**3.02.**  **Unauthorized Representations.**  RNA shall not make representations regarding the Products, other than those approved or distributed by InPhonic or any of its Suppliers, unless otherwise authorized in writing by InPhonic.  InPhonic shall not be bound by any unauthorized representations or warranties regarding the Private Label Products that are made by RNA.

## SECTION 4.  THE RESPONSIBILITIES OF INPHONIC

InPhonic shall be solely responsible for the fulfillment of orders and procurement of the Products from its suppliers (the "**Suppliers**").  Products shall be packaged together with (i) any material provided by the Suppliers pertaining to the operation and maintenance of the products; (ii) the terms and conditions of the service plans offered by the Suppliers in connection with such products; and (iii) any material provided by InPhonic pertaining to such products.

2

**SECTION 5. CUSTOMER SUPPORT.** InPhonic shall manage the customer support services with respect to the Products, including, without limitation, account maintenance, billing and collections with respect to wireless communications products, and technical support activities. Technical support activities may be provided, under certain circumstances, by one or more of the Suppliers, and the Suppliers shall in all events manage billing and collections with respect to wireless communications services. RNA shall direct inquiries relating to customer support services to InPhonic.

### SECTION 6. PAYMENTS

**6.01**    As material consideration for RNA's marketing commitment, InPhonic shall pay to RNA as provided in Attachment A to this SOW No. 1. Upon termination of this SOW No. 1, except for Cause, as defined in definition of "Cause", section (b) only, InPhonic may at its discretion either continue to pay RNA for any sales resulting from the Services hereunder or assign the Toll-Free numbers to RNA for his own usage.

### SECTION 7. TRANSFER OF CUSTOMERS

**7.01.** During the Term of SOW No. 1 and for a period of one (1) year thereafter (the "Non-Solicitation Period"), RNA shall not take any action to cause any Customer to transfer its then active satellite products or services to any other satellite service, system or carrier. Such prohibited actions include, but are not limited to, providing competitive wireless communications products or service providers or carriers with the name, address, telephone number, email address, or other identifying information relating to any Customer. Information pertaining to Customers shall be deemed to be Proprietary and Confidential Information of InPhonic.

### SECTION 8. GRANT OF LICENSE

InPhonic hereby grants to RNA a non-exclusive, non-transferable, non-sublicenseable license to use the logo, trademarks or trade names of InPhonic (collectively, the **"InPhonic Marks"**) solely in connection with the promotion and sale of the Products through the Yellow Page Advertisements. RNA acknowledges that the InPhonic Marks are the sole property of InPhonic and, other than the license granted herein, nothing shall be construed to grant RNA any right, title or interest in or to the InPhonic Marks. InPhonic reserves the right to approve the form and placement of the InPhonic Marks, or any materials used to promote the Products, such approval not to be unreasonably withheld or delayed. InPhonic may immediately require RNA to suspend the use of InPhonic Marks should InPhonic reasonably determine that such use is misleading or inappropriate or fails to comply with its policies regarding the use of its intellectual property.

**IN WITNESS WHEREOF**, the Parties, through their authorized representatives, hereby acknowledge that they have read the foregoing SOW No. 1 and each has been independently advised as to the terms hereof by their own separate counsel and by the execution hereof below, consent to be bound by the terms of this SOW No. 1.

**INPHONIC, INC.**

_____
Name
PRESIDENT VMC

**RNA, INC.**

_____
Name  RANDALL VAN DYKE

3

Title

4

## EXHIBIT A

For installs from June 2005 – May 2006, InPhonic will pay a commission payment of $1,752,676, less commission already paid of $152,120, for a payment of $1,600,556. Payment of the $1,600,556 to be paid according to the following:

- Payment of $400,139 upon execution by InPhonic of this SOW No. 1.
- Twenty-four (24) equal payments of $50,000 payable monthly on the last day of each month, beginning January 2007.

