## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | : | Chapter 11 |
| In re: | : | |
| | : | Case No. 07-11666 (KG) |
| INPHONIC, INC., *et al.*, | : | Jointly Administered |
| | : | Related to DI 12, 102, 144 |
| Debtors. | : | **Obj. Deadline: December 3, 2007** |
| | : | **Hearing Date: December 10, 2007 @ 10:00 a.m.** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO THE MOTION OF DEBTORS FOR AN ORDER PURSUANT
TO SECTIONS 105(a), 363 AND 365 OF THE BANKRUPTCY CODE AND
RULES 2002, 6004, AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY
PROCEDURE (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF
THEIR ASSETS; (II) APPROVING AN ASSET PURCHASE AGREEMENT,
SUBJECT TO HIGHER AND BETTER OFFERS; (III) APPROVING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; AND
(IV) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee"), by and

through its proposed counsel, files this objection to the Debtors' Motion of Debtors for

an Order Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules

2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the

Sale of Substantially All of Their Assets; (II) Approving an Asset Purchase Agreement,

Subject to Higher and Better Offers; (III) Approving the Assumption and Assignment

of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related

Relief (the "Sale Motion"), and states as follows:

## I.     PRELIMINARY STATEMENT

1.      On November 8, 2007 (the "Petition Date"), the Debtors filed voluntary

petitions for relief under chapter 11 of the Bankruptcy Code in the United States

Bankruptcy Court for the District of Delaware (the "Court").  The Debtors continue to

possess their property and manage their businesses as debtors in possession. The

Debtors' cases are being jointly administered.

    2.     On the Petition Date, in addition to filing the Sale Motion, the Debtors

filed, *inter alia*:

    A.     the Motion to Approve (I) Bid Procedures Relating to Sale of
Substantially All of the Debtors' Assets; (II) Scheduling a Hearing to Consider the Sale
and Approving the Form and Matter of Notices, (III) Establishing Procedures Relating
to Assumption and Assignment of Certain Contracts, Including Notice of Proposed
Cure Amounts, (IV) Approving Expense Reimbursement Provision, and (V) Granting
Related Relief (the "Bid Procedures Motion"), wherein Adeptio is permitted to credit
bid $50 million of the Purchased Claims with additional rights to credit bid; and

    B.     the Motion of Debtors In Possession for Interim and Final Orders
(I) Authorizing and Approving Post petition Financing; (II) Granting Liens, and
Security Interests and Providing Superpriority Administrative Expense Status; (III)
Authorizing Use of Cash Collateral and Affording Adequate Protection; (IV)
Modifying Automatic Stay; and (V) Scheduling Final Hearing, Pursuant to Section 105,
361, 362, 363 and 364 of the Bankruptcy Code (the "Financing Motion"), wherein
Adeptio is the DIP Facility Lender.

    3.     On November 9, 2007, this Court, as part of the First Day Hearings,

approved the Bid Procedures Order (D.I. 52). The Bid Procedures Order included

several determinations including that: Adeptio INPC Funding, LLC ("Adeptio") is a

Qualified Bidder; Adeptio is permitted to credit bid under Section 363 (k) of the

Bankruptcy Code; and Adeptio may initially credit bid $50 million of the approximate

$90 Million face amount of the Purchased Claims with additional rights to make further

credit bids.

    4.     The Bid Procedures Order and the Sale Motion both attach an Asset

Purchase Agreement executed by Adeptio as the stalking horse bidder (the "APA").

5.    On November 16, 2007, the Office of the United States Trustee for the District of Delaware appointed the Official Committee of Unsecured Creditors ("Committee") for this case.

6.    The Committee has filed a motion seeking dismissal (or conversion) of the Debtors' bankruptcy cases ("Motion to Dismiss" at D.I. 86) as Adeptio is the only party that can hope to receive a benefit from these bankruptcy cases, which Motion to Dismiss is incorporated herein by reference.

7.    Additionally, the Committee has filed a Motion to Reconsider the Bid Procedures Order ("Motion to Reconsider" at D.I. 102, and Reply to the Response of Adeptio at D.I. 144), as well as an objection to the DIP Financing Motion (D.I. 104), and an objection to the Debtors' Application to retain the Goldsmith, Agio, Helms Securities, Inc. as the Debtors' Investment Banker (D.I. 91), each of which are herein incorporated by reference.

