UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                              .      Chapter 11
                                    .
INPHONIC, INC., *et al.*,           .      Case No. 07-11666(KG)
                                    .      (Jointly Administered)
                                    .
                                    .      November 9, 2007
                                    .      3:00 p.m.
            Debtors.                .      (Wilmington)
                                    .

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE CLERK: Please rise.

2          THE COURT: Good afternoon everyone.

3          UNIDENTIFIED SPEAKER: Good afternoon.

4          THE COURT: Please be seated.  Hello Mr. Glassman.

5          MR. GLASSMAN: Hello, Your Honor.

6          THE COURT: You brought me a new case.

7          MR. GLASSMAN: Yes, Your Honor.  We'll see how happy

8     Your Honor is after - -

9          THE COURT: Okay.

10          MR. GLASSMAN:  - - that he gets to hear this

11     matter.

12          THE COURT: All right.

13          MR. GLASSMAN: For the record, Neil Glassman of The

14     Bayard Firm for Inphonic and seven other debtors in

15     possession.  And I will read their names for the record.

16     CAIS Acquisition, LLC, CAIS Acquisition II, LLC, SimIPC

17     Acquisition Corp., Star Number, Inc., Mobile Technology

18     Services, LLC, FON, that's f-o-n, Acquisition, LLC, 1010

19     Interactive, LLC.

20          THE COURT: Yes.

21          MR. GLASSMAN:  What I'd like to do Your Honor is

22     basic introductions so Your Honor has some idea of who the

23     players are.

24          THE COURT: Yes.

25          MR. GLASSMAN: And really hear from you how you'd

1    like us to do.  What I had in mind was turning the podium

2    over to our co-counsel, Mr. Califano, Tom Califano from DLA

3    Piper, and then he can give you background.

4         THE COURT: Correct.

5         MR. GLASSMAN: And then going through the first days

6    in whatever fashion Your Honor thinks appropriate.  But maybe

7    we should just address that when we get there.

8         THE COURT: That's fine.

9         MR. GLASSMAN: Okay.

10        THE COURT: Thank you, Mr. Glassman.  Yes.

11        MR. GLASSMAN: In terms of introductions.  First,

12   co-counsel is Tom Califano.

13        THE COURT: Good afternoon and welcome.

14        MR. CALIFANO: Thank you, thank you.

15        MR. GLASSMAN: And also Jeremy Johnson sitting next

16   to him.

17        THE COURT: Mr. Johnson.

18        MR. GLASSMAN: From DLA Piper.  My colleague Eric

19   Sutty.

20        THE COURT: Yes.  Mr. Sutty, hello.

21        MR. GLASSMAN: Of course you know Mr. Schepacarter.

22        THE COURT: I sure do.

23        MR. GLASSMAN: In terms of our client, sitting back

24   there with the somewhat orange tie in Ken Schwarz.

25        THE COURT: Mr. Schwarz, welcome to you.

1          MR. GLASSMAN: Behind him is Walt Beach, who is, who

2     is the general counsel.  Our investment bankers are Andy

3     Torgove from Lazard Middle Market.

4          THE COURT: Hello.

5          MR. GLASSMAN: And his two colleagues, Jason Cowen

6     and Dermit O'Flannigan.

7          THE COURT: Welcome.

8          MR. GLASSMAN: Lender's counsel in this, the lender

9     is Adeptio, LLC, represented by David Agay from Kirkland &

10    Ellis.

11         THE COURT: Mr. Agay.

12         MR. GLASSMAN: And Mr. Brady and Mr. Morton you know

13    from Young Conaway.

14         THE COURT: Yes.  Welcome everyone.

15         MR. GLASSMAN: So I hope I haven't offended anybody.

16    And with that, we'd like to give you some background.

17         THE COURT: Okay.  That would be wonderful.  Mr.

18    Califano.

19         MR. CALIFANO: Yes, Your Honor.

20         THE COURT: You may proceed when you're ready.

21         MR. CALIFANO: Good afternoon, Your Honor, and thank

22    you for seeing us on a Friday afternoon.  I just think it

23    makes, it might make some sense and assist the Court if I can

24    just give you some background on who we are, how we got here,

25    and how we plan on getting, going, getting out of here.

1    InPhonic and it's subsidiaries, it's a public company that

2    was created in 1999.  It's in the business, in the web, web-

3    based business of selling cellular phones and accessories and

4    the like, and also having activation.  Being able to activate

5    it.  So somebody can buy a cell phone, various different

6    types, and also pick a service from the various carriers, buy

7    it through us, in one spot, and activate also over the web.

8    And then it's shipped out.  The business has operated at a

9    loss each year since it's creation for a number of reasons,

10   and in fact this year to date, through the three quarters,

11   the loss has amounted to 132 million or so.  The company had,

12   pre-petition, a line of credit and a term loan with Goldman

13   Sachs and Citi Bank.  The company had to restate earnings at

14   the beginning of the summer.  Through the end of the summer

15   tried various transactions to raise funding, to try and enter

16   into a transaction to sell the company or obtain investors.

17   Went through a competitive process to bid out its logistics

18   business.  And that resulted in a tentative offer from an

19   entity called Brightstar.  And that involved getting $15

20   million from the existing lenders at the end, in August to

21   take them through that transaction process, and then

22   Brightstar was going to pay back the banks that 15 million

23   that had been extended, which brought the existing line from

24   75 million up to 90 million, and by putting 5 million in

25   equity in the company, paying 20 to $30 million for the

1   inventory, inventory financing, and paying 3.2 to take over

2   the logistics operations.  That deal fell through, Your

3   Honor, and that was announced in an AK that went out on

4   October 11th, and the Debtor was not able to pay the 15

5   million in monies that had been advanced, and also was in

6   default on the preexisting line of credit and term loan.

7   They went out, the company went out then and talked to

8   various work out advisors, Lazard Middle Market, and

9   Greenhill Capital.  Lazard was retained.  Lazard did due

10  diligence, put together a list of financial buyers and a

11  book, and went out to a number of strategic and financial

12  buyers for the company.  I'm going to just step back.  Also

13  when Lazard was hired, a press release went out that

14  announced that in light of the Brightstar transaction

15  disappearing, that Lazard was going to enter into a process.

16  So that was another, that let the market know that the

17  company was being sold.  The, Lazard concluded that there

18  were no, there was no strategy other than the sale of the

19  company, and went, and tried, and entered into this pre-

20  petition marketing process.  Versa, who is the parent of

21  Adeptio, was one of the entities that was contacted.  And

22  after spending a week on site at the company, two and a half

23  weeks later, they committed to the process.  They committed

24  to the process by purchasing the debt.  We entered into

25  negotiations with Adeptio for a DIP financing and to take it

1    through a sale process, which is set forth in the documents

2    we'll discuss.  And as part of that process, we filed this

3    Chapter 11, which anticipates a sale, 363 sale to Adeptio,

4    which is now the secured creditor.  We have a number of first

5    day motions on, Your Honor, and we have consulted with the US

6    Trustee, and we have agreed to make certain changes to those

7    motions after consultation with the US Trustee.  And the

8    first one is a motion - -

9         THE COURT: Can I assume - - forgive me for

10   interrupting Mr. Califano - - that you're going to be relying

11   in support of these motions on the affidavit of Mr. Schwarz?

12        MR. CALIFANO: Yes, Your Honor.  I'm sorry.

13        THE COURT: No.  That's fine.

14        MR. CALIFANO: Thank you.  We are relying on the

15   affidavit of Mr. Schwarz, and he is available in the

16   courtroom if the Court has questions, or anyone would like to

17   cross examine him.

18        THE COURT: Exactly.  Thank you, Mr. Califano.

19        MR. CALIFANO: Thank you.  Your Honor, the first

20   motion we have is the joint administration motion.

21        THE COURT: Yes.

22        MR. CALIFANO: We have eight Debtors in total, three

23   of them are operating.  We believe that this is an

24   appropriate case for joint administration.  Almost all of the

25   pleadings, all the pleadings that are on, and all the

1    pleadings that I can anticipate would involve all of the

2    Debtors.  Having separate cases would be an unnecessary

3    expense to the estate and to creditors, and would in fact be

4    confusing.  We have agreed, after consultation with the US

5    Trustee, that it's, that it's ordered with, it would be

6    ordered with the proviso that in the event the US Trustee

7    seeks grounds to de-jointly administer, or de-consolidate it,

8    that it would not be without prejudice to that.

9        THE COURT: Yes.  Mr. Schepacarter and I had a

10   recent experience.

11       MR. SCHEPACARTER: Your Honor, I never really looked

12   at these motions before this.  Hopefully as I look at them

13   now with respect to the case that you and I recently had

14   yesterday, so - -

15       THE COURT: Yes.

16       MR. SCHEPACARTER:  - - that's why that provision is

17   put in there.  I doubt that that's going to occur with this

18   case, because I don't see it, at least in the, way out in

19   Pluto, to see something like that happen in this case.  But I

20   am going to reserve the right, and I guess Your Honor would

21   also reserve the right to sua sponte look at that issue as

22   well.

23       THE COURT: Exactly.  Thank you, Mr. Schepacarter.

24       MR. SCHEPACARTER: Thank you.

25       THE COURT: And when - -

1          MR. CALIFANO: Thank you, Your Honor.

2          THE COURT: And when I say that I would reserve the

3    right to do it sua sponte, I would not just, you know, enter

4    it one night on you.  We would, we would discuss it first.

5          MR. CALIFANO: Thank you, Your Honor.  The next

6    motion we have is the utilities motion.  We have - -

7          THE COURT: And I'm prepared to approve that order.

8    How do you, how would you prefer to proceed?  Handing up all

9    the orders at the end?  Or - -

10          MR. CALIFANO: I would suggest me handing them all

11   up at the end.

