# EXHIBIT 1

EXECUTION COPY

---

$100,000,000

# CREDIT AGREEMENT

dated as of November 7, 2006

among

InPhonic, Inc.,

THE LENDERS FROM TIME TO TIME PARTY HERETO,

Goldman Sachs Credit Partners L.P.,
as Lead Arranger, Lead Bookrunner and Lead Syndication Agent,

and

Citicorp North America, Inc.,
as Administrative Agent,

---

TABLE OF CONTENTS

Page


ARTICLE I
DEFINITIONS AND ACCOUNTING TERMS

Section 1.01 Defined Terms ....... 1
Section 1.02 Other Interpretative Provisions ....... 24
Section 1.03 Accounting Terms and Determinations. ....... 25
Section 1.04 Times of Day ....... 25

ARTICLE II
THE COMMITMENTS AND LOAN

Section 2.01 The Loans ....... 25
Section 2.02 Prepayments. ....... 26
Section 2.03 Repayment of Loans. ....... 27
Section 2.04 Interest. ....... 27
Section 2.05 Administrative Agent Fees ....... 28
Section 2.06 Computation of Interest and Fees ....... 28
Section 2.07 Evidence of Debt ....... 28
Section 2.08 Payments Generally; Administrative Agent's Clawback. ....... 28
Section 2.09 Sharing of Payments by Lenders ....... 29

ARTICLE III
TAXES, YIELD PROTECTION AND ILLEGALITY

Section 3.01 Taxes. ....... 30
Section 3.02 Increased Costs. ....... 31
Section 3.03 Mitigation Obligations. ....... 32
Section 3.04 Survival ....... 33

ARTICLE IV
CONDITIONS PRECEDENT TO LOANS

Section 4.01 Conditions to Loan ....... 33
Section 4.02 Additional Conditions to Loan ....... 37

ARTICLE V
REPRESENTATIONS AND WARRANTIES

Section 5.01 Existence, Qualification and Power ....... 37
Section 5.02 Authorization; No Contravention. ....... 38
Section 5.03 Governmental Authorization; Other Consents ....... 38
Section 5.04 Binding Effect ....... 38
Section 5.05 Financial Condition; No Material Adverse Effect; No Internal Control Event. ....... 38
Section 5.06 Litigation ....... 39
Section 5.07 No Default ....... 40
Section 5.08 Ownership of Property; Liens; Investments. ....... 40
Section 5.09 Environmental Compliance. ....... 40
Section 5.10 Insurance ....... 41

Table of Contents (cont.)


Page

Section 5.11 Taxes ... 41
Section 5.12 ERISA; Employee Benefit Arrangements. ... 41
Section 5.13 Subsidiaries; Equity Interests; Loan Parties ... 42
Section 5.14 Margin Regulations; Investment Company Act. ... 42
Section 5.15 Disclosure ... 43
Section 5.16 Compliance with Law ... 43
Section 5.17 Intellectual Property ... 43
Section 5.18 Solvency ... 43
Section 5.19 Labor Matters ... 43
Section 5.20 Collateral Documents. ... 44
Section 5.21 No Broker's Fee ... 44

ARTICLE VI
AFFIRMATIVE COVENANTS

Section 6.01 Financial Statements ... 44
Section 6.02 Certificates; Other Information ... 45
Section 6.03 Notices ... 47
Section 6.04 Payment of Obligations ... 48
Section 6.05 Preservation of Existence Etc ... 48
Section 6.06 Maintenance of Properties ... 48
Section 6.07 Maintenance of Insurance ... 49
Section 6.08 Compliance with Laws ... 49
Section 6.09 Books and Records ... 49
Section 6.10 Inspection Rights ... 49
Section 6.11 Use of Proceeds ... 49
Section 6.12 Covenant to Guarantee Obligations and Give Security. ... 49
Section 6.13 Compliance with Environmental Laws ... 52
Section 6.14 Further Assurances ... 52
Section 6.15 Compliance with Terms of Leaseholds and Co-Location Agreement ... 52
Section 6.16 Cash Collateral Accounts ... 52

ARTICLE VII
NEGATIVE COVENANTS

Section 7.01 Restriction on Liens ... 52
Section 7.02 Limitation on Indebtedness ... 54
Section 7.03 Investments ... 56
Section 7.04 Fundamental Changes ... 58
Section 7.05 Dispositions ... 59
Section 7.06 Restricted Payments, etc ... 60
Section 7.07 Change in Nature of Business ... 61
Section 7.08 Transactions with Affiliates ... 61
Section 7.09 Burdensome Agreements ... 61
Section 7.10 Use of Proceeds ... 62
Section 7.11 Financial Covenants ... 62
Section 7.12 Capital Expenditures ... 62
Section 7.13 Amendment of Organizational Documents; Change of Jurisdiction ... 63
Section 7.14 Accounting Changes ... 63
Section 7.15 Prepayments/Amendments of Certain Indebtedness, etc ... 63

Table of Contents (cont.)


Page

Section 7.16 Certain Activities ....63
Section 7.17 Operating Leases ....63
Section 7.18 Sale and Leaseback Transactions ....63
Section 7.19 Limitation on Foreign Operations ....64
Section 7.20 Independence of Covenants ....64

ARTICLE VIII
DEFAULTS

Section 8.01 Events of Default ....64
Section 8.02 Remedies upon Event of Default ....66
Section 8.03 Application of Funds ....67

ARTICLE IX
AGENCY PROVISIONS

Section 9.01 Appointment and Authority. ....67
Section 9.02 Rights as a Lender ....68
Section 9.03 Exculpatory Provisions ....68
Section 9.04 Reliance by Administrative Agent ....69
Section 9.05 Delegation of Duties ....69
Section 9.06 Resignation of Administrative Agent ....69
Section 9.07 Non-Reliance on Administrative Agent and Other Lenders ....70
Section 9.08 Reserved. ....70
Section 9.09 Administrative Agent May File Proofs of Claim ....70
Section 9.10 Collateral and Guaranty Matters ....70

ARTICLE X
MISCELLANEOUS

Section 10.01 Amendments, Etc. ....71
Section 10.02 Notices; Effectiveness; Electronic Communication. ....72
Section 10.03 No Waiver; Cumulative Remedies ....74
Section 10.04 Expenses; Indemnity; Damage Waiver ....74
Section 10.05 Payments Set Aside ....75
Section 10.06 Successors and Assigns. ....76
Section 10.07 Treatment of Certain Information; Confidentiality ....79
Section 10.08 Right of Setoff ....80
Section 10.09 Interest Rate Limitation ....80
Section 10.10 Counterparts; Integration; Effectiveness ....80
Section 10.11 Survival of Representations and Warranties ....81
Section 10.12 Severability ....81
Section 10.13 Replacement of Lenders ....81
Section 10.14 Governing Law; Jurisdiction Etc. ....82
Section 10.15 Waiver of Jury Trial ....82
Section 10.16 No Advisory or Fiduciary Responsibility ....83
Section 10.17 USA Patriot Act Notice ....83
Section 10.18 Entire Agreement ....83




ffny03\creedsh\671924.13

## Table of Contents (cont.)

Page

Schedules:


Schedule 1.01 - Refinanced Agreements
Schedule 1.01(b) - Carried Residual Payments
Schedule 2.01 - Commitments and Applicable Percentage
Schedule 5.02 - Contracts
Schedule 5.03 - Certain Authorizations
Schedule 5.05 - Supplement to Interim Financial Statements
Schedule 5.06 - Litigation
Schedule 5.08(b) - Existing Liens
Schedule 5.08(c) - Owned Real Property
Schedule 5.08(d)(i) - Leased Real Property (Lessee)
Schedule 5.08(d)(ii) - Leased Real Property (Lessor)
Schedule 5.08(e) - Existing Investments
Schedule 5.09 - Environmental Matters
Schedule 5.12 - Certain ERISA Matters
Schedule 5.13 - Subsidiaries and Other Equity Investments; Loan Parties
Schedule 5.17 - Intellectual Property Matters
Schedule 6.12 - Guarantors
Schedule 7.01 - Existing Liens
Schedule 7.02 - Existing Indebtedness
Schedule 7.09 - Burdensome Agreements
Schedule 10.02 - Administrative Agent's Office; Certain Addresses for Notices


Exhibits:


Exhibit A – Form of Committed Loan Notice

Exhibit B – Form of Note

Exhibit C – Form of Assignment and Assumption

Exhibit D – Form of Compliance Certificate

Exhibit E-1 – Form of Opinion of Counsel for the Borrower and the Other Loan Parties

Exhibit E-2 – Form of Opinion of the General Counsel of the Borrower

Exhibit F – Form of Guaranty

Exhibit G-1 – Form of Security Agreement
Exhibit G-2 Form of Pledge Agreement
Exhibit G-3 – Form of Perfection Certificate
Exhibit G-4 – Form of Mortgage
Exhibit G-5 – Form of Leasehold Mortgage

Exhibit H – Form of Loan Party Accession Agreement

Exhibit I – Form of Solvency Certificate

# CREDIT AGREEMENT

This Credit Agreement ("Agreement") is entered into as of November 7, 2006, among InPhonic, Inc., a Delaware corporation (the "Borrower"), each lender from time to time party hereto (collectively, the "Lenders" and, individually, a "Lender"), and Citicorp North America, Inc., as Administrative Agent (in such role, the "Administrative Agent").

The Borrower has requested that the Lenders extend credit on the terms and conditions set forth herein. The Lenders are willing to make the requested credit facility available on the terms and conditions set forth herein. Accordingly, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

**Section 1.01 Defined Terms**. As used in this Agreement, the following terms have the meanings set forth below:

"Accession Agreement" means a Loan Party Accession Agreement, substantially in the form of Exhibit H hereto, executed and delivered by an Additional Subsidiary Guarantor after the Closing Date in accordance with Section 6.12(a).

"Account Control Agreement" has the meaning assigned to such term in the Security Agreement.

"Additional Subsidiary Guarantor" means each Person that becomes a Subsidiary Guarantor after the Closing Date by execution of an Accession Agreement as provided in Section 6.12.

"Administrative Agent" means Citicorp North America, Inc. in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified; provided, however, that the Goldman Sachs Group, Inc. and its Affiliates (including Goldman Sachs & Co. and Goldman Sachs Credit Partners) shall not be considered an Affiliate of any Loan Party.

