EXHIBIT 3

EXECUTION COPY

INPHONIC SECURITY AGREEMENT

dated as of November 7, 2006

among

THE LOAN PARTIES FROM TIME TO TIME PARTY HERETO

and

CITICORP NORTH AMERICA, INC.,
as Administrative Agent

ffny03\rosenke\670190.14

TABLE OF CONTENTS

Page

## ARTICLE I
## DEFINITIONS

Section 1.01    Terms Defined in the Loan Documents ...................................................... 1
Section 1.02    Terms Defined in the UCC ........................................................................ 1
Section 1.03    Additional Definitions ............................................................................... 1
Section 1.04    Terms Generally ........................................................................................ 8

## ARTICLE II
## SECURITY INTERESTS

Section 2.01    Grant of Security Interests ........................................................................ 9
Section 2.02    Continuing Liability of Each Loan Party ................................................. 9
Section 2.03    Security Interests Absolute ..................................................................... 10
Section 2.04    Cash Collateral Account. ........................................................................ 11
Section 2.05    Investment of Funds in Collateral Accounts ......................................... 11

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Section 3.01    Title to Collateral .................................................................................... 12
Section 3.02    Validity, Perfection and Priority of Security Interests. .......................... 12
Section 3.03    Fair Labor Standards Act ........................................................................ 13
Section 3.04    Receivables .............................................................................................. 13
Section 3.05    No Consents ............................................................................................. 13
Section 3.06    Deposit and Securities Accounts ............................................................ 13

## ARTICLE IV
## COVENANTS

Section 4.01    Delivery of Perfection Certificate; Initial Perfection and Delivery of Search Reports ....................................................................................... 14
Section 4.02    Change of Name, Identity, Structure or Location; Subjection to Other Security Agreements ............................................................................... 14
Section 4.03    Further Actions ........................................................................................ 14
Section 4.04    Collateral in Possession of Other Persons, Leased Real Property Locations ................................................................................................. 15
Section 4.05    Books and Records .................................................................................. 15
Section 4.06    Delivery of Instruments, Etc .................................................................. 15
Section 4.07    Collection and Verification of Receivables. ........................................... 15
Section 4.08    Notification to Account Debtors ............................................................. 16
Section 4.09    Certificates of Title; Fixtures ................................................................. 16
Section 4.10    Disposition of Collateral ........................................................................ 16
Section 4.11    Insurance .................................................................................................. 16
Section 4.12    Information Regarding Collateral ........................................................... 17
Section 4.13    Covenants Regarding Intellectual Property ........................................... 17
Section 4.14    Electronic Chattel Paper ......................................................................... 19

- i -

Table of Contents (Cont.)

                                                                              Page

Section 4.15          Claims ..................................................................................................... 19
Section 4.16          Letter-of-Credit-Rights ............................................................................ 19

                              ARTICLE V
                    GENERAL AUTHORITY; REMEDIES

Section 5.01          General Authority ..................................................................................... 19
Section 5.02          Remedies upon Event of Default. ............................................................ 20
Section 5.03          Limitation on Duty of Administrative Agent in Respect of Collateral ............... 23
Section 5.04          Application of Proceeds. .......................................................................... 24

                              ARTICLE VI
                         ADMINISTRATIVE AGENT

Section 6.01          Concerning the Administrative Agent ...................................................... 24
Section 6.02          Appointment of Co-Administrative Agent ............................................... 24

                              ARTICLE VII
                            MISCELLANEOUS

Section 7.01          Notices ...................................................................................................... 25
Section 7.02          No Waivers; Non-Exclusive Remedies ................................................... 25
Section 7.03          Compensation and Expenses of the Administrative Agent;
                      Indemnification. ....................................................................................... 25
Section 7.04          Enforcement. ............................................................................................ 27
Section 7.05          Amendments and Waivers ....................................................................... 27
Section 7.06          Successors and Assigns ........................................................................... 27
Section 7.07          Governing Law ......................................................................................... 28
Section 7.08          Limitation of Law; Severability. ............................................................. 28
Section 7.09          Counterparts; Effectiveness ..................................................................... 28
Section 7.10          Additional Loan Parties ........................................................................... 28
Section 7.11          Termination. .............................................................................................. 29
Section 7.12          Entire Agreement. .................................................................................... 29

ffny03\rosenke\670190.14

## Table of Contents (Cont.)

Page

**Schedules:**

| | | |
|---|---|---|
| Schedule 1.01 | - | Claims |
| Schedule 3.06 | - | Deposit Accounts and Securities Accounts |
| Schedule 4.01 | - | Filings to Perfect Security Interests |

**Exhibits:**

| | | |
|---|---|---|
| Exhibit A | - | Form of Assignment of Security Interest in United States Patents and Trademarks |
| Exhibit B | - | Form of Assignment of Security Interest in United States Copyrights |
| Exhibit C | - | Form of Deposit Account Control Agreement |
| Exhibit D | - | Form of Landlord's Waiver and Consent |
| Exhibit E | - | Form of Consent to Assignment of Letter of Credit Proceeds |
| Exhibit F | - | Form of Collateral Description |

ffny03\rosenke\670190.14

SECURITY AGREEMENT dated as of November 7, 2006 (as amended, modified or supplemented from time to time, this "Agreement") among the LOAN PARTIES from time to time party hereto and CITICORP NORTH AMERICA, INC., as Administrative Agent for the benefit of the Secured Parties referred to herein.

InPhonic, Inc., a Delaware corporation (the "Borrower"), proposes to enter into a Credit Agreement dated the date hereof (as amended, restated, modified or supplemented from time to time and including any agreement extending the maturity of, refinancing or otherwise restructuring all or any portion of the obligations of the Borrower under such agreement or any successor agreement, the "Credit Agreement") among the Borrower, the banks and other lending institutions from time to time party thereto (each a "Lender" and, collectively, the "Lenders") and Citicorp North America, Inc., as Administrative Agent (together with its successor or successors in such capacity, the "Administrative Agent").

The Lenders and the Administrative Agent and their respective successors and assigns are herein referred to individually as a "Secured Party" and collectively as the "Secured Parties".

To induce the Lenders to enter into the Credit Agreement and the other Loan Documents and as a condition precedent to the obligations of the Secured Parties thereunder, the Borrower and its subsidiaries (each a "Guarantor" and, collectively, the "Guarantors") have agreed, jointly and severally, to provide a guaranty of all obligations of the Borrower and the other Loan Parties under or in respect of the Loan Documents.

As a further condition precedent to the obligations of the Lenders under the Loan Documents, the Borrower and each Guarantor (each a "Loan Party" and, together with each other person that becomes a party hereto pursuant to Section 7.10 hereof and the respective successors and permitted assigns of each of the foregoing, the "Loan Parties") has agreed or will agree to grant a continuing security interest in favor of the Administrative Agent in and to the Collateral (as hereinafter defined) to secure the Obligations. Accordingly, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01    Terms Defined in the Loan Documents. Capitalized terms defined in the Credit Agreement and not otherwise defined herein have, as used herein, the respective meanings provided for therein.

Section 1.02    Terms Defined in the UCC. Unless otherwise defined herein or in the Credit Agreement or the context otherwise requires, the following terms, together with any uncapitalized terms used herein which are defined in the UCC (as defined below), have the respective meanings provided in the UCC: (i) As-Extracted Collateral; (ii) Certificated Security; (iii) Chattel Paper; (iv) Documents; (v) Financial Asset; (vi) Instruments; (vii) Inventory; (viii) Investment Property; (ix) Payment Intangibles; (x) Proceeds; (xi) Securities Account; (xii) Securities Intermediary; (xiii) Security; (xiv) Security Certificate; (xv) Security Entitlements; and (xvi) Uncertificated Security.

Section 1.03    Additional Definitions. Terms defined in the introductory section hereof have the respective meanings set forth therein. The following additional terms, as used herein, have the following respective meanings:

"Account Control Agreement" means (i) with respect to the Cash Collateral Account, the Cash Collateral Account Control Agreement; (ii) with respect to all deposit accounts, a deposit account control agreement, substantially in the form of Exhibit C hereto or otherwise containing substantially similar terms and acceptable in form and substance to the Administrative Agent, among one or more Loan Parties, the Administrative Agent and the bank which maintains such Deposit Account and (iii) with respect to a Securities Account, a securities account control agreement, substantially in the form of Exhibit B to the Pledge Agreement or otherwise containing substantially similar terms and acceptable in form and substance to the Administrative Agent, among one or more Loan Parties, the Administrative Agent and the Securities Intermediary which maintains such Securities Account, in each case as the same may be amended, restated, modified or supplemented from time to time .

"Accounts" means (i) all "accounts" (as defined in the UCC), (ii) all of the rights of any Loan Party in, to and under all purchase orders for goods, services or other property, (iii) all of the rights of any Loan Party to any goods, services or other property represented by any of the foregoing (including returned or repossessed goods and unpaid seller's rights of rescission, replevin, reclamation and rights to stoppage in transit) and (iv) all monies due to or to become due to any Loan Party under any and all contracts for any of the foregoing (in each case, whether or not yet earned by performance on the part of such Loan Party), including, without limitation, the right to receive the Proceeds of said purchase orders and contracts, all Supporting Obligations of any kind given by any Person with respect to all or any of the foregoing.

"Account Debtor" means an "account debtor" (as defined in the UCC), and also means and includes Persons obligated to pay negotiable instruments and other Receivables.

"Cash Collateral Account" has the meaning set forth in Section 2.04 of this Agreement.

"Cash Collateral Account Control Agreement" means the Account Control Agreement dated the date hereof, by and between the Borrower, the Administrative Agent and Goldman Sachs & Co. as Securities Intermediary, with respect to the Cash Collateral Account.

"Cash Equivalents" has the meaning set forth in Section 2.05 of this Agreement.

"Claims" means all "commercial tort claims" (as defined in the UCC), including, without limitation, each of the claims described on Schedule 1.01 hereto, as such Schedule may be amended, modified or supplemented from time to time, and also means and includes all claims, causes of action and similar rights and interests (however characterized) of a Loan Party, whether arising in contract, tort or otherwise, and whether or not subject to any action, suit, investigation or legal, equitable, arbitration or administrative proceedings.

"Collateral" has the meaning set forth in Section 2.01 of this Agreement.

"Collateral Accounts" means one or more of the Cash Collateral Account and any Deposit Accounts established with or in the possession or under the control of the Administrative Agent.

"Computer Hardware" means all computer and other electronic data processing hardware of a Loan Party, whether now or hereafter owned, licensed or leased by such Loan Party, including, without limitation, all integrated computer systems, central processing units, memory units, display terminals, printers, features, computer elements, card readers, tape drives, hard and soft disk drives, cables, electrical supply hardware, generators, power equalizers, accessories, peripheral devices and other related computer hardware, all documentation, flowcharts, logic diagrams, manuals, specifications, training materials, charts and pseudo codes associated with any of the foregoing and all

S-2

options, warranties, services contracts, program services, test rights, maintenance rights, support rights, renewal rights and indemnifications relating to any of the foregoing.

