EXHIBIT 21

EXECUTION VERSION

## AMENDMENT NO. 9 TO CREDIT AGREEMENT

AMENDMENT, dated as of August 8, 2007 (this "Amendment"), to the Credit Agreement, dated as of November 7, 2006, as amended by Amendment to the Credit Agreement, dated as of February 6, 2007, by Amendment No. 2 to the Credit Agreement, dated as of March 30, 2007, by Amendment No. 3 to the Credit Agreement, dated as of April 9, 2007, by Amendment No. 4 to the Credit Agreement, dated as of April 23, 2007, Amendment No. 5 to the Credit Agreement, dated as of May 1, 2007, Amendment No. 6 to the Credit Agreement, dated as of May 31, 2007, Amendment No. 7 to the Credit Agreement, dated as of June 15, 2007, and Amendment No. 8 to the Credit Agreement, dated as of June 29, 2007 (collectively, the "Agreement"), among InPhonic, Inc., a Delaware corporation (the "Borrower"), the Lenders listed on the signature pages hereof as Lenders, and Citicorp North America, Inc., as Administrative Agent.

WHEREAS, the parties hereto have previously entered into the Agreement; and

WHEREAS, the parties desire to amend the Agreement on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein, the parties agree as follows:

**Section 1.**       **Definitions.**

(a) The definition of Cash Flow From Operating Activities is hereby deleted in its entirety and replaced by the following text:

"Cash Flow From Operating Activities" means such amounts for the Borrower and its Consolidated Subsidiaries as reported in the financial statements, excluding amounts received from Inventory Transactions (as defined below) or any other sales, dispositions or other transactions not in the ordinary course of business, required to be delivered pursuant to Sections 6.01(a) and (b) of the Agreement prepared in conformity with GAAP applied on a consistent basis, as in effect from time to time, in a manner consistent with that used in preparing the audited financial statements for the year ended December 31, 2006.

(b) Capitalized terms used but not otherwise defined herein shall have the respective meanings given to them in the Agreement.

**Section 2.**       **Effectiveness of the Amendment.** This Amendment shall become effective (the date of any such effectiveness, the "Effective Date") upon the satisfaction of all of the following conditions:

(a) *Amendment Counterparts.* The Administrative Agent has received counterparts hereof duly executed by:

(1) the Borrower,

(2) each of the Guarantors,

(3) the Administrative Agent, and

(4) each Lender

(b) *Organizational /Authorization Deliverables*. The Administrative Agent has received a copy of the Organization Documents, including all amendments thereto, of each Loan Party, certified as of a recent date by the Secretary of State or other applicable Governmental Authority of its respective jurisdiction of organization, together with:

(1) a certificate as to the good standing of each Loan Party, as of a recent date, from the Secretary of State or other applicable authority of its respective jurisdiction;

(2) a certificate of the Secretary or Assistant Secretary of each Loan Party dated the Closing Date and certifying (x) that the Organization Documents of such Loan Party have not been amended since the date of the last amendment thereto shown on the certificate of good standing from its jurisdiction of organization furnished pursuant to clause (1) above; (y) that attached thereto is a true and complete copy of the agreement of limited partnership, operating agreement or by-laws of such Loan Party, as applicable, as in then effect and at all times since a date prior to the date of the resolutions described in clause (z) below, (z) that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors or other governing body of such Loan Party authorizing the execution, delivery and performance of the Amendment and ratifying all other Loan Documents to which it is to be a party, and that such resolutions have not been modified, rescinded or amended and are in full force and effect;

(3) as to the incumbency and specimen signature of each officer executing the Amendment and any other document delivered in connection herewith on behalf of such Loan Party; and

(4) a certificate of another officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary executing the certificate pursuant to clause (2) above.

(c) *Legal Opinion*. The Administrative Agent and each Lender has received a favorable written opinion of Patton Boggs LLP (or other law firm acceptable to the Administrative Agent and the Required Lenders), special counsel to the Loan

Parties, addressed to the Administrative Agent and each Lender, dated the Effective Date, in form and substance satisfactory to the Administrative Agent and the Lenders.

