# EXHIBIT 1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| INPHONIC, INC., et al[1] | : | Case No. 07-11666 (KG) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |
|  | : | Ref. No. 11 |
|  | : |  |

## INTERIM ORDER (I) AUTHORIZING AND APPROVING DEBTORS' POST-PETITION FINANCING; (II) GRANTING LIENS AND SECURITY INTERESTS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) AUTHORIZING USE OF CASH COLLATERAL AND AFFORDING ADEQUATE PROTECTION; (IV) MODIFYING AUTOMATIC STAY; AND (V) SCHEDULING FINAL HEARING

This matter coming before this Court on the Debtors' Motion for Entry and Approval of

Interim and Final Orders: (A) Authorizing and Approving Postpetition Financing; (B) Granting

Liens and Security Interests and Providing Superpriority Administrative Expense Status;

(C) Authorizing Use of Cash Collateral and Affording Adequate Protection; (D) Modifying

Automatic Stay; and (E) Scheduling Final Hearing, Pursuant to 11 U.S.C. § § 105, 362, 363 and

364 and Federal Rules of Bankruptcy Procedure 2002 and 4001(c) and (d) (the "Motion") for an

interim hearing on November 9, 2007 (the "Interim Hearing"). The Motion requests the entry of

an interim order (the "Interim Order"):

(a)     authorizing and approving, pursuant to Sections 105, 361, 362, 363, and 364 of

the United States Bankruptcy Code, 11 U.S.C. § § 101, et seq. (the "Bankruptcy Code") and

Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

---

[1] The Debtors are InPhonic, Inc, CAIS Acquisition, LLC, SimIPC Acquisition Corp., Star Number, Inc., Mobile Technology Services, LLC, CAIS Acquisition II, LLC, FON Acquisition, LLC, and 1010 Interactive, LLC.

Rules"), postpetition financing (the "DIP Facility"), from Adeptio INPC Funding, LLC (together

with its successors, assigns and transferees, the "DIP Lender") to (i) fund, among other things,

ongoing working capital needs of the Debtors, and (ii) pay fees and expenses (including, without

limitation, reasonable attorneys' fees and expenses) owed to the DIP Lender under the DIP

Facility and the other DIP Facility Documents (as defined below);

       (b)     authorizing the Debtors to enter into and comply in all respects with the DIP

Facility and the other DIP Facility Documents, and approval of all of the terms and conditions of

the DIP Facility and the other DIP Facility Documents;

       (c)     requesting that the financing under the DIP Facility, including, without limitation,

as to all principal, accrued interest, unpaid fees and expenses, indemnification, and all other

amounts due from time to time under the documents referred to below, including the

Obligations[2] (collectively, the "DIP Facility Obligations"):

       (i)     have priority, pursuant to Bankruptcy Code § 364(c)(1), over any and all

administrative expenses, subject only to the Carve-Out (as defined below), which allowed

superpriority claims of the DIP Lender shall be payable from and have recourse to all prepetition

and postpetition property of the Debtors, as provided for herein; and

       (ii)     pursuant to Bankruptcy Code § § 364(c)(2), (c)(3) and (d), be and be

deemed to be secured by valid, binding, continuing, enforceable, fully perfected and unavoidable

first priority senior security interests in, and liens upon (all such liens and security interests

granted to the DIP Lender, pursuant to this Interim Order and the DIP Facility Documents, the

---

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the DIP Facility
Documents or the Order (A) Approving Bid Procedures Relating to Sale of Substantially All of the Debtors'
Assets; (B) Scheduling a Hearing to Consider the Sale and Approving the Form and Matter of Notices;
(C) Establishing Procedures Relating to Assumption and Assignment of Certain Contracts, Including Notice of
Propsoed Cure Amounts; (D) Approving Expense Reimbursement Provision; and (E) Granting Related Relief.

"DIP Facility Liens"), all prepetition and postpetition assets of the Debtors, whether now existing or hereafter acquired, including all of the real, personal and mixed property (including equity interests) and all monies and other property of any kind received on account thereof (including, upon and following the approval of the Bankruptcy Court, Avoidance Actions), and all proceeds thereof, in which Liens are granted whether pursuant to the Interim Order and Final Order, as applicable, the Collateral Documents, or otherwise, in each case as security for the Obligations (each of the foregoing, the "Collateral"), but specifically (i) being subject solely to the Carve-Out to the extent provided for below, and (ii) receiving a junior lien on all Collateral encumbered by the Permitted Encumbrances, pursuant to Bankruptcy Code § 364(c)(2), subject to the provisions of paragraph 6 below;

(d)     authorizing the Debtors' use of the Prior Lender's (as defined below) cash collateral and granting adequate protection on account of the Prepetition Loan Agreement (as defined below) under Bankruptcy Code § § 105, 361, 362 and 363;

(e)     requesting, pursuant to Bankruptcy Rule 4001, that a final hearing (the "Final Hearing") be held before this Court to consider entry of order authorizing and granting the relief requested in the Motion on a final basis (the "Final Order"); and

(f)     granting of certain related relief.

The Court having found that due and appropriate notice, under the circumstances, of the Motion, the relief requested therein, the material terms of this Interim Order and the Interim Hearing was provided by the Debtors pursuant to Bankruptcy Rules 4001(b) and 4001(c)(1), on the following parties: (a) the office of the United States Trustee for the District of Delaware (the "U.S. Trustee"); (b) the entities listed on the Consolidated List of Creditors Holding the 20 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) the Internal Revenue

3

Service; (d) the Securities and Exchange Commission; (e) the Prior Lender; and (f) the Existing Agent (collectively, the "Interim Notice Parties"). The Court having held the Interim Hearing on November 9, 2007; having considered all the pleadings filed with this Court; and having overruled all unresolved objections to the relief requested in the Motion; and upon the record made by the Debtors at the Interim Hearing, including the Motion and other filings and pleadings in the Debtors' Chapter 11 cases, and after due deliberation and consideration and good and sufficient cause appearing therefore;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.  Petition Date. On November 8, 2007 (the "Petition Date"), each of the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court" or this "Court"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code § § 1107 and 1108.

B.  Jurisdiction and Venue. This Court has core jurisdiction over the Debtors' Chapter 11 cases, this Motion and the parties and property affected hereby pursuant to 28 U.S.C. § § 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. § § 1408 and 1409.

C.  Notice. Notice of the Interim Hearing, the Motion and proposed entry of this Interim Order has been provided to the Interim Notice Parties. Under the urgent circumstances, requisite notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rules 4001(b) and (c) and 9014, which notice is

4

sufficient for this Motion, and the entry of the Interim Order, and no further notice of, or hearing on, the Motion or this Interim Order is necessary or required.

D.     Creditors' Committee. As of the date hereof, the U.S. Trustee has not appointed a Creditors' Committee in accordance with Bankruptcy Code § 1102.

E.     The Debtors' Stipulations as to Existing Secured Debt. Subject to the limitations contained in paragraph 10 of this Interim Order, the Debtors, for themselves, their estates and all representatives of such estates, admit, stipulate, acknowledge and agree that:

(a)     Prior to the Petition Date, the Debtors entered into that certain Credit Agreement dated as of November 7, 2006 (as amended, the "Prepetition Loan Agreement"), by and among the Debtors, the lenders from time to time party thereto (the "Prior Lender") and Citicorp North America, Inc. as Administration Agent (the "Existing Agent").

(b)     As collateral for the Prepetition Indebtedness, the Debtors granted to the Prior Lender and Existing Agent a first-priority security interest in and lien upon (collectively, the "Prepetition Liens") all of the Debtors' assets (the "Prepetition Collateral").

(c)     As of the Petition Date, the Debtors were indebted to the Prior Lender and Existing Agent in the aggregate principal amount of not less than $90 million plus accrued interest with respect thereto and any fees, expenses, costs and charges (the "Prepetition Obligations") provided under the Prepetition Loan Agreement.

(d)     The DIP Lender currently holds all of the Prior Lender's Prepetition Indebtedness, the Prepetition Loan Agreement, and the Prepetition Liens (all terms as defined in the DIP Credit Agreement).

5

(e)     The Prepetition Obligations constitute the legal, valid and binding obligations of the Debtors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising from Bankruptcy Code § 362).

(f)     No portion of the Prepetition Obligations are subject to avoidance, recharacterization, recovery or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law.

(g)     The Prepetition Liens in and to the Prepetition Collateral constitute valid, binding, enforceable, and perfected first-priority liens in and to the Prepetition Collateral, subject only to the liens described in the Prepetition Loan Agreement, if any, and are not subject to avoidance, reduction, recharacterization, disallowance, disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(h)     The Debtors do not have, and hereby forever release, any claim, counterclaims, causes of action, defenses or setoff rights, whether arising under the Bankruptcy Code or otherwise against the Prior Lender, the Existing Agent and the DIP Lender, and their respective affiliates, partners, members, agents, officers, directors, employees, attorneys and advisors whether arising under or in connection with the Prepetition Loan Agreement or the transactions contemplated thereunder, the Prepetition Indebtedness or the Prepetition Liens, including, without limitation, any right to assert any disgorgement or recovery.

(i)     The foregoing acknowledgments, stipulations and agreements are subject only to the rights of any Creditors' Committee ("Creditors' Committee") and parties in interest pursuant to paragraph 10 below.

F.     Findings Regarding Postpetition Financing.

6

(a)     *Debtors' Request.*  The Debtors have requested from the DIP Lender, and the DIP Lender is willing to extend, certain loans, advances and other financial accommodations, as more particularly described and on the terms and conditions set forth in this Interim Order and the DIP Facility Documents.

(b)     *Need for Postpetition Financing.*  The Debtors have an immediate need to obtain the DIP Facility and use the Prepetition Collateral, including the Cash Collateral, in order to permit, among other things, the orderly continuation of the operation of their businesses, the management and preservation of Debtors' assets and properties, the sale of substantially all of the Debtors' assets (the "Proposed Sale") at an Auction pursuant to the Bidding Procedures Order (as defined in paragraph 7(b) below), to maintain business relationships with vendors, suppliers and customers, to make payroll, to satisfy other working capital and operational needs and maintain the going concern value of the Debtors' estates. Without such cash and credit, the Debtors' estates would be irreparably harmed.

(c)     *No Credit Available on More Favorable Terms.*  The Debtors represent that they are unable to obtain sufficient financing from sources other than the DIP Lender on terms more favorable than under the DIP Credit Agreement (as defined below and in substantially the form affixed as Exhibit 1 hereto, subject only to non-material modifications as may be agreed to by the parties thereto) and any and all documents and instruments delivered pursuant thereto or in connection therewith (inclusive of the DIP Credit Agreement, the "DIP Facility Documents") and are not able to obtain sufficient unsecured credit allowable as an administrative expense under Bankruptcy Code § 503(b)(1). The Debtors are also unable to obtain unsecured credit with the enhanced priority afforded by Bankruptcy Code § 364(c)(1). New credit is unavailable to the Debtors without providing the DIP Lender with (a) the DIP

7

Facility Superpriority Claims and (b) the DIP Facility Liens as provided herein and in the DIP
Facility Documents.

      (d)    *Budget.* The Debtors have prepared and delivered the Budget to the DIP
Lender, a copy of which Budget is attached hereto as <u>Exhibit 2</u>. Such Budget has been
thoroughly reviewed by the Debtors and their management. The Debtors represent that the
Budget is achievable and will allow the Debtors to operate their businesses, conduct the Auction
and Sale and otherwise conduct their Chapter 11 cases. The DIP Lender is relying upon the
Debtors' compliance with the Budget in accordance with the Interim Order in determining to
enter into the postpetition financing arrangements provided for herein.

      (e)    *Cash Collateral.* The Debtors stipulate, agree and acknowledge, subject
to the rights of any Creditors' Committee or other party in interest pursuant to paragraph 10
below, that its cash, including, without limitation, all cash and other amounts on deposit or
maintained in any account or accounts by the Debtors, and any amounts generated by the
collection of accounts receivable, the sale of inventory or other disposition of Prepetition
Collateral, constitute proceeds of the Prepetition Collateral and are cash collateral of the Prior
Lender within the meaning of Bankruptcy Code § 363(a) (the "<u>Cash Collateral</u>"). The Prior
Lender is entitled, pursuant to Bankruptcy Code § § 361, 363(c)(2), 363(e) and 364(d)(1), to
adequate protection of its interests in the Prepetition Collateral, in an amount equal to the
aggregate diminution in value of the Prior Lender's Prepetition Collateral, including, without
limitation, any such diminution resulting from the use of Cash Collateral, the implementation of
the DIP Facility, the sale, lease or use by the Debtors (or other decline in value) of the
Prepetition Collateral and the imposition of the automatic stay pursuant to Bankruptcy Code
§ 362. The Prior Lender has indicated a willingness to consent and agree to allow the Debtors to

<div align="center">8</div>

use its Cash Collateral and provide financing to the Debtors through the date of the Final Hearing on the Motion, subject to (i) the entry of this Interim Order, (ii) the terms and conditions of the DIP Credit Agreement and the DIP Facility Documents, (iii) the terms and conditions of all "First-Day Orders" being, in form and substance, reasonably satisfactory to the Prior Lender and (iv) findings by the Court that such postpetition financing is essential to the Debtors' estates, that the terms of such financing were negotiated in good faith and at arm's length, and that the DIP Lender's DIP Facility Liens and DIP Facility Superpriority Claims, and other protections granted pursuant to this Interim Order and the DIP Facility Documents will not be affected by any subsequent reversal, modification, vacatur, or amendment of this Interim Order or any other order, as provided in Bankruptcy Code § 364(e).

(f)     *Business Judgment and Good Faith Pursuant to Section 364(e).*  Based on the record of the Interim Hearing, the terms of the DIP Facility Documents, this Interim Order and the use of Cash Collateral are fair, just and reasonable under the circumstances, ordinary and appropriate for secured financing to debtors-in-possession, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration. The use of Cash Collateral and the terms of the DIP Credit Agreement and the other DIP Facility Documents have been negotiated in good faith and at arm's length between the Debtors, the Prior Lender and the DIP Lender, with all parties represented by counsel, and any credit extended, loans made, and other financial accommodations extended to the Debtors by the Prior Lender or the DIP Lender shall be deemed to have been extended, issued, or made, as the case may be, in "good faith" as that term is used in Bankruptcy Code § 364(e) and in express reliance upon the protections afforded by

9

Bankruptcy Code § 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

        (g)    *Good Cause, Immediate Entry.* The Debtors represent that the relief requested by the Motion is necessary, essential and appropriate and is in the best interests of and will benefit the Debtors, their estates and their creditors as its implementation will, among other things, provide the Debtors with the necessary liquidity to (i) minimize disruption to the Debtors' businesses and on-going operations, including in connection with the Sale, (ii) preserve and maximize the value of the Debtors' estates for the benefit of all of the Debtors' creditors, and (iii) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets. Thus, good cause has been shown for the immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).

