UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

IN RE:                          .    Chapter 11
                                .
INPHONIC, INC., *et al.*,        .    Case No. 07-11666(KG)
                                .    (Jointly Administered)
                                .
                                .    December 11, 2007
                                .    2:00 p.m.
            Debtors.            .    (Wilmington)
                                .


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY COURT JUDGE


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1           THE CLERK: Please rise.

2           THE COURT: Good afternoon, everyone.  Please be

3     seated.  Thank you.  Mr. Glassman.

4           MR. GLASSMAN: Good afternoon, Your Honor.  Neil

5     Glassman of The Bayard Firm for the InPhonic Debtors.  Your

6     Honor, we are - -

7           THE COURT: Tell me what you propose.

8           MR. GLASSMAN: Well, let me give you a little bit of

9     background, and then I think Your Honor's going to tell us

10    what Your Honor would like to do.

11          THE COURT: Okay.

12          MR. GLASSMAN: I suspect.  We, we being Adeptio's

13    counsel, and the Committee's counsel, and Debtors' counsel,

14    together with professional advisors, just spent quite a bit

15    of time at a negotiating session at our firm's offices.  And

16    I think we, frankly I think we made a lot of progress.

17    Things are a lot closer than they were Saturday.  Having said

18    that, there is still not an understanding.  It's against that

19    backdrop that we sort of ran out of runway and are standing

20    before Your Honor right now.  The Committee also filed a

21    motion to extend the investigation period, and, and that's

22    something that the Court needs to tell us, you know, in which

23    order – - I think in terms of the DIP, we're going to do an

24    interim today, if we can.  And obviously both sides have a

25    story to tell you.

1          THE COURT: Well, you know, I, I love to rule.  But

2    I also love to see people reach an accommodation when it's

3    possible.  And I think it's in everyone's best interest when

4    that happens, usually.  You know, because Judge's only know a

5    part of the story very often.

6          MR. GLASSMAN: Um-hum.

7          THE COURT: Someone once compared it to walking into

8    a room and they flick the lights on, and then flick them off,

9    you know, and they keep doing that, and you only get a

10   picture.  A bit of a picture.  And I was looking at my

11   calendar before I came in, and if the parties need more time,

12   and really think that they can make progress, I'm prepared to

13   give them time tomorrow.  But at the same time, I don't want

14   to delay, or if parties want to proceed, we can proceed.

15         MR. GLASSMAN: Mr. Califano has - -

16         THE COURT: Mr. Califano.

17         MR. GLASSMAN:  - - has scheduling problems

18   tomorrow, Your Honor.

19         THE COURT: Oh, okay.

20         MR. CALIFANO: Well, it's not.  I think what's more

21   important than that, Your Honor, than my scheduling problems

22   - - because since we've filed this case, I've thrown

23   everything off - - but what's more important is that we have

24   some funding needs.

25         THE COURT: Okay.

1          MR. CALIFANO: Because we took, when we were here

2   last, we put everything off until today - -

3          THE COURT: Right.

4          MR. CALIFANO:  - - knowing that today was the day

5   that we needed some funding.  And I am told that we need $2.3

6   million in interim funding to carry us through Thursday.  We

7   have payroll that we need to fund.  Payroll needs to be paid

8   on Thursday, so it would need to be funded today.  And we

9   have a negative cash balance on some inventory that needs to

10  be paid.  We don't want a Debtor that's bouncing checks.  So

11  I think, Your Honor, if we just put a, what needs to be, what

12  we need today, and I believe that Adeptio is willing to go

13  forward on an interim basis, carry things through under the

14  same terms we had last week, just increasing, once again, the

15  interim cap to $2.3 million.  All the other terms that we

16  agreed to last week stay the same.  And then Your Honor, we

17  can come back on Thursday and deal with the final order with

18  the sale and everything else.  But that's the real issue,

19  scheduling issues aside, the real issue is getting that

20  funding authorized.

21         THE COURT: I appreciate that.  Why don't I hear

22  from the Committee, if I may, to see what their view is on

23  this.

24         MS. SPRINGER: Good afternoon, Your Honor.

25         THE COURT: Good afternoon, Ms. Springer.

1          MS. SPRINGER: Claudia Springer for the Committee,

2    with Kurt Gwynne.  Your Honor, we're disappointed that we're

3    here before you without a resolution of this, but that's the

4    way it is.  And we have done our best to try to bring about a

5    resolution.  And I'm not foreclosing the possibility of a

6    resolution.  However, the problem with the solution that is

7    being suggested by the Debtor is that it continues the

8    interim DIP, which was never acceptable to the Committee in

9    the first place.  And you know, specifically, the diminution

10   in value claim continues to go up.  And that, according to

11   the interim DIP anyway, attaches to the proceeds of avoidance

12   actions.  Which obviously is a problem for the, the rest of

13   the unsecured creditors, to the extent there, you know, is a

14   deficiency and a diminution in the, the post-petition

15   lending, which we anticipate there likely will be.  You know,

16   our argument has always been that Adeptio is making this loan

17   for Adeptio's benefit.  Adeptio has already committed itself,

18   if you will, to lending to this Debtor, and also to acquiring

19   these assets.  So we don't see any reason why they should

20   increase their diminution of collateral claim against the

21   avoidance actions.  That's one issue.

22          THE COURT: Okay.

23          MS. SPRINGER: We are prepared to go forward today

24   on the motion to dismiss.  We're also prepared to continue to

25   negotiate to see if a resolution can be obtained, and what I

1   would say is that there are, you know, a handful of issues

2   remaining.  But they're issues.  They're major issues that

3   are important to both sides.  And while I'm hopeful that

4   we'll be able to find a resolution, you know, we haven't been

5   able to do so yet, and I would suggest that the only way

6   there is going to be a resolution, if at all, is if everybody

7   stays focused on this.  But at the same time, I really don't

8   understand why Adeptio needs the protections that it needs,

9   when in reality in my mind, they really don't have much of a

10  choice if they want to protect their investment, but to make

11  this loan, because, you know, without it, the company will

12  essentially not be able to make payroll.  And by the way, I

13  also have not been given any details, nor have, has our

14  financial advisor, regarding that 2.3 million.  I don't know

15  what it consists of.  I do know they need to make payroll,

16  however I don't know what that number is.  We haven't been

17  given any of the backup for the 2.3.  And that, that's a

18  number I just heard today, this afternoon.

19          THE COURT: Well, let me - -

20          MS. SPRINGER: So I really don't know what the, what

21  the backup is.  Obviously, we would want to, if the Court was

22  inclined to continue this, for even a short period of time,

23  we would want that - -

24          THE COURT: The budget.

25          MS. SPRINGER:  - - interim number to be as low as

1    possible.  And frankly, I think that's one point that Adeptio

2    would agree with us on.

3            THE COURT: Thank you, Ms. Springer.

4            MR. CALIFANO: Well, Your Honor - -

5            THE COURT: Mr. Califano is, is there - -

6            MR. CALIFANO: If we want to talk, we can get a

7    budget.  And Mr. Coles (phonetic) is here.  He can either say

8    it, and I can read it into the record, or - -

9            THE COURT: Sure.

10           MR. CALIFANO:  - - we can put him on the stand.

11   But it's, that's money that needs to be funded.  I mean,

12   it's, it' s the - - we have Adeptio agreeing to it.  They're

13   not laying out any more money than they absolutely have to.

