# EXHIBIT B

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of November 8, 2007, by and among Adeptio INPC Funding, LLC, a Delaware limited liability company ("Adeptio" or "Buyer"), InPhonic, Inc., a Delaware corporation (the "Company" and a "Seller"), and each of the Company's direct and indirect Subsidiaries listed on the signature pages hereto (individually, a "Seller" and, together with the Company, the "Sellers").

## RECITALS

WHEREAS, the Sellers are engaged in the business of selling wireless services and products, including wireless service plans, devices and accessories, wireless activation services, satellite television services, mobile virtual network enabling and data services, data services and online dynamic marketing services through both owned websites and third party websites (the "Business"); and

WHEREAS, the Sellers desire to sell substantially all of their assets to Buyer, and Buyer desires to purchase substantially all of the assets of the Sellers, on the terms and subject to the conditions hereinafter set forth; and

WHEREAS, upon the execution of this Agreement, each of the Sellers has agreed to file (the date on which such filings is made, the "Petition Date") a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on November 8, 2007, and each such Seller will request that the Sellers' respective Chapter 11 cases be jointly administered for procedural purposes under a single Case Number (the "Bankruptcy Case"); and

WHEREAS, the Board of Directors (or similar governing body) of each Seller has determined that it is advisable and in the best interests of their respective estates and the beneficiaries of such estates to consummate the transactions provided for herein pursuant to the Bidding Procedures Order and the Sale Order (as such terms are defined below); and

WHEREAS, the parties desire to consummate the transactions contemplated by this Agreement as promptly as practicable after the Bankruptcy Court enters the Sale Order approving such transactions; and

WHEREAS, the parties desire to make certain representations, warranties, covenants and agreements in connection with the transactions contemplated hereby.

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby expressly acknowledged by Seller and Buyer, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

The terms defined in this Article shall have the following respective meanings for all purposes of this Agreement, with the definitions being equally applicable to both the singular and plural forms of the terms defined:

"Affiliate" means, with respect to any Person, any other Person that controls, is controlled by, or is under common control with another Person. For purposes of this definition of "Affiliate", a Person shall be deemed to control another Person if it possesses, directly or indirectly, the power to direct or cause the direction of the management policies of such other Person, whether through ownership of voting securities, by contract or otherwise.

"Allocation Statement" has the meaning given to such term in Section 2.3.

"Alternate Transaction" means a transaction or series of related transactions pursuant to which the Sellers (i) accept a Qualified Bid, other than that of Buyer, as the highest or best offer, or (ii) sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Sellers or otherwise), including pursuant to a stand-alone plan of reorganization or refinancing, all or substantially all of the Assets (or agrees to do any of the foregoing) in a transaction or series of transactions to a party or parties other than Buyer within one year from the date hereof.

"Assets" means, other than the Excluded Assets, all of the Sellers' right, title and interest in and to the tangible and intangible assets, properties, rights, claims and contracts owned, leased and/or licensed by any of the Sellers of every kind, character and description, whether accrued, contingent or otherwise, existing as of the Closing (which assets comprise substantially all of the Sellers' assets, properties, rights, claims and contracts), including, without limitation:

(a)     all inventory, wherever located, including supplies, goods-in-transit, works in process, raw materials and finished products;

(b)     all accounts receivable and other receivables of the Sellers (including, without limitation, all accounts receivable and other receivables to collect from customers) and all rights of any kind or nature to retain all fees and other amounts payable, or that may become payable, to any of the Sellers with respect to services performed by or on behalf of any Seller on or prior to the Closing Date and all defenses, claims, counterclaims and cross-claims with respect to any right of setoff or recoupment asserted with respect to such account receivable or receivable;

(c)     all tangible personal property owned or used by any Seller, including, without limitation, all equipment, furniture, fixtures, supplies, machinery, vehicles, tools and furnishings;

(d)     all Owned Property, together with all buildings, fixtures, structures, improvements and other appurtenances thereto and thereon;

-2-

(e)     all Designated Contracts;

(f)     all books and records, files, data, reports, computer codes and sourcing data, customer and supplier lists, cost and pricing information, business plans, quality control records and manuals, blueprints, research and development files, accounting and tax files, personnel records and other records of any Seller or related to the operations of any Seller and/or the Business;

(g)     the Intellectual Property and all telephone numbers utilized by any Seller in connection with the Business (including, without limitation, all of the trademarks, trade names, URL's and telephone numbers listed on Schedule 1.1), in each case, to the extent assignable;

(h)     All Software owned by Sellers or leased by Sellers pursuant to a Designated Contract;

(i)     all Permits that relate to the Business, to the extent assignable;

(j)     all marketing, advertising and promotional materials;

(k)     all rights, privileges, claims (including warranty claims, to the extent transferable), Avoidance Actions (other than Excluded Avoidance Actions), offsets, demands, choses in action and indemnification rights of Sellers against or with respect to (including all of Sellers' rights under any indemnification agreements) any Person (including, without limitation, all of the foregoing against any of the Persons described in clauses (i) and (ii) of the definition of Excluded Avoidance Actions) in connection with and/or otherwise related to the Business, any of the Assets and/or any of the Assumed Liabilities and arising prior to (or related to facts, circumstances and/or events arising prior to) the Closing, whether choate or inchoate, known or unknown, contingent or noncontingent;

(l)     all rights of any Seller relating to deposits and prepaid charges and expenses, claims for refunds, indemnification rights and rights to offset in respect thereof relating to the Assets;

(m)     all goodwill associated with the Business and/or the Assets;

(n)     any interest in and to any refunds of Taxes of whatever nature;

(o)     all rights under all insurance policies and all rights of every nature and description under or arising out of such policies, except as provided in clause (g) of the definition of "Excluded Assets" and except to the extent such insurance policies are non-assignable of a matter of law;

(p)     all of Sellers' ownership rights in Flipswap, Inc.; and

(q)     all cash (including checks received prior to the Closing, whether or not deposited or cleared prior to the Closing), cash equivalents and short-term investments

(including, without limitation, all cash deposits to or for the benefit of utilities, including any such cash deposits maintained in escrow).

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement substantially in the form attached hereto as Exhibit A.

"Assumed Liabilities" means, without duplication, only the (i) Cure Costs associated with, and the liabilities and obligations of the Sellers arising from and after the Closing under, the Designated Contracts assigned to Buyer, (ii) trade payables to the extent first arising after the Petition Date directly relating to the operation of the Business in the ordinary course, (iii) all product returns and warranty claims with respect to the Assets, but solely to the extent requiring return, replacement or repair of the product or service provided (and specifically excluding any other Liabilities relating to products or services sold or provided prior to the Closing, including, without limitation, any Liability for any claim under any Environmental Law and any claims for property damage, personal injury or death) and (iv) without duplication, the Company's obligation (if any) to pay any accrued but unpaid fees and expenses owed by the Company to GAH as of the Closing under Section 2 of the GAH Fee Letter (excluding any and all Liabilities of any Seller under or with respect to (x) Section 2(f) of the GAH Fee Letter, (y) the Indemnification Letter (as such term is defined in the operation of the GAH Fee Letter) and/or (z) any other provision of the GAH Fee Letter, all of which shall be deemed "Excluded Liabilities" under this Agreement), but only to the extent that GAH has properly submitted a claim for payment of such fees and expenses to the Bankruptcy Court under the Bankruptcy Case and the final allowance of such claim has been approved by the Bankruptcy Court.  Notwithstanding any provision of this Agreement to the contrary, the Assumed Liabilities shall not include any of the Excluded Liabilities.

"Assumption Notice" has the meaning give to such term in Section 2.5(b).

"Auction" means the auction for the sale of the Assets conducted by Sellers if any other Qualified Bid is received pursuant to the Bidding Procedures Order.

"Avoidance Actions" means any causes of action arising under Chapter 5 of the Bankruptcy Code (11 U.S.C. Section 501 et seq.).

"Bankruptcy Case" has the meaning given to such term in the Recitals.

"Bankruptcy Code" means title 11 of the United States Code, as amended and in effect from time to time.

"Bankruptcy Court" has the meaning given to such term in the Recitals.

"Bidding Procedures Order" means the order of the Bankruptcy Court authorizing and approving procedures for soliciting Qualified Bids and conducting the Auction, and approving payment of the Expense Reimbursement on the terms and conditions set forth herein, substantially in the form affixed hereto as Exhibit B (subject to non-material changes only).

"Bill of Sale" means the Bill of Sale, substantially in the form attached hereto as Exhibit C.

-4-

"Buyer Plans" has the meaning given to such term in Section 5.4(b).

"Buyer Ancillary Documents" has the meaning given to such term in Section 4.2.

"Business" has the meaning assigned to such term in the Recitals.

"Business Day" means a day that is a day of the year in which banks are not required or authorized by law to close in Wilmington, Delaware.

"Casualty" has the meaning given to such term in Section 5.5.

"Claim(s)" means (a) claims as that term is defined in section 101(5)(A) of the Bankruptcy Code, and (b) claims as that term is defined in section 101(5)(B) of the Bankruptcy Code.

"Closing" means the consummation and effectuation of the transactions contemplated herein pursuant to the terms and conditions of this Agreement, which shall be held two (2) Business Days after the date that all conditions (except for closing conditions that by their terms can only be satisfied on the Closing Date) to the parties' obligations to consummate the transactions contemplated herein have been satisfied or, if applicable, waived by the appropriate party or parties, at 10:00 A.M. (Eastern time) in the offices of Kirkland & Ellis LLP, 200 East Randolph Drive, Chicago, IL 60601, or on such other date or at such other time or place as is mutually agreed by the parties hereto.

"Closing Date" means the date on which the Closing actually occurs.

"COBRA" means the Consolidated Omnibus Budget Reconciliation Act of 1985.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any agreement, contract, commitment or other binding arrangement or understanding, whether written or oral, to which any Seller is a party and which any Seller is permitted under the Bankruptcy Code to assume and assign other than an Employee Benefit Plan.

"Contract Retention Period" has the meaning give to such term in Section 2.5(b).

"Copyrights" means all copyrights, including without limitation moral rights and rights of attribution and integrity, copyrights in software and in the content contained on any web site, and registrations and applications for any of the foregoing, and rights to sue for past infringement thereof.

"CPA Partners" means third-parties for whom the Sellers create and manage websites, through which services and devices are sold, including online businesses, member-based organizations and associations and national retailers.

"Credit Bid Amount" has the meaning given to such term in Section 2.2(a).

Adeptio - INP APA
675236-1

"Creditors' Committee" means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case.

