# EXHIBIT 1

<u>NON-EXCLUSIVE LICENSE AND SERVICING AGREEMENT</u>

This Non-Exclusive License and Servicing Agreement (the "Agreement"), is effective as of October 7, 2003 , by and between Qualution Systems, Inc. ("Qualution"), a California Corporation located at 23901 Calabasas Road, Suite 2024, Calabasas, California 91302 ("Qualution"), and STAR NUMBER, INC. THROUGH ITS DIVISON, LIBERTY WIRELESS,, a Delaware corporation, ("Star Number") located at 1601 McCormick Place, Largo, Maryland 20774, concerning to the wireless resale customers of Star Number.

## RECITALS

**WHEREAS,** Qualution owns a proprietary wireless communications customer relations management software application suite known as Catalyst For Telecom ("CATALYST");

**WHEREAS,** Star Number resells wireless service to its end users (the "Customers");

**WHEREAS,** Star Number desires to outsource customer management, service management, usage rating, invoicing, and receivables management for the Customers;

**WHEREAS,** Star Number intends to reach an agreement with third parties to provide a call center and data center(s) to host the support systems and network management for customer management, service management, invoicing, and receivables management for the Customers;

**WHEREAS,** in order to provide an outsourced solution for customer care and invoicing services to the Customers, Star Number requires the use of CATALYST;

**WHEREAS,** Qualution desires to make available to Star Number a version of CATALYST sufficient to service and invoice the Customers;

NOW, THEREFORE, in consideration of the mutual promises set forth herein, the sufficiency of which is hereby acknowledged by each of the parties hereto, the parties hereby agree as follows:

## AGREEMENT:

1.    **Incorporation of Recitals.**  The foregoing Recitals are incorporated herein as a part of this Agreement.  Each of the parties hereto agrees that the Recitals are true and accurate in all material respects.


2.    **Definitions.**  Unless otherwise expressly provided herein or unless the context otherwise requires, the following terms with initial capital letters in this Agreement shall be defined as follows:

2.1    "Additional Programming Services"  means programming services provided to Star Number by Qualution in addition to the Maintenance Services.   Such services may include but are not limited to changes and enhancements requested by Star Number not precipitated by Qualution and which are not required to accurately and timely invoice the Customers per the Star Number Product Catalog and manage the receivables due from the Customers.  An addition or change in Designated Service Provider will be subject to additional programming fees. If requested by StarNumber, a statement of work and estimate of cost will be provided by Qualution and must be accepted in writing by Star Number before Qualution commences any Additional Programming Services.

2.2    "Agreement"  means this Non-Exclusive License and Servicing Agreement, and all exhibits and schedules which are attached hereto and incorporated herein by

reference.

2.3    "Customers" means collectively the end users to whom Star Number resells wireless services.

2.4    "Customer Management" means, but not be limited to, the ability to track, maintain, activate, temporarily disconnect, deactivate, track payment history, update and report on a transactional level on Star Number's Customers.

2.5    "CATALYST" means, in whole or in part, the proprietary customer relationship management, receivables management and invoicing system, including but not limited to related source code, whether used on the Internet and/or an Intranet and/or a local area network, and/or a stand-alone computer, all of which the parties agree is owned by and the sole property of Qualution.

2.6    "Data Center" means the centralized computer facility housing the computer servers, and other hardware, operating systems, network and database software and storage necessary to run the CATALYST application, and provides the network connectivity necessary for Qualution and other local and remote users of CATALYST, and the third party interfaces to communicate with CATALYST.

2.7    "Designated Service Provider" means the Star Number contractually obligated provider of wireless services of which are being resold by Star Number to Customers.

2.8    "Designated Service Vendor" means the Star Number contractually obligated provider of services to be performed in the interest and benefit of Star Number and it's Customers.

2.9    "Intellectual Property Rights" means all domestic and worldwide (i) copyrights (including without limitation the exclusive right to reproduce, distribute copies of,

display and perform the copyrighted work and prepare derivative work), copyright registrations and applications, trade secrets, trademark rights (including without limitation all registrations and applications), patent rights (including without limitation all registrations and applications), trade names, trademarks, trade secrets, mask-work rights, moral rights, author's rights, algorithms, rights and packaging, good will and other intellectual property rights, and all renewals and extensions thereof, regardless of whether any of such rights arise under the laws of the United States or any other state, country or jurisdiction; (ii) intangible legal rights or interests evidenced by or embodied in any Work Product, including but not limited to, any idea, design, concept, object code, source code, technique, invention, discovery, enhancement or improvement, regardless of its patentability, but including patents, patents applications, trade secrets and know-how; and (iii) all derivatives (as defined in the U.S. Copyright Act) of any of the foregoing relating to CATALYST.

2.10    "Invoicing" and "Invoicing System" means providing accurate and timely invoicing to Liberty Wireless Customers. Invoicing to be based upon the Service Provider's monthly CDR for usage and the Monthly Recurring charges as tracked by Catalyst. Invoices to include all applicable federal, state and local taxes calculated by Star Number's pre-approved taxing software. The providing of print files to print vendor of Star Number's choice for Paper copy invoices, as well as, enabling customers on-line access to their statements.

