UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                          . Case No. 07-11666 (KG)
                                .
                                .
  INPHONIC, INC., et al.,       . 824 Market Street
                                . Wilmington, Delaware  19801
                Debtors.   .
                                . December 13, 2007
. . . . . . . . . . . . . . . . 4:15 p.m.
```

TRANSCRIPT OF MOTIONS HEARING
BEFORE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY COURT

APPEARANCES:

For the Debtors:              DLA Piper US LLP
                              By: THOMAS CALIFANO, ESQ.
                              1251 Avenue of the Americas
                              New York, NY  10020

For Adeptio:                  Kirkland & Ellis
                              By: DAVID AGAY, ESQ.
                                  ANUP SATHY, ESQ.
                              Aon Center
                              200 East Randolph Drive
                              Chicago, IL  60601

For the U.S. Trustee:         Office of the U.S. Trustee
                              By: RICHARD SCHEPACARTER, ESQ.
                              J. Caleb Boggs Federal Building
                              844 King Street
                              Suite 2313
                              Lockbox 35
                              Wilmington, DE  19801

Audio Operator:               Nicole Schaefer

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311  Fax No.  (609) 587-3599**

**APPEARANCES CONTINUED:**

For Cellco Partnership:        Blank Rome, LLP
                                   By:  REGINA STANGO KELBON, ESQ.
                                 One Logan Square
                                 Philadelphia, PA  19103

For AT&T:                Kilpatrick Stockton LLP
                                 By:  PAUL M. ROSENBLATT, ESQ.
                                 Suite 2800
                                 1100 Peachtree Street
                                 Atlanta, GA  30309

For T-Mobile:            Womble Carlyle Sandridge & Rice
                                 By:  FRANK MONACO, ESQ.
                                 One Atlantic Center
                                 1201 West Peachtree Street
                                 Suite 3500
                                 Atlanta, GA  30309

For Alltel Communications:    Smith, Katzenstein & Furlow LLP
                                 By: KATHLEEN M. MILLER, ESQ.
                                 The Corporate Plaza
                                 800 Delaware Avenue
                                 P.O. Box 410
                                 Wilmington, DE  19899

For Echostar Satellite:       Morris, Nichols, Arsht &
                                 Tunnell
                                 By: DANIEL B. BUTZ, ESQ.
                                 1201 North Market Street
                                 P.O. Box 1347
                                 Wilmington, DE  19899

For Sprint Nextel:            McGuireWoods LLP
                                 By:  DAVID I. SWAN, ESQ.
                                 McLean, VA

For Verizon Business:        McCarter & English, LLP
                                 By:  L. KATHARINE MAYER, ESQ.
                                 Mellon Bank Center
                                 919 Market Street
                                 Suite 1800
                                 Wilmington, DE 19899

For Microsoft:            Brown Stone Nimeroff, LLC
                                 By:  JAMI B. NIMEROFF, ESQ.

**APPEARANCES CONTINUED:**

For Spanco Telesystems:          Wilentz, Goldman & Spitzer P.A.
                                 By:  DAVID STEIN, ESQ.
                                 90 Woodbridge Center Drive
                                 P.O. Box 10
                                 Woodbridge, NJ  07095

For Yellow Page Authority:       Buchanan, Ingersoll & Rooney PC
                                 By:  PETER A. DUHIG, ESQ.
                                 Wilmington, DE

For U.S. Cellular:               Richards, Layton & Finger, P.A.
                                 By:  JASON MADRON, ESQ.
                                 One Rodney Square
                                 920 N. King Street
                                 P.O. Box 551
                                 Wilmington, DE  19899

For Infite Computers:            Seitz, Van Ogtrop & Green, P.A.
                                 By:  KEVIN A. GUERKE, ESQ.
                                      TIM McGARY, ESQ.
                                 222 Delaware Avenue
                                 Suite 1500
                                 P.O. Box 68
                                 Wilmington, DE  19899

For Creditors Committee:         Reed Smith, LLP
                                 By:  KURT GWYNNE, ESQ.
                                      CLAUDIA Z. SPRINGER, ESQ.
                                 2500 One Liberty Place
                                 Philadelphia, PA  19103

4

**I N D E X**

WITNESS FOR THE COMMITTEE:                          **PAGE**

   DANIEL POLSKY

     Direct Examination by Mr. Gwynne              44

1              COURT CLERK:  Please rise.

2              THE COURT:  Thank you, you may be seated.  Mr.

3    Califano.

4              MR. CALIFANO:  Good afternoon, Your Honor.

5              THE COURT:  Oh, is it Friday?  It's hard to believe

6    it's still Thursday.

7              MR. CALIFANO:  It seems long.

8              THE COURT:  Yes, sir.

9              MR. CALIFANO:  Good afternoon, Your Honor.  We have a

10   number of matters on today

11             THE COURT:  Yes.

12             MR. CALIFANO:  We have -- but I am happy to announce

13   that the Debtors, the Official Committee of Unsecured Creditors

14   and Adeptio have agreed to a modification of the sale and sale

15   order that resolves the Committee's outstanding motion to

16   dismiss, objections to the sale and the other motions, and does

17   provide the basis, the framework for a post closing plan.  And

18   there is a term sheet that I'd like to read into the record.

19             Your Honor, this is -- it provides for Adeptio to

20   fund through confirmation of a plan, up to $1. million dollars

21   in total professional fees, excluding Lazard, Goldsmith Agio.

22   In addition, provide $200,000 in what is defined as wind down

23   funding, and we have a term sheet that we'd like to make part

24   of the -- make it as an attachment to the sale order.

25             THE COURT:  Yes.

1          MR. CALIFANO:  And, I'm just reading the highlights.

2          THE COURT:  That will work.

3          MR. CALIFANO:  Provides for a loan to a liquidating

4   trust of $500,000 by Adeptio.  It provides for allowance of the

5   Adeptio deficiency claim at the amount of $20 million dollars.

6   It provides for the funding of up to $500,000 in priority

7   claims.  It provides that any of the avoidance actions that

8   Adeptio would be buying are deemed released upon the closing

9   and then, Your Honor, the Debtors would like to come back here

10  on our next scheduled hearing date, which I believe is December

11  20th --

12          THE COURT:  I believe that's right.

13          MR. CALIFANO:  I'm not sure, but I believe it's

14  December 20th.

15          THE COURT:  Yes, it is, 3 p.m.

16          MR. CALIFANO:  And we'd like to come back here on

17  that date and make a showing to have the remainder of the

18  preference actions released or abandoned by the estate,

19  whichever is appropriate.  Lazard, Goldsmith, Agio, Helms has

20  agreed to cap their success fee at the amount of $1.3 million,

21  conditioned on it being allowed today, at today's hearing, and

22  none of the parties have objected, including the U.S. Trustee,

23  to the allowance at this hearing and what we'd ask Your Honor,

24  after I go through the terms, would be that you allow the fee

25  and that we submit an order that the fee be allowed today.

**J&J COURT TRANSCRIBERS, INC.**

1          The parties have agreed that the Creditors Committee

2    investigation period will end today, and I believe that Mr.

3    Gwynne has a showing with respect to that.  We've agreed to

4    come back on an expedited basis for a 9019 order, also on the

5    20th.  The parties have agreed to work together in good faith

6    to reach an agreement on the composition, constitution and

7    governance of a liquidating trust to be formed.

8          This is a final settlement, obviously, and all the

9    parties are bound by this today, and they're going to sign on.

10   The only issue that needs to be adjusted, there's a commitment

11   that certain directors and officers receive releases and we're

12   not exactly sure of the form that that will be in and there

13   needs to be cooperation agreements, but there's a commitment by

14   all the parties that those individuals, I'm sorry, the

15   individuals identified in the term sheet, that they be

16   released, subject to cooperation.  So, we'll have the parties

17   sign the term sheet and submit it with the sale order, Your

18   Honor.

19          THE COURT:  Yes.

20          MR. CALIFANO:  And, I don't know which of the other

21   matters you'd like to go forward with because matter three,

22   which was the motion to dismiss -- I'm sorry, that's the sale

23   order, the first of our contested matters going forward.

24          THE COURT:  I think another matter of some

25   significance that we ought to address, perhaps, Mr. Califano,

1 is on the sale order, well, I suppose we can take those -- I

2 was going to say the objections on the assignment rejection.

3         MR. CALIFANO:  On the cure amount objection?

4         THE COURT:  On the cure amount objections and --

5         MR. CALIFANO:  Yes, and Mr. Agay from Kirkland &

6 Ellis on behalf of Adeptio, has worked out some language, I

7 believe, to be incorporated in the order.

8         THE COURT:  Okay.

9         MR. CALIFANO:  And, I would just ask him --

10         THE COURT:  I didn't want to jump ahead, but fine,

11 Mr. Agay, please, thank you.

12         MR. AGAY:  It can wait, Your Honor.

13         THE COURT:  I just wanted people to know, kind of,

14 that that was being addressed and they didn't have to --

15         MR. CALIFANO:  Okay, we can address it after.

16         THE COURT:  -- they didn't have to rush to the podium

17 to make a point of it.

18         MR. CALIFANO:  Okay.  So, Your Honor, we received a

19 series of objections to the sale and what I'd like to do first

20 is just proffer why the sale is in the best interest of the

21 estate.

22         THE COURT:  Yes.

23         MR. CALIFANO:  And I do have an officer of the Debtor

24 here to testify, if necessary, Mr. Walt Leich, but I'll offer a

25 proffer on why the sale is in the best interest of the estate.

