# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | : Chapter 11 |
| | : |
| SN LIQUIDATION, INC., et al.,[1] | : Case No. 07-11666 (KG) |
| | : |
| Debtors. | : (Jointly Administered) |
| | : |
| | : |

## DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION OF
## SN LIQUIDATION, INC., *ET AL.* PROPOSED BY THE DEBTORS IN POSSESSION
## AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
## DATED APRIL 14, 2008

**DLA PIPER US LLP**

Thomas R. Califano
Jeremy Johnson
1251 Avenue of the Americas
New York, New York  10020

**BAYARD P.A.**

Neil B. Glassman (No. 2087)
Mary E. Augustine (No. 4477)
222 Delaware Avenue, Suite 900
Wilmington, Delaware  19899

Counsel for Debtors and Debtors in Possession


**REED SMITH LLP**

Kurt F. Gwynne (No. 3951)
1201 Market Street
Suite 1500
Wilmington, DE 19801

Robert P. Simons (admitted in PA)
Claudia Z. Springer (admitted in PA)
Joshua C. Lewis (admitted in PA)

Counsel for the Official Committee of Unsecured Creditors

---

[1] The Debtors and debtors in possession are INP Liquidation Corp. f/k/a InPhonic, Inc., CS I Liquidation, LLC f/k/a CAIS Acquisition, LLC, CS II, LLC f/k/a CAIS Acquisition II, LLC, SI Liquidation Corp. f/k/a SimIPC Acquisition Corp., SN Liquidation, Inc. f/k/a Star Number, Inc., MTS Liquidation, LLC f/k/a Mobile Technology Services, LLC, FN LLC f/k/a FON Acquisition, LLC, 1010, LLC f/k/a 1010 Interactive, LLC.

505
4/14/08

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN OF LIQUIDATION OF THE DEBTOR SN LIQUIDATION, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND SCHEDULES ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF SN LIQUIDATION, INC. OR ANY OF THE AFFILIATED DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER APPLICABLE EVIDENTIARY RULES.

THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, INPHONIC, INC. OR

ANY OF THE AFFILIATED DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES.

THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AS PLAN PROPONENTS, BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND THE HOLDERS OF ALL CLAIMS. ACCORDINGLY, THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS URGE THOSE HOLDERS OF CLAIMS ENTITLED TO VOTE TO VOTE TO ACCEPT THE PLAN.

IF YOU HAVE QUESTIONS ABOUT THE PACKET OF MATERIALS THAT YOU RECEIVED, PLEASE CONTACT WILLIAM COLEMAN, DLA PIPER US LLP, 1251 AVENUE OF THE AMERICAS, NEW YORK, NEW YORK 10020-1104, TELEPHONE NUMBER (212) 335-3745, OR WILLIAM.COLEMAN@DLAPIPER.COM.

ARTICLE I         SUMMARY OF THE CHAPTER 11 CASES AND PLAN ......................... 4

    A.    Introductory Note.................................................................................... 4

    B.    Business Overview.................................................................................. 6

    C.    Prepetition Capital Structure and Debt Obligations............................... 7

    D.    The Chapter 11 Cases ............................................................................ 8

    E.    Sale of Substantially All Assets........................................................... 10

    F.    General Structure of the Plan............................................................... 11

    G.    Summary of Treatment of Claims and Interests Under the Plan .......... 12

    H.    Acceptance or Rejection of the Plan.................................................... 16

ARTICLE II        HISTORY, OPERATIONS AND STRUCTURE OF THE DEBTORS ....... 16

    A.    Introductory Note.................................................................................. 16

    B.    The Company........................................................................................ 17

    C.    Prepetition Capital Structure of Debtors.............................................. 19

        1.    Prepetition Credit Agreement and Amendment........................ 19

        2.    Corporate Structure of Debtors................................................ 20

ARTICLE III       CHAPTER 11 CASES.......................................................................... 21

    A.    Lack of Liquidity and Events Leading to Chapter 11 Cases ................ 21

    B.    Necessity of, and Reasons for, Chapter 11 Filings Necessary.............. 21

    C.    Continuation of Business; Stay of Litigation....................................... 24

    D.    First Day Orders................................................................................... 25

    E.    Debtor in Possession Financing........................................................... 26

    F.    Appointment of Creditors Committee .................................................. 27

    G.    The  Committee's Objections to Sale Motion and Relief Requested ................. 28

    H.    Resolution of Objections to the Sale.................................................... 29

    I.    Other Material Relief Obtained During the Chapter 11 Cases ............. 30

    J.    Summary of Claims Process and Bar Date........................................... 30

        1.    Schedules and Statements of Financial Affairs ....................... 30

i

| | | |
|---|---|---|
| K. | The Sale | 31 |
| L. | Retention of Windown/Post-Closing Specialist | 32 |
| **ARTICLE IV** | **SUMMARY OF PLAN OF REORGANIZATION** | **32** |
| A. | Treatment of Claims and Interests | 32 |
| | 1. Unclassified Claims | 32 |
| | 2. Unimpaired Claims | 34 |
| | 3. Impaired Claims Entitled to Vote | 36 |
| | 4. Impaired Classes of Claims (deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan) | 37 |
| | 5. Impaired Classes of Interest (deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan) | 37 |
| | 6. Allowed Claims | 37 |
| B. | Acceptance or Rejection of the Plan | 38 |
| | 1. Impaired Classes of Claims Entitled to Vote | 38 |
| | 2. Acceptance by an Impaired Class | 38 |
| | 3. Presumed Acceptance by Unimpaired Classes | 38 |
| | 4. Classes Deemed to Reject Plan | 38 |
| | 5. Summary of Classes Voting on the Plan | 39 |
| C. | Means for Implementation of the Plan | 39 |
| | 1. Sale | 39 |
| | 2. Corporate Action | 39 |
| | 3. Post-Effective Date Compensation of Professionals | 40 |
| | 4. Sources for Plan Distribution | 41 |
| | 5. Litigation Trust; Litigation Trustee | 41 |
| | 6. Claims Administration Process | 49 |
| **ARTICLE V** | **TREATMENT OF EXECUTORY CONTRACTS AND LEASES UNDER THE PLAN** | **54** |
| A. | Assumption of Insurance Policies; Assignment of Rights | 54 |

