**The  Committee's Objections to Sale Motion and Relief Requested**

The Committee objected to approval of the Sale Motion and DIP Motion.  In addition, the Committee filed various motions (collectively, the "Committee Motions") contesting the relief sought in these bankruptcy cases including, but not limited, to:

(a)     Motion of the Official Committee of Unsecured Creditors for an Order (i) Dismissing (or Converting) Debtors' Bankruptcy Cases Pursuant to Section 1112(b) of the Bankruptcy Code or, Alternatively, (ii) Compelling the Trustee to Abandon Fully-Encumbered Estate Property Pursuant to Section 554(b) of the Bankruptcy Code;

(b)     Objection of the Official Committee of Unsecured Creditors to the Motion of Debtors for an Order Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Sale of Substantially All of their Assets; (II) Approving an Asset Purchase Agreement, Subject to Higher and Better Offers; (III) Approving the Assumption and Assignment of Certain Executory Contracts, and Unexpired Leases; and (IV) Granting Related Relief (the "Committee Objection"); and

(c)     Emergency Motion of the Official Committee of Unsecured Creditors for an Order (I) Postponing the Sale Hearing Currently Scheduled for December 13, 2007, and (II) Extending the Investigation Period.

**H.**     ~~H.~~

{00815667;v~1~6}

**Resolution of Objections to the Sale**

At the hearing on the DIP Motion and Sale Motion on December 13, 2007, after intensive discussions, the Committee, the Debtors, and Adeptio reached a global settlement on the Committee's various objections and motions, including the Committee Motions, allowing for entry of final orders approving the Sale Motion (the "Final Sale Order") and the DIP Motion (the "Final DIP Order"). The settlement is reflected in the term sheet (the "Term Sheet") that was approved and incorporated into the December 13, 2007 Final Sale Order.

The salient provisions of the Term Sheet are summarized as follows:that upon closing of the APA, Adeptio will:

(a)    Professional Fee Payments. Upon allowance or other court authorization, pay all professional fees accrued through the confirmation, up to the aggregate amount budgeted for such fees in the DIP budget from the filing date through confirmation of a plan (to the extent not previously paid by the debtor from DIP funds) (the "Professional Funding"). For the avoidance of doubt, and notwithstanding the foregoing, the aggregate amount paid by Adeptio on account of the Professional Funding shall not exceed $1,100,000;

(b)    (a) Upon closing, Adeptio will: (a) pay all allowed professional fees accrued through the effective date of a plan of liquidation, up to the aggregate amount budgeted from such fees in the DIP Budget, but not to exceed $1,100,000 ("Professional Funding"); (b) fundInvestigation, Litigation and Wind Down Funding. Fund (i) the administrative costs of maintaining the Debtors' estates post- closing in anthe amount up toof $200,000 ("Wind Down Funding"); (c) fund allowed professional fees related to investigation, commencement, prosecution and litigation of appropriate claims of and (ii) the costs of professional fees necessary to investigate the viability of avoidance actions and other litigation claims and commence and prosecute such litigation if appropriate that the EstateDebtors' estates through a Litigation Trust to be formed pursuant to the Planmay possess through a senior secured loan of up to $500,000(which shall accrue interest as ruled by the Court) of up to a total $500,000, in accordance with the terms set forth below (the "Investigation Funding"). which amount shall be repaid from first proceeds paid to the Litigation Trust;

(c)    (b) Deficiency Claim.  Adeptio shall have an allowed deficiency claim of $20,000,000 on account of its prepetition secured claim and DIP funding claims.;

(d)    (c) Priority Claims.  Upon the confirmation of a chapter 11 plan, Adeptio shall contribute up to a total $500,000 solely for the sole purpose of making distributions to under such plan on account of allowed priority claims as such claims become allowed pursuant to the terms and conditions of section 1129(a)(9) of the Bankruptcy Code (the "Priority Claims Funding").

(d)    The Debtors shall promptly release all Bankruptcy Code section 547 preference claims which are not being sold to Adeptio.

(e)    Adeptio assumes liability for all obligations in connection with the GAH Fee, which shall be allowed in a total amount of $1,300,000, including the amount already paid to GAH to date of closing.

    (i)    (f) The Estates' retention of Claims against certain individuals and parties (whether or not an officer of director) with an on-going, post-closing business relationship with the Debtors' post-closing business, which are considered Purchased Assets under the APA

    (ii)    (g) In connection with the purchase of Avoidance Actions or litigation claims purchased under the APA, Avoidance Actions against the putative defendants shall be deemed released as of the closing of the sale under the APA.

    (iii)    (h) The Committee's investigation period shall be deemed to have expired on December 13, 2007, and Adeptio shall be deemed to have a valid, first priority secured claim against the Debtors' estates and shall be released from any and all claims as of the sale closing.

(e)    Retained Litigation Claims.  The Debtors' estates shall retain Excluded Assets, as set forth and defined in the APA, including Excluded Avoidance Actions and excluded litigation claims (including claims against individuals and parties with no on-going, post-closing business relationship) and the Debtors shall promptly seek to abandon/waive all section 547 preference claims.  These claims include those set forth in the Notice of Circumstances sent by the Debtors on November 29, 2007 to its respective Directors and Officers liability insurance carriers it being understood that such claims do not include claims against individuals and parties (whether or not an officer or director) with an on-going, post-

{00815667;v16}

closing business relationship with the Debtors' post-closing business, which claims are considered Purchased Assets under the APA.

(f)    Assumed Liabilities.  Adeptio shall assume the following liabilities, as set forth in the APA (all as defined in the APA): Cure Costs under Designated Contracts and the Assumed Liabilities.  It is understood that the Assumed Liabilities include Adeptio's obligations in connection with the GAH Fee which shall be allowed in the amount of $1,300,000 inclusive of amounts paid to GAH to the date of closing, which such obligations are in addition to the Professional Funding.

(g)    No Further Obligations.  It is expressly understood that Adeptio has no obligation to the Debtors' or their estates other than under

    (i)    the DIP Facility;

    (ii)    the APA;

    (iii)    the Wind Down Funding;

    (iv)    the Professional Funding;

    (v)    the Investigation and Litigation Funding; and

    (vi)    the Priority Claims Funding.

(h)    Purchased Actions.  In connection with the purchase of Avoidance Actions or litigation claims purchased under the APA, Avoidance Actions against the putative defendants shall be deemed released as of the closing of the sale under the APA.

(i)    Final Settlement.  This settlement shall be a final, unconditional settlement between Adeptio, the Official Committee of Unsecured Creditors, and the Debtors, with no investigation or other contingencies.

(j)    Reservation of Rights and No Amendment.  The APA, the DIP Facility, and the prepetition secured loan facility remain in full force and effect, with no amendment or modification whatsoever, and Adeptio fully reserves all rights thereunder.

L.    L.

**Other Material Relief Obtained During the Chapter 11 Cases**

In addition to the first day relief sought in these Chapter 11 Cases, the Debtors have sought authority with respect to a multitude of matters designed to assist in the administration of the Chapter 11 Cases and to maximize the value of the Debtors' Estates. Documents relating to these various forms of relief can be obtained from the Debtors' closing and notice agent, The BMC Group, Inc. at www.bmcgroup.com/inphonic.

