# EXHIBIT 2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| SN LIQUIDATION, INC., et al., | : | Case No. 07-11666 (KG) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |
|  | : | **Re: Docket No. 542** |
|  | : |  |

**ORDER PURSUANT TO SECTIONS 1125, 1126, AND 105 OF THE BANKRUPTCY
CODE, BANKRUPTCY RULES 2002, 3017, 3018 AND 3020, AND LOCAL RULE 3017-1
(A) APPROVING ADEQUACY OF DISCLOSURE STATEMENTS, (B) ESTABLISHING
PROCEDURES FOR SOLICITATION AND TABULATION OF VOTES TO ACCEPT
OR REJECT THE PLAN, (C) FIXING THE ADMINISTRATIVE EXPENSE BAR DATE,
AND (D) FIXING DATE, TIME AND PLACE FOR CONFIRMATION HEARING**

Upon the motion (the "Motion") of the above-captioned debtors and debtors in

possession (collectively, the "Debtors") and the Official Committee of Unsecured Creditors (the

"Committee") for entry of an order (the "Order") pursuant to sections 1125, 1126, and 105 of

title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), Rules 2002,

3017, 3018 and 3020 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

and Rule 3017-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "Local Rules") (a) approving the adequacy of

the Second Amended Disclosure Statement for the Second Amended Joint Plan of Liquidation of

SN Liquidation, Inc., *et al.,* Proposed by the Debtors in Possession and the Official Committee of

Unsecured Creditors Dated April 14, August____, 2008, to be distributed to the holders of

Secured Lender Claims (as amended on June 12, 2008 and as may be further amended, the

"Disclosure Statement"), and the Disclosure Statement and Summary of Second Amended Joint

Plan of Liquidation of SN Liquidation, Inc., *et al.,* Proposed by the Debtors in Possession and the

Official Committee of Unsecured Creditors Dated April 14, August____, 2008, to be distributed

to the holders of General Unsecured Claims (as amended on June 12, 2008 and as may be further

amended, the "Class 4 Disclosure Statement", together with the Disclosure Statement, the "Disclosure Statements"), ~~as may be subsequently amended,~~ pursuant to section 1125 of the Bankruptcy Code, (b) establishing procedures for solicitation and tabulation of votes to accept or reject the_Second Amended Joint Plan of Liquidation of SN Liquidation, Inc., *et al.* Proposed by the Debtors in Possession and the Official Committee of Unsecured Creditors Dated ~~April 14,~~August_____, 2008 (~~as amended on June 12, 2008 and~~ as may be further amended, the "Plan"); (c) fixing the administrative expense bar date; and (d) fixing the date, time, and place to consider approval of the Plan; and it appearing that the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and that is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having scheduled the date, time, and place for the hearing to consider approval of the Disclosure Statements (the "Disclosure Statement Hearing"); and it appearing that proper and adequate notice of the Disclosure Statement Hearing has been given to all parties in interest in accordance with the Motion; and the Disclosure Statement Hearing having been held on June 13, 2008; and a further Status Conference regarding the Disclosure Statements hearing been held on July 15, 2008; and all parties in interest having been given an opportunity to be heard at the Disclosure Statement Hearing, and all objections to the Motion having been overruled or otherwise disposed of;

NOW, THEREFORE, the Court hereby finds as follows:

A.      The Disclosure Statements comply with due process, the requirements of the Bankruptcy Code and the Bankruptcy Rules and contain "adequate information" as such term is defined in section 1125 of the Bankruptcy Code;

{BAY:01104094v1}

B.     Proper and adequate notice of the Disclosure Statement Hearing and the time fixed for filing objections to the Disclosure Statements has been given to all parties in interest, and such notice complies with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules;

C.     The Solicitation Procedures proposed in the Motion are reasonable, provide a fair and equitable voting process, and are consistent with section 1126 of the Bankruptcy Code;

D.     The cost of publication of the Confirmation Hearing Notice (as defined below) is unduly burdensome given the resources remaining in the estates;

E.     The procedures for transmitting the Disclosure Statements, the Plan, the Ballots (as defined below) and the voting instructions are fair, reasonable and adequate and comply with the requirements of Bankruptcy Rule 3017(e), and

F.     The relief requested in the Motion and granted herein is warranted under the circumstances and is in the best interests of the Debtors' estates and their creditors.

ACCORDINGLY, after due deliberation, and sufficient cause appearing therefor, it is hereby ORDERED that:

1.     The Motion is GRANTED.

2.     The Disclosure Statement attached hereto as Exhibit A is APPROVED.

3.     The Class 4 Disclosure Statement attached hereto as Exhibit B is APPROVED.

4.     The Debtors are authorized to (a) make non-material changes to the Disclosure Statements and related documents (including, without limitation, the exhibits thereto) and (b) revise the Disclosure Statements and related documents (including, without limitation, the exhibits thereto) to add further disclosure concerning events occurring at or after the Disclosure Statement Hearing, prior to distribution of the Disclosure Statements.

5. The voting instructions and the forms of ballots substantially in the form attached hereto as Exhibit C ~~to the Motion~~, are hereby approved.

6. The Debtors, through BMC Group, Inc. (the "Voting Agent"), are directed to transmit by first-class mail copies of (i) the notice of the confirmation hearing (the "Confirmation Hearing Notice") attached hereto as Exhibit D and the Disclosure Statement to Holders of Administrative Claims and Holders of Priority Tax Claims, (ii) the Confirmation Hearing Notice, this Order and the Disclosure Statement to all parties requesting notice pursuant to Rule 2002 of the Bankruptcy Rules, (iii) the Notice of Unimpaired Non-Voting Status for Debtors' Joint Chapter 11 Plan to Holders of Class 1 Other Secured Claims and Holders of Class 2 Priority Non-Tax Claims, (iv) the Notice of Impaired Non-Voting Status for Debtors' Joint Chapter 11 Plan to Holders of Class 5 Intercompany Claims and Holders of Class 6 Equity Interests, (v) the Disclosure Statement, Plan, the Confirmation Hearing Notice and the Ballot for Class 3 Secured Lender Claims to Holders of Class 3 Secured Lender Claims, and (vi) the Class 4 Disclosure Statement, Confirmation Hearing Notice and Ballot for Class 4 General Unsecured Claims to Holders of Class 4 General Unsecured Claims, provided, that such Holders' claims are listed in the Debtors' schedules of liabilities as not contingent, unliquidated or disputed (excluding scheduled claims that have been superseded by filed claims) provided, further, that with respect to those persons or entities to whom the Debtors or their Voting Agent mailed a prior notice that was returned by the United States Postal Service as undeliverable with no forwarding address, the Debtors and their Voting Agent shall not be required to mail such persons the Solicitation Materials.

7. Copies of the Disclosure Statement and Plan are available to the Holders of General Unsecured Claims through both the Bankruptcy Court's internet website

4

(www.deb.uscourts.gov)          and          the          Voting          Agent's          internet          website

(www.bmcgroup.com/inphonic) or upon written request to the Voting Agent.

8.      Because the Holders of (i) Intercompany Claims and (ii) Equity Interests (each as

defined in the Plan) will not receive any distribution under the Plan, and are thus conclusively

presumed to have rejected the Plan, the Debtors shall not be required to transmit copies of the

Disclosure Statement and the Plan to such holders, rather, the Debtors, through their Voting

Agent, shall send by first class mail a notice (the "Impaired Non-Voting Notice"), substantially

in the form attached hereto as Exhibit E to the Motion, which will, among other things, (i)

include a summary of the treatment provided under the Plan to such class, (ii) include the date of

the Confirmation Hearing and (iii) state the date fixed to file objections to confirmation of the

Plan.

9.      Because the holders of (i) Other Secured Claims, and (ii) Priority Non-Tax

Claims (each as defined in the Plan) are not impaired under the Plan, and are thus conclusively

presumed to have accepted the Plan, the Debtors shall not be required to transmit copies of the

Disclosure Statement and the Plan to such holders, rather, the Debtors, through their Voting

Agent, shall send by first class mail, a notice (the "Unimpaired Non-Voting Notice"),

substantially in the form attached hereto as Exhibit F to the Motion, which will, among other

things, (i) include a summary of the treatment provided under the Plan to each such class, (ii)

advise that the Disclosure Statement and Plan can be obtained through the Bankruptcy Court's

internet          website          (www.deb.uscourts.gov),          the          Voting          Agent's          website

(www.bmcgroup.com/inphonic), or upon written request to the Voting Agent, (iii) include the

date of the Confirmation Hearing, and (iv) state the date fixed to file objections to confirmation

of the Plan.

10. Pursuant to Bankruptcy Rule 3017(d), ~~June 13,~~August 1, 2008 shall be the solicitation record date (the "Solicitation Record Date") for purposes of determining which holders of claims are entitled to vote on the Plan and are entitled to receive the Solicitation Materials.

11. All Ballots accepting or rejecting the Plan must be received by BMC Group, Inc. by 4:00 p.m., ~~Prevailing Pacific~~prevailing Central Time, on ~~August 1,~~September 16, 2008 (the "Voting Deadline") at the following address:

{BAY:01104094v1}

***(By U.S. Regular Mail)***

SN LIQUIDATION, INC., *et al.* f/k/a INPHONIC, INC., *et al.*
c/o BMC GROUP, INC.
P.O. BOX ~~9782~~2005
~~EL SEGUNDO, CA 90245-2822~~
CHANHASSEN, MN 55317-2005

***(By Messenger or Overnight Courier)***

SN LIQUIDATION, INC., *et al.* f/k/a INPHONIC, INC., *et al.*
c/o BMC GROUP, INC.
~~444 N. NASH ST.~~
~~EL SEGUNDO, CA 90245~~
18750 LAKE DRIVE EAST
CHANHASSEN, MN 55317

12.    For voting purposes only and not, as discussed below, for determining who has an allowed claim or who is entitled to receive a distribution under the Plan, the following voting procedures will be followed: each holder of a Voting Claim shall have an allowed claim, solely for the purpose of voting on the Plan, in an amount equal to (i) the amount of such claim as set forth on a timely-filed proof of claim, or (ii) in the absence of a timely-filed proof of claim, the liquidated, non-contingent and non-disputed amount of such claim as set forth in the Debtors' schedule of liabilities, provided, however, that the assignee of a transferred and assigned scheduled or filed Claim shall be permitted to vote such claim only if the transfer and assignment has been reflected on the Court's docket as of the close of business on the Solicitation Record Date, and provided, further, that (a) if a claim for which a proof of claim has been timely filed is listed on the Debtors' schedules of liabilities as contingent, unliquidated or disputed, such claim shall be allowed for voting purposes only and not for the purpose of allowance or distribution, in an amount equal to $1.00, (b) if a claim for which a proof of claim has been timely filed is for a contingent or unliquidated amount, such claim shall be allowed for voting purposes only and not for the purpose of allowance or distribution, in an amount equal to $1.00, (c) if a claim for which

a proof of claim has been timely filed is for an unknown amount, such claim shall be allowed for voting purposes only and not for the purpose of allowance or distribution, in an amount equal to $1.00, (d) if a claim has been estimated or otherwise allowed for voting purposes by order of the Court, such claim shall be allowed for voting purposes only in the amount estimated or allowed by the Court, unless, prior to the Voting Deadline, the Court enters an order disallowing such claim, (e) if a claim is deemed allowed pursuant to the Plan and the holder of the claim is entitled to vote on the Plan, the claim shall be allowed for voting purposes in the amount deemed allowed pursuant to the Plan, (f) if a holder of claims has timely-filed multiple proofs of claims on account of a single claim (whether such claims were filed against one or more Debtors), and such holder files properly executed ballots related to more than one such multiple proofs of claim, the Debtors reserve the right to treat only one such claim as an allowed claim for voting purposes and not count additional ballots submitted by the holder on account of additional claims, and (g) if a claim is estimated at $0.00 by Court Order, the holder of such claim shall have no voting rights.  In addition, if a Voting Claim is listed in the Debtors' schedules of liabilities as contingent, unliquidated, unknown, disputed, or is not listed on the Debtors' schedules of liabilities, and a proof of such claim was not timely filed, such claim shall have no voting rights.

13.   If the Debtors or Committee have served and filed an objection to a Voting Claim at least ten (10) days prior to the Voting Deadline, such claim shall be disallowed for voting purposes only and, pending final resolution of such objection, not for the purpose of allowance or distribution; provided that any undisputed portions of such claim shall be allowed for voting purposes only.

14.   The following procedures shall be followed in connection with tabulating ballots:

(a)   only original Ballots returned to the Voting Agent bearing original signatures will be counted,

(b)     any unsigned Ballot shall not be counted;

(c)     any Ballot that is illegible or contains insufficient information to permit the identification of the holder shall not be counted;

(d)     any Ballot cast by a person or entity that does not hold a claim in a class entitled to vote on the Plan shall not be counted;

(e)     any Ballot that is properly completed, executed and timely returned to the Voting Agent that does not indicate an acceptance or rejection of the Plan shall not be counted;

(f)     any Ballot that is properly completed, executed and timely returned to the Voting Agent that indicates both acceptance and rejection of the Plan shall not be counted;

(g)     whenever a holder of a Voting Claim returns more than one Ballot voting the same claim prior to the Voting Deadline, only the last properly executed Ballot timely returned to the Voting Agent shall be counted;

(h)     each holder of a Voting Claim shall be deemed to have voted the full amount of its claim;

(i)     holders of Voting Claims shall not split their vote within a claim, but shall vote their entire claim within a particular class either to accept or reject the Plan; and

(j)     any Ballot received by the Voting Agent by facsimile or other electronic communication shall not be counted.

15.     The report on the outcome of the voting must be received by the Proponents from the Voting Agent by 4:00 p.m., prevailing Eastern Time, on ~~August 15,~~October 3, 2008 (the "Voting Report Deadline").

16.     The administrative expense bar date is the first business day that is thirty (30) days after the Effective Date of the Plan (the "Administrative Expense Bar Date").

17.     The following persons or entities are not required to file an Administrative Claim by the Administrative Expense Bar Date:  (a) any person or entity which has already filed an Administrative Claim against the Debtor; (b) holders of Administrative Claims previously allowed by Order(s) of this Court; (c) any professional retained (pursuant to section 327 or 363

9

of the Bankruptcy Code) in these chapter 11 cases by the Debtors or the Committee, for professional fees and reimbursement of expenses;.

