UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                      .    Case No. 07-11666(KG)
                            .
                            .    Jointly Administered
SN LIQUIDATION, INC.,       .
et al.,                     .    824 North Market Street
                            .    Wilmington, DE 19801
                            .
        Debtors.            .    December 8, 2008
. . . . . . . . . . . . . ..      10:02 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE KEVIN GROSS
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:             Bayard, P.A.
                            By:  JAMIE L. EDMONSON, ESQ.
                            222 Delaware Avenue
                            Suite 900
                            P.O. Box 25130
                            Wilmington, DE  19899


For Illinois National       Peabody & Arnold, LLP
Insurance Co.:              By:  ROBERT McCALL, ESQ.
                                 (telephonic appearance)
                            600 Atlantic Avenue
                            Boston, MA  02210



Audio Operator:             Brandon McCarthy




Proceedings recorded by electronic sound recording, transcript
produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (Cont'd.):

For Adeptio INPC          Kirkland & Ellis, LLP
Funding, LLC:             By:  JEFFREY D. PAWLITZ, ESQ.
                               (telephonic appearance)
                          200 East Randolph Dr.
                          Chicago, IL  60601

For Schwartz & Zeinfeld:  Venable LLP
                          By:  LISA TANCREDI, ESQ.
                          1800 Mercantile Bank & Trust Building
                          2 Hopkins Plaza
                          Baltimore, MD  21201

For XL Specialty          White and Williams LLP
Insurance Co.:            By:  JAMES S. YODER, ESQ.
                          824 North Market Street
                          Suite 902
                          Wilmington, DE  19801

                          Ross, Dixon & Bell, LLP
                          By:  GARY DIXON, ESQ.
                          2001 K Street, N.W.
                          Washington, DC  20006

For Illinois National     Womble Carlyle Sandridge
Insurance Co.:             & Rice
                          By:  KEVIN J. MANGAN, ESQ.
                          222 Delaware Avenue, 15th Floor
                          Wilmington, DE  19801

For the Creditors'        Reed Smith, LLP
Committee:                By:  KURT F. GWYNNE, ESQ.
                          1201 Market Street
                          Suite 1500
                          Wilmington, DE  19801

**J&J COURT TRANSCRIBERS, INC.**

1          THE CLERK:  Please rise.

2          THE COURT:  Good morning, counsel.  Please be seated.

3 Thank you.

4          MS. EDMONSON:  Good morning, Your Honor.  Jamie

5 Edmonson of Bayard on behalf of the debtors.

6          THE COURT:  Good to see you, Ms. Edmonson.  Good

7 morning.

8          MS. EDMONSON:  Good to see you, Your Honor.  Your

9 Honor, starting with Item 1 on the agenda, this is a continued

10 motion for relief from stay filed by Illinois National

11 Insurance.

12          THE COURT:  Yes.

13          MS. EDMONSON:  Pending resolution of Item Number 3 on

14 the agenda, we may be coming back to this matter.

15          THE COURT:  I thought that might be the case.

16          MS. EDMONSON:  With respect to Item 2 on the agenda,

17 that was a motion under Rule 9019 to approve a settlement

18 between the debtors and the Commonwealth of Pennsylvania which

19 Your Honor has already entered an order.

20          THE COURT:  Yes.

21          MS. EDMONSON:  That brings us to Item Number 3, which

22 is the motion of Illinois National Insurance to withdraw their

23 motion for relief from stay, so I will turn the podium over to

24 Mr. Mangan.

25          THE COURT:  Thank you.  Good morning, Mr. Mangan.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. MANGAN:  Good morning, Your Honor.  Kevin Mangan

2  on behalf of the Illinois International Insurance Company.  On

3  the phone today is Robert McCall, my co-counsel from Boston,

4  and I would ask that he address the Court with regard to our

5  motion to withdraw.

6          THE COURT:  That would be fine, Mr. Mangan.  Thank

7  you.

8          MR. MANGAN:  Thank you.

9          THE COURT:  Oh, Mr. Yoder --

10          MR. YODER:  Your Honor --

11          THE COURT:  -- did you wish to be heard?

12          MR. YODER:  Yes.  Interject?

13          THE COURT:  Yes.

14          MR. YODER:  You may --

15          THE COURT:  If you would come to the podium, only

16  because we want to make sure we pick you up on the recording?

17          MR. YODER:  May it please the Court.  James Yoder for

18  XL Specialty Insurance Company.  If -- we beg the Court's

19  indulgence for perhaps ten minutes of time with counsel.  We

20  might have a possible resolution of the -- both Northern

21  Illinois motion and the XL Specialty.

22          THE COURT:  That's certainly acceptable.  I'm pleased

23  to give you additional time to try and resolve it.

24          MR. YODER:  Thank you.

25          THE COURT:  Also ready to move forward, so -- but I

1 think the additional time is certainly wise here.

2          MR. YODER:  Thank you, Your Honor.

3          THE COURT:  So why don't we take a 10- or 15- or 20-

4 minute recess, what time you need, and as long as you're making

5 progress, and just let us know when you're ready to proceed at

6 that point?

7          MR. YODER:  Twenty minutes.

8          THE COURT:  Twenty minutes is fine.  If you need

9 less, you'll come and get me sooner.

10          MR. YODER:  Yes.  Thank you.

11          THE COURT:  All right, counsel.  Thank you.  We'll

12 stand in recess.

13                    (Recess)

14          THE CLERK:  Please rise.

15          THE COURT:  Thank you, everyone.  Please be seated.

16 Thank you.  Ms. Edmonson.

17          MS. EDMONSON:  Your Honor, I think we're actually

18 ready to move forward with the motions as they were filed.