The above commission payment relinquishes InPhonic of any future payments for installs related to June 2005 – May 2006 Yellow Page advertising buys. InPhonic's obligations to make the above commission payment shall survive the termination of this SOW No. 1 and the Master Services Agreement.

For the months of June 2006 – September 2006, InPhonic will pay $135,120 for yellow page insertion fee, equal to 25% of the monthly spend, payable upon execution by InPhonic of this SOW No. 1.

Beginning October 2006, InPhonic will pay a Yellow Page insertion fee of 25% of the monthly spend for yellow page ads, payable to RNA, net 30 days of first invoice received from Yellow Page Vendor for that insertion month. For purposes of this Agreement, "Yellow Page Vendor" means any person or entity that sells advertising space in Yellow Pages.

Beginning June 2006, any future payments of $135 per net installation is calculated as such:
- Monthly Yellow Page spend + 25% Yellow Page insertion fee equals total payment made by InPhonic. Total payment divided by $135 equals total installations required before any future commission is earned. Once the breakeven number of net installations is met, InPhonic will pay $135 per net installation.

- Commission is payable twice monthly (15th and EOM) by wire transfer. ; provided, however, in the event that InPhonic experiences a business downturn related to this SOW, the parties shall negotiate in good faith and amend the SOW to provide for a lesser commission.

For Affiliate Satellite Services, using separate InPhonic tracking URLs and/or TFNs, separate from those activations from Managed Yellow Page advertising, InPhonic will pay $135 per net installation. For purposes of this SOW No. 1, "Affiliate Satellite Services" means installations provided by ad space owned by RNA and/or its affiliates.

INPHONIC CONFIDENTIAL INFORMATION

<div align="center">

**MASTER SERVICES AGREEMENT**
**STATEMENT OF WORK NO. 4**
**(Marketing and Distribution of Alarm Services)**

</div>

**THIS STATEMENT OF WORK NO. 4** (the "*SOW No. 4*") dated March 1, 2007 (the "*Effective Date*") is issued pursuant to that certain Master Services Agreement, dated March 1, 2007 (the "*Agreement*"), by and between InPhonic, Inc. ("*InPhonic*") and RNA, Inc. ("*RNA*").

**WHEREAS**, the Parties desire that RNA shall assist InPhonic in offering certain home alarm services ("*Alarm Services*") for sale to the public via the Yellow Page Advertisements other direct response programs, on the terms and conditions set forth herein;

**NOW, THEREFORE**, in consideration of the covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## SECTION 1. DEFINITIONS

For purposes of this SOW No. 4, unless otherwise expressly provided herein, the terms defined herein shall have the same meaning set forth in the Agreement.

**"Budget"** means that certain financial budget established in writing by the parties detailing the amounts to be expended during each year of the Term by InPhonic.

**"Cause"** means any of the following:
(a) In the event that the other Party (i) ceases to function as a going concern or to conduct operations in the normal course of business, or (ii) files a petition, voluntarily or involuntarily, under any state or federal bankruptcy or insolvency law, which petition has not been dismissed or set aside within sixty (60) days of its filing;
(b) In the event that the other Party (i) has committed any act of fraud or dishonesty against the other Party or other act which may reasonably harm the reputation of the other Party or any of its Suppliers to the extent such Party has independently verifiable evidence of such fraud or act; or
(c) In the event that the other Party breaches any material provision of this Agreement and fails to correct such breach within ten (10) days of its receipt of notice of such breach.

**"Customer(s)"** means the individual(s), companies, and other entities that purchase Products through InPhonic.

**"Final Sale"** means an order placed for a Product that results in an installation of Alarm services to the Customer and InPhonic receiving full and complete payment for the installation and does not result in a chargeback by the Supplier.

**"Products"** means the Alarm Services products and services offered by InPhonic from time to time pursuant to this SOW No. 4.

"**Yellow Page Advertisements**" means advertisements developed by RNA subject to the prior written approval of InPhonic promoting the Products for sale through yellow pages within the United States.