8.    The Committee has also filed a motion to permit discovery on an expedited schedule regarding, *inter alia*, the Sale Motion, seeking among other things: (i) whether the sale of substantially all of the Debtors' assets is in the best interests of the Debtors' estate and its creditors; (ii) whether the APA was negotiated in good faith and without collusion; (iii) whether the sale process confers an unfair advantage on Adeptio as the Debtors' secured lender and the stalking horse bidder to the detriment of unsecured creditors; (iv) whether there are any insider connections between and among the sellers of the Purchased Claim (as defined below), the buyer of the Purchased Claim, Adeptio, and the Debtors and their respective officers and directors; (v) the validity, priority and amount of Adpetio's claim and whether Adeptio should be

allowed to credit bid; and (vi) whether this bankruptcy case is being pursued solely for the benefit of Adeptio.

## II.    SUMMARY OF ARGUMENT

9.    Six days prior to the Petition Date, on November 2, 2007, Adeptio was assigned all right, title and interest in and to the Debtors' prepetition credit facility and related claims ("Purchased Claims").  See Affidavit of Kenneth D. Schwarz, Chief Financial Officer of the Debtors, In Support of First Day Motions and Applications ("Schwarz Affidavit").

10.    Upon information and belief, the consideration paid by Adeptio for the Purchased Claims was at a very steep discount from the approximate $90 Million amount due under the prepetition credit facility.  Further, upon information and belief, Adeptio acquired the Purchased Claims after first participating as a prospective buyer in the Debtors' prepetition efforts to sell its assets.

11.    Immediately after Adeptio acquired the Purchased Claim, Adeptio made clear to the Debtors that it was unwilling to either (i) advance additional funding or (ii) consummate a sale outside of a Chapter 11 proceeding.  Accordingly, the petitions were filed at Adeptio's insistence, along with the Bid Procedures Motion, the Sale Motion and the DIP Facility Motion.

12.    Pursuant to the Sale Motion, the Debtors seek to sell substantially all their assets to Adeptio for a $50 million credit bid, subject to higher and better offers.  See Sale Motion at ¶ 34.

13.    The APA also provides:

Section 10.15  General Release.  Effective upon the Closing Date, each Seller, on behalf of itself and its estate, acknowledges that it has no claim,

counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever (including, for the avoidance of doubt, actions for avoidance, subordination or recharacterization of any of Buyer's pre-Petition Date Claims, Encumbrances, and Liens) against the Buyer and any of its members, employees, agents, Affiliates, attorneys or financial advisors (collectively, the "Buyer Group"), that directly or indirectly arise out of, are based upon, or in any manner are connected with (i) the pre-Petition Date agreements to which Buyer (or its Affiliates) and any of the Sellers were parties and all transactions referred to in such agreements, or (ii) the acquisition by the Buyer of Claims and Liens in and against the Sellers (jointly, the "Released Claims"). Should any Released Claims nonetheless exist, each Seller, on behalf of itself and its estate, hereby (i) releases and discharges each member of the Buyer Group from any liability whatsoever on such Released Claims and (ii) releases, waives and discharges all such Released Claims against any member of the Buyer Group.

(the "APA Releases").

14.     Part of the Assets to be purchased by Adeptio, the APA provides:

"Avoidance Actions (i) against or otherwise involving any counterparty to any Designated Contract, any post-Closing employees, officers or directors of the Business, including Transferred Employees, and/or any of the Sellers' wireless network carriers, lenders, landlords, vendors, call centers, or CPA Partners, and/or (ii) relating to the ongoing or future operations of the Business." (*emphasis added*).

*See*, APA subsection (k) to definition of "Assets".

15.     Hence, included in the Assets to be purchased by Adeptio under the APA are all causes of actions that the Debtors' Estates might have against, among others, their directors and officers, and the lenders, and all insurance that is available that would cover such claims. *See*, APA subsection (k) and (o) to definition of "Assets"

16.     The Debtors state that no other entity or group of entities has provided a definitive offer to purchase the assets for greater economic value to the Debtors' estates than Adeptio, which according to the Debtors, is "particularly telling" given the Debtors' prepetition marketing efforts. See Schwarz Affidavit at ¶ 136.

17.     Any perceived benefits from the proposed bid procedures and auction process are illusory.  No bid will exceed the face amount of Adeptio's recently-acquired $90 million secured claims.  The Sale Motion was filed, and the sale process is being conducted, *as demanded by Adeptio*, for Adeptio's sole benefit.