12          THE COURT: Okay.

13          MR. CALIFANO: If that's all right with Your Honor.

14          THE COURT:  That's fine with me, Mr. Califano.

15   Certainly.

16          MR. CALIFANO: The next one is the utilities issue,

17   the utilities motion.  And the US Trustee had no issue with

18   that motion, Your Honor.

19          THE COURT: And I don't either.  We've employed this

20   methodology a number of times.  And - -

21          MR. CALIFANO: Okay.

22          THE COURT: And it certainly is acceptable.  And

23   it's an, it's an interim order.  Is that correct?

24          MR. CALIFANO: Yes, Your Honor.

25          THE COURT: So with that, yes.  I'm prepared to sign

1    that order as well.

2          MR. CALIFANO: All right.  Thank you, Your Honor.

3    The next one is the wage motion.  And the wage motion relates

4    to 421 employees that the Debtor has.  270 of which are

5    salaried, 151 are hourly.  The Debtor pays its, its employees

6    semi-monthly, and the next payment would be due November 15th,

7    2007.  With respect to the pre-petition payments, there are

8    only two employees who's individual payments would be over

9    the 10,950, and those are sales people.  And those are

10   commissions that relate to sales people.

11         THE COURT: Yes.

12         MR. CALIFANO: And that total overage is only $18

13   hundred.  And those are not management, senior management,

14   these are strictly field sales-type people.  With respect to

15   the benefits, we're not seeking approval of any executive or

16   retention programs, or bonuses for executives.  We are

17   seeking continuation of a non-executive bonus plan, a health,

18   life, and 401K plan, Worker's Comp, we have to pay an $80

19   thousand premium there, and payroll taxes of some $240

20   thousand.  And once again, the US Trustee had no objection to

21   that motion.

22         THE COURT: And I have no questions or comments.  It

23   certainly was very straightforward.

24         MR. CALIFANO: Thank you, Your Honor.  And the next

25   motion we have on, Your Honor, is the cash management motion,

1   which I believe is fairly straightforward and does not

2   involve anything novel.  We're maintaining our current cash

3   system.  We intend to stamp new checks and business forms

4   with the DIP designation.  We do not need a 345 waiver,

5   because all of our banks are authorized depositories.  We

6   have agreed to make two changes at the request of the US

7   Trustee.  One was to make it clear that the Debtor could and

8   did track all inter-company disbursements between entities.

9   And that was something that we did pre-petition, and we are

10   able to do on the system that we have.  So we put that in the

11   order.  The other change was, it shows up that we have a

12   money market account that only had $100 balance.  And the US

13   Trustee suggested, which was very practical and I thank him,

14   that we close that account.  And we will.

15          THE COURT: And with that, I don't know if Mr.

16   Schepacarter had anything further to report.  But with those

17   changes, I'm prepared to enter the order as well.

18          MR. CALIFANO: The next motion we have on, Your

19   Honor, is a motion to continue our pre-petition customer

20   programs.  And the two programs that we're looking to

21   continue are, one a product return program which affects, by

22   our estimate, about $7,800 worth of goods.  And the other is

23   what we call goodwill payments.  Which are in response to

24   customer complaints, we'll give out gift cards or concessions

25   or the like.  And in accordance with our pre-petition

1    ordinary course policy.  And our estimation is, and the DIP

2    budget provides, that, for $20 thousand in total - -

3              THE COURT: Yes.

4              MR. CALIFANO:  - - on those payments.  And as set

5    forth in Mr. Schwarz's affidavit, and if he was called upon

6    to testify, he would testify this is very important to our

7    marketing partners to keep their customers happy, to keep

8    them satisfied.  And that even though it's relatively small

9    in nature, in comparison to the case, totaling less than $28

10   thousand, it really does have an impact on the Debtors'

11   business, and its relationship with these important marketing

12   partners.

13             THE COURT: Thank you, Mr. Califano.  Did, does

14   anyone wish to heard from?  Then I will enter that order

15   approve that order as well.  Certainly it's clearly within

16   the business judgment of the Debtor, and appropriate here.

17             MR. CALIFANO: Thank you, Your Honor.  The next

18   motion is the motion to pay trust fund taxes.  The total

19   taxes that are at issue are $320 thousand.  And that's

20   inclusive of the $240 thousand in payroll taxes that I

21   mentioned as part of the wage motion.  So it's an additional

22   80 thousand in trust fund taxes.  We went over that with the

23   US Trustee.  There's no issue there.  All those taxes are

24   due.  And that's, you know, something that's budgeted for in

25   the DIP.

1          THE COURT: I approve that order as well.  I've

2     never known a debtor to pay taxes they didn't have to pay, so

3     I'm going to enter that order.

4          MR. CALIFANO: Thank you, Your Honor.  The next

5     motion that's on for today is our motion to retain BMC as our

6     noticing, ballot, and claims agent.  It's pretty

7     straightforward.  And BMC, luckily, and I think it's in our,

8     it's going to work to our advantage, BMC was the pre-petition

9     entity that had set up the electronic data room and

10    electronic due diligence room for the Debtor, so it made an

11    easy transition, sensible transition because now we can

12    maintain that for bidders.  So we propose to retain BMC in

13    the capacity of noticing, ballot, and claims agent.  There

14    were two issues which the US Trustee brought up and we've

15    resolved both of them, and we've confirmed with BMC that they

16    consent.  One was to confirm that the $5,000 retainer we're

17    paying to BMC is not an evergreen retainer.  It's more of a

18    security retainer.  We confirmed that.  And the second issue

19    was that there would, the indemnification would not be with

20    respect to any gross or willful conduct, and what was

21    referred to as the Planet Hollywood - -

22          THE COURT: Yes.

23          MR. CALIFANO:  - - indemnification.

24          THE COURT: Yes.

25          MR. CALIFANO: And we have their consent to that.

1    And then finally that their limitation on liability is not

2    limited to their fees.  So we've resolved those, and I think

3    with that, with those resolutions, the US Trustee does not

4    have any issue with the BMC.

5          THE COURT: Yes, Mr. Schepacarter.

6          MR. SCHEPACARTER: Thank you.  For the record,

7    Richard Schepacarter for the United States Trustee.  We have

8    no issue with this.  Given those revisions, it's fine.

9          THE COURT: That's fine.  And it's fine with the

10   Court as well.  And I know that BMC has been a frequent

11   claims agent in this court, so it understands the process.

12         MR. CALIFANO: Your Honor, I do want to bring one

13   issue to your attention.  Based on the, the timing of the

14   filing and with BMC.  The first days went out to all the 20

15   largest creditors, the notice of the hearing was not

16   received.  When we learned of that, we faxed it out this

17   morning.  We also called, individually, each creditor on the

18   20 largest, and made contact, and told them about today's

19   hearing.  And I think the fact that that was effective is

20   shown by the number of creditors who are on the phone, and

21   also here in the court today.

22         THE COURT: Definitely.

23         MR. CALIFANO: And thank you to Mr. Glassman for

24   pointing that out and reminding me that I wanted to make

25   that, bring that to the Court's attention.

1          THE COURT: Yes.

2          MR. CALIFANO: Finally, Your Honor, we have the two

3    motions that I have not addressed, and these sort of go hand

4    in glove.  The bid procedures and the DIP motion.  Now, Mr.

5    Schwarz is here, and as is set forth in his affidavit, and as

6    I referenced in the background, this Debtor has, to some

7    extent, and to a large extent, been shopped, been marketed

8    several times already pre-petition, in a couple of different

9    sort of forms.  Once when they were looking for the deal that

10   resulted in the Brightstar deal, and second when they were,

11   then they were looking for the transaction that resulted in

12   Adeptio going out and buying the debt, the senior debt.  Now

13   this, we have on today the bid procedures motion, Your Honor.

14   And we're seeking approval of that motion today.  We don't

15   believe that it substantively effects the rights of any

16   creditors.  And I think that this case is that kind of

17   special case that would require that a bid procedures be

18   dealt with early on.  As I said, there's no effect on any

19   creditors.  While there is, there's no breakup fee, and while

20   there is a provision for an expense reimbursement, since

21   Adeptio is credit bidding, and they're only credit bidding a

22   portion of their debt, it really, the $1 million expense

23   reimbursement here, Your Honor, really does not affect the

24   estate.  It's really Adeptio taking it from one pocket and

25   putting it in the other.  It would only be relevant to the

1    estate in the effect, in the event we got over the amount of

2    the pre-petition debt, which is some 90+ million.  And the

3    DIP, which is approximately 25 million, and then the assumed

4    liabilities.  And if that's the case, I think we'll all be

5    happy to be in that situation.  But we don't anticipate that.

6    Your Honor, also one other thing is that this is a unique

7    business as I've described.  The people who would be

8    interested in this business know this business as was

9    evidenced by one fact that Mr. Schwarz would testify to, that

10    Lazard, when they did their marketing process, went out to 30

11    strategic buyers.  Ten of those buyers actually came in, saw

12    the company, and had management presentations.  That's a high

13    percentage for that kind of activity.  And it shows that

14    people, there are, it's a defined universe of people who

15    would be interested in this company, and they understand the

16    company.  Another thing that's shown, that to me shows how

17    quickly due diligence can be done and a transaction

18    evaluated, is the time frame that Versa, itself, looked at

19    this deal.  And Versa is actually different than the normal

20    stalking horse who comes into this Court on a 363 sale,

21    because they're already committed.  They've already bought

22    the pre-petition debt.  Whatever happens here with the

23    process, they're already into it, and they're getting further

24    into it every day.  Just on the, you know, the interim to

25    final DIP, they'll be another $10 million lent to this

1    company.  So they were able to conclude that that, this deal

2    made sense for them simply two, within two and a half weeks

3    after they were contacted.  They spent one week at the

4    company, and then I understand that last Friday, a week from,

5    a week ago today, they purchased the senior debt.  So I think

6    that that shows that the due diligence can be done quickly.