"Agreement" means this Credit Agreement.

"Applicable Percentage" means, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Facility represented by the principal amount of such Lender's Loans at such time.

"Approved Fund" means any Fund that is administered or managed by (i) a Lender, (ii) an Affiliate of a Lender or (iii) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignee Group" means two or more Eligible Assignees that are Affiliates of one another or two or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b)), and accepted by the Administrative Agent, in substantially in the form of Exhibit C-1 hereto or any other form approved by the Administrative Agent.

"Attributable Indebtedness" means, at any date, (i) in respect of any Capital Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, (ii) in respect of any Synthetic Lease Obligation of any Person, the capitalized or principal amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease or other agreement were accounted for as a Capital Lease, (iii) in respect of any Sale/Leaseback Transaction, the present value, discounted in accordance with GAAP at the interest rate implicit in the related lease, of the obligations of the lessee for net rental payments over the remaining term of such lease (including any period for which such lease has been extended or may, at the option of the lessor be extended) and (iv) all Synthetic Debt of such Person.

"Audited Financial Statements" means the audited consolidated balance sheet of the Borrower and its Consolidated Subsidiaries for the fiscal year ended December 31, 2005, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year of the Borrower and its Consolidated Subsidiaries, including the notes thereto.

"Availability Period" means the period from and including the Closing Date to the earliest of (A) the Maturity Date, (B) the date of termination of the Commitments pursuant to Section 8.02 and (C) the date that falls 90 days after the Closing Date.

"Borrower" means InPhonic, Inc. and its successors.

"Borrower Materials" has the meaning specified in Section 6.02.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Borrower's chief executive office or the Administrative Agent's Office is located.

"Capital Lease" of any Person means any lease of (or other arrangement conveying the right to use) property (whether real, personal or mixed) by such Person as lessee which would, in accordance with GAAP, be required to be accounted for as a capital lease on the balance sheet of such Person.

"Capital Lease Obligations" means, with respect to any Person, all obligations of such Person as lessee under Capital Leases, in each case taken at the amount thereof accounted for as liabilities in accordance with GAAP.

"Carried Residual Payments" means the amount of residual based revenue recognized in accordance with GAAP for the given quarterly period and as defined more precisely in Schedule 1.01B.

"Cash Collateral Account" means a deposit or securities account of the Borrower at Goldman, Sachs & Co. or one of its Affiliates, as to which the Administrative Agent for the benefit of the Secured Parties has a first priority, perfected security interest and otherwise established in a manner satisfactory to the Administrative Agent and the Required Lenders.

"Cash Equivalents" means any of the following types of Investments, to the extent owned by the Borrower or any of its Subsidiaries free and clear of all Liens (other than Liens created under the Collateral Documents):

(i) readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 90 days from the date of acquisition thereof; provided that the full faith and credit of the United States of America is pledged in support thereof;

(ii) time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (A) (x) is a Lender or (y) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (B) issues (or the parent of which issues) commercial paper rated as described in clause (iii) of this definition and (C) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than 90 days from the date of acquisition thereof;

(iii) commercial paper or auction rate securities issued by any Person not an Affiliate of the Borrower organized under the laws of any state of the United States of America and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than 180 days from the date of acquisition thereof; and

(iv) Investments, classified in accordance with GAAP as current assets of the Borrower or any of its Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, which are administered by any Lender or their Affiliates or financial institutions that have the highest rating obtainable from either Moody's or S&P, and the portfolios of which are limited substantially to Investments of the character, quality and maturity described in clauses (i), (ii) and (iii) of this definition.

"Casualty" means any casualty, loss, damage, destruction or other similar loss with respect to real or personal property or improvements.

"Casualty Insurance Policy" means any insurance policy maintained by any Group Company covering losses with respect to Casualties.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980.

"CERCLIS" means the Comprehensive Environmental Response, Compensation and Liability Information System maintained by the U.S. Environmental Protection Agency.

"CFC" means a Person that is a controlled foreign corporation under Section 957 of the Code.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (i) the adoption or taking effect of any law, rule, regulation or treaty, (ii) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (iii) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"Change of Control" means the occurrence of any of the following events:

(v) any "person" or "group" (as such terms are used in Section 13(d) and 14(d) of the Exchange Act) (other than any Permitted Investor) has become the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that a person or group shall be deemed to have "beneficial ownership" of all securities that any such person or group has the right to acquire, whether such right is exercisable immediately or only after the passage of time (such right, an "option right")), directly or indirectly, by way of merger, consolidation or otherwise, of 25% or more of the Voting Securities of the Borrower on a fully-diluted basis after giving effect to the conversion and exercise of all outstanding Equity Equivalents (whether or not such securities are then currently convertible or exercisable and talking into account all such securities that such "person" or "group" has the right to acquire pursuant to any option right); or

(vi) during any period of 12 consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Borrower ceases to be composed of individuals (A) who were members of that board or equivalent governing body on the first day of such period, (B) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (A) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (C) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (A) and (B) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body (excluding, in the case of both clause (B) and clause (C), any individual whose initial nomination for, or assumption of office as, a member of that board or equivalent governing body occurs as a result of an actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors); or

(vii) any Person or two or more Persons acting in concert (other than any Permitted Investor) shall have acquired by contract or otherwise, or shall have entered into a contract or arrangement that, upon consummation thereof, will result in its or their acquisition of the power to exercise, directly or indirectly, a controlling influence over the management or policies of the Borrower, or control over the Voting Securities of the Borrower on a fully-diluted basis (and taking into account all such securities that such Person or Persons have the right to acquire pursuant to any option right) representing 25% or more of the Voting Securities of the Borrower; or

(viii) a "Rule 13e-3 transaction" within the meaning of Rule 13e-3 of the General Rules and Regulations under the Securities Exchange Act of 1934 shall occur, or the Borrower is no longer required to file periodic reports under Section 13(a) or 15(d) of the Exchange Act; or

(ix) a "change of control" or comparable term in any document pertaining to any Permitted Subordinated Indebtedness with an aggregate outstanding principal amount in excess of the Threshold Amount occurs.

"Closing Date" means November 7, 2006.

"Closing Date Commitment" means as to each Closing Date Lender, its obligation to make a Loan to the Borrower pursuant to Section 2.01 in an aggregate principal amount at any one time outstanding not to exceed the amount requested by the Borrower prior to the Closing Date and set forth opposite such Lender's name on Schedule 2.01 under the caption "Closing Date Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Closing Date Lender" means each Lender making a Loan to the Borrower on the Closing Date.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means all of the "Collateral" referred to in the Collateral Documents and all of the other property and assets that are or are required under the terms hereof or of the Collateral Documents to be subject to Liens in favor of the Administrative Agent for the benefit of the Secured Parties.

"Collateral Documents" means, collectively, the Security Agreement, the Pledge Agreement, the Depositary Bank Agreement, the Secured Cash Management Agreement, each Mortgage, any Additional Collateral Documents, any additional pledges, security agreements, patent, trademark or copyright filings or mortgages that create or purport to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties and any instruments of assignment, control agreements, lockbox letters or other instruments or agreements executed pursuant to the foregoing.

"Commitment" means, as to each Lender, the sum of its Closing Date Commitment and its Delayed Draw Commitment, in any event not to exceed for all Lenders an aggregate of $100,000,000.

"Compliance Certificate" means a certificate substantially in the form of Exhibit D.

"Condemnation" means any taking by a Governmental Authority of property or assets, or any part thereof or interest therein, for public or quasi-public use under the power of eminent domain, by reason of any public improvement or condemnation or in any other manner.

"Condemnation Award" means all proceeds of any Condemnation or transfer in lieu thereof.

"Consolidated Capital Expenditures" means, with respect to any Person for any period, the aggregate amount of all expenditures (whether paid in cash or other consideration or accrued as a liability) that would, in accordance with GAAP, be included as additions to property, plant and equipment and other capital expenditures of such Person and its Consolidated Subsidiaries for such period, as the same are or would be set forth in a consolidated statement of cash flows of such Person and its Consolidated Subsidiaries for such period (including the amount of assets leased under any Capital Lease), but excluding (to the extent that they would otherwise be included):

(i) any such expenditures made for the replacement or restoration of assets to the extent paid for by any Casualty Insurance Policy or Condemnation Award with respect to the asset or assets being replaced or restored to the extent such expenditures are permitted under the Loan Documents;

(ii) for purposes of Section 7.12 only, capital expenditures for Permitted Acquisitions; and

(iii) the purchase price of equipment that is purchased substantially contemporaneously with the trade-in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for the equipment being traded in at such time.

"Consolidated EBITDA" means at any date, with respect to any Person and its Subsidiaries, the sum of:

(i) Consolidated Net Income for the relevant period excluding therefrom (x) any extraordinary items of gain and (y) any gain from discontinued operations; plus

(ii) without duplication, those amounts which, in the determination of Consolidated Net Income for such period, have been deducted for:

(A) Consolidated Interest Expense;

(B) provisions for Federal, state, local and foreign income, value added and similar taxes;

(C) depreciation, amortization (including, without limitation, amortization of goodwill and other intangible assets), impairment of goodwill and other non-recurring non-cash charges or expenses (excluding any such non-cash charge or expense to the extent that it represents amortization of a prepaid cash expense that was paid in a prior period or an accrual of, or a reserve for, cash charges or expenses in any future period and any such charge that results from the write-down or write-off of inventory); and

(D) non-cash compensation expense, or other non-cash expenses or charges, arising from the granting of stock options, the granting of stock appreciation rights and similar arrangements (including any repricing, amendment, modification, substitution or change of any such stock option, stock appreciation rights or similar arrangements); and

(E) one-time charges occurring no more than one time per fiscal year for restructurings, settlements of pending or threatened litigation or governmental investigations and losses from discontinued operations not to exceed in the aggregate $10,000,000 during any period of four fiscal quarters; minus

(iii) any amount which, in the determination of Consolidated Net Income for such period, has been added for (A) interest income and (B) any non-cash income or non-cash gains, all as determined in accordance with GAAP; minus

(iv) the aggregate amount of cash payments made during such period in respect of any non-cash accrual, reserve or other non-cash charge or expense accounted for in a prior period which were added to Consolidated Net Income to determine Consolidated EBITDA for such prior period and which do not otherwise reduce Consolidated Net Income for the current period.