"Copyright" means any of the following, whether now existing or hereafter arising, created or acquired:

       (i)     the United States and foreign copyrights described on Schedule V to the Perfection Certificate (as such schedule may be amended, modified or supplemented from time to time) and any renewals thereof;

       (ii)    all other common law and/or statutory rights in all copyrightable subject matter under the Laws of the United States or any other country (whether or not the underlying works of authorship have been published);

       (iii)   all registrations and applications for registration of any such copyright in the United States or any other country, including registrations, recordings, supplemental, derivative or collective work registrations and pending applications for registrations in the United States Copyright Office or any other country;

       (iv)   all computer programs, web pages, computer data bases and computer program flow diagrams, including all source codes and object codes related to any or all of the foregoing;

       (v)    all claims for, and rights to sue for, past, present and future infringement of any of the foregoing;

       (vi)   all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing, including, without limitation, damages and payments for past, present or future infringements thereof and payments and damages under all Copyright Licenses in connection therewith;

       (vii)   all rights in any of the foregoing, whether arising under the Laws of the United States or any foreign country or otherwise, to copy, record, synchronize, broadcast, transmit, perform and/or display any of the foregoing or any matter which is the subject of any of the foregoing in any manner and by any process now known or hereafter devised; and

       (viii)  the name and title of each Copyright item and all rights of any Loan Party to the use thereof, including, without limitation, rights protected pursuant to trademark, service mark, unfair competition, anti-cybersquatting and/or the rules and principles of any other applicable statute, common law or other rule or principle of law now existing or hereafter arising.

"Copyright Security Agreement" means a Grant of Security Interest in United States Copyrights Agreement, substantially in the form of Exhibit B to this Agreement, between one or more Loan Parties and the Administrative Agent, as the same may be amended, modified or supplemented from time to time.

"Copyright License" means any agreement now or hereafter in existence granting to any Loan Party any rights, whether exclusive or non-exclusive, to use another Person's copyrights or copyright applications, or pursuant to which any Loan Party has granted to any other Person, any right, whether exclusive or non-exclusive, with respect to any Copyright, whether or not registered, including,

without limitation, the Copyright Licenses described on <u>Schedule V</u> to the Perfection Certificate (as such schedule may be amended, modified or supplemented from time to time).

"<u>Deposit Accounts</u>" means all "deposit accounts" (as defined in the UCC) and also means and includes all demand, time, savings, passbook or similar accounts maintained by a Loan Party with a bank or other financial institution, whether or not evidenced by an Instrument, all cash and other funds held therein and all passbooks related thereto and all certificates and Instruments, if any, from time to time representing, evidencing or deposited into such deposit accounts.

"<u>Equipment</u>" means all "equipment" (as defined in the UCC), including all items of machinery, equipment, Computer Hardware, furnishings and fixtures of every kind, whether or not affixed to real property, as well as all motor vehicles, automobiles, trucks, trailers, railcars, barges and vehicles of every description, handling and delivery equipment, all additions to, substitutions for, replacements of or accessions to any of the foregoing, all attachments, components, parts (including spare parts) and accessories whether installed thereon or affixed thereto and all fuel for any thereof and all options, warranties, service contracts, program services, test rights, maintenance rights, support rights, improvement rights and indemnifications relating to any of the foregoing.

"<u>Event of Default</u>" means one or more Events of Default, as such term is defined in the Credit Agreement.

"<u>Excluded Contract</u>" means at any date any rights or interest of a Loan Party in, to or under any agreement, contract, license, instrument, document or other general intangible (referred to solely for purposes of this definition as a "<u>Contract</u>") to the extent that such Contract by the express terms of a valid and enforceable restriction in favor of a Person who is not a Group Company (as defined in the Credit Agreement), (i) prohibits, or requires any consent or establishes any other condition for, an assignment thereof or a grant of a security interest therein by a Loan Party or (ii) would give any party to such Contract other than a Group Company an enforceable right to terminate its obligations thereunder; <u>provided</u> that (i) in the case of each such Contract in existence or the subject of rights in favor of a Loan Party as of the Closing Date the contravention or violation of which could reasonably be expected to have a Material Adverse Effect, such Contract is listed and designated as such on <u>Schedule 5.02</u> to the Credit Agreement; (ii) rights to payment under any such Contract otherwise constituting an Excluded Contract by virtue of this definition shall be included in the Collateral to the extent permitted thereby or by Section 9-406 or Section 9-408 of the UCC; (iii) all Proceeds paid or payable to any Loan Party from any sale, transfer or assignment of such Contract and all rights to receive such Proceeds shall be included in the Collateral; and (iv) the term "<u>Excluded Contract</u>" shall not include any rights or interest of a Loan Party in, to or under any Contract arising after the Closing Date which is material to the conduct of the business of a Loan Party or with respect to which a contravention or other violation caused or arising by its inclusion as Collateral under this Agreement could reasonably be expected to have a Material Adverse Effect unless (A) the Loan Party shall have used, or shall be diligently using, commercially reasonable and good faith efforts to obtain all requisite consents or approvals by the other party to such Contract of all of such Loan Party's right, title and interest thereunder to the Administrative Agent or its designee and (B) the Loan Party shall have given prompt written notice to the Administrative Agent upon any failure to obtain such consent or approval.

"<u>Excluded Equipment</u>" means at any date any Equipment of a Loan Party which is subject to, or secured by, a Capital Lease Obligation or Purchase Money Debt which is permitted under <u>Sections 7.01</u> and <u>7.02</u> of the Credit Agreement if and to the extent that (i) the express terms of a valid and enforceable restriction in favor of a Person who is not a Group Company contained in the agreements or documents granting or governing such Capital Lease Obligation or Purchase Money Debt prohibits, or requires any consent or establishes any other conditions for, an assignment thereof, or a grant of a security

S-4

interest therein, by a Loan Party and (ii) such restriction relates only to the asset or assets acquired by a Loan Party with the Proceeds of such Capital Lease Obligation or Purchase Money Debt; provided that all Proceeds paid or payable to any Loan Party from any sale, transfer or assignment or other voluntary or involuntary disposition of such Equipment and all rights to receive such Proceeds shall be included in the Collateral to the extent not otherwise required to be paid to the holder of the Capital Lease Obligation or Purchase Money Debt secured by such Equipment.

"Exempt Deposit Accounts" means Deposit Accounts the balance of which consists exclusively of (i) withheld income taxes and federal, state or local employment taxes in such amounts as are required in the reasonable judgment of the Borrower to be paid to the Internal Revenue Service or state or local government agencies within the following two months with respect to employees of any of the Loan Parties and (ii) amounts required to be paid over to an employee benefit plan pursuant to DOL Reg. Sec. 2510.3-102 on behalf of or for the benefit of employees of one or more Loan Parties.

"General Intangibles" means all "general intangibles" (as defined in the UCC) and also means and includes (i) all Payment Intangibles and other obligations and indebtedness owing to any Loan Party (other than Accounts), from whatever source arising, (ii) all Claims, Judgments and/or Settlements, (iii) all rights or claims in respect of refunds for taxes paid, (iv) all rights in respect of any pension plans or similar arrangements maintained for employees of any Loan Party or any member of the ERISA Group, (v) all interests in limited liability companies and/or partnerships which interests do not constitute Securities and (vi) all Supporting Obligations of any kind given by any Person with respect to all or any of the foregoing.

"Goldman Sachs" means Goldman Sachs & Co. and its Affiliates.

"Intellectual Property" means all Patents, Trademarks, Copyrights, Software, Licenses, rights in intellectual property, goodwill, trade names, service marks, trade secrets, confidential or proprietary technical and business information, know-how, show-how, domain names, mask works, customer lists, vendor lists, subscription lists, data bases and related documentation, registrations, franchises and all other intellectual or other similar property rights.

"Judgments" means all judgments, decrees, verdicts, decisions or orders issued in resolution of or otherwise in connection with a Claim, whether or not final or subject to appeal, and including all rights of enforcement relating thereto and any and all Proceeds thereof.

"Letter-of-Credit Right" means all "letter-of-credit rights" (as defined in the UCC) and also means and includes all rights of a Loan Party to demand payment or performance under a letter of credit (as defined in Article V of the UCC).

"License" means any Patent License, Trademark License, Copyright License, Software License or other license or sublicense as to which any Loan Party is a party.

"Loan Party" means the Borrower and each Subsidiary Guarantor, individually, and "Loan Parties" means all of them, collectively.

"Minimum Cash Collateral" means the sum of $25,000,000.

"Obligations" shall have the meaning set forth in the Credit Agreement.

"Patent" means any of the following:

S-5

(i)       the United States and foreign patents described on <u>Schedule V</u> to the Perfection Certificate (as such schedule may be amended, modified or supplemented from time to time) and any renewals thereof;

(ii)      all other letters patent and design letters patent of the United States or any other country;

(iii)     all applications filed or in preparation for filing for letters patent and design letters patent of the United States or any other country including, without limitation, applications in the United States Patent and Trademark Office or in any similar office or agency of the United States or any other country or political subdivision thereof;

(iv)     all reissues, divisions, continuations, continuations-in-part, revisions, renewals or extensions thereof;

(v)      all claims for, and rights to sue for, past, present or future infringement of any of the foregoing;

(vi)     all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing, including, without limitation, damages and payments for past, present or future infringements thereof and payments and damages under all Patent Licenses in connection therewith; and

(vii)    all rights corresponding to any of the foregoing whether arising under the Laws of the United States or any foreign country or otherwise.

"<u>Patent and Trademark Security Agreement</u>" means a Grant of Security Interest in United States Patents and Trademarks Agreement, substantially in the form of <u>Exhibit A</u> to this Agreement, between one or more Loan Parties and the Administrative Agent, as the same may be amended, modified or supplemented from time to time.

"<u>Patent License</u>" means any agreement now or hereafter in existence granting to any Loan Party any right, whether exclusive or non-exclusive, with respect to any Person's patent or any invention now or hereafter in existence, whether or not patentable, or pursuant to which any Loan Party has granted to any other Person, any right, whether exclusive or non-exclusive, with respect to any Patent or any invention now or hereafter in existence, whether or not patentable and whether or not a Patent or application for Patent in or hereafter comes into existence on such invention, including, without limitation, the Patent Licenses described on <u>Schedule V</u> to the Perfection Certificate (as such schedule may be amended, modified or supplemented from time to time).

"<u>Perfection Certificate</u>" means a certificate, substantially in the form of <u>Exhibit G-3</u> to the Credit Agreement, completed and supplemented with the schedules and attachments contemplated thereby.

"<u>Permitted Lien</u>" means any Lien referred to in, and permitted by, <u>Section 7.01</u> of the Credit Agreement.

"<u>Receivables</u>" means all Accounts, all Payment Intangibles, all Instruments, all Chattel Paper, all Letter-of-Credit Rights and all Supporting Obligations supporting or otherwise relating to any of the foregoing.

ffny03\rosenke\670190.14

"Recordable Intellectual Property" means Intellectual Property the transfer of which is required to be recorded in the United States Patent and Trademark Office or the United States Copyright Office in order to be effective against subsequent third party transferees; provided that for the avoidance of doubt the following shall not be considered "Recordable Intellectual Property" hereunder: (i) unregistered United States Copyrights and Trademarks; (ii) licenses, other than exclusive copyright licenses or registered copyrights; and (iii) licenses that are reasonably susceptible of being considered assignments.

"Secured Party" has the meaning set forth in the introductory section hereof.

"Security Interests" means the security interests in the Collateral granted under this Agreement securing the Obligations.

"Settlements" means all right, title and interest of a Loan Party in, to and under any settlement agreement or other agreement executed in settlement or compromise of any Claim, including all rights to enforce such agreements and all payments thereunder or arising in connection therewith.