(d) *Issuance of Warrants*. The Warrant Agreement shall be amended, in form and substance reasonably satisfactory to the Administrative Agent and the Lenders, to provide that the Borrower shall issue 800,000 additional Warrants, dated the Effective Date, to the Lenders (or designees of the Lenders) (to be issued in proportion to each such Lenders' Applicable Percentage in respect of the Facility after giving effect to the Loan on the Effective Date). Such additional Warrants shall have been validly issued to the Lenders (or designees of the Lenders) as specified in this clause (d) and the parties to the Warrant Agreement shall have received counterparts of the amendment thereof duly executed by each of the parties thereto

(e) *Amendment Fee*. The Borrower shall have paid an amendment fee of $500,000 to the Administrative Agent for the accounts of the Lenders (to be distributed to the Lenders in proportion to each such Lender's Applicable Percentage in respect of the Facility after giving effect to the Loan on the Effective Date).

(f) *Expenses*. The Borrower shall have paid or reimbursed the Administrative Agent and each of the Lenders for all legal, accounting and other out-of-pocket expenses invoiced prior to or on the Effective Date.

(g) *Deposit and Security Accounts*. The Borrower and each other Loan Party shall have entered into and caused all deposit banks and securities intermediaries at which any Loan Party has any account to enter into and maintain account control agreements, in form and substance satisfactory to the Administrative Agent and the Required Lenders, with respect to each Account (as defined in the Security Agreement) of the Borrower or such Loan Party, as the case may be.

(h) *Representations and Warranties*. The representations and warranties of the Borrower and each other Loan Party contained in Article V of the Agreement or any other Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct on and as of the Effective Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct as of such earlier date.

(i) *No Default*. No Default shall exist as of the Effective Date or would result from the making of the Loan on the Effective Date or from the application of the proceeds thereof.

(j) *Officer's Certificate*. An executive officer of the Borrower shall certify to the Administrative Agent and the Lenders that, as of the Effective Date, the conditions in clauses (g), (h) and (i) above have been satisfied.

(k)        *Borrowing Request*. The Borrower shall have made a telephonic borrowing request for $15,000,000 at least one (1) Business Day prior to the Effective Date.

*Outside Date.* If the Effective Date has not occurred by August 21, 2007, then this Amendment shall not be effective and shall be of no force or effect whatsoever.

**Section 3.**        <u>**Amendment to Agreement – Delayed Draw.**</u>

(a)    *Section 2.01*. Section 2.01 is hereby amended and restated in its entirety as follows:

"Subject to the terms and conditions set forth herein, (a) each Closing Date Lender severally agrees to make a Loan to the Borrower on the Closing Date in an aggregate amount not to exceed each such Lender's Closing Date Commitment (and the Borrower acknowledges its prior receipt in full of such Loans in a total aggregate principal amount of $75,000,000) and (b) the Delayed Draw Lender severally agrees to make a Loan to the Borrower on the Effective Date of Amendment No. 9 to Credit Agreement in an aggregate amount equal to $15,000,000. The Delayed Draw Lender's Delayed Draw Commitment is reduced from $25,000,000 to $15,000,000. Amounts borrowed under this Section 2.01 and repaid or prepaid may not be reborrowed."

(b)    *Section 10.06(h)* Section 10.06(h) is deleted in its entirety.

(c)    *Definitions*.

(i)     The definition of "Availability Period" is deleted.

(ii)    In the definition of "Commitment" the reference to "$100,000,000" is replaced with "$90,000,000."

(iii)   In the definition of "Delayed Draw Commitment" the reference to "(including Section 10.06(h))" is deleted.

(iv)   The definition of "Delayed Draw Lender" is amended and restated to read as follows: "<u>Delayed Draw Lender</u>" means AP InPhonic Holdings, LLC, as a Lender with a Delayed Draw Commitment to make a loan of $15,000,000 to the Borrower on the Effective Date of Amendment No. 9 to Credit Agreement.

(v)    The definition of Facility is amended and restated to read as follows: "<u>Facility</u>" means, at any time, the aggregate principal amount of the Loans outstanding at such time."