Based upon the foregoing, and after due consideration and good cause appearing therefor:

IT IS ORDERED, ADJUDGED AND DECREED, that:

    1.    Motion Granted. The Motion is granted in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Interim Order. This Interim Order shall immediately become effective upon its entry.

    2.    Objections Overruled. All objections to the entry of this Interim Order are withdrawn or resolved by the terms hereof or, to the extent not resolved, are overruled.

    3.    Authorization of the DIP Financing Documents. Upon finalizing and executing that certain Senior Secured Super-Priority Debtor-in-Possession Credit Agreement (the "DIP Credit Agreement") by and between the Debtors and the DIP Lender (subject only to non-material modifications as may be agreed to by the parties thereto), and provided that the Debtors are not in default under the terms of this Interim Order, the Debtors are immediately authorized to use the Prior Lender's Cash Collateral and to borrow under the DIP Facility from the DIP

Lender in an interim amount not to exceed $10.0 million and to continue to operate its business, in accordance with the terms of this Interim Order, the DIP Credit Agreement and the DIP Facility Documents. Upon execution and delivery of the DIP Facility Documents, the DIP Facility Documents shall constitute and are hereby deemed to be legal, valid, and binding obligations of the Debtors and the Debtors' estates, enforceable against the Debtors and their estates in accordance with the terms of the DIP Facility Documents. Until the Final Hearing on the Motion, Cash Collateral and available financing and advances under the DIP Credit Agreement will be used or made only, in accordance with the Budget, to: (a) fund the Debtors' ordinary working capital and general corporate needs and (b) to pay such other amounts as are required or permitted to be paid pursuant to the DIP Credit Agreement, this Interim Order and any other orders of this Court.

4.      Execution and Compliance with DIP Facility Documents. The Debtors are authorized and directed to execute, deliver, perform and comply with all of the terms and covenants of the DIP Credit Agreement and DIP Facility Documents, each of which constitute valid, binding, enforceable and non-avoidable obligations of the Debtors for all purposes during the Debtors' Chapter 11 cases, any subsequently converted case of any Debtor under Chapter 7 of the Bankruptcy Code or after the dismissal or reorganization of any Debtor's Chapter 11 case. The Debtors are authorized and directed to perform all acts, and execute and comply with the terms of all instruments and documents (including, without limitation, the execution of security agreements, mortgages and financing statements), as the DIP Lender may reasonably require as evidence of and for the protection of the Obligations and the Collateral or which may be otherwise deemed necessary by the DIP Lender to effectuate the terms and conditions of this Interim Order and the DIP Facility Documents.

11

5.    DIP Facility Superpriority Claims.  As security for the DIP Facility Obligations now existing or hereafter arising pursuant to the DIP Facility, the DIP Facility Documents and this Interim Order, to the extent the DIP Facility Liens do not satisfy the DIP Facility Obligations, the DIP Lender is granted allowed super-priority administrative claim pursuant to Bankruptcy Code § 364(c)(1), which claim shall have priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, now in existence or hereafter incurred by any of the Debtors and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, Bankruptcy Code § § 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), and/or 364(c)(1) (the "DIP Facility Superpriority Claim"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed claims shall be payable from and have recourse to all pre and postpetition property of the Debtors and all proceeds thereof, provided, however, that the DIP Facility Superpriority Claim shall be subordinate to the Carve-Out to the extent specifically provided for in paragraph 8 of this Interim Order.

6.    DIP Facility Liens.  As security for the DIP Facility Obligations, pursuant to Bankruptcy Code § § 364(c)(2), (c)(3), and (d) and the consent of the Prior Lender and the Existing Agent, the DIP Lender shall have, and is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, control agreements, pledge agreements, lock box agreements financing statements, or otherwise) the DIP Facility Liens; provided, however that such liens and security interests shall not include Avoidance Actions or the proceeds thereof until the entry of the Final Order:

12

      (a)     pursuant to Bankruptcy Code § 364(c)(2), valid, perfected, enforceable and non-avoidable first priority liens on and security interests in all now owned or hereafter acquired assets and property of the Debtors, including, without limitation, avoidance actions under Chapter 5 of the Bankruptcy Code and the proceeds thereof upon entry of the Final Order, that are not subject to valid, perfected, enforceable and non-avoidable liens as of the Petition Date;

      (b)     pursuant to Bankruptcy Code § 364(c)(3), valid, perfected, enforceable and non-avoidable second priority or other junior liens on and security interests in all now owned or hereafter acquired assets and property of the Debtors that are subject to valid, perfected, enforceable and non-avoidable liens in existence on the Petition Date or to valid liens in existence on the Petition Date that are perfected subsequent to such commencement as permitted by Bankruptcy Code § 546(b) (other than assets and property that are subject to the existing liens as referred to in subparagraph (c) below, which existing liens shall be primed as provided therein); and

      (c)     pursuant to Bankruptcy Code § 364(d), valid, perfected, enforceable and non-avoidable first priority senior priming liens on and security interests in the Prepetition Collateral, except as to those liens and security interests in existence on the Petition Date to which the Prepetition Collateral is subject in accordance with the Prepetition Loan Agreement and as consented to by the DIP Lender, to the extent such liens and security interests are valid, perfected, enforceable and non-avoidable (provided that with respect to such excepted liens and security interests, the DIP Lender shall be granted the second priority or other junior liens granted in subparagraph (b) above).

In the event of the occurrence of an Event of Default (as defined below), or an event that would constitute an Event of Default with the giving of notice or lapse of time or both (a "Default"), the DIP Facility Liens shall be subject only to the payment of the Carve-Out (as defined below).

7.    Adequate Protection. The Prior Lender and Existing Agent are entitled to adequate protection for DIP Facility Liens and the Debtors' use of Cash Collateral, and solely to the extent of diminution in value from the Debtors' use of Cash Collateral. As adequate protection, the Prior Lender and Existing Agent are hereby granted the following:

(a)    *Replacement Liens.* The Prior Lender and Existing Agent are granted (effective and perfected upon the entry of this Interim Order and without the necessity of the execution by the Debtors of security agreements, financing statements or other agreements) valid, perfected replacement security interests in and lien upon all Prepetition Collateral of the Debtors and the proceeds thereof, subject and subordinate only to (i) the Prepetition Liens, (ii) the DIP Facility Liens granted to the DIP Lender under this Interim Order and pursuant to the DIP Credit Agreement and (iii) the Carve-Out.

(b)    *Sale Process.* The Debtors' motion, filed on the Petition Date, for an order, *inter alia,* (i) approving bid procedures with respect to the proposed sale of substantially all of the Debtors' Assets, as more fully set forth in that certain asset purchase agreement (the "Agreement") by and between the Debtors and Adeptio INPC Funding, LLC, (ii) scheduling a hearing and approving the form and manner of notice of the Auction and the Bid Procedures; (iii) establishing procedures relating to the assumption and assignment of certain Contracts, including notice of proposed cure amounts; (iv) approving the expense reimbursement provision; and (v) granting related relief (the "Bid Procedures Motion") shall be heard as part of the

14

Debtors' other first-day motions and an order (the "Bidding Procedures Order" which includes the Bid Procedures as an exhibit) shall be entered, in the form filed by the Debtors with the Motion, upon such motion no later than November 9, 2007; and the relief requested in the Bid Procedures Motion, including, without limitation, the dates of the Auction, Sale Hearing and Closing Date, and the Debtors' agreement that the Sale shall be consummated with the Qualified Bidder that submits the highest or otherwise best bid at the Auction, shall not be modified except with the consent of the Prior Lender and the Existing Agent.

(c)     *Budget.*  Except pursuant to permitted variances provided for in the DIP Financing Documents as in effect as of the entry of this Interim Order, the Debtors shall not make disbursements in excess of those projected in the Budget and shall not otherwise deviate from the terms of the Budget, without the written consent of the Prior Lender and Existing Agent.

(d)     *Fees and Expenses.*  The Debtors are hereby authorized and directed to pay to the Prior Lender, all present and future costs, fees, charges and expenses of the Prior Lender following receipt of a summary invoice, including all reasonable fees and expenses of consultants, advisors, professionals and attorneys including Capstone Advisory Group, LLC whether incurred prepetition or postpetition.  None of such Prior Lender's costs, fees, charges, and expenses shall be subject to Court approval, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court, provided that the Court shall have jurisdiction to determine any dispute concerning such invoices.  The Prior Lender shall provide a copy of the summary invoice regarding any fees and expenses incurred postpetition to the U.S. Trustee and any Creditors' Committee's counsel subject to confidentiality and applicable privilege.

15

8.      <u>Carve-Out</u>. Liens, security interests and super-priority administrative expense
claims of the Prior Lender, the Existing Agent and the DIP Lender shall be subject to and
subordinate only to (a) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable
to the clerk of the Court (collectively, the "<u>UST/Clerk Fees</u>"); and (b) allowed, unpaid fees and
expenses of attorneys, accountants, and other professionals retained in the case by the Debtors or
the Creditors' Committee (collectively, the "<u>Professionals</u>") pursuant to Bankruptcy Code
§ § 327, 328 and 1103 (the "<u>Priority Professional Expenses</u>"), but the amount entitled to priority
under this sub-clause (b) shall not exceed $1.2 million outstanding in the aggregate at any time
(the "<u>Professional Expense Cap</u>," and together with the UST/Clerk Fees, the "<u>Carve-Out</u>");
<u>provided, however</u>, that any payments actually made to the Professionals, whether under
Bankruptcy Code sections 330 and 331 or otherwise, shall reduce the Professional Expense Cap
on a dollar-for-dollar basis, irrespective of whether such payment was made pre-Event of Default
or post-Event of Default, it being expressly understood that any prepetition retainers held by
Professionals shall not count against, and shall not reduce, the Professional Expense Cap. The
Carve-Out shall be free and clear of all liens, claims and encumbrances granted hereunder and
shall be subject only to the allowed claims of the Professionals for such fees and expenses as
may be awarded by the Court under Bankruptcy Code § § 327 or 328; <u>provided, however</u>, the
Carve-Out cannot be used for the payment or reimbursement of any fees or disbursements of the
Debtors or the Creditors' Committee or any other party-in-interest incurred in connection with
the assertion or joinder in any claim, counter-claim, action, proceeding, application, motion,
objection, defense or other contested matter, the purpose of which is to seek any order, judgment,
determination or similar relief: (1) invalidating, setting aside, avoiding, subordinating, in whole
or in part, the DIP Facility Obligations or the Prepetition Indebtedness or lien and security

16

interest securing the DIP Facility Obligations or the Prepetition Indebtedness; or (2) preventing, hindering or delaying, whether directly or indirectly, the assertion by the Prior Lender or the DIP Lender or enforcement by the Prior Lender or the DIP Lender or enforcement by the Prior Lender or the DIP Lender of its liens or realization upon any of the respective Collateral; or (3) challenging the postpetition liens or claims seeking an affirmative recovery from the Prior Lender or the DIP Lender; provided that the Carve-Out may be used to investigate the Prepetition Indebtedness and the validity and perfection of the liens and security interests securing the Prepetition Indebtedness.

9.    Fees and Expenses of Professionals. So long as no Default or Event of Default shall have occurred and be continuing or have occurred and be waived, the Debtors shall be permitted to pay the compensation and reimbursement of fees and expenses allowed and payable under Bankruptcy Code § § 328, 330 and 331 (but excluding fees and expenses of third party professionals employed by Creditors' Committee members), as the same may be due and payable and as are otherwise permitted under this Interim Order and the DIP Credit Agreement. Nothing contained herein is intended to constitute, nor should be construed as consent to the allowance of any fees, disbursements or expenses by any party and nothing herein shall affect the ability or right of the Debtors, the DIP Lender, the Creditors' Committee, the U.S. Trustee or any other party in interest to object to the allowance and payment of any amounts incurred or requested.

10.    Prepetition Lien/Claim Challenge. The stipulations and admissions contained in this Interim Order shall be binding upon the Debtors and their estates in all circumstances. Subject to the terms of this paragraph, the Creditors' Committee shall have twenty-five (25) days from the date of appointment of counsel for the Creditors' Committee (and if no Creditors' Committee is formed, any party-in-interest shall have twenty-five (25) days from entry of this

17

Interim Order) within which to commence an adversary proceeding (collectively, a "Prepetition

Lien/Claim Challenge") with respect to the validity, priority, extent, perfection, and

enforceability of the Prepetition Liens or the Prepetition Indebtedness, or any other claims or

causes of action against the Prior Lender and DIP Lender relating to the Prepetition Loan

Agreement. If such a Prepetition Lien/Claim Challenge is not timely commenced within such

applicable period set forth above, (a) the stipulations contained in paragraph E of this Interim

Order shall be irrevocably binding on the estates, the Creditors' Committee and all parties in

interest (including without limitation a receiver, administrator, or trustee appointed in this case or

in any jurisdiction), (b) the Prepetition Liens or the Prepetition Indebtedness and the Prior

Lender's and the DIP Lender's liens upon and security interests in the Collateral shall be

recognized and allowed as valid, binding, in full force and effect, not subject to any claims,

counterclaims, setoff or defenses and perfected, (c) the Creditors' Committee and any other party

in interest (including without limitation a receiver, administrator, or trustee appointed in this case

or in any jurisdiction) shall thereafter be forever barred from bringing any Prepetition

Lien/Claim Challenge, and (d) the Prior Lender and the DIP Lender and their respective agents,

officers, directors and employees shall be deemed released and discharged from all claims and

causes of action of any kind, nature or description arising at any time immediately prior to the

Petition Date, and all of Debtors' acknowledgements, releases and waivers of claims granted to

or in favor of the Prior Lender or the DIP Lender relating to the Prepetition Loan Agreement in

accordance with this Interim Order shall be binding upon all parties-in-interest in the Debtors'

Chapter 11 cases and/or in any subsequently converted case(s) under Chapter 7 of the

Bankruptcy Code. Nothing in this Interim Order shall be deemed to confer or deny standing to

commence an action on the Creditors' Committee.

11.    <u>Waiver of 506(c) Claims Against the Prior Lender and the DIP Lender</u>.  Except

for the Carve-Out and upon entry of the Final Order, no costs or expenses of administration

which already have been, or may hereafter be, incurred in the Debtors' Chapter 11 cases or in

any subsequently converted case under Chapter 7 of the Bankruptcy Code shall be charged or

asserted by the Debtors against the Prior Lender or the DIP Lender, their claims or the Collateral,

pursuant to Bankruptcy Code § § 105 or 506(c) or otherwise without the prior written consent of

the Prior Lender or the DIP Lender (and no such consent shall be implied from any other action,

inaction or acquiescence by the Prior Lender or the DIP Lender in this proceeding, including, but

not limited to, funding of the Debtors' ongoing operations by the DIP Lender).