14   It's what's needed to preserve the value.  And if the

15   Committee wants to talk about a diminution in value?  If they

16   want to see value diminished, let them shut down this DIP,

17   shut down funding, and we'll see value go out the window.  I

18   mean, I think as a matter of law, let's set aside Adeptio as

19   a secured creditor, would have an administrative priority

20   claim against all assets.  They have an administrative

21   priority claim.  Whether it attaches to the avoidance

22   proceedings or not, it's a matter of law.  It doesn't even

23   have to be in the order.  It's in the order because people

24   put it in the order.  But as a matter of law, they have an

25   entitlement to administrative claim if there's a diminution

1    in value.  What everybody should keep in mind is that claim,

2    and the DIP claim, and all the other claims are waived at the

3    sale.  Because that's all being bid in.  So what we're really

4    talking about, Your Honor, we're talking about something that

5    they're entitled to under the Code, which is the

6    administrative priority claim for diminution of value, that

7    being waived for a two day period while we, to allow funding

8    for payroll and other necessary expenses, and, to allow us to

9    go forward.  So I think what we're trying to do, and I think

10   Mr. Glassman was completely correct, there were a number of

11   items that the parties reached progress on.  I think we, for

12   the first time we've seen some progress.  People are talking

13   about the same things in the same framework, as opposed to

14   talking past each other.

15          THE COURT: Well the problem, big picture-wise, from

16   the Court's standpoint is everyone is playing chicken here.

17          MR. CALIFANO: Right.

18          THE COURT: I mean if the case, for example, is

19   dismissed, as the Committee wants to urge on the one hand,

20   there are no avoidance actions.  And - -

21          MR. CALIFANO: They are playing chicken, Your Honor.

22   And I'm just trying to make sure that people who have checks

23   out there for goods that have been delivered, post-petition,

24   get those covered.  And that people who have been working,

25   and who expect a paycheck due on Thursday, get paid on

1    Thursday.  Everything else is argument, positioning, the

2    like.  And people have the right to do that, if they want, to

3    advance their client's interests, but I'm talking about some

4    specific things that need to be done.  And then everybody

5    else can continue to throw rocks at each other.  But I think

6    we need to get the interim financing done, and if there's a

7    question about what it pertains to, Mr. Coles is here.  He

8    has all the details.  Mr. Coles do you mind standing?

9              THE COURT: Yes.  I, hi Mr. Coles.

10             MR. CALIFANO: Okay.

11             THE COURT: Welcome.

12             MR. CALIFANO: And he has all the details.  And we

13   can either give it informally, we can put him on the record,

14   he can write it down I can read it into the record.  That's

15   not an issue.  The money is not being used for any purpose

16   that doesn't benefit the estate.  And we can deal with the

17   motion that we received yesterday afternoon.  I'd like to

18   deal with that motion, in fact.  But I think what we need to

19   do, to preserve everything, and allow people to continue to

20   take their positions without the, you know, the house

21   burning, is just to approve the DIP on an interim basis.

22   We've been able to negotiate, with Adeptio, their willingness

23   to keep funding through then.  And then let's just get, let's

24   get that sword from over our heads.

25             THE COURT: And then we come back on Thursday - -

1          MR. CALIFANO: And come back on Thursday, Your

2   Honor.

3          THE COURT: Either with a resolution, or we sort

4   everything out.

5          MR. CALIFANO: Exactly, Your Honor.  That's, and at

6   least the Debtor hasn't lost any value between now and then,

7   and no one's position is harmed.

8          THE COURT: Mr., yes, Mr. Gwynne.  You snuck in on

9   Mr. Brady.

10         MR. GWYNNE: Yes I did.  I caught him not looking,

11  Your Honor.

12         THE COURT: But he's used to it.

13         MR. GWYNNE: Your Honor, with respect - - one of the

14  reasons why we want to go forward today with the motion to

15  dismiss is we don't look at it as playing chicken.  As we

16  said before, not one single job has to be lost if the case is

17  dismissed.  Not one single contract that the Debtor wants to

18  assume and assign cannot be assumed and assigned outside of

19  bankruptcy, pursuant to state law.  But it is important, Your

20  Honor, that we stop this diminution claim from accruing

21  against the preference claim.  Mr. Califano just represented

22  to Your Honor that that claim goes away at the sale hearing.

23  Well I asked counsel for Adeptio if that was true, because it

24  was not my understanding, and I think they'll tell you it's

25  not their understanding as well.  One of the biggest problems

1   with this case, Your Honor, is we're accruing a diminution

2   claim every time we continue a hearing.  And we're going to

3   end up with a sale with no assets in the estate to fund the

4   plan, with a $25 million diminution claim that the only

5   potential assets remaining would be some of the avoidance

6   actions that they're not purporting to buy, although how,

7   Your Honor, they can credit bid a lien on avoidance actions

8   is new to me.  But there is prejudice every time this is

9   continued.  We've bent over backwards, both Robert Simons and

10  Claudia Springer from our office have been available.

11  They've been negotiating tirelessly.  And I'm not going to

12  get into settlement negotiations, but Your Honor, I think

13  that the blood is out of the Committee's stone.  We're

14  prepared to go forward today.  I think it's important that we

15  do that.  And even if Your Honor doesn't want to rule today,

16  and wants to rule tomorrow or Thursday, let us at least, now

17  that we're here again and ready to go forward, put the case

18  on, make the argument, and get it over with.  And then I

19  agree with Mr. Califano that we also need to address the

20  motion that we filed yesterday with respect to continuing the

21  sale hearing and the investigation period.  Thank you, Your

22  Honor.

23         THE COURT: Thank you very much Mr. Gwynne.  By the

24  way by saying playing chicken, I meant no disrespect to the

25  Committee.  I simply meant, meant that everyone is playing

1   this right to the very edge.  And, and I understand why.

2   Perhaps I, I think I understand why in any event.  But that's

3   just, let me make that record clear.

4           MR. BRADY: Good afternoon, Your Honor.

5           THE COURT: Mr. Brady, good afternoon.

6           MR. BRADY: Robert Brady on behalf of Adeptio.  Your

7   Honor, we too are disappointed that there's no deal yet.

8   We've worked very hard to try to reach a resolution.  In

9   fact, we, we have an agreement with the Debtor on a

10  modification that we think satisfies a number of, all of Your

11  Honor's concerns.  We're trying to reach an agreement with

12  the Committee as well.  And we're prepared to keep working to

13  do that.  But the Debtor needs money.  And Adeptio is

14  prepared to fund, under a further interim order, to maintain

15  the status quo and to keep the company alive.  But we're

16  being asked to do that with a motion to dismiss, an objection

17  to the sale, and a motion to extend the investigation period

18  all hanging over our head.  We're prepared to put more money

19  in, but only under those protections we were afforded in the

20  interim order, for a short period of time, until we either

21  see, Your Honor, if there's going to be a deal, or the entire

22  case is in front of Your Honor on Thursday.  The sale, the

23  dismissal, the investigation period, the DIP, everything is

24  there Thursday.  And we either have a deal, or Your Honor

25  hears the whole case in one day.

1          THE COURT: Well let me just tell you my one

2    concern.  And that has to do with the diminution issue which

3    has been raised, because the status quo is fine, but I don't

4    know that the continued diminution is really status quo.  I

5    think that is Adeptio gaining a little more ground with an

6    interim DIP, to the disadvantage of the Committee.

7          MR. BRADY: Well certainly, Your Honor, we were

8    prepared to live under the $10 million.  The problem is the

9    Debtor can't live under the $10 million and needs funding.

10   This money is going to go to employees, it's going to go to

11   creditors who did business with the Debtor post-petition.

12   This isn't, Adeptio would prefer, Your Honor, to either have

13   a deal, or to litigate this case.  We think we're making

14   progress with the Committee.  It's worth time, more time to

15   see if we can reach a deal.  But in the meantime, the Debtor

16   - -

17         THE COURT: We need money.

18         MR. BRADY:  - - needs money.

19         THE COURT: Okay.  Thank you, Mr. Brady.  I think

20   what we ought to do - - how long will it take you to bring

21   the Committee up to speed on the use of the interim DIP

22   proceeds, and what it's needed for, and really the

23   justification for $2.3 million?