"Cure Costs" means amounts that must be paid and obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and sale and assignment of the Designated Contracts.

"Designated Contracts" has the meaning given to such term in Section 2.5.

"DIP Amount" has the meaning given to such term in Section 2.2(b)(i).

"Employee Benefit Plans" has the meaning given to such term in Section 3.9.

"Encumbrance" means any mortgage, conditional sales agreement, title retention contract, easement, encumbrance, security interest, Lien, debt, levy, charge, indenture, lease, option, pledge or restriction (whether on voting, sale, transfer, disposition or otherwise), whether imposed by agreement, understanding, law, equity or otherwise, except for any restrictions generally arising under any applicable federal or state securities laws.

"Environmental Laws" means all federal, state, local and foreign environmental, health and safety laws, codes and ordinances and all rules and regulations promulgated thereunder, including, without limitation, laws relating to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes into the environment (including, without limitation, air, surface water, ground water, land surface or subsurface strata) or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of hazardous substance or waste or other pollutants, contaminants, chemicals, or industrial, solid, toxic or hazardous substances or wastes.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" has the meaning given to such term in Section 3.9.

"Excluded Assets" means all of the Sellers' right, title and interest in and to the following assets:

        (a)     all minute books, stock records and corporate seals;

        (b)     all records that Seller is required by law to retain in its possession and all personnel records with respect to employees that are not considered Transferred Employees (provided that records necessary for Buyer to provide COBRA coverage as legally required shall not be considered Excluded Assets and shall be considered to be Assets for all purposes of this Agreement); provided, however, that Seller shall make such records available to Buyer if required by Buyer from and after the Closing;

        (c)     the Excluded Avoidance Actions;

(d)     any rights of the Sellers under this Agreement;

(e)     the equity securities of the Sellers;

(f)     any Contracts or leases that are not Designated Contracts; and

(g)     all rights under insurance policies to the extent relating to claims for losses related exclusively to any Excluded Asset or otherwise non-assignable as a matter of law.

"Excluded Avoidance Actions" means all Avoidance Actions except those (i) against or otherwise involving any counterparty to any Designated Contract, any post-Closing employees, officers or directors of the Business, including Transferred Employees, and/or any of the Sellers' wireless network carriers, lenders, landlords, vendors, call centers, or CPA Partners, and/or (ii) relating to the ongoing or future operations of the Business.

"Excluded Contract" has the meaning given to such term in Section 2.5

"Excluded Liabilities" shall include all Liabilities of the Sellers not specifically assumed by the Buyer pursuant to this Agreement as Assumed Liabilities.

"Expense Reimbursement" means the documented actual out-of-pocket costs and expenses (including, without limitation, actual fees and expenses of counsel) incurred by Buyer and/or its Affiliates in connection with the negotiation, documentation and implementation of this Agreement and the transactions contemplated hereby and participation in the Bankruptcy Case up to a maximum of $1,000,000.00.

"GAH Fee Letter" means that certain letter agreement between the Company and Goldsmith, Agio and Helms Securities, Inc. ("GAH"), dated as of October 11, 2007 and without giving effect to any amendments, modifications and/or waivers thereto (unless specifically agreed to in writing by Buyer).

"Governmental Entity" means any government or any agency, bureau, board, commission, court (including, without limitation, the Bankruptcy Court), department, official, political subdivision, tribunal or other instrumentality of government, whether federal, state, local, domestic or foreign.

"Hazardous Material" means any substance, material or waste which is regulated by any Governmental Entity including petroleum and its by-products, asbestos, and any material or substance which is defined as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" under any provision of Environmental Law.

"Held Contract" has the meaning given to such term in Section 2.5

"Intellectual Property" means Copyrights, Patents, Trademarks, Software and Trade Secrets owned or used by Seller or held for use in the Business.

"Intellectual Property Assignments" has the meaning given to such term in Section 2.1(b).

"Liability" means any debt, liability, claim, Lien, expense, commitment or obligation, whether accrued or not, known or unknown, disclosed or undisclosed, fixed or contingent, asserted or unasserted, liquidated or unliquidated, and including all costs and expenses relating thereto.

"Lien" means any debt, mortgage, security interest, lien, encumbrance, pledge, charge, defect, Claim, option, right of first refusal, restriction or adverse claim of any kind or nature whatsoever.

"Material Adverse Effect" means any event, occurrence or effect that has had or would be reasonably likely to have, individually or when taken as a whole with any other events, occurrences or effects, a material adverse effect on the Assets, Business of the Sellers and/or the ability of the Sellers to consummate the transactions contemplated by this Agreement

"Material Contracts" has the meaning given to such term in Section 3.8.

"Multiemployer Plans" has the meaning given to such term in Section 3.9.

"Multiple Employer Plans" has the meaning given to such term in Section 3.9.

"Notice" has the meaning given to such term in Section 10.4.

"Owned Property" has the meaning given to such term in Section 3.7.

"Patents" means all patents and industrial designs, including, without limitation, any continuations, divisionals, continuations-in-part, renewals, reissues and applications for any of the foregoing, and rights to sue for past infringement thereof.

"Petition Date" has the meaning given to such term in the Recitals.

"Permits" means permits, certificates, licenses, filings, approvals and other authorizations of any Governmental Entity.

"Permitted Encumbrances" means any (i) Encumbrances described on Schedule 1.4; (ii) any easements and any rights of lessors under any leases included in the Designated Contracts; and (iii) statutory liens arising in the ordinary course which are not past due and that do not materially affect the value or use of the affected asset.

"Person" means any individual, partnership, corporation, limited liability company, trust, unincorporated organization, association, joint venture or other entity or a Governmental Entity.

"Purchase Price" has the meaning given to such term in Section 2.2.

"Qualified Bid" has the meaning given to such term in Section 9.2(c).

-8-

"Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, or leaching into the indoor or outdoor environment, or into or out of any property.

"Sale Hearing" has the meaning given to such term in Section 9.2(b).

"Sale Order" means an order of the Bankruptcy Court authorizing and approving the sale of the Assets by Sellers to Buyer and the sale and assignment by Sellers and assumption by Buyer of the Designated Contracts, substantially in the form affixed hereto as Exhibit D (subject to non-material changes only).

"Seller Ancillary Documents" has the meaning given to such term in Section 3.2.

"Senior Credit Agreement" means the Credit Agreement, dated November 7, 2006, entered into by and between the Company, as borrower, the lenders party thereto from time to time, and Citicorp North America, Inc. as administrative agent, as amended, modified or restated.

"Senior Secured Priming Super-Priority Debtor-in-Possession Credit Agreement" means the Senior Secured, Super-Priority Debtor-in-Possession Credit and Guaranty Agreement, dated on or about the date hereof, entered into by and between the Company, as borrower, and Buyer, as lender, as amended, modified or restated.

"Software" means any and all (i) computer programs, (ii) databases and compilations, (iii) descriptions, flow-charts and other work product used to design, plan and/or develop any of the foregoing, (iv) screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and (v) all documentation including user manuals and other training documentation related to any of the foregoing.

"Subsidiary" means, with respect to a Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity, a majority of the partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof. For purposes hereof, a Person shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director or general partner of such limited liability company, partnership, association or other business entity. For purposes of this Agreement, each of the Sellers, other than the Company, shall be deemed a Subsidiary of the Company.

"Taxes" means all taxes, duties, customs, charges, fees, levies and assessments of any kind or nature imposed by any Governmental Entity, including, without limitation, all income, sales, use, ad valorem, value added, franchise, severance, net or gross proceeds,

-9-

withholding, payroll, employment, unemployment, social security, excise, personal property, real property, intangible, windfall profits, production, license alternative or add-on minimum, transfer, stamp, duty or other taxes (including any interest thereon and any penalties, additions to tax or additional amounts with respect thereto).

"Tax Return" means any return, declaration, report, statement, information return, exhibit, attachment or other similar information required to be supplied with respect to Taxes.

"Title IV Plans" has the meaning given to such term in Section 3.9.

"Trademarks" means all trademarks, service marks, trade names, domain names, brand names, corporate names, designs, logos, emblems, signs or insignia, slogans, other similar designations of source or origin and general intangibles of like nature, together with the goodwill of the business symbolized by any of the foregoing, registrations and applications relating to any of the foregoing, and rights to sue for past infringement thereof.

"Trade Secrets" means all trade secrets including, without limitation, trade secrets of the following nature: financing and marketing information, technology, know-how, inventions, proprietary processes, formulae, algorithms, models and methodologies, and rights to sue for past infringement thereof.

"Transfer Taxes" means transfer, recording, stamp or similar Taxes.

"Transferred Employees" has the meaning given to such term in Section 5.4(a).

## ARTICLE II
## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

### Section 2.1. Purchase and Sale.

(a)     Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, upon the terms and subject to the conditions contained in this Agreement, at the Closing, Sellers shall sell, assign, transfer and convey, or cause to be sold, assigned, transferred and conveyed, to Buyer, and Buyer shall purchase and accept all of Sellers' right, title and interest in, to and under the Assets, free and clear of all pledges, security interests, Liens, Claims, options, charges, Encumbrances, and restrictions (other than the Assumed Liabilities and Permitted Encumbrances). The Assets that are being sold and transferred by Sellers at Closing shall be conveyed to and accepted by Buyer on an "as is," "where is" and "with all faults" condition, free of any warranties or representations whatsoever, whether express or implied, except as expressly set forth in this Agreement.

(b)     The sale, assignment, transfer and conveyance of the Assets shall be made pursuant to the terms of this Agreement and shall be effectuated by the execution and delivery at the Closing by Sellers of one or more Bill of Sales, together with any reasonably necessary transfer declarations or other filings, and such other instruments of assignment, transfer and conveyance as Buyer shall reasonably request in order to vest in Buyer good and marketable title to the Assets, in form and substance as Buyer shall reasonably request, including, without limitation, assignments regarding all Intellectual Property (the "Intellectual

Property Assignments"). Sellers will not sell, and Buyer will not purchase, any of the Excluded Assets pursuant to this Agreement.

(c)    At the Closing, Seller shall assign to Buyer, and Buyer shall assume, the Assumed Liabilities by the execution and delivery at the Closing by Buyer and Sellers of one or more Assignment and Assumption Agreements. Notwithstanding any other provision in this Agreement to the contrary, the Buyer is assuming only the Assumed Liabilities and is not assuming any other Liability or obligation of any Seller (or any predecessor of any Seller or any prior owner of all or part of any such Seller's Business and/or assets) of whatever nature, whether presently in existence or arising hereafter.