2.11    "License" means the non-exclusive license set forth in section 3, below.

2.12    "Maintenance Services" means the correction of any failure of CATALYST or any of its components to support the basic functions necessary to accurately maintain, invoice, manage the receivables and report on the Customers to comply with the Star Number Product Catalog defined in Exhibit A, and provide such services and repairs required to

P.T.

maintain CATALYST so it operates properly and in accordance with this Agreement.

2.13    "Product Catalog" shall mean the Liberty Wireless Plans and business rules as described in Exhibit A.

2.14    "Qualution" shall mean Qualution Systems, Inc.

2.15    "Receivable Management" shall mean, but not be limited to, the tracking, updating, collection of credit card payment through the designated Star Number vendor, collection of electronic check payments through the designated Star Number vendor, collection of sales tax, activating, temporarily disconnecting, deactivating customers as outlined by Star Number's business rules and reporting on customers and aged balances to Star Number and designated collection agencies.

2.16    "Reporting" shall mean reports having already been developed and provided as of 12/31/2002. Additional Reports will be agreed to by both parties after a written (e-mail) estimate of the number of hours it will take to develop the report is accepted by Star Number via E-mail communication.

2.17    "Work Product" shall mean the product of all work performed by Qualution under or related to this Agreement, including but not limited to, in whole or in part: CATALYST, the work performed in connection with or related to CATALYST, the Maintenance Services, the Additional Programming Services, Intellectual Property Rights;, any inventions, designs, computer programs, interfaces, software, discoveries and improvements, whether or not patentable or copyrightable, conceived, first reduced to practice, made or developed in the course of or as a result of services provided under this Agreement, and any Intellectual Property Rights applicable thereto, shall be owned by Qualutions. Work Product developed by Qualutions as it relates to confidential business practices developed, conceived or

reduced to practice by Star Number pursuant to this Agreement may not be shared with other

Qualutions clients and are subject to the Confidentiality provisions of this Agreement and the

NDA signed August 1, 2002.


3.    **Agreement and License.**  Qualution solely owns CATALYST and all the Work

Product.  Star Number acknowledges and agrees that CATALYST and the source code belong

to, are owned by and are the property of Qualution, and that other than the License granted

hereby it has and shall acquire no property or other legal or equitable interest of any kind to

CATALYST, the source code or any other intellectual property Qualution delivers, licenses,

makes available or provides to Star Number.  Star Number has and will have no ownership rights

in CATALYST or the Work Product.  Qualution hereby grants toStar Number a non- exclusive

License to use CATALYST as set forth in this Agreement and further agrees to provide the

Maintenance Services for the purpose of servicing the Customers.  Qualution reserves the right

in its sole and absolute discretion to modify or amend CATALYST as licensed under this

Agreement.  The License allows Star Number to use CATALYST to provide ) the services

described in this Agreement, to include but not be limited to customer service, invoicing and

receivables management for the Customers as set forth herein and for no other reason or purpose

and in no other manner, and on the terms and conditions set forth herein and on no others.  The

License automatically and without further notice shall terminate upon the termination of this

Agreement.  CATALYST may be used under this license in the following manner, and no other:

     a.    To support the conversion of Worldcom wireless Sprint market

subscribers to Star Number;

b.    To rate wholesale usage to support the price plans in the Star Number Product Catalog;

c.    To provide software tools to enable invoicing, customer care, reporting, receivables management and payment processing, for Star Number's wireless resale Customers;

d.    To provide access to near real-time usage and invoices via the Internet.

e.    Collection of monies as prescribed by Star Number customers and provided by designated credit card and electronic check vendors.

f.    Reconcile costs, invoices and customer lists between Star Number and the Designated Service Provider.

4.    **Duties of Qualution.**

4.1    Qualution shall provide Maintenance Services to CATALYST.

4.2    Qualution shall provide telephone technical support.

4.3    Qualution shall provide such information and assistance as are required to efficiently run CATALYST at Star Number's outsourced data center(s).

4.4    Pursuant to the License and this Agreement, Qualution also shall provide Additional Programming Services authorized by Star Number and agreed to by Qualution. The schedule for the provision of the Additional Programming Services (if any) shall be as agreed to by Qualution and Star Number. Qualution shall use its commercially reasonable efforts to meet any and all timelines.

4.5    If Star Number provides Qualution information that is marked "Confidential" or "Proprietary" Qualution shall take reasonable steps and security precautions to

prevent the unauthorized disclosure of such information and to maintain the confidentiality of such information, but, in any event, not less than that it takes to protect its own confidential or proprietary information.

4.6     Qualtion shall take reasonable steps and security precautions to prevent the unauthorized disclosure, and shall not willfully disclose the specific details of Star Number's business model and related business rules.  Such information does not include information that is available to the Customers or becomes generally available to the public.

4.7     Qualtion shall monitor the 3rd party interfaces to its application and take reasonable steps to remedy or initiate remedial action for any problem(s) it identifies.

4.8     Each month Qualtion shall create and send to Star Number's Designated Service Vendor for tax filings, a file of the taxes owed by Star Number to the respective federal state and local jurisdiction per the Star Number approved tax software package used by Catalyst.. This file shall meet the requirements of the Designated Service Vendor.