1  And then we can go through the objections and what we've done

2  with the objections.

3        But, Your Honor, as you've heard on the first day in

4  this case, this Debtor was an extremist, prepetition.  It was

5  at a point where it had defaulted with its prepetition lenders,

6  Goldman, Sachs and CitiBank.

7        THE COURT:  Yes.

8        MR. CALIFANO:  They were not willing to support the

9  Debtor through a Chapter 11 process.  They were not willing to

10  allow themselves to be primed and, basically, they were done.

11  Through the efforts of Goldsmith, Lazard, the Debtor was able

12  to find an entity, Adeptio, which is a subsidiary of Versa

13  Capital, to go out and purchase that secured debt and provide a

14  DIP financing on top of it, as an avenue to obtain the assets

15  and maintain the company.

16        Prepetition, the Debtor had been marketed in a series

17  of different manners, including in the transaction that

18  resulted in Adeptio purchasing the debt.  It's a public

19  company, there were public disclosures that the company had

20  been in play and we believe that prepetition, it had been

21  adequately marketed.

22        Your Honor, post petition, Lazard went out to a

23  number of strategic and financial buyers.  There was a website

24  set up with access to the Debtors information, due diligence.

25  About 38 parties signed NDA's, non-disclosure agreements, a

1  number went in and actually did due diligence.  A smaller

2  number, actually had management presentations and interviews

3  and at our bid deadline, which was last Friday, we received no

4  bids, whatsoever, nor did we receive any requests that the bid

5  deadline be extended.  So, we believe that the Debtors assets

6  have been adequately marketed.  And I think the fact today that

7  nobody is here saying they needed more time, is a clear

8  indication that the Debtors assets had been properly and

9  adequately marketed.

10         This Debtor has been losing money, as we've discussed

11  through this case and at one point, it was losing money at the

12  rate of $3.2 million dollars.  We've only been able to survive,

13  post petition, through the Debtor-in-Possession funding that

14  Adeptio provided.  That Debtor-in-Possession funding was

15  conditioned on the sale of the assets.  There isn't a prospect

16  for a reorganization as a stand alone company, the company

17  needs funding desperately and we've been able to obtain that

18  funding from Adeptio.  So, we believe we can show the exigency

19  to justify a sale outside of a plan process.

20         We've received a number of objections to the sale,

21  many of which we have resolved, Your Honor.  We received an

22  objection from the United States Trustee regarding, first, this

23  363(o) language and at one of the prior hearings we agreed to

24  incorporate that in the sale order and we believe we've

25  resolved that objection.

1          The other objection related to the 363(b)(1)

2    appointment of a consumer ombudsman.  That we dealt with at a

3    prior hearing also, Your Honor, so we believe we've resolved

4    the U.S. Trustee's objections.  And Mr. --

5          MR. SCHEPACARTER:  That's correct.

6          MR. CALIFANO:  Thank you.

7          THE COURT:  Thank you, Mr. Schepacarter.

8          MR. CALIFANO:  The Official Committee of Unsecured

9    Creditors objected for various reasons that now are resolved by

10    the term sheet and the settlement, Your Honor.

11          We received an objection from NEA Members Benefits

12    Corporation, which objected to the cure amount.  Your Honor,

13    we're putting that off.  We have not determined yet whether

14    that contract will be assumed or not and we'll seek a further

15    date to resolve that cure objection.

16          Once again, Compare Wireless made a sale objection

17    that also is based on the cure amount.  It was really a cure

18    objection.  Once again, we believe those objections are

19    premature and can be resolved at a later date.

20          Spanco Telesystems and Solutions, Your Honor,

21    objected to the sale on the grounds that the bid procedures did

22    not provide timing of the assumption or payment of the cure.

23    We'll resolve that, we believe that that also is really a cure

24    objection.

25          Microsoft Licensing, they also filed a limited

1  objection to the sale motion asking the Court to deny the sale

2  motion or condition the approval upon determination and payment

3  of actual cure costs and payment of attorneys fees.  Once again

4  we believe that that's premature.  And, I don't want to address

5  their claim to attorneys fees.

6        Also, Microsoft objected to the extent that allows

7  post closing use of their software in contravention of their

8  licensing agreements, and I can represent that they're not

9  going to be using their software post closing.  Your Honor,

10 that also is on the hold list, that will be put off and

11 resolved before the assumption.

12       Then we received objections, other objections, from

13 Yellow Page Authority, Verizon and the like, that were cure

14 objections, that were styled as sale objections and I believe

15 the cure objections are all resolved by either putting that to

16 another date where the contested cure objections can be dealt

17 with, and I think at the end of this hearing we should pick

18 another holding date for those contracts.

19       THE COURT:  And by dealt with, Mr. Califano, I assume

20 you're talking about having an opportunity to talk with the

21 objecting parties?

22       MR. CALIFANO:  Yes, we'll have an opportunity to deal

23 with the objecting parties and if we can't resolve any issues,

24 come back before Your Honor to determine whether those cure

25 amounts -- but we don't think that that's an issue for today

1 because a number of these -- all these contracts are on what's

2 referred to under the APA, as the hold list, meaning a

3 determination has not yet been made as to whether those

4 contracts will be assumed or rejected.

5          I believe, Your Honor, that addresses all the sale

6 objections, other than the cure objections that Mr. Agay is

7 here to address.

8          THE COURT:  Thank you.  Mr. Agay?

9          MR. AGAY:  Good afternoon, Your Honor.

10          THE COURT:  Good afternoon.,

11          MR. AGAY:  David Agay for Adeptio, the purchaser.

12 I'll be brief, Your Honor.  Several of our carriers, with whom

13 we have agreements that are important to the business, objected

14 to the sale.  While we would have loved to have been in a

15 position today to be making a decision as to those agreements,

16 we have --

17          THE COURT:   Been otherwise occupied.

18          MR. AGAY:  Yes.  A lot going on.  So, they're at the

19 front of the line in terms of our priorities, but in the

20 meantime, we are not in a position today to make a decision on

21 their agreements and for that reason we have agreed to attach a

22 rider to the sale order which we will be handing up, Your

23 Honor.  This has been vetted with the carriers, I believe we're

24 in agreement as to the language which, in effect, preserves the

25 status quo as to those agreements.  That is, the sale order and

1 the 363(f) language will not cut off their offset rights.

2 They're going to reserve their rights as to any cure and

3 adequate assurance objections, if and when it comes time to

4 assume, for the Debtors to seek to assume their contracts, and

5 in exchange, and I would ask Your Honor's indulgence in this

6 respect, we have asked that the carriers represent on the

7 record that at the same time that Adeptio will be picking up

8 the carry costs for these contracts and assuming post petition

9 trade payables, so we will be honoring the Debtors side of the

10 bargain, we've asked that the carriers get up and state on the

11 record that they'll be honoring their side of the bargain on

12 these contacts and honoring their obligations thereunder, fully

13 understanding that they're reserving all rights, defenses,

14 interests, et cetera, under the order.  So, if I've

15 misrepresented anything, I'm sure that they'll tell you, but we

16 have asked that the carriers put on the record that they'll

17 honor their obligations under the contracts.

18          THE COURT:  Thank you, thank you, Mr. Agay.  Let me

19 ask this first, just in general.  Does anyone wish to

20 cross-examine the witness whose testimony was proffered?  Okay.

21 Well, at this point, then, I do think it's appropriate to hear

22 from the objecting parties and, of course, hopefully to confirm

23 that which Mr. Agay has stated on the record here.

24          Good afternoon, thank you for your patience everyone.

25          MS. KELBON:  Thank you, Your Honor.  Regina Stango

1    Kelbon on behalf of Cellco Partnership, doing business as

2    Verizon Wireless.   I just want to point out, Your Honor,

3    there's another Verizon entity, at least another one, that's

4    involved in the case, that has filed a separate objection,

5    they're represented by separate counsel and they, I believe,

6    are on the adjourned list to be heard at a different point in

7    time, so I wanted to make that clear when Mr. Califano said

8    Verizon was being kicked to another day, that's a different

9    Verizon entity.   So, I want to make sure that was clear for the

10   record.

11            THE COURT:   Thank you.

12            MS. KELBON:   Because I represent Verizon Wireless.

13            THE COURT:   Okay.

14            MS. KELBON:   Which is the wireless carrier.   Your

15   Honor, I think generally what Mr. Agay has said is true.   I

16   want to make it clear, a couple of things, the concerns that we

17   have.

18            The concerns we have is that the language in the APA

19   that we don't want anything to be used as a defense or as an

20   impairment of any offset or recoupment rights that exist either

21   today, as of the filing date or hereafter, because we have, for

22   example, just to give you an example under our contract,

23   commissions are not fully earned for six months.   They get an

24   advance payment and then as deactivations occur that is

25   recouped every month thereafter.   So, you never know what

1  you're fully entitled to as a commission for a six month period

2  after an activation occurs.  So that is an issue.  There's also

3  purchases of equipment under the same contract, at least for

4  our carrier, so we have -- and we assert recoupment rights.

5  So, when Mr. Agay says that he wants the carriers to get up and

6  say that they're going to comply with the contract, I don't

7  want there to be any misunderstanding, we're not turning over

8  our commissions, because we believe we have recoupment and

9  setoff rights, and we're holding onto that money to preserve

10  that and we have no obligation under our contract to ship

11  equipment.  It says we may but are not obligated to.  So, I

12  don't know what he's expecting from Verizon but I wanted to

13  make that clear so he is not under any misimpression.