B.      Rejection of Other Executory Contracts .................................................. 55

ARTICLE VI      DISALLOWANCE OF CONTRIBUTION CLAIMS.................................. 56

ARTICLE VII      CONFIRMATION AND CONSUMMATION OF THE PLAN
PURSUANT TO BANKRUPTCY CODE SECTION 1129 (B).................. 56

ARTICLE VIII      CONDITIONS PRECEDENT TO CONFIRMATION AND
CONSUMMATION OF THE PLAN ....................................................... 57

A.      Conditions to Confirmation ..................................................................... 57

B.      Conditions to Effective Date..................................................................... 57

C.      Waiver of Conditions ................................................................................ 58

ARTICLE IX      RETENTION OF JURISDICTION ...................................................... 58

ARTICLE X      MISCELLANEOUS PROVISIONS........................................................ 58

1.      Modification and Amendment ........................................................ 58

2.      Severability ................................................................................... 58

3.      Successors and Assignment ........................................................... 58

4.      Exculpation and limitation of Liability......................................... 58

5.      Binding Effect................................................................................ 58

6.      Revocation .................................................................................... 58

7.      Notice............................................................................................ 58

8.      Prepayment ................................................................................... 58

9.      Dissolution of the Committee ....................................................... 58

10.      Termination of Injunction or Stays ............................................... 58

ARTICLE XI      ALTERNATIVES TO CONFIRMATION AND CONSUMMATION
OF PLAN.............................................................................................. 59

A.      Liquidation Under Chapter 7 .................................................................. 59

B.      Alternative Plan of Reorganization......................................................... 59

{00815667;v1}

## EXHIBITS

A.    Plan of Reorganization

## INTRODUCTION

SN Liquidation, Inc. ("SN Liquidation") and its affiliated debtors and debtors in possession (collectively, the "Debtors")[2] and the Official Committee of Unsecured Creditors (the "Committee" and together with the Debtors, the "Plan Proponents") submit this disclosure statement (the "Disclosure Statement") for the joint plan of liquidation (as amended or modified, the "Plan") of the Debtors pursuant to Bankruptcy Code section 1125, for use in the solicitation of votes on the Plan. A copy of the Plan is annexed hereto as Exhibit A of this Disclosure Statement.

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the need to seek Chapter 11 protection, significant events that have occurred during the Chapter 11 Cases, the sale of Debtors' operating assets to Adeptio INPC Funding LLC ("Adeptio"), the negotiated settlement of certain litigation among the Debtors, the Committee and Adeptio, and the liquidation of the Debtors' remaining assets, which consist mainly of litigation claims. This Disclosure Statement also describes terms and provisions of the Plan, certain effects of confirmation of the Plan, and the manner in which distributions, if any, will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan. Unless otherwise noted

---

[2] The Debtors and debtors in possession are INP Liquidation Corp. f/k/a InPhonic, Inc., CS I Liquidation, LLC f/k/a CAIS Acquisition, LLC, CS II, LLC f/k/a CAIS Acquisition II, LLC, SI Liquidation Corp. f/k/a SimIPC Acquisition Corp., SN Liquidation, Inc. f/k/a Star Number, Inc., MTS Liquidation, LLC f/k/a Mobile Technology Services, LLC, FN LLC f/k/a FON Acquisition, LLC, 1010, LLC f/k/a 1010 Interactive, LLC.

herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

## ARTICLE I

### SUMMARY OF THE CHAPTER 11 CASES AND PLAN

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan.

The following introduction and summary (the "Overview") is intended as a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan.  This Overview is intended solely as a summary of the background of the Chapter 11 Cases and the provisions of the Plan and is qualified in its entirety by the terms and provisions of the Plan.  FOR A MORE COMPLETE UNDERSTANDING OF THE PLAN, RECIPIENTS SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY.  All capitalized terms not defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.  A copy of the Plan is annexed hereto as Exhibit A.

A.     **Introductory Note**

As detailed more fully herein, prior to November 8, 2007 (the "Petition Date"), the Debtors reached an agreement (the "Asset Purchase Agreement" or "Agreement"), subject to higher and better offers, pursuant to which the Debtors would sell (the "Sale") substantially all of their assets to Adeptio, the parent corporation of Simplexity, Inc. (the "Buyer's Subsidiary," together with Adeptio, the "Purchaser"), assignee to the Buyer's rights under the Sale Order (defined below) and Agreement.  On the Petition Date, the Debtors commenced these Chapter 11

{00815667;v1}

Cases to effectuate the sale process as a means to maximize value and provide themselves with a vehicle to explore any and all of their restructuring alternatives.

Accordingly, on the Petition Date, the Debtors filed the Motion of Debtors for an Order Pursuant to Section 105(a), 363 and 365 of title 11 of the Untied States Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (i) Authorizing the Sale of Substantially All of Debtors' Assets; (ii) Approving an Asset Purchase Agreement, Subject to Higher and Better Offers; (iii) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (iv) Granting Related Relief (the "Sale Motion"). Pursuant to the Sale Motion, the Debtors sought to sell substantially all of their assets to Adeptio.

On the Petition Date, the Debtors also filed the Motion for Order (i) Approving Bid Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (ii) Scheduling a Hearing to Consider the Sale and Approving the Form and Matter of Notice; (iii) Establishing Procedures Relating to Assumption and Assignment of Certain Contracts, including Notice of Proposed Cure Amounts; (iv) Approving Expense Reimbursement Provisions, and (v) Granting Related Relief (the "Bid Procedures Motion").

Also, on the Petition Date, the Debtors filed a Motion for Entry of Interim and Final Orders (I) Authorizing and Approving Postpetition Financing (the "DIP Facility"); (II) Granting Liens and Security Interests and Providing Superpriority Administrative Expenses Status; (II) Authorizing Use of Cash Collateral and Affording Adequate Protection; (IV) Modifying Automatic Stay; and (V) Scheduling Final Hearing, Pursuant to Section 105, 361, 362, 363 and 364 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002 and 4001(C) and (D) (the "DIP Motion").

## B.    Business Overview

Before the Sale, InPhonic, Inc. ("InPhonic"), one of the affiliated debtors was a leading internet (online) seller of wireless services and devices to consumers.  InPhonic sold these services and devices through company owned and branded websites, including without limitation www.wirefly.com, as well as through a variety of private labeled websites that it developed and managed for marketing partners such as internet businesses, affinity organizations and national retailers.  InPhonic marketed its services through a variety of online advertising programs including display advertising, search marketing, email marketing and affiliate programs.