**J.**      ~~J.~~ **Summary of Claims Process and Bar Date**

**1.      Schedules and Statements of Financial Affairs**

The Debtors filed Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "Schedules and Statements") with the Bankruptcy Court on November 9, 2007. Among other things, the Schedules and Statements set forth the Claims of known creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records. On February 8, 2008, the Debtors amended their schedules and statements to, among other things, more accurately reflect the universe of known and potential claims and liabilities.

### a.    Claims Bar Date and Proofs of Claim

The Bankruptcy Court:  (a) set March 21, 2008 (the "General Bar Date") at 4:00 p.m., Prevailing Eastern Time, as the last date and time by which those parties who believe that they hold claims against the Debtors ("Bar Date"), with the exception of those parties having a claim stemming from rejection of a contract subject to the Rejection Bar Date or governmental entities (as defined in the Bankruptcy Code), must file proofs of claim on account of such claims or be forever barred from asserting such claims; (b) set the Bar Date, for any claim resulting from the rejection of an executory contract or unexpired lease (a "Rejection Claim"), thirty (30) days from entry of the order authorizing rejection of the contract or lease underlying such claim or such other date as ordered (the "Rejection Bar Date"); (c) set the Bar Date, for claims by governmental entities, as set forth in Bankruptcy Code section 502(b)(9), as May 6, 2008 (the "Governmental Bar Date").

The register of Claims asserted against the Debtors will be available for review during normal business hours at the offices of the Debtors claims agent identified above as well as by reviewing the links for Filed Claims on the BMC Website.

### K.    K. The Sale

As stated above, during the Chapter 11 Cases, the Debtors pursued a sale of substantially all of the Debtors' operating assets in an effort to maximize the value of their businesses for the benefit of the Debtors' creditor constituencies.  The Debtors, in conjunction with GAH explored various possible sale opportunities and determined that a sale to Adeptio for a credit bid of $50,000,000 was the best and most feasible possible course of action, subject to higher and better offers.  As detailed below, the Salesale was approved by the Bankruptcy Court on December 13, 2007 and closed on December 21, 2007.

### L.    L.

{00815667;v46}

**Retention of ~~Windown~~Wind Down/Post-Closing Specialist**

The Debtors lost all of their employees after the sale of their assets to Adeptio and Simplexity. On January 31, 2008, in order to avoid the resignation of the sole remaining director without any replacement, the remaining director appointed Joseph Myers to fill a vacant seat on the board of INP Liquidation Corp. f/k/a InPhonic, Inc. and subsequently resigned. Shortly thereafter, on February 21, 2008, Mr. Myers appointed Joseph Pardo, a person entirely independent from CTG, to the board of directors of INP Liquidation Corp., and thereafter, Joseph Myers resigned. The remaining debtor affiliates are wholly-owned subsidiaries of INP Liquidation Corp., and the Debtors appointed Mr. Pardo to serve as a director or manager or other authorized person, to the extent the entities are limited liability companies, for the affiliated debtors. As director of INP Liquidation Corp., Mr. Pardo retained CTG and Myers as Chief Wind-Down Officer for the Debtors.

### ARTICLE IV

### SUMMARY OF PLAN OF REORGANIZATION

**A.**      ~~A.~~Treatment of Claims and Interests

   **1.**      **Unclassified Claims**

      **a.**      **Administrative Claims**

Except as otherwise provided herein, and subject to the requirements of the Plan, APA Final Sale Order and Term Sheet, on, or as soon as reasonably practicable after the later of (i) the repayment in full of the Adeptio Loan, (ii) the Distribution Date or (~~iii~~iii) the date such Administrative Claim becomes an Allowed Administrative Claim, a Holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Administrative Claim or (b) such other treatment as to which

37

such Holder and the Debtors and shall have agreed upon in writing; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by a Debtors in the ordinary course of business during these Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto (i) prior to the Effective Date, by the Debtors or Adeptio (as required by the terms of the Asset Purchase Agreement), as applicable, and (ii) subsequent to the Effective Date, by the Litigation Trustee or Adeptio (as required by the terms of the Asset Purchase Agreement, Sale Order and Term Sheet), as applicable.   All unpaid Allowed Administrative Claims shall be paid interest from the Effective Date to the date of distribution the published L.I.B.O.R. rate of interest plus 4%.

Allowed Administrative Claims total an estimated $1,482,000.00.1,800,000.   Of that total, $700,000 in Allowed Administrative Claims remain unpaid.  Currently, the Estates do not have sufficient cash to make a distribution to Holders of Allowed Administrative Claims.  The payment of unpaid Allowed Administrative Claims will be funded by the proceeds, if any, of any Litigation or Causes of Action commenced by the Committee or Litigation Trust.

ProceedsSubject to repayment of the Adeptio Loan, proceeds, if any, once recovered by the Litigation Trust will be used to pay Allowed Administrative Claims with interest as provided above.   If there are insufficient proceeds to pay the Holders of the unpaid Allowed Administrative Claims, such Holders will receive a Pro Rata distribution and distributions thereafter from the Litigation Trust to the extent the proceeds are available until fully paid, before which there shall be no distributions to Holders of General Unsecured Claims on account of such claims. The Plan may be confirmed only if the Holders of unpaid Administrative Claims consent to such treatment. If Holders of unpaid Administrative Claims do not object to the Plan,

they are deemed to consent to the treatment proposed herein upon entry of an order confirming the Plan.

      **b.**    **Priority Tax Claims**

On, or as soon as reasonably practicable after, the latest of (i) the Distribution Date; (ii) the date such claim becomes an Allowed Priority Tax Claim, or (iii) the date such Allowed Priority Tax Claim becomes payable pursuant to any agreement between the Litigation Trustee and each Holder of an Allowed Priority Tax, each Holder of such Allowed Priority Tax Claim ~~up to a maximum of $500,000~~ shall receive on account of such Allowed Priority Tax Claim, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Tax Claim, (a) Cash equal to the unpaid portion of such Allowed Priority Tax claim or (b) such other treatment as to which the Allowed Priority Tax Claim Holder and the Litigation Trustee shall have agreed in writing.  The Debtors estimate that the Allowed Priority Tax Claims will not exceed $500,000.  To the extent that Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims exceed $500,000, the Holders of Allowed Priority Tax Claims shall receive their Pro Rata share of such differential, which shall be paid by the Litigation Trust in regularly quarterly distributions over the time period set forth 1129(a)(9)(C)(ii) to the extent the Litigation Trust contains sufficient Cash.  In the event an Allowed Priority Tax Claims is not paid on the Distribution Date, the Holders thereof will be paid interest on such Priority Tax Claim accruing from the Distribution Date to the date of actual distribution at the United States Treasury's current interest rate for bankruptcy tax claims as of the Distribution Date.  Adeptio shall make available up to $500,000 solely for the purpose of making distributions on account of Allowed Priority Claims; provided, however, that Adeptio shall make payments on account of Allowed Priority Claims only to the extent such claims are allowed and only as requested by the Debtors

on or before the Effective Date or by the Litigation Trustee if the request is made after the Effective date.

      **c.**    **Trustee Fee Claims**

All Trustee Fee Claims will be satisfied on or before the Effective Date.