18.    Any person or entity asserting an Administrative Expense Claim against the Debtor and its Estate that arose during the period on and after the Commencement Date and through and including the Administrative Expense Bar Date must file, on or before the Administrative Expense Bar Date, an Administrative Claim so as to be <u>actually</u> <u>received</u> at the appropriate destination not later than 4:00 p.m. (Prevailing Pacific Time) on or before the Administrative Expense Bar Date, by mailing the original to:  (a) claims agent, BMC Group, *via* U.S. regular mail at (i) SN Liquidation Inc., *et al.* f/k/a InPhonic, Inc., *et al.*, c/o BMC Group, Inc., P.O. Box 978, El Segundo, CA 90245-2822, or *via* messenger or overnight courier at (ii) SN Liquidation Inc., *et al.* f/k/a InPhonic, Inc., *et al.*, c/o BMC Group, Inc., 444 N. Nash St., El Segundo, CA 90245; with copies to (b) Bayard, P.A., 222 Delaware Avenue, Suite 900, P.O. Box 25130, Wilmington, DE  19899, Attention: Neil B. Glassman, Esquire; (c) DLA PIPER US LLP, 1251 Avenue of the Americas, New York, NY, Attention:  Jeremy R. Johnson, Esquire; (e) Reed Smith LLP, 1201 Market Street, Suite 1500, Wilmington, DE, Attention: Kurt Gwynne, Esquire. An Administrative Expense Claim will be deemed timely filed only when <u>actually</u> <u>received</u> on or before the Administrative Expense Bar Date.

19.    The hearing to consider confirmation of the Plan (the "Confirmation Hearing") shall be held before The Honorable Kevin Gross, United States Bankruptcy Judge, 824 Market Street, 6th Floor, Courtroom 3, Wilmington, Delaware on ~~August 20,~~October 14, 2008 at 2:00 p.m., or such later date as may be scheduled by this Court.  The Debtors and Committee may give notice of any adjournment of the Confirmation Hearing by announcement in open Court at the Confirmation Hearing or by the filing of an agenda that indicates adjournment.

10

20.    The Debtors are relieved of any publication requirement of the Confirmation Hearing Notice.

21.    Objections, if any (including any supporting memoranda), to confirmation of the Plan (a) shall be in writing, (b) shall comply with the Bankruptcy Code, Bankruptcy Rules and any orders of this Court, (c) shall set forth the name and contact information of the objector and the nature and amount of any claim or interest asserted by the objector against the estates or property of the Debtors, (d) shall state with particularity the legal and factual basis for such objection, and (e) shall be filed with this Court, together with proof of service thereof, and served upon the following persons so as to be received, no later than 4:00 p.m., prevailing Eastern Time, on: ~~August 1,~~ September 16, 2008.

      (i)    ~~(i)~~——Counsel for the Debtors and Debtors in Possession

        BAYARD, P.A.
        222 Delaware Avenue, Suite 900
        P.O. Box 25130
        Wilmington, DE 19899
        Telephone:  302-655-5000
        Facsimile: 302-658-6395
        Email: nglassman@bayardlaw.com
        Attn:  Neil B. Glassman, Esquire

        DLA PIPER US LLP
        1251 Avenue of the Americas
        New York, NY  10022
        Telephone:  212-335-4500
        Facsimile:  212-884-8562
        Email:  jeremy.johnson@dlapiper.com
        Attn:  Jeremy R. Johnson, Esquire

      (ii)    ~~(ii)~~——Official Committee of Unsecured Creditors

        REED SMITH LLP
        1201 Market Street
        Suite 1500
        Wilmington, DE  19801
        Telephone:  (302) 302-778-7500

11

Facsimile:  (302) 778-7575
Email:  kgwynne@reedsmith.com
Attn:  Kurt F. Gwynne, Esquire

(iii)    (iii)——The United States Trustee

OFFICE OF THE UNITED STATES TRUSTEE
844 King Street, Suite 2207
Wilmington, Delaware 19801
Facsimile: (302) 573-6497
Attn:   Kelly Beaudin Stapleton

(iv)    Counsel for Adeptio and Simplexity

KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, Illinois 60601-6636
Telephone:  (312) 861-2000
Facsimile:  (312) 861-2200
Email: asathy@kirkland.com
        dagay@kirkland.com
Attn:   Anup Sathy, P.C., Esquire
        David A. Agay, Esquire

22.    The Debtors are authorized to file a reply to any objections to confirmation on or

before August 15, October 9, 2008 at 4:00 p.m.

23.    Unless an objection to confirmation of the Plan is timely served and filed in

accordance with this Order, it may not be considered by the Court.

24.    This Court shall retain jurisdiction over all matters related to or arising from the

Motion or the interpretation or implementation of this Order.


Dated: JuneAugust ____, 2008
        Wilmington, Delaware

        _____
        THE HONORABLE KEVIN GROSS
        UNITED STATES BANKRUPTCY JUDGE

12

{BAY:01104094v1}

# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| SN LIQUIDATION, INC., et al.,[1] | : | Case No. 07-11666 (KG) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |
| | : | |

---

### ~~FIRST~~SECOND AMENDED DISCLOSURE STATEMENT FOR JOINT PLAN OF LIQUIDATION OF SN LIQUIDATION, INC., *ET AL.* PROPOSED BY THE DEBTORS IN POSSESSION AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS DATED ~~JUNE 12,~~AUGUST ___, 2008

**DLA PIPER US LLP**

Thomas R. Califano
Jeremy Johnson
1251 Avenue of the Americas
New York, New York  10020

**BAYARD P.A.**

Neil B. Glassman (No. 2087)
Mary E. Augustine (No. 4477)
222 Delaware Avenue, Suite 900
Wilmington, Delaware  19899

Counsel for Debtors and Debtors in Possession

**REED SMITH LLP**

Kurt F. Gwynne (No. 3951)
1201 Market Street
Suite 1500
Wilmington, DE 19801

Robert P. Simons (admitted in PA)
Claudia Z. Springer (admitted in PA)
Joshua C. Lewis (admitted in PA)

Counsel for the Official Committee of Unsecured Creditors

---

[1]  The Debtors and debtors in possession are INP Liquidation Corp. f/k/a InPhonic, Inc., CS I Liquidation, LLC f/k/a CAIS Acquisition, LLC, CS II, LLC f/k/a CAIS Acquisition II, LLC, SI Liquidation Corp. f/k/a SimIPC Acquisition Corp., SN Liquidation, Inc. f/k/a Star Number, Inc., MTS Liquidation, LLC f/k/a Mobile Technology Services, LLC, FN LLC f/k/a FON Acquisition, LLC, 1010, LLC f/k/a 1010 Interactive, LLC.

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN OF LIQUIDATION OF THE DEBTOR SN LIQUIDATION, INC. AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.  NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.   PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND SCHEDULES ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.   THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016(c) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.   THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF SN LIQUIDATION, INC. OR ANY OF THE AFFILIATED DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER APPLICABLE EVIDENTIARY RULES.

THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, INPHONIC, INC. OR

ANY OF THE AFFILIATED DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES.

THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, AS PLAN PROPONENTS, BELIEVE THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND THE HOLDERS OF ALL CLAIMS. ACCORDINGLY, THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS URGE THOSE HOLDERS OF CLAIMS ENTITLED TO VOTE TO VOTE TO ACCEPT THE PLAN.

IF YOU HAVE QUESTIONS ABOUT THE PACKET OF MATERIALS THAT YOU RECEIVED, PLEASE CONTACT EDITH MIRANDA, BAYARD, P.A., P.O. BOX 25130, WILMINGTON, DE 19801, TELEPHONE NUMBER (302) 655-5000, OR BANKSERVE@BAYARDLAW.COM.

INTRODUCTION ..................................................................................................................1

ARTICLE I          SUMMARY OF THE CHAPTER 11 CASES AND PLAN ...........................2

    A.     Introductory Note..........................................................................................2

    B.     Business Overview.........................................................................................4

    C.     Prepetition Capital Structure and Debt Obligations.......................................5

    D.     The Chapter 11 Cases ...................................................................................6

    E.     Sale of Substantially All of the Debtors' Assets...........................................8

    F.     General Structure of the Plan......................................................................10

    G.     Summary of Treatment of Claims and Interests Under the Plan ..........................11

    H.     Acceptance or Rejection of the Plan ...........................................................15

ARTICLE II         HISTORY, OPERATIONS AND STRUCTURE OF THE DEBTORS .........15

    A.     Introductory Note........................................................................................15

    B.     The Company...............................................................................................16

    C.     Prepetition Capital Structure of Debtors.....................................................18

        1.     Prepetition Credit Agreement and Amendment..........................18

        2.     Corporate Structure of Debtors .................................................19

ARTICLE III        CHAPTER 11 CASES ...................................................................................20

    A.     Lack of Liquidity and Events Leading to Chapter 11 Cases ................................20

    B.     Necessity of, and Reasons for, Chapter 11 Filings .................................21

    C.     Continuation of Business; Stay of Litigation...............................................23

        1.     The Adversary Proceeding Against Icon International, Inc.......................24

    D.     First Day Orders..........................................................................................26

    E.     Debtor in Possession Financing ..................................................................27

    F.     Appointment of Creditors Committee .........................................................28

    G.     The  Committee's Objections to Sale Motion and Relief Requested ...................29

i

H.    Resolution of Objections to the Sale...................................................29

I.     Other Material Relief Obtained During the Chapter 11 Cases .............................32

J.     Summary of Claims Process and Bar Date ....................................32

     1.     Schedules and Statements of Financial Affairs ........................32

         a.     Claims Bar Date and Proofs of Claim............................32

K.    The Sale ...........................................................................33

L.     Retention of Wind Down/Post-Closing Specialist...................................33

ARTICLE IV        SUMMARY OF PLAN OF REORGANIZATION.......................................34

A.     Treatment of Claims and Interests ....................................34

     1.     Unclassified Claims ..............................................34

         a.     Administrative Claims ....................................34

         b.     Priority Tax Claims.......................................35

         c.     Trustee Fee Claims ......................................36

     2.     Unimpaired Claims ...............................................36

         a.     Class 1 – Other Secured Claims............................36

         b.     Class 2 – Priority Non-Tax Claims.........................3637

     3.     Impaired Claims Entitled to Vote .................................3738

         a.     Class 3 – Secured Lender..................................3738

         b.     Class 4 – General Unsecured Claims.......................3738

     4.     Impaired Classes of Claims (deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan)............................3839

         a.     Class 5 – Intercompany Claims ............................3839

     5.     Impaired Class of Interests (deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan)............................3839

         a.     Class 6 – Equity Interests.................................3839

     6.     Allowed Claims ..................................................3839

{BAY:00815667;v618}

B.     Acceptance or Rejection of the Plan.................................................3940

    1.    Impaired Classes of Claims Entitled to Vote.......................3940

    2.    Acceptance by an Impaired Class.........................................3940

    3.    Presumed Acceptance by Unimpaired Classes ....................3940

    4.    Classes Deemed to Reject Plan.............................................40

    5.    Summary of Classes Voting on the Plan................................4041

C.     Means for Implementation of the Plan.........................................4041

    1.    Sale.......................................................................................4041

    2.    Corporate Action..................................................................4041

        a.    Merger of Debtors..................................................4041

        b.    Rejection of Indemnification ObligationsClaims ..........................41

        c.    Continued Corporate Existence .................................4142

        d.    Retention of Wind Down Specialist .........................42

    3.    Post-Effective Date Compensation of Professionals .................................42

    4.    Sources for Plan Distribution.................................................42

    5.    Litigation Trust; Litigation Trustee .......................................43

        a.    Sources of Litigation Trust Funding .........................4344

        b.    Litigation Trust Operation ...........................................46

    6.    Claims Administration Process...............................................51

        a.    Deadline for Filing of Administrative and Professional Fee Claims .....................................................................51

        b.    Estimation of Claims.................................................5152

        c.    Late Claims ..............................................................5253

        d.    Procedures for Treatment and Resolving Disputed, Contingent and/or Unliquidated Claims .....................5253

        e.    Claims Reserve .......................................................53

{BAY:00815667;v618}

f.      Setoffs ........................................................... 53 54

g.      Undeliverable and Unclaimed Distributions ............................... 54

h.      Transmittal of Distributions and Notice ......................... 55

i.      Distribution Dates ................................................ 55 56

j.      Payments of Less than $15.00 ....................... 55 56

k.      Remainder of Funds in Reserve ......................... 56

l.      Execution of Documents ................................. 56 57

ARTICLE V        TREATMENT OF EXECUTORY CONTRACTS AND LEASES
                 UNDER THE PLAN ................................................ 56 57

   A.    Assumption of Insurance Policies; Assignment of Rights ....................... 56 57

   B.    Rejection of Other Executory Contracts ......................... 57 58

ARTICLE VI       DISALLOWANCE OF CONTRIBUTION CLAIMS ................................. 58

ARTICLE VII      CONFIRMATION AND CONSUMMATION OF THE PLAN
                 PURSUANT TO BANKRUPTCY CODE SECTION 1129 (b) ............... 58 59

   A.    Rule 9019(a) Settlement .............................................. 59

ARTICLE VIII     CONDITIONS PRECEDENT TO CONFIRMATION AND
                 CONSUMMATION OF THE PLAN ....................................... 59 60

   A.   A. Conditions to Confirmation ....................................... 59 60

   B.    Conditions to Effective Date .......................................... 59 60

   C.    Waiver of Conditions ................................................ 60 61

ARTICLE IX       RETENTION OF JURISDICTION ........................................... 60 61

ARTICLE X        MISCELLANEOUS PROVISIONS .......................................... 60 61

   A.    Estate Releases ................................................... 61

   B.    Third Party Releases ............................................... 62

iv

ARTICLE XI      ALTERNATIVES TO CONFIRMATION AND CONSUMMATION
                OF PLAN ................................................................................................6166

        A.  A. Liquidation Under Chapter 7 ...........................................................6166

        B.      Alternative Plan of Reorganization...................................................6267

CONCLUSION AND RECOMMENDATIONS ....................................................6267

# EXHIBITS

A.    Plan of Reorganization

## INTRODUCTION

SN Liquidation, Inc. ("SN Liquidation") and its affiliated debtors and debtors in possession (collectively, the "Debtors")[2] and the Official Committee of Unsecured Creditors (the "Committee" and together with the Debtors, the "Plan Proponents") submit this disclosure statement (the "Disclosure Statement") for the joint plan of liquidation (as amended or modified, the "Plan") of the Debtors pursuant to Bankruptcy Code section 1125, for use in the solicitation of votes on the Plan. A copy of the Plan is annexed hereto as Exhibit A of this Disclosure Statement.