19          THE COURT:  Okay.

20          MS. EDMONSON:  And we'll start with -- well, Item

21 Number 3 was the motion to withdraw, so I guess that's probably

22 the most logical place to start --

23          THE COURT:  Yes.

24          MS. EDMONSON:  -- and then move back from there.

25          THE COURT:  And I think that is the one that Mr.

**J&J COURT TRANSCRIBERS, INC.**

1  McCall was going to handle.  Is that right, Mr. Mangan?

2          MR. MANGAN:  Yes, Your Honor.  He's --

3          THE COURT:  All --

4          MR. MANGAN:  -- on the line right now.

5          THE COURT:  All right.  Mr. McCall, good morning.

6                      (Pause)

7          UNIDENTIFIED SPEAKER:  Counsel, still on the line?

8          MR. McCALL: MR. COLLINS:  Yes.  Good morning, Your

9  Honor.

10          THE COURT:  Is this Mr. McCall?

11          MR. McCALL:  Yes, it is.

12          THE COURT:  Yes, good morning, Mr. McCall.

13          MR. COLLINS:  I have three very simple reasons why

14 the motion should be allowed as an adverse course.  First, Your

15 Honor, as the Court is aware, Illinois National filed this

16 motion to withdraw after XL Specialty Insurance filed a motion

17 for relief from stay.  That motion seeks the same relief as

18 Illinois National's original motion.  In this context it's

19 entirely appropriate that Illinois National be granted leave to

20 withdraw its motion.

21          Second, whether -- Your Honor, whether to prosecute a

22 motion for relief from stay is entirely at the discretion of

23 the movant, so long as that party complies with the automatic

24 stay.  Here there's no issue of compliance with the stay,

25 therefore, the motion to withdraw, we submit, should be granted

1 for that reason.

2          And the third and final reason, Your Honor, is the

3 motion to withdrawal has the assent of the only party that

4 objected to the underlying motion, specifically, the Creditors'

5 Committee.  The objector to the motion to withdraw has no

6 standing here to prevent withdrawal.

7          In addition, the objection is essentially rendered

8 moot by the XL motion.  For these very simple reasons, the

9 motion to withdraw should be granted.  Thank you, Your Honor.

10          THE COURT:  All right.  I think I probably want to

11 hear now -- next from Ms. Tancredi.  Good morning.

12          MS. TANCREDI:  Good morning, Your Honor.  I think

13 that we really need to step back and see what's really going on

14 here.  On October 9th, 2008 Illinois National filed its motion

15 for relief from stay, so that it could pay defense costs.

16          THE COURT:  Yes.

17          MS. TANCREDI:  And this Court entered a confirmation

18 order on October 22nd, 2008, and Your Honor may recall that I

19 was here at the confirmation hearing raising this very same

20 issue, and I was told by Mr. Gwynne don't worry.  Yeah, I was

21 assured as much as he could assure me, but, you know, Illinois

22 National has filed a motion for relief from stay.  That will be

23 resolved.  And I think that we all relied on Illinois following

24 through and prosecuting its motion for releif from stay.

25          I'm not sure what the argument means that XL's motion

1  seeks the exact same relief, because XL's motion seeks relief

2  to have Illinois National pay attorney's fees.  So to me it's

3  just very curious that they want to withdraw.  What's really

4  going on here is that the law firms aren't getting paid.

5          THE COURT:  Right.

6          MS. TANCREDI:  There is a dispute about what kind of

7  review process needs to occur in order for the law firms to be

8  paid, and that ought to be resolved, and that ought to be

9  resolved promptly.  And as for my firm, my firm's agreed to

10  abide by whatever procedure is ordered by the Court.  But in

11  the meantime, we're almost up to a year providing services and

12  not being paid.  So Venable having agreed to do whatever it is

13  that Your Honor orders, I see no reason why relief from stay

14  can't be granted, at least to pay our fees subject to the

15  review process.

16          THE COURT:  Okay.

17          MS. TANCREDI:  Thank you, Your Honor.

18          THE COURT:  Thank you.  Mr. Gwynne.

19          MR. GWYNNE:  Good morning, Your Honor.  Kurt Gwynne

20  from Reed Smith on behalf of the Creditors' Committee.  First

21  of all, with respect to the history and what's happened, what's

22  going on, we had a hearing before the Court on November 7th.

23  Your Honor already said that the estate should have the

24  opportunity to review the invoices, because this property --

25  this policy -- the policy proceeds are property of the estate,

1  and even though there's an order of payment provision, the

2  estate has the right and, in fact, should protect the estate's

3  interests and what's remaining beyond these attorney's fees or

4  beyond settlements on behalf of the D and O carriers.

5          On November 7th, the day of the hearing, Joshua Lewis

6  of my office sent an e-mail to Mr. McCall and Ms. Tancredi

7  saying pursuant to the hearing today and consistent with the

8  Judge's statements, we would like to review, you know, the

9  invoices, so that we can determine whether or not, you know,

10  the fees are reasonable, and that things were billed properly.

11  For example, the hearings that we have in this Bankruptcy Court

12  we don't think are properly covered by the D and O defense

13  costs.  They're not defending that litigation.

14          We don't know what's been being billed.  Ms. Tancredi

15  and Mr. McCall didn't send us any invoices, so Mr. Lewis from

16  our office issued a deposition notice with respect to Illinois

17  National, deposition duces tecum, figuring, okay, if you're not

18  going to give us the documents or respond, we'll send a

19  deposition notice, so we'll see the documents at the depo.  And

20  then Illinois National decided to withdraw the motion, so

21  there's no reason to go forward with the deposition.  And on

22  November 24th Mr. Lewis sent -- that was, I believe, the day

23  that was the conference call with the Court, because the e-mail

24  starts, "Consistent with today's conference call with the

25  Court, we look forward to working with you in an attempt to

1 reach a resolution," blah, blah, blah, asked again for billing

2 information, copies of invoices, so that we could resolve the

3 matter as expeditiously as possible.  Got nothing.