## SECTION 2.  TERM AND EXCLUSIVITY

InPhonic hereby engages RNA on an exclusive basis for a period commencing on the Effective Date and ending on the last day of the thirty-sixth (36th) consecutive month thereafter (the "**Term**"), to promote offers for Products via the YellowPage Advertisements or other direct response programs, as may be agreed upon by the Parties in writing from time to time.   During the Term, and as long as InPhonic maintains an advertising spend of at least fifty percent (50%) of the Budget, InPhonic shall be the exclusive provider to RNA and RNA shall be the exclusive marketer for InPhonic of such Products through the Yellow Page Advertisements.  If no Budget is established and agreed upon by the Parties, then RNA may provide services to others but RNA shall be the exclusive marketer for InPhonic of such Products through the Yellow Page Advertisements.

## SECTION 3.  THE RESPONSIBILITIES OF RNA

**3.01.**  On the Effective Date or on such date as is mutually agreed upon by the parties hereto, RNA shall develop and provide to InPhonic a comprehensive marketing program that shall actively promote the sale of  Products during the Term, including but not limited to the Yellow Page Advertisements. Any promotion must conform in all respects to any content, design and functionality specifications provided by InPhonic to RNA.  Any amendments, supplements or modifications that RNA proposes to make with respect to the promotion of the Products shall be subject to the prior written approval of InPhonic, such approval not to be unreasonably withheld. RNA shall promote offers only for the Products pursuant to the terms of this SOW No.4.  RNA shall have sole discretion and control over which vendors RNA uses to promote the sale of Products subject to the prior written approval of the provider of such services or products.

**3.02.   Unauthorized Representations.**  RNA shall not make representations regarding the Products, other than those approved or distributed by InPhonic or any of its Suppliers, unless otherwise authorized in writing by InPhonic.  InPhonic shall not be bound by any unauthorized representations or warranties regarding the Private Label Products that are made by RNA.

## SECTION 4.  THE RESPONSIBILITIES OF INPHONIC

InPhonic shall be solely responsible for the fulfillment of orders and procurement of the Products from its suppliers (the "**Suppliers**").  Products shall be packaged together with (i) any material provided by the Suppliers pertaining to the operation and maintenance of the products; (ii) the terms and conditions of the service plans offered by the Suppliers in connection with such products; and (iii) any material provided by InPhonic pertaining to such products.

**SECTION 5. CUSTOMER SUPPORT.**  InPhonic shall manage the customer support services with respect to the Products, including, without limitation, account maintenance, billing and collections with respect to wireless communications products, and technical support activities.  Technical support activities may be provided, under certain circumstances, by one or more of the Suppliers, and the Suppliers shall in all events manage billing and collections with respect to wireless communications services. RNA shall direct inquiries relating to customer support services to InPhonic.

2

## SECTION 6. PAYMENTS

**6.01**   As material consideration for RNA's marketing commitment, InPhonic shall pay to RNA as provided in Attachment A to this SOW No. 4 Upon termination of this SOW No. 4, except for Cause, as defined in definition of "Cause", section (b) only, InPhonic may at its discretion either continue to pay RNA for any sales resulting from the Services hereunder or assign the Toll-Free numbers to RNA for his own usage.


## SECTION 7. TRANSFER OF CUSTOMERS

**7.01.**   During the Term of SOW No. 4 and for a period of one (1) year thereafter (the "Non-Solicitation Period"), RNA shall not take any action to cause any Customer to transfer its then active Alarm Sservcies to any other satellite service, system or carrier.  Such prohibited actions include, but are not limited to, providing competitive wireless communications products or service providers or carriers with the name, address, telephone number, email address, or other identifying information relating to any Customer.  Information pertaining to Customers shall be deemed to be Proprietary and Confidential Information of InPhonic.