18.     The thinly-veiled result dictated by the proposed sale process is two-fold. First, the Debtors' have represented that the proposed auction sale of their assets will not generate any bid other than Adeptio's $50 million credit bid.  Schwarz Affidavit at ¶135.  As a result, it is likely that if the sale process were to go forward, Adeptio will acquire the Debtors' assets free and clear of liens, claims and interests via the Purchased Claims (which were acquired at a steep discount) with no benefit to unsecured and, potentially, administrative creditors.  Second, in the unlikely event that a bid is received in excess of Adeptio's $50 million bid, the sale process will have served as a vehicle for Adeptio to arbitrage the Purchased Claims.  Should over bidding occur, Adeptio may either take its profit on the Purchased Claims or continue to outbid a third party cash purchaser with its credit bid.  Neither outcome must be permitted under the fundamental, equitable principles of Bankruptcy Law.

19.     In short, the entire sale process is a farce that, if permitted, would run its course at the expense of many unsecured creditors that will not receive any benefit from the sale.  The purpose of the proposed sale is to benefit Adeptio by providing for the transfer of the Debtors' assets free and clear of liens, claims and interests, and to release, among others, everyone associated with the Purchased Claim, the bankruptcy filings, and the Sale process from any and all liability to, *inter alia*, the Debtors' estates. Although only Adeptio would benefit from this sale process, Adeptio purports to

impose upon the estates and their other creditors the costs and expenses associated with the sale process with no resulting benefit to those creditors.

20.    Further manifesting Adeptio's rape and pillaging of the chapter 11 process is that fact that Adeptio has not agreed to pay priority unsecured claims, thereby leaving the Debtors' and their estates without the ability to confirm a plan.

## III.    RELIEF REQUESTED

21.    The Committee respectfully requests that this Court enter an Order (i) denying approval of the Sale Motion pending the entry of a final order with respect to the Committee's Motion to Dismiss; alternatively, (ii) denying approval of the Sale Motion until such time as the Committee has completed discovery in respect of the legitimacy and good faith nature of the Sale as proposed; alternatively, (iii) denying the Adeptio the right to credit-bid for cause.  Should the Court authorize the Sale of the Debtors assets, the Committee respectfully requests that any such order prohibit the sale of all avoidance actions authorized by sections 544-550 of the Bankruptcy Code, and eliminate all APA Releases.

## IV.    BASIS FOR RELIEF REQUESTED

### A.    This Court Must Disallow A Credit Bid Where Cause Exists.

22.    It is painfully obvious that these chapter 11 cases have been filed at Adeptio's insistence and solely for Adeptio's benefit.  The singular purpose of these cases is to obtain for Adeptio an order transferring the Debtors' assets free and clear of liens, claims and interests.  While these actions considered in isolation may not be violative of the spirit of the Bankruptcy Code, these cases offer no material recovery for

the unsecured creditors. Adeptio, however, seeks to impose upon the estates and their creditors the burden of the costs and expenses associated with these cases.

23.  Adeptio has not filed a proof of claim.

24.  Accepting Adeptio's credit bid as a Qualified Bid prior to the time within which the Committee can investigate Adeptio's claim should be prohibited, since section 363(k) authorizes only "allowed" claims to serve as a "credit bid."

25.  Section 363(k) provides:

> At a sale under subsection (b) of this section of property that is subject to a lien that secured an ***allowed*** claim, ***unless the court for cause orders otherwise*** the holder of the claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. §363(k) (emphasis added).

26.  The Committee must be given an opportunity to determine the validity, extent and priority of the Purchased Claims. For example, the Court must determine if the assets to be purchased are in fact collateral subject to a perfected lien in favor of Adeptio. Without doing any investigation with respect to the liens and collateral documents supporting the Purchased Claim, it is plain to see that the APA seeks to "sell" to Adeptio most of the avoidance actions which belong to these estates without any consideration paid to this estate.

27.  The impermissibility of Adeptio's proposed credit bid is further manifested by the fact that Adeptio does not have any lien on, and has no right to credit bid for, the *estates'* avoidance actions.