7    We have a defined universe of people who can be contacted,

8    and that the marketing process should move as swiftly as

9    possible.  I also think that anybody who comes and looks at

10   this deal now will have an advantage that even these pre-

11   petition potential buyers didn't have.  The fact is now the

12   deal is structured.  We have, we have an APA, which is filed

13   with this Court, which is going to be on the BMC website.

14   With that APA we have some 300 pages?  Correct?  Am I

15   correct?  300 pages of schedules which are very detailed.

16   Give detailed information about the company.  That's going to

17   be on this court's, you know, the court's website.  It's also

18   going to be on the BMC website.  Anybody can access that.  So

19   buyers, potential buyers, can do a great deal of due

20   diligence right off the bat there.  We'll also have the data

21   room up and running that people who sign confidentiality

22   agreements, through Lazard, can gain access to.  Lazard is

23   ready to go out with what they call a teaser and a non-

24   disclosure agreement, or confidentiality agreement, and a

25   copy of the bid procedures assuming Your Honor enters the

1   order.  They'd be ready to go out on Monday.  To some 306

2   financial buyers that have been identified and some 74

3   strategic buyers.  Because the company is losing money, Your

4   Honor, at this rate, we believe it's in the best interest of

5   the estate and of the Debtor that this process move swiftly.

6   Additionally, our marketing partners need to know that we are

7   going to get through this process quickly, and there's going

8   to be a business at the end.  So they need to see a light at

9   the end of the tunnel.  And I think it's important to them,

10  and it's important to the, to our customers, and to the

11  people we deal with, that a bid procedures order be entered.

12  And ordinarily the DIP gives people confidence.  In this

13  particular circumstance, the DIP and the bid procedures, I

14  believe, are what this Debtor needs to keep its marketing

15  partners committed.  We also have carriers that we have

16  relationships with that are, that have substantial sums owed

17  that are going to need to be dealt with.  And with the, the

18  fact that a DIP deal is there, and we're heading towards a

19  transaction, I think it's going to give them some, a great

20  deal of confidence.  So Your Honor, we'd like, today, for

21  Your Honor to approve the bid procedures, and the bid

22  procedures provide that three days after the entry of the bid

23  procedures order we would serve the auction and sale notices

24  to all the creditors and parties in interest, and anyone who

25  expressed an interest.  In addition to Lazard's process of

1   going out with what they call a teaser, the confidentiality

2   agreement and the bid procedures.

3        THE COURT: And BMC's website as well?  Will these

4   materials be available there?

5        MR. CALIFANO: Yes.  The materials will be on BMC's

6   website.  They're downloading them now.  I don't know how

7   long that takes, but they'll be on there as soon as possible.

8   They're in the process of doing that now.  Five days after

9   entry of the order, cure notices will be sent out to the,

10  what are called, what are identified in the asset purchase

11  agreement as designated contract parties.  Objections to

12  assumption, assignment, and cure, are due December 3rd, 2007.

13  We have a publication notice that will go out seven days

14  after entry of the bid procedures order.  We're asking for

15  objections to the sale motion on December 3rd, 2007.  Bids due

16  on December 7th, 2007.  An auction on December 12th, 2007, and

17  then a sale hearing before Your Honor, subject to Your

18  Honor's schedule, on December 13th, 2007.  And we're looking

19  to close, unfortunately, on December 24th, 2007.  So Your

20  Honor, those are the bid procedures.  And I understand it

21  might be out of the ordinary for a Debtor to come in on the

22  first day and seek to establish bid procedures like that, but

23  I believe it's very important to get the process going.  If a

24  committee is formed, and a committee has an issue with these

25  bid procedures, you know, there are, there will be plenty of

1  opportunity for them to address them.  Your Honor, no one's

2  substantive rights are affected.  And as I said, there's no,

3  the estate is not being bound to any financial burdens.

4  Because even though there is an expense reimbursement

5  provision, it really is coming out of Adeptio's own secured

6  position as the credit bidder.

7          THE COURT: Thank you Mr. Califano.  I'm sure that

8  maybe the parties wish to be heard from on the - -

9          MR. CALIFANO: Thank you, Your Honor.

10          THE COURT:  - - the timing, if not the substance.

11          MR. SCHEPACARTER: Thank you, Your Honor.  I don't

12  know if there's any creditors in attendance that would want

13  to comment on this.  I think that they would if they have

14  gotten notice of it, because of the aggressive nature that

15  Versa or Adeptio, as they've termed themselves, the stance

16  that they have taken in this case.  Given the fact that they

17  are seeking bid procedures coupled with the fact that, which

18  hasn't been raised yet, the interim DIP has a 25 day window

19  for the committee to do its investigation.  Which, again,

20  coupled with the bid procedures coming on the first day, and

21  basically trying to close this during the holiday season, and

22  I think that has to be highlighted as well.

23          THE COURT: Yes.

24          MR. SCHEPACARTER: The fact that the 25 days

25  includes Thanksgiving, a weekend, and a Friday, which usually

1   no business is taking place, it's really like a three day

2   window of opportunity.  Which I think is quite unfair.  I

3   think that has to be addressed with respect to the bid

4   procedures.  If you look at the bid procedures, as counsel

5   has basically put them before the Court, without looking at

6   the DIP as well, they don't seem to be as offensive as they,

7   as they really are when you look at them in the context of

8   the DIP and with the context of the investigation period.  It

9   doesn't appear to be offensive, given the fact that Adeptio

10  has a credit bid.  They're not even credit bidding the full

11  amount of their, what they could credit bid.  There was no

12  breakup fee.  There is expense reimbursements, which isn't

13  really, given the fact that they've probably done some due

14  diligence, probably not a lot of money.  Though I'm sure a

15  million dollars probably covers most of the fees.  Though I

16  know they had a financial advisor, so sometimes they can be a

17  little expensive.  So the million dollars might be subsumed

18  into that.  But given the fact that a committee hasn't been

19  formed, a committee hopefully will be formed within a week,

20  but that still doesn't excuse the fact that the process needs

21  to be protected.  If you look at the DIP, and I have to keep

22  referring to this.  If you look at the procedures regarding

23  local rules regarding the investigation period, it's

24  basically a 60 day, 75 day, basically 75 days from the order,

25  or 60 days from the formation that is, that is permissible.

1   Even Judge Walsh, who basically I think he's the one that

2   conceived these, these ideas, probably would not permit such

3   a thing.  Even the local rules, and I know they're just local

4   rules, they're not bankruptcy rules and they're not statute,

5   but they even indicate, after going through the laundry list

6   of all the things that need to be highlighted, basically say

7   that absent extraordinary circumstances, these things, such

8   as a change in the, in the investigation period, period,

9   should not be, not be allowed.  Outside extraordinary

10  circumstances.  I don't think any extraordinary circumstances

11  have been proved.  Counsel has indicated that this is a

12  unique case, and there are special circumstances, and there

13  really aren't.  In the context of cases that come before this

14  Court and that are filed here in Delaware, this is pretty

15  much a run of the mill case.  We've had all kinds of cases

16  from telecommunications, to airlines, to all kinds of cases

17  and businesses that have come before the Court, and it's

18  pretty much at this point I would say a standard type case,

19  nothing really extraordinary that's been presented, or there

20  is really nothing extraordinary about the business.  I think

21  what, what is at play here is the fact that, and I know Judge

22  Walsh would basically say this, that there's a cost for

23  coming into this court.  There's a cost for the process, and

24  the, part of the cost of the process is allowing the

25  creditors their rights, and the creditors committee the

1   opportunity to present its case and be able to do its

2   investigation within the period of time that it can do it.

3   What Versa would like to do is to short circuit that, and

4   basically save money, and save expense in foreclosing its

5   collateral, because that's basically what it's done, and be

6   able to do that on a, on a very inexpensive basis.  Basically

7   cutting short the process.  As I indicated, there's a cost

8   for coming before this Court, that being the cost of

9   administration.  The financial advisors and the like.  And I

10  think that that has to be recognized.  With respect to the

11  DIP and with respect to the bid procedures.  One of the, one

12  of the things that I think needs to be highlighted is the

13  fact that - - I'll try to think exactly what I want to, how I

14  want to phrase this.  One of the things I think needs to be,

15  needs to be, to be recognized is that this is a short time

16  period in which this, this case is going to be done.  I think

17  it's kind of, I don't want to cast any aspersions on counsel,

18  because I think they've done a pretty good job, and I have

19  the highest respect for them, but I think it's a little

20  unfair to come before the Court and say that the committee

21  can ask for more time.  I think that the committee should

22  have more time from the beginning.  And if the committee

23  agrees, and its counsel, and its financial advisors sit down

24  with counsel for the bank or Versa, and sit down with counsel

25  for the Debtor, they should be able to negotiate it in that

1    fashion.  Not basically have to try to gain ground, but

2    already have the ground, and then give some of it back.  In

3    this case, what's going to happen is the committee is going

4    to be basically pinned down at the one yard line and have to

5    go 99 yards.  They should get the ball at the 20, and be able

6    to, to go forward from there.

7            THE COURT: On the timing, Mr. Schepacarter, are

8    your comments addressed primarily to the DIP?  Or to the sale

9    order?

10           MR. SCHEPACARTER: It's to the DIP and to the, and

11   to the bid procedures.

12           THE COURT: Bid procedures.

13           MR. SCHEPACARTER: I would ask the Court to not

14   approve the bid procedures at this point.  Allow the

15   committee to get up and running.  And again, the committee is

16   going to be formed, well the meeting is going to happen on

17   the 16th.  Hopefully we form the committee.  I know there are

18   some creditors who apparently have appeared on the phone and

19   may even be behind me who hopefully will, will be there, and

20   we can form a committee on the 16th.  That was frankly the

21   earliest I could, could do it.  Within a week's period of

22   time.  Being able to send out the questionnaire and get all

23   the information back.