For purposes of calculating Consolidated EBITDA for any fiscal quarter, if during such fiscal quarter (or in the case of pro-forma calculations, during the period from the last day of such fiscal quarter to and including the date as of which such calculation is made) any Group Company shall have made a Material Asset Disposition or a Material Permitted Acquisition, Consolidated EBITDA for such fiscal quarter shall be calculated after giving effect thereto on a Pro-Forma Basis. As used in this definition, "Material Permitted Acquisition" means any Permitted Acquisition which involves consideration in excess of $5,000,000, and "Material Asset Disposition" means any Disposition or series of related Dispositions that (i) involves assets comprising all or substantially all of an operating unit of a business or constitutes all or substantially all of the common stock of a Subsidiary and (ii) yields gross proceeds to any Group Company in excess of $5,000,000.

"Consolidated Interest Expense" means at any date, with respect to any Person and its Subsidiaries, the total interest expense of such Person and its Consolidated Subsidiaries for the most recently completed fiscal quarter, whether paid or accrued, (including, without limitation, amortization of debt issuance costs, including the Warrants, and original issue discount, non-cash interest payments, the interest component of any deferred payment obligations and the interest component of all payments under Capital Leases), all commissions, discounts and other fees and charges owed with respect to bankers' acceptances).

"Consolidated Net Income" means at any date, with respect to any Person and its Subsidiaries, the net income (or net loss) after taxes of such Person and its Consolidated Subsidiaries for the most recently completed fiscal quarter, determined on a consolidated basis in accordance with GAAP; provided that there shall be excluded from the calculation of Consolidated Net Income for such period (i) the income (or loss) of any Person in which any other Person (other than such Person or any of its Wholly-Owned Consolidated Subsidiaries) has an ownership interest, except to the extent that any such income is actually received in cash by such Person or such Wholly-Owned Consolidated Subsidiary in the form of Restricted Payments during such period, (ii) the income (or loss) of any Person accrued prior to the date it becomes a Consolidated Subsidiary of such Person or is merged with or into or consolidated with such Person or any of its Consolidated Subsidiaries or that Person's assets are acquired by such Person or any of its Consolidated Subsidiaries, except as provided in the definitions of "Consolidated EBITDA" and "Pro-Forma Basis" herein and (iii) the income of any Subsidiary of such Person to the extent that the declaration or payment of Restricted Payments or similar distributions by that Subsidiary of that income is not at the time permitted by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulation applicable to that Subsidiary.

"Consolidated Subsidiary" means with respect to any Person at any date any Subsidiary of such Person or other entity the accounts of which would be consolidated with those of such Person in its consolidated financial statements if such statements were prepared as of such date in accordance with GAAP.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise; provided, however, that in the case of the Borrower and its Subsidiaries beneficial ownership of 10% or more of the aggregate outstanding Voting Securities of such Personal shall be deemed to constitute control. "Controlling" and "Controlled" have meanings correlative thereto.

"Debt Equivalents" of any Person means (i) any Equity Interest of such Person which by its terms (or by the terms of any security for which it is convertible or for which it is exchangeable or exercisable), or upon the happening of any event or otherwise (including an event which would constitute a Change of Control), (A) matures or is mandatorily redeemable or subject to any mandatory repurchase requirement, pursuant to a sinking fund or otherwise, in whole or in part, on or prior to the first anniversary of the Maturity Date, (B) is convertible into or exchangeable for Indebtedness or Debt Equivalents or (C) is redeemable or subject to any repurchase requirement arising at the option of the holder thereof, in whole or in part, on or prior to the first anniversary of the Maturity Date and (ii) if such Person is a Subsidiary of the Borrower, any Preferred Stock of such Person.

"Debt Issuance" means the issuance by any Group Company of any Indebtedness.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means an interest rate equal to (A) the Interest Rate plus (B) 2.00% per annum.

"Delayed Draw Commitment" means as to any Delayed Draw Lender, its obligation, subject to the terms and conditions hereof (including Section 10.06(h)), to make a Loan to the Borrower pursuant to Section 2.01 in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 under the caption "Delayed Draw Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Delayed Draw Lender" means each Lender with a Delayed Draw Commitment to make a Loan to the Borrower after the Closing Date and prior to the termination of the Availability Period (subject to the terms and conditions hereof (including Section 10.06(h))).

"Depositary Bank Agreement" means an agreement between a Loan Party and any bank or other depositary institution, substantially in the form of Exhibit D to the Security Agreement, as the same may be amended, modified or supplemented from time to time.

"Deposit Account" has the meaning assigned to such term in the Security Agreement.

"Disclosed Litigation" has the meaning specified in Section 5.06.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition of any property by any Person (including any Sale/Leaseback Transaction and any sale of Equity Interests, but excluding any issuance by such Person of its own Equity Interests), including any sale, assignment,

transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Dollars" and "$" means lawful money of the United States of America.

"Domestic Subsidiary" means with respect to any Person each Subsidiary of such Person that is organized under the laws of the United States or any political subdivision thereof, and "Domestic Subsidiaries" means any two or more of them.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 10.06(b)(iii), (v) and (vi) (subject to such consents, if any, as may be required under Section 10.06(b)(iii)).

"Employee Benefit Arrangements" means in any jurisdiction the benefit schemes or arrangements in respect of any employees or past employees operated by any Group Company or in which any Group Company participates and which provide benefits on retirement, ill-health, injury, death or voluntary withdrawal from or termination of employment, including termination indemnity payments and life assurance and post-retirement medical benefits, other than Plans.

"Environmental Laws" means any and all Federal, state, local, and foreign statutes, Laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of remediation, fines, penalties or indemnities), of any Group Company directly or indirectly resulting from or based on (i) violation of any Environmental Law, (ii) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Material, (iii) exposure to any Hazardous Material, (iv) the release or threatened release of any Hazardous Material into the environment or (v) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"Equipment" has the meaning specified in Section 1.01 of the Security Agreement.

"Equity Equivalents" means with respect to any Person any rights, warrants, options, convertible securities, exchangeable securities, indebtedness or other rights, in each case exercisable for or convertible or exchangeable into, directly or indirectly, Equity Interests of such Person or securities exercisable for or convertible or exchangeable into Equity Interests of such Person, whether at the time of issuance or upon the passage of time or the occurrence of some future event.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or

nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means: (i) a Reportable Event with respect to a Pension Plan; (ii) a withdrawal by the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (iii) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (iv) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (v) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (vi) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate.

"Event of Default" has the meaning specified in Section 8.01.

"Excess Cash Flow" means the amount equal to (a) cash flows generated/lost from operations, minus (b) cash provided from/used in investment activities, in each case of the Borrower and its consolidated subsidiaries for the relevant year.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (i) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its Lending Office is located, (ii) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which the Borrower is located and (iii) in the case of a Foreign Lender, any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lending Office) or is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with Section 3.01(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 3.01(a).

"Existing Debt" has the meaning specified in Section 7.02(iii).

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person not in the ordinary course of business, including pension plan reversions, Condemnation Awards (and payments in lieu thereof) and indemnity payments; provided that (i) with respect to cash receipts or payments relating to damage to equipment used or useful in the business of such Person, "Extraordinary

Receipt" shall mean such cash to the extent it exceeds amount actually expended to replace such equipment, and (ii) with respect to cash receipts or payments provided by the landlord of space rented by the Company or its Subsidiaries, "Extraordinary Receipt" shall mean such cash to the extent it exceeds amounts actually expended to refurbish, construct, or acquire improvements to such leased space.

"Facility" means, at any time (i) during the Availability Period, the sum of (A) the aggregate amount of Commitments at such time and (B) the aggregate principal amount of all Loans outstanding at such time, and (ii) thereafter, the aggregate principal amount of the Loans outstanding at such time.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (i) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to the Administrative Agent on such day on such transactions as determined by the Administrative Agent.

"Foreign Subsidiary" means with respect to any Person any Subsidiary of such Person that is not a Domestic Subsidiary of such Person.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is a resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Plan" has the meaning specified in Section 5.12(d).

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central bank).

"Group Company" means any of the Borrower or any of its Subsidiaries (regardless of whether or not consolidated with the Borrower for purposes of GAAP), and "Group Companies" means all of them, collectively.

"Guarantee" means, with respect to any Person, without duplication, any obligation (other than endorsements in the ordinary course of business of negotiable instruments for deposit or

collection) guaranteeing, intended to guarantee, or having the economic effect of guaranteeing, any Indebtedness or other obligation of any other Person in any manner, whether direct or indirect, and including, without limitation, any obligation, whether or not contingent, (i) to purchase any such Indebtedness or other obligation or any property constituting security therefor, (ii) to advance or provide funds or other support for the payment or purchase of such Indebtedness or obligation or to maintain working capital, solvency or other balance sheet condition of such other Person (including, without limitation, maintenance agreements, comfort letters, take or pay arrangements, put agreements or similar agreements or arrangements) for the benefit of the holder of Indebtedness or other obligation of such other Person, (iii) to lease or purchase property, securities or services primarily for the purpose of assuring the owner of such Indebtedness or other obligation or (iv) to otherwise assure or hold harmless the owner of such Indebtedness or obligation against loss in respect thereof. The amount of any Guarantee hereunder shall (subject to any limitations set forth therein) be deemed to be an amount equal to the outstanding principal amount (or maximum principal amount, if larger) of the Indebtedness or other obligation in respect of which such Guarantee is made.

"Guarantors" means, collectively, the Subsidiaries of the Borrower listed on Schedule 5.13 and each other Subsidiary of the Borrower that shall be required to execute and deliver an Accession Agreement or other guaranty or guaranty supplement pursuant to Section 6.12.