"Software" means all "software" (as defined in the UCC), and also means and includes all software programs, whether now or hereafter owned, licensed or leased by a Loan Party, designed for use on Computer Hardware, including, without limitation, all operating system software, utilities and application programs in whatever form and whether or not embedded in goods, all source code and object code in magnetic tape, disk or hard copy format or any other listings whatsoever, all firmware associated with any of the foregoing all documentation, flowcharts, logic diagrams, manuals, specifications, training materials, charts and pseudo codes associated with any of the foregoing, and all options, warranties, services contracts, program services, test rights, maintenance rights, support rights, renewal rights and indemnifications relating to any of the foregoing.

"Software License" means any agreement (including any agreement constituting a Copyright License, Patent License and/or Trademark License) now or hereafter in existence granting to any Loan Party any right, whether exclusive or non-exclusive, to use another Person's Software, or pursuant to which any Loan Party has granted to any other Person, any right, whether exclusive or non-exclusive, to use any Software, whether or not subject to any registration.

"Supporting Obligation" means a Letter-of-Credit Right, Guarantee or other secondary obligation supporting or any Lien securing the payment or performance of one or more Receivables, General Intangibles, Documents, or Investment Property.

"Trademark" means any of the following:

(i)     the United States and foreign trademarks described on Schedule V to the Perfection Certificate (as such schedule may be amended, modified or supplemented from time to time) and any renewals thereof (but excluding in all cases all intent-to-use United States trademark applications for which an amendment to allege use or statement of use has not been filed under 15 U.S.C. § 1051(c) or 15 U.S.C. § 1051(d), respectively, or if filed, has not been deemed in conformance with 15 U.S.C. § 1051(a) or examined and accepted, respectively, by the United States Patent and Trademark Office (the "Excluded Trademarks"));

(ii)    all other trademarks, trade names, corporate names, company names, business names, fictitious business names, trade styles, service marks, logos, certification marks, collective marks, brand names and trade dress which are or have been used in the United States or in any state, territory or possession thereof, or in any other place, nation or jurisdiction, along

S-7

with package and other designs, and any other source or business identifiers, and general intangibles of like nature, and the rights in any of the foregoing which arise under applicable Law;

          (iii)    the goodwill of the business symbolized thereby or connected with the use of each of the foregoing;

          (iv)    all registrations and applications in connection therewith, including, without limitation, registrations and applications in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof;

          (v)    all reissues, extensions and renewals thereof;

          (vi)    all claims for, and rights to sue for, past, present or future infringements of any of the foregoing;

          (vii)    all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing, including, without limitation, damages and payments for past, present or future infringements thereof and payments and damages under all Trademark Licenses in connection therewith; and

          (viii)    all rights corresponding to any of the foregoing whether arising under the Laws of the United States or any foreign country or otherwise.

        "Trademark License" means any agreement now or hereafter in existence granting to any Loan Party any right, whether exclusive or non-exclusive, to use another Person's trademarks or trademark applications, or pursuant to which any Loan Party has granted to any other Person, any right, whether exclusive or non-exclusive, to use any Trademark, whether or not registered, including, without limitation, the Trademark Licenses described on Schedule V to the Perfection Certificate (as such schedule may be amended, modified or supplemented from time to time) and the rights to prepare for sale, sell and advertise for sale, all of the inventory now or hereafter owned by any Loan Party and now or hereafter covered by such license agreements.

        "UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that if by reason of mandatory provisions of Law, the perfection, the effect of perfection or non-perfection or the priority of the Security Interests in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

        Section 1.04    Terms Generally.  The definitions in Sections 1.02 and 1.03 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.  Unless otherwise expressly provided herein, the word "day" means a calendar day.

ffny03\rosenke\670190.14

## ARTICLE II
## SECURITY INTERESTS

Section 2.01    <u>Grant of Security Interests</u>.  To secure the due and punctual payment of all Obligations, howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing or due or to become due, in accordance with the terms thereof and to secure the performance of all of the obligations of each Loan Party hereunder and under the other Loan Documents, each Loan Party hereby grants to the Administrative Agent for the benefit of the Secured Parties a security interest in, and each Loan Party hereby pledges and collaterally assigns to the Administrative Agent for the benefit of the Secured Parties, all of such Loan Party's right, title and interest in, to and under the following, whether now owned or existing or hereafter acquired, created or arising, whether tangible or intangible, and regardless of where located (all of which are herein collectively called the "<u>Collateral</u>"):

       (i)     all Receivables;

       (ii)     all Inventory;

       (iii)     all General Intangibles;

       (iv)     all Intellectual Property;

       (v)     all Documents and all Supporting Obligations of any kind given by any Person with respect thereto;

       (vi)     all Equipment;

       (vii)     all Investment Property and all Supporting Obligations of any kind given by any Person with respect thereto;

       (viii)     all Deposit Accounts;

       (ix)     all As-Extracted Collateral;

       (x)     the Collateral Accounts, all cash and other property deposited therein or credited thereto from time to time, and other monies and property of any kind of any Loan Party maintained with or in the possession of or under the control of the Administrative Agent;

       (xi)     all books and records (including, without limitation, customer lists, credit files, computer programs, printouts and other computer materials and records) of each Loan Party pertaining to any of the Collateral; and

       (xii)     all Proceeds of all or any of the Collateral described in <u>clauses (i)</u> through <u>(xii)</u> hereof;

<u>provided,</u> <u>however</u> that the Collateral shall not include any Excluded Contracts, Excluded Equipment, Excluded Trademarks or Exempt Deposit Accounts.

Section 2.02    <u>Continuing Liability of Each Loan Party</u>.  Anything herein to the contrary notwithstanding, each Loan Party shall remain liable to observe and perform all the terms and conditions to be observed and performed by it under any contract, agreement, warranty or other obligation

ffny03\rosenke\670190.14

with respect to the Collateral. Neither the Administrative Agent nor any Secured Party shall have any obligation or liability under any such contract, agreement, warranty or obligation by reason of or arising out of this Agreement or the receipt by the Administrative Agent or any Secured Party of any payment relating to any Collateral, nor shall the Administrative Agent or any Secured Party be required to perform or fulfill any of the obligations of any Loan Party with respect to any of the Collateral, to make any inquiry as to the nature or sufficiency of any payment received by it or the sufficiency of the performance of any party's obligations with respect to any Collateral. Furthermore, neither the Administrative Agent nor any Secured Party shall be required to file any claim or demand to collect any amount due or to enforce the performance of any party's obligations with respect to the Collateral.

Section 2.03    Security Interests Absolute. All rights of the Administrative Agent, all security interests hereunder and all obligations of each Loan Party hereunder are unconditional and absolute and independent and separate from any other security for or guaranty of the Obligations, whether executed by such Loan Party, any other Loan Party. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be released, discharged or otherwise affected or impaired by:

(i)    any extension, renewal, settlement, compromise, acceleration, waiver or release in respect of any obligation of any other Loan Party under any Loan Document or any other agreement or instrument evidencing or securing any Obligation, by operation of law or otherwise;

(ii)    any change in the manner, place, time or terms of payment of any Obligation or any other amendment, supplement or modification to any Loan Document or any other agreement or instrument evidencing or securing any Obligation;

(iii)    any release, non-perfection or invalidity of any direct or indirect security for any Obligation, any sale, exchange, surrender, realization upon, offset against or other action in respect of any direct or indirect security for any Obligation or any release of any other obligor or Loan Parties in respect of any Obligation;

(iv)    any change in the existence, structure or ownership of any Loan Party, or any insolvency, bankruptcy, reorganization, arrangement, readjustment, composition, liquidation or other similar proceeding affecting any Loan Party or its assets or any resulting disallowance, release or discharge of all or any portion of any Obligation;

(v)    the existence of any claim, set-off or other right which any Loan Party may have at any time against the Borrower, any other Loan Party, any Agent, any other Secured Party or any other Person, whether in connection herewith or any unrelated transaction; provided that nothing herein shall prevent the assertion of any such claim by separate suit or compulsory counterclaim;

(vi)    any invalidity or unenforceability relating to or against the Borrower or any other Loan Party for any reason of any Loan Document or any other agreement or instrument evidencing or securing any Obligation or any provision of applicable Law or regulation purporting to prohibit the payment by the Borrower or any other Loan Party of any Obligation;

(vii)    any failure by any Secured Party: (A) to file or enforce a claim against any Loan Party or its estate (in a bankruptcy or other proceeding); (B) to give notice of the existence, creation or incurrence by any Loan Party of any new or additional indebtedness or obligation under or with respect to the Obligations; (C) to commence any action against any Loan

S-10

Party; (D) to disclose to any Loan Party any facts which such Secured Party may now or hereafter know with regard to any Loan Party; or (E) to proceed with due diligence in the collection, protection or realization upon any collateral securing the Obligations;

(viii)    any direction as to application of payment by the Borrower, any other Loan Party or any other Person;

(ix)    any subordination by any Secured Party of the payment of any Obligation to the payment of any other liability (whether matured or unmatured) of any Loan Party to its creditors;

(x)    any act or failure to act by the Administrative Agent or any other Secured Party under this Agreement or otherwise which may deprive any Loan Party of any right to subrogation, contribution or reimbursement against any other Loan Party or any right to recover full indemnity for any payments made by such Loan Party in respect of the Obligations; or

(xi)    any other act or omission to act or delay of any kind by any Loan Party or any Secured Party or any other Person or any other circumstance whatsoever which might, but for the provisions of this clause, constitute a legal or equitable discharge of any Loan Party's obligations hereunder.

Each Loan Party has irrevocably and unconditionally delivered this Agreement to the Administrative Agent, for the benefit of the Secured Parties, and the failure by any other Person to sign this Agreement or a security agreement similar to this Agreement or otherwise shall not discharge the obligations of any Loan Party hereunder.

This Agreement shall remain fully enforceable against each Loan Party irrespective of any defenses that any other Loan Party may have or assert in respect of the Obligations, including, without limitation, failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury.

Section 2.04    Cash Collateral Account.

*Creation of Cash Collateral Account.*  Borrower shall establish with Goldman Sachs, as securities intermediary, a securities Account (the "Cash Collateral Account"), as to which the Administrative Agent, for the benefit of the Secured Parties, has a first priority perfected security interest and in which there shall be on deposit (to the extent required by the Credit Agreement) at all times an amount not less than the Minimum Cash Collateral. The Cash Collateral Account together with any property or assets from time to time deposited in or credited to the Cash Collateral Account shall constitute part of the Collateral hereunder and shall not constitute payment of the Obligations until applied thereto as hereinafter provided.

Section 2.05    Investment of Funds in Collateral Accounts.  Amounts on deposit in the Cash Collateral Accounts shall be invested and re-invested from time to time in such Cash Equivalents as the Borrower shall determine; provided that, if an Event of Default has occurred and is continuing, the Administrative Agent may liquidate any such Cash Equivalents and apply or cause to be applied the proceeds thereof in the manner specified in Section 5.04. The Borrower shall be permitted to remove amounts in excess of the Minimum Cash Collateral from the Cash Collateral Account if at such time there has not been an occurrence and the continuance of an Event of Default.