(d)  *Schedule 2.01*.  Schedule 2.01 to the Agreement is deleted and replaced with the following:

Commitments and Applicable Percentage

| Lender | Closing Date Commitment | Delayed Draw Commitment | Total Commitments |
|---|---|---|---|
| Goldman Sachs Credit Partners, L.P. | $55,000,000.00 | | $55,000,000.00 |
| Citicorp North America, Inc. | $20,000,000.00 | | $20,000,000.00 |
| AP InPhonic Holdings, LLC | | $15,000,000.00 | $15,000,000.00 |
| Totals | $75,000,000.00 | $15,000,000.00 | $90,000,000.00 |

Section 4.    **Amendment to Agreement – Inventory Transaction and Related Mandatory Prepayment**

Section 11 of Amendment No. 8 of the Credit Agreement, dated as of June 29, 2007, is amended and restated to read as follows:

"The Borrower has advised the Administrative Agent and the Lenders that it intends to sell for cash consideration resulting in Net Cash Proceeds to the Borrower of at least $15,000,000 all or a substantial portion of its inventory in a single transaction or series of related transactions to a third party that shall, among other things, serve as the outsourced provider of the Borrower's inventory management, logistics and fulfillment operations, which will close on or before September 30, 2007 (the "Inventory Transaction").

The Borrower acknowledges and agrees that the Inventory Transaction is not in the ordinary course of business and, accordingly, is not permitted pursuant to Section 7.05(i) of the Agreement.

The Inventory Transaction shall not be subject to subclause (C) of Section 7.05(ix) of the Agreement.

In connection with the Inventory Transaction, the Borrower shall obtain from the entities that were the vendors (or their successor(s) in interest) of the assets to the Borrower and the other Loan Parties that will be the subject of the Inventory Transaction a written release (in form and substance reasonably satisfactory to the Administrative Agent) of all Liens (whether perfected or unperfected) in favor of such vendors (or their successor(s) in interest) secured by any of the assets of the Borrower and (to the extent

applicable) the other Loan Parties. The Borrower represents, warrants and agrees that the Inventory Transaction will be conducted in accordance in all material respects with applicable law and the contractual obligations of the Loan Parties.

The Borrower shall apply the Net Cash Proceeds from this Inventory Transaction (within two Business Days of the receipt thereof) as follows:

(i) *first*, $15,000,000 will be used to prepay the Loans, by payment to the Administrative Agent for the ratable accounts of AP Inphonic Holdings, LLC and Citicorp North America, Inc., as Lenders; and

(ii) *second*, all remaining proceeds may be retained by the Borrower.

Effective from and after the closing of the Inventory Transaction and the application of the Net Cash Proceeds as specified above, Section 7.01 (xiv) shall be deleted and replaced with "[reserved]".

**Section 5.**          <u>**Amendment to Agreement – Affirmative Covenants**</u>

*Section 6.17*. A new Section 6.17 is hereby added to the Agreement to read as follows:

"*Inventory Transaction / Outsourcing Agreements*. By September 30, 2007, the Borrower shall (i) conclude the Inventory Transaction (as defined in Amendment No. 9 to Credit Agreement) resulting in Net Cash Proceeds to the Borrower of at least $15,000,000, and (ii) enter into a definitive agreement that shall provide for, among other things, the outsourcing of the Borrower's inventory management, logistics and fulfillment operations."

**Section 6.**          <u>**Amendments to Agreement – Cash Collateral Account.**</u>

(a) *Definition*. The definition of "Cash Collateral Account" and the definition of "Secured Cash Management Agreement" are deleted in their entirety.

(b) *Section 6.16*. Section 6.16. is deleted in its entirety and replaced by "[reserved]".

(c) *Section 7.11(b)*. Section 7.11(b) is deleted in its entirety and replaced by "[reserved]".

(d) *Section 10.01(vii)*. In Section 10.01(vii), the "(x)" and the phrase "and (y) the Administrative Agent may release any or all of the cash or Cash Equivalents in the Cash Collateral Account with the consent of the Required Lenders" are deleted.

**Section 7.**          <u>Amendment to Amendment No. 8 - Financial Covenants – Minimum Cash Flow From Operating Activities</u>

*Section 7.11(c)*. In Section 7.11(c) the provision "For the fiscal quarters of the Borrower ending on September 30, 2007 and on December 31, 2007, fail to satisfy the following minimum Cash Flow From Operating Activities indicated for such fiscal quarter as follows:

| Fiscal Quarter Ending | Amount |
|---|---|
| September 30, 2007 | $8,000,000 |
| December 31, 2007 | $10,000,000" |

Shall be replaced with the provision "For the fiscal quarters of the Borrower ending on September 30, 2007 and on December 31, 2007, fail to satisfy the following minimum Cash Flow From Operating Activities indicated for such fiscal quarter as follows:

| Fiscal Quarter Ending | Amount |
|---|---|
| September 30, 2007 | $4,000,000 |
| December 31, 2007 | $10,000,000." |

**Section 8.**          <u>Amendment to Agreement – Financial Covenants- Accounts Payable</u>

*Section 7.11(d)*. A new Section 7.11(d) is hereby added to the Agreement to read as follows:

*Accounts Payable*. On the last day of each fiscal quarter, payment for no more than 50% of accounts payable of the Borrower and the other Loan Parties (on a consolidated basis) shall be pending longer than 70 days after receipt by the Borrower or other Loan Party of the invoice for the account payable.