12.    <u>Restrictions on Use of Proceeds</u>.  Subject to the limitations applicable in the DIP

Credit Agreement, the Debtors shall use the Prior Lender's Cash Collateral and the proceeds of

the DIP Facility made or arranged for by the DIP Lender pursuant to the DIP Facility Documents

and this Interim Order, and in accordance with this Interim Order and the Budget: (a) to support

the working capital and general corporate purposes of the Debtors, (b) to make any other

payments permitted to be made by the Bankruptcy Code, in this Interim Order or in any other

order of this Court to the extent provided for under the DIP Facility Documents or consented to

by the DIP Lender as provided in the DIP Facility Documents, (c) to pay certain fees and

expenses relating to the credit facilities established under the DIP Facility Documents, and (d) to

promptly pay all present and future costs, fees, charges and expenses of the DIP Lender

following receipt of a summary invoice (with a copy provided to the U.S. Trustee and any

Creditors' Committee's counsel subject to confidentiality and applicable privilege), including all

reasonable fees and expenses of consultants, advisors, professionals and attorneys paid or

incurred at any time in connection with these cases whether incurred prepetition or postpetition,

19

all of which unpaid costs and expenses shall be added to, and are included as part of, the

principal amount of the Obligations, secured by the Collateral and afforded all of the rights,

priorities and protections afforded to the DIP Lender in respect of the Obligations under this

Interim Order and the DIP Facility Documents. None of such DIP Lender's costs, fees, charges,

and expenses shall be subject to Court approval, and no recipient of any such payment shall be

required to file with respect thereto any interim or final fee application with the Court, provided

that the Court shall have jurisdiction to determine any dispute concerning such invoices.

13.    Commitment Termination Date. The DIP Facility Obligations shall be due and

payable, without notice or demand, on the Commitment Termination Date.

14.    Restrictions on the Debtors. Other than the Carve-Out, no claim having a priority

superior or *pari passu* with those granted by this Interim Order to the DIP Lender shall be

granted or permitted by any order of the Court heretofore or hereafter entered in the case, while

any portion of the DIP Facility (or refinancing thereof) or the commitment thereunder remains

outstanding without the consent of the DIP Lender. Except as may be expressly permitted by the

DIP Credit Agreement, the Debtors will not, at any time during the case, grant mortgages,

security interests, or liens in the Collateral or any portion thereof to any other parties pursuant to

Bankruptcy Code § 364(d) or otherwise without the consent of the DIP Lender.

15.    Lien Perfection. This Interim Order shall be sufficient and conclusive evidence of

the priority, perfection and validity of all of the liens and security interests in and upon the

Collateral granted pursuant to this Interim Order and/or the DIP Facility Documents, without the

necessity of (a) filing, recording or serving any financing statements, mortgages, deeds of trust or

other agreements, documents or instruments which may otherwise be required under federal or

state law in any jurisdiction (collectively, the "Lien Recording Documents"), (b) taking

possession of Collateral or evidence thereof (provided, that, without limiting the foregoing, any third party in possession of any Collateral is hereby deemed a bailee for the benefit of and on behalf of the DIP Lender) or (c) taking any other action to validate or perfect the liens and security interests granted in this Interim Order and/or the DIP Facility Documents. If the DIP Lender shall, in its discretion, elect for any reason to file any such Lien Recording Documents with respect to such liens and security interests, the Debtors are authorized and directed to execute, or cause to be executed, all such Lien Recording Documents upon the DIP Lender's request and the filing, recording or service thereof (as the case may be) of such Lien Recording Documents shall be deemed to have been made at the time of and on the Petition Date. The DIP Lender may, in its discretion, without seeking modification of the automatic stay under Bankruptcy Code § 362, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the Debtors have an interest in real or personal property and, in such event, the subject filing or recording officer is authorized and directed to file or record such certified copy of this Interim Order. To the extent that any applicable non-bankruptcy law would otherwise restrict the grant, scope, enforceability, attachment or perfection of the liens and security interests authorized or created hereby, or otherwise would impose filing or registration requirements with respect thereto, such law is preempted to the maximum extent permitted by the Bankruptcy Code, applicable federal law, and the judicial power of this Court (provided that if the DIP Lender takes steps to perfect their liens and security interests under otherwise applicable state law, it does so without waiving the benefits of this provision of this Interim Order). In the event that any Lien Recording Document which the DIP Lender elects to file in accordance with this paragraph contains any limitations, defects, deficiencies or other information which might otherwise limit or adversely affect the DIP Lender's liens upon and

security interests in the Collateral or any of the DIP Lender's claims, rights, priorities and/or protections afforded under this Interim Order and/or the DIP Facility Documents, such limitations, defects, deficiencies or other information shall not impair, limit, restrict or adversely affect in any way any of the DIP Lender's liens and security interests in the Collateral or their claims, rights, priorities and/or protections granted under this Interim Order and/or the DIP Facility Documents.

16.    Modification of Automatic Stay.  Subject only to the provisions of the DIP Credit Agreement and without further order from this Court, the automatic stay provisions of Bankruptcy Code § 362 are vacated and modified to the extent necessary to permit the DIP Lender to implement the provisions of the DIP Facility Documents and this Interim Order including exercising, upon the occurrence and during the continuance of any Event of Default, all rights and remedies provided for in the DIP Facility Documents; provided, however, that prior to the exercise of any enforcement or liquidation remedies against the Collateral, the DIP Lender shall be required to give five (5) business days written notice to the Debtors, its bankruptcy counsel, the Creditors' Committee's counsel, if any, and the U.S. Trustee.  Notwithstanding the occurrence of an Event of Default or the Commitment Termination Date or anything herein, all of the rights, remedies, benefits, and protections provided to the DIP Lender under the DIP Facility Documents and this Interim Order shall survive the Commitment Termination Date.

17.    Binding Effect of Interim Order and DIP Facility Documents.

(a)    The Debtors irrevocably waive any right to seek any modifications or extensions of this Interim Order without the prior written consent of the DIP Lender as authorized under the DIP Credit Agreement to give such consent, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Lender.

(b)     The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered converting the Debtors' Chapter 11 cases to a Chapter 7 case, dismissing any of the Debtors' bankruptcy cases (in the case of any such dismissal, to the maximum extent permitted under the Bankruptcy Code and other applicable law) or any order which may be entered confirming or consummating any plan of reorganization of the Debtors; and the terms and provisions of this Interim Order as well as the priorities in payment, liens, and security interests granted pursuant to this Interim Order and the DIP Facility Documents shall continue in this or any superseding case under the Bankruptcy Code, and such priorities in payment, liens and security interests shall maintain their priority as provided by this Interim Order until all Obligations are indefeasibly paid and satisfied in full; provided that all obligations and duties of the DIP Lender hereunder, under the DIP Facility Documents or otherwise with respect to any future loans and advances or otherwise shall terminate immediately upon the earlier of the date of any Event of Default, the Commitment Termination Date or the date that a plan of reorganization of the Debtors becomes effective unless the DIP Lender as is required under the DIP Facility Documents have given its express prior written consent thereto, no such consent being implied from any other action, inaction or acquiescence by the DIP Lender.

(c)     The provisions of this Interim Order and the DIP Facility Documents shall be binding upon and inure to the benefit all parties-in-interest in these cases, including, without limitation, the Debtors, the DIP Lender, and the Creditors' Committee, and their respective successors and assigns (including, to the fullest extent permitted by applicable law, any Chapter 7 or Chapter 11 trustee hereinafter appointed or elected for any Debtor's estate, an examiner appointed pursuant to Bankruptcy Code § 1104 (upon entry of a Final Order) or any other

23

fiduciary hereafter appointed as a legal representative of the Debtors or with respect to the property of the Debtors' estates), and shall inure to the benefit of the Debtors, the DIP Lender, and the Creditors' Committee, and their respective successors and assigns; provided, however, that DIP Lender shall have no obligation to extend any financing to any Chapter 7 trustee or similar responsible person appointed for the Debtors' estates.

18.     Survival. The rights of the DIP Lender under the DIP Facility Documents or this Interim Order, the provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order (i) confirming a plan of reorganization in this case (and, to the extent not satisfied in full in cash, the DIP Facility Obligations shall not be discharged by the entry of any such order, or pursuant to Bankruptcy Code § 1141(d)(4), the Debtors having hereby waived such discharge); (ii) converting the case to a chapter 7 case; or (iii) dismissing the case, and the terms and provisions of this Interim Order as well as the DIP Facility Superpriority Claims and the DIP Facility Liens granted to and conferred upon the DIP Lender and the protection afforded to the DIP Lender pursuant to this Interim Order and the DIP Facility Documents shall continue in full force and effect notwithstanding the entry of any such order, and such claims and liens shall maintain their priority as provided by this Interim Order and the DIP Facility Documents and to the maximum extent permitted by law until all of the DIP Facility Obligations shall have been paid and satisfied in full in accordance with the provisions of the DIP Credit Agreement (and that such DIP Facility Liens, DIP Facility Superpriority Claims and other protections shall remain binding on all interested parties).

19.     Nullifying Prepetition Restrictions on Postpetition Lien Grants. Notwithstanding anything to the contrary contained in any prepetition agreement, contract, lease, document, note or instrument to which any Debtor is a party or under which any Debtor is obligated, any

24

provision that restricts, limits or impairs in any way any Debtor's ability or right to grant liens or security interests upon any of the Collateral (including, among other things, any anti-lien granting or anti-assignment clauses in any leases or other contractual arrangements to which any Debtor is a party) under the DIP Facility Documents or this Interim Order or otherwise enter into and comply with all of the terms, conditions and provisions thereof (all such provisions being collectively referred to as the "Restrictive Clauses") shall not be effective and shall be unenforceable against any such Debtor and the DIP Lender to the maximum extent permitted under the Bankruptcy Code and other applicable law, but only with respect to the entry of this Interim Order granting such postpetition financing, and, therefore, shall not adversely affect the validity, priority or enforceability of the liens, security interests, claims, rights, priorities and/or protections granted to the DIP Lender pursuant to this Interim Order and/or the DIP Facility Documents or any of the rights of the DIP Lender hereunder or thereunder to the maximum extent permitted under the Bankruptcy Code and other applicable law. Such Restrictive Clauses shall not, to the maximum extent permitted under the Bankruptcy Code and applicable law, render any contract or lease unable to be assumed and/or assigned by any Debtor (or by the DIP Lender pursuant to the provisions contained in this Interim Order), or in any way impair or limit the ability or right of any Debtor (or by the DIP Lender, on behalf of any Debtor, pursuant to the provisions contained in this Interim Order) to assume and/or assign any contract or lease under Bankruptcy Code § § 365 or 1123.

20.    After-Acquired Property.  Except as otherwise provided in this Interim Order, pursuant to Bankruptcy Code § 552(a), all property acquired by the Debtors after the Petition Date, including, without limitation, all Collateral pledged or otherwise granted to the DIP Lender, on behalf of itself, pursuant to the Debtors' use of Cash Collateral, the DIP Facility

25

Documents and this Interim Order, is not and shall not be subject to any lien of any person or entity resulting from any security agreement entered into by the Debtors prior to the Petition Date (other than Permitted Encumbrances), except to the extent that such property constitutes proceeds of property of the Debtors that is subject to a valid, enforceable, perfected, and unavoidable lien as of the Petition Date which is not subject to subordination under Bankruptcy Code §510(c) or other provisions or principles of applicable law.

21.     Access to the Debtors.  Without limiting the rights of access and information afforded the DIP Lender under the DIP Facility Documents, the Debtors shall permit representatives, agents and/or employees of the DIP Lender to have reasonable access to its premises and records during normal business hours (without unreasonable interference with the proper operation of the Debtors' business) and shall cooperate, consult with, and provide to such representatives, agents and/or employees all such non-privileged information as they may reasonably request.

22.     Amendment to DIP Facility Documents.  The DIP Lender, with the consent of the Debtors, is authorized to amend and/or modify the DIP Credit Agreement or any other DIP Facility Documents without further order of the Court; provided that any such amendments or modifications must be in writing and served upon counsel for the Creditors' Committee (if appointed at such time) and the U.S. Trustee; provided, further that any amendments or modifications that would have the effect of shortening the maturity date of the facilities or the aggregate fees payable, or the rate or amount of interest payable, under the DIP Facility Documents shall be done only pursuant to further order of the Court; provided, however, that any amendment or modification to increase the aggregate amount of borrowings permitted must be in writing, filed with the Court and served upon counsel for the Creditors' Committee (if appointed

26

at such time), the Creditors' Committee and all parties who filed requests for notices under

Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002, and such

parties shall have five (5) days to object to such amendment or modification or it shall become

effective.

23.    Insurance Policies. Upon entry of this Interim Order, the DIP Lender shall be,

and shall be deemed to be, without any further action or notice, named as an additional insured

and loss payee on each insurance policy maintained by the Debtors which in any way relates to

the Collateral. The Debtors are authorized and directed to take any action necessary to have the

DIP Lender added as an additional insured and loss payee on each insurance policy.

24.    Conclusive Evidence of Obligations. The terms, conditions and covenants of the

DIP Credit Agreement and the other DIP Facility Documents shall be sufficient and conclusive

evidence of the borrowing and financing arrangements among the Debtors and the DIP Lender

for all purposes, including, without limitation, the Debtors' obligation to pay all principal,

interest, fees (including, without limitation, unused line fees, agency fees, servicing fees, letter of

credit fees, closing fees, syndication fees, early termination fees and appraisal fees), and other

costs and expenses (including, without limitation, all reasonable fees and expenses of

consultants, advisors and attorneys), as more fully set forth and to the extent provided in the DIP

Credit Agreement and the other DIP Facility Documents.

25.    Maintenance of Collateral. The Debtors shall not sell, transfer, lease, encumber

or otherwise dispose of any portion of the Collateral, except for sales contemplated under the

Agreement, sales of the Debtors' inventory in the ordinary course of their businesses or except as

otherwise provided for in the DIP Facility Documents and/or this Interim Order. Nothing

contained in this paragraph shall limit or impair the right of any lessor or other contract party of

any Debtor to request that the Court compel the Debtors to assume or reject any lease or license of real or personal property.