24         MR. CALIFANO: One minute.  One minute.

25         THE COURT: Why don't we take a five minute recess

1    so that you're not doing that, you know, under pressure.

2    There can be a little bit of an exchange that way.  And I'll

3    come back out in five minutes, and we'll proceed.

4              MR. CALIFANO: That's great.

5              THE COURT: Okay.

6              MR. CALIFANO: Thank you, Your Honor.

7              THE COURT: Thank you.

8         (Whereupon at 3:10 p.m. a recess was taken in the

9    hearing in this matter.)

10        (Whereupon at 3:19 p.m. the hearing in this matter

11   reconvened and the following proceedings were had:)

12             THE CLERK: Please rise.

13             THE COURT: Thank you everyone.  Please be seated.

14   Mr. Califano.

15             MR. CALIFANO: Yes, Your Honor.  At, we, at the

16   break, we made Mr. Coles available to Mr. Polski (phonetic),

17   and he laid out the various items that compile the 2.3

18   million.  There is $85 thousand in outstanding checks that

19   need to be covered.  There's payroll in arrears through the

20   15th of a million two five.  There is some inventory purchases

21   that have already been ordered.  And that also nets out some

22   $450 thousand that is expected to come in as income during

23   that period.  So that's 2.3 million is actually the bare

24   minimum that we need, Your Honor, to honor post-petition

25   obligations that are current, to pay employees who have

1   worked already, because this is a pay period from the 1st

2   through the 15th, and to make these inventory purchases that

3   have been ordered.  And it nets out our expected income.  So

4   Your Honor, that is the bare, bare minimum.  Addressing the

5   diminution claim.

6            THE COURT: Yes.

7            MR. CALIFANO: You know, the way I read 507(b), it's

8   there.  It's a claim.  Now this, the lien may be an issue for

9   the final order, but we're only going under the interim

10  order.  It's a lien, it's a super priority lien on all, it's

11  just a super priority administrative claim.  It comes before

12  every other claim in the case, as a matter of law.  It's just

13  a fact, Your Honor.  We didn't, we wouldn't even need to put

14  it in the order, but that's something the DIP lenders want in

15  the order.  What they're asking, Your Honor, is in this

16  interim period, for us to go two days forward where we're

17  trying to maintain the status quo, they're asking Your Honor,

18  to take an affirmative step of declaring that the secured

19  creditor doesn't get a 507(b) claim.  There's nothing in the

20  statute, I wouldn't try and limit Your Honor's authority, or

21  jurisdiction, but there's nothing in the statute that says,

22  unless the Court otherwise orders, or - -

23           THE COURT: No, no.  I understand.

24           MR. CALIFANO: So I would think that just going

25  forward on the interim basis, allowing the company to get

1    funded, whether or not that creates a super priority claim,

2    whether that, you know - -  it's a metaphysical super

3    priority claim anyway, because the secured creditor is

4    starting out under water, so we don't need to argue about it.

5    But I think that, at a minimum.  And then we can deal with

6    all the other issues.  There's not another motion that the

7    Committee has filed, including yesterday's motion, that I'm

8    neither afraid to deal with or reluctant to deal with.  If

9    people want to spend the time that we have, rather than

10   trying to get, pick up where we, where we were before, if

11   they want to spend their time fighting over these motions,

12   then have at it.  I just want to make sure that, you know,

13   we're funded until the next time we come back here.  And I do

14   want to pick up on something Mr. Brady said, to update the

15   Court.  And I didn't do it, and I was remiss.  We did strike

16   a deal with Adeptio.  We struck a deal with Adeptio for post-

17   closing funding of the estate.

18        THE COURT: I read that, yes.

19        MR. CALIFANO: And in an amount that we believed was

20   adequate to preserve whatever claims are there.  Whatever - -

21   and provide for an orderly wind down.  But we also, nobody

22   said to the Committee, This is the deal.  See you in Court.

23   What we did is we said, This is the deal that we have made.

24   Continue to talk to Adeptio, and Adeptio, the Committee, and

25   the Debtor have continued to talk.  But at least we know Your

1    Honor, that there is a bottom.  There is a floor.  We don't

2    have, and it's a lot of what has been said in the

3    Committee's, in the Committee's papers just isn't accurate

4    anymore.  And I think that has changed the playing field.  We

5    heard Your Honor.  Your Honor said, I want to make sure that

6    this case is not administratively insolvent, there's an

7    orderly wind down.  Well, we negotiated what we believe, and

8    I am firmly convinced, provides for that adequate wind down.

9    It may not provide for what the Committee wants, but no one

10   has shut them down and said we can't go further.  But there

11   is that deal.  That deal was struck on Friday afternoon, and

12   shared with the Committee.  And then there was - - excuse me?

13   There's negotiations going forward continually.  But at least

14   we know - - and we can talk in further detail about that

15   deal, but at least we know there is a floor.  If the

16   Committee can do better than that, that's great.  And the

17   parties have been in Mr. Glassman's office, in the conference

18   room hammering things out this morning, and into the

19   afternoon, and hopefully if we don't have to deal with some

20   of this other stuff, then we can go back and pick up where we

21   left off.  But if we want to, if we have to do, hear motions,

22   we hear motions.  But I want the Court to know that we have a

23   floor, we have a deal, and we can go into the details of the

24   deal.  But let's do what I think is, is right in these

25   circumstances.  You know, we, we can, we've got the minimal

1    funding, we can preserve everybody's rights, and we know that

2    even if there isn't a deal that we're not, we're not going to

3    leave a, an insolvent estate.  An administratively insolvent

4    estate.  And then we can deal with some of the stuff relating

5    to the sale hearing and to the investigation period.  And we

6    can talk about what really happened over this weekend and

7    over yesterday.  Thank you, Your Honor.

8            THE COURT: Thank you Mr. Califano.  Ms. Springer.

9            MS. SPRINGER: Yes, Your Honor.  First of all, Your

10   Honor, you know, while I recognize the fact that in term of a

11   diminution in value in the collateral they would have, under

12   the Code, a super priority administrative claim, the fact of

13   the matter is the Committee is not supportive of continuing

14   this Chapter 11 case if it's going to add to that claim.

15   That's precisely the issue that's before the Court.

16           THE COURT: Well isn't that something else to be

17   negotiated?

18           MS. SPRINGER: Well, yes.  But with each passing

19   day, we're getting further in the hole.  And that's, that's

20   exactly what the problem is.  Although I would, you know,

21   venture to say that when I saw the numbers, you know, I would

22   argue vociferously that the amount that's being expended, the

23   $2.3 million, is really a preservation of value.  It's not,

24   you know, it's to preserve the value of their collateral, and

25   is not, you know, it's not for any other reason.  Because the

1   fact is they are the secured lender, they are the proposed

2   bidder for the assets, and if you start liquidating this

3   company, and the employees start walking off the job, and you

4   can't pay for inventory, we're going to see a very prompt

5   diminution in value of this collateral.  And frankly, I think

6   the additional money is just that, to preserve the value, and

7   it does nothing to diminish the value.  But having said that,

8   I still don't want their claim to be, to attach to the

9   avoidance action proceeds.  If there are any avoidance action

10  proceeds.  So that's, that's the first point.  The second

11  point is that we are not privy to a, quote, "deal", to fund

12  the costs that would be associated with getting this case to

13  a plan.  You know, maybe there is such a deal.  I don't know.