### Section 2.2.   Consideration.

(a)    The aggregate consideration for the purchased Assets (the "Purchase Price") shall be equal to the following, as calculated on the Closing Date:

(i)    $50,000,000.00 (the "Credit Bid Amount"); plus

(ii)    the assumption by Buyer of the aggregate amount of the Assumed Liabilities.

(b)    At the Closing on the Closing Date, the Purchase Price shall be payable, in Buyer's sole discretion, with respect to the Credit Bid Amount, as follows:

(i)    with respect to obligations of any kind outstanding under the Senior Secured Priming Super-Priority Debtor-in-Possession Credit Agreement in an aggregate amount equal to the sum of all outstanding obligations of any kind thereunder (the "DIP Amount"), by (x) delivering to Sellers fully executed releases and waivers from the lenders under the Senior Secured Priming Super-Priority Debtor-in-Possession Credit Agreement of the aggregate amount of the DIP Amount or (y) with the written consent of the lenders under the Senior Secured Priming Super-Priority Debtor-in-Possession Credit Agreement, assuming the Sellers' obligations with respect to the DIP Amount on terms reasonably acceptable to the Buyer;

(ii)    with respect to the remainder of the Credit Bid Amount (and without duplication), by (x) delivering to Sellers fully executed releases and waivers from the lenders under the Senior Credit Agreement with respect to obligations thereunder in an aggregate amount equal to the excess of the Credit Bid Amount over the DIP Amount or (z) with the written consent of the lenders under the Senior Credit Agreement, assuming the Sellers' obligations under the Senior Credit Agreement with respect to obligations thereunder in an aggregate amount equal to the excess of the Credit Bid Amount over the DIP Amount on terms reasonably acceptable to the Buyer.

### Section 2.3.   Allocation; IRS Filings.

(a)    Within the earlier of (i) 120 days after the Closing Date and (ii) 20 days prior to the extended due date of the Tax Returns to which IRS Form 8594 must be attached, Buyer shall deliver to the Company a statement (the "Allocation Statement") allocating,

-11-

Adeptio - INP APA
675236-1

for tax purposes, the consideration paid by Buyer for the Assets among the Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder.

(b)      The parties to this Agreement hereby agree to (i) be bound by the Allocation Statement, (ii) act in accordance with the Allocation Statement in connection with the preparation, filing and audit of any Tax Return (including, without limitation, in the filing of IRS Form 8594 and any corresponding other Tax forms), and (iii) take no position inconsistent with the Allocation Statement for any Tax purpose (including, without limitation, in any audit, judicial or administrative proceeding).

**Section 2.4.    Transfer Taxes.**

To the extent not exempt under the Bankruptcy Code, all Transfer Taxes arising out of, in connection with, or attributable to, the transactions effected pursuant to this Agreement shall be borne and paid exclusively by Buyer to the extent imposed by Governmental Entities. Buyer shall prepare and timely file all relevant Tax Returns required to be filed in respect of such Transfer Taxes and shall pay such Transfer Taxes.

**Section 2.5.    Assignment and Assumption.**

(a)      At Closing, Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement(s) and other transfer and assignment documents reasonably requested by the Buyer, assume and sell and assign to Buyer (the consideration for which is included in the Purchase Price), the executory Contracts and unexpired leases to which any such Seller is a party and which may be assigned by any such Seller to Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code ("Designated Contract(s)") and which are set forth on a list (identifying the name, parties and date of each such Designated Contract) provided by Buyer to the Company on or before the date which is six (6) days prior to the date set for the Auction (provided that the Company provides written notice to the Buyer of the date of the Auction at least nine (9) days prior to the date on which the Auction is to begin); provided, however, that Buyer shall have the right in its sole and absolute discretion to notify the Sellers in writing of any Designated Contract that it does not wish to assume immediately prior to the commencement of the Sale Hearing (as defined below).   Buyer will pay all Cure Costs in connection with such assumption and sale and assignment (as agreed to between the Buyer and the Company or as determined by the Bankruptcy Court), and Buyer will assume and agree to perform and discharge the Assumed Liabilities under the Designated Contracts, pursuant to the Bill of Sale; provided, however, that on or before November 14, 2007, Sellers shall provide to Buyer (i) a schedule setting forth all of the costs of cure to be satisfied in order for the Sellers to assume and assign to Buyer the executory contracts and unexpired leases to which any Seller is a party, to the extent Buyer elects to designate any such contract or lease as a Designated Contract and (ii) a schedule setting forth a detailed description of all such contracts and leases and, notwithstanding Schedule 3.8, each Material Contract.  From and after the date hereof, Sellers shall not reject any Designated Contract unless otherwise agreed to in writing by the Buyer. Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to Designated Contracts and take all other actions necessary to cause such Designated Contracts to be assumed by Sellers and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, and Buyer shall, at or prior to Closing, comply with all requirements under

Adeptio - INP APA
675936-1

Section 365 necessary to assign to Buyer the Designated Contracts. The Buyer and Sellers agree that there shall be excluded from the Assets any Designated Contracts that are not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than any Seller, to the extent that such consent shall not have been given prior to the Closing, and the Closing shall proceed with respect to the remaining Assets without reduction to the Purchase Price, subject to Buyer's termination right set forth in Section 6.1(c)(vii).

      (b)     Buyer shall have the right, by written notice to the Sellers within ten (10) days after the Closing Date, to specify any Contracts or leases that are not included as Designated Contracts (each such other Contract and lease, an "Excluded Contract") that shall be held by the Sellers and not rejected pursuant to Section 365 of the Bankruptcy Code (any such Contract, a "Held Contract") for the duration of the Contract Retention Period, and the Sellers shall have the right at any time following ten days after the Closing to cause any Excluded Contract other than the Held Contracts to be rejected pursuant to Section 365 of the Bankruptcy Code; it being understood and agreed that, without limiting any other obligation of the Sellers hereunder, none of the Sellers shall in any event reject or seek to reject any Contract during the period beginning on the date hereof and ending on the ten (10) day period following the Closing Date, except with Buyer's prior written consent. As to Held Contracts, Sellers shall not seek to reject such contracts for a period of 210 days following the Closing Date (the "Contract Retention Period") and, as soon as practicable after receiving further written notice(s) (each, an "Assumption Notice") from Buyer during the Contract Retention Period requesting assumption and assignment of any Held Contract, the Sellers shall, subject to Buyer's demonstrating adequate assurance of future performance thereunder, take all actions reasonably necessary to seek to assume and assign to Buyer pursuant to section 365 of the Bankruptcy Code any Contract(s) set forth in an Assumption Notice, and any applicable cure cost shall be satisfied in accordance with the definition of Assumed Liabilities. The Sellers agree and acknowledge that the covenant set forth in this Section 2.5(b) shall survive the Closing; provided, that, with respect to any Held Contract, Buyer shall compensate the Sellers for Liabilities for the continuation of such Held Contracts during the Contract Retention Period up to and including the date which is five (5) days following Sellers' receipt of written notice from Buyer authorizing rejection of the same, it being understood and agreed that Sellers' obligation to assume and assign any Held Contract shall be conditioned upon Buyer's payment of such amounts and that Buyer's covenant to pay such amounts shall survive the Closing and the expiration of the Contract Retention Period. Notwithstanding anything in this Agreement to the contrary, on the date any Contract is assumed and assigned to Buyer pursuant to this Section 2.5(b), such Contract shall be deemed an Designed Contract for all purposes under this Agreement.

    **Section 2.6.** Bulk Sales Law.

      The Buyer hereby waives compliance by the Sellers with the requirements and provisions of any "bulk-transfer" laws of any jurisdiction that may otherwise be applicable with respect to the sale and transfer of any or all of the Assets to the Buyer.

Adeptio - INP APA
675236-1

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as otherwise indicated in the Schedules attached hereto, each Seller hereby jointly and severally represents and warrants to Buyer, as of the date hereof, the following:

### Section 3.1.  Organization.

Each Seller is an entity duly organized, validly existing and in good standing under the laws of its state of organization and has the full corporate, limited liability company or partnership (as applicable) right, power and authority to own, lease and operate all of its properties and assets (including the Assets) and to carry out its Business as it is presently conducted, subject to the Bankruptcy Code.  Each Seller is duly licensed or qualified to do business as a foreign corporation, company or partnership (as applicable) and is in good standing in each jurisdiction in which the ownership of its property or the conduct of its business requires such qualification or license, except to the extent that the failure to be so qualified, individually or in the aggregate, has not resulted in, and would not reasonably likely to result in, a Material Adverse Effect.  Other than one of the other Sellers, no Seller has any Subsidiaries and there are no corporations, joint ventures, partnerships or other entities or arrangements in which any Seller, directly or indirectly, owns any capital stock or an equity interest (other than one of the Sellers).

### Section 3.2.  Authority.

Subject to entry of the Sale Order by the Bankruptcy Court, each Seller has all requisite corporate, limited liability company or partnership (as applicable) right, power and authority to execute, deliver and perform this Agreement and each instrument of conveyance and other document to be executed and delivered by such Seller pursuant to the requirements of this Agreement (all such instruments and documents, the "Seller Ancillary Documents").  The execution, delivery and performance of this Agreement and each Seller Ancillary Document by each such Seller has been duly and validly authorized and approved by all necessary corporate, limited liability company or partnership (as applicable) action, subject to the approval of the Bankruptcy Court.  Subject to the approval of the Bankruptcy Court, this Agreement has been duly and validly executed and delivered, and at the Closing each Seller Ancillary Document will be duly and validly executed and delivered, by each such Seller, and (a) assuming this Agreement has been duly authorized, executed and delivered by Buyer, this Agreement constitutes the legal, valid and binding obligation of each such Seller, enforceable against each such Seller in accordance with its terms, and (b) assuming each such Seller Ancillary Document, if applicable, has been duly authorized, executed and delivered by Buyer (to the extent Buyer is required to be party thereto), each such Seller Ancillary Document shall constitute the legal, valid and binding obligation of each such Seller, enforceable against such Seller in accordance with its terms.

### Section 3.3.  Consents and Approvals; No Violations.

Subject to entry of the Sale Order by the Bankruptcy Court, the execution, delivery and performance of this Agreement by each Seller will not (with or without the giving

Adeptio - INP APA
675236-1

of notice or the passage of time, or both) (a) violate any applicable provision of law or any rule or regulation of any Governmental Entity, or any order, writ, injunction, judgment or decree of any Governmental Entity applicable to such Seller, (b) violate, or require any consent under, the Certificate of Incorporation, By-Laws and/or other comparable organizational documents of such Seller and, to the extent such consent is required, it shall have been received, (c) require any consent under or constitute a default (or give rise to any right of termination, amendment, cancellation or acceleration) under any agreement, indenture, mortgage, deed of trust, lease, license, or other instrument to which such Seller is a party or by which such Seller is bound, or any material Permit held by such Seller, (d) require any consent or approval by, notice to, or registration with, any Governmental Entity or (e) result in the creation of any Lien upon any of the Assets.