4.9     Qualtion shall process the monthly invoicing of the Customers and provide reports to Star Number for basic revenue assurance and financial reporting.  Reports requested after 12/31/2002 are subject to the Custom Report Development fee in Schedule A.

4.10     Qualtion hereby indemnifies Star Number from any license, intellectual property, patent  or other intellectual property rights that Qualtion may have violated in implementing and licensing the application to Star Number.


5.     **Duties of Star Number.**

5.1     Star Number is to insure its outsourced data center(s) provides and maintains a fully functional operating environment and network including the hosting hardware,

software, interfaces, and connectivity to a data center necessary to run CATALYST efficiently. Star Number is to insure its outsourced data center(s) provides, maintains, and supports the client end-user hardware and software to allow connectivity to CATALYST. Star Number is to insure its outsourced data center(s) provides Qualution with 24 hour, 7 days/week, 365 days/year remote access to CATALYST database and application servers, web servers, Sprint's network, including MAF (usage) feed, and machine-to-machine provisioning interface and continual and reliable internet connectivity.

     5.2    Star Number is to insure its outsourced data center(s) provides database administration and system administration for CATALYST'S database and actively undertake regular performance tuning exercises on the O/S (disk layout, kernel parameters, etc) and database (tables, kernel parameters, SGA, etc.) Star Number acknowledges its outsourced data center(s) is solely responsible for maintaining complete backup records and/or files of all information and data relating to the Customers and CATALYST, and storing such copies in a secure environment. It is important that regular (daily) backups are performed and restore procedures routinely tested to meet Star Number's service level agreement. Star Number is to insure its outsourced data center(s) takes reasonable measures to prevent infection of CATALYST by computer viruses and worms, and takes reasonable steps and security precautions to prevent the unauthorized disclosure of CATALYST and to maintain the confidentiality of CATALYST.

     5.3    Star Number is to insure its outsourced data center(s) acquires all licenses and vendor support agreements for databases and operating systems and other third party software required to run CATALYST; purchases the subscription and pays the license fees for

any third party service or software vendors interfacing with CATALYST or supplying data for

CATALYST, and acquires any other third party support required to operate CATALYST.

     5.4    Star Number agrees to pay all applicable fees if software escrow is

required.

     5.5    Star Number agrees to pay all applicable fees if third party backup support

for software is required.

     5.6    Star Number agrees it is to be responsible for generating, printing, and

mailing any required form letters and invoices.

     5.7    Star Number agrees it is to be responsible for near-immediate resolution of

unbillable usage.

     5.8    Star Number agrees it is to provide user security administration on

CATALYST.

     5.9    Star Number agrees its outsourced data center(s), Designated Service

Provider and Designated Service Vendors will minimize points of contact with Qualution to a

few designated personnel.

     5.10    Star Number agrees to notify Qualution in writing of any business rule,

policy or processes supported by Catalyst for which it has applied for or received a patent or

copyright.

**6.    <u>Compensation.</u>**

     6.1    Star Number shall pay directly to Qualution the fees or charges for

Additional Programming Services requested by Star Number at the rate set forth in Schedule A.

     6.2    Star Number shall pay directly to Qualution fees and/or other



compensation as set forth in Schedule A, for the License and the Maintenance Services provided by this Agreement.

6.3    Qualution shall charge a late fee of one and five-tenths percent (1.5%) per month for any payments not made by Star Number within thirty days of the date on Qualution's billing statement.

6.4    Star Number's agreement to pay direct to Qualution as set forth in section in 6.5 is a condition to Qualution's obligations under this Agreement.

6.5    Qualution reserves the right to suspend any and all delivery of CATALYST support and programming services, and the right to use it under this License, including support of program functionality, periodic updates and telephone and email support, in the event amounts due Qualution from Star Number are not paid when due, provided that Qualution has given at least Fifteen  (15) days prior  written notice of such past-due amounts which are not, in good faith, being disputed.  Fees and Charges do not include taxes and other government charges, which will be added as required by law.

7.    **Exclusivity.**  Each party is free to contract and enter into licensing agreements with other parties in all respects, including but not limited to wireless communication software services, programs and consulting; subject, however, to those requirements hereunder with respect to Confidentiality and Proprietary information regarding business rules, processes and policies.  Star Number shall not assign this Agreement or the License without Qualution's prior written consent which shall not be unreasonably withheld.  Such consent shall also be required if assignment is to a parent company, subsidiary company or Affiliate, or to an Entity that acquires all or any party of Star Number's business.  Star Number is to promptly notify Qualution in

P-7

writing of any such request for assignment. CATALYST shall not be made the subject of any leasing arrangement. Qualution shall not assign this Agreement or the License without Star Number's prior written consent which shall not be unreasonably withheld. Except as provided above, this Agreement shall be binding on and inure to the benefit of the heirs, successors and assigns of the parties to this Agreement.