14          So, we'll comply with what we believe we're entitled

15  to and if he disagrees, I guess he'll bring whatever action

16  they think is appropriate as well.  But I think the point of

17  the language that has been negotiated is to say that we're

18  fully preserved in all of our arguments, so we think we have

19  100 -- we're owed 1.2 million, Your Honor, we owe them $760,000

20  as of November we owed that, we don't want any arguments that

21  they sold the accounts for 10 cents on a dollar, therefore, we

22  have to get 10 cents on a dollar in our offset.  No.  It's

23  fully -- all of our rights are fully preserved, we're not being

24  diminished or impaired by anything that's occurring with

25  respect to this sale, for valuation issues or anything else.

1 Thank you, Your Honor.

2          THE COURT:  Thank you.  And, perhaps, Mr. Agay, are
3 you prepared to respond?

4          MR. AGAY:  To confirm whatever her rights are under
5 the contract, they are.

6          THE COURT:  Okay, thank you.

7          MR. ROSENBLATT:  Good afternoon, Your Honor.

8          THE COURT:  Good afternoon.

9          MR. ROSENBLATT:  Paul Rosenblatt on behalf of AT&T.
10 With respect to Mr. Agay's comments, AT&T generally concurs
11 with them.  AT&T is performing under its dealer agreement with
12 the Debtor and it also reserves all of its rights and remedies
13 with respect to that agreement.  It expects the Debtor to
14 properly perform under that agreement as well.

15          With respect to the terms of the language that was
16 negotiated and will be attached as an addendum to the sale
17 order, it's the intent of that language that nothing in the
18 sale order, the agreement that is subject to the sale order, or
19 otherwise with respect to the sale process, will affect any of
20 AT&T or the other carrier's rights with respect to their setoff
21 positions, their recoupment positions, their offset positions,
22 or their purchase money security interest positions.

23          And, with that, we would see approval of that
24 Addendum A to be attached to the order, Your Honor.

25          THE COURT:  Thank you, Mr. Rosenblatt.

1          MR. ROSENBLATT:  Thank you.

2          THE COURT:  Thank you.  Mr. Monaco, good afternoon.

3          MR. MONACO:  Good afternoon, Your Honor, Frank Monaco

4  for T-Mobile.  Your Honor, I do not have anything really more

5  to add to what my other carrier colleagues have said.  It's my

6  understanding it's business as usual between my client and the

7  Debtor, but we do reserve whatever rights we have under our

8  dealer contract and we are fine with the language that's been

9  appended to the sale order and we'll withdraw objection.

10         THE COURT:  Thank you, Mr. Monaco.  Good afternoon,

11 Ms. Miller.

12         MS. MILLER:  Good afternoon, Your Honor.  Kathy

13 Miller on behalf of Alltel, whom we also agree with the other

14 statements by the carriers and Alltel is very happy, willing,

15 and ready to work with the purchaser to see if we can work

16 through our issues in the next 45 days or so.

17         THE COURT:  Thank you.

18         MS. MILLER:  Thank you, Your Honor.

19         THE COURT:  Good afternoon.

20         MR. BUTZ:  Good afternoon, Your Honor, Daniel Butz

21 from Morris, Nichols, Arsht and Tunnell on behalf of Echostar

22 Satellite LLC.  Echostar also filed an objection and we're in a

23 slightly different position than all of the other carriers in

24 that we are on the designated contracts list, at least as of

25 Tuesday when they refiled it.

**J&J COURT TRANSCRIBERS, INC.**

1       We don't oppose, in theory, the assumption and

2   assignment of our retailer agreement, as long as it's clear

3   that all of Echostar's rights under that agreement are not

4   being impaired and are going to the purchaser.  We have

5   indemnification obligations, whether or not they arose pre or

6   post petition, although they probably haven't been reduced to a

7   money amount, recoupment, setoff rights, and many of the other

8   rights as previously described by others who have been up here.

9   And, we ask that whatever language is inserted makes it clear

10  that Echostar's rights are fully preserved going forward, and

11  that the purchaser doesn't come back an try to claim that oh,

12  no, that wasn't an assumed liability even though this is an

13  assumed contract.  Thank you.

14          THE COURT:  Mr. Agay, any problem with that request?

15          MR. AGAY:  We're assuming the contract, Your Honor,

16  so --

17          THE COURT:  But, I don't believe I'm entering an --

18          MR. AGAY:  For Echostar, Echostar is on the

19  designated list.

20          THE COURT:  For Echostar -- forgive me.

21          MR. AGAY:  So, we're assuming the contract.

22          THE COURT:  Yes.  Okay.  Then I think that Mr. Butz's

23  concerns have been addressed?

24          MR. AGAY:  They should be, yes.

25          MR. BUTZ:  If their definition of assumed is the

1 standard bankruptcy definition and there's no fancy language in

2 the order or the APA trying to carve anything out and they take

3 all obligations under it, then we're fine, Your Honor.

4          THE COURT:  Mr. Agay, I think that's the case.

5          MR. AGAY:  We're not creating any new definitions of

6 assumption under the bankruptcy code, Your Honor.

7          THE COURT:  Thank you, thank you, sir.

8          MR. SWAN:  Good afternoon, Your Honor, David Swan

9 for Sprint Nextel Corporation.  We've also been asked to

10 confirm, we're also a carrier, we've been asked to confirm that

11 we agree to perform under the contract and we do confirm that.

12 We reserve our rights, and so forth.

13          One other point that was not covered in the

14 presentation is, the rider also provides that the contracts

15 must be assumed and assigned by January 31st, 2008.  That's a

16 drop dead date and if it's not assumed and assigned by then,

17 it's deemed rejected.  So, I just wanted to make that point on

18 the record, that that is also in the rider.

19          THE COURT:  Thank you.

20          MR. SWAN:  Thank you.

21          THE COURT:  Thank you very much, Mr. Swan.  Good

22 afternoon.

23          MS. MAYER:  Good afternoon, Your Honor, Katherine

24 Mayer.  I'm actually filling in for Bill Taylor who had to

25 leave early today, so I'm coming into this a little bit late in

1  the game, but we represent Verizon Business, which is formally

2  known as MCI WorldCom, which is the other Verizon entity that

3  counsel just referenced earlier.  We did raise an objection.

4          Verizon provides, we consider, crucial business

5  services.  We provide seven 1-800 numbers, that's basically

6  how the customers are able to provide -- get services.  We also

7  provide -- handle the billing for the customers through the

8  websites and IP addresses.

9          At this point in time, I don't know where we are,

10  other than being on the hold list.  We did raise an objection

11  because we were not provided with the status as to whether we

12  were being assumed or rejected, and the cure amount, we

13  believe, is in excess of 200,000, the majority of which is post

14  petition.  So, we would preserve any right to file a motion to

15  compel assumption or rejection in the event that we don't

16  resolve it amicably between the parties.

17          THE COURT:  Thank you very much.  And I think --

18  well, obviously, your rights are preserved, therefore, and

19  hopefully in a very short time, any issues will be resolved

20  between you.

21          MS. MAYER:  Thank you.

22          THE COURT:  Or you'll always have, obviously,

23  availability to the Court.

24          MS. MAYER:  Thank you, Your Honor.

25          THE COURT:  Thank you.

1            MS. NIMEROFF:  Good afternoon, Your Honor, Jami

2   Nimeroff, I'm here on behalf of Microsoft.

3            THE COURT:  Yes.

4            MS. NIMEROFF:  Two different Microsoft entities.

5   Microsoft Licensing and Microsoft On Line.  Microsoft Licensing

6   is the entity that deals with the licensing of the software.

7   Microsoft On Line is a contract entity that deals with

8   advertising services on the MSN Network.

9            Microsoft originally filed a limited objection based

10  on a cure.  We were originally put on a list of possible, to be

11  assumed contracts and there are a lot of contracts in place

12  between the Debtor and Microsoft so it wasn't clear and,

13  basically, we reserved our rights with regard to cure.

14           Subsequently, we were taken off, or not put on the

15  designated contracts list, which is fine, but I rise today

16  because the biggest issue that we have that we're dealing with

17  relates to the software, Microsoft software and the licenses

18  for that.

19           The best that I can tell from the version of the APA

20  that I've seen, that while software is included in the

21  definition of assets that are going to be sold, it talks about

22  software pursuant to a designated contract.  As of right now,

23  the best that I can tell is Microsoft is not a designated

24  contract and, therefore, those licenses are not purporting to

25  be transferred as part of this, and will be subsequently dealt

1  with through the assumption and the assignment procedures.

2         It's Microsoft's position that these software

3  licenses are not assignable, pursuant to West Electronics and

4  the progeny that requires the consent of Microsoft.  At this

5  point, we are looking to try to have time to talk with the

6  buyer and/or the Debtor about whether these licenses will be,

7  as well as the other Microsoft contracts will be assumed and

8  assigned, but we just wanted to make it clear to everyone that

9  it's our position that the software cannot be used post

10 closing.  To the extent these issues are not resolved, that

11 they're not being transferred as part of this case and we're

12 reserving all of our rights, vis-a-vis, copyright infringement,

13 et cetera, post closing.  You know Microsoft is looking to try

14 to resolve the issues and we hope to have time to do that.  We,

15 obviously, with all the issues going on, it was not something

16 that really bubbled up to the top today and that's fine.  So, I

17 wanted to make that clear.