CAIS Acquisitions II, a wholly-owned subsidiary of InPhonic, did business under the name VMC Satellite.  Through VMC Satellite, InPhonic marketed consumer digital broadcast satellite television, broadband and VOIP services.  VMC Satellite marketed its services through a portfolio of its own websites, affiliate websites, print advertisement and private labeled websites, as well as through an in-bound call center.

InPhonic's Mobile Virtual Network Enabler ("MVNE") business leveraged the company's e-commerce platform and operational infrastructure to enable communications service providers and consumer brands to offer a branded wireless service to their customers without having to own or operate the underlying wireless network or operational infrastructure. InPhonic's MVNE platform provided a turn-key solution that combined system integration to every major U.S. wireless carrier with enterprise strength billing and customer care solutions.

InPhonic also developed and sold a unified communications service that provided users with a private toll-free number and a professional set of small business messaging services for one monthly fee.  Users had one central location for all of their voicemail, email, faxes, calendar appointments and address books and could manage all of their messages from anywhere by accessing a single message box using any phone or computer.  The platform offered users many

{00815667;v1}

voice messaging, fax delivery, conference calling and call routing services integrated into a single application accessible by telephone or computer for a single monthly fee.

All of the Debtors were headquartered in Washington, D.C. The Debtors maintained technology and operations centers in Largo, Maryland; Reston, Virginia; and Great Falls, Virginia.

**C.    Prepetition Capital Structure and Debt Obligations**

InPhonic, a Delaware corporation, is publicly traded on the National Association of Securities Dealers Automated Quotations (NASDAQ: INPC). InPhonic is the sole member of CAIS, CAIS II, MTS, FON and 1010 Interactive, all of which are Delaware limited liability companies. InPhonic is also the sole shareholder of SimIPC and Star Number, Inc.,[3] both Delaware corporations. On November 19, 2004, InPhonic closed an initial public offering of its common stock, which resulted in net proceeds of approximately $108.9 million.

As discussed in more detail below, on November 7, 2006, InPhonic entered into a Credit Agreement (the "Prepetition Credit Agreement") with Goldman Sachs Credit Partners L.P., as Lead Arranger, Lead Bookrunner and Lead Syndication Agent, Citicorp North America, Inc., as Administrative Agent, and the lenders from time to time party thereto (collectively, the "Prepetition Lenders"). On or about October 5, 2007 the Debtors received Notice of a Default under the Credit Agreement for, inter alia, failure to pay interest when due. On November 2, 2007, the Prepetition Lenders assigned all of their rights, title and interest in, to and under the Prepetition Credit Agreement and related loan documents to Adeptio.

---

[3] Star Number, Inc. recently changed its Certificate of Incorporation to change its name to SN Liquidation, Inc.

**D.    The Chapter 11 Cases**

Beginning in 2006, several factors caused a rapidly declining cash balance and eventual lack of cash liquidity, including increased spending on marketing that proved to be unprofitable, insufficient improvement in revenue assurance and collection efforts, inability to maintain adequate inventory of the most popular wireless devices, increasing general and administrative expenses and declining gross margin in revenue generated by customer activations.  InPhonic began to address these challenges by proactively reducing overall marketing costs, focusing marketing expenses on the marketing channels that resulted in activations with the highest gross margins, reducing general and administrative expenses and improving collection efforts.  These measures, however, did not result in enough immediate cash liquidity to increase inventory to levels necessary to fill orders for the most popular wireless devices.  The positive effects of the improvements were offset by the revenue lost due to a rapidly increasing number of customer orders that were placed for wireless devices that were "out-of-stock".

On the Petition Date, InPhonic and its wholly-owned corporate and limited liability company subsidiaries:   (a) CAIS Acquisition, LLC, a Delaware limited liability company ("CAIS"); (b) CAIS Acquisition II, LLC, a Delaware limited liability company ("CAIS II"); (c) SimIPC Acquisition Corp., a Delaware corporation ("SimIPC"); (d) Star Number, Inc., a Delaware corporation ("Star Number"); (e) Mobile Technology Services, LLC, a Delaware limited liability company ("MTS"); (f) FON Acquisition, LLC, a Delaware limited liability company ("FON"); and (g) 1010 Interactive, LLC, a Delaware limited liability company ("1010 Interactive"), as debtors and debtors in possession, each commenced these Chapter 11 Cases.

At the same time, the Debtors began evaluating strategic alternatives, and engaged Goldsmith, Agio, Helms Securities, Inc. ("GAH") as their investment banker to advise and assist with the evaluation of such alternatives.  GAH immediately commenced due diligence and

{00815667;v1}

worked with the Companies to explore various alternatives available to the Debtors. First, the Debtors made a good faith effort to market their assets to potential buyers other than Adeptio, targeting both strategic and financial buyers. Second, a marketing book was prepared by GAH and sent to over 30 prospective purchasers. Based upon those efforts, the Debtors and their investment banker pursued a variety of transactions, including the sale of substantially all of the Debtors' assets.

Although the Debtors and GAH contacted numerous potentially interested parties regarding financing and sales, it became apparent that Adeptio was the most likely potential purchaser of the Debtors' assets and the most likely provider of debtor in possession financing. Accordingly, the Debtors and their advisors approached Adeptio regarding its interest in serving as a "stalking horse" bidder in a bankruptcy court-supervised sale of the Debtors' businesses. At the same time, the Debtors began to negotiate the terms and conditions of a debtor in possession financing facility with the original Prepetition Lenders. Adeptio was brought in during the prepetition marketing process, they were not insiders during this process. The Asset Purchase Agreement was negotiated at arms length, and the Debtors' objective has always been the maximization and preservation of the estate.

To ensure that the Debtors would have sufficient liquidity to fund operations while the Debtors pursued their restructuring objectives, at the outset of the Chapter 11 Cases, the Debtors obtained the Bankruptcy Court's approval of a debtor in possession revolving credit facility that provided for up to $25 million total and $10 million interim financing in the form of the DIP Facility. The DIP Facility was secured by first priority liens on substantially all of the Debtors' assets, as well as liens on all other assets, junior to existing prepetition liens. Proceeds from the

DIP Facility were used to fund operations during the Chapter 11 Cases. The balance outstanding under the DIP Facility was deemed paid in full with proceeds of the Sale.