**2.**    **Unimpaired Claims**

      **a.**    **Class 1 –** ~~Assumed Liability Claims~~

~~Assumed Liability Claims shall be satisfied by Adeptio pursuant to the terms of the Asset Purchase Agreement: (i) in the ordinary course of business; (ii) pursuant to the terms of the applicable agreement underlying such claim; or (iii) such other treatment as to which such Holder and Adeptio shall have agreed. The Debtors cannot estimate the amount of Allowed Assumed Liability Claims at this time.~~

      ~~**b.**~~    ~~**Class 2**~~**—Other Secured Claims**

On, or as soon as reasonably practicable after, the later of: (i) <u>repayment in full of the Adeptio Loan; (ii)</u> the Distribution Date; (iii~~ii~~) the date such claim becomes an Allowed Other Secured Claim; or (iv~~iii~~) the date such Other Secured Claim becomes payable pursuant to any agreement between the Debtors or Litigation Trustee and the Holder of such Allowed Other Secured Claim, a Holder of a Secured Claim, other than a Secured Lender Claim, shall receive either (i) Cash equal to the amount of the Allowed Other Secured Claim; (ii) the collateral which secures its claim; or (iii) such other treatment as to which the Debtors and the Holder of an Allowed Other Secured Claim agrees, on the later of the Effective Date or the date such Claim becomes an Allowed Other Secured Claim. The Debtors estimate that no Allowed Other Secured Claims exist. <u>To the extent there is collateral securing Allowed Secured Claims the priority of such security interest or lien shall not be affected or "primed" by the Adeptio Loan.</u>

      **<u>b.</u>**    ~~c.~~**Class 3~~2~~ – Priority Non-Tax Claims**

On, or as soon as reasonably practicable after, the latest of:  (i) the Distribution Date; (ii) the date such claim becomes an Allowed Priority Non-Tax Claim; or (iii) the date such Allowed Priority Non-Tax Claim becomes payable pursuant to any agreement between the Debtors or Litigation Trustee and the Holder of such Allowed Priority Non-Tax Claim, each Holder of an Allowed Priority Non-Tax Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Non-Tax Claim (i) Cash equal to the unpaid portion of such Allowed Priority Non-Tax Claim or (ii) such other treatment as to which the Litigation Trustee and such Holder shall have agreed upon in writing.  The Debtors estimate that no Allowed Priority Non-Tax Claims exist. ~~The Debtors estimate that the combined amount of Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims will not exceed $500,000. To the extent that Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims exceed $500,000, the Holders of Allowed Priority Non-Tax Claims shall receive their Pro Rata share of such differential, which shall be paid by the Litigation Trust in regularly quarterly distributions over the time period set forth 1129(a)(9)(C)(ii) to the extent the Litigation Trust contains sufficient Cash.~~  Adeptio shall make available up to $500,000 solely for the purpose of making distributions on account of Allowed Priority Claims; provided, however, that Adeptio shall make payments on account of Allowed Priority Claims only to the extent such claims are allowed and only as requested by the Debtors on or before the Effective Date or by the Litigation Trustee if the request is made after the Effective date.

41

3. **Impaired Claims Entitled to Vote**

   a. **Class 4 ~~3~~ Secured Lender**

On the Effective Date, ~~all Claims by the Secured Lender, including any Claims arising under the DIP Facility or any prepetition agreement, the Secured Lender shall,~~ pursuant to the Term Sheet and subject to the terms of the Term Sheet, in <u>exchange for and in</u> full satisfaction, settlement, release and discharge of ~~and in exchange for such~~<u>the Secured Lender's</u> Allowed Secured Lender Claim, <u>the Secured Lender shall</u> receive ~~the Secured Lender's~~<u>an Allowed</u> Deficiency Claim in the amount of Twenty Million Dollars ($20,000,000), which entitles the Secured Lender to a Pro Rata share of the interests in the Litigation Trust Interests to be distributed to the Holders of <u>Allowed</u> General Unsecured Claims in Class ~~5.~~<u>4.</u>

   b. **Class 5 ~~4~~ – General Unsecured Claims**

Each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Litigation Trust Interests, which shall entitle the holder of a Litigation Trust Interest to its Pro Rata share of any distributions (up to the amount of such holder's Allowed General Unsecured Claim) made by the Litigation Trust after satisfaction in full of<u> the Adeptio Loan,</u> all Liquidation Expenses, unpaid Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims.  Distributions on Litigation Trust Interests shall be made in accordance with and pursuant to the Litigation Trust Agreement and shall be made by the Litigation Trust at such times and in such amounts as the Litigation Trustee, after consultation with the Litigation Trust Committee, shall determine.   The Debtors believe there are a total of approximately $~~204,964,908.04~~<u>350,718,352</u> in General Unsecured Claims.

4.    **Impaired Classes of Claims (deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan).**

    a.    **Class 6̶5 – Intercompany Claims**

On the Confirmation Date or such other date as may be set by an order of the ~~court~~Court, but subject to the occurrence of the Effective Date, all Intercompany Claims shall be deemed expunged and extinguished. The Holders of Intercompany Claims shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Claims. Class 6̶5 is deemed to have rejected the Plan and, therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

5.    **Impaired Class of Interests (deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan).**

    a.    **Class 7̶6 – Equity Interests**

On the Effective Date, the all Equity Interests shall be canceled and each Holder thereof shall not be entitled to, and shall not receive or retain any property or interest in property on account of, such Equity Interests. Class 7̶6 is deemed to have rejected the Plan and, therefore, Holders of Equity Interests are not entitled to vote to accept or reject the Plan.

6.    **Allowed Claims**

Notwithstanding any provision herein to the contrary, the Litigation Trustee shall only make distributions to Holders of Allowed Claims. No Holder of a Disputed Claim will receive any distribution on account thereof until (and then only to the extent that) its Disputed Claim becomes an Allowed Claim. SN Liquidation and/or the Litigation Trustee may, in their discretion, withhold distributions otherwise due hereunder to any Claimholder until its Claim becomes an Allowed Claim. Any Holder of a Claim that becomes an Allowed Claim after the Effective Date will receive its distribution in accordance with the terms and provisions of the

Plan and the Litigation Trust Agreement.  For the avoidance of doubt, Adeptio's $20,000,000 Allowed Deficiency Claim is deemed an Allowed Claim.

**B.**    B. Acceptance or Rejection of the Plan

**1.    Impaired Classes of Claims Entitled to Vote**

Subject to Article III of the Plan, Claimholders in each Impaired Class of Claims are entitled to vote as a Class to accept or reject the Plan.

**2.    Acceptance by an Impaired Class**

In accordance with Bankruptcy Code section 1126(c) and except as provided in Bankruptcy Code section 1126(e), an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

**3.    Presumed Acceptance by Unimpaired Classes**

In accordance with Bankruptcy Code section 1124, Holders of Claims in Classes 1, 2 1 and 3 2 are not Impaired by the Plan.  Under Bankruptcy Code section 1126(f), and each Holder of a Claim in Classes 1 through 3 and 2 is presumed to have accepted the Plan, and the votes of such Claim Holders will not be solicited.

4.     **Classes Deemed to Reject Plan**

Holders of Claims in Class 6~~5~~ and Holders of Interests in Class 7~~6~~ are not entitled to receive or retain any property under the Plan.  Under Bankruptcy Code section 1126(g), Class 6~~5~~ Claim Holders and Class 7~~6~~ Interest Holders are deemed to reject the Plan, and the votes of such Claim or Interest Holders will not be solicited.

### 5.    Summary of Classes Voting on the Plan

As a result of the provisions of Article ~~IV~~III of the Plan, only the votes of Holders of

Claims in Classes 4~~3~~ and 5~~4~~ will be solicited with respect to the Plan.