This Disclosure Statement iswas prepared with information the Proponents obtained from the Debtors' SEC filings, the Committee's investigation into potential recoveries into the estates for the benefit of general unsecured creditors, and publicly available pleadings filed in courts where causes of action are pending against the Debtors. This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the need to seek Chapter 11 protection, significant events that have occurred during the Chapter 11 Cases, the sale of Debtors' operating assets to Adeptio INPC Funding LLC ("Adeptio"), the negotiated settlement of certain litigation among the Debtors, the Committee and Adeptio, and the liquidation of the Debtors' remaining assets, which consist mainly of litigation claims. This Disclosure Statement also describes terms and provisions of the Plan, certain effects of confirmation of the Plan, and the manner in which distributions, if any, will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting

---

[2] The Debtors and debtors in possession are INP Liquidation Corp. f/k/a InPhonic, Inc., CS I Liquidation, LLC f/k/a CAIS Acquisition, LLC, CS II, LLC f/k/a CAIS Acquisition II, LLC, SI Liquidation Corp. f/k/a SimIPC Acquisition Corp., SN Liquidation, Inc. f/k/a Star Number, Inc., MTS Liquidation, LLC f/k/a Mobile Technology Services, LLC, FN LLC f/k/a FON Acquisition, LLC, 1010, LLC f/k/a 1010 Interactive, LLC.

procedures that holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan. Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

## ARTICLE I

## SUMMARY OF THE CHAPTER 11 CASES AND PLAN

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan.

The following introduction and summary (the "Overview") is intended as a general overview only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan. This Overview is intended solely as a summary of the background of the Chapter 11 Cases and the provisions of the Plan and is qualified in its entirety by the terms and provisions of the Plan. FOR A MORE COMPLETE UNDERSTANDING OF THE PLAN, RECIPIENTS SHOULD READ THE DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY. All capitalized terms not defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan. A copy of the Plan is annexed hereto as Exhibit A.

### A.    Introductory Note

As detailed more fully herein, prior to November 8, 2007 (the "Petition Date"), the Debtors reached an agreement (the "Asset Purchase Agreement" or "Agreement"), subject to higher and better offers, pursuant to which the Debtors would sell (the "Sale") substantially all of

2

their assets to Adeptio, the parent corporation of Simplexity, Inc. (the "Buyer's Subsidiary," together with Adeptio, the "Purchaser"), assignee to the Buyer's rights under the Final Sale Order (defined below) and Agreement.  On the Petition Date, the Debtors commenced these Chapter 11 Cases to effectuate the sale process as a means to maximize value and provide themselves with a vehicle to explore any and all of their restructuring alternatives.

Accordingly, on the Petition Date, the Debtors filed the Motion of Debtors for an Order Pursuant to Section 105(a), 363 and 365 of title 11 of the Untied States Code and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (i) Authorizing the Sale of Substantially All of Debtors' Assets; (ii) Approving an Asset Purchase Agreement, Subject to Higher and Better Offers; (iii) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (iv) Granting Related Relief (the "Sale Motion").  Pursuant to the Sale Motion, the Debtors sought to sell substantially all of their assets to Adeptio.

On the Petition Date, the Debtors also filed the Motion for Order (i) Approving Bid Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (ii) Scheduling a Hearing to Consider the Sale and Approving the Form and Matter of Notice; (iii) Establishing Procedures Relating to Assumption and Assignment of Certain Contracts, including Notice of Proposed Cure Amounts; (iv) Approving Expense Reimbursement Provisions, and (v) Granting Related Relief (the "Bid Procedures Motion").

Also, on the Petition Date, the Debtors filed a Motion for Entry of Interim and Final Orders (I) Authorizing and Approving Postpetition Financing (the "DIP Facility"); (II) Granting Liens and Security Interests and Providing Superpriority Administrative Expenses Status; (II) Authorizing Use of Cash Collateral and Affording Adequate Protection; (IV) Modifying Automatic Stay; and (V) Scheduling Final Hearing, Pursuant to Section 105, 361, 362, 363 and

3

364 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002 and 4001(C) and (D) (the "DIP Motion").

## B.    Business Overview

Before the Sale, InPhonic, Inc. ("InPhonic"), one of the affiliated debtors was a leading internet (online) seller of wireless services and devices to consumers.  InPhonic sold these services and devices through company owned and branded websites, including without limitation www.wirefly.com, as well as through a variety of private labeled websites that it developed and managed for marketing partners such as internet businesses, affinity organizations and national retailers.  InPhonic marketed its services through a variety of online advertising programs including display advertising, search marketing, email marketing and affiliate programs.

CAIS Acquisitions II, a wholly-owned subsidiary of InPhonic, did business under the name VMC Satellite.  Through VMC Satellite, InPhonic marketed consumer digital broadcast satellite television, broadband and VOIP services.  VMC Satellite marketed its services through a portfolio of its own websites, affiliate websites, print advertisement and private labeled websites, as well as through an in-bound call center.

InPhonic's Mobile Virtual Network Enabler ("MVNE") business leveraged the company's e-commerce platform and operational infrastructure to enable communications service providers and consumer brands to offer a branded wireless service to their customers without having to own or operate the underlying wireless network or operational infrastructure. InPhonic's MVNE platform provided a turn-key solution that combined system integration to every major U.S. wireless carrier with enterprise strength billing and customer care solutions.

InPhonic also developed and sold a unified communications service that provided users with a private toll-free number and a professional set of small business messaging services for one monthly fee.  Users had one central location for all of their voicemail, email, faxes, calendar

4

appointments and address books and could manage all of their messages from anywhere by accessing a single message box using any phone or computer.  The platform offered users many voice messaging, fax delivery, conference calling and call routing services integrated into a single application accessible by telephone or computer for a single monthly fee.

All of the Debtors were headquartered in Washington, D.C.  The Debtors maintained technology and operations centers in Largo, Maryland; Reston, Virginia; and Great Falls, Virginia.

## C.    Prepetition Capital Structure and Debt Obligations

InPhonic, a Delaware corporation, is publicly traded on the National Association of Securities Dealers Automated Quotations (NASDAQ: INPC).  InPhonic is the sole member of CAIS, CAIS II, MTS, FON and 1010 Interactive, all of which are Delaware limited liability companies.  InPhonic is also the sole shareholder of SimIPC and Star Number, Inc.,[3] both Delaware corporations.  On November 19, 2004, InPhonic closed an initial public offering of its common stock, which resulted in net proceeds of approximately $108.9 million.

As discussed in more detail below, on November 7, 2006, InPhonic entered into a Credit Agreement (the "Prepetition Credit Agreement") with Goldman Sachs Credit Partners L.P., as Lead Arranger, Lead Bookrunner and Lead Syndication Agent, Citicorp North America, Inc., as Administrative Agent, and the lenders from time to time party thereto (collectively, the "Prepetition Lenders").  On or about October 5, 2007 the Debtors received Notice of a Default under the Credit Agreement for, inter alia, failure to pay interest when due.  On November 2, 2007, the Prepetition Lenders assigned all of their rights, title and interest in, to and under the Prepetition Credit Agreement and related loan documents to Adeptio.

**D.      The Chapter 11 Cases**

Beginning in 2006, several factors caused a rapidly declining cash balance and eventual lack of cash liquidity, including increased spending on marketing that proved to be unprofitable, insufficient improvement in revenue assurance and collection efforts, inability to maintain adequate inventory of the most popular wireless devices, increasing general and administrative expenses and declining gross margin in revenue generated by customer activations.  InPhonic began to address these challenges by proactively reducing overall marketing costs, focusing marketing expenses on the marketing channels that resulted in activations with the highest gross margins, reducing general and administrative expenses and improving collection efforts.  These measures, however, did not result in enough immediate cash liquidity to increase inventory to levels necessary to fill orders for the most popular wireless devices.  The positive effects of the improvements were offset by the revenue lost due to a rapidly increasing number of customer orders that were placed for wireless devices that were "out-of-stock".

On the Petition Date, InPhonic and its wholly-owned corporate and limited liability company subsidiaries:  (a) CAIS Acquisition, LLC, a Delaware limited liability company ("CAIS"); (b) CAIS Acquisition II, LLC, a Delaware limited liability company ("CAIS II"); (c) SimIPC Acquisition Corp., a Delaware corporation ("SimIPC"); (d) Star Number, Inc., a Delaware corporation ("Star Number"); (e) Mobile Technology Services, LLC, a Delaware limited liability company ("MTS"); (f) FON Acquisition, LLC, a Delaware limited liability company ("FON"); and (g) 1010 Interactive, LLC, a Delaware limited liability company ("1010 Interactive"), as debtors and debtors in possession, each commenced these Chapter 11 Cases.

At the same time, the Debtors began evaluating strategic alternatives, and engaged Goldsmith, Agio, Helms Securities, Inc. ("GAH") as their investment banker to advise and assist

Incorporation to change its name to SN Liquidation, Inc.

6

with the evaluation of such alternatives.  GAH immediately commenced due diligence and worked with the Companies to explore various alternatives available to the Debtors.  First, the Debtors made a good faith effort to market their assets to potential buyers other than Adeptio, targeting both strategic and financial buyers.  Second, a marketing book was prepared by GAH and sent to over 30 prospective purchasers.  Based upon those efforts, the Debtors and their investment banker pursued a variety of transactions, including the sale of substantially all of the Debtors' assets.

Although the Debtors and GAH contacted numerous potentially interested parties regarding financing and sales, it became apparent that Adeptio was the most likely potential purchaser of the Debtors' assets and the most likely provider of debtor in possession financing. Accordingly, the Debtors and their advisors approached Adeptio regarding its interest in serving as a "stalking horse" bidder in a bankruptcy court-supervised sale of the Debtors' businesses.  At the same time, the Debtors began to negotiate the terms and conditions of a debtor in possession financing facility with the original Prepetition Lenders.  Adeptio was brought in during the prepetition marketing process, they were not insiders during this process.  The Asset Purchase Agreement was negotiated at arms length, and the Debtors' objective has always been the maximization and preservation of the estate.

To ensure that the Debtors would have sufficient liquidity to fund operations while the Debtors pursued their restructuring objectives, at the outset of the Chapter 11 Cases, the Debtors obtained the Bankruptcy Court's approval of a debtor in possession revolving credit facility that provided for up to $25 million total and $10 million interim financing in the form of the DIP Facility.  The DIP Facility was secured by first priority liens on substantially all of the Debtors' assets, as well as liens on all other assets, junior to existing prepetition liens.  Proceeds from the

7

DIP Facility were used to fund operations during the Chapter 11 Cases. The balance outstanding under the DIP Facility was deemed paid in full with proceeds of the Sale.

Ultimately, the Debtors and their advisors concluded that a going concern sale provided the best overall outcome, and accordingly, on December 13, 2007, the Bankruptcy Court entered an order approving the Sale to the Buyer.

Major creditor groups in the case participated actively in all aspects of the Chapter 11 Cases, including the Sale process. Holders of General Unsecured Claims were represented by the Creditors' Committee. The Creditors' Committee was represented by both legal and financial advisors that they selected (Reed Smith LLP and Deloitte & Touche USA, respectively).

**E.      Sale of Substantially All of the Debtors' Assets**

Pursuant to Bankruptcy Code section 363, and through the Sale Motion, the Debtors sought approval of the sale of substantially all of their assets in order to maximize value to their estates and provide a vehicle to explore any and all restructuring alternatives. Through the Bid Procedures Motion, the Debtors sought approval of the Bid Procedures. Among other things, the requested Bid Procedures Motion set forth procedures regarding the Debtors' solicitation of additional offers in an effort to maximize sale proceeds, culminating in an auction (the "Auction") if any qualified, additional offers were obtained. An order approving the Bid Procedures Motion (the "Bid Procedures Order") was entered on November 9, 2007. Following entry of the Bid Procedures Order, the Debtors received no other qualified, additional offers. Accordingly, pursuant to the Bid Procedures Order, no auction was held, and the Debtors pursued approval of the Asset Purchase Agreement with Adeptio.

On December 10, 2007, pursuant to section 2.5(a) of the APA, the Adeptio submitted to the Debtors, and the Debtors subsequently filed with the Bankruptcy Court, the Notice of

8

Assumption Sale and Assignment of Designated Unexpired Leases and Executory Contracts ("Notice of Designated Contracts"), setting forth certain executory contracts and unexpired leases to which one of the Debtors is a party that, subject to subsequent notice of the Adeptio under Section 2.5 of the APA, Adeptio intended to have assumed and assigned pursuant to section 363 and 365 of the Bankruptcy Code ("Designated Contracts").

At the hearing on the DIP Motion and Sale Motion on December 13, 2007, the Court entered the final orders approving the Sale Motion (the "Final Sale Order") and the DIP Motion (the "Final DIP Order"). The Debtors closed on the Sale on December 21, 2007 (the "Closing Date").

The Final Sale Order authorized the Debtors to assume and assign the Designated Contracts to Adeptio. The Final Sale Order also authorizes Adeptio to direct the Debtors to assume additional contracts and "hold" contracts as follows:

> [t]he Buyer may designate certain unexpired leases or executory contracts as a Held Contract. The Debtors shall hold and not reject each Held Contract for the Contract Retention Period. During the Contract Retention Period, the Buyer may direct the Debtors to assume and assign the Held Contract to the Buyer. As soon as practicable after receiving written notice from the Buyer to assume and assign the Held Contract the Debtors shall take all actions reasonably necessary to assume and assign the Held Contract to Buyer pursuant to Bankruptcy Code §365.

Final Sale Order, ¶30. The Contract Retention Period expires 210 days from the Sale Closing Date on July 18, 2008.

On or around December 21, 2007, the Adeptio assigned to Simplexity, LLC, a Delaware limited liability company and a subsidiary of the Buyer ("Simplexity"), its rights to receive the Assets (as defined in the APA) from the Adeptio under the APA.

On December 31, 2007, pursuant to the Final Sale Order and section 2.5(b) of the APA, Simplexity submitted to the Debtors the Notice of Held Contracts and Additional Designated

9

Contract Notice, setting forth additional designated contracts for assumption and assignment and Held Contracts to be "held" by the Debtors pursuant to the terms of section 2.5(b) of the APA and Final Sale Order.

Since the Closing Date, the Debtors and Adeptio have worked to effectuate various transfers contemplated by the Final Sale Order and the APA and to determine the respective liabilities under such documents. As of the date of this Disclosure Statement, the Bankruptcy Court has entered six orders authorizing the rejection of executory contracts and unexpired leases and five orders authorizing the assumption and assignment of executory contracts and unexpired leases to Adeptio.