4         So Your Honor's already said we were entitled to

5 review these invoices.  What's really going on is that the

6 insurers and defense counsel are coming back.  This is the

7 third time they're basically asking Your Honor for the same

8 thing.  It's the same type of relief, and we shouldn't have to

9 be here for this XL motion let alone the dealing with

10 withdrawing the Illinois National one.  But that's I think a

11 fairer statement, Your Honor, of the facts and what's going on,

12 and the estate's willingness for people to get paid.  We just

13 want the opportunity to review the invoices.

14         As Ms. Tancredi  said at the last hearing, this is

15 just like a situation with the secured creditor.  Well, what's

16 -- it would be the same if the secured creditor was saying pay

17 my fees, but you don't get to review anything, and that's not

18 the way it works, as Your Honor knows, in every DIP order.

19         So with respect to the Illinois National motion, we

20 support it being withdrawn.  We were the only party that

21 objected to the motion.  I think under Rule 41 probably

22 could've filed a stipulation of dismissal as opposed to a

23 motion, but I disagree with some of the reasons counsel for

24 Illinois National, or at least one of the reasons he said why

25 the motion should be withdrawn.  He said that because XL filed

1   the same motion, he should be able to withdraw his.  I disagree

2   with that, because I think there are issues that I'll get to

3   with respect to XL's standing and ability to file a motion

4   asking the Court to pay attorneys' fees when they're an excess

5   carrier and the primary policy hasn't been exhausted, and

6   there's no allegation that it has been.

7           But the only movant here was Illinois National.  They

8   want to withdraw their motion.  We were the only party that

9   objected.  We agreed to it.  I don't think they should be

10  forced to pursue a motion when other folks could've filed their

11  own but didn't.  Thank you, Your Honor.

12          THE COURT:  All right.  Thank you, Mr. Gwynne.  Ms.

13  Tancredi, let me hear from you again, and then I want to hear

14  from Mr. McCall.  But it seems to me that, you know, I want

15  defense costs to be paid.  I've reviewed the cases.  I've

16  reviewed the policies.  I spent a good bit of time on it just

17  yesterday afternoon, because I am concerned about the delay

18  that's taking place.  And I may, depending on the XL motion,

19  but I really -- I think I -- I think I'm in a position of

20  reconsidering where I was previously.  But in order to move

21  this matter forward, what is the concern about submitting

22  invoices, if I may ask precisely?

23          MS. TANCREDI:  As far as Venable is concerned, we

24  don't have a concern other than this issue is really between

25  AIG and the Committee, and AIG pays us.

1              THE COURT:  Yes.

2              MS. TANCREDI:  So it's not a case where the debtor's

3     going to pay us, so the Committee reviews it, and, therefore,

4     we don't have any issues.  We get paid by AIG.

5              THE COURT:  Okay.

6              MS. TANCREDI:  And we don't want to run afoul of AIG.

7     We just want clear direction.  Tell us what to do.  We'll do

8     it.  And that's why we didn't just go ahead and send our

9     invoices to Mr. Gwynne, because AIG has made its preferences

10    clearly known that would prefer --

11             THE COURT:  That they don't want you to do that.

12             MS. TANCREDI:  -- not to have invoices sent.  And as

13    for the standing issue, we really relied on Illinois National

14    to prosecute that motion.  I mean we -- we could have and may

15    well would have filed a motion for relief from stay in order to

16    be paid by this time.  But they filed their motion, and we

17    thought, well, they're doing the right thing.  They're seeking

18    to pay defense counsel, and we'll let them do their job, and

19    now they want to withdraw it.

20             So, Your Honor, again, I would just ask the Court to

21    lift the stay, so that at least Venable can be paid, or we will

22    agree to do whatever the Court says ought to be done, you know,

23    and have our fees reviewed afterwards.  But it's important that

24    the defense counsel be paid by year end and --

25             THE COURT:  Yes.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. TANCREDI:  -- you know, we not reach the one-year

2    anniversary, which we will next month, of our working on the

3    case.

4          THE COURT:  Okay.

5          MS. TANCREDI:  Thank you, Your Honor.

6          THE COURT:  Thank you.  Anything further from you,

7    Mr. McCall?

8                         (Pause)

9          THE COURT:  Mr. McCall, anything further?

10         MR. McCALL:  I'm sorry.  Your Honor, I didn't really

11   hear anything from either side as to why my client should be

12   forced to go forward with this motion.  This is, obviously, a

13   motion for relief from stay to pay defense costs, is a motion

14   that could have been brought also by the insureds.

15         And in terms of the issue about what we should

16   produce or provide to the Trustee or the Committee, that's a

17   more complicated issue than simply Venable.  We have other

18   defense counsel.  So, you know, at this point I think, you

19   know, we're just seeking to withdraw the motion, and I -- for

20   whatever reason, whether it's for the reason argued by Mr.

21   Gwynne or for the various reasons I mentioned, I think you

22   should be permitted to withdraw.

23         THE COURT:  All right, Mr. McCall.  What I'm going to

24   do on this one, I'm going to reserve my decision until I hear

25   the argument relating to XL's motion, and perhaps -- I just

1 want a little more information I think and to be able to deal

2 with these on an overall basis.  So I think that's how we'll

3 proceed at the moment.

4           MS. EDMONSON:  Your Honor, would you like to proceed

5 with the XL motion --

6           THE COURT:  Yes.

7           MS. EDMONSON:  -- before we go to Item 4 on the

8 agenda?

9           THE COURT:  Yes.

10          MS. EDMONSON:  Okay.

11          THE COURT:  Mr. Yoder, if you're going to introduce

12 Mr. Dixon to me, he needs no introduction.

13          MR. YODER:  Okay.  That's what I was going to do.

14          THE COURT:  And I'm very pleased to hear from him.

15          MR. YODER:  And he's been admitted pro hac.

16          THE COURT:  Yes, thank you, Mr. Yoder.  Mr. Dixon,

17 it's good to see you, sir.