## SECTION 8. GRANT OF LICENSE

InPhonic hereby grants to RNA a non-exclusive, non-transferable, non-sublicenseable license to use the logo, trademarks or trade names of InPhonic (collectively, the "**InPhonic Marks**") solely in connection with the promotion and sale of the Products through the Yellow Page Advertisements.  RNA acknowledges that the InPhonic Marks are the sole property of InPhonic and, other than the license granted herein, nothing shall be construed to grant RNA any right, title or interest in or to the InPhonic Marks.  InPhonic reserves the right to approve the form and placement of the InPhonic Marks, or any materials used to promote the Products, such approval not to be unreasonably withheld or delayed. InPhonic may immediately require RNA to suspend the use of InPhonic Marks should InPhonic reasonably determine that such use is misleading or inappropriate or fails to comply with its policies regarding the use of its intellectual property.

**IN WITNESS WHEREOF**, the Parties, through their authorized representatives, hereby acknowledge that they have read the foregoing SOW No. 4 and each has been independently advised as to the terms hereof by their own separate counsel and by the execution hereof below, consent to be bound by the terms of this SOW No. 4.

**INPHONIC, INC.**

Name
Title  PRESIDENT VMC

**RNA, INC.**

Name  Randall Van Dyke
Title  CEO, Randall Van Dyke Associates

3

## EXHIBIT A

Alarm Services – Phase II
Insertion Fee

Beginning October 2006, InPhonic will pay a Yellow Page insertion fee of 25% of the monthly spend for yellow page ads, payable to RNA, net 30 days of invoice received from Yellow Page Vendor.

Alarm Services – Phase II
Activation Commission

Beginning October 2006, any future payments of $200 per activation, calculated as such:
- Monthly Managed Yellow Page spend + 25% Yellow Page insertion fee equals total payment made by InPhonic.  Total payment divided by $200 equals total activations required before any future commission is earned.  Once the breakeven number of activations is met, InPhonic will pay $200 per activation.

Commission is payable 75 days after activation, paid monthly by wire transfer.

Affiliate Alarm Services – Phase II
Activation Commission

- Using separate InPhonic tracking URLs and TFNs, separate from those activations from managed yellow page advertising, InPhonic will pay $200 per activation with rolling chargebacks; provided, however, in the event that InPhonic experiences a business downturn related to this SOW No.4, the parties shall negotiate in good faith and amend the SOW to provide for a lesser activation fee.

Commission is payable 75 days after activation, paid monthly by wire transfer.

4

INPHONIC CONFIDENTIAL INFORMATION

## MASTER SERVICES AGREEMENT
## STATEMENT OF WORK NO. 3
### (Marketing and Distribution of Broadband Services)

**THIS STATEMENT OF WORK NO. 3** (the "*SOW No. 3*") dated March 1, 2007 (the "*Effective Date*") is issued pursuant to that certain Master Services Agreement, dated March 1, 2007 (the "*Agreement*"), by and between InPhonic, Inc. ("*InPhonic*") and RNA, Inc. ("*RNA*").

**WHEREAS**, the Parties desire that RNA shall assist InPhonic in offering certain broadband services ("*Broadband*") for sale to the public via the Yellow Page Advertisements other direct response programs, on the terms and conditions set forth herein;

**NOW, THEREFORE**, in consideration of the covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## SECTION 1.  DEFINITIONS

For purposes of this SOW No. 3, unless otherwise expressly provided herein, the terms defined herein shall have the same meaning set forth in the Agreement.

**"Budget"** means that certain financial budget established in writing by the parties detailing the amounts to be expended during each year of the Term by InPhonic.

**"Cause"** means any of the following:
(a) In the event that the other Party (i) ceases to function as a going concern or to conduct operations in the normal course of business, or (ii) files a petition, voluntarily or involuntarily, under any state or federal bankruptcy or insolvency law, which petition has not been dismissed or set aside within sixty (60) days of its filing;
(b) In the event that the other Party (i) has committed any act of fraud or dishonesty against the other Party or other act which may reasonably harm the reputation of the other Party or any of its Suppliers to the extent such Party has independently verifiable evidence of such fraud or act; or
(c) In the event that the other Party breaches any material provision of this Agreement and fails to correct such breach within ten (10) days of its receipt of notice of such breach.