28.  The Committee must be given the opportunity to investigate the lending that took place in August, 2007; the sale of the Prepetition Lenders Claim to Versa

(Adeptio's predecessor in title); Versa's transfer to Adeptio i.e., the Purchased Claims; Adeptio's and Versa's participation in the prepetition sale process prior to the sale of the Purchased Claims; affiliations among and between Adeptio, Versa, the Prepetition Lenders and the Debtors, and there respective insiders; and negotiation of the DIP Facility and the APA, before deeming Adeptio's credit bid a "Qualified Bid." For example, the Committee needs to determine whether the Purchased Claim should be equitably subordinated, recharacterized as equity, or if there was collusion with respect to the bidding which would violate, *inter alia*, section 363(n) of the Bankruptcy Code, or if the sale process and the APA are not the result of arms-length, good faith negotiations before Adeptio's Credit Bid is to be accepted by the Court.[1]

**B.      This Court Must Deny Approval of the Sale Motion as it Provides Broad Releases Without Ability to Conclude "Good Faith", Without Due Process, and Without Fair Consideration Paid to the Debtors' Estates**

29.      Section 363(m) of the Bankruptcy Code, the APA, and the Proposed Sale Order as submitted by the Debtors, require that the Court find that the Sale was conducted in "good faith."

30.      Furthermore, "a sale under section 363 may be avoided if the sale price was controlled by an agreement among potential bidders". See, 11 U.S.C. §363(n).[2]

---

[1]  See, In re Radnor Holding, 353 B.R. 820 (Banrk. D.Del. 2006, appeal dismissed per stipulation, NO. 06-00784 (D.Del. Apr. 19, 2007), where the Committee was granted extensive pre-trial discovery on, and the court conducted an eight day trial with respect to the legitimacy of the credit bid.

[2]  Section 363(n) also provides that the "court may grant judgment for punitive damages in favor of the estate and against any such party that entered into an agreement in willful disregard to this subsection."

31.     If approved, the APA would absolve the Debtors, Adeptio, Versa, their officers and directors, among others (arguably including the Prepetition Lenders), from any liability that would otherwise redound to the benefit of the Debtors' estates. This result – without providing the Committee with an opportunity to conduct full discovery, would not only deprive the Committee of due process, but would also serve as a springboard for, or otherwise encourage, fraudulent transfers with the blessing of the Court.

32.     Presently, there appears to be no reason for these cases to remain pending in this Court, other than to provide Adeptio a "free and clear order" and to provide the APA Releases to anyone who had anything to do with the Purchased Claim, the filing of the bankruptcy cases, and the Sale.

33.     The approval of the APA Releases is in effect a "settlement" of claims that these estates may have against the released parties. Any such settlement "requires a bankruptcy judge to assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal. Taking our cue from <u>Protective Committee Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414, 424-25, 20 L. Ed. 2d 1, 88 S. Ct. 1157 (1968), we recognize four criteria that a bankruptcy court should consider in striking this balance: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors. *See* <u>In re Neshaminy Office Bldg. Assocs.</u>, 62 Bankr. 798, 803 (E.D. Pa. 1986). " <u>In re Martin</u>, 91 F.3d 389, 393 (3d Cir. 1996).

34.    Furthermore, when releases are to be granted to non-debtors, the court must consider additional factors to determine the fairness of the compromise. See, In re Continental Airlines, 203 F.3d 203, 212-214 (3d Cir. 2000); In re Coram Healthcare Corp., 315 B.R. 321, 335-336 (Bankr. D.Del. 2004). To the extent that the APA Releases are intended to grant releases to non-debtors by non-debtors, such relief is not permitted by the Bankruptcy Code. See, In re Zenith Elecs. Corp., 241 B.R. 92, 110 (Bankr. D. Del. 1999).

35.    Without a fair opportunity for the Committee to conduct discovery with respect to the issues raised herein, the Court should not approve the Sale with a finding of "good faith" as required by section 363(m); should not deprive the Debtors' estates with respect to any violations of section 363(n); and should not absolve the parties that may be liable to the Debtors' estates and third parties by approving the APA Releases, without understanding the reason for the releases and the consideration to be received by the Debtors' Estates on account of such releases.

**C.    This Court Must Deny the Sale of the Avoidance Actions**

36.    Included in the Assets to be sold are "Avoidance Actions."

"Avoidance Actions (i) against or otherwise involving any counterparty to any Designated Contract, any post-Closing employees, officers or directors of the Business, including Transferred Employees, and/or any of the Sellers' wireless network carriers, lenders, landlords, vendors, call centers, or CPA Partners, and/or (ii) relating to the ongoing or future operations of the Business." (*emphasis added*).

*See*, APA subsection (k) to definition of "Assets."