24           THE COURT: Certainly.

25           MR. SCHEPACARTER: We're off Monday.  Monday's a

1    holiday, so we have a short week.  And I want to be able to

2    get the committee up and running as soon as possible.  That

3    should not affect the fact that I think that the bid

4    procedures can be put on a hearing some time after the

5    committee is formed, so the committee has a chance to look at

6    what's going on in this case and be able to slow the process

7    down.  Able to enforce their rights, basically.  The

8    creditors' rights.  The other part of it is, you know, we

9    understand that Versa and Adeptio have a certain amount of

10   money that's been invested.  And as the Debtor has a certain

11   amount of human capital, and given the fact that they want to

12   continue to have their people employed, and be able to have a

13   going concern going.  But there's also the creditors' rights

14   that have to be protected.  Basically there's no one else,

15   other than maybe if there's somebody on the phone or behind

16   me that can say that, but basically other than myself,

17   there's nobody that's going to come up here and be able to

18   stand up for the creditors in this case.  And again, we don't

19   represent the creditors, but we stand for the process.  The

20   process being, needs to be fair. . .(microphone not

21   recording).  So I would urge the Court to defer or set the

22   hearing for the bid procedures sometime in the very near

23   future, and allow the process to go forward from that point

24   on.  If the company's been marketed like has been

25   represented, and there is a somewhat of a small universe of

1    people, I think pushing it back some period of time is not,

2    for bid procedures so that the committee can get on board, is

3    not going to harm that process, as well.  So my, that's what

4    I'm, with respect to the bid procedures, that's what I'm

5    talking about.  Basically push that back some short period of

6    time so that the bid procedures can be, can be going forward.

7    The committee can have its opportunity to weigh in, vet the

8    issues that need to be weighed in upon, and then go forward

9    with a, with a sale process.  Doing that now, on a short time

10   frame, and during this period of time of the year, when we

11   have the Thanksgiving holidays, and all other kinds of

12   holidays coming up, just isn't, in my mind, just not, just

13   not fair.

14            THE COURT: Thank you, Mr. Schepacarter.

15            MR. SCHEPACARTER: And I'll, when we get to the DIP,

16   we can discuss that as well.

17            THE COURT: Talk about those points.  Absolutely.

18   Because I do think that there is some inter-relationship

19   between them.  And certainly there has to be some greater

20   allowance, perhaps for creditors, under these circumstances,

21   for unsecured creditors, than, than this appearing in the DIP

22   papers.  But we'll get to that as you said, and you'll have

23   another opportunity to address those.

24            MR. SCHEPACARTER: Thank you.

25            THE COURT: Thank you.  Mr. Califano.

1         MR. CALIFANO: Yes, Your Honor.

2         THE COURT: Timing, you know, it's, it's, I

3    appreciate the desire to move things along quickly.  On the

4    other hand, here we have a situation where the lender is the

5    stalking horse, and has all of the, the debt tied up, and is

6    really in a situation to dictate or to loosen the schedule a

7    little bit.  To lighten the schedule.  So, and I understand

8    that you're Debtors' counsel, and you're standing here in

9    your difficult position on these motions, and probably don't

10   have an opportunity to really respond to the Trustee's

11   arguments, but if you'd like to try, or if you'd like to hear

12   from Adeptio, that would be fine too.  Mr. Brady, good

13   afternoon.

14        MR. BRADY: Good afternoon, Your Honor.  Robert

15   Brady on behalf of Adeptio, an affiliate of Versa Capital.

16   Your Honor, I think it helps to put this case in context.

17   Adeptio is now providing really rescue financing.  This

18   company has been cash starved for a long time.  And is

19   experiencing a significant cash burn.  And I know Your Honor

20   hears that in a lot of cases, but to put it in context, in

21   the seven week budget that's attached - -

22        THE COURT: Yes.

23        MR. BRADY: - - to the DIP motion, the cash needs

24   of the company are $23.4 million.

25        THE COURT: I saw that.

1        MR. BRADY: So nearly $25 million of cash burn in

2   seven weeks.  That's an average of $3.3 million a week.  So I

3   think that fact alone, along with the Debtors' evidence on

4   the pre-petition marketing process, the Debtors have met

5   their burden that this is a case that needs to move quickly,

6   and can move quickly.  Now let's talk about the 25 day

7   period, investigation period.  Because we recognize, Your

8   Honor, that that's not the norm in this jurisdiction.

9        THE COURT: Right.

10       MR. BRADY: But there are reasons, and one is this

11  is a credit bid.  The Debtor needs to understand how to value

12  Adeptio's bid.  And really can't do that until the

13  investigation period has expired to determine if there's

14  going to be a challenge to Adeptio's liens.  Now 60 days is

15  more the norm and I would submit, Your Honor, the real reason

16  committees get 60 days or need 60 days is not to conduct a

17  lien search, it's really to evaluate causes of action.  I

18  think we can all agree that a lien search can be performed in

19  a couple of days.  Here, Adeptio's only been in one week.

20  Adeptio did not declare the default under the pre-petition

21  facility.  This is a public company.  The loans have been

22  public.  It has an. . .(microphone not recording) shareholder

23  base.  To the extent the committee believes there are claims

24  against the prior lenders, there's nothing in this order that

25  impacts that.  Really what the committee needs to look at

1    here, or any party in interest is, are the liens good - -

2         THE COURT: Right.

3         MR. BRADY:  - - and there's a very, very narrow

4    period of a week where Adeptio was the pre-petition lender.

5    And I think 25 days is appropriate.  But Your Honor, we

6    recognize that the committee, if formed, will have an

7    opportunity to review this.  The local rules provide that.

8    There's no burden shifting here.  If a committee comes

9    forward and tells you there's smoke, and they need more time,

10   Your Honor will consider that, and there will be no

11   prejudice.  But I think what we're hearing from the Debtor,

12   and the evidence supports, is this has to move quickly.  In

13   order for our credit bid to be considered, it has to be tied

14   to the investigation period.  And Mr. Schepacarter mentioned

15   a couple of times that this is a credit bid, a credit bid.

16   But let's also remember what this bid does.  In addition to a

17   credit bid, Adeptio is picking up cure claims.  So they would

18   be paying any cure claims for assumed and assigned contracts.

19   It's assuming any trade payables that were incurred in the

20   ordinary course and not paid.  And it's going to provide

21   jobs.  So this is more than just a credit bid, Your Honor.

22   There's a lot of other consideration that this bid has.  And

23   other parties in interest will have time to come forward and

24   participate in the process.  I recognize bid procedures don't

25   usually get entered on the first day, but in the American

1    Home case, Judge Sontchi did approve them on the first day.

2    Finding it was really a melting ice cube.  The asset was

3    withering, and if the process didn't get put in place

4    immediately, value would be lost.  At a burn rate of $3.3.

5    million a week, I think it's fair to say value will be lost

6    here.  This period is not unlike the period Your Honor

7    approved in the Quaker Fabrics case.

8                THE COURT: Right.

9                MR. BRADY: Judge Walsh approved in the Tweeter

10   case.  Also the World Health case.  It's, it's on a quick

11   schedule, but given the pre-petition marketing effort, given

12   the cash burn, and given that there is a bidder at the table

13   who can move forward, we think this is appropriate.  Again, a

14   committee will have time.  But really, because of the expense

15   reimbursement really being covered, since we're the secured

16   creditor, this is scheduling at this point.  We're asking the

17   Court to create this schedule, or the Debtor is asking the

18   Court to create this schedule, and the DIP lender is

19   requiring that, because if Adeptio is going to put in $10

20   million in the next 15 days, and pledge to put in a total of

21   $25 million, it needs to know that the burn will stop and

22   that a sale process will occur.  Happy to answer any question

23   Your Honor has.

24                THE COURT: Two questions.  Two things that concern

25   me.  One is would the extension of the investigation period

1   for the committee constitute a default under the DIP?

2          MR. BRADY: Yes.  As currently constructed, I

3   believe the 25 day period is necessary because of the, the

4   ability of the Debtor to value Adeptio's bid.  Mr. Califano

5   is saying it may not be an express - -

6          THE COURT: It may not be.

7          MR. BRADY:  - - default, but it seems - -

8          THE COURT: I thought I saw it as an event of

9   default, but I wasn't, I was not certain.

10          MR. BRADY: I guess there's probably two ways, Your

11  Honor.  The auction needs to be teed up for the 13th, and the

12  Debtor needs to understand how to value our bid before that.

13  And I recall that the order needs to be in a form acceptable

14  to Adeptio as well.

15          THE COURT: Okay.  All right.  And the other point,

16  just one minute.  And the other point I wanted to, to, I

17  realize on an interim basis, you're not asserting a lien on

18  avoidance actions, but I did see that on the final order you

19  would be proposing that.

20          MR. BRADY: That's correct, Your Honor.  We're

21  reserving the lien on avoidance for a final order.

22          THE COURT: Okay.  Thank you Mr. Brady.  Good

23  afternoon.

24          MS. KELBON: Good afternoon, Your Honor.  Regina

25  Stango Kelbon from Blank Rome.

1          THE COURT: Yes.

2          MS. KELBON: On behalf of Cellco Partnership doing

3     business as Verizon Wireless.

4          THE COURT: Yes.

5          MS. KELBON: Your Honor, just by way of background,

6     InPhonics is a web agent for Verizon Wireless, so Verizon

7     sells equipment to InPhonics and also owes them commissions.

8     So there are setoff and recoupment rights and other rights

9     between the parties.  And I don't, I'm not sure if I'm

10    talking out of turn, but I think you're hearing both of

11    these, the DIP motion and the bid procedures together, so I

12    didn't want to miss the objection part on the DIP motion.

13         THE COURT: Yes.  There's some overlap here.

14         MS. KELBON: Yes.

15         THE COURT: So please don't be - -

16         MS. KELBON: Okay.  So if I'm - -

17         THE COURT:  - - afraid to - -

18         MS. KELBON:  - - out of turn, I'm sorry.

19         THE COURT: No, you're not.

20         MS. KELBON: I just want to make sure that the DIP

21    order, and you know, any order that's entered, is, does not

22    impair or impact any setoff or recoupment rights that Verizon

23    Wireless may have.  There is a priming lien, and there's,

24    it's seeking liens under C and D, and I just want to make

25    sure that all rights are reserved.