"Guaranty" means, collectively, the Guaranty made by the Guarantors in favor of the Secured Parties, substantially in the form of Exhibit F, together with each other guaranty and guaranty supplement delivered pursuant to Section 6.12.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environment Law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(i) all obligations of such Person for borrowed money;

(ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(iii) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person to the extent of the value of such property (other than customary reservations or retentions of title under agreements with suppliers entered into in the ordinary course of business);

(iv) all obligations, other than intercompany items, of such Person to pay the deferred purchase price of property or services (other than trade accounts payable and accrued expenses arising in the ordinary course of business and due within four months of the incurrence thereof);

(v) the Attributable Indebtedness of such Person in respect of Capital Lease Obligations, Sale/Leaseback Transactions and Synthetic Lease Obligations (regardless of whether accounted for as indebtedness under GAAP);

(vi) all obligations of such Person to purchase securities or other property which arise out of or in connection with the sale of the same or substantially similar securities or property;

(vii) all obligations, contingent or otherwise, of such Person to reimburse any bank or other Person in respect of amounts paid under a letter of credit, bankers' acceptance or similar instrument;

(viii) all obligations of others secured by (or for which the holder of such obligations has an existing right, contingent or otherwise, to be secured by) a Lien on, or payable out of the proceeds of production from, any property or asset of such Person, whether or not such obligation is assumed by such Person; provided that the amount of any Indebtedness of others that constitutes Indebtedness of such Person solely by reason of this clause (viii) shall not for purposes of this Agreement exceed the greater of the book value or the fair market value of the properties or assets subject to such Lien;

(ix) all Guarantees of such Person with respect to any other Indebtedness;

(x) all Debt Equivalents of such Person; and

(xi) the Indebtedness of any other Person (including any partnership in which such Person is a general partner and any unincorporated joint venture in which such Person is a joint venturer) to the extent such Person would be liable therefor under applicable Law or any agreement or instrument by virtue of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such person shall not be liable therefor;

provided that Indebtedness shall not include (A) deferred compensation arrangements, (B) earn-out obligations until matured or earned or (C) non-compete or consulting obligations incurred in connection with Permitted Acquisitions.

"Indemnified Taxes" means taxes other than Excluded Taxes.

"Indemnitee" has the meaning specified in Section 10.04(b).

"Information" has the meaning specified in Section 10.07.

"Insurance Proceeds" means all insurance proceeds (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), damages, awards, claims and rights of action with respect to any Casualty.

"Interest Payment Date" means the last Business Day of each March, June, September and December and the Maturity Date.

"Interest Rate" means 9.00% per annum.

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, the Borrower's internal controls over financial reporting, in each case as described in the Securities Laws.

"Inventory" has the meaning specified in Section 1.01 of the Security Agreement.

"Investment" in any Person means (i) the acquisition (whether for cash, property, services, assumption of Indebtedness, securities or otherwise and in one transaction or a series of transactions) of assets, Equity Interests, Equity Equivalents, Debt Equivalents, Indebtedness or other securities of such Person, (ii) any deposit with, or advance, loan or other extension of credit to or for the benefit of such Person (other than deposits made in connection with the purchase of equipment or inventory in the ordinary course of business) or (iii) any other capital contribution to or investment in such Person, including by way of Guarantee of any obligation of such Person, any support for a letter of credit issued on behalf of such Person incurred for the benefit of such Person or in the case of any Subsidiary of the Borrower, any release, cancellation, compromise or forgiveness in whole or in part of any Indebtedness owing by such Person. The outstanding amount of any Investment shall be deemed to equal the difference of (i) the aggregate initial amount of such Investment less (ii) all returns of principal thereof or capital with respect thereto and all dividends and other distributions of income received in respect thereof and all liabilities expressly assumed by another Person (and with respect to which the Borrower and its Subsidiaries, as applicable, shall have received a novation) in connection with the sale of such Investment.

"IP Rights" has the meaning specified in Section 5.17.

"Joint Venture" means (i) any Person which would constitute an "equity method investee" of the Borrower or any of its Subsidiaries, (ii) any other Person designated by the Borrower in writing to the Administrative Agent (which designation shall be irrevocable) as a "Joint Venture" for purposes of this Agreement and at least 50% but less than 100% of whose Equity Interests are directly owned by the Borrower or any of its Subsidiaries and (iii) any Person in whom the Borrower or any of its Subsidiaries beneficially owns any Equity Interest that is not a Subsidiary.

"Landlord Consent and Estoppel" means with respect to any Material Real Property, a letter, certificate or other instrument in writing from the lessor under the related lease, satisfactory in form and substance to the Administrative Agent, pursuant to which such lessor agrees, for the benefit of the Administrative Agent, (i) that without any further consent of such lessor or any further action on the part of the Loan Party holding such Material Real Property, such Material Real Property may be encumbered pursuant to a Mortgage and may be assigned to the purchaser at a foreclosure sale or in a transfer in lieu of such a sale (and to a subsequent third party assignee if the Administrative Agent, any Lender or an Affiliate of either so acquires such Material Real Property), (ii) that such lessor shall not terminate such lease as a result of a default by such Loan Party thereunder without first giving the Administrative Agent notice of such default and at least 60 days (or, if such default cannot reasonably be cured by the Administrative Agent within such period, such longer period as may reasonably be required) to cure such default and (iii) to such other matters relating to such Material Real Property as the Administrative Agent may request.

"Laws" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directives, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of Law.

"Leaseholds" means with respect to any Person all of the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, buildings, improvements and/or fixtures.

"Lender" means each bank or other lending institution listed on Schedule 2.01, each Eligible Assignee that becomes a Lender pursuant to Section 10.06(b), and their respective successors.

"Lending Office" means with respect to any Lender, the "Lending Office" of such Lender (or of an Affiliate of such Lender) designated in such Lender's Administrative Questionnaire or in any applicable Assignment and Assumption pursuant to which such Lender became a Lender hereunder or such other office of such Lender (or of an Affiliate of such Lender) as such Lender may from time to time specify to the Administrative Agent and the Borrower as the office by which its Loans are to be made and maintained.

"Lien" means any security interest, mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to Real Property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Loan" means an advance by any Lender to the Borrower under Article II under the Facility.

"Loan Documents" means, collectively, this Agreement, the Notes, the Guaranty, the Collateral Documents, the Perfection Certificate and each Accession Agreement.

"Loan Party" means each of the Borrower and each Subsidiary Guarantor, and "Loan Parties" means any combination of the foregoing.

"Make-Whole Premium" means, with respect to any prepayment of Loans, an amount equal to (i) the present value of the remaining payments of interest on and principal of the Loans being prepaid, assuming prepayment of such principal amount on the 3 year anniversary of the Closing Date at par, and using an annual discount factor (applied quarterly) equal to the applicable Treasury Rate plus 0.50% per annum less (ii) the principal of the Loan being prepaid; provided, however, that in no case shall the Make-Whole Premium be less than zero. For purposes of this definition, "Treasury Rate" means a rate equal to the then current yield to maturity on the most actively traded U.S. Treasury security having a maturity nearest the 3 year anniversary of the Closing Date.

"Margin Stock" means "margin stock" as such term is defined in Regulation U.

"Material Adverse Effect" means (i) any material adverse effect upon the business, assets, condition (financial or otherwise) or results of operations of the Borrower and its Consolidated Subsidiaries, taken as a whole, (ii) a material impairment of the ability of the Borrower or the Loan Parties, taken as a whole, to perform any of its or their obligations under any Loan Document to which it is a party, (iii) a material impairment of the rights and remedies of the Lenders under the Loan Documents taken as a whole or (iv) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Documents to which it is a party.

"Material Real Property" means (i) (a) any fee-owned Real Property having a fair market value in excess of $250,000 as of the date of the acquisition thereof and (b) all Leaseholds other than those with respect to which the aggregate payments under the terms of the lease are less than $250,000 per year, or (ii) any Real Property that the Administrative Agent or the Required Lenders have determined in their reasonable judgment is material to the business, operations properties, assets or condition (financial or otherwise) of the Borrower and its Subsidiaries taken as a whole.

"Maturity Date" means November 7, 2011; provided, however, that if such date is not a Business Day, the Maturity Date shall be the next preceding Business Day.

"Minimum Cash Collateral Amount" has the meaning specified in Section 7.11(b).

"Moody's" means Moody's Investors Service, Inc., a Delaware corporation, and its successors or, absent any such successor, such nationally recognized statistical rating organization as the Borrower and the Administrative Agent may select.

"Mortgage" means (i) in the case of owned real property interests, a mortgage or deed of trust, substantially in the form of, or otherwise substantially identical in substance to, the provisions of Exhibit G-4 hereto, among any Loan Party, the Administrative Agent and one or more trustees, as the same may be amended, modified or supplemented from time to time, or (ii) in the case of a Leasehold, a Leasehold mortgage or Leasehold deed of trust, substantially in the form of, or otherwise substantially identical in substance to, the provisions of Exhibit G-4 hereto, among any Loan Party, the Administrative Agent and one or more trustees, as the same may be amended, modified or supplemented from time to time.

"Mortgaged Property" means any Real Property of a Group Company that is (or is required to be) subject to a Mortgage.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Cash Proceeds" means:

(i) with respect to the Disposition of any asset by any Group Company, any Casualty or any Condemnation, the excess, if any, of (A) the sum of cash and Cash Equivalents received in connection with such Disposition, Casualty or Condemnation (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received and, with respect to any Casualty or Condemnation, any Insurance Proceeds or Condemnation Awards actually received by or paid to or for the account of such Group Company) over (B) the sum of (1) the principal amount of any Indebtedness that is secured by the asset subject to such Disposition, Casualty or Condemnation and that is repaid in connection with such Disposition, Casualty or Condemnation (other than Indebtedness under the Loan Documents), (2) the out-of-pocket expenses (including attorneys' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees) actually incurred or reasonably expected to be incurred by such Group Company in connection with and within 90 days of such Disposition, Casualty or Condemnation and as to which notice has been provided to the Administrative Agent, (3) taxes paid or reasonably estimated to be payable within two years of the date of the relevant transaction as a result of any gain recognized in connection therewith by such Group Company or any of the direct or indirect members thereof and attributable to such Disposition, Casualty or Condemnation; provided that, if the amount of any estimated taxes pursuant to this subclause (3) exceeds the amount of taxes actually required to be paid in cash, the aggregate amount of such excess shall constitute "Net Cash Proceeds", and (4) any reserve for adjustment in respect of (x) the sale price of such asset or assets established in accordance with GAAP and (y) any liabilities associated with such asset or assets and retained by such Group Company after such sale or other disposition thereof, including pension and other post-employment benefit liabilities and liabilities

related to environmental matters or against any indemnification obligations associated with such transaction and it being understood that "Net Cash Proceeds" shall include any cash or Cash Equivalents (x) received upon the Disposition of any non-cash consideration received by such Group Company in any such Disposition and (y) upon the reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount) of any reserve described in clause (4) above or, if such liabilities have not been satisfied in cash and such reserve not reversed within 365 days after such Disposition, Casualty or Condemnation, the amount of such reserve; provided that (x) no proceeds realized in a single transaction or series of related transactions shall constitute Net Cash Proceeds unless such proceeds shall exceed $100,000 and (y) no proceeds shall constitute Net Cash Proceeds under this clause (i) in any fiscal year until the aggregate amount of all such proceeds in such fiscal year shall exceed $250,000 (and thereafter only proceeds in excess of such amount shall constitute Net Cash Proceeds under this proviso); and

(ii) with respect to any Debt Issuance by any Group Company, the excess, if any, of (A) the sum of the cash received in connection with such sale over (B) the investment banking fees, underwriting discounts, commissions, costs and other out-of-pocket expenses and other customary expenses, incurred by such Group Company in connection with such incurrence or issuance.