S-11

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants on the Closing Date and on the date any Loan is made:

Section 3.01    Title to Collateral. Such Loan Party has good and marketable title to, or valid license or leasehold interests in, all of the Collateral in which it has granted a security interest hereunder, free and clear of any Liens other than Permitted Liens. Such Loan Party has taken all actions necessary under the UCC to perfect its interest in any Receivables purchased by or assigned to it, as against its assignors and creditors of its assignors. Other than financing statements or other similar or equivalent documents or instruments with respect to the Security Interests, Permitted Liens and Liens securing indebtedness to be repaid with the proceeds of the Loan under the Credit Agreement and in respect of which the Administrative Agent has received pay-off letters and instruments appropriate under local Law to effect the termination of such Liens, no financing statement, mortgage, security agreement or similar or equivalent document or instrument covering all or any part of the Collateral is on file or of record in any jurisdiction in which such filing or recording would be effective to perfect a Lien on such Collateral. No Collateral having a value individually or collectively in excess of $500,000 is in the possession or control of any Person (other than a Loan Party) asserting any claim thereto or any security interest therein.

Section 3.02    Validity, Perfection and Priority of Security Interests.

(a)    The Security Interests constitute valid security interests under the UCC securing the Obligations.

(b)    When Uniform Commercial Code financing statements shall have been filed in the offices specified in Schedule 4.01 hereto, the Security Interests will constitute perfected security interests in all right, title and interest of such Loan Party in the Collateral to the extent that a security interest therein may be perfected by filing pursuant to the UCC, prior to all other Liens and rights of others therein except for Permitted Liens.

(c)    When each Patent and Trademark Security Agreement has been filed with the United States Patent and Trademark Office and each Copyright Security Agreement has been filed with the United States Copyright Office, and the financing statements contemplated in Subsection (b) above and filed as contemplated therein, the Security Interests will constitute perfected security interests in all right, title and interest of such Loan Party in the Recordable Intellectual Property therein described to the extent that a security interest therein may be perfected by such filings pursuant to applicable Law, prior to all other Liens and rights of others therein except for Permitted Liens.

(d)    When each Account Control Agreement has been executed and delivered to the Administrative Agent, the Security Interests will constitute perfected security interests in all right, title and interest of the Loan Parties in the Deposit Accounts and Securities Accounts, as applicable, subject thereto, prior to all other Liens and rights of others therein and subject to no adverse claims except for Permitted Liens.

(e)    When each consent substantially in the form of Exhibit F hereto has been executed and delivered to the Administrative Agent, the Security Interests shall constitute perfected security interests in all right, title and interest of such Loan Party in the Letter-of-Credit Rights referred to therein, prior to all other Liens and rights of others therein except for Permitted Liens.

S-12

(f)      So long as such Loan Party is in compliance with the provisions of <u>Section 4.15</u>, the Security Interests shall constitute perfected security interests in all right, title and interest of such Loan Party in all electronic Chattel Paper, prior to all other Liens and rights of others therein except for Permitted Liens.

Section 3.03    <u>Fair Labor Standards Act</u>.  To the knowledge of each Loan Party, all of such Loan Party's Inventory has or will have been produced in compliance with the applicable requirements of the Fair Labor Standards Act, as amended from time to time, or any successor statute, and regulations promulgated thereunder.

Section 3.04    <u>Receivables</u>.  With respect to each material Receivable of such Loan Party, all records, papers and documents relating thereto (if any) are genuine and in all respects what they purport to be, and all papers and documents (if any) relating thereto (i) represent legal, valid and binding obligations of the respective Account Debtor, subject to adjustments customary in the business of such Loan Party, with respect to unpaid indebtedness or other monetary obligations incurred by such Account Debtor in respect of the performance of labor or services, the sale, lease, license, assignment, exchange and delivery of the merchandise or other property listed therein, the incurrence of a secondary obligation as set forth therein or the use of a credit or charge card or information contained on or for use with such a card or any combination of the foregoing, and (ii) are the only original writings evidencing and embodying such obligations of the Account Debtor named therein (other than copies created for general accounting purposes) and are in material compliance with all applicable federal, state and local Laws and applicable Laws of any relevant foreign jurisdiction.

Section 3.05    <u>No Consents</u>.  No consent of any other Person (including, without limitation, any stockholder or creditor of such Loan Party or any of its Subsidiaries) and no order, consent, approval, license, authorization or validation of, or filing, recording or registration with, or exemption by any Governmental Authority is required to be obtained by such Loan Party in connection with the execution, delivery or performance of this Agreement, or in connection with the exercise of the rights and remedies of the Administrative Agent pursuant to this Agreement, except (i) as may be required to perfect (as described in <u>Schedule 4.01</u> hereto) and maintain the perfection of the security interests created hereby, (ii) with respect to vehicles represented by a certificate of title, (iii) with respect to Receivables subject to the Federal Assignment of Claims Act or (iv) in connection with the disposition of the Collateral by Laws affecting the offering and sale of securities generally or as described in <u>Schedule 5.04</u> to the Credit Agreement; <u>provided</u>, <u>however</u>, that (i) the registration of Copyrights in the United States Copyright Office may be required to obtain a security interest therein that is effective against subsequent transferees under United States Federal copyright law and (ii) to the extent that recordation of the Security Interests in the United States Patent and Trademark Office or the United States Copyright Office is necessary to perfect the Security Interests or to render the Security Interests effective against subsequent third parties, such recordations will not have been made with respect to the items that are not Recordable Intellectual Property.

Section 3.06    <u>Deposit and Securities Accounts</u>.  <u>Schedule 3.06</u> hereto sets forth as of the date hereof a complete and correct list of each Loan Party's Deposit Accounts and Securities Accounts, the name and address of the financial institution which maintains each such account and the purpose for which such account is used.

S-13

ARTICLE IV
COVENANTS

Each Loan Party covenants and agrees that until the payment in full of all Obligations and until there is no commitment by any Secured Party to make further advances, incur obligations or otherwise give value, such Loan Party will comply with the following:

Section 4.01    Delivery of Perfection Certificate; Initial Perfection and Delivery of Search Reports. Prior to the Closing Date, (i) the Borrower shall deliver the Perfection Certificate to the Administrative Agent, (ii) the Borrower shall deliver to the Administrative Agent the fully executed Cash Collateral Account Control Agreement with respect to the Cash Collateral Account, (iii) each Loan Party shall deliver to the Administrative Agent a fully executed consent substantially in the form of Exhibit E hereto with respect to each of its Letter-of-Credit Rights and (iv) each Loan Party shall cause all filings and recordings specified in Schedule 4.01 hereto to have been completed. The information set forth in the Perfection Certificate shall be correct and complete as of the Closing Date.

Section 4.02    Change of Name, Identity, Structure or Location; Subjection to Other Security Agreements. Such Loan Party will not change the location of any Collateral without providing prior notice to the Administrative Agent of the new location(s). Such Loan Party will not change its name, identity, structure or location (determined as provided in Section 9-307 of the UCC) in any manner, and shall not become bound, as provided in Section 9-203(d) of the UCC, by a security agreement entered into by another Person, in each case unless it shall have given the Administrative Agent not less than 30 days' prior notice thereof. Such Loan Party shall not in any event change the location of any Collateral or its name, identity, structure or location (determined as provided in Section 9-307 of the UCC), or become bound, as provided in Section 9-203(d) of the UCC, by a security agreement entered into by another Person, if such change would cause the Security Interests in any Collateral to lapse or cease to be perfected unless such Loan Party has taken on or before the date of lapse all actions necessary to ensure that the Security Interests in the Collateral do not lapse or cease to be perfected.

Section 4.03    Further Actions. Such Loan Party will, from time to time at its expense and in such manner and form as the Administrative Agent may reasonably request, execute, deliver, file and record any financing statement, specific assignment, instrument, document, agreement or other paper and take any other action (including, without limitation, any filings of financing or continuation statements under the Uniform Commercial Code and any filings with the United States Patent and Trademark Office and the United States Copyright Office) that from time to time may be necessary under the UCC or with respect to Recordable Intellectual Property, or that the Administrative Agent may reasonably request, in order to create, preserve, perfect, confirm or validate the Security Interests or to enable the Administrative Agent and the Secured Parties to obtain the full benefit of this Agreement or to exercise and enforce any of its rights, powers and remedies created hereunder or under applicable Law with respect to any of the Collateral. To the extent permitted by applicable Law, such Loan Party hereby authorizes the Administrative Agent to file, in the name of such Loan Party or otherwise and without the signature or other separate authorization or authentication of such Loan Party appearing thereon, such Uniform Commercial Code financing statements or continuation statements as the Administrative Agent in its sole discretion may deem necessary or appropriate to further perfect or maintain the perfection of the Security Interests. Such Loan Party hereby authorizes the Administrative Agent to file financing and continuation statements describing as the Collateral covered thereby "all of the debtor's personal property and assets" or words to similar effect, notwithstanding that such description may be broader in scope than the Collateral described in this Agreement. Such Loan Party agrees that a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement. The Loan Parties shall pay the costs of, or incidental to, any recording or filing of any financing or continuation statements or other assignment documents concerning the Collateral.

Section 4.04    Collateral in Possession of Other Persons, Leased Real Property Locations. If any of such Loan Party's Collateral having a value individually or collectively in excess of $500,000 is at any time in the possession or control of any warehouseman, vendor, bailee or any agents or processors of any Loan Party, such Loan Party shall (i) notify such warehouseman, vendor, bailee, agent or processor of the Security Interests created hereby, (ii) instruct such warehouseman, vendor, bailee, agent or processor to hold all such Collateral for the Administrative Agent's account and subject to the Administrative Agent's instructions, (iii) use commercially reasonable efforts to cause such warehouseman, vendor, bailee, agent or processor to authenticate a record acknowledging that it holds possession of such Collateral for the benefit of the Administrative Agent and the Secured Parties and (iv) make such authenticated record available to the Administrative Agent; provided that network servers and similar computer hardware used in the Borrower's internet business and kept at a co-location facility shall not be subject to this Section 4.04. Such Loan Party agrees that if any warehouse receipt or receipt in the nature of a warehouse receipt is issued with respect to any of its Inventory, such warehouse receipt or receipt in the nature thereof shall not be "negotiable" (as such term is used in Section 7-104 of the Uniform Commercial Code as in effect in any relevant jurisdiction or under other relevant Law). If any Loan Party enters into any lease of real estate after the date hereof, prior to entering into and for a period of 90 days after entering into any such lease, such Loan Party will use commercially reasonable efforts to obtain waivers from the landlords of all such real estate, substantially in the form of Exhibit D hereto or in such other form as shall be reasonably acceptable to the Administrative Agent.

Section 4.05    Books and Records. Such Loan Party shall keep full and accurate books and records relating to the Collateral, including, but not limited to, the originals of all documentation with respect thereto, records of all payments received, all credits granted thereon, all merchandise returned and all other dealings therewith, and such Loan Party will make the same available to the Administrative Agent for inspection, at such Loan Party's own cost and expense, at any and all reasonable times upon demand; provided that, so long as no Event of Default has occurred and is continuing, the Administrative Agent may make any such request no more than two times per calendar year.

Section 4.06    Delivery of Instruments, Etc. Such Loan Party will immediately deliver each Instrument and each Certificated Security (other than (i) Cash Equivalents held in the Cash Collateral Account and subject to an effective Account Control Agreement as required by Section 2.04 hereof and (ii) Instruments or Certificated Securities having individually, a face amount of less than $100,000 in the case of Instruments or Certificated Securities subject to this clause (ii)) to the Administrative Agent, appropriately indorsed to the Administrative Agent; provided that so long as no Default or Event of Default shall have occurred and be continuing, and except as required by any other Loan Document, such Loan Party may (unless otherwise provided in Section 2.04(b)) retain for collection in the ordinary course of business any checks, drafts and other Instruments received by it in the ordinary course of business, and the Administrative Agent shall, promptly upon request of such Loan Party, make appropriate arrangements for making any other Instrument or Certificated Security pledged by such Loan Party available to it for purposes of presentation, collection or renewal (any such arrangement to be effected, to the extent deemed appropriate to the Administrative Agent, against trust receipt or like document).