*Section 6.01* A new Section 6.01(e) is hereby added to the Agreement to read as follows:

(e)     *Accounts Payable Aging*. As soon as available, but in any event within 15 days after the end of each fiscal quarter, a schedule certified by the chief financial officer, treasurer or controller of the Borrower showing in reasonable detail the aging of accounts payables of the Borrower and the other Loan Parties (on a consolidated basis) and showing compliance with the requirements of Section 7.11(d).

**Section 9.**         <u>Waivers</u>.

(a)      With respect to the annual financial statements for the year-ended December 31, 2006, the Administrative Agent and the Lenders hereby waive the requirement set forth in Section 6.01(a) of the Agreement that Borrower deliver an opinion (the "<u>Internal Controls Opinion for 2007</u>") of a Registered Public Accounting Firm independently assessing the Borrower's internal controls over financial reporting in accordance with Item 308 of SEC Regulation S-K, PCAOB Auditing Standard No. 2, and Section 404 of Sarbanes-Oxley expressing a conclusion that contains no statement that there is a material weakness in such internal controls to the extent that the Internal Controls Opinion for 2007 (x) is delivered later than March 31, 2007 and (y) mentions that there are material weaknesses in such internal controls; provided that the waiver in this Section 9 shall terminate and be of no force or effect unless (i) the Borrower cures all of the material weakness in internal controls (identified in Schedule A to Amendment No. 2 to Credit Agreement dated as of March 30, 2007 or in the Internal Controls Opinion for 2007) by August 30, 2007, and (ii) the Borrower receives the Internal Controls Opinion for 2007 (and delivers a copy to the Administrative Agent and the Lenders) by August 30, 2007.

(b)      The Borrower acknowledges that it did not comply with the requirements of Section 6.12(d) within the time frame specified therein, as in effect without giving effect to this Amendment, thereby resulting in an Event of Default (the "<u>Specified Event of Default</u>") occurring and continuing to exist from and after July 20, 2007 pursuant to Section 8.01(b)(i). The Lenders hereby waive the Specified Event of Default expressly specified in this Section 9(b), effective only on and after the Effective Date of this Amendment but with retroactive effect to July 20, 2007.

**Section 10.**         <u>Representations and Warranties</u>. The Borrower hereby repeats and restates those representations and warranties set forth in Article V of the Agreement, as if made on and as of the date hereof (except to the extent such representations and warranties expressly relate to an earlier date), which representations and warranties are hereby incorporated herein by reference, as if specifically set forth herein; <u>provided</u> that references to "the Agreement" in any Loan Documents shall be and are deemed to mean the Agreement as amended hereby.

The Borrower represents and warrants to the Administrative Agent and the Lenders that attached to Amendment No. 2 to Credit Agreement dated as of March 30, 2007 as <u>Schedule A</u> is a brief description of the material weaknesses in the Borrower's internal controls over financial reporting in accordance with Item 308 of SEC Regulation S-K, PCAOB Auditing Standard No. 2, and Section 404 of Sarbanes-Oxley identified with respect to the annual financial statements for the year-ended December 31, 2006.

The Borrower represents and warrants to the Administrative Agent and the Lenders that the attached <u>Updated Schedule 5.08(b)</u> sets forth a complete and accurate list of all Liens on the

property or assets of each Loan Party and each of its Subsidiaries, showing as of the Effective Date of this Amendment No. 9 the lienholder thereof, the principal amount of the obligations (or the facility or arrangement) secured thereby and the property or assets of such Loan Party or such Subsidiary subject thereto.

The Borrower represents and warrants to the Administrative Agent and the Lenders that, after giving effect to this Amendment, no Default or Event of Default exists on the Effective Date of this Amendment.