26.    Remedies upon Occurrence of Event of Default.  In the event of any of the following: (a) the failure of the Debtors to perform in any material respect any of their obligations pursuant to this Interim Order, (b) the occurrence and continuation of any "Event of Default" as defined under the DIP Credit Agreement or the other DIP Facility Documents, (c) the termination or non-renewal of the DIP Facility Documents as provided for in the DIP Credit Agreement, or if terminated sooner by an order of this Court, or (d) any termination events occurring under the Agreement (each of the foregoing being referred to in this Interim Order, individually, as an "Event of Default" and collectively, as the "Events of Default"); then (unless such Event of Default is specifically waived in writing by the DIP Lender as provided for in the DIP Facility Documents, which waiver shall not be implied from any other action, inaction or acquiescence by such the DIP Lender) the DIP Lender may, notwithstanding the provisions of Bankruptcy Code § 362, without any application, motion or notice to or order from, the Bankruptcy Court, without prior notice, take any one or more of the following actions:  (a) terminate all or any portion of the Revolving Credit Commitment (as defined in the DIP Credit Agreement) whereupon the DIP Lender's obligation to make further Revolving Credit Advances (as defined in the DIP Credit Agreement) shall terminate; (b) declare all or any portion of the Obligations to be forthwith due and payable whereupon such Obligations shall become and be due and payable; and/or (c) exercise any rights and remedies provided to the DIP Lender under the DIP Facility Documents or at law or equity, including all remedies provided under the Bankruptcy Code; and, pursuant to the Interim Order and the Final Order, the automatic stay of Bankruptcy Code § 362 shall be modified and vacated to permit the DIP Lender to exercise its

28

remedies under the DIP Credit Agreement and the DIP Facility Documents, without further application or motion to, or order from, the Bankruptcy Court; provided, however, notwithstanding anything to the contrary contained herein, the DIP Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of Borrower in the Collateral only upon five (5) Business Days' prior written notice to the Debtors, the United States Trustee for the District of Delaware, and any counsel approved by the Bankruptcy Court for the Creditors' Committee. Upon the occurrence of an Event of Default and the exercise by the DIP Lender of its rights and remedies under the DIP Credit Agreement and the other DIP Facility Documents, the Debtors shall assist the DIP Lender to the extent practicable in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition. Nothing contained in this Interim Order or otherwise shall be construed to obligate the DIP Lender in any way to lend or advance any additional funds to the Debtors, or provide other financial accommodations to the Debtors upon or after the occurrence of an Event of Default.

27.     Collateral Rights. Until all of the Obligations shall have been indefeasibly paid and satisfied in full in immediately available funds and without further order of the Court:

(a)     In the event that any party who holds a lien or security interest in any of the Collateral that is junior and/or subordinate to the liens and claims of the DIP Lender in such Collateral receives or is paid proceeds of the Collateral prior to the indefeasible payment and satisfaction in full of all Obligations, such junior or subordinate lienholder shall be deemed to have received, and shall hold, such Collateral proceeds in trust for the DIP Lender and shall immediately turnover to the DIP Lender such proceeds for application to the Obligations in accordance with the DIP Facility Documents and/or this Interim Order;

(b)    Upon the acceleration of the Obligations following an Event of Default, and subject to the DIP Lender providing the notice required by this Interim Order, in connection with a liquidation of any of the Collateral, the DIP Lender (or any of its employees, agents, consultants, contractors or other professionals) shall have the right, at the cost and expense of the Debtors to be added to the Obligations, to: (i) enter upon, occupy and use any personal property, fixtures and equipment owned or leased by the Debtors and (ii) use any and all trademarks, tradenames, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a lien of any third party and which are used by the Debtors in their businesses. If the DIP Lender exercises any remedies provided for in this paragraph, the DIP Lender will be responsible for the payment of any applicable fees, rentals, royalties or other amounts due such lessor, licensor or owner of such property for the period of time that the DIP Lender actually uses the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals or other amounts due for any period prior to the date that the DIP Lender actually occupies or uses such assets or properties); and

(c)    Upon the acceleration of the Obligations following an Event of Default, and subject to the DIP Lender providing the notice required by this Interim Order, as well as three (3) business days notice to any Debtor's real property lessor of the DIP Lender's intention to enter onto or into such lessor's leased premises to remove or otherwise dispose of any Collateral located at such leased premises in accordance with the terms of this paragraph, the DIP Lender shall have the right, following the expiration of such three (3) business days notice period described in this paragraph, to enter onto or into such leased premises for the purpose of removing the Collateral from the leased premises or selling such Collateral at the leased premises, in each case subject to the applicable terms of such Debtor's lease arrangements with

30

such lessor to the extent enforceable or effective under the Bankruptcy Code and subject to the rights of the DIP Lender provided for herein. Subject to the following sentence, the Debtors shall remain obligated to perform any obligation and to pay any rent and additional rent due under the terms of their leases at all times, including during the period commencing upon the DIP Lender obtaining the right to enter the Debtors' leased premises in accordance with this paragraph. Nothing herein shall require the DIP Lender to assume any lease or cure any defaults as a condition to the rights afforded in this paragraph.

28.     Reservation of Rights. Entry of this Interim Order shall not be deemed to prejudice any and all rights, remedies, claims and causes of action the DIP Lender may have against third parties, and shall not prejudice the rights of the DIP Lender from and after the entry of this Interim Order to seek any other relief in the Debtors' Chapter 11 cases. Entry of this Interim Order shall not in any way constitute: (a) a preclusion or a waiver of any right of the DIP Lender to file, or to prosecute if already filed, a motion for relief from stay, a motion or request for other relief, including but not limited to any adversary proceeding; (b) agreement, consent, or acquiescence to the terms of any plan of reorganization by virtue of any term or provision of this Interim Order; (c) a preclusion or waiver to assert any other rights, remedies or defenses available to the DIP Lender, or to respond to any motion, application, proposal, or other action, all such rights, remedies, defenses and opportunities to respond being specifically reserved by the DIP Lender; or (d) a preclusion, waiver or modification of any rights or remedies that the DIP Lender have against any other person or entity.

29.     Restrictions on Additional Use of Cash Collateral, Additional Financing. All postpetition advances and other financial accommodations under the DIP Credit Agreement and the other DIP Facility Documents are made in reliance on this Interim Order and in the event that

an order is entered at any time in the Debtors' Chapter 11 cases or in any subsequently converted case under Chapter 7 of the Bankruptcy Code (other than the Final Order) which (a) authorizes the use of cash collateral of the Debtors in which the DIP Lender has an interest or the sale, lease, or other disposition of property of the Debtors' estates in which the DIP Lender has a lien or security interest, except as expressly permitted hereunder or in the DIP Facility Documents, or (b) authorizes under Bankruptcy Code § 364 the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest in property in which the DIP Lender holds a lien or security interest, or which is entitled to priority administrative claim status which is equal or superior to that granted to the DIP Lender herein; then, in each instance described in clauses (a) and (b) of this paragraph, (i) the DIP Lender as is required by the DIP Credit Agreement shall first have given their express prior written consent thereto, no such consent being implied from any other action, inaction or acquiescence by such the DIP Lender, or (ii) such other order shall require that all Obligations first shall be indefeasibly paid in full in immediately available funds. The liens and security interests granted to or for the benefit of the DIP Lender hereunder and the rights of the DIP Lender pursuant to this Interim Order and the DIP Facility Documents with respect to the Obligations and the Collateral are cumulative and shall not be altered, modified, extended, impaired, or affected by any plan of reorganization of the Debtors and, the DIP Lender shall expressly consent in writing that the Obligations shall not be repaid in full upon confirmation and effectiveness thereof, shall continue after confirmation and effectiveness of any such plan.

30.    Limitation of Liability.  Nothing in this Interim Order or the DIP Facility Documents shall in any way be construed or interpreted to impose, or allow the imposition upon the DIP Lender of, any liability for any claims arising from the prepetition or postpetition

32

activities by the Debtors in the operation of its business or in connection with its restructuring efforts.

31.    No Modification or Stay of Interim Order. If any or all of the provisions of this Interim Order or the DIP Facility Agreement are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect (a) the validity of any obligation, indebtedness or liability incurred by the Debtors to the DIP Lender prior to the effective date of such modification, vacation or stay, or (b) the validity or enforceability of any security interest, lien, or priority authorized or created hereunder or pursuant to the DIP Facility Documents, as applicable. Notwithstanding any such modification, vacation or stay, any indebtedness, obligations or liabilities incurred by the Debtors to the DIP Lender prior to the effective date of such modification, vacation or stay shall be governed in all respects by the original provisions of this Interim Order; and the DIP Lender shall be entitled to all the rights, remedies, privileges and benefits granted herein with respect to all such indebtedness, obligations and/or liabilities. The indebtedness, obligations and/or liabilities of the Debtors to the DIP Lender under this Interim Order and/or the DIP Facility Documents shall not be discharged by the entry of an order confirming a plan of reorganization in the Debtors' bankruptcy cases pursuant to Bankruptcy Code § 1141(d)(4) or otherwise, unless and until all indebtedness, obligations and liabilities of the Debtors to the DIP Lender are indefeasibly paid in full in accordance with the terms and conditions of the DIP Facility Documents prior to or concurrently with the entry of such order. No indebtedness, obligation or liability owed by the Debtors to the DIP Lender under this Interim Order or the DIP Facility Documents, prior to the effective date of any modification, vacation or stay of this Interim Order can, as a result of any subsequent order in these Chapter 11 cases, or in any superseding case, be subordinated, lose its lien priority or super-priority

33

administrative claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Lender under this Interim Order and/or the DIP Facility Documents.

32.    Good Faith.  The terms of the financing arrangements among the Debtors and the DIP Lender have been negotiated in good faith and at arms' length among the Debtors and the DIP Lender and any loans, advances or other financial accommodations which are made or caused to be made to the Debtors by the DIP Lender pursuant to the DIP Facility Documents are deemed to have been made and provided in good faith, as the term "good faith" is used in Bankruptcy Code § 364(e), and shall be entitled to the full protection of Bankruptcy Code § 364(e) in the event that this Interim Order or the DIP Facility Documents or any provisions are hereafter modified, vacated, amended, or stayed by subsequent order of this Court or any other court without the consent of the DIP Lender.

33.    Final Hearing and Objection Date.  This matter is set for a Final Hearing at 3:00 p.m. on November 30, 2007, in the United States Bankruptcy Court for the District of Delaware.  The Debtors shall promptly mail copies of this Interim Order to (a) the Interim Notice Parties, (ii) all parties who filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002, (iii) counsel to be selected by the Creditors' Committee upon its formation if selected by such date, (iv) the taxing authorities to which the Debtors pay taxes; and (v) those other creditors known to the Debtors who may have liens upon or perfected security interests in any of the Debtors' assets and properties.  Objections to the entry of the Final Order shall be in writing and shall be filed with the Clerk of this Court, on or before November 23, 2007, at 4:00 p.m., with a copy served upon: (i) counsel for the Debtors, DLA Piper US LLP, 1251 Avenue of the Americas, New York, NY 10020, Attn: Thomas R. Califano and The Bayard Firm, 222 Delaware Avenue, Suite 900, P.O. Box 25130, Wilmington,

DE 19899, Attn: Neil B. Glassman; (ii) counsel for Adeptio, Kirkland & Ellis, LLP, 200 E.
Randolph Dr., Chicago, IL 60601, Attn: David Agay, Anup Sathy and John Schoenfeld, and
Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 W. Street, 17th Floor,
Wilmington, DE 19801, Attn: Robert S. Brady; (iii) counsel to be selected by the Creditors'
Committee upon its formation if selected by such date; and (iv) the U.S. Trustee. Any objections
by creditors or any other party-in-interest to the Motion or any of the provisions of the
postpetition financing and cash collateral arrangements among the Debtors and the DIP Lender
shall be deemed waived unless filed and received in accordance with the foregoing on or before
the close of business on such date. In the event this Court modifies any of the provisions of this
Interim Order and the DIP Facility Documents following such Final Hearing, such modifications
shall not affect the rights and priorities of the DIP Lender pursuant to this Interim Order with
respect to the Collateral and any portion of the Obligations which arises, or is incurred or is
advanced prior to such modifications (or otherwise arising prior to such modifications), and this
Interim Order shall remain in full force and effect except as specifically modified pursuant to
such Final Hearing.

    34.    Conflicting Provisions. Unless otherwise provided in this Interim Order, to the
extent the terms and conditions of the DIP Facility Documents are in conflict with the terms and
conditions of this Interim Order, the terms and conditions of this Interim Order shall control.

35.    _Effectiveness_.  Notwithstanding any Bankruptcy Rule to the contrary, the terms

and conditions of this Interim Order shall (a) be immediately enforceable, and (b) not be stayed

absent the grant of such stay under Bankruptcy Rule 8005 after a hearing upon notice to the

Debtors and the DIP Lender.


Dated: Wilmington, Delaware

NOVEMBER 9, 2007


_____

Kevin Gross

United States Bankruptcy Judge

# EXHIBIT 1

**EXECUTION VERSION**

SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION

CREDIT AND GUARANTY AGREEMENT

DATED AS OF NOVEMBER 9, 2007

BETWEEN

INPHONIC, INC.

AS BORROWER,

THE GUARANTORS PARTY HERETO

AND

ADEPTIO INPC FUNDING, LLC

AS

LENDER

## TABLE OF CONTENTS

Page

1. AMOUNT AND TERMS OF CREDIT ..................................................................... 2

    1.1.   Revolving Credit Advances. ................................................................. 2
    1.2.   Repayment of Revolving Credit Loan; Termination of Revolving Credit
           Commitments. ................................................................................ 3
    1.3.   Use of Proceeds. .............................................................................. 3
    1.4.   Interest on Revolving Credit Loans. ...................................................... 4
    1.5.   Fees. ............................................................................................. 5
    1.6.   Receipt of Payments. ........................................................................ 5
    1.7.   Application and Allocation of Payments. ................................................. 5
    1.8.   Accounting. .................................................................................... 5
    1.9.   Indemnity. ...................................................................................... 6
    1.10.  Access. .......................................................................................... 6
    1.11.  Taxes. ........................................................................................... 7
    1.12.  Super-Priority Nature of Obligations and Lender's Liens. ........................... 8
    1.13.  Payment of Obligations. .................................................................... 9
    1.14.  No Discharge; Survival of Claims. ....................................................... 9
    1.15.  Release. ........................................................................................ 9
    1.16.  Waiver of Any Primary Rights. .......................................................... 10

2. CONDITIONS PRECEDENT .............................................................................. 10

    2.1.   Conditions to the Initial Revolving Credit Advance. ................................. 10
    2.2.   Further Conditions to Each Revolving Credit Advance after the Closing Date... 12

3. REPRESENTATIONS AND WARRANTIES .......................................................... 13

    3.1.   Corporate Existence; Compliance with Law. ......................................... 13
    3.2.   Executive Offices; Corporate or Other Names; FEIN. .............................. 13
    3.3.   Corporate Power; Authorization; Enforceable Obligations. ......................... 14
    3.4.   Financial Statements. ...................................................................... 14
    3.5.   Material Adverse Effect. ................................................................... 14
    3.6.   Ownership of Property; Liens. ........................................................... 15
    3.7.   Restrictions; No Default. .................................................................. 15
    3.8.   Labor Matters. ............................................................................... 15
    3.9.   Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness. ...... 16
    3.10.  Government Regulation. ................................................................... 16
    3.11.  Margin Regulations. ........................................................................ 16
    3.12.  Taxes. ......................................................................................... 16
    3.13.  ERISA. ........................................................................................ 17
    3.14.  No Litigation. ................................................................................ 18
    3.15.  Brokers. ....................................................................................... 18
    3.16.  Intellectual Property. ....................................................................... 18

Error! Unknown document property name.