14  But we've been trying to negotiate that very point.  That's

15  one of the, the issues that the Committee finds to be very

16  troubling, is that when you're in a Chapter 11 case, like we

17  are, there ought to be a, certainly an intention, and a way

18  out, that uses the vehicle of a confirmed plan.  Not, not

19  something that is just used to get a quick sale completed,

20  and then, you know, convert the case so that, you know, all

21  the admin claimants, and the priority claimants are left with

22  nothing.  So we're not aware of any commitment yet to, that,

23  you know, where Adeptio is saying, Yes, we will provide the

24  funding necessary to take this case to its conclusion within

25  a Chapter 11.  Maybe there is something.  We don't know.

1          THE COURT: I saw something filed that referred to I

2    think it was two point something million dollars for - -

3          MR. CALIFANO: And if Your Honor, if I may?

4          THE COURT: Yes.

5          MR. CALIFANO: I'd like - -

6          THE COURT: Yes, please.

7          MR. CALIFANO: I'd like to explain that.

8          THE COURT: Have you finished Ms. Springer?  I don't

9    want to interrupt you.

10          MS. SPRINGER: No, I mean, I am finished.  Except to

11   say that, you know, we, we want to continue to negotiate in

12   terms of getting this resolved, but there has to be a, you

13   know, there has to be some finality here.  We don't want this

14   hole to get any bigger than it currently is.

15          THE COURT: Thank you.

16          MS. SPRINGER: And we are prepared to go forward

17   today on the motion to dismiss.

18          THE COURT: Yes, Mr. Califano.

19          MR. CALIFANO: Thank you, Your Honor.  And I want to

20   thank Ms. Springer for making my case on why we should have a

21   DIP, because it does preserve the value here.  And I'm glad

22   that she conceded that.  Your Honor, it's, it's pretty clear.

23   Not, I mean, not every kid should go to college, and not

24   every case gets confirmed.  What we need to make sure here is

25   that there aren't any, there aren't any administrative

1    expenses that remain unpaid.  And that's covered.  We have a

2    carve out in the existing DIP, and we have Adeptio under the

3    sale assuming all of the post-petition trade payables.  Now

4    what we've negotiated over the weekend, Your Honor, is, it

5    amounts to $2.7 million in total value to the estate.  Now

6    what it provides is we have, we firmly believe, and I think

7    the Committee firmly believes - - because everybody wants to

8    go after these litigation assets that are there.  And the

9    question is how do we do it, how do we get somebody to commit

10   to do that at the very early stages of the case.  And you

11   know, I said early on, there's a $35 million D&O policy,

12   claims were made on that D&O policy, we shared that claim

13   with the Committee, the Committee actually gave input, we

14   added the Committee's proposed language to the notice of

15   claim given to the insurers.  So all that is covered.  And

16   Your Honor, what we have here, and what we've negotiated with

17   Adeptio, is a situation where their funding, post-closing,

18   another $350 thousand.  Okay?  And $350 thousand is a

19   significant number in this case, and in the, when you think

20   of the, the assets that are being purchased, and the

21   investment.  350 thousand would go for an investigation

22   period.  A brief investigation period.  It would provide for

23   the payment of the administrative expenses, and give a very

24   brief period of time to determine whether there are claims,

25   and if there are claims commence those claims.  At that

1    point, all the options are open, Your Honor.  That 350, after

2    that, after the, if there are claims found, they can be

3    pursued, and if there are claims that can be valued and

4    investigated, and as opposed to in the short period of time

5    we have here, vetted and asking a secured lender to commit to

6    those, then Your Honor, we can get financing.  There are a

7    multitude, I anticipate, of ways if there are claims.  If

8    there aren't claims, Your Honor, then there isn't an asset.

9    And it's in everybody's responsibility to get this case

10   converted then, stop the administrative bleeding, leave

11   whatever money is there for the Chapter 7 Trustee, and have

12   the case wound down.  If there are claims, I think it will be

13   very easy to fund them.  If there aren't claims, I think it's

14   everybody's responsibility to put this case to bed.  So this

15   does that.  In addition, Adeptio is going to waive $10

16   million of its deficiency claim as a portion.  This is the

17   term sheet we worked out.  Your Honor, we have provided this

18   term sheet.  And I never said this was a term sheet for the

19   funding of a plan, because I don't think there is any, there

20   is a reason to demand that there be a plan funded here.  I

21   don't know if, until we know there are these litigation

22   assets, these avoidance proceedings that we've heard so much

23   about, until we know that they exist, I don't think there's

24   any basis to demand that a plan be, be confirmed.

25            THE COURT: I'm thinking of it in terms of post-

1    closing funding.

2          MR. CALIFANO: Yes.  And this is a post-closing

3    plan, Your Honor.  This is 350 thousand, and we've worked out

4    a budget, and we believe that in very short period of time,

5    and we think we can get a handle on these claims very easily,

6    because we can, this is a, this is a public company.  There

7    was SEC investigations, there was an internal investigation,

8    there was various derivative suits, and class actions.  Once

9    the dust settles, we can get a very quick handle on it.  And

10   you'll be able, you'll have a post closing wrap up.  It's not

11   like the case closes, and then everybody flies away and

12   there's no money.  There's 350, which is real money.  So

13   that's what we worked out.  And that was the deal that we

14   worked out with Adeptio.  Now from there, as I said, we

15   worked that deal out, gave it to the Committee, and said, Go

16   at it.  Good luck.  If you can do better than this, do better

17   than this.  But we believe it's responsible, we think it

18   covers our fiduciary duties, then covers our duties to the

19   Court to make sure that the case is wound down, and make sure

20   that post-closing there is something to determine what

21   happens here with this case.  Now three, if there aren't any,

22   we'll be able to evaluate the claims very quickly.  If there

23   aren't claims, then the case will be converted.  If there are

24   claims, then we can use our imagination to find a way to fund

25   it.  And I wouldn't have any problem, if I can establish

 1   claims, going to some of the well-healed Committee members,

 2   like Yahoo and Google, who have more money in the cushions of

 3   their couch than would be required to fund this litigation.

 4   So that's the plan, Your Honor.  And it's not like we're

 5   being irresponsible, it's not like we're running away, it's

 6   not like Adeptio is not paying the price for bringing this

 7   case here.  And it was all, from the very beginning, I think

 8   on the very first day here, we talked about the fact that we

 9   hadn't had a wind down worked out yet, but we were discussing

10   it.  And we saw the Committee from the very beginning.  And

11   in our stipulation of facts that we had in connection with

12   the motion to dismiss, we said, We're talking about it, but

13   we haven't come to an agreement.  And now we have come to an

14   agreement.  And Adeptio, to its credit, has not said, This is

15   it.  I made my deal, it's 350 thousand to fund this post-

16   closing, do what, you do what you will.  I'm done.  And

17   they've continued to negotiate.  And we've continued to

18   facilitate the negotiations.  But at least Your Honor knows

19   that if there isn't a deal, and the sale closes on Thursday

20   - - I'm sorry, the sale is confirmed on Thursday, and we

21   close thereafter, we don't have an estate that isn't properly

22   provided for.  It may not be a plan, and a plan is

23   preferable, but if there shouldn't be a plan, there shouldn't

24   be a plan.  And if we can't make the economic justification

25   for a plan, there's no reason to have a plan.  So I just want

1   to make sure that all the facts are out on the table, Your

2   Honor.  We do have a copy of the term sheet.  If we wanted to

3   put it into evidence, we can.  I gave Your, I've given Your

4   Honor the main points, but at least we know that there is a

5   - - we heard Your Honor.  You wanted to know that there was a

6   wind down.  Your Honor didn't say a funding for a plan, you

7   said for a proper wind down.  And I think this covers it.

8   And if the Committee can do better, they can do better.  Now

9   the other thing, with respect to the sale, there were no

10  other bidders.  And I think one thing that's significant in

11  the fact, in addition to the fact there were no other

12  bidders, there was no one here before Your Honor saying that

13  they needed more time.  At the bid procedures or thereafter.