**Section 3.4.** Intellectual Property.

Schedule 3.4 lists all Intellectual Property other than Trade Secrets owned by each Seller and currently used in the operation of the Sellers' Business. Except as set forth on Schedule 3.4, (i) with respect to any Intellectual Property owned by any Seller (as opposed to Intellectual Property of which any Seller is a licensee), the Sellers have all right, title and interest to all Intellectual Property, without any conflict known to any Seller with the rights of others, (ii) no Person other than the Sellers has the right to use the Intellectual Property owned by Sellers, and (iii) Sellers have the valid right to use, pursuant to a license, sublicense or other agreement, any Intellectual Property used in Sellers' Business that is owned by a party other than Sellers.

**Section 3.5.** Assets.

The Sellers have good, valid, marketable and undivided title to all assets used in the operation of the Business (including the Assets), free and clear of all Encumbrances other than those Encumbrances set forth on Schedule 3.5 and Permitted Encumbrances and, subject to the entry of the Sale Order, Buyer will be vested with good title to the Assets, free and clear of all Encumbrances other than Permitted Encumbrance. No governmental or other consents are required to assign any such assets to the Buyer.

**Section 3.6.** No Brokers or Finders.

No agent, broker, finder or investment or commercial banker, or other Person or firm engaged by, or acting on behalf of, any of the Sellers in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement, other than as set forth on Schedule 3.6, the fees and expenses of which Sellers shall bear, is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transaction.

**Section 3.7.** Real Property.

None of the Sellers owns any Owned Property.

**Section 3.8.** Material Contracts.

Adeptio - INP APA
675276-1

Schedule 3.8 sets forth a complete list of all of the material Contracts (other than purchase orders and supplier orders, but including all real property leases) to which any Seller is a party or by which it is bound and that are used in or related to any such Seller's ordinary course of business or by which any of the Assets or the Business may be bound or affected (collectively, the "Material Contracts").  Sellers have provided Buyer with true and complete copies of all Material Contracts.

## Section 3.9. Employee Benefits.

Schedule 3.9 lists: (i) all "employee benefit plans", as defined in Section 3(3) of ERISA, and all other employee benefit plans or programs, including bonus plans, consulting or other compensation agreements, incentive, equity or equity-based compensation, deferred compensation arrangements, stock purchase, severance pay, sick leave, vacation pay, salary continuation, disability, hospitalization, medical insurance, life insurance, and scholarship programs maintained by any Seller or to which any Seller has contributed or is obligated to contribute for current or former employees of any of the Sellers (the "Employee Benefit Plans"), and (ii) all "employee pension benefit plans," as defined in Section 3(2) of ERISA, subject to Title IV of ERISA or Section 412 of the Code, maintained by either any individual Seller or any trade or business (whether or not incorporated) which is treated as a single employer with any of the Sellers under Section 414(b), (c), (m) or (o) of the Code ("ERISA Affiliate") or to which any Seller or any ERISA Affiliate contributed or is obligated to contribute (the "Title IV Plans"). Schedule 3.9 separately sets forth each Title IV Plan which is a multiemployer plan as defined in Section 3(37) of ERISA ("Multiemployer Plans"), or has been subject to Sections 4063 or 4064 of ERISA ("Multiple Employer Plans").  Schedule 3.9 also specifically identifies any Contracts or other arrangements, whether written or oral, that could give rise to an "excess parachute payment" under Section 280G of the Code or that could subject the beneficiary thereof to the deferred compensation provisions contained in Section 409A of the Code.  To the knowledge of the Sellers, all such plans, programs, arrangements, agreements or Contracts described or referred to in this Section 3.9 are, and have been, maintained in substantial compliance with applicable law.  Schedule 3.9 identifies all notices received by any Seller within the last two (2) years of any violations that were both material to a Seller and have not been cured as of the date hereof of any of the plans listed on said schedule.

## Section 3.10. Labor.

Except as set forth on Schedule 3.10, none of the Sellers is a party to any labor or collective bargaining agreement.  There are no unfair labor practice charges, grievances or complaints pending or, to the knowledge of the Sellers, threatened by or on behalf of any current or former employee or group of employees of any Seller, except in each case as would not reasonably be expected to result in material liability to Buyer or have a Material Adverse Effect.

## Section 3.11. Environmental Matters.

Except as set forth on Schedule 3.11, to the knowledge of the Sellers there have been and are no Releases, threat of Releases, events, conditions, circumstances, incidents, actions or omissions relating to or in any way affecting any Seller, the Assets and/or the Business that (i) violate any Environmental Law, (ii) have given rise to any Liability under any Environmental

-16-

Law (including, without limitation, any Hazardous Materials which have been released, disposed of, emitted, treated, stored, generated, placed, deposited, discharged or spilled at, upon or under any facility ever owned, operated or leased by any Seller, or any facility to which any Seller has sent any Hazardous Material), or (iii) otherwise form the basis of any Claim, action, demand, suit, proceeding, hearing, study or investigation (x) under any Environmental Law or (y) based on or related to the manufacture, processing, distribution, use, treatment, storage (including, without limitation, underground storage tanks), disposal, transport or handling, or the emission, discharge, Release or threatened Release of any Hazardous Material.

Section 3.12.  Board Approval and Recommendations.

The Board of Directors (or similar governing body) of each Seller has determined that, based upon its consideration of the available alternatives, and subject to the approval of the Bankruptcy Court and the provisions in this Agreement regarding the solicitation of Alternate Transactions, a sale, assignment and assumption of the Assets and Assumed Liabilities pursuant to this Agreement under sections 105, 363 and 365 of the Bankruptcy Code is in the best interests of such Seller.

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers, as of the date hereof, the following:

Section 4.1.  Organization.

Buyer is a limited liability company duly formed and in good standing under the laws of the state of Delaware and has the full limited liability company right, power and authority to own, lease and operate all of its properties and assets and to carry out its business as it is presently conducted.

Section 4.2.  Authority.

Subject to entry of the Sale Order by the Bankruptcy Court, Buyer has all requisite limited liability company right, power and authority to execute, deliver and perform this Agreement and each instrument of conveyance and other document to be executed and delivered by Buyer pursuant to the requirements of this Agreement (the "Buyer Ancillary Documents"). The execution, delivery and performance of this Agreement and each Buyer Ancillary Document by Buyer has been duly and validly authorized and approved by all necessary limited liability company action, subject to the approval of the Bankruptcy Court. Subject to the approval of the Bankruptcy Court, this Agreement has been duly and validly executed and delivered by Buyer, and at the Closing each Buyer Ancillary Document will be duly and validly executed and delivered by Buyer, and (a) assuming this Agreement has been duly authorized, executed and delivered by Sellers, this Agreement constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, and (b) assuming each such Buyer Ancillary Document has been duly authorized, executed and delivered by Sellers (to the extent

-17-

Sellers are required to be party thereto), each such Buyer Ancillary Document shall constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

### Section 4.3.  Consents and Approvals; No Violations.

Subject to entry of the Sale Order by the Bankruptcy Court, the execution, delivery and performance of this Agreement by Buyer will not (with or without the giving of notice or the passage of time, or both) (a) violate any applicable provision of law or any rule or regulation of any Governmental Entity applicable to Buyer, or any order, writ, injunction, judgment or decree of any court, administrative agency or Governmental Entity applicable to Buyer, or (b) require any consent under or constitute a default (or give rise to any right of termination, amendment, cancellation or acceleration) under any material agreement, indenture, mortgage, deed of trust, lease, license, or other instrument to which Buyer is a party or by which it is bound, or any material Permit held by Buyer.

### Section 4.4.  No Brokers or Finders.

No agent, broker, finder or investment or commercial banker, or other Person or firm engaged by or acting on behalf of Buyer in connection with the negotiation, execution or performance of this Agreement or the transactions contemplated by this Agreement, is or will be entitled to any brokerage or finder's or similar fees or other commissions as a result of this Agreement or such transactions.

### Section 4.5.  Legal Proceedings.

There is no order or action pending or, to the knowledge of Buyer, threatened against or affecting Buyer that individually or when aggregated with one or more other actions would have a material adverse effect on Buyer's ability to perform this Agreement and the Buyer Ancillary Documents or any material aspect of the transactions contemplated by this Agreement.

### Section 4.6.  Financing.

Buyer has available sufficient funding to enable Buyer to consummate the purchase of the Assets from Seller on the terms set forth in Article II and otherwise to perform all of Buyer's obligations under this Agreement.

### ARTICLE V
### FURTHER COVENANTS AND AGREEMENTS

### Section 5.1.  Covenants of Seller Pending the Closing.

From the date hereof until the Closing, or any termination of this Agreement in accordance with Article VI hereof, except as required by orders of the Bankruptcy Court or with the prior written consent of the Buyer, the Sellers shall:

Adeptio - INP APA
675236-1

-18-

(a)     not take or intentionally omit to take any action which could reasonably be expected to result in a breach of any of Sellers' representations and warranties hereunder;

(b)     promptly disclose to Buyer any information relating to Sellers' representations and warranties hereunder that any Seller becomes aware of after the date hereof, which makes any information previously provided to Buyer incomplete or incorrect in any material respect and all information regarding any material damage to or material loss of any of the Assets;

(c)     use its commercially reasonable efforts to cause all of the conditions to the obligations of Buyer under Article VII to be satisfied on or prior to the Closing Date and to make commercially reasonable efforts to obtain, prior to the Closing, in writing (copies of which shall be delivered to Buyer) all consents, waivers or approvals of all third parties and Governmental Entities which are necessary for the consummation by Sellers of the transactions contemplated by this Agreement;

(d)     use its commercially reasonable efforts to (i) conduct the Business in substantially the same manner as conducted as of the date of this Agreement and only in the ordinary course, (ii) use commercially reasonable efforts to preserve the existing business organization and management of the Business intact, (iii) keep available the services of the current officers and employees of the Business, to the extent reasonably feasible, (iv) maintain the existing relations with customers, carriers, call centers, distributors, suppliers, creditors, business partners, employees, "CPA" partners and others having business dealings with the Business, to the extent reasonably feasible, and (v) refrain from changing in any material respect any of its product prices or pricing policies (e.g., discount policies) for any of its products except as shall be necessary to meet competition or customer requirements;