**No Brokering.** Star Number shall not broker, license, sub-license, re-sell or provide CATALYST to third parties.

9.    **Limited Warranty and Limitation of Liability.**

9.1    Qualution agrees to be available 24 hours/day 7 days/week 365 days/year to service and correct any problems with CATALYST. Qualution agrees that if Star Number encounters any problem with CATALYST or if CATALYST fails to work in any way, Qualution will immediately undertake to correct, fix and repair the problem at its own expense. Any part of the problem that is not the fault of CATALYST shall be corrected, fixed and repaired at Star Number's expense.    9.2    OTHER THAN EXPRESSLY SET FORTH IN THIS AGREEMENT, QUALUTION MAKES, AND STAR NUMBER RECEIVES, NO WARRANTY, EXPRESS OR IMPLIED. QUALUTION EXPRESSLY DISCLAIMS AND EXCLUDES ALL WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. NEITHER PARTY SHALL HAVE ANY LIABLITY FOR AND EXPRESSLY DISCLAIMS ANY LIABLITY OR RESPONSIBILITY FOR CONSEQUENTIAL, EXEMPLARY, OR INCIDENTAL DAMAGES. QUALUTION EXPRESSLY EXCLUDES ANY AND ALL LIABILITY FOR THE OUTCOME OF ANY

P-7

AUDIT BY ANY FEDERAL, STATE, OR LOCAL AUTHORITY OF SALES, USE AND OTHER TAX OBLIGATIONS. WITHOUT LIMITING THE FOREGOING, QUALUTION SHALL HAVE NO OBLIGATION OR LIABILITY WITH RESPECT TO PROBLEMS RELATED TO THE OPERATION OF THE LICENSED SOFTWARE THAT QUALUTION REASONABLY DETERMINES TO BE CAUSED IN ANY WAY BY LICENSEE.

9.3    Except for the obligations of indemnification pursuant to Section 14 of this Agreement, any  financial liability of either party to the other party hereunder whether in tort, contract or otherwise, shall not exceed the charges paid by Star Number to Qualution during the previous 12 months under this Agreement.

9.4    Agreement.  By way of example, this applies to  (i) loss of revenue or anticipated profits or lost business, business interruption, costs of delay, loss of information, any failure of delivery, costs of lost or damaged data or documentation, or liabilities to third parties arising from any source, including but not limited to any claim of miscalculation, overcharge or undercharge of charges or related tax, charge or surcharge asserted by or on behalf of CATALYST contains and is integrated with third party tax database and tax engine for calculating telecom and sales taxes.  Qualution assumes no liability or responsibility for the calculation of taxes.  Qualution assumes no liability or responsibility for errors or losses caused by third-party taxation software used in conjunction with CATALYST.

9.5    Qualution assumes no liability or responsibility for errors or losses caused by any errors or omissions in (except where error or loss is determined to be caused by Catalyst):

- The sales process
- Order entry or data entry

- Business rules, formulas, or methods to determine billable vs. non-billable events or used to determine application logic

- Duplicate, erroneous, or missing usage records or usage that cannot be guided or directed to an active service

- Connectivity to the Star Number network, or the Designated Service Provider network, or the Internet from Star Number's data center(s)

- Third party vendors and third party software and third party interfaces not under the total control of Qualution Systems.

9.6    QUALUTION IS NOT ENGAGED IN RENDERING LEGAL, ACCOUNTING OR TAX ADVICE. IF LEGAL, ACCOUNTING OR OTHER ASSISTANCE IS REQUIRED, THE SERVICES OF A COMPETENT PROFESSIONAL PERSON SHOULD BE SOUGHT.

10.    **Nature of Relationship.** The parties agree that they are separate entities and are not partners or joint venturers of each other. Each party shall have no right, power or authority to bind the other party to any obligation or agreement without that party's express prior written consent.

11.    **Term and Termination.**

11.1    This Agreement may be terminated by any party hereto by notifying the other party hereto in writing not less than one hundred and twenty  (120) calendar days prior to the date of the terminating party's intention to terminate the Agreement provided, however, in the event  StarNumber, its affiliates, or parent company acquires substantially all of the assets or

stock or Qualution, the 120 day notice period shall no longer apply.. Upon the occurrence of an Event of Default as defined below, the non-defaulting party may immediately terminate this Agreement.

     11.2    The occurrence of any of the following events or conditions shall constitute an Event of Default under this Agreement:

     11.2.1    Any failure to pay any sum due under this Agreement for thirty (30) days after written notice the sum is past due and demand for payment from the other party is made except where formal dispute of charges and fees has been provided in writing prior to due date.

     11.2.2    The failure or neglect to perform or observe any of the covenants, conditions or provisions of this Agreement after written notice and sixty (60) days in which to cure such failure or neglect.

     11.2.3 Any warranty, representation or statement contained in this Agreement, or any other document or instrument executed or delivered in connection herewith shall prove to have been false when made or furnished.

     11.2.4 The liquidation, dissolution or termination of any party.

     11.2.5 The filing by or against either party of (i) any proceeding under the federal bankruptcy laws now or hereafter in effect; (ii) any proceeding for reorganization, arrangement, composition, or similar relief under any law regarding insolvency or relief for debtors; or (iii) the appointment of a receiver, trustee or custodian, or conservator of any part of the assets of either party.