18        And, to the extent that my understanding of the

19 language in the APA is not right, I would appreciate to hear

20 that.

21        Your Honor, I just want to raise one or two questions

22 or issues with regard to the sale order.  There's a lot of

23 language in there that overrules objections, overrules

24 reservations of rights, things like that.  To the extent that

25 it has to do with the actual sale itself, we're not objecting

1 to the sale.  What we are, at this point, reserving our

2 position, vis-a-vis, any attempts to assume or assign contracts

3 with Microsoft and we would want it to be clear either here

4 with Your Honor, through statements made by counsel, language

5 added to the order, whatever, that the attempts to overrule

6 objections, to say objections are overruled, they're resolved,

7 their, you know, reservations aren't protected any more, that

8 that is not --

9         THE COURT:  That is not the case.

10         MS. NIMEROFF:  -- the intention of the language of

11 this order.

12         THE COURT:  And, we should have that on the record, I

13 agree, Ms. Nimeroff.  Thank you.  Was there anything further?

14 Mr. Agay, did you want to say anything with regard specifically

15 to the Microsoft issues?

16         MR. AGAY:  Just briefly.  Firstly, Your Honor, the

17 sale order provides -- does Your Honor have a copy of the sale

18 order?

19         THE COURT:  I don't.  I was looking for it a little

20 while ago and -- I can find it somewhere in here, but it might

21 be faster to just get a copy.

22         MR. AGAY:  Apparently with all the activity, Your

23 Honor, it did not get handed out.  May I approach?

24         THE COURT:  Please.  Thank you, Mr. Agay.  Okay.

25         MR. AGAY:  I've handed up to Your Honor a clean and

1 black line.  The black line is a comparison against what was

2 originally filed with the Court.  And apologies for not handing

3 out the sale order sooner.

4         I would just point out paragraph 30, that we have

5 added, it is the penultimate sentence of paragraph 30, which

6 says, parties to the held contracts shall retain their rights

7 to object to such assumption and assignment under Bankruptcy

8 Code Section 365.  So, I hope that addresses counsels

9 questions.

10         We're aware of the West Electronics precedent, in

11 terms of how that pertains to our use of the software, absent

12 assumption and assignments.  We're reserving our rights in the

13 same way that counsel is reserving -- Microsoft is reserving

14 her rights.  Suffice to say, though, that we're aware of the

15 Microsoft contract, we're in contact, the business people are

16 in contact with each other, and we hope to resolve any

17 outstanding issues as quickly as possible.

18         THE COURT:  Thank you, Mr. Agay and Ms. Nimeroff,

19 does the additional language comfort you?

20         MS. NIMEROFF:  Yes, Your Honor, the order is long and

21 I've been taking my time getting through it, so there is

22 language in there with regard to that and I appreciate that.

23         THE COURT:  Yes.

24         MS. NIMEROFF:  I just would like some clarification

25 if I can, Your Honor, just briefly on whether the language in

1 the APA in terms of definition of assets at this point is

2 intended to count for software or licenses that are not part of

3 an otherwise designated contract.

4          MR. AGAY:  Your Honor, without the APA in front of

5 me, I can't say on the record, one way or the other.  It speaks

6 for itself, Your Honor.  Let me take a look at it and maybe we

7 can come back to this.

8          THE COURT:  Why don't we do that if we could just

9 roll this over to the end of the hearing.

10          MR. AGAY:  Yes.

11          THE COURT:  Or at least the end of this agenda item.

12          MR. AGAY: Okay.  And setting this aside, one point I

13 didn't make earlier, which I should have made, is we have an

14 agreement with GSI Commerce, which is not currently on the

15 designated contracts list, to make a decision on that contract

16 within 120 days, rather than the 210 days that's currently in

17 the asset purchase agreement.

18          THE COURT:  Thank you.

19          MR. STEIN:  Good afternoon, Your Honor.,

20          THE COURT:  Good afternoon.

21          MR. STEIN:  David Stein, Wilentz, Goldman & Spitzer

22 representing Spanco Telesystems & Solutions Limited.  Spanco

23 was a provider of a call center in Mumbia, India, that employs

24 approximately 125 people, to answer anywhere from 1700 to 3000

25 calls per day for the Debtor.  It's owed approximately $2.1

1 million dollars.  We've been getting paid post petition.

2 Unfortunately, the Debtor has neither designated us as a

3 designated contract or as a held contract and we're being

4 basically held hostage to the process.

5          Under the terms of the sale order in the APA, the

6 Debtor has approximately 210 days, well, it has 10 days post

7 closing and then it can hold the contracts for 210 days

8 thereafter.  We believe that's patently unfair, there's no

9 precedent, under the code and it's just improper to hold us

10 hostage to the process.  We have our own vendors to pay, we are

11 getting pressure and we are having significant problems holding

12 onto our own business as we are compelled to perform services

13 for the Debtor.

14          We would ask that the decision to assume or reject

15 immediately be made at closing and it's patently unfair that

16 the Debtor gets to cherry pick between contract parties,

17 whether it's the end of January or it's 120 days out, it's just

18 patently unfair that there are different standards for

19 different parties, and my client is being held hostage to the

20 process and we need a prompter resolution.  I understand we

21 have a reservation of rights under 365, but we did file an

22 objection, we want those rights reserved and preserved and, if

23 necessary, we'll come back before Your Honor, before the end of

24 the year, to have this issue determined, but we want our rights

25 reserved.  And if there is anything Your Honor can do with

1  respect to a faster decision under the APA, rather than 210

2  days, I'd so implore Your Honor.

3              THE COURT:  Thank you.

4              MR. CALIFANO:  Your Honor --

5              THE COURT:  Mr. Califano, we have, perhaps, a special

6  case here?

7              MR. CALIFANO:  Well, no, actually, not.  Excuse me.

8              MR. STEIN:  Sure.

9              MR. CALIFANO:  Really, they're not a special case,

10  and I think the concession that they made, that they're being

11  paid currently, I think that resolves any issue of prejudice.

12  And they have been paid, they're being paid on a current basis.

13  We have an APA which requires Adeptio to assume post petition

14  trade payables, and also to reimburse the estate for any costs

15  incurred during the hold period if a contract is being held.

16  If Spanco doesn't like the way that 365 works and allows a

17  Debtor to cherry pick, I mean, their remedy is not here, Your

18  Honor.  I mean, they have no prejudice, they're being paid on a

19  current basis, there's no showing or even allegation that

20  there's any risk of payment and they will be dealt with in

21  accordance with the APA.  But until they're deal with, they

22  will be paid, and there's provision for their payment.

23              MR. STEIN:  But, ironically, Your Honor, the 210 day

24  period really doesn't benefit the estate, it's an Adeptio APA

25  requirement.  So, if there's any benefit, it's not to the

1   estate, it's to Adeptio and, frankly, again, 210 days to

2   determine whether they're going to assume or reject our

3   contract, and it's not really the Debtor it's actually Adeptio,

4   whether they're going to assume and take an assignment of the

5   contract, waiting that period of time is putting a tremendous

6   burden and hardship on our business and Your Honor has the

7   implicit right, it's not simply under 365, it's under 363 of

8   this APA and the sale order, Your Honor has the right to

9   shorten the period, to set a reasonable deadline consistent

10  with the treatment of all other contract parties and I would

11  implore Your Honor to do that.

12          THE COURT:  What, Mr. Stein, what is the prejudice to

13  Spanco under these circumstances, where they are being paid --

14          MR. STEIN:  Because we don't know, Your Honor,

15  whether or when to ratchet down our business.  We have to

16  employ 125 people daily to field these phone calls.  If they

17  decide whether it be at Christmas, or at some point in the

18  future, to terminate us on shortened notice, we have

19  significant costs and significant overhead, I can't tell you

20  there's a Warren issue in India, but they still have

21  obligations to pay, they still have vendors, they still have

22  employees and it's just an unfair process to allow Adeptio as

23  the contract purchaser to take the benefit for 365 for some

24  indefinite period, out basically for seven months.  This is not

25  a benefit to the estate, this is a benefit to the contract

1  purchaser and that decision should be made in short order.

2          MR. CALIFANO:  Your Honor, well, there's benefit to

3  the estate, it's part of a deal.

4          THE COURT:  It's part of this transaction.

5          MR. CALIFANO:  It's part of the deal, it was

6  negotiated and I don't think that shortening the period helps

7  them, if they're concerned about being rejection, and

8  ratcheting down because --

9          THE COURT:  Whether it was 30 days, or 210 days, I

10  don't see how there would be a difference.

11          MR. CALIFANO:  I don't see -- yeah, I don't, Your

12  Honor.

13          THE COURT:  Yes.  Under those circumstances, I'm

14  going to deny the objection to the 210 day period.

15          MR. STEIN:  But with the reservation as to our 365

16  rights?

17          MR. CALIFANO:  Yeah, whatever rights --

18          THE COURT:  I think -- yes.

19          MR. DUHIG:  Good afternoon, Your Honor, Peter Duhig

20  on behalf of Yellow Page Authority.  I just wanted to make a

21  clarification.  We had filed an objection to the notice of

22  possible assumption and sale of our contract and I'm looking at

23  paragraph 30 that looks like it has a reservation of rights

24  with respect to held contracts.  I'm not sure we are a held

25  contractor or not but I just want to make sure that all of

1  Yellow Page's rights are reserved, either to amend the

2  objection or pursuant to its contract.