Ultimately, the Debtors and their advisors concluded that a going concern sale provided the best overall outcome, and accordingly, on December 13, 2007, the Bankruptcy Court entered an order approving the Sale to the Buyer.

Major creditor groups in the case participated actively in all aspects of the Chapter 11 Cases, including the Sale process. Holders of General Unsecured Claims were represented by the Creditors' Committee. The Creditors' Committee was represented by both legal and financial advisors that they selected (Reed Smith LLP and Deloitte & Touche USA, respectively).

### E.    Sale of Substantially All of the Debtors' Assets

Pursuant to Bankruptcy Code section 363, and through the Sale Motion, the Debtors sought approval of the sale of substantially all of their assets in order to maximize value to their estates and provide a vehicle to explore any and all restructuring alternatives. Through the Bid Procedures Motion, the Debtors sought approval of the Bid Procedures. Among other things, the requested Bid Procedures Motion set forth procedures regarding the Debtors' solicitation of additional offers in an effort to maximize sale proceeds, culminating in an auction (the "Auction") if any qualified, additional offers were obtained. An order approving the Bid Procedures Motion (the "Bid Procedures Order") was entered on November 9, 2007.

Following entry of the Bid Procedures Order, the Debtors received no other qualified, additional offers. Accordingly, pursuant to the Bid Procedures Order, no auction was held, and the Debtors pursued approval of the Asset Purchase Agreement with Adeptio. At the hearing on the DIP Motion and Sale Motion on December 13, 2007, the Court entered the final orders approving the Sale Motion (the "Final Sale Order") and the DIP Motion (the "Final DIP Order").

10

The Debtors closed on the Sale on December 21, 2007 (the "Closing Date"). Since the Closing Date, the Debtors and the purchaser have worked to effectuate various transfers contemplated by the Sale Order and the Asset Purchase Agreement and to determine the respective liabilities under such documents.

**F.      General Structure of the Plan**

On April 14, 2008, the Debtors and the Committee filed the Plan. The Plan is the result of ongoing negotiations with a number of creditors and creditor representatives. The Plan provides for the orderly liquidation of the Debtors' Estates. Because substantially all of their operating assets were sold as part of the Sale, the Plan provides for the formation of Litigation Trust that will administer the remaining Estate Assets and assess the value thereof. These remaining Estate Assets include, but are not limited to, any Causes of Action against the recipients of stock redemption payments and claims, former directors and officers, or otherwise. Those Causes of Action are central to the success of the Plan and the distribution of any value to Holders of General Unsecured Claims.

There are eight (8) distinct legal entities that are being liquidated pursuant to the Plan. The Plan, however, provides for the merger of all of the Debtors' estates into SN Liquidation. To the extent that all of the Estates are merged, on the Effective Date (i) all intercompany claims by, between and among the Debtors shall be eliminated, (ii) all assets and liabilities of the Affiliate Debtors shall be merged or treated as if they were merged with the assets and liabilities of SN Liquidation, (iii) any obligation of a Debtor and all guarantees thereof by one or more of the other Debtors shall be deemed to be one obligation of SN Liquidation, (iv) the Subsidiary Interests shall be cancelled and (v) each Claim filed or to be filed against any Debtor shall be deemed filed only against SN Liquidation and shall be deemed a single claim against and a single obligation of SN Liquidation.

{00815667;v1}

In addition, and to the extent that the Estates are merged on the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all Claims based upon guarantees of collection, payment or performance made by the Debtors as to the obligations of another Debtor shall be released and of no further force and effect. The existing common and voting stock of the Debtors shall be cancelled under the Plan, and no distributions are provided for holders of such stock interests or claims based upon or arising from the ownership of such stock.

**G.**     **Summary of Treatment of Claims and Interests Under the Plan**

Certain Classes of Claims are impaired under the Plan and, accordingly, are entitled to vote on the Plan. The Debtors are seeking votes to accept the Plan from holders of Claims in these Classes. The Class of Interests, however, will receive no distribution or benefits under the Plan because all Interests will be extinguished under the Plan. Accordingly, the Class of Interests is deemed to have rejected the Plan.

Estimated Claims amounts for certain Classes are based upon a preliminary analysis by the Debtors and their Professionals of claims filed in the Debtors' Chapter 11 Cases. There can be no assurance that these estimated amounts are correct. The following treatments are possible only if the Plan is approved. The timing of distributions under the Plan, if any, is subject to conditions and determinations described in later sections of this Disclosure Statement.

Each Class of Claims and Interests, except Administrative Claims, Priority Tax Claims Trustee Fees, and DIP Financing Facility Claims are placed in the following Classes and will receive the following treatment under the Plan:

{00815667;v1}

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| **Class 1 – Assumed Liability Claims** | N/A | No | Assumed Liability Claims shall be satisfied by Adeptio pursuant to the terms of the Asset Purchase Agreement: (i) in the ordinary course of business; (ii) pursuant to the terms of the applicable agreement underlying such claim, or (iii) such other treatment as to which such Holder and Adeptio shall have agreed. |
| **Class 2 – Other Secured Creditor Claims** | $ -0- | No | On, or as soon as reasonably practicable after, the later of: (i) the Distribution Date; (ii) the date such claim becomes an Allowed Other Secured Claim; or (iii) the date such Other Secured Claim becomes payable pursuant to any agreement between the Debtors or Litigation Trustee and the Holder of such Allowed Other Secured Claim, a Holder of a Secured Claim, other than a Secured Lender Claim, shall receive either (i) Cash equal to the amount of the Allowed Other Secured Claim; (ii) the collateral which secures its claim; or (iii) such other treatment as to which the Debtors and the Holder of an Allowed Other Secured Claim agrees in writing, on the later of the Effective Date or the date such Claim becomes an Allowed Other Secured Claim. |