### C.    ~~C.~~ Means for Implementation of the Plan

The Debtors and the Litigation Trust will implement and consummate the Plan through

the means set forth in the Term Sheet and contemplated by Bankruptcy Code sections

1123(a)(5)(B) and (D), 1123(b)(3)(A) and (B), and 1123(b)(4).

### 1.    Sale

The ~~plan~~Plan completes the implementation of the Final Sale Order and the Term Sheet

~~and Settlement Agreement,~~ which are incorporated by reference into the Plan.

### 2.    Corporate Action

### a.    Merger of Debtors

Pursuant to Section 303 of the Delaware General Corporation Law (8 Del. C. § 303), on

the Effective Date, (a) the members of the board of directors or managers, as the case may be, of

each of the Debtors including SN Liquidation shall be deemed to have resigned; (b) each of the

Debtors shall be merged with and into SN Liquidation without the necessity of any other or

further action to be taken by or on behalf of the Debtors.

### b.    Rejection of Indemnification Obligations

Except as otherwise provided in the Plan, the Sale Order, or any other contract, instrument, release or other agreement or document entered into in connection with the Plan, and approved by the Bankruptcy Court, on the Effective Date, the Bylaws and all related corporate documents ~~shall be deemed rejected and all obligations related to any corporate contract, instrument, certificate of incorporation, by law, comparable organizational document or any other document or applicable law shall be~~, including limited liability company operating agreements, shall be amended to provide that former directors or managing members are removed from coverage of the mandatory advancement provision, and then such bylaws or operating agreements are deemed rejected as of the Effective Date including indemnification rights as they relate to any indemnification rights claimed by any former employee, officer or director of the Debtors. This provision shall have no effect on the obligation of any non-debtor to any other non-debtor.

Indemnification obligations (whether arising by contract, operation of law or statute or by-laws or charter or resolution) owed to any present or former professionals or advisors of the Debtors arising out of acts that occurred prior to the Petition Date, including, without limitation, accountants, auditors, financial consultants, underwriters, or attorneys, shall be deemed to be, and shall be treated as through they are, Executory Contracts that are rejected pursuant to Bankruptcy Code section 365 under the Plan as of the Effective Date and any such claims for indemnification whether asserted pre-or post-petition constitute pre-petition general unsecured claims subject to the provisions of the Bankruptcy Code, relevant rules and the Plan.

### c.    Continued Corporate Existence

On the Effective Date, immediately after (i) the merger of the other Debtors into The Debtors and (ii) the transfer of all Estate Assets to the Litigation Trust, the Debtors will cease to

47

exist and shall be deemed disallowed under applicable state law, and the Debtors shall be entitled to use the Confirmation Order as evidence of the authority to terminate the Debtors' corporate existence and to make all necessary filings associated therewith.

### d. Retention of ~~Windown~~Wind Down Specialist

The Plan contemplates the continued employment of Clear Thinking Group and Joseph Myers in order to facilitate the orderly wind down of the Debtors' estates until the Effective Date.

### 3. Post-Effective Date Compensation of Professionals

The Professionals employed by the Debtors, the Committee, and the Litigation Trust shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities, including the preparation, filing and prosecution of final fee applications, upon the submission of invoices to the Litigation Trustee. Any time or expenses incurred in the preparation, filing and prosecution of final fee applications shall be disclosed by each Professional in its final fee application and shall be subject to approval of the Bankruptcy Court.

{00815667;v16}

4.      **Sources for Plan Distribution**

All Cash necessary for the Debtors or the Litigation Trustee to make payments pursuant to the Plan shall be obtained from the following sources:  (a) the Debtors' or SN Liquidation's Cash on hand, (b) Cash received in liquidation of the Debtors' Excluded Assets, (c) proceeds of all the Debtors' Causes of Action against directors and officers or otherwise; (d) Adeptio's funding obligations pursuant to the Final Sale Order and Term Sheet, including the:  (i) Professional Funding; (ii) ~~Windown~~Wind Down Funding; (iii) Investigation Funding; (iv) and Priority Claims Funding, all as defined in the Term Sheet and in accordance with the terms of such Term Sheet.  The Term Sheet provides that upon the closing of the APA, Adeptio shall fund (i) the administrative costs of maintaining the Debtors' estates post closing in the amount of $200,000 (the "Wind Down Funding") and (ii) the costs of professional fees necessary to investigate the viability of ~~avoidance  actions~~Avoidance Actions and other ~~litigation claims~~Causes of Action and commence and prosecute such litigation, if appropriate, that the Debtors' estates through a Litigation Trust may possess through a senior secured loan (which shall accrue interest as ruled by the Court) of up to a total $500,000, in accordance with the terms set forth in the Term Sheet (the "Investigation Funding"), which amount shall be secured by all assets of the Litigation Trust and shall repaid first from the proceeds paid to the Litigation Trust. The terms of the Investigation Funding are set forth in the Adeptio Loan Agreement attached to the Plan as Exhibit 3 and may include funding on a draw-down basis, whereby Adeptio will provide the Litigation Trustee with Investigation Funding in the amount requested, when requested, and any repayments shall permanently reduce the Investigation Funding dollar-for-dollar.

5.      **Litigation Trust; Litigation Trustee**

49

On the Effective Date, the Litigation Trust shall be created pursuant to the Litigation Trust Agreement. Morton Branzburg, Esquire, shall be appointed as the initial Litigation Trustee. The Committee selected Morton Branzburg, Esquire, to be Litigation Trustee based upon his experience in chapter 11 liquidations and, in particular, his recent experience with D&O and stock redemption litigation. Adeptio consented to the selection of Morton Branzburg.

a.      **Sources of Litigation Trust Funding**

(i)      Investigation Funding. Pursuant to the Term Sheet, upon formation of the Litigation Trust, Adeptio shall ~~fund~~provide the ~~costs of~~funding for the professional fees necessary to investigate, commence and prosecute Causes of Action, through ~~a senior secured loan of up to a total $500,000.~~the Adeptio Loan.

(ii)      Transfer of Estate Assets. Pursuant to the Term Sheet, upon the formation of the Litigation Trust, all Estate Assets and the proceeds thereof shall be transferred to the Litigation Trust, as set forth and defined in the Term Sheet. ~~The~~Other than in connection with the Investigation Funding, the Estate Assets shall be deemed vested in and became property of the Litigation Trust free and clear of all claims, liens, encumbrances and interests of Adeptio or the Debtors subject to the terms of the Plan.

These Estate Assets include, without limitation, those set forth in the Notice of Circumstances sent by the Debtors on November 29, 2007 to its respective directors and officers liability insurance carriers and the supplemental letter sent by Committee counsel dated November 30, 2007 to such liability insurance carriers. As set forth herein in Article III.C.1, the Insurance Policies terminated on November 30, 2007. The Debtors and other third parties have claims against these Insurance Policies, and, at this time, the Proponents cannot predict with certainty or quantify the benefits to be realized from pursuing claims under the policies or against the proceeds payable thereunder to defendants.