**F.    General Structure of the Plan**

On April 14, 2008, the Debtors and the Committee filed the Plan. The Plan is the result of ongoing negotiations with a number of creditors and creditor representatives. The Plan provides for the orderly liquidation of the Debtors' Estates. Because substantially all of their operating assets were sold as part of the Sale, the Plan provides for the formation of Litigation Trust that will administer the remaining Estate Assets and assess the value thereof. These remaining Estate Assets include, but are not limited to, any Causes of Action against the recipients of stock redemption payments and claims, former directors and officers, or otherwise. Those Causes of Action are central to the success of the Plan and the distribution of any value to Holders of General Unsecured Claims.

There are eight (8) distinct legal entities that are being liquidated pursuant to the Plan. The Plan, however, provides for the merger of all of the Debtors' estates into SN Liquidation. To the extent that all of the Estates are merged, on the Effective Date (i) all intercompany claims by, between and among the Debtors shall be eliminated, (ii) all assets and liabilities of the Affiliate Debtors shall be merged or treated as if they were merged with the assets and liabilities

10

of SN Liquidation, (iii) any obligation of a Debtor and all guarantees thereof by one or more of the other Debtors shall be deemed to be one obligation of SN Liquidation, (iv) the Subsidiary Interests shall be cancelled and (v) each Claim filed or to be filed against any Debtor shall be deemed filed only against SN Liquidation and shall be deemed a single claim against and a single obligation of SN Liquidation.

In addition, and to the extent that the Estates are merged on the Effective Date, and in accordance with the terms of the Plan and the consolidation of the assets and liabilities of the Debtors, all Claims based upon guarantees of collection, payment or performance made by the Debtors as to the obligations of another Debtor shall be released and of no further force and effect. The existing common and voting stock of the Debtors shall be cancelled under the Plan, and no distributions are provided for holders of such stock interests or claims based upon or arising from the ownership of such stock.

## G.    Summary of Treatment of Claims and Interests Under the Plan

Certain Classes of Claims are impaired under the Plan and, accordingly, are entitled to vote on the Plan. The Debtors are seeking votes to accept the Plan from holders of Claims in these Classes. The Class of Interests, however, will receive no distribution or benefits under the Plan because all Interests will be extinguished under the Plan. Accordingly, the Class of Interests is deemed to have rejected the Plan.

Estimated Claims amounts for certain Classes are based upon a preliminary analysis by the Debtors and their Professionals of claims filed in the Debtors' Chapter 11 Cases. There can be no assurance that these estimated amounts are correct. The following treatments are possible only if the Plan is approved. The timing of distributions under the Plan, if any, is subject to conditions and determinations described in later sections of this Disclosure Statement.

11

Each Class of Claims and Interests, except Administrative Claims, Priority Tax Claims Trustee Fees, and DIP Financing Facility Claims are placed in the following Classes and will receive the following treatment under the Plan:

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| **Class 1 – Other Secured Creditor Claims** | $-0- | No | On or as soon as reasonably practicable after, the later of: (i) repayment in full and Termination of the Adeptio Loan; (ii) the Distribution Date; (iii) the date such claim becomes an Allowed Other Secured Claim; or (iv) the date such Other Secured Claim becomes payable pursuant to any agreement between the Debtors or Litigation Trustee and the Holder of such Allowed Other Secured Claim, a Holder of a Secured Claim, other than a Secured Lender Claim, shall receive either (i) Cash equal to the amount of the Allowed Other Secured Claim; (ii) the collateral which secures its claim; or (iii) such other treatment as to which the Debtors and the Holder of an Allowed Other Secured Claim agrees on the later of the Effective Date or the date such Claim becomes an Allowed Other Secured Claim. |
| **Class 2 – Non-Tax Priority Claims** | $-0- | No | On or as soon as reasonably practicable after, the latest of: (i) the Distribution Date; (ii) the date such claim becomes an Allowed Priority Non-Tax Claim; or (iii) the date such Priority Non-Tax Claim becomes payable pursuant to any agreement between the Debtors or Litigation Trustee and the Holder of such Allowed Priority Non-Tax Claim, each Holder of an Allowed Priority Non-Tax Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Non-Tax Claim (i) Cash equal to the unpaid portion of such Allowed Priority Non-Tax Claim or (ii) such other treatment as to which the Litigation Trustee and such Holder shall have agreed upon in writing. |

12

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| **Class 3 – Secured Lender Claims** | N/A | Yes | On the Effective Date, pursuant to the Term Sheet and subject to the terms of the Term Sheet, in exchange for and in full satisfaction, settlement, release and discharge of the Secured Lender's Allowed Secured Lender Claim, the Secured Lender shall receive an Allowed Deficiency Claim in the amount of Twenty Million Dollars ($20,000,000), which entitles the Secured Lender to a Pro Rata share of the interests in the Litigation Trust Interests to be distributed to the Holders of Allowed General Unsecured Claims in Class 4. |
| **Class 4 – General Unsecured Claims** | $350,718,352 | Yes | Each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Litigation Trust Interests, which shall entitle the holder of a Litigation Trust Interest to its Pro Rata share of any distributions (up to the amount of such holder's Allowed General Unsecured Claim) made by the Litigation Trust after satisfaction in full and Termination of the Adeptio Loan, all Liquidation Expenses, unpaid Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims. Distributions on Litigation Trust Interests shall be made in accordance with and pursuant to the Litigation Trust Agreement and shall be made by the Litigation Trust at such times and in such amounts as the Litigation Trustee, after consultation with the Litigation Trust Committee, shall determine. |
| **Class 5 – Intercompany Claims** | N/A | Yes | On the Confirmation Date or such other date as may be set by an order of the court, but subject to the occurrence of the Effective Date, all Intercompany Claims shall be deemed expunged and extinguished. The Holders of Intercompany Claims shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Claims. Class 5 is deemed to have rejected the Plan and, therefore, Holders of |

13

| Class Description | Estimated Amount of Allowed Claims | Impaired | Treatment |
|---|---|---|---|
| | | | Intercompany Claims are not entitled to vote to accept or reject the Plan. |
| **Class 6 -- Equity Interests** | N/A | Yes | On the Effective Date, all Equity Interests shall be canceled and each Holder thereof shall not be entitled to, and shall not receive or retain any property or interest in property on account of, such Equity Interests. Class 6 is deemed to have rejected the Plan and, therefore, Holders of Equity Interests are not entitled to vote to accept or reject the Plan. |

14

**H.      Acceptance or Rejection of the Plan**

In accordance with Bankruptcy Code section 1124, Holders of Claims in Classes 1 and 2 are not Impaired by the Plan.  Under Bankruptcy Code section 1126(f), each Holder of a Claim in Classes 1 and 2 is presumed to have accepted the Plan, and the votes of such Claim Holders will not be solicited.

Holders of Claims in Class 5 and Holders of Interests in Class 6 are not entitled to receive or retain any property under the Plan.  Under Bankruptcy Code section 1126(g), Class 5 Claim Holders and Class 6 Interest Holders are deemed to reject the Plan, and the votes of such Claim or Interest Holders will not be solicited.

As a result, only the votes of Holders of Claims in Classes 3 and 4 will be solicited with respect to the Plan.  Thus, in accordance with Bankruptcy Code section 1126(c) and except as provided in Bankruptcy Code section 1126(e), an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of Classes 3 and 4 that have timely and properly voted to accept or reject the Plan.

## ARTICLE II

### HISTORY, OPERATIONS AND STRUCTURE OF THE DEBTORS

**A.      Introductory Note**

As detailed more fully herein, on December 13, 2007, the Bankruptcy Court approved the sale of substantially all of the Debtors' assets to Adeptio.  Subsequently, on or about December 21, 2007, Adeptio assigned to its subsidiary, Simplexity, the rights to receive the Assets from the Sellers under the Agreement and Final Sale Order.  After the Closing Date of the Sale, the Debtors' operations ceased, and the Debtors began the process of winding down their Estates,

15

assessing their liabilities, and liquidating their remaining assets. A description of the Debtors' history, structure, and business practices is provided to help understand and analyze the Plan.

**B.     The Company**

InPhonic was incorporated in 1997 and began operations in 1999. InPhonic's business principally involved the marketing of wireless telephone and satellite television services and related equipment and support services. InPhonic focused its business in four (4) areas: (a) wireless device activation services, (b) television satellite activation services, (c) MVNE services, and (d) unified communication services.

InPhonic was a leading internet (online) seller of wireless services and devices to consumers. InPhonic sold these services and devices through company owned and branded websites, including without limitation www.wirefly.com, as well as through a variety of private labeled websites that it developed and managed for marketing partners such as internet businesses, affinity organizations and national retailers.

InPhonic marketed its services through a variety of online advertising programs including display advertising, search marketing, email marketing and affiliate programs. InPhonic's website www.wirefly.com, a leading one-stop shopping site for mobile phones and wireless plans, was awarded "Best of the Web" by Forbes magazine and "Best in Overall Customer Experience" by Keynote Performance Systems.

InPhonic also marketed its services through its partners' private label websites which InPhonic created to leverage its partners' brands and their existing customer relationships. InPhonic private-labels customer touch points to the partners' brands, including the web storefront, customer communications (such as call centers and in-box collateral) and device packaging.

16

CAIS Acquisitions II, a wholly-owned subsidiary of InPhonic, did business under the name VMC Satellite. Through VMC Satellite, InPhonic marketed consumer digital broadcast satellite television, broadband and VOIP services. VMC Satellite marketed its services through a portfolio of its own websites, affiliate websites, print advertisement and private labeled websites, as well as through an in-bound call center.

InPhonic's Mobile Virtual Network Enabler, "MVNE," business leveraged the company's e-commerce platform and operational infrastructure to enable communications service providers and consumer brands to offer a branded wireless service to their customers without having to own or operate the underlying wireless network or operational infrastructure. InPhonic's MVNE platform provided a turn-key solution that combined system integration to every major U.S. wireless carrier with enterprise strength billing and customer care solutions.

InPhonic developed and sold a unified communications service that provided users with a private toll-free number and a professional set of small business messaging services for one monthly fee. Users had one central location for all of their voicemail, email, faxes, calendar appointments and address books and could manage all of their messages from anywhere by accessing a single message box using any phone or computer. The platform offered users many voice messaging, fax delivery, conference calling and call routing services integrated into a single application accessible by telephone or computer for a single monthly fee.

InPhonic had agreements with the largest wireless carriers in the U.S., as well as large satellite, broadband and VOIP providers, to market their products and services. InPhonic also had agreements with thousands of affiliate and marketing partners that marketed Debtors products and services under their brands through private-label websites that InPhonic created and managed and/or their websites.

17

All of the Debtors were headquartered in Washington, D.C.  The Debtors maintain technology and operations centers in Largo, Maryland; Reston, Virginia; and Great Falls, Virginia.

## C.    Prepetition Capital Structure of Debtors

### 1.    Prepetition Credit Agreement and Amendment

On November 7, 2006, InPhonic entered into a Credit Agreement (the "Prepetition Credit Agreement") with Goldman Sachs Credit Partners L.P., as Lead Arranger, Lead Bookrunner and Lead Syndication Agent, Citicorp North America, Inc., as Administrative Agent, and the lenders from time to time party thereto (collectively, the "Prepetition Lenders").  InPhonic is the borrower under the Prepetition Credit Agreement, and each of the other Debtors is a guarantor of InPhonic's obligations to the Prepetition Lenders.

The Credit Agreement provided for a $100 million aggregate principal amount senior secured term loan bearing a fixed interest rate of nine percent (9%) per annum.  The term loan was secured by substantially all of InPhonic's assets and matures in November 2011.  InPhonic pledged the stock and membership interests of each of the other Debtors to further secure its obligations under the Credit Agreement.

As additional consideration, InPhonic granted the Prepetition Lenders warrants (the "Warrants") to purchase an aggregate of 1,250,000 shares of InPhonic common stock at an exercise price of $0.01 per share.  The Warrants would have expired on November 7, 2011.  The Warrants were issued in reliance on the exemptions provided for in Section 4(2) of the Securities Act relating to sales not involving any public offering.

InPhonic received $75 million of the term loan proceeds on November 8, 2006 and had the option to draw the remaining amount within 90 days.  The Prepetition Credit Agreement contained affirmative and negative covenants, including financial covenants and covenants

18

restricting indebtedness, liens, investments, asset transfers and distributions. After November 2009, InPhonic had the ability to repay principal on the term loan without penalty and, conversely, the Prepetition Lenders had the right to call the remaining outstanding principal of the term loan without penalty.

In connection with the Prepetition Credit Agreement, InPhonic terminated a loan facility with Comerica Bank and used a portion of the proceeds from the term loan to repay the outstanding principal obligation of $19.9 million plus accrued interest under the Comerica facility.

On August 8, 2007, InPhonic entered into an amendment to the Prepetition Credit Agreement (the "Amendment"), pursuant to which the Delayed Draw Lender (as defined in the Amendment) loaned InPhonic an aggregate amount of $15 million. The Amendment also reduced the total loan commitment from $100 million to $90 million and the Delayed Draw Lender's Delayed Draw Commitment (as defined in the Amendment) from $25 million to $15 million. The Amendment also required InPhonic to issue immediately exercisable warrants to the Lenders to purchase 800,000 shares of InPhonic's common stock at a price of $0.01 per share. On or about October 5, 2007 the Debtors received Notice of a Default under the Credit Agreement for inter alia failure to pay interest when due.

On November 2, 2007, the Prepetition Lenders assigned all of their right, title and interest in, to and under the Prepetition Credit Agreement and related loan documents to Adeptio.

### 2.    Corporate Structure of Debtors

InPhonic, a Delaware corporation, is publicly traded on the National Association of Securities Dealers Automated Quotations (NASDAQ: INPC). InPhonic is the sole member of CAIS, CAIS II, MTS, FON and 1010 Interactive, all of which are Delaware limited liability

companies. InPhonic is also the sole shareholder of SimIPC and Star Number, both Delaware corporations.

On November 19, 2004, InPhonic closed an initial public offering of its common stock, which resulted in net proceeds of approximately $108.9 million. Inphonic's last Form 10-K was filed for the fiscal year ending December 31, 2006 and the last Form 10-Q was filed for the quarter ending June 30, 2007. The Debtors are currently in discussions with the Staff of the SEC regarding either filing a Form 15 Certification and Notice of Termination of Registration Under Section 12(g) of the Securities Exchange Act of 1934 or Suspension of Duty to File Reports Under Section 13 and 15(d) of the Securities Exchange Act of 1934 or a consent to revocation of registration of securities pursuant to Section 12(j) of the Securities Exchange Act of 1934 prior to confirmation of the Plan.