18          MR. DIXON:  Thank you, Your Honor.  Good morning.

19          THE COURT:  Good morning.

20          MR. DIXON:  Your Honor, the matter is in an unusual

21 procedural posture, but hopefully that won't prevent us from

22 getting to the right result here.  We understand that people do

23 want to get paid.  AIG's policy is primary.  Our policy is

24 impended.  It's in excess of $20 million of coverage.

25          THE COURT:  Yes.

1          MR. DIXON:  As Mr. McCall and others have pointed

2     out, they do have a priority of payments clause.  They have A

3     side coverage just as our policy has.

4          You know, this is -- backing up a bit, but just with

5     respect to the interests that the Trustee would assert here or

6     that the Committee might assert at the present time, you know,

7     they would have three potential interests here.  One would be

8     as a debtor, as a defendant, in the securities case, which is

9     not applicable.  I mean they're not a defendant at the current

10    time.

11          THE COURT:  Right.

12          MR. DIXON:  Secondly would be the reimbursement of

13    any indemnification obligation that they might have.  It's, you

14    know, far from clear that that will occur here, but even if it

15    did, any dollars that AIG advances will dollar for dollar

16    reduce the amounts that would be the source of that

17    indemnification claim, so there's no real harm flowing there.

18    The advancements and the payments of defense costs will take

19    away the amounts that would be claimed by way of

20    indemnification.

21          So it's really the third punitive interest that I

22    think is mainly being asserted here, and I think that Judge

23    Case's language in Allied Digital, a portion of which you

24    quoted in your World Health Alternatives opinion -- and if I

25    may just read that.  Judge Case said in Allied Digital, "The

**J&J COURT TRANSCRIBERS, INC.**

1   Trustee's real concern is that payment of defense costs may
2   affect his rights as a plaintiff seeking to recover from the D
3   and O policy rather than as a potential defendant seeking to be
4   protected by the D and O policy.  In this way, Trustee is no
5   different than any third party plaintiffs suing defendants
6   covered by a wasting policy.  No one has suggested that such a
7   plaintiff would be entitled to an order limiting the covered
8   defendant's rights to reimbursement of their defense costs.
9   The bottom line is that the Trustee seeks to protect the amount
10  he may receive in the suit against the directors and officers
11  while limiting coverage for the defense costs of the directors
12  and officers.  This is not what the directors and officers
13  bargained for.  In bringing the action against the directors
14  and officers the Trustee knew that the proceeds could be
15  completed by legal fees, and he took that chance.  The law does
16  not support the Trustee's request to regulate defense costs."

17          Now, I know we don't have the Trustee in place here
18  yet, and I know that, you know, the Committee is speaking for
19  those interests, but I do think that's a large part -- when you
20  look at the first two, the real interests that they would have
21  directly under the policy, I really don't think either of those
22  are implicated by the present situation.

23          Now, all that having been said, I mean the goal here
24  -- AIG was and I think still is willing to advance defense
25  costs, and we've only brought our motion, because we found out

1  that they were withdrawing their motion, and we want the

2  defense costs advancement to take place where it should take

3  place within the primary policy, and -- so that's the purpose

4  of our motion.  And we've been trying mightily to find a way to

5  just resolve the issue of the bill review --

6            THE COURT:  Yes.

7            MR. DIXON:  -- but it's not -- you know, that's not

8  primarily XL's issue.  We just want a process that works for

9  AIG, works for the Committee, and works for the defense

10 counsel.  In the case of Venable it seems like we may be pretty

11 close.  I mean they seem to be willing to do at least what the

12 Committee is asking for.

13           The other -- I think there are three other law firms

14 involved, and they're not here, so I can't speak for them in

15 terms of what they would be willing to do and again what might

16 be acceptable to AIG.  But maybe I should stop there, and then

17 I'm happy to answer questions or come back after others speak.

18           THE COURT:  No, you know, I've been reading the

19 cases, and particularly, I think I've been focusing, not

20 surprisingly, on the <u>Adelphia</u> decision and the <u>First Central</u>

21 <u>Financial Corp.</u> decision and then the <u>Laminate</u> decision.  And

22 it's pretty clear from those that those courts at least -- and

23 in -- I know that with insurance policies there are always

24 some, you know, differences, and people always, and rightfully

25 so, argue what those differences are.

1          But it's pretty clear from reading those cases that

2   the courts are, first of all, concerned where is Coverage A,

3   such there is here, and then Coverage B, that the contractual

4   rights of the directors not be impaired, and, you know, some of

5   the cases talk about that it's not primarily -- these types of

6   policies are not primarily a vehicle for corporate protection.

7   There are primarily directors and officers policies --

8   protection policies, and that's how you get officers and

9   directors to serve for a corporation, is by providing them with

10  coverage and then don't  look to pull that coverage out from

11  under them.

12         So that is clearly going to be an important factor in

13  my thinking, and also a vehicle for resolving the issue about

14  the propriety of the charges.  So why don't, Mr. Dixon, I hear

15  now from -- I think from the Committee I'd like to hear from

16  next, if I may.

17         MR. DIXON:  Thank you, Your Honor.

18         THE COURT:  Thank you.  Mr. Gwynne.

19         MR. GWYNNE:  Good morning again, Your Honor.  First

20  of all, I do want to address a standing issue with respect to

21  XL.  XL, as it acknowledges in Paragraph 9 on Page 4 of its

22  motion, is an excess insurer.  It is not the primary insurer.