**"Customer(s)"** means the individual(s), companies, and other entities that purchase Products through InPhonic.

**"Final Sale"** means an order placed for a Product that results in an installation of Broadband services to the Customer and InPhonic receiving full and complete payment for the installation and does not result in a chargeback by the Supplier.

**"Products"** means the Broadband products and services offered by InPhonic from time to time pursuant to this SOW No. 3.

"**Yellow Page Advertisements**" means advertisements developed by RNA subject to the prior written approval of InPhonic promoting the Products for sale through yellow pages within the United States.

## SECTION 2.  TERM AND EXCLUSIVITY

InPhonic hereby engages RNA on an exclusive basis for a period commencing on the Effective Date and ending on the last day of the thirty-sixth (36th) consecutive month thereafter (the "**Term**"), to promote offers for Products via the YellowPage Advertisements or other direct response programs, as may be agreed upon by the Parties in writing from time to time.   During the Term, and as long as InPhonic maintains an advertising spend of at least fifty percent (50%) of the Budget, InPhonic shall be the exclusive provider to RNA and RNA shall be the exclusive marketer for InPhonic of such Products through the Yellow Page Advertisements.  If no Budget is established and agreed upon by the Parties, then RNA may provide services to others but RNA shall be the exclusive marketer for InPhonic of such Products through the Yellow Page Advertisements.

## SECTION 3.  THE RESPONSIBILITIES OF RNA

**3.01.**  On the Effective Date or on such date as is mutually agreed upon by the parties hereto, RNA shall develop and provide to InPhonic a comprehensive marketing program that shall actively promote the sale of  Products during the Term, including but not limited to the Yellow Page Advertisements. Any promotion must conform in all respects to any content, design and functionality specifications provided by InPhonic to RNA.  Any amendments, supplements or modifications that RNA proposes to make with respect to the promotion of the Products shall be subject to the prior written approval of InPhonic, such approval not to be unreasonably withheld. RNA shall promote offers only for the Products pursuant to the terms of this SOW No.3.  RNA shall have sole discretion and control over which vendors RNA uses to promote the sale of Products, subject to the prior approval of the provider of such products or services.

**3.02.   Unauthorized Representations.**  RNA shall not make representations regarding the Products, other than those approved or distributed by InPhonic or any of its Suppliers, unless otherwise authorized in writing by InPhonic.  InPhonic shall not be bound by any unauthorized representations or warranties regarding the Private Label Products that are made by RNA.

## SECTION 4.  THE RESPONSIBILITIES OF INPHONIC

InPhonic shall be solely responsible for the fulfillment of orders and procurement of the Products from its suppliers (the "**Suppliers**").  Products shall be packaged together with (i) any material provided by the Suppliers pertaining to the operation and maintenance of the products; (ii) the terms and conditions of the service plans offered by the Suppliers in connection with such products; and (iii) any material provided by InPhonic pertaining to such products.

**SECTION 5.  CUSTOMER SUPPORT.**  InPhonic shall manage the customer support services with respect to the Products, including, without limitation, account maintenance, billing and collections with respect to wireless communications products, and technical support activities.  Technical support activities may be provided, under certain circumstances, by one or more of the Suppliers, and the

Suppliers shall in all events manage billing and collections with respect to wireless communications services. RNA shall direct inquiries relating to customer support services to InPhonic.

## SECTION 6. PAYMENTS

**6.01** As material consideration for RNA's marketing commitment, InPhonic shall pay to RNA as provided in Attachment A to this SOW No. 3 Upon termination of this SOW No. 3, except for Cause, as defined in definition of "Cause", section (b) only, InPhonic may at its discretion either continue to pay RNA for any sales resulting from the Services hereunder or assign the Toll-Free numbers to RNA for his own usage.