37.    Avoidance actions are not assets which the Debtor is entitled to sell.

The avoidance power provided in section 544(b) is distinct from others because a trustee or debtor in possession can use this power only if there is an unsecured creditor of the debtor that actually has the requisite nonbankruptcy cause of action. Yet, once avoidable pursuant to this provision, the transfer is avoided in its entirety for the benefit of all creditors, not just to the extent necessary to satisfy the individual creditor actually holding the avoidance claim. ... The use of this authorization for the benefit of creditors is at the heart of the avoiding powers.... *[N]either the fraudulent transfer claim nor the avoidance power was an asset of the debtor.*

In re Cybergenics Corporation, 226 F.3d 237, 244-45 (3d Cir. 2000) (emphasis added).

**D.     This Court Must Deny Approval of the Sale and Dismiss The Debtors' Bankruptcy Cases for Reasons Stated in Committee's Motion to Dismiss.**

38.     Adeptio's end game for these bankruptcy cases is a Section 363 sale in which Adeptio expects to obtain a "free and clear" sale order, together with absolution for all of those involved in the Purchased Claim, bankruptcy filings, and the APA.

39.     As set for the in Sale Motion, there will be no value to distribute to creditors after Adeptio takes the Debtors' assets via the Adeptio bid. The sale process is a farce that, if permitted, would run its course at the expense of many unsecured creditors that will not receive any benefit from the sale. Accordingly, the Committee has filed its Motion to Dismiss, which is herein incorporated by reference.

40.     As debtors in possession, the Debtors must ensure that their actions benefit the diverse interests of the various creditors and other constituencies that have a stake in the bankruptcy case. In re Integrated Resources, Inc., 147 B.R. 650, 659 (S.D.N.Y. 1992). Appeasing a vocal group of creditors or a single creditor, even a large creditor like Adeptio, is not a sufficient business purpose to permit a sale of substantially all of a debtor's assets. See In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153-54 (D.Del.

1999) (quoting <u>Lionel</u> factors); <u>In re Encore Healthcare Assocs.</u>, 312 B.R. 52, 55

(Bankr. E.D.Pa. 2004); <u>In re Global Crossing Ltd.</u>, 295 B.R. 726, 745 (Bankr. S.D.N.Y.

2003) (a "chapter 11 debtor should not take an action simply because a particular

constituency, even an important one, wants it").  It follows that a court should not

permit a Section 363 sale solely based on the "hue and cry of the most vocal special

interest group." <u>Lionel</u>, 722 F.2d at 1070.

     41.    Courts have recognized that the interest of a single creditor, even a

secured creditor, is an insufficient justification for a chapter 11 proceeding, which is

intended to be a collective process for the benefit of the creditor group.  <u>See</u> <u>In re</u>

<u>Mazzocone</u>, 183 B.R. 402, 414 (Bankr. E.D.Pa. 1995) ("We have not found a single

case where the preference of a single creditor was held to be dispositive" of the

creditors' best interests).

     42.    Recognizing that bankruptcy is intended to be a collective process and

not a private collection tool for the exclusive benefit of a secured creditor, a bankruptcy

court declared as follows:

> From the start of this case, the United States Trustee has taken
> the position that, where there is no equity in the assets for the
> estate, the sale that the Lender contemplates should not be
> permitted to occur in bankruptcy unless the Lender guarantees a
> meaningful dividend for unsecured creditors.  Transcript of
> Hearing of August 27, 2002, at p. 11.  The Committee itself
> reiterated this position as its principal objection to the financing
> motion.  The Court agrees and has made its position clear from
> the start of this case.  Where all equity in a debtor's assets
> belongs to the secured creditor, with no appreciable expectation
> of a remainder for unsecured creditors, the liquidation of the
> assets serves no bankruptcy purpose and should not be permitted
> to occur in bankruptcy.

<u>In re Duro Indus., Inc.</u>, 2002 WL 34159091, at *5 (Bankr. D.Mass. Oct. 7, 2002).

43.    Similarly concluding that there was no justification for a Section 363 sale, another bankruptcy court reasoned that:

> The proposed sale would not, as a whole benefit the Debtor or creditors.  In fact, if allowed, the sale would terminate Debtor's existence.  If Debtor's proposed sale were authorized, the likelihood of reorganization would dissipate as there would remain no assets from which a plan could be proposed.  *Additionally, the proceeds from the proposed sale would, at most, benefit one creditor only.  The sale would not create proceeds that would inure to the benefit of unsecured creditors.*

In re Fremont Battery Co., 73 B.R. 277, 279 (Bankr. N.D. Ohio 1987) (emphasis added); see also Encore Healthcare, 312 B.R. at 57 (Debtor's motion to approve sale denied based in part on the fact that proposed sale benefits a secured creditor only).