1          THE COURT: Thank - -

2          MS. KELBON: Especially on the short notice.

3          THE COURT: Thank you.

4          MS. KELBON: Thank you.

5          THE COURT: Does anyone else wish to be heard?

6          MR. CALIFANO: I know it's my fault, Your Honor,

7    that we melted these, that we sort of moved these motions

8    together, but - -

9          THE COURT: Yes.  I think we're still dealing,

10   really with the bid procedures.

11         MR. CALIFANO: Right.  I just want to - - and it's

12   my own fault.  I caused this problem.

13         THE COURT: I let you.

14         MR. CALIFANO: So we're both to blame, Your Honor.

15   The point, the one, I was just about to point out, the real

16   thing that it seems to have concerned the US Trustee, and I

17   believe the Court, is the, the 25 day committee period.  I

18   don't, I think that the, the calendar in the scheduling of

19   the auction, I don't think is as substantive an issue.  And I

20   know I opened this can of worms by putting them together, but

21   I do believe, Your Honor, that we have shown, and I can, and

22   we can show that in this case it is both necessary and

23   beneficial to the estate to have this accelerated process

24   that once again does not burden the estate to any financial

25   burdens, and has no substantive effect on any creditor in

1    this case.  There will be a sale and an auction, and if

2    there's an issue, and the creditors committee can at that

3    sale hearing, obviously, raise any objection to the sale, and

4    one of the objections would be that, you know, the marketing

5    isn't sufficient, or that the period was too short, or that

6    the sale is not appropriate.  And they'll have that right.

7    Because, you know, the committee that will be here, if there

8    was a committee here, and they wanted to weigh in, since

9    we've taken away their normal objections of breakup fee and

10   the like, the only thing they could be complaining about

11   would be the timing.  And there's nothing we're not, they

12   could raise that issues at a sale hearing, so no substantive

13   rights are being affected.  So I do believe, Your Honor, and

14   now if I can undo what I did and take the sale procedure

15   separately.

16            THE COURT: Yes.

17            MR. CALIFANO: I would ask that Your Honor approve

18   the sale procedures, as we set forth.  Because I do believe

19   it's important for the Debtor, and not just for the DIP and

20   for the concerns that the lender has, it's important for the

21   Debtor, in its dealing with its business partners, and also

22   for the fact that we have Lazard lined up to fire off these

23   things, you know, on Monday, and get this process going.  I

24   think that that is important.  And I would ask that Your

25   Honor approve the sale procedures, and then we can address

1    the issues that remain with respect to the DIP.

2           THE COURT: Thank you Mr. Califano.  Mr.

3    Schepacarter.

4           MR. SCHEPACARTER: I got one more wrench to throw

5    into the works.

6           THE COURT: Okay.

7           MR. SCHEPACARTER: And this is one that Congress

8    actually just gave me, not too long ago.  I'm going to give a

9    copy of this to counsel.  I mentioned it to counsel earlier,

10   but he never got a chance to look at it.  But I need to make

11   this argument.  Maybe I should give one to Your Honor.  This

12   is the privacy policy for the, for the Debtor.

13          THE COURT: Yes.

14          MR. SCHEPACARTER: And I think it's - -

15          THE COURT: Yes.  May I?

16          MR. SCHEPACARTER:  - - important to mention this.

17          THE COURT: Thank you, Mr. Schepacarter.  Thank you.

18   Oh, okay.

19          MR. SCHEPACARTER: It's important to mention this

20   now, because the sale, in the context of a 363 sale under the

21   Code as it has been newly drafted, it allows for the

22   appointment of two types of ombudsmen.  One's a healthcare

23   ombudsman, which we don't have in this case.

24          THE COURT: Right.

25          MR. SCHEPACARTER: But we do have a privacy

1    ombudsman issue.  And I think that that needs to be

2    addressed.  When I read the policy, it seemed to me that this

3    policy doesn't satisfy the statute in this, in the, in the

4    way that it needs to not have an ombudsman.  So I think that

5    if we need an ombudsman, that person needs to be appointed, I

6    think, at least five days prior to the, to the sale, which

7    given the short time frame, doesn't give much of an

8    opportunity for the ombudsman, one to be appointed, and be

9    able to protect the personally identifiable information that

10   would otherwise be, be out there for, for use.  I don't know

11   if counsel, I did mention this in our negotiations, in our

12   discussions earlier.  But I think it sort of got lost in the

13   shuffle.  But I bring it up now.  I mean, I'll leave it to

14   counsel to somehow address it, but it seems to me that if we

15   need an ombudsman, then that may have an impact on the sale

16   process.

17              THE COURT: Yes.  Because talking about a sale on

18   the 13th, or the 12th, excuse me.

19              MR. SCHEPACARTER: Correct.

20              THE COURT: And we would be talking about at least

21   five days in advance, the 7th of December.  Which does not

22   give us a lot of time.

23              MR. CALIFANO: It will be, it will be, I believe

24   it's the 13th would be the sale hearing we requested Your

25   Honor.  So it would be five days before the 13th.

1          THE COURT: Is it before the sale hearing or before

2     the sale?

3          MR. CALIFANO: It's - -

4          THE COURT: I thought it was - -

5          MR. CALIFANO: §(b).

6          THE COURT: Yes.

7          MR. CALIFANO: It refers to §363(b)(1)(8), and

8     (b)(1)(8) is, (b)(1)(8) is I think, I believe that's the sale

9     hearing, Your Honor, that you would have to have it five days

10    before.

11         THE COURT: And I'm looking at the wrong month.  I'm

12    sorry.  So the 12th is - -

13         MR. CALIFANO: Well, it would be the 13th, so.

14         THE COURT: The 13th is Thursday.  So five days would

15    be the 6th.

16         MR. CALIFANO: But I would like to, Your Honor, just

17    address the issue of the consumer privacy ombudsman.

18         THE COURT: Yes.

19         MR. CALIFANO: Which is, you know, that is an issue

20    that I'm glad Mr. Schepacarter brought up, because it was

21    something that we had, that we thought about, and you know,

22    we haven't exhaustibly analyzed it, but we believe we've

23    given it some thought.  And there's two issues.  One is that

24    we're not attempting, through the sale transaction that we

25    have on, in contemplation, we're not doing any, we're not

1   going to use whatever if we do have any private consumer

2   information, we're not using it in a way that's inconsistent

3   with the Debtors' prior use.  Because we're selling the

4   business.  We're not selling customer lists.  We're not going

5   out and selling, you know, people's confidential information.

6   It will be, to the extent it's in the Debtors' database, and

7   it's necessary for servicing of these, of these customers

8   that we have, that will be in the Debtors' database, and I

9   don't think, under the statute, an ombudsman is necessary

10  just because the ultimate equity ownership of the Debtor or

11  its assets is changing.  And that's what's happening here.

12  We're not, this isn't through a liquidation.  This is a sale

13  as a going concern.  And the, the, the business that Adeptio

14  intends to carry on is the same business that the Debtor is

15  currently carrying on through the WireFly, and I don't think

16  it would implicate the consumer privacy ombudsman statute.

17  The other thing that I believe is that we have very little

18  consumer information, because I believe when you, and I,

19  correct me, Mr. Schwarz, when you click on and provide, you

20  go straight to the carrier's website.  Isn't that correct.

21          MR. SCHWARZ: We do capture that information.

22          MR. CALIFANO: Oh, you do capture that?

23          MR. SCHWARZ: We do not have the social security

24  number, but you have. . .(microphone not recording).

25          MR. CALIFANO: Okay.  There's some personally

1    identifiable information, but not the social security number.

2    Your Honor, if you look at §332, it's not a sale or lease of

3    the personally identifiable information, it is, I'm sorry - -

4              THE COURT: That's fine.

5              MR. CALIFANO: No, the transaction is a transaction

6    where the entire business is being sold.  The assets and the

7    going concern.  And I believe that there is, there is nothing

8    contemplated by the proposed conduct of the business by

9    Adeptio that would change or conflict with the privacy

10   policy.  I'm getting that representation from Mr. Agay, they

11   would not depart from the privacy policy that the Debtor has.

12   And you know, we could provide in the sale order, and add to

13   the bid procedures, that any bidder would have to comply with

14   the privacy policy, if that would make the Court more

15   comfortable with this issue.

16             THE COURT: Well I don't think it's really before me

17   today, but it's something that we clearly may have to

18   address.  And I think that perhaps Mr. Schepacarter's raising

19   it is as much to put everyone on notice that this could

20   become an issue, and on very short notice.

21             MR. CALIFANO: Well we could, Your Honor, if it

22   would make Your Honor more comfortable, tee up the motion to

23   address that and have that either on the second day hearing

24   or some hearing.  We could tee that up, if that would resolve

25   the issue, tee that up for the second day hearing.  Which

1   would be after Thanksgiving, and resolve the issue.   And

2   perhaps enter an, you know, have some order - -

3           THE COURT: Yes.   I think that would be - -

4           MR. CALIFANO:  - - that would say - -

5           THE COURT: I think that would do well.

6           MR. CALIFANO: Put that on for the second, we'll tee

7   up an order for then.

8           THE COURT: Yes.

9           MR. CALIFANO: And that will, that will make sure

10  that that issue, and that that section is complied with.   In

11  any transaction we enter into.