"Note" means a promissory note, substantially in the form of Exhibit B, evidencing the obligation of the Borrower to repay outstanding Loans made by a Lender, as such note may be amended, modified or supplemented from time to time.

"NPL" means the National Priorities List under CERCLA.

"Obligations" means, with respect to each Loan Party, without duplication:

(i) in the case of the Borrower, all principal of and interest (including, without limitation, any interest which accrues after the commencement of any proceeding under any Debtor Relief Law with respect to the Borrower, whether or not allowed or allowable as a claim in any such proceeding) on any Loan, any Note or any other Loan Document;

(ii) in the case of each Subsidiary Guarantor, all amounts now or hereafter payable by such Subsidiary Guarantor and all other obligations or liabilities now existing or hereafter arising or incurred (including, without limitation, any amounts which accrue after the commencement of any proceeding under any Debtor Relief Law with respect to the Borrower or such Subsidiary Guarantor, whether or not allowed or allowable as a claim in any such proceeding) on the part of such Subsidiary Guarantor pursuant to this Agreement, the Guaranty or any other Loan Document;

(iii) all fees, expenses, indemnification obligations and other amounts of whatever nature now or hereafter payable by any Loan Party (including, without limitation, any amounts which accrue after the commencement of any proceeding under any Debtor Relief Law with respect to such Loan Party, whether or not allowed or allowable as a claim in any such proceeding) pursuant to this Agreement or any other Loan Document;

(iv) all expenses of the Administrative Agent as to which the Administrative Agent has a right to reimbursement by any Loan Party under Section 10.04(a) of this Agreement or under any other similar provision of any other Loan Document, including, without limitation, any and all sums advanced by the Administrative Agent to preserve the Collateral or preserve its

security interests in the Collateral to the extent permitted under any Loan Document or applicable Law; and

(v) all amounts paid by any Indemnitee as to which such Indemnitee has the right to reimbursement by any Loan Party under Section 10.04(b) of this Agreement or under any other similar provision of any other Loan Document;

together in each case with all renewals, modifications, consolidations or extensions thereof.

"Operating Lease" means, as applied to any Person, a lease (including leases which may be terminated by the lessee at any time) of any property (whether real, personal or mixed) by such Person as lessee which is not a Capital Lease.

"Organization Documents" means: (i) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-United States jurisdiction); (ii) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (iii) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Outstanding Amount" means with respect to Loans the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Loans, as the case may be, occurring on such date.

"Participant" has the meaning specified in Section 10.06(d).

"PBGC" means the Pension Benefit Guaranty Corporation.

"PCAOB" means the Public Company Accounting Oversight Board.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Perfection Certificate" means with respect to any Loan Party a certificate, substantially in the form of Exhibit G-3 to this Agreement, completed and supplemented with the schedules and attachments contemplated thereby to the satisfaction of the Administrative Agent and duly executed by the chief executive officer and the chief financial officer of such Loan Party.

"Permitted Acquisition" has the meaning set forth in Section 7.03(viii).

"Permitted Encumbrances" means (i) those liens, encumbrances and other matters affecting title to any Mortgaged Property listed in the Mortgage Policies in respect thereof and found, on the date of delivery of such Mortgage Policies to the Administrative Agent in accordance with the terms hereof, reasonably acceptable by the Administrative Agent, (ii) zoning, building codes, land use and other similar Laws and municipal ordinances which are not violated in any material respect by the existing improvements and the present use by the mortgagor of the Premises (as defined in the respective Mortgage) and (iii) such other items on any Mortgaged Property to which the Administrative Agent may consent (such consent not to be unreasonably withheld).

"Permitted Investors" means David A. Steinberg and his Affiliates, The Goldman Sachs Group, Inc. and its Affiliates, and Technology Crossover Ventures and its Affiliates.

"Permitted Joint Venture" means a Joint Venture, in the form of a corporation, limited liability company, business trust, joint venture, association, company or partnership, entered into by the Borrower or any of its Subsidiaries which (i) is engaged in a line of business related to those engaged in by the Borrower and its Subsidiaries and (ii) is formed or organized in a manner that limits the exposure of the Borrower and its Subsidiaries for the liabilities thereof to (A) the Investments of the Borrower and its Subsidiaries therein permitted under Section 7.03(x) and (B) any Indebtedness of any Permitted Joint Venture or any Guarantee by the Borrower or any of its Subsidiaries in respect of such Indebtedness, which Indebtedness or Guarantee are permitted at the time under Section 7.02.

"Permitted Liens" means those Liens permitted by Section 7.01.

"Permitted Refinancing" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; provided that (i) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder or as otherwise permitted pursuant to Section 7.02, (ii) such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended, (iii) if the Indebtedness being modified, refinanced, refunded, renewed or extended is subordinated in right of payment to the Obligations, such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended, (iv) the terms and conditions (including, if applicable, as to collateral) of any such modified, refinanced, refunded, renewed or extended Indebtedness are not materially less favorable to the Loan Parties or the Lenders, taken as a whole, than the terms and conditions of the Indebtedness being modified, refinanced, refunded, renewed or extended, (v) such modification, refinancing, refunding, renewal or extension is incurred by the Person who is the obligor on the Indebtedness being modified, refinanced, refunded, renewed or extended and such new or additional obligors as are or become Loan parties in accordance with Section 6.12 and with respect to subordinated Indebtedness the obligations of such obligors shall be subordinated in right of payment to the Obligations on terms, taken as a whole, at least as favorable to the Lenders as those contained in documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended, and (vi) at the time thereof, no Default shall have occurred and be continuing.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established, or required to be contributed to by, the Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Pledge Agreement" means the Pledge Agreement, substantially in the form of Exhibit G-2 hereto, dated as of the date hereof among the Borrower, the Subsidiary Guarantors and the Administrative Agent, as the same may be amended, modified or supplemented from time to time.

"Pledged Collateral" has the meaning specified in the Pledge Agreement.

"Preferred Stock" means, as applied to the Equity Interests of a Person, Equity Interests of any class or classes (however designated) which is preferred as to the payment of dividends or distributions, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over the Equity Interests of any other class of such Person.

"Pro-Forma Basis" and "Pro-Forma Compliance" means, for purposes of calculating compliance with the each of the financial covenants set forth in Section 7.11 in respect of a Specified Transaction, or for purposes of determining compliance with the condition precedent set forth in Section 4.01(e), that such Specified Transaction and the following transactions in connection therewith shall be deemed to have occurred as of the first day of the applicable period of measurement in such covenant: (i) income statement items (whether positive or negative) attributable to the property or Person subject to such Specified Transaction, in the case of a Permitted Acquisition or Investment described in the definition of "Specified Transaction", shall be included, (ii) any retirement of Indebtedness and (iii) any Indebtedness incurred or assumed by any Group Company in connection with such Specified Transaction, and if such Indebtedness has a floating or formula rate, shall have an implied rate of interest for the applicable period for purposes of this definition determined by utilizing the rate which is or would be in effect with respect to such Indebtedness as at the relevant date of determination; provided that the foregoing pro-forma adjustments may be applied to the financial covenants set forth in Section 7.11 to the extent that such adjustments are consistent with the definition of Consolidated EBITDA and may not take into account projected cost savings or revenue enhancements.

"Purchase Money Indebtedness" means Indebtedness of the Borrower or any of its Subsidiaries incurred for the purpose of financing all or any part of the purchase price or cost of construction or improvement of property used in the business of the Borrower or such Subsidiary; provided that such Indebtedness is incurred within 120 days after such property is acquired or, in the case of improvements, constructed.

"Real Property" means, with respect to any Person, all of the right, title and interest of such Person in and to land, buildings, improvements and fixtures, including Leaseholds.

"Refinanced Agreements" means those instruments, documents and agreements listed on Schedule 1.01.

"Register" has the meaning specified in Section 10.06(c).

"Registered Public Accounting Firm" has the meaning specified in the Securities Laws and shall be independent of the Borrower as prescribed by the Securities Laws.

"Regulation D, O, T, U or X" means Regulation D, O, T, U or X, respectively, of the Board of Governors of the Federal Reserve System as amended, or any successor regulation.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Required Lenders" means, as of any date of determination, Lenders holding more than 50% of the Facility on such date; provided, however, that notwithstanding anything herein to the contrary, for purposes of approving any amendment or waiver with respect to the provisions of Article VII hereof (and any related definitions), "Required Lenders" shall mean at least two Lenders (that are not Affiliates of each other) holding more than 50% of the Facility on such date.

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer, assistant treasurer or controller of a Loan Party and any other officer or employee of the applicable Loan Party so designated by any of the foregoing officers in a notice to the Administrative Agent. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to any Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.

"Sale/Leaseback Transaction" means any direct or indirect arrangement with any Person or to which any such Person is a party providing for the leasing to the Borrower or any of its Subsidiaries of any property, whether owned by the Borrower or any of its Subsidiaries as of the Closing Date or later acquired, which has been or is to be sold or transferred by the Borrower or any of its Subsidiaries to such Person or to any other Person from whom funds have been, or are to be, advanced by such Person on the security of such property.

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002.