Section 4.07    Collection and Verification of Receivables.

(a)    Collection of Receivables. Such Loan Party shall use its commercially reasonable efforts to cause to be collected from each Account Debtor, as and when due, any and all amounts owing under or on account of each Receivable (including, without limitation, Receivables which are delinquent, such Receivables to be collected in accordance with lawful collection procedures) unless such Loan Party shall reasonably determine in respect of any such Receivable that such efforts would be

of negligible economic value, and shall apply forthwith upon receipt thereof all such amounts as are so collected to the outstanding balance of such Receivable. Such Loan Party shall not rescind or cancel any indebtedness or obligation evidenced by any Receivable, make adjustments to, extend, renew, compromise or settle any material dispute, claim, suit or legal proceeding relating to, or sell or assign, any Receivable, or interest therein, except in the ordinary course of business in accordance with past practice. The costs and expenses (including, without limitation, attorneys' fees) of collection of Receivables, whether incurred by such Loan Party or the Administrative Agent, shall be borne by the Loan Parties.

(b) _Verification of Receivables_. Upon the occurrence and during the continuance of a Default or an Event of Default, the Administrative Agent shall have the right to make test verifications of Receivables in a reasonable manner and through any medium that it considers advisable, and each Loan Party agrees to furnish all reasonable assistance and required information as to the Administrative Agent. Upon the occurrence and during the continuance of an Event of Default, each Loan Party, at its own expense, will cause its chief financial officer to furnish to the Administrative Agent at any time and from time to time promptly upon the Administrative Agent's request (i) a reconciliation of all Receivables, (ii) an aging of all Receivables, (iii) trial balances and (iv) a test verification of such Receivables as the Administrative Agent may request.

Section 4.08    Notification to Account Debtors. Upon the occurrence and during the continuance of any Event of Default and if so requested by the Administrative Agent, such Loan Party will promptly notify (and such Loan Party hereby authorizes the Administrative Agent so to notify) each Account Debtor in respect of any Receivable that such Collateral has been assigned to the Administrative Agent hereunder for the benefit of the Secured Parties, and that any payments due or to become due in respect of such Collateral are to be made by such Account Debtor and any other Person via direct wire transfer directly to the Administrative Agent or its designee in accordance with Section 2.04 hereof.

Section 4.09    Certificates of Title; Fixtures. Upon the occurrence and during the continuance of an Event of Default and if requested by the Administrative Agent, such Loan Party shall (i) on or prior to the Closing Date, in the case of Equipment constituting one or more titled vehicles now owned, and (ii) within 10 days of acquiring any other Equipment constituting one or more titled vehicles, deliver to the Administrative Agent any and all certificates of title, applications for title or similar evidence of ownership of such Equipment and shall cause the Administrative Agent to be named as lienholder on any such certificate of title or other evidence of ownership.

Section 4.10    Disposition of Collateral. Such Loan Party will not sell, lease, exchange, license, assign or otherwise dispose of, or grant any option with respect to, any Collateral or create or suffer to exist any Lien (other than the Security Interests and Permitted Liens) on any Collateral except that, subject to the rights of the Administrative Agent and the Secured Parties hereunder, so long as no Event of Default shall have occurred and be continuing, such Loan Party may sell, lease, exchange, license, assign or otherwise dispose of, or grant options with respect to, Collateral to the extent expressly permitted by the Credit Agreement, whereupon, in the case of any such disposition, the Security Interests created hereby in such item (but not in any Proceeds arising from such disposition) shall, except as otherwise specified in the Credit Agreement, cease immediately without any further action on the part of the Administrative Agent.

Section 4.11    Insurance. Prior to the Closing Date, such Loan Party will cause the Administrative Agent to be named as an additional insured party and loss payee, effective at all times on and after the Closing Date, on each insurance policy covering risks relating to any of its Inventory and Equipment. Each such insurance policy shall include effective waivers by the insurer of all claims for insurance premiums against the Administrative Agent and the Secured Parties, provide for coverage to the Administrative Agent for the benefit of the Secured Parties regardless of the breach by such Loan Party of

ffny03\rosenke\670190.14

any warranty or representation made therein, not be subject to co-insurance, and provide that the Administrative Agent shall be notified of cancellations, terminations or material modifications of such policies. Such Loan Party hereby appoints the Administrative Agent as its attorney-in-fact, effective during the continuance of an Event of Default, to make proof of loss, claims for insurance and adjustments with insurers, and to execute or endorse all documents, checks or drafts in connection with payments made as a result of any insurance policies.

Such Loan Party assumes all liability and responsibility in connection with the Collateral acquired by it and the liability of such Loan Party to pay the Obligations shall in no way be affected or diminished by reason of the fact that such Collateral may be lost, destroyed, stolen, damaged or for any reason whatsoever unavailable to such Loan Party.

Section 4.12    Information Regarding Collateral.  Such Loan Party will, promptly upon request, provide to the Administrative Agent all information and evidence it may reasonably request concerning the Collateral to enable the Administrative Agent to enforce the provisions of this Agreement.

Section 4.13    Covenants Regarding Intellectual Property.  Except in respect of subparagraphs (a), (b), (c), (e) and (f) below where the failure to do so could not reasonably be expected to have a Material Adverse Effect:

(a)    Such Loan Party (either itself or through licensees) will, for each Patent, not do any act, or omit to do any act, whereby any Patent which is necessary or material to the conduct of such Loan Party's business may become invalidated or dedicated to the public, and shall continue to mark any products covered by a Patent with the relevant patent number or indication that a Patent is pending as required by the patent laws.

(b)    Such Loan Party (either itself or, if permitted by Law, through its licensees or its sublicensees) will, for each Trademark material to the conduct of such Loan Party's business, (i) maintain such Trademark in full force free from any claim of abandonment or invalidity from non-use, material alteration, naked licensing or genericide, (ii) maintain the quality of products and services offered under such Trademark in a manner substantially consistent with or better than the quality of such products and services as of the date hereof, (iii) display such Trademark with proper notice, including notice of federal registration to the extent permitted by applicable Law, (iv) not knowingly use or knowingly permit the use of such Trademark in violation of any third party rights, (v) not permit any assignment in gross of such Trademark and (vi) allow the Administrative Agent and its designees the right, at any time and from time to time, to inspect such Loan Party's premises and to examine and observe such Loan Party's books, records and operations, including, without limitation, its quality control processes, upon reasonable notice and at such reasonable times and as often as may be reasonably requested.

(c)    Such Loan Party (either itself or through licensees) will, for each work covered by a Copyright material to the conduct of its business, continue to publish, reproduce, display, adopt and distribute the work with appropriate copyright notice.

(d)    Such Loan Party shall promptly notify the Administrative Agent if it knows or has reason to know that any Patent, Trademark or Copyright (or any application or registration relating thereto) necessary or material to the conduct of its business may become abandoned or dedicated to the public, or of any adverse determination or development (including, without limitation, the institution of, or any such determination or development in, any proceeding in the United States Patent and Trademark Office, the United States Copyright Office or any court) regarding such Loan Party's ownership of any Patent, Trademark, Copyright or Software necessary or material to the conduct of its business, its right to register the same or to keep, use or maintain the same.

S-17

(e)       Such Loan Party will take all necessary steps to file, maintain and pursue each material application relating to the Patents, Trademarks and/or Copyrights (and to obtain the relevant grant or registration) and to preserve and maintain all common law rights in any Trademarks and each registration of the Patents, Trademarks and Copyrights in each instance which are material to the conduct of its business, including filing and paying fees for applications for renewal, reissues, divisions, continuations, continuations-in-part, affidavits of use, affidavits of incontestability and maintenance, and, unless such Loan Party shall reasonably determine that any such action would be commercially unreasonable, to initiate opposition, interference, reexamination and cancellation proceedings against third parties.

(f)       If any rights to any Patent, Trademark, Copyright, Software or License relating thereto necessary or material to the conduct of its business is believed infringed, misappropriated, breached or diluted by a third party, such Loan Party shall notify the Administrative Agent promptly after it learns thereof and shall, unless such Loan Party shall reasonably determine that any such action would be commercially unreasonable, promptly sue for infringement, misappropriation, breach or dilution and to recover any and all damages for such infringement, misappropriation or dilution, and take such other actions as such Loan Party shall reasonably deem appropriate under the circumstances to protect such Patent, Trademark, Copyright, Software or License.

(g)       Whenever a Loan Party, either itself or through any agent, employee, licensee or designee, files an application for any Patent, Trademark or Copyright with the United States Patent and Trademark Office, the United States Copyright Office or any office or agency in any political subdivision of the United States or in any other country or any political subdivision thereof, such Loan Party shall inform the Administrative Agent promptly, but in no event later than (i) 21 days after any such filing in the United States Copyright Office; or (ii) 60 days after any such filing in the United States Patent and Trademark office. Upon request of the Administrative Agent, such Loan Party shall execute and deliver any and all agreements, instruments, documents and papers as the Administrative Agent may request to evidence the Security Interests in such application, any resulting Patent, Trademark or Copyright and the goodwill or accounts and general intangibles of such Loan Party relating thereto or represented thereby, and such Loan Party hereby appoints the Administrative Agent its attorney-in-fact to execute and file such writings for the foregoing purposes.

(h)       As to all material Licenses (excluding non-exclusive Licenses of Software) entered into after the date hereof with any third party licensor, such Loan Party will use commercially reasonable and good faith efforts to obtain all requisite consents or approvals by the licensor to effect the assignment of all of such Loan Party's right, title and interest thereunder to the Administrative Agent or its designee and to effect the sub-license contemplated under Section 5.02(e)(i) upon and during the continuance of an Event of Default, and such Loan Party shall provide immediate written notice to the Administrative Agent upon failure to obtain any such consent or approval.

(i)       Such Loan Party shall take all actions (and cause all other Persons, including licensees, to the extent such other Persons are subject to its control) which are necessary or advisable to protect, preserve and confirm the validity, priority, perfection or enforcement of the rights granted to the Administrative Agent under this Agreement and (iii) give the Administrative Agent prompt written notice if, after the date hereof, such Loan Party shall obtain rights to any Trademarks, Patents or Copyrights, or enter into any new license agreements regarding any of the foregoing, and such Loan Party hereby agrees that the provisions of this Agreement shall automatically apply thereto. Such Loan Party will use commercially reasonable efforts so as not to permit the inclusion in any contract or agreement governing or relating to any Trademarks, Patents or Copyrights obtained after the date hereof or any license agreements entered into after the date hereof relating to any of the foregoing of any provisions that would be reasonably likely to impair or prevent the creation of a security interest in, or the assignment of, such

S-18

Loan Party's rights and interests therein. Such Loan Party will, upon request of the Administrative Agent, execute any and all agreements, instruments, documents and papers as the Administrative Agent may request to evidence the Security Interests in any Patent, Trademark or Copyright (or application therefor) and the goodwill or accounts and general intangibles of such Loan Party relating thereto or represented thereby, and such Loan Party hereby appoints the Administrative Agent its attorney-in-fact to execute and file such writings for the foregoing purposes.