Section 11.    **Consent of Guarantors.** By signing below, each of the Guarantors irrevocably consents and agrees to this Amendment and all of the terms and provisions hereof.

Section 12.    **Miscellaneous**. This Amendment may be executed by one or more of the parties to this Amendment on any number of counterparts (including by facsimile), and all of said counterparts taken together shall be deemed to constitute one and the same instrument. This Amendment is a Loan Document. The Borrower shall pay or reimburse each of the Lenders and the Administrative Agent for all of their reasonable out-of-pocket expenses in connection with the negotiation, preparation, execution and delivery of this Amendment, including without limitation, the reasonable fees and expenses of Fried, Frank, Harris, Shriver & Jacobson, LLP and Dechert LLP. The provisions of Sections 10.14 and 10.15 of the Agreement are incorporated by reference into this Amendment *mutatis mutandis*. This Amendment shall not constitute an amendment or waiver of any of the terms and provisions of the Agreement and shall not be construed as a waiver or consent to any further or future action on the part of the Borrower or any Guarantor, except to the extent expressly set forth herein. None of the terms or provisions of this Amendment shall be effective unless and until the Effective Date. Except as specifically set forth herein, all of the terms and provisions of the Agreement and the other Loan Documents are confirmed and shall remain in full force and effect and the Borrower and the Guarantors shall continue to be bound by such terms and provisions.

[Signature Pages Follow]

IN WITNESS WHEREOF, each of the parties hereto has caused this Amendment to be duly executed and delivered as of the date first above written.

Borrower:

INPHONIC, INC.

By: _____
Name: David A. Steinberg
Title: Chief Executive Officer

Guarantors:

CAIS ACQUISITION, LLC

By: _____
Name: David A. Steinberg
Title: President

CAIS ACQUISITION II, LLC

By: _____
Name: David A. Steinberg
Title: President

FON ACQUISITION, LLC

By: _____
Name: David A. Steinberg
Title: President

MOBILE TECHNOLOGY SERVICES, LLC

By: _____
Name: David A. Steinberg
Title: President

[Signature Page to Amendment No. 9 to InPhonic Credit Agreement]

SIMIPC ACQUISITION CORP.

By: _____
Name: David A. Steinberg
Title: Chief Executive Officer

STAR NUMBER, INC.

By: _____
Name: David A. Steinberg
Title: Chief Executive Officer

1010 INTERACTIVE, LLC

By: _____
Name: David A. Steinberg
Title: Chief Executive Officer

[Signature Page to Amendment No. 9 to InPhonic Credit Agreement]

AP INPHONIC HOLDINGS, LLC,
as a Lender

By: _____
Name: SCOTT G. BAUCE
Title: MANAGING DIRECTOR

[Signature Page to Amendment No. 9 to InPhonic Credit Agreement]

GOLDMAN SACHS CREDIT PARTNERS, L.P.,
as a Lender

By: _____
Name: Ken Eberts
Title: Managing Director, Goldman, Sachs & Co. – Attorney in Fact Goldman Sachs Credit Partners

[Signature Page to Amendment No. 9 to InPhonic Credit Agreement]

CITICORP NORTH AMERICA, INC.,
as Administrative Agent and as a Lender

By: _____
Name: Jeanne Appelt
Title: V.P.

Schedule 5.08(b)
Lien Agreements
as of July 31, 2007

| Perfected by UCC (security interest & liens) | Est. value of collateral | Footnote |
|---|---:|---|
| Voicestream Wireless Corp - T-mobile | $ 9,408,108.66 | C, T |
| Sprint Solutions/Nextel | $ 7,002,999.84 | B, T |
| Insight Global Finance f/k/a CIT (capital lease) | $ 3,245.06 | E |
| CitiCapital Technology Finance, Inc. (capital lease) | $ - | G |
| DeLage Landen Financial Services, Inc (capital lease) | $ - | H |
| Caterpillar Financial Services Corporation (capital lease) | $ 1,719.90 | I |
| Sun Microsystems Finance (capital lease) | $ - | J |
| Sun Microsystems Finance (capital lease) | $ - | K |
| DeLage Landen Financial Services, Inc (capital lease) | $ - | M |
| Eplus Group Inc (capital lease) | $ 223,556.23 | N |
| Oce Financial Services, Inc (capital lease) | $ 96,189.02 | O |
| General Electric Capital Corporation (operating lease) | $ 113,200.00 | P |