3.17.   Full Disclosure. ........................................................................................... 19
3.18.   Environmental Matters. ................................................................................. 19
3.19.   Insurance Policies. ........................................................................................ 19
3.20.   Deposit and Disbursement Accounts. ........................................................... 19
3.21.   Government Contracts. .................................................................................. 20
3.22.   Customer and Trade Relations. ..................................................................... 20
3.23.   Agreements and Other Documents. ............................................................... 20
3.24.   Bankruptcy Matters. ..................................................................................... 20

4.   FINANCIAL STATEMENTS AND INFORMATION ............................................ 21

4.1.   Reports and Notices. ..................................................................................... 21
4.2.   Communication with Accountants. ................................................................ 21
4.3.   Documents Filed with the Bankruptcy Court or Delivered to the U.S. Trustee or
        Committee. .................................................................................................... 21

5.   AFFIRMATIVE COVENANTS ............................................................................. 22

5.1.   Maintenance of Existence and Conduct of Business. ..................................... 22
5.2.   Payment of Charges and Claims. ................................................................... 22
5.3.   Books and Records. ...................................................................................... 22
5.4.   Litigation. ..................................................................................................... 23
5.5.   Insurance. ...................................................................................................... 23
5.6.   Compliance with Laws. ................................................................................. 23
5.7.   Agreements; Leases. ..................................................................................... 23
5.8.   Supplemental Disclosure. .............................................................................. 24
5.9.   Environmental Matters. ................................................................................. 24
5.10.   Application of Proceeds. ............................................................................... 25
5.11.   Fiscal Year. .................................................................................................. 25
5.12.   Subsidiaries. .................................................................................................. 25
5.13.   Further Assurances. ....................................................................................... 25
5.14.   Appraisals. .................................................................................................... 25
5.15.   Intellectual Property. ..................................................................................... 25
5.16.   Sale Process. ................................................................................................. 25
5.17.   Schedule of Financial Affairs. ...................................................................... 25

6.   NEGATIVE COVENANTS .................................................................................... 25

6.1.   Mergers, Subsidiaries, Etc. ........................................................................... 25
6.2.   Investments. .................................................................................................. 26
6.3.   Indebtedness. ................................................................................................. 26
6.4.   Affiliate and Employee Transactions. ........................................................... 26
6.5.   Capital Structure and Business. ..................................................................... 26
6.6.   Guaranteed Indebtedness. ............................................................................. 26
6.7.   Liens. ............................................................................................................. 26
6.8.   Sale of Assets. ............................................................................................... 27
6.9.   ERISA. .......................................................................................................... 27

ii

6.10.  Financial Covenants.................................................................27
6.11.  Restricted Payments..............................................................27
6.12.  Hazardous Materials..............................................................28
6.13.  Sale-Leasebacks....................................................................28
6.14.  Cancellation of Indebtedness................................................28
6.15.  Bank Accounts.......................................................................28
6.16.  No Speculative Investments...................................................28
6.17.  Margin Regulations.................................................................28
6.18.  Limitation on Negative Pledge Clauses..................................28
6.19.  Material Contracts..................................................................28
6.20.  Leases....................................................................................28
6.21.  New Premises.........................................................................29
6.22.  Repayment of Indebtedness...................................................29
6.23.  Reclamation Claims...............................................................29
6.24.  Chapter 11 Claims..................................................................29
6.25.  Change of Management..........................................................29

7.  TERM    29

7.1.  Duration.................................................................................29
7.2.  Survival of Obligations..........................................................29

8.  EVENTS OF DEFAULT; RIGHTS AND REMEDIES..................................30

8.1.  Events of Default....................................................................30
8.2.  Remedies................................................................................34
8.3.  Waivers by Borrower..............................................................34

9.  SUCCESSORS AND ASSIGNS ..............................................................35

9.1.  Successors and Assigns.........................................................35
9.2.  Participations; Assignments...................................................35

10.  MISCELLANEOUS ...............................................................................36

10.1.  Complete Agreement; Modification of Agreement...................36
10.2.  Fees and Expenses................................................................36
10.3.  No Waiver..............................................................................37
10.4.  Remedies...............................................................................38
10.5.  Severability............................................................................38
10.6.  Conflict of Terms...................................................................38
10.7.  Right of Setoff.......................................................................38
10.8.  Authorized Signature.............................................................38
10.9.  Notices...................................................................................38
10.10.  Section Titles.........................................................................40
10.11.  Counterparts..........................................................................40
10.12.  Time of the Essence...............................................................40
10.13.  GOVERNING LAW...................................................................40

iii

10.14.  WAIVER OF JURY TRIAL........................................................................................... 41
10.15.  Publicity................................................................................................................... 41
10.16.  Dating....................................................................................................................... 41
10.17.  Parties Including Trustees; Bankruptcy Court Proceedings. ................................ 41

11. GUARANTY ................................................................................................................................ 42

11.1.   Guaranty of the Obligations.................................................................................... 42
11.2.   Payment by Guarantors........................................................................................... 42
11.3.   Liability of Guarantors Absolute ........................................................................... 42
11.4.   Waivers by Guarantors ........................................................................................... 44
11.5.   Guarantors' Rights of Subrogation, Contribution, etc. ......................................... 44
11.6.   Subordination of Other Obligations ....................................................................... 45
11.7.   Continuing Guaranty............................................................................................... 45
11.8.   Authority of Guarantors or Borrower ..................................................................... 45
11.9.   Financial Condition of Borrower ............................................................................ 45

Error! Unknown document property name.

## INDEX OF ANNEXES, SCHEDULES AND EXHIBITS

| | | |
|---|---|---|
| Annex A | – | Definitions; Rules of Construction |
| Annex B | – | Financial Statements and Notices |
| Annex C | – | Financial Covenants |
| Annex D | – | Form of Budget |
| Annex E | – | Revenue |
| | | |
| Schedule 1.3 | – | Use of Proceeds |
| Schedule 2.1(a) | – | Closing Agenda |
| Schedule 2.1(k) | – | First Day Orders |
| Schedule 3.2 | – | Executive Offices; Principal Places of Business; Locations of Collateral; Trade Names |
| Schedule 3.5 | – | Restricted Payments; Redemptions |
| Schedule 3.6 | – | Real Estate and Leases |
| Schedule 3.8 | – | Labor Matters |
| Schedule 3.9 | – | Ventures, Subsidiaries and Affiliates; Outstanding Stock |
| Schedule 3.12 | – | Tax Matters |
| Schedule 3.13 | – | ERISA Plans, etc. |
| Schedule 3.14 | – | Litigation |
| Schedule 3.16 | – | Patents, Trademarks, Copyrights, Internet Domain Names and Licenses |
| Schedule 3.18 | – | Environmental Matters |
| Schedule 3.20 | – | Disbursement and Deposit Accounts |
| Schedule 3.21 | – | Government Contracts |
| Schedule 3.22 | – | Customer & Trade Relations |
| Schedule 3.23 | – | Certain Contracts |
| Schedule 6.2 | – | Investments |
| Schedule 6.3 | – | Indebtedness |
| Schedule 6.4 | – | Loans to and Transactions with Employees |
| Schedule 6.7 | – | Liens |
| Schedule 6.12 | – | Hazardous Materials |
| Schedule 10.8 | – | Authorized Signatures |
| | | |
| Exhibit A | – | Form of Notice of Revolving Credit Advance |
| Exhibit B | – | Form of Revolving Credit Note |
| Exhibit C | – | Form of Interim Order |

v

Error! Unknown document property name.

SENIOR    SECURED,    SUPER-PRIORITY    DEBTOR-IN-POSSESSION
REVOLVING CREDIT AND GUARANTY AGREEMENT, dated as of November 9, 2007 (this
"Agreement"), between INPHONIC, INC., a Delaware corporation ("Borrower"), as borrower,
the subsidiaries of the Borrower party hereto, as guarantors (each, a "Guarantor" and
collectively, the "Guarantors") and ADEPTIO INPC FUNDING, LLC, a Delaware limited
liability company (together with its successors, assigns and transferees, the "Lender"), as lender.
Capitalized terms used herein are defined in Annex A or in the text hereof.

### RECITALS

A.    On November 8, 2007 (the "Petition Date"), Borrower commenced
Chapter 11 Case No. 07-_____ (the "Borrower's Case") by filing a voluntary petition for
reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. 101 *et seq.* (the
"Bankruptcy Code"), with the United States Bankruptcy Court for the District of Delaware (the
"Bankruptcy Court"). Each Guarantor also commenced a case under Chapter 11 of the
Bankruptcy Code (such cases, together with the Borrower's Case, the "Chapter 11 Cases") in the
Bankruptcy Court on the Petition Date. The Borrower and the Guarantors continue to operate
their businesses and manage their properties as debtors and a debtors-in-possession pursuant to
Sections 1107(a) and 1108 of the Bankruptcy Code;

B.    Prior to the Petition Date, the Borrower and the Guarantors entered into
that certain Credit Agreement dated as of November 7, 2006 (as amended, the "Pre-Petition Loan
Agreement"), by and among the Borrower, the Lenders from time to time party thereto (the
"Prior Lenders") and Citicorp North America, Inc. as Administration Agent (the "Existing
Agent"). The Lender holds all of the Prior Lenders' Pre-Petition Indebtedness, the Pre-Petition
Loan Documents, and the Pre-Petition Liens;

C.    Borrower has requested that Lender provide a revolving credit facility that
is senior secured, super-priority as to Borrower of up to Twenty-Five Million Dollars
($25,000,000.00) to fund certain of the working capital requirements of Borrower;

D.    Lender is willing to provide a revolving credit facility to Borrower of up
to such amount upon the terms and conditions set forth herein;

E.    Borrower and the Guarantors have agreed to secure all of their obligations
under the Loan Documents by, among other things, granting Lender a security interest in and
lien upon substantially all of their existing and after-acquired personal and real property; and

F.    Unless otherwise indicated, all references in this Agreement to sections,
subsections, schedules, exhibits, and attachments shall refer to the corresponding sections,
subsections, schedules, exhibits, and attachments of or to this Agreement. All schedules,
annexes, exhibits and attachments hereto, or expressly identified to this Agreement, are
incorporated herein by reference, and taken together, shall constitute but a single agreement.
Unless otherwise expressly set forth herein, or in a written amendment referring to such
schedules and annexes, all schedules and annexes referred to herein shall mean the schedules and
annexes as in effect as of the Closing Date. These Recitals shall be construed as part of this
Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, the parties hereto agree as follows:

## 1. AMOUNT AND TERMS OF CREDIT

### 1.1. Revolving Credit Advances.

(a) Upon and subject to the terms and conditions hereof, the Lender agrees to make available, from time to time, commencing on the date on which each of the conditions specified herein shall have been satisfied or waived by the Lender until the Commitment Termination Date, for the use of Borrower and upon the request of Borrower therefor, loans (each a "Revolving Credit Advance") in an aggregate principal amount at any time outstanding up to but not exceeding the lesser of (i) the Interim Availability Amount and (ii) the Revolving Credit Commitment.. Borrower may from time to time borrow, repay and reborrow Revolving Credit Advances under this Section 1.1 subject to the limitation in the foregoing sentence. Notwithstanding the foregoing, no Revolving Credit Advance shall exceed (x) the amount of borrowings permitted under the Budget to be outstanding for such period less, (y) the amount by which Borrower's and Guarantors' actual receipts for such period exceeds the amount of anticipated receipts for such period as set forth in the Budget.

(b) Borrower shall give Lender notice of each borrowing of a Revolving Credit Advance hereunder as provided in Section 1.1(c) and, Lender shall make available the amount of the Revolving Credit Advance or Advances to be made by it on the requested date, in immediately available funds.

(c) Each notice of a borrowing of a Revolving Credit Advance shall be given in writing (by telecopy, hand delivery, or U.S. mail) by Borrower to Lender at its address at c/o Versa Capital Management, Inc., Cira Centre, 2929 Arch Street, Philadelphia, PA 19104-2868, Attention: David S. Lorry, Telephone No. 215-609-3416, Telecopy No. 215-609-3499, given no later than 12:00 Noon (Eastern time) (i) no more frequently than one time per week and, except for the first week following the Petition Date, only on or after the delivery of the Weekly Budget Variance Report for the immediately prior week, and (ii) at least one Business Day prior to the date of the proposed Revolving Credit Advance. Each such notice of borrowing (a "Notice of Revolving Credit Advance") shall be substantially in the form of Exhibit A, specifying therein the requested date, the amount of such Revolving Credit Advance, and such other information as may be reasonably required by Lender. Lender shall be entitled to rely upon and shall be fully protected under this Agreement in accepting any Notice of Revolving Credit Advance reasonably believed by Lender to be genuine and to assume that the persons executing and delivering the same were duly authorized unless the responsible individual acting thereon for Lender shall have actual knowledge to the contrary.

(d) The Revolving Credit Advances made by Lender may be, upon request of Lender, evidenced by a promissory note issued by Borrower in favor of Lender substantially in the form of Exhibit B, dated the Closing Date, payable to Lender in a maximum principal amount equal to the amount of the Revolving Credit Commitment as originally in effect and otherwise duly completed.

1.2.   Repayment of Revolving Credit Loan; Termination of Revolving Credit Commitments.

(a)   Borrower hereby promises to pay to Lender the entire outstanding principal amount of the Revolving Credit Loan and all other outstanding Obligations, and the Revolving Credit Loan and all other outstanding Obligations shall mature, on the Commitment Termination Date.

(b)   In the event that the outstanding principal amount of the Revolving Credit Loan shall, at any time, exceed the Borrowing Availability, Borrower shall immediately repay that portion of the Revolving Credit Loan that is in excess of the Borrowing Availability.