14  There was no one, when the Committee filed their motion to

15  reconsider the bid procedures, nobody came in and said, Me

16  too.  Okay.  There's no one here today, when they made their

17  motion to extend the sale, saying Yes, Judge.  If you put it

18  off, like the Committee asks for, we'll come in with a check.

19  So I think the disposition of these assets that we've

20  proposed is reasonable and fair under the circumstances.  So

21  I think Your Honor, and I think all of the professionals here

22  can feel comfortable that we have disposed of the assets in a

23  way that is reasonable under the circumstances and best

24  optimizes their value.  And we, oh another thing we have to

25  keep here, they want to put the sale off, but they're afraid

1    of diminution of value.  They want to put the sale off, but

2    they don't want us to have any money to stay alive until the

3    sale.  They want to put the sale off, but they want to

4    dismiss the case, because they want to preserve avoidance

5    actions that will go away when the case is dismissed.  So

6    wherever the logic is in that, Your Honor, I just want Your

7    Honor to know that we have worked out a proposal that will

8    make sure that post-closing this case is provided for.  Thank

9    you, Your Honor.

10             THE COURT: Thank you, Mr. Califano.  Mr. Brady.

11             MR. BRADY: Your Honor, Robert Brady for Adeptio.

12    Mr. Califano covered a number of the points I wanted to

13    address to the Court.  But to be, to be clear, Your Honor,

14    from the very first pleadings filed by this Committee, they

15    have attempted to demonize Adeptio.  And as Mr. Califano

16    said, no other bidders appeared.  We are the only bid for

17    these assets.  And we've already gone through, Your Honor, at

18    the first day hearing, the advantages of this deal to the

19    Creditors of the estate.  The Committee often states in their

20    papers there's nothing here for the creditors.  But Your

21    Honor, this bid reduces the secured debt of the company, it

22    provides jobs to the employees, it pays cure claims for

23    assumed contracts, and it guarantees post-petition trade will

24    be paid.  Now in addition to that, Your Honor, having heard

25    your comments, we negotiated with the Debtor for post-closing

1    funding and a further reduction of the secured claim of

2    Adeptio of another $10 million.  And again, we have continued

3    to discuss with the Committee, because we would like a global

4    resolution of all of these issues.  Now unfortunately the

5    Debtor needs more money.  Adeptio has put in nearly the $10

6    million under the interim order, and the Committee has

7    conceded that it needs money to preserve value, to preserve

8    jobs, to preserve the business.  We're prepared to do that,

9    even though we have a risk that Your Honor grants the

10   dismissal motion, or Your Honor denies the final DIP, or Your

11   Honor puts of the sale to a point where the company cannot

12   survive and there's no asset to buy.  We're prepared to do

13   that if the status quo is maintained.  The Committee doesn't

14   want the status quo.  They want us to give up a right under

15   the Bankruptcy Code.  And Adeptio's not prepared to do that.

16   It is prepared to maintain the status quo and put more money

17   in to give us two more days to either get this case settled

18   or bring these issues before Your Honor.

19        THE COURT: Thank you, Mr. Brady.  Mr. Schepacarter,

20   good afternoon.

21        MR. SCHEPACARTER: Good afternoon, Your Honor.

22   Richard Schepacarter for the United States Trustee.  We

23   really don't have a dog in the fight among the parties.

24   However, I have, I cannot let some of the comments that I've

25   heard go unchallenged or un-talked about.  Mr. Califano makes

1   a good case for conversion of this case.  He made my case for

2   me if I were going to make a motion to convert, which I may

3   well do, and may have before Your Honor here on Thursday.

4   There's a, there's - - without the $2.3 million, there's a

5   diminution in the value of the estate from the standpoint of

6   the diminution claim that's going to be incurred.  Mr.

7   Califano, and I hope no other debtors ever do this again, but

8   talked about well, there's not going to be a plan, there's

9   not going to be a plan.  There's your reasonable likelihood

10  of rehabilitation under the new Code.  So given those two

11  facts, there really is no other alternative for this Court

12  but to either convert or dismiss this case based on, on those

13  statements.  I read some of the papers.  I'll go into

14  something that really wasn't talked about was, but it will be

15  talked about later, is the review period for the Committee.

16  On the first day I said that, and I talked to all of the

17  parties here about that kind of stuff, and I found that, the

18  25 days to be unrealistic and unconscionable.  The parties

19  assured me, Well, it can be extended, it can be extended.  I

20  stood here on the first day and I said, 25 days is not

21  enough, and I read in the papers that, Well, 25 days is, is

22  fine.  They should be able to get it done within 25 days.  I

23  hope that, and the Debtor at least on the cases that I have

24  under my watch, that if the Debtor comes here on the first

25  day and asks for 25 days, and doesn't have a reasonable

1    likelihood of filing at least a plan of liquidation, which

2    really is a fallback, we're talking about a plan of

3    reorganization in most cases.  In a classic Chapter 11 case,

4    the Chapter 11 debtor would file a plan of reorganization.

5    Some business to reorganize.  In these cases that are, that

6    are here today, for the most part, become sale cases, and we

7    have a plan of liquidation, with a liquidation trustee and

8    the like.  In a case where the debtor has no reasonable

9    likelihood, or it doesn't appear that there's going to be a,

10   a plan that's going to be filed, and has something along the

11   lines of a 25 day period, really what we're talking about is

12   a case that doesn't belong here.  Not, I'm not talking about

13   venue-wise, or any of those other issues.  I'm talking about

14   a case that doesn't belong in a Chapter 11 case.  From the

15   standpoint of there's not going to be a plan that's going to

16   be, that's going to go forward, and all you're doing is

17   you're, you're basically administering the case so that the

18   secured creditor, who has the debt, is going to get a free

19   and clear lien, or free and clear title to the assets of the

20   bankruptcy estate.  When I first started practicing law, 19

21   years ago - - I know I look young for the 19 years.

22          THE COURT: Yes you do.

23          MR. SCHEPACARTER: Thank you.  But, when I started

24   practicing law 19 years ago, Chapter 11 cases, for the most

25   part - - and this is back in New Jersey - - for the most

1    part, they were, they were, the cases where the trustees

2    would give out trustee deeds.  And a trustee deed was gold

3    for the secured creditor, because the secured creditor would

4    basically make a contribution to the estate, and as long as

5    the trustee had some money to pay to some creditors,

6    everything was fine, everything was kosher at that point.

7    And the secured creditor would get that trustee deed, free

8    and clear of liens and encumbrances, and the liens would

9    attach to the proceeds.  And whatever the proceeds were that

10   the secured creditor decided that it would pay were fine.

11   That's what went forward.  And that's what became either the

12   basis for a plan, or the case converted, and that's what the

13   Chapter 7 trustee dealt with.  We don't do that anymore.

14   After Lan Associates (phonetic) basically, which was based on

15   a trustee compensation issue - -

16           THE COURT: Yes.

17           MR. SCHEPACARTER:  - - on a credit bid, which is a

18   little bit different.  But the bottom line is, you don't

19   administer cases for secured creditors and over-encumbered

20   assets get abandoned by Chapter 7 trustees.  So if that's the

21   case, then I agree with the Committee that the case should be

22   dismissed.  They've asked for dismissal.  You can have either

23   dismissal or conversion.

24           THE COURT: Well - -

25           MR. SCHEPACARTER: But it seems to me that there's a

1   substantial - - I'm astounded by the - -

2          THE COURT: I share your unhappiness, Mr.

3   Schepacarter.

4          MR. SCHEPACARTER:  - - the amount of, the amount of

5   money to go forward from today until Thursday is $2.3

6   million.  It's a lot of money.