(e)     not make any loans to or otherwise enter into any transaction with any officer, employee, partner or Affiliate, or make or grant any increase in any employee's or officer's wages, salary, bonus or other compensation or make or grant any increase in any employee benefit plan, incentive arrangement, or other benefit covering any of its officers or employees, or establish, amend, or contribute to any pension, retirement, severance, profit sharing, plan or multiemployer plan covering any of the employees of the Business, except as required by Law;

(f)     not enter into, assume, amend, modify or terminate any material Contract or lease (including any Designated Contract) or amend or other modify any of its organizational documents;

(g)     not adopt or propose any change to, or fail to maintain, the current levels of insurance coverage afforded the Sellers under existing insurance policies;

(h)     not redeem or repurchase, directly or indirectly, or pay or declare any dividends or other distributions in respect of, any of its equity interests;

(i)     not issue any notes, bonds or other debt securities or otherwise incur any indebtedness for borrowed money or material capital leases or guarantee or otherwise become liable for any such obligations of any other Person;

(j)     not sell, assign, transfer, lease or license any of the Assets, other than sales of inventory in the ordinary course of business, or subject any of the Assets or the Business to any Lien or Encumbrance (except for Permitted Encumbrances);

(k)     not cancel or compromise any material debt or claim or waive or release any material right of the Sellers that constitutes an Asset;

(l)     not enter into any commitment for capital expenditures except pursuant to any budget approved by the lenders under the Senior Secured Priming Super-Priority Debtor-in-Possession Credit Agreement; and

(m)     not take any action that will cause a default or an event of default under the Senior Secured Priming Super-Priority Debtor-in-Possession Credit Agreement.

**Section 5.2.  Covenants of Buyer Pending the Closing.**

Pending the Closing and prior to any termination of this Agreement in accordance with Article VI hereof, and except as otherwise agreed to in writing by the Company, Buyer shall:

(a)     not take or intentionally omit to take any action which could reasonably be expected to result in a breach of any of Buyer's representations and warranties hereunder in any material respect;

(b)     promptly disclose to the Company any information relating to Buyer's representations and warranties hereunder that Buyer becomes aware of at any time after the date hereof, which makes any information previously provided by Buyer incomplete or incorrect in any material respect; and

(c)     use commercially reasonable efforts to cause all of the conditions to the obligations of the Sellers under Article VIII to be satisfied on or prior to the Closing Date and make commercially reasonable efforts to obtain, prior to the Closing, in writing (copies of which shall be delivered to the Company) all consents, waivers or approvals of all third parties and Governmental Entities which are necessary for the consummation by Buyer of the transactions contemplated by this Agreement (if any).

**Section 5.3.  Further Assurances and Services.**

The parties shall cooperate reasonably with each other in connection with any steps required to be taken under this Agreement, and shall (a) furnish upon request to each other such further information; (b) execute and deliver to each other such other documents; and (c) do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement.

-20-

In addition, each Seller shall provide, and cause its Affiliates, officers, directors, employees, attorneys, accountants and other agents to provide, Buyer and its accounting, legal and other representatives full and complete access at all reasonable times to such Seller's directors, managers, officers, personnel, key customers, vendors, carriers, clients and suppliers, consultants, attorneys, accountants and facilities and to business, financial, legal, regulatory, tax, compensation and other data and information concerning the Business.

**Section 5.4.** Employment Matters.

(a)     The Sellers agree that, from and after the date hereof, the Buyer may offer employment, effective as of the Closing, to any Persons employed by any Seller, which employment will become effective as of the Closing Date and only if the Closing occurs. Only if the Closing occurs, any such Person who accepts such an offer of employment with the Buyer shall be a "Transferred Employee" and shall be employed by the Buyer on such terms and conditions as the Buyer and each such Transferred Employee may mutually agree. Upon request of the Buyer, the Sellers shall provide the Buyer reasonable access to data (including computer data) regarding the ages, dates of hire, compensation, benefits and job descriptions of the Transferred Employees.

(b)     At Closing, Buyer shall make available or establish an employee benefit plan for the Transferred Employees and their dependents. The Buyer shall credit (i) each Transferred Employee with his or her service with the Sellers, to the same extent such service would have been credited had such service been with Buyer, and (ii) the Transferred Employees with all service recognized by Sellers under employee plans as service with Buyer for purposes of eligibility to participate and vesting under all employee benefit plans, programs and policies of Buyer, whether now existing or hereafter adopted (the "Buyer Plans"). The Buyer shall waive any coverage waiting period, pre-existing condition and actively-at-work requirements under Buyer Plans to the extent such conditions or requirements have been satisfied under corresponding plans of Sellers and shall provide that any eligible expenses incurred before the Closing Date by a Transferred Employee (and his or her dependents) during the calendar year of the Closing and disclosed to Buyer by such Transferred Employee shall be taken into account for purposes of satisfying the applicable deductible, coinsurance and maximum out-of-pocket provisions, and applicable annual and/or lifetime maximum benefit limitations of Buyer Plans.

**Section 5.5.** Casualty.

If, between the date of this Agreement and the Closing, any of the Assets shall be destroyed or damaged in whole or in part by fire, earthquake, flood, other casualty or any other cause ("Casualty"), then Buyer shall have the option to: (a) acquire such Assets on an "as is" basis and take an assignment from Sellers of all insurance proceeds payable to Sellers in respect of the Casualty, or (b) in the event that the Casualty would have a Material Adverse Effect, terminate this Agreement and the transactions contemplated hereby.

**Section 5.6.** Name Change.

At Closing, Sellers will deliver to Buyer a duly and properly authorized and executed evidence (in form and substance satisfactory to Buyer) as to the amendment of such

-21-

Sellers' organizational documents (collectively, the "Organizational Amendments") changing each Seller's name to another name which does not include any of the following words "InPhonic", "CAIS", "SimIPC", "Mobile Technology", "FON", "1010 Interactive" and/or "Star Number." Upon the Closing, each Seller hereby irrevocably authorizes Buyer to file the Organizational Amendments with the applicable Secretary of State of each Seller's jurisdiction of formation and in each State in which each such Seller is qualified to do business on each such Seller's behalf. Furthermore, after the Closing, each Seller shall discontinue the use of its current name (and any other tradenames currently utilized by any of the Sellers) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "InPhonic", "CAIS", "SimIPC", "Mobile Technology", "FON", "1010 Interactive" and/or "Star Number" without the prior written consent of the Buyer. From and after the Closing, each of the Sellers covenants and agrees not to use or otherwise employ any of the trade names, corporate names, dba's or similar Intellectual Property rights utilized by any of the Sellers in the conduct of the Business, which rights shall be included in the Assets purchased hereunder.

## ARTICLE VI
## TERMINATION

**Section 6.1.** Termination.

This Agreement may be terminated at any time prior to the Closing:

 (a) by mutual written agreement executed by the Company and Buyer.

 (b) automatically and without any action or notice by either the Company (on behalf of all Sellers) to Buyer, or Buyer to the Company, immediately upon:

  (i) the issuance of an order, decree, or ruling or any other action by a Governmental Entity to restrain, enjoin or otherwise prohibit the transfer of the Assets contemplated hereby;

  (ii) approval by the Bankruptcy Court of an Alternate Transaction;

  (iii) acceptance by the Sellers of an Alternate Transaction; or

  (iv) Buyer is not declared the winning bidder upon completion of the Auction.

 (c) by Buyer:

  (i) if the Bidding Procedures Order shall not have been entered by November 9, 2007;

  (ii) if the Auction has not concluded by December 12, 2007;

Adeptio - INP APA
675236-1

(iii)    if the Bankruptcy Court has not entered the Sale Order by December 13, 2007 (or such later date as Buyer may have designated in writing to the Company);

(iv)    if there has been a material violation or breach by any Seller of any representation, warranty or covenant contained in this Agreement which (x) has rendered the satisfaction of any condition to the obligations of Buyer impossible or is not curable or, if curable, has not been cured within five (5) days following receipt by the Company of written notice of such breach from Buyer, and (y) has not been waived by Buyer;

(v)    at any time after December 24, 2007, if the Closing shall not have occurred;

(vi)    if Seller's Bankruptcy Case shall be converted into a case under Chapter 7 of the Bankruptcy Code or dismissed, or if a trustee is appointed in the Bankruptcy Case;

(vii)    if the lenders' obligations under the Senior Secured Priming Super-Priority Debtor-in-Possession Credit Agreement are terminated;

(viii)    if either of the interim or final order authorizing and approving the Senior Secured Priming Super-Priority Debtor-in-Possession Credit Agreement has not been entered within the time periods set forth therein;

(ix)    if there shall be excluded from the Assets any Designated Contract that is not assignable or transferable pursuant to the Bankruptcy Code or otherwise without the consent of any Person other than Sellers, to the extent that such consent shall not have been given prior to the Closing and such Designated Contract shall, in the opinion of Buyer, prevent it from effectively operating the Business; or

(x)    if Buyer so elects in writing pursuant to Section 5.5 hereof.

(d)    by the Company, if there has been a material violation or breach by Buyer of any agreement or any representation or warranty contained in this Agreement which (x) has rendered the satisfaction of any condition to the obligations of Sellers impossible or is not curable or, if curable, has not been cured within five (5) days following receipt by Buyer of written notice of such breach from the Company, and (y) has not been waived by the Company.

**Section 6.2.**  Expense Reimbursement.

(a)    If this Agreement is terminated pursuant to (x) Section 6.1(c)(ii), Section 6.1(c)(iii), Section 6.1(c)(iv), Section 6.1(c)(v), Section 6.1(c)(vi) or Section 6.1(c)(viii), solely if the event specified in such applicable Section occurs as a direct result of any Seller's actions or inactions, or (y) Section 6.1(b), Section 6.1(c)(i), Section 6.1(c)(vii) or Section 6.1(c)(ix), Sellers shall pay the Expense Reimbursement to Buyer in immediately available funds, without need for further order of or from the Bankruptcy Court, upon receipt of reasonable evidence of the amounts constituting the Expense Reimbursement by (i) the Company and (ii) the Creditors' Committee.  The Expense Reimbursement shall be a super-priority

-23-

administrative expense priority obligation under Section 364(c)(1) of the Bankruptcy Code with priority over all expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, subject to any super-majority claims of the Sellers' post-petition lenders.

(b)    The parties agree that Buyer shall have no right to the Expense Reimbursement if this Agreement is terminated pursuant to Section 6.1(a) or Section 6.1(d).