     11.2.6 Failure to deliver Deposit Materials as defined in Exhibit B and specified in Sec 11.4.

P-T.

11.3    Notwithstanding any termination of this Agreement, this Agreement and the respective duties, warranties, rights and obligations of the parties hereunder shall remain in full force and effect as to all services provided hereunder prior to the termination date. Upon termination, in addition to any other obligations or responsibilities hereunder, Star Number shall return all Work Product and Confidential Information in their or their designated data center(s) possession, to Qualution, remove CATALYST from Star Number data center(s) servers and otherwise discontinue Star Number's participation and use of CATALYST. The License shall also terminate as of the termination date.

11.4 Upon the occurrence of an Event of Default that is not cured and that affects StarNumber's ability to use Catalyst, StarNumber shall have the right to continue to use Catalyst until the first to occur of the Event of Default being cured, and the passage of 90 days from the notice of default. If software maintenance and support is necessary, it may only be provided, at StarNumber's expense, through an approved third party backup software support company according to the escrow agreement detailed in Schedule B. Qualtions has 30 days from execution of this agreement to deliver Deposit Materials as specified in Schedule B or be in default of this Agreement. StarNumber is not being granted access to Catalyst source code, under any circumstance. During any such continued usage period, StarNumber shall continue to pay Qualution (or its successors, assignee and heir) the license fee as specified in Schedule A.

12.    **Binding Arbitration.**

12.1    General. Upon the request of either party, any dispute, claim or controversy of any kind arising from or in any way relating to this Agreement or the parties' rights, obligations, or duties hereunder, shall be resolved by binding arbitration heard and

decided by a single retired Judge  The arbitration shall take place in Los Angeles, California. The arbitration shall be administered by JAMS Endispute or a similar service, but not the American Arbitration Association.

    12.2   <u>Commencement</u>.  Either party may commence arbitration by serving upon the other party a written demand for arbitration.

    12.3   <u>Venue</u>.  Arbitration shall take place in  Los Angeles, California.

    12.4   <u>Other Remedies</u>.  No provision of, nor the exercise of any rights under, this Section shall limit the rights of either party to employ the following remedies: (i) exercising self-help remedies (including offset rights if not expressly disallowed); or (ii) obtaining provisional or ancillary remedies such as injunctive relief, sequestration, attachment, or the appointment of a receiver from a court having jurisdiction before, during, or after the pendency of any arbitration.  The exercise of self-help remedies or the institution and maintenance of an action for provisional or ancillary remedies shall not constitute a waiver of the right of any party, including the plaintiff, to submit a dispute to arbitration nor render inapplicable the compulsory arbitration provisions of this Agreement.

    12.5   <u>Miscellaneous</u>.  The decision of the arbitrator shall be conclusive, final and binding upon the parties.  The arbitrator shall be entitled to award compensatory and equitable relief only and may not award punitive damages.  The arbitrator shall award reasonable attorneys' fees and costs in favor of the prevailing party.  Judgment upon any award obtained from arbitration may be entered in a court of appropriate jurisdiction.  In all arbitration proceedings in which the amount in controversy exceeds $100,000 in the aggregate, the arbitrator shall make specific, written findings of fact and conclusions of law.

13.    <u>Waiver of Jury Trial</u>. THE PARTIES DO HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY AND IRREVOCABLY WAIVE ANY RIGHT THEY MAY HAVE TO A JURY TRIAL in every jurisdiction, in any action, proceeding or claim brought by a party against the other or their respective affiliates, successors or assigns in respect of any matter arising out of or in connection with this Agreement or any other document executed and delivered by any party in connection therewith (including, without limitation, any action to rescind or cancel this Agreement, and any claims or defenses asserting that this Agreement was fraudulently induced or otherwise void or voidable).

14.    <u>Indemnification</u>.

14.1    Each party agrees to indemnify and hold harmless the other party and any of its directors, officers, employees and agents for any claim, suit, penalty, hearing, cost, disbursement, expense, forfeiture, fine, loss or liability (including without limitation any attorneys' fees and court costs) incurred as a result of any act or omission, negligence, fraud or willful misconduct of itself or its directors, officers, employees or agents; provided, however, no party shall be responsible for any such losses or damages arising in whole or in part from the gross negligence or willful misconduct of the other party. In the event of any event, claim, action or proceeding giving rise to indemnification or a claim of indemnification, the party entitled to indemnification shall promptly notify the other party in writing of such.

14.2    The indemnifying party is under no obligation to indemnify and hold the other party harmless unless: (i) the indemnifying party shall have been promptly notified of the suit or claim by the indemnified party and furnished by the indemnified party with a copy of each communication, notice or other action relating to said claim; (ii) the indemnifying party

shall have the right to assume sole authority to conduct the trial or settlement of such claim or any negotiations related thereto at the party's own expense and through counsel of its own choice; and (iii) the indemnified party shall provide reasonable information and assistance requested by the indemnifying party in connection with such claim or suit.