3         THE COURT:  Thank you, Mr. Duhig.

4         MR. DUHIG:  Thanks.

5         MR. MADRON:  Good afternoon, Your Honor, for the

6  record Jason Madron of Richards, Layton & Finger on behalf of

7  U.S. Cellular.  Your Honor, I rise, I believe this issue has

8  been adequately addressed on the record today.  We had filed a

9  cure objection in response to the Debtors November 14th notice

10 that blanket listed a number of executory contracts including

11 U.S. Cellular.

12         We are not among the parties listed on the December

13 10th notice that designates the contracts.  I rise, however,

14 solely to confirm our understanding that should the decision be

15 made down the road to attempt to assume any agreements with

16 U.S. Cellular, all of our rights to object on any basis,

17 including our cure objection, are fully preserved.

18         THE COURT:  Yes.

19         MR. MADRON:  Thank you very much, Your Honor.

20         THE COURT:  That has been the representation and that

21 is the Court's insistence as well.

22         MR. MADRON:  Thank you very much, Your Honor.

23         THE COURT:  Thank you, Mr. Madron.

24         MR. GUERKE:  Good afternoon, Your Honor, Kevin Guerke

25 on behalf of ICS.  I'd like to introduce my co-counsel Tim

1  McGary to the Court.  I filed a motion pro hac for Mr. McGary

2  and I'm not sure that it has been decided or signed yet, so

3  with permission, I'd like to allow Mr. McGary to address the

4  Court.

5           THE COURT:  Thank you.  That permission is granted.

6  Mr. McGary, whether I've signed it or not I can't say for

7  certain, but it will be.

8           MR. McGARY:  Thank you, Your Honor.

9           THE COURT:  Thank you.

10          MR. McGARY:  Your Honor, our situation is a little

11 bit different in that we filed a motion to compel acceptance or

12 rejection to the contract, but the issues that are encompassed

13 in that are almost identical to some of the objections to the

14 sale, so I thought I'd rise now to address that issue in the

15 interest of time.

16          Your Honor, our concern was, we believed that there

17 could be a gap between the period in time when the settlement

18 occurred and whether or not the held contracts, the hold

19 bucket, as I've been calling it, if you didn't get on that hold

20 list right away, you could be in a 10 day gap, 10 or more day

21 gap where you would ultimately be rejected and you would simply

22 have your rejection damages and not the administrative claim

23 for cure or the claim for administrative expense that would be

24 funded by Adeptio.

25          I've had discussions with Adeptio's counsel and

Debtors counsel this afternoon, and it is my understanding

that, just so the record is clear, so that the other unsecured

creditors known as well, that Adeptio under the APA is agreeing

to pay all of the administrative carrying costs, that is the

operating costs, for both the post petition period and post

closing up until the date that a contract is accepted, or

rejected, by the Debtor, which is really accepted or rejected

for the benefit of Adeptio.

So, they're responsible, if we do work at all,

they're responsible for that cost, Adeptio is, all the way

through until they actually give us notice of rejection.  I

think that's the understanding, but it was unclear to me in

both my discussions and my reading of the documents.

THE COURT:  Maybe we can get some clarification.

MR. CALIFANO:  That is my understanding.

THE COURT:  Mr. Agay?

MR. AGAY:  Yes.

THE COURT:  You're the man of the moment here.

MR. AGAY:  Your Honor, it is correct that we're

picking up the carrying costs of these contracts, post closing

and that we're assuming post petition trade payables.  Counsel

was a little bit liberal with the language he was using, we are

assuming liabilities as defined in the APA and that definition

of liability is pretty broad.  Counsel can take a look at it,

so I think it would encompass the types of things he's

1  concerned about, Your Honor.

2          THE COURT:   Thank you.   Thank you, Mr. Agay.   Mr.

3  McGary, does that satisfy your issue?

4          MR. McGARY:   Well, Your Honor, I had discussions with

5  counsel and it is my understanding -- I guess more globally, I

6  was worried about the other creditors, I'm worried about my

7  client --

8          THE COURT:   Of course.

9          MR. McGARY:   -- and that is, my understanding is, if

10 my client performs services, they have been continuing to

11 perform services post petition, but if they provide services

12 post closing, they will get paid for those and if that is the

13 case, then I think that somewhat moots my motion to accept or

14 reject the executory contracts, which is really some of the

15 same issues as we've had on the objection to sale.   And, I

16 guess that's my understanding.   Mr. Agay is nodding his head in

17 agreement, so I think that's --

18         THE COURT:   I think -- Mr. Agay?

19         UNIDENTIFIED MALE SPEAKER:   We have the nod on the

20 record.

21         MR. AGAY:   Getting a lot of exercise today, Your

22 Honor.   That's correct.

23         THE COURT:   Very well.   Thank you.

24         MR. McGARY:   Very good, Your Honor.   And, that would

25 also take care of one other docket item, which is my motion to

1  accept -- compel acceptance or rejection of executory contract.

2  Thank you, Judge.

3          THE COURT:  Okay.  Thank you, Mr. McGary.  Anyone

4  next?   No?

5          MR. CALIFANO:  I believe that is it, Your Honor, on

6  the sale and the cure.

7          THE COURT:  How about the Committee?  Are the

8  Committees -- just for the record, I suppose the Committee's

9  objections have been dealt with in the term sheet that will be

10  attached to the sale order?

11          MR. GWYNNE:  Yes, thank you, Your Honor.  Kurt Gwynne

12  from Reed Smith along with Claudia Springer on behalf of the

13  Committee.  First of all, Your Honor, I want to thank you for

14  your patience and all of your time today that we've taken up

15  much of, and also thank our committee members, who have been

16  diligently sitting by the phone --

17          THE COURT:  Absolutely.

18          MR. GWYNNE:  -- listening to the silence for much of

19  the day and also the attorneys that were in the courtroom who

20  were patient when we were working things out. So, the Committee

21  thanks everybody for that.

22          With respect to our objections, they have been

23  resolved and actually takes care of not just our objections to

24  the sale, but resolves our motion to dismiss, the motion to

25  reconsider the bid procedures, the motion to continue the

1 investigation period, continue the sale hearing and the

2 objection to the final DIP order as well.

3          I just want to clarify a couple things.  One is, to

4 the extent that there's any inconsistency with the sale order,

5 I haven't had a chance to go through it and all the black

6 lines, but to the extent there's any inconsistency between that

7 and the term sheet, we presume that the term sheet would govern

8 because that is a specific deal that we have negotiated with

9 the parties and would like counsel to either confirm that, or

10 the Court to order that.

11          THE COURT:  Yes, I will make that clear in the order.

12          MR. GWYNNE:  And to the final DIP order as well, Your

13 Honor, to the extent that's inconsistent with the term sheet.

14          With respect to the $500,000 loan to the trust that

15 Mr. Califano mentioned in the term sheet, that gets paid first

16 out of the proceeds of the trust, but is a non-interest bearing

17 note, but paid with the first proceeds of the trust.

18          THE COURT:  Thank you.

19          MR. GWYNNE:  I just wanted that to be clear as well.

20 And, that's it with respect to, I think, the sale and the term

21 sheet and, again, thank Your Honor, we do have the issue with

22 the finding of facts and the investigation but I understand Mr.

23 Califano has some other things he wants to do first, so thank

24 you.

25          THE COURT:  Okay, thank you.  Thank you, Mr. Gwynne.

1              MR. CALIFANO:  Your Honor, it's not that -- I just

2    thought that that finding goes best with the DIP because that's

3    --

4              THE COURT:  Yes, I think that's right.

5              MR. CALIFANO:  -- that's the determination of the

6    investigation period.

7              THE COURT:  Correct.

8              MR. CALIFANO:   The finding relates to that and I

9    think we can get to the final DIP that's appropriate.

10             So, the next matter, Your Honor, is the motion for

11   the Committee to dismiss the case, item number six.

12             THE COURT:  I assume, Mr. Agay.

13             MR. CALIFANO:  Oh, okay, I'm sorry.

14             THE COURT:   We're back to Microsoft?

15             MR. AGAY:  Yes, Your Honor, I apologize.  Counsel for

16   Microsoft has asked me to confirm, I'm reading the APA and the

17   APA lists as an acquired asset all software owned by the

18   Debtors or leased by the sellers -- I'm sorry, owned by the

19   sellers or leased by the sellers pursuant to a designated

20   contract.  Since she's not yet a designated contract, her

21   software is not the subject of an assumption and assignment as

22   of today.

23             THE COURT:  Ms. Nimeroff, does that satisfy you?

24             MS. NIMEROFF:  Yes, thank you, Your Honor.

25             THE COURT:  Your persistence paid off.

1          MS. NIMEROFF:  Thank you, Your Honor.

2          MR. CALIFANO:  Your Honor, we'll skip ahead, the next

3 item that's on is the --

4          THE COURT:  Would you like me to be considering a

5 number of the motions together?  Is that how you wish to

6 proceed?

7          MR. CALIFANO:  Yes.  The next one that's on is the

8 DIP and I think we can take the rest of them together.  The

9 final Debtor-in-Possession financing, Your Honor.