{00815667;v1}

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| **Class 3 – Non-Tax Priority Claims** | $-0- | No | On, or as soon as reasonably practicable after, the latest of: (i) the Distribution Date; (ii) the date such claim becomes an Allowed Priority Non-Tax Claim; or (iii) the date such Allowed Priority Non-Tax Claim becomes payable pursuant to any agreement between the Debtors or Litigation Trustee and the Holder of such Allowed Priority Non-Tax Claim. The Holders of Allowed Priority Tax Claims and Allowed Priority Non-Tax Claim shall receive up to a maximum of $500,000 in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Non-Tax Claim (i) Cash equal to the unpaid portion of such Allowed Priority Non-Tax Claim or (ii) such other treatment as to which the Litigation Trustee and such Holder shall have agreed upon in writing. The Debtors estimate that the all Priority Claims will not exceed $500,000. |
| **Class 4 – Secured Lender Claims** | N/A | Yes | On the Effective Date, all Claims by the Secured Lender, including any Claims arising under the DIP Facility or any prepetition agreement, the Secured Lender shall, pursuant to the Term Sheet and subject to the terms of the Term Sheet, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Secured Lender Claim, receive the Secured Lender Deficiency Claim, which entitles the Secured Lender to the Pro Rata share of the assets of the Litigation Trust as provided to all Holders of General Unsecured Claims in Class 5. |

{00815667;v1}

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| Class 5 – General Unsecured Claims | $106,548,592.00 | Yes | Each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of all Cash available for distribution by the Litigation Trust up to the full amount of the Allowed General Unsecured Claim, after satisfaction in full of all Liquidation Expenses, unpaid Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims. Distributions on Allowed General Unsecured Claims shall be made in accordance with and pursuant to the Litigation Trust Agreement and shall be made by the Litigation Trust at such times and in such amounts as the Litigation Trustee shall determine. |
| Class 6 – Intercompany Claims | N/A | Yes | On the Confirmation Date or such other date as may be set by an order of the court, but subject to the occurrence of the Effective Date, all Intercompany Claims shall be deemed expunged and extinguished. The Holders of Intercompany Claims shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Claims. Class 6 is deemed to have rejected the Plan and, therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan. |
| Class 7 – Equity Interests | N/A | Yes | On the Confirmation Date or such other date as may be set by an order of the court, but subject to the occurrence of the Effective Date, all Interests shall be deemed expunged and extinguished. The Holders of Interests shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Interests. Class 7 is deemed to have rejected the Plan and, therefore, Holders of Interests are not entitled to vote to accept or reject the Plan. |

15

{00815667;v1}

H.    **Acceptance or Rejection of the Plan**

In accordance with Bankruptcy Code section 1124, Holders of Claims in Classes 1, 2 and 3 are not Impaired by the Plan. Under Bankruptcy Code section 1126(f), each Holder of a Claim in Classes 1 through 3 is presumed to have accepted the Plan, and the votes of such Claim Holders will not be solicited.

Holders of Claims in Class 6 and Holders of Interests in Class 7 are not entitled to receive or retain any property under the Plan. Under Bankruptcy Code section 1126(g), Class 6 Claim Holders and Class 7 Interest Holders are deemed to reject the Plan, and the votes of such Claim or Interest Holders will not be solicited.

As a result, only the votes of Holders of Claims in Classes 4 and 5 will be solicited with respect to the Plan. Thus, in accordance with Bankruptcy Code section 1126(c) and except as provided in Bankruptcy Code section 1126(e), an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of Classes 4 and 5 that have timely and properly voted to accept or reject the Plan.

## ARTICLE II

## HISTORY, OPERATIONS AND STRUCTURE OF THE DEBTORS

A.    **Introductory Note**

As detailed more fully herein, on December 13, 2007, the Bankruptcy Court approved the sale of substantially all of the Debtors' assets to Adeptio. Subsequently, on or about December 21, 2007, Adeptio assigned to its subsidiary, Simplexity, the rights to receive the Assets from the Sellers under the Agreement and Sale Order. After the Closing Date of the Sale, the Debtors' operations ceased, and the Debtors began the process of winding down their Estates,

{00815667;v1}

assessing their liabilities, and liquidating their remaining assets. A description of the Debtors' history, structure, and business practices is provided to help understand and analyze the Plan.

**B.     The Company**

InPhonic was incorporated in 1997 and began operations in 1999. InPhonic's business principally involved the marketing of wireless telephone and satellite television services and related equipment and support services. InPhonic focused its business in four (4) areas: (a) wireless device activation services, (b) television satellite activation services, (c) MVNE services, and (d) unified communication services.

InPhonic was a leading internet (online) seller of wireless services and devices to consumers. InPhonic sold these services and devices through company owned and branded websites, including without limitation www.wirefly.com, as well as through a variety of private labeled websites that it developed and managed for marketing partners such as internet businesses, affinity organizations and national retailers.

InPhonic marketed its services through a variety of online advertising programs including display advertising, search marketing, email marketing and affiliate programs. InPhonic's website www.wirefly.com, a leading one-stop shopping site for mobile phones and wireless plans, was awarded "Best of the Web" by Forbes magazine and "Best in Overall Customer Experience" by Keynote Performance Systems.

InPhonic also marketed its services through its partners' private label websites which InPhonic created to leverage its partners' brands and their existing customer relationships. InPhonic private-labels customer touch points to the partners' brands, including the web storefront, customer communications (such as call centers and in-box collateral) and device packaging.

{00815667;v1}

CAIS Acquisitions II, a wholly-owned subsidiary of InPhonic, did business under the name VMC Satellite. Through VMC Satellite, InPhonic marketed consumer digital broadcast satellite television, broadband and VOIP services. VMC Satellite marketed its services through a portfolio of its own websites, affiliate websites, print advertisement and private labeled websites, as well as through an in-bound call center.

InPhonic's Mobile Virtual Network Enabler, "MVNE," business leveraged the company's e-commerce platform and operational infrastructure to enable communications service providers and consumer brands to offer a branded wireless service to their customers without having to own or operate the underlying wireless network or operational infrastructure. InPhonic's MVNE platform provided a turn-key solution that combined system integration to every major U.S. wireless carrier with enterprise strength billing and customer care solutions.

InPhonic developed and sold a unified communications service that provided users with a private toll-free number and a professional set of small business messaging services for one monthly fee. Users had one central location for all of their voicemail, email, faxes, calendar appointments and address books and could manage all of their messages from anywhere by accessing a single message box using any phone or computer. The platform offered users many voice messaging, fax delivery, conference calling and call routing services integrated into a single application accessible by telephone or computer for a single monthly fee.

InPhonic had agreements with the largest wireless carriers in the U.S., as well as large satellite, broadband and VOIP providers, to market their products and services. InPhonic also had agreements with thousands of affiliate and marketing partners that marketed Debtors products and services under their brands through private-label websites that InPhonic created and managed and/or their websites.