50

The Committee has been investigating all such actions, including claims against former directors and officers (where such claims have not been released or transferred pursuant to the Sale or the Term Sheet).    The Committee's investigation of Causes of Action includes an analysis of claims relating to the Debtors' redemption of stock.   Specifically, the Committee has begun investigating claims in connection with two InPhonic stock repurchase programs (the ""Stock Repurchase Programs"").    These Stock Repurchase Programs were apparently authorized by the Board of Directors during August 2005 and November 2006, respectively.   In each of the Stock Repurchase Programs, the Board of Directors apparently authorized repurchase of up to $30 million of common stock during the ensuing 12 months.   InPhonic repurchased common stock with a reported value of at least $13.59 million between August 17, 2005 and March 31, 2006, and at least $13.96 million between November 15, 2006 and June 30, 2007.   In pursuit of Causes of Action, the Estate will seek recovery from the Insurance Policies to make distributions on account of Allowed Claims.   In addition, the Committee is investigating the repurchase of common shares with a reported value of at least $2.79 million that were repurchased between April 1, 2007 and June 30, 2007, outside of the publicly announced Share Repurchase Programs.   The Committee believes the Debtors were insolvent (or rendered more deeply insolvent) during these time periods, and this insolvency was exacerbated by the Stock Repurchase Programs.

The Committee's  investigation is ongoing.   That investigation will be continued by the Litigation Trust.   Any Causes of Action that the Estates may pursue may be investigated by the Committee and/or the Litigation Trust and may then be asserted against any appropriate defendant.   Nothing in this Disclosure Statement or the Plan should be interpreted as limiting any

Causes of Action that the Litigation Trust may file and prosecute for the benefit of the Holders of the Litigation Trust Interests.

The Causes of Action are entrusted to the Litigation Trust under the Plan for the benefit of creditors. The value of the Causes of Action, related breaches of fiduciary duty by directors and officers, the potential for recovery, the potential defenses to such claims, and the timing of any recoveries cannot be determined at this time. *The pursuit of the Causes of Action, however, is the purpose of confirming the Plan, and establishing Litigation Trust, and the only opportunity of which Proponents are aware for any distribution to the Holders of General Unsecured Claims.*

From and after the transfer of all such rights to the Litigation Trust, pursuant to Bankruptcy Code section 1123(b)(3), and the terms of the Litigation Trust, the Litigation Trustee shall be deemed the appointed representative to, and may pursue, litigate, and compromise and settle any such rights, claims, or Causes of Action in accordance with the best interests of and for the benefit of the beneficiaries of the Litigation Trust. Such transfers shall be free and clear of any Claims, Interests, or Encumbrances, except the rights of the beneficiaries of the respective Litigation Trust hereunder and under the respective Trust Agreement and except as expressly provided in the Plan.

(iii)    Priority Claims Funding. Upon the Effective Date, Adeptio shall contributemake available to the Litigation Trust up to a total $500,000 solely for the purpose of making distributions under the Plan on account of Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims as such claims become allowed pursuant to the terms and conditions of Bankruptcy Code section 1129(a)(9).

b.    **Litigation Trust Operation**

(i)      Quarterly Reports.  As soon as practicable after each calendar quarter, and in no event later than thirty (30) days after the end of each quarter, the Litigation Trustee shall submit to the United States Trustee and any Beneficiary who requests copies of such quarterly report after the Effective Date, an unaudited written report and account showing: (a) the assets and liabilities of the Litigation Trust, (b) any Distributions made and Liquidation Trust Expenses paid pursuant to the Plan and the Litigation Trust Agreement, (c) any changes in the Estate Assets that have not been previously reported, and (d) any material action taken by the Litigation Trustee in the performance of his or her duties under the Litigation Trust Agreement that have not been previously reported.

(ii)      Disbursing Agent.  The Litigation Trust or its nominee shall serve as the disbursing agent under the Plan and shall make all Distributions provided for under the Plan.  Pursuant to the terms of the Litigation Trust Agreement, the Litigation Trust shall maintain a reserve in trust for the payment of any accrued and anticipated Liquidation Trust Expenses of the Litigation Trust and any Disputed Claims.

(iii)      Litigation Trustee Appointment of Professionals.  The Litigation Trust is authorized, without further order of the Bankruptcy Court, to employ such persons, including professionals, as it may deem necessary to enable it to perform its functions hereunder, and the costs of such employment and other expenditures shall be paid from the Litigation Trust. Such persons shall be compensated and reimbursed for their reasonable and necessary fees and out-of-pocket expenses on a monthly basis from the Litigation Trust without further notice, hearing or approval of the Bankruptcy Court.

(iv)      Liquidation of Causes of Action.  Notwithstanding any other term or provision of the Plan, subject to the terms of the Litigation Trust Agreement, the Litigation

{00815667;v16}

Trustee shall have sole authority and responsibility for investigating, analyzing, and if appropriate, commencing, prosecuting, litigating, compromising, collecting and otherwise administering the Causes of Action.

(v)     Objection to and Compromise of Claims. Pursuant to Bankruptcy Rule 9019(b), the Plan and the Litigation Trust Agreement, as of the Effective Date (i) the Litigation Trustee is authorized to object to or approve compromises of the Causes of Action and all Claims, Disputed Claims and Liens and to execute necessary documents, including Lien releases and stipulations of settlement or release, without notice to any party and without further order of the Bankruptcy Court.

(vi)    Distribution. Distribution of proceeds shall be made in accordance with the Term Sheet, Plan, the Confirmation Order, and the Litigation Trust Agreement.

(vii)   Reserve for Disputed Claims. For purposes of calculating Pro Rata or any other distributions to be made under the Plan to Holders of Allowed Claims, the calculation of the total Allowed Claims in any Class shall be computed as if all Disputed Claims then pending were allowed in the full amount thereof.

(viii)  Allowance of Disputed Claims. Distributions shall be made with respect to any Disputed Claim which becomes an Allowed Claim after the Effective Date on or as soon as practicable after the date on which each such Disputed Claim becomes an Allowed Claim. The amount of such distribution shall be calculated on a Pro Rata basis, so that the subject Claim receives an initial distribution equal to the total percentage distributions made prior to the date of such allowance to other Allowed Claims in its Class. No interest shall be payable to the Holders of Disputed Claims on account of funds reserved by the Litigation Trust, if any, under the Plan to satisfy such Disputed Claims.

(ix)    Final Distribution. Final Distribution. The Litigation Trustee shall cause the distribution of all remaining available assets, if any, of the Litigation Trust to the Holders of Allowed Claims, after repayment in full of the Adeptio Loan, the payment of all Allowed Administrative Claims (with interest) and all debtorsof the debts and obligations of the Litigation Trust, including the Adeptio Loan,and all unpaid Allowed Claims in Classes 1 through 4and 2 of thisthe Plan. After making a final distribution, the Litigation Trust, acting through the Litigation Trustee, shall file a final report and account of all receipts and disbursements with the Bankruptcy Court and the United States Trustee. The Litigation Trustee shall be discharged from his or her obligations under thisthe Plan or the Litigation Trust Agreement at such time as the Litigation Trust has terminated pursuant to its terms (or upon the Litigation Trustee's prior resignation or termination).

(x)    Means of Cash Payment. Cash payments made pursuant to the Plan shall be paid by wire transfer or checks drawn on an account maintained by the Litigation Trust.

(xi)    Release of Liens. On the Effective Date, all Liens against the Estate Assets shall be fully and completely released and discharged and all of the Estate Assets when transferred to the Litigation Trust shall be free and clear of any such Liens.