## ARTICLE III

## CHAPTER 11 CASES

A.     **Lack of Liquidity and Events Leading to Chapter 11 Cases**

Beginning in 2006, several factors caused InPhonic to experience a rapidly declining cash balance and eventual lack of cash liquidity, including increased spending on marketing that proved to be unprofitable, insufficient improvement in revenue assurance and collection efforts, inability to maintain adequate inventory of the most popular wireless devices, increasing general and administrative expenses and declining gross margin in revenue generated by customer activations.

InPhonic began to address these challenges by proactively reducing overall marketing costs, focusing marketing expenses on the marketing channels that resulted in activations with the largest gross margins, reducing general and administrative expenses, and improving collection efforts. These measures, however, did not result in enough immediate cash liquidity

{BAY:00815667;v618}

to increase inventory to levels necessary to fulfill orders for the most popular wireless devices. The positive effect of the improvements were offset by the revenue lost due to rapidly increasing number of customer orders that were placed for wireless devices that were "out-of-stock."

**B.      Necessity of, and Reasons for, Chapter 11 Filings**

Prior to filing these Chapter 11 Cases, the Debtors were involved in a multitude of litigation.  On May 7 and 18, 2007, two putative federal securities law class actions were filed in the United States District Court for the District of Columbia on behalf of persons who purchased InPhonic common stock between August 2, 2006 and May 3, 2007.  These substantially similar lawsuits asserted claims pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, against InPhonic, its chief executive officer and its chief financial officer.  These claims related to InPhonic's April 3, 2007, and May 4, 2007, announcements concerning the restatement of certain previously issued financial statements.

Moreover, fifteen related putative federal court class actions have been filed against the Debtors arising out of InPhonic-sponsored rebate offers for online purchases of wireless telephones. Several of those lawsuits also named either InPhonic's current or former third-party rebate processor as a defendant.  On October 25, 2006, the Judicial Panel on Multidistrict Litigation ("JPML") granted the Debtors' motion to consolidate the federal court actions in the United States District Court for the District of Columbia before the Honorable Ellen Segal Huvelle.  The consolidated amended class action complaint alleges, among other things, that the Debtors and their current or former third-party rebate processor (depending on the particular claim) violated the consumer protection laws of various States, various D.C. state laws and the federal RICO (anti-racketeering) statute in connection with our disclosure and implementation of the terms and conditions of rebate offers. The class action plaintiffs seek compensatory damages

21

and/or restitution, statutory penalties and treble damages under D.C. consumer protection laws and RICO, attorneys' fees and punitive damages, as well as injunctive relief.

On April 27, 2007, InPhonic and the Federal Trade Commission (FTC) announced that they had entered into a consent agreement in which InPhonic agreed to clearly and prominently disclose certain information regarding its rebate offers, such as when consumers can expect to receive their rebates, any time period that consumers must wait before submitting a rebate request, and certain information that would disqualify a consumer from receiving a rebate. InPhonic also agreed to provide rebates within time frames and under terms and conditions reasonably specified by InPhonic in its communications with its customers.  InPhonic further agreed to provide rebates to certain customers whom had previously been denied them.

On February 15, 2007, InPhonic reached a final settlement with the District of Columbia Attorney General's Office concerning the Debtors' use of mail-in rebates.

On August 5, 2004, Avesair, Inc.  ("Avesair") filed suit against InPhonic in the Superior Court of North Carolina demanding, among other matters, that InPhonic issue to Avesair certain shares of common stock pursuant to an asset purchase agreement between InPhonic and Avesair. On October 16, 2007 the court granted Avesair's motion for summary judgment entitling Avesair to recover $3,999,999 worth of the common stock of InPhonic as damages for InPhonic's breach of the terms of the asset purchase agreement between InPhonic and Avesair.

InPhonic was also the subject of prepetition litigation with certain of its vendors, including without limitation, the following cases:

(a)  PeopleSupport, Inc.  ("PeopleSupport") filed an action in the Superior Court of California for breach of contract and other common counts against InPhonic and its subsidiary StarNumber seeking $114,109 plus interest and costs and attorneys fees.

(b)  Amazon Services LLC ("Amazon") filed an action in the Superior Court of Washington, King County, for breach of contract and other common

22

counts against InPhonic seeking $1,100,000 plus interest and costs and attorneys fees.

(c)     Ferron filed a lawsuit against Echostar Satellite Corporation ("Echostar") and certain of its retailers, including InPhonic's subsidiary, CAIS Acquisitions II, LLC (d/b/a VMC Satellite) in the United States District Court for the Southern District of Ohio, Case No. 2:06CV453, alleging certain violations of Ohio consumer protection laws related to the content and distribution of certain e-mails marketing Echostar services.

(d)     Microsoft Online, L.P. d/b/a MSN filed an action in the Superior Court of Washington, King County, for breach of a certain agreement alleging InPhonic owes $9,705,631.51

(e)     ProLink Communications, LLC ("ProLink"), a provider of consulting services to InPhonic, filed an action in the Superior Court of the District of Columbia alleging that InPhonic breached its obligations under a certain Master Services Agreement and seeks $472,959 from InPhonic.

(f)     X Prize Foundation, Inc.("X Prize") filed an action against InPhonic in the Superior Court of California, Los Angeles County, for breach of a certain agreement alleging that InPhonic owes an amount not less than $500,000.

(g)     M. Arthur Gensler Jr. & Associates filed an action against InPhonic in the Superior Court for the District of Columbia asserting claims for breach of contract.

Given the Debtors' financial condition and lack of liquidity, compounded by a plethora of litigation and the operational and other circumstances set forth above, the Debtors commenced these Chapter 11 Cases to, among other things, use the section 363 sale process as a means to maximize the Estates' value and provide the Estates with a vehicle to explore any and all of their restructuring alternatives.

## C.     Continuation of Business; Stay of Litigation

On November 8, 2007, the Debtors filed voluntary petitions for relief under Chapter 11 of title 11 of the United States Code in the Bankruptcy Court. The cases (case numbers 07-11666 through 07-11673) were assigned to the Honorable Kevin Gross.

23

Since the Petition Date, the Debtors have continued to operate as debtors in possession subject to the supervision of the Bankruptcy Court and in accordance with the Bankruptcy Code. Under the Bankruptcy Code, the Debtors are required to comply with certain statutory reporting requirements, including the filing of monthly operating reports. As of the date hereof, the Debtors have complied with such requirements. The Debtors are authorized to operate their businesses in the ordinary course of business, with transactions out of the ordinary course of business requiring Bankruptcy Court approval.

An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors. This relief provides the Debtors with the "breathing room" necessary to assess and reorganize their business. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of a plan of liquidation.

1.    The Adversary Proceeding Against Icon International, Inc.

On February 15, 2008, the Debtors commenced an adversary proceeding (the "Adversary Proceeding") against Icon International, Inc. ("Icon") seeking (1) a declaratory judgment that Icon violated the automatic stay by commencing and prosecuting a civil action against non-debtor defendants who are former officers of the Debtors (the "Individual Defendants") pending in the United States District Court for the District of Columbia captioned *Icon International, Inc. v. David A. Steinberg, et al.* (the "Icon Action"); and (2) an injunction against Icon's further prosecution of the Icon Action. In the Icon Action, Icon seeks money damages for alleged fraud

24

and negligent misrepresentation arising out of the Individual Defendants' roles in a financing

transaction.

After briefing, oral argument and letter submissions, on June 2, 2008, the Bankruptcy

Court granted the Debtors' motion for a preliminary injunction to enjoin the Icon Action.  In the

Opinion filed by the Court on June 2, 2008, the Bankruptcy Court found as follows:

> The Debtors have three insurance policies which may provide coverage for the Icon Action and the class actions described herein.  The coverage totals approximately $35 million, after defense costs.
>
> The Debtors' three insurance policies in effect during the time Icon's claims arose (the "Insurance") are as follows:
>
> (1)      (1)——AIG (National Insurance Company) Limit of Liability: $10,000,000.  Combined Coverage available to directors, officers and Debtors ("Primary Policy").
>
> (2)      (2)——CNA (Continental Casualty Company) Limit of Liability: $10,000,000.  Excess Coverage available to Debtors ("CNA Excess Policy").
>
> (3)      (3)——XL Specialty Insurance Company Limit of Liability: $15,000,000.  Second Payer of excess coverage available to directors and officers ("XL Excess Policy").
>
> The Primary Policy contains two coverages.  Coverage A protects any "insured person" (defined as an executive) except when and to the extent the "Organization" (i.e. the Debtors) have indemnified the Insured Person.  Coverage B protects the Debtors but only for securities claims.  Coverage B also covers the Debtors for losses incurred from indemnifying an Insured Person . . . The excess policies follow form to the Primary Policy.  The CNA Excess Policy is also property of the Debtors' estate. . . .
>
> By letter, dated January 11, 2008, the Individual Defendants asserted indemnification claims against the Debtors for their costs and expenses to defend themselves in the Icon Action.  Debtors' by-laws provide for indemnification if the officer or directors acted in good faith and in a manner reasonably believed to be in the Debtors' best interest.

25

Opinion Dated June 2, 2007 at pp. 4-5.

On June 12, 2008, Icon filed the Motion to Amend and/or Make Additional Findings of Fact and Conclusions of Law and for New Trial regarding the Opinion. Briefing on this motion is not yet completed. Trial of the Adversary Proceeding has not yet been scheduled. The Committee sought authority to intervene in the Adversary Proceeding on June 26, 2008.

The indemnification claims asserted by the Individual Defendants put the Estate Assets at risk because there are finite proceeds available to multiple litigation claimants, and there is a risk that indemnity payments to directors and officers will result in insufficient coverage available to the Estates. *See* IV.C.5.a.ii. The automatic stay provision of Bankruptcy Code section 362 applies to the Icon Action pursuant to Article XI.L of the Plan.

**D.     First Day Orders**

During the first day hearing (the "First Day Hearing") held in these Chapter 11 Cases, the Debtors filed numerous motions seeking immediate relief. As a result, the Bankruptcy Court entered numerous "first day orders." First day orders are intended to facilitate the transition between a debtor's prepetition and post-petition business operations by approving certain regular business practices that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court. Many of the first day orders obtained in these cases are typical for large Chapter 11 cases.

The first day orders in the Chapter 11 Cases, include, but are not limited to, the following Orders:

    (a)    Granting Joint Administration of the Chapter 11 Cases

    (b)    (I) Prohibiting Utility Providers From Altering, Refusing or Discontinuing service to Debtors, (II) Deeming Utilities Adequately Assured of Future Performance, And (III) Establishing Procedures for Adequate Assurance of Future Performance;

26

(c)    Approving Motion for (I) Bid Procedures Relating to Sale of Substantially All of the Debtors' Assets; (II) Scheduling a Hearing to Consider the Sale and Approving the Form and Matter of Notices; (III) Establishing Procedures Relating to Assumption and Assignment of Certain Contracts, Including Notice of Proposed Cure Amounts, (IV) Approving Expense Reimbursement Provision, and (V) Granting Related Relief Filed;

(d)    Authorizing Payment of Prepetition (I)Wages, Salaries and Other Compensation of Employees and Subcontractors, (II) Employee Medical and Similar Benefits, (III) Reimbursable Employee Expenses, and (IV) Other Miscellaneous Employee Expenses and Benefits;

(e)    Authorizing (I) Continued Use of Existing Cash Managements System, (II) Maintenance of Existing Bank Accounts, (III) Continued Use of Existing Checks and Business Forms, and (IV) Continued Use of Existing Investment Guidelines;

(f)    Authorizing and Approving, on an Interim Basis (I) Postpetition Financing; (II) Granting Liens, and Security Interests and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of Cash Collateral and Affording Adequate Protection; (IV) Modifying Automatic Stay; and (V) Scheduling Final Hearing;

(g)    Authorizing Debtors to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue their Customers Programs and Practices in the Ordinary Course of Business;

(h)    Authorizing Payment of Prepetition Trust Fund Taxes in the Ordinary Course of Business;

(i)    Authorizing and Approving the Appointment of the BMC Group, Inc. As Noticing, Claims, and Voting Agent For the Bankruptcy Court.

**E.    Debtor in Possession Financing**

To ensure that they would have sufficient liquidity to conduct their businesses during the Chapter 11 Cases, the Debtors determined that it was in the best interests of the Debtors and their creditors to obtain a commitment for debtor in possession financing (the "DIP Funding"). Accordingly, as discussed above, at the outset of these cases, the Debtors sought and obtained interim authority to enter into the DIP Facility with Adeptio (the "Interim DIP Order"). The DIP Lender was the same financial institution that held the Prepetition Term Loan. Final authority to

27

enter into the DIP Facility was granted by the Bankruptcy Court on December 13, 2007 (the "Final DIP Order").

The DIP Facility provided for secured post-petition financing from the DIP Lenders in the aggregate amount of approximately $25 million (consisting of a $56 million DIP Term Loan and a $47 million Revolving DIP Facility). Under the terms of the DIP Facility, to secure the repayment of the borrowing and all other obligations arising under the DIP Facility, the Debtors granted the DIP Lenders first priority senior priming liens on substantially all of their assets, junior only to other valid liens existing on the Petition Date. Obligations under the DIP Facility were also granted "superpriority" claim status under Bankruptcy Code section 364(c)(1), meaning they had priority over all other administrative expenses.

The liens and claims granted to the DIP Lenders were subject to the fees and expenses of the Office of the United States Trustee under 28 U.S.C. § 1930 and the Clerk of the Bankruptcy Court, as well as a carve-out for fees and disbursements of the Debtors' professionals and the Creditors' Committee's professionals incurred after an event of default under the DIP Facility. The DIP Facility also contained covenants, representations and warranties, events of default, and other terms and conditions typical of credit facilities of a similar nature. All obligations under the DIP Facility were satisfied by the terms of the Sale.

F.    **Appointment of Creditors Committee**

On November 16, 2007, the United States Trustee for the District of Delaware pursuant to Bankruptcy Code section 1102(a), appointed certain entities to the Official Committee of Unsecured Creditors of the Debtors (the "Committee"). The Members of the Committee included:

(a)    JBR Media Ventures, LLC.

(b)    Google Inc.

28

(c)    Infinite Computer Solutions, Inc.

(d)    Yahoo!, Inc.

(e)    ACN Communications Services, Inc.