23  Pursuant to the policy, as I indicated in the motion, I believe

24  it's also in Paragraph 9, that they're not responsible to pay

25  costs until the primary insurance, the Illinois National

1 insurance, until that layer is exhausted.  There's no evidence

2 that the primary layer has been exhausted.  I don't think

3 anybody contends that the primary layer has been exhausted, and

4 there's at least four cases where the courts have held that an

5 excess insurer is not required to pay any defense costs until

6 the primary layer of insurance is exhausted.  There's <u>Nutmeg</u>

7 decision from the Northern District of Texas on February 24th

8 of '06, <u>General Refractories</u> from the Eastern District of

9 Pennsylvania, June 8, '94, <u>Employers Reinsurance</u>, 2007, Western

10 District of Oklahoma, and the <u>LaFarge</u> case, 1994, District of

11 Maryland.  I have those, Your Honor, if Your Honor needs to see

12 them.  I --

13          THE COURT:  I'm fine.  No, I don't need to see them.

14 I'm going to ask Mr. Dixon what they're -- what his client's

15 interest is in pursuing the motion, but --

16          MR. GWYNNE:  Yes, and it -- I mean I've never seen an

17 excess insurer come to court and say, Your Honor, make the

18 primary insurer pay something, so that I can then pay people,

19 too.  I mean usually -- the only interests of an excess insurer

20 is making sure that nothing implicates their policy.  That you

21 don't get up that high to their policy.

22          Now, and counsel acknowledged this was an unusual

23 procedural posture.  I'm not an insurance attorney, but I

24 haven't seen it in Bankruptcy Court in this posture ever.

25          THE COURT:  I haven't either.  I've also never seen

1  just a flip to what you were arguing, a flip side, and that is

2  I've never seen an insurance company pay more than it felt it

3  was proper to pay.  Having represented insurance companies, I

4  know that they check bills very, very carefully.

5         MR. GWYNNE:  Your Honor, but we dealt with this at

6  the last hearing, and I think one of the things I pointed out

7  was that is not true when you're talking about layered

8  insurance, where you have multi-million dollar claims, and you

9  have the first layer of insurance.  For example, I had a case

10  where we had $15 million worth of insurance, and the first

11  layer was $5 million, <u>Carolina Casualty</u>, and there was an

12  insurance coverage litigation that ended up reference being

13  withdrawn in front of Judge Robinson, and we had mediation.

14  And all they wanted to know was where to write the check.  They

15  didn't care whether it went to settlement or defense costs,

16  because they knew that their layer was going to be exhausted.

17  So I don't think that's true when you're talking about a bottom

18  layer that is certainly going to be exhausted by either defense

19  costs, settlement, or judgments.

20         THE COURT:  Well, we don't -- we're not there yet

21  though.  Are we?

22         MR. GWYNNE:  No.  Well, Your Honor, there have been

23  very large claims asserted --

24         THE COURT:  Yes.

25         MR. GWYNNE:  -- against these directors and officers,

1  and we're -- those cases are relatively early in the process,

2  and there's already $900,000 in fees.  So I think it is pretty

3  obvious that the first layer's going to be exhausted, and I

4  submit, for the same reason we said at the last hearing, we

5  don't think they have any real incentive at all to review the

6  attorney's fees.  Maybe if you get to the second, third, or

7  fourth layer, somebody who has skin in the game, because their

8  layer is not going to be exhausted, well, then they do have an

9  incentive and would review the fees.

10        And as we indicated last time, the policy itself

11  refers to the fees as being reasonable.  We know and we

12  acknowledge that the estate's interest comes after the D and O

13  insurers.  We don't have any problem with them -- their

14  attorney's fees being paid.  We don't -- and we were the ones

15  that were trying to push this along in early November, so they

16  could get paid promptly by just asking for backup, because the

17  estate does have an interest.  It may not be the first

18  interest, but there is an interest, and it's actually a little

19  different than when Mr. Dixon said.

20        There are two interests the estate has.  He mentioned

21  that we're just trying to protect our rights as a plaintiff to

22  the policy.  And sure, that's something that's important to the

23  estate, but there are -- and I asked Ms. Edmonson while Mr.

24  Dixon was speaking to confirm that there were, as my

25  recollection was, class proofs of claim filed by securities

1  plaintiffs against the estate.  So the estate does have a

2  coverage issue to protect, too.  It's not just the estate as in

3  the cases that counsel may have been pointing to where the

4  estate was only concerned about its interest as a plaintiff.

5  The estate's concerned about the claims that have been filed

6  against it and having some proceeds to use to pay those claims

7  as well.

8        So we -- with respect to XL, we think that they have

9  no standing, and see how they have any skin in the game as a

10 matter of law, even constitutional standing, I think is

11 lacking.  And for that reason their motion should be denied.

12 And if Your Honor's inclined to grant either the motions that's

13 pending or to grant some relief for the D's and O's, we've

14 always recognized with -- in discussions with Ms. Tancredi that

15 her firm can get paid.  That we don't have any problem with her

16 firm getting paid.  We just want to make sure that the costs

17 and fees that they're billing are properly charged to the D and

18 O coverage not to something else like the general bankruptcy

19 case.

20       And, as Your Honor indicated last time, the estate

21 have an interest in the proceeds, should be able to protect it,

22 and that's all we want to do.  If Ms. Tancred it is willing to

23 have her invoices reviewed, then we should be able to set up a

24 process to deal with that.  And, Your Honor, knows law firms

25 like to get paid by year end, and that's one of the reasons why

1  we had requested those invoices, so that we could expeditiously

2  resolve it.

3          But with respect to Ms. Tancredi's firm, she's been

4  here, is obviously interested.  She's been here for a number of

5  the hearings.  We're fine with those, because we know there's

6  going to be a lot more fees.  We're fine with those fees being

7  paid by year end, and the review of those invoices would really

8  be after the fact, and then going forward we would just

9  establish a procedure where the Trustee would have 20 days to

10  review invoices if the Trustee doesn't object are paid in full.

11  If the Trustee has an issue, the Trustee could bring it to the

12  Court.

13          THE COURT:  So what you're saying is you don't have a

14  problem with the $900,000, approximately.