## SECTION 7.  TRANSFER OF CUSTOMERS

**7.01.**  During the Term of SOW No. 3 and for a period of one (1) year thereafter (the "Non-Solicitation Period"), RNA shall not take any action to cause any Customer to transfer its then active VOIP products or services to any other satellite service, system or carrier.  Such prohibited actions include, but are not limited to, providing competitive wireless communications products or service providers or carriers with the name, address, telephone number, email address, or other identifying information relating to any Customer.  Information pertaining to Customers shall be deemed to be Proprietary and Confidential Information of InPhonic.

## SECTION 8. GRANT OF LICENSE

InPhonic hereby grants to RNA a non-exclusive, non-transferable, non-sublicenseable license to use the logo, trademarks or trade names of InPhonic (collectively, the **"InPhonic Marks"**) solely in connection with the promotion and sale of the Products through the Yellow Page Advertisements.  RNA acknowledges that the InPhonic Marks are the sole property of InPhonic and, other than the license granted herein, nothing shall be construed to grant RNA any right, title or interest in or to the InPhonic Marks.  InPhonic reserves the right to approve the form and placement of the InPhonic Marks, or any materials used to promote the Products, such approval not to be unreasonably withheld or delayed. InPhonic may immediately require RNA to suspend the use of InPhonic Marks should InPhonic reasonably determine that such use is misleading or inappropriate or fails to comply with its policies regarding the use of its intellectual property.

**IN WITNESS WHEREOF**, the Parties, through their authorized representatives, hereby acknowledge that they have read the foregoing SOW No. 3 and each has been independently advised as to the terms hereof by their own separate counsel and by the execution hereof below, consent to be bound by the terms of this SOW No. 3.

**INPHONIC, INC.**

Name
Title  PRESIDENT VMC

**RNA, INC.**

Name  Rappoul VAN Dike
Title  CEO, Rappoul VAN Dike : Associa

3

**EXHIBIT A**

Broadband Services – Phase II
Insertion Fee

Beginning October 2006, InPhonic will pay a Yellow Page insertion fee of 25% of the monthly spend for yellow page ads, payable to RNA, net 30 days of first invoice received from Yellow Page Vendor for that insertion period

Broadband Services – Phase II
Activation Commission

Beginning October 2006, any future payments of $65 per activation, calculated as such:

- Monthly Managed Yellow Page spend + 25% Yellow Page insertion fee equals total payment made by InPhonic. Total payment divided by $65 equals total activations required before any future commission is earned. Once the breakeven number of activations is met, InPhonic will pay $65 per activation.

Commission is payable 75 days after activation, paid monthly by wire transfer.

Affiliate Broadband Services – Phase II
Activation Commission

- Using separate InPhonic tracking URLs and/or TFNs, separate from those activations from Managed Yellow Page advertising, InPhonic will pay $65 per activation with rolling chargebacks; provided, however, in the event that InPhonic experiences a business downturn related to this SOW No.3, the parties shall negotiate in good faith and amend the SOW to provide for a lesser activation fee.

Commission is payable 75 days after activation, paid monthly by wire transfer

4

INPHONIC CONFIDENTIAL INFORMATION

## MASTER SERVICES AGREEMENT
## STATEMENT OF WORK NO. 2
### (Marketing and Distribution of Voice Over Internet Protocol Services)

**THIS STATEMENT OF WORK NO. 2** (the "*SOW No. 2*") dated March 1, 2007 (the "*Effective Date*") is issued pursuant to that certain Master Services Agreement, dated March 1, 2007 (the "*Agreement*"), by and between InPhonic, Inc. ("*InPhonic*") and RNA, Inc. ("*RNA*").

**WHEREAS**, the Parties desire that RNA shall assist InPhonic in offering certain voice over internet protocol services ("*VOIP*") for sale to the public via the Yellow Page Advertisements other direct response programs, on the terms and conditions set forth herein;

**NOW, THEREFORE**, in consideration of the covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## SECTION 1.  DEFINITIONS

For purposes of this SOW No. 2, unless otherwise expressly provided herein, the terms defined herein shall have the same meaning set forth in the Agreement.