44.    In In re Shoe Corp. of America, Inc., No. 99-55400 (Bankr. S.D. Ohio 2000), the creditors' committee asserted that the bank group sought to liquidate the debtors' assets for the bank group's own benefit.  Therefore, the committee contended that the bank group should liquidate the debtors' assets outside of the auspices of chapter 11.  On the other hand, the bank group wanted to keep the cases in chapter 11 to effectuate an asset sale to a third party that would have maximized the bank group's recovery, albeit still leaving the bank group substantially under water.  The court indicated that it would grant the committee's motion to convert, unless the bank group reached an agreement with the committee satisfactory to the committee.  The dispute was settled when the bank group agreed to carve-out a portion of its secured claim to be made available solely for the benefit of the committee's constituency.

45.    A secured creditor should not be the sole constituent to benefit from a Section 363 sale.  "Recognizing as much, most secured creditors understand the

necessity of making some distribution available to other creditors as the price of the court-approved sale." Encore Healthcare, 312 B.R. at 57 n.10.

46.     A trustee, or debtor in possession, should not liquidate assets solely for the benefit of secured creditors. See In re Integrated Agri, Inc., 313 B.R. 419, 425 (Bankr. C.D.Ill. 2004) ("It is well settled that it is improper for a bankruptcy trustee to liquidate property solely for the benefit of secured creditors. Even acquiescence by the trustee does not transform the bankruptcy court into a collection forum for secured creditors.") (citations omitted).   Instead, where the Debtors' assets are fully encumbered with no potential equity for unsecured creditors, the trustee or debtor in possession should abandon those assets. Id.; see 11 U.S.C. § 554(a) (trustee may abandon property that is "burdensome" or "of inconsequential value and benefit").

47.     In these cases, Adeptio has tried to manipulate the bankruptcy process as its personal collection tool for Adeptio's sole benefit.

48.     Although Adeptio could simply have foreclosed on its security interests, Adeptio *required* the Debtors to file a chapter 11 and seek a "free and clear" sale order for Adeptio's sole benefit.   Although Adeptio required the Debtors to commence these cases, Adeptio seeks to impose upon other creditors the costs and expenses associated with the these bankruptcy cases, including without limitation, (i) the financial impact of any deterioration in Adeptio's collateral during the sale process (i.e., its superpriority claim for any diminution in collateral value), (ii) the fees and other obligations under the DIP facility (as well as the loss of rights such as Section 506(c) claims), (iii) and the costs and expenses associated with Adeptio's Section 363 sale (including, among

others, investment banker fees and indemnification obligations and Adeptio's due diligence expenses).

49.    Because the sale as contemplated by the APA is not in accordance with the well understood tenants of bankruptcy law, the APA provides the APA Releases for all of those involved in the Purchased Claim, bankruptcy filing, and the APA transactions – again to the sole detriment of the Debtors' estates.

50.    In addition to the egregious APA Releases, Adeptio asserts a superpriority claim against the estates for the diminution in Adeptio's collateral resulting from the automatic stay during the course of the bankruptcy sale that *Adeptio required*.

51.    Adeptio, having purchased the Debtors' secured debt at a steep discount, bears little risk associated with its claims against the Debtors.  Moreover, Adeptio voluntarily became a creditor long after the Debtors' financial troubles and just 6 days prior to the filing of these cases.  Adeptio should not be able to compound the misfortune of the Debtors' other creditors by orchestrating a chapter 11 bankruptcy petition that benefits only Adeptio.

52.    Adeptio can, and should, simply pursue its foreclosure rights under the Uniform Commercial Code.  Those proceedings would be very fast and much, much less expensive than these cases.

53.    Adeptio has not agreed to provide the Debtors with any cash to fund a wind-down budget.  Thus, the Debtors will have no liquid assets to pay their administrative expenses or unsecured priority claims, let alone make any meaningful distribution on account of unsecured nonpriority claims.  Adeptio should not be

permitted to wring chapter 11 of all its advantages and then leave in its wake chapter 11 estates that are ultimately destined for dismissal or conversion.

54.    In determining whether a sound business purpose exists to permit a Section 363 sale, a court should determine whether a debtor will be able to confirm a plan after the sale. In other words, no business purpose exists to justify a Section 363 sale if the Debtor will ultimately be unable to confirm a plan. See Encore, 312 B.R. at 57 n.10 ("there are limits to the use of § 363, and it is clear that Chapter 11 liquidations are still subject to the proscriptions of Chapter 11 concerning, *inter alia*, the filing of a plan").