12          THE COURT: Okay.   Well, let me address the bid

13  procedures motion, unless anyone else wishes to be heard

14  from, because the Court is very sensitive to a number of

15  issues that are connected with that motion.   And obviously

16  the impact it may have upon the rights of creditors.   But I'm

17  satisfied, based upon the evidence, and by evidence I'm

18  talking about Mr. Schwarz's affidavit, and the arguments of

19  counsel, and the persuasive arguments of lender's counsel,

20  Adeptio's counsel, that we do have a situation which is

21  sufficiently unique, and of an emergency basis.   Nature.   Of

22  an emergency nature I should say.   That while it certainly

23  shouldn't become the normal course of cases here, I think

24  that this is the exception.   This financial emergency of the

25  Debtor.   And so I am going to approve the bid procedures

1  motion.  But obviously, if a creditors committee comes in and

2  makes persuasive arguments and shows a need for perhaps a

3  departure from some of the dates in the schedule, I can't say

4  that the Court would not be very sensitive to those, those

5  concerns of the committee.  Or of the United States Trustee

6  in the future.  So I'm entering the order, but I don't want

7  anyone to think that this is simply the highway at this

8  point, until we have a committee in place.

9        MR. CALIFANO: Yes, Your Honor.  Thank you.  And I

10  understand that completely.

11        MR. SCHEPACARTER: Your Honor - -

12        THE COURT: Yes, Mr. Schepacarter.

13        MR. SCHEPACARTER: - - one point of clarification.

14  For the record, Richard Schepacarter, the United States

15  Trustee.  With respect to the request, you had indicated that

16  if the committee goes forward and asks, basically for more

17  time in any aspect, and I guess we'll get to the DIP in a

18  second, I guess there's been an indication, and perhaps some

19  argument or information given, that potentially that the

20  extension of time could be a default - -

21        THE COURT: Yes.

22        MR. SCHEPACARTER: - - under the APA.  I think I

23  would want counsel for Adeptio to confirm that if a committee

24  does come up and ask for more time, that that would not be an

25  event of default.

1          MR. CALIFANO: Your Honor, there's one more item on

2     the bid procedures.  We do have a blank.

3          THE COURT: Yes.

4          MR. CALIFANO: If Your Honor can, if Your Honor can

5     entertain a sale hearing on the 13th, I need a time that you

6     can do the sale.

7          THE COURT: I can do it.  I can do it on the 13th,

8     I'm just looking for the best time.  I have a hearing that

9     will not be very lengthy, and may even not have to go

10    forward.  So I could do Thursday the 13th at 10 o'clock.

11         MR. CALIFANO: Thank you, Your Honor.

12         THE COURT: And when I get the, your form of order

13    from you at the end of the hearing, I will include that date.

14    And as far as, I think you were looking for your next hearing

15    on the 3rd.

16         MR. CALIFANO: Yes.  The, the next hearing.

17    (Microphone not recording). . .on the 3rd would be the

18    objections to assumption and assignment.

19         THE COURT: I can do that also at 10 o'clock.

20         MR. CALIFANO: Oh, I'm sorry.  The objections are

21    due on the 3rd.

22         THE COURT: I'm sorry, sir.  I wrote it down wrong.

23    Forgive me.

24         MR. CALIFANO: So the hearing would be on the - -

25    the hearing would also be on the 13th on the assumption and

1   the cure.  Okay.  The only, the only date we do need is

2   second day hearings.

3            THE COURT: Right.  And that's, that we're talking

4   about the final DIP, among other things?

5            MR. CALIFANO: Yes.  Your Honor, is Your Honor

6   available on the 30th for the second day?

7            THE COURT: I am.

8            MR. CALIFANO: Okay.  Thank you, Your Honor.

9            THE COURT: Why don't we do it on the 30th.  I hate

10  to do it on a Friday to you, but 3 p.m. on the 30th.

11           MR. CALIFANO: That's fine, Your Honor.  Thank you.

12           THE COURT: Okay.  I think that Mr. Schepacarter was

13  still waiting to hear from perhaps Adeptio.

14           MR. BRADY: Yes, Your Honor.  Robert Brady on behalf

15  of Adeptio.  We certainly understand that if a committee gets

16  appointed, we're going to be talking to them about the

17  schedule.  I can't commit today that we would agree to any

18  changes.

19           THE COURT: Okay.

20           MR. BRADY: But it would not be a default for them

21  to ask for more time.  But I cannot commit today that Adeptio

22  would agree to add an extension to the schedule.  Again,

23  given the cash burn of the company, the schedule is very

24  important.

25           MR. SCHEPACARTER: Richard Schepacarter for the

1  United States Trustee.  I understand that that's what counsel

2  will do.  I just don't want counsel to come back and say, at

3  another hearing when the committee does ask for more time,

4  that we can't give you more time because it's a default under

5  the APA, and we have to live by that.  That's, I don't, I

6  can't, I can't live with that.

7         THE COURT: Well, look.  I think that that can be

8  their position.  And the Court, and the committee, will have

9  to weigh, to balance those issues.  So I'm not going to

10 demand a commitment on the part of the lender today, and

11 we'll have to see more after a committee is formed, I think.

12 We may have a committee formed that is prepared to proceed

13 very, very promptly.  And a lot of it, also, will depend upon

14 Adeptio's cooperation in providing documents and information

15 to a committee.

16        MR. SCHEPACARTER: Understood.  Thank you, Your

17 Honor.

18        MR. AGAY: Good afternoon, Your Honor.  David Agay

19 here - -

20        THE COURT: Mr. Agay, good afternoon.

21        MR. AGAY: How are you, Your Honor?

22        THE COURT: Very well, sir.

23        MR. AGAY: I believe my *pro hac* is on - -

24        THE COURT: Yes.  I think I've, if I haven't signed

25 it, it's, it will be.

1          MR. AGAY: Let me just make very clear, Your Honor,

2     that if the committee asks for more time, you will not see

3     Adeptio here saying that the committee cannot have more time

4     because the Judge approved this order on the first day.  We

5     will be prepared to address the substance of that issue, and

6     we're not viewing this as law of the case, Your Honor.

7          THE COURT: Understood.  Thank you, but thank you

8     for your reassurance.  Okay.  So I will, I will enter that

9     order as well.

10          MR. CALIFANO: Yes, the, the - -

11          THE COURT: The bid procedures.

12          MR. CALIFANO: The bid procedures order.

13          THE COURT: Yes.

14          MR. CALIFANO: Okay.  So now, getting back to - -

15          THE COURT: The DIP.

16          MR. CALIFANO:  - - the DIP.  With respect to some

17     comments that we received from the US Trustee, we made some

18     changes to the interim DIP order.  We, if Your Honor would

19     like, I can walk Your Honor through the changes.

20          THE COURT: Thank you.  Yes.

21          MR. CALIFANO: The first change, and this is item 9

22     in the binder.  9, tab 9, and it's page 4 of the order.  We,

23     there's a provision there regarding notice.

24          THE COURT: Yes.

25          MR. CALIFANO: Okay.  Did Your Honor receive a black

1    line of the order?  There's a black line that was just - -

2              THE COURT: No.  I did not.

3              MR. CALIFANO: May I approach the bench?

4              THE COURT: I can - - if you have an extra fine.

5    Otherwise, I'm happy to work with - -

6              MR. CALIFANO: Yes.  May I approach the bench?

7              THE COURT: Oh, yes.  You certainly may.  Thank you.

8    Thank you, Mr. Califano.  Page 4, I think you mentioned.

9              MR. CALIFANO: Yes.  Page 4, there's a, there was a

10   provision in there about notice - -

11             THE COURT: Yes.

12             MR. CALIFANO: - - in item C.  Your Honor, you can

13   see that we changed it to take it from for all purposes under

14   the Bankruptcy Code to notice appropriate for the motion and

15   the - -

16             THE COURT: Yes.  I'm - -

17             MR. CALIFANO: (Microphone not recording.)

18             THE COURT: I like that better.

19             MR. CALIFANO: Your Honor, there was the issue that

20   was raised about the super priority claims.  That was not

21   modified, on page 12.

22             THE COURT: Um-hum.

23             MR. CALIFANO: But there was a modification to make

24   it clear that while the, while the DIP lender is not seeking,

25   in the interim basis, super priority lien against avoidance

1   actions, in the final order they're seeking a super priority

2   lien on the proceeds of avoidance actions.  Not super

3   priority lien, super priority administrative claim against

4   avoidance actions.

5         THE COURT: The Court, of course, becomes concerned

6   what will be left for unsecured creditors in this case.

7         MR. CALIFANO: I believe that that's now, that's not

8   an issue for today.

9         THE COURT: No, it's not an issue for today.

10        MR. CALIFANO: It's something to put off for the - -

11  I'm sorry, Your Honor.

12        THE COURT: No.  It's quite all right.

13        MR. CALIFANO: This is the one you gave me.  I'm

14  sorry, Your Honor.

15        THE COURT: Take your time.  You're fine.

16        MR. CALIFANO: All right, Your Honor.  It was

17  changed in that version.  But they, I guess, it is not.  It's

18  on for today, now.  The DIP it's. . .(microphone not

19  recording) of the avoidance. . .the US Trustee referenced.

20        MR. BRADY: Your Honor.

21        THE COURT: Mr. Brady, yes.

22        MR. BRADY: Robert Brady on behalf of Adeptio.  I'll

23  tell you, Your Honor, we talked to Mr. Schepacarter about

24  this.  He did ask us to remove the super priority claim on

25  proceeds of avoidance actions.  Again, we're not seeking a

1    lien on the avoidance actions or the proceeds, but we are

2    asking for a super priority claim.  And let, let me tell you

3    why.  And we discussed this with Mr. Schepacarter.  This is,

4    again, somewhat a unique situation.  The company has been

5    cash starved for some time.  Its inventory is down.  Its

6    receivables are down.  This is not the old bricks and mortar

7    type business.  It involves the internet and it's more of a

8    virtual business.  So the assets a DIP lender would look to

9    to secure a DIP loan are just not there, as you would

10   normally see in a, in a pure bricks and mortar type business.

11   So given that between the interim order and the final order

12   Adeptio is going to lend $10 million, we have asked, as

13   protection on that $10 million, a super priority claim on the

14   proceeds.  And again, reserving the right at the final to ask

15   for a lien.  But it is the unique situation where there

16   aren't a lot of hard assets here at this company to provide

17   Adeptio the security for loaning $10 million in this

18   situation.