"S&P" means Standard & Poor's Ratings Group, a division of McGraw Hill, Inc., a New York corporation, and any successor thereto.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Cash Management Agreement" means the securities account control agreement or cash management agreement, in form and substance satisfactory to the Administrative Agent and the Required Lenders, dated as of the date hereof entered into by and between the Borrower, Goldman Sachs & Co., as securities intermediary, and the Administrative Agent.

"Secured Parties" means, collectively, the Lenders and the Administrative Agent.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"Security Agreement" means the Security Agreement, substantially in the form of Exhibit G-1 hereto, dated as of the date hereof among the Borrower, the Subsidiary Guarantors and the Administrative Agent, as the same may be amended, modified or supplemented from time to time.

"Solvent" and "Solvency" mean, with respect to any Person on any date of determination, that on such date (i) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (ii) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (iii) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (iv) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital and (v) such Person is able to pay its debts and liabilities, contingent obligations and other commitments as they mature in the ordinary course of business. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Specified Transaction" means any closing condition, Investment, incurrence of Indebtedness or Sale/Leaseback Transaction in respect of which compliance with the financial covenants set forth in Section 7.11 is by the terms of this Agreement required to be calculated on a Pro-Forma Basis.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guarantor" means each Subsidiary of the Borrower on the Closing Date and each Subsidiary of the Borrower that becomes a party to the Guaranty after the Closing Date by execution of an Accession Agreement, and "Subsidiary Guarantors" means any two or more of them.

"Substitute Delayed Draw Lender" shall mean Goldman Sachs Credit Partners, L.P.

"Swap Contract" means (i) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (ii) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other

master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligations" of any Person means all obligations (including, without limitation, any amounts which accrue after the commencement of any bankruptcy or insolvency proceeding with respect to such Person, whether or not allowed or allowable as a claim under any proceeding under any Debtor Relief Law) of such Person in respect of any Swap Contract, excluding any amounts which such Person is entitled to set-off against its obligations under applicable Law.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (i) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (ii) for any date prior to the date referenced in clause (i), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Synthetic Debt" means, with respect to any Person as of any date of determination thereof, all obligations of such Person in respect of transactions entered into by such Person that are intended to function primarily as a borrowing of funds (including any minority interest transactions that function primarily as a borrowing) but are not otherwise included in the definition of "Indebtedness" or as a liability on the consolidated balance sheet of such Person and its Subsidiaries in accordance with GAAP.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (i) a so-called synthetic, off-balance sheet or tax retention lease, or (ii) an agreement for the use or possession of property (including Sale/Leaseback Transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Threshold Amount" means $500,000.

"Transactions" means the events contemplated by this Agreement, the other Loan Documents and the Warrant Agreement or otherwise referred to herein or therein.

"Unfunded Pension Liability" means, with respect to Pension Plans, the excess of the present value of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time

in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"United States" and "US" mean the United States of America.

"U.S. Loan Party" means any Loan Party that is organized under the laws of one of the states of the United States of America and that is not a CFC.

"Voting Securities" means Equity Interests of any Person having ordinary power to vote in the election of members of the board of directors, managers, trustees or other controlling Persons of such Person (irrespective of whether, at the time, Equity Interests of any other class or classes of such Person shall have or might have voting power by reason of the happening of any contingency.

"Warrant Agreement" means that certain Warrant Agreement, dated the date hereof, between the Borrower and each of the initial Lenders (or their respective designees).

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (i) the sum of the products obtained by multiplying (A) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (B) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (ii) the then outstanding principal amount of such Indebtedness.

"Wholly-Owned Subsidiary" means, with respect to any Person at any date, any Subsidiary of such Person all of the shares of capital stock or other ownership interests of which (except directors' qualifying shares) are at the time directly or indirectly owned by such Person.

**Section 1.02** Other Interpretative Provisions. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a) The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Preliminary Statements, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Preliminary Statements, Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such Law and any reference to any law or regulation shall, unless otherwise specified, refer to such Law or regulation as amended, modified or supplemented from time to time and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b) In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each mean "to but excluding," and the word "through means "to and including."

(c) Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

**Section 1.03 Accounting Terms and Determinations.**

(a) *Generally*. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, except as otherwise specifically prescribed herein.

(b) *Changes in GAAP*. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and any other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

(c) *Consolidation of Variable Interest Entities*. All references herein to consolidated financial statements of the Borrower and its Subsidiaries or to the determination of any amount of the Borrower and its Subsidiaries on a consolidated basis or any similar reference shall, in each case, be deemed to include each variable interest entity that the Borrower is required to consolidate pursuant to FASB Interpretation No. 46 – Consolidation of Variable Interest Entities; an interpretation of ARB No. 51 (January 2003) as if such variable interest entity were a Subsidiary as defined herein.

(d) *Computation of Certain Financial Cove*nants. Unless otherwise specified herein, all defined financial terms (and all other definitions used to determine such terms) shall be to those determined and computed in respect of the Borrower and its Subsidiaries.

**Section 1.04 Times of Day**. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

## ARTICLE II
## THE COMMITMENTS AND LOAN

**Section 2.01 The Loans**. Subject to the terms and conditions set forth herein, (a) each Closing Date Lender severally agrees to make a Loan to the Borrower on the Closing Date in an aggregate amount not to exceed each such Lender's Closing Date Commitment and (b) each Delayed Draw Lender severally agrees to make a Loan to the Borrower from time to time at the Borrower's option, upon 2 Business Days' notice by the Borrower, on any Business Day during the Availability Period for the Facility, in an aggregate amount not to exceed such Lender's Delayed Draw Commitment.

Each Loan requested by the Borrower shall be in an amount which is a whole integral multiple of $25,000,000, and the aggregate Loans requested by the Borrower shall not exceed the aggregate amount of the Commitment. The Delayed Draw Lender shall not be required to make any Loans until the other Lenders, either previously or concurrently therewith, shall have funded Loans in a total aggregate principal amount of $75,000,000, at which time the Delayed Draw Lender shall (subject to the terms and conditions set forth herein) be required to make a Loan, when requested by the Borrower, in the amount of the Delayed Draw Commitment, subject to the provisions of Section 10.06(h). The Borrower shall, within 90 days of the Closing Date, have made up to two requests for Loans which, in the aggregate, equal the full amount of the Facility. Amounts borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed.

**Section 2.02 Prepayments.**

(a) *Optional.*

The Borrower may, upon notice to the Administrative Agent, at any time or from time to time voluntarily prepay Loans in whole or in part; provided that (A) such notice must be received by the Administrative Agent not later than 11:00 a.m. two Business Days prior to the date of prepayment; and (B) any prepayment of Loans shall be in a principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment. Any such prepayment shall include all accrued and unpaid interest on the principal amount of the Loans so prepaid plus, if prior to the third anniversary of the Closing Date, a Make-Whole Premium on the principal amount of the Loans so prepaid. The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Percentage). If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.

(b) *Mandatory.*

(i) *Dispositions.* If the Borrower or any of its Subsidiaries Disposes of any property (other than any Disposition of any property permitted by Section 7.05(i), (iii), (v), (vi) or (viii)) which results in the realization by such Person of Net Cash Proceeds, the Borrower shall prepay an aggregate principal amount of Loans equal to 100% of such Net Cash Proceeds within two Business Days after receipt thereof by such Person.

(ii) *Debt Issuances.* Upon the incurrence or issuance by the Borrower or any of its Subsidiaries of any Indebtedness (other than Indebtedness expressly permitted to be incurred or issued pursuant to Section 7.02), the Borrower shall prepay an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds received therefrom immediately upon receipt thereof by the Borrower or such Subsidiary.

(iii) *Extraordinary Receipts.* Upon any Extraordinary Receipt received by or paid to or for the account of the Borrower or any of its Subsidiaries, and not otherwise included in clause (i) or (ii) of this Section 2.02(b), the Borrower shall prepay an aggregate principal amount of Loans equal to 100% of all Net Cash Proceeds received therefrom within two Business Days after receipt thereof by the Borrower or such Subsidiary.

(c) *Make-Whole Premium*. Whenever any prepayment or repayment of principal of any Loans is (i) made pursuant to Section 2.02(a) or (b)(ii), (ii) required as a result of a declaration pursuant to Article VIII that such Loans are due and payable or (iii) in any other circumstance (other than prepayments made pursuant to Section 2.02(b)(i) or (b)(iii)), in each case within three years after the Closing Date, the Borrower shall on the date of such prepayment or repayment pay to the Administrative Agent for the ratable accounts of the Lenders a Make-Whole Premium in respect of the principal amount of the Loans so prepaid or repaid.

**Section 2.03 Repayment of Loans.**

(a) The Borrower shall repay to the Administrative Agent for the ratable accounts of the Lenders the aggregate principal amount of all Loans outstanding on the Maturity Date, all accrued and unpaid interest thereon and any other amounts owing hereunder.

(b) Upon receipt of notice from the Required Lenders at any time after the third anniversary of the Closing Date, the Administrative Agent shall provide a notice ("Required Prepayment Notice") to the Borrower, which Required Prepayment Notice shall indicate that the Required Lenders have chosen, in their sole discretion, to require repayment in full of the Loans and shall specify a date, not earlier than 91 days after delivery of such Required Prepayment Notice, upon which date (the "Required Prepayment Date") the Loans shall become due and payable. On such Required Prepayment Date, the Borrower shall repay to the Administrative Agent for the ratable accounts of the Lenders the aggregate principal amount of all Loans then outstanding, all accrued and unpaid interest thereon and any other amounts owing hereunder.

**Section 2.04 Interest.**

(a) *Stated Interest*. Subject to the provisions of Section 2.04(b), Loans shall bear interest on the outstanding principal amount thereof at a rate per annum equal to the Interest Rate.

(b) *Default Interest*.

(i) If any amount of principal of any Loan is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at the Default Rate to the fullest extent permitted by applicable Laws.

(ii) If any amount (other than principal of any Loan) payable by the Borrower under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then upon the request of the Required Lenders such amount shall thereafter bear interest at the Default Rate to the fullest extent permitted by applicable Laws.

(iii) While any Event of Default exists, the Borrower shall pay interest on the principal amount of all outstanding Obligations at the Default Rate to the fullest extent permitted by applicable Laws.

(iv) Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c) *Payments of Interest*. Interest on the Loans shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest

hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

Section 2.05 Administrative Agent Fees. The Borrower shall pay to the Administrative Agent for its own account a fee in the amount of $75,000 per year, payable in advance on the Closing Date and each anniversary of such date thereafter. Such fee is fully earned when paid and is non-refundable.