      Section 4.14    Electronic Chattel Paper. Such Loan Party shall create, store and otherwise maintain all records comprising electronic Chattel Paper in a manner such that: (i) a single authoritative copy of each such record exists which is unique, identifiable and, except as provided in clause (iv) below, unalterable, (ii) the authoritative copy of each such record shall identify the Administrative Agent as the assignee thereof, (iii) the authoritative copy of each such record is communicated to and maintained by the Administrative Agent or its designee, (iv) copies or revisions that add or change any assignees of such record can be made only with the participation of the Administrative Agent, (v) each copy (other than the authoritative copy) of such record is readily identifiable as a copy and (vi) any revision of the authoritative copy of such record is readily identifiable as an authorized or unauthorized revision.

      Section 4.15    Claims. In the event any Claim in excess of $500,000 arises or otherwise becomes known after the date hereof, the applicable Loan Party will deliver to the Administrative Agent a supplement to Schedule 1.01 hereto describing such Claim and expressly subjecting such Claim, all Judgments and/or Settlements with respect thereto and all Proceeds thereof to the Security Interests hereunder.

      Section 4.16    Letter-of-Credit-Rights. If any Letter-of-Credit Rights are hereafter acquired by any Loan Party, the applicable Loan Party will deliver or cause to be delivered to the Administrative Agent a fully executed consent with respect thereto substantially in the form of Exhibit E hereto or in such other form as shall be reasonably acceptable to the Administrative Agent. Absent the occurrence and continuance of an Event of Default, the provisions of this Section 4.16 shall not apply to (i) Letter of Credit Rights arising in respect of letters of credit having a face or stated amount of less than $100,000 or (ii) letters of credit in respect of which a Loan Party, after diligently using commercially reasonable and good faith efforts, fails to obtain from the issuer of such letter of credit the consent contemplated by the preceding sentence.

## ARTICLE V
## GENERAL AUTHORITY; REMEDIES

      Section 5.01    General Authority. Each Loan Party hereby irrevocably appoints the Administrative Agent and any officer or agent thereof as its true and lawful attorney-in-fact, with full power of substitution, in the name of such Loan Party, the Administrative Agent, the Secured Parties or otherwise, for the sole use and benefit of the Administrative Agent and the Secured Parties, but at such Loan Party's expense, to the extent permitted by Law, to exercise at any time and from time to time while a Default or an Event of Default has occurred and is continuing all or any of the following powers with respect to all or any of the Collateral, all acts of such attorney being hereby ratified and confirmed; such power, being coupled with an interest, is irrevocable until the Obligations are paid in full and until there is no commitment by any Secured Parties to make further advances, incur obligations or otherwise give value:

         (i)    to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to carry out the terms of this Agreement;

S-19

(ii)     to receive, take, indorse, assign and deliver any and all checks, notes, drafts, acceptances, documents and other negotiable and non-negotiable Instruments taken or received by such Loan Party as, or in connection with, Collateral;

(iii)     to accelerate any Receivable which may be accelerated in accordance with its terms, and to otherwise demand, sue for, collect, receive and give acquittance for any and all monies due or to become due on or by virtue of any Collateral;

(iv)     to commence, settle, compromise, compound, prosecute, defend or adjust any Claim, suit, action or proceeding with respect to, or in connection with, the Collateral;

(v)     to sell, transfer, assign or otherwise deal in or with the Collateral or the Proceeds or avails thereof, including, without limitation, for the implementation of any assignment, lease, License, sublicense, grant of option, sale or other disposition of any Patent, Trademark, Copyright or Software or any action related thereto, as fully and effectually as if the Administrative Agent were the absolute owner thereof;

(vi)     to extend the time of payment of any or all of the Collateral and to make any allowance and other adjustments with respect thereto; and

(vii)     to do, at its option, but at the expense of such Loan Party, at any time or from time to time, all acts and things which the Administrative Agent deems necessary to protect or preserve the Collateral and to realize upon the Collateral.

Section 5.02    Remedies upon Event of Default.

(a)     If any Event of Default has occurred and is continuing, the Administrative Agent, upon being instructed to do so by the Required Lenders, may, in addition to all other rights and remedies granted to it in this Agreement and in any other agreement securing, evidencing or relating to the Obligations: (i) exercise on behalf of the Secured Parties all rights and remedies of a Secured Party under the UCC (whether or not in effect in the jurisdiction where such rights are exercised) and, in addition, (ii) without demand of performance or other demand or notice of any kind (except as herein provided or as may be required by mandatory provisions of Law) to or upon any Loan Party or any other Person (all of which demands and/or notices are hereby waived by each Loan Party), (A) withdraw all cash and Cash Equivalents in the Cash Collateral Account and apply such cash and Cash Equivalents and other cash, if any, then held by it as Collateral as specified in Section 5.04, (B) require each Loan Party to put in place an Account Control Agreement with regard to each of its Deposit Accounts, (C) give notice and take sole possession and control of all amounts on deposit in or credited to any Deposit Account pursuant to the related Account Control Agreement and apply all such funds as specified in Section 5.04, and (D) if there shall be no such cash, Cash Equivalents or other amounts or if such cash, Cash Equivalents and other amounts shall be insufficient to pay all the Obligations in full or cannot be so applied for any reason or if the Administrative Agent determines to do so, collect, receive, appropriate and realize upon the Collateral and/or sell, assign, give an option or options to purchase or otherwise dispose of and deliver the Collateral (or contract to do so) or any part thereof at public or private sale, at any office of the Administrative Agent or elsewhere in such manner as is commercially reasonable and as the Administrative Agent may deem best, for cash, on credit or for future delivery, without assumption of any credit risk and at such price or prices as the Administrative Agent may deem satisfactory.

(b)     The Administrative Agent shall give each Loan Party not less than 20 days' prior notice of the time and place of any sale or other intended disposition of any of the Collateral, except any Collateral which is perishable or threatens to decline speedily in value or is of a type customarily sold on

S-20

a recognized market. Any such notice shall (i) in the case of a public sale, state the time and place fixed for such sale, (ii) in the case of a private sale, state the day after which such sale may be consummated, (iii) contain the information specified in Section 9-613 of the UCC, (iv) be authenticated and (v) be sent to the parties required to be notified pursuant to Section 9-611(c) of the UCC; provided that, if the Administrative Agent fails to comply with this sentence in any respect, its liability for such failure shall be limited to the liability (if any) imposed on it as a matter of law under the UCC. The Administrative Agent and each Loan Party agree that such notice constitutes reasonable notification within the meaning of Section 9-611 of the UCC. Except as otherwise provided herein, each Loan Party hereby waives, to the extent permitted by applicable Law, notice and judicial hearing in connection with the Administrative Agent's taking possession or disposition of any of the Collateral.

(c)    The Administrative Agent or any Secured Party may be the purchaser of any or all of the Collateral so sold at any public sale (or, if the Collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations, at any private sale). Each Loan Party will execute and deliver such documents and take such other action as the Administrative Agent deems necessary or advisable in order that any such sale may be made in compliance with Law. Upon any such sale, the Administrative Agent shall have the right to deliver, assign and transfer to the purchaser thereof the Collateral so sold. Each purchaser at any such sale shall hold the Collateral so sold to it absolutely and free from any claim or right of whatsoever kind. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Administrative Agent may fix in the notice of such sale. At any such sale, the Collateral may be sold in one lot as an entirety or in separate parcels, as the Administrative Agent may determine. The Administrative Agent shall not be obligated to make any such sale pursuant to any such notice. The Administrative Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place to which the same may be so adjourned without further notice. In the case of any sale of all or any part of the Collateral on credit or for future delivery, the Collateral so sold may be retained by the Administrative Agent until the selling price is paid by the purchaser thereof, but the Administrative Agent shall not incur any liability in the case of the failure of such purchaser to take up and pay for the Collateral so sold and, in the case of any such failure, such Collateral may again be sold upon like notice. .

(d)    For the purpose of enforcing any and all rights and remedies under this Agreement, the Administrative Agent may, if any Event of Default has occurred and is continuing, (i) require each Loan Party to, and each Loan Party agrees that it will, at its expense and upon the request of the Administrative Agent, forthwith assemble, store and keep all or any part of the Collateral as directed by the Administrative Agent and make it available at a place designated by the Administrative Agent which is, in the Administrative Agent's opinion, reasonably convenient to the Administrative Agent and such Loan Party, whether at the premises of such Loan Party or otherwise, it being understood that such Loan Party's obligation so to deliver the Collateral is of the essence of this Agreement and that, accordingly, upon application to a court of equity having jurisdiction, the Administrative Agent shall be entitled to a decree requiring specific performance by such Loan Party of such obligation; (ii) to the extent permitted by applicable Law, enter, with or without process of law and without breach of the peace, any premise where any of the Collateral is or may be located, and without charge or liability to any Loan Party, seize and remove such Collateral from such premises; (iii) have access to and use such Loan Party's books and records relating to the Collateral; and (iv) prior to the disposition of the Collateral, store or transfer it without charge in or by means of any storage or transportation facility owned or leased by such Loan Party, process, repair or recondition it or otherwise prepare it for disposition in any manner and to the extent the Administrative Agent deems appropriate and, in connection with such preparation and disposition, use without charge any Intellectual Property or technical process used by such Loan Party.

The Administrative Agent may also render any or all of the Collateral unusable at any Loan Party's premises and may dispose of such Collateral on such premises without liability for rent or costs.

        (e)    Without limiting the generality of the foregoing, if any Event of Default has occurred and is continuing:

        (i)    the Administrative Agent may, subject to the express terms of any valid and enforceable restriction in favor of a Person who is not a Group Company that prohibits, or requires any consent or establishes any other conditions for, an assignment thereof, license, or sublicense, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any Patents, Trademarks or Copyrights included in the Collateral throughout the world for such term or terms, on such conditions and in such manner as the Administrative Agent shall in its sole discretion determine;

        (ii)    the Administrative Agent may (without assuming any obligations or liability thereunder), at any time and from time to time, enforce (and shall have the exclusive right to enforce) against any Licensee or sublicensee all rights and remedies of any Loan Party in, to and under any License and take or refrain from taking any action under any provision thereof, and each Loan Party hereby releases the Administrative Agent and each of the Secured Parties from, and agrees to hold the Administrative Agent and each of the Secured Parties free and harmless from and against any claims arising out of, any lawful action so taken or omitted to be taken with respect thereto;

        (iii)    upon request by the Administrative Agent, each Loan Party will use its commercially reasonable efforts to obtain all requisite consents or approvals by the licensor or sublicensor of each License to effect the assignment of all of such Loan Party's right, title and interest thereunder to the Administrative Agent or its designee and will execute and deliver to the Administrative Agent a power of attorney, in form and substance reasonably satisfactory to the Administrative Agent, for the implementation of any lease, assignment, License, sublicense, grant of option, sale or other disposition of a Patent, Trademark or Copyright; and

        (iv)    the Administrative Agent may direct each Loan Party to refrain, in which event each such Loan Party shall refrain, from using or practicing any Trademark, Patent or Copyright in any manner whatsoever, directly or indirectly, and shall, if requested by the Administrative Agent, change such Loan Party's name to eliminate therefrom any use of any Trademark and will execute such other and further documents as the Administrative Agent may request to further confirm this change and transfer ownership of the Trademarks, Patents, Copyrights and registrations and any pending applications therefor to the Administrative Agent.