| Unperfected (contracts with rights to perfect) | Est. value of collateral | Footnote |
|---|---:|---|
| Cingular | $ 4,796,247.00 | A, T |
| Us Cellular | $ 80,155.49 | |
| CC Processor - Paymentech LLC - US and Canada | $ 220,000.00 | Q |
| CC Processor Comerica - Global Payments | $ 600,000.00 | R |
| CC Processor - TransFirst | $ 1,073,918.00 | R |
| CC Processor - CardService International | $ 4,900.00 | R |

| Capital leases | Est. value | Footnote |
|---|---:|---|
| Oracle 2 | $ 114,369.53 | S |

A   Continuing and unconditional security interest in all inventory of equipment purchased from Cingular and all parts, accessories, substitutions, increases and products thereof in any form, together with all records relating thereto and all proceeds of the Collateral, until full payment of any and all sums due Cingular by InPhonic.

B   If an equipment purchase provides for payments on credit, InPhonic grants Sprint a security interest in the Sprint Products purchased from Sprint by InPhonic, whether now owned or hereafter acquired, and any proceeds therefrom to secure payment and performance in full by InPhonic of all amounts invoiced for the Sprint Products.

C   All inventory and equipment now owned or hereafter acquired by debtor in business and all proceeds of debtor's inventory in any form or forms, account, contract rights, chattel paper, genteal intangibles, instruments or other rights to payment, all machinery and equipment, vehicles, all insurance policies and proceeds thereof pertaining to the foregoing, and commissions now and hereafter arising out of business of debtor including, but not limited to, handsets, accessories, prepaid coupons,"PINS", and replenishing cards, and other tangible items shipped by Voice Stream or its agents to debtor.

E   (7)2.8CHZ XEON PROCESSOR OPTION(7)PROLIANT DL360 G3 Rack 2.8X5(14)36GB 10K U320 PLUGGABLE HARD (12) PROLIANT DL140 XEON - 2.4G (1P) "plus all other types of office equipment and products, computers, security systems and other items of equipment now and hereafter leased to and/or financed for Debtor/Lessee by Secured Party/Lessor, and including all replacements, upgrades and substitutions hereafter occurring to all of the foregoing equipment and all now existing and future attachments, parts, accessories and add-ons for all of the foregoing items and types of equipment, and all proceeds and products thereof".
G   Lease obligation satisfied in 2007
H   Lease obligation satisfied in 2007
I   One Caterpillar XQ105 Power Module, S/N F7428F/001 W/One 600A automatic transfer switch S/N 009Y8120NE Caterpillar CQ 225 Power Module, S/N 8JJ00854 W/One ZTF 000A00080E automatic transfer switch, S/N 144517AND substitution, replacements, additions, & accessions thereto, now owned or hereafter acquired, and proceeds thereof.
J   Lease obligation satisfied in 2007
K   Lease obligation satisfied in 2007
M   Lease obligation satisfied in 2007
N   The asset(s) as described in Schedule No.1 dated August 17, 2005 to Lease Agreement No. DCC158 dated August 17, 2005 together with any and all accessions, replacements, substitution and proceeds thereof. The transaction covered by this UCC-1 is intended by Lessor and Lessee to be a true lease. In the event the lease is terminated, or is deemed to be a disguised security interest prior to Lessor's or its assignees' receipt of full payment due pursuant to this transaction, this transaction shall be deemed to grant a security interest. This UCC-1 is filed for informational and notice purposes only.
O   The equipment covered under equipment PO#16176 between secured party and debtor, including the equipment described below, and all accessions, attachments, replacements substitutions, modifications, and additions thereto now or hereafter acquired, and all proceeds thereof (including insurance proceeds). Model serial # with all peripherals. VP3090A   0234500156  VP3090  2034500160 VP2100   0236401273. This is a precautionary filing in connection with a true lease transaction and is not to be construed as indicating the transaction is other than a true lease.
P   All equipment, described herein of otherwise, leased to or financed for the Debtor by Secured Party under certain equipment lease agreement No. 7352061-007 dated 12/30/05 including all accessories, accessions, replacements, additions, substitutions, add-ons and upgrades thereto.
Q   Former Credit Card Processor - will be returned to the company over the next two months
R   Current Credit Card Processor
S   Oracle Software
T   Net amounts owed to/from such creditors vary from time to time