(c)   Subject to Section 1.5(c), Borrower shall have the right at any time upon ten (10) days' prior written notice by Borrower to Lender to voluntarily terminate the Revolving Credit Commitment (in whole but not in part) without premium or penalty. Upon the effective date of such termination, Borrower's right to receive Revolving Credit Advances and Borrower's obligation to pay the Unused Fee (except to the extent for the period prior to such termination) shall simultaneously terminate, and, notwithstanding anything to the contrary contained herein or in any Loan Document, the entire outstanding balance of the Revolving Credit Loan and all other Obligations shall be immediately due and payable. On the date of such termination, Borrower shall pay to Lender in immediately available funds all of the Obligations, including any accrued and unpaid interest thereon.

1.3.   Use of Proceeds. Borrower shall utilize the Collateral and the proceeds of the Revolving Credit Loans which are incurred on the Closing Date (net of any amounts used on the Closing Date to pay Fees) as follows: (i) for working capital and general corporate purposes including certain fees and expenses of professionals retained by Borrower, subject to the Interim Order and Final Order, but excluding in any event the making of any Restricted Payment not specifically permitted by Section 6.11 and solely for the purposes specified in the Budget and (ii) certain other pre-petition expenses that are approved by the Bankruptcy Court and previously approved by Lender. Other than as may be expressly permitted in the Interim Order and Final Order, Borrower shall not be permitted to use the proceeds of the Revolving Credit Loans or the Collateral: (A) to finance in any way any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type relating to or in connection with the Pre-Petition Loan Agreement or any of the loan documents or in instruments entered into in connection therewith, including, without limitation, any investigation of or challenges to the obligations under the Pre-Petition Loan Agreement, or the validity, perfection, priority, or enforceability of any Lien securing such claims or any payment made thereunder; (B) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of Lender or its rights and remedies under this Agreement, the other Loan Documents, the Interim Order or the Final Order; (C) to make any distribution under a plan of reorganization in any Chapter 11 Case; or (D) to make any payment in settlement of any claim, action or proceeding before any court, arbitrator or other governmental body without the prior written consent of Lender. Schedule 1.3 contains a description of Borrower's sources and uses of funds as of the Closing Date, including Revolving Credit Loans to be made on that date, and a funds flow memorandum detailing how funds from each source are to be transferred particular uses.

3

1.4.    <u>Interest on Revolving Credit Loans.</u>

(a)    Borrower shall pay interest on all outstanding Revolving Credit Loans to Lender, (i) in arrears for the preceding calendar month, on the first Business Day of each calendar month commencing December 1, 2007, (ii) on the Commitment Termination Date, and (iii) if any interest accrues or remains payable after the Commitment Termination Date, upon demand. If any interest or other payment under this Agreement becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(b)    Borrower shall be obligated to pay interest to Lender on the outstanding balance of the Revolving Credit Loan at a floating rate equal to the Prime Rate (as in effect from time to time) <u>plus</u> three and twenty-five hundredths percent (3.25%) per annum. All computations of interest shall be made on the basis of a three hundred and sixty (360) day year, in each case for the actual number of days occurring in the period for which such interest is payable.

(c)    Upon the occurrence and during the continuance of any Event of Default, the interest rate applicable to all of the Obligations automatically shall be the Default Rate.

(d)    Notwithstanding anything to the contrary set forth in this <u>Section 1.4</u>, if, at any time prior to the Termination Date, the rate of interest payable to Lender hereunder exceeds the highest rate of interest permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto (the "<u>Maximum Lawful Rate</u>"), then in such event and so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder to Lender shall be equal to the Maximum Lawful Rate; <u>provided, however,</u> that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, Borrower shall continue to pay interest hereunder to Lender at the Maximum Lawful Rate until such time as the total interest received by Lender from the making of the Revolving Credit Loans hereunder is equal to the total interest which Lender would have received had the interest rate payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement. Thereafter, the interest rate payable to Lender hereunder shall be the rate of interest provided in <u>Sections 1.4 (b) or (c)</u>, as applicable, of this Agreement, unless and until the rate of interest again exceeds the Maximum Lawful Rate, in which event this paragraph shall again apply. In no event shall the total interest received by Lender pursuant to the terms hereof exceed the amount which Lender could lawfully have received had the interest due hereunder been calculated for the full term hereof at the Maximum Lawful Rate. In the event the Maximum Lawful Rate is calculated pursuant to this paragraph, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made. In the event that a court of competent jurisdiction, notwithstanding the provisions of this <u>Section 1.4(d)</u>, shall make a final determination that Lender has received interest hereunder or under any of the Loan Documents in excess of the Maximum Lawful Rate, Lender shall, to the extent permitted by Applicable Law, promptly apply such excess first to any lawful interest due and not yet paid hereunder, then to the outstanding principal of the Obligations, then to Fees and any other unpaid

4

Obligations and thereafter shall promptly refund any excess to Borrower or as a court of competent jurisdiction may otherwise order.

1.5.    Fees.

(a)    Unused Fee. Borrower agrees to pay to Lender an unused facility fee (the "Unused Fee") equal to one-half percent (.5%) per annum on the average unused daily balance of Lender's Revolving Credit Commitment, payable monthly in arrears (a) on the first Business Day of each calendar month commencing on December 1, 2007 and (b) on the Commitment Termination Date. All computations of the foregoing fee shall be made by Lender on the basis of a three hundred sixty (360) day year, and for the actual number of days occurring in the period for which such fee is payable.

(b)    Commitment Fee. On the Closing Date, Borrower agrees to pay to Lender a one-time commitment fee equal to one percent (1%) of the Revolving Credit Commitment, which shall be added to the outstanding principal amount of the Revolving Credit Loan.

(c)    Exit Fee. Borrower agrees to pay to Lender a one-time exit fee equal to one percent (1%) of the principal amount of Revolving Credit Commitment in effect on the Closing Date, which amount shall be payable by the Borrower upon the Commitment Termination Date.

1.6.    Receipt of Payments. Borrower shall make each payment under this Agreement not later than 2:00 p.m. (Eastern time) on the day when due in Dollars in immediately available funds to Lender's account at Citizens Bank of Pennsylvania, ABA# 036076150, Credit to: Adeptio INPC Funding, LLC, Account 6218879317.

1.7.    Application and Allocation of Payments. Borrower irrevocably waives the right to direct the application of any and all payments at any time or times hereafter received from or on behalf of Borrower. Notwithstanding the foregoing, in the absence of a specific determination by Lender with respect thereto, or if an Event of Default shall have occurred and be continuing, such payments shall be applied in the following order: (a) then due and payable Fees and expenses of Lender; (b) then due and payable interest payments on the Revolving Credit Loans; (c) Obligations to Lender other than Fees, expenses and interest and principal payments; (d) principal of the Revolving Credit Loans; and (e) to the extent there are no other Obligations then due and payable, to Borrower or its successors or assigns or as a court of competent jurisdiction may direct.

1.8.    Accounting. Lender shall maintain a loan account (the "Loan Account") on its books to record: all Advances, all payments made by Borrower, and all other debits and credits as provided in this Agreement with respect to the Revolving Credit Loans or any other Obligations. All entries in the Loan Account shall be made in accordance with Lender's customary accounting practices as in effect from time to time. The balance in the Loan Account, as recorded on Lender's most recent printout or other written statement, shall, absent manifest error, be presumptive evidence of the amounts due and owing to Lender by Borrower; provided, that any failure to so record or any error in so recording shall not limit or otherwise affect Borrower's duty to pay the Obligations.

Error! Unknown document property name.

1.9.    Indemnity.

(a)    Borrower shall indemnify and hold harmless Lender and its Affiliates, and its officers, directors, employees, attorneys and representatives (each, an "Indemnified Person"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigations or defense, including those incurred upon any appeal) (each, a "Claim") which may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Agreement and any other Loan Document and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder, and any actions or failures to act in connection therewith, including any and all Environmental Liabilities and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents (collectively, "Indemnified Liabilities"); provided, however, that Borrower shall not be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results solely from that Indemnified Person's gross negligence or willful misconduct as finally determined by a court of competent jurisdiction.  NO INDEMNIFIED PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY OTHER PARTY TO ANY LOAN DOCUMENT, ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES WHICH MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.

(b)    Borrower hereby acknowledges and agrees that Lender (as of the date hereof) is not now nor has ever been in control of any of the Subject Property or the affairs or operations of Borrower.

1.10.    Access.

(a)    Borrower shall: (i) provide access during normal business hours to Lender and any of its officers, employees and agents as frequently as Lender determines to be appropriate upon reasonable advance notice to Borrower (unless a Default shall have occurred and be continuing, in which event no such notice shall be required and such access shall be at any and all times) to the properties and facilities of Borrower; (ii) permit Lender and any of its officers, employees and agents, as frequently as Lender determines to be appropriate, to inspect, audit and make extracts from all of Borrower's records, files and books of account upon reasonable advance notice to Borrower (unless a Default shall have occurred and be continuing, in which event no such notice shall be required and such access shall be at any and all times); and (iii) permit Lender and any of its officers, employees and agents, as frequently as Lender determines to be appropriate, upon reasonable advance notice to Borrower (unless a Default shall have occurred and be continuing, in which event no such notice shall be required and such access shall be at any and all times) to conduct audits and to inspect, review and evaluate the Collateral, in each case subject to any confidentiality agreements binding Borrower, and Borrower agrees to

6

Error! Unknown document property name.

render to Lender at Borrower's cost and expense such clerical and other assistance as may be reasonably requested with regard thereto.

(b)     Borrower shall give not less than three (3) Business Day's prior written notice to Lender of any meeting of the Board of Directors of the Borrower, which notice shall state the location of such meeting, and Borrower shall give a representative designated by Lender the opportunity to attend such meeting as an observer or, if such meeting is held by telephone, to attend such meeting by telephone (other than any portion of such meeting in which the Board of Directors discusses competing bids for the Borrower's assets); it being understood that nothing herein shall restrict in any way the Borrower's ability to hold or conduct meetings of its Board of Directors whether or not Lender elects to have a representative attend any such meeting. Notwithstanding the foregoing, Borrower shall be permitted to take reasonable measures to preserve Borrower's attorney-client privilege in the context of such meetings.

(c)     Borrower shall make available to Lender and its counsel, as quickly as practicable under the circumstances, originals or copies of all books, records, board minutes, contracts, insurance policies, environmental audits, business plans, files, financial statements (actual and pro forma), filings with federal, state and local regulatory agencies, other instruments and documents in the custody or control or otherwise belonging to or property of Borrower and key personnel for interviews which Lender may reasonably request. Borrower shall deliver any document or instrument reasonably necessary for Lender, as it may from time to time request, to obtain records from any service bureau or other Person which maintains records for Borrower, and shall maintain duplicate records or supporting documentation on media, including computer tapes and discs owned by Borrower. Borrower shall make available to Lender, upon its reasonable request, information and records prepared by its certified public accountants and its banking and other financial institutions.

1.11.    Taxes.

(a)     Any and all payments by or on behalf of Borrower hereunder or under any Revolving Credit Note or other Loan Document shall be made, in accordance with this Section 1.11, free and clear of and without deduction for any and all present or future Taxes. If Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any Revolving Credit Note or other Loan Document, (i) the sum payable shall be increased as shall be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 1.11), Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions, and (iii) Borrower shall pay the full amount deducted to the relevant taxing or other authority in accordance with Applicable Law.

(b)     In addition, Borrower agrees to pay any present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies that arise from any payment made hereunder or from the execution, delivery or registration of, or otherwise with respect to, this Agreement (hereinafter referred to as "Other Taxes").

(c)     Borrower shall indemnify and, within ten (10) days of demand therefor, pay Lender for the full amount of Taxes or Other Taxes (including any Taxes or Other Taxes

Error! Unknown document property name.

imposed by any jurisdiction on amounts payable under this Section 1.11) paid by Lender and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, whether or not such Taxes or Other Taxes were correctly or legally asserted.

(d)     Within thirty (30) days after the date of any such payment of Taxes or Other Taxes described in Sections 1.11(a), (b) or (c), Borrower shall furnish to Lender the original or a certified copy of a receipt evidencing payment thereof or other evidence of payment satisfactory to Lender.

1.12.    Super-Priority Nature of Obligations and Lender's Liens.

(a)     The priority of Lender's Liens on the Collateral shall be as set forth in the Interim Order and the Final Order. Subject to the applicable DIP Order, no filings, recordings or other actions shall be necessary to perfect and maintain the perfection and status of such Liens.

(b)     All Obligations of Borrower and the Guarantors shall constitute administrative expenses of such party in the Chapter 11 Cases, with administrative priority and senior-secured status under Sections 364(c) and 364(d) of the Bankruptcy Code. Subject only to the Carve-Out Amount, such administrative claim shall have priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provision of the Bankruptcy Code and shall at all times be senior to the rights of Borrower and the Guarantors, Borrower's and Guarantors' estates, and any successor trustee or estate representative in the Chapter 11 Case or any subsequent proceeding or case under the Bankruptcy Code. The liens and security interests granted to Lender in and against the Collateral, and the priorities accorded to the Obligations, shall have the priority and senior-secured status afforded by Sections 364(c) and 364(d)(1) of the Bankruptcy Code (all as more fully set forth in the Interim Order and Final Order) senior to all claims and interests other than the Carve-Out Expenses up to the Carve-Out Amount.

(c)     Lender's Liens and its administrative claim under Sections 364(c)(1) and 364(d) of the Bankruptcy Code afforded the Obligations shall also have priority over any claims arising under Section 506(c) of the Bankruptcy Code, subject and subordinate only to the Carve-Out Expenses subject to the Carve-Out Amount, subject to the right of the Lender and any other party-in-interest to object to the award of such fees and expenses in accordance with any applicable Bankruptcy Rule or, if applicable, order of the Bankruptcy Court relating to the approval of fees and expenses and objections thereto; provided, however, that Carve-Out Expenses shall not include, and the Carve-Out Amount shall not be available to pay, any fees or disbursements (A) arising after the conversion of a Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code or (B) related to the commencement or prosecution of any claims or proceedings against (i) Lender or its claims or security interests in, or Liens upon, the Collateral whether under this Agreement or any other Loan Document and (ii) any Prior Lender under the Pre-Petition Loan Agreement or its claims or security interests in connection with the Pre-Petition Loan Agreement or any of the loan documents or instruments entered into in connection therewith. In the event of any inconsistency in the definition of "Carve-Out Amount" between the provisions of this Agreement and the Interim Order or Final Order, the provisions of the Interim Order or Final Order shall govern.

(d)     Except as set forth herein or in the Final Order, no other claim having a priority superior or pari passu to that granted to Lender by the Final Order shall be granted or approved while any Obligations under this Agreement remain outstanding.

1.13.   Payment of Obligations.   Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Lender shall be entitled to immediate payment of such Obligations without further application to, or order of, the Bankruptcy Court.