7          THE COURT: It is a lot of money.  And I share your

8   unhappiness.  On the first day I wasn't happy with the 25 day

9   review period either, as one example.  But I was hopeful that

10  the unsecureds appeared to be, unsecured creditors appeared

11  to be completely out of the money, and that the secured

12  creditor, which is also the DIP lender - -

13         MR. SCHEPACARTER: Um-hum.

14         THE COURT:  - - which is also the purchaser of the

15  assets, would appreciate the need to provide a substantial

16  recovery to the Unsecured Creditors Committee.

17         MR. SCHEPACARTER: Um-hum.  Absolutely.

18         THE COURT: And, or, I'm sorry, for the unsecured

19  creditors represented by the Committee.  And to the extent

20  that doesn't happen, then I think I've made it clear the

21  motion to dismiss, and - -

22         MR. SCHEPACARTER: Um-hum.

23         THE COURT:  - - the potential motion for conversion

24  are, Adeptio is at serious risk.

25         MR. SCHEPACARTER: Right.

1          THE COURT: Of the Court's granting the relief.  I,

2     I'm not party to the negotiations.

3          MR. SCHEPACARTER: And neither am I for the most

4     part.

5          THE COURT: And I don't know if either side is

6     overplaying its hand.  And that's why I used the word chicken

7     with regard to people are playing chicken, because to some

8     extent I think people are, are running very serious risks of

9     injury.

10          MR. SCHEPACARTER: Um-hum.

11          THE COURT: That the unsecured creditors will wind

12     up with nothing, or that Adeptio will wind up without a sale

13     and purchase.  So that's really where the Court's sitting at

14     the moment.  And I've allowed things to, to play out since

15     that first day in the hope that everyone will recognize their

16     peril.

17          MR. SCHEPACARTER: Understood.  But I think the, the

18     facts of the case lend itself to the fact that everybody's

19     going to play chicken in this case.  You know, the parties

20     have made papers and filed papers that sound like the same

21     kind of papers that get filed when they want to get rid of an

22     equity committee, or they want to deny a motion for the

23     appointment of an equity committee.  Basically saying that

24     the Debtor is hopelessly insolvent, and that the equity is

25     out of the money, and the reason that equity doesn't get a

1   seat at the table is because they're so far out of the money

2   that all they can do is just take pot shots at everybody.

3   And I think that that's the kind of case that we have here.

4   Because it is an over, over-encumbered asset, being the

5   Debtor.  And I think that if there's not going to be a plan

6   that's going to be either funded, or there's not going to be

7   enough money to be put at the table, then the case needs to

8   be converted or dismissed.  I mean, Mr. Brady, I mean in all

9   deference, says that, you know, we're demonizing Adeptio.

10  Well, to a certain extent I don't see his horns, but I see

11  the tail.  Because they are to a, they are to - - not on Mr.

12  Brady, I'm seeing it on everything else.  But to a certain

13  extent, they need to come to the, into this process.  And

14  they needed to, and I think we've, we established that on the

15  first day, when they come into this process, they need to,

16  sort of pay the freight.  And I'm not sure that - -

17          THE COURT: Pay the rent.

18          MR. SCHEPACARTER:  - - they are paying the freight.

19          THE COURT: Yes.  I understand.

20          MR. SCHEPACARTER: Thank you, Your Honor.

21          UNIDENTIFIED SPEAKER: Your Honor - -

22          MS. SPRINGER: Can I just - -

23          THE COURT: Thank you, Mr. Schepacarter.

24          MS. SPRINGER: Can I just - -

25          THE COURT: Why don't we hear from Ms. Springer

1    first.

2          MS. SPRINGER: I just, Your Honor, I just want to

3    correct some things that Mr. Califano said, because I want

4    to, you know, I wasn't thinking that today he would put into

5    the record some of the settlement discussions that have taken

6    place.  But since he did, and since he started talking about

7    a quote, "deal" that he and Adeptio reached, I just want to

8    make it clear what this quote, "deal" is.  If Your Honor

9    recalls, as part of the interim DIP, Adeptio made available

10   to the professionals, other than Lazard, I believe, a $1.2

11   million carve out.  Okay.  The one, what happened was the so

12   called deal reduces that carve out to $850 thousand.  Takes

13   the difference between 1.2 and 850 thousand, which is $350

14   thousand, and turns it into a quote, "senior secured loan".

15   The senior secured loan being available to possibly fund an

16   investigation and bringing of litigation with respect to the

17   D&O claims, and other types of claims that they did not

18   propose to purchase.  Okay.  So that's the first thing.  So

19   basically what they did was they took away some money from a

20   previously agreed to carve out, which was also part of the

21   interim DIP order, and put it in another pot which, by the

22   way, now they have the discretion as to whether to lend that

23   or not.  And whether to lend some of it or all of it.  Okay.

24   So that's the first clarification that needs to be made.

25   Secondly, with respect to the avoidance actions, they want to

1    purchase the avoidance actions, ostensibly so that nobody

2    brings avoidance actions against folks that they are

3    currently doing business with.  But if you read between the

4    lines, and you don't have to read too, too tough, is that

5    what they really want to do with the avoidance actions is

6    they want to utilize those to make sure that the unsecured

7    creditors, who are already losing tons of money in this case,

8    continue to do business with them on the same terms that they

9    did business with them pre-petition, otherwise they will risk

10   the, the threat of, of more litigation and having to give

11   money back to the new, the new party in charge here.  Okay.

12   So that's the great deal that the Debtor cut.  Thirdly, there

13   was no agreement to fund, you know, all of the wind down

14   costs, as far as I can see, and we still don't know what all

15   of the wind down costs are in this estate.  So you know,

16   we're talking about the fact that we don't even get to a

17   plan, and we don't know what the wind down costs are, and

18   they certainly haven't agreed to fund the priority expenses.

19   So I just want to make sure that the Court understands that

20   this is the, this is the terrific deal that was, that was,

21   was reached.  Oh, and let me add another thing.  The

22   investigation period, that was to conclude today.

23            THE COURT: Yes.

24            MS. SPRINGER: That was going to be the end of the

25   investigation period.  For a case that, you know, where,

1   where basically the parties have been trying to negotiate a

2   settlement since this case was started prior, immediately

3   prior to Thanksgiving.  Well, at least that's when the

4   Committee was formed.  So that, that's, that's the great deal

5   that, you know, that Mr. Califano was referring to.  Needless

6   to say, you know, that doesn't give anything to our

7   constituents.  Thank you.

8         MR. BRADY: Your Honor - -

9         THE COURT: Yes.

10        MR. BRADY:  - - I have to respond.  Because talk

11  about inappropriate.  The Committee a moment ago said they

12  were unaware of any, any deal, and now all of a sudden Ms.

13  Springer suddenly became very aware of the deal and decided

14  to go through Your Honor what really were settlement

15  discussions with the Committee, subject to Rule 408.  Now I

16  think we're going to take the high road here, Your Honor, and

17  not walk you through their proposal, because I've been doing

18  this a long time, Your Honor, and for the Committee to make

19  the proposals they've made in this case have been completely

20  unconstructive.  But we've worked through it.

21        MS. SPRINGER: Your Honor - -

22        MR. BRADY: And Your Honor - - I did not interrupt

23  you, Ms. Springer.

24        THE COURT: Ms. Springer, please.

25        MR. BRADY: We worked through it, Your Honor.  And

1   we're prepared to continue to work through it.  And if we

2   don't have a deal, you can hear all sides of the story on

3   Thursday.  But I think what you're hearing is there is a

4   chance of the deal here, Your Honor, notwithstanding, this

5   hearing has not exactly been productive in that area.  But

6   there is still a chance.  And the question for Your Honor is

7   are you going to approve additional funding for the Debtor to

8   get us to Thursday, or are we going to hear the motion to

9   dismiss, by Your Honor's own statements, which benefits no

10  one.