(c)    Sellers hereby acknowledge that the obligation to pay the Expense Reimbursement (to the extent due hereunder) shall survive the termination of this Agreement, and shall have administrative priority status against the Sellers and their respective estates. In the event that the Buyer is entitled to receive the Expense Reimbursement in accordance with the provisions of this Agreement, then Buyer's sole and exclusive remedy shall be payment of the Expense Reimbursement.

## ARTICLE VII
## CONDITIONS TO BUYER'S OBLIGATIONS

Each and every obligation of Buyer to consummate the transactions described in this Agreement shall be subject to the fulfillment (or, with respect to any obligation other than Bankruptcy Court approval of the Bidding Procedures Order and Sale Order, waiver thereof by Buyer in writing) on or before the Closing Date, of the following conditions precedent:

**Section 7.1.** Sellers' Closing Deliveries.

Sellers shall have delivered, or caused to be delivered, to Buyer at the Closing each of the following:

(a)    one or more Bills of Sale (as requested by Buyer), executed by Sellers;

(b)    duly executed and acknowledged (as appropriate) assignments of the U.S. trademark registrations and applications and U.S. patents and patent applications included in the purchased Intellectual Property, in a form suitable for recording in the U.S. Patent and Trademark Office, assignment documents for trademark and/or patent rights in other jurisdictions as reasonably requested by Buyer, and general assignments of all other purchased Intellectual Property;

(c)    possession of the Assets;

(d)    a certified copy of the Sale Order;

(e)    a non-foreign affidavit dated as of the Closing Date in form and substance required under Treasury Regulations issued pursuant to Section 1445 of the Code so that Buyer is exempt from withholding any portion of the Purchase Price;

(f)    duly and properly authorized and executed Organizational Amendments; and

Adeptio - INP APA
675236-1

(g)    any other documents reasonably requested by Buyer in order to effect the transfer at the Closing of the Assets.

### Section 7.2.  Representations and Warranties True.

The representations and warranties of Sellers contained in this Agreement shall have been true on the date of this Agreement, and shall be true in all material respects (except as to those representations and warranties that are qualified by materiality and/or Material Adverse Effect, which shall be true in all respects) on the Closing Date with the same effect as though such representations were made as of such date or, in the case of representations and warranties made as of a specified date earlier than the Closing Date, on and as of such earlier date.

### Section 7.3.  Performances.

Sellers shall have performed and complied with all covenants and obligations required by this Agreement to be performed or complied with by it prior to or at the Closing.

### Section 7.4.  Governmental Consents and Approvals.

The parties shall have received all necessary and appropriate governmental consents, approvals and filings required for them to consummate the transactions contemplated hereby, including, without limitation, any approval under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations thereunder, if applicable.

### Section 7.5.  Bankruptcy Court Approvals.

The Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order substantially in the forms affixed hereto as Exhibits B and D, respectively (subject to non-material changes only), and provided such other relief as may be necessary or appropriate to allow the consummation of the transactions contemplated by this Agreement.  The Sale Order shall have become a final and nonappealable order, unless this condition has been waived in writing by Buyer in its sole discretion.

### Section 7.6.  No Injunction.

There shall not be in effect, at the Closing Date, any injunction or other binding order of any court or other tribunal having jurisdiction over the Buyer that prohibits the purchase of the Assets by Buyer.  The Sale Order shall not have been reversed or vacated, and shall not be subject to a stay pending appeal.  The stay provided for in Fed.R.Bankr.P. 6004(h) shall have expired or been waived by the Bankruptcy Court.

### Section 7.7.  Credit Bid Approval.

The Bankruptcy Court shall have entered an order, binding on all parties in interest in the Bankruptcy Case (which order may be the Sale Order) unconditionally allowing (i) a Claim by Buyer in the Bankruptcy Case in an amount equal to the DIP Amount and (ii) a Claim by Buyer in the Bankruptcy Case in an aggregate amount equal to all obligations under the Senior Credit Agreement as pre-petition senior secured obligations, and, in each case,

-25-

Adeptio - INP APA
675236-1

authorizing and approving the credit bid by Buyer contemplated by this Agreement pursuant to Section 363(k) of the Bankruptcy Code.

## ARTICLE VIII
## CONDITIONS TO SELLER'S OBLIGATIONS

Each and every obligation of the Sellers to consummate the transactions described in this Agreement shall be subject to the fulfillment (or, with respect to any obligation other than Bankruptcy Court approval of the Bidding Procedures Order and Sale Order, the waiver thereof by the Company in writing) on or before the Closing Date, of the following conditions precedent:

**Section 8.1.** Representations and Warranties.

The representations and warranties of Buyer contained in this Agreement shall have been true on the date of this Agreement, and shall be true in all material respects (except as to those representations and warranties that are qualified by materiality, which shall be true in all respects) on the Closing Date with the same effect as though such representations were made as of such date or, in the case of representations and warranties made as of a specified date earlier than the Closing Date, on and as of such earlier date.

**Section 8.2.** Governmental Consents and Approvals.

The parties shall have received all necessary and appropriate governmental consents, approvals and filings required for them to consummate the transactions contemplated hereby, including, without limitation, any approval under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations thereunder, if applicable.

**Section 8.3.** Performances.

Buyer shall have performed and complied in all material respects with all covenants and obligations required by this Agreement to be performed or complied with by it prior to or at the Closing.

**Section 8.4.** Buyer's Closing Deliveries.

Buyer shall deliver, or cause to be delivered, as applicable, to Seller, at the Closing each of the following:

(a)    the Assignment and Assumption Agreements executed by Buyer; and

(b)    such other deliveries as Buyer may be required to make on the Closing pursuant to any other provision of this Agreement.

**Section 8.5.** Bankruptcy Court Approvals.

The Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order substantially in the forms affixed hereto as Exhibits B and D, respectively (subject to

-26-

non-material changes only) and provided such other relief as may be necessary or appropriate to allow the consummation of the transactions contemplated by this Agreement. The Sale Order shall have become a final and nonappealable order, unless this condition has been waived by Buyer in its sole discretion.

**Section 8.6.** No Injunction.

There shall not be in effect, at the Closing Date, any injunction or other binding order of any court or other tribunal having jurisdiction over the Sellers that prohibits the sale of the Assets to Buyer. The Sale Order shall not have been reversed or vacated, and shall not be subject to a stay pending appeal. The stay provided for in Fed.R.Bankr.P. 6004(h) shall have expired or been waived by the Bankruptcy Court.

## ARTICLE IX
## BANKRUPTCY MATTERS

**Section 9.1.** Motion(s).

The Sellers shall file with the Bankruptcy Court, within one (1) Business Day after the full execution and delivery of this Agreement and the commencement of the Bankruptcy Case, a motion(s) (the "Motion") seeking the Bankruptcy Court's approval of the Bidding Procedures Order and the Sale Order in the forms affixed hereto as Exhibits B and D, respectively. Sellers shall affix a true and complete copy of this Agreement to the Motion filed with the Bankruptcy Court.

**Section 9.2.** Bidding Procedures Order.

The Motion shall request, among other things, (i) the scheduling of the date for the Auction to be commenced no later than December 12, 2007, and the Sale Hearing (as defined below) not more than one (1) Business Day following the completion of the Auction, and (ii) the entry of the Bidding Procedures Order, containing, among other provisions acceptable to Buyer, the following provisions:

(a)     a date for a hearing to approve the Bidding Procedures Order to be held on the same date as the Bankruptcy Court's hearing on the Sellers' other "first-day" motions, but in no event shall the Bidding Procedures Order be entered later than November 9, 2007;

(b)     a schedule of the date(s) for the Auction and the hearing (the "Sale Hearing") to consider the entry of the Sale Order;

(c)     the establishment of notice requirements, bidding procedures, including expressly approving the Buyer's right to credit bid under Section 363(k) of the Bankruptcy Code, requirements regarding competing bids, and the pre-qualification of competing bids and bidders ("Qualified Bids") for the Auction;

(d)     a requirement that a competing bidder shall be required to demonstrate that it has the financial wherewithal to consummate the transactions contemplated by this Agreement;

-27-

(e)     a requirement that any party desiring to submit a Qualified Bid must submit a deposit equal to $5,000,000 simultaneously with the submission of a Qualified Bid;

(f)     a requirement that Qualified Bids must be in substantially the form of this Agreement and marked to show any modifications to this Agreement;

(g)     a requirement that a Qualified Bid must be in an amount that is at least $2,000,000 greater than the Purchase Price;

(h)     a requirement that subsequent bids must be in an amount that is at least $500,000 more than the prior bid;

(i)     a requirement that the Sellers file with the Bankruptcy Court not later than twenty-four hours after Buyer has delivered to the Company the list of Designated Contracts pursuant to Section 2.5(a), the list identifying the Designated Contracts and the amounts necessary to cure defaults under each of the Designated Contracts (the "Cure Schedule"); and

(j)     establishment of cure claim notice and dispute procedures relating to the assumption and sale and assignment of the Designated Contracts.

The Sellers shall serve on all counterparties to those Contracts and leases which may be designated as Designated Contracts a notice specifically stating that the Sellers are or may be seeking the assumption and assignment of the Designated Contracts and shall notify such parties of the deadline for objecting to the amounts listed in the Cure Schedule, which deadline shall not be less than three business days prior to the Sale Hearing. In cases in which the Sellers are unable to establish that a default exists, the relevant cure amount shall be set at $0.00. The Motion shall reflect the Buyer's promise to perform from and after the Closing under the Designated Contracts shall be the only adequate assurance of future performance necessary to satisfy the requirements of section 365 of the Bankruptcy Code in respect of the assignment to Buyer of such Designated Contracts. Notwithstanding anything to the contrary in this Agreement, Buyer acknowledges and agrees that if Sellers are unable to transfer or assign any Designated Contract by reason of Buyer's failure to provide adequate assurance of future performance, and provided that the Buyer, in its reasonable discretion, determines that such contract is not material to the operation of the Business or if Buyer has failed to use its commercially reasonable efforts to demonstrate adequate assurance of future performance with respect to such Designated Contract, such Contract shall thereupon become an Excluded Asset.