### 15    Title and Proprietary Rights.

15.1    Intent. Except as otherwise expressly set forth herein, no party shall have any claims to or shall acquire any ownership or other interest in, or title, economic proprietary rights to, any property of any other party, including but not limited to Confidential Information, Intellectual Property Rights and Work Product (including but not limited to CATALYST). In addition, and more specifically, Qualution does not grant any express or implied rights to Star Number under any Intellectual Property Rights or Work Product. To the extent any Work Product or Intellectual Property Rights may not vest automatically and completely in Qualution, and Star Number may be deemed to have any interests or rights in such, Star Number hereby irrevocably assigns, conveys and otherwise transfers such interests or rights to Qualution.

15.2    Developed information and Work Product. All information developed pursuant to or during the term of this Agreement, or any Work Product, shall be the exclusive property of Qualution. Such shall be kept in confidence by Star Number and  Star Number's employees and associates, and may be utilized by Star Number only in conjunction with the terms of this Agreement or as otherwise agreed to expressly in writing by Qualution. All such information and Work Product shall be considered proprietary to Qualution and shall be and remain the sole and exclusive property of Qualution.

15.3    Qualution recognizes the Customers' data and history remains proprietary and confidential information owned solely by Star Number. .

## 16.    Confidentiality.

16.1    Except as otherwise expressly set forth herein, the parties understand that all information, documents and records, oral or written, provided or disclosed to each other in connection with this Agreement (including but not limited to the terms of this Agreement, customer lists and/or information, data research, services, ideas, concepts, pricing, contracts, agreements, competitive advantages or disadvantages, cost analyses, policies and/or procedures, computer programs, software, CATALYST, Work Product, Intellectual Property Rights, financial information, unannounced products or services, manuals, training materials, inventions, processes, plans, methodology, developments, forecasts, projections, proposals and marketing philosophy and objectives) are confidential and proprietary to the other party ("Confidential Information"). Each party agrees to keep in confidence and not disclose, reveal, publish, sell or distribute to any third party, duplicate, or use for the benefit of any third party or themselves, any Confidential Information of the other party without that party's prior express written consent. Each party also agrees to take all reasonable measures to enforce the obligations of confidentiality contained in this Agreement, and agrees to return all documents and other media containing such information to the other party upon termination of this Agreement.

16.2    Confidential Information does not include information which (i) becomes generally available to the public other than as a result of disclosure by a party or its agents or employees, (ii) is shown by written documentation to have been available prior to its disclosure, or (iii) is shown by written documentation to have become available from another



source (unless the source of such information is bound by a confidentiality agreement and is not otherwise prohibited from transmitting the information by a contractual, legal or fiduciary obligation). It is expressly agreed that CATALYST, and any former versions of CATALYST that may have been disclosed or in the possession of Star Number or any of its Affiliates is deemed Qualtion Confidential Information.

16.3    Notwithstanding any other provision of this Agreement, the disclosure of Confidential Information by a party shall not be precluded if such disclosure is (i) in response to an order of any court or other governmental body of the United States or any political subdivision thereof, or (ii) otherwise required by law. In the event of any such disclosure, the party disclosing shall give reasonable advance notice to the other party prior to such disclosure and an opportunity to resist disclosure.

16.4    The parties recognize that the disclosure of Confidential Information by a party may give rise to irreparable injury that may not be adequately compensated by damages. Accordingly, in the event of a breach or threatened breach by a party, or its agents or employees, the other party shall be entitled to an injunction restraining the breaching party from disclosing, in whole or in part, the Confidential Information, or from rendering services or providing or selling products to any person or entity with the use or benefit of the Confidential Information. Nothing herein shall be construed as prohibiting either party from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of damages.

16.5    Other than as expressly set forth in this Agreement or as set forth in a separate writing signed by all the signatories to this Agreement, Star Number shall not and will not at any time decode, disassemble, decompile, reverse engineer or any other manner or way

P.T.

reduce or seek to reduce to human-perceivable form, or put to any use other than as expressly set forth in this Agreement, CATALYST and any derivative, extension or further or modified version of CATALYST, or any other products, services, ideas, Concepts, software, Confidential Information, Work Product or Intellectual property Rights of Qualution.

16.6    Other than as expressly set forth in this Agreement or as set forth in a separate writing signed by all the signatories to this Agreement, Star Number shall not and will not at any time create derivative works based upon or using any part or portion of, display, distribute, lease, license, loan, modify, sublicense, transfer or use for any commercial purpose, CATALYST and any derivative, extension, or further or modified version of CATALYST, or any other products, services, ideas, Concepts, software, Confidential Information, Work Product or Intellectual Property Rights of Qualution.

16.7    Other than as expressly set forth in this Agreement or as set forth in a separate writing signed by all the signatories to this Agreement, during the term of this Agreement Star Number shall not and will not develop software, or market, promote or sell any software, that offers, performs, provides or serves any of the functions of CATALYST and any derivative, expansion or modified version of CATALYST, and Star Number shall not and will not compete with Qualution in development, marketing, promoting or selling of software to the telecom industry.

16.8    Other than as expressly set forth in this Agreement or as set forth in a separate writing signed by all the signatories to this Agreement, during the term of this Agreement Qualution shall not and will not become a Sprint PCS PLS partner or have any investment either directly or indirectly with a Sprint PCS PLS partner. .

P.T.