10          THE COURT:  Yes.

11          MR. CALIFANO:  Your Honor, in the interim we have

12 made and we have today, once again, an officer of the Debtor

13 whose testimony I would like to proffer now, who would testify

14 that in the Debtors opinion the DIP, both the interim which has

15 been extended twice, as the negotiations have gone on, and the

16 final DIP, are in the Debtors best interests.  It is necessary

17 to provide financing to keep the Debtor in operations.  The

18 alternative to the DIP would cause great damage to the estate

19 and all stakeholders and constituencies.  The sale would not be

20 possible without the DIP and the Debtor believes that the terms

21 of the DIP, including the fees, are reasonable under the

22 circumstances.  The Debtor could not have pursued an

23 alternative to the Debtor-in-Possession financing obtained from

24 Adeptio.  Despite the fact that Adeptio is woefully under

25 secured, it was willing to fund an additional $25 million

1  dollar DIP commitment, post petition, that allowed the Debtor

2  to operate, pay all its operating expenses and pay the

3  administrative expenses.

4          Your Honor, so with that, I would move that the DIP

5  be approved.  The Committee has objected to the DIP, a number

6  of items and we've gone over them in the past.  I believe that

7  one item that Mr. Gwynne would like to put on the record is why

8  the Committee believes that the investigation period, which

9  expires today, was reasonable under the circumstances and I

10 just might add, for the Court's benefit, why the Debtor

11 believes that the investigation period was reasonable.

12         Adeptio was not involved with the Debtor prepetition,

13 other than after it purchased the debt, preexisting debt, and

14 that occurred one week, less than one week prior to the filing

15 that occurred on November 2nd.  I believe we filed on November

16 8th.  All the transactions between the Debtors and Adeptio were

17 brought before Your Honor, with the bid procedures and the

18 motions for sale and the Debtor-in-Possession financing.

19 Adeptio had no board seats, it had no management control over

20 the Debtor.  It did not receive any payments, pre or post

21 petition and once again, as I said, all the transactions

22 between Adeptio and the Debtor have been brought before your

23 court, before Your Honor.

24         The lien search was performed prepetition by the

25 Debtors.  Those liens turned out to be good in our opinion and

1  we were satisfied that a shortened investigation period was

2  appropriate.   I believe that Mr. Gwynne can proffer information

3  as to why he believes that the Committee has satisfied its

4  fiduciary duties with respect to the investigation.

5            THE COURT:  Thank you, Mr. Califano.  Mr. Gwynne.

6            MR. GWYNNE:   Thank you, Your Honor, Kurt Gwynne on

7  behalf of the Committee.

8            What I'd like to do is describe for Your Honor the

9  investigation that Reed Smith did, legally, but then I'd also

10 like to have Dan Polsky on the stand to testify as to the

11 investigation he did, some of which he did yesterday, that I'm

12 not aware of all of the scope of what he did.  I think it would

13 best to have him on the stand.

14           And, to clarify, I think what we're asking the Court

15 to conclude is that not the investigation period was

16 necessarily reasonable under the circumstances, it was what it

17 was, but that our investigation was reasonable under the

18 circumstances of this case, and the exigencies of this case,

19 and that the investigation was adequate and appropriate.

20           With respect to the lien investigation, Your Honor,

21 Reed Smith reviewed the liens, we believe that there were a few

22 issues.  There was a period missing in the Debtors name, and

23 one financing statement but because it obviously came on our

24 lien search, we didn't think it would be seriously misleading.

25 There was late perfection in the deposit accounts, there was

1  late perfection with respect to 1010 Interactive.  When I say

2  late perfection, they were not perfected until a little over

3  100 days prior to the filing.  That made us think that we

4  needed to look at whether the prior lenders were potentially

5  insiders and if they were, what the value of the claims would

6  be.  We know that one of the prior lenders held 16 or 17

7  percent of an equity interest in the Debtor, 20 percent would

8  render them an automatic insider.  The statute says, including,

9  so it's not exhaustive.  So, we tried to look into that a

10  little bit further, but part of the analysis and how deeply we

11  dealt there, how deeply we've delved into those issues was

12  governed by the fact that 1010 Interactive apparently had few

13  employees, very little assets.  It had 900 some thousand

14  dollars in assets in its schedules and I believe that a

15  significant portion of those several hundred thousand were

16  inter-company claims.

17        With respect to the deposit accounts, Your Honor, the

18  fact that they were not perfected might have helped us back

19  when there was more cash in them, but to the extent that that's

20  not the case now, we don't know that that would have

21  necessarily garnered us too much ground in the case.

22        We also believe that there was no grant of a security

23  interest in commercial tort claims and that there was no grant

24  of a security interest in preference claims.  With respect to

25  the lack of a grant of s security interest in the commercial

1  tort claims, I believe the financing statement referred to

2  commercial tort claims but, obviously, you need a grant of a

3  security interest in the first instance.

4         So, for those reasons, we thought there were issues

5  with respect to whether Adeptio could credit bid for those

6  assets in connection with the sale, but in light of the fact

7  that there was also a DIP loan that extended, perhaps, more

8  broadly to assets than did the prepetition loan, in light of

9  that fact and the fact that this is, I think in the Debtors

10 words, a melting ice cube where there's $3 million dollars a

11 week in cash burn.  I think in the stipulation of facts which

12 we had for this hearing, the Debtors stipulate it's going to

13 lose 25 million between the petition date and the sale closing

14 and that, obviously, was something also that governed the speed

15 with which we had to do the investigation in the parameters set

16 by the Court.

17        With respect to the investigation of the prior

18 lenders, not just Adeptio who bought its debt six days before

19 the case, but the prior lenders, we did look into that

20 relationship to the extent we could, from public filings, 8K's,

21 10K's, 10Q's, but there is the ENRON issue as Debtors and

22 Adeptio have said, where the ENRON district court decision

23 would cut off those claims, we had a different view, thought we

24 needed to look into those.  We did receive several thousand

25 documents from the Debtor, much less from Adeptio.

1          With respect to those documents and the investigation

2    that we had done up to this point, Your Honor, we didn't see

3    any smoke yet that led us to believe that the prior lenders did

4    anything wrong.  And by that I don't mean to say that we're

5    saying that under no circumstances did they, what we're saying

6    is, within the parameters of the investigation that we did with

7    respect to potential claims that may have been brought against

8    Adeptio, as the holder or the successor of their security

9    interests, we didn't come across anything that we think

10   precluded us from doing the deal that we did today or otherwise

11   being able to say that we did an adequate investigation within

12   the time frame that Your Honor approved on the first day of the

13   case.

14          I would like to briefly call -- I know Your Honor has

15   to leave in five minutes --

16          THE COURT:  I have time.

17          MR. GWYNNE:   Okay.

18          THE COURT:  So, let's everyone, you know, take time

19   and --

20          MR. GWYNNE:  Well, your courtroom deputy said that

21   you did and I don't want to cross her.

22          THE COURT:  She's very protective of me.

23          MR. GWYNNE:   So, I will try to be very quick, Your

24   Honor.

25          THE COURT:  Thank you.

1          MR. GWYNNE:  Your Honor, the Committee calls Dan

2    Polsky from Deloitte.

3          THE COURT:  Thank you.  Mr. Polsky, you may take the

4    stand.  Thank you.

5    DAN POLSKY, COMMITTEE'S WITNESS, SWORN:

6          COURT CLERK:  Please be seated.  Please state your

7    name for the record.

8          THE WITNESS:  Daniel Seth Polsky.

9          THE COURT:  Thank you, Mr. Polsky.

10                    DIRECT EXAMINATION

11   BY MR. GWYNNE:

12   Q    Good afternoon, Mr. Polsky.

13   A    Good afternoon, Mr. Gwynne.

14   Q    By whom are you employed?

15   A    Deloitte Financial Advisory Services.

16   Q    And, is Deloitte Financial Advisory Services the proposed

17   financial advisor to the Committee?

18   A    Yes, it is.

19         MR. GWYNNE:  Should I assume now, Your Honor, we

20   really need to make sure we get applications to employee files

21   since the case is not being dismissed today.

22         THE COURT:  Yes, please.  Nunc pro tunc I suppose.

23         MR. GWYNNE:  Oh, yeah.  We have them pretty much

24   ready to go and I think we'll do that tomorrow.

25         THE COURT:  Good.

1  Q    Mr. Polsky, can you describe for the Court, generally, the

2  investigation that you did regarding potential claims or causes

3  of action that may have been asserted against Adeptio?

4  A    Yes.  I have personally read 10K's, 10Q's, other SEC

5  filings, including 8K's.  I've read as many other case

6  documents as possible, including the DIP motion and other

7  relevant documents.  I attended meetings yesterday at the

8  Debtors headquarters in Virginia where I met with a number of

9  members of the management team to discuss a variety of areas of

10  interest, including the history of the case, the history of

11  Adeptio's involvement in this case, understanding some of the

12  individual legal entities, how the financials are put together

13  from the standpoint of consolidation, to understand the

14  inter-company accounts, to understand the cash management

15  system, how cash flowed between the bank and the Debtors,  how

16  cash flowed between the Debtors.

17  Q    Okay. Did you also review any projections or prior

18  business projections that the Debtor had?  Financial

19  statements, and those type of documents?

20  A    Well, historically, I've looked at actual financial

21  results.  From the standpoint of forecasts, I have primarily

22  looked at the DIP budget, which was appended to the DIP motion.

23  Q    What Debtor representatives did you speak with yesterday?

24  A    I met with at least Debtor representatives yesterday.  Mr.

25  Leich, who is the general counsel, Mr. Cole, who is treasurer,

1 or assistant treasurer, and Mr. Schwartz, who is the CFO of the

2 company.