18

All of the Debtors were headquartered in Washington, D.C.  The Debtors maintain technology and operations centers in Largo, Maryland; Reston, Virginia; and Great Falls, Virginia.

**C.      Prepetition Capital Structure of Debtors**

**1.      Prepetition Credit Agreement and Amendment**

On November 7, 2006, InPhonic entered into a Credit Agreement (the "Prepetition Credit Agreement") with Goldman Sachs Credit Partners L.P., as Lead Arranger, Lead Bookrunner and Lead Syndication Agent, Citicorp North America, Inc., as Administrative Agent, and the lenders from time to time party thereto (collectively, the "Prepetition Lenders").  InPhonic is the borrower under the Prepetition Credit Agreement, and each of the other Debtors is a guarantor of InPhonic's obligations to the Prepetition Lenders.

The Credit Agreement provided for a $100 million aggregate principal amount senior secured term loan bearing a fixed interest rate of nine percent (9%) per annum.  The term loan was secured by substantially all of InPhonic's assets and matures in November 2011.  InPhonic pledged the stock and membership interests of each of the other Debtors to further secure its obligations under the Credit Agreement.

As additional consideration, InPhonic granted the Prepetition Lenders warrants (the "Warrants") to purchase an aggregate of 1,250,000 shares of InPhonic common stock at an exercise price of $0.01 per share.  The Warrants would have expired on November 7, 2011.  The Warrants were issued in reliance on the exemptions provided for in Section 4(2) of the Securities Act relating to sales not involving any public offering.

InPhonic received $75 million of the term loan proceeds on November 8, 2006 and had the option to draw the remaining amount within 90 days.  The Prepetition Credit Agreement contained affirmative and negative covenants, including financial covenants and covenants

19

restricting indebtedness, liens, investments, asset transfers and distributions. After November 2009, InPhonic had the ability to repay principal on the term loan without penalty and, conversely, the Prepetition Lenders had the right to call the remaining outstanding principal of the term loan without penalty.

In connection with the Prepetition Credit Agreement, InPhonic terminated a loan facility with Comerica Bank and used a portion of the proceeds from the term loan to repay the outstanding principal obligation of $19.9 million plus accrued interest under the Comerica facility.

On August 8, 2007, InPhonic entered into an amendment to the Prepetition Credit Agreement (the "Amendment"), pursuant to which the Delayed Draw Lender (as defined in the Amendment) loaned InPhonic an aggregate amount of $15 million. The Amendment also reduced the total loan commitment from $100 million to $90 million and the Delayed Draw Lender's Delayed Draw Commitment (as defined in the Amendment) from $25 million to $15 million. The Amendment also required InPhonic to issue immediately exercisable warrants to the Lenders to purchase 800,000 shares of InPhonic's common stock at a price of $0.01 per share. On or about October 5, 2007 the Debtors received Notice of a Default under the Credit Agreement for inter alia failure to pay interest when due.

On November 2, 2007, the Prepetition Lenders assigned all of their right, title and interest in, to and under the Prepetition Credit Agreement and related loan documents to Adeptio.

2.    **Corporate Structure of Debtors**

InPhonic, a Delaware corporation, is publicly traded on the National Association of Securities Dealers Automated Quotations (NASDAQ: INPC). InPhonic is the sole member of CAIS, CAIS II, MTS, FON and 1010 Interactive, all of which are Delaware limited liability

{00815667;v1}

companies. InPhonic is also the sole shareholder of SimIPC and Star Number, both Delaware corporations.

On November 19, 2004, InPhonic closed an initial public offering of its common stock, which resulted in net proceeds of approximately $108.9 million.

**ARTICLE III**

**CHAPTER 11 CASES**

A.      **Lack of Liquidity and Events Leading to Chapter 11 Cases**

Beginning in 2006, several factors caused InPhonic to experience a rapidly declining cash balance and eventual lack of cash liquidity, including increased spending on marketing that proved to be unprofitable, insufficient improvement in revenue assurance and collection efforts, inability to maintain adequate inventory of the most popular wireless devices, increasing general and administrative expenses and declining gross margin in revenue generated by customer activations.

InPhonic began to address these challenges by proactively reducing overall marketing costs, focusing marketing expenses on the marketing channels that resulted in activations with the largest gross margins, reducing general and administrative expenses, and improving collection efforts. These measures, however, did not result in enough immediate cash liquidity to increase inventory to levels necessary to fulfill orders for the most popular wireless devices. The positive effect of the improvements were offset by the revenue lost due to rapidly increasing number of customer orders that were placed for wireless devices that were "out-of-stock."

B.      **Necessity of, and Reasons for, Chapter 11 Filings**

Prior to filing these Chapter 11 Cases, the Debtors were involved in a multitude of litigation. On May 7 and 18, 2007, two putative federal securities law class actions were filed in the United States District Court for the District of Columbia on behalf of persons who purchased

21

InPhonic common stock between August 2, 2006 and May 3, 2007. These substantially similar lawsuits asserted claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, against InPhonic, its chief executive officer and its chief financial officer. These claims related to InPhonic's April 3, 2007, and May 4, 2007, announcements concerning the restatement of certain previously issued financial statements.

Moreover, fifteen related putative federal court class actions have been filed against the Debtors arising out of InPhonic-sponsored rebate offers for online purchases of wireless telephones. Several of those lawsuits also named either InPhonic's current or former third-party rebate processor as a defendant. On October 25, 2006, the Judicial Panel on Multidistrict Litigation ("JPML") granted the Debtors' motion to consolidate the federal court actions in the United States District Court for the District of Columbia before the Honorable Ellen Segal Huvelle. The consolidated amended class action complaint alleges, among other things, that the Debtors and their current or former third-party rebate processor (depending on the particular claim) violated the consumer protection laws of various States, various D.C. state laws and the federal RICO (anti-racketeering) statute in connection with our disclosure and implementation of the terms and conditions of rebate offers. The class action plaintiffs seek compensatory damages and/or restitution, statutory penalties and treble damages under D.C. consumer protection laws and RICO, attorneys' fees and punitive damages, as well as injunctive relief.

On April 27, 2007, InPhonic and the Federal Trade Commission (FTC) announced that they had entered into a consent agreement in which InPhonic agreed to clearly and prominently disclose certain information regarding its rebate offers, such as when consumers can expect to receive their rebates, any time period that consumers must wait before submitting a rebate request, and certain information that would disqualify a consumer from receiving a rebate.