(xii)    Cancellation of Notes, Instruments, Securities and Other Documentation. On the Effective Date, all agreements (other than those established by the Term Sheet and assumed contracts or leases), credit agreements, prepetition loan documents, postpetition loan documents, and evidence of Liens shall be deemed to be canceled and of no further force and effect, without any further action on the part of the Debtors or the Litigation Trust. The Holders of or parties to such canceled instruments, agreements, securities and other

55

documentation will have no remaining rights against the Debtors, their Estates, or the Litigation Trust arising from or relating to such documents or the cancellation thereof except the right to receive distributions under ~~this~~the Plan.

(xiii)   Exemption from Certain Taxes.  Pursuant to Section 1146 of the Bankruptcy Code, all transactions, including the transfers described in the Plan, and the delivery and recordation of any instrument, under, in furtherance of, or in connection with the Plan shall not be subject to any stamp tax, real estate transfer tax or similar transfer fee or tax.

(xiv)   Other Tax Matters.  The Litigation Trust shall be treated as a grantor trust for federal income tax purposes, within the meaning of Sections 671 through 677 of the Internal Revenue Code.  Pursuant to and in accordance with the Plan, the Litigation Trustee shall be responsible for all tax matters of the Estates including, but not limited to, the filing of all tax returns and other filings with governmental authorities on behalf of the Estates for time periods ending on or before the Final Tax Day, including the filing of tax returns for the Litigation Trust as a grantor trust pursuant to Section 1-671-4(a) of the United States Income Tax Regulations, the filing of any determination requests under Section 505(b) of the Bankruptcy Code, and responding to any tax audits of the Estates.  The Litigation Trustee shall provide such information to the beneficiaries as will enable them to properly file their separate tax returns and withhold and pay over any amounts required by tax law.  The Litigation Trustee is authorized to act as agent for the Estates in withholding or paying over any amounts required by law (including tax law), if any, to be withheld or paid by the Estates in connection with the transfer and assignment of the Estate Assets to the Litigation Trust pursuant to the Plan.

The Litigation Trust Agreement requires each Holder of an Allowed Class ~~5~~4 General Unsecured Claim to report on its U.S. federal income tax return its allocable share of the

Litigation Trust's income.  Because Persons who are Holders of Disputed Claims as of the end of the Litigation Trust's tax year will not receive any interest or earnings on cash held in the Litigation Trust for such tax year, the Litigation Trustee shall allocate all such interest and earnings to Holders of Allowed Class 54 Claims for U.S. federal income tax purposes.  A Holder of an Allowed Class 54 Claim may incur a U.S. federal income tax liability with respect to its allocable share of the income of the Litigation Trust whether or not the Litigation Trust has made any concurrent distribution to the Holder of an Allowed Class 54 Claim.  Holders of Allowed Class 54 Claims are urged to consult their tax advisors.

(xv)    Except as otherwise set forth in the Litigation Trust Agreement or the Plan, any items of income, deduction, credit, or loss of the Litigation Trust shall be allocated for federal income tax purposes among the beneficiaries Pro Rata on the basis of their beneficial interests; provided, however, that to the extent any item of income cannot be allocated in the taxable year in which it arises, the Litigation Trust shall pay the federal, state and local taxes attributable to such income (net of related deductions) and the amount of such taxes shall be treated as having been received by, and paid on behalf of the beneficiaries when such allocations are made.  The Litigation Trustee shall be entitled to deduct any federal or state withholding taxes from any payments made with respect to Allowed Claims, as appropriate.

(xvi)    Duration of Trust.  The Litigation Trust shall continue to exist until such time as the Litigation Trustee has administered all assets of the Litigation Trust and performed all other duties required by the Plan and the Litigation Trust Agreement.  As soon as practicable after the Final Distribution Date, if any, or such other time as the Litigation Trustee deems appropriate, the Litigation Trustee may seek entry of a Final Order closing these Chapter 11 Cases pursuant to Bankruptcy Code section 350.

6.      **Claims Administration Process**

     a.      **Deadline for Filing of Administrative and Professional Fee Claims**

Any person asserting an Administrative Claim (other than a Professional Fee Claim) shall file an application therefore with the Bankruptcy Court not later than thirty (30) days after the Effective Date.

Any Person asserting a Professional Fee Claim shall file a fee application with the Bankruptcy Court not later than thirty (3060) days after the Effective Date for professional services rendered and out-of-pocket costs incurred through the Effective Date.

Any Administrative Claim or Professional Fee Claim not filed within the deadlines set forth above shall be forever barred, and the Debtors and the Litigation Trust shall be discharged of any obligation on such Claim.

     b.      **Estimation of Claims**

The Litigation Trustee may, at any time, request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claim pursuant to Bankruptcy Code sections 105 and 502(c) in the interests of expeditious administration of the Estates or the Litigation Trust regardless of whether an objection has been filed with respect to such Claim. If the Bankruptcy Court estimates any contingent, Disputed or unliquidated Claim, the estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, at the option of the Litigation Trustee. If the estimated amount constitutes a maximum limitation on such Claim, the Litigation Trustee may pursue any supplemental proceedings to object to the allowance and ultimate distribution on such Claim after reservation for such claim. If the estimated amount is treated as the Allowed Amount of such claim, such claim shall be paid only up to an amount not to exceed the estimated amount, even if such Claim, as finally allowed, exceeds the maximum estimated amount thereof. Furthermore, neither the Litigation Trust nor

the Litigation Trustee shall have any liability to such claimant. Unless otherwise ordered by the

Bankruptcy Court, resolution or compromise of estimated Claims shall be done pursuant to the

Plan. All Claims objection, estimation and resolution procedures are cumulative and not

exclusive of one another. The Committee and the Debtors, shall have the right to move the

Bankruptcy Court for disallowance of any Claim for voting purposes.

### c.  Late Claims

No Distribution shall be made on account of any Claims filed after the Bar Date, unless

specifically allowed by Final Order of the Bankruptcy Court after notice and opportunity for

hearing.

### d.  Procedures for Treatment and Resolving Disputed, Contingent and/or Unliquidated Claims

(i)  Notwithstanding any other provision of the Plan, no property shall be distributed under the Plan on account of all or any portion of any Disputed Claim or any Claim that is contingent or unliquidated.

(ii)  Pursuant to Section V.E. 2(d) of the Plan, from and after the Effective Date, the Litigation Trustee shall be authorized and shall have the exclusive right to file and serve all objections to the allowance of any Claim Interest. The Litigation Trustee is exclusively authorized to take all actions necessary or advisable to pursue, settle or compromise any such Disputed Claims. The Litigation Trustee shall review and object to Claims as and when the Litigation Trustee deems appropriate taking into account, the funds available for distribution to Holders of a particular Class, the amount of such Claims, and any other issues that the Litigation Trustee deems appropriate.

(iii)  At such time as a Disputed Claim becomes an Allowed Claim, (i) the Holder of such Allowed Claim shall receive a distribution, in the same Pro Rata amount as other members of its Class have already received, without interest. Such distribution, if any, shall be made within thirty (30) days of the date that the order or judgment of the Bankruptcy Court allowing such Claim become a Final Order (or as soon as practicable thereafter).

(iv)    Except with respect to Estimated Claims, or at the discretion of the Litigation Trustee, no partial distributions will be made with respect to a Disputed Claim until all disputes with respect to such Disputed Claim have been resolved by a Final Order and have become Allowed Claims.

### e.    Claims Reserve

After the Effective Date, the Litigation Trustee shall deposit any available Cash into the claims reserve ("Claims Reserve") in an amount reasonably sufficient, in the Litigation Trustee's sole discretion, to pay without interest all Disputed Claims that may become Allowed Claims and to pay any post-confirmation tax liability, Trustee Fees, professional fees and other expenses or costs that the Trustee, in his sole discretion, believes may be incurred.