{BAY:00815667;v618}

**G.      The Committee's Objections to Sale Motion and Relief Requested**

The Committee objected to approval of the Sale Motion and DIP Motion.  In addition, the

Committee filed various motions (collectively, the "Committee Motions") contesting the relief

sought in these bankruptcy cases including, but not limited, to:

(a)      Motion of the Official Committee of Unsecured Creditors for an Order (i) Dismissing (or Converting) Debtors' Bankruptcy Cases Pursuant to Section 1112(b) of the Bankruptcy Code or, Alternatively, (ii) Compelling the Trustee to Abandon Fully-Encumbered Estate Property Pursuant to Section 554(b) of the Bankruptcy Code;

(b)      Objection of the Official Committee of Unsecured Creditors to the Motion of Debtors for an Order Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code and Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (I) Authorizing the Sale of Substantially All of their Assets; (II) Approving an Asset Purchase Agreement, Subject to Higher and Better Offers; (III) Approving the Assumption and Assignment of Certain Executory Contracts, and Unexpired Leases; and (IV) Granting Related Relief (the "Committee Objection"); and

(c)      Emergency Motion of the Official Committee of Unsecured Creditors for an Order (I) Postponing the Sale Hearing Currently Scheduled for December 13, 2007, and (II) Extending the Investigation Period.

**H.      Resolution of Objections to the Sale**

At the hearing on the DIP Motion and Sale Motion on December 13, 2007, after intensive

discussions, the Committee, the Debtors, and Adeptio reached a global settlement on the

Committee's various objections and motions, including the Committee Motions, allowing for

entry of final orders approving the Sale Motion (the "Final Sale Order") and the DIP Motion (the

"Final DIP Order").  The settlement is reflected in the term sheet (the "Term Sheet") that was

approved and incorporated into the December 13, 2007 Final Sale Order.

The salient provisions of the Term Sheet are that upon closing of the APA, Adeptio will:

(a)      Professional Fee Payments.  Upon allowance or other court authorization, pay all professional fees accrued through the confirmation, up to the aggregate amount budgeted for such fees in the DIP budget from the filing date through confirmation of a plan (to the extent not previously paid by

30

the debtor from DIP funds) (the "Professional Funding"). For the avoidance of doubt, and notwithstanding the foregoing, the aggregate amount paid by Adeptio on account of the Professional Funding shall not exceed $1,100,000;

(b)    Investigation, Litigation and Wind Down Funding. Fund (i) the administrative costs of maintaining the Debtors' estates post closing in the amount of $200,000 ("Wind Down Funding") and (ii) the costs of professional fees necessary to investigate the viability of avoidance actions and other litigation claims and commence and prosecute such litigation if appropriate that the Debtors' estates through a Litigation Trust may possess through a senior secured loan (which shall accrue interest as ruled by the Court) of up to a total $500,000, in accordance with the terms set forth below (the "Investigation Funding") which amount shall be repaid from first proceeds paid to the Litigation Trust;

(c)    Deficiency Claim. Adeptio shall have an allowed deficiency claim of $20,000,000 on account of its prepetition secured claim;

(d)    Priority Claims. Upon confirmation of a chapter 11 plan, contribute up to a total $500,000 solely for the purpose of making distributions under such plan on account of allowed priority claims as such claims become allowed pursuant to the terms and conditions of section 1129(a)(9) of the Bankruptcy Code (the "Priority Claims Funding").

   (i)     The Estates' retention of Claims against certain individuals and parties (whether or not an officer of director) with an on-going, post-closing business relationship with the Debtors' post-closing business, which are considered Purchased Assets under the APA

   (ii)    In connection with the purchase of Avoidance Actions or litigation claims purchased under the APA, Avoidance Actions against the putative defendants shall be deemed released as of the closing of the sale under the APA.

   (iii)   The Committee's investigation period shall be deemed to have expired on December 13, 2007, and Adeptio shall be deemed to have a valid, first priority secured claim against the Debtors' estates and shall be released from any and all claims as of the sale closing.

(e)    Retained Litigation Claims. The Debtors' estates shall retain Excluded Assets, as set forth and defined in the APA, including Excluded Avoidance Actions and excluded litigation claims (including claims against individuals and parties with no on-going, post-closing business relationship) and the Debtors shall promptly seek to abandon/waive all section 547 preference claims. These claims include those set forth in the

31

Notice of Circumstances sent by the Debtors on November 29, 2007 to its respective Directors and Officers liability insurance carriers it being understood that such claims do not include claims against individuals and parties (whether or not an officer or director) with an on-going, post-closing business relationship with the Debtors' post-closing business, which claims are considered Purchased Assets under the APA.

(f)   <u>Assumed Liabilities</u>.  Adeptio shall assume the following liabilities, as set forth in the APA (all as defined in the APA): Cure Costs under Designated Contracts and the Assumed Liabilities.  It is understood that the Assumed Liabilities include Adeptio's obligations in connection with the GAH Fee which shall be allowed in the amount of $1,300,000 inclusive of amounts paid to GAH to the date of closing, which such obligations are in addition to the Professional Funding.

(g)   <u>No Further Obligations</u>.  It is expressly understood that Adeptio has no obligation to the Debtors' or their estates other than under

   (i)    the DIP Facility;

   (ii)   the APA;

   (iii)  the Wind Down Funding;

   (iv)   the Professional Funding;

   (v)    the Investigation and Litigation Funding; and

   (vi)   the Priority Claims Funding.

(h)   <u>Purchased Actions</u>.   In connection with the purchase of Avoidance Actions or litigation claims purchased under the APA, Avoidance Actions against the putative defendants shall be deemed released as of the closing of the sale under the APA.

(i)   <u>Final Settlement</u>.  This settlement shall be a final, unconditional settlement between Adeptio, the Official Committee of Unsecured Creditors, and the Debtors, with no investigation or other contingencies.

(j)   <u>Reservation of Rights and No Amendment</u>.  The APA, the DIP Facility, and the prepetition secured loan facility remain in full force and effect, with no amendment or modification whatsoever, and Adeptio fully reserves all rights thereunder.

I.      **Other Material Relief Obtained During the Chapter 11 Cases**

In addition to the first day relief sought in these Chapter 11 Cases, the Debtors have sought authority with respect to a multitude of matters designed to assist in the administration of the Chapter 11 Cases and to maximize the value of the Debtors' Estates.  Documents relating to these various forms of relief can be obtained from the Debtors' closing and notice agent, The BMC Group, Inc. at www.bmcgroup.com/inphonic.

J.      **Summary of Claims Process and Bar Date**

1.      **Schedules and Statements of Financial Affairs**

The Debtors filed Schedules of Assets and Liabilities and Statements of Financial Affairs (collectively, the "Schedules and Statements") with the Bankruptcy Court on November 9, 2007. Among other things, the Schedules and Statements set forth the Claims of known creditors against the Debtors as of the Petition Date, based upon the Debtors' books and records.   On February 8, 2008, the Debtors amended their schedules and statements to, among other things, more accurately reflect the universe of known and potential claims and liabilities.

a.      **Claims Bar Date and Proofs of Claim**

The Bankruptcy Court:  (a) set March 21, 2008 (the "General Bar Date") at 4:00 p.m., Prevailing Eastern Time, as the last date and time by which those parties who believe that they hold claims against the Debtors ("Bar Date"), with the exception of those parties having a claim stemming from rejection of a contract subject to the Rejection Bar Date or governmental entities (as defined in the Bankruptcy Code), must file proofs of claim on account of such claims or be forever barred from asserting such claims; (b) set the Bar Date, for any claim resulting from the rejection of an executory contract or unexpired lease (a "Rejection Claim"), thirty (30) days from entry of the order authorizing rejection of the contract or lease underlying such claim or such other date as ordered (the "Rejection Bar Date"); (c) set the Bar Date, for claims by

33

governmental entities, as set forth in Bankruptcy Code section 502(b)(9), as May 6, 2008 (the "Governmental Bar Date").

The register of Claims asserted against the Debtors will be available for review during normal business hours at the offices of the Debtors claims agent identified above as well as by reviewing the links for Filed Claims on the BMC Website.

## K.    The Sale

As stated above, during the Chapter 11 Cases, the Debtors pursued a sale of substantially all of the Debtors' operating assets in an effort to maximize the value of their businesses for the benefit of the Debtors' creditor constituencies. The Debtors, in conjunction with GAH explored various possible sale opportunities and determined that a sale to Adeptio for a credit bid of $50,000,000 was the best and most feasible possible course of action, subject to higher and better offers. As detailed below, the sale was approved by the Bankruptcy Court on December 13, 2007 and closed on December 21, 2007.

## L.    Retention of Wind Down/Post-Closing Specialist

The Debtors lost all of their employees after the sale of their assets to Adeptio and Simplexity. On January 31, 2008, in order to avoid the resignation of the sole remaining director without any replacement, the remaining director appointed Joseph Myers to fill a vacant seat on the board of INP Liquidation Corp. f/k/a InPhonic, Inc. and subsequently resigned. Shortly thereafter, on February 21, 2008, Mr. Myers appointed Joseph Pardo, a person entirely independent from CTG, to the board of directors of INP Liquidation Corp., and thereafter, Joseph Myers resigned. The remaining debtor affiliates are wholly-owned subsidiaries of INP Liquidation Corp., and the Debtors appointed Mr. Pardo to serve as a director or manager or other authorized person, to the extent the entities are limited liability companies, for the affiliated

34

debtors. As director of INP Liquidation Corp., Mr. Pardo retained CTG and Myers as Chief Wind-Down Officer for the Debtors.

## ARTICLE IV

## SUMMARY OF PLAN OF REORGANIZATION

**A.     Treatment of Claims and Interests**

    **1.     Unclassified Claims**

        **a.     Administrative Claims**

Except as otherwise provided herein, and subject to the requirements of the Plan, APA Final Sale Order and Term Sheet, on, or as soon as reasonably practicable after the later of (i) the repayment in full and Termination of the Adeptio Loan, (ii) the Distribution Date or (iii) the date such Administrative Claim becomes an Allowed Administrative Claim, a Holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of the Face Amount of such Allowed Administrative Claim or (b) such other treatment as to which such Holder and the Debtors and shall have agreed upon. All unpaid Allowed Administrative Claims shall be paid interest from the Effective Date to the date of distribution the published L.I.B.O.R. rate of interest plus 4%.

Allowed Administrative Claims total an estimated $1,800,000. Of that total, $700,000 in Allowed Administrative Claims remain unpaid. Currently, the Estates do not have sufficient cash to make a distribution to Holders of Allowed Administrative Claims. The payment of unpaid Allowed Administrative Claims will be funded by the proceeds, if any, of any Litigation or Causes of Action commenced by the Committee or Litigation Trust.

Subject to repayment in full and Termination of the Adeptio Loan, proceeds, if any, once recovered by the Litigation Trust will be used to pay Allowed Administrative Claims with

interest as provided above.  If there are insufficient proceeds to pay the Holders of the unpaid Allowed Administrative Claims, such Holders will receive a Pro Rata distribution and distributions thereafter from the Litigation Trust to the extent the proceeds are available until fully paid, before which there shall be no distributions to Holders of General Unsecured Claims on account of such claims.  The Plan may be confirmed only if the Holders of unpaid Administrative Claims consent to such treatment.  If Holders of unpaid Administrative Claims do not object to the Plan, they are deemed to consent to the treatment proposed herein upon entry of an order confirming the Plan.

### b.    Priority Tax Claims

On, or as soon as reasonably practicable after, the latest of (i) the Distribution Date; (ii) the date such claim becomes an Allowed Priority Tax Claim, or (iii) the date such Allowed Priority Tax Claim becomes payable pursuant to any agreement between the Litigation Trustee and each Holder of an Allowed Priority Tax, each Holder of such Allowed Priority Tax Claim shall receive on account of such Allowed Priority Tax Claim, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Priority Tax Claim, (a) Cash equal to the unpaid portion of such Allowed Priority Tax claim or (b) such other treatment as to which the Allowed Priority Tax Claim Holder and the Litigation Trustee shall have agreed in writing. Adeptio contends that payment of Allowed Priority Tax Claims should occur only after the occurrence of the above conditions and the repayment in full and Termination of the Adeptio Loan.  The Debtors contend that the Term Sheet does not require repayment in full and Termination of the Adeptio Loan prior to payment of Allowed Priority Tax Claims.  The Plan is a compromise of such claims.

The Debtors estimate that the Allowed Priority Tax Claims will not exceed $500,000.  To the extent that Allowed Priority Tax Claims and Allowed Priority Non-Tax Claims exceed

36

$500,000, the Holders of Allowed Priority Tax Claims shall receive their Pro Rata share of such differential, which shall be paid by the Litigation Trust in regularly quarterly distributions over the time period set forth 1129(a)(9)(C)(ii) to the extent the Litigation Trust contains sufficient Cash.  In the event an Allowed Priority Tax Claims is not paid on the Distribution Date, the Holders thereof will be paid interest on such Priority Tax Claim accruing from the Distribution Date to the date of actual distribution at the ~~United States Treasury's current~~ interest rate ~~for bankruptcy tax claims~~set forth in 26 U.S.C. §§ 6621 and 6622 as of the ~~Distribution~~Effective Date.  Adeptio shall make available up to $500,000 solely for the purpose of making distributions on account of Allowed Priority Claims; provided, however, that Adeptio shall make payments on account of Allowed Priority Claims only to the extent such claims are allowed and only as requested by the Debtors on or before the Effective Date or by the Litigation Trustee if the request is made after the Effective date.

### c.    Trustee Fee Claims

All Trustee Fee Claims will be satisfied on or before the Effective Date.

### 2.    Unimpaired Claims

### a.    Class 1 – Other Secured Claims

On, or as soon as reasonably practicable after, the later of:  (i) repayment in full and Termination of the Adeptio Loan;  (ii) the Distribution Date; (iii) the date such claim becomes an Allowed Other Secured Claim; or (iv) the date such Other Secured Claim becomes payable pursuant to any agreement between the Debtors or Litigation Trustee and the Holder of such Allowed Other Secured Claim, a Holder of a Secured Claim, other than a Secured Lender Claim, shall receive either (i) Cash equal to the amount of the Allowed Other Secured Claim; (ii) the collateral which secures its claim; or (iii) such other treatment as to which the Debtors and the Holder of an Allowed Other Secured Claim agrees, on the later of the Effective Date or the date

37

such Claim becomes an Allowed Other Secured Claim. The Debtors estimate that no Allowed Other Secured Claims exist. To the extent there is collateral securing Allowed Secured Claims the priority of such security interest or lien shall not be affected or "primed" by the Adeptio Loan.