15          MR. GWYNNE:  Well, it's not -- that's not all owed to

16  Ms. Tancredi's firm.

17          THE COURT:  Oh.

18          MR. GWYNNE:  We don't have a problem with that being

19  paid to any defense counsel that's willing to agree to the same

20  things as Ms. Tancredi's firm is.  If they're not willing to

21  agree, well, then we do have an issue.  But those folks aren't

22  here, so I don't know how Your Honor wants to handle that, but

23  they shouldn't get more favorable treatment, obviously, than

24  what Ms. Tancredi's willing to do.

25          THE COURT:  Certainly.

**J&J COURT TRANSCRIBERS, INC.**

1          MR. GWYNNE:   Thank you.

2          THE COURT:   Thank you.  Mr. Dixon, as far as XL is

3  concerned, what is its interest at this moment in time where

4  its -- certainly, its coverage has not yet been implicated in

5  any way?

6          MR. DIXON:   Your Honor, XL's interest is that if

7  there is neither insurance available nor indemnification to

8  these insureds, they have and they will take the position that

9  our policy should pay.  And this is not a circumstance in which

10  our policy should or would be triggered, but we will be

11  confronted with that decision.   I mean there is underlying

12  coverage here.

13          THE COURT:   Yes.

14          MR. DIXON:   The -- AIG is not denying coverage.   They

15  were -- they filed a motion.   They were willing to advance and

16  I believe are willing to advance under the right circumstances.

17  And our policy should not come into play in any way.   I agree

18  it turns the whole insurance program upside down --

19          THE COURT:   Yes.

20          MR. DIXON:   -- but that doesn't mean that we won't be

21  confronted with arguments.   If the insureds are denied

22  indemnification and denied insurance elsewhere, they will then

23  look to us.

24          THE COURT:   Okay.  Thank you, Mr. Dixon.  You know,

25  I'm trying to find a solution, because what appears to be the

1 parties' sort of -- they're locked on this issue of review of

2 the billing, and once solution that I thought of -- and this

3 will play into the motions, by the way.  I'm not just -- I will

4 be ruling on the motions, but it's along these lines.  One

5 thought I had was to appoint a mediator who would receive the

6 invoices and review the invoices and then would sit down with

7 the parties to the extent the parties thought it necessary and

8 attempt to resolve -- in other words, to act as a go between.

9 Someone to act as a go between between the parties, between the

10 Committee or Trustee, and the insureds' counsel to sort of see

11 if it can -- if there couldn't be a resolution.

12        And to the extent there wasn't a resolution, then to

13 bring the matter back before the Court.  But I think the

14 problem is that there has to be an honest broker here, and

15 that's -- I see Mr. Gwynne starting to rise, but that's sort of

16 the thought that I have, an independent party who would make a

17 review of the invoices and then could work with counsel as far

18 as communicating what concerns there were, and, hopefully, that

19 the Committee would have some faith in the independent party.

20        And to the extent there were particular issues, for

21 example, the Committee could simply as a mediator are there any

22 bills relating to the bankruptcy case, and perhaps then the

23 parties could -- would be in a position to discuss that and

24 what those bills were and what the amounts were and that sort

25 of thing and whether it was de minimis or significant, and what

those issues specifically perhaps related to.  Is that

something that might be workable as far as the Committee is

concerned, as far as the Venable firm and its client is

concerned?

MR. GWYNNE:  Good morning, Your Honor.  Counsel for

the debtor and I apparently had the same ideas.  As soon as I

looked at her, she said how are we going to pay for that in

this case in particular.  I think, Your Honor, Ms. Tancredi has

agreed to -- that she would let the estate -- and it really

will be the Trustee.  And, by the way, I can give Your Honor an

update of that before the end of the hearing, where that

process is going effective.

But the invoices -- the Trustee is not going to spend

a ton of time reviewing these invoices either, Your Honor,

because, as you may recall under the settlement with the

Adeptio, the Trustee's fees, they get paid, are for pursuing

and prosecuting the causes of action not reviewing the fees.

So I think that in and of itself is going to keep this

streamlined, and I think the Trustee understands -- and Ms.

Edmonson and I spoke with his counsel at the break --

understands like we do, that the D and O fees do get paid

first, and we're not looking to fly speck them on whether they

spent .7 instead of .5 on a particular telephone call.  We just

want to make sure there's nothing in there really that's

egregious with the picture big and think that because of the

1  scarce resources of these estate that it would be better to

2  just proceed that way without a mediator.  And the fact that

3  Mr. Branzburg doesn't have a blank check to review these

4  things, I think we'll keep him certainly from doing that.

5            THE COURT:  All right.

6            MR. GWYNNE:  Thank you, Your Honor.

7            THE COURT:  Thank you.  Ms. Tancredi, is the solution

8  at least workable where it sounds to me like what we're talking

9  about is payment to -- of all defense costs promptly permitted,

10 and then on an ongoing basis there would be a review of

11 invoices by an independent party and again on an ongoing basis

12 which would then enable you to be paid?  I realize that they

13 may challenge some of the roughly $900,000 later on, but to the

14 extent those challenges are valid, perhaps we could, you know,

15 just do that as a reduction on future invoices.

16           MS. TANCREDI:  Yes, Your Honor.  I mean, Your Honor,

17 we will abide by whatever procedure the Court sets up.  I like

18 the idea of having an honest broker, because then I would think

19 that some of the insurance companies' concerns about giving

20 invoices, redacted or not, to what could be plaintiffs would be

21 alleviated.  But again Venable doesn't want to get caught in

22 this fight between AIG and Illinois and the Committee.  We'll

23 do whatever -- I mean that sounds very workable.  We're happy

24 to agree to it.

25           But again it -- you know, AIG hasn't been asked its

1  position.  I don't know if it's agreeable to it, and it just

2  seems like the case cries out for Your Honor to just tell us

3  what to do, please.

4          THE COURT:  Impose, if you will, a solution.  Yes,

5  that's what I think, too.