**"Budget"** means that certain financial budget established in writing by the parties detailing the amounts to be expended during each year of the Term by InPhonic.

**"Cause"** means any of the following:
 (a) In the event that the other Party (i) ceases to function as a going concern or to conduct operations in the normal course of business, or (ii) files a petition, voluntarily or involuntarily, under any state or federal bankruptcy or insolvency law, which petition has not been dismissed or set aside within sixty (60) days of its filing;
 (b) In the event that the other Party (i) has committed any act of fraud or dishonesty against the other Party or other act which may reasonably harm the reputation of the other Party or any of its Suppliers to the extent such Party has independently verifiable evidence of such fraud or act; or
 (c) In the event that the other Party breaches any material provision of this Agreement and fails to correct such breach within ten (10) days of its receipt of notice of such breach.

**"Customer(s)"** means the individual(s), companies, and other entities that purchase Products through InPhonic.

**"Final Sale"** means an order placed for a Product that results in an installation of VOIP services to the Customer and InPhonic receiving full and complete payment for the installation and does not result in a chargeback by the Supplier.

**"Products"** means the VOIP products and services offered by InPhonic from time to time pursuant to this SOW No. 2.

"**Yellow Page Advertisements**" means advertisements developed by RNA subject to the prior written approval of InPhonic promoting the Products for sale through yellow pages within the United States.

## SECTION 2.  TERM AND EXCLUSIVITY

InPhonic hereby engages RNA on an exclusive basis for a period commencing on the Effective Date and ending on the last day of the thirty-sixth (36th) consecutive month thereafter (the "**Term**"), to promote offers for Products via the YellowPage Advertisements or other direct response programs, as may be agreed upon by the Parties in writing from time to time.  During the Term, and as long as InPhonic maintains an advertising spend of at least fifty percent (50%) of the Budget, InPhonic shall be the exclusive provider to RNA and RNA shall be the exclusive marketer for InPhonic of such Products through the Yellow Page Advertisements.  If no Budget is established and agreed upon by the Parties, then RNA may provide services to others but RNA shall be the exclusive marketer for InPhonic of such Products through the Yellow Page Advertisements.

## SECTION 3.  THE RESPONSIBILITIES OF RNA

**3.01.**  On the Effective Date or on such date as is mutually agreed upon by the parties hereto, RNA shall develop and provide to InPhonic a comprehensive marketing program that shall actively promote the sale of  Products during the Term, including but not limited to the Yellow Page Advertisements. Any promotion must conform in all respects to any content, design and functionality specifications provided by InPhonic to RNA.  Any amendments, supplements or modifications that RNA proposes to make with respect to the promotion of the Products shall be subject to the prior written approval of InPhonic, such approval not to be unreasonably withheld. RNA shall promote offers only for the Products pursuant to the terms of this SOW No.2.  RNA shall have sole discretion and control over which vendors RNA uses to promote the sale of Products, subject to the prior approval of the provider of such products or services.

**3.02.  Unauthorized Representations.**  RNA shall not make representations regarding the Products, other than those approved or distributed by InPhonic or any of its Suppliers, unless otherwise authorized in writing by InPhonic.  InPhonic shall not be bound by any unauthorized representations or warranties regarding the Private Label Products that are made by RNA.

## SECTION 4.  THE RESPONSIBILITIES OF INPHONIC

InPhonic shall be solely responsible for the fulfillment of orders and procurement of the Products from its suppliers (the "**Suppliers**").  Products shall be packaged together with (i) any material provided by the Suppliers pertaining to the operation and maintenance of the products; (ii) the terms and conditions of the service plans offered by the Suppliers in connection with such products; and (iii) any material provided by InPhonic pertaining to such products.