55.    One bankruptcy court has held that "[i]f Debtor's proposed sale were authorized, the likelihood of reorganization would dissipate as there would remain no assets from which a plan could be proposed." See Fremont, 73 B.R. at 279. Likewise, the facts of these cases are such that if the credit-bid sale motion is granted, without any assurances regarding the payment of administrative expense claims, the Debtors will not be able to effectuate a plan of liquidation. As a Section 363 sale is not meant as an end run around the confirmation process, this is a sufficient basis upon which to deny the Sale Motion and dismiss these cases. See Encore Healthcare, 312 B.R. at 57 n.10 (Section 363 sale does not provide an avenue to avoid the confirmation process).

56.    If the sale were to occur, the Debtors would also have no operational assets and little ability (or motivation) to confirm a plan. For that reason, this Court should not approve the proposed sale. Similarly, the Debtors' inability to confirm a plan in these cases also constitutes "cause" for dismissal (or conversion) of these cases under Section 1112 of the Bankruptcy Code.

E.      **The Court Must Hold Adeptio Liable for All Administrative Claims; Clarification Of Assumed Liabilities and Designated Contracts Under APA Must be Provided**

57.     For the reasons set forth above, and because the chapter 11 cases and the sale is for the sole benefit of Adeptio, Adeptio should bear the full costs of the administration of these cases.  While the APA seems to "hint" that Adeptio will assume some of these obligations, the Committee believes that the APA is full of double-talk with respect to obligations and liabilities that Adeptio is agreeing to pay under the APA.

58.     The APA provides:

"Assumed Liabilities" means, without duplication, only the (i) **Cure Costs** associated with, and the liabilities and obligations of the Sellers **arising from and after the Closing** under, the **Designated Contracts** assigned to Buyer, (ii) trade payables to the extent first arising after the Petition Date directly relating to the operation of the Business in the ordinary course,.....

"Cure Costs" means amounts that must be paid and obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and sale and assignment of the Designated Contracts.

"Designated Contracts" has the meaning given to such term in Section 2.5.

59.     Section 2.5 provides:  Assignment and Assumption.

At Closing, Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement(s) and other transfer and assignment documents reasonably requested by the Buyer, assume and sell and assign to Buyer (the consideration for which is included in the Purchase Price), the executory Contracts and unexpired leases to which any such Seller is a party and which may be assigned by any such Seller to Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code ("Designated Contract(s)") and which are set forth on a list (identifying the name, parties and date of each such Designated Contract) provided by Buyer to the Company on or before the date which is six (6) days prior to the date set for the Auction (provided that the Company provides written notice to the Buyer of the date of the Auction at least nine (9) days prior to the date on which the Auction is to begin); **provided, however, that Buyer**

18

**shall have the right in its sole and absolute discretion to notify the Sellers in writing of any Designated Contract that it does not wish to assume immediately prior to the commencement of the Sale Hearing** (as defined below).  Buyer will pay all **Cure Costs** in connection with such assumption and sale and assignment (as agreed to between the Buyer and the Company or as determined by the Bankruptcy Court), and Buyer will assume and agree to perform and discharge the Assumed Liabilities under the Designated Contracts, pursuant to the Bill of Sale; provided, however,...........

Buyer shall have the right, by written notice to the Sellers **within ten (10) days** _after_ **the Closing Date, to specify any Contracts or leases that are not included as Designated Contracts (each such other Contract and lease, an "Excluded Contract")** that shall be held by the Sellers and not rejected pursuant to Section 365 of the Bankruptcy Code (any such Contract, a "Held Contract") for the duration of the Contract Retention Period, and the Sellers shall have the right at any time following ten days after the Closing to cause any Excluded Contract other than the Held Contracts to be rejected pursuant to Section 365 of the Bankruptcy Code; it being understood and agreed that, without limiting any other obligation of the Sellers hereunder, none of the Sellers shall in any event reject or seek to reject any Contract during the period beginning on the date hereof and ending on the ten (10) day period following the Closing Date, except with Buyer's prior written consent As to Held Contracts, Sellers shall not seek to reject such contracts for a period of 210 days following the Closing Date (the "Contract Retention Period") and, as soon as practicable after receiving further written notice(s) (each, an "Assumption Notice") from Buyer during the Contract Retention Period requesting assumption and assignment of any Held Contract, the Sellers shall, subject to Buyer's demonstrating adequate assurance of future performance thereunder, take all actions reasonably necessary to seek to assume and assign to Buyer pursuant to section 365 of the Bankruptcy Code any Contract(s) set forth in an Assumption Notice, and any applicable cure cost shall be satisfied in accordance with the definition of Assumed Liabilities.  The Sellers agree and acknowledge that the covenant set forth in this Section 2.5(b) shall survive the Closing; provided, that, with respect to any Held Contract, **Buyer shall compensate the Sellers for Liabilities for the continuation of such Held Contracts during the Contract Retention Period up to and including the date which is five (5) days following Sellers' receipt of written notice from Buyer authorizing rejection of the same, it being understood and agreed that Sellers' obligation to assume and assign any Held Contract shall be conditioned upon Buyer's payment of such amounts and that Buyer's covenant to pay such amounts shall survive the Closing and the expiration of the Contract Retention Period.  Notwithstanding anything in this Agreement to the contrary, on the date any Contract is assumed and assigned to Buyer pursuant to this Section 2.5(b), such Contract shall be deemed an Designed Contract for all purposes under this Agreement.**