19          THE COURT: Thank you Mr. Brady.

20          MR. CALIFANO: I'm sorry.  I know there's confusion

21   because there's two black lines.  Okay.  Your Honor, there's

22   one other change.  On page 23, item C, paragraph C.  There's

23   a provision that this order would be binding on the examiner,

24   or the other fiduciaries.  The examiner now is being, they're

25   seeking that on the final order, not on the interim order. .

1    .(microphone not recording).

2              THE COURT: Okay.

3              MR. CALIFANO: So those are the changes that were

4    made to the interim DIP order.

5              THE COURT: Yes.  Mr. Agay.

6              MR. AGAY: Your Honor, counsel for Verizon has asked

7    me to put one reservation on the record, which we're happy to

8    do for purposes of this interim order.  And that reservation

9    is as follows.  That nothing contained in the interim order

10   shall impact or impair any setoff or recoupment rights of

11   Cellco Partnership, does business as Verizon Wireless.  And

12   we're happy to make that - -

13             THE COURT: Thank you.

14             MR. AGAY:  - - for the record.

15             MS. KELBON: Thank you, Your Honor.  That's, I know

16   counsel  doesn't want to revise even more, and they want to

17   get it entered today, so I'm satisfied with that.  I would

18   just request that it be included in the final order.

19             THE COURT: Okay.

20             MS. KELBON: Thank you.

21             THE COURT: Understood.  Thank you.

22             MR. CALIFANO: Your Honor, this, this DIP set aside

23   the one issue that the US Trustee has mentioned we would

24   spend some time discussing.  The investigation period.  I

25   don't think there's any issue that this DIP is very

1    reasonable under the circumstances.  We have a rate which is

2    prime plus 3¼, which is well in line with the market for

3    DIPs.  Facility fee of ½ a point on the unused balance.  A 1%

4    commitment fee and a 1% exit fee.  All terms which are very

5    reasonable and well within the market of DIPs.  And if we, if

6    it was necessary, Mr. Torgove could testify to that, and to

7    the fact that in the, in DIPs entered in this District and in

8    other districts, the terms, the financial terms are extremely

9    reasonable.  As was said before, from, you know, from day

10   one, Adeptio is significantly under secured, and under

11   collateralized.  This Debtor is burning cash at the rate of

12   $3.3 million a week.  It went through a, it lost $132 million

13   in just the first three quarters of this year.  It needs cash

14   desperately to survive.  Under these circumstances, we

15   believe that the DIP is reasonable, beneficial, and necessary

16   to the estate.  Especially since right now any money that

17   goes in just increases the deficiency and the fact that the

18   DIP deal is under secured.  So we would ask that Your Honor

19   approve this Debtor-in-Possession financing today.  It is

20   necessary, because the Debtor is in dangerous, is in danger

21   of running out of cash at this point.

22          THE COURT: Thank you, Mr. Califano.

23          MR. CALIFANO: Thank you, Your Honor.

24          THE COURT: Mr. Schepacarter.

25          MR. SCHEPACARTER: Thank you, Your Honor.  Richard

1    Schepacarter for the United States Trustee.  There are three

2    issues that I think that remain that we have with respect to

3    the DIP order.  The first one, I think has already been

4    discussed.  It's the super priority claim issue.

5          THE COURT: Yes.

6          MR. SCHEPACARTER: Which is on page 12, I believe.

7    And the reason we have an objection to this, as I explained

8    to Mr. Brady, the liens on avoidance actions are not there in

9    the interim DIP, and I understand that.  But the proceeds of

10   those are subject to the super priority claim, which again is

11   different than having a lien on it.  But it's still subject

12   to a super priority claim.  To a certain extent, the liens on

13   avoidance actions, as I told him I'd like to have them at

14   least in the interim order DIP to remain pristine.  Basically

15   untouched.  And by having the super priority claim on them,

16   they are not as pristine as I would like them to be.  Given

17   the fact that if the liens of somehow an avoidance action is

18   taken within the next 25 days or 15 days, or however long we

19   are to a final hearing, or that the rights accrue, or

20   whatever that may happen, the Committee with the gun having

21   to be able to enforce the avoidance actions, has a gun with

22   no bullets in it, basically, because what will happen is

23   those proceeds will go directly to, to the secured creditor.

24   It's kind of unfair, because the committee would have done

25   something in the interim to its own benefit, and then there

1   would be no benefit to the unsecured creditors to have that

2   having gone to the secured lender.  I've seen that happen

3   before in case.  It was the <u>Valley Media</u> case that was in

4   front of Judge Walsh.  There was a lot of litigation over

5   that one issue because it basically was something that

6   happened later on where, I mean, the unsecured creditors

7   thought that they had the liens on avoidance actions, and in

8   essence they didn't because of a provision similar to this.

9   I don't think it was exactly like this, but it was a

10  provision similar to this.  I think it was actually in the

11  settlement agreement.  So we would object to that, at least

12  in the interim.  If they want to seek that type of priority

13  claim, just on the proceeds of the avoidance actions, they

14  get the proceeds of the other stuff, that's not a problem.

15  It's just on the avoidance actions.

16          THE COURT: Understood.

17          MR. SCHEPACARTER: I can see that going forward in

18  the final order.  Because again, committee would be here,

19  would be able to weigh in, and do all the things a committee

20  does.  The second issue, and I'll sort of leave the 25 day

21  issue to the, to the end.  It's found on page 25, I believe,

22  of the black line, and it talks about these restrictive

23  clauses.  And the only issue I have with that is that it's

24  sort of notice due process issue.  And I'll allow Your Honor

25  to find that first.  And the issue I have here - - is Your

1    Honor ready to hear that one?

2         THE COURT: Yes.

3         MR. SCHEPACARTER: Okay.  The issue I have here, as

4    I said, is a due process type issue.  Notice issue.  Given

5    the fact that if there are any other leases or contractual

6    agreements to which the Debtor is a party, the, these

7    restrictive clauses, the way I read them, would not be

8    effective against the Debtor and the DIP lender.  So there

9    are some, there would be some third party out there that

10   would have already had the benefit of these restrictive

11   clauses and somehow that those rights would be somehow

12   harmed, or somehow impaired.  And I don't think it's fair to

13   that third party, given the fact that if they're relying on

14   that now somehow that's been trumped, and somehow been

15   impaired without notice to them.  It's almost like having a

16   TRO without having gone through all the factors of seeking a

17   temporary restraining order, and irreparable harm, and the

18   like.  So I don't agree with that provision.  The third, the

19   third provision, again, is the 25 day provision.  The local

20   rule really kicks in with respect to this one.  I had

21   mentioned it earlier before with respect to the bid

22   procedures.  But here is where the local rule really, because

23   it does affect financing orders, it directly discusses these

24   type of orders.

25        THE COURT: Yes.

1          MR. SCHEPACARTER:  As I said before, there is a

2    cost of coming before the Court and being able to have your

3    liens.  And I understand that Adeptio's argument's going to

4    be, and Mr. Brady can make it, but it's going to be that

5    we've only been in for a week, and that there's not much that

6    you can do against Adeptio.  It's the pre-petition lenders.

7    And I understand that, but I think the Committee still has

8    the  opportunity to look at those liens.  To look at whatever

9    Adeptio bought and make sure that the perfection is, has been

10   perfected.  Given the fact that the sales transaction that

11   Adeptio bought it only occurred I think a week or so before

12   the filing of the bankruptcy case.  So I think that the

13   committee should have the full amount of time, 60 to 75 days,

14   60 days from formation, and have the ability to, to look at

15   those liens.  Again, I cite to the local rule that basically

16   says if you want to somehow change those deadlines and change

17   those dates, you have to show extraordinary circumstances.

18   And I've talked, I've heard about the unique nature of this

19   business.  That it doesn't have bricks and mortar, and it is

20   the internet, and it's somewhat of a, I think somebody said a

21   melting ice cube.  But given all of that, I don't know that

22   those are extraordinary circumstances that would allow those

23   deadlines and those dates to be impaired.  Especially with

24   respect to a committee that's just going to get on board,

25   like I said before, within a week, and they're going to have

1    a short period of time to basically, for their counsel to, to

2    get a, up to speed.  Most committees down here, in the

3    District of Delaware, are, are represented by well - -

4    competent counsel.  But given all of that, they still have to

5    do their due diligence, and they still, like I said before,

6    they would be pinned down at the 1 yard line having to go 99

7    yards.  And again, I think they should be given the ball at

8    the 20 yard line, which is basically the norm in this

9    District.  Again, there's a cost of coming to the Bankruptcy

10   Court, and being before this Court, and having the benefits

11   of the process.  The benefits being to be able to have a sale

12   on a fairly quick, quick time frame.  Being able to have all

13   the benefits of the Bankruptcy Code and the graces of this

14   Court.  But at the same time there's a cost being that the

15   liens get investigated, and the credit bid gets investigated,

16   and not just causes of action, but also I think the lien

17   needs to be investigated as well, because if they find some

18   defect in the lien, there's going to be some issues that go

19   back and forth on that.  So I think, like I said before, and

20   I'll, I'll make the argument again, that the 60 days period

21   should be in place in this case, even given the fact that the

22   sale is on a shortened time frame.  Thank you.

23        THE COURT: Thank you, Mr. Schepacarter.  Help me

24   out, Mr. Brady, if you will, with the nullifying pre-petition

25   restrictions provision.

1          MR. BRADY: Yes, Your Honor.  The language is that

2     we're only seeking that to the extent permitted, to the

3     maximum extent permitted under the code or applicable law.

4     So we're, I don't read the order to say that Your Honor is

5     nullifying them unless there's a provision of the Bankruptcy

6     Code or other applicable law that would permit that.  And if

7     this issue becomes an issue, Your Honor would then consider

8     whether they're unenforceable due to any provision of the

9     Code or applicable law.  So we think that is a protection

10    that if, if  someone comes forward and says Your Honor didn't

11    have the right to do this, Your Honor would be able to

12    consider whether you did under the Code or applicable law.