Section 2.06 Computation of Interest and Fees. Interest shall accrue on the Loan for the day on which the Loan is made, and shall not accrue on the Loan, or any portion thereof, for the day on which the Loan or such portion is paid. All interest will be calculated based upon a year of 360 days and actual days elapsed. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.07 Evidence of Debt. The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Loans made by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error. Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loan in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loan and payments with respect thereto.

Section 2.08 Payments Generally; Administrative Agent's Clawback.

(a) *General*. All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Any prepayment of the Loans shall be accompanied by all accrued interest on the principal amount prepaid, together with any additional amounts required pursuant to Sections 2.02(c), 3.01 and 3.02. Except as otherwise expressly provided for herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 P.M. on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Applicable Percentage in respect of the Facility (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent after 2:00 PM shall be deemed received on the next succeeding Business day and any applicable interest or fee shall continue to accrue. If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b) *Failure to Satisfy Conditions Precedent*. If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender without interest.

(c) *Obligations of Lenders Several*. The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 10.04(c) are several and not joint. The failure of any Lender to make any Loan, to fund any such participation or to make any payment under Section 10.04(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 10.04(c).

(d) *Funding Source*. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(e) *Insufficient Funds*. If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

**Section 2.09 Sharing of Payments by Lenders.** If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, including by the receipt of payment in a proceeding conducted pursuant to any Debtor Relief Laws or the receipt of any Collateral, obtain payment in respect of (i) Obligations due and payable to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (x) the amount of such Obligations due and payable to such Lender at such time to (y) the aggregate amount of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time) of payments on account of the Obligations due and payable to all Lenders hereunder and under the other Loan Documents at such time obtained by all the Lenders at such time or (ii) Obligations owing (but not due and payable) to such Lender hereunder and under the other Loan Documents at such time in excess of its ratable share (according to the proportion of (x) the amount of such Obligations owing (but not due and payable) to such Lender at such time to (y) the aggregate amount of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Parties at such time) of payment on account of the Obligations owing (but not due and payable) to all Lenders hereunder and under the other Loan Documents at such time obtained by all of the Lenders at such time then the Lender receiving such greater proportion shall (A) notify the Administrative Agent of such fact, and (B) purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of Obligations then due and payable to the Lenders or owing (but not due and payable) to the Lenders, as the case may be, provided that:

(i) if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii) the provisions of this Section shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary thereof (as to which the provisions of this Section shall apply).

The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

## ARTICLE III
## TAXES, YIELD PROTECTION AND ILLEGALITY

**Section 3.01** **Taxes.**

(a) *Payments Free of Taxes*. Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes; provided that if the Borrower shall be required by applicable Law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent or any Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Law.

(b) *Payment of Other Taxes by the Borrower*. Without limiting the provisions of subsection (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Law.

(c) *Indemnification by the Borrower*. The Borrower shall indemnify the Administrative Agent and each Lender within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by the Administrative Agent or such Lender, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount (setting forth the basis therefore and the calculation thereof in reasonable detail) of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d) *Evidence of Payments*. As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e) *Status of Lenders*. Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will

enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

Without limiting the generality of the foregoing, if the Borrower is resident for tax purposes in the United States, any Foreign Lender shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i) duly completed copies of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party;

(ii) duly completed copies of Internal Revenue Service Form W-8ECI;

(iii) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (A) a certificate to the effect that such Foreign Lender is not (x) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (y) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Code, or (z) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (B) duly completed copies of Internal Revenue Service Form W-8BEN, or

(iv) any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made.

(f) *Treatment of Certain Refunds*. If the Administrative Agent or any Lender determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender if the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This subsection shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

**Section 3.02 Increased Costs.**

(a) *Increased Costs Generally*. If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets held by, deposits with or for the account of, or credit extended or participated in by, any Lender (or its Lending Office);

(ii) subject any Lender (or its Lending Office) to any tax of any kind whatsoever with respect to this Agreement, or change the basis of taxation of payments to such Lender in respect thereof (except for Indemnified Taxes or Other Taxes covered by Section 3.01 and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender);

(iii) impose on any Lender (or its Lending Office) any other condition, cost or expense affecting this Agreement made by such Lender or participation therein;

and the result of any of the foregoing shall be to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender, as the case may be, for such additional costs incurred or reduction suffered.

(b) *Capital Requirements*. If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c) *Certificates for Reimbursement*. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender, as the case may be, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d) *Delays in Requests*. Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

**Section 3.03 Mitigation Obligations.**

(a) *Designation of a Different Lending Office*. If any Lender requests compensation under Section 3.02, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.02, as the case may be, in the future, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such

Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b) *Replacement of Lenders*. If a Lender requests compensation under Section 3.02 or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of a Lender pursuant to Section 3.01, the Borrower may replace such Lender in accordance with Section 10.13.

**Section 3.04 Survival**. All of the Borrower's obligations under this Article III shall survive termination of the Commitments and repayment of all other Obligations hereunder.

## ARTICLE IV
## CONDITIONS PRECEDENT TO LOANS

**Section 4.01 Conditions to Loan**. The obligation of each Lender to honor its Closing Date Commitment hereunder is subject to the satisfaction of the following conditions precedent:

(a) *Deliverables*. The Administrative Agent's receipt of the following, each of which shall be originals or telecopies (followed by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Administrative Agent and each of the Lenders:

(i) executed counterparts of this Agreement and the Guaranty, sufficient in number for distribution to the Administrative Agent, each Lender and the Borrower;

(ii) a Note executed by the Borrower in favor of each Lender requesting a Note;

(iii) executed counterparts of the Security Agreement, the Pledge Agreement and all other Collateral Documents, duly executed by each Loan Party, together with:

(A) a Perfection Certificate for all of the Loan Parties;

(B) appropriate financing statements (Form UCC-1 or such other financing statements or similar notices as shall be required by local Law) authenticated and authorized for filing under the Uniform Commercial Code or other applicable local Law of each jurisdiction in which the filing of a financing statement or giving of notice may be required, or reasonably requested by the Administrative Agent, to perfect the security interests intended to be created by the Collateral Documents;

(C) copies of reports from CT Corporation or another independent search service reasonably satisfactory to the Administrative Agent listing all effective financing statements, notices of tax, or judgment liens or similar notices that name the Borrower or any other Loan Party, as such (under its present name and any previous name and, if requested by the Administrative Agent, under any trade names), as debtor that are filed in the jurisdictions referred to in clause (B) above or in any other jurisdiction having files which must be searched in order to determine fully the existence of the Uniform Commercial Code security interests, notices of the filing of federal tax Liens (filed pursuant to Section 6323 of the Code), or judgment Liens on any Collateral, together with copies of such financing statements, notices of tax, or judgment Liens or

similar notices (none of which shall cover the Collateral except to the extent evidencing Permitted Liens or for which the Administrative Agent shall have received termination statements (Form UCC-3 or such other termination statements as shall be required by local Law) authenticated and authorized for filing);

(D) searches of ownership of intellectual property in the appropriate governmental offices and such patent, trademark and/or copyright filings as may be requested by the Administrative Agent to the extent necessary or reasonably advisable to perfect the Administrative Agent's security interest in intellectual property Collateral; provided that searches required by this clause (D) delivered within 30 days after the Closing Date shall be deemed delivered as of the Closing Date;

(E) all of the Pledged Collateral, which Pledged Collateral shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, with signatures appropriately guaranteed, accompanied in each case by any required transfer tax stamps, all in form and substance reasonably satisfactory to the Administrative Agent; and

(F) evidence of the completion of all other filings and recordings of or with respect to the Collateral Documents and of all other actions as may be necessary or, in the opinion of the Administrative Agent, desirable to perfect the security interests intended to be created by the Collateral Documents (including receipt of duly executed payoff letters and UCC-3 termination statements);

(iv) a short form assignment or grant of security interest in intellectual property, in substantially the form of Exhibit A to the Security Agreement (for patents and trademarks) or Exhibit B to the Security Agreement (for copyrights), duly executed by each Loan Party, together with evidence that all action that the Administrative Agent may deem necessary or desirable in order to perfect the Liens in intellectual property created under Security Agreement and under such short form assignments or grants of security interests has been taken;

(v) executed counterparts of the Warrant Agreement and of each of the Warrant certificates for the respective Purchasers referenced therein, duly executed by the Borrower and the other parties thereto;

(vi) a copy of the Organization Documents, including all amendments thereto, of each Loan Party, certified as of a recent date by the Secretary of State or other applicable Governmental Authority of its respective jurisdiction of organization, together with:

(A) a certificate as to the good standing of each Loan Party, as of a recent date, from the Secretary of State or other applicable authority of its respective jurisdiction of organization and from each other jurisdiction in which such Loan Party is qualified or is required to be qualified to do business, together in each case, to the extent generally available, with a certificate or other evidence of good standing as to payment of any applicable franchise or similar taxes from the appropriate taxing authority of each such jurisdiction;

(B) a certificate of the Secretary or Assistant Secretary of each Loan Party dated the Closing Date and certifying (1) that the Organization Documents of such Loan Party have not been amended since the date of the last amendment thereto shown on the certificate of good standing from its jurisdiction of organization furnished pursuant

to clause (A) above; (2) that attached thereto is a true and complete copy of the agreement of limited partnership, operating agreement or by-laws of such Loan Party, as applicable, as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in clause (3) below, (3) that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors or other governing body of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which it is to be a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect; and (4) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party; and

(C) a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate pursuant to clause (B) above.