        (f)    In the event of any disposition following the occurrence and during the continuance of any Event of Default of any Patent, Trademark or Copyright pursuant to this Article V, each Loan Party shall supply its know-how and expertise relating to the manufacture and sale of the products or services bearing Trademarks or the products, services or works made or rendered in connection with or under Patents, Trademarks or Copyrights, and its customer lists and other records relating to such Patents, Trademarks or Copyrights and to the distribution of said products, services or works, to the Administrative Agent.

        (g)    If any Event of Default has occurred and is continuing, the Administrative Agent, instead of exercising the power of sale conferred upon it pursuant to this Section 5.02, may proceed by a suit or suits at law or in equity to foreclose the Security Interests and sell the Collateral, or any portion thereof, under a judgment or decree of a court or courts of competent jurisdiction, and may in addition

institute and maintain such suits and proceedings as the Administrative Agent may deem appropriate to protect and enforce the rights vested in it by this Agreement.

(h)    If any Event of Default has occurred and is continuing, the Administrative Agent shall, to the extent permitted by applicable Law, without notice to any Loan Party or any party claiming through any Loan Party, without regard to the solvency or insolvency at such time of any Person then liable for the payment of any of the Obligations, without regard to the then value of the Collateral and without requiring any bond from any complainant in such proceedings, be entitled as a matter of right to the appointment of a receiver or receivers (who may be the Administrative Agent) of the Collateral or any part thereof, and of the profits, revenues and other income thereof, pending such proceedings, with such powers as the court making such appointment shall confer, and to the entry of an order directing that the profits, revenues and other income of the property constituting the whole or any part of the Collateral be segregated, sequestered and impounded for the benefit of the Administrative Agent and the Secured Parties, and each Loan Party irrevocably consents to the appointment of such receiver or receivers and to the entry of such order.

(i)    Each Loan Party agrees, to the extent it may lawfully do so, that it will not at any time in any manner whatsoever claim or take the benefit or advantage of, any appraisal, valuation, stay, extension, moratorium, turnover or redemption Law, or any Law permitting it to direct the order in which the Collateral shall be sold, now or at any time hereafter in force which may delay, prevent or otherwise affect the performance or enforcement of this Agreement, and each Loan Party hereby waives all benefit or advantage of all such Laws. Each Loan Party covenants that it will not hinder, delay or impede the execution of any power granted to the Administrative Agent, the Administrative Agent or any other Secured Party in any Loan Document.

(j)    Each Loan Party, to the extent it may lawfully do so, on behalf of itself and all who claim through or under it, including, without limitation, any and all subsequent creditors, vendees, assignees and lienors, waives and releases all rights to demand or to have any marshalling of the Collateral upon any sale, whether made under any power of sale granted herein or pursuant to judicial proceedings or under any foreclosure or any enforcement of this Agreement, and consents and agrees that all of the Collateral may at any such sale be offered and sold as an entirety.

(k)    Each Loan Party waives, to the extent permitted by Law, presentment, demand, protest and any notice of any kind (except the notices expressly required hereunder or in the other Loan Documents) in connection with this Agreement and any action taken by the Administrative Agent with respect to the Collateral.

**Section 5.03    Limitation on Duty of Administrative Agent in Respect of Collateral.** Beyond the exercise of reasonable care in the custody thereof, neither the Administrative Agent nor the Secured Parties shall have any duty to exercise any rights or take any steps to preserve the rights of any Loan Party in the Collateral in its or their possession or control or in the possession or control of any agent or bailee or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto, nor shall the Administrative Agent or any Secured Party be liable to any Loan Party or any other Person for failure to meet any obligation imposed by Section 9-207 of the UCC or any successor provision. Each Loan Party agrees that the Administrative Agent shall at no time be required to, nor shall the Administrative Agent be liable to any Loan Party for any failure to, account separately to any Loan Party for amounts received or applied by the Administrative Agent from time to time in respect of the Collateral pursuant to the terms of this Agreement.    Without limiting the foregoing, the Administrative Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Administrative Agent accords its own property, and shall not be liable or responsible for any loss or

ffny03\rosenke\670190.14

damage to any of the Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehouseman, carrier, forwarding agency, consignee or other agent or bailee selected by the Administrative Agent in good faith.

Section 5.04    **Application of Proceeds**.

(a)    *Priority of Distributions*.  The proceeds of any sale of, or other realization upon, all or any part of the Collateral and any cash held in the Collateral Accounts shall be applied as provided in Section 8.03 of the Credit Agreement.  The Administrative Agent may make distributions hereunder in cash or in kind or, on a ratable basis, in any combination thereof.  All distributions made by the Administrative Agent pursuant to this Section shall be presumptively correct (except in the event of manifest error), and the Administrative Agent shall have no duty to inquire as to the application by the Secured Parties of any amounts distributed to them.

(b)    *Deficiencies*.  It is understood that the Loan Parties shall remain liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the amount of the Obligations.

## ARTICLE VI
## ADMINISTRATIVE AGENT

Section 6.01    **Concerning the Administrative Agent**.  The provisions of Article IX of the Credit Agreement shall inure to the benefit of the Administrative Agent in respect of this Agreement and shall be binding upon all Loan Parties and all Secured Parties and upon the parties hereto in such respect.  In furtherance and not in derogation of the rights, privileges and immunities of the Administrative Agent therein set forth:

(i)    The Administrative Agent is authorized to take all such actions as are provided to be taken by it as Administrative Agent hereunder and all other action reasonably incidental thereto.  As to any matters not expressly provided for herein (including, without limitation, the timing and methods of realization upon the Collateral), the Administrative Agent shall act or refrain from acting in accordance with written instructions from the Required Lenders or, in the absence of such instructions or provisions, in accordance with its discretion.

(ii)    The Administrative Agent shall not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Security Interests in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder unless such action or omission constitutes gross negligence or willful misconduct.  The Administrative Agent shall have no duty to ascertain or inquire as to the performance or observance of any of the terms of this Agreement by any Loan Party.

Section 6.02    **Appointment of Co-Administrative Agent**.  At any time or times, in order to comply with any legal requirement in any jurisdiction, the Administrative Agent may appoint another bank or trust company or one or more other persons, either to act as co-agent or co-agents, jointly with the Administrative Agent, or to act as separate agent or agents on behalf of the Secured Parties with such power and authority as may be necessary for the effectual operation of the provisions hereof and may be specified in the instrument of appointment (which may, in the discretion of the Administrative Agent, include provisions for the protection of such co-agent or separate agent similar to the provisions of Section 6.01); provided, that so long as no Event of Default shall have occurred and be continuing, the Administrative Agent shall consult with the Borrower prior to any such appointment.

S-24

# ARTICLE VII
## MISCELLANEOUS

**Section 7.01**    <u>Notices</u>. (a)    Unless otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing (including by facsimile transmission) and mailed, faxed or delivered, to the address, facsimile number or (subject to <u>subsection (b)</u> below) electronic mail address specified for notices: (i) in the case of any Subsidiary Guarantor, as set forth in <u>Section 5.01</u> of the Guaranty; (ii) in the case of the Borrower, the Administrative Agent or any Lender, as specified in or pursuant to <u>Section 10.01</u> of the Credit Agreement; (iii) in the case of the Administrative Agent, as set forth in the signature pages hereto; or (iv) in the case of any party, at such other address as shall be designated by such party in a notice to the Administrative Agent and each other party hereto. All such notices and other communications shall be deemed to be given or made upon the earlier to occur of: (i) actual receipt by the intended recipient and (ii)(A) if delivered by hand or by courier, when signed for by the intended recipient; (B) if delivered by mail, four Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile transmission, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail (which form of delivery is subject to the provisions of <u>subsection (b)</u> below), when delivered. Rejection or refusal to accept, or the inability to deliver because of a changed address of which no notice was given, shall not affect the validity of notice given in accordance with this Section.

(b)    Except as expressly provided herein or as may be agreed by the Administrative Agent in its sole discretion, electronic mail and internet and intranet websites may be used only to distribute routine communications, such as financial statements and other information, and to distribute Loan Documents for execution by the parties thereto, to distribute executed Loan Documents in Adobe PDF format and may not be used for any other purpose.

**Section 7.02**    <u>No Waivers; Non-Exclusive Remedies</u>. No failure or delay on the part of the Administrative Agent or any Secured Party to exercise, no course of dealing with respect to, and no delay in exercising, any right, power or privilege under this Agreement or any other Loan Document or any other document or agreement contemplated hereby or thereby and no course of dealing between the Administrative Agent or any Secured Party and any of the Loan Parties shall operate as a waiver thereof nor shall any single or partial exercise of any such right, power or privilege hereunder or under any Loan Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. The rights and remedies provided herein and in the other Loan Documents are cumulative and are not exclusive of any other remedies provided by Law. Without limiting the foregoing, nothing in this Agreement shall impair the right of any Secured Party to exercise any right of set-off or counterclaim it may have and to apply the amount subject to such exercise to the payment of indebtedness of any Loan Party other than its indebtedness under the Loan Documents. Each Loan Party agrees, to the fullest extent it may effectively do so under applicable Law, that any holder of a participation in an Obligation, whether or not acquired pursuant to the terms of any applicable Loan Document, may exercise rights of set-off or counterclaim or other rights with respect to such participation, as fully as if such holder of a participation were a direct creditor of the Loan Party in the amount of such participation.

**Section 7.03**    <u>Compensation and Expenses of the Administrative Agent; Indemnification.</u>

(a)    <u>*Expenses*</u>. The Loan Parties, jointly and severally, agree (i) to pay or reimburse the Administrative Agent for all out-of-pocket costs and expenses incurred in connection with the preparation, negotiation and execution of this Agreement and any amendment, waiver, consent or other modification of the provisions hereof (whether or not the transactions contemplated hereby are

S-25

consummated), and the consummation of the transactions contemplated hereby, including all reasonable fees, disbursements and other charges of counsel for the Administrative Agent, (ii) to pay or reimburse the Administrative Agent and the other Secured Parties for all taxes which the Administrative Agent or any Secured Party may be required to pay by reason of the security interests granted in the Collateral (including any applicable transfer taxes) or to free any of the Collateral from the lien thereof and (iii) to pay or reimburse each Agent and each other Secured Party for all reasonable costs and expenses incurred in connection with the enforcement, attempted enforcement or preservation of any rights and remedies under this Agreement (including all such costs and expenses incurred during any "workout" or restructuring in respect of the Obligations and during any legal proceeding, including any proceeding under any bankruptcy or insolvency proceeding), including all reasonable fees and disbursements of counsel (including the allocated charges of internal counsel). The foregoing costs and expenses shall include all search, filing, recording, title insurance and appraisal charges and fees and taxes related thereto, and other out-of-pocket expenses incurred by any Agent and the costs of independent public accountants and other outside experts retained by or on behalf of the Agents and the Secured Parties. The agreements in this Section 7.03(a) shall survive the termination of the Commitments and repayment of all Obligations.