1.14.   No Discharge; Survival of Claims.   Borrower and the Guarantors agree, to the extent applicable, that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a plan of reorganization in the Chapter 11 Cases (and Borrower and the Guarantors, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waive any such discharge) and (b) any super-priority administrative claim granted to Lender pursuant to any order described in Section 1.12 and the Liens granted to Lender pursuant to any order described in Section 1.12 shall not be affected in any manner by the entry of an order confirming a plan of reorganization in the Chapter 11 Cases.

1.15.   Release.   Borrower and the Guarantors hereby acknowledge that, upon entry of a Final Order, Borrower and the Guarantors shall not have any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of such parties' liability to repay Lender as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from Lender. Borrower and each Guarantor, each in its own right and also with respect to its estate, and on behalf of its successors, assigns, and any Affiliates and any Person acting for and on behalf of, or claiming through it, (collectively, the "Releasing Parties"), hereby fully, finally and forever releases and discharge Lender and all of Lender's past and present officers, directors, servants, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past, present and future actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, any interim or final bankruptcy order, the Interim Order, the Final Order and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

9

Error! Unknown document property name.

1.16.    Waiver of Any Primary Rights.    Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligation shall be outstanding, Borrower hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Lien securing the Obligations, or to approve a claim of equal or greater priority than the Obligations.

## 2.    CONDITIONS PRECEDENT

2.1.    Conditions to the Initial Revolving Credit Advance.    Notwithstanding any other provision of this Agreement and without affecting in any manner the rights of Lender hereunder, Borrower shall have no rights under this Agreement (but shall have all applicable obligations hereunder), and Lender shall not be obligated to make any Revolving Credit Advances, or to take, fulfill, or perform any other action hereunder, until the following conditions have been fulfilled to the satisfaction of Lender:

(a)    Lender shall have received duly executed counterparts of the Agreement and the other Loan Documents from the Borrower and the Guarantors, and such documents, instruments, certificates, and agreements as Lender shall reasonably request in connection with the transactions contemplated by this Agreement, including all documents, instruments, agreements and other materials listed in Schedule 2.1(a), each in form and substance satisfactory to Lender;

(b)    Lender shall have received evidence satisfactory to it that Borrower and the Guarantors have obtained consents and acknowledgments of all Persons whose consents and acknowledgments may be required, including, but not limited to, all requisite Governmental Authorities, to the terms and to the execution and delivery, of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby.  Lender shall have received resolutions of the Board of Directors or other governing body of Borrower and each Guarantor approving and authorizing, among other things, the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or assistant secretary as being in full force and effect without modification or amendment.    Lender shall have received good standing certificates from the applicable Governmental Authority of each of Borrower's and each Guarantor's jurisdiction of incorporation, organization or formation and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business (other than, in the case of jurisdictions other than Borrower's or such Guarantor's jurisdiction of incorporation, organization or formation, where the failure to be in good standing or so qualified could not be reasonably expected to have a Material Adverse Effect).  Lender shall have received signature and incumbency certificates of the officers of such Person executing the Loan Documents.;

(c)    Lender shall have received certificates of property and liability insurance of Borrower and the Guarantors showing loss payable or additional insured clauses or endorsements, or both, as appropriate, in favor of Lender, in form and substance satisfactory to Lender;

10

Error! Unknown document property name.

(d)      Borrower shall have consented to an increase of the Revolving Credit Loans by an amount equal to all Fees, costs, and expenses due at closing (including fees and expenses of consultants and counsel to Lender presented as of the Closing Date) (it being understood that the Borrower's acceptance of the initial Revolving Credit Loan shall be evidence of such consent);

(e)      No action, proceeding, investigation, regulation or legislation shall have been instituted or threatened before any Governmental Authority to enjoin, restrain or prohibit, or to obtain damages in respect of, or which is related to or arises out of this Agreement or any of the other Loan Documents or the consummation of the transactions contemplated hereby and thereby and which, in Lender's sole judgment, would make it inadvisable to consummate the transactions contemplated by this Agreement or any of the other Loan Documents;

(f)      No later than five (5) days after the Petition Date, the Bankruptcy Court shall have entered, upon motion in form and substance satisfactory to Lender, on such prior notice to such parties as may be satisfactory to Lender, the Interim Order. The Interim Order shall be in full force and effect, shall not be subject to a motion for reconsideration and shall not have been vacated, reversed, modified, amended stayed or subject to a pending appeal;

(g)      Other than the Chapter 11 Cases and the defaults under the Pre-Petition Loan Agreement and as may be disclosed in Schedule 2.1(g), none of the following shall have occurred and be continuing: (i) a Material Adverse Effect; (ii) a material increase in liabilities, liquidated or contingent (net of any offsetting increase in assets), or a material decrease in assets of Borrower and Guarantors; or (iii) any litigation or other proceeding is pending or threatened which, if successful, could, individually or in the aggregate, reasonably be expected to have or result in a Material Adverse Effect;

(h)      Lender's satisfaction with the composition of the Board of Directors of the Borrower;

(i)      Lender shall have received all requested financial information and financial statements requested of Borrower certified by the Chief Financial Officer of Borrower and in form and substance satisfactory to Lender;

(j)      Lender shall be reasonably satisfied with the corporate structure, capital structure, debt instruments, material contracts, and governing documents of Borrower and the Guarantors, and the tax effects resulting from the commencement of the Chapter 11 Cases and the credit facility evidenced by this Agreement;

(k)      The "first day" orders described on Schedule 2.1(k) (the "First Day Orders") in form and substance satisfactory to Lender shall have been entered in the Chapter 11 Cases;

(l)      Lender, Borrower and Guarantors shall have entered into the Asset Purchase Agreement and Lender shall have received a copy of the docket in the Borrower's Case (or other of the Chapter 11 Cases which is the "lead case") which reflects the filing of a sale motion (which shall seek, among other things, approval of the Asset Purchase Agreement) by Borrower, which pleading(s) shall be in form and substance satisfactory to Lender; and

11

(m)    Lender shall have received the Budget.

2.2.    Further Conditions to Each Revolving Credit Advance after the Closing Date. It shall be a further condition to the funding of the initial and each subsequent Revolving Credit Advance that the following statements shall be true on the date of each such funding, advance or incurrence, as the case may be:

(a)    The Revolving Credit Advance requested would not cause the aggregate outstanding amount of the Revolving Credit Loans to exceed the amount then authorized by the Interim Order or the Final Order, as the case may be;

(b)    Borrower's and Guarantors' representations and warranties contained herein or in any of the Loan Documents shall be true and correct in all material respects on and as of the Closing Date and the date on which such Revolving Credit Advance is made as the case may be, as though made on or incurred on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date and except for changes therein permitted or contemplated by this Agreement;

(c)    No event shall have occurred and be continuing, or would result from the making of such Revolving Credit Advance which constitutes or would constitute a Default;

(d)    After giving effect to such Revolving Credit Advance, the aggregate principal amount of the Revolving Credit Loan shall not exceed the Borrowing Availability;

(e)    Lender shall have a senior priming, first priority perfected security interest in the Collateral subject only to the Carve-Out Expenses up to the Carve-Out Amount;

(f)    As to each Revolving Credit Advance requested to occur on or after the date that is 15 days after the Petition Date, the Bankruptcy Court shall have entered the Final Order, on such prior notice to such parties as may be satisfactory to Lender and in compliance with the terms set forth in the Interim Order, which Final Order shall be in full force and effect, shall not be subject to a motion for reconsideration and shall not have been vacated, reversed, modified, amended stayed or subject to a pending appeal;

(g)    As to each Revolving Credit Advance that would, when added to the aggregate amount of all Revolving Credit Loans then outstanding, exceed the Interim Availability Amount, the Bankruptcy Court shall have entered the Final Order authorizing the Borrower to incur loans to the extent of such aggregate advance;

(h)    There shall be no motion pending that would, if granted, permit any administrative expense against Borrower or any Guarantor to have administrative priority equal to or superior to the priority of the Lender's in respect of the Obligations;

(i)    Borrower shall have consented to an increase of the Revolving Credit Loans by an amount equal to all Fees, costs, and expenses (including fees and expenses of consultants and counsel to Lender presented on or before such date) then due and owing (it being understood that the Borrower's acceptance of the requested Revolving Credit Loan shall be evidence of such consent);

12

(j)     Borrower and Guarantors shall have used their reasonable efforts to obtain duly executed and enforceable account control agreements (with respect to each of their Deposit Accounts) in form and substance satisfactory to Lender, pursuant to which Lender shall be granted sole dominion and control over the deposits from time to time on deposit in such accounts; and

(k)     The funding of any Revolving Credit Advance shall not be enjoined, temporarily, preliminary or permanently or cause Borrower to breach any agreement, the enforcement of which is not stayed by the Chapter 11 Cases, to which Borrower or any Guarantor may be a party.

The request and acceptance by Borrower of the proceeds of any Revolving Credit Advance shall be deemed to constitute, as of the date of such request or acceptance, (i) a representation and warranty by Borrower and the Guarantors that the conditions in this Section 2.2 (and, in the case of the initial Revolving Credit Advance made on the Closing Date, Section 2.1) have been satisfied and (ii) a confirmation by Borrower and the Guarantorsof the granting and continuance of Lender's Liens, pursuant to the Interim Order, Final Order or Collateral Documents, as the case may be.

## 3.     REPRESENTATIONS AND WARRANTIES

To induce Lender to enter into this Agreement and make the Revolving Credit Loans Borrower makes the following representations and warranties to Lender (and each such representation and warranty shall survive the execution and delivery of this Agreement) that:

3.1.    Corporate Existence; Compliance with Law.     Each of the Borrower and each Guarantor: (a) is an entity duly organized or formed, validly existing and in good standing under the laws of the jurisdiction of its formation and is duly qualified to do business and is in good standing in each other jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification; (b) subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, has the requisite power and authority and the legal right to own, pledge, mortgage or otherwise encumber and operate its properties, to lease the property it operates under lease, and to conduct its business as now, heretofore and proposed to be conducted; (c) has all material licenses, permits, consents or approvals from or by, and has made all filings with, and has given all material notices to, all Governmental Authorities having jurisdiction, to the extent required for such ownership, operation and conduct; (d) is in compliance with its certificate or articles of formation and by-laws; and (e) is in compliance in all material respects with all Applicable Law except to the extent that (i) such compliance is excused by the U.S. Bankruptcy Code or by an applicable order of the Bankruptcy Court and (ii) such non-compliance would neither have nor could reasonably be expected to have a Material Adverse Effect on Borrower's business or assets or upon any of the rights, remedies or interests of the Lender.

3.2.    Executive Offices; Corporate or Other Names; FEIN.     The current locations of Borrower's and Guarantors' executive offices, principal place of business, corporate offices, all warehouses and premises within which any Collateral is stored or located, and the locations of Borrower's and Guarantors' records concerning the Collateral are set forth in Schedule 3.2 and,

13

Error! Unknown document property name.

except as set forth in Schedule 3.2, such locations have not changed during the preceding 12 months. In addition, the federal employer identification number of Borrower is shown on Schedule 3.2. During the prior five (5) years, except as set forth in Schedule 3.2, neither Borrower nor any Guarantor has been known as or used any corporate, fictitious or trade name.

3.3.    Corporate Power; Authorization; Enforceable Obligations. Upon the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, the execution, delivery and performance by each of the Borrower and each Guarantor of the Loan Documents to which it is a party and all other instruments and documents to be delivered by it hereunder and thereunder to the extent it is a party thereto and the creation of all Liens provided for herein and therein: (a) are within its organizational power; (b) have been duly authorized by all necessary action; (c) are not in contravention of any provision of its certificate or articles of organization or by-laws or other organizational documents; (d) will not violate any law or regulation, or any order or decree of any court or governmental instrumentality; (e) will not conflict with or result in the breach or termination of, constitute a default under or accelerate any performance required by, any material indenture, mortgage, deed of trust, lease, agreement or other instrument to which it is a party or by which it or any of its material property is bound; (f) will not result in the creation or imposition of any Lien upon any of the property of Borrower other than those in favor of Lender, all pursuant to the Loan Documents; and (g) do not require the consent or approval of any Governmental Authority or any other Person, all of which will have been duly obtained, made or complied with prior to the Closing Date and which are in full force and effect. At or prior to the Closing Date, each of the Loan Documents to which each of the Borrower and each Guarantor is a party shall have been duly executed and delivered by it and shall then, assuming due execution and delivery by the other parties thereto, subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, constitute a legal, valid and binding obligation of it to the extent it is a party thereto, enforceable against it in accordance with its terms.

3.4.    Financial Statements. Borrower has delivered to Lender audited financial statements of Borrower for the fiscal year ended December 31, 2006 and unaudited financial statements for the most recent fiscal quarter (together, the "Financial Statements"). The Financial Statements, taken as whole, fairly present in all material respects, in accordance with GAAP, (i) the financial condition of Borrower and Guarantors as of the date thereof, and (ii) the results of operations and cash flow of Borrower for the fiscal year ended December 31, 2006 and the most recently available fiscal quarter, as applicable.

3.5.    Material Adverse Effect. Except as set forth in Schedule 3.5, Borrower and Guarantors have no material obligations, contingent liabilities, or liabilities for Charges, long-term leases or unusual forward or long-term commitments which are not reflected in the Financial Statements. Except as otherwise permitted hereunder or as set forth in Schedule 3.5, no Restricted Payment has been made since June 30, 2007, and no shares of Stock of Borrower have been, or are now required to be, redeemed, retired, purchased or otherwise acquired for value by Borrower. Other than as disclosed in the audited financial statements of Borrower for the fiscal year ended December 31, 2006 or the unaudited financial statements of Borrower for the fiscal quarter ended June 30, 2007, since such date no event or events have occurred or are continuing which, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect, other than the commencement of the Chapter 11 Cases.

14

3.6.    Ownership of Property; Liens.    Except as described in Schedule 3.6, the real estate listed in Schedule 3.6 constitutes all of the real property leased or used in Borrower's and Guarantors' businesses. Each of Borrower and Guarantors has valid leasehold interests in the properties listed on such Schedule. Borrower and Guarantors do not own any real property or have any real property interests other than as set forth on Schedule 3.6 None of the properties and assets of Borrower or a Guarantor are subject to any Liens, except (x) Permitted Encumbrances, (y) the Pre-Petition Liens and (z) from and after the Closing Date, the Lien in favor of Lender pursuant to the Collateral Documents. Except as described in Schedule 3.6, Borrower has received all deeds, assignments, waivers, consents, non-disturbance and recognition or similar material agreements, bills of sale and other documents, and duly effected all recordings, filings and other material actions necessary to establish, protect and perfect Borrower's and Guarantors' right, title and interest in and to all such real estate and other assets or property. Except as described in Schedule 3.6: (i) Neither Borrower nor any Guarantor owns, holds or is obligated under or a party to, any option, right of first refusal or any other contractual right to purchase, acquire, sell, assign or dispose of any real property owned by Borrower it as set forth in Schedule 3.6, and (ii) no material portion of any real property owned by it has suffered any material damage by fire or other casualty loss which has not heretofore been completely repaired and restored to its condition before the casualty. All permits required to have been issued or appropriate to enable the real property owned by Borrower or a Guarantor to be lawfully occupied and used for all of the purposes for which they are currently occupied and used have been lawfully issued and are, as of the date hereof, in full force and effect.