11          THE COURT: Thank you, Mr. Brady.  Now Ms. Springer.

12          MS. SPRINGER: Your Honor, I merely responded to Mr.

13  Califano.  First of all, I had no idea that Mr. Califano was

14  going to talk about this quote, "deal", because I didn't know

15  that it was a quote, "deal".  He, he opened the door.  He

16  started talking about it.

17          THE COURT: I agree.

18          MS. SPRINGER: And he didn't give you the full

19  story.  And I wanted to make sure that you got the full

20  story.  I absolutely did not talk about any negotiations that

21  the Committee has had with the Debtor or Adeptio.  What I was

22  referring to, what that piece of paper shows, is what Mr.

23  Califano showed us, was, what I'm now hearing, was a deal.  I

24  didn't know it was a deal.  I thought it was a proposal.  And

25  now I find out it was a deal.  And I wanted Your Honor to be

1    aware of what the components of that deal really are.  And

2    how they compare to the interim DIP.  Thank you.

3          THE COURT: Thank you, Ms. Springer.

4          MR. GLASSMAN: Your Honor, may I be heard for just

5    one second?  Because I'm perhaps the cause of this, or the

6    cause of the problem.  I told Mr. Califano that if Debtors

7    struck a deal, as it did, signing a term sheet, signatures on

8    it between the Debtors' counsel and Adeptio's counsel, which

9    I believe was provided to the Committee, I told him, You

10   ought to tell the Court.  Which he did do.  I don't think Mr.

11   Califano intended to disclose settlement negotiations between

12   the Debtor and the Committee, or Adeptio and the Committee.

13   He simply told the Court what the Debtor had done, because

14   it's Your Honor's job to know and to bird dog us.  That's how

15   that came about.

16         THE COURT: Thank you, Mr. Glassman.

17         MR. CALIFANO: Thank you, Mr. Glassman.

18         THE COURT: Well, here's what we're going to do.

19   I'm going to grant the interim DIP relief.  Which will get us

20   to Thursday.  Presumably, although I, there's an awful lot of

21   obvious hostility here, presumably the parties can go back

22   and perhaps the more peaceful minded among you can have some

23   discussions apart from the others.  To try to reach a

24   resolution.  To the extent we don't have an agreement, which

25   the Court, from my vantage point, still believes a resolution

1    would be in everyone's interest.  I mean, to dismiss the case

2    is not going to benefit the creditors, it's not going to

3    benefit Adeptio, it's not going to benefit the Debtor.

4    Everyone loses.  But it's a real risk that the Court will

5    have to address, and perhaps even the United States Trustee's

6    motion to convert.  Although I'm not sure that that really

7    will be the answer.  I think probably the case will either be

8    dismissed or will survive and we'll go to the sale.  I'm not

9    ruling in advance, but I have to tell you that sitting here,

10   I don't know how continuing the sale is going to benefit

11   anyone.  Because at the rate that we're talking about burning

12   through dollars, it's only going to create more of a morass

13   than we already have.  So we will begin Thursday's hearing

14   with the motion to dismiss.  And I will hear that motion to

15   dismiss, and I will be prepared to make a ruling on it.  And

16   then if, if denied, we will proceed with the issues

17   pertaining to the sale.  But I'm just concerned that, that to

18   hear argument is only going to be disruptive to the process

19   that we, that I've already urged the parties to engage in.

20   And I think I, at this point, ought to give you a little bit

21   more time to try to reach an accommodation.

22           MR. CALIFANO: Thank you, Your Honor.

23           MR. GWYNNE: Your Honor is always the calming

24   influence.  With respect to our motion to extend the

25   investigation period, and continue the sale, we do want to

1    point that one of the reasons why we asked to continue the

2    sale is because the sale agreement, the APA, has a release of

3    Adeptio.  So they're kind of tied in.  Although we do believe

4    the sale could go forward if the case were not dismissed, and

5    the investigation period continue, but so far they've been

6    inextricably tied. That's the only reason why we addressed

7    the sale.  We do - -

8             THE COURT: And it was more urgent because

9    potentially there was going to be bidding - -

10            MR. GWYNNE: Right.

11            THE COURT: - - and everyone had to know what the

12   credit bid was.

13            MR. GWYNNE: Right.

14            THE COURT: The creditor number.

15            MR. GWYNNE: So I assume that will be carried to

16   Thursday too - -

17            THE COURT: Yes.

18            MR. GWYNNE: - - to the extent the case isn't

19   dismissed.  If it was, then it would not be relevant - -

20            THE COURT: Correct.

21            MR. GWYNNE:  - - obviously, at that point.

22            THE COURT: If the case isn't dismissed, that issue

23   will still remain of significance.

24            MR. GWYNNE: Thank you very much, Your Honor.

25            THE COURT: Mr. Monaco.  I'm trying to recall who

1   you're representing.  Forgive me.

2          MR. MONACO: T Mobile, Your Honor.

3          THE COURT: Thank you.

4          MR. MONACO: For the record, Frank Monaco for T

5   Mobile.  Your Honor, getting back to the DIP financing order,

6   I, as you might recall, I raised a concern on the part of my

7   client, and the rest of the carriers regarding the priming

8   language.  I assume that that issue will be carried over into

9   Thursday.  I don't want to burden the record.

10         THE COURT: I assume so.  But let's be careful and

11  make sure.

12         MR. CALIFANO: Yes, yes, Your Honor.  We have no

13  intention of changing the prior agreement with the carriers.

14         THE COURT: Excellent.

15         MR. MONACO: Okay.  Your Honor, I did want to

16  address the motion to continue the sale hearing - -

17         THE COURT: Please.

18         MR. MONACO:  - - because my, my client has

19  authorized me to join in that continuance.  Your Honor

20  probably has not had an opportunity to read the reply to the

21  sale objections, but T Mobile, along with a number of other

22  carriers, filed objections to the sale.  Mainly along the

23  lines of cure amount objections, adequate assurance of future

24  performance - -

25         THE COURT: Yes.

1          MR. MONACO:  - - and that the sale not interfere

2    with the carriers' rights of setoff and recoupment.  Your

3    Honor, there was a footnote in the reply to the objections,

4    which basically says that - - I don't know if Your Honor has

5    it.

6          THE COURT: I do.

7          MR. MONACO: Rather me read it into the record.

8    It's paragraph, it's footnote 8 at paragraph 20 of their

9    response to the objections.  But basically what it says is

10   that they have not yet reached stipulations with a number of

11   the carriers, and that with respect to T Mobile in

12   particular, that their have no substantive negotiations, and

13   that if they don't reach an agreement with my client by

14   Thursday, then they intend to reject.  Well first of all,

15   Your Honor, that statement is neither accurate nor fair.

16   There have been substantive negotiations.  And second of all,

17   I don't think that they should use the sale hearing to try to

18   jam something down our throat, or the other carriers throats.

19   Because quite honestly, this sale cannot be successful unless

20   they reach deals with the carriers.  So to say they're just

21   going to reject, or there's, is just really inappropriate.

22   And I would join in a continuance to give the parties more

23   time to try to work things out.

24          THE COURT: You mean a continuance of the sale

25   itself?

1          MR. MONACO: Yes, Your Honor.  So I would join the

2     Committee's request for that.  And one other, and the other

3     thing, Your Honor, that I wanted to note for the record.  We

4     had requested a form of stipulation which they apparently

5     sent to other carriers.  We did not, we requested that last

6     week, we didn't get it until I literally, five minutes before

7     I walked into the hearing.  So we are interested in

8     negotiating in good faith, and getting this done, but they

9     need to cooperate with us also.  And one other corollary to

10    all this.  For the first time in a pleading, they mentioned

11    this 210 day hold period.  I just want the record to reflect

12    that we're hopeful that we get this worked out, but if we

13    don't, we'd only be held hostage for 210 days.  And we do not

14    think that this provision can eviscerate our rights under 362

15    for relief from the automatic stay, or 365 to compel

16    assumption or rejection.  I want that noted for the record.