**Section 9.3. Sale Order.**

The Motion shall seek the entry of the Sale Order containing, *inter alia*, the following provisions:

(a)     finding that the notice of the Sale Hearing and the Auction was proper and sufficient under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Bankruptcy Court's Local Bankruptcy Rules, that the Sellers and the Buyer entered into the Agreement in good faith, the Purchase Price and Assumed Liabilities constitute fair value in

-28-

consideration for the Assets and Designated Contracts and determining that the Buyer is a "good faith" purchaser entitled to the protections afforded by Section 363(m) of the Bankruptcy Code with respect to the transactions, the Assets and the Designated Contracts;

(b)    authorizing the Sellers to transfer to the Buyer all right, title, privilege and interest of the Sellers in and to the Assets, free and clear of any Encumbrances, with all such Encumbrances attaching to the net proceeds of sale, if any;

(c)    authorizing the Sellers to assume and sell and assign the Designated Contracts to the Buyer pursuant to Sections 363 and 365 of the Bankruptcy Code;

(d)    finding that the Buyer is a not a successor to the Sellers or their respective estates by reason of any theory of law or equity with respect to any Liens, Claims, and Encumbrances against the Debtor or the Assets; and

(e)    establishing the amounts, if any, which the Sellers must pay or escrow to cure any defaults or actual pecuniary losses under or with respect to the Designated Contracts.

### Section 9.4.  Assumption of Designated Contracts.

Pursuant to Section 365 of the Bankruptcy Code and as requested by parties to the Designated Contracts and required by the Bankruptcy Court, the Buyer shall provide adequate assurance of future performance under and with respect to the Designated Contracts. After the Closing Date, the Sellers shall be released from any further liability under the Designated Contracts as provided for under Section 365(k) of the Bankruptcy Code.

### Section 9.5.  Procedure.

To the extent practicable under the circumstances, the Sellers shall provide the Buyer with drafts of any and all pleadings and proposed orders to be filed or submitted in connection with this Agreement for the Buyer's prior review and comment. The Bidding Procedures Order and Sale Order shall be in the forms affixed hereto as Exhibits B and D, respectively, and any changes thereto shall be subject to the Company's and Buyer's approval, with such approval to be in the sole discretion of each party. Sellers shall seek approval of the Bidding Procedures Order and the Sale Order. In the event the entry of the Sale Order shall be appealed, the Sellers and the Buyer shall each defend such appeal.

### Section 9.6.  Buyer Protections.

The Sellers shall pay to Buyer the Expense Reimbursement pursuant to the terms and conditions set forth in Section 6.2 hereof.

## ARTICLE X
## MISCELLANEOUS

### Section 10.1.  Entire Understanding, Waiver, Etc.

Adeptio - INP APA
675236-1

This Agreement (including the Exhibits and the Schedules attached hereto) collectively represent the entire understanding and agreement of the parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement or waiver is sought. A waiver by any party of any of the terms or conditions of this Agreement, or of any breach thereof, shall not be deemed a waiver of such term or condition for the future, or of any other term or condition, or of any subsequent breach thereof.

**Section 10.2.** <u>Severability.</u>

If any provision of this Agreement or the application of such provision shall be held by a court of competent jurisdiction to be unenforceable, the remaining provisions of this Agreement shall remain in full force and effect.

**Section 10.3.** <u>Captions.</u>

The captions herein are for convenience only and shall not be considered a part of this Agreement for any purpose, including, without limitation, the construction or interpretation of any provision.

**Section 10.4.** <u>Notices.</u>

All notices, requests, demands and other communications (collectively, "<u>Notices</u>") that are required or may be given under this Agreement shall be in writing. All Notices shall be deemed to have been duly given or made: (a) if by hand, immediately upon delivery if it is a Business Day between the hours of 9:00 a.m. and 5:00 p.m. (Eastern time) in the place of receipt and otherwise at the beginning of the first Business Day thereafter; (b) if by telecopier or similar device, immediately upon sending, provided notice is sent on a Business Day between the hours of 9:00 a.m. and 5:00 p.m. (Eastern time) in the place of receipt, but if not, then immediately upon the beginning of the first Business Day after being sent; (c) if by Federal Express, Express Mail or any other reputable overnight delivery service, one (1) Business Day after being placed in the exclusive custody and control of said courier; and (d) if mailed by certified mail, return receipt requested, five (5) Business Days after mailing. Notwithstanding the foregoing, with respect to any Notice given or made by telecopier or similar device, such Notice shall not be effective unless and until (i) the telecopier or similar device being used prints a written confirmation of the successful completion of such communication by the party sending the Notice, and (ii) a copy of such Notice is deposited in first class mail to the appropriate address for the party to whom the Notice is sent. In addition, notwithstanding the foregoing, a Notice of a change of address by a party hereto shall not be effective until received by the party to whom such notice of a change of address is sent. All Notices are to be given or made to the parties at the following addresses (or to such other address as either party may designate by Notice in accordance with the provisions of this Section):

If to any Seller:

-30-

c/o InPhonic, Inc.
1010 Wisconsin Avenue, Suite 600
Washington, DC 20007
Attention: Walter W. Leach III, General Counsel
Fax No.:  (202) 333-8280

with a mandatory copy (which shall not constitute Notice) to:

DLA Piper US LLP
1251 Avenue of the Americas
New York, New York 10020-1104
Attention: Thomas R. Califano, Esq.
Fax No.:  (212) 884-8690


If to Buyer:

Adeptio INPC Funding, LLC
c/o Versa Capital Management, Inc.
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Attention: Paul Halpern
Fax No.:  (215) 609-3434
Email: phalpern@versafund.com

with a mandatory copy (which shall not constitute Notice) to:

Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, IL 60601
Attention:  Anup Sathy, P.C.
             John A. Schoenfeld, P.C.
Fax No.:  (312) 861-2200

**Section 10.5.  Assignment.**

Neither this Agreement nor any rights or obligations under it are assignable, except that Buyer may assign or delegate its rights and obligations (in whole or in part) hereunder to one or more newly formed entities, to one or more of its Subsidiaries and/or to one or more Persons that Buyer determines to partner with in connection with the transactions contemplated by this Agreement; provided, however, that Buyer shall remain liable for all of its obligations under this Agreement.

**Section 10.6.  Parties in Interest.**

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

### Section 10.7. Counterparts and Facsimile Signatures.

This Agreement may be executed in two or more counterparts and by facsimile or electronic pdf counterpart signatures, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument.

### Section 10.8. Construction of Terms.

Any reference herein to the masculine or neuter shall include the masculine, the feminine and the neuter, and any reference herein to the singular or plural shall include the opposite thereof unless the context requires otherwise. All references to articles, sections, paragraphs, schedules or exhibits shall be deemed references to articles, sections or paragraphs of or schedules or exhibits to this Agreement unless the context requires otherwise. "Hereunder," "hereof," "hereto," and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section or other provision of this Agreement. The words "including" (and with correlative meaning "include") means "including without limiting the generality of any description preceding such term." The word "or" is used in the inclusive sense of "and/or." With respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding." Unless otherwise noted in this Agreement, all references to dollars or $ are United States dollars. References to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments to such documents, instruments or agreements. The singular number includes the plural number and vice versa. Reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are not prohibited by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually. Since each party and counsel to each party has participated in the drafting of this Agreement, this Agreement shall not be interpreted against one party or the other based upon who drafted any provision.

### Section 10.9. Waiver of Jury Trial.

EACH PARTY HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, ANTITRUST CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON-LAW OR STATUTORY CLAIMS. EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH LEGAL COUNSEL OF ITS OWN CHOOSING, OR HAS HAD AN OPPORTUNITY TO DO SO, AND THAT IT

-32-

KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS, HAVING HAD THE OPPORTUNITY TO CONSULT WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS, OR MODIFICATIONS TO THIS AGREEMENT. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT WITHOUT A JURY.

**Section 10.10.** Non-Survival of Representations and Warranties.

The representations and warranties respectively made by the Sellers and the Buyer in this Agreement and in any certificate delivered hereunder will expire as of the Closing. Subsequent to Closing, no claim with respect to any breach of any representation or warranty contained in this Agreement may be pursued or maintained (either hereunder or otherwise) against any other party. The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing for any breach thereof.

**Section 10.11.** Calculation of Time Periods.

When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

**Section 10.12.** Governing Law; Jurisdiction.

THIS AGREEMENT AND ALL DOCUMENTS, INSTRUMENTS AND AGREEMENTS EXECUTED AND DELIVERED PURSUANT TO THE TERMS AND PROVISIONS HEREOF WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE BANKRUPTCY CODE AND, TO THE EXTENT NOT INCONSISTENT WITH THE BANKRUPTCY CODE, THE INTERNAL LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICTING PROVISION OR RULE (WHETHER OF THE STATE OF DELAWARE OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE LAWS OF ANY JURISDICTION OTHER THAN DELAWARE TO BE APPLIED. IN FURTHERANCE OF THE FOREGOING, THE LAW OF DELAWARE WILL CONTROL THE INTERPRETATION AND CONSTRUCTION OF THIS AGREEMENT AND SELLER ANCILLARY DOCUMENTS AND BUYER ANCILLARY DOCUMENTS, EVEN IF UNDER SUCH JURISDICTION'S CHOICE OF LAW OR CONFLICT OF LAW ANALYSIS, THE SUBSTANTIVE LAW OF SOME OTHER JURISDICTION WOULD ORDINARILY APPLY.

THE BUYER AND SELLERS FURTHER AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (A) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY SELLER ANCILLARY DOCUMENT OR BUYER ANCILLARY DOCUMENT AND (B) THE ASSETS AND THE ASSUMED LIABILITIES. BUYER

Adeptio - INP APA
675236-1

CONSENTS TO AND EXPRESSLY AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION; *PROVIDED, HOWEVER*, THAT IF THE BANKRUPTCY COURT REFUSES TO ACCEPT JURISDICTION OVER ANY SUCH DISPUTE, THEN EACH PARTY HERETO HEREBY IRREVOCABLY SUBMITS TO AND ACCEPTS FOR ITSELF AND ITS PROPERTIES, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF AND SERVICE OF PROCESS PURSUANT TO THE LAWS OF THE STATE OF DELAWARE AND THE RULES OF ITS COURTS, WAIVES ANY DEFENSE OF FORUM NON CONVENIENS AND AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY ARISING UNDER, OR OUT OF, IN RESPECT OF, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY OTHER DOCUMENT IN CONNECTION WITH THIS AGREEMENT OR OBLIGATION. EACH PARTY FURTHER IRREVOCABLY DESIGNATES AND APPOINTS THE INDIVIDUAL IDENTIFIED IN OR PURSUANT TO <u>SECTION 10.4</u> HEREOF TO RECEIVE NOTICES ON ITS BEHALF, AS ITS AGENT TO RECEIVE ON ITS BEHALF SERVICE OF ALL PROCESS IN ANY SUCH ACTION BEFORE ANY GOVERNMENTAL ENTITY, SUCH SERVICE BEING HEREBY ACKNOWLEDGED TO BE EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT. A COPY OF ANY SUCH PROCESS SO SERVED SHALL BE MAILED BY REGISTERED MAIL TO EACH PARTY AT ITS ADDRESS PROVIDED IN <u>SECTION 10.4</u> <u>PROVIDED, THAT</u> UNLESS OTHERWISE PROVIDED BY APPLICABLE LAW, ANY FAILURE TO MAIL SUCH COPY SHALL NOT AFFECT THE VALIDITY OF THE SERVICE OF SUCH PROCESS. IF ANY AGENT SO APPOINTED REFUSES TO ACCEPT SERVICE, THE DESIGNATING PARTY HEREBY AGREES THAT SERVICE OF PROCESS SUFFICIENT FOR PERSONAL JURISDICTION IN ANY ACTION AGAINST IT IN THE APPLICABLE JURISDICTION MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO ITS ADDRESS PROVIDED IN <u>SECTION 10.4</u>. EACH PARTY HEREBY ACKNOWLEDGES THAT SUCH SERVICE SHALL BE EFFECTIVE AND BINDING IN EVERY RESPECT. NOTHING HEREIN SHALL AFFECT THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT OF ANY PARTY TO BRING ANY ACTION OR PROCEEDING AGAINST THE OTHER PARTY IN ANY OTHER JURISDICTION IF THE BANKRUPTCY COURT REFUSES TO ACCEPT JURISDICTION. NOTHING HEREIN SHALL LIMIT OR OTHERWISE AFFECT ANY CHOICE OF LAW OR CHOICE OF VENUE MADE BY SELLER AND BUYER IN ANY OTHER AGREEMENT TO WHICH THEY ARE BOTH A PARTY.