16.9.  The parties recognize and agree that the terms and conditions of that certain Non-Disclosure Agreement, dated August 1, 2002, by and between StarNumber and Qualution shall remain in full force and effect and such terms are herein incorporated by reference.

**General Provisions.**

17.1    <u>Severability</u>.  In the event any term or provision of this Agreement is declared to be invalid or unenforceable for any reason, the remaining terms and provisions of this Agreement shall remain in full force and effect and shall be interpreted as though such invalid or unenforceable provision were not a part hereof.

17.2    <u>Headings</u>.  The headings used herein are for convenience and reference only and are not intended to define, limit, or describe the scope or intent of any provision of this Agreement.

17.3    <u>No Alterations or Amendments</u>.  Except as otherwise expressly set forth in this Agreement, this Agreement shall not be altered or amended except by a writing signed by the party against whom enforcement of such alteration or amendment is sought.

17.4    <u>No Waiver</u>.  Failure of either party to exercise any contractual right or privilege, even if known to such party, shall not be deemed a waiver of any such right or privilege, or a waiver of any rights or remedies, present or future.  Any waiver, in order to operate as such, must be acknowledged in writing.  Neither any failure nor any delay on the part of either party in exercising any right hereunder shall operate as a waiver; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof.

17.5    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of California applicable to contracts made and to be

performed entirely within that State, with the exception of any conflict of laws provisions under such laws.

   17.6    <u>Interpretation</u>.  The language in all parts of this Agreement shall in all cases be construed as a whole according to its fair meaning and not strictly for nor against any party.  The parties agree that each party has reviewed this Agreement and has had the opportunity to have legal counsel review the same and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply in the interpretation of this Agreement or any amendments thereto.  Except where specifically provided to the contrary, when used in this Agreement, the term "including" shall mean without limitation by reason of enumeration.

   17.7    <u>Time Periods</u>.  If the last day of any time period stated herein shall fall on a Saturday, Sunday or legal holiday in the State of California, then the duration of such time period shall be extended so that it shall end on the next succeeding day which is not a Saturday, Sunday or legal holiday in the State of California.

   17.8    <u>Gender</u>.  When the context in which the words are used in this Agreement indicate that such is the intent, the singular and plural number shall be deemed to include the other and the masculine, feminine and neuter genders shall be deemed to include the other.  The term "person" shall mean any corporation, limited liability company, natural person, firm, joint venture, partnership, trust, unincorporated organization, government (including, but not limited to, any department or agency thereof), or any other entity or form of entity, and the respective heirs, executors, administrators, legal representatives, successors, and assigns thereof.

   17.9    <u>Attorneys' Fees</u>.  The prevailing party in any dispute arising under this Agreement shall be entitled to receive reasonable costs, fees, and expenses, including attorneys'



fees. For any matter resolved by a court and not by arbitration pursuant to the terms of this Agreement, reasonable attorneys' fees shall be determined by the court and not a jury.'

17.10  Time of the Essence. Time is declared to be of the essence of this Agreement.

17.11  Rights of Assignment/Subagents. Neither this Agreement nor the licenses granted hereunder are transferable by either party without the prior written consent of the other party; any attempt to do so shall be void. However, either party may assign its right to payment or commission for services rendered under this Agreement to a third party.

17.12  Notices. Any notice, demand, or other communication required hereunder ("Notice") shall be in writing and shall be delivered personally or mailed, postage prepaid, by first class mail to the address set forth above or to such other address as either party may from time to time designate by Notice hereunder. Such notices shall be effective immediately, if delivered, or forty-eight (48) hours after deposit in the mail, if mailed.

17.13  Disclosure. Neither party shall publish or otherwise disclose through press releases, articles or other advertisement in any media, the financial remuneration, license fee, user fee and insurance commission division arrangement to or with the other party without the other party's prior written consent

17.14  Cumulative. The rights, remedies and obligations contained in this Agreement are cumulative and are in addition to any and all rights, remedies and obligations, at law or in equity, which the parties are entitled to under state and federal laws.

17.15  Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which taken together shall constitute one and the same instrument and agreement.

17.16   Third Parties.  Except as may be expressly set forth herein, the parties do not intend to confer any rights or remedies upon any other parties.

17.17   Successors and Assigns.  This Agreement shall be binding upon the parties and their successors and assigns, including but not limited to any corporate successors by a merger, consolidation or other corporate reorganization without limitation. Should Qualutions enter into an agreement to sell or merge substantially all the assets or capital ownership of the corporation , Star Number is hereby given a right of first refusal to Acquire or right to renegotiate for right of use.

17.18   Survival of Provisions.  All covenants and conditions relating to the rights and obligations of the parties subsequent to the termination of this Agreement, including but not limited to the payment of any fees owed hereunder, and the disclaimer of warranty, limitation of liability, indemnification and confidentiality provisions, shall survive such termination and shall continue in full force and effect in accordance with the terms of the specific provision.

17.19   Force Majeure.  Neither party shall be responsible for any delay or failure in performance resulting from acts beyond the control of such party.  Such acts shall include but not be limited to an act of God, war, riots, a strike or lockout, or failures of communications lines, power lines or computer equipment.  The affected party shall make good faith efforts to remedy any such delay or failure in performance as soon as reasonably possible and keep the other party informed as to their progress in doing so.