3 Q    And, did they answer any questions that you had?

4 A    They answered all my questions.

5 Q    As a result of your investigation within the time frame

6 that you had to conduct your investigation, did you come across

7 any facts that would give you concern that there may be

8 potential claims against Adeptio or Versa?

9 A    No, I saw nothing that would give rise to those concerns

10 at this point.

11 Q    Now, you mentioned that you had looked at SEC filings,

12 10K's, 10Q's, 8K's and those type of things.  When did you

13 first start reviewing those type of documents?

14 A    I began to review them a few days before the formation

15 meeting, when I was aware of this case and the potential to

16 serve as financial advisor in the case.

17 Q    And, when you reviewed them, were you reviewing them with

18 an eye towards potential claims against Adeptio, prior lenders,

19 stock -- parties that redeemed stock or otherwise?

20 A    I think that, perhaps, is why we got the job in the first

21 place.

22 Q    Did you have, I'm not going to ask you about the

23 substance, but did you also, as part of your investigation,

24 have discussions with Reed Smith, as proposed Committee

25 counsel?

1  A    I've had discussions with Reed Smith, I don't believe we

2  spoke before the formation meeting, but since the time that we

3  were engaged, yes, we've had extensive conversations.

4  Q    And, do you believe that the investigation that you

5  performed regarding potential claims against Adeptio was

6  reasonable, appropriate and adequate in light of the

7  circumstances of this case, the deadline as originally set by

8  the Court, the fact that the Debtor was losing $3 million

9  dollars a week, and the other exigencies of the case?

10  A    Yes, I do.

11         MR. GWYNNE:  I have no further questions, Your

12  Honor.

13         THE COURT:  Thank you.  Is there anyone who wishes to

14  cross-examine or examine Mr. Polsky?

15         MR. CALIFANO:  No, thank you.

16         THE COURT:  No one?  Thank you, Mr. Polsky, you may

17  step down.  Anything further, Mr. Gwynne, other than my

18  finding?

19         MR. GWYNNE:  No, Your Honor, I just wanted to say,

20  based on what I told you about Reed Smith's investigation, what

21  Mr. Polsky said about his investigations, the deadlines that

22  were set by Your Honor, the losses in this case, the

23  exigencies, the amount that was lost, the amount of the Debtors

24  losses in a relatively short time and the sale hearing, and all

25  of the scheduling reasons as well, for all those reasons, we

1 think that the investigation that we did was appropriate, and

2 adequate and reasonable in light of the circumstances of the

3 case, and believe that Your Honor should make such a finding in

4 the sale order, I think, and the DIP order because even though,

5 as Mr. Califano points out, the investigation period was set

6 forth in the DIP order, there is also a release in Section

7 10.15 of the asset purchase agreement that's also referred to

8 in the sale order and that's a release of Adeptio as well.

9          THE COURT:  Thank you very much, Mr. Gwynne.

10          MR. GWYNNE:  Thank you, Your Honor.

11          THE COURT:  Mr. Monaco, did you wish to be heard on

12 this issue?

13          MR. MONACO:  The DIP financing.

14          THE COURT:  Yes.

15          MR. MONACO:  Your Honor, this is a little bit of belt

16 and suspenders.  As you may recall, I rose on behalf of my

17 client and the other carriers with respect to the insertion of

18 some language to protect our interests with regard to our

19 setoff and purchase money security interest rights.

20          The Debtor and Adeptio gave us some language that's

21 generally acceptable and gets us all the way there.

22          THE COURT:  That would be the rider that's been

23 referred to?

24          MR. MONACO:  Well, I'm talking about paragraph 31 of

25 the final DIP order.  It's the black lined version.  For some

1 reason, they were reluctant to put language that specifically

2 said they would not prime these rights, but they were willing

3 to say so on the record, so I just want to confirm that and get

4 them to say that on the record, then I think we're finished

5 with that issue.

6          THE COURT:  Thank you.

7          MR. CALIFANO:  Yes, Your Honor, the same reservation

8 of rights that has applied throughout in the interim now is

9 also put through the final.

10         THE COURT:  Is that satisfactory, Mr. Monaco?

11         MR. MONACO:  If Mr. Califano is saying that it --

12         THE COURT:  There's no priming.

13         MR. MONACO:  -- will not attempt to prime our -- to

14 the extent that we have those security interests --

15         MR. CALIFANO:  To the extent they insist not being

16 primed by this order, not making a ruling on whether they're

17 valid or not, but to the extent they exist, they have the same

18 rights, notwithstanding this order.

19         THE COURT:  And, I think that's what Mr. Monaco is

20 concerned about.

21         MR. CALIFANO:  Yes.

22         MR. MONACO:  Yes and I can confirm that as well.

23 That's why we didn't want to put it in the order, it's just the

24 rights are what they are, Your Honor.

25         THE COURT:  Thank you.

1          MR. CALIFANO:  Thank you, Your Honor.

2          THE COURT:  Thank you, Mr. Monaco.  Yes, Mr.

3  Schepacarter.

4          MR. SCHEPACARTER:  Your Honor, good evening.

5          THE COURT:  Good evening, yes.

6          MR. SCHEPACARTER:  Richard Schepacarter for the

7  United States Trustee.  I would agree with Mr. Gwynne's

8  comments regarding the investigation portion of it, not

9  necessarily that the investigation period was necessarily

10  reasonable or something that we would agree with, but that the

11  investigation that was done by the Committee within the short

12  period of time within which it had to do its investigation, was

13  reasonable.

14          THE COURT:  Thank you very much, Mr. Schepacarter.

15          MR. SCHEPACARTER:  Thank you.

16          THE COURT:  And is there anything further that you

17  had to comment upon on this, Mr. Califano?

18          MR. CALIFANO:  Yes, Your Honor.  In the vein of

19  nothing goes easy in this case, I'm just informed that there's

20  an issue with respect to the interpretation of the term sheet.

21  Mr. Gwynne mentioned interest free.  My understanding was,

22  interest would not be paid, because in the document it says

23  senior secured loan.  Interest should not be paid, it would

24  (indiscernible), because it wouldn't be funding, it would be

25  paid from first dollar proceeds and that was the -- interest

1 rate.

2        Adeptio had the same understanding, they point out

3 that there are tax consequences to an interest free loan.

4        THE COURT:  To a loan without interest?  Yes.

5        MR. CALIFANO:  And that is why an interest free loan

6 is a problem.  So, I was surprised by the issue of the -- I

7 thought everyone assumed there would be interest, but the

8 interest would be imputed and paid when proceeds are paid.  I

9 mean, interest is not paid interest, it accrues.  And I believe

10 the Committee thought it was an interest free loan, despite the

11 fact that that would have adverse tax consequences.

12        THE COURT:  Mr. Gwynne?

13        MR. GWYNNE:  Your Honor, there was never any

14 discussion of interest, it was 500,000, it was going to be

15 repaid and I wanted to make that clear before I came up and

16 said that to the Court.  I went over to Mr. Sathy, I believe

17 his name is, and I said the same thing and he said well, I'm

18 fine with it, you don't need to put it on the record, and I

19 thought well, let me do it anyway to be safe.  Sure enough, I

20 guess his client or someone, I don't know where the

21 misunderstanding was, but as Your Honor knows, I think we

22 didn't discuss interest and I don't know what they're talking

23 about, I think we have a deal, it's the first money out and I

24 thought that was part of -- from our perspective, part of the

25 reason why we agreed it was the first dollars out, as opposed

1  to sharing with everyone else initially, the first 500,000 goes

2  right to them and, you know, that's the deal I think we had,

3  Your Honor, and I really don't want to renegotiate it or put on

4  evidence of a contested sale hearing at this point.

5          THE COURT:  My tax knowledge is somewhat limited, but

6  does it make a difference if it's pursuant to an order of this

7  Court, or are there still tax consequences?

8          MR. SATHY:  Your Honor, there are --

9          THE COURT:  Mr. Sathy.

10          MR. SATHY:  -- there were two issues that we

11  discussed.  One was that the loan would be paid first, from the

12  proceeds.

13          THE COURT:  Correct.  And that everyone understands.

14          MR. SATHY:  That was the point that I felt didn't

15  need to be put on the record because the term sheet is clear,

16  that it's a senior secured loan and as a result the loan is

17  secured, therefore, it should be paid first.  That's an

18  understanding that everybody had.  The idea of whether or not

19  the loan would have interest or not, the term sheet does not

20  describe that issue, does not resolve that issue.  It says it's

21  a loan and this was an issue that was candidly not discussed in

22  the context of our negotiations, up until maybe during this

23  hearing and the reality, Your Honor, is we view it as a loan

24  and like our DIP loan, it's going to have some kind of

25  interest.  We understand that this is a trust and that the

1 proceeds are going to have to get generated before the loan can

2 get repaid.

3          And so, our proposal or our construction of it was

4 that the loan would either accrue or pick and would be prepaid

5 in the context of whether or not it's borrowed and to the

6 extent it's borrowed.  Again, this is going to be used by the

7 trust, the trust will decide when and if and to what extent

8 those funds will be borrowed and they will be used to pay for

9 the cost of professional fees necessary to investigate the

10 viability of these actions.

11          And so, our view was that for purposes of our cost of

12 capital, that the loan would have an interest component to it.