{00815667;v1}

InPhonic also agreed to provide rebates within time frames and under terms and conditions reasonably specified by InPhonic in its communications with its customers. InPhonic further agreed to provide rebates to certain customers whom had previously been denied them.

On February 15, 2007, InPhonic reached a final settlement with the District of Columbia Attorney General's Office concerning the Debtors' use of mail-in rebates.

On August 5, 2004, Avesair, Inc. ("Avesair") filed suit against InPhonic in the Superior Court of North Carolina demanding, among other matters, that InPhonic issue to Avesair certain shares of common stock pursuant to an asset purchase agreement between InPhonic and Avesair. On October 16, 2007 the court granted Avesair's motion for summary judgment entitling Avesair to recover $3,999,999 worth of the common stock of InPhonic as damages for InPhonic's breach of the terms of the asset purchase agreement between InPhonic and Avesair.

InPhonic was also the subject of prepetition litigation with certain of its vendors, including without limitation, the following cases:

(a)    PeopleSupport, Inc. ("PeopleSupport") filed an action in the Superior Court of California for breach of contract and other common counts against InPhonic and its subsidiary StarNumber seeking $114,109 plus interest and costs and attorneys fees.

(b)    Amazon Services LLC ("Amazon") filed an action in the Superior Court of Washington, King County, for breach of contract and other common counts against InPhonic seeking $1,100,000 plus interest and costs and attorneys fees.

(c)    Ferron filed a lawsuit against Echostar Satellite Corporation ("Echostar") and certain of its retailers, including InPhonic's subsidiary, CAIS Acquisitions II, LLC (d/b/a VMC Satellite) in the United States District Court for the Southern District of Ohio, Case No. 2:06CV453, alleging certain violations of Ohio consumer protection laws related to the content and distribution of certain e-mails marketing Echostar services.

23

(d)  Microsoft Online, L.P. d/b/a MSN filed an action in the Superior Court of Washington, King County, for breach of a certain agreement alleging InPhonic owes $9,705,631.51

(e)  ProLink Communications, LLC ("ProLink"), a provider of consulting services to InPhonic, filed an action in the Superior Court of the District of Columbia alleging that InPhonic breached its obligations under a certain Master Services Agreement and seeks $472,959 from InPhonic.

(f)  X Prize Foundation, Inc.("X Prize") filed an action against InPhonic in the Superior Court of California, Los Angeles County, for breach of a certain agreement alleging that InPhonic owes an amount not less than $500,000.

(g)  M. Arthur Gensler Jr. & Associates filed an action against InPhonic in the Superior Court for the District of Columbia asserting claims for breach of contract.

Given the Debtors' financial condition and lack of liquidity, compounded by a plethora of litigation and the operational and other circumstances set forth above, the Debtors commenced these Chapter 11 Cases to, among other things, use the section 363 sale process as a means to maximize the Estates' value and provide the Estates with a vehicle to explore any and all of their restructuring alternatives.

**C.    Continuation of Business; Stay of Litigation**

On November 8, 2007, the Debtors filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code in the Bankruptcy Court. The cases (case numbers 07-11666 through 07-11673) were assigned to the Honorable Kevin Gross.

Since the Petition Date, the Debtors have continued to operate as debtors in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. Under the Bankruptcy Code, the Debtors are required to comply with certain statutory reporting requirements, including the filing of monthly operating reports. As of the date hereof, the Debtors have complied with such requirements. The Debtors are authorized to operate their

24

businesses in the ordinary course of business, with transactions out of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors. This relief provides the Debtors with the "breathing room" necessary to assess and reorganize their business. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of a plan of liquidation.

**D.     First Day Orders**

During the first day hearing (the "First Day Hearing") held in these Chapter 11 Cases, the Debtors filed numerous motions seeking immediate relief. As a result, the Bankruptcy Court entered numerous "first day orders." First day orders are intended to facilitate the transition between a debtor's prepetition and postpetition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court. Many of the first day orders obtained in these cases are typical for large Chapter 11 cases.

The first day orders in the Chapter 11 Cases, include, but are not limited to, the following Orders:

(a)     Granting Joint Administration of the Chapter 11 Cases

(b)     (I) Prohibiting Utility Providers From Altering, Refusing or Discontinuing service to Debtors, (II) Deeming Utilities Adequately Assured of Future Performance, And (III) Establishing Procedures for Adequate Assurance of Future Performance;

25

(c)    Approving Motion for (I) Bid Procedures Relating to Sale of Substantially All of the Debtors' Assets; (II) Scheduling a Hearing to Consider the Sale and Approving the Form and Matter of Notices; (III) Establishing Procedures Relating to Assumption and Assignment of Certain Contracts, Including Notice of Proposed Cure Amounts, (IV) Approving Expense Reimbursement Provision, and (V) Granting Related Relief Filed;

(d)    Authorizing Payment of Prepetition (I)Wages, Salaries and Other Compensation of Employees and Subcontractors, (II) Employee Medical and Similar Benefits, (III) Reimbursable Employee Expenses, and (IV) Other Miscellaneous Employee Expenses and Benefits;

(e)    Authorizing (I) Continued Use of Existing Cash Managements System, (II) Maintenance of Existing Bank Accounts, (III) Continued Use of Existing Checks and Business Forms, and (IV) Continued Use of Existing Investment Guidelines;

(f)    Authorizing and Approving, on an Interim Basis (I) Postpetition Financing; (II) Granting Liens, and Security Interests and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of Cash Collateral and Affording Adequate Protection; (IV) Modifying Automatic Stay; and (V) Scheduling Final Hearing;

(g)    Authorizing Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue their Customers Programs and Practices in the Ordinary Course of Business;

(h)    Authorizing Payment of Prepetition Trust Fund Taxes in the Ordinary Course of Business;

(i)    Authorizing and Approving the Appointment of the BMC Group, Inc. As Noticing, Claims, and Voting Agent For the Bankruptcy Court.

E.    **Debtor in Possession Financing**

To ensure that they would have sufficient liquidity to conduct their businesses during the Chapter 11 Cases, the Debtors determined that it was in the best interests of the Debtors and their creditors to obtain a commitment for debtor in possession financing (the "DIP Funding").

{00815667;v1}

Accordingly, as discussed above, at the outset of these cases, the Debtors sought and obtained interim authority to enter into the DIP Facility with Adeptio (the "Interim DIP Order"). The DIP Lender was the same financial institution that held the Prepetition Term Loan. Final authority to enter into the DIP Facility was granted by the Bankruptcy Court on December 13, 2007 (the "Final DIP Order").