### f.    Setoffs

The Litigation Trustee may, pursuant to Bankruptcy Code section 553 and applicable non-bankruptcy law, set off against any distribution to the Holder of an Allowed Claim, the claims, rights and Causes of Action that the Litigation Trust may hold against the Holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim shall constitute a waiver or release by the Litigation Trustee of any such claims, rights and causes of action that the Trustee may possess against such Creditor. Creditors shall maintain their setoff rights existing prior to the Filing Date, but such setoff rights may be exercised only with prior Bankruptcy Court approval.

### g.    Undeliverable and Unclaimed Distributions

Unclaimed and undeliverable distributions shall include:  (i) checks (and the funds represented thereby) which have been returned as undeliverable without a proper forwarding address, (ii) checks (and the funds represented thereby) which have been issued to the Holder of an Allowed Claim in accordance with the Plan but which have not been presented for payment within ninety (90) days after the date of such checks, and (iii) checks (and the funds represented

60

thereby) which were not mailed or delivered because of the absence of a complete or correct mailing address. If any distribution made on account of an Allowed Claim is returned to the Litigation Trustee as undeliverable, no further distributions shall be made to such Creditor unless and until the Litigation Trustee is notified in writing of such Creditor's then-current address. Subject to the following paragraph, undeliverable distributions shall remain in the possession of the Trustee until such time as such distribution becomes deliverable. Undeliverable distributions shall not be entitled to any interest or other accruals of any kind. Nothing in the Plan shall require the Litigation Trustee to attempt to locate any Holder of an Allowed Claim.

In the event that any distribution on account of any Allowed Claim remains undeliverable or unclaimed for a period of ninety (90) days after the date of the check (the "Claiming Period"), the entire unpaid Allowed Claim upon which such distribution was issued shall, on the first (1st) Business Day after expiration of the Claiming Period, be deemed expunged and reduced to zero ($0) dollars for purposes of calculating any subsequent distribution. The proceeds of all unclaimed and undeliverable distributions shall remain in the Litigation Trust's operating account and be distributed to the other Holders of Allowed Claims. Notwithstanding the foregoing, the Litigation Trustee shall retain the discretion to pay any Allowed Claim after the expiration of the Claiming Period.

If, after payment of all Allowed Claims pursuant to the Plan and the expiration of the Claiming Period, the unclaimed distributions on deposit in the Litigation Trust's operating account equal $50,000.00 or less, the Litigation Trustee shall be authorized, without further order of the Court, to donate such sum to the United Way. If such amount is $50,000.00 or greater, the Trustee shall make a further distribution to Holders of Allowed Claims in accordance with the terms of the Plan.

{00815667;v16}

### h.    Transmittal of Distributions and Notice

Except as may otherwise be agreed among the Trustee and the Holder of a particular Claim, any distribution or notice to which the Holder of a Claim shall be or become entitled under the provisions of the Plan shall be delivered to such Holder by regular mail, postage prepaid, in an envelope addressed to the last known address maintained by the Debtors' Claims Agent from time to time, according to any respective proof of Claim, the Schedules (if no proof of Claim was filed), or any assignment of Claim or other written notice of change of address delivered to the Debtors' Claims Agent by such Holder.  Distributions and notices delivered in accordance herewith will be deemed delivered to the Creditor regardless of whether such distributions or notices are actually received by such Creditor or Interest Holder.  To the extent that the Debtors' Claims Agent resigns or is terminated, any future changes of address shall be delivered to the Litigation Trustee and filed with the Bankruptcy Court.

62

### i.    Distribution Dates

Whenever any distribution to be made under the Plan shall be due on a day other than a Business Day, such distribution shall instead be made, on the next following Business Day.

### j.    Payments of Less than $15.00

The Litigation Trustee shall not be required to make any distribution in an amount of less than $15.00.  The Litigation Trustee is authorized to round down all distributions under the Plan to the nearest $15.00.  To the extent that such a distribution shall be called for, the Litigation Trustee shall establish a reserve for all distributions in the amount of less than $15.00 and shall, when and if the Holder of a Claim is entitled to a distribution of $15.00 or more, make such a distribution at such time.

### k.    Remainder of Funds in Reserve

If, in the Litigation Trustee's sole discretion, the Litigation Trustee determines that it is unnecessary to maintain funds in the Claims Reserve described in the Plan, then the Trustee shall deposit such funds or transfer such remaining funds from the Claims Reserve into the Litigation Trust's operating account.

### l.    Execution of Documents

The Proponents are authorized and directed to execute any and all documents necessary to effectuate the Plan.

### ARTICLE V

### TREATMENT OF EXECUTORY CONTRACTS AND LEASES UNDER THE PLAN

### A.    A. Assumption of Insurance Policies; Assignment of Rights

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto (the "Insurance Policies"), unless previously canceled or transferred to Adeptio, are treated as Executory Contracts under the Plan, and the Plan shall constitute a motion to

63

assume the Insurance Policies and to assign all of the Estates' rights under such Insurance Policies to the Litigation Trust. Subject to the occurrence of the Effective Date, the entry of the Confirmation Order by the Clerk of the Bankruptcy Court shall constitute approval of such assumption pursuant to Bankruptcy Code sections 365(a) and 1123(b)(2) and a finding by the Bankruptcy Court that such assumption is in the best interest of the Debtors, their estates, and all parties in interest in these Chapter 11 Cases. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date because the Debtors are current. To the extent the Bankruptcy Court determines otherwise as to any of the Insurance Policies, the Debtors reserve the right to seek rejection of such insurance policy or other available relief. For the avoidance of doubt, the Term Sheet and the APA are deemed assumed under the Plan, and are not rejected.

**B.**    **B. Rejection of Other Executory Contracts**

On the Effective Date, all Executory Contracts (except for the Insurance Policies and any Executory Contracts that are Held Contracts pursuant to section 2.5(b) of the Asset Purchase Agreement), including without limitation, all written employment agreements, collective bargaining agreements, severance contracts, employee benefit or retirement or supplemental retirement benefit plans and agreements, indemnification agreements (whether discrete or set forth in another document) and unexpired real or personal property leases of the Debtors, that are not the subject of a motion to assume or reject pending on the Effective Date, shall be deemed rejected by the Debtors as of the Petition Date. Further, on the Effective Date, all Held Contracts that are not the subject of a notice of assumption and assignment pending on the Effective Date or a motion to reject pending on the Effective Date, shall be deemed rejected by the Debtors and such rejection shall be deemed to be effective as of July 19, 2008.

64

Each Person who is a party to an Executory Contract which was not previously rejected prior to the Effective Date or which is rejected pursuant to ~~this~~the Plan, shall be entitled to file a proof of claim for damages alleged to have arisen from the rejection of the Executory Contract to which such Person is a party.  All proofs of claim with respect to Claims arising from the rejection of any Executory Contract shall be filed with the Bankruptcy Court on or before the relevant Bar Date.  ~~All Claims arising out of the rejection of Executory Contracts shall be General Unsecured Claims and classified in Class 5, which shall be Allowed or disallowed as provided in this~~ and shall pre-petition general unsecured claims subject to the provisions of the Bankruptcy Code, relevant rules and the Plan.