      **b.**      **Class 2 – Priority Non-Tax Claims**

On, or as soon as reasonably practicable after, the latest of: (i) the Distribution Date; (ii) the date such claim becomes an Allowed Priority Non-Tax Claim; or (iii) the date such Allowed Priority Non-Tax Claim becomes payable pursuant to any agreement between the Debtors or Litigation Trustee and the Holder of such Allowed Priority Non-Tax Claim, each Holder of an Allowed Priority Non-Tax Claim shall receive in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Non-Tax Claim (i) Cash equal to the unpaid portion of such Allowed Priority Non-Tax Claim or (ii) such other treatment as to which the Litigation Trustee and such Holder shall have agreed upon in writing. <u>Adeptio contends that payment of Allowed Priority Non-Tax Claims should occur only after the occurrence of the above conditions and the repayment in full and Termination of the Adeptio Loan. The Debtors contend that the Term Sheet does not require repayment in full and Termination of the Adeptio Loan prior to payment of Allowed Priority Non-Tax Claims. The Plan is a compromise of such claims.</u>

The Debtors estimate that no Allowed Priority Non-Tax Claims exist. Adeptio shall make available up to $500,000 solely for the purpose of making distributions on account of Allowed Priority Claims; provided, however, that Adeptio shall make payments on account of Allowed Priority Claims only to the extent such claims are allowed and only as requested by the Debtors on or before the Effective Date or by the Litigation Trustee if the request is made after the Effective date.

38

39

### 3.    Impaired Claims Entitled to Vote

#### a.    Class 3– Secured Lender

On the Effective Date, pursuant to the Term Sheet and subject to the terms of the Term Sheet, in exchange for and in full satisfaction, settlement, release and discharge of the Secured Lender's Allowed Secured Lender Claim, the Secured Lender shall receive an Allowed Deficiency Claim in the amount of Twenty Million Dollars ($20,000,000), which entitles the Secured Lender to a Pro Rata share of the interests in the Litigation Trust Interests to be distributed to the Holders of Allowed General Unsecured Claims in Class 4.

#### b.    Class 4 – General Unsecured Claims

Each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Litigation Trust Interests, which shall entitle the holder of a Litigation Trust Interest to its Pro Rata share of any distributions (up to the amount of such holder's Allowed General Unsecured Claim) made by the Litigation Trust after satisfaction in full of the Adeptio Loan, all Liquidation Expenses, unpaid Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims. Distributions on Litigation Trust Interests shall be made in accordance with and pursuant to the Litigation Trust Agreement and shall be made by the Litigation Trust at such times and in such amounts as the Litigation Trustee, after consultation with the Litigation Trust Committee, shall determine. The Debtors believe there are a total of approximately $350,718,352 in General Unsecured Claims.

40

4. **Impaired Classes of Claims (deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan)**

    a.    **Class 5 – Intercompany Claims**

On the Confirmation Date or such other date as may be set by an order of the Court, but subject to the occurrence of the Effective Date, all Intercompany Claims shall be deemed expunged and extinguished. The Holders of Intercompany Claims shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Claims. Class 5 is deemed to have rejected the Plan and, therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

5. **Impaired Class of Interests (deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan)**

    a.    **Class 6 – Equity Interests**

On the Effective Date, the all Equity Interests shall be canceled and each Holder thereof shall not be entitled to, and shall not receive or retain any property or interest in property on account of, such Equity Interests. Class 6 is deemed to have rejected the Plan and, therefore, Holders of Equity Interests are not entitled to vote to accept or reject the Plan.

6. **Allowed Claims**

Notwithstanding any provision herein to the contrary, the Litigation Trustee shall only make distributions to Holders of Allowed Claims. No Holder of a Disputed Claim will receive any distribution on account thereof until (and then only to the extent that) its Disputed Claim becomes an Allowed Claim. SN Liquidation and/or the Litigation Trustee may, in their discretion, withhold distributions otherwise due hereunder to any Claimholder until its Claim becomes an Allowed Claim. Any Holder of a Claim that becomes an Allowed Claim after the Effective Date will receive its distribution in accordance with the terms and provisions of the

41

Plan and the Litigation Trust Agreement.  For the avoidance of doubt, Adeptio's $20,000,000 Allowed Deficiency Claim is deemed an Allowed Claim.

**B.      Acceptance or Rejection of the Plan**

**1.      Impaired Classes of Claims Entitled to Vote**

Subject to Article III of the Plan, Claimholders in each Impaired Class of Claims are entitled to vote as a Class to accept or reject the Plan.

**2.      Acceptance by an Impaired Class**

In accordance with Bankruptcy Code section 1126(c) and except as provided in Bankruptcy Code section 1126(e), an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject the Plan.

**3.      Presumed Acceptance by Unimpaired Classes**

In accordance with Bankruptcy Code section 1124, Holders of Claims in Classes 1 and 2 are not Impaired by the Plan.  Under Bankruptcy Code section 1126(f), and each Holder of a Claim in Classes 1 and 2 is presumed to have accepted the Plan, and the votes of such Claim Holders will not be solicited.

### 4. Classes Deemed to Reject Plan

Holders of Claims in Class 5 and Holders of Interests in Class 6 are not entitled to receive or retain any property under the Plan.  Under Bankruptcy Code section 1126(g), Class 5 Claim Holders and Class 6 Interest Holders are deemed to reject the Plan, and the votes of such Claim or Interest Holders will not be solicited.

43

5.'    **Summary of Classes Voting on the Plan**

As a result of the provisions of Article III of the Plan, only the votes of Holders of Claims in Classes 3 and 4 will be solicited with respect to the Plan.

**C.    Means for Implementation of the Plan**

The Debtors and the Litigation Trust will implement and consummate the Plan through the means set forth in the Term Sheet and contemplated by Bankruptcy Code sections 1123(a)(5)(B) and (D), 1123(b)(3)(A) and (B), and 1123(b)(4).

**1.    Sale**

The Plan completes the implementation of the Final Sale Order and the Term Sheet, which are incorporated by reference into the Plan.

**2.    Corporate Action**

**a.    Merger of Debtors**

Pursuant to Section 303 of the Delaware General Corporation Law (8 Del. C. § 303), on the Effective Date, (a) the members of the board of directors or managers, as the case may be, of each of the Debtors including SN Liquidation shall be deemed to have resigned; (b) each of the Debtors shall be merged with and into SN Liquidation without the necessity of any other or further action to be taken by or on behalf of the Debtors.

44

**b.** ~~Rejection of Indemnification Obligations~~**Indemnification Claims**

~~Except as otherwise provided in the Plan, the Sale Order, or any other contract, instrument, release or other agreement or document entered into in connection with the Plan and approved by the Bankruptcy Court, on the Effective Date, the Bylaws and all related corporate documents, including limited liability company operating agreements, shall be amended to provide that former directors or managing members are removed from coverage of the mandatory advancement provision, and then such bylaws or operating agreements are deemed rejected as of the Effective Date including indemnification rights as they relate to any indemnification rights claimed by any former employee, officer or director of the Debtors. This provision shall have no effect on the obligation of any non-debtor to any other non-debtor.~~

~~Indemnification obligations (whether arising by contract, operation of law or statute or by laws or charter or resolution) owed to any present or former professionals or advisors of the Debtors arising out of acts that occurred prior to the Petition Date, including, without limitation, accountants, auditors, financial consultants, underwriters, or attorneys, shall be deemed to be, and shall be treated as through they are, Executory Contracts that are rejected pursuant to Bankruptcy Code section 365 under the Plan as of the Effective Date and any such~~<u>Any</u> claims for indemnification<u>, such claims being subject to objection by the Debtors and the Litigation Trustee, which relate to or arise directly or indirectly from events, acts, or omissions that occurred pre-petition,</u> whether asserted pre-or post-petition<u>,</u> constitute pre-petition general unsecured claims subject to the provisions of the Bankruptcy Code, relevant rules and ~~the~~<u>this</u> Plan.

45

### c.    Continued Corporate Existence

On the Effective Date, immediately after (i) the merger of the other Debtors into The Debtors and (ii) the transfer of all Estate Assets to the Litigation Trust, the Debtors will cease to exist and shall be deemed disallowed under applicable state law, and the Debtors shall be entitled to use the Confirmation Order as evidence of the authority to terminate the Debtors' corporate existence and to make all necessary filings associated therewith.

### d.    Retention of Wind Down Specialist

The Plan contemplates the continued employment of Clear Thinking Group and Joseph Myers in order to facilitate the orderly wind down of the Debtors' estates until the Effective Date.

### 3.    Post-Effective Date Compensation of Professionals

The Professionals employed by the Debtors, the Committee, and the Litigation Trust shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities, including the preparation, filing and prosecution of final fee applications, upon the submission of invoices to the Litigation Trustee.  Any time or expenses incurred in the preparation, filing and prosecution of final fee applications shall be disclosed by each Professional in its final fee application and shall be subject to approval of the Bankruptcy Court.

### 4.    Sources for Plan Distribution

All Cash necessary for the Debtors or the Litigation Trustee to make payments pursuant to the Plan shall be obtained from the following sources:  (a) the Debtors' or SN Liquidation's Cash on hand, (b) Cash received in liquidation of the Debtors' Excluded Assets, (c) proceeds of all the Debtors' Causes of Action against directors and officers or otherwise; (d) Adeptio's funding obligations pursuant to the Final Sale Order and Term Sheet, including the:    (i)

46

Professional Funding; (ii) Wind Down Funding; (iii) Investigation Funding; (iv) and Priority Claims Funding, all as defined in the Term Sheet and in accordance with the terms of such Term Sheet.  The Term Sheet provides that upon the closing of the APA, Adeptio shall fund (i) the administrative costs of maintaining the Debtors' estates post closing in the amount of $200,000 (the "Wind Down Funding") and (ii) the costs of professional fees necessary to investigate the viability of Avoidance Actions and other Causes of Action and commence and prosecute such litigation, if appropriate, that the Debtors' estates through a Litigation Trust may possess through a senior secured loan (which shall accrue interest as ruled by the Court) of up to a total $500,000, in accordance with the terms set forth in the Term Sheet (the "Investigation Funding"), which amount shall be secured by all assets of the Litigation Trust and shall repaid first from the proceeds paid to the Litigation Trust.  The terms of the Investigation Funding are set forth in the Adeptio Loan Agreement Term Sheet attached to the Plan as Exhibit 3 and ~~may include~~includes funding on a draw-down basis, whereby Adeptio will provide the Litigation Trustee with Investigation Funding in the amount requested, when requested, and any repayments shall permanently reduce the Investigation Funding dollar-for-dollar.  Adeptio contends that the Investigation Funding should be repaid in full and the Adeptio Loan Terminated prior to any proceeds being made available from the Priority Claims Funding, as defined in the Term Sheet. The Plan provides for payment of Allowed Priority Claims up to $500,000 prior to the repayment in full and Termination of the Adeptio Loan and is a compromise of Adeptio's contention.

5.    **Litigation Trust; Litigation Trustee**

On the Effective Date, the Litigation Trust shall be created pursuant to the Litigation Trust Agreement.  Morton Branzburg, Esquire, shall be appointed as the initial Litigation Trustee.  The Committee selected Morton Branzburg, Esquire, to be Litigation Trustee based

47

upon his experience in chapter 11 liquidations and, in particular, his recent experience with D&O and stock redemption litigation.  Adeptio consented to the selection of Morton Branzburg.

### a.    Sources of Litigation Trust Funding

(i)    Investigation Funding.  Pursuant to the Term Sheet, upon formation of the Litigation Trust, Adeptio shall provide the funding for the professional fees necessary to investigate, commence and prosecute Causes of Action, through the Adeptio Loan.

(ii)    Transfer of Estate Assets.  Pursuant to the Term Sheet, upon the formation of the Litigation Trust, all Estate Assets and the proceeds thereof shall be transferred to the Litigation Trust, as set forth and defined in the Term Sheet.  Other than in connection with the Investigation Funding, the Estate Assets shall be deemed vested in and became property of the Litigation Trust free and clear of all claims, liens, encumbrances and interests of Adeptio or the Debtors subject to the terms of the Plan.

These Estate Assets include, without limitation, those set forth in the Notice of Circumstances sent by the Debtors on November 29, 2007 to its respective directors and officers liability insurance carriers and the supplemental letter sent by Committee counsel dated November 30, 2007 to such liability insurance carriers.  As set forth herein in Article III.C.1,1 herein, the Insurance Policies terminated on November 30, 2007.  The Debtors and other third parties have claims against these Insurance Policies, and, at this time, the Proponents cannot predict with certainty or quantify the benefits to be realized from pursuing claims under the policies or against the proceeds payable thereunder to defendants.

The Committee has been investigating all such actions, including claims against former directors and officers (where such claims have not been released or transferred pursuant to the Sale or the Term Sheet).  The Committee's investigation of Causes of Action includes an analysis of claims relating to the Debtors' redemption of stock.  Specifically, the Committee has

48

begun investigating claims in connection with two InPhonic stock repurchase programs (the "Stock Repurchase Programs"). These Stock Repurchase Programs were apparently authorized by the Board of Directors during August 2005 and November 2006, respectively. In each of the Stock Repurchase Programs, the Board of Directors apparently authorized repurchase of up to $30 million of common stock during the ensuing 12 months. InPhonic repurchased common stock with a reported value of at least $13.59 million between August 17, 2005 and March 31, 2006, and at least $13.96 million between November 15, 2006 and June 30, 2007. In pursuit of Causes of Action, the Estate will seek recovery from the Insurance Policies to make distributions on account of Allowed Claims. In addition, the Committee is investigating the repurchase of common shares with a reported value of at least $2.79 million that were repurchased between April 1, 2007 and June 30, 2007, outside of the publicly announced Share Repurchase Programs. The Committee believes the Debtors were insolvent (or rendered more deeply insolvent) during these time periods, and this insolvency was exacerbated by the Stock Repurchase Programs.

The Committee's investigation is ongoing. That investigation will be continued by the Litigation Trust. Any Causes of Action that the Estates may pursue may be investigated by the Committee and/or the Litigation Trust and may then be asserted against any appropriate defendant. Nothing in this Disclosure Statement or the Plan should be interpreted as limiting any Causes of Action that the Litigation Trust may file and prosecute for the benefit of the Holders of the Litigation Trust Interests.