6          MS. TANCREDI:  Thank you, Your Honor.

7          THE COURT:  Thank you, Ms. Tancredi.  Well, then I

8  think what I'm going to do is this.  I do think that Illinois

9  National has the right to withdraw its motion, and I'm going to

10 grant the withdrawal subject to the solution, if you will, I

11 have described.  And I will make that clear in the order that

12 it's granted subject to the appointment of a mediator, and I

13 name someone.  It may not be an attorney, because I think,

14 frankly, that the parties don't need an attorney and -- to be

15 the mediator, and it would be less expensive if we use someone

16 other than an attorney as well, but someone who's accustomed to

17 dealing with insurance issues and insurance billing and has

18 reviewed them and that sort of thing.  I think that might be

19 helpful, for one.  Ms. Tancredi.  I'm sorry.  Ms. Edmonson --

20         MS. EDMONSON:  Ms. Edmonson.

21         THE COURT:  -- wants to be heard on that issue.

22         MS. EDMONSON:  Again, Your Honor, I guess it comes

23 down to where payment to a mediator is going to be made.  The

24 estate really has absolutely no funds to disburse at this

25 point.  We actually are -- you know, we have funds that were

1  set aside in a carve out.  That's going to pay what's left of

2  attorney's fees, and still attorney's fees are not being paid

3  anywhere near in full.  And the only hope that unsecureds are

4  getting in these cases to be paid is through the litigation

5  trustee's hopefully recovery on whatever suits he's able to

6  bring and realize funds to estate.  So I guess that's still

7  what we're trying to come up with a workable solution, since we

8  don't know where the funds would come from to pay for a

9  mediator.

10       THE COURT:  Well, I wonder if perhaps the insurer

11 would be prepared to advance costs for the payment of a

12 mediator.  Mr. McCall.

13       MR. McCALL:  I would have to confer with my client on

14 this, and while I understand the Court's desire to figure out a

15 way to sort of cord and not here, you know, for a process like

16 this I think, you know, we -- to work it would need to involve

17 other defense counsel, and we certainly can't necessarily make

18 a determination on whether they would agree to submit defense

19 bills without actually talking to them.  And I appreciate

20 Venable's position, but, you know, I -- we have other folks

21 that we need to answer to and their concerns.

22       THE COURT:  All right.  Well, I'm going to make that

23 a condition of the withdrawal of your motion, and that the

24 expenses for the mediator be advanced.  And we can reserve for

25 later a request by Illinois National to be reimbursed from the

1  estate in the event there is money from recoveries for

2  reimbursement.

3       Now, as far as XL is concerned, you know, I think

4  that really XL, to some extent, has served as almost an amicus

5  for the benefit of the Court, and it's very much appreciated,

6  and I think was extremely helpful to keep this issue -- to

7  clarify some of the issues for me to sort of refocus me on the

8  issues and to give me a very different sort of outlook on the

9  merits of the Illinois National lift stay motion.  I came to a

10 different -- I came to somewhat of a different conclusion.

11      But at the same time I don't think that XL does have

12 the standing to -- first of all, its policy has not yet been

13 implicated and may never be implicated.  And, as well, I don't

14 know that it has standing to order Illinois National to provide

15 defense costs coverage at this point based upon its  lack of

16 standing.  I do think that that is correct, but it served a

17 very valid purpose, its motion, and the Court appreciates the

18 education and the guidance received from XL.  So --

19      MR. DIXON:  Thank you, Your Honor.

20      THE COURT:  -- it was an important role to play, Mr.

21 Dixon, and I don't want you think that I don't think that -- I

22 do think that it was extremely beneficial to have XL come

23 forward at this point, but I don't think it has standing on

24 that.  I'm going to deny the motion without prejudice,

25 obviously, to come before the Court at a later date on a lift

1  stay motion that -- at a more appropriate time.  So there is my

2  ruling.  I'm going to grant the motion to withdraw the motion

3  of Illinois National but subject to the conditions that I've

4  outlined, and I will draft an order and find a good mediator

5  who I think will act reasonably and be able to act promptly in

6  the -- you know, in the future at a reasonable cost to everyone

7  with some experience in insurance matters.  And it may or may

8  not be an attorney.  Probably not an attorney, but -- because

9  again I just think that that will help with the expense costs

10 and also -- but I would like someone perhaps from the corporate

11 world who has dealt with issues such as these and has reviewed,

12 you know, the bills that have come in from attorneys.  And,

13 obviously, the Court is always here to resolve those issues

14 ultimately if the parties can't mediate the issues.  So that I

15 think is the issues.  Have I covered everything?  Does anyone

16 have any questions or issues?

17          MR. McCALL:  Your Honor, Robert McCall again.  I

18 guess the question here about, you know, subject to coming back

19 to the Court to be reimbursed from the estate, does the Court

20 mean by that as an administrative expense, a priority expense,

21 or something else?

22          THE COURT:  It's post-confirmation.  As I've seen Mr.

23 Gwynne whispering, and he's quite correct.  So to that extent,

24 it is as if it's an administrative expense.  Is that correct?

25 Is that your position here?  In other words, it's certainly not

1  an unsecured.

2          MR. GWYNNE:  Right, it would an expense of the

3  liquidating trust.

4          THE COURT:  Right.

5          MR. McCALL:  All right.  And I guess the next

6  question I would have is would it be without prejudice to

7  requesting that it be considered part of the insureds' expense

8  under the policy?

9          MR. GWYNNE:  What he's saying is --

10          MR. McCALL:  In other words, charged against policy

11  limits.

12          THE COURT:  I don't see why that would be a problem.

13          MR. GWYNNE:  It's six of one, half dozen of the other

14  from our perspective.

15          THE COURT:  Okay.  Is that what you'd like in the

16  order, Mr. McCall?

17          MR. McCALL:  I just want a clarification on that.

18  Obviously, again, you know, we still have the concerns that I

19  raised earlier, but, you know, we'll --

20          THE COURT:  And you still have the concern that you

21  don't have the client's permission for this, but I'm not --

22  respectfully, I'm not asking their permission.  I think this is

23  what I'm just going to put into the order.

24          MR. McCALL:  No, I appreciate that.

25          THE COURT:  Certainly.  Ms. Tancredi.

1      MS. TANCREDI:  Your Honor, I don't know how much a

2 mediator would cost.  Hopefully, it will be de minimis.  But as

3 far as charging it against policy limits, I mean that's not

4 part of what the insureds' coverage provides.  I mean to me

5 it's the cost of the insurance companies to do business.  They

6 want -- you know, the Committee wants some sort of review of

7 the bills.  The insurance company doesn't want the Committee or

8 the Trustee to review the bills, so this is the solution.  I'm

9 concerned that it would come out of policy limits and reduce

10 the coverage to my clients.  It doesn't have any bearing on

11 their coverage other than the payment to the attorneys.

12      THE COURT:  I appreciate that.  There's a significant

13 amount of insurance here, and I think it will be a de minimis

14 amount.  So I think the way I'm going to draft the order is

15 that in the first instance Illinois National will have a charge

16 against the litigation trust to the extent there are funds

17 available, because, otherwise, I would be imposing these costs

18 on the debtor here -- the debtors' estate.

19      To the extent there are not sufficient funds

20 available, then I think as a fallback position, I will permit

21 Illinois National to charge this as against policy limits.  And

22 I do hope it will be and think it will be a very, very modest

23 amount and probably won't have much impact on your client's D

24 and O coverage.

25      MS. TANCREDI:  Thank you, Your Honor.  And just one

**J&J COURT TRANSCRIBERS, INC.**

1  more point of clarification.

2          THE COURT:  Yes, please.

3          MS. TANCREDI:  Will your order specify what counsel

4  is supposed to provide and to whom and --

5          THE COURT:  Yes.

6          MS. TANCREDI:  -- what information should be

7  exchanged?  Thank you.

8          THE COURT:  Yes, we will do that.  All right.  Ms.

9  Edmonson, I think there's one more issue on for today.  Is that

10 correct?

11         MS. EDMONSON:  Yes, Your Honor.  We have a motion for

12 reconsideration that was filed by the Herman Alexis & Company.

13 I'm not sure if anybody is on the line representing the

14 company.

15         THE COURT:  I will ask, but I don't see anyone on my

16 list.  Is anyone here representing the movant on the motion for

17 reconsideration?

18                    (No verbal response)

19         THE COURT:  No one is here, so it's -- it's kind of

20 awkward I think, as it has been right along.  The fact of the

21 matter is this -- as I understand it, this is a claim arising

22 out of their shareholdings --

23         MS. EDMONSON:  That's correct, Your Honor.

24         THE COURT:  -- which --

25         MS. EDMONSON:  -- have been canceled through the plan

1  and --

2            THE COURT:  Yes.

3            MS. EDMONSON:  -- the plan has been confirmed.

4            THE COURT:  Yes.

5            MS. EDMONSON:  We filed an objection basically

6  stating as much.  The claim had already been estimated at zero,

7  and Mr. Alexis filed an objection to plan confirmation, which

8  was overruled, as you are aware.  That's why we would ask that

9  this motion also be denied.

10            THE COURT:  I will so deny it, and I will enter an

11  order denying it.

12            MS. EDMONSON:  I have a form of order.  If I may

13  approach?

14            THE COURT:  You may.  Thank you for the assistance.

15  Thank you, Ms. Edmonson.  Good morning.

16            MS. EDMONSON:  Thank you, Your Honor.  The only other

17  item would be a brief update as to where things stand, which I

18  believe Mr. Gwynne wanted to present.

19            THE COURT:  Yes.  And on the order you just handed to

20  me, I probably am just going to add that no one appeared on

21  behalf of the movant.

22            MS. EDMONSON:  Thank you, Your Honor.

23            THE COURT:  Thank you.  Yes, Mr. Gwynne?  Good news?

24            MR. GWYNNE:  Yes, relatively good news.  There is yet

25  another conference call today between Dominic Pacitti from

1 Klehr Harrison, who's counsel for the Trustee, Mort Branzburg

2 of Klehr Harrison.  They're having a conference call with the

3 Adeptio today at 3:00, and they are hoping to resolve the

4 couple larger issues that are still outstanding with the note.

5 This is the note under the liquidating trust.

6          And, as Your Honor knows, Adeptio is a tough

7 negotiator, but hopefully, they'll be able to resolve that.

8 And if they don't resolve it in the next week or so, we've

9 expressed our view that we ought to just bring it before the

10 Court like we did earlier in the case in which we'll cut to the

11 chase and get it resolved.  But  hopefully, they'll be able to

12 do that today.

13          THE COURT:  I would hope so, and to the extent I need

14 to resolve the issue, I certainly will make time for you to

15 bring it on as quickly as you'd like and is in your interest.

16          MR. GWYNNE:  Thank you very much, Your Honor.

17          THE COURT:  Thank you, Mr. Gwynne.  Does anyone have

18 any further questions?

19                    (No verbal response)

20          THE COURT:  All right.  Mr. Mangan?

21          MR. MANGAN:  No.  No, Your Honor.

22          THE COURT:  No questions.  All right.  And thank you,

23 counsel.  Then we will stand in recess.  I appreciate

24 everyone's good arguments and appearing here today.  Good day,

25 everyone.

**J&J COURT TRANSCRIBERS, INC.**

37

1          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

2                           * * * * *

3                   **C E R T I F I C A T I O N**

4          I, PATRICIA C. REPKO, court approved transcriber,

5     certify that the foregoing is a correct transcript from the

6     official electronic sound recording of the proceedings in the

7     above-entitled matter, and to the best of my ability.

8

9     /s/ Patricia C. Repko           DATE:  December 16, 2008
10    PATRICIA C. REPKO
11    J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**