**SECTION 5.  CUSTOMER SUPPORT.**  InPhonic shall manage the customer support services with respect to the Products, including, without limitation, account maintenance, billing and collections with respect to wireless communications products, and technical support activities.  Technical support activities may be provided, under certain circumstances, by one or more of the Suppliers, and the Suppliers shall in all events manage billing and collections with respect to wireless communications services.  RNA shall direct inquiries relating to customer support services to InPhonic.

2

## SECTION 6.  PAYMENTS

6.01   As material consideration for RNA's marketing commitment, InPhonic shall pay to RNA as provided in <u>Attachment A</u> to this SOW No. 2.  Upon termination of this SOW No. 2, except for Cause, as defined in definition of "Cause", section (b) only, InPhonic may at its discretion either continue to pay RNA for any sales resulting from the Services hereunder or assign the Toll-Free numbers to RNA for his own usage.

## SECTION 7.  TRANSFER OF CUSTOMERS

7.01.   During the Term of SOW No. 2 and for a period of one (1) year thereafter (the "Non-Solicitation Period"), RNA shall not take any action to cause any Customer to transfer its then active VOIP products or services to any other satellite service, system or carrier.   Such prohibited actions include, but are not limited to, providing competitive wireless communications products or service providers or carriers with the name, address, telephone number, email address, or other identifying information relating to any Customer.   Information pertaining to Customers shall be deemed to be Proprietary and Confidential Information of InPhonic.

## SECTION 8.  GRANT OF LICENSE

InPhonic hereby grants to RNA a non-exclusive, non-transferable, non-sublicenseable license to use the logo, trademarks or trade names of InPhonic (collectively, the "**InPhonic Marks**") solely in connection with the promotion and sale of the Products through the Yellow Page Advertisements.  RNA acknowledges that the InPhonic Marks are the sole property of InPhonic and, other than the license granted herein, nothing shall be construed to grant RNA any right, title or interest in or to the InPhonic Marks.  InPhonic reserves the right to approve the form and placement of the InPhonic Marks, or any materials used to promote the Products, such approval not to be unreasonably withheld or delayed.  InPhonic may immediately require RNA to suspend the use of InPhonic Marks should InPhonic reasonably determine that such use is misleading or inappropriate or fails to comply with its policies regarding the use of its intellectual property.

**IN  WITNESS  WHEREOF**, the Parties, through their authorized representatives, hereby acknowledge that they have read the foregoing SOW No. 2 and each has been independently advised as to the terms hereof by their own separate counsel and by the execution hereof below, consent to be bound by the terms of this SOW No. 2.

**INPHONIC, INC.**

Name

Title   PRESIDENT VMC

**RNA, INC.**

Name   RANDALL VAN DYKE

Title   CEO , RANDALL VAN DYKE & ASSOCIATES

3

## EXHIBIT A

VoIP Services – Phase II
Insertion Fee

Beginning October 2006, InPhonic will pay a Yellow Page insertion fee of 25% of the monthly spend for yellow page ads, payable to RNA, net 30 days of first invoice received from Yellow Page Vendor for that insertion period.

VoIP Services – Phase II
Activation Commission

Beginning October 2006, any future payments of $65 per activation, calculated as such:

- Monthly Managed Yellow Page spend + 25% Yellow Page insertion fee equals total payment made by InPhonic. Total payment divided by $65 equals total activations required before any future commission is earned. Once the breakeven number of activations is met, InPhonic will pay $65 per activation; provided, however, in the event that InPhonic experiences a business downturn related to this SOW No.2, the parties shall negotiate in good faith and amend the SOW to provide for a lesser activation fee.

Commission is payable 75 days after activation, paid monthly by wire transfer.

Affiliate VoIP Services – Phase II
Activation Commission

Using separate InPhonic tracking URLs and/or TFNs, separate from those activations from Managed Yellow Page advertising, InPhonic will pay $65 per activation with rolling chargebacks.

Commission is payable 75 days after activation, paid monthly by wire transfer.

4