(*emphasis added*).

60.    The Committee is unable to discern from this double-talk which contracts and leases Adeptio intends to "assume" through the assignment by the Debtors, and what Adeptio is really agreeing to pay.

61.    The Committee believes that Adeptio must, before the auction, designate which obligations and which contracts and leases it will assume and pay as a condition of the Sale, and that Adeptio should not be permitted to later change its mind. Without such information, it is impossible to determine the value of Adeptio's bid.

62.    Finally, because these cases are for the sole benefit of Adeptio, the Committee maintains that Adeptio must pay all administrative claims, and pay all obligations to cure all contracts and leases that it designated for assumption prior to the Sale hearing together with any additional contracts and leases that it may add to the designated category, prior to the entry of any final order confirming the sale to Adeptio.

## V.    RESERVATION OF RIGHTS

63.    The Committee was recently formed on November 16, 2007.

64.    The Committee intends to conduct discovery in connection with the Sale Motion. Accordingly, the Committee reserves its right to assert such other, different, or further bases to object to the Sale Motion at the hearing on the Sale Motion.

WHEREFORE, for the reasons set forth above, the Committee respectfully requests that this Court enter an Order denying the approval of the Sale Motion. Should the Court decide not to dismiss these bankruptcy cases and not to compel the Debtors to abandon the property subject to the Adeptio's lien (if and when allowed),

then the Committee requests that the Court enter an order:  (i) prohibiting Adeptio

from making a credit bid until a hearing on the allowance of Adeptio's claims,

preceded by a reasonable discovery period; (ii) denying Adeptio as a "Qualified Bid"

until a hearing on the allowance of Adeptio's claim, preceded by a reasonable

discovery period, occurs; (iii) denying the finding of "good faith" as required by

363(m) until such time as the Committee has had discovery on the issues raised herein

and in the Motion to Dismiss; (iv) eliminating the APA Releases from the APA and

any order approving the Sale unless and until adequate consideration is paid to the

Debtors' estates for such releases; (v) excluding from the sale all avoidance actions;

(vi) requiring Adeptio to certify with particularity prior to the sale confirmation

hearing, and in writing, which contracts, leases and liabilities it is assuming;

(vii) conditioning the entry of a final order confirming the sale to Adeptio upon

Adeptio's payment of all costs of administering these cases and operating the Debtors'

businesses post-petition, as well as payment of all cure obligations; and (viii) for such

further and consistent relief to the Committee as is appropriate.

Dated: December 3, 2007          Respectfully submitted,
       Wilmington, Delaware

                                 REED SMITH LLP

                                 By:  /s/ Kurt F. Gwynne
                                      Kurt F. Gwynne (No. 3951)
                                      1201 N. Market Street, Suite 1500
                                      Wilmington, DE 19801
                                      Telephone: (302) 778-7500
                                      Facsimile: (302) 778-7575
                                      E-mail:  kgwynne@reedsmith.com

                                          and

Robert P. Simons, Esquire
435 Sixth Avenue
Pittsburgh, PA 15219
Telephone:  (412) 288-3131
Facsimile:  (412) 288-3063
E-mail: rsimons@reedsmith.com

and

Claudia Z. Springer, Esquire
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103-7301
Telephone: 215-851-8100
Facsimile: 215-851-1420
E-mail: cspringer@reedsmith.com

Proposed Counsel to the Official
Committee of Unsecured Creditors