13         THE COURT: Okay.  That's all.  Thank you.

14         MR. BRADY: On the other points, Your Honor, the

15    super priority claim, I did explain.  Again, we think this is

16    a unique situation.  Given the way the business really was

17    cash starved, and the reduced inventory, which led to reduced

18    sales, reduced receivables, there aren't a lot of hard assets

19    there for the $10 million of really rescue financing this

20    company needs immediately to keep operating and to make it

21    through this sale process.  And, again, Your Honor, the

22    investigation period, Mr. Schepacarter's right.  While the

23    local rules suggest a period of 60, it does expressly provide

24    under extraordinary circumstances the Court can approve a

25    different period.  And we think that the Debtors have met

1    that burden of extraordinary circumstances.  Both in terms of

2    the pre-petition marketing effort, the cash burn for the sale

3    process, and given that Adeptio's bid is a credit bid,

4    there's really no effective way to put any teeth in Your

5    Honor's bid procedures order if the Debtor advises Adeptio at

6    the auction it can't value its bid, because the period to

7    challenge the liens has, has not expired.  Adeptio has agreed

8    to give a committee all the way up, Your Honor, until the day

9    before the auction.  Really, at its own prejudice that it

10   could find out the day of the auction that there's a

11   challenge to its liens and the Debtor is not valuing its bid.

12   So we, Adeptio has given as much time as the facts and

13   circumstances of this case will allow, and is prepared to

14   proceed on that basis.

15            THE COURT: Well, let me - -

16            MR. BRADY: And again - -

17            THE COURT: Go on, Mr. Brady.  I'm sorry.

18            MR. BRADY: If the committee comes forward, Your

19   Honor, and, and says there's smoke here, Judge, I need more,

20   we need more time, Your Honor will be free to consider that,

21   and, and then consider this issue in connection with the

22   facts.  But really what Mr. Schepacarter's saying is it's not

23   the norm, and so Your Honor shouldn't look at the

24   extraordinary facts of this case, you should simply grant the

25   norm.

1          THE COURT: Well, I, I always appreciate the US

2    Trustee's position at these hearings, because they are in

3    fact representing that committee that's not yet been formed.

4    Future beneficiary, if you will.  So I appreciate that.  But

5    I have a couple of concerns.  Look.  I'm having a little bit

6    of difficulty seeing how the case is going to serve the

7    benefit of anyone other than Adeptio.  And to that extent, I

8    have to question really why Adeptio isn't willing to at least

9    create some potential benefit for unsecured creditors.  And

10   secondly, let me just throw out my second point.  We're

11   talking about a credit bid.  Well, Adeptio may not have to,

12   if you will, bid its entire credit amount.  Because we don't

13   know what the other bids are going to be.  In order to defeat

14   a, you know, a alternative bid, it may only be required to

15   bid in a portion of its credit.  And I'm just wondering why

16   we can't at least have a provision that would allow a longer

17   period of time for the committee to investigate the liens

18   beyond, beyond which Adeptio is bidding.

19          MR. BRADY: Well, Your - -

20          THE COURT: That's, I mean, I'm trying to come up

21   with a resolution, because I'm uncomfortable with the

22   provisions in the DIP.

23          MR. BRADY: I understand, Your Honor.  Because as

24   we've discussed, this is, this is not the norm.  But first on

25   the, on the benefit to unsecured creditors.  Again, the

1    Debtor was unable to locate anyone prepared to put money into

2    this company and - -

3         THE COURT: Yes.

4         MR. BRADY:  - - Adeptio's prepared to put in $25

5    million.  The APA, the work on the APA has been done, as Mr.

6    Califano said, significant work.  There's now a structure of

7    the deal.  There are, the schedules are in place for other

8    participants to benefit from, as they want to engage in this

9    process.  But the sale, the APA that Adeptio has put in does

10   provide for other bids outside of just the credit bid.  It

11   again, the cure claims, Your Honor.  It's picking up cure

12   claims, and anticipates taking the assignment of a large

13   number of the agreements.  The agreements necessary to run

14   the business.  And so those contract parties would be

15   benefitted by the sale.  It is - -

16        THE COURT: Those, those creditors, if you will.

17        MR. BRADY: That's correct.  It assumes the trade,

18   those parties that continue to do business with the Debtor

19   post-petition, recognize with this bid in place not only is

20   there 25 million in post-petition financing, but there is an

21   assumption of any liabilities, trade liabilities by the

22   buyer.  So they're protected.  And continue to do business.

23   There are the employees.  Those employees who may, with the

24   company's financial condition, wonder if they have a job, now

25   see a buyer willing to step up, buy this company, and

1    continue to operate it, and keep those jobs in place.

2    Vendors will continue to have a customer.  That is the,

3    Adeptio, if it's the winning bidder, will continue to operate

4    this business, and will continue to provide those vendors.

5    So there are a lot of benefits and considerations outside of

6    just the credit bid.  But to the extent a bidder comes

7    forward and bids more, then that, obviously, would provide

8    additional benefits as well to the estate.  This sets the

9    floor for how the creditors could do in this case.  Your

10   Honor, again, I recognize that because, because the process,

11   the timetable has been set by the bid procedures, typically

12   you don't have to get into the investigation period.

13          THE COURT: Right.

14          MR. BRADY: The committee has more time.  But with

15   this credit bid component, it seems very difficult for the

16   Debtor to be able to value this bid.  And if there are other

17   bidders, it's going to make it very hard for the Debtor to

18   determine how to value and select the winning bidder.  And

19   what provides the most value to the estate.  Again, the

20   distinction here is a committee really has to look at the

21   liens, and the liens can be reviewed very quickly.  In fact,

22   you heard evidence, testimony as part of the presentation by

23   the Debtor that Adeptio came in and purchased the pre-

24   petition debt in a total of 2½ weeks.  So they reviewed these

25   liens of the prior lenders, and purchased this debt on a

1    very, very short time table.  The normal causes of action a

2    committee would look at from the pre-petition lenders are

3    still there for the prior lenders.  This does not impact

4    that.

5           THE COURT: Right.

6           MR. BRADY: Adeptio has only been in one week, and

7    as a result, I really think that takes it out of the normal

8    situation of needing 60 days.

9           THE COURT: Thank you Mr. Brady.  All right.  Well,

10   I am persuaded that given the desperate financial condition,

11   the financial terms are certainly excellent for the DIP.  As

12   far as the time by which the investigation has to be

13   completed, I can understand why, having set, in effect, the

14   bid procedures, there has to be a limitation on that period

15   of time, and obviously we are leaving it to some extent,

16   we're leaving a small window open for the committee to come

17   back in and object.  The one thing I'm still very, very hung

18   up on are the, is the super priority claim on the proceeds of

19   avoidance actions, because once again, I don't think that

20   we're leaving anything for unsecured creditors.  And that is

21   something that I put into effect today.  That's just on an

22   interim basis.  Is that just on the interim basis?  Mr.

23   Brady?  That's my understanding.

24          MR. BRADY: Yes, Your Honor.  It would just be for

25   the purposes of the interim order.  It could be revisited as

1    part of the final order.  Though amounts that are loaned

2    during the interim period would - -

3          THE COURT: Yes.

4          MR. BRADY:  - - would have the protections of this

5    order.

6          THE COURT: I understand that.  That I understand.

7    But, all right.  On that basis, and being persuaded that the

8    Debtor has, in fact, made efforts, great efforts to secure

9    other financing, and that the Debtor has exercised reasonable

10   business judgment, I am going to improve the DIP, the interim

11   DIP, and we will see where we go from here on December the,

12   December the, November the 30th, excuse me.

13         MR. CALIFANO: November 30th, Your Honor.

14         THE COURT: As far as the final hearing, as far as

15   the final order is concerned.

16         MR. CALIFANO: Thank you, Your Honor.

17         THE COURT: Anything further?

18         MR. CALIFANO: No, that's it, Your Honor.

19         MR. BRADY: No, Your Honor.

20         THE COURT: I'll take, if you would, if you'll give

21   to me the orders.  Thank you Mr. Sutty.  Thank you, sir.  And

22   I'm going to get these signed and on the docket today.  Oh,

23   thank you, Mr. Sutty.  Thank you, sir.  And we will stand in

24   recess until November 30 unless counsel need to hear from me

25   first.  Thank you.

```
 1               ALL: Thank you, Your Honor.

 2               MR. SUTTY:  Your Honor.

 3               THE COURT: Yes.

 4               MR. SUTTY: (Microphone not recording.)

 5               THE COURT:  Take your time.  Take your time.

 6               MR. MORTON: Your Honor?

 7               THE COURT: Oh, yes.

 8               MR. MORTON: Your Honor, if I may, Edmon Morton from

 9     Young Conaway on the record.

10               THE COURT: Mr. Morton.  Yes.

11               MR. MORTON: It may make sense, I need about five

12     minutes total here while you're signing the other orders.

13               THE COURT: Fine.

14               MR. MORTON: And I think we should be in position.

15          (The remainder of the page is intentionally left blank.)

16

17

18

19

20

21

22

23

24

25
```

1          THE COURT: I'll be back in chambers, and you can

2     just let us know, and we'll get that back to you.

3          MR. MORTON: Thank you very much, Your Honor.

4          THE COURT: Thank you.

5      (Whereupon at 4:40 p.m. the hearing in this matter was

6     concluded for this date.)

7

8

9

10

11

12

13

14

15

16

17

18          I, Jennifer Ryan Enslen, approved transcriber

19     for the United States Courts, certify that the foregoing is a

20     correct transcript from the electronic sound recording of the

21     proceedings in the above entitled matter.

22

23     _/s/Jennifer Ryan Enslen_                    ___12/03/07___
       Jennifer Ryan Enslen
24     43 Bay Boulevard
       Newark, DE 19702
25     (302)836-1905