(vii) a favorable written opinion of Skadden, Arps, Slate, Meagher & Flom LLP, special counsel to the Loan Parties, addressed to the Administrative Agent and each Lender, dated the Closing Date, substantially in the form of Exhibit E-1 hereto and covering such additional matters incident to the Transactions as the Administrative Agent or the Required Lenders may reasonably request;

(viii) a favorable written opinion of the General Counsel of the Borrower, addressed to the Administrative Agent and each Lender, dated the Closing Date, substantially in the form of Exhibit E-2 hereto and covering such additional matters incident to the Transactions as the Administrative Agent or the Required Lenders may reasonably request;

(ix) evidence satisfactory to each Lender that appropriate approvals have been obtained in order that The Goldman Sachs Group, Inc., Goldman Sachs & Co. and their respective affiliates become "interested stockholders" with the approval of the board of directors of the Borrower for purposes of Section 203 of the General Corporation Law of the State of Delaware;

(x) [reserved];

(xi) certificates attesting to the Solvency of (a) the Borrower, and (b) all of the Loan Parties taken as a whole, before and after giving effect to the Transactions, from its chief financial officer;

(xii) evidence that all insurance required to be maintained pursuant to this Agreement has been obtained and is in effect together with the certificates of insurance, naming the Administrative Agent, on behalf of the Lenders, as an additional insured or loss payee, as the case may be, under all insurance policies maintained with respect to the assets and properties of the Loan Parties that constitutes Collateral;

(xiii) such other assurances, certificates, documents, consents or opinions as the Administrative Agent or any Lender reasonably may require.

(b) *Administrative Agent Fees*. All fees required to be paid to the Administrative Agent on or before the Closing Date shall have been paid.

(c) *Counsel Fees*. Unless waived by the Administrative Agent and each Lender, the Borrower shall have paid all fees, charges and disbursements of counsel to the Administrative Agent and each lender (or directly to such counsel if requested by the Administrative Agent or such Lender) to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between the Borrower and the Administrative Agent and each Lender).

(d) *Financial Information*. Each Lender shall have received: (i) forecasts prepared by management of the Loan Parties, each in form reasonably satisfactory to the Required Lenders, of balance sheets, income statements and cash flow statements on a quarterly basis for the first year following the Closing Date and on an annual basis for each year thereafter prior to the Maturity Date; (ii) evidence satisfactory to the Required Lenders that the consolidated earnings before interest, taxes, depreciation and amortization (reported in accordance with GAAP, i.e., without other add-backs or adjustments) for the three-fiscal quarter period ended September 30, 2006, for the Borrower and its Subsidiaries, is not less than $9,000,000; and (ii) written certifications from the chief executive officer and chief financial officer of the Borrower satisfying the requirements of each of Section 906 and Section 302 of Sarbanes-Oxley; provided that written certifications required by this clause (ii) delivered within 10 days after the Closing Date shall be deemed delivered as of the Closing Date.

(e) *Refinancing of Certain Existing Indebtedness; Other Indebtedness*. On the Closing Date, the commitments under all Refinanced Agreements shall have been terminated or will be terminated concurrently therewith, all loans and other obligations outstanding thereunder shall have been repaid in full or will be repaid in full concurrently therewith (other than contingent indemnification obligations not yet due and payable), together with accrued interest thereon (including, without limitation, any prepayment premium), all letters of credit issued thereunder shall have been terminated or cash collateralized in a manner satisfactory to the Required Lenders and the Administrative Agent, and all other amounts owing pursuant to each Refinanced Agreement shall have been repaid in full, or will be repaid in full concurrently therewith and the Administrative Agent shall have received evidence in form, scope and substance reasonably satisfactory to it that the matters set forth in this subsection (e) have been satisfied at such time. In addition, on the Closing Date, the creditors under each Refinanced Agreement shall have terminated and released all applicable Liens on the capital stock of and assets owned by the Borrower and its Subsidiaries, and the Administrative Agent shall have received all such releases as may have been requested by the Administrative Agent, which releases shall be in form and substance satisfactory to the Administrative Agent.

(f) *Consents and Approvals*. On the Closing Date, all necessary governmental (domestic or foreign), regulatory and third party approvals (including, without limitation, with respect to real property leases and license agreements relating to intellectual property) in connection with the Transactions shall have been obtained and remain in full force and effect, and all applicable waiting and appeal periods, if any, shall have expired, in each case without any action being taken by any competent authority which have or could have a reasonable likelihood of restraining, preventing or imposing materially burdensome conditions on such transactions or impose, in the reasonable judgment of the Administrative Agent, materially burdensome conditions upon the consummation of such transactions. Each Loan Party shall provide a certificate of a Responsible Officer either (A) attaching copies of all such consents and approvals or (B) stating that no such consents or approvals are so required.

(g) *Material Adverse Effect*. Each Loan Party shall provide a certificate of a Responsible Officer stating that no Material Adverse Effect upon the Borrower and its Subsidiaries, taken

as a whole (both before and after giving effect to the Transactions), has occurred since December 31, 2005.

Without limiting the generality of the provisions of Section 9.04, for purposes of determining compliance with the conditions specified in this Section 4.01, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

(h) *TCV Investor Right Agreement.* The Borrower shall have received a consent and/or waiver with respect to Section 2.12 of that certain Seventh Amended and Restated Investor Rights Agreement, dated as of June 12, 2003, by and among the Borrower and the other parties thereto, in form and substance satisfactory to the initial purchasers of the Warrants under the Warrant Agreement, and such consent and/or waiver shall be in full force and effect and not subject to any unsatisfied conditions precedent.

(i) *Representations and Warranties.* The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct on and as of the Closing Date and the date of the making of any Loan, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date.

(j) *No Default.* No Default shall exist as of the Closing Date or would result from the making of the Loans or from the application of the proceeds thereof.

Section 4.02 **Additional Conditions to Loan**. The obligation of the Delayed Draw Lender to honor its Delayed Draw Commitment is subject to the satisfaction of the following condition:

(a) *No Default.* No Default shall exist, or would result from the making of the Loans or from the application of the proceeds thereof, either as of the Closing Date or the date of the making of any Loan.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent and the Lenders on the date of this Agreement on the Closing Date and on the date any Loan is made:

Section 5.01 **Existence, Qualification and Power**. Each Loan Party and each of its Subsidiaries (i) is duly organized or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, (ii) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (A) own or lease its assets and carry on its business and (B) execute, deliver and perform its obligations under the Loan Documents to which it is a party and consummate the Transactions, and (iii) is duly qualified and is licensed and, as applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license; except in each case referred to in clause (ii)(A) or (iii), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 5.02 Authorization; No Contravention.

(a) The execution, delivery and performance by each Loan Party of each Related Document to which such Person is party have been duly authorized by all necessary corporate, partnership, limited liability company or other organizational action, and do not and will not (i) contravene the terms of any of such Person's Organization Documents; (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under, (A) any Contractual Obligation to which such Person is a party or (B) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (iii) violate any Law.

(b) Except as set forth in Schedule 5.02, the rights and interests of each Loan Party in, to or under any agreement, contract, license, instrument, document or other general intangible (referred to solely for purposes of this subsection 5.02(b) as a "Contract") are not subject by the express terms of such Contract to a restriction, prohibition, consent right or any other condition in favor of a Person who is not a Group Company with respect to an assignment thereof or a grant of a security interest therein by a Loan Party, except where the contravention or violation of such provision, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.03 Governmental Authorization; Other Consents. No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (i) the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, (ii) the grant by any Loan Party of the Liens granted by it pursuant to the Collateral Documents, (iii) the perfection or maintenance of the Liens created under the Collateral Documents (including the first priority nature thereof) or (iv) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, except for (i) such filings as may be necessary to perfect the liens in the Collateral and (ii) the authorizations, approvals, actions, notices and filings listed on Schedule 5.03, all of which have been duly obtained, taken, given or made and are in full force and effect. All applicable waiting periods in connection with the Transactions have expired without any action having been taken by any Governmental Authority restraining, preventing or imposing materially adverse conditions upon the Transactions or the rights of the Loan Parties or their Subsidiaries freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them.

Section 5.04 Binding Effect. This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto. This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except (i) as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and (ii) that rights of acceleration and the availability of equitable remedies may be limited by equitable principles of general applicability (regardless of whether enforcement is sought by proceedings in equity or at law).

Section 5.05 Financial Condition; No Material Adverse Effect; No Internal Control Event.

(a) *Audited Financial Statements*. The Audited Financial Statements: (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in

accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all material indebtedness and other liabilities, direct or contingent, of the Borrower and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness.

(b) *Interim Financial Statements*. The unaudited consolidated balance sheets of the Borrower and its Subsidiaries dated September 30, 2006, and the related consolidated statements of income or operations, shareholders' equity and cash flows for the fiscal quarter ended on that date (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments. Schedule 5.05 sets forth all material indebtedness and other liabilities, direct or contingent, of the Borrower and its consolidated Subsidiaries as of the date of such financial statements, including liabilities for taxes, material commitments and Indebtedness. Schedule 7.02 is complete and accurate as of the Closing Date.

(c) *Material Adverse Change*. There has been no event or circumstance since the date of the Audited Financial Statements, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(d) *Internal Control Event*. To the best knowledge of the Borrower, no Internal Control Event exists or has occurred since the date of the Audited Financial Statements that has resulted in or could reasonably be expected to result in a misstatement in any material respect, in any financial information delivered or to be delivered to the Administrative Agent or the Lenders, of (i) covenant compliance calculations provided hereunder or (ii) the assets, liabilities, financial condition or results of operations of the Borrower and its Subsidiaries on a consolidated basis.

(e) *[Reserved.]*

(f) *Projections*. The consolidated forecasted balance sheets, statements of income and cash flows of the Borrower and its Subsidiaries delivered pursuant to Section 4.01 or Section 6.01(d) were prepared in good faith on the basis of the assumptions stated therein, which assumptions were fair and reasonable in light of the conditions existing at the time of delivery of such forecasts, and represented, at the time of delivery, the Borrower's best estimate of its future financial condition and performance.

(g) *Post-Closing Financial Statements*. The financial statements delivered to the Lenders pursuant to Section 6.01(a) and (b), if any, (i) have been prepared in accordance with GAAP (except as may otherwise be permitted under Section 6.01(a) and (b)) and (ii) present fairly (on the basis disclosed in the footnotes to such financial statements, if any) in all material respects the consolidated (and, if presented therein, consolidating) financial condition, results of operations and cash flows of the Borrower and its Consolidated Subsidiaries as of the respective dates thereof and for the respective periods covered thereby.

**Section 5.06 Litigation.** There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of any Loan Party after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Group Company or against any of their properties or revenues that (i) purport to affect or pertain to this Agreement or any other Loan Document, or any of the Transactions, (ii) except as specifically disclosed in Schedule 5.06 (the "Disclosed Litigation"), either individually or in the aggregate; if determined