(b)     _Protection of Collateral._ If any Loan Party fails to comply with the provisions of any Loan Document, such that the value of any Collateral or the validity, perfection, rank or value of any Security Interest is thereby diminished or potentially diminished or put at risk, the Administrative Agent may, but shall not be required to, effect such compliance on behalf of such Loan Party, and the Loan Parties shall reimburse the Administrative Agent for the costs thereof on demand. All insurance expenses and all expenses of protecting, storing, warehousing, appraising, handling, maintaining and shipping the Collateral, any and all excise, property, sales and use taxes imposed by any state, federal or local authority on any of the Collateral, or in respect of periodic appraisals and inspections of the Collateral, or in respect of the sale or other disposition thereof shall be borne and paid by the Loan Parties. If any Loan Party fails to promptly pay any portion thereof when due, the Administrative Agent may, at its option, but shall not be required to, pay the same and charge the Loan Parties' account therefor, and the Loan Parties agree to reimburse the Administrative Agent therefor on demand. All sums so paid or incurred by the Administrative Agent for any of the foregoing and any and all other sums for which any Loan Party may become liable hereunder and all costs and expenses (including attorneys' fees, legal expenses and court costs) reasonably incurred by the Administrative Agent or any Secured Party in enforcing or protecting the Security Interests or any of their rights or remedies under this Agreement, shall, together with interest thereon until paid at the Default Rate, be additional Obligations hereunder.

(c)     _Indemnification._ Whether or not the transactions contemplated hereby or by the other Loan Documents are consummated, each Loan Party, jointly and severally, agrees to indemnify, save and hold harmless the Administrative Agent, the Representatives, each other Secured Party and their respective Affiliates, directors, officers, employees, counsel, agents and attorneys-in-fact and their respective successors and assigns (collectively, the "Indemnitees") from and against: (i) any and all claims, demands, actions or causes of action that may at any time (including at any time following repayment of the Obligations and the resignation or removal of any Agent or Representative or the replacement of any Lender) be asserted or imposed against any Indemnitee, arising out of or in any way relating to or arising out of the manufacture, ownership, ordering, purchasing, delivery, control, acceptance, lease, financing, possession, operation, condition, sale, return or other disposition or use of the Collateral (including, without limitation, latent or other defects, whether or not discoverable), the violation of the Laws of any country, state or other Governmental Authority, or any tort (including, without limitation, any claims, arising or imposed under the doctrine of strict liability, or for or on account of injury to or the death of any Person (including any Indemnitee), or property damage) or contract claim;; (ii) any administrative or investigative proceeding by any Governmental Authority arising out of or related to a claim, demand, action or cause of action described in clause (i) above; and (iii) any

and all liabilities (including liabilities under indemnities), losses, costs or expenses (including fees and disbursements of counsel) that any Indemnitee suffers or incurs as a result of the assertion of any foregoing claim, demand, action or cause of action or proceeding, or as a result of the preparation of any defense in connection with any foregoing claim, demand, action or cause of action or proceeding, in all cases, and whether or not an Indemnitee is a party to such claim, demand, action or cause of action, or proceeding; provided that no Indemnitee shall be entitled to indemnification for any claim to the extent such claim is determined by a court of competent jurisdiction in a final non-appealable judgment to have been caused by its own gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this Section 7.03(b) applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by any Loan Party, its directors, shareholders or creditors or an Indemnitee or any other Person or any Indemnitee is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. Without prejudice to the survival of any other agreement of the Loan Parties hereunder and under the other Loan Documents, the agreements and obligations of the Loan Parties contained in this Section 7.03(b) shall survive the repayment of the Loans and other obligations under the Loan Documents and the termination of the Commitments. Any amounts paid by any Indemnitee as to which such Indemnitee has a right to reimbursement hereunder shall constitute Obligations.

(d)     _Contribution._  If and to the extent that the obligations of any Loan Party under this Section 7.03 are unenforceable for any reason, each Loan Party hereby agrees to make the maximum contribution to the payment and satisfaction of such obligations which is permissible under applicable Law.

Section 7.04     **Enforcement.**  The Secured Parties agree that this Agreement may be enforced only by the action of the Administrative Agent, acting upon the instructions of the Required Lenders (or, after the date on which all Obligations have been paid in full and all Commitments with respect thereto terminated, the holders of at least 51% of the outstanding Swap Obligations) and that no other Secured Party shall have any right individually to seek to enforce this Agreement or to realize upon the security to be granted hereby, it being understood and agreed that such rights and remedies may be exercised by the Administrative Agent or the holders of at least 51% of the outstanding Swap Obligations, as the case may be, for the benefit of the Secured Parties upon the terms of this Agreement and the other Loan Documents.

Section 7.05     **Amendments and Waivers.**  Any provision of this Agreement may be amended, changed, discharged, terminated or waived if, but only if, such amendment or waiver is in writing and is signed by each Loan Party directly affected by such amendment, change, discharge, termination or waiver (it being understood that the addition or release of any Loan Party hereunder shall not constitute an amendment, change, discharge, termination or waiver affecting any Loan Party other than the Loan Party so added or released and it being further understood and agreed that any supplement to Schedule 1.01 delivered pursuant to Section 4.16 shall not require the consent of any Loan Party) and the Administrative Agent (with the consent of the Required Lenders or, to the extent required by Section 10.01 of the Credit Agreement, all of the Lenders); provided, however, that no such amendment, change, discharge, termination or waiver shall be made to Section 5.04 hereof or this Section 7.05 without the consent of each Secured Party adversely affected thereby.

Section 7.06     **Successors and Assigns.**  This Agreement shall be binding upon each of the parties hereto and inure to the benefit of the Administrative Agent and the Secured Parties and their respective successors and assigns. In the event of an assignment of all or any of the Obligations, the rights hereunder, to the extent applicable to the indebtedness so assigned, may be transferred with such indebtedness. No Loan Party shall assign or delegate any of its rights and duties hereunder without the

ffny03\rosenke\670190.14

prior written consent of the Required Lenders or all of the Lenders as provided in Section 10.03 of the Credit Agreement.

        Section 7.07   Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING, WITHOUT LIMITATION, SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES, EXCEPT AS OTHERWISE REQUIRED BY MANDATORY PROVISIONS OF LAW AND EXCEPT TO THE EXTENT THAT REMEDIES PROVIDED BY THE LAWS OF ANY JURISDICTIONS OTHER THAN NEW YORK ARE GOVERNED BY THE LAWS OF SUCH JURISDICTIONS.

        Section 7.08    Limitation of Law; Severability.

        (i)    All rights, remedies and powers provided in this Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable provision of Law, and all the provisions of this Agreement are intended to be subject to all applicable mandatory provisions of Law which may be controlling and be limited to the extent necessary so that they will not render this Agreement invalid, unenforceable in whole or in part, or not entitled to be recorded, registered or filed under the provisions of any applicable Law.

        (ii)    If any provision hereof is invalid or unenforceable in any jurisdiction, then, to the fullest extent permitted by Law, (i) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be read and/or understood in an effort to carry out the intentions of the parties hereto as nearly as may be possible, and (ii) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provisions in any other jurisdiction.

        Section 7.09    Counterparts; Effectiveness. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement shall become effective with respect to each Loan Party when the Administrative Agent shall receive counterparts hereof executed by itself and such Loan Party.

        Section 7.10   Additional Loan Parties. It is understood and agreed that any Affiliate of the Borrower that is required by any Loan Document to execute a counterpart of this Agreement after the date hereof shall automatically become a Loan Party hereunder with the same force and effect as if originally named as a Loan Party hereunder by executing an instrument of accession or joinder satisfactory in form and substance to the Administrative Agent and delivering the same to the Administrative Agent. Concurrently with the execution and delivery of such instrument, such Affiliate shall take all such actions and deliver to the Administrative Agent all such documents and agreements as such Affiliate would have been required to deliver to the Administrative Agent on or prior to the date of this Agreement had such Affiliate been a party hereto on the date of this Agreement. Such additional materials shall include, among other things, supplements to Schedules 1.01, 3.06 and 4.01 hereto (which Schedules shall thereupon automatically be amended and supplemented to include all information contained in such supplements) such that, after giving effect to the joinder of such Affiliate, each of Schedules 1.01, 3.06 and 4.01 hereto is true, complete and correct with respect to such Affiliate as of the effective date of such joinder. The execution and delivery of any such instrument of accession or joinder, and the amendment and supplementation of the Schedules hereto as provided in the immediately preceding sentence, shall not require the consent of any other Loan Party hereunder. The rights and

ffny03\rosenke\670190.14

obligations of each Loan Party hereunder shall remain in full force and effect notwithstanding the addition of any new Loan Party as a party to this Agreement.

Section 7.11    <u>Termination</u>.    Upon the full, final and irrevocable payment and performance of all Obligations and the termination of all Commitments under the Loan Documents, the Security Interests shall terminate and all rights to the Collateral shall revert to the Loan Parties. In addition, at any time and from time to time prior to such termination of the Security Interests, the Administrative Agent may release any of the Collateral to the extent required by the Credit Agreement or with the prior written consent of the Required Lenders; <u>provided</u> that the release of all or substantially all of the Collateral shall require the consent of all of the Lenders. Upon any such termination of the Security Interests or release of Collateral, the Administrative Agent will, upon request by and at the expense of any Loan Party, execute and deliver to such Loan Party such documents as such Loan Party shall reasonably request to evidence the termination of the Security Interests or the release of such Collateral, as the case may be. Any such documents shall be without recourse to or warranty by the Administrative Agent or the Secured Parties. The Administrative Agent shall have no liability whatsoever to any Secured Party as a result of any release of Collateral by it as permitted by this <u>Section 7.11</u>. Upon any release of Collateral pursuant to this <u>Section 7.11</u>, none of the Secured Parties shall have any continuing right or interest in such Collateral or the Proceeds thereof. Thereafter, the Administrative Agent shall take such actions and execute such documents, at such Loan Party's sole expense, as are reasonably requested by the Borrower or any of the other Loan Parties to evidence such termination.

Section 7.12    <u>Entire Agreement</u>.    This Agreement and the other Loan Documents constitute the entire agreement and understanding among the parties hereto and supersede any and all prior agreements and understandings, oral or written, and any contemporaneous oral agreements and understandings relating to the subject matter hereof and thereof.

[Signature Pages Follow]

ffny03\rosenke\670190.14

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first written above.

**LOAN PARTIES:**

INPHONIC, INC.

By:
Name: David A. Steinberg
Title: CEO

CAIS ACQUISITION, LLC

By:
Name: David A. Steinberg
Title: President

CAIS ACQUISITION II, LLC

By:
Name: David A. Steinberg
Title: President

FON ACQUISITION, LLC

By:
Name: David A. Steinberg
Title: President

MOBILE TECHNOLOGY SERVICES, LLC

By:
Name: David A. Steinberg
Title: President

*Signature page to Security Agreement*

SIMIPC ACQUISITION CORP.

By: _____
    Name: David A Steinberg
    Title: CEO

STARNUMBER, INC.

By: _____
    Name: David A Steinberg
    Title: CEO

ADMINISTRATIVE AGENT:    CITICORP NORTH AMERICA, INC.,
    as Administrative Agent

By: _____
    Name:
    Title:

    390 Greenwich St.
    7th Floor
    New York, NY 10013
    Attention: David Stempler
    Telephone:
    Telecopier:

SIMIPC ACQUISITION CORP.

By:_____
   Name:
   Title:

STARNUMBER, INC.

By:_____
   Name:
   Title:

ADMINISTRATIVE AGENT:     CITICORP NORTH AMERICA, INC.,
                     as Administrative Agent

                   By:  _S+ 7L_____
                   Name: Scot P. French
                   Title: Managing Director / Vice President

                   390 Greenwich St.
                   7th Floor
                   New York, NY 10013
                   Attention: David Stempler
                   Telephone:
                   Telecopier:

*Signature page to Security Agreement*