3.7.    Restrictions; No Default.    No Contract, lease, agreement, instrument or other document to which Borrower is a party or by which it or any of its properties or assets is bound or affected and no provision of any charter, corporate restriction, Applicable Law or governmental regulation, individually or in the aggregate, has had a Material Adverse Effect. Borrower and Guarantors are not in default other than (i) the defaults under the Pre-Petition Loan Agreement and (ii) to the knowledge of Borrower and Guarantors, no third party is in default, under or with respect to any Contract, lease, agreement, instrument or other documents to which Borrower or a Guarantor is a party, which default or defaults, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect. To the knowledge of Borrower and Guarantors, no Default has occurred and is continuing.

3.8.    Labor Matters.    There are no strikes or other material labor disputes against Borrower or Guarantors that are pending or, to the knowledge of Borrower or Guarantors, threatened. Hours worked by and payment made to employees of Borrower or Guarantors have not been in violation of the Fair Labor Standards Act or any other applicable laws dealing with such matters. All material payments due from Borrower or Guarantors on account of employee health and welfare insurance have been paid or accrued as a liability on the books of Borrower or Guarantors. Except as set forth in Schedule 3.8, Borrower or Guarantors have no obligation under any collective bargaining agreement, management agreement, or any employment agreement, and a correct and complete copy of each agreement listed in Schedule 3.8 has been provided to Lender. Except as set forth in Schedule 3.14, there are no representation proceedings pending or, to the knowledge of Borrower or Guarantors, threatened with the National Labor Relations Board, and no labor organization or group of employees of Borrower or Guarantors has made a pending demand for recognition, and, there are no complaints or charges against Borrower or Guarantors pending or, to the knowledge of Borrower or Guarantors, threatened to

15

Error! Unknown document property name.

be filed with any federal, state, local or foreign court, governmental agency or arbitrator based on, arising out of, in connection with, or otherwise relating to the employment or termination of employment by Borrower or Guarantors of any individual.

3.9.    Ventures, Subsidiaries and Affiliates; Outstanding Stock and Indebtedness.
Borrower has no Subsidiaries other than the Guarantors. · Borrower and the Guarantors are not engaged in any joint venture or partnership with another Person, except as set forth in Schedule 3.9. Except as set forth in Schedule 3.9, there are no outstanding rights to purchase options, warrants or similar rights or agreements pursuant to which Borrower may be required to issue, sell or purchase any Stock or other equity security. Schedule 3.9 lists all outstanding Stock of Borrower and the Guarantors and the percentage of ownership and voting interests of the owners thereof as of the Closing Date.

3.10.    Government Regulation.    Borrower and the Guarantors are not (a) an "investment company" or an "affiliated person" of, or "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940 as amended; or (b) subject to regulation under the Federal Power Act, the Interstate Commerce Act or any other federal or state statute that restricts or limits Borrower's and Guarantors' ability to incur Indebtedness, pledge their assets, or to perform their obligations hereunder, or under any other Loan Document; and the making of the Revolving Credit Advances by Lender, the application of the proceeds and repayment thereof by Borrower and the Guarantors and the consummation of the transactions contemplated by this Agreement and the other Loan Documents, will not violate any provision of any such statute or any rule, regulation or order issued by the Securities and Exchange Commission.

3.11.    Margin Regulations.    Borrower and the Guarantors are not engaged in the business of extending credit for the purpose of purchasing or carrying Margin Stock and no proceeds of any Revolving Credit Advance will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock. Borrower and the Guarantors will not take any action which might cause any Loan Document or any document or instrument delivered pursuant hereto or thereto to violate any regulation of the Board of Governors of the Federal Reserve Board.

·3.12.    Taxes.    Except as set forth in Schedule 3.12, all federal, state, local and foreign tax returns, reports and statements, including information returns required to be filed with respect to Borrower and the Guarantors have been timely filed, all such tax returns, reports and statements are correct and complete in all material respects, and except as otherwise prohibited · by the Chapter 11 Cases, all Charges and other impositions due and payable with respect to Borrower and the Guarantors (whether or not shown on any such tax returns, reports and statements) have been paid prior to the date on which any fine, penalty, interest or late charge may be added thereto for nonpayment thereof. Borrower and the Guarantors have adequately provided for in their books and records for all unpaid Charges and other impositions, being those not yet due and payable. Proper and accurate amounts have been withheld by Borrower and the Guarantors from their employees and other third parties for all periods and such withholdings have been timely paid to the respective Governmental Authorities. Schedule 3.12 sets forth those taxable years for which any of the tax returns of Borrower and the Guarantors are currently being audited by the IRS or any other applicable Governmental Authority, and any currently,

16

pending or threatened assessments, actions, disputes or claims with respect to taxes are listed thereon. There are no liens on any of the assets of Borrower and the Guarantors with respect to Taxes except for Permitted Encumbrances. Except as described in Schedule 3.12, Borrower and the Guarantors have not executed or filed with the IRS or any other Governmental Authority any agreement or other document extending, or having the effect of extending, the period for assessment or collection of any Charges or the filing of any tax return. None of the property owned by Borrower and the Guarantors is property which it is required to treat as being owned by any other Person pursuant to the provisions of IRC Section 168(f)(8) of the Internal Revenue Code of 1954, as amended, and in effect immediately prior to the enactment of the Tax Reform Act of 1986 or is "tax-exempt use property" within the meaning of IRC Section 168(h). Borrower and the Guarantors have not agreed or been requested to make any adjustment under IRC Section 481(a) by reason of a change in accounting method or otherwise. Borrower and the Guarantors have no obligation under any tax-sharing agreement or arrangement, or liability for Charges or impositions for any other Person under applicable law, as transferee or successor, or by contract, except as described in Schedule 3.12.

    3.13.  ERISA.  Schedule 3.13 lists all Plans maintained or contributed to by Borrower and the Guarantors and all Qualified Plans, Pension Plans, Retiree Welfare Plans or Welfare Plans maintained or contributed to by any ERISA Affiliate. Except as set forth on Schedule 3.13, none of the Borrower, any Guarantors or any current or former ERISA Affiliate sponsors (or has sponsored), contributes to (or has contributed to), or is (or was) required to contribute to or has any liability with respect to any Title IV Plan, any Plan subject to IRC Section 412 or ERISA Section 302, or any Retiree Welfare Plan. Except as set forth on Schedule 3.13, none of Borrower, any Guarantor or any current or former ERISA Affiliate contributes to (or has contributed to) or is (or was) required to contribute to any Multiemployer Plan.   IRS determination letters regarding the qualified status under IRC Section 401 of each Qualified Plan have been received as of the dates listed in Schedule 3.13. Each of the Qualified Plans has been amended to comply with the Tax Reform Act of 1986 and to make other changes required under the IRC or ERISA, and if such required amendments are not subject to the determination letters described in the previous sentence, each Qualified Plan so amended will be submitted to the IRS for a determination letter as to the ongoing qualified status of the Plan under the IRC within the applicable IRC Section 401(b) remedial amendment period; and each such Plan shall be amended, including retroactive amendments, as required during such determination letter process to maintain the qualified status of such Plans.   To the knowledge of Borrower and the Guarantors, the Qualified Plans as amended continue to qualify under Section 401 of the IRC, the trusts created thereunder continue to be exempt from tax under the provisions of IRC Section 501(a), and nothing has occurred which would cause the loss of such qualification or tax-exempt status. Except as set forth on Schedule 3.13, each Plan is in compliance in all material respects with the applicable provisions of ERISA and the IRC, including the filing of all reports required under the IRC or ERISA which are true and correct as of the date filed, and all required contributions and benefits have been paid in accordance with the provisions of each such Plan. Borrower and the Guarantors have not engaged in a prohibited transaction, as defined in IRC Section 4975 or Section 406 of ERISA, in connection with any Plan which would subject any such Person (after giving effect to any exemption) to a material tax on prohibited transactions imposed by IRC Section 4975 or any other material liability. Except as set forth in Schedule 3.13: (i) there are no pending, or to the knowledge of Borrower and the Guarantors, threatened claims, actions or lawsuits (other than claims for benefits in the normal course), asserted or

17

instituted against (x) any Plan or its assets, (y) any fiduciary with respect to any Plan or (z) Borrower or the Guarantors or any ERISA Affiliate with respect to any Plan; (ii) Borrower and the Guarantors and each ERISA Affiliate have complied with the notice and continuation coverage requirements of IRC Section 4980B and the proposed or final regulations thereunder; and (iii) no liability under any Plan has been funded, nor has such obligation been satisfied with, the purchase of a contract from an insurance company that is not A rated by A.M. Best and the equivalent by each other nationally recognized rating agency.

3.14.  No Litigation.  Other than the Chapter 11 Cases and except as set forth in Schedule 3.14 as of the Closing Date, no litigation, action, suit, arbitration, investigation or other proceeding is now pending or, to the knowledge of Borrower and the Guarantors, threatened against it, at law, in equity or otherwise; and no such matter (whether shown on Schedule 3.14 as of the Closing Date or subsequently arising) (a) challenges any such Person's right, power, or competence to enter into or perform any of its obligations under the Loan Documents, or the validity or enforceability of any Loan Document or any action taken thereunder or any Liens granted to Lender, or (b) if determined adversely, individually or in the aggregate, could reasonably be expected to have or result in a Material Adverse Effect.  To the knowledge of Borrower and the Guarantors other than the Chapter 11 Cases and except as set forth in Schedule 3.14 as of the Closing Date, there does not exist a state of facts which could reasonably be expected to give rise to any such litigation, action, suit, claim, arbitration, investigation or other proceeding.

3.15.  Brokers.  No broker or finder, investment banker or other intermediary of any kind acting on behalf of Borrower and the Guarantors brought about the obtaining, making or closing of the credit extended pursuant to this Agreement or the transactions contemplated by the Loan Documents, and Borrower and the Guarantors have no obligation to any Person in respect of any finder's, brokerage investment banking, placement or other fees or amounts (including expenses) due in connection therewith.

3.16.  Intellectual Property.  Set forth in Schedule 3.16 is a list and brief description of all domestic and foreign patents, patent rights, patent applications, trademarks, trademark applications, service marks, service mark applications, trade names, internet domain names and copyrights, and all applications for such which are in the process of being prepared, owned by or registered in the name of Borrower and the Guarantors, or of which Borrower and any of the Guarantors is a licensor or licensee or in which Borrower or any of the Guarantors has any right. Borrower and the Guarantors own all Intellectual Property which is necessary to continue to conduct their business as heretofore conducted by them now conducted by them and proposed to be conducted by them.  Borrower and the Guarantors own or possess adequate fully paid or perpetual licenses or other rights to use all patents, patent applications, trademarks, trademark applications, service marks, service mark applications, trade names, internet domain names, copyrights, manufacturing processes, software, formulae, trade secrets, customer lists and know how necessary to the conduct of their business as proposed to be conducted.  To its knowledge, the Intellectual Property that Borrower and any of the Guarantors owns or has a right to use does not infringe upon or misappropriate the rights of others, and no one is infringing upon or misappropriating the Intellectual Property that Borrower or any of the Guarantors owns or has a right to use.  No claim is pending, or to Borrower's and Guarantors' knowledge, threatened to the effect that the operations of Borrower and the Guarantors infringe upon or conflict with the

18

asserted rights of any other person under any Intellectual Property. No claim is pending, or to Borrower's and the Guarantors' knowledge, threatened to the effect that any such Intellectual Property owned or licensed by Borrower and any of the Guarantors , or which Borrower and any of the Guarantors otherwise has the right to use, is invalid or unenforceable by Borrower and the Guarantor. All technical information developed by and belonging to Borrower and the Guarantors which has not been patented has been kept confidential. Borrower and the Guarantors are not aware that any of their employees is obligated under any contract (including licenses, covenants or commitments of any nature) or other agreement, or subject to any judgment, decree or order of any court or administrative agency, that would interfere with the use of his or her best efforts to promote the interests of Borrower and the Guarantors or that would conflict with Borrower's and the Guarantors' business as presently conducted or as proposed to be conducted.

3.17.    Full Disclosure.  No information contained in this Agreement, the other Loan Documents, the Financial Statements or any written statement furnished by or on behalf of Borrower and the Guarantors pursuant to the terms of this Agreement or any other Loan Document, which has previously been delivered to Lender, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

3.18.    Environmental Matters.Except as set forth on Schedule 3.18 and for routine operations in the ordinary course of business in compliance with applicable permits issued by or law of a Governmental Authority, the Subject Property is free of any Hazardous Material and Borrower and the Guarantors have not caused or suffered to occur any Release at, under, above or within any Subject Property, which violated any Environmental Law. Except as set forth on Schedule 3.18, there are no existing or potential Environmental Liabilities for Borrower and the Guarantors of which they have knowledge. Borrower and the Guarantors are not involved in operations which are reasonably likely to result in material Environmental Liabilities on it, or any owner of any premises which it occupies, or any Lien securing the same under any Environmental Law. Borrower and the Guarantors have provided to Lender copies of all existing environmental reports, reviews and audits and all written information pertaining to actual or potential Environmental Liabilities relating to or affecting the Subject Property. Borrower and the Guarantors hereby acknowledge and agree that Lender is not now, and has not ever been, in control of any of the Subject Property or Borrower's and the Guarantors' affairs, and (ii) does not have the capacity through the provisions of this Agreement or the other Loan Documents or otherwise to influence Borrower's and the Guarantors' conduct with respect to the ownership, operation or management of any of the Subject Property or compliance (or not) with Environmental Laws.

3.19.    Insurance Policies.  Borrower's and Guarantors' insurance is reasonable and standard for Borrower's and Guarantors' industry and geographic location.

3.20.    Deposit and Disbursement Accounts.  Schedule 3.20 lists all banks and other financial institutions at which Borrower and the Guarantors maintain deposits or other accounts or post office lock boxes and such Schedule correctly identifies the name, address and telephone number of each depository, the name in which the account is held, a description of the purpose of the account, and the complete account number. Borrower and the Guarantors have delivered to

19