17    Thank you, Your Honor.

18          THE COURT: Thank you.

19          MR. CALIFANO: Your Honor, one of the unfortunate

20    byproducts of our litigation has been that things that need

21    to get done have not been done, because of distractions to

22    everybody on the team, and including people at the company

23    who are trying to get - - I understand what Mr. Monaco is

24    saying.  I was hopeful, and Ms. Kelbon is here, and she also

25    beat me up in the hallway saying, You told me we'd be done by

1   now.  I was hopeful.  This is a major priority for us to get

2   resolved before Thursday.  We had thought that initially we'd

3   work out a, sort of a - -

4          THE COURT: A global - -

5          MR. CALIFANO:  - - prototype stipulation with Ms.

6   Kelbon's client, and use that with all the other ones.

7   Because it's pretty much the same transaction.  I hear Mr.

8   Monaco.  I will make it a priority for us.  Also, Your Honor

9   - -

10         THE COURT: Well, it obviously would be an

11  impediment to the sale.

12         MR. CALIFANO: It will be.  And it's something that,

13  with all the other impediments we would, we have to deal

14  with, that I, he's a squeaky wheel, and we'll get him some

15  oil.  The other thing is, Your Honor, the 210 day period has

16  always been a factor in the sale.  And that is an issue in

17  the APA.  And we can address that on Thursday.  But I hear

18  Mr. Monaco, and I'm going to make it a priority to deal with

19  these carriers.

20         THE COURT: Thank you.

21         MR. CALIFANO: Thank you, Your Honor.

22         THE COURT: That's helpful.

23         MR. MONACO: Your Honor, and I do appreciate that.

24  I know that the Debtor is dealing with a lot of issues, but

25  we really do need to be put to the forefront.  One other

1   thing I, I alluded to - -

2          THE COURT: The carriers are, are critical component

3   of this - -

4          MR. MONACO: Yes, Your Honor.

5          THE COURT:  - - obviously.

6          MR. MONACO: And we shouldn't be at the back burner.

7   We should be at the front burner.  But one other issue that I

8   alluded to earlier, but I wanted to make clear is that we, we

9   need to get comfortable with Adeptio.  We'd like to get

10  financial information.  So again, that will, that will - -

11         THE COURT: That's the adequate assurance aspect.

12         MR. MONACO: Right.  That's the adequate assurance

13  issue.  And if we could get that information before Thursday,

14  that might also go away.  So I would also request that.

15         THE COURT: Mr. Brady, do you think that would be

16  possible?  I assume not only for Mr. Monaco's client, but for

17  the other carriers as well.

18         MR. BRADY: Yes Your Honor.  We recognize we have to

19  provide adequate assurance.

20         THE COURT: Very well.  Good afternoon.

21         MR. AGAY: Good afternoon, Your Honor.  David Agay

22  for Adeptio.

23         THE COURT: Yes.

24         MR. AGAY: We recognize the need for adequate

25  assurance packages for those contracts that we're planning to

1   assume, and we're in the process of pulling that together.

2         THE COURT: Excellent.

3         MR. AGAY: And there may be some contracts that we

4   don't, do not assume, and that issue may be moot.

5         THE COURT: Okay.

6         MR. AGAY: So we just want to clarify that for the

7   record.

8         THE COURT: Thank you Mr. Agay.  Mr. Schepacarter.

9         MR. SCHEPACARTER: For the record, Richard

10  Schepacarter.  This is non-controversial.  341 is going to,

11  341 in the case is going to be Thursday afternoon.  Just

12  wanted Your Honor to be aware of that.  It's scheduled I

13  think for 1:30 in the afternoon.

14        THE COURT: Okay.  Well, let's look at the calendar,

15  because I was thinking - - what time are we scheduled to

16  start here?  We are scheduled, let me answer my own - -

17        MR. CALIFANO: 10 a.m., Your Honor.

18        THE COURT:  - - question.  10 a.m.?  Good.  Okay.

19  I was going to suggest that we start in the morning.  And I

20  do have a couple of what I think will be very short hearings

21  that may just very briefly interrupt the proceedings.  And we

22  will have to take a break, then, at 1:30, and I appreciate

23  that.  And - -

24        MR. SCHEPACARTER: Thank you, Your Honor.

25        THE COURT: And we can do that and then resume.  If

1    necessary.

2              MR. SCHEPACARTER: Thank you.

3              THE COURT: But we will start at 10 a.m. with the

4    motion to dismiss, and hopefully the parties will have

5    reached an agreement by then.  But if not, I'll hear you.

6              MR. CALIFANO: Your Honor, we have the second - -

7              THE COURT: Mr. Califano.

8              MR. CALIFANO:  - - the second amended interim - -

9              THE COURT: Yes.

10             MR. CALIFANO:  - - order.

11             THE COURT: Ms. Augustine, did you want to be heard?

12             MS. AUGUSTINE: Yes.  I apologize for interrupting.

13   However, the 341 meeting we have scheduled at 2:30, not 1:30.

14   So I wanted to make sure that everyone was at the same - -

15             MR. SCHEPACARTER: Was it 2:30?

16             MS. AUGUSTINE: Yeah.  I think it was just so

17   everyone could have a nice - -

18             MR. SCHEPACARTER: I lied.  It is controversial.

19             THE COURT: You're very young looking, Mr.

20   Schepacarter, but you're older than Ms. Augustine, and I will

21   - -

22             MS. AUGUSTINE: I'm sorry.  I try to be - -

23             THE COURT:  - - defer to her.

24             MS. AUGUSTINE:  - - the only one that isn't

25   controversial.  But thank you.

1          MR. GWYNNE: 1:30 central, Your Honor.

2          THE COURT: That's it.  Thank you.

3          MR. JOHNSON: Your Honor, Jeremy Johnson from DLA

4    Piper.  We do have a copy of a second interim order.  We'll

5    run this by the Committee first, Your Honor.  The order is

6    fairly simple.  It extends the investigation period through

7    December 13th, it authorizes the 2.3 million, and it keeps the

8    terms of the interim order, the first interim order in place,

9    Your Honor.  And that's, it's a very short order.  So we'll

10   run it by the Committee - -

11         THE COURT: Fine.

12         MR. JOHNSON:  - - and make sure it's okay.  But

13   we'll submit it to chambers if that's appropriate.

14         THE COURT: That would be, that would be

15   appropriate.  If there is an issue, then I'll come back.

16         MR. JOHNSON: Okay.

17         THE COURT: If necessary.  Hopefully there won't be.

18   I understand the Committee has a general issue with the

19   interim, but I'm talking about those specifics.

20         MR. JOHNSON: It's four paragraphs long, so

21   hopefully that will keep the issues to a minimum, Your Honor.

22         THE COURT: That will be fine.  All right, then - -

23         MR. JOHNSON: Thank you.

24         THE COURT:  - - we will stand in recess.  If you

25   need me in the meantime, reach out - -

1          MR. JOHNSON: We will.

2          THE COURT:  - - by telephone.

3          MR. JOHNSON: Thank you, Your Honor.

4          THE COURT: Thank you.

5      (Whereupon at 4:06 p.m. the hearing in this matter was

6  concluded for this date.)

7

8

9

10

11

12

13

14

15

16

17

18          I, Jennifer Ryan Enslen, approved transcriber

19  for the United States Courts, certify that the foregoing is a

20  correct transcript from the electronic sound recording of the

21  proceedings in the above entitled matter.

22

23   _/s/Jennifer Ryan Enslen_                    ___12/18/07___
   Jennifer Ryan Enslen
24  43 Bay Boulevard
   Newark, DE 19702
25  (302)836-1905