**Section 10.13.** <u>Expenses.</u>

Except as expressly provided otherwise in Section 6.2, the parties hereto shall each bear their own expenses incurred in connection with this Agreement and each other document or certificate pursuant to this Agreement, including, without limitation, the Seller Ancillary Documents and the Buyer Ancillary Documents.

**Section 10.14.** <u>Books and Records.</u>

From and after the Closing Date, the Buyer shall provide the Sellers with such non-privileged information in its possession as may be reasonably requested by Sellers for

Adeptio - INP APA
675236-1

-34-

periods prior to the Closing Date to enable Sellers to prepare Tax Returns and other financial reports and otherwise in connection with further disposition of their bankruptcy cases.

### Section 10.15.   General Release.

Effective upon the Closing Date, each Seller, on behalf of itself and its estate, acknowledges that it has no claim, counterclaim, setoff, recoupment, action or cause of action of any kind or nature whatsoever (including, for the avoidance of doubt, actions for avoidance, subordination or recharacterization of any of Buyer's pre-Petition Date Claims, Encumbrances, and Liens) against the Buyer and any of its members, employees, agents, Affiliates, attorneys or financial advisors (collectively, the "Buyer Group"), that directly or indirectly arise out of, are based upon, or in any manner are connected with (i) the pre-Petition Date agreements to which Buyer (or its Affiliates) and any of the Sellers were parties and all transactions referred to in such agreements, or (ii) the acquisition by the Buyer of Claims and Liens in and against the Sellers (jointly, the "Released Claims"). Should any Released Claims nonetheless exist, each Seller, on behalf of itself and its estate, hereby (i) releases and discharges each member of the Buyer Group from any liability whatsoever on such Released Claims and (ii) releases, waives and discharges all such Released Claims against any member of the Buyer Group.

### Section 10.16.   Press Releases.

At and prior to the Closing, no party hereto shall issue any press release or make any public announcement relating to the subject matter of this Agreement without the prior written approval of the Buyer and the Company, which approval shall not be unreasonably withheld, except that any Party may make any announcement required by law or by order of the Bankruptcy Court after notice to the Buyer and the Company and consultation with such Persons. After the Closing Date, no press releases or public announcement related to this Agreement and the transactions contemplated herein, or other announcements to the employees, customers, carriers, vendors, clients or suppliers of the Business, shall be issued without Buyer's prior written consent.

### Section 10.17.   Remedies.

Each of the Sellers, on the one hand, and the Buyer, on the other hand, acknowledges and agrees that the other party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each of the parties agrees that the other party shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having jurisdiction over the Parties and the matter, in addition to any other remedy to which they may be entitled, at law or in equity.

Adeptio - INP APA
675236-1

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the day and year first above written.

BUYER:                              Adeptio INPC Funding, LLC

                                    By:
                                        Name: *Paul Halpern*
                                        Title: *Authorized Signatory*

SELLERS:                            InPhonic, Inc.

                                    By:_____
                                        Name:
                                        Title:


                                    CAIS Acquisition, LLC

                                    By:_____
                                        Name:
                                        Title:


                                    Mobile Technology Services, LLC

                                    By:_____
                                        Name:
                                        Title:


Adeptio - INP APA

**IN WITNESS WHEREOF**, the parties have duly executed this Agreement on the day and year first above written.

**BUYER:**                                        Adeptio INPC Funding, LLC

By:_____
                                                        Name:
                                                        Title:

**SELLERS:**                                      InPhonic, Inc.

By:
                                                        Name: Andrew B. Zenfeld
                                                        Title: Chief Executive Officer

                                                        CAIS Acquisition, LLC

By:
                                                        Name: Andrew B. Zenfeld
                                                        Title: President

                                                        Mobile Technology Services, LLC

By:
                                                        Name: Andrew B. Zenfeld
                                                        Title: President

CAIS Acquisition II, LLC

By: _____
    Name: Andrew B. Zeinfeld
    Title: President

FON Acquisition, LLC

By: _____
    Name: Andrew B. Zeinfeld
    Title: President

1010 Interactive, LLC

By: _____
    Name: Andrew B. Zeinfeld
    Title: President

Star Number, Inc.

By: _____
    Name: Andrew B. Zeinfeld
    Title: President

SimIPC Acquisition Corp.

By: _____
    Name: Andrew B. Zeinfeld
    Title: President

BALT1\4395711.2 11/4/07 05:09 PM DRAFT
MIF 356037:18.

Exhibit A

### ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Agreement"), dated as of _____, 2007, is by and between _____, a Delaware corporation ("Seller") and [Adeptio INPC Funding, LLC], a Delaware limited liability company ("Buyer").

WHEREAS, pursuant to an Asset Purchase Agreement by and between Buyer, Seller and the other seller parties thereto as of November __, 2007 (as amended and in effect from time to time, the "Asset Purchase Agreement"), Buyer has purchased substantially all of the assets of Seller; and

WHEREAS, pursuant to the Asset Purchase Agreement, Seller has agreed to assign certain rights and agreements to Buyer, and Buyer has agreed to assume certain obligations of Seller, as set forth herein, and this Agreement is contemplated by the Asset Purchase Agreement;

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

(a)    *Capitalized Terms.*  Capitalized terms used but not defined herein shall have the meanings for such terms that are set forth in the Asset Purchase Agreement.

(b)    *Assumption.*  Buyer hereby assumes and agrees to observe and perform all of the duties, obligations, terms, provisions and covenants, and to pay and discharge all of the liabilities of Seller to be observed, performed, paid or discharged in connection with the Assumed Liabilities.  Buyer assumes no other liabilities, and the parties hereto agree that all such other liabilities shall remain the sole responsibility of Seller.

(c)    *Terms of the Asset Purchase Agreement.*  The terms of the Asset Purchase Agreement are incorporated herein by this reference.  In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern.

(d)    *Further Actions.*  Each of the parties hereto covenants and agrees, at its own expense, to execute and deliver, at the request of the other party hereto, such further instruments of transfer and assignment and to take such other action as such other party may reasonably request to more effectively consummate the assignments and assumptions contemplated by this Agreement.

(e)    *Governing Law; Counterparts.*  This Agreement shall be construed and enforced in accordance with the laws (other than the conflict of law rules) of the State of Delaware.  This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together will constitute one and the same agreement.

[Signature Page Follows]

BALTI\4395711.2 11/4/07 05:09 PM DRAFT
MJF 356037-18
675236-1

IN WITNESS WHEREOF, the parties have duly executed this Assignment and Assumption Agreement on the date first above written.

**BUYER:**

Adeptio INPC Funding, LLC

By: _____
     Name:
     Title:

**SELLER:**

By: _____
     Name:
     Title:

**Exhibit B**

## BIDDING PROCEDURES ORDER

BALT1\4395711.2 11/4/07 05:09 PM DRAFT
MJF 356037-18
673236-1

**Exhibit C**

BILL OF SALE

       **This Bill of Sale** (this "<u>Bill of Sale</u>") is made as of _____, 2007 by _____, a Delaware corporation ("**Seller**") for the benefit of Adeptio INPC Funding, LLC, a Delaware limited liability company ("**Buyer**").

Section 1.    <u>Transfer of Assets</u>.

       Effective at 11:59 p.m., Eastern time, on the date hereof, upon the terms and subject to the conditions set forth in that certain Asset Purchase Agreement dated as of _____ \_\_, 2007 (as amended, modified or supplemented, the "<u>Purchase Agreement</u>")[1], between the Seller, the Buyer and the other seller parties thereto, Seller does hereby give, grant, bargain, sell, transfer, assign, convey and deliver to Buyer all of Seller's right, title and interest in and to the Assets.

Section 2.    <u>Miscellaneous</u>

       (a)    The Purchase Agreement is incorporated herein by reference, shall continue in full force and effect as though set forth herein at length to the extent provided for in the Purchase Agreement, and shall control in the event of any conflict with the terms of this Agreement.

       (b)    THIS AGREEMENT AND ALL DOCUMENTS, INSTRUMENTS AND AGREEMENTS EXECUTED AND DELIVERED PURSUANT TO THE TERMS AND PROVISIONS HEREOF WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE BANKRUPTCY CODE AND, TO THE EXTENT NOT INCONSISTENT WITH THE BANKRUPTCY CODE, THE INTERNAL LAWS OF THE STATE OF DELAWARE, WITHOUT GIVING EFFECT TO ANY CHOICE OF LAW OR CONFLICTING PROVISION OR RULE (WHETHER OF THE STATE OF DELAWARE OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE LAWS OF ANY JURISDICTION OTHER THAN DELAWARE TO BE APPLIED.

       (c)    A facsimile counterpart signature to this Agreement shall be acceptable and binding.

[Signature Page Follows]

---

[1]    Defined terms used herein, but not defined herein, shall have the meanings given to such terms in the Purchase Agreement.

**IN WITNESS WHEREOF,** Seller has caused this Bill of Sale to be executed by its duly authorized officer as of the day and year first above written.

_____

By:_____
                Name:
                Title:

Exhibit D

SALE ORDER