17.20   Logo, Trademark.  Except as otherwise set forth herein, neither party will use the other's name nor any other name, logo, trademark, service mark or symbol that is now or may hereafter be owned by the other party, except in the manner and to the extent that the other party may specifically authorize in writing and as set forth in this Agreement.  Upon termination



of this Agreement, each party will immediately discontinue the use of any such name, logo, trademark, service mark or symbol belonging to the other party, except as may otherwise be agreed in writing by the parties.

17.21    Corporate Standing; Authority.  The parties represent that they are corporations or other entities duly organized, validly existing and in good standing under the laws of their respective state of organization, and that they have all requisite power and authority to enter into this Agreement and to carry out their duties hereunder.

17.22    Regulatory Examinations.  To the extent either party is subject to periodic examinations by federal and/or state regulatory authorities, each party agrees to undertake reasonable efforts to cooperate with the other in connection with any such examinations.

17.23    Further Information and Instruments.  Each party shall promptly execute and deliver further instruments, documents and papers, and shall perform any and all acts necessary, to give full force and effect to all of the terms and provisions of this Agreement.

17.24    Venue.  Both parties agree that any claim asserted by a party against the other party and arising under or related to this Agreement shall be heard and determined exclusively either in ~~New York City~~ *Los Angeles P.-T.* for any arbitration(s) or otherwise in the state or federal courts located in the ~~City of New York, New York~~. *P-T*  *Los Angeles, CA.  See 12.3.*

THE PARTIES UNDERSTAND AND AGREE THAT THIS WRITING IS THE FINAL AND BINDING EXPRESSION OF THEIR CONTRACT AND AGREEMENT AND THEIR EXPECTATIONS CONCERNING ITS PERFORMANCE AND THAT IT IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE TERMS THEREOF,



SUPERSEDING ALL PRIOR NEGOTIATIONS, PROPOSALS, REPRESENTATIONS
AND AGREEMENTS, WHETHER WRITTEN OR VERBAL.


QUALUTION SYSTEMS, INC.

By: _____
        Pedram Toussi

Its: _Pedram Toussi_
        President        10,27,2003


STAR NUMBER INC.

By: _____
        Donald Charlton

Its: _____
        President
                10|10|03

### SCHEDULE A
TO QUALTION INC./STAR NUMBER SERVICE AGREEMENT DATED AS OF October 9, 2003.

**Prerequisite Third-Party Software**
> Oracle9i - Sufficient Oracle licenses for the number of Licensee's end users of Licensed Product and number of CPU processors of Licensee's computer hardware.
> Oracle Support
> Windows 95 or higher  - Sufficient number of licenses for each of Licensee's end users of Licensed Product.

**Requisite Third-Party Subscriptions**
> **CCH** ZIPcomm™ Database Cellular & Long Distance
> **CCH** ZIPcomm™ ZIP+4
> **CCH** Additional Affiliates/Data Center single affiliate charge
> **SyncSort Third-Party Software**
>> High performance sorting utility
> **CIBERNET License fee**
>> Required by Sprint PCS to process real time MAF feed.

**Charges and Fees**

| Fee | Amount |
|---|---|
| Additional Programming Service | $120 per hour with a one-hour minimum per request. |
| **Monthly Fee** | |
| Number of Mobile Numbers active, temporarily suspended under 31 days, hotlined, having any usage, or incurring any charges during billing period other than accounts with only a late charge. There is no charge for accounts suspended for more than 30 days or accounts with late fees only. | The final invoice of Prepaid Mobile Numbers that are deactivated within 30 days of activation, shall be charged at 50% of the designated tiered rate. No charge for accounts with late fees only. |

| FROM | TO | Charge per MIN | Minimum Monthly Fee per tier |
|---|---|---|---|
| 1 | 10,000 | $1.13 | $5,000 |
| 10,001 | 20,000 | $1.06 | $11,250 |
| 20,001 | 40,000 | $1.00 | $21,250 |
| 40,001 | 50,000 | $0.94 | $40,000 |
| 50,001 | 100,000 | $0.81 | $46,875 |
| 100,001 | 150,000 | $0.75 | $81,250 |
| 150,001 | 200,000 | $0.69 | $112,500 |
| 200,001 | 250,000 | $0.63 | $137,500 |
| 250,001 | 500,000 | $0.56 | $156,250 |
| 500,001 | 1,000,000 | $0.40 | $281,250 |

| | |
|---|---|
| Each mobile on EBPP (Electronic Bill Presentment and Payment | Included |
| CDR processing and analysis, and processing of monthly invoices | Included in Monthly Fee |
| Fees or charges for 3rd party services or subscriptions or fees incurred by Qualution from 3rd party vendors. | The amount invoiced by the 3rd party vendor, passed through without markup. |
| Final data export fee - Upon cancellation of contract, or term of the agreement, the subscriber information can be returned in standard Catalyst export format. | $10,000 plus media charges (tapes, CDs, DVDs, etc.) |
| Custom Report development | $120 per hour with a one-hour minimum per request. |