13 It candidly wasn't discussed at all and this is not an issue of

14 us saying one thing, and them saying another thing.  I think

15 this is just an issue that is right before us right now.

16          THE COURT:  I'm trying to think of a solution.

17          MR. CALIFANO:  Well, I think I have one.

18          THE COURT:  Go on I'll listen to yours first.

19          MR. CALIFANO:  It sounds to me like we have a

20 contract interpretation problem.  On the contract that the ink

21 has not yet dried on.  So, everything has moved very fast in

22 this case, Your Honor.  And we're now having contract disputes

23 over contracts before they're signed.  But everything is new in

24 this case.

25          My suggestion is, Your Honor, it's a contract, we lay

1  the issue before Your Honor, I think a fair rate would be the

2  federal judgment rate, and pick -- you know, it's a contract

3  interpretation of loan, whether it carries interest or not

4  rather than specifying interest rate.  The federal judgment, or

5  the IRS rate, one of the federal statutory rates, and let's

6  just draw that on, Your Honor.

7          THE COURT:  And, the federal interest rate, the IRS

8  rate, by that you're talking about the rate at which there's no

9  implied --

10         MR. CALIFANO:  What is the --

11         THE COURT:  -- interest.

12         MR. CALIFANO:  -- what's lower the federal judgment

13 or --

14         MS. SPRINGER:  Your Honor, I think there is actually

15 a rate, this is a bankruptcy lawyer talking tax, so it's

16 dangerous, but I believe that the IRS publishes rates --

17         THE COURT:  I believe it does.

18         MS. SPRINGER:  -- that are the lowest rates that may

19 be charged without the loan being deemed a gift.

20         UNIDENTIFIED MALE SPEAKER:  Imputation of interest.

21         THE COURT:  Yes.

22         MS. SPRINGER:  And, I believe that there is a rate,

23 and I don't know how often they publish these rates, I think

24 it's annually, and they are published and people use those

25 rates when giving gifts to know that they're -- I mean, when

1  giving loans to family members and others, so that they're not

2  deeded gifts.  And, that would be the lowest rate, I would

3  assume that you could charge without it being deemed a gift or

4  something like that.

5         THE COURT:  Yes.

6         MR. SATHY: And Judge, I think for our perspective,

7  there's two elements to this.  One, we obviously don't want to

8  get tagged with a tax liability --

9         THE COURT:  Correct.

10        MR. SATHY:  -- but the other is that if we are going

11 to make a loan, there's going to be a cost of capital to us.

12 These are proceeds that either we will have to borrow, or

13 proceeds that we already have borrowed.  So, to the extent that

14 there's a cost of capital to us, our view is, like the DIP

15 loan, which is at prime plus 3 or 3 1/2, whatever the DIP loan,

16 that's a cost of capital.  So, it's more than just the issue of

17 avoiding an adverse tax consequence from our perspective.

18        THE COURT:  Well, I think that since the parties

19 didn't discuss it, that it ought to be at the lowest rate to

20 avoid if you will, liability to Adeptio and that would be my

21 finding on the issue, if you the ambiguity, that may exist on

22 that particular issue.  This is not something where it's not

23 really as much -- it's not a business issue, this wasn't a

24 business decision made by Adeptio to advance these dollars, as

25 much as it was a decision made to ease the resolution of

1  serious issues.  And I think it ought to be a minimal rate of

2  interest.

3         MR. CALIFANO:  And, I would suggest, Your Honor, if

4  we can't reach agreement on that rate, we just bring that issue

5  before Your Honor with the IRS code, whatever --

6         THE COURT:  Whatever the Internal Revenue Service

7  code provides is the rate of interest, which avoids an

8  imputation that an advance of dollars as a gift would be the

9  appropriate amount.  It would be the appropriate interest rate

10  here.

11         MR. CALIFANO:  So, if we can't reach, when we're back

12  in next week, if we can't we'll put it before Your Honor.

13         THE COURT:  Very well.

14         MR. CALIFANO:  Your Honor, I believe that the other

15  DIP issues have been resolved, and I would like to -- okay, I'd

16  like to hand up the amended DIP order --

17         THE COURT:  Please.

18         MR. CALIFANO:  -- with the understanding, rather than

19  -- everybody hasn't, as we said before, everybody hasn't read

20  that DIP order in focus with the term sheet but if there's

21  specific language in the term sheet which conflicts with the

22  general language in the DIP order, I think everyone agrees the

23  term sheet language would control on that issue.  So, we have

24  the final DIP order.  I'll hand it up at the end of the hearing

25  if that's all right.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Thank you.  That will be fine.

2          MR. CALIFANO:  Your Honor, the next items that are

3 on, items six, seven, and eight, six, is the motion to dismiss

4 or convert which is resolved.

5          THE COURT:  Yes.

6          MR. CALIFANO:  Seven is a motion to reconsider the

7 bid procedures.  That is resolved and mooted by the sale.  And

8 eight, Your Honor, is the emergency motion to postpone the sale

9 hearing and extend the investigation period.  That is both

10 resolved and mooted, Your Honor.  So, that would resolve --

11 with that, Your Honor, I'd like to hand up the final DIP order

12 and also the final sale order, with the term sheet and the

13 we'll be back Your Honor --

14                    (Pause)

15          MR. CALIFANO:  -- Your Honor I also would ask that

16 the -- it's a good request from Mr. Gwynne, that the findings

17 that were just made in connection with the investigation be

18 deemed to be a part of the findings in this order.

19          THE COURT:  Yes. I think that's fine.  I just want to

20 confirm on the record that the Court, based upon the testimony

21 of Mr. Polsky, the Court's knowledge of what has transpired in

22 this case, the rather difficult circumstances that have existed

23 because of the, I suppose, the business exigencies that the

24 Debtor has to really proceed to the sale as quickly as possible

25 providing, really, a minimal amount of time for the Committee

1  to conduct its investigation, it's lien investigation, the

2  Court is very much satisfied that the Committee's investigation

3  is adequate and appropriate under the circumstances and that

4  the Committee has, under these very difficult facts, satisfied

5  its fiduciary duty here and it is upon the satisfaction of that

6  duty and really the performance of its duty that it is able to

7  enter into the agreements reached in connection with the sale

8  and the DIP and other related matters, including the withdraw

9  of its motion to dismiss the case.

10      MR. CALIFANO:  Thank you, Your Honor.  So, with that,

11  Your Honor, we have resolved today's calendar.

12      THE COURT:  And, the Court is satisfied with the

13  findings in the sale order as well as the DIP.  Obviously, with

14  regard to the sale order, that it is in the best interest of

15  the Debtors and its estate and that there was arms length

16  negotiations, that the marketing effort was complete and in

17  accordance with those findings, I'm prepared to enter the sale

18  order.  Similarly, the DIP was entered into at arms length and

19  appears to have been the best alternative under the

20  circumstances.  There were no better alternatives available to

21  the Debtors given these circumstances and that the DIP is in

22  the best interests of the Debtors and its estates, and I will

23  enter the financing order as well.

24      I think -- was there any finding -- oh, there was a

25  finding that I was to make in connection with the Luzard fee

1  application and that is that Luzard's fee application as

2  amended is granted by the Court.    Anything else?

3          MR. CALIFANO:  Yes, Your Honor.  Mr. Sathy wanted --

4  Your Honor, did make a good faith finding with respect to

5  Adeptio.

6          THE COURT:  I did.

7          MR. CALIFANO:  Yes, thank you, Your Honor.  Your

8  Honor, I appreciate the Court's indulgence today, and all the

9  assistance in resolving this difficult matter.

10          THE COURT:  It was a difficult matter and I think the

11  business circumstances really did demand that the Court be

12  patient and allow the parties to negotiate and I do commend the

13  parties on very hard fought negotiations and in reaching, I

14  think, a resolution that is in everyone's best interest under

15  the circumstances.

16          MR. CALIFANO:  Your Honor, thank you.  We appreciate,

17  on behalf of the Debtors, the estate, the employees, we

18  appreciate Your Honor's patience.  What I would just suggest,

19  while people are signing the term sheet and we'll just bring

20  the term sheet and the order to Your Honor.

21          THE COURT:  That will be fine.

22          MR. CALIFANO:  And, I have the final DIP order, I can

23  hand it up.

24          THE COURT:  That would be -- that's excellent.

25          MR. CALIFANO:  And, then I will bring the sale order

60

1   to Your Honor.

2           THE COURT:  Thank you very much.  Mr. Gwynne, did you

3   need something included in the order or is my finding

4   sufficient and, maybe, perhaps, I can just state that -- maybe

5   I'll write in something to the effect that -- for the reasons

6   set forth on the record?

7           MR. GWYNNE:  That would be much appreciated, Your

8   Honor.

9           THE COURT:  I will do that on both the DIP and the

10  sale order.

11          MR. GWYNNE:  Yes, thank you.

12          THE COURT:  Fine.  Counsel, thank you all for your

13  patience, it was a long day and it was very, very constructive

14  and we will stand in recess until next week.

15          VARIOUS COUNSEL:  Thank you, Your Honor.

16          THE COURT:  Good day.

17                              *****

18

19

20

21

22

23

24

25

## CERTIFICATION

I, ELAINE HOWELL, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and to the best of my ability.

/s/ Elaine Howell                Date:  December 19, 2007

ELAINE HOWELL

J&J COURT TRANSCRIBERS, INC.