The DIP Facility provided for secured postpetition financing from the DIP Lenders in the aggregate amount of approximately $25 million (consisting of a $56 million DIP Term Loan and a $47 million Revolving DIP Facility). Under the terms of the DIP Facility, to secure the repayment of the borrowing and all other obligations arising under the DIP Facility, the Debtors granted the DIP Lenders first priority senior priming liens on substantially all of their assets, junior only to other valid liens existing on the Petition Date. Obligations under the DIP Facility were also granted "superpriority" claim status under Bankruptcy Code section 364(c)(1), meaning they had priority over all other administrative expenses.

The liens and claims granted to the DIP Lenders were subject to the fees and expenses of the Office of the United States Trustee under 28 U.S.C. § 1930 and the Clerk of the Bankruptcy Court, as well as a carve-out for fees and disbursements of the Debtors' professionals and the Creditors' Committee's professionals incurred after an event of default under the DIP Facility. The DIP Facility also contained covenants, representations and warranties, events of default, and other terms and conditions typical of credit facilities of a similar nature. All obligations under the DIP Facility were satisfied by the terms of the Sale.

F.    **Appointment of Creditors Committee**

On November 16, 2007, the United States Trustee for the District of Delaware pursuant to Bankruptcy Code section 1102(a), appointed certain entities to the Official Committee of

{00815667;v1}

Unsecured Creditors of the Debtors (the "Committee"). The Members of the Committee included:

    (a)    JBR Media Ventures, LLC.

    (b)    Google Inc.

    (c)    Infinite Computer Solutions, Inc.

    (d)    Yahoo!, Inc.

    (e)    ACN Communications Services, Inc.

**G.    The Committee's Objections to Sale Motion and Relief Requested**

The Committee objected to approval of the Sale Motion and DIP Motion. In addition, the Committee filed various motions (collectively, the "Committee Motions") contesting the relief sought in these bankruptcy cases including, but not limited, to:

    (a)    Motion of the Official Committee of Unsecured Creditors for an Order (i) Dismissing (or Converting) Debtors' Bankruptcy Cases Pursuant to Section 1112(b) of the Bankruptcy Code or, Alternatively, (ii) Compelling the Trustee to Abandon Fully-Encumbered Estate Property Pursuant to Section 554(b) of the Bankruptcy Code;

    (b)    Objection of the Official Committee of Unsecured Creditors to the Motion of Debtors for an Order Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Sale of Substantially All of their Assets; (II) Approving an Asset Purchase Agreement, Subject to Higher and Better Offers; (III) Approving the Assumption and Assignment of Certain Executory Contracts, and Unexpired Leases; and (IV) Granting Related Relief (the "Committee Objection"); and

    (c)    Emergency Motion of the Official Committee of Unsecured Creditors for an Order (I) Postponing the Sale Hearing Currently Scheduled for December 13, 2007, and (II) Extending the Investigation Period.

{00815667;v1}

H.    **Resolution of Objections to the Sale**

At the hearing on the DIP Motion and Sale Motion on December 13, 2007, after intensive discussions, the Committee, the Debtors, and Adeptio reached a global settlement on the Committee's various objections and motions, including the Committee Motions, allowing for entry of final orders approving the Sale Motion (the "Final Sale Order") and the DIP Motion (the "Final DIP Order"). The settlement is reflected in the term sheet (the "Term Sheet") that was approved and incorporated into the December 13, 2007 Sale Order.

The salient provisions of the Term Sheet are summarized as follows:

(a)    Upon closing, Adeptio will: (a) pay all allowed professional fees accrued through the effective date of a plan of liquidation, up to the aggregate amount budgeted from such fees in the DIP Budget, but not to exceed $1,100,000 ("Professional Funding"); (b) fund the administrative costs of maintaining the Debtors' estates post-closing in an amount up to $200,000 ("Wind Down Funding"); (c) fund allowed professional fees related to investigation, commencement, prosecution and litigation of appropriate claims of the Estate through a Litigation Trust to be formed pursuant to the Plan through a senior secured loan of up to $500,000 (the "Investigation Funding").

(b)    Adeptio shall have an allowed deficiency claim of $20,000,000 on account of its prepetition secured claim and DIP funding claims.

(c)    Upon the confirmation of a chapter 11 plan, Adeptio shall contribute up to $500,000 for the sole purpose of making distributions to allowed priority claims pursuant to the terms and conditions of section 1129(a)(9) of the Bankruptcy Code (the "Priority Claims Funding").

(d)    The Debtors shall promptly release all Bankruptcy Code section 547 preference claims which are not being sold to Adeptio.

(e)    Adeptio assumes liability for all obligations in connection with the GAH Fee, which shall be allowed in a total amount of $1,300,000, including the amount already paid to GAH to date of closing.

{00815667;v1}

(f)    The Estates' retention of Claims against certain individuals and parties (whether or not an officer of director) with an on-going, post-closing business relationship with the Debtors' post-closing business, which are considered Purchased Assets under the APA

(g)    In connection with the purchase of Avoidance Actions or litigation claims purchased under the APA, Avoidance Actions against the putative defendants shall be deemed released as of the closing of the sale under the APA.

(h)    The Committee's investigation period shall be deemed to have expired on December 13, 2007, and Adeptio shall be deemed to have a valid, first priority secured claim against the Debtors' estates and shall be released from any and all claims as of the sale closing.

## I.    Other Material Relief Obtained During the Chapter 11 Cases

In addition to the first day relief sought in these Chapter 11 Cases, the Debtors have sought authority with respect to a multitude of matters designed to assist in the administration of the Chapter 11 Cases and to maximize the value of the Debtors' Estates. Documents relating to these various forms of relief can be obtained from the Debtors' closing and notice agent, The BMC Group, Inc. at www.bmcgroup.com/inphonic.

## J.    Summary of Claims Process and Bar Date

### 1.    Schedules and Statements of Financial Affairs

The Debtors filed Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "Schedules and Statements") with the Bankruptcy Court on November 9, 2007. Among other things, the Schedules and Statements set forth the Claims of known creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records. On February 8, 2008, the Debtors amended their schedules and statements to, among other things, more accurately reflect the universe of known and potential claims and liabilities.

{00815667;v1}