## ARTICLE VI

### DISALLOWANCE OF CONTRIBUTION CLAIMS

On the Effective Date, any Claim for reimbursement, indemnification, contribution or subrogation of an Entity that is liable with any Debtors on or that has secured the Claim of a creditor not heretofore disallowed by order of the Bankruptcy Court shall be deemed disallowed to the extent (a) such Creditor's Claim against the Debtors is disallowed; (b) such Claim for reimbursement, indemnification, contribution or subrogation is contingent as of the Confirmation Date, including, without limitation, all Claims which are disallowed under Bankruptcy Code section 502(e); or (c) such Entity asserts a right of subrogation to the rights of such Creditor under Bankruptcy Code section 509 except as otherwise specifically provided therein.

## ARTICLE VII

### CONFIRMATION AND CONSUMMATION OF THE PLAN PURSUANT TO BANKRUPTCY CODE SECTION 1129 (b)

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Proponents will request confirmation of the Plan, as it may be modified from time to

time, under Bankruptcy Code section 1129(b).  The Proponents reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan exhibit or schedule, including the right to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary.

## ARTICLE VIII

## CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

**A.**      A. Conditions to Confirmation

The following are conditions precedent to the occurrence of the Confirmation Date:  (a) entry of an Order finding that the Disclosure Statement contains adequate information pursuant to Bankruptcy Code section 1125; and (b) the proposed Confirmation Order shall be in form and substance acceptable to the Proponents.

**B.**      B. Conditions to Effective Date

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with the Plan:

1.      The Confirmation Order shall have been entered in form and substance reasonably satisfactory to the Proponents;

2.      The Confirmation Order shall provide that  the Proponents are authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the Litigation Trust Agreement and any other contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with the Plan;

3.      The Litigation Trust Agreement shall be executed and approved by order of the Bankruptcy Court in form and substance reasonably acceptable to the Proponents;

4.      The Estate Assets shall have been transferred to the Litigation Trust pursuant to the Plan; and

5.      The Adeptio Loan shall have been funded by Adeptio or other arrangements with Adeptio satisfactory to the Proponents shall have been made.

**C.**      C.

**Waiver of Conditions**

Each of the conditions set forth in this Article may be waived in whole or in part by the Proponents. The failure of the Proponents to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right the may be asserted at any time.

## ARTICLE IX

## RETENTION OF JURISDICTION

Under Bankruptcy Code sections 105(a) and 1142, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, these Chapter 11 Cases and the Plan to the fullest extent permitted by law, as described more fully in the Plan.

## ARTICLE X

## MISCELLANEOUS PROVISIONS

The following shall be governed by the terms and provisions of the plan:

1.    ~~Modification and Amendment;~~Modifications and Amendments;

2.    Severability of Plan Provisions;

3.    Adeptio Release[4] – through the Adeptio Release, as is more fully set forth in the Plan, the Estates generally release Adeptio effective the Effective Date from claims and causes of action excluding the Retained Litigation Claims set forth in the Term Sheet;

4.    Litigation Trustee Bound;

5.    ~~3.~~Successors and ~~Assignment~~Assigns;

6.    ~~4.~~Exculpation and Limitation of Liability;

---

[4] The Debtors reserve all rights to refrain from granting the Adeptio Release if consideration satisfactory to the Debtors is not received.

{00815667;v16}

7.        5. Binding Effect;

8.        6. Revocation, Withdrawal, or Non-Consummation;

7.        Notice;

9.        Notices;

10.       Indemnification and Related Matters;

11.       8. Prepayment;

12.       9. Dissolution of the Committee; and

13.       10. Term of Injunction or Stays.

For a more detailed description of the aforementioned issues and their treatment under the plan please see Article XI of the Plan.

## ARTICLE XI

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN

**A.**       **A. Liquidation Under Chapter 7**

If no chapter 11 the Plan is not confirmed, these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed to liquidate the assets of the Debtors, or the Cases could be dismissed. The Debtors and the Committee believe that liquidation under chapter 7 or dismissal would result in smaller, if any, distributions to creditors than those provided for in this the Plan. This is because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals during such liquidation, and because some the payment of the payments Investigation Funding and the Priority Claims Funding, to be made by Adeptio pursuant to the Term Sheet, might not occur if these Chapter 11 Cases are converted to chapter 7 bankruptcy cases. The Debtors and the Committee contend that Adeptio would continue to be obligated to perform its obligations under the Term Sheet and Settlement Agreement if these

69

cases are converted to cases under chapter 7 of the Bankruptcy Code, but if Adeptio does not provide the Adeptio Loan pursuant to the Term Sheet and Settlement Agreement, there might be no recovery for the chapter 7 estate will not contain sufficient funds to pursue the Causes of Action, which makes it highly unlikely that a chapter 7 trustee will pursue the Causes of Action. Consequently, it is unlikely that there would be any recovery to Holders of General Unsecured Claims and there would be less --or possibly no--recovery for Holders of Allowed Administrative Claims than would otherwise be the case. In addition, if the cases are converted to cases under chapter 7 of the Bankruptcy Code, Adeptio may not provide the Priority Claims Funding and there would be little to no recovery priority for claimants.

Therefore, in order to use the Investigation and Priority Claims Funding provided by Adeptio pursuant to the Term Sheet and the Plan, the Proponents contend that confirmation and consummation of the Plan is in the best interests of Creditors.

**B.**    ~~B.~~ **Alternative Plan of Reorganization**

If ~~this~~the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan of reorganization.  During the course of negotiating ~~this~~the Plan, the Proponents explored various other alternatives and concluded that ~~this~~the Plan represented the best alternative to protect the interests of creditors and other parties in interest.  The Proponents have not changed their conclusions, and believe that ~~this~~the Plan represents the best alternative to protect the interests of creditors.

<u>**CONCLUSION AND RECOMMENDATIONS**</u>

The Debtors and the Committee urge all creditors entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by immediately returning their properly

completed ballots to the appropriate voting agent as set forth on the ballots within the time stated

in the notice served with this Disclosure Statement.

Dated: ~~April 14,~~June 12, 2008

| FOR THE DEBTORS: | FOR THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS |
|---|---|
| By: _____ | By: _____ |
|    Name: |    Name: |
|    Title: |    Title: |

{00815667;v~1~6}

FOR THE DEBTORS:                    FOR THE OFFICIAL COMMITTEE OF
                                    UNSECURED CREDITORS

By: _____     By: _____
    Name:                               Name:
    Title:                              Title:

                                    REED SMITH LLP

BAYARD, P.A.

                                    By:    /s/ Kurt F. Gwynne    
                                           _____
By: _____            Kurt F. Gwynne (No. 3951)
    Neil B. Glassman (No. 2087)            1201 Market Street
    Mary E. Augustine (No. 4477)           Suite 1500
    222 Delaware Avenue, Suite 900         Wilmington, DE 19801
    P.O. Box 25130
    Wilmington, DE 19899

        and                                    and

DLA PIPER US LLP                    Robert P. Simons
Thomas R. Califano                  Joshua C. Lewis
Jeremy Johnson                      435 Sixth Avenue
1251 Avenue of the Americas         Pittsburgh, PA  15219-1886
New York, NY  10020

Counsel for Debtors and Debtors in         and
Possession
                                    Claudia Z. Spinger
                                    1500 One Liberty Place
                                    1650 Market Street
                                    Philadelphia, PA  19103

                                    Counsel for the Official Committee of
                                    Unsecured Creditors

{00815667;v16}