The Causes of Action are entrusted to the Litigation Trust under the Plan for the benefit of creditors. The value of the Causes of Action, related breaches of fiduciary duty by directors and officers, the potential for recovery, the potential defenses to such claims, and the timing of any recoveries cannot be determined at this time. *The pursuit of the Causes of Action, however,*

49

*is the purpose of confirming the Plan, and establishing Litigation Trust, and the only opportunity of which Proponents are aware for any distribution to the Holders of General Unsecured Claims.*

From and after the transfer of all such rights to the Litigation Trust, pursuant to Bankruptcy Code section 1123(b)(3), and the terms of the Litigation Trust, the Litigation Trustee shall be deemed the appointed representative to, and may pursue, litigate, and compromise and settle any such rights, claims, or Causes of Action in accordance with the best interests of and for the benefit of the beneficiaries of the Litigation Trust. Such transfers shall be free and clear of any Claims, Interests, or Encumbrances, except the rights of the beneficiaries of the respective Litigation Trust hereunder and under the respective Trust Agreement and except as expressly provided in the Plan.

(iii)    Priority Claims Funding. Upon the Effective Date, Adeptio shall make available to the Litigation Trust up to a total $500,000 solely for the purpose of making distributions under the Plan on account of Allowed Priority Claims as such claims become allowed pursuant to the terms and conditions of Bankruptcy Code section 1129(a)(9).

**b.    Litigation Trust Operation**

(i)    Quarterly Reports. As soon as practicable after each calendar quarter, and in no event later than thirty (30) days after the end of each quarter, the Litigation Trustee shall submit to the United States Trustee and any Beneficiary who requests copies of such quarterly report after the Effective Date, an unaudited written report and account showing: (a) the assets and liabilities of the Litigation Trust, (b) any Distributions made and Liquidation Trust Expenses paid pursuant to the Plan and the Litigation Trust Agreement, (c) any changes in the Estate Assets that have not been previously reported, and (d) any material action taken by the

50

Litigation Trustee in the performance of his or her duties under the Litigation Trust Agreement that have not been previously reported.

(ii)     Disbursing Agent.  The Litigation Trust or its nominee shall serve as the disbursing agent under the Plan and shall make all Distributions provided for under the Plan.  Pursuant to the terms of the Litigation Trust Agreement, the Litigation Trust shall maintain a reserve in trust for the payment of any accrued and anticipated Liquidation Trust Expenses of the Litigation Trust and any Disputed Claims.

(iii)     Litigation Trustee Appointment of Professionals.  The Litigation Trust is authorized, without further order of the Bankruptcy Court, to employ such persons, including professionals, as it may deem necessary to enable it to perform its functions hereunder, and the costs of such employment and other expenditures shall be paid from the Litigation Trust. Such persons shall be compensated and reimbursed for their reasonable and necessary fees and out-of-pocket expenses on a monthly basis from the Litigation Trust without further notice, hearing or approval of the Bankruptcy Court.

(iv)     Liquidation of Causes of Action.  Notwithstanding any other term or provision of the Plan, subject to the terms of the Litigation Trust Agreement, the Litigation Trustee shall have sole authority and responsibility for investigating, analyzing, and if appropriate, commencing, prosecuting, litigating, compromising, collecting and otherwise administering the Causes of Action.

(v)     Objection to and Compromise of Claims.  Pursuant to Bankruptcy Rule 9019(b), the Plan and the Litigation Trust Agreement, as of the Effective Date (i) the Litigation Trustee is authorized to object to or approve compromises of the Causes of Action and all Claims, Disputed Claims and Liens and to execute necessary documents, including Lien

51

releases and stipulations of settlement or release, without notice to any party and without further order of the Bankruptcy Court.

(vi)     Distribution.  Distribution of proceeds shall be made in accordance with the Term Sheet, Plan, the Confirmation Order, and the Litigation Trust Agreement.

(vii)     Reserve for Disputed Claims.  For purposes of calculating Pro Rata or any other distributions to be made under the Plan to Holders of Allowed Claims, the calculation of the total Allowed Claims in any Class shall be computed as if all Disputed Claims then pending were allowed in the full amount thereof.

(viii)     Allowance of Disputed Claims.  Distributions shall be made with respect to any Disputed Claim which becomes an Allowed Claim after the Effective Date on or as soon as practicable after the date on which each such Disputed Claim becomes an Allowed Claim.  The amount of such distribution shall be calculated on a Pro Rata basis, so that the subject Claim receives an initial distribution equal to the total percentage distributions made prior to the date of such allowance to other Allowed Claims in its Class.  No interest shall be payable to the Holders of Disputed Claims on account of funds reserved by the Litigation Trust, if any, under the Plan to satisfy such Disputed Claims.

(ix)     Final Distribution.  Final Distribution.  The Litigation Trustee shall cause the distribution of all remaining available assets, if any, of the Litigation Trust to the Holders of Allowed Claims, after repayment in full and Termination of the Adeptio Loan, the payment of all Allowed Administrative Claims (with interest) and all of the debts and obligations of the Litigation Trust, and all unpaid Allowed Claims in Classes 1 and 2 of the Plan.  After making a final distribution, the Litigation Trust, acting through the Litigation Trustee, shall file a final report and account of all receipts and disbursements with the Bankruptcy Court and the

52

United States Trustee. The Litigation Trustee shall be discharged from his or her obligations under the Plan or the Litigation Trust Agreement at such time as the Litigation Trust has terminated pursuant to its terms (or upon the Litigation Trustee's prior resignation or termination).

(x)    Means of Cash Payment. Cash payments made pursuant to the Plan shall be paid by wire transfer or checks drawn on an account maintained by the Litigation Trust.

(xi)    Release of Liens. On the Effective Date, all Liens against the Estate Assets shall be fully and completely released and discharged and all of the Estate Assets when transferred to the Litigation Trust shall be free and clear of any such Liens.

(xii)    Cancellation of Notes, Instruments, Securities and Other Documentation. On the Effective Date, all agreements (other than those established by the Term Sheet and assumed contracts or leases), credit agreements, prepetition loan documents, postpetition loan documents, and evidence of Liens shall be deemed to be canceled and of no further force and effect, without any further action on the part of the Debtors or the Litigation Trust. The Holders of or parties to such canceled instruments, agreements, securities and other documentation will have no remaining rights against the Debtors, their Estates, or the Litigation Trust arising from or relating to such documents or the cancellation thereof except the right to receive distributions under the Plan.

(xiii)    Exemption from Certain Taxes. Pursuant to Section 1146 of the Bankruptcy Code, all transactions, including the transfers described in the Plan, and the delivery and recordation of any instrument, under, in furtherance of, or in connection with the Plan shall not be subject to any stamp tax, real estate transfer tax or similar transfer fee or tax.

{BAY:00815667:v6l8}

(xiv)   Other Tax Matters.   The Litigation Trust shall be treated as a grantor trust for federal income tax purposes, within the meaning of Sections 671 through 677 of the Internal Revenue Code.   Pursuant to and in accordance with the Plan, the Litigation Trustee shall be responsible for all tax matters of the Estates including, but not limited to, the filing of all tax returns and other filings with governmental authorities on behalf of the Estates for time periods ending on or before the Final Tax Day, including the filing of tax returns for the Litigation Trust as a grantor trust pursuant to Section 1-671-4(a) of the United States Income Tax Regulations, the filing of any determination requests under Section 505(b) of the Bankruptcy Code, and responding to any tax audits of the Estates.   The Litigation Trustee shall provide such information to the beneficiaries as will enable them to properly file their separate tax returns and withhold and pay over any amounts required by tax law.   The Litigation Trustee is authorized to act as agent for the Estates in withholding or paying over any amounts required by law (including tax law), if any, to be withheld or paid by the Estates in connection with the transfer and assignment of the Estate Assets to the Litigation Trust pursuant to the Plan.

The Litigation Trust Agreement requires each Holder of an Allowed Class 4 General Unsecured Claim to report on its U.S. federal income tax return its allocable share of the Litigation Trust's income.   Because Persons who are Holders of Disputed Claims as of the end of the Litigation Trust's tax year will not receive any interest or earnings on cash held in the Litigation Trust for such tax year, the Litigation Trustee shall allocate all such interest and earnings to Holders of Allowed Class 4 Claims for U.S. federal income tax purposes.   A Holder of an Allowed Class 4 Claim may incur a U.S. federal income tax liability with respect to its allocable share of the income of the Litigation Trust whether or not the Litigation Trust has made

54

any concurrent distribution to the Holder of an Allowed Class 4 Claim. Holders of Allowed Class 4 Claims are urged to consult their tax advisors.

(xv)    Except as otherwise set forth in the Litigation Trust Agreement or the Plan, any items of income, deduction, credit, or loss of the Litigation Trust shall be allocated for federal income tax purposes among the beneficiaries Pro Rata on the basis of their beneficial interests; provided, however, that to the extent any item of income cannot be allocated in the taxable year in which it arises, the Litigation Trust shall pay the federal, state and local taxes attributable to such income (net of related deductions) and the amount of such taxes shall be treated as having been received by, and paid on behalf of the beneficiaries when such allocations are made. The Litigation Trustee shall be entitled to deduct any federal or state withholding taxes from any payments made with respect to Allowed Claims, as appropriate.

(xvi)    Duration of Trust. The Litigation Trust shall continue to exist until such time as the Litigation Trustee has administered all assets of the Litigation Trust and performed all other duties required by the Plan and the Litigation Trust Agreement. As soon as practicable after the Final Distribution Date, if any, or such other time as the Litigation Trustee deems appropriate, the Litigation Trustee may seek entry of a Final Order closing these Chapter 11 Cases pursuant to Bankruptcy Code section 350.

6.    **Claims Administration Process**

a.    **Deadline for Filing of Administrative and Professional Fee Claims**

Any person asserting an Administrative Claim (other than a Professional Fee Claim) shall file an application therefore with the Bankruptcy Court not later than thirty (30) days after the Effective Date.

55

Any Person asserting a Professional Fee Claim shall file a fee application with the Bankruptcy Court not later than thirty (60) days after the Effective Date for professional services rendered and out-of-pocket costs incurred through the Effective Date.

Any Administrative Claim or Professional Fee Claim not filed within the deadlines set forth above shall be forever barred, and the Debtors and the Litigation Trust shall be discharged of any obligation on such Claim.

### b.    Estimation of Claims

The Litigation Trustee may, at any time, request that the Bankruptcy Court estimate any contingent, unliquidated or Disputed Claim pursuant to Bankruptcy Code sections 105 and 502(c) in the interests of expeditious administration of the Estates or the Litigation Trust regardless of whether an objection has been filed with respect to such Claim.  If the Bankruptcy Court estimates any contingent, Disputed or unliquidated Claim, the estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, at the option of the Litigation Trustee.  If the estimated amount constitutes a maximum limitation on such Claim, the Litigation Trustee may pursue any supplemental proceedings to object to the allowance and ultimate distribution on such Claim after reservation for such claim.  If the estimated amount is treated as the Allowed Amount of such claim, such claim shall be paid only up to an amount not to exceed the estimated amount, even if such Claim, as finally allowed, exceeds the maximum estimated amount thereof.  Furthermore, neither the Litigation Trust nor the Litigation Trustee shall have any liability to such claimant.  Unless otherwise ordered by the Bankruptcy Court, resolution or compromise of estimated Claims shall be done pursuant to the Plan.  All Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another.  The Committee and the Debtors, shall have the right to move the Bankruptcy Court for disallowance of any Claim for voting purposes.

{BAY:00815667;v6\_18}

c.    **Late Claims**

No Distribution shall be made on account of any Claims filed after the Bar Date, unless specifically allowed by Final Order of the Bankruptcy Court after notice and opportunity for hearing.

d.    **Procedures for Treatment and Resolving Disputed, Contingent and/or Unliquidated Claims**

(i)    Notwithstanding any other provision of the Plan, no property shall be distributed under the Plan on account of all or any portion of any Disputed Claim or any Claim that is contingent or unliquidated.

(ii)    Pursuant to Section V.E. 2(de) of the Plan, from and after the Effective Date, the Litigation Trustee shall be authorized and shall have the exclusive right to file and serve all objections to the allowance of any Claim Interest.  The Litigation Trustee is exclusively authorized to take all actions necessary or advisable to pursue, settle or compromise any such Disputed Claims.  The Litigation Trustee shall review and object to Claims as and when the Litigation Trustee deems appropriate taking into account, the funds available for distribution to Holders of a particular Class, the amount of such Claims, and any other issues that the Litigation Trustee deems appropriate.

(iii)    At such time as a Disputed Claim becomes an Allowed Claim, (i) the Holder of such Allowed Claim shall receive a distribution, in the same Pro Rata amount as other members of its Class have already received, without interest.  Such distribution, if any, shall be made within thirty (30) days of the date that the order or judgment of the Bankruptcy Court allowing such Claim become a Final Order (or as soon as practicable thereafter).

(iv)    Except with respect to Estimated Claims, or at the discretion of the Litigation Trustee, no partial distributions will be made with respect to a Disputed Claim until all disputes with respect to such Disputed Claim have been resolved by a Final Order and have become Allowed Claims.

e.    **Claims Reserve**

After the Effective Date, the Litigation Trustee shall deposit any available Cash into the claims reserve ("Claims Reserve") in an amount reasonably sufficient, in the Litigation Trustee's

57

sole discretion, to pay without interest all Disputed Claims that may become Allowed Claims and to pay any post-confirmation tax liability, Trustee Fees, professional fees and other expenses or costs that the Trustee, in his sole discretion, believes may be incurred.

### f.    Setoffs

The Litigation Trustee may, pursuant to Bankruptcy Code section 553 and applicable non-bankruptcy law, set off against any distribution to the Holder of an Allowed Claim, the claims, rights and Causes of Action that the Litigation Trust may hold against the Holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim shall constitute a waiver or release by the Litigation Trustee of any such claims, rights and causes of action that the Trustee may possess against such Creditor.  Creditors shall maintain their setoff rights existing prior to the Filing Date, but such setoff rights may be exercised only with prior Bankruptcy Court approval.  The Litigation Trustee shall not have the authority to effectuate any setoff right against Adeptio or any of its affiliates except to the extent such setoff arises on account of a dispute in connection with the Plan, Final Sale Order, APA, and Term Sheet, including with respect to Adeptio's or Simplexity's obligations thereunder. Adeptio and its affiliates reserve all rights to contest such assertions.

### g.    Undeliverable and Unclaimed Distributions

Unclaimed and undeliverable distributions shall include:  (i) checks (and the funds represented thereby) which have been returned as undeliverable without a proper forwarding address, (ii) checks (and the funds represented thereby) which have been issued to the Holder of an Allowed Claim in accordance with the Plan but which have not been presented for payment within ninety (90) days after the date of such checks, and (iii) checks (and the funds represented thereby) which were not mailed or delivered because of the absence of a complete or correct mailing address.  If any distribution made on account of an Allowed Claim is returned to the